

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**
312 North Spring Street, Room G-8
Los Angeles, CA 90012
Tel: (213) 894-3535

**SOUTHERN DIVISION**
411 West Fourth Street, Suite 1053
Santa Ana, CA 92701-4516
(714) 338-4750

**EASTERN DIVISION**
3470 Twelfth Street, Room 134
Riverside, CA 92501
(951) 328-4450

**SHERRI R. CARTER**
District Court Executive and
Clerk of Court

April 18, 2008

Clerk, United States District Court
Northern District of California
Phillip Burton U. S. Courthouse, 16th Floor
450 Golden Gate Avenue
San Francisco, CA 94102-3434

# E-filing

FILED
APR 24 2007
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Re:   Transfer of our Civil Case No.   CV 07-03125 CAS (FMOx)

      Case Title:   In Re: Yahoo! Inc.

Dear Sir/Madam:

   An order having been made transferring the above-numbered case to your district, we are transmitting herewith our entire original file in the action, together with certified copies of the order and the docket. Please acknowledge receipt of same and indicate below the case number you have assigned to this matter on the enclosed copy of this letter and return it to our office. Thank you for your cooperation.

```
*** Please use your Court's PACER account and
    password to access all efiling documents
    to our website:  http://ecf.cacd.uscourts.gov.

Thank you.
```

Very truly yours,

Clerk, U.S. District Court

By _____  J. Kami        (213) 894-0747

Deputy Clerk

cc:   All counsel of record

==============================================================================================

## TO BE COMPLETED BY RECEIVING DISTRICT

Receipt is acknowledged of the documents described herein and we have assigned this matter case number CV: _____   CV 08 - 2150 MHP

Clerk, U.S. District Court

By _____  Helen L. Almacen

Deputy Clerk

(FMOx), CLOSED, DISCOVERY, LEADPT, RELATED-G, TRANSFERRED

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:07-cv-03125-CAS-FMO

Ellen Rosenthal Brodsky v. Yahoo! Inc. et al
Assigned to: Judge Christina A. Snyder
Referred to: Magistrate Judge Fernando M. Olguin
Member case: (View Member Case)
Related Case: 2:05-cv-04588-CAS-FMO
Cause: 15:78m(a) Securities Exchange Act

**CV 08 2150**

Date Filed: 05/11/2007
Date Terminated: 03/10/2008
Jury Demand: Plaintiff
Nature of Suit: 850
Securities/Commodities
Jurisdiction: Federal Question

**MHP**

E-filing

### Plaintiff

**Ellen Rosenthal Brodsky**
*On Behalf of Herself and All Others
Similarly Situated*

represented by **Anne L Box**
Coughlin Stoia Geller Rudman and
Robbins
655 West Broadway
Suite 1900
San Diego, CA 92101
619-231-1058
Email: anneb@csgrr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Darren J Robbins**
Coughlin Stoia Geller Rudman and
Robbins LLP
655 West Broadway Suite 1900
San Diego, CA 92101
619-231-7423
Email: e_file_sd@csgrr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Henry Rosen**
Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway Suite 1900
San Diego, CA 92101
619-231-1058
Email: henryr@csgrr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary K Blasy**
Coughlin Stoia Geller Rudman and



I hereby attest and certify on **4/18/08**
that the foregoing document is a full, true
and correct copy of the original on file in
my office, and in my legal custody.

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

_____ Deputy

**0101**

Robbins
655 West Broadway, Suite 1900
San Diego, CA 92101
619-231-1058
Email: maryb@csgrr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nate Bear**
Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway Suite 1900
San Diego, CA 92101
619-231-1058
Email: nbear@csgrr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick J Coughlin**
Coughlin Stoia Geller Rudman and
Robbins LLP
655 West Broadway Suite 1900
San Diego, CA 92101
619-231-1058
Email: patc@csgrr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Spencer A Burkholz**
Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway Suite 1900
San Diego, CA 92101-4297
619-231-1058
Email: spenceb@csgrr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laurie L Largent**
Coughlin Stoia Geller Rudman Robbins
LLP
655 W Broadway
Suite 1900
San Diego, CA 92101
619-231-1058
Email: llargent@csgrr.com
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**Pension Trust Fund for Operating**　　represented by **Anne L Box**

**Engineers**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Henry Rosen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laurie L Largent**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary K Blasy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nate Bear**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Spencer A Burkholz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tricia L McCormick**
Coughlin Stoia Geller Rudman and
Robbins
655 West Broadway
Suite 1900
San Diego, CA 92101
619-231-1058
Email: triciam@csgrr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Consol Plaintiff**</u>

**Pompano Beach Police & Firefights
Retirement System**

represented by **Anne L Box**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Henry Rosen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laurie L Largent**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary K Blasy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nate Bear**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Spencer A Burkholz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tricia L McCormick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**State-Boston Retirement System**          represented by **Alan I Ellman**
Labaton Sucharow and Rudoff
100 Park Avenue
New York, NY 10017
212-907-0700
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrei V Rado**
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
212-907-0821
Email: arado@labaton.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher J Keller**
Labaton Sucharow
140 Broadway
New York, NY 10005
212-907-0853
Email: ckeller@labaton.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark I Labaton**
Kreindler and Kreindler LLP
707 Wilshire Boulevard
Suite 4100
Los Angeles, CA 90017
213-622-6469
Email: mlabaton@kreindler.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Yahoo! Inc.**                          represented by **Anna Erickson White**
Morrison & Foerster
755 Page Mill Rd
Palo Alto, CA 94304-1018
650-813-5600
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jordan Eth**
Morrison and Foerster
425 Market Street
San Francisco, CA 94105-2482
415-268-7000
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Judson E Lobdell**
Morrison and Foerster
425 Market Street
San Francisco, CA 94105-2482
415-268-6717
Email: jlobdell@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark R S Foster**
Morrison and Foerster
425 Market Street
San Francisco, CA 94105
415-268-6335
Email: mfoster@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Terry S Semel**                                    represented by   **Anna Erickson White**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Jordan Eth**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Judson E Lobdell**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Mark R S Foster**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Susan L Decker**                                   represented by   **Anna Erickson White**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Jordan Eth**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Judson E Lobdell**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Mark R S Foster**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Consol Defendant**

**Daniel L Rosensweig**                              represented by   **Mark R S Foster**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Consol Defendant**

**Farzad Nazem**

represented by **Mark R S Foster**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/11/2007 | 1 | COMPLAINT against Defendants Yahoo! Inc., Terry S Semel, Susan L Decker. (Filing fee $ 350 PAID.) Jury Demanded. , filed by Plaintiff Ellen Rosenthal Brodsky.(et) (Entered: 05/23/2007) |
| 05/11/2007 | | 20 DAY Summons Issued re Complaint - (Discovery) [1] as to Yahoo! Inc., Terry S Semel, Susan L Decker. (et) (Entered: 05/23/2007) |
| 05/11/2007 | 2 | CERTIFICATION AS TO Interested Parties filed by Plaintiff Ellen Rosenthal Brodsky. (et) (Entered: 05/23/2007) |
| 05/11/2007 | | FAX number for Attorney Patrick J Coughlin is 310-278-2148. (et) (Entered: 05/23/2007) |
| 05/11/2007 | | FAX number for Attorney Darren J Robbins is 619-231-7423. (et) (Entered: 05/23/2007) |
| 05/11/2007 | 3 | NOTICE of Related Case(s) filed by Plaintiff Ellen Rosenthal Brodsky. Related Case(s): CV 06-2737 CAS (FMO) (rn, ) (Entered: 05/30/2007) |
| 06/04/2007 | 4 | ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 224 - Related Case- filed. Related Case No: CV 05-4588 CAS (FMOx). Case transfered from Judge Rosalyn M. Chapman and George P. Schiavelli to Judge Christina A. Snyder and Fernando M. Olguin for all further proceedings. The case number will now reflect the initials of the transferee Judge CV 07-3125 CAS (FMOx).Signed by Judge Christina A. Snyder (rn) (Entered: 06/04/2007) |
| 06/11/2007 | 7 | NOTICE of Pendency of Other Actions filed by defendants Yahoo! Inc., Terry S Semel, Susan L Decker. (ad) (Entered: 07/02/2007) |
| 06/12/2007 | 5 | AGREED STIPULATION AND ORDER Deferring Response Dates by Judge Christina A. Snyder: Defendants response date shall be deferred until 20 days following the appointment of a lead plaintiff and lead counsel, by which time counsel for lead plaintiff and counsel for defendants shall confer to: (a) confirm whether the lead plaintiff will file a new complaint that supercedes all previously filed complaints or deem the existing complaint operative; and (b) establish a common response date for all defendants, including a briefing schedule on defendants anticipated motions to dismiss; (see document for further details.) (pcl) (Entered: 06/14/2007) |
| 06/12/2007 | 6 | CERTIFICATION as to Interested Parties filed by Defendants Yahoo! Inc., Terry S Semel, Susan L Decker. (pcl) (Entered: 06/14/2007) |
| 06/12/2007 | | FAX number for Attorneys Jordan Eth, Mark R S Foster, Judson E Lobdell is 415-268-7522. (pcl) (Entered: 06/14/2007) |

| 06/12/2007 | | FAX number for Attorney Anna Erickson White is 650-494-0792. (pcl) (Entered: 06/14/2007) |
|---|---|---|
| 06/28/2007 | 8 | NOTICE TO COUNSEL by Judge Christina A. Snyder: This case has been assigned to the calendar of Judge Christina A. Snyder. Counsel are advised that the Court expects strict compliance with the provisions of the Local Rules and the Federal Rules of Civil Procedure. (See document for details.) (pcl) (Entered: 07/06/2007) |
| 07/10/2007 | 9 | NOTICE OF MOTION AND MOTION to Consolidate Related Action, to Appoint Pension Trust Fund For Operating Engineers And Pompano Beach Police & Firefighters Retirement System As Lead Plaintiff And To Approve Lead Plaintiffs Selection Of Lead Counsel filed by movants Pension Trust Fund for Operating Engineers, Pompano Beach Police & Firefights Retirement System.Motion set for hearing on 8/13/2007 at 10:00 AM before Judge Christina A. Snyder. (pcl) (Entered: 07/12/2007) |
| 07/10/2007 | 10 | MEMORANDUM of Law in Support of MOTION to Consolidate Related Actions, to Appoint Pension Trust Fund For Operating Engineers And Pompano Beach Police & Firefighters Retirement System As Lead Plaintiff and to Approve Lead Plaintiffs Selection of Lead Counsel [9] filed by Movants Pension Trust Fund for Operating Engineers, Pompano Beach Police & Firefights Retirement System. (pcl) (Entered: 07/12/2007) |
| 07/10/2007 | 11 | DECLARATION of Tricia L McCormick in Support of MOTION to Consolidate Related Actions, to Appoint Pension Trust Fund For Operating Engineers And Pompano Beach Police & Firefighters Retirement System As Lead Plaintiff and to Approve Lead Plaintiffs Selection of Lead Counsel [9] filed by Movants Pension Trust Fund for Operating Engineers, Pompano Beach Police & Firefights Retirement System. (pcl) (Entered: 07/12/2007) |
| 07/10/2007 | | FAX number for Attorney Mark I Labaton is 213-622-6019. (pcl) (Entered: 07/12/2007) |
| 07/10/2007 | | FAX number for Attorneys Alan I Ellman, Christopher J Keller, Andrei V Rado is 212-818-0477. (pcl) (Entered: 07/12/2007) |
| 07/10/2007 | 12 | NOTICE OF MOTION For Consolidation, Appointment As Lead Plaintiff, And Approval Of Selection Of Lead Counsel filed by movant State-Boston Retirement System. Motion set for hearing on 8/20/2007 at 10:00 AM before Judge Christina A. Snyder. Lodged proposed order. (pcl) (Entered: 07/12/2007) |
| 07/10/2007 | 13 | MEMORANDUM of Points and Authorities in Support of MOTION for Consolidation, Appointment As Lead Plaintiff and Approval of Selection of Lead Counsel [12] filed by Movant State-Boston Retirement System. (pcl) (Entered: 07/12/2007) |
| 07/10/2007 | 14 | DECLARATION of Alan I Ellman in Support of MOTION for Consolidation, Appointment As Lead Plaintiff, and Approval of Selection of Lead Counsel [12] filed by Movant State-Boston Retirement System. |

| | | |
|---|---|---|
| | | (pcl) (Entered: 07/12/2007) |
| 07/10/2007 | 15 | PROOF OF SERVICE filed by movant State-Boston Retirement System, re MOTION for Consolidation, Appointment As Lead Plaintiff, and Approval of Selection of Lead Counsel [12], Memorandum of Points and Authorities in Support of Motion[13], Declaration of Alan I Ellman [14] served on 7/10/2007. (pcl) (Entered: 07/12/2007) |
| 07/11/2007 | 16 | MINUTES (IN CHAMBERS) by Judge Christina A. Snyder: The Court is in receipt of the folowing motions: (1) MOTION to Consolidate Related Action, to Appoint Pension Trust Fund For Operating Engineers And Pompano Beach Police & Firefighters Retirement System As Lead Plaintiff and to Approve Lead Plaintiffs Selection of Lead Counsel [9], noticed for 8/13/2007 at 10:00 AM; and (2) MOTION for Consolidation, Appointment As Lead Plaintiff, and Approval of Selection of Lead Counsel [12], noticed for 8/20/2007 at 10:00 AM. On the Courts own motion, the Court continues the above-referenced motion noticed for 8/13/2007 to 8/20/2007 at 10:00 AM. (pcl) (Entered: 07/12/2007) |
| 07/12/2007 | | NOTICE OF FILING FEE DUE on Pro Hac Vice Application mailed to attorney Alan I Ellman for State-Boston Retirement System. (pcl) (Entered: 07/12/2007) |
| 07/12/2007 | | NOTICE OF FILING FEE DUE on Pro Hac Vice Application mailed to attorney Andrei V Rado for State-Boston Retirement System. (pcl) (Entered: 07/12/2007) |
| 07/12/2007 | | NOTICE OF FILING FEE DUE on Pro Hac Vice Application mailed to attorney Christopher J Keller for State-Boston Retirement System. (pcl) (Entered: 07/12/2007) |
| 08/06/2007 | 20 | RESPONSE IN SUPPORT of MOTIONS for Appointment of Lead Plaintiff and Consolidation[12][9], filed by Defendants Yahoo! Inc., Terry S Semel, Susan L Decker.(cj) (Entered: 08/26/2007) |
| 08/06/2007 | 21 | STATEMENT IN RESPONSE to the MOTIONS for Consolidation, Appointment As Lead Plaintiff, and Approval of Selection of Lead Counsel[12][9], filed by Movant State-Boston Retirement System.(cj) (Entered: 08/26/2007) |
| 08/06/2007 | 22 | OPPOSITION TO MOTION State Boston Retirement System as Lead Plaintiff[12], filed by Movant Pension Trust Fund for Operating Engineers.(cj) (Entered: 08/26/2007) |
| 08/07/2007 | 23 | AMENDED CERTIFICATE OF SERVICE of Response in Support of Motion[20], and Amended Proof of Service, filed by Defendants Yahoo! Inc., Terry S Semel, Susan L Decker, served on 8/6/2007 by Facsimile and Overnight Delivery.(cj) (Entered: 08/26/2007) |
| 08/09/2007 | 17 | APPLICATION of Alan I Ellman for Leave to Appear Pro Hac Vice. FEE PAID. filed by plaintiff State-Boston Retirement System. Lodged proposed order. (pcl) (Entered: 08/13/2007) |
| 08/10/2007 | 18 | ORDER by Judge Christina A. Snyder: Granting [17] Application to |

|  |  | Appear Pro Hac Vice by Attorney Alan I Ellman on behalf of State-Boston Retirement System, designating Mark Labaton as local counsel. (pcl) (Entered: 08/13/2007) |
|---|---|---|
| 08/13/2007 | 24 | REPLY in Further Support of MOTIONS to Consolidate Cases, for Appointment As Lead Plaintiff, and for Appointment of Counsel[12][9], filed by Movant Pension Trust Fund for Operating Engineers.(cj) (Entered: 08/26/2007) |
| 08/20/2007 | 19 | MINUTES OF Motion Hearing held before Judge Christina A. Snyder: RE: MOTION to Consolidate Related Actions, Appoint Pension Trust Fund For Operating Engineers And Pompano Beach Police & Firefighters Retirement System As Lead Plaintiff, and Approve Lead Plaintiff's Selection of Lead Counsel [9]; MOTION of State-Boston Retirement System for Consolidation, Appointment As Lead Plaintiff and Approval of Selection of Lead Counsel [12]. For the foregoing reasons, the Court hereby GRANTS the motions of Boston and the Pension Funds to consolidate, GRANTS the Pension Funds' motion for appointment as lead plaintiff and for appointment of lead class counsel, and DENIES Boston's motions for appointment as lead plaintiff and for appointment of lead class counsel. (See document for further details.) Court Reporter: Laura Elias.(pcl) (Entered: 08/24/2007) |
| 09/24/2007 | 25 | NOTICE of Change of Address by Mary K Blasy, Anne L Box attorney for Plaintiff Ellen Rosenthal Brodsky, changing firm's name to Couglin Stoia Geller Rudman and Robbins LLP. Filed by plaintif (ak) (Entered: 09/26/2007) |
| 10/05/2007 | 26 | STIPULATION AND ORDER by Judge Christina A. Snyder Granting the (1) Filing of a Consolidated Amended Complaint and (2) Briefing Schedule on Defendants' Motions to Dismiss. Deadlines/Briefing: Consolidated Amended Complaint due 11/26/2007; Motions to Dismiss shall be filed by 1/25/2008, noticing the hearing for 4/21/2008 at 10:00 am; Oppositions shall be filed by 3/10/2008; and Replies shall be filed by 4/7/2008.(cj) (Entered: 10/11/2007) |
| 10/18/2007 | 27 | MINUTES OF IN CHAMBERS ORDER held before Judge Christina A. Snyder : It is hereby ORDERED that Movant's attorneys Christopher J Keller and Andrei V Rado show cause in writing no later than 11/5/2007 why they failed to file application for admission and and fee, proof of admission in this action (pj) (Entered: 10/19/2007) |
| 10/26/2007 | 28 | APPLICATION OF NON-RESIDENT ATTORNEY Andrei V. Rado to appear on behalf of Movant State-Boston Retirement System, and designating local counsel Mark Labaton. FEE PAID. (gk) (Entered: 11/04/2007) |
| 10/26/2007 |  | FAX number for Attorney Andrei V Rado is 212-883-7521. (gk) (Entered: 11/04/2007) |
| 10/26/2007 | 29 | APPLICATION OF NON-RESIDENT ATTORNEY Christopher J. Keller to appear on behalf of Movant State-Boston Retirement System, and designating local counsel Mark Labaton. FEE PAID. (gk) (Entered: |

| | | |
|---|---|---|
| | | 11/04/2007) |
| 10/26/2007 | | FAX number for Attorney Christopher J Keller is 212-883-7053. (gk) (Entered: 11/04/2007) |
| 11/01/2007 | 30 | ORDER by Judge Christina A. Snyder granting Application of Non-Resident Attorney Andrei V. Rado to appear on behalf of Movant State-Boston Retirement System [28], and designating local counsel Mark Labaton. (gk) (Entered: 11/04/2007) |
| 11/01/2007 | 31 | ORDER by Judge Christina A. Snyder granting Application of Non-Resident Attorney Christopher J. Keller to appear on behalf of Movant State-Boston Retirement System [29], and designating local counsel Mark Labaton. (gk) (Entered: 11/04/2007) |
| 11/21/2007 | 32 | STIPULATION AND ORDER: lead plaintiff shall file Consolidated Amended Complaint on or before 12/21/07; defendants shall file their motions to dismiss on or before 2/29/08; lead plaintiff shall file any opposition on or before 4/14/08; defendantgs shall file any reply briefs on or before 5/14/08; motions to dismiss shall be noticed for heairng o 6/2/08 10:00 AM by Judge Christina A. Snyder (lc) (Entered: 11/27/2007) |
| 12/21/2007 | 33 | CONSOLIDATED AMENDED COMPLAINT against Yahoo! Inc., Terry S. Semel, Susan L. Decker, Daniel L. Rosensweig and Farzad Nazem; related to: Complaint [1]; with Jury Demand; filed by Plaintiff Ellen Rosenthal Brodsky. (gk) (Entered: 12/30/2007) |
| 12/21/2007 | | ISSUED 20 DAY Summons re Consolidated Amended Complaint [33]. (gk) (Entered: 12/30/2007) |
| 01/04/2008 | 34 | NOTICE of Appearance filed by attorney Mary K Blasy on behalf of Plaintiff Ellen Rosenthal Brodsky, Movants Pension Trust Fund for Operating Engineers, Pompano Beach Police & Firefights Retirement System (Blasy, Mary) (Entered: 01/04/2008) |
| 01/10/2008 | 35 | MINUTES (IN CHAMBERS) - ORDER CONSOLIDATING CASES by Judge Christina A. Snyder: The Court hereby ORDERS civil case numbers CV 07-3125 CAS (FMOx) and CV 07-3902 CAS (FMOx) were consolidated by Court Order of 8/20/2007. Civil case number CV 07-3902 CAS (FMOx) is consolidated into civil action number CV 07-3125 CAS (FMOx) for purposes of pretrial and discovery proceedings before this Court. All related actions that are subsequently filed in, or transferred to, this district shall be consolidated into this action for pretrial and discovery purposes. This Order shall apply to every such related action, absent order of the Court. The docket in civil action number CV 07-3125 CAS (FMOx) shall constitute the Master Docket for this action. See document for details. Court Reporter: Not Present. (gk) (Entered: 01/11/2008) |
| 01/31/2008 | 36 | STIPULATION for Order REGARDING (1) THE FILING OF DEFENDANTS' MOTION TO TRANSFER VENUE AND (2) REVISED BRIEFING SCHEDULE ON DEFENDANTS' MOTIONS |

| | | TO DISMISS filed by Defendants Daniel L Rosensweig, Farzad Nazem, Yahoo! Inc., Terry S Semel, Susan L Decker. (Attachments: # 1 ATTACHMENT 1: [PROPOSED] ORDER REGARDING (1) THE FILING OF DEFENDANTS' MOTION TO TRANSFER VENUE AND (2) REVISED BRIEFING SCHEDULE ON DEFENDANTS' MOTIONS TO DISMISS)(Foster, Mark) (Entered: 01/31/2008) |
|---|---|---|
| 02/01/2008 | 39 | ORDER REGARDING (1) THE FILING OF DEFENDANTS' MOTION TO TRANSFER VENUE AND (2) REVISED BRIEFING SCHEDULE ON DEFENDANTS' MOTIONS TO DISMISS by Judge Christina A. Snyder: Upon Stipulation 36, IT IS HEREBY ORDERED that any motions to dismiss Plaintiffs' Consolidated Amended Complaint and supporting papers filed on behalf of Defendant Yahoo! Inc., and the Individual Defendants in this Court shall be filed no later than 21 days after the Court rules onDefendants' motion to transfer. Any papers in opposition to Defendants' motions to dismiss filed in this Court shall be filed no later than 45 days after the motions to dismiss are filed. Any reply papers filed in this Court shall be filed no later than 30 days after Plaintiffs' opposition papers are filed. Any hearing on Defendants' motions to be dismiss in this Court shallbe set at the time the motions are filed. The hearing that was set for 6/2/2008, is vacated. (gk) (Entered: 02/04/2008) |
| 02/04/2008 | 37 | WAIVER OF SERVICE Returned Executed filed by Named Plaintiff and Lead Plaintiffs Ellen Rosenthal Brodsky, Pension Trust Fund for Operating Engineers, Pompano Beach Police & Firefights Retirement System. upon Farzad Nazem waiver sent by Plaintiff on 1/2/2008, answer due 3/2/2008. Waiver of Service signed by Mark R.S. Foster. (Bear, Nate) (Entered: 02/04/2008) |
| 02/04/2008 | 38 | WAIVER OF SERVICE Returned Executed filed by Named Plaintiff and Lead Plaintiffs Ellen Rosenthal Brodsky, Pension Trust Fund for Operating Engineers, Pompano Beach Police & Firefights Retirement System. upon Daniel L Rosensweig waiver sent by Plaintiff on 1/2/2008, answer due 3/2/2008. Waiver of Service signed by Mark R.S. Foster. (Bear, Nate) (Entered: 02/04/2008) |
| 02/12/2008 | 40 | NOTICE OF MOTION AND MOTION to Transfer Case to Northern District of California filed by Defendants Daniel L Rosensweig, Farzad Nazem, Yahoo! Inc., Terry S Semel, Susan L Decker.Motion set for hearing on 3/10/2008 at 10:00 AM before Judge Christina A. Snyder. (Attachments: # 1 Attachment # 1: [Proposed] Order Granting Defendants' Motion To Transfer Venue)(Foster, Mark) (Entered: 02/12/2008) |
| 02/12/2008 | 41 | DECLARATION of Jordan Eth In Support Of MOTION to Transfer Case to Northern District of California40 filed by Consol Defendants Daniel L Rosensweig, Farzad Nazem, Defendants Yahoo! Inc., Terry S Semel, Susan L Decker. (Attachments: # 1 Exhibit Ex. 1 1.Excerpts from Yahoo!s Form 10-K for year ending December 31, 2001# 2 Exhibit Ex. 2.Transcript of interview with Daniel Rosensweig on CNNfn The Money Gang, dated April 8, 2004# 3 Exhibit Ex. 3. Transcript of interview with |

|            |    | Daniel Rosensweig on CNNfn The Biz, dated July 8, 2004# 4 Exhibit Ex. 4 4.Excerpts from Yahoo!s Form 10-K for year ending December 31, 2004# 5 Exhibit Ex. 5 5.Article titled Pacific Crest Securities to Host Seventh Annual Technology Forum Next Week, dated August 4, 2005# 6 Exhibit Ex. 6 6.Transcript of interview with Susan Decker on CNBC/Dow Jones Business Video, dated October 19, 2005# 7 Exhibit Ex. 7 7.Press release issued by Yahoo! on February 23, 2006, entitled Yahoo! to Participate at Upcoming Investor Conference; Live Webcast Available# 8 Exhibit Ex. 8 8.Excerpts from Yahoo!s Form 10-K for year ending December 31, 2005# 9 Exhibit Ex. 9 9.Excerpt from a Prudential Equity Group, LLC, report entitled YHOO: Prudential Hosts Meeting with YHOO Management; Reiterate Overweight Rating, dated June 7, 2006# 10 Exhibit Ex. 10 10.Excerpts from Yahoo!s Form 10-K for year ending December 31, 2006# 11 Exhibit Ex. 11 11.Excerpts from Yahoo!s Form 10-Q for the quarter ending March 31, 2007# 12 Exhibit Ex. 12 12.Notice and Order of Voluntary Dismissal Pursuant to Fed. R. Civ. P. 41(a)(1), in the action captioned Manfred Hacker v. Yahoo! Inc., Terry S. Semel, and Susan L. Decker, C 07-2592-MJJ, filed June 12, 2007# 13 Exhibit Ex. 13 13.Complaint filed in the action captioned Crosthwaite v. Vargas & Esquivel Construction, No. 3:07-cv-06267-MEJ, December 11, 2007# 14 Exhibit 14.The History of Yahoo! How It All Started..., issued by Yahoo! Media Relations and copyrighted in 2005# 15 Exhibit Ex. 15 15.Yahoo!s Company Timeline copyrighted in 2008# 16 Exhibit Ex. 16 16.Home page for the website of Pompano Beach Police & Firefighters Retirement System)(Foster, Mark) (Entered: 02/12/2008) |
| 02/12/2008 | 42 | DECLARATION of Ceming Chao In Support Of MOTION to Transfer Case to Northern District of California40 filed by Consol Defendants Daniel L Rosensweig, Farzad Nazem, Defendants Yahoo! Inc., Terry S Semel, Susan L Decker. (Foster, Mark) (Entered: 02/12/2008) |
| 02/12/2008 | 43 | DECLARATION of Aman Kothari In Support Of MOTION to Transfer Case to Northern District of California40 filed by Consol Defendants Daniel L Rosensweig, Farzad Nazem, Defendants Yahoo! Inc., Terry S Semel, Susan L Decker. (Foster, Mark) (Entered: 02/12/2008) |
| 02/13/2008 | 44 | CERTIFICATE OF SERVICE filed by DEFENDANTS Daniel L Rosensweig, Farzad Nazem, Yahoo! Inc., Terry S Semel, Susan L Decker, re Declaration (Motion related), Declaration (Motion related), Declaration (Motion related), Declaration (Motion related), Declaration (Motion related), Declaration (Motion related), Declaration (Motion related), Declaration (Motion related), Declaration (Motion related)41, MOTION to Transfer Case to Northern District of California40, Declaration (Motion related)42, Declaration (Motion related)43 served on 02/13/2008. (Foster, Mark) (Entered: 02/13/2008) |
| 02/25/2008 | 45 | MEMORANDUM in Opposition to MOTION to Transfer Case to Northern District of California40 *Plaintiff's' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Transfer Venue Under 28 U.S.C. §1404(a)* filed by Plaintiff Ellen Rosenthal Brodsky, Consol Plaintiffs Pension Trust Fund for Operating Engineers, Pompano |

| | | Beach Police & Firefights Retirement System. (Burkholz, Spencer) (Entered: 02/25/2008) |
|---|---|---|
| 02/25/2008 | 46 | DECLARATION of Spencer A. Burkholz in Opposition to MOTION to Transfer Case to Northern District of California40 *Declaration of Spencer A. Burkholz in Support of Plaintiffs' Opposition to Defendants' Motion to Transfer Venue Under 28 U.S.C. §1404(a)* filed by Plaintiff Ellen Rosenthal Brodsky, Consol Plaintiffs Pension Trust Fund for Operating Engineers, Pompano Beach Police & Firefights Retirement System. (Burkholz, Spencer) (Entered: 02/25/2008) |
| 03/03/2008 | 47 | REPLY In Support Of MOTION to Transfer Case to Northern District of California40 filed by Consol Defendants Daniel L Rosensweig, Farzad Nazem, Defendants Yahoo! Inc., Terry S Semel, Susan L Decker. (Foster, Mark) (Entered: 03/03/2008) |
| 03/03/2008 | 48 | DECLARATION of Jordan Eth In Support Of MOTION to Transfer Case to Northern District of California40 *SUPPLEMENTAL* filed by Consol Defendants Daniel L Rosensweig, Farzad Nazem, Defendants Yahoo! Inc., Terry S Semel, Susan L Decker. (Attachments: # 1 1.Docket sheet in the action captioned Online Merchant Systems, LLC v. Overture Services, Inc., CV05-04833-RGK (MANx) (C.D. Cal.)# 2 Exhibit 2.Docket sheet in the action captioned Checkmate Strategic Group Inc. v. Yahoo! Inc, CV05-04588-CAS (FMOx) (C.D. Cal.)# 3 Exhibit 3.Docket sheet in the action captioned In re Yahoo! Litigation (Draucker Development and True Communication Inc.), Master File No. CV06-02737-CAS (FMOx))(Foster, Mark) (Entered: 03/03/2008) |
| 03/03/2008 | 49 | APPENDIX filed by Consol Defendants Daniel L Rosensweig, Farzad Nazem, Defendants Yahoo! Inc., Terry S Semel, Susan L Decker. Re: Reply (Motion related)47 *APPENDIX OF CASES CITED IN REPLY* (Attachments: # 1 # 2 # 3 # 4 # 5 # 6 # 7 # 8 # 9 # 10 # 11 # 12 # 13 # 14 # 15 # 16 # 17 # 18 # 19 # 20 # 21 # 22 # 23 # 24 # 25 # 26 # 27 # 28 # 29 # 30 # 31 # 32 # 33 # 34 # 35 # 36 # 37 # 38 # 39 # 40 # 41 # 42 # 43 # 44 # 45 # 46 # 47 # 48 # 49 # 50 # 51 # 52 # 53 # 54 # 55 # 56 # 57 # 58)(Foster, Mark) (Entered: 03/03/2008) |
| 03/05/2008 | 50 | EX PARTE APPLICATION for Leave to to File Response to Defendants' Reply Brief in Accordance with Local Rule 7-10 filed by Plaintiffs Ellen Rosenthal Brodsky, Pension Trust Fund for Operating Engineers, Pompano Beach Police & Firefights Retirement System. (Attachments: # 1 Exhibit Tab 1# 2 Exhibit Tab 2# 3 Proposed Order) (Burkholz, Spencer) (Entered: 03/05/2008) |
| 03/05/2008 | 51 | DECLARATION of Spencer A. Burkholz in Support of EX PARTE APPLICATION for Leave to to File Response to Defendants' Reply Brief in Accordance with Local Rule 7-1050 filed by Plaintiff Ellen Rosenthal Brodsky, Consol Plaintiffs Pension Trust Fund for Operating Engineers, Pompano Beach Police & Firefights Retirement System. (Burkholz, Spencer) (Entered: 03/05/2008) |
| 03/06/2008 | 52 | OBJECTIONS In Opposition re: EX PARTE APPLICATION for Leave |

| | | to to File Response to Defendants' Reply Brief in Accordance with Local Rule 7-1050 filed by Consol Defendants Daniel L Rosensweig, Farzad Nazem, Defendants Yahoo! Inc., Terry S Semel, Susan L Decker. (Foster, Mark) (Entered: 03/06/2008) |
|---|---|---|
| 03/06/2008 | 53 | ORDER GRANTING PLAINTIFFS EX PARTE APPLICATION FOR LEAVE TO FILE RESPONSE TO DEFENDANTS REPLY BRIEF IN ACCORDANCE WITH LOCAL RULE 7-10 by Judge Christina A. Snyder, re EX PARTE APPLICATION for Leave to to File Response to Defendants' Reply Brief in Accordance with Local Rule 7-1050 : The Court having considered Plaintiffs Ex Parte Application for Leave to File Response to Defendants Reply Brief in Accordance with Local Rule 7-10 (the Application), related briefing and the Courts files, hereby orders: Plaintiffs Sur-Reply in Opposition to Defendants Reply in Support of Motion to Transfer Venue Under 28 U.S.C. §1404(a), and the Declaration of Spencer A. Burkholz in support thereof, which are attached to the Application as Tabs 1 and 2, respectively, are hereby deemed filed as of this date. IT IS SO ORDERED. (csl) (Entered: 03/07/2008) |
| 03/06/2008 | 54 | PLAINTIFF'S SUR-REPLY IN OPPOSITION TO DEFENDANT'S REPLY IN SUPPORT OF MOTION TO TRANSFER VENUE UNDER 28 USC 1404(a) 40 filed by Plaintiffs.(csl) (Entered: 03/07/2008) |
| 03/10/2008 | 56 | MINUTES OF Motion Hearing held before Judge Christina A. Snyder: re: Defendant's Motion to Transfer Venue Under 28 USC 1404(a). The Court GRANTS defendants' motion to transfer this action to the Northern District of California. IT IS SO ORDERED. (Made JS-6. Case Terminated.) Court Reporter: Laura Elias. (mmu) (Entered: 03/17/2008) |
| 03/13/2008 | 55 | NOTICE of Appearance filed by attorney Laurie L Largent on behalf of Plaintiff Ellen Rosenthal Brodsky, Consol Plaintiffs Pension Trust Fund for Operating Engineers, Pompano Beach Police & Firefights Retirement System (Largent, Laurie) (Entered: 03/13/2008) |
| 04/18/2008 | 57 | TRANSMITTAL of documents - mailed all original, manually filed documents in case file (documents numbered 1-29 and 33), and certified copies of the Civil Minutes transferring venue and civil docket sheet to the USDC, Northern District of California (San Francisco). Transferee court instructed to access our website through PACER for electronic filings. (gk) (Entered: 04/18/2008) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/18/2008 16:05:57 | | | |
| **PACER Login:** | us3877 | **Client Code:** | |
| **Description:** | Docket | **Search** | 2:07-cv-03125-CAS- |

| | Report | Criteria: | FMO |
|---|---|---|---|
| Billable Pages: | 10 | Cost: | 0.80 |

1 | COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
2 | SPENCER A. BURKHOLZ (147029)
HENRY ROSEN (156963)
3 | ANNE L. BOX (224354)
MARY K. BLASY (211262)
4 | NATHAN W. BEAR (247042)
655 West Broadway, Suite 1900
5 | San Diego, CA 92101
Telephone: 619/231-1058
6 | 619/231-7423 (fax)
spenceb@csgrr.com
7 | henryr@csgrr.com
anneb@csgrr.com
8 | maryb@csgrr.com
nbear@csgrr.com
9 |
Lead Counsel for Plaintiffs
10 |
[Additional counsel appear on signature page]

*E-filing*

CV 08

2150

MHP

FILED

2007 DEC 21 PM 4:34

11 | UNITED STATES DISTRICT COURT
12 | CENTRAL DISTRICT OF CALIFORNIA
13 | WESTERN DIVISION

CAS

14
15 | ELLEN ROSENTHAL BRODSKY, et al.,   )    Case No. CV-07-03125-GPS(RCx)
     )    **(Consolidated)**
16 |           Plaintiffs,    )
17 |       vs.    )    <u>CLASS ACTION</u>
     )
18 | YAHOO! INC., TERRY S. SEMEL,    )    CONSOLIDATED AMENDED
SUSAN L. DECKER, DANIEL L.    )    COMPLAINT FOR VIOLATION OF
19 | ROSENSWEIG AND FARZAD    )    THE FEDERAL SECURITIES LAWS
NAZEM,    )
20 |           Defendants.    )    <u>DEMAND FOR JURY TRIAL</u>
21 | ————————————— )
22
23
24
25
26
27
28

1

**TABLE OF CONTENTS**

2

Page

3   SUMMARY ................................................................................................ 1

4   PARTIES ................................................................................................. 8

5   CONFIDENTIAL SOURCES .............................................................. 14

6   JURISDICTION AND VENUE .......................................................... 31

7   BACKGROUND TO THE CLASS PERIOD ..................................... 32

8   CLASS PERIOD EVENTS, CONDUCT AND MISSTATEMENTS ... 39

9   DEFENDANTS' KNOWLEDGE AND ADDITIONAL INDICIA OF
      SCIENTER ...................................................................................... 166

10
      Defendants' Knowledge of the Fraud ......................................... 166
11
      Overture ....................................................................................... 167
12
      Project Panama ........................................................................... 169
13
      Systems and Controls .................................................................. 172
14
      Click Fraud .................................................................................. 174
15
      Additional Indicia of Scienter ..................................................... 175
16
      The Individual Defendants and Corporate Insiders  Personally Profited
17      from the Fraudulent Scheme ..................................................... 175

18    Executive Compensation .............................................................. 177

19    GAAP Violations ......................................................................... 181

20  YAHOO!'S MISLEADING FINANCIAL STATEMENTS AND
      DISCLOSURES .............................................................................. 181
21
      Yahoo!'s Failure to Properly Account  for Marketing Revenues ... 183
22
      Yahoo!'s Failure to Accrue Liabilities for Obligations Arising from
23      Click Fraud ................................................................................. 185

24    Yahoo! Failed to Make Required Disclosures About the Impact of
        Click Fraud on Its Results ......................................................... 186
25
      Defendants Certified False and Misleading Financial Results ... 192
26
    PROXIMATE LOSS CAUSATION/ECONOMIC LOSS .................... 195
27
    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-
28      THE-MARKET DOCTRINE ......................................................... 199

1

2                                                                                    **Page**

3   NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS ............. 199

4   LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS .................................. 200

5   Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated
        Thereunder Against All Defendants ............................................................. 201

6
    Violation of §20(a) of the 1934 Act Against All Defendants................................ 205
7
    Insider Trading Under §20A of the 1934 Act Against the Individual
8       Defendants................................................................................................ 206

9   PRAYER ......................................................................................................... 208

10  JURY TRIAL DEMANDED .............................................................................. 209

11

12

13

14

15

16

17                                                                               .

18

19

20

21

22

23

24

25

26

27

28

1

## SUMMARY

2    1.    This is a securities class action brought on behalf of all persons who

3 purchased the common stock of Yahoo! Inc. ("Yahoo!" or the "Company") between

4 April 8, 2004 and July 18, 2006 (the "Class Period") and who suffered billions of

5 dollars of losses due to the wrongdoing alleged herein. The defendants are Yahoo!

6 and Yahoo!'s top four officers. This suit alleges violations of the Securities Exchange

7 Act of 1934 (the "1934 Act") and Rule 10b-5 of the Securities and Exchange

8 Commission ("SEC"), based on false statements, material omissions and a scheme and

9 wrongful course of business that operated as a fraud or deceit on purchasers of

10 Yahoo!'s stock, involving one of the largest insider trading schemes in history.

11    2.    During the Class Period, the defendants' positive statements, Yahoo!'s

12 falsified financial reports and the scheme to defraud artificially inflated Yahoo!'s

13 stock from a low of $21 per share in March 2004, just before the beginning of the

14 Class Period, to a Class Period high of $43.66 per share in January 2006 – a price

15 increase exceeding 100%, that substantially outstripped the performance of the S&P

16 500 Index. Yahoo!'s top executives took advantage of the artificial inflation in

17 Yahoo!'s stock price, selling off an enormous amount of their Yahoo! stock – **nearly**

18 **27 million shares – for illegal insider trading proceeds of almost $880 million**!

19 **These sales were suspicious in nature since they were far in excess of sales made**

20 **before the Class Period. Yahoo!'s top four executives below ("Individual**

21 **Defendants") each sold off between 80%-90% of the Yahoo! shares they actually**

22 **owned** as shown below:

23

| Defendant | Position | Shares Sold | Proceeds | % of Shares Sold Owned |
|-----------|----------|-------------|----------|------------------------|
| Semel | Chairman/CEO | 17,766,786 | $577,409,000 | 90.68% |
| Rosensweig | COO | 2,101,000 | $70,627,000 | 84.25% |
| Decker | EVP/CFO | 2,203,333 | $73,885,000 | 84.65% |
| Nazem | EVP/CTO | 4,623,324 | $157,470,000 | 88.30% |
| **TOTALS:** | | **26,694,443** | **$879,400,000** | |

24
25
26
27
28

3.    To accomplish their massive insider trading scheme, the defendants made a series of false and misleading statements representing that Yahoo!'s business model, was succeeding – and most importantly – that its search business, which accounted for 40% of its total revenues, was competitive with Google.  In late 2003/early 2004, Yahoo! acquired Inktomi and Overture to replace its reliance on Google's search engine and in order to compete with Google in the fast-growing search business that was estimated to grow from $15.4 billion in 2005 to $28 billion in 2010.  Investors were told by defendants that the Overture acquisition was a success, and Yahoo!'s new search engine was world-class and competitive with Google.  Yet, throughout 2004, defendants failed to disclose that the Overture acquisition was a disaster from the beginning and its search business was far inferior to Google.  Yahoo!'s traffic, including all its affiliate website "content match" partners, overwhelmed the Overture system, and the system was "bursting" at the seams.  In 2004, defendants embarked on "Project Panama" to revamp the Overture system and also improve it so it could compete better with Google in terms of "monetizing" the search business.  Investors were concerned as Yahoo! continued to lose market share to Google in 2004/2005 and the amount of money Google made on its search business was twice that of Yahoo.  In order to appease investors, defendants told investors that its search monetization efforts (*i.e.*, Panama) would rollout in late 2005, and the first-half of 2006 and that Yahoo! would see a financial upside throughout 2006.  However, defendants failed to disclose that Project Panama was a disaster and way behind schedule.  Internally, the project changed leadership three different times in 2004/2005, and engineers from Overture left due to a lack of resource commitment from senior management or were terminated due to the culture clash between Yahoo! and legacy Overture employees.  Also, a project to put all of Overture's backend-functions on a single platform known internally as "solving the blob" was a necessary precursor to Panama.  However, the "solving the blob" project, which involved integrating the separate software systems such as the CRM system and the click detection system onto a single platform, was

1    scheduled to be completed in 3Q 05 but was not even finished until 2006, in part
2    because Yahoo! had fired the Overture engineers most knowledgeable about the
3    different systems. By the fall of 2005, defendants knew that their promise to investors
4    of a rollout of Panama in the first-half of 2006 was misleading and they decided to
5    scrap other Yahoo! projects and devote more resources to Panama. Yet, even these
6    resources would not stop the delays with Panama.

7        4.    Defendants were also under incredible pressure to show revenue and
8    earnings growth, in particular 40% growth in its paid search business which was the
9    fastest growing part of its business compared to the legacy banner ads. Any sign that
10   Yahoo! was not keeping up with Google, or growing less than 40%, or giving lower
11   guidance going forward would have a negative impact on Yahoo!'s stock price. In
12   fact, during the Class Period when Yahoo!'s financial results just met expectations or
13   concerns were raised about its growth prospects, Yahoo!'s stock price declined,
14   forcing defendants to issue false statements to keep the stock inflated. In order to
15   cover up the problems with its search business in 2004/2005, and to meet earnings
16   estimates, defendants falsified Yahoo!'s financial results by improperly recognizing
17   revenue it received from click-fraud. When analysts started raising the issue of click
18   fraud in 2005, defendants falsely stated that "click fraud is not a significant problem"
19   and that Yahoo! had a sophisticated click-fraud detection system in place. In fact, the
20   opposite was true. Defendants knew that Yahoo!'s content match program, and its
21   publishers' network, allowed any website to join and that its customers' ads were
22   being subject to click fraud. Defendants allowed the practice to continue because
23   Yahoo! benefited from the practice. Advertisers would pay Yahoo! every time
24   someone clicked on one of its ads. Through the Content Match program, Yahoo!
25   would place a customer ad on Yahoo!'s website as well as third-party affiliate
26   websites. These third-party affiliates were paid a percentage of the money paid by the
27   advertisers to Yahoo! The affiliate websites were incentivized to click on ads on their
28

1  own websites to receive revenues. Click-fraud also occurred when competitors of the
2  advertisers clicked on the ads to deplete the advertising budget of its competitors.

3      5.      Yahoo!'s system was so overburdened in 2004/2005 that its click-fraud
4  detection system was inadequate to handle all the customer traffic and serve its
5  purpose to eliminate click fraud as defendants promised investors. Due to the Yahoo!
6  traffic overwhelming the Overture System in the spring of 2004, a tsunami of
7  fraudulent clicks would hit advertisers. Defendants were benefiting from the fraud so
8  despite the possibility of fixing the problems they let it continue. The Content Match
9  affiliates were exacerbating the problem and Yahoo!'s advertisers were misled about
10 the problem. Ultimately Yahoo!'s advertisers sued in 2005 and Yahoo! settled the
11 action in June 2006 by providing refunds due to click fraud going back to January
12 2004. Defendants also misled investors about Yahoo!'s true financial performance by
13 "relaxing" the click-fraud filtering system at quarter-end in order to increase revenues
14 and meet its earnings estimates. Ex-Yahoo! employees have confirmed that this
15 practice of "opening the faucet" began in late 2004 and was ratcheted up in 2005 as
16 Yahoo! continued to lose market share to Google and faced the prospect of missing its
17 earnings estimates.

18     6.      On January 17, 2006, Yahoo! began to partially reveal the true state of its
19 business when it issued its 4Q 05 results. Yahoo! missed its 4Q 05 estimates, and
20 issued lower guidance for FY 2006 than expected by investors. Yahoo!'s stock
21 declined over 10% on 118 million shares – more than five times Yahoo!'s normal
22 trading volume. As analyst Safa Rashtchy from Piper Jaffray stated on the January
23 17, 2006 conference call – "[y]our results in this quarter while within your guidance
24 show a marked deceleration from last quarter and your guidance for '06 suggests even
25 further deceleration." Another analyst from Needham issued a report the next day
26 stating "[g]uidance was mostly disappointing," and a Deutsche Bank analyst also
27 stated "[t]he big issue was '06 guidance lower." One of the reasons for the earnings
28 miss and lower guidance was a deceleration in search growth, and increased Traffic

- 4 -

1  Acquisition Costs ("TAC") that Yahoo! would be paying its partner websites. With
2  click-fraud lawsuits and increased media scrutiny, Yahoo! was being pressured to
3  drop lower quality websites from its network that were being utilized for click-fraud
4  that was also benefiting Yahoo! By taking on higher quality websites that demanded a
5  higher percentage of the revenues Yahoo! received from advertisers, Yahoo!'s future
6  revenues and margins would be lower. In fact, Yahoo! announced that it expected to
7  lose $70 million in revenue in 2006 from advertising partners because it would have to
8  share more advertising revenue with its partners and get rid of lower quality partners
9  that were contributing to click-fraud revenue.

10      7.    With investors pressuring Yahoo! to implement a new search system to
11  compete with Google, defendants in January 2006 now promised investors that Project
12  Panama would be in place by the second-half of 2006 to better monetize searches and
13  stop the bleeding of market share to Google. Prior to this announcement, investors
14  had expected the new search system to be in place in the first half of 2006. An
15  Oppenheimer analyst report dated January 18, 2006, stated, "[w]e view this *delay* as a
16  negative for the company as Google . . . continues to gain relative share." A Stanford
17  Group report issued the same day stated, "Yahoo management indicated that
18  *monetization gains in its search business could take longer to realize than we had*
19  *anticipated*." Bear Stearns analysts stated in a January 18, 2006 report: "Concerns [–]
20  Yahoo has a relatively weak market position in search. Yahoo!'s monetization efforts
21  lags Google and translates into weaker revenue in this segment. Benefits from
22  *improvements in monetization may impact revenues later that [sic] the market*
23  *perceives*." However, internally defendants knew that a 2006 rollout of Panama was
24  still not possible because the precursor "blob" project had not been completed and
25  "code" had not even been completed.

26      8.    Defendants told anxious investors on the 1Q 06 conference call in April
27  2006 that Project Panama was on track for a second half implementation which caused
28  Yahoo!'s stock price to increase almost 10% and remain artificially inflated.

1  Defendants provided further detail during a May 18, 2006 analyst day that a three-
2  phase roll out of Panama would begin in 3Q 06 and be completed in 4Q 06 when in
3  fact they knew Panama would be delayed once again and internally they had fallen so
4  far behind with the lead project manager of Panama telling defendant Nazem that a 3Q
5  06 first-phase launch was impossible.  Finally, on July 18, 2006, Yahoo! issued its
6  2Q 06 results which missed revenue estimates with Yahoo!'s search revenue falling
7  4%, rather than rising 4%, and announced that Project Panama would not be fully
8  rolled out in 4Q 06, but would be delayed yet once again.  *Having been misled for at*
9  *least a second time on the rollout of Panama, investors punished Yahoo!'s stock,*
10 *sending it down over 22% on 204 million shares – over 10 times its normal trading*
11 *volume*.

12         9.     Investors were troubled with defendants' non-explanation for yet another
13 delay of Panama which was expected to produce more than $100 million in additional
14 revenue each quarter.  Analyst Safa Rashtchy stated "'I find it troubling'" that they
15 gave a "'nonanswer'" to explain they delay.  "Panamawful" stated a RBC report with
16 "[m]anagement loses some credibility due to the delay."  Another analyst (Pacific
17 Crest) stated Panama was "the company's *most material* project" and the delay was
18 "disappointing."  The disappointing Panama delay news "was amplified by Q2's
19 weaker than expected search results" stated a Bear Stearns analyst with "[s]earch was
20 relatively weak" and "disappointing revenue per search."  A CIBC analyst report
21 stated "Reducing Outlook on Delays in New Platform Launch & Slowing Rev/Search
22 Growth" with "disappointing search monetization and revenue per search were
23 responsible for the weakness in US revenues."

24         10.    With settlement of a click-fraud lawsuit brought by advertisers of
25 Yahoo!, the filing of another click-fraud lawsuit in May 2006, and increased media
26 scrutiny of the problem of click fraud, Yahoo! also announced that its search revenue
27 was lower and its TAC rates had increased as it continued to get rid of affiliate
28 websites that were contributing to click fraud.  Yahoo!'s decision to acknowledge that

- 6 -

1    it needed to address the click-fraud issue it was previously benefiting from would
2    result in lower revenue and margin growth rates going forward. In response to an
3    analyst question about cutting off "poor traffic affiliates" hurting revenue growth,
4    defendant Decker admitted on the July 18, 2006 conference call that "the total effect
5    on our rev[enue] ex-TAC took about 2 points off of our overall growth" and "[w]e
6    expect that roughly 200 basis points impact to continue for the back half."

7       11.    As this negative information entered the market, Yahoo!'s stock plunged
8    from its Class Period high of $43.66 in January 2006 – first to as low as $34.33 per
9    share in January 2006 and then to as low as $24.91 in July 2006, falling much further
10   and faster than the S&P 500 Index. The decline in the prices of Yahoo!'s stock was
11   caused by a series of company-specific revelations of adverse information that had
12   previously been misrepresented to, or withheld from, the market and which undercut
13   or was inconsistent with the defendants' earlier representations and Yahoo!'s earlier
14   reported financial results, damaging Class Period purchasers of Yahoo!'s stock
15   billions of dollars, as shown on the following graph:



1    12.    However, Yahoo!'s top four executives did not fare so badly. By the
2 time Yahoo!'s publicly traded securities collapsed, they had pocketed nearly $880
3 million in illegal insider trading proceeds by selling off almost 27 million shares of
4 their Yahoo! stock – 84%-90% of the stock they owned – at artificially inflated prices
5 and before the "truth" entered the market. These sales were unusual in timing and
6 amount, dwarfing these insiders' stock sales in the months before the Class Period, as
7 shown by the chart set forth below:



Yahoo! Inc.
All Defendants - Quarterly Insider Sales Dollar Volume
January 2002 to December 2006

## PARTIES

13.    (a)    Lead Plaintiff Pension Trust Fund for Operating Engineers
purchased the common stock of Yahoo! at artificially inflated prices during the Class
Period and was damaged thereby.

- 8 -

1          (b)     Lead Plaintiff Pompano Beach Police & Firefighters' Retirement

2 System purchased the common stock of Yahoo! at artificially inflated prices during

3 the Class Period and was damaged thereby.

4          (c)     Plaintiff Ellen Rosenthal Brodsky purchased the common stock of

5 Yahoo! at artificially inflated prices during the Class Period and was damaged

6 thereby.

7      14.     Defendant Yahoo! is a public corporation with its executive offices in

8 California. Yahoo! also has offices in this District. During the Class Period, Yahoo!

9 stock traded on the Nasdaq in a highly efficient market, trading millions of shares

10 every day. Yahoo! was followed by a large number of analysts and constantly in

11 communication with the markets and investors in quarterly conference calls and

12 frequent presentations to investor and analyst conferences. Yahoo! also filed periodic

13 public reports with the SEC, and regularly used press releases to the financial press.

14 Financial information about Yahoo! was widely distributed.

15      15.     Defendant Terry S. Semel ("Semel") became the Chairman of the Board

16 and CEO of Yahoo! in May 2001 and served as such throughout the Class Period until

17 June 18, 2007, when he gave up the CEO position. Semel was thoroughly

18 knowledgeable about all aspects of Yahoo!'s business operations as he received

19 constant reports regarding sales, demand, product quality and customer service and

20 support issues, and was briefed on a weekly basis by senior management regarding the

21 status of Project Panama. Semel was intimately involved in the preparation of

22 Yahoo!'s quarterly and annual financial statements, including the amounts of reserves

23 and what disclosures would be made, and the functioning of Yahoo!'s internal

24 financial, accounting and disclosure controls. Semel was also intimately involved in

25 and fully knowledgeable concerning the click-fraud issues, even making public

26 statements regarding the issue. He reviewed and approved Yahoo!'s SEC filings and

27 Annual Report to Shareholders and signed Yahoo!'s 2004 and 2005 10-Ks. During

28 the Class Period, Semel sold 17,766,786 shares of his Yahoo! stock (90% of the

- 9 -

1   shares he owned) for $577,409,000 in insider trading proceeds. These sales were
2   unusual in timing and amount and inconsistent with Semel's historical Yahoo! stock
3   sales, as the following chart shows.

4



19   16.   Defendant Daniel L. Rosensweig ("Rosensweig") was COO of Yahoo!
20   throughout the Class Period until March 31, 2007, when s/he left the Company.
21   Rosensweig was thoroughly knowledgeable about all aspects of Yahoo!'s business
22   operations including Project Panama and the click-fraud issue. Rosensweig was
23   intimately involved in the preparation of Yahoo!'s quarterly and annual financial
24   statements, including the amounts of reserves and what disclosures would be made,
25   and the functioning of Yahoo!'s internal financial, accounting and disclosure controls.
26   He reviewed and approved Yahoo!'s SEC filings and Annual Report to Shareholders
27   and Yahoo!'s 2004 and 2005 10-Ks. During the Class Period, Rosensweig sold
28   2,101,000 shares of his Yahoo! stock (84% of the shares he owned) for $70,627,000 in

- 10 -

1  insider trading proceeds.   These sales were unusual in timing and amount and
2  inconsistent with Rosensweig's historical Yahoo! stock sales, as the following chart
3  shows.



**Yahoo! Inc.**
Dan Rosensweig - Quarterly Insider Sales Dollar Volume
January 2002 to December 2006

Pre-Class Period Sales
Shares Sold        598,250
Proceeds        $5,536,238

Class Period Sales
Shares Sold      2,101,000
Proceeds       $70,627,778

Class Period: 4/8/04 - 7/18/06

19  17.   Defendant Farzad Nazem ("Nazem") was Executive Vice President and
20  Chief Technology Officer of Yahoo! until May 31, 2007, when s/he left the Company.
21  Nazem was thoroughly knowledgeable about all aspects of Yahoo!'s business
22  operations including the Panama and click-fraud issues.   For example, he was
23  involved in the decision to cancel Project Symphony in January 2006 so that all those
24  resources could be used for Project Panama, which was behind schedule, and met
25  weekly with the Panama Project manager.   Nazem was intimately involved in the
26  preparation of Yahoo!'s quarterly and annual financial statements, including the
27  amounts of reserves and what disclosures would be made, and the functioning of
28  Yahoo!'s internal financial, accounting and disclosure controls.   He reviewed and

- 11 -

1   approved Yahoo!'s SEC filings and Annual Report to Shareholders and Yahoo!'s
2   2004 and 2005 10-Ks. During the Class Period, Nazem sold 4,623,324 shares of his
3   Yahoo! stock (88% of the shares he owned) for $157,470,000 in insider trading
4   proceeds. These sales were unusual in timing and amount and inconsistent with
5   Nazem's historical Yahoo! stock sales, as the following chart shows.



**Yahoo! Inc.**
**Farzad Nazem - Quarterly Insider Sales Dollar Volume**
**January 2002 to December 2006**

21      18.    Defendant Susan L. Decker ("Decker") was Executive Vice President of
22  Finance and Administration and CFO of Yahoo! during the Class Period. Decker was
23  thoroughly knowledgeable about all aspects of Yahoo!'s business operations as she
24  received constant reports regarding sales, demand, product quality and customer
25  service and support issues, including advertising issues. Decker was intimately
26  involved in monitoring the click-fraud issues at Yahoo. In fact, CW8, a Yahoo!
27  Manager of Loss Prevention, met with defendant Decker in 2005 about the click-fraud
28  issue. According to CW9, Decker regularly reviewed customer complaints about

- 12 -

1 click-fraud.  Decker also met weekly with Semel, Rosensweig and Nazem where
2 Nazem updated the other defendants on the status and delays with Panama.  Decker
3 was intimately involved in the preparation of Yahoo!'s quarterly and annual financial
4 statements, including the amounts of reserves and what disclosures would be made,
5 and the functioning of Yahoo!'s internal financial, accounting and disclosure controls.
6 She reviewed and approved Yahoo!'s SEC filings and Annual Report to Shareholders
7 and signed Yahoo!'s 2004 and 2005 10-Ks, as well as its Sarbanes-Oxley certificates.
8 During the Class Period, Decker sold 2,203,333 shares of her Yahoo! stock (84% of
9 the shares she owned) for $73,885,000 in insider trading proceeds.  These sales were
10 unusual in timing and amount and inconsistent with Decker's historical Yahoo! stock
11 sales, as the following chart shows.



**Yahoo! Inc.**
**Susan Decker - Quarterly Insider Sales Dollar Volume**
**January 2002 to December 2006**

1
2
3

**CONFIDENTIAL SOURCES**

4      19.    The allegations of falsity and actual knowledge pled herein are made on
5  information and belief and are supported by the first-hand accounts of 15 confidential
6  witnesses ("CW"), including former Yahoo! employees and customers. Confidential
7  witnesses have been identified with as much particularity as possible without
8  disclosing their identities. Plaintiffs are informed and believe that disclosing the
9  witnesses' identities publicly, and/or to defendants, could result in serious injury to the
10  witnesses or their careers. The confidential witnesses are as follows:

11      20.    Confidential Witness #1 ("CW1") was employed by Yahoo! for 10 years
12  in a variety of engineering roles, including Vice President of Engineering throughout
13  the Class Period. In October 2005, CW1 was assigned to lead Project Panama. When
14  s/he was assigned to lead Panama, there was a "running joke" at Yahoo! about
15  Panama, because the project had been started three different times. The first attempt
16  was to "revamp" the legacy Overture system in 2003 to 2004, which failed. The
17  second attempt was under Executive Vice President of Engineering, Phu Hoang. This
18  second attempt was originally intended to deliver a new "test" advertising system in
19  Australia, which was a smaller market than the United States. It was limited to
20  Australia in order to limit the risks of a large scale launch, but this attempt "failed
21  miserably" and resulted in Hoang's removal from Project Panama in July or August
22  2005 by defendant Nazem. The third and final attempt was the re-initiation of Project
23  Panama under CW1 and Senior VP of Product Management Mark Morrissey.
24  According to CW1, until at least October 2005, Panama suffered from "a lack of
25  executive buy-in" which arose from a culture clash among the executives of Yahoo!
26  and Overture. In early 2005, many individuals who had critical roles in Project
27  Panama departed Yahoo!, often after "internal disagreements" regarding Panama.
28  Thus, CW1 was under "alot of pressure" to "get it out there immediately" when s/he

1   took over Panama. This pressure came verbally from defendant Nazem and Executive
2   Vice President Jeff Weiner, who each reported directly to defendant Semel.
3   Additionally, CW1 stated that the completion of Panama was critical, because with
4   any delay, Yahoo! risked "missing its commitments to Wall Street" due to the
5   expected increase in revenues from Project Panama.

6           (a)     CW1 was one of the additional resources Yahoo! assigned to
7   Panama in the second half of 2005, after defendant Nazem and other Yahoo! corporate
8   staff made Panama a high priority. According to CW1, when s/he was assigned to
9   Panama, that project was slated for a 2Q 06 launch, which was not a feasible launch
10  date. Therefore, in December 2005, CW1 created a new schedule with a launch date
11  of August 2006. As of December 2005, Panama had been designed, but none of the
12  code had been written. Defendant Nazem was updated once a week by CW1 on
13  Panama's progress during Wednesday meetings in Burbank. CW1 knows that
14  defendant Nazem met on a weekly basis with defendants Semel, Decker and
15  Rosensweig in Sunnyvale, and stated that defendant Nazem provided updates on
16  Panama in those meetings with the other defendants. Defendant Nazem regularly said
17  that Panama was the "number one priority" for Yahoo!. Every day, CW1 assigned a
18  "confidence number" to the likelihood of meeting the August 2006 launch date. By
19  April 2006, the schedule for Project Panama slipped again and CW1 told Nazem that
20  the August 2006 launch was not going to happen and Nazem, in turn, shaved that
21  information in his/her weekly Sunnyvale meetings with defendants Semel, Decker and
22  Rosensweig. Also, according to CW1, the August 2006 date slipped because between
23  October 2005 and April 2006, Yahoo! "lost" about four weeks to internal
24  arguments/disagreements among the team, another four weeks due to hardware
25  readiness issues, and another two weeks due to integration testing issues.

26          21.     Confidential Witness #2 ("CW2") began working for Overture's
27  predecessor, GoTo.com in 1999, and became an Overture's employee following
28  Overture's acquisition of GoTo.com. Following Yahoo!'s acquisition of Overture,

1  CW2 became an Inside Sales Manager with Yahoo!, and remained in that role until
2  June 2007. Working out of the Pasadena facility, CW2 managed a group that serviced
3  new search customers, educating them about the search products and assisting them in
4  building advertising campaigns. CW2 recalled a visit by Nazem to the Pasadena
5  facility around March 2006 to meet with sales management. During that meeting,
6  Nazem confirmed that Yahoo! had committed extraordinary resources to Project
7  Panama in the fall of 2005. CW2 also confirmed that Panama was delayed because
8  the back-end was still not ready.

9      22.    Confidential Witness #3 ("CW3") is a former Engineering Manager
10  employed with Overture for approximately a year-and-a-half prior to Yahoo!'s
11  October 2003 acquisition of Overture. CW3 then worked for Yahoo! in the Business
12  Information Systems group at the legacy Overture facility in Pasadena, California
13  until approximately October 2004. The Business Information Systems group at
14  Yahoo! was responsible for programming and data reporting related to: (1) billing
15  systems; (2) a click-fraud detection system; and (3) a search servicing system. These
16  systems supported Yahoo!'s sponsored search project, contextual advertisement
17  programs, one or two domain match products, and Yahoo!'s local match product.
18  While employed with Yahoo, CW3 led the click-fraud detection system. Yahoo!
19  defined click fraud in four ways.

20      (a)    The first category of click fraud was perpetrated by "other
21  advertisers." Yahoo!'s search advertisement product ran as a "real time auction" so
22  that its advertising customers bid a certain amount of money per click for specific
23  search terms. Where the customer ranked in search results was a direct reflection of
24  how much they bid for a specific search term. The competitors of Yahoo!'s
25  advertising customers, which were often Yahoo! customers themselves, would
26  purposely click on another company's ad in an effort to deplete the funds that the
27  customers had allotted for advertising at Yahoo.

28

1          (b)    The second type of click fraud was perpetrated by publishers and
2    various advertising partners with which Yahoo! shared advertising revenues.
3    According to CW3, Yahoo! had a network of a least several hundred website and/or
4    online "publishers," some of whom received as much as a 70% revenue share for
5    displaying the ads of Yahoo!'s customers on their own websites. Publishers who had
6    revenue share agreements with Yahoo! had a motive to perpetrate click fraud because
7    it could potentially bolster their own revenues and Yahoo! benefited from increased
8    revenues as well.

9          (c)    The third type of click fraud which Yahoo! defined was clicks on
10   Yahoo! customers' advertisements by "delusional" Yahoo! shareholders who believed
11   they might increase Yahoo!'s revenues and thereby the value of their investment in
12   the Company. The fourth type of click fraud was the "theoretical abuser" defined by
13   Yahoo! as a user who was angry with spammers and wanted to get even with them by
14   inappropriately and repeatedly clicking on their advertisements.

15         (d)    Yahoo! decided in late 2004 to "relax" the business rules and
16   filters in the click-fraud detection system for Yahoo!'s advertising partners, in
17   particular Yahoo!'s content match partners, also known as "contextual ad partners."
18   The Business Information Systems Overture was aimed at optimizing the performance
19   of systems and increasing their efficiency since Yahoo!'s acquisition of Overture in
20   October 2003. The click-fraud detection system was regularly programmed with new
21   "business rules" and filters aimed at weeding out clicks that were illegitimate and for
22   which customers should not have been billed. The business rules incorporated into the
23   click-fraud detection system were designed to track clicks and eliminate clicks that
24   exceeded a certain, specified maximum number of clicks in a given time period. The
25   relaxation of the click-fraud rules allowed Yahoo! to generate additional revenues by
26   allowing for the counting of additional improper clicks on the content match partner
27   sites. According to CW3, changes to the "business rules" were simple modifications
28   to the coded instructions that say what to look for concerning click fraud. The

1    business rules and filters interfaced with the billing system at Yahoo. CW3 learned of
2    this relaxation in rules from Yahoo!'s manager of Loss Prevention.

3            (e)    The content match partners consisted of essentially anyone who
4    had a blog site or website and wished to display the ads of Yahoo!'s customers as a
5    means of generating revenue. The content match partners were essentially "self sign
6    up" partners and virtually anyone who sought to be one of Yahoo!'s content match
7    partners was given that status. Yahoo! would provide the content match partner a
8    "script" for the advertisement and the partner would begin generating revenue payable
9    to Yahoo! in exchange for displaying Yahoo!'s customers' ads to the extent anyone
10   actually clicked on the ad when it appeared on the contextual advertiser's site. In
11   contrast, Yahoo!'s Search Advertising Group conducted at least some due diligence
12   on search ad partners and typically interacted with such partners in contract
13   negotiations. According to CW3 these individuals were more willing to engage in or
14   allow click fraud on their sites because they had less to lose than the larger more
15   established search ad partners and their own revenues from Yahoo! would be
16   bolstered.

17           (f)    The decision to relax the business rules upset many of the legacy
18   Overture personnel because of inappropriate revenue being generated by Yahoo! and
19   because the customers were not satisfied with contextual ad traffic since such traffic
20   had a low conversion rate. CW3 foresaw that the relaxation of business rules
21   pertaining to the contextual ad program would only increase customer dissatisfaction.
22   According to CW3, customers did not have the choice to opt out of having their ads
23   displayed on the contextual ad syndication. CW3 estimates revenues generated from
24   the relaxation in rules represented approximately 25% of Overture's operating
25   revenues.

26       23.    Confidential Witness #4 ("CW4") is a former Product Manager at
27   Yahoo! employed from February 2003 to March 2006 whose primary responsibility
28   was to work on a component of project Panama called "Cheetah." Cheetah gathered

1  and collated click-impression information which was used to credit advertiser's ads
2  resulting in the placement, position and price per click associated with the
3  advertisement. CW4 provided information regarding the planned release of Panama
4  in 2005 and that the project was "going nowhere" until the Company devoted much
5  larger resources to the project and the Company's headquarters took over the
6  development of that project in the fall of 2005. At that time, Yahoo!'s engineering
7  and product management decided that leaving the project to the Overture Pasadena
8  office where it was designed was not resulting in any clear progress. CW4 also
9  confirmed that by February 2006, the Company had yet to achieve important
10 milestones for back-end components necessary to complete Panama. At the Overture
11 Pasadena location, project Panama was plagued by personnel turnover as CW4
12 him/herself described that s/he had seven managers in the previous 18 months prior to
13 the project being transferred to the Company's Sunnyvale office. By the time s/he
14 departed Yahoo!, CW4 believed that a 3Q 06 Panama rollout was not feasible. CW4
15 believed that the advertiser's desire to have the product released during 3Q 06 so that
16 necessary training could be completed prior to the busy holiday season in 4Q 06
17 caused Yahoo! managers to commit to a rollout date that was not feasible. CW4 also
18 confirmed that Project Panama was run out of defendant Nazem's office in Sunnyvale
19 after it was transferred there in October 2005.

20      24.    Confidential Witness #5 ("CW5") worked at Yahoo! in 2003 to 2004 as a
21 Senior Credit Analyst at the corporate headquarters in Sunnyvale. In that role, CW5
22 was responsible for working with Yahoo! customers who advertise on Yahoo!'s
23 various websites, for both banner and pay-per-click advertisements.    In the
24 performance of his/her duties, s/he accessed and viewed invoices on Yahoo!'s Oracle
25 accounting system. According to CW5, there was one "major issue" with that system,
26 in that Yahoo! was unable to bill customers based on the actual number of clicks, and
27 instead billed customers based on an estimated number of clicks. This "major issue"
28 was the subject of customer complaints. During CW5's training for this position, s/he

- 19 -

1 | was informed of this "major issue" and was instructed to inform customers that there
2 | was a "limitation in the system" and that Yahoo! was working towards upgrading the
3 | system so that customer invoices would reflect the actual, and not estimated, number
4 | of clicks. However, those promised upgrades had not been completed by the time
5 | CW5 left Yahoo! in June 2004.

6 |     25.    Confidential Witness #6 ("CW6") was employed by Yahoo! from
7 | November 2003 through the end of the Class Period. S/He first worked for Overture
8 | and then for Yahoo! as a sales representative in its 25-person "Platinum Sales
9 | Group"(advertisers that bought $100,000 to $150,000 of ads per month). CW6 had
10 | regular communication with customers who complained about click fraud with the
11 | nature of the complaints consistent – customer complaining about poor sales results
12 | while experiencing large volumes of clicks which was depleting their ad budgets.
13 | CW6 fellow sales reps had the same experiences with customers. The main cause of
14 | complaints was "bad mapping" which was customer ads appearing in results of non-
15 | relevant search terms and was mainly in the content match area. There was no set
16 | formula or standard to determine customer refunds and the main focus was on
17 | minimizing customer repayments. At Overture there were not a lot of issues with
18 | customer complaints, but after Yahoo! took over and "content match" was introduced,
19 | complaints began to escalate. CW6 confirmed that 15% of the revenue generated in
20 | his/her group was created via click fraud and irrelevant clicks from poor content
21 | match.

22 |     26.    Confidential Witness #7 ("CW7") was a former International Sales
23 | Specialist at Yahoo!'s Overture facility in Pasadena from December 2004 to February
24 | 2006. CW7 has knowledge of the project to put all Overture's backend functions on a
25 | single platform internally know as "solving the blob" that was a necessary precursor
26 | to Project Panama. As of 4Q 05, the "solving the blob" project was delayed and was
27 | not even complete in February 2006 when s/he left the Company. Originally, "solving
28 | the blob" was scheduled to be completed in 3Q or 4Q 05. CW7 confirmed that this

1  | integration project was a necessary step before project Panama could be completed
2  | because that project depended on the integration of Yahoo!'s Search Marketing
3  | backend business information systems. Because of the delay in "solving the blob,"
4  | Project Panama was also delayed when CW7 left Yahoo!.

5  | 27. According Confidential Witness #8 ("CW8") a former Manager of the
6  | legacy Overture Loss Prevention organization, who continued in that role after Yahoo!
7  | purchased Overture, there was an effort inside Yahoo! to relax the click-fraud
8  | detection standards. CW8 began working for Overture in December 2002 and
9  | continued his/her employment with Yahoo! until February 2006. After the click-fraud
10 | class action suit was filed in 2005, CW8 met with defendant Decker to discuss the
11 | click-fraud issue at Yahoo!, and CW8 emphasized that defendant Decker was
12 | "definitely aware of the issue" of click fraud.

13 | 28. Confidential Witness #9 ("CW9") worked for Yahoo! from December
14 | 2003 to February 2007, holding a number of positions in the Customer Solutions
15 | Group dealing with Yahoo! customers. In early 2006 s/he was assigned to the Click
16 | Activity Research ("CAR") team where s/he stayed until s/he left Yahoo! in 2007.
17 | The CAR team was responsible for handling customer complaints regarding click
18 | fraud. CW9 reported to Christina Poe, the manager of Customer Service. CW9 stated
19 | that based on the customer complaints, the vast majority of customer complaints about
20 | click fraud were associated with Yahoo!'s Content Match and domain partners which
21 | resulted in poor quality traffic. In addition to the poor conversion rate of these
22 | partners, customers were overcharged for the dramatic increase in clicks on their ads
23 | posted on the poor domain partner sites. Customers were troubled that Yahoo! did not
24 | allow its advertising customers to "opt out" of the domain partner advertising.
25 | Regardless of whether customers selected Content Match or Search Advertising, the
26 | ads were sent to Yahoo!'s domain partners which had an incentive to commit click
27 | fraud or increase non-billable clicks since they received a piece of the revenues from
28 | Yahoo!. Yahoo! had thousands of Content Match and domain partners and was not

1  willing to block these partners because that decision would decrease Yahoo!'s
2  revenues. There was no formula or process to determine how a customer was entitled
3  to a refund, but rather it was a judgment call made by the Loss Prevention Group
4  which also reviewed the claim. A customer complaint had to be received within 60
5  days or it was rejected. CW9 was fired after the Class Period in 2007 when defendant
6  Decker disapproved of his/her handling of a customer complaint. CW9's supervisor
7  Poe told him/her that Decker had reviewed his/her notes of his/her interactions with
8  the customer on the Customer Relationship Management system and was upset
9  because a customer that had $20 per day of typical charges had spiked to $8,000 in
10 one day and Yahoo! was going to have to refund the $8,000.

11     29.    Confidential Witness #10 ("CW10") is a former Engineering Director
12 with Yahoo! in Pasadena, California who worked for Overture at the time it was
13 acquired by Yahoo! in October 2003. CW10 worked at Yahoo! following the
14 Overture acquisition until January 2005. CW10 was one of dozens of legacy Overture
15 engineers who ultimately were terminated by Yahoo! as part of the Overture
16 integration plan even though the Overture engineers were more knowledgeable than
17 the Yahoo! engineers about how the Overture information systems operated. While
18 employed at Yahoo!, CW10 worked in the Yahoo! Search Marketing Business
19 Information systems group and had 38 to 40 individuals reporting to him/her from the
20 click-fraud analytic team, the data reporting team and the data operations team. All of
21 these teams were focused on processing data related to searches and clicks. For
22 example, some of the data was analyzed to determine whether it related to non-billable
23 clicks. Other data related to gross revenue that was uploaded for Yahoo!'s Oracle
24 Financial system and other still was related to specific advertisers that was filtered and
25 loaded onto the Business Information website so the advertising customer could
26 access data specific to it. CW10 explained that during his/her tenure at Overture and
27 Yahoo!, the "number one" source of non-billable click activity was perpetrated by
28 competing advertisers who clicked on competitors to simultaneously deplete their

- 22 -

1 advertising budgets and to increase their own position in response to a search, *i.e.*,
2 "come up first" once their competitors advertising budgets were exhausted. The
3 second most common source of non-billable click activity was by Yahoo!'s marketing
4 partners who deliberately clicked on advertisements on their own websites in order to
5 boost their own revenue. One of the important functions of the various teams the
6 employees s/he oversaw worked for was to calculate "discard rates" by analyzing
7 what clicks could not be passed on to advertisers and thus eliminated from billing.
8 Yahoo!'s "discard rates" were analyzed for each marketing partner to determine
9 whether they were poor quality partners. CW10 confirmed that Yahoo! had a large
10 problem with poorer quality international partners and that these problems
11 notwithstanding, Yahoo! would not allow advertising customers to opt out of
12 international partner traffic up to the time s/he left Yahoo!. While s/he worked for
13 Overture prior to that company's acquisition by Yahoo!, Overture routinely "turned
14 off" poorer quality partners who had unacceptable "discard rates." Overture
15 maintained high standards and maintained score cards for partners to ensure high
16 conversion rates by customers. Following the Overture acquisition, Yahoo! was not
17 as concerned with the quality of the traffic from marketing partners. Yahoo! failed to
18 evaluate marketing partners set up by Yahoo! employees who as a result received
19 advertising revenue directly from Yahoo!. Yahoo! had a "CVS code log" system in
20 place and a method to track changes to the software system which allowed the
21 company to alter the click detection standards. The CVS system allowed Yahoo! to
22 amend the method to determine whether a click was billable. These rules, for
23 example, would not allow two clicks in a row from the same source and IP address to
24 be billable. CW10 was responsible for granting access to the revenue reporting
25 system at the Overture Pasadena facility and gave defendant Decker access. Yahoo!'s
26 customer relationship management ("CRM") system kept track of refunds provided to
27 advertisers. CW10 confirmed that Yahoo! only gave refunds upon request and would
28 only develop code to eliminate unwanted clicks after the clicks analysis team

1  determined that a specific customer was having problems. Yahoo! monitored the
2  quality of clicks and details regarding the specific partner site on the Business
3  Information intranet. CW10 also confirmed that Yahoo! did not provide his/her group
4  with adequate funding for increasing the number of servers to upgrade the systems so
5  his/her team could post all data required under Service Level Agreements ("SLA")
6  with advertisers on the Business Information intranet. This information was supposed
7  to be filtered so non-billable clicks were eliminated. Yahoo!'s ability to filter out non-
8  billable clicks was impacted by not having adequate resources. At the time CW10 left
9  Yahoo! in February 2005, the Company was extremely far behind in completing a
10  project inside the Company known as "solving the blob." This project was a
11  necessary precursor to Project Panama. This project involved integrating the very
12  separate software systems such as the CRM system and the click detection system into
13  a single platform. This integration was essential so that Yahoo! could comply with
14  the terms of the SLA with advertising customers and provide filtered data on a timely
15  basis. CW10 confirmed that this project was far behind schedule because Yahoo!
16  fired the Overture engineers most knowledgeable about the different systems.

17      30.    According to Confidential Witness #11 ("CW11") a former advertising
18  account manager of Yahoo! and Overture, also worked for Yahoo! after it acquired
19  Overture in the fall 2003. CW11 worked for Yahoo! until December 2004 as the
20  account manager for some of Yahoo!'s largest customers. Since leaving Yahoo! to
21  the present, CW11 has been a customer of Yahoo!. At the time of the Overture
22  acquisition, Yahoo!'s Overture platform, responsible for more than 50% of the
23  Company's revenue, was literally "bursting at the seams." Even though Overture was
24  producing most of Yahoo!'s revenue, the Pasadena office could not get approval for
25  additional servers to deal with the enormous Yahoo! internet traffic. With the
26  increased traffic, the Overture platform was literally self destructing. The platform's
27  limitations caused down time, reporting problems, account access problems and new
28  product failures. CW11 also confirmed that at the same time Yahoo! sales managers

1 were asking customers when the most opportune time to roll-out Panama was from a
2 customer perspective, 2Q 06, 4Q 06 or 1Q 07, they were promising on a monthly basis
3 that Panama would be ready for release the following month. CW11 confirmed that
4 Panama's release date was the laughing stock of the industry. Yahoo!'s assurances to
5 the market that Panama would be ready for a 3Q 06 launch were not achievable
6 because the user interface was not ready and algorithm uncertain in 2Q 06 when s/he
7 participated in Panama usability studies in Pasadena. The Overture platform was
8 incapable of handling the increasing numbers of advertisers, marketing partners and
9 users. To address the inadequacies of the system and to deal with the increasing
10 numbers of users, Yahoo!, through Overture, continued working on the development
11 of Panama, a software project designed to handle extremely large amounts of data,
12 nimbly allow advertisers to bid on key words and simultaneously map search listings
13 to content. Yahoo! rushed Content Match to market with a very manual mapping
14 process that led to wide variations in search results. Content Match led to very
15 undesirable results such as irrelevant clicks and even "click tsunamis." A click
16 tsunami occurred when a search mapped to results that caused thousands of clicks,
17 with little or no conversion, on an advertiser's site. CW11 provided an example of a
18 click tsunami such as when a mortgage seller's ad would appear on a news article
19 announcing a federal reserve interest rate cut. A large volume of readers would click
20 on an ad next to the article thinking they would obtain more information about what
21 impact the federal reserve's action would have on mortgage interest rates and instead
22 clicked through to the mortgage seller's website. Because Yahoo!'s content Match
23 System lacked any method to prevent the resulting onslaught of clicks, the small
24 advertiser who may have only budgeted for $200/day would receive billing for
25 thousands of dollars, far exceeding the budget or capacity to pay. CW11 also
26 confirmed that Content Match lacked any features to prevent actual click fraud or any
27 method to monitor any sort of referral log data to eliminate non-billable clicks. CW11
28

- 25 -

1  also stated that Yahoo! aggressively marketed to affiliates without any sort of filter to
2  make up for lost traffic from MSN.

3      31.    Confidential Witness #12 ("CW12") was a former Operations Sales
4  Manager who worked for Overture and then Yahoo!.  In June 2000, CW12 was
5  employed in a customer service capacity by GoTo.com, which later evolved into
6  Overture.  By 2001, CW12 moved into a sales role and eventually became an
7  Operations Sales Manager and continued his/her employment with Yahoo! after
8  Yahoo!'s acquisition of Overture in October 2003 until s/he left Yahoo! in October
9  2006.

10      (a)    As an Operations Sales Manager, CW12 was involved with
11  anything that had to do with sales and was an integral member of the Product team as
12  well as having a Project Management role in the initiation and roll-out of Project
13  Panama.

14      (b)    In approximately 2003, under the direction of then-Overture CEO
15  Ted Meisel, Overture initiated a project known internally as Overture 2.0.  Overture
16  2.0 was a project aimed to take Overture off of the "duct tape and bailing wire"
17  systems that had sustained the company as a small start-up and sufficed during the
18  period of Overture's rapid growth.  The Overture 2.0 project consisted of a new
19  customer interface, a new algorithm and a new revenue generating process that would
20  emphasize the relevance of search term results as opposed to rankings according to
21  bid amounts.

22      (c)    Overture 2.0 was supposed to take approximately two years to
23  complete when it was initiated by Overture engineers in 2003.  The Overture
24  engineers recognized the importance of improving the algorithm and bidding system
25  in order for Yahoo! to compete with Google.  Initially Overture 2.0 was planned to be
26  executed in two phases.  First, the Overture engineers sought to implement systems
27  that would implement platforms that would allow Overture the scale and scope to
28  grow and to create a more effective bidding system.  The legacy Overture system was

1 based on the highest bidder per key word receiving the highest ranking in the search
2 results. However, Google had more effectively monetized searches by making
3 searches more result-oriented, and thereby earned more revenue per search. Phase
4 two of Overture 2.0 consisted of creating a better customer interface and direct traffic
5 center.

6 (d) Real problems emerged when Yahoo! acquired Overture because
7 Yahoo! took the project away from the direction of Meisel and the Overture engineers.
8 Yahoo! fumbled the project and it was drastically "stalled, delayed and derailed."
9 This occurred because Yahoo! had gotten rid of the technical experts and did not
10 realize the scope and complexity of the project. CW12 emphasized Overture (and
11 later Yahoo!) had to execute "perfectly" to continue to compete with Google and
12 Yahoo! "fumbled" and failed to execute in a manner that would have allowed Yahoo!
13 to remain competitive with Google.

14 (e) At some point in time Yahoo! "rebranded" Overture 2.0 as Project
15 Panama. Senior Yahoo! executives, including Phu Hoang, came to the legacy
16 Overture facility in late 2004, and under the direction of Hoang and others, legacy
17 Overture masters and technical heads were alienated. The alienation of these
18 individuals was significant because according to CW12, the legacy Overture systems
19 were held together with "bailing wire and duct tape."

20 (f) In late 2001, Overture engineers had initiated "Project Symphony"
21 to bring the Company's CRM system online and up to date. Project Symphony was
22 considered to be one of the "back-end system" projects associated with Project
23 Panama. Project Symphony had been progressing, but after Yahoo! acquired Overture
24 in late 2004, it began to realize the complexity and scope of Project Panama.

25 (g) According to CW12, at least by late 2005, Google was "absolutely
26 kicking Yahoo!'s ass" and that Yahoo!'s revenues began suffering as a result. As a
27 consequence of the Project Panama launch continuing to "slip" and the fierce
28 competition from Google, Yahoo!'s revenues began to decline "month by month"

- 27 -

1  beginning in 4Q 05. CW12 was aware of the decline in revenues for several reasons.
2  CW12 heard individuals at Yahoo! say that the Company was "not hitting its
3  numbers" in the 4Q 05 timeframe. S/He also saw traffic forecasts that showed where
4  Yahoo! expected to be in 4Q 05 and knew from his/her review of the actual revenues
5  that Yahoo!'s revenues were declining. CW12 knew from his/her attendance at
6  weekly Platinum Customer Service team meetings in 4Q 05 that Yahoo! was missing
7  its 4Q 05 traffic forecasts by approximately 10 to 15 percent. Because Yahoo! was
8  not meeting its traffic forecasts, the Company was not attaining its revenue forecasts
9  associated with those clicks in 4Q 05. In addition, according to CW12, customers and
10 clients began complaining in 4Q 05 about not attaining the projections that Yahoo!
11 had provided to them. Yahoo! typically provided its advertising customer and clients
12 with "spreadsheets" that showed how many clicks, conversions and other key
13 measurements they would likely experience in a given month while working with
14 Yahoo!.

15            (h)     According to CW12, Yahoo! launched the Yahoo Publisher
16 Network ("YPN") in August of 2005 and it was a "total failure." YPN was Yahoo!'s
17 attempt to compete with Google's AdSense product. As more customers utilized the
18 contextual match product, and after Yahoo! launched YPN, the issue of "bogus
19 traffic" associated with the contextual match product escalated. Customers could
20 evaluate the source of the traffic on their ads and were able to couple this data with the
21 rate of conversion of clicks on their ads to determine that the clicks and traffic
22 associated with contextual match were "bogus" more often than with the sponsered
23 search site. According to CW12, there were massive holes in the contextual match
24 system, so that the system was unable to effectively detect these bogus clicks and
25 eliminate them from billing.

26            (i)     Because so many resources had been pulled from Project
27 Symphony and dedicated to Project Panama by early 2006, the system was "not
28 working at all." CW12 participated in a meeting in January or February of 2006

- 28 -

1 where defendant Nazem announced that Project Symphony was being "scratched" and
2 that all the resources from Symphony had to be redirected to Panama. It was clear to
3 CW12 that as of this early 2006 timeframe there were issues with releasing Project
4 Panama because Project Symphony had so many difficulties and had been so delayed.
5 According to CW12, defendant Rosensweig was aware of the failure of Project
6 Symphony and the impact this would likely have on Project Panama.

7         (j)       According to CW12, Project Panama was not well managed in
8 Yahoo!'s hands and the schedule kept slipping so that it was difficult for him/her to
9 specify when Yahoo! intended to release Panama. In the January and February 2006
10 timeframe, there was a "big joke" internally at the legacy Overture facilities among
11 the personnel as to whether Panama would ever be launched.

12         (k)      According to CW12, there were always issues regarding click
13 fraud, even prior to Yahoo!'s acquisition of Overture in October 2003. CW12,
14 discussed click-fraud issues with many people, including the Manager of Loss
15 Prevention at Yahoo. According to CW12, there were some "questionable practices"
16 regarding the revenues recognized on and refunds granted to customers who
17 complained about click fraud. Yahoo! delayed refunding any amounts owed to
18 customers until after quarter end. Complaints from customers came in through the
19 sales department, and the sales personnel, including CW12 would perform some
20 preliminary research regarding the clicks about which customers complained and then
21 would pass the file to the Loss Prevention team.

22         (l)       According to CW12, the running joke at Yahoo! Search Marketing
23 was that there was a "dial" on the click-fraud detection system which Yahoo! turned
24 down at the end of the quarter to allow more non-billable click activity to be passed on
25 to customers, thereby increasing the Company's revenues at the end of the quarter.
26 The non-billable click activity was being allowed through the click detection system at
27 the end of the quarter, and being passed on to advertising customers in the form of
28 charges to their account. According to CW12, there were a lot more complaints from

1 advertising customers at the end of the quarter regarding click fraud. Customer
2 Service Representatives used different "talk scripts" at the end of the quarter than at
3 other times during the quarter. These end-of-the-quarter "talk scripts" provided word
4 for word explanations of how the Customer Service personnel were supposed to
5 respond to complaints at the end of the quarter regarding credits taking longer than
6 "normal," including there were "technical limitations" resulting from the number of
7 accounts that had to be reviewed to determine whether credits were warranted.

8       32.    Confidential Witness #13 ("CW13") was employed at Yahoo! from
9 November 2003 through the end of the Class Period. S/he was a Senior Director in
10 Yahoo! Search Marketing from 2003-2005 and then a Senior Director in the Brand
11 Marketing division. CW13 reported to a Senior VP in both jobs. In both positions at
12 Yahoo! s/he had some exposure to project Panama. CW13 stated that the leadership
13 of Panama changed three times during the course of the project. There was a "matrix"
14 team which consisted of senior management leaders from Engineering, Project
15 Management, Marketing, Communications, and Finance. The designated leader of the
16 important Engineering group changed three times and the lead of Project Management
17 twice. These leaders were responsible for briefing defendant Semel on a weekly
18 basis.

19      33.    Confidential Witness #14 ("CW14") was a Yahoo! employee from March
20 2003 to April 2006, working as an engineer in the Search and Marketplace division.
21 His/her group was responsible for developing Yahoo!'s search algorithm for various
22 Yahoo! properties and was the legacy group from Yahoo!'s acquisition of Inktomi in
23 2003. Executive Vice President Jeff Weiner was in charge of the Search and
24 Marketplace division and reported directly to defendant Semel. Beginning in
25 approximately August 2005, Yahoo! began pumping more ads onto the search pages
26 and various properties pages in order to meet earnings expectations. CW14 stated that
27 during Search and Marketplace meetings in the second half of 2005, increasing ads
28 was discussed to help Yahoo! meet earnings expectations. The increased ads ruined

1  customers' search experience and caused a rift between the Sales group (Search
2  Advertising) and CW14's group. The dilution of the search experience was known to
3  Semel because he attended a meeting in August 2005 with 10-12 engineers in CW14's
4  group as part of his weekly practice to meet with a random dozen employees. Semel
5  promised to look into the issue but never got back to the group.

6      34.    Confidential Witness #15 ("CW15") was an employee of Overture in
7  2003 before it was acquired by Yahoo! and was at Yahoo! through the end of the
8  Class Period. CW15 was part of the operations management team and sat in on
9  various management meetings where Panama was discussed, as well as Overture's
10  inadequate search design to process and function with the huge volume of Yahoo!
11  traffic and Overture's legacy search technology called a "ball of string." In the
12  summer of 2004 a decision was made at Yahoo!'s highest levels to redesign the
13  technical platform so it could include multiple algorithms for relevancy and be
14  competitive with Google. Panama was suppose to be complete by the end of 2005.
15  Instead, that project experienced massive delays and required Yahoo! to commit more
16  resources to the project in the latter part of 2005. CW15 attended meetings led by
17  defendant Nazem who was in charge of Panama.

18                        **JURISDICTION AND VENUE**

19      35.    The claims asserted herein arise under and pursuant to §§10(b), 20(a) and
20  20A of the Securities Exchange Act of 1934 ("1934 Act") (15 U.S.C. §§78j(b), 78t(a)
21  and 78t-1) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-
22  5).

23      36.    This Court has jurisdiction over the subject matter of this action pursuant
24  to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa).

25      37.    Venue is proper in this District pursuant to §27 of the 1934 Act and 28
26  U.S.C. §1391(b). Yahoo! maintains a major place of business in this District and
27  many of the acts and practices complained of herein occurred in substantial part in this
28  District.

1    38.    In connection with the acts in this Complaint, defendants, directly or
2  indirectly, used the means and instrumentalities of interstate commerce, including, but
3  not limited to, the mails, interstate telephone communications and the facilities of the
4  national securities markets.

5                         **BACKGROUND TO THE CLASS PERIOD**

6    39.    Yahoo! went public in 1996, and during the high-tech "boom" its stock
7  soared to as high as $125 per share from less than $2 per share.  However, when the
8  "boom" burst, Yahoo! stock collapsed, falling back to $4 per share in September
9  2001. Yahoo! reported huge losses in 2001 and underwent a number of management
10  reorganizations in an effort to restore the Company to profitability and restore value to
11  its crushed stock.  In 2001, Terry Semel – a Hollywood executive – became Chairman
12  and CEO of the Company – a move greeted with widespread skepticism given his lack
13  of technical experience or expertise in the high-tech corporate world.    Semel
14  assembled a new management team – Susan Decker as CFO, Daniel Rosensweig as
15  COO, with Farzad Nazem remaining as Chief Technology Officer.  Due to the
16  collapse in Yahoo!'s stock and the widespread doubts as to Semel and his team's
17  ability to restore the Company's growth and its stock price, the defendants were all
18  under very considerable pressure to produce profitable growth in the business – and
19  upward movement in its stock price – or face ouster from their lucrative jobs.  Semel
20  also got a huge pay package that was options heavy and tied to the performance in
21  Yahoo!'s stock.  In addition to these external pressures to perform, these key insiders
22  (and Yahoo!'s entire management team) set themselves up to pocket hundreds of
23  millions of dollar in bonuses and stock option profits if they could push Yahoo!'s
24  stock price much higher.

25    40.    Following positive quarter results throughout 2003, on January 14, 2004,
26  Yahoo! reported very strong 4Q 04 and FY 04 results.  In a conference call with
27  investors following the earnings release, the following occurred:

28

1      Our 2003 results are a demonstration of how Yahoo! has
2  significantly benefited from our focused mission, that great product
3  equals great business.  *We delivered the best performance in the*
4  *company's history in numerous financial metrics, including full-year*
5  *and quarterly revenue, quarterly operating income, and full-year*
6  *GAAP EPS*.

7                  *       *       *

8      Over the past three years, we have built and acquired to create the
9  largest and most diverse advertising platform on the Web; and as a
10  result, we are benefiting from our broad exposure to small, medium-
11  sized businesses and global blue-chip advertisers.  Though our reported
12  growth rate was higher, helped by acquisitions, *our full-year 2003*
13  *organic growth rate, the entire marketing services business, was*
14  *greater than 40%, and accelerated in each quarter throughout 2003*.

15      This performance is a result of growing contributions from our
16  brand advertising, as advertisers become increasingly satisfied with the
17  results of online advertising *and the benefits of our integrated*
18  *marketing solutions, as well as continued strong growth in sponsored*
19  *search*.

20                  *       *       *

21      Overture's core business remains strong in 2003 . . . . Overture's
22  great track record with distribution partners has enabled them to attract
23  and retain key accounts.

24                  *       *       *

25      *The integration of the Yahoo! and Overture operations is*
26  *proceeding according to plan, we're excited about the progress we're*
27  *making testing and implementing Overture's content match product*

28

*into Yahoo! verticals, such as entertainment, finance, travel and yellow
pages, with many other verticals to come.*

\*       \*       \*

Given the strength of both our brand and pay for performance
advertising, we currently expect to grow on an organic basis, excluding
acquisitions, in the range of 25 to 30%, *outperforming the industry....*

*Fortunate that we're extremely well-positioned to benefit from
some of the most exciting business opportunities of our time.*

41.    On February 18, 2004, Yahoo! announced the introduction of its own
new search algorithm, thus ending its prior relationship with Google, where Yahoo!
had licensed – and thus depended upon – Google's search algorithm for placing
sponsored/paid search ads.  Yahoo!'s release stated:

**Yahoo! Introduces More Comprehensive and Relevant Search
Experience with New Yahoo! Search Technology**

\*       \*       \*

Yahoo! Inc. . . . today announced *that it has created a more
comprehensive and relevant search experience for users through the
deployment of its own algorithmic search technology on Yahoo!
Search®.*  Starting today, the company will begin rolling out the new
Yahoo! Search Technology (YST) . . . .

"Today's announcement marks the beginning of a rapid
succession of innovations from Yahoo! Search that will deliver against
our mission of providing the highest quality search experience on the
Web," said Jeff Weiner, senior vice president, Yahoo! Search and
Marketplace.  "Within the next few weeks and months, consumers will
continue to see improvement to Yahoo!'s search technology . . . ."

\*       \*       \*

1

2

3

4

5

6

7

*"The combination of a world-class engineering team and proprietary search technologies, together with Yahoo!'s global reach, breadth and depth of content and leading network assets, uniquely positions Yahoo! to change the game in search*," added Weiner.

*Yahoo! Search Technology is already integrated . . . . Yahoo! Search Technology will power search for Overture's algorithmic search partners . . . .*

8      42.    The introduction of Yahoo!'s own search algorithm was an extremely

9   important event as Yahoo! would now succeed or fail in sponsored/paid search

10   advertising based on its own technology, *i.e.*, its own algorithm – and now be in direct

11   competition with Google and its algorithm – the one Yahoo! had previously used.

12   The significance of this development was not at all lost on the investment community.

13   On February 19, 2004, SG Cowen reported:

14      **Yahoo! Waves Goodbye To Google**

15      **Conclusion**:   Yahoo! announced yesterday that is deploying its own

16      proprietary algorithmic search technology.   This expected move will

17      allow Yahoo! to control its users' Web search experience rather than

18      relying on its longtime partner, Google.

19   •   Yahoo! Goes It Alone.   We believe this is the next key step in

20      Yahoo!'s effort to offer full service to its user base and compete with

21      Google to be the leading destination site. . . .

22   •   **Ad Recovery Will Boost Revenue**. We believe that Yahoo! is well-

23      positioned to take advantage of the coming ad recovery given that

24      more than 80% of its revenue is derived from marketing services and

25      listings.   We believe its $1.8 billion acquisition of Overture in

26      October 2003 will provide Yahoo! with increased revenue as the

27      company develops new ways to fully-leverage local advertising and

28      present it to potential consumers in an efficient fashion.

- 35 -

1     43.    The financial media gave wide coverage to this watershed event. On

2 February 19, 2004, the *San Jose Mercury News* reported:

3            Yahoo Splits with Google

4            The Google-Yahoo divorce is final.

5            Yahoo said Wednesday it has stopped using Google's search

6       engine and is now relying on it own technology to provide what the

7       company called "***more comprehensive and relevant***" results for users.

8            Yahoo flipped the switch on its new search engine at 9:30 p.m.

9       Tuesday, ***positioning the Sunnyvale Web portal to compete directly with***

10       ***Google in what is quickly becoming a bare-knuckles battle for***

11       ***advertisers and supremacy in the online search world***.

12                   *     *     *

13            "I think at some point Yahoo had to differentiate from Google,"

14       said Aaron Kessler, an analyst with JPMorgan-Equity Research in San

15       Francisco. "People pretty much knew they were using Google for their

16       results, so they thought, 'Why not just go straight to Google?'"

17                   *     *     *

18       ***Drawing on its in-house talent and the expertise gained from its***

19       ***acquisitions, Yahoo developed its own search engine and index of Web***

20       ***sites***, Weiner said.

21     44.    Because Yahoo! got 80% of its revenue from marketing services, *i.e.*,

22 advertising – and that was where its growth was to come from, investors were vitally

23 interested in how this new Yahoo! search engine would do.

24     45.    Just before the beginning of the Class Period, in late March 2004, Yahoo!

25 issued its 2003 Annual Report – which contained a letter from Semel, stating:

26            When reviewing Yahoo!'s progress over the past three years since

27       I joined, it's clear that 2001 was our transition year, 2002 the year in

28       which we started to plant the seeds for growth, and 2003 the year in

which we began to reap the initial results of our efforts, while continuing to reinvest in the future.

\* \* \*

Our Company provides a comprehensive marketing solutions platform for advertisers . . . .

### Largest & Most Diverse Online Advertising Platform

The tremendous performance within our marketing services business in 2003 is the result of our efforts over the past three years to build, buy and partner *in order to create the largest and most diverse advertising platform on the Web*. As a result, we benefited from our brand exposure to small- and medium-sized businesses as well as global, blue chip advertisers. We almost doubled our global marketing services revenue year over year. While this growth was aided by acquisitions, our full-year 2003 legacy growth rate of the entire marketing services business was approximately 40 percent, and accelerated in each quarter throughout 2003. Growth came from two areas: (1) marketers seeking brand solutions to drive overall awareness and differentiation; and (2) businesses looking for an immediate return on their marketing commitments through lead generation services such as pay-for-performance search.

*Yahoo!'s share gains and revenue growth in 2003 were the direct result of focused execution of our customer-centric selling strategy.* . . . .

\* \* \*

*We also benefited from the rapid growth in the pay-for-performance category as businesses of all sizes took advantage of this affordable* and highly effective channel to acquire customers. Ongoing product improvements in Web search, *vertical integration of paid*

- 37 -

1  *search into parts of Yahoo!, as well as the incremental contribution*
2  *from our Overture acquisition, were the most significant factors*
3  *contributing to our success in this large area of opportunity.*

4  *The integration of the Yahoo! and Overture operations has*
5  *proceeded well, and the combination seems even more compelling than*
6  *we initially thought.* We're excited about our progress in testing and
7  implementing Overture's Content Match product into Yahoo! properties,
8  such as Entertainment, Finance, Travel and Yellow Pages, with many
9  other verticals to come.

10  46.    The investment community eagerly awaited Yahoo!'s 1Q 04 results. On
11  April 5, 2004, *CNET News.com* reported that:

12  Yahoo earnings to shine on search; The portal giant is set to report
13  its financial earnings, capping another quarter dominated by efforts to
14  take on Google and beef up its Web search business.

15  Yahoo will report financial earnings on Wednesday, capping
16  another busy quarter dominated by efforts to beef up its Web search
17  business.

18  The Sunnyvale, Calif.-based company is expected to report a
19  quarterly profit of 11 cents a share on $497.9 million in revenue for the
20  period ending March 31, according to consensus estimates from
21  Thomson First Call.

22  Yahoo reports revenue excluding traffic acquisition costs (TAC),
23  which refers to the percentage of revenue it shares with third parties that
24  display paid search ads from its Overture Services subsidiary. The
25  practice has come under criticism from some Wall Street analysts who
26  believe that TAC clouds Yahoo's true financial health. Yahoo said TAC-
27  less revenue is a more accurate portrait of its overall business.

28

1                       Analysts are not expecting any drastic changes at Yahoo and

2         predict continued revenue and profitability growth, fueled by paid search

3         and online advertising.

4                       "I don't foresee paid search having too much downward pressure,"

5         said Martin Pyykkonen, an equity analyst at Junco Partners. "I'm

6         expecting it to be up year over year."

7                       Yahoo CEO Terry Semel said search continued to be the

8         company's main priority in 2004, helped by last year's acquisition of

9         Overture and the integration of search technology provider Inktomi.

10                      Most of Yahoo's moves were prompted by heightened

11       competition against popular search engine Google, which is beginning to

12       look more like Yahoo. Google once powered Yahoo's algorithmic search

13       engine, but Yahoo dropped Google in February and replaced it with its

14       own technology.

15     47.    As the investment community eagerly awaited Yahoo!'s important 1Q 04

16 results, and anticipated a very positive earnings report and commentary about

17 Yahoo!'s business, the stock moved up from $20.88 on March 15, 2004 to a 52-week

18 high of $25.50 on April 5, 2004.

19           **CLASS PERIOD EVENTS, CONDUCT AND MISSTATEMENTS**

20     48.    The statements made by defendants set forth in ¶¶40-46 were alive and

21 reflected in the market price of Yahoo!'s stock at the beginning of the Class Period.

22     49.    On April 7, 2004, Yahoo! reported its highly anticipated 1Q 04 results –

23 its first quarter of operations, based on its own sponsored/paid search algorithm via a

24 release, stating:

25         **Company Posts Revenues of $758 Million, Operating Income**

26         **of $132 Million, Operating Income Before Depreciation and**

27         **Amortization of $211 Million**

28

- 39 -

1    Yahoo! Inc. (Nasdaq: YHOO) today reported results for the first

2    quarter ended March 31, 2004. "*Yahoo!'s performance surpassed even*

3    *our high expectations, delivering the most successful quarter in the*

4    *Company's history*," said Terry Semel, chairman and chief executive

5    officer, Yahoo! "*With our products more popular than ever before, we*

6    *have experienced success across our entire business including strong*

7    *growth in our fee-based and marketing services*."

8    •    Revenues were $758 million in the first quarter of 2004 . . . .

9    •    Operating income for the first quarter of 2004 was $132 million

10    . . . .

11    *    *    *

12    "Yahoo! is off to a great start in 2004. *Our growth is a result of*

13    *very impressive performance from our ongoing operations, leveraged*

14    *further by recent acquisitions*," said Susan Decker, chief financial

15    officers, Yahoo! ". . . Due to our increased optimism about our business,

16    we have raised our financial outlook for the full year 2004."

17    50.    On April 7, 2004, Yahoo! held a conference call for analysts,

18    shareholders and the financial media in which Semel, Decker and Rosensweig

19    participated. During the call, the following information was disseminated to the

20    markets:

21    TERRY SEMEL, CHAIRMAN, CEO, YAHOO, INC.: . . . *I have*

22    *a big smile on my face. I'm very excited to announce that this is by far*

23    *the most successful quarter in Yahoo!'s history*.

24    Our impressive performance shows that our company really hit its

25    stride on two fronts. *On the technology front we hit the ball out of the*

26    *park. . . . I'm really proud of the technology and product groups who*

27    *did an extraordinary job this quarter*. On the business side, our two

28    core businesses both had a terrific quarter, *led by continued growth in*

- 40 -

1
2

*marketing services* . . . . [W]e have seen increasing momentum in our strategy and the resulting impact on our business.

3
4
5
6
7
8

In the first quarter, Yahoo! generated $758 million in revenue, our fourth straight quarter of record revenues . . . . Operating income before depreciation and amortization was $211 million . . . . Yahoo! delivered GAAP earnings per share of 14 cents in the quarter . . . . And as a result of our continued, strong performance, we have upwardly revised our full-year business outlook . . . .

9
10
11
12
13
14

. . . *We have . . . created an efficient operating model* in which all of the interconnected pieces, including search, consent, commerce, communications and access, are starting to support each other's performance, essentially making the whole greater than the sum of its parts. . . . *Yahoo! has been well-positioned to take a disproportionate share.*

15
16
17
18
19
20

. . . *Our most significant launch was the seamless introduction of Yahoo! search technology in 18 countries, which received overwhelmingly positive reviews from users and industry experts alike. In the span of a few months, we went from having no search products of our own to creating the best ever search experience on Yahoo!. Remember, this is just the beginning.*

21

\*     \*     \*

22
23
24
25
26
27
28

*In the broader area of pay-for-performance advertising, we experienced rapid growth as businesses of all sizes took advantage of this affordable channel to acquire customers. . . . This was aided by our global introduction of Yahoo! Search Technology, an expansion of sponsored results across key verticals.* Also contributing to the growth was the introduction of new products such as content match across the Yahoo! network and to Overture's distribution partners. . . .

- 41 -

1    *To sum up our marketing services business, we have built an*
2    *attractive advertising platform . . . .*

3                              *    *    *

4    *Looking at Overture specifically within these figures, as we*
5    *mentioned last time, the underlying strategic fit with Yahoo! and*
6    *financial upside to our network has surpassed our original*
7    *expectations.*

8                              *    *    *

9    SAFA RASHTCHY, ANALYST, U.S. BANCORP PIPER
10   JAFFRAY: . . . Great quarter, congratulations. . . . You know, *we've*
11   *always focused on the advertising growth, and it has been tremendous*
12   . . . .

13                              *    *    *

14   SUE DECKER, CFO, YAHOO, INC.: . . . *[W]e are looking for a*
15   *continuation of robust growth . . . .*

16                              *    *    *

17   *[A]s you look at the sponsored click side . . . we're primarily focused*
18   *on revenue per search. And revenue per search kinda' collapses*
19   *several of the key monetization methods including price per click,*
20   *coverage per click. And one of the things happening industry-wide in*
21   *our business is that Overture has come up with interesting ways for*
22   *affiliates, including us, to increase coverage levels, meaning we could*
23   *bring in new verticals or key words, which could have a different price*
24   *per click than the overall average. So, that process of doing that has*
25   *kept the overall price per click relatively stable for the last couple of*
26   *quarters, although year-over-year it's still growing nicely at double-*
27   *digits. And the important thing is that overall impact on paid clicks*
28   *has been very, very strong as you can see in our results.*

1    51.    Yahoo!'s much better-than-expected 1Q 04 results received widespread
2  attention in the financial press. For instance, on April 8, 2004, *The New York Times*
3  reported:

4                Yahoo Reports a Surge In Quarterly Earnings . . .

5                When Yahoo, the Internet portal company, announced first-quarter
6        financial results yesterday that were *far stronger than expected* . . . .

7                *Shares of Yahoo rose more than 10 percent in after-hours*
8        *trading* . . . .

9                "*Yahoo's results are just incredible*," said Jordan Rohan, an
10       analyst with Schwab Soundview Capital Markets. . . .

11               Terry S. Semel, Yahoo's chief executive, attributed the financial
12       results mainly to accelerating sales in the company's two advertising
13       businesses – graphic display advertising and *text ads linked to Internet*
14       *searches*. . . .

15               "*All the pieces are coming together*," Mr. Semel said in an
16       interview yesterday. In the first quarter of this year, Yahoo earned $101
17       million, more than double the $47 million it earned in the same quarter a
18       year ago. That comes to 14 cents a share, well above the 11 cents
19       analysts had expected.

20                             *    *    *

21               Mr. Semel said that the company was sharply increasing its
22       spending on product development. In the first quarter, it replaced Web
23       search results provided by Google – which has become Yahoo's biggest
24       competitor – with its own Web search system. Mr. Semel said that the
25       switch was technically smooth and increased the satisfaction of users.

26                             *    *    *

27               Mr. Rohan said that Yahoo's *profit margin reached a level he*
28       *had not expected for a year or two*.

- 43 -

1    Indeed, he said, *Yahoo! appears to be a year ahead of his*
2    *expectations on a number of financial measures*. . . . [H]e expects
3    investors to continue to bid up the stock. . . .

4    Yahoo raised its own guidance for its financial results.

5    52.    On April 8, 2004, COO Rosensweig was interviewed on CNNfn and
6    stated:

7    ALI VELSHI, CNNfn ANCHOR, THE MONEYGANG:  . . .
8    Yahoo! shares up 15 percent today hitting a 52-week high after the
9    company reported quarterly results blowing past analysts' estimates . . .
10    and raising projections.

11                        *    *    *

12    [GREG] CLARKIN[, CNNfn CORRESPONDENT]: And Dan,
13    let's continue with the advertiser stream of thought here. . . . [A]re you
14    seeing advertisers giving Yahoo! a bigger chunk of the advertising pie
15    than they were a few years back . . . are you getting new advertisers as
16    well that maybe weren't considering the Internet before?

17    ROSENSWEIG: We're actually getting both and what seems to
18    be happening is there's a secular shift of media consumption on to the
19    Internet . . . .  [W]e're seeing more advertisers overall. *Sponsored*
20    *searches, of course, helping that by bringing in just tens of thousands*
21    *of them*.  On the brand based side we see larger advertisers renewing at
22    extremely high rates, signing longer contracts and investing more  in
23    each one. *So both sides of the business are growing very rapidly*.

24                        *    *    *

25    We're very lucky to have the quality of employees we have and the brain
26    power that we have in the company that can build this company quite
27    like this.

28                        *    *    *

- 44 -

1
2
3

*[W]e just recently launched Yahoo! search technology around the world . . . all within two weeks and it is very exciting and it's doing very well.*

4     53.    As a result of Yahoo!'s strong financial results and the defendants'
5  repeated positive statements and presentations during the Class Period, many
6  securities analysts issued very positive reports on Yahoo!, reporting and/or repeating
7  what the defendants had said publicly or told them in meetings, praising the
8  effectiveness of the Yahoo! model, forecasting strong growth in revenues and
9  improvements in profit margins and EPS and recommending the purchase of Yahoo!
10  shares.  For instance:

11  •   On April 8, 2004, Deutsche Bank issued a report entitled, "Blow-out 1Q –
12      Advertising Momentum Continuing – BUY."  The report stated:
13      Momentum Continues in . . . Search Businesses.

14          We reiterate our BUY investment rating on shares of Yahoo!
15      based on continued momentum in the . . . search businesses, as seen
16      w/the blow-out 1Q results.

17                          *       *       *

18          We remain bullish on Yahoo!'s growth prospects as well as the
19      sustainability of the current growth trajectory based on the following
20      themes:

21                          *       *       *

22          Yahoo!'s paid search business remains robust, with paid search
23      volume growth benefiting from the implementation of Yahoo! Search
24      Technology across the platform, integration of Overture into key
25      verticals and international properties, a growing affiliate network . . . .
26      Overall paid search revenues (including revenues) increased 21% Q/Q,
27      driven largely by paid click volumes . . . .

28                          *       *       *

- 45 -

1           Integration of Yahoo! Search Technology across the platform,

2 which has been well received by the market, should drive increased

3 usage and query volumes.

4 •    On April 7, 2004 Prudential Equity Group, LLC, issued a report entitled,

5      "YHOO: BLOWOUT 1Q RESULTS, FUELED BY SPONSORED SEARCH

6      . . . RAISING OUR ESTIMATES." The report stated:

7           Yahoo! reported impressive first-quarter results that exceeded top-

8 and bottom-line expectations.

9             *    *    *

10 Yahoo!'s Marketing Services segment continues to be the main driver

11 behind the strong . . . performance . . . . *Sponsored search [advertising]*

12 *remains in hyper-growth mode* . . . .

13             *    *    *

14 *The company stated that price-per-click in its sponsored search*

15 *advertising grew by "double digits" on a year-over-year basis, but*

16 *remained flat sequentially.*

17 •    On April 8, 2004, Piper Jaffray issued a report entitled, "Massive Upside

18 Signals A Strong Year; Expect Accelerating Growth & Upsides." That report

19 stated:

20      **A Massive Upside**. Revenues of $551 vs. our Street-high $511;

21 GAAP EPS pf $0.14 vs. our consensus $0.11. *This significant upside*

22 *was driven by an accelerating growth in* . . . Overture search . . . .

23 •    On April 8, 2004, Pacific Growth Equities issued a report entitled, "Upgrading

24 to Over Weight . . . and Raising Estimates Substantially Following "Blowout"

25 1Q:04 Results." This report stated:

26 INVESTMENT HIGHLIGHTS

27      "Blowout" 1Q results . . . . In almost every way, Yahoo! 1Q:04

28 results were truly outstanding – arguably, the best we have seen from the

- 46 -

1    Company in our 6-plus years of covering it and far surpassing even the
2    most "bullish" outlook we thought possible.

3                              *      *      *

4    Marketing Services (AKA, online advertising) is on fire, and Yahoo!
5    seems to be taking share.... *Paid Search is still in the "hyper-growth"*
6    *phase of its adoption curve and that Yahoo!'s transition away from*
7    *Google (private) has been fairly seamless*.

8  • On April 8, 2004, Citigroup/Smith Barney issued a report entitled, "YHOO:
9    An Embarrassment of Riches." That report stated:

10   Yahoo!'s first quarter results were far stronger than we expected . . . .
11   *Clearly, we underestimated the momentum in Yahoo!'s businesses, as*
12   *well as the acceleration that is coming from vertical integration in the*
13   *search business*.

14  • On April 8, 2004, Bear Stearns issued a report that stated:

15        *Yahoo! reported impressive quarterly results, demonstrating*
16   *particularly strong growth in all aspects of online advertising. Organic*
17   *revenue growth in the core marketing services division increased 48%*
18   *with strong contributions from both search and branded advertising*.

19  • On April 8, 2004, William Blair & Company issued a report entitled, "Hitting
20   on All Cylinders; Record Quarter and Stronger Outlook." The report stated:

21        Yahoo! reported results that were well above consensus and our
22   estimate. . . .

23        Management significantly raised its outlook . . . .

24        Business is accelerating . . . .

25                              *      *      *

26   Summary and Valuation

27

28

1

2

3

*... Yahoo! is clearly executing well as management is effectively integrating acquired businesses such as Overture ... extracting more synergy than expected ....*

4

5

6

*Furthermore, the company's search strategy is working. Search volume experienced double-digit growth over last year and revenue likely increased at a rate similar to growth in all of marketing services*.

7    54.    Yahoo!'s stock, which closed on April 7, 2004 at $24.18, now soared

8    higher on April 8, 2004, to as high as $28.12 per share on volume over 90,000,000

9    shares, three to four times the average daily volume.

10    55.    Yahoo!'s 1Q 04 results were later filed with the SEC in Yahoo!'s 1Q 04

11    10-Q Report, signed by Decker. This 10-Q Report contained Yahoo!'s false 1Q 04

12    financial results, including those previously publicly reported. The 10-Q also

13    contained the false Sarbanes-Oxley certificates and statements about Yahoo!'s internal

14    controls detailed in the "Yahoo!'s Misleading Financial Statements and Disclosures"

15    section of this Complaint (¶¶199-207) signed by defendants Semel and Decker.

16    56.    Defendants' statements regarding Yahoo!'s 1Q 04 financial results and

17    the success of integrating acquired businesses such as Overture contained in ¶¶49-55

18    were materially false and misleading when made. Defendants knew or recklessly

19    disregarded, but failed to disclose, the following:

20    (a)    Contrary to defendants' statements such as: "On the technology

21    front we hit the ball out of the park," "we experienced rapid growth . . . aided by our

22    global introduction of Yahoo! Search Technology . . . [and] the introduction of new

23    products such as content match," "[a]ll the pieces are coming together," and "the

24    switch [from Google search] was technically smooth and increased the satisfaction of

25    users," Yahoo! was actually "bursting at the seams." According to CW11, following

26    Yahoo!'s acquisition of Overture, the Overture platform was incapable of handling the

27    increasing numbers of advertisers, marketing partners and users overloading the

28    system from Yahoo!. Compounding the problem was that even though the increasing

1  traffic from Yahoo! was literally causing the Overture system to self-destruct, and
2  despite that system's importance to Yahoo!'s overall business performance, Yahoo!
3  refused to provide the Overture Pasadena facility with adequate resources to deal with
4  the increased Yahoo! traffic. According to CW10, CW11 and CW12, a culture clash
5  between Yahoo!'s Sunnyvale engineers and Overture's Pasadena engineers occurred
6  following the Overture acquisition which adversely impacted Yahoo!'s ability to
7  smoothly integrate Overture. To address the increasing Yahoo! traffic, Overture
8  engineers requested that Yahoo! provide funding for additional servers to handle the
9  increasing traffic. According to CW10, not only did Yahoo! refuse to provide
10  additional funding for servers, the Sunnyvale office ultimately decided to terminate
11  dozens of legacy Overture engineers, even though those engineers were more
12  knowledgeable about how the Overture information systems operated. Confirmed by
13  CW12, the decision to terminate the senior legacy Overture engineers had dramatic
14  and adverse consequences on Yahoo!'s ability to develop new software systems to
15  address the ever increasing Yahoo! traffic on the overloaded Overture platform.
16  According to both witnesses, the Yahoo! team assigned to replace the terminated and
17  replaced legacy Overture engineers did not have an appreciation for the size and
18  complexity of integrating Overture, and as a result "stalled, delayed and derailed" the
19  attempts to develop a new search platform;

20  (b)  Defendants' statements that the acquisition of Overture was
21  successful and the introduction of the new search platform was technically smooth
22  were also false and misleading because the acquisition and new search introduction
23  were neither successful nor smooth because Yahoo!'s refusal to provide adequate
24  funding to Overture and the decision to terminate the most senior and knowledgeable
25  Overture engineers severely impacted Yahoo!'s business operations. According to
26  CW10, Yahoo!'s refusal to provide sufficient funding for additional servers impacted
27  his/her teams' abilities to analyze data relating to searches and clicks for customers so
28  that Yahoo! could provide meaningful data pursuant to the terms of the SLAs on a

- 49 -

1  daily basis.  The data provided to advertising customers had to be analyzed by
2  numerous teams that reported to CW10 and derived from numerous sources before it
3  was forwarded to clients.  Some of the important functions preformed by the various
4  teams s/he supervised included the calculation of "discard rates" by analyzing what
5  clicks could not be passed on to advertisers and thus eliminated from billing and
6  "conversion rates" advertisers experienced from users who clicked on their ads.  The
7  discard rates were analyzed for each marketing partner to determine whether they
8  were poor quality partners.  According to CW10, because Yahoo! refused to provide
9  his/her team with additional servers, their ability to calculate accurate discard and
10  conversion rates was severely impacted.  Instead, Yahoo! increasingly failed to
11  eliminate bad or nonbillable clicks and provided customers with worthless discard
12  rates and conversion rates.

13                (c)     In addition to not providing Overture engineers with adequate
14  resources to service the Yahoo! traffic, the Company also failed to provide adequate
15  staffing for the development of an internal project referred to as "solving the blob."
16  According to CW10 and CW7, throughout the Class Period, Yahoo! was behind
17  schedule on this project, a necessary precursor to Project Panama.  This project
18  involved integrating the very separate software systems such as the CRM system and
19  the click detection system into a single platform.  This integration was essential so that
20  Yahoo! could comply with the terms of the SLA with advertising customers and
21  provide filtered data on a timely basis.  CW10 confirmed that this project was far
22  behind schedule because Yahoo! fired the Overture engineers most knowledgeable
23  about the different systems.

24                (d)     Yahoo!'s decision to terminate the senior legacy Overture
25  engineers who were the most knowledgeable about how and why Yahoo! needed to
26  improve the search algorithm and bidding system so that Yahoo! could compete with
27  Google also impacted Yahoo!'s switch to its own search technology, and this switch
28  was not technically smooth as defendants represented.  Following the acquisition of

- 50 -

1 Overture and switch from Google's search engine, Yahoo! rushed to market its new
2 Content Match product before it functioned properly. Yahoo! rushed Content Match
3 to market with a very manual mapping process that led to wide variations in search
4 results. Content Match led to very undesirable results such as irrelevant clicks and
5 even "click tsunamis." A click tsunami occurred when a search mapped to results that
6 caused thousands of clicks, with little or no conversion, on an advertiser's site. CW11
7 provided an example of a click tsunami such as when a mortgage seller's ad would
8 appear on a news article announcing a federal reserve interest rate cut. A large
9 volume of readers would click on an ad next to the article thinking they would obtain
10 more information about what impact the federal reserve's action would have on
11 mortgage interest rates and instead clicked through to the mortgage seller's website.
12 Because Yahoo!'s Content Match system lacked any method to prevent the resulting
13 onslaught of clicks, the small advertiser who may have only budgeted for \$200/day
14 would receive billing for thousands of dollars, far exceeding the budget or capacity to
15 pay.

16     (e) Yahoo!'s introduction of its own search technology was not
17 technically smooth because, as confirmed by CW11, Content Match lacked any
18 features to prevent actual click fraud or any method to monitor any sort of referral log
19 data to eliminate non-billable clicks. CW10 confirmed that Yahoo! had a large
20 problem with poorer quality international partners and that these problems
21 notwithstanding, Yahoo! would not allow advertising customers to opt out of
22 international partner traffic up to the time s/he left Yahoo!. While s/he worked for
23 Overture prior to that company's acquisition by Yahoo!, Overture routinely "turned
24 off" poorer quality partners who had unacceptable "discard rates." Overture
25 maintained high standards and maintained score cards for partners to ensure high
26 conversion rates by customers. Following the Overture acquisition, Yahoo! was not
27 as concerned with the quality of the traffic from marketing partners.

28

1          (f)     In combination, Yahoo!'s failure to have a functioning system to

2 detect click fraud or non-billable clicks, the Company's rocky transition to a new

3 search technology, the integration of Overture marred by the engineering culture

4 clash, the termination of the most senior Overture engineers and failure to provide

5 adequate resources to Overture to manage the Yahoo! traffic and Yahoo!'s decision to

6 rush Content Match to market all had a disastrous impact on Yahoo!'s business

7 performance. As a result, the Company's paid search revenues stagnated. This

8 development put defendants in a bind because they were desperate to demonstrate

9 growing search ad revenues and meet the high end of or exceed their guidance to

10 securities analysts. As a result, defendants developed ways to recognize ad search

11 revenue they had not earned. To accomplish this, defendants implemented a method

12 to change the "dial" on the Company's click-fraud detection system at the end of the

13 quarter to allow more non-billable click activity to be passed on to customers, thereby

14 increasing the Company's revenues at the end of the quarter. According to CW12, the

15 non-billable click activity was being allowed through the click detection system at the

16 end of the quarter, and being passed on to advertising customers in the form of

17 charges to their account, and resulted in increasing numbers of complaints from

18 advertising customers at the end of the quarter.

19          (g)     As detailed in ¶¶202-210, during 1Q 04, Yahoo! improperly

20 recognized at least 10% of its paid search revenue – which constituted approximately

21 41% of the total marketing services revenue in 1Q 04 – attributable to click fraud or

22 $26,330,000, because the revenue recognized via click fraud was not earned;

23          (h)     As detailed in ¶¶211-213, during 1Q 04, Yahoo! failed to properly

24 record a loss contingency in violation of Generally Accepted Accounting Priciples

25 ("GAAP"), as set forth in Statement of Financial Accounting Standard ("SFAS") No.

26 5, *Accounting for Contingencies*;

27          (i)     As detailed in ¶¶214-227, during 1Q 04, Yahoo! failed to disclose,

28 as required by SEC Regulation S-K, known trends and uncertainties by not reporting

1  the practice of improperly recognizing revenue generated by click fraud and thereby
2  not disclosing Yahoo!'s actual financial performance;

3          (j)      As detailed in ¶¶214-227, during 1Q 04, Yahoo!'s publicly issued
4  financial statements violated fundamental accounting principles requiring that such
5  statements contain complete and reliable information, presented in a conservative
6  manner regarding how managers discharged their stewardship responsibilities of the
7  Company and the actual financial performance of the Company;

8          (k)      As detailed in ¶¶202-210, during the 1Q 04, as a consequence of
9  the aforementioned practices, the Company's revenues and net income were
10 artificially inflated and reported financial results were in violation of GAAP in that the
11 Company's revenue was inflated by $26,330,000 and net income was overstated by
12 $0.02/per share.

13      57.     The May 1, 2004 edition of *Financial Executive* contained an interview
14 with Decker entitled, "Something to Yahoo! About: an Internet winner; Susan
15 Decker." The interview stated:

16          Q:      Where does Yahoo!'s highest revenues come from – is it
17      advertising?

18          Decker: . . . *[A]dvertising is the biggest revenue generator*.

19          Q:      Let's look at Yahoo!'s overall strategy. In many cases, you
20      started with a partnership and then acquired the company. Talk about
21      the business rationale for some of these.

22          Decker: On the acquisition front, the two big ones in the last year
23      were both in search, as both the science and the art of search have
24      changed dramatically over the last few years. *The "science" is the pure*
25      *number of documents that are crawled by search algorithms, a lot*
26      *more of the Web is being crawled by search engines today. The "art"*
27      *is the relevance of the results served back to the user. A few years ago,*
28      *you would probably type in a one-word query; today, most people type*

- 53 -

1
2

*two- or three-word queries. They can get more precise, as the basic service of search has gotten better.*

3
4
5

*Thus, we decided that to innovate more directly and improve the consumer experience, we needed to own assets rather than license the service, which is what we had done with Google.* . . .

6
7
8
9
10
11

The other side of the equation is how you ring the cash register of search, the monetization piece. Here, we also previously had a partnership [with] Overture. But as we became a larger part of Overture, it made sense for us to capture all of the economic stream rather than sharing it. It also made sense to have control over the search platform, the advertisers and the sales opportunities.

12
13
14
15
16
17
18
19

58.    On May 13, 2004, Yahoo! held its annual "Analysts Day" at the Ritz-Carlton hotel in San Francisco, an event attended by over 100 members of the financial analyst and media communities and many large (institutional) Yahoo! shareholders. The presentation by the Yahoo! executives was widely reported by analysts and the media to the markets and investors. Yahoo!'s stock increased from $25.76 on May 12, 2004 to $28.10 on May 13, 2004 and over $30 per share a few days later, as this positive information entered the market and was digested and acted on by investors.

20
21
22

59.    The information disseminated by the Yahoo! executives during presentations and private conversations with analysts during the "Analysts Day" was reflected in the media and analysts' reports set forth below:

23
24
25
26

•    On May 13, 2004, *Market Watch* reported on Yahoo!'s analyst day and stated:
Yahoo expects to be more profitable on annual sales of $5 billion, have 15 million paying subscribers, and soon have a paid search business in China.

27
28

- 54 -

1    Those were just some of the highlights and new information

2    Yahoo gave investors at its annual Analyst Day meeting, held in San

3    Francisco Thursday.

4                        *        *        *

5    Jeff Weiner, senior vice president of search and marketplace, said

6    that the key ingredients needed to be a dominant search engine are strong

7    algorithmic technology, registered users, breadth and depth of content

8    and services, a global presence, brand name and accessibility. Weiner

9    said that Yahoo has high marks in all the areas, with the exception of

10   search brand and accessibility. Google, on the other hand, received high

11   marks for brand, according to Weiner's PowerPoint slide.

12 • On May 14, 2004, *Market Watch* again reported on Yahoo!'s analyst day and

13   stated:

14   Yahoo was also emphatic about the company's commitment to

15   improve its core search technology. In the past 18 months, Yahoo has

16   increased the number of engineers to 500 engineers from 15, said Phu

17   Hoang, Yahoo's senior vice president of engineering. Yahoo has 50

18   projects in the pipeline, and its main search focus is search and anti-spam

19   technologies.

20 • On May 14, 2004, Deutsche Bank issued a report entitled, "Bullish Analyst

21   Meeting Reinforces Continued Growth & Margin Expansion – Buy." That

22   report stated:

23       *    We reiterate our BUY investment rating on shares of

24   Yahoo! . . . . *Yahoo!'s analyst meeting outlined the continued robust*

25   *growth in the paid search segment* . . . .

26                        *        *        *

27   Yahoo! yesterday hosted its annual Analyst & Investor Day in San

28   Francisco, which provided us and investors with quite a few details

- 55 -

1  regarding the growth and business objectives slated for 2004 and
2  beyond.  With . . . a solid (and rapidly-growing) position in . . . paid
3  search advertising segments, and a steadily-growing premium services
4  business, Yahoo! should continue to enjoy very health levels of growth
5  in the next several years.  We think that there were several major themes
6  and initiatives coming out of the Analyst meeting that should help fuel
7  growth in future years . . . .

8                          *       *       *

9  No Surprise Here – Rapid Growth in Paid Search Continues

10         *In his presentation, Ted Meisel indicated that the growth*
11  *prospects for paid search remain quite strong, and Yahoo! Overture is*
12  *well-positioned with its tier-ing strategy for search terms.  The*
13  *company has segmented search terms by the number of words in order*
14  *to acquire new advertisers, expand listings from existing advertisers*
15  *and enhance matching technologies to drive higher relevance on*
16  *search queries.  Thus far, the strategy is working* . . . .

17  •  On May 14, 2004, Bear Stearns issued a report entitled, "Upbeat Analyst Day –
18     The Best Is Yet To Come."  The report stated:

19  Key Points

20         Yahoo! held an upbeat investor day in San Francisco yesterday.
21  Management was very positive about the outlook of all business units,
22  particularly emphasizing the growth opportunities in branded
23  advertising, search . . . .

24                          *       *       *

25         On the advertising side, management commented that just by
26  maintaining current share, Yahoo! could double current ad revenue,
27  adding another $2 billion given the positive industry-wide growth trends,

28

1   which include a share shift of advertising from traditional mediums to
2   the Internet and the explosive growth characteristics of search.

3                               *       *       *

4       We walked away from the analyst day even further impressed by
5   the multiple growth opportunities that still exist behind an already
6   impressive platform.

7                               *       *       *

8   The company highlighted the impressive expected growth in online
9   advertising as traditional advertisers continue to embrace the
10  Internet. . . .

11      COO Dan Rosensweig . . . spoke to how Yahoo! was *very well*
12  *positioned* to succeed in this high growth environment.

13  • On May 14, 2004, Citigroup/Smith Barney issued a report entitled, "YHOO:
14  Everything Comes Together Pointing to Sustainable 40% FCF Growth." The
15  report stated:

16  Summary

17      > *Yahoo!'s analyst meeting demonstrated that after three*
18  *years of reprioritization, careful strategic planning, focused*
19  *investment, and opportunistic acquisitions the company and its model*
20  *have been dramatically strengthened*.

21                              *       *       *

22      *In terms of things that have been fixed or strengthened at*
23  *Yahoo! since 2001, we believe that the most important changes*
24  *showcased at the meeting today include vertical integration in search*
25  . . . .

26      For each of the areas that the current management team has
27  worked to reposition and strengthen, the company also laid out clear

28

- 57 -

1   examples of success. *In search, results relevance seems to have*
2   *improved . . . fueled by Yahoo!'s new vertical integration here.*

3   • On May 14, 2004, Prudential Equity Group, LLC, issued a report entitled,
4   "YHOO: Analyst Day Reveals the Company is Gearing Up to Battle Google,
5   Using Breadth and Depth of Product and Service Offerings." The report stated:

6   On May 13, 2004, we attended Yahoo!'s Analyst Day in San
7   Francisco. . . . The slogan of the day was "*the best is yet to come*."

8   \*     \*     \*

9   *Search remains the key driver at Yahoo!, and it is clear that the*
10  *company intends to do battle with Google . . . . Management believes*
11  *that its significant breadth and depth of content and services give it a*
12  *competitive advantage over its newest archrival.*

13  • On May 14, 2004, Pacific Crest issued a report that stated:
14  BUY

15  \*     \*     \*

16  \*     Yahoo! confirms strong search trends. *Management*
17  *reiterated its belief that search pricing and volume are strong.*

18  • On May 14, 2004, Piper Jaffray issued a report entitled, "Innovation &
19  Expansion To Fuel Yahoo!'s Growth; Strengthen Competitive Position." The
20  report stated:

21  Analyst Day 2004. The two key themes of Yahoo! analyst day,
22  held yesterday, May 13, in San Francisco, were the large scope of
23  opportunity ahead of Yahoo[!], *and Yahoo[!]'s competitive advantage*
24  *in exploiting this opportunity.*

25  \*     \*     \*

26  Search/Google. Yahoo! . . . *will be able to compete effectively*
27  *with Google, possibly narrowing the gap and certainly maintaining its*
28  *market share.*

- 58 -

1  •    On May 14, 2004, Credit Suisse Bank issued a report entitled, "Analyst Day:
2       Outlook Positive." The report stated:

3            Yahoo! hosted its analyst day on May 13, 2004, where senior
4       management gave an update on the company, its operations, and its
5       outlook. . . .

6            . . . Branded Advertising and Sponsored Search. . . . [M]uch of the
7       day's time was focused on sponsored search and the growth that is
8       expected to come through increases in price per click and click through
9       rate . . . .

10       60.    Defendants' statements regarding Yahoo!'s success of integrating
11  acquired businesses such as Overture and introduction of its new search techology
12  made to the *Financial Executive* and during the May 13, 2004 annual "Analyst Day"
13  contained in ¶¶57-59 were materially false and misleading when made. Defendants
14  knew or recklessly disregarded, but failed to disclose, the following:

15            (a)    Contrary to defendants' statements that Yahoo! gets high marks for
16  its strong algorithmic technology and breadth and depth of its content and services,
17  and that its search strategy was working, Yahoo! was actually "bursting at the seams."
18  According to CW11, following Yahoo!'s acquisition of Overture, the Overture
19  platform was incapable of handling the increasing numbers of advertisers, marketing
20  partners and users overloading the system from Yahoo!. Compounding the problem
21  was that even though the increasing traffic from Yahoo! was literally causing the
22  Overture system to self-destruct, and despite that system's importance to Yahoo!'s
23  overall business performance, Yahoo! refused to provide the Overture Pasadena
24  facility with adequate resources to deal with the increased Yahoo! traffic. According
25  to CW10, CW11 and CW12, a culture clash between Yahoo!'s Sunnyvale engineers
26  and Overture's Pasadena engineers occurred following the Overture acquisition that
27  adversely impacted Yahoo!'s ability to smoothly integrate Overture. To address the
28  increasing Yahoo! traffic, Overture engineers requested that Yahoo! provide funding

1  for additional servers to handle the increasing traffic.  According to CW10, not only

2  did Yahoo! refuse to provide additional funding for servers, the Sunnyvale office

3  ultimately decided to terminate dozens of legacy Overture engineers even though

4  those engineers were more knowledgeable about how the Overture information

5  systems operated.  Confirmed by CW12, the decision to terminate the senior legacy

6  Overture engineers had dramatic and adverse consequences on Yahoo!'s ability to

7  develop new software systems to address the ever increasing Yahoo! traffic on the

8  overloaded Overture platform.    According to both witnesses, the Yahoo! team

9  assigned to replace the terminated and replaced legacy Overture engineers did not

10  have an appreciation for the size and complexity of integrating Overture and as a

11  result "stalled, delayed and derailed" the attempts to develop a new search platform;

12          (b)      Defendants' statements that the acquisition of Overture was

13  successful and the introduction of the new search platform was technically smooth

14  were also false and misleading because the acquisition and new search introduction

15  were neither successful nor smooth because Yahoo!'s refusal to provide adequate

16  funding to Overture and the decision to terminate the most senior and knowledgeable

17  Overture engineers severely impacted Yahoo!'s business operations.  According to

18  CW10, Yahoo!'s refusal to provide sufficient funding for additional servers impacted

19  his/her teams' abilities to analyze data relating to seaches and clicks for customers so

20  that Yahoo! could provide meaningful data pursuant to the terms of the SLAs on a

21  daily basis.    The data provided to advertising customers had to be analyzed by

22  numerous teams that reported to CW10 and derived from numerous sources before it

23  was forwarded to clients.  Some of the important functions preformed by the various

24  teams s/he supervised included the calculation of "discard rates" by analyzing what

25  clicks could not be passed on to advertisers and thus eliminated from billing and

26  "conversion rates" advertisers experienced from users who clicked on their ads.  The

27  discard rates were analyzed for each marketing partner to determine whether they

28  were poor quality partners.  According to CW10, because Yahoo! refused to provide

1  his/her teams with additional servers, their ability to calculate accurate discard and
2  conversion rates was severely impacted. Instead, Yahoo! increasingly failed to
3  eliminate bad or nonbillable clicks and provided customers with worthless discard
4  rates and conversion rates.

5          (c)     In addition to not providing Overture engineers with adequate
6  resources to service the Yahoo! traffic, the Company also failed to provide adequate
7  staffing for the development of an internal project referred to as "solving the blob."
8  According to CW10 and CW7, throughout the Class Period, Yahoo! was behind
9  schedule on this project, a necessary precursor to Project Panama. This project
10 involved integrating the very separate software systems such as the CRM system and
11 the click detection system into a single platform. This integration was essential so that
12 Yahoo! could comply with the terms of the SLA with advertising customers and
13 provide filtered data on a timely basis. CW10 confirmed that this project was far
14 behind schedule because Yahoo! fired the Overture engineers most knowledgeable
15 about the different systems.

16         (d)     Yahoo!'s decision to terminate the senior legacy Overture
17 engineers who were the most knowledgeable about how and why Yahoo! needed to
18 improve the search algorithm and bidding system so that Yahoo! could compete with
19 Google also impacted Yahoo!'s switch to its own search technology, and this switch
20 was not technically smooth as defendants represented. Following the acquisition of
21 Overture and switch from Google's search engine, Yahoo! rushed to market its new
22 Content Match product before it functioned properly. Yahoo! rushed Content Match
23 to market with a very manual mapping process that led to wide variations in search
24 results. Content Match led to very undesirable results such as irrelevant clicks and
25 even "click tsunamis." A click tsunami occurred when a search mapped to results that
26 caused thousands of clicks, with little or no conversion, on an advertiser's site. CW7
27 provided an example of a click tsunami such as when a mortgage seller's ad would
28 appear on a news article announcing a federal reserve interest rate cut. A large

1 volume of readers would click on an ad next to the article thinking they would obtain
2 more information about what impact the federal reserve's action would have on
3 mortgage interest rates and instead clicked through to the mortgage seller's website.
4 Because Yahoo!'s Content Match system lacked any method to prevent the resulting
5 onslaught of clicks, the small advertiser who may have only budgeted for $200/day
6 would receive billing for thousands of dollars, far exceeding the budget or capacity to
7 pay.

8         (e)    Yahoo!'s introduction of its own search technology was not
9 technically smooth because, as confirmed by CW7, Content Match lacked any
10 features to prevent actual click fraud or any method to monitor any sort of referral log
11 data to eliminate non-billable clicks.  CW10 confirmed that Yahoo! had a large
12 problem with poorer quality international partners and that these problems
13 notwithstanding, Yahoo! would not allow advertising customers to opt out of
14 international partner traffic up to the time s/he left Yahoo!.  While s/he worked for
15 Overture prior to that company's acquisition by Yahoo!, Overture routinely "turned
16 off" poorer quality partners who had unacceptable "discard rates."  Overture
17 maintained high standards and maintained score cards for partners to ensure high
18 conversion rates by customers.  Following the Overture acquisition, Yahoo! was not
19 as concerned with the quality of the traffic from marketing partners.

20         (f)    In combination, Yahoo!'s failure to have a functioning system to
21 detect click fraud or non-billable clicks, the Company's rocky transition to a new
22 search technology, the integration of Overture marred by the engineering culture
23 clash, the termination of the most senior Overture engineers and failure to provide
24 adequate resources to Overture to manage the Yahoo! traffic and Yahoo!'s decision to
25 rush Content Match to market all had a disastrous impact on Yahoo!'s business
26 performance.  As a result, the Company's paid search revenues stagnated.  This
27 development put defendants in a bind because they were desperate to demonstrate
28 growing search ad revenues and meet the high end of or exceed their guidance to

1 securities analysts. As a result, defendants developed ways to recognize ad search
2 revenue they had not earned. To accomplish this, defendants implemented a method
3 to change the "dial" on the Company's click-fraud detection system at the end of the
4 quarter to allow more non-billable click activity to be passed on to customers, thereby
5 increasing the Company's revenues at the end of the quarter. According to CW12, the
6 non-billable click activity was being allowed through the click detection system at the
7 end of the quarter, and being passed on to advertising customers in the form of
8 charges to their account and resulted in increasing numbers of complaints from
9 advertising customers at the end of the quarter.

10    61.    On July 7, 2004, Yahoo! reported "record" 2Q 04 results via release
11 stating:

12         Company Posts Revenues of $832 Million, Operating Income of
13         $149 Million, Operating Income of $149 Million, Operating Income
14         Before Depreciation and Amortization of $234 Million

15         Yahoo! Inc. (Nasdaq: YHOO) today reported results for the
16         second quarter ended June 30, 2004.

17         "*Yahoo!'s second quarter results represent another record*
18         *quarter for the Company and demonstrate continued execution of our*
19         *core priorities*," said Terry Semel, chairman and chief executive officer,
20         Yahoo! " Yahoo! is in the midst of a product renaissance, as we have
21         been busier than ever rolling our new products and services we believe
22         will be essential to our users."

23                        *    *    *

24         "Yahoo! is benefiting from its diverse and balanced sources of
25         revenue, which have *well positioned* the Company to deliver strong,
26         consistent, and profitable growth," said Susan Decker, chief financial
27         officer, Yahoo!."

28

- 63 -

1    62.   On July 7, 2004, Yahoo! held a conference call for members of the
2    analyst and financial media communities conducted by Semel, Decker and
3    Rosensweig, during which the following exchange occurred:

4         TERRY SEMEL, CEO, YAHOO!, INC.: . . . In Q2, *we delivered*
5    *the best quarter in Yahoo!'s history*.  This continues to be a very
6    exciting and busy time for our company.  In fact, the past year has been a
7    period of unprecedented growth with this, our fifth straight quarter of
8    record revenues.  We are demonstrating the consistency and growth of
9    Yahoo!'s business strategy . . . .  *We have an extremely healthy and*
10   *diversified business model and our two core businesses, advertising*
11   *and premium consumer services, are both performing very well*. . . .
12   Let's start with a brief recap of some of our key financials that
13   demonstrate the increasing momentum in our strategy.  In the second
14   quarter, Yahoo! generated a record $832 million in revenue . . . .

15                          *    *    *

16        So let's now focus on our marketing services business, which
17   achieved a 215% year-over-year increase to $691 million in revenue due
18   to both dramatic growth in our organic business and incremental revenue
19   from acquisitions.  *We believe we are in a position of strength as a full*
20   *service advertising provider with the ability to offer branding*
21   *capabilities, lead generation advertising, or a combination of both*.  As
22   advertisers look to shift their dollars to the internet, which is projected to
23   be the fastest growing advertising medium in 2004, *Yahoo! is extending*
24   *its leadership position as we meet our advertiser's needs* . . . .

25                          *    *    *

26   I think we have a fantastic long-term growth potential ahead.

27                          *    *    *

28

1 SAFA RASHTCHY, ANALYST, PIPER JAFFRAY: Good

2 afternoon. Terry, you mentioned the theme that you had talked about

3 during the analyst day that the best is yet to come, yet the organic growth

4 slowed down from first quarter, which I believe was 48% down to

5 45%.... [G]iven that last quarter you beat the guidance by nearly 45

6 million and this quarter you came in just within the guidance, help us,

7 how do we reconcile that? Thanks.

8 SUE DECKER[, CFO, YAHOO!, INC.]: I'll start then, Safa, and

9 if Terry wants to add, he can do that. The overall organic growth rate

10 that you cited was marketing growth, which was 48%, 47-48 last quarter

11 and 45 this quarter. The overall company total revenue growth,

12 organically, actually picked up in this quarter, it was 42% versus 41%

13 last quarter. *As far as the marketing growth, this was very consistent*

14 *with what we expected, in fact it was actually a little better, it was at the*

15 *high range of a range that we very, very substantially increased last*

16 *quarter*.... [W]e feel like *it was pretty extraordinary growth, actually,*

17 *and a little above our expectation* ....

18       * * *

19 JORDAN ROHAN, ANALYST, SCHWAB SOUNDVIEW:

20 Thanks, guys..... *Sounds to me like growth would be less than 30%*

21 *by the time we reach the back half of the year in sponsored search*.

22 And one thing to add to that, it seems like the branded or core

23 advertising might actually exceed that kind of growth rate. Do you think

24 we're at a different tipping point here where branded advertising may

25 actually exceed the growth rate of sponsored search? Thank you.

26 SUE DECKER: ... *Both have been very, very strong and we*

27 *have very, very optimistic expectations for their future*.

28

1    63.    Despite Yahoo!'s apparently strong 2Q 04 report and commentary,
2  because analysts perceived slowing growth, in particular in Yahoo!'s important search
3  business, Yahoo!'s stock was punished, falling from $33.14 on July 7, 2004 to as low
4  as $29 on July 8, 2004. This sharp decline which demonstrated to the Yahoo! insiders
5  that to keep the stock price up as they were determined to do, they had to have Yahoo!
6  report very strong growth and to give greater credibility to their very positive
7  commentary – the market and analyst community would not accept anything less.

8    64.    On July 8, 2004, *The Wall Street Journal* reported:

9    Yahoo Net Soars On Revenue Gain, But Shares Sag – Investors Are
10    Disappointed By Second-Period Results, Its Outlook for All of 2004

11        Yahoo Inc. said second-quarter net income and revenue more than
12    doubled, driven by the Internet company's online advertising and
13    consumer-service businesses.

14        But Yahoo failed to blow past Wall Street estimates, as some had
15    predicted, and only slightly upgraded its outlook for 2004. . . . Yahoo!
16    shares . . . fell to $28.75, or 12%, in after-hours trading.

17        . . . Yahoo's profit and revenue were both in line with analyst
18    estimates, as compiled by Thomson First Call. But some investors had
19    come to expect an upside surprise, based on recent history. "*People are*
20    *disappointed*," said Scott Kessler, an equity analyst at Standard & Poor's
21    Corp. . . .

22        Yahoo executives remained upbeat, saying that they were even
23    more optimistic about their 2004 growth than after the first quarter.
24    "*Our businesses are red hot*," said Yahoo chairman and chief executive
25    Terry Semel in an interview. "*We feel fantastic and the results are*
26    *really great*."

27        Advertising-related revenue accounted for 83% of Yahoo's total
28    revenue . . . .

- 66 -

1    65.    On July 8, 2004, *The New York Times* reported:

2    Yahoo's Quarterly Earnings Double but Disappoint Investors

3          Yahoo said yesterday that its profit more than doubled in the

4    second quarter, driven both by acquisitions and a surging online

5    advertising market.   *But the numbers only matched Wall Street*

6    *estimates; investors, who had been hoping for much better results,*

7    *pushed the company's shares down in after-hours trading*.

8          In the first quarter, Yahoo's results, buoyed by a rapidly growing

9    market for Internet advertising, were surprisingly strong, and many

10   investors were looking for a repeat in the latest period. . . . *Yahoo's*

11   *shares . . . fell as low as $28.86 after hours*.

12                          *      *      *

13         Terry S. Semel, Yahoo's chief executive, said in an interview

14   yesterday that he thought the company was performing well.   "*Our*

15   *numbers were fantastic," he said.   "Our core business is performing*

16   *very, very well*."

17                          *      *      *

18         *Some investors have started to worry that the rapid growth in the*

19   *search advertising market is beginning to slow*.

20   66.    On July 8, 2004, Rosensweig was interviewed on CEO WIRE/CNNfn:

21         DAVID HAFFENREFFER, CNNfn ANCHOR, THE BIZ: . . . .

22   [J]oining us now . . . is Yahoo!'s chief operating officer Dan

23   Rosensweig.

24                          *      *      *

25         HAFFENREFFER: Nice looking quarter but Wall Street seemed a

26   little bit blue on the whole subject, apparently feeling as though you

27   didn't knock it out of the park.   What was your reaction to that?

28

- 67 -

1  ROSENSWEIG: . . . In the first quarter, we substantially raised
2  our guidance and we came in at the very high end of a very large number
3  for the second quarter. *So we feel great about it. . . . So we think our*
4  *business is in great shape and growing at a very fast pace. So we're*
5  *actually extremely excited about the results*.

6  HAFFENFEFFER: . . . Where are you seeing most of your
7  strength? Is it in the advertising side of thing or other areas?

8  ROSENSWEIG:   *Well, fortunately, we're actually seeing*
9  *strength in both parts of our business, which are the advertising side,*
10  *which is the branded advertising, as well as sponsored search through*
11  *our Overture division. . . .*

12  *So both parts of our business is doing remarkably well*. And
13  we've had significant growth not only in the U.S., but around the world.
14  So we're very excited about the future of the business opportunity.

15  67.  Analyst reports issued after, and based on, Yahoo!'s July 7, 2004 release
16  and conference call reflected continuing confidence in Yahoo!'s business strength and
17  model but concern over the growth in Yahoo!'s advertising business because unlike
18  1Q 04 results, Yahoo! only managed to achieve the middle range of management
19  guidance. As a result, analysts issued more cautionary reports about Yahoo!'s results.
20  For instance:

21  •  On July 8, 2004 Pacific Growth Equities issued a report that stated: "In line 2Q
22  results and guidance not enough to satisfy the Street."

23  •  On July 8, 2004, Pacific Crest issued a report entitled, "Marketing Services
24  Disappoints, but Trends Remain Strong." The report stated:
25  Advertising trends were not as strong as we thought.

26  *       *       *

27  Although revenue was disappointing, the broader trend remains solid.
28  •  On July 7, 2004, Citigroup Smith Barney issued a report that stated:

- 68 -

However, 2Q 04 results were clearly not the fireworks show we saw last quarter and for the first time in two years Yahoo! reported results that came in below the high end of management guidance.

. . . [W]e believe investors are likely to fret over the "in-line" results this quarter, and the implications for Yahoo!'s longer term growth rates.

68. Yahoo!'s 2Q 04 results were later filed with the SEC in Yahoo!'s 2Q 04 Form 10-Q, signed by Decker. This Form 10-Q contained Yahoo!'s false 2Q 04 financial results, including those previously reported on July 7, 2004. The 2Q 04 Form 10-Q also contained false Sarbanes-Oxley certificates and statements about Yahoo!'s internal controls detailed in the "Yahoo!'s Misleading Financial Statements and Disclosures" section of this Complaint (¶¶199-227) signed by defendants Semel and Decker.

69. Defendants were extremely concerned over the negative market reaction to Yahoo!'s 2Q 04 report – especially when the stock continued to fall to as low as $27.50 on July 22, 2004. They knew they had to convince the market that Yahoo!'s Marketing Services division and the paid click portion of that division would show very strong growth to keep the stock inflated. To do so, they went on a campaign to meet with analysts to boost interest in the stock and persuade the market and investors that Yahoo!'s business model was intact and its sponsored search business was growing very strongly.

70. On July 28, 2004, CIBC issued a report entitled, "Initiating Coverage with Sector Outperformer Rating, $36 Price Target." The report stated:

Following the stock's 20% pullback this month, we are initiating coverage of Yahoo! with a Sector Outperformer rating.

*    *    *

Longer term, we believe the critical factors for continued success will be content, technology, brand and the ability to integrate and cross-sell

- 69 -

within a network of sites for repeated monetization of the user base. We're confident Yahoo!'s industry-leading user base should enable it to maintain access to best-of-breed content. . . . Yahoo! has demonstrated several examples of being able to engage and monetize, directly or indirectly through advertising, the user across its networks of sites. This represents an area where we believe Yahoo! should only gain strength. . . .

71.    By July 29, 2004, Yahoo!'s stock price recovered to almost $31 per share.

72.    As a continuing part of defendants' campaign to boost Yahoo!'s stock price, the Individual Defendants met with analysts at Yahoo!'s headquarters on September 14, 2004. A Prudential Equity Group report summarized this meeting and distributed to the market and investors the information provided to these analysts by the Individual Defendants at the meeting.  For instance:

- On September 15, 2004, Prudential Equity Group, LLC issued a report entitled, "YHOO:    PRUDENTIAL    HOSTS    MEETING    WITH    YAHOO! MANAGEMENT IN SUNNYVALE."  The report stated:

    Yesterday afternoon Prudential Equity Group hosted a meeting with Yahoo! management at its headquarters in Sunnyvale, CA.

    *        *        *

    YHOO Remains Focused *On A Better User Experience in Search.* . . .

    Jeff Weiner, SVP of Search & Marketplace, discussed Yahoo!'s *competitive positioning in Search, one of the key revenue and profit drivers for the company over the past several years*. He stated that the company is focused on creating a better user experience in Search, which encompasses a better understanding of the intent of the user, and then assisting the user in completing tasks against that intent (as opposed to just collecting relevant information for the user).  As evidence of this

1    focus, Mr. Weiner *pointed to the recent launch of 30 shortcuts on*
2    *Yahoo! Search that help the user complete common tasks*.  While Mr.
3    Weiner appeared upbeat about YHOO's Search product, and its
4    competitive positioning vis-à-vis Google . . . *he did acknowledge that*
5    *YHOO has not gained market share in the U.S., despite its significant*
6    *improvement in Search functionality over the past six months.*
7    *However, he does believe that YHOO has stabilized its market share*
8    *(although we note that recent data from Nielson-Netratings suggests*
9    *that Google continues to gain market share, albeit at a less rapid pace*
10   *than in the past)*.

11   73.     Defendants' statements regarding Yahoo!'s 2Q 04 financial results
12   contained in ¶¶61-72 were materially false and misleading when made.  Defendants
13   knew or recklessly disregarded, but failed to disclose, the following:

14   (a)     Contrary to defendants' statements such as "our core business is
15   performing very, very well," "we're actually extremely excited about the results" and
16   "fortunately, we're actually seeing strength in both parts of our business, . . . as well
17   as sponsored search through our Overture division," Yahoo! was actually "bursting at
18   the seams."  According to CW11, following Yahoo!'s acquisition of Overture, the
19   Overture platform was incapable of handling the increasing numbers of advertisers,
20   marketing partners and users overloading the system from Yahoo!.  Compounding the
21   problem was that even though the increasing traffic from Yahoo! was literally causing
22   the Overture system to self-destruct, and despite that system's importance to Yahoo!'s
23   overall business performance, Yahoo! refused to provide the Overture Pasadena
24   facility with adequate resources to deal with the increased Yahoo! traffic.  According
25   to CW10, CW11 and CW12, a culture clash between Yahoo!'s Sunnyvale engineers
26   and Overture's Pasadena engineers occurred following the Overture acquisition that
27   adversely impacted Yahoo!'s ability to smoothly integrate Overture.  To address the
28   increasing Yahoo! traffic, Overture engineers requested that Yahoo! provide funding

1    for additional servers to handle the increasing traffic. According to CW10, not only
2    did Yahoo! refuse to provide additional funding for servers, the Sunnyvale office
3    ultimately decided to terminate dozens of legacy Overture engineers even though
4    those engineers were more knowledgeable about how the Overture information
5    systems operated. Confirmed by CW12, the decision to terminate the senior legacy
6    Overture engineers had dramatic and adverse consequences on Yahoo!'s ability to
7    develop new software systems to address the ever increasing Yahoo! traffic on the
8    overloaded Overture platform. According to both witnesses, the Yahoo! team
9    assigned to replace the terminated and replaced legacy Overture engineers did not
10   have an appreciation for the size and complexity of integrating Overture and as a
11   result "stalled, delayed and derailed" the attempts to develop a new search platform;

12              (b)    Defendants' statements that the acquisition of Overture was
13   successful and the introduction of the new search platform was technically smooth
14   were also false and misleading because the acquisition and new search introduction
15   were neither successful nor smooth because Yahoo!'s refusal to provide adequate
16   funding to Overture and the decision to terminate the most senior and knowledgeable
17   Overture engineers severely impacted Yahoo!'s business operations. According to
18   CW10, Yahoo!'s refusal to provide sufficient funding for additional servers impacted
19   his/her teams' abilities to analyze data relating to seaches and clicks for customers so
20   that Yahoo! could provide meaningful data pursuant to the terms of the SLAs on a
21   daily basis. The data provided to advertising customers had to be analyzed by
22   numerous teams that reported to CW10 and derived from numerous sources before it
23   was forwarded to clients. Some of the important functions preformed by the various
24   teams s/he supervised included the calculation of "discard rates" by analyzing what
25   clicks could not be passed on to advertisers and thus eliminated from billing and
26   "conversion rates" advertisers experienced from users who clicked on their ads. The
27   discard rates were analyzed for each marketing partner to determine whether they
28   were poor quality partners. According to CW10, because Yahoo! refused to provide

1   his/her teams with additional servers, their ability to calculate accurate discard and
2   conversion rates was severely impacted.  Instead, Yahoo! increasingly failed to
3   eliminate bad or nonbillable clicks and provided customers with worthless discard
4   rates and conversion rates.

5           (c)    In addition to not providing Overture engineers with adequate
6   resources to service the Yahoo! traffic, the Company also failed to provide adequate
7   staffing for the development of an internal project referred to as "solving the blob."
8   According to CW10 and CW7, throughout the Class Period, Yahoo! was behind
9   schedule on this project, a necessary precursor to Project Panama.  This project
10  involved integrating the very separate software systems such as the CRM system and
11  the click detection system into a single platform.  This integration was essential so that
12  Yahoo! could comply with the terms of the SLA with advertising customers and
13  provide filtered data on a timely basis.  CW10 confirmed that this project was far
14  behind schedule because Yahoo! fired the Overture engineers most knowledgeable
15  about the different systems.

16          (d)    Yahoo!'s decision to terminate the senior legacy Overture
17  engineers who were the most knowledgeable about how and why Yahoo! needed to
18  improve the search algorithm and bidding system so that Yahoo! could compete with
19  Google also impacted Yahoo!'s switch to its own search technology, and this switch
20  was not technically smooth as defendants represented.  Following the acquisition of
21  Overture and switch from Google's search engine, Yahoo! rushed to market its new
22  Content Match product before it functioned properly.  Yahoo! rushed Content Match
23  to market with a very manual mapping process that led to wide variations in search
24  results.  Content Match led to very undesirable results such as irrelevant clicks and
25  even "click tsunamis."  A click tsunami occurred when a search mapped to results that
26  caused thousands of clicks, with little or no conversion, on an advertiser's site.  CW11
27  provided an example of a click tsunami such as when a mortgage seller's ad would
28  appear on a news article announcing a federal reserve interest rate cut.  A large

1   volume of readers would click on an ad next to the article thinking they would obtain
2   more information about what impact the federal reserve's action would have on
3   mortgage interest rates and instead clicked through to the mortgage seller's website.
4   Because Yahoo!'s Content Match system lacked any method to prevent the resulting
5   onslaught of clicks, the small advertiser who may have only budgeted for $200/day
6   would receive billing for thousands of dollars, far exceeding the budget or capacity to
7   pay.

8           (e)     Yahoo!'s introduction of its own search technology was not
9   technically smooth because, as confirmed by CW11, Content Match lacked any
10  features to prevent actual click fraud or any method to monitor any sort of referral log
11  data to eliminate non-billable clicks.  CW10 confirmed that Yahoo! had a large
12  problem with poorer quality international partners and that these problems
13  notwithstanding, Yahoo! would not allow advertising customers to opt out of
14  international partner traffic up to the time s/he left Yahoo!.  While s/he worked for
15  Overture prior to that company's acquisition by Yahoo!, Overture routinely "turned
16  off" poorer quality partners who had unacceptable "discard rates."   Overture
17  maintained high standards and maintained score cards for partners to ensure high
18  conversion rates by customers.  Following the Overture acquisition, Yahoo! was not
19  as concerned with the quality of the traffic from marketing partners.

20          (f)     In combination, Yahoo!'s failure to have a functioning system to
21  detect click fraud or non-billable clicks, the Company's rocky transition to a new
22  search technology, the integration of Overture marred by the engineering culture
23  clash, the termination of the most senior Overture engineers and failure to provide
24  adequate resources to Overture to manage the Yahoo! traffic and Yahoo!'s decision to
25  rush Content Match to market all had a disastrous impact on Yahoo!'s business
26  performance.  As a result, the Company's paid search revenues stagnated.  This
27  development put defendants in a bind because they were desperate to demonstrate
28  growing search ad revenues and meet the high end of or exceed their guidance to

- 74 -

securities analysts. As a result, defendants developed ways to recognize ad search revenue they had not earned. To accomplish this, defendants implemented a method to change the "dial" on the Company's click-fraud detection system at the end of the quarter to allow more non-billable click activity to be passed on to customers, thereby increasing the Company's revenues at the end of the quarter. According to CW12, the non-billable click activity was being allowed through the click detection system at the end of the quarter, and being passed on to advertising customers in the form of charges to their account and resulted in increasing numbers of complaints from advertising customers at the end of the quarter.

(g)     As detailed in ¶¶202-210, during 2Q 04, Yahoo! improperly recognized at least 10% of its paid search revenue – which constituted approximately 39% of the total marketing services revenue in 2Q 04 – attributable to click fraud or $27,200,000 because the revenue recognized via click fraud was not earned;

(h)     As detailed in ¶¶211-213, during 2Q 04, Yahoo! failed to properly record a loss contingency in violation of GAAP, as set forth in SFAS No. 5, *Accounting for Contingencies*;

(i)     As detailed in ¶¶214-227, during 2Q 04, Yahoo! failed to disclose, as required by the SEC Regulation S-K, known trends and uncertainties by not reporting the practice of improperly recognizing revenue generated by click fraud and thereby not disclosing Yahoo!'s actual financial performance;

(j)     As detailed in ¶¶214-227, during 2Q 04, Yahoo!'s publicly issued financial statements violated fundamental accounting principles requiring that such statements contain complete and reliable information, presented in a conservative manner regarding how managers discharged their stewardship responsibilities of the Company and the actual financial performance of the Company;

(k)     As detailed in ¶¶202-210, during the 2Q 04, as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP in that the

- 75 -

1 Company's revenue was inflated by $27,200,000 and net income was overstated by
2 $0.01/per share.

3     74.    As a result of the Individual Defendants' campaign to push Yahoo!'s
4 stock higher by disseminating false and misleading information to analysts who they
5 knew would pass it along to the market and investors, Yahoo! stock continued to
6 recover, moving up from $30.49 on September 9, 2004 to $33.94 on September 16,
7 2004. By early October 2004, Yahoo! had climbed to over $35 per share, had
8 recovered back to its high reached before its disappointing 2Q 04 report was issued in
9 early July 2004.

10     75.    On October 12, 2004, Yahoo! reported its 3Q 04 results via a release
11 stating:

12             Yahoo! Reports Third Quarter 2004 Financial Results

13             Company Posts Revenues of $907 Million, Operating Income of
14     $172 Million, Operating Income Before Depreciation and Amortization
15     of $260 Million

16             Yahoo! Inc. (Nasdaq: YHOO) today reported results for the third
17     quarter ended September 30, 2004.

18             "Yahoo! began to demonstrate the next stage in the Company's
19 evolution in the third quarter, and in doing so recorded its sixth
20 consecutive quarter of record revenue," said Terry Semel, chairman and
21 chief executive officer, Yahoo!. "We accelerated the pace at which new
22 products and services were developed, which in-turn helped increase the
23 level of user engagement across the Yahoo! network. Our engaged
24 audience enables us to deliver an unmatched set of advertising
25 opportunities, providing deeper value to our marketers, and supporting
26 the mantra that great products are the key to a great business."

27

28

1

- Revenues were $907 million for the third quarter of 2004, a 154

2

percent increase compared to $357 million for the same period of

3

2003.

4    76.    Following the October 12, 2004 release, Yahoo! held a conference call

5  for analysts and the financial media, in which Semel, Rosensweig and Decker

6  participated. During the call, the following happened:

7        TERRY SEMEL, CHAIRMAN & CEO, YAHOO, INC.: . . .

8        *Yahoo has continued its run of exceptional growth with this being the*

9        *sixth straight quarter of record revenues. Our . . . continued*

10       *investment in people and infrastructure have led to the increased*

11       *product quality and powerful rate of innovation which are really both*

12       *paying off.* The list of accomplishments during the past quarter and this

13       year . . . is substantial.

14                            *    *    *

15       We are creating a self reinforcing cycle with our consumers that

16       we see as a key to Yahoo's future growth. . . . *By executing against*

17       *these principals we believe we are building a substantial competitive*

18       *advantage that puts Yahoo in a leadership position that will enable us*

19       *to continue to outpace the industry.* The two best long-term measures

20       of this are our financial results and our consumer metrics. So let's go

21       right to the them. Yahoo reported gross revenues of $907 million, up

22       154% compared to 357 million in the third quarter of last year. *Yahoo is*

23       *benefiting from the diversity within both of our core businesses of*

24       *advertising and premium consumer services which has delivered*

25       *consistently growing and sustainable results over the past year.* Our

26       operating income before depreciation and amortization was $260 million

27       in the quarter, more than double last year's quarterly performance. And

28

1    Yahoo delivered 9 cents earnings per share, excluding a gain from the

2    sale of investments.

3                              *       *       *

4    To sum up our marketing services business, last quarter we said we were

5    comfortable that our organic marketing services business which excludes

6    acquisitions would exceed 35%, *We now feel comfortable that number*

7    *will be approaching 40% for the year, further validating that this*

8    *medium is coming of age as a significant advertising platform. We*

9    *believe we are in a position of strength as the leading on-line*

10   *advertising provider that is a principal in both broad and graphical*

11   *advertising as well as sponsored search. As advertisers look to shift*

12   *more of their dollars to the Internet which is projected to be the fastest*

13   *growing advertising medium over the next few years Yahoo is*

14   *extending its leadership position as we meet our advertisers' needs and*

15   *become essential to their media mix. When marketers think about*

16   *buying advertising on-line they think about Yahoo.*

17                             *       *       *

18            SUE DECKER, CFO, YAHOO, INC.: . . . We are very pleased

19   to be able to report results that exceed all three of the key financial

20   objectives that we have shared with you in the past. Those goals are,

21   first, to reach 30% in organic revenue growth, second, to deliver 50% of

22   incremental flow through to operating cash flow and, third, to convert

23   70% of operating cash flow to free cash. What's more important than

24   exceeding any one of those targets however is the way in which we've

25   achieved them. These returns are flowing from a robust foundation.

26   They are based on an extraordinary breadth of product enhancements.

27   They flow from an increasing depth of differentiated functionality and

28   they extend across a high quality and diverse paying customer base.

1    77.    Following the release of Yahoo!'s "record" 3Q 04 results which "beat"
2  estimates and the very favorable information defendants disseminated about the state
3  of Yahoo!'s business, its business model and its marketing services segment,
4  Yahoo!'s stock advanced from $33.60 during the day on October 12, 2004 to $36.28
5  on October 13, 2004 and continued to trade between $35 and $36 for the next several
6  days. Analysts were impressed with the favorable results and information and issued
7  reports regaling it – further distributing it into the market and to investors.  For
8  instance:

9  •    On October 12, 2004, Citigroup Smith Barney issued a report entitled, "YHOO:
10      Breadth, Depth and Diversity Yield Strong Results."  The report stated:

11          Yahoo!'s 3Q 04 results were better than we anticipated, led once
12      again by paid search. *The strength in search should calm fears about*
13      *near term maturation*.

14                                    *     *     *

15      We are raising our estimates for 2004 and 2005 . . . .

16                                    *     *     *

17          Yahoo!'s third quarter results present the picture of strong and
18      secular revenue growth, predictable operating performance, robust free
19      cash flow generation and an increasingly broad and well-balanced
20      business.   *Additionally, Yahoo!'s "clean up hitter" paid search*
21      *business continues to deliver impressive gains*, with a low-teens
22      sequential revenue growth rate during what was expected to be a softer
23      summer season.

24  •    On October 12, 2004, Equity Research Rowen issued a report that stated:

25          Yahoo!'s Marketing Services continues to be the main driver
26      behind the company's growth, as segment revenue (excluding TAC)
27      increased 212% year over year on a reported basis, helped by several
28      acquisitions (38% year over year excluding acquisitions).  *Growth in*

- 79 -

1    *Sponsored Search advertising improved this quarter, with query*
2    *volume up by a mid-to-high single digit percentage sequentially*
3    *(compared to flat sequential growth in the second quarter), and both*
4    *the U.S. and international segments reporting positive growth. On a*
5    *year-over-year basis, revenue per search achieved "solid growth" in*
6    *the U.S. and double-digit growth internationally. Management noted*
7    *that revenue-per-search grew sequentially after two quarters of no*
8    *sequential growth*.

9    • On October 13, 2004 Pacific Growth Equities issued a report that stated:

10        Yesterday, Yahoo! posted strong Q3:04 results, topping the high
11    end of guidance, our estimates and Street consensus.

12        *Advertising (especially Paid Search) was the key driver of growth*
13    *and out performance, fueled by both pricing and volume gains*.

14    • On October 13, 2004, Piper Jaffray issued a report entitled, "Strong Upside;
15    Growing Solidly – Ahead of Plan; Raising Estimates Impressive, As Expected."
16    The report stated:

17        Yahoo reported a solid quarter with $18M upside to our revenue
18    estimate (similar to consensus), and $5M above the high end of company
19    guidance, resulting in a $0.01 of upside to our GAAP EPS estimate
20    (before one-time gain). This was largely expected and Yahoo! delivered
21    solidly. *In fact, this solid performance is becoming a hallmark of*
22    *Yahoo, with predictable outperformance that deserves a premium to*
23    *the otherwise volatile group. Search was clearly a driver of this upside*
24    . . . .

25    • On October 13, 2004, Bear Stearns issued a report that stated:
26    Key Points

27
28

1    Yahoo! reported a strong quarter with EPS of $0.09 right on target

2    with our estimates, excluding one-time proceeds from the sale of GOOG

3    shares.

4    All areas delivered impressive double-digit growth. ***Marketing***

5    ***services grew 38% organic, driven by strong growth in branded and***

6    ***search*** as advertisers continue to shift ad dollars on line and are now

7    spreading ad dollars across the network. . . .

8    Management noted it is exceeding the goals it outlined at its

9    investor day in May, and once again tweaked up guidance . . . .

10   • On October 13, 2004, Deutsche Bank issued a report entitled, "Paid Search

11   Volume Growth Drives 3Q Upside – Buy." The report stated:

12   Paid Search Still King. . . . We estimate that the paid search

13   business increased 15% Q/Q (to $323 mn), largely driven by growth on

14   the Yahoo!-branded search sites globally as well as incremental revenues

15   from new Overture network partners internationally.   For the core

16   Yahoo! search service, we believe that paid search revenues grew by

17   18% Q/Q (to $218 mn) driven by 8% query volume gains, up to an 8%

18   increase in monetization and 2% growth in PPCs (to $0.45).   We had

19   expected much stronger growth in pricing in our assumption, which

20   appeared to be somewhat muted in the grand scheme. Most importantly,

21   search volumes increased 8% Q/Q in the seasonally slower 3Q, a sign

22   that the company's focus on search within verticals and outbound search

23   marketing initiatives appear to be bearing fruit.

24   • On October 18, 2004, Prudential Equity Group, LLC issued a report entitled,

25   "Third Quarter 2004 Review." That report stated:

26   Growth in Sponsored Search advertising improved this quarter,

27   with query volume up by a mid-to-high single digit percentage

28   sequentially (compared to flat sequential growth last quarter), and both

- 81 -

1    the U.S. and international segments reporting positive growth.  On a
2    year-over-year basis, revenue per search achieved "solid growth" in the
3    U.S. and double-digit growth internationally.  *Management noted that*
4    *revenue-per-search grew sequentially after two quarters of no growth.*

5    78.   Yahoo!'s 3Q 04 results were later filed with the SEC in Yahoo!'s 3Q 04
6    Form 10-Q, signed by Decker.  This Form 10-Q contained Yahoo!'s false 3Q 04
7    financial results, including those previously reported on July 7, 2004.  The 3Q 04
8    Form 10-Q also contained false Sarbanes-Oxley certificates and statements about
9    Yahoo!'s internal controls detailed in the "Yahoo!'s Misleading Financial Statements
10    and Disclosures" section of this Complaint (¶¶199-227) signed by defendants Semel
11    and Decker.

12    79.   Defendants' statements regarding Yahoo!'s 3Q 04 financial results
13    contained in ¶¶75-78 were materially false and misleading when made.  Defendants
14    knew or recklessly disregarded, but failed to disclose, the following:

15    (a)   Contrary to defendants' statements such as "[o]ur . . . continued
16    investment in people and infrastructure have led to the increased product quality and
17    powerful rate of innovation which are really both paying off," Yahoo! was actually
18    "bursting at the seams."  According to CW11, following Yahoo!'s acquisition of
19    Overture, the Overture platform was incapable of handling the increasing numbers of
20    advertisers, marketing partners and users overloading the system from Yahoo!.
21    Compounding the problem was that even though the increasing traffic from Yahoo!
22    was literally causing the Overture system to self-destruct, and despite that system's
23    importance to Yahoo!'s overall business performance, Yahoo! refused to provide the
24    Overture Pasadena facility with adequate resources to deal with the increased Yahoo!
25    traffic.  According to CW10, CW11 and CW12, a culture clash between Yahoo!'s
26    Sunnyvale engineers and Overture's Pasadena engineers occurred following the
27    Overture acquisition that adversely impacted Yahoo!'s ability to smoothly integrate
28    Overture.  To address the increasing Yahoo! traffic, Overture engineers requested that

- 82 -

1  Yahoo! provide funding for additional servers to handle the increasing traffic.
2  According to CW10, not only did Yahoo! refuse to provide additional funding for
3  servers, the Sunnyvale office ultimately decided to terminate dozens of legacy
4  Overture engineers even though those engineers were more knowledgeable about how
5  the Overture information systems operated.  Confirmed by CW12, the decision to
6  terminate the senior legacy Overture engineers had dramatic and adverse
7  consequences on Yahoo!'s ability to develop new software systems to address the ever
8  increasing Yahoo! traffic on the overloaded Overture platform.  According to both
9  witnesses, the Yahoo! team assigned to replace the terminated and replaced legacy
10  Overture engineers did not have an appreciation for the size and complexity of
11  integrating Overture and as a result "stalled, delayed and derailed" the attempts to
12  develop a new search platform;

13         (b)    Defendants' statements that the acquisition of Overture was
14  successful and the introduction of the new search platform was technically smooth
15  were also false and misleading because the acquisition and new search introduction
16  were neither successful nor smooth because Yahoo!'s refusal to provide adequate
17  funding to Overture and the decision to terminate the most senior and knowledgeable
18  Overture engineers severely impacted Yahoo!'s business operations.  According to
19  CW10, Yahoo!'s refusal to provide sufficient funding for additional servers impacted
20  his/her teams' abilities to analyze data relating to seaches and clicks for customers so
21  that Yahoo! could provide meaningful data pursuant to the terms of the SLAs on a
22  daily basis.  The data provided to advertising customers had to be analyzed by
23  numerous teams that reported to CW10 and derived from numerous sources before it
24  was forwarded to clients.  Some of the important functions preformed by the various
25  teams s/he supervised included the calculation of "discard rates" by analyzing what
26  clicks could not be passed on to advertisers and thus eliminated from billing and
27  "conversion rates" advertisers experienced from users who clicked on their ads.  The
28  discard rates were analyzed for each marketing partner to determine whether they

1  were poor quality partners.  According to CW10, because Yahoo! refused to provide
2  his/her teams with additional servers, their ability to calculate accurate discard and
3  conversion rates was severely impacted.  Instead, Yahoo! increasingly failed to
4  eliminate bad or nonbillable clicks and provided customers with worthless discard
5  rates and conversion rates.

6          (c)      In addition to not providing Overture engineers with adequate
7  resources to service the Yahoo! traffic, the Company also failed to provide adequate
8  staffing for the development of an internal project referred to as "solving the blob."
9  According to CW10 and CW7, throughout the Class Period, Yahoo! was behind
10  schedule on this project, a necessary precursor to Project Panama.  This project
11  involved integrating the very separate software systems such as the CRM system and
12  the click detection system into a single platform.  This integration was essential so that
13  Yahoo! could comply with the terms of the SLA with advertising customers and
14  provide filtered data on a timely basis.  CW10 confirmed that this project was far
15  behind schedule because Yahoo! fired the Overture engineers most knowledgeable
16  about the different systems.

17          (d)      Yahoo!'s decision to terminate the senior legacy Overture
18  engineers who were the most knowledgeable about how and why Yahoo! needed to
19  improve the search algorithm and bidding system so that Yahoo! could compete with
20  Google also impacted Yahoo!'s switch to its own search technology, and this switch
21  was not technically smooth as defendants represented.  Following the acquisition of
22  Overture and switch from Google's search engine, Yahoo! rushed to market its new
23  Content Match product before it functioned properly.  Yahoo! rushed Content Match
24  to market with a very manual mapping process that led to wide variations in search
25  results.  Content Match led to very undesirable results such as irrelevant clicks and
26  even "click tsunamis."  A click tsunami occurred when a search mapped to results that
27  caused thousands of clicks, with little or no conversion, on an advertiser's site.  CW11
28  provided an example of a click tsunami such as when a mortgage seller's ad would

1  appear on a news article announcing a federal reserve interest rate cut. A large
2  volume of readers would click on an ad next to the article thinking they would obtain
3  more information about what impact the federal reserve's action would have on
4  mortgage interest rates and instead clicked through to the mortgage seller's website.
5  Because Yahoo!'s Content Match system lacked any method to prevent the resulting
6  onslaught of clicks, the small advertiser who may have only budgeted for $200/day
7  would receive billing for thousands of dollars, far exceeding the budget or capacity to
8  pay.

9      (e)    Yahoo!'s introduction of its own search technology was not
10 technically smooth because, as confirmed by CW11, Content Match lacked any
11 features to prevent actual click fraud or any method to monitor any sort of referral log
12 data to eliminate non-billable clicks. CW10 confirmed that Yahoo! had a large
13 problem with poorer quality international partners and that these problems
14 notwithstanding, Yahoo! would not allow advertising customers to opt out of
15 international partner traffic up to the time s/he left Yahoo!. While s/he worked for
16 Overture prior to that company's acquisition by Yahoo!, Overture routinely "turned
17 off" poorer quality partners who had unacceptable "discard rates." Overture
18 maintained high standards and maintained score cards for partners to ensure high
19 conversion rates by customers. Following the Overture acquisition, Yahoo! was not
20 as concerned with the quality of the traffic from marketing partners.

21     (f)    In combination, Yahoo!'s failure to have a functioning system to
22 detect click fraud or non-billable clicks, the Company's rocky transition to a new
23 search technology, the integration of Overture marred by the engineering culture
24 clash, the termination of the most senior Overture engineers and failure to provide
25 adequate resources to Overture to manage the Yahoo! traffic and Yahoo!'s decision to
26 rush Content Match to market all had a disastrous impact on Yahoo!'s business
27 performance. As a result, the Company's paid search revenues stagnated. This
28 development put defendants in a bind because they were desperate to demonstrate

1  growing search ad revenues and meet the high end of or exceed their guidance to
2  securities analysts. As a result, defendants developed ways to recognize ad search
3  revenue they had not earned. To accomplish this, defendants implemented a method
4  to change the "dial" on the Company's click-fraud detection system at the end of the
5  quarter to allow more non-billable click activity to be passed on to customers, thereby
6  increasing the Company's revenues at the end of the quarter. According to CW12, the
7  non-billable click activity was being allowed through the click detection system at the
8  end of the quarter, and being passed on to advertising customers in the form of
9  charges to their account and resulted in increasing numbers of complaints from
10 advertising customers at the end of the quarter.

11             (g)    As detailed in ¶¶202-210, during 3Q 04, Yahoo! improperly
12 recognized at least 10% of its paid search revenue – which constituted approximately
13 39% of the total marketing services revenue in 3Q 04 – attributable to click fraud or
14 $35.9 million because the revenue recognized via click fraud was not earned;

15             (h)    As detailed in ¶¶211-213, during 3Q 04, Yahoo! failed to properly
16 record a loss contingency in violation of GAAP, as set forth in SFAS No. 5,
17 *Accounting for Contingencies*;

18             (i)    As detailed in ¶¶214-227, during 3Q 04, Yahoo! failed to disclose
19 as required by the SEC Regulation S-K known trends and uncertainties by not
20 reporting the practice of improperly recognizing revenue generated by click fraud and
21 thereby not disclosing Yahoo!'s actual financial performance;

22             (j)    As detailed in ¶¶214-227, during 3Q 04, Yahoo!'s publicly issued
23 financial statements violated fundamental accounting principles requiring that such
24 statements contain complete and reliable information, presented in a conservative
25 manner regarding how managers discharged their stewardship responsibilities of the
26 Company and the actual financial performance of the Company;

27             (k)    As detailed in ¶¶202-210, during the 3Q 04, as a consequence of
28 the aforementioned practices, the Company's revenues and net income were

1   artificially inflated and reported financial results were in violation of GAAP in that the
2   Company's revenue was inflated by \$35.9 million and net income was overstated by
3   \$0.02/per share.

4       80.    Yahoo!'s stock jumped from a low of \$3.00 on November 1, 2004 to as
5   high as \$39.25 on November 3, 2004, on much higher than normal volume in reaction
6   to the favorable information the defendants disseminated to the market at the
7   November 1, 2004 conference.

8       81.    On January 18, 2005, Yahoo! reported its 4Q 2004 and full year 2004
9   financial results via a release stating:

10          Company Posts Full Year Revenue of \$3,575 Million, Operating
11          Income of \$689 Million, Operating Income Before Depreciation and
12          Amortization of \$1,032 Million

13          Yahoo! Inc. (Nasdaq: YHOO) today reported results for the fourth
14          quarter and full year ended December 31, 2004.

15              "*Yahoo! moved at an impressive pace in the fourth quarter,*
16          *capping another record year for the Company. Our users were more*
17          *engaged in 2004 than ever before because of Yahoo!'s relentless focus*
18          *on delivering the most innovative products and services on the*
19          *Internet,*" said Terry Semel, chairman and chief executive officer,
20          Yahoo!. "Yahoo! also benefited from the growing acceptance of online
21          advertising with marketers who recognize its effectiveness and are
22          therefore increasingly using this platform to reach their consumers."

23          • Revenues were \$1,078 million for the fourth quarter of 2004, a 62
24              percent increase compared to \$664 million for the same period of
25              2003.

26          • Revenues excluding traffic acquisition costs ("TAC") were \$785
27              million for the fourth quarter of 2004, a 54 percent increase compared
28              to \$511 million for the same period of 2003.

- 87 -

- Gross profit for the fourth quarter of 2004 was $691 million, a 56 percent increase compared to $443 million for the same period of 2003.

- Operating income for the fourth quarter of 2004 was $235 million, a 149 percent increase compared to $94 million in the same period of 2003.

- Operating income before depreciation and amortization for the fourth quarter 2004 was $327 million, an 84 percent increase compared to $178 million for the same period of 2003.

- Cash flow from operating activities for the fourth quarter of 2004 was $337 million, a 231 percent increase compared to $102 million for the same period of 2003.

- Free cash flow for the fourth quarter 2004 was $251 million, a 172 percent increase compared to $92 million for the same period of 2003.

- Net income for the fourth quarter of 2004 was $373 million or $0.25 per diluted share (including a net impact of $185 million, or $0.13 per diluted share, related to the sale of an investment). Excluding this gain, net income for the fourth quarter was $187 million, or $0.13 per diluted share. This compares with net income of $75 million or $0.05 per diluted share for the same period of 2003.

    "*Yahoo!'s strong fourth quarter performance completes our third consecutive year of delivering strong organic revenue growth, expanding operating margins* . . ." said Susan Decker, chief financial officer, Yahoo!. . . .

- Revenues for the year ended December 31, 2004 were $3,575 million, a 120 percent increase compared to $1,625 million for 2003.

- 88 -

1    • Revenues excluding TAC for 2004 were $2,600 million, a 77 percent
2        increase compared to $1,473 million for 2003.

3    • Gross profit for 2004 was $2,276 million, an 80 percent increase
4        compared to $1,267 million for 2003.

5    • Operating income for 2004 was $689 million, a 133 percent increase
6        compared to $296 million for 2003.

7    • Operating income before depreciation and amortization for 2004 was
8        $1,032 million, a 116 percent increase compared to $477 million for
9        2003.

10   • Cash flow from operating activities for 2004 was $1,090 million, a
11       155 percent increase compared to $428 million for 2003.

12   • Free cash flow for 2004 was $844 million, a 149 percent increase
13       compared to $339 million for 2003.

14   • Net income for 2004 was $840 million or $0.58 per diluted share
15       (including a net impact of $314 million, or $.022 per diluted share,
16       related to the sale of an investment and the associated tax benefit
17       resulting from fully reserved capital losses become realizable).
18       Excluding this gain, net income for 2004 was $526 million, or $0.36
19       per diluted share.  This compares with net income of $238 million or
20       $0.18 per diluted share for 2003.

21       82.    The same day, January 18, 2005, Yahoo! held a conference call,
22   conducted by Semel, Decker and Rosensweig, for members of the analyst and
23   financial media communities to discuss 4Q 04 and year-end 2004 financial results.
24   The call repeated and addressed information previously made public in the
25   defendants' press release. The following exchanges occurred during the conference
26   call:

27       TERRY SEMEL, CHAIRMAN, CEO, YAHOO, INC.:  . . .
28       Yahoo! has delivered a terrific fourth quarter to cap off a remarkable

- 89 -

1
2
3
4
5
6
7
8
9

year. *We validated our strategy by further extending Yahoo!'s leadership position as the most comprehensive and valuable internet service for consumers and the most diversified and largest global on-line advertising platform*. . . . The list of accomplishments during this past year is too numerous for me to mention. . . . . [T]here are a few that stand out . . . . Although we launched our Algorhythmic [sic] Search product just 10 months ago, today many analysts and critics already believe Yahoo! Search technology is now among the best in the world. . . .

10
11
12
13
14
15
16
17
18
19
20

. . . *Our high standards of quality and commitment to provide the best experience for our users permeated every one of our products* and Yahoo!'s break-neck pace resulted in more users on Yahoo!, consuming more services and spending more time than anywhere else on the internet. I believe this was also the year in which we witnessed the beginning of a tipping point in advertising in which marketers addressed the continued shift in consumers' changing media habits by investing more of their marketing dollars on-line. *With the largest and most engaged audience and the most comprehensive and advanced advertising platforms, Yahoo! is the best-positioned internet Company to take advantage of this shift*.

21
22
23
24
25
26
27
28

These factors translated into great financial results of the Company, but now let's take a quick look at the fourth quarter. Yahoo! reported gross revenue of $1.1 billion for the quarter, our seventh straight quarter of record revenues, and up 62 percent from the fourth quarter of the previous year. This makes our 2004 full-year gross revenue $3.6 billion, more than double the 1.6 billion in 2003. Overall, we are benefiting from the diversity within both of our core businesses of advertising and premium consumer services, which have delivered

1      consistently growing [e]nd results over the past year. We continue to

2      increase our levels of profitability while also investing in the business

3      . . . . Operating income before depreciation and amortization in the

4      fourth quarter was \$327 million and more than \$1 billion for the full year

5      . . . [a]nd Yahoo! delivered . . . 36 cents per diluted share for the full year

6      . . . .

7                  \*     \*     \*

8      In the fourth quarter, our Marketing Services business achieved

9      more than 67 percent year-over-year growth to \$911 million in gross

10      revenues due to strong growth in both our brand and sponsored search

11      businesses. This contributed to a remarkable \$3 billion in marketing

12      services gross revenue for the full year. Actually, a 150 percent increase

13      over 2003. Yahoo!'s Marketing Services revenue grew faster than the

14      rapidly-growing internet advertising segment, indicating that we

15      continued to build share. . . . In our sponsored search business, we

16      achieved record revenue growth. Our team made it easier than ever for

17      advertisers to participate by allowing them to focus more on their

18      marketing objectives and less on key words and bidding.

19      . . . Success in our marketing services business overall is

20      predicated on our ability to deliver the best quality audience, the most

21      comprehensive and effective set of advertising solutions, and the highest

22      impact results for our marketers. . . . Our 2004 results are a fantastic

23      way to begin the next decade.

24                  \*     \*     \*

25      [O]ur goal is to further extend our leadership in advertising and

26      marketing services by providing the most engaged and valuable

27      audiences and the most innovative suite of interactive marketing

28      solutions fee both brand and sponsored search ad partners.

1                                      *      *      *

2      Yahoo! is once again well positioned to grow market share in a rapidly

3      growing segment.  Yahoo! has obviously had a phenomenal year . . . .

4      I'm very, very excited about our future. . . .

5            SUE DECKER, CFO, EXEC. VP-FIN. AND ADMIN., YAHOO,

6      INC.: . . . As we close 2004 and commence 2005, we're very pleased to

7      be able to report for the second consecutive year financial results that

8      exceeded all 3 of the key objectives we had previously shared with you.

9      First, to reach 30 percent in organic revenue growth . . . .

10                                     *      *      *

11     Let's look now at the revenue breakdown by lines of business.  Global

12     Marketing our largest service generated $618 million of revenue ex-TAC

13     for the quarter, up 57 percent year-over-year.  Excluding acquisitions,

14     marketing services grew a healthy 45 percent on an organic basis,

15     representing an acceleration from the 38 percent last quarter. . . .

16           . . . [I]n Sponsored Search, we're seeing broader participation by

17     more industry categories, creating greater diversification and new growth

18     opportunities.

19                                     *      *      *

20     Let's turn now to our business outlook for 2005. . . Starting with the first

21     quarter, we expect revenue ex-TAC to be in a range of [$]765 to $805

22     million . . . .

23           Turning to profitability . . . we expect to operate within an

24     operating cash flow range of [$]290 to $310 million in Q1 . . . .  For the

25     full year of 2005, we expect revenue ex-TAC . . . to be in the range of

26     $1.39 billion to $1.49 billion . . . .

27           [W]e hope and expect 2005 to be the year Yahoo! exceeds $1

28     billion of free cash flow . . . .  Financially, at the mid-point of the ranges,

                                      - 92 -

1  our full-year 2005 outlook calls for . . . a third consecutive year of at
2  least 30 percent in organic revenue ex-TAC.

3                              *     *     *

4  LAUREN FINE, ANALYST, MERRILL LYNCH: . . . The ex-
5  TAC rate actually came down and I'm wondering if that is more a
6  function of a shift on Search between Yahoo! Network versus affiliates
7  or if it's just because of the extraordinary growth of branded?

8  SUE DECKER [Yahoo! Inc. CFO, Exec. VP-Finance and
9  Administration]:  . . . The ex-TAC rate percentage that you are
10  calculating is the ex-TAC payments on our total revenue and a lot of our
11  revenue . . . is not eligible for ex-TAC payment, so just to give you a
12  sense for what's happening on the Sponsored Search revenue, to which
13  the ex-TAC is relevant, we can look at ex-TAC increased worldwide
14  sequentially from the third quarter to the fourth quarter by about 16
15  percent, and that really did reflect roughly stable ex-TAC rates quarter-
16  to-quarter, both in the U.S. and international. International ex-TAC you
17  can see in volume of dollars was up about 19 percent due to the really
18  strong growth in our affiliate business, which is especially noteworthy
19  because there were not a lot of new significant affiliates the quarter.

20  DAN ROSENSWEIG [Yahoo, Inc. – CEO]: . . . In terms of the
21  whole advertising opportunity . . . we are working on advanced tools and
22  technologies as we have been all along . . . . [W]e just think there's a
23  very big opportunity, as long as we continue to extend our leadership, by
24  focusing on making sure we have the right technology . . . .

25      83.    Following Yahoo!'s reported 4Q 04 results and the upbeat conference
26  call, securities analysts following the Company, including analysts from Jefferies,
27  Pacific Crest, Credit Suisse First Boston, Bear Sterns, Legg Mason, S.G. Cowen &
28  Co. and Citigroup issued reports on Yahoo! repeating the positive information and

- 93 -

1    further disseminating the information to investors and the markets. These analysts
2    noted Yahoo! beat consensus revenue and EPS estimates and established better-than-
3    expected FY05 guidance. In addition, analysts continued to be impressed by Yahoo!'s
4    results noting most of the upside to revenue growth came from Marketing Services.

5    •     On January 19, 2005, analyst Youssef H. Squali of Jefferies issued a report
6          entitled, "Upgrading to Buy on Bullish Guidance." The article stated: "While
7          management does not release a break-down of marketing services revenues,
8          they commented that search revenues were strong, driven primarily by growth
9          in volume . . . ."

10   •     On January 19, 2005, Pacific Crest issued a report entitled, "High Growth
11         Should Continue in 2005." The article stated: "[S]ignificant product
12         innovation taking place in search" that may provide an upside to Yahoo!'s
13         growth rate estimates for marketing services and fees."

14   •     On January 24, 2005, Citigroup issued a report entitled, "YHOO: 2005 Sets Up
15         as a Showcase Year." The article stated: "Yahoo!'s operating fundamentals
16         remain strong on all fronts . . . . We believe that 2005 will be a showcase year
17         for Yahoo! . . . ."

18   •     *On January 19, 2005, Deutsche Bank issued a report that stated: "[T]he paid*
19         *search business increased by 74% Y/Y . . . largely driven by growth in click*
20         *volumes on Yahoo! and its partner sites both in the US and internationally*."

21   •     On January 19, 2005, Pacific Growth Equities issued a report entitled, "Very
22         Strong Q4:04 Results; Tweaking Estimates; Reiterate Over Weight Rating."
23         The article stated: "[It] expect[ed] the stock to work higher, given the
24         Company's category dominance, outstanding growth prospects, business model
25         characteristics, and *flawless operational performance*."

26         84.    In late March 2005, Yahoo! issued its 2004 Annual Report and Form 10-
27   K, which were written and/or reviewed and approved by the Individual Defendants.

28

1 | These defendants included Yahoo!'s 2004 final results, including its quarterly 2004
2 | results as previously announced and reported.

3 | 85. The 2004 Annual Report contained a letter from Semel, stating:

4 | Our 2004 results are a fantastic way to begin the next decade. . . .

5 | Full year 2004 revenue was $3.6 billion, more than double the

6 | $1.6 billion in 2003. *We delivered record revenues every quarter* as we

7 | benefited from the diversity within our core businesses of advertising

8 | and premium services. . . .

9 | Our terrific results were generated by Yahoo!'s . . . *most*

10 | *diversified and largest global online advertising platform*.

11 | . . . The list of accomplishments during the past year is too long

12 | for me to mention, however among the hundreds of product launches and

13 | enhancements, there are a few that stand out as they have redefined their

14 | categories.

15 | • *Although we only launched our own algorithmic search product in*

16 | *February 2004, today many analysts and critics already believe*

17 | *Yahoo! Search Technology is now among the best in the world.*

18 | * * *

19 | High Performance Global Advertising Platform

20 | 2004 was the year in which advertisers addressed the continued

21 | shift in users' changing media habits by investing more of their

22 | advertising dollars online. With . . . *a very comprehensive and*

23 | *advanced advertising platform, we believe Yahoo! is the best positioned*

24 | *Internet company to take advantage of this shift*.

25 | Our full year marketing services revenue was over $3 billion,

26 | almost a 140 percent increase over 2003. Yahoo!'s marketing services

27 | revenue *grew faster than the rapidly growing Internet advertising*

28 | *segment, indicating that we continued to build share*.

- 95 -

1

\*    \*    \*

2

***Our search marketing offerings have also achieved substantial***

3

***growth*. . . .**

4

Success in our marketing services business overall is predicated on

5

our continued ability to deliver . . . the most comprehensive and effective

6

set of advertising solutions, and the highest impact results for advertisers.

7

\*    \*    \*

8

. . . Our marketing offerings experienced great success in 2004,

9

and we enter 2005 with tremendous momentum.

10

\*    \*    \*

11

***In conclusion, Yahoo! has had a phenomenal year . . . I work***

12

***with a seasoned and extremely talented management team* . . . .**

13

86.    Yahoo!'s 2004 10-K (included in its 2004 Annual Report) stated:

14

**Marketing Services for Businesses**

15

As part of our strategy to provide the most efficient and effective

16

marketing services for businesses, we are committed to providing end-to-

17

end marketing solutions for advertisers.  There is ongoing growth in the

18

advertising market and an increasing shift in advertisers' use of media

19

towards the Internet and away from traditional media.   We are

20

committed to capitalizing on this shift and helping our advertisers create

21

Internet marketing solutions that are cost effective, compelling and

22

engaging to the user.  We leverage our research of the marketplace and

23

our understanding of our users and their interests to offer a suite of

24

marketing services for our advertisers to meet the full range of their

25

needs from brand building, to consumer awareness, direct marketing,

26

lead generation and commerce services.  Our offerings enable marketers

27

to display their advertisements in different forms and in different

28

locations on the Yahoo! Network and our affiliates' websites.

1
2
3
4
5
6
7
8
9

Advertisers can display textual, rich media and graphical advertisements across the Yahoo! Network on each page that is viewed by our users. We work with our advertisers to maximize the effectiveness of their campaigns by optimizing advertisement formats and placement on the network. We also help advertisers reach their desired audiences by placing contextually relevant advertisements on our pages. For these advertising services, we earn revenue as "impressions" are delivered where "impressions" are the number of times that an advertisement appears in pages viewed by users.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

In addition, *we offer a series of sponsored search offerings that enable advertisers to display text based links to their websites on the Yahoo! Network as well as on our affiliates' websites*. These advertisements are displayed in response to different user actions – a keyword in a search query initiated by a user or when specific content is being viewed on the Yahoo! Network or the networks of our affiliates by a user. For example, if a user searches on the keyword "television" in the Yahoo! Search box or the search box on the website of one of our affiliates, links to websites for advertisers selling televisions will appear alongside the algorithmic search results. Alternatively, if the user is reading an article about interest rates, he or she may be presented with advertising links to websites for mortgage-related advertisers. For these advertising services, we earn revenue when "click-throughs" occur, where "click-throughs" are defined as the number of times a user clicks on an advertiser's listing.

25

87.    Yahoo!'s 2004 10-K discussed its finances and stated:

26

**Revenue Sources**

27
28

Marketing Services revenue is generated from several offerings including: the display of textual, rich media and graphical

- 97 -

1    advertisements, display of text based links to an advertiser's listing,

2    listing based services, and commerce based transactions.

3                                *    *    *

4         We generate revenue from the display of text based links to the

5    websites of our advertisers which are placed on the Yahoo! Network as

6    well as on the websites of our affiliates who have integrated our

7    sponsored search offerings into their websites. We recognize revenue

8    from these arrangements as "click-throughs" occur. "Click-throughs"

9    are defined as the number of times a user clicks on an advertiser's listing.

10                               *    *    *

11                        Years ended December 31

| **Operating Highlights** (in thousands) | 2003 | 2004 | Year-over-Year Change |
|---|---|---|---|
| Revenues | $1,625,097 | $3,574,517 | $1,949,420 |
| Income from operations | $295,666 | $688,581 | $392,915 |

16                               *    *    *

17   **Revenues**. Revenues by groups of similar services were as follows

18   (dollars in thousands):

19                        Years Ended December 31

| | 2002 | (1) | 2003 | (1) | 2004 | (1) | 2002-2003 % Change | 2003-2004 % Change |
|---|---|---|---|---|---|---|---|---|
| Marketing Services Fees | $745,126 | 78% | $1,326,905 | 82% | $3,148,941 | 88% | 78% | 137% |
| | 207,941 | 22% | 298,192 | 18% | 425,576 | 12% | 43% | 43% |
| Total Revenues | $953,067 | 100% | $1,625,097 | 100% | $3,574,517 | 100% | 71% | 120% |

25   (1)   Percentage of total revenues.

26        **Marketing Services Revenues.** Marketing Services revenue for

27   the year ended December 31, 2004 increased by approximately $1,822

28   million, or 137 percent as compared to the prior year. Marketing

                              - 98 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Services revenue for the year ended December 31, 2003 increased by approximately $582 million, or 78 percent as compared to the prior year. *The successive year-over-year growth in our marketing services revenue can be attributed to a combination of acquisitions and organic growth.* Incremental revenue from acquisitions contributed approximately $1,230 million and $285 million to the increases in the years ended December 31, 2004 and 2003, respectively. The remainder of the increase, approximately $592 million in 2004 and $297 million in 2003, is from organic growth in advertising across the entire Yahoo! Network.

*This growth in our marketing services revenue is driven by our growing number of users, advertisers and inventory.* As our user base increases and users spend more time on the Yahoo! Network, they drive a higher number of page views, which we view as inventory; and a higher number of search queries which result in a higher number of impressions and paid clicks. This increased level of engagement on the Yahoo! Network attracts more advertisers to our advertising services which also contributes to the growth in our marketing services revenue.

88.    Regarding revenue recognition, Yahoo!'s 2004 financial statements stated:

**Revenue Recognition.** The Company's revenues are derived principally from services, which comprise marketing services for businesses and offerings to users. The Company classifies these revenues as marketing services and fees.

\*    \*    \*

The Company generates revenue from the display of text based links to the websites of its advertisers which are placed on the Yahoo! Network as well as on the websites of third party entities (which the Company refers to as "affiliates") who have integrated the Company's

- 99 -

1  sponsored search offerings into their websites. The Company recognizes
2  revenue from these arrangements as "click-throughs" occur. "Click-
3  throughs" are defined as the number of times a user clicks on an
4  advertiser's listing.  The Company pays affiliates based on click-
5  throughs on the advertiser's listings that are displayed on the websites of
6  these affiliates. These payments are called traffic acquisition costs.

7  89.    Yahoo!'s financial results for 4Q 04 and FY 2004 were later filed with
8  the SEC in Yahoo!'s 4Q 04 Form 10-Q and 2004 10-K signed by Decker. The Form
9  10-Q and 2004 10-K contained Yahoo!'s false financial results for FY 2004 and 4Q
10 04, including those previously reported on January 18, 2005. The 2004 Form 10-K
11 and the 4Q 04 Form 10-Q also contained false Sarbanes-Oxley certificates and
12 statements about Yahoo!'s internal controls detailed in the "Yahoo!'s Misleading
13 Financial Statement and Disclosures" section of this Complaint (¶¶199-227) signed by
14 defendants Semel and Decker.

15 90.    Defendants' statements regarding Yahoo!'s 4Q 04 and FY 04 financial
16 results contained in ¶¶81-89 were materially false and misleading when made.
17 Defendants knew or recklessly disregarded the following:

18 (a)    According to CW11, following Yahoo!'s acquisition of Overture,
19 the Overture platform was incapable of handling the increasing numbers of
20 advertisers, marketing partners and users overloading the system from Yahoo!.
21 Compounding the problem was that even though the increasing traffic from Yahoo!
22 was literally causing the Overture system to self-destruct, and despite that system's
23 importance to Yahoo!'s overall business performance, Yahoo! refused to provide the
24 Overture Pasadena facility with adequate resources to deal with the increased Yahoo!
25 traffic. According to CW10, CW11 and CW12, a culture clash between Yahoo!'s
26 Sunnyvale engineers and Overture's Pasadena engineers occurred following the
27 Overture acquisition that adversely impacted Yahoo!'s ability to smoothly integrate
28 Overture. To address the increasing Yahoo! traffic, Overture engineers requested that

1  Yahoo! provide funding for additional servers to handle the increasing traffic.
2  According to CW10, not only did Yahoo! refuse to provide additional funding for
3  servers, the Sunnyvale office ultimately decided to terminate dozens of legacy
4  Overture engineers even though those engineers were more knowledgeable about how
5  the Overture information systems operated. Confirmed by CW12, the decision to
6  terminate the senior legacy Overture engineers had dramatic and adverse
7  consequences on Yahoo!'s ability to develop new software systems to address the ever
8  increasing Yahoo! traffic on the overloaded Overture platform. According to both
9  witnesses, the Yahoo! team assigned to replace the terminated and replaced legacy
10 Overture engineers did not have an appreciation for the size and complexity of
11 integrating Overture and as a result "stalled, delayed and derailed" the attempts to
12 develop a new search platform;

13         (b)     Yahoo!'s refusal to provide adequate funding to Overture and the
14 decision to terminate the most senior and knowledgeable Overture engineers severely
15 impacted Yahoo!'s business operations. According to CW10, Yahoo!'s refusal to
16 provide sufficient funding for additional servers impacted his/her teams' abilities to
17 analyze data relating to seaches and clicks for customers so that Yahoo! could provide
18 meaningful data pursuant to the terms of the SLAs on a daily basis. The data provided
19 to advertising customers had to be analyzed by numerous teams that reported to
20 CW10 and derived from numerous sources before it was forwarded to clients. Some
21 of the important functions preformed by the various teams s/he supervised included
22 the calculation of "discard rates" by analyzing what clicks could not be passed on to
23 advertisers and thus eliminated from billing and "conversion rates" advertisers
24 experienced from users who clicked on their ads. The discard rates were analyzed for
25 each marketing partner to determine whether they were poor quality partners.
26 According to CW10, because Yahoo! refused to provide his/her teams with additional
27 servers, their ability to calculate accurate discard and conversion rates was severely
28

- 101 -

1  impacted. Instead, Yahoo! increasingly failed to eliminate bad or nonbillable clicks
2  and provided customers with worthless discard rates and conversion rates.

3          (c)     In addition to not providing Overture engineers with adequate
4  resources to service the Yahoo! traffic, the Company also failed to provide adequate
5  staffing for the development of an internal project referred to as "solving the blob."
6  According to CW10 and CW7, throughout the Class Period, Yahoo! was behind
7  schedule on this project, a necessary precursor to Project Panama. This project
8  involved integrating the very separate software systems such as the CRM system and
9  the click detection system into a single platform. This integration was essential so that
10 Yahoo! could comply with the terms of the SLA with advertising customers and
11 provide filtered data on a timely basis. CW10 confirmed that this project was far
12 behind schedule because Yahoo! fired the Overture engineers most knowledgeable
13 about the different systems.

14         (d)     Yahoo!'s decision to terminate the senior legacy Overture
15 engineers who were the most knowledgeable about how and why Yahoo! needed to
16 improve the search algorithm and bidding system so that Yahoo! could compete with
17 Google also impacted Yahoo!'s switch to its own search technology, and this switch
18 was not technically smooth as defendants represented. Following the acquisition of
19 Overture and switch from Google's search engine, Yahoo! rushed to market its new
20 Content Match product before it functioned properly. Yahoo! rushed Content Match
21 to market with a very manual mapping process that led to wide variations in search
22 results. Content Match led to very undesirable results such as irrelevant clicks and
23 even "click tsunamis." A click tsunami occurred when a search mapped to results that
24 caused thousands of clicks, with little or no conversion, on an advertiser's site. CW11
25 provided an example of a click tsunami such as when a mortgage seller's ad would
26 appear on a news article announcing a federal reserve interest rate cut. A large
27 volume of readers would click on an ad next to the article thinking they would obtain
28 more information about what impact the federal reserve's action would have on

1 mortgage interest rates and instead clicked through to the mortgage seller's website.
2 Because Yahoo!'s Content Match system lacked any method to prevent the resulting
3 onslaught of clicks, the small advertiser who may have only budgeted for $200/day
4 would receive billing for thousands of dollars, far exceeding the budget or capacity to
5 pay.

6 (e) Yahoo!'s introduction of its own search technology was not
7 technically smooth because, as confirmed by CW11, Content Match lacked any
8 features to prevent actual click fraud or any method to monitor any sort of referral log
9 data to eliminate non-billable clicks. CW10 confirmed that Yahoo! had a large
10 problem with poorer quality international partners and that these problems
11 notwithstanding, Yahoo! would not allow advertising customers to opt out of
12 international partner traffic up to the time s/he left Yahoo!. While s/he worked for
13 Overture prior to that company's acquisition by Yahoo!, Overture routinely "turned
14 off" poorer quality partners who had unacceptable "discard rates." Overture
15 maintained high standards and maintained score cards for partners to ensure high
16 conversion rates by customers. Following the Overture acquisition, Yahoo! was not
17 as concerned with the quality of the traffic from marketing partners.

18 (f) In combination, Yahoo!'s failure to have a functioning system to
19 detect click fraud or non-billable clicks, the Company's rocky transition to a new
20 search technology, the integration of Overture marred by the engineering culture
21 clash, the termination of the most senior Overture engineers and failure to provide
22 adequate resources to Overture to manage the Yahoo! traffic and Yahoo!'s decision to
23 rush Content Match to market all had a disastrous impact on Yahoo!'s business
24 performance. As a result, the Company's paid search revenues stagnated. This
25 development put defendants in a bind because they were desperate to demonstrate
26 growing search ad revenues and meet the high end of or exceed their guidance to
27 securities analysts. As a result, defendants developed ways to recognize ad search
28 revenue they had not earned. To accomplish this, defendants implemented a method

- 103 -

1  to change the "dial" on the Company's click-fraud detection system at the end of the
2  quarter to allow more non-billable click activity to be passed on to customers, thereby
3  increasing the Company's revenues at the end of the quarter. According to CW12, the
4  non-billable click activity was being allowed through the click detection system at the
5  end of the quarter, and being passed on to advertising customers in the form of
6  charges to their account and resulted in increasing numbers of complaints from
7  advertising customers at the end of the quarter.

8       (g)    As detailed in ¶¶202-210, during 4Q 04, Yahoo! improperly
9  recognized at least 10% of its paid search revenue – which constituted approximately
10  39% of the total marketing services revenue in 4Q 04 – attributable to click fraud or
11  $35.9 million because the revenue recognized via click fraud was not earned;

12      (h)    As detailed in ¶¶211-213, during 4Q 04, Yahoo! failed to properly
13  record a loss contingency in violation of GAAP, as set forth in SFAS No. 5,
14  *Accounting for Contingencies*;

15      (i)    As detailed in ¶¶214-227, during 4Q 04, Yahoo! failed to disclose,
16  as required by the SEC Regulation S-K, known trends and uncertainties by not
17  reporting the practice of improperly recognizing revenue generated by click fraud and
18  thereby not disclosing Yahoo!'s actual financial performance;

19      (j)    As detailed in ¶¶214-227, during 4Q 04, Yahoo!'s publicly issued
20  financial statements violated fundamental accounting principles requiring that such
21  statements contain complete and reliable information, presented in a conservative
22  manner regarding how managers discharged their stewardship responsibilities of the
23  Company and the actual financial performance of the Company;

24      (k)    As detailed in ¶¶202-210, during the 4Q 04, as a consequence of
25  the aforementioned practices, the Company's revenues and net income were
26  artificially inflated and reported financial results were in violation of GAAP in that the
27  Company's revenue was inflated by $35.9 million and net income was overstated by
28  $0.02/per share.

1    91.    Defendants' statements on and about January 19, 2005 and March 2005,
2    which were false and misleading when made, had a direct effect on Yahoo!'s stock
3    price which continued to trade at artificially inflated levels.

4    92.    On April 6, 2006, *The Wall Street Journal* published an article titled,
5    "'Click Fraud' Joins Spam and ID Theft as Scourge of Web Business Models –
6    Affected Companies See Ad Fees Rise." The article stated:

7    "Click Fraud" [is] a term the industry uses to describe someone
8    clicking with ill intent. A fraudulent clicker can exploit the way Web
9    ads work to rack up fees for a business rival, boost the placement of his
10   own ads or to make money for himself. Some people even employ
11   software that automatically clicks on ads multiple times.

12   ... Some believe about 20% of clicks are from people not
13   necessarily interested in the product advertised, and therefore in the
14   industry's view, fraudulent; others say the problem is less severe. *What*
15   *is clear is that if left unchecked, click fraud could damage the*
16   *credibility of Google, Yahoo and the search-ad industry that spurred*
17   *their meteoric growth*.

18   *    *    *

19   *Yahoo says it uses a complex system of filters and analysis to*
20   *weed out fraudulent clicks*.

21   "Anyone who says this is not a real challenge is kidding you!"
22   said John Slade, a senior director for product management at Yahoo's
23   search-ad arm.

24   *    *    *

25   Google and Yahoo won't give a public estimate of the number of
26   bad clicks. . . .

27   Michael Yavonditte, chief executive of Quigo Technologies Inc.,
28   which handles search advertising for companies, estimates that between

- 105 -

1    5% and 13% of all clicks are fraudulent. Jorge Zuniga of Dallas-based

2    ClickAssurance LLC, a company that sells anticlick-fraud services

3    estimates that as many as 80% are fraudulent for some key words on

4    certain search engines.

5    93.    On April 19, 2005, Yahoo! issued a news release over *Business Wire* in

6    which they reported Yahoo!'s financial results for 1Q 05. The release stated in

7    pertinent part as follows:

8    Consolidated Financial Results

9    • Revenues were $1,174 million for the first quarter of 2005, a 55

10       percent increase compared to $758 million for the same period of

11       2004.

12         • Marketing services revenue was $1,025 million for the first

13            quarter of 2005, a 54 percent increase compared to $665 million

14            for the same period of 2004.

15         • Fees revenue was $149 million for the first quarter of 2005, a 61

16            percent increase compared to $93 million for the same period of

17            2004.

18    • Revenues excluding traffic acquisition costs ("TAC") were $821

19       million for the first quarter of 2005, a 49 percent increase compared

20       to $550 million for the same period of 2004.

21    • Gross profit for the first quarter of 2005 was $720 million, a 51

22       percent increase compared to $476 million for the same period of

23       2004.

24    • Operating income for the first quarter of 2005 was $247 million, an

25       87 percent increase compared to $132 million for the same period of

26       2004.

27

28

1
2
3

- Operating income before depreciation and amortization for the first quarter of 2005 was $345 million, a 64 percent increase compared to $211 million for the same period of 2004.

4
5
6

- Cash Flow from operating activities for the first quarter of 2005 was $386 million, a 63 percent increase compared to $236 million for the same period of 2004.

7
8
9
10
11

- Net income for the first quarter of 2005 was $205 million or $0.14 per diluted share (including net income of $15 million, or $0.01 per diluted share, related to the sale of certain investments and settlements). This compares with net income of $101 million or $0.07 per diluted share for the same period of 2004.

12
13
14
15
16
17

"In the first quarter, Yahoo! continued to grow its user base and drive deeper engagement, the core user fundamentals that lead to favorable financial returns," said Susan Decker, chief financial officer, Yahoo!. "We continued to increase levels of free cash flow while investing in the business, demonstrating the leverage in our operating model, and driving long-term shareholder value."

18
19
20
21
22

94.    Later that day, on April 19, 2005, Yahoo! hosted a conference call with analysts and investors to discuss Yahoo!'s 1Q 05 results, current business operations and future prospects. Defendants Semel, Decker and Rosensweig had an opportunity to address analysts' and investors' questions and concerns. During the call, defendant Semel commented on Yahoo!'s advertising business and search technology:

23
24
25
26

Good afternoon. Yahoo! is off to a terrific start in 2005. We have raised the bar even higher in the first quarter. The pace of innovation and the appeal of our services has translated into deeper relationships with our users and continued growth for Yahoo!.

27

*    *    *

28

- 107 -

1
2
3
4
5
6
7
8
9

Building the best quality services to attract the world's largest and most engaged online audience has enabled Yahoo! to create what we believe is the best advertising environment on the Internet today. *Our marketing services business delivered just over $1 billion in revenue in the quarter*.... Sponsored search is ... equally exciting and [a] huge opportunity for us. Yesterday we officially rebranded Overture to be called Yahoo! Search Marketing and *will bring together our Sponsored Search and other self-service offerings to make it even easier for marketers to take advantage of all of our services*.

10
11
12
13
14

... For example, we have improved our matching capabilities which create more opportunities for marketers to get their messages in front of consumers, at the moment they are interested, *increasing coverage of ads and providing more ways for advertisers to get high quality clicks*.

15

\* \* \*

16
17
18

In short, we have established a positive cycle of innovation, breadth, and depth and improved and expanded modernization opportunities that we believe positions us well for the future ahead.

19
20

95.     Also during the call, defendant Sue Decker gave the business outlook for 2005:

21
22
23
24

Let's turn now to some of the details behind our strong and growing profitability. Specifically, operating cash flow came in at $345 million, up 72% year-over-year, and well above the high end of our business outlook.

25

\* \* \*

26
27

Let's turn now to the business outlook which we are upwardly revising due to better than expected results. Starting with the second

28

- 108 -

1  quarter, we expect revenue ex-TAC to be in the range of [$]855 to $895
2  million . . . .

3      Turning to profitability, . . . we expect to operate within an
4  operating cash flow range of [$]340 to $360 million . . . For the full year
5  of 2005, we expect ex-TAC to range from [$]3 billion 565 million to
6  [$]3 billion 715 million . . . .

7      96.   Defendants Rosenzweig and Decker addressed the issue of click fraud
8  raised by analyst Mark Maheney:

9      Great, thank you very much. *Could you address the issue of click fraud*
10  to what extent the incident has been increasing and to what extent it is an
11  increasing cost to business in the search industry[?]

12      DAN ROSENSWEIG: Yes, this is Dan. And I think Sue and I
13  will tackle that one together. *In the – in the category of click fraud or*
14  *click spam, clearly there has been a lot of press around it lately.*  In any
15  emerging and dynamic marketplace these kinds of obstacles and issues
16  are inevitable, it has happened through the first ten years of the Internet,
17  whether it was Spam or privacy or commerce related issues. *And*
18  *Yahoo! has always been a leader in learning about these things,*
19  *identifying them, fighting them.  We use technology and human*
20  *resources on this.  Overture had really been a leader in really focusing*
21  *on this, and we built numerous layers of defense against it.  It's not a*
22  *big issue.  At this point we've been able to contain it.  We take it very,*
23  *very seriously.*  And so we're going to continue to invest and make sure
24  that it is a regular cost of business for us. So, I don't know, Sue?

25      SUE DECKER: Yes, Mark, I do not have a lot to add. I think that
26  Dan really covered it. *It is one of these things that Overture had*
27  *addressed for many years and is very[,] very capable and continues to,*
28  *to [Inaudible]  Algorithms that fight this, that filter out the clicks.  We*

- 109 -

1    *see it almost immediately, so it is very straightforward to filter them*

2    *out, and we continue to improve our process and the fight is getting*

3    *better and better, and we feel like it is well under control.*

4    97.    After the April 19, 2005 conference call, securities analysts following the

5    Company, including Credit Suisse First Boston, Deutsche Bank (April 19, 2005),

6    Jefferies & Company, Inc. (April 20, 2005), Pacific Growth Equities (April 20, 2005),

7    Bear Stearns, Piper Jaffray, and CIBC World Markets reported Yahoo! exceeded

8    consensus estimates for revenue and EPS for 1Q 05, and that the Company had raised

9    its FY05 guidance.  Certain analysts further reported estimated paid search revenue at

10    approximately $380 million.  As a result, the majority of analysts following the

11    Company raised their estimates for 2Q 05.  Additionally analysts commented:

12    - Deutsche Bank's April 19, 2005 report entitled, "Balanced 'Growth

13      Engine' Drives 1Q-Buy," stated: "We believe that paid search growth

14      was driven almost entirely by paid click volume growth, which

15      benefited from expanded keyword coverage due to growth in the

16      number of categories and advertisers participating in [the] network."

17    - RBC Capital Markets' April 20, 2005 report entitled, "Very Strong

18      Quarter, Upside in Search Surprising," stated: "Yahoo admitted that

19      recent [third party] affiliate signings had inflated [TAC] cost

20      percentages."

21    - CIBC World Markets' April 20, 2005 report entitled, "1Q Ahead

22      Mainly on Fees; Branded (& Possibly Search) Quite Strong," stated:

23      "[W]hether Yahoo!'s growth is indicative of broader industry trends

24      or *whether the company added new third-party distribution parties*

25      *to drive growth vs. the growth being at its sites or from existing*

26      *partners.*"

27

28

1

2

3

- Walton Holdings LLC's May 12, 2005 report noted: "On its earnings call, *management, in response to a question, commented that "click fraud" is not [yet] a significant problem*."

4

5

98.    Analysts predicted the improvement of Yahoo!'s search algorithm (*i.e.*, Project Panama) would be complete in late 2005 or early 2006:

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

- Citigroup's June 8, 2005 report states: "The 'fixing' of Yahoo!'s search algorithm – *We believe that a major R&D priority for Yahoo! this year is improving its search algorithm*. Yahoo! has been at a distinct disadvantage to Google here, not having its years of experience in both algorithmic and paid search execution. To date, Yahoo! and Google have also taken different paths to paid search results, with Yahoo!'s Overture sorting paid search results by price (*i.e.* top bidder gets top ranking) and Google sorting paid search results by both price and relevancy (*i.e.* higher click-thru rates get higher ranking). The result has been more relevant paid search results by Google, which has generated higher click-thru rates and higher monetization. . . . [W]e believe Yahoo! is working to change its search algorithm to make it more like Google's *We believe the timing is likely late 2005 or early 2006, and we believe this 'fix' could be a positive catalyst*."

21

22

23

24

- RBC Capital Markets Research Comment of June 27, 2005, states: "*We do not believe that Yahoo has adjusted its search monetization formula yet, but that the tweaks should start to have an impact on results, possibly by 4Q05*."

25

26

27

28

99.    Analysts believed these improvements to Yahoo!'s search algorithms would increase Yahoo!'s advertising yields and improve the Company's competitiveness against Google and others. Needham analyst Mark May's report dated June 23, 2005, states:

1
2
3
4
5
6

We believe Yahoo is currently conducting tests with privately-held Revenue Science that could lead to the addition of behavioral targeting capabilities both to Yahoo's Network and to its Partner Network. ***Not only could such an offering increase Yahoo's advertising yields, it could also improve the company's competitiveness against competitors, including Google's AdSense for Content.***

7   100.   Defendants' statements which were false and misleading when made had
8  a direct effect on Yahoo!'s stock which increased to $34.65 on April 20, 2005 from
9  $33.22 on April 19, 2005 and continued to trade at artificially inflated levels.

10   101.   Yahoo!'s 1Q 05 results were later filed with the SEC in Yahoo!'s 1Q 05
11  10-Q Report, signed by Decker.  This 10-Q Report contained Yahoo!'s false 1Q 05
12  financial results, including those previously publicly reported.  The 10-Q also
13  contained the false Sarbanes-Oxley certificates and statements about Yahoo!'s internal
14  controls detailed in "Yahoo!'s Misleading Financial Statements and Disclosures"
15  section of this Complaint (¶¶199-227) signed by Defendants Semel and Decker.

16   102.   Defendants' statements regarding Yahoo!'s 1Q 05 financial results
17  contained in ¶¶92-101 were materially false and misleading when made.  Defendants
18  knew or recklessly disregarded, but failed to disclose, the following:

19   (a)   According to CW11, following Yahoo!'s acquisition of Overture,
20  the Overture platform was incapable of handling the increasing numbers of
21  advertisers, marketing partners and users overloading the system from Yahoo!.
22  Compounding the problem was that even though the increasing traffic from Yahoo!
23  was literally causing the Overture system to self-destruct, and despite that system's
24  importance to Yahoo!'s overall business performance, Yahoo! refused to provide the
25  Overture Pasadena facility with adequate resources to deal with the increased Yahoo!
26  traffic.  According to CW10, CW11 and CW12, a culture clash between Yahoo!'s
27  Sunnyvale engineers and Overture's Pasadena engineers occurred following the
28  Overture acquisition that adversely impacted Yahoo!'s ability to smoothly integrate

1  Overture. To address the increasing Yahoo! traffic, Overture engineers requested that
2  Yahoo! provide funding for additional servers to handle the increasing traffic.
3  According to CW10, not only did Yahoo! refuse to provide additional funding for
4  servers, the Sunnyvale office ultimately decided to terminate dozens of legacy
5  Overture engineers even though those engineers were more knowledgeable about how
6  the Overture information systems operated. Confirmed by CW12, the decision to
7  terminate the senior legacy Overture engineers had dramatic and adverse
8  consequences on Yahoo!'s ability to develop new software systems to address the ever
9  increasing Yahoo! traffic on the overloaded Overture platform. According to both
10 witnesses, the Yahoo! team assigned to replace the terminated and replaced legacy
11 Overture engineers did not have an appreciation for the size and complexity of
12 integrating Overture and as a result "stalled, delayed and derailed" the attempts to
13 develop a new search platform;

14          (b)    Yahoo!'s refusal to provide adequate funding to Overture and the
15 decision to terminate the most senior and knowledgeable Overture engineers severely
16 impacted Yahoo!'s business operations. According to CW10, Yahoo!'s refusal to
17 provide sufficient funding for additional servers impacted his/her teams' abilities to
18 analyze data relating to searches and clicks for customers so that Yahoo! could
19 provide meaningful data pursuant to the terms of the SLAs on a daily basis. The data
20 provided to advertising customers had to be analyzed by numerous teams that reported
21 to CW10 and derived from numerous sources before it was forwarded to clients.
22 Some of the important functions preformed by the various teams s/he supervised
23 included the calculation of "discard rates" by analyzing what clicks could not be
24 passed on to advertisers and thus eliminated from billing and "conversion rates"
25 advertisers experienced from users who clicked on their ads. The discard rates were
26 analyzed for each marketing partner to determine whether they were poor quality
27 partners. According to CW10, because Yahoo! refused to provide his/her teams with
28 additional servers, their ability to calculate accurate discard and conversion rates was

- 113 -

1    severely impacted. Instead, Yahoo! increasingly failed to eliminate bad or nonbillable
2    clicks and provided customers with worthless discard rates and conversion rates.

3            (c)    In addition to not providing Overture engineers with adequate
4    resources to service the Yahoo! traffic, the Company also failed to provide adequate
5    staffing for the development of an internal project referred to as "solving the blob."
6    According to CW10, the project involved integrating very separate software systems
7    such as the Customer Relationship Management ("CRM") system and the click
8    detection system into a single platform. The integration of these systems was essential
9    so that Yahoo! could comply with the terms of the SLA with advertising customers
10    and provide filtered data on a timely basis. CW10 confirmed this project was behind
11    schedule because Yahoo! had fired Overture engineers most knowledgeable about the
12    different systems. According to CW7, a former International Sales Specialist at
13    Yahoo!'s Overture facility in Pasadena, "solving the blob" was a project to put all of
14    Overture's back end functions on a single platform. According to CW10, by February
15    2005, the Company was extremely far behind in "solving the blob."

16            (d)    Yahoo!'s decision to terminate the senior legacy Overture
17    engineers who were the most knowledgeable about how and why Yahoo! needed to
18    improve the search algorithm and bidding system so that Yahoo! could compete with
19    Google also impacted Yahoo!'s switch to its own search technology, and this switch
20    was not technically smooth as defendants represented. Following the acquisition of
21    Overture and switch from Google's search engine, Yahoo! rushed to market its new
22    Content Match product before it functioned properly. Yahoo! rushed Content Match
23    to market with a very manual mapping process that led to wide variations in search
24    results. Content Match led to very undesirable results such as irrelevant clicks and
25    even "click tsunamis." A click tsunami occurred when a search mapped to results that
26    caused thousands of clicks, with little or no conversion, on an advertiser's site. CW11
27    provided an example of a click tsunami such as when a mortgage seller's ad would
28    appear on a news article announcing a federal reserve interest rate cut. A large

1 volume of readers would click on an ad next to the article thinking they would obtain
2 more information about what impact the federal reserve's action would have on
3 mortgage interest rates and instead clicked through to the mortgage seller's website.
4 Because Yahoo!'s Content Match system lacked any method to prevent the resulting
5 onslaught of clicks, the small advertiser who may have only budgeted for $200/day
6 would receive billing for thousands of dollars, far exceeding the budget or capacity to
7 pay.

8       (e)     Yahoo!'s introduction of its own search technology was not
9 technically smooth because, as confirmed by CW11, Content Match lacked any
10 features to prevent actual click fraud or any method to monitor any sort of referral log
11 data to eliminate non-billable clicks.  CW10 confirmed that Yahoo! had a large
12 problem with poorer quality international partners and that these problems
13 notwithstanding, Yahoo! would not allow advertising customers to opt out of
14 international partner traffic up to the time s/he left Yahoo!.  While s/he worked for
15 Overture prior to that company's acquisition by Yahoo!, Overture routinely "turned
16 off" poorer quality partners who had unacceptable "discard rates."  Overture
17 maintained high standards and maintained score cards for partners to ensure high
18 conversion rates by customers.  Following the Overture acquisition, Yahoo! was not
19 as concerned with the quality of the traffic from marketing partners.

20       (f)     In combination, Yahoo!'s failure to have a functioning system to
21 detect click fraud or non-billable clicks, the Company's rocky transition to a new
22 search technology, the integration of Overture marred by the engineering culture
23 clash, the termination of the most senior Overture engineers and failure to provide
24 adequate resources to Overture to manage the Yahoo! traffic and Yahoo!'s decision to
25 rush Content Match to market all had a disastrous impact on Yahoo!'s business
26 performance.  As a result, the Company's paid search revenues stagnated.  This
27 development put defendants in a bind because they were desperate to demonstrate
28 growing search ad revenues and meet the high end of or exceed their guidance to

- 115 -

1   securities analysts.  As a result, defendants developed ways to recognize ad search
2   revenue they had not earned.  To accomplish this, defendants implemented a method
3   to change the "dial" on the Company's click-fraud detection system at the end of the
4   quarter to allow more non-billable click activity to be passed on to customers, thereby
5   increasing the Company's revenues at the end of the quarter.  According to CW12, the
6   non-billable click activity was being allowed through the click detection system at the
7   end of the quarter, and being passed on to advertising customers in the form of
8   charges to their account and resulted in increasing numbers of complaints from
9   advertising customers at the end of the quarter.

10          (g)    As detailed in ¶¶202-210, during 1Q 05, Yahoo! improperly
11   recognized at least 10% of its paid search revenue – which constituted approximately
12   38% of the total marketing services revenue in 1Q 05 – attributable to click fraud or
13   $38.7 million because the revenue recognized via click fraud was not earned;

14          (h)    As detailed in ¶¶211-213, during 1Q 05, Yahoo! failed to properly
15   record a loss contingency in violation of GAAP, as set forth in SFAS No. 5,
16   *Accounting for Contingencies*;

17          (i)    As detailed in ¶¶214-227, during 1Q 05, Yahoo! failed to disclose,
18   as required by SEC Regulation S-K, known trends and uncertainties by not reporting
19   the practice of improperly recognizing revenue generated by click fraud and thereby
20   not disclosing Yahoo!'s actual financial performance;

21          (j)    As detailed in ¶¶214-227, during 1Q 05, Yahoo!'s publicly issued
22   financial statements violated fundamental accounting principles requiring that such
23   statements contain complete and reliable information, presented in a conservative
24   manner regarding how managers discharged their stewardship responsibilities of the
25   Company and the actual financial performance of the Company;

26          (k)    As detailed in ¶¶202-210, during the 1Q 05, as a consequence of
27   the aforementioned practices, the Company's revenues and net income were
28   artificially inflated and reported financial results were in violation of GAAP in that the

- 116 -

1   Company's revenue was inflated by $38.7 million and net income was overstated by
2   $0.02/per share.

3       103.   On July 19, 2005, Yahoo! issued a news release over the *Business Wire*
4   in which it reported Yahoo!'s financial results for 2Q 05.   The release stated in
5   pertinent part as follows:

6           "Yahoo! continued to see solid growth in the second quarter as a
7       result of our strength in both search marketing and brand advertising,
8       increased engagement from our large, global audience, and our ability to
9       execute and perform according to plan," said Terry Semel, chairman and
10      chief executive officer, Yahoo!. "We have a healthy business model that
11      we believe will enable us to take advantage of future growth
12      opportunities and we remain dedicated to providing our users with the
13      very best services on the Internet."

14      Consolidated Financial Results

15   • Revenues were $1,253 million for the second quarter of 2005, a 51
16       percent increase compared to $832 million for the same period of
17       2004.

18       • Marketing services revenue was $1,094 million for the second
19           quarter of 2005, a 51 percent increase compared to $723 million
20           for the same period of 2004.

21       • Fees revenue was $159 million for the second quarter of 2005, a
22           45 percent increase compared to $109 million for the same period
23           of 2004.

24   • Revenues excluding traffic acquisition costs ("TAC") were $875
25       million for the second quarter of 2005, a 44 percent increase
26       compared to $609 million for the same period of 2004.

27

28

- 117 -

- Gross profit for the second quarter of 2005 was $767 million, a 43 percent increase compared to $535 million for the same period of 2004.

- Operating income for the second quarter of 2005 was $261 million, a 75 percent increase compared to $149 million for the same period of 2004.

- Operating income before depreciation and amortization for the second quarter of 2005 was $368 million, a 57 percent increase compared to $234 million for the same period of 2004.

- Cash flow from operating activities for the second quarter of 2005 was $404 million, a 62 percent increase compared to $250 million for the same period of 2004.

- Free cash flow for the second quarter of 2005 was $300 million, a 55 percent increase compared to $194 million for the same period of 2004.

- Net income for the second quarter of 2005 was $755 million or $0.51 per diluted share (including net income of $563 million, or $0.38 per diluted share, related to the sale of an investment). This compares with net income of $113 million or $0.08 per diluted share for the same period of 2004.

104.   That same day, July 19, 2005, Yahoo! hosted a conference call with analysts and investors to discuss Yahoo!'s 2Q 05 results, current business operations and future prospects. Defendants Semel, Decker and Rosensweig had the opportunity to address analysts' and investors' questions and concerns. During the call, defendant Semel gave a detailed review of Yahoo!'s advertising business:

TERRY SEMEL, CHAIRMAN, CEO, YAHOO, INC.: . . . .

Yahoo! continued to operate full speed ahead in the second quarter delivering our ninth consecutive quarter of record results.

1 |                                    *    *    *

2 |          In the second quarter we reported revenue of $1.3 billion, up 51%

3 | from the second quarter of last year. . . .

4 |          Operating income before depreciation and amortization in Q2 was

5 | Yahoo!'s highest ever at $368 million . . . .

6 |                                    *    *    *

7 |          Our marketing services business delivered almost $1.1 billion in

8 | revenue for the quarter, representing 51% year-over-year growth as a

9 | result of strong contributions by all forms of advertising. We are

10 | extremely pleased with this performance as our revenue growth for the

11 | first half of the year on an ex-TAC basis suggest a run rate that will

12 | again outpace the market currently forecasted growth 34% this year on a

13 | global basis.

14 |                                    *    *    *

15 |          Search advertising is of course an equally exciting opportunity for

16 | us. We became a leading player in just 18 months ago and we see even

17 | more opportunity in this area around some of our larger initiatives.

18 |          ***We have a strong road map in place for improving technologies***

19 | ***in order to optimize relevance and matching capabilities in our core***

20 | ***services globally***. During the balance of this year, we will introduce

21 | important upgrades in areas such as advertiser and publishing self-

22 | service platforms, which we expect will substantially improve our

23 | offerings in both content match and sponsored search.

24 |          ***We also plan to offer new contextual targeting capabilities which***

25 | ***would enhance our services both on Yahoo! and for small publishers***

26 | ***throughout the Web***. These initiatives are among the highest priorities

27 | within the Company and important investment in Yahoo!'s long-term

28 | growth.

1    We expect to improve the relevancy and performance of our core
2    business as well as create new opportunities for our marketing partners
3    and for Yahoo!. We anticipate that we will begin realizing additional
4    value from these long-term initiatives as 2006 progresses.

5        Looking at our overall marketing services business, we are in a
6    position of real strength.

7                    *    *    *

8        SUE DECKER, CFO[, EVP, ADMIN.], YAHOO, INC.: . . . .
9                    *    *    *

10    Let's move now to the P&L.

11        The overall summary is that consistent with out financial strategy
12    we are successfully supporting a massive and growing base of more
13    revenue productive users which has allowed us to exceed both our longer
14    term revenue and operating cash flow objective. Specifically, second
15    quarter revenue ex-TAC came in at $875 million . . . .

16                    *    *    *

17    [O]perating cash flow came in at $368 million . . . .

18                    *    *    *

19        Let's turn now to the business outlook, which we are modestly
20    raising at midpoint and narrowing in terms of the range of forecasted
21    outcomes.

22                    *    *    *

23        To sum up, as we take stock of our financial vital signs halfway
24    through '05, we're very pleased with how we're tracking. First, in Q1
25    after seeing how well our business was doing, we raised the midpoint of
26    our outlook for revenue ex-TAC by $175 million, and our midpoint of
27    our operating cash flow by nearly $100 million.

28

- 120 -

1

2

3

Our visibility has improved as we've completed another quarter allowing us to tweak these ranges a bit higher at the midpoint and to modestly narrow them.

4

\*    \*    \*

5

6

7

8

In our confidence in our ability to forecast our owned and operated search business, now that we've been principle in it for over 18 months, has improved. And we're currently benefiting from a more stable affiliate new business environment.

9

\*    \*    \*

10

11

12

13

14

15

HEATH TERRY, ANALYST, CREDIT SUISSE FIRST BOSTON: Thank you. I was hoping you could, without knowing you're not going into specific numbers, just kind of characterize the difference that you're seeing in the growth between your branded business and your search business and kind of what your expectations for that relationship going forward's going to be.

16

\*    \*    \*

17

TERRY SEMEL[, CHAIRMAN CEO, YAHOO INC.]: . . . .

18

\*    \*    \*

19

20

21

22

23

24

25

26

27

So if you just think about us one more time in our first year in the search or sponsored search business and search business, *we dedicated that year to coming up with what I think is the best algorithmic search product in the world. And as we began year two, as we began '05, we put together a very aggressive and very achievable road map which included some of the best and greatest engineers we had here at Yahoo!, had worked on, many of whom had worked on the algorithmic approach, and we went after the clear question of how do we increase our abilities to monetize our sponsored search better, and I believe*

28

1    *we're right on track and we're very excited about the developments and*

2    *I think you just see a lot more of it in the latter part of this year.*

3                              *        *        *

4    JEETIL PATEL, ANALYST, DEUTSCHE BANK SECURITIES:

5    Great. Thank you. Two questions. Have you done any sort of different

6    implementation as it relates to contextually integrating some of the

7    sponsored links? It looks like you're taking a different type of a kind of

8    approach as it relates to kind of serving up some of the advertising on

9    some of the content pages inside the network-related sponsored links.

10   Can you talk about how you're seeing click-throughs or click-through

11   rates trend in that side of the equation?

12                             *        *        *

13   DAN ROSENSWEIG, COO, YAHOO, INC.:  This is Dan. I'll

14   take the first part of your question on the different implementations

15   regarding content managed throughout the Yahoo! network.

16   We're sort of very excited about the opportunity with content

17   match. *What we try to do now is make sure that we create the right*

18   *format of advertising, the greatest amount of relevancy within the*

19   *environments and create the best experience for both users and*

20   *advertisers.*

21   So we're always experimenting with the right kind of matching

22   algorithms and the right kind of locations and the balance between

23   branded and contextual ads on the same page. So you'll always see us

24   testing different implementations to make sure we maximize it.

25   *All of it is yielding very good results so the technology about*

26   *improving the matching algorithms on contextual advertising are*

27   *going up each and every day and that's been very helpful. The new*

28   *implementations are working very well and so we're seeing increased*

- 122 -

1    *success with that and we expect to continue to roll that out across the*
2    *network.*

3                                    \*       \*       \*

4                    ANTHONY NOTO, ANALYST, GOLDMAN SACHS: . . . .

5              . . . Second question is really about monetization Terry. You
6    talked about that in your comments. I was wondering, do you think you
7    can launch a new monetization algorithm before the year-end and if not
8    at what time? And have you tested it at all at this point?

9              Our calculations would show that for every 100 basis points
10   improvement and click-through rate you can drive about 8% increase in
11   leads that you generate within search.

12                                   \*       \*       \*

13             TERRY SEMEL[, Yahoo, Inc. – Chairman, CEO]: Scott and Dan
14   can jump in if you would like as well.

15             So let's agree on one thing. Testing is good. And testing only
16   makes things better and in this case testing means to us even greater
17   monetization capabilities.

18             So I just got off on this whole area with, you know, feeling just
19   pretty fantastic because everything we do represents more. And
20   everything we do represents incremental value to our Company.

21             So when we start off that way, bear in mind that, yes, there's no
22   question about the fact that there will be and one can just totally assume
23   that there will be testing going on on the number of different fronts. And
24   we've done it before.

25             We're doing it again and we're doing it with a very open mind to
26   try to determine what's best for our users, what's best for our advertisers
27   and at the end of the day what's best for our bottom line. So we're very
28   excited about it.

                                    - 123 -

1    *No, we have no intentions just jumping out one day and just*
2    *releasing everything, but you should assume that there are multiple*
3    *steps within our road map. We are right on target and we'll be*
4    *following those steps, excited all the way home*.

5    105.   Based on the 2Q 05 conference call, analysts believed Project Panama
6    would be ready for 2006.

7    • On July 20, 2005, Pacific Crest issued a Morning Note entitled, "Q2
8      Is Disappointing but the Major Trends Are Intact," stating:
9      "*Management indicated that it expects its initiatives to improve*
10     *relevancy of its key-word matching should be ready for 2006*. We
11     believe that there is a significant gap in monetization between Yahoo
12     and Google, due at least in part to relevancy, and these initiatives
13     should provide Yahoo an additional growth driver in 2006."

14   • On July 20, 2005, Citigroup Smith Barney stated:  "*We view the*
15     *'fixing' of YHOO's search algorithm at year-end* and strong
16     December seasonality as the next major catalysts."

17   • On July 20, 2005, Deutsche Bank stated: "We expect to see steady
18     growth in paid search, as the company continues to invest in its web
19     search technology to optimize relevance, performance and create new
20     revenue-generating opportunities. *In particular, we are looking for*
21     *upgrades to the sponsored search program, improvements to the*
22     *self-service platform and new releases of contextual targeting*
23     *initiatives in the next few quarters*."

24   • On July 20, 2005, William Blair & Company issued a Research Note
25     entitled, "Strong Organic Growth But No Upside Surprise," stating:
26     "During the call, management expressed optimism about the health of
27     the business including . . . improved search functionality in 2006, and
28     the outlook for online branded advertising and paid search. . . .

- 124 -

1
2

*Management stated that there is testing underway today and that improvements should be evident in 2006.*"

3
4
5
6
7
8
9
10
11

• On September 28, 2005, RBC Capital Markets issued its report: "*Assuming YHOO is able to rank paid search ads on its network on a click-yield basis, similar to Google, Yahoo should experience an immediate monetization uptick* . . . . Again, we do not believe that any beta testing has begun for this change in the Yahoo search platform, and, therefore, are not able to forecast a specific date for the change in monetization to occur. *Yahoo management has recently confirmed its intention to make this change happen late this year or early in 2006.*"

12
13
14
15
16

106. Based on information provided by defendants during the July 19, 2005 conference call, analysts were pleased the Company exceeded its guidance, but noted disappointment concerning the delay in Yahoo!'s monetization of its search engine. Analysts were concerned about the delay because they recognized how important this monetization was in order for Yahoo! to compete with Google.

17
18
19
20
21
22
23
24
25
26
27
28

• William Blair & Company's July 20, 2005 report states: "*We view the most compelling opportunity for the company as that of improving its pay-for-placement (PFP) ranking algorithm to incorporate relevancy in addition to price in determining listing position.* Not only should this help the company better monetize traffic, but it should also improve user experience and help halt share losses – possibly leading to share gains. We are a bit concerned by some of the metrics we have seen regarding the relevance of Yahoo's search algorithm as compared to Google's. By comparing click-through rates for Yahoo and Google for the top-five ranked search results by position, we interpret Google's sharp decline in click-throughs as compared to the top ranked result as quantitative

1    evidence of Google's superior relevance. . . . *We are optimistic*
2    *about Yahoo's plans to adjust its search algorithm, as we believe*
3    *that improved relevance will yield market share upside*."

4    • Credit Suisse First Boston's July 20, 2005 report states: "For 2006,
5    our estimates are $4.98B and $0.77, up from $0.67 to reflect our
6    revised expectations for margin expansion and tax rates. *We believe*
7    *there could be considerable upside to these estimates if Yahoo is*
8    *able to begin closing the monetization gap with Google in its search*
9    *business*."

10   107.   In fact, analysts updated their model to reflect the results from Yahoo!'s
11   2Q 05. Credit Suisse First Boston's July 20, 2005 report states:

12        "We have updated our model to reflect the results from this
13   quarter. Our estimates for the second half are essentially unchanged,
14   though roughly $15M in revenue shifts from Q3 into Q4. For 2006, our
15   estimates are $4.98B and $0.77, up from $0.67 to reflect our revised
16   expectations for margin expansion and tax rates. *We believe there could*
17   *be considerable upside to these estimates if Yahoo is able to begin*
18   *closing the monetization gap with Google in its search business*."

19   108.   Yahoo! understood it had to beat its estimates each quarter and raise its
20   projections to satisfy analysts. Legg Mason's July 20, 2005 report states:

21        "The quarter is likely to be viewed in a negative light, given the
22   overwhelming consensus view of 'beat and raise.'"

23   109.   On August 8, 2005, Yahoo! gave a presentation at Pacific Crest
24   Securities Technology Forum to discuss its search business.  Audience members
25   questioned Jeff Weiner, Yahoo!'s Senior Vice President of Search who reported
26   directly to defendant Semel, about improvements to its search monetization:

27

28

1     UNIDENTIFIED AUDIENCE MEMBER: You talked about the

2     benefits 10 publishers from the Yahoo! Publisher Network. Can you

3     talk about what the benefits are to the advertisers?

4     JEFF WEINER[, SVP OF SEARCH, YAHOO!, INC.]: Sure.

5     With regard to whether it's the Yahoo! Publisher Network or sponsored

6     search on the Yahoo! Network or anyone of the branding opportunities,

7     not just the performance marketing, I think in this day and age on the

8     performance marketing side it is demonstrable return on investment.

9     *And I think as long as we continue to help our advertising customer*

10    *get a demonstrable return on investment and increasingly become*

11    *more efficient and improve the optimization process, we're going to be*

12    *creating value for them*. . . .

13    . . . By way of example, in terms of how we create value for

14    advertisers, earlier today some of you may have seen we announced that

15    we released some APIs to some third party search engine marketing

16    service providers. And in doing so, we are facilitating the advertiser

17    experience. So now advertisers in one place with their SCM can get the

18    tools necessary to increasingly optimize their budgets.

19    *And the flip side of that is that we are getting better data that is*

20    *going to enable us to prevent click fraud going forward. So I think*

21    *that's one example of how we're creating value.*

22                              *      *      *

23    UNIDENTIFIED AUDIENCE MEMBER: Could you maybe talk

24    about – I know (indiscernible) has talked about '06 improving the

25    monetization in search, and there's a lot of noise out there whether you

26    might sort of change the auction based CPC model so it is more of a

27    formula. Can you maybe just talk a little bit about that and the

28    opportunities?

- 127 -

1    JEFF WEINER[, SVP of Search, Yahoo!, Inc.]:  Absolutely.  I

2    think when we start talking about the monetization side of the equation

3    with regard to search, the first thing that I like to say is *when we initially*

4    *acquired those companies, there was a very conscious effort made to*

5    *prioritize and focus on improving the algorithmic experience.  So*

6    *acquiring those three search technologies – Overture was a fourth*

7    *company – integrating with Yahoo! a fifth company, and integrating*

8    *them seamlessly over a five month span and so we could deploy our*

9    *own world-leading search technology, it was a lot of effort.* . . .

10    . . . So our first priority was getting the quality of that search

11    technology right and integrating those assets until we had one team and

12    that . . . was Yahoo! Search Technology.

13    *Now we're very excited because that team is in place, the*

14    *foundation has been created and we can leverage that world-class*

15    *talent that world-class infrastructure and cross-pollinate to improve*

16    *the monetization stuff.*

17    So when you talk about improving monetization, what are we

18    talking about? . . .  You are talking about coverage; you are talking about

19    clickthrough; you're talking about price per click.  So let's break that

20    down.  *Where could we start to see some improvement*?  From a

21    coverage perspective and a matching technology: Somebody comes in,

22    they type a query, and whereas in the past that query may not have

23    generated an exact match with a keyword, if you are improving your

24    matching technology, you're going to get a result back.  That result is

25    going to increase coverage.

26    Once you have the additional coverage, how do you ensure that it

27    is more relevant?  Well, that same matching technology I was talking

28    about, improved algorithms.

- 128 -

1      You increase liquidity, you get more advertisers into your system,

2      you should see some upward buying pressure. You should see some

3      increase in price per click. Multiply those three dimensions through and

4      I think ultimately we have the potential to improve monetization and

5      *given that that is now an extremely high priority to the Company, given*

6      *that we are allocating the right talent and the right infrastructure*

7      *against that, we are fairly optimistic*.

8      UNIDENTIFIED AUDIENCE MEMBER: What is the process – I

9      mean is this something where it[']s one quarter you approve coverage

10     and maybe (indiscernible) might not know it because I know you guys

11     don't (indiscernible) search. Is this something where maybe six months

12     from now all three of these slowly happen where they click, where you

13     just get like a huge gap in terms of basis points (indiscernible) search. I

14     know people are paying for every hundred basis points, an increase of

15     tax (ph) and increase the output of (indiscernible).

16     JEFF WEINER[, Yahoo!, Inc. – SVP of Search]: Yes.... I think

17     as far as what we have officially said, and I don't think I'm going to

18     change that, what Paula said and probably what Marta has said is *you'll*

19     *start to see some changes by the end of '05 and you'll see it in bigger*

20     *changes in '06*.

21     STEVE WEINSTEIN[, Pacific Crest – Analyst]: Do you think

22     these changes – do they tend to – in (indiscernible), would it have a

23     gradual affect on improving monetization or is it a real catalyst? Do you

24     roll something out within a month?

25     JEFF WEINER[, Yahoo!, Inc. – SVP of Search]: It depends on

26     the change.... Improving an algorithm can have an immediate impact

27     insofar as better matching technology can create better coverage and *I*

28     *think you will see the benefits of that immediately*.

- 129 -

1   110.   Defendants' statements on July 19, 2005 and August 8, 2005, which were
2   false and misleading when made, had a direct effect on Yahoo!'s stock price which
3   continued to trade at artificially inflated levels.

4   111.   On July 19, 2005, Yahoo! reported 2Q 05 results that were in-line with
5   management's guidance, but that fell shy of some analysts' expectations. The stock
6   traded down 10% in the after-market to $33.82 from its closing price of $37.73.

7   112.   Yahoo!'s 2Q 05 results were later filed with the SEC in Yahoo!'s 2Q 05
8   10-Q report, signed by Decker. This 10-Q report contained Yahoo!'s 2Q financial
9   results, including those previously publicly reported. The 10-Q also contained the
10  false Sarbanes-Oxley certificates and statements about Yahoo!'s internal controls
11  detailed in "Yahoo!'s Misleading Financial Statements and Disclosures" section of
12  this Complaint (¶¶199-227) signed by defendants Decker and Semel.

13  113.   Defendants' statements regarding Yahoo!'s 2Q 05 and FY 05 financial
14  results contained in ¶¶103-112 were materially false and misleading when made.
15  Defendants knew or recklessly disregarded, but failed to disclose, the following:

16          (a)   According to CW11, following Yahoo!'s acquisition of Overture,
17  the Overture platform was incapable of handling the increasing numbers of
18  advertisers, marketing partners and users overloading the system from Yahoo!.
19  Compounding the problem was that even though the increasing traffic from Yahoo!
20  was literally causing the Overture system to self-destruct, and despite that system's
21  importance to Yahoo!'s overall business performance, Yahoo! refused to provide the
22  Overture Pasadena facility with adequate resources to deal with the increased Yahoo!
23  traffic. According to CW10, CW11 and CW12, a culture clash between Yahoo!'s
24  Sunnyvale engineers and Overture's Pasadena engineers occurred following the
25  Overture acquisition that adversely impacted Yahoo!'s ability to smoothly integrate
26  Overture. To address the increasing Yahoo! traffic, Overture engineers requested that
27  Yahoo! provide funding for additional servers to handle the increasing traffic.
28  According to CW10, not only did Yahoo! refuse to provide additional funding for

1   servers, the Sunnyvale office ultimately decided to terminate dozens of legacy
2   Overture engineers even though those engineers were more knowledgeable about how
3   the Overture information systems operated.  Confirmed by CW12, the decision to
4   terminate the senior legacy Overture engineers had dramatic and adverse
5   consequences on Yahoo!'s ability to develop new software systems to address the ever
6   increasing Yahoo! traffic on the overloaded Overture platform.  According to both
7   witnesses, the Yahoo! team assigned to replace the terminated and replaced legacy
8   Overture engineers did not have an appreciation for the size and complexity of
9   integrating Overture and as a result "stalled, delayed and derailed" the attempts to
10  develop a new search platform;

11          (b)    Defendants' statements that the acquisition of Overture was
12  successful and the introduction of the new search platform was technically smooth
13  were also false and misleading because the acquisition and new search introduction
14  were neither successful nor smooth because Yahoo!'s refusal to provide adequate
15  funding to Overture and the decision to terminate the most senior and knowledgeable
16  Overture engineers severely impacted Yahoo!'s business operations.  According to
17  CW10, Yahoo!'s refusal to provide sufficient funding for additional servers impacted
18  his/her teams' abilities to analyze data relating to seaches and clicks for customers so
19  that Yahoo! could provide meaningful data pursuant to the terms of the SLAs on a
20  daily basis.  The data provided to advertising customers had to be analyzed by
21  numerous teams that reported to CW10 and derived from numerous sources before it
22  was forwarded to clients.  Some of the important functions preformed by the various
23  teams s/he supervised included the calculation of "discard rates" by analyzing what
24  clicks could not be passed on to advertisers and thus eliminated from billing and
25  "conversion rates" advertisers experienced from users who clicked on their ads.  The
26  discard rates were analyzed for each marketing partner to determine whether they
27  were poor quality partners.  According to CW10, because Yahoo! refused to provide
28  his/her teams with additional servers, their ability to calculate accurate discard and

1 conversion rates was severely impacted.  Instead, Yahoo! increasingly failed to
2 eliminate bad or nonbillable clicks and provided customers with worthless discard
3 rates and conversion rates.

4　　　　　　(c)　　In addition to not providing Overture engineers with adequate
5 resources to service the Yahoo! traffic, the Company also failed to provide adequate
6 staffing for the development of an internal project referred to as "solving the blob."
7 According to CW10, the project involved integrating very separate software systems
8 such as the Customer Relationship Management ("CRM") system and the click
9 detection system into a single platform.  The integration of these systems was essential
10 so that Yahoo! could comply with the terms of the SLA with advertising customers
11 and provide filtered data on a timely basis.  CW10 confirmed this project was behind
12 schedule because Yahoo! had fired Overture engineers most knowledgeable about the
13 different systems.  According to CW7, a former International Sales Specialist at
14 Yahoo!'s Overture facility in Pasadena, "solving the blob" was a project to put all of
15 Overture's back end functions on a single platform.  According to CW10, by February
16 2005, the Company was extremely far behind in "solving the blob."

17　　　　　　(d)　　According to CW1 the second attempt to launch Project Panama
18 was under Executive Vice President of Engineering, Phu Hoang.  The second attempt
19 was originally intended to deliver a new "test" system in Australia, which was a
20 smaller market than the United States.  It was limited to Australia in order to limit the
21 risks of a large scale launch.  According to CW3 this attempt "failed miserably" and
22 resulted in Hoang's removal from Project Panama in July or August 2005 by
23 defendant Nazem.

24　　　　　　(e)　　Yahoo!'s decision to terminate the senior legacy Overture
25 engineers who were the most knowledgeable about how and why Yahoo! needed to
26 improve the search algorithm and bidding system so that Yahoo! could compete with
27 Google also impacted Yahoo!'s switch to its own search technology and this switch
28 was not technically smooth as defendants represented.  Following the acquisition of

Overture and switch from Google's search engine, Yahoo! rushed to market its new Content Match product before it functioned properly. Yahoo! rushed Content Match to market with a very manual mapping process that led to wide variations in search results. Content Match led to very undesirable results such as irrelevant clicks and even "click tsunamis." A click tsunami occurred when a search mapped to results that caused thousands of clicks, with little or no conversion, on an advertiser's site. CW11 provided an example of a click tsunami such as when a mortgage seller's ad would appear on a news article announcing a federal reserve interest rate cut. A large volume of readers would click on an ad next to the article thinking they would obtain more information about what impact the federal reserve's action would have on mortgage interest rates and instead clicked through to the mortgage seller's website. Because Yahoo!'s Content Match system lacked any method to prevent the resulting onslaught of clicks, the small advertiser who may have only budgeted for $200/day would receive billing for thousands of dollars, far exceeding the budget or capacity to pay.

(f)     Yahoo!'s introduction of its own search technology was not technically smooth because, as confirmed by CW11, Content Match lacked any features to prevent actual click fraud or any method to monitor any sort of referral log data to eliminate non-billable clicks. CW10 confirmed that Yahoo! had a large problem with poorer quality international partners and that these problems notwithstanding, Yahoo! would not allow advertising customers to opt out of international partner traffic up to the time s/he left Yahoo!. While s/he worked for Overture prior to that company's acquisition by Yahoo!, Overture routinely "turned off" poorer quality partners who had unacceptable "discard rates." Overture maintained high standards and maintained score cards for partners to ensure high conversion rates by customers. Following the Overture acquisition, Yahoo! was not as concerned with the quality of the traffic from marketing partners.

1           (g)    In combination, Yahoo!'s failure to have a functioning system to
2 detect click fraud or non-billable clicks, the Company's rocky transition to a new
3 search technology, the integration of Overture marred by the engineering culture
4 clash, the termination of the most senior Overture engineers and failure to provide
5 adequate resources to Overture to manage the Yahoo! traffic and Yahoo!'s decision to
6 rush Content Match to market all had a disastrous impact on Yahoo!'s business
7 performance. As a result, the Company's paid search revenues stagnated. This
8 development put defendants in a bind because they were desperate to demonstrate
9 growing search ad revenues and meet the high end of or exceed their guidance to
10 securities analysts. As a result, defendants developed ways to recognize ad search
11 revenue they had not earned. To accomplish this, defendants implemented a method
12 to change the "dial" on the Company's click-fraud detection system at the end of the
13 quarter to allow more non-billable click activity to be passed on to customers, thereby
14 increasing the Company's revenues at the end of the quarter. According to CW12, the
15 non-billable click activity was being allowed through the click detection system at the
16 end of the quarter, and being passed on to advertising customers in the form of
17 charges to their account and resulted in increasing numbers of complaints from
18 advertising customers at the end of the quarter.

19           (h)    As detailed in ¶¶202-210, during 2Q 05, Yahoo! improperly
20 recognized at least 10% of its paid search revenue – which constituted approximately
21 36% of the total marketing services revenue in 2Q 05 – attributable to click fraud or
22 $39.1 million because the revenue recognized via click fraud was not earned;

23           (i)    As detailed in ¶¶211-213, during 2Q 05, Yahoo! failed to properly
24 record a loss contingency in violation of GAAP, as set forth in SFAS No. 5,
25 *Accounting for Contingencies*;

26           (j)    As detailed in ¶¶214-227, during 2Q 05, Yahoo! failed to disclose,
27 as required by SEC Regulation S-K, known trends and uncertainties by not reporting
28

1 the practice of improperly recognizing revenue generated by click fraud and thereby
2 not disclosing Yahoo!'s actual financial performance;

3 (k) As detailed in ¶¶214-227, during 2Q 05, Yahoo!'s publicly issued
4 financial statements violated fundamental accounting principles requiring that such
5 statements contain complete and reliable information, presented in a conservative
6 manner regarding how managers discharged their stewardship responsibilities of the
7 Company and the actual financial performance of the Company;

8 (l) As detailed in ¶¶202-210, during the 2Q 05, as a consequence of
9 the aforementioned practices, the Company's revenues and net income were
10 artificially inflated and reported financial results were in violation of GAAP in that the
11 Company's revenue was inflated by $39.1 million and net income was overstated by
12 $0.02/per share.

13 114. On October 18, 2005, Yahoo! issued a news release over the *Business*
14 *Wire* in which it reported Yahoo!'s financial results for 3Q 05. The release stated in
15 pertinent part as follows:

16 "Yahoo! had another record quarter and continued to see solid
17 growth across our business. We introduced a number of new and
18 innovative products and services and continued to provide more effective
19 means for advertisers to engage with consumers," said Terry Semel,
20 chairman and chief executive officer, Yahoo! "Our ongoing ability to
21 execute against plan and utilize our industry-leading technology
22 continues to position us for long-term growth and enables us to provide
23 our users with the best content and most relevant online experience."

24 Consolidated Financial Results

25 • Revenues were $1,330 million for the third quarter of 2005, a 47
26 percent increase compared to $907 million for the same period of
27 2004.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- Marketing services revenue was $1,160 million for the third quarter of 2005, a 46 percent increase compared to $797 million for the same period of 2004.

- Fees revenue was $170 million for the third quarter of 2005, a 55 percent increase compared to $110 million for the same period of 2004.

- Revenues excluding traffic acquisition costs ("TAC") were $932 million for the third quarter of 2005, a 42 per cent increase compared to $655 million for the same period of 2004.

- Gross profit for the third quarter of 2005 was $810 million, a 41 percent increase compared to $574 million for the same period of 2004.

- Operating income for the third quarter of 2005 was $270 million, a 57 percent increase compared to $172 million for the same period of 2004.

- Operating income before depreciation and amortization for the third quarter of 2005 was $385 million, a 48 percent increase compared to $260 million for the same period of 2004.

- Cash flow from operating activities for the third quarter of 2005 was $440 million, a 65 percent increase compared to $267 million for the same period of 2004.

- Free cash flow for the third quarter of 2005 was $345 million, a 71 percent increase compared to $202 million for the same period of 2004.

- Net income for the third quarter of 2005 was $254 million or $0.17 per diluted share (including a net impact of $16 million, or $0.01 per diluted share, related to the sales of investments). For the same period of 2004, net income was $253 million or $0.17 per diluted

- 136 -

1
2

share (including a net impact of $129 million, or $0.09 per share, related to the sale of an investment and an associated tax benefit).

3
4
5
6
7
8

"We are extremely pleased with our third quarter results, which exceeded expectations, showing strong revenue growth, continued profitability, and significant free cash flow," said Susan Decker, chief financial officer, Yahoo! "Our ability to deliver another quarter of record results, while also investing in internal operations and external acquisitions, continues to reinforce the power of our business model."

9
10
11
12
13

115.   On October 18, 2005, Yahoo! hosted a conference call with analysts and investors to discuss Yahoo!'s 3Q 05 results, current business operations and future prospects. Defendants Semel, Decker, and Rosensweig had an opportunity to address analysts' and investors' questions and concerns. During the call, defendants Semel commented on Yahoo!'s monetization capabilities:

14
15
16
17
18
19

TERRY SEMEL, CHAIRMAN CEO, YAHOO! INC.:   Thank you, Paul and good afternoon, ladies and gentlemen.   Yahoo!! has continued its run of exceptional growth.  Our relentless focus on our consumers and continued investments in people and infrastructure has led to increased product quality and a powerful rate of innovation which are really paying off.

20

\*       \*       \*

21
22
23
24
25
26

So let's turn now to the modernization [sic] side of the equation. We are making significant investments in our diverse modernization [sic] capabilities and we continue to see excellent results. Our marketing services business delivered almost $1.2 billion in revenue for the quarter, representing 46% year-over-year growth as a result of strong contributions by all forms of advertising.

27

\*       \*       \*

28

1    Search advertising continues to be a very, very exciting
2    opportunity for us and of course, as one of our most important priorities.
3    *We're right on plan, improving and growing our modernization [sic]*
4    *capability and see this area as providing real upside for Yahoo! in the*
5    *near future*.

6                                    *    *    *

7    So in conclusion, we're very proud of what we've accomplished
8    so far, but fully embrace the belief that we are still at the beginning of
9    significant long-term opportunities. And as the web evolves into the
10   next exciting phase, we believe Yahoo! is in the best position to lead.
11   *And our business model gives us the competitive edge to take*
12   *advantage of the growth opportunities on the Internet*.

13   116. During the October 18, 2005 conference call, defendant Decker
14   commented on Yahoo!'s "strong search offerings" and gave guidance for 4Q 05:

15   SUE DECKER, CFO, EXEC VP, YAHOO!, INC.:    Thanks,
16   Terry. Very pleased with our third quarter results because they clearly
17   underscore two fundamental business model strengths. Excellent growth
18   and great balance and it is not an accident. We've been careful,
19   deliberate and persistent about committing the appropriate investment –
20   of internal operations and external acquisitions.

21                                   *    *    *

22   Moving now to the P and L. The overall summary is that
23   consistent with our financial strategy, we are successfully supporting a
24   massive and growing base of more revenue productive users which has
25   allowed us to exceed both our longer term revenue and operating cash
26   flow growth objectives.

27                                   *    *    *

28

- 138 -

1           Global marketing, [our] largest service generated $762 million of

2   revenue ex-TAC for the quarter up 40% year-over-year roughly

3   consistent with both the very strong gains we saw in the first half of 2005

4   and also with the growth rates we experienced in '03 and '04. This was

5   nicely balanced across our various offerings to advertisers. From pay for

6   performance to branding. ***In short, we believe Yahoo! is sitting in the***

7   ***captain's seat relative to competitors as we have both strong brand and***

8   ***strong search offerings and this strong positioning is showing up in the***

9   ***numbers***. We believe we[']re on track to gain market shares of the

10  global online ad business for the fourth consecutive year.

11                                *    *    *

12          Taking into account [all] of those factors we expect fourth quarter

13  revenue ex-TAC to come in a range of [$]1 billion [$]32 million to $1

14  billion [$]820 million, up about 35% from a year ago. These revenue

15  levels we expect to operate within a[n] operating cash flow range of

16  [$]452 to $482 million. Representing a 50% margin on incremental

17  revenues and yielding a 44% margin at the midpoint. This Q4 outlook is

18  expected to drive a full year range for 2005 of [$]3 billion [$]660 million

19  to $3 billion [$]710 million in revenue ex-TAC up 42% from a year ago

20  levels to the midpoint.

21       117.  ***When questioned about Yahoo!'s search monetization effort, defendant***

22  ***Decker responded that the benefits from Project Panama would hit late 2005 and***

23  ***the financial impact would build throughout 2006***:

24              ANTHONY NOTO, ANALYST, GOLDMAN SACHS: . . . .

25                             *    *    *

26  Terry, you had mentioned monetization. Could you comment on what –

27  sponsored leads on search on Yahoo!.com? Thanks.

28

1    SUE DECKER[, Yahoo! Inc. – CFO, Exec. VP]: . . . On the
2    sponsored search side we think the key is to focus on the fundamentals
3    of the industry and how much revenue each of those advertisers are
4    generating.  Whether it's more inventory or revenue per search but
5    getting into the specifics on queries our worldwide trends on Yahoo!
6    sites and our affiliates are up very strong double digits.

7                          *    *    *

8    The last question is modernization [sic] and where is that going to go?
9    And I think I'll just remind you what we said before, which is you know,
10   when we acquired overture we first focused on the algorithm side. After
11   that we turned our attention to the monitorization [sic] side of the
12   equation and a lot of our plans this year were all about developing a
13   product suite. A very sequenced product suite in terms of how we could
14   improve our monitorization [sic] and we see that as all upside from
15   where we are now. *What we said is we expected to see some of those*
16   *products start to hit and benefit late this year and then the financial*
17   *impact really to build throughout 2006*.

18       Since there's been a lot of speculation on exactly what that is and
19   what we're doing I think we'll share a little more transparencies on the
20   product suite that drives that. So just to review, Terry talked a little bit
21   about the Yahoo! publisher network which was launched in beta in
22   August and [will] be more widely available in beta in Q1 of 2006. So
23   that's one important bucket of activity that we expected and has already
24   been launched.   Second broad bucket is our improving matching
25   capabilities. Over the last couple of quarters we've been rolling out new
26   capabilities that enhance matching that leads to overall increase[d]
27   coverage and better RPS.

28

- 140 -

1
2
3
4
5
6
7
8
9
10

We're continuing to enhance those tools to broaden our matching capabilities and we should see changes rolled out every quarter throughout the year but we're already start[ing] [to] see some benefit from that but we expect that to grow in 2006 as well. The third and final broad bucket of various initiatives is concerned around improving our relevance and our quick through rates of our paid listings. When our matching initiatives is largely focused on coverage and these are largely focused on click throughs and better tools to advertisers. Our plan there is to begin testing some of those initiatives in the first half of '06 with a broader rollout thereafter.

11
12
13
14
15

*All of these initiatives have been already much right on track and consistent with our original plan which is to have a sequenced series of products building throughout next year and that's why we have been advising you that we expect the financial impact to grow throughout 2006*.

16
17

118.  On October 19, 2005, defendant Decker was interviewed by CNBC Anchor Liz Claman about Yahoo!'s 3Q 05 results:

18
19
20
21
22
23

LIZ CLAMAN, CNBC ANCHOR: Not bad numbers at all over at Yahoo!, and this morning, investors are yodeling about them. The web portal reported that Q3 profits why [sic] nearly unchanged from a year ago. *But the company still beat the Street by 2 cents a share*. So the shares are jumping by 5 1/2 percent or $1.88 to $35.58. Joining us now from New York is Susan Decker. She's chief financial officer of Yahoo!.

24
25

Well, Ms. Decker, I guess online advertising is back. It accounted for 82 percent of your sales. Who's doing all the advertising?

26
27
28

SUSAN DECKER, CHIEF FINANCIAL OFFICER, YAHOO!: You know, we're seeing advertising strength from really across the board.  On our branded side, we do business with the nation's top

- 141 -

1       marketers. The top 200 marketers represent a large share of our total

2       business, and they keep spending more and finding new ways to reach

3       their consumers. And on the sponsored search side, we offer advertising

4       opportunities to hundreds of thousands of small and medium sized

5       businesses, along with e-commerce companies. All of them are seeking

6       the same thing, which is that more and more consumers are on the web,

7       and that's how they're able to reach them directly.

8               CLAMAN: *What are you doing to improve the monetization of*

9       *each search*?

10              DECKER: We have a number of initiatives on the way. You

11      know, when we first got into the search business a couple of years ago,

12      our first priority was on the algorithmic side. *Then we turned our efforts*

13      *about a year ago, and all our operating plans this year are all around*

14      *trying to enhance monetization, which, to the company, represents all*

15      *up side*. You saw the first of that in this quarter. We launched an invite-

16      only beta for the Yahoo! Publisher Network. That's extending some of

17      the inventory we have, and we'll open that up more broadly in early '06.

18      In addition, we're working on various matching algorithms that help

19      drive the coverage of terms and drive revenue-per-search up. And then

20      longer term, we're really focusing on the algorithms themselves to drive

21      click-through rates and some of the advertiser tools that will help reduce

22      friction in the system. *And we should see some of the benefits of that*

23      *later in '06. So we're really pleased*.

24              119. Although Yahoo!'s 3Q 05 results were above analysts' estimates,

25      consensus and management guidance, analysts were hoping Yahoo! would become

26      more effective in converting its online traffic into profit-producing clicks on the

27      advertising links displayed next to its search results, *i.e.*, monetization.

28      •       Credit Suisse First Boston reported on October 18, 2005, that:

- 142 -

1    Management updated its guidance for Q4 and provided initial
2    guidance for FY'06. For Q4, Yahoo expects net revenue of $1,032M-
3    $1,082M and EBITDA in the range of $452M to $482M. For FY'05, the
4    company now expects revenue of $3,660M to $3,710M, compared to
5    previous guidance of $3,600M to $3,700M and EBITDA of $1,550M-
6    $1,580M up from $1,515M-$1,575M. *Our forward estimates are*
7    *unchanged, however we believe there could be considerable upside to*
8    *these estimates if Yahoo is successful in closing the monetization gap*
9    *in its search business.*

10    *. . . That said, we continue to believe that there is significant*
11    *upside in owning YHOO, particularly as the company's efforts to better*
12    *monetize search begin to show through on the income statement.*

13                          *        *        *

14    With the internet space entering into the seasonally strongest part of the
15    year and the *potential catalyst of monetization improvement* ahead we
16    believe shares of Yahoo should significantly outperform over the next 6-
17    12 months. Therefore, we are maintaining our rating and price target.

18  •  RBC Capital Markets reported on October 19, 2005, that:

19    *If Yahoo is able to fix its search monetization*, and one would have to
20    believe that the recent increase in headcount is in part related to that
21    important objective, *then the shares of Yahoo will work higher over*
22    *time*, without a huge concern over losing Microsoft.

23    120.   Based on defendant Decker's comments during the conference call,
24  analysts reported to the market that initiatives from Yahoo!'s monetization strategy
25  should benefit Yahoo! starting in late 2005 and build through 2006.

26  •  Prudential Equity Group, LLC issued an analyst report entitled, "YHOO: Nice
27    3Q, with Top and Bottom Line Outperformance; Raising Estimates as Online
28    Advertising Trends Are Strong Heading into 4Q," on October 18, 2005, stating:

- 143 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

YHOO provided some insight into its monetization strategy: a tool aimed at small publishers, better matching capabilities, improved click-through rates and better tools for advertisers. *These initiatives should benefit YHOO starting late '05 and build throughout 06*.

\*     \*     \*

YHOO provided limited insight into its ongoing monetization improvement strategy, which currently consist[s] of three initiatives. First, CEO Semel referred to the Yahoo! publisher network, a self-serve tool aimed at tapping into the small and medium sized publisher network. A beta version of the service was launched this past August, and will be more widely available (still in beta) in 1Q'06. The second initiative is improving and enhancing search-matching capabilities, with the goal of increased advertising coverage ratios and higher revenue per search. The company continues to roll out changes in its algorithms as they are ready, and management reports that it is already seeing some benefit from the enhancements. The third initiative is focused on improving YHOO's relevance and click through rates on paid listings, as well as getting more useful tools to advertisers. YHOO plans to begin testing some of these initiatives in 1H'06 with a broader roll out thereafter.

*YHOO expects these monetization plans to begin to benefit the company late this year, with the bulk of the financial impact building throughout 2006.*

• William Blair & Company reported on October 19, 2005 that:

Most important, the outlook seems to be strengthening as the company is progressing at or above internal expectations against many of its growth initiatives. *Management highlighted the progress it is making in search monetization, which is beginning to have a favorable impact on*

- 144 -

1    *results that slowly build and become more meaningful as we enter next*

2    *year* – which could be a key driver to upside earnings revisions.

3    \*      \*      \*

4    Management highlighted the three key areas of monetization

5    including: new offerings such as the Yahoo Publisher Network, which

6    was launched in beta in August and opens the company's paid listings

7    database to smaller media properties; the ongoing enhancement of

8    advertiser tools and extended search coverage; and an upgrade to the

9    company's ranking algorithms in early 2006 that likely will incorporate

10   relevancy and price into the ranking of company's paid listings.

11   • Bear Stearns reported on October 19, 2005, that:

12   *Monetization improvements are still expected although*

13   *management reiterated that their real financial impact is not likely to*

14   *be seen until we enter 2006*. Efforts in focus include 1) expanding the

15   Yahoo! Publisher Network beyond larger publishers such as USA Today,

16   Viacom and iVillage to include more small to medium sized publishers

17   2) improving matching capabilities, and 3) increasing click through rates.

18   • Citigroup reported on October 19, 2005, that:

19   We are incrementally more +. The co provided much needed

20   clarity on its plans to "fix" its Search business. *The 2006 timing is later*

21   *than expected, but the plans are broader than expected*. Meanwhile,

22   Branded advertising continues robust 30%+ Y/Y growth & Fees revenue

23   is strengthening. If search is "fixed," there could be an impressive

24   revenue growth acceleration story.

25   • RBC Capital Markets reported on October 19, 2005, that:

26   *Negatives included* a sequential downtick in gross margins, in part

27   related to upgrading technological infrastructure and subsidizing a small

28   monthly loss for each new music subscriber, *and the slight push-off of*

- 145 -

1  *timing for the uptick in search monetization to the middle part of 2006,*
2  *where the company had clearly called for an early 2006 benefit in prior*
3  *conference calls.*

4  • Bear Stearns reported on October 24, 2005, that:

5  Yahoo is clearly trying to improve search monetization.
6  *Management highlighted on their conference call earlier this week that*
7  *we should see the fruit of these efforts in 2006.* This industry executive
8  believes it may not [be] too late for Yahoo to catch up however
9  expressed his surprise that it has taken so long given Overture's
10  acquisition in 2003. He commented that Yahoo currently lags Google's
11  monetization by about 35%-40% despite it's [sic] first mover position in
12  search, which raises the question about whether Yahoo will always be
13  several steps behind.

14  121. Defendants' statements which were false and misleading had a direct
15  effect on Yahoo!'s stock which increased to $35.91 on October 19, 2005 from $33.70
16  on October 18, 2005, going up approximately three times the average trading volume
17  and continued to trade at artificially inflated levels.

18  122. Yahoo!'s 3Q 05 results were later filed with the SEC in Yahoo!'s 3Q 05
19  10-Q report, signed by Decker. This 10-Q report contained Yahoo!'s 1Q 05 financial
20  results, including those previously publicly recorded. The 10-Q also contained the
21  false Sarbanes-Oxley certificates signed by defendants Semel and Decker and
22  statements about Yahoo!'s internal controls detailed in "Yahoo!'s Misleading
23  Financial Statements and Disclosures" section of this Complaint (¶¶199-227).

24  123. Defendants' statements regarding Yahoo!'s 3Q 05 financial results
25  contained in ¶¶114-122 were materially false and misleading when made. Defendants
26  knew or recklessly disregarded, but failed to disclose, the following:

27  (a) According to CW1 the third and final attempt to launch Project
28  Panama occurred in October 2005 when he was assigned to lead Project Panama. By

- 146 -

1  the time CW1 was assigned to run Project Panama it was a "running joke" at Yahoo!
2  because the project has been slated three separate times. According to CW1, until at
3  least October 2005, Panama suffered from "a lack of executive buy-in" which arose
4  from a culture clash among the executives of Yahoo! and Overture.

5          (b)    In early 2005, many individuals who had critical roles in Project
6  Panama departed Yahoo!, often after "internal disagreements" regarding Panama.
7  CW1 was under "a lot of pressure" to "get it out there immediately" when he took
8  over Panama. This pressure came verbally from defendant Nazem and Executive
9  Vice President Jeff Weiner, who each reported directly to defendant Semel.
10 According to CW1, when he was assigned to Project Panama in the second half of
11 2005, the project was slated for a 2Q 06 launch, which was not a feasible date.

12         (c)    According to CW4, Project Panama was "going nowhere" until the
13 Company devoted much larger resources to the project and it was moved to Yahoo!
14 headquarters in the fall of 2005. At that time, Yahoo!'s engineering and product
15 management decided that leaving the project to the Overture Pasadena office where it
16 was designed was not resulting in any progress.

17         (d)    According to CW12, when Yahoo! launched the YPN project in
18 August 2005, it was a "total failure." YPN was Yahoo!'s attempt to compete with
19 Google's AdSense product. As more customers utilized the contextual match product,
20 and after Yahoo! launched YPN, the issue of "bogus traffic" associated with the
21 contextual match product escalated. According to CW12, there were massive holes in
22 the contextual match system, so that the system was unable to effectively detect the
23 "bogus" clicks and eliminate them from customer billing.

24         (e)    According to CW14, a former engineer in Yahoo!'s search and
25 marketplace division, beginning in approximately August 2005, Yahoo! began
26 pumping more ads onto its search pages and properties pages in order to meet earnings
27 expectations. CW14 stated that during search and marketplace meetings in the second
28 half of 2005, Yahoo! personnel discussed increasing ads to help Yahoo! meet earnings

1   expectations. The increase in ads ruined the customers' search experience and caused
2   a rift between the sales group (search advertising) and CW14's group. The dilution of
3   the customers' search experience was known to Semel because he attended a meeting
4   in August 2005 with 10-12 engineers in the search and marketplace divisions, part of
5   his weekly practice to meet with a random dozen Yahoo! employees. Semel promised
6   to look into the issue but never got back to CW14's group.

7           (f)     The material adverse facts in ¶¶113 are incorporated herein.

8           (g)     As detailed in ¶¶202-210, during 3Q 05, Yahoo! improperly
9   recognized at least 10% of its paid search revenue – which constituted approximately
10  39% of the total marketing services revenue in 3Q 05 – attributable to click fraud or
11  $30.1 million because the revenue recognized via click fraud was not earned;

12          (h)     As detailed in ¶¶211-213, during 3Q 05, Yahoo! failed to properly
13  record a loss contingency in violation of GAAP, as set forth in SFAS No. 5,
14  *Accounting for Contingencies*;

15          (i)     As detailed in ¶¶214-227, during 3Q 05, Yahoo! failed to disclose,
16  as required by SEC Regulation S-K, known trends and uncertainties by not reporting
17  the practice of improperly recognizing revenue generated by click fraud and thereby
18  not disclosing Yahoo!'s actual financial performance;

19          (j)     As detailed in ¶¶214-227, during 3Q 05, Yahoo!'s publicly issued
20  financial statements violated fundamental accounting principles requiring that such
21  statements contain complete and reliable information, presented in a conservative
22  manner regarding how managers discharged their stewardship responsibilities of the
23  Company and the actual financial performance of the Company;

24          (k)     As detailed in ¶¶202-210, during the 3Q 05, as a consequence of
25  the aforementioned practices, the Company's revenues and net income were
26  artificially inflated and reported financial results were in violation of GAAP in that the
27  Company's revenue was inflated by $30.1 million and net income was overstated by
28  $0.02/per share.

124.  On January 17, 2006, Yahoo! issued its 4Q 05 and FY 05 results:

Fourth Quarter 2005 Financial Results

- Revenues were $1,501 million for the fourth quarter of 2005, a 39 percent increase compared to $1,078 million for the same period of 2004.

  - Marketing services revenue was $1,315 million for the fourth quarter of 2005, a 39 percent increase compared to $943 million for the same period of 2004.

  - Fees revenue was $186 million for the fourth quarter of 2005, a 38 percent increase compared to $135 million for the same period of 2004.

- Revenues excluding traffic acquisition costs ("TAC") were $1,068 million for the fourth quarter of 2005, a 36 percent increase compared to $785 million for the same period of 2004. . . .

  Full Year 2005 Financial Results

- Revenues for the year ended December 31, 2005 were $5,258 million, a 47 percent increase compared to $3,575 million for 2004.

  - Marketing services revenue was $4,594 million for 2005, a 47 percent increase compared to $3,127 million for 2004.

  - Fees revenue was $664 million for 2005, a 48 percent increase compared to $447 million for 2004.

  - Revenues excluding TAC for 2005 were $3,696 million, a 42 percent increase compared to $2,600 million for 2004.

125.  Defendants also made the following statement on a conference call held the same day. On Panama's rollout in 2006, Decker stated:

Regarding click through rate, we do have a number of relevancy initiatives that we've said in the past we would begin testing in the first half and we would roll out thereafter. . . .

- 149 -

1    As I mentioned in the comments, we will start to see more benefit

2    of that in the back half but more meaningful as we move into '07 after

3    we've had full roll out of the initiatives.

4    126.    Defendants also made a partial disclosure that they were reducing

5  guidance because Yahoo!'s TAC rates would be increasing because it had to get rid of

6  lower-quality websites that were contributing to click-fraud revenues and causing

7  tremendous unrest with advertisers.  The following exchange between an analyst and

8  defendant Decker acknowledges this issue is negatively impacting Yahoo!'s growth

9  rate going forward:

10    SAFA RASHTCHY, ANALYST, PIPER JAFFRAY:  Sue and

11    Terry, could you talk about the growth trends that you see.  Your *results*

12    *in this quarter while within your guidance showed a marked*

13    *deceleration from last quarter and your guidance for '06 suggests even*

14    *further deceleration, yet trends in the industry that we see are*

15    *suggesting that the growth is continuing to be strong and in some cases*

16    *accelerating*.  I think you mention you feel you're gaining shares.  Could

17    you help us reconcile the two trends?  That will be my only question.

18  Decker stated:

19    We did quanti[f]y i[t] for you the $70 million we expect from continuing

20    increase in TAC rates, price of traffic has gone up in line with our

21    expectations.  We have been saying that from the outset when we

22    acquired Overture, but the affiliate network is very important to our

23    overall network, but it is not necessarily likely to be a major profit center

24    longer term given the competitive dynamics in the market.

25    When you take those things into consideration, *it takes about 400*

26    *basis points off the revenue growth rate that we outlined and it also*

27    *takes off a couple points of margin*.

28

- 150 -

1    127. Even with these partial disclosures, defendants did not admit the true
2  reason for Yahoo!'s loss of affiliates and revenue – which was that the click-fraud
3  revenues obtained from these affiliate websites were becoming harder to justify and
4  allow with advertiser backlash and increased media scrutiny in this area.

5    128. As reported by the *Associated Press* on January 18, 2006:

6        Yahoo Inc.'s shares dropped more than 12 percent Wednesday as
7        investors expressed their disappointment with the Internet powerhouse's
8        inability to reap bigger gains as advertisers shift more of their spending
9        to the Web.

10        The selloff came after Sunnyvale, Calif.-based company reported
11        late Tuesday that its fourth-quarter profit nearly doubled, but fell shy of
12        analyst expectations.

13        It marked the second consecutive quarter in which Yahoo reported
14        earnings growth that *investors interpreted as a sign that the company*
15        *isn't capitalizing on the online advertising boom as well as its rival,*
16        *online search engine leader Google Inc*.

17    129. Analysts also commented on the weaker results, poor guidance and delay
18  in Panama:

19  •   Oppenheimer's January 18, 2006 report states: "Minuses: search improvements
20      most likely 2H06 story, TAC continues to increase.  The *company lags*
21      *competition in monetizing search* and it seems *improvements are not in the*
22      *cards in 1H06*."

23  •   RBC Capital Markets' January 18, 2006 report states:

24        **Examining the Issues with the 4Q05 Earnings Report**. We are
25        quite aware that the quarter and guidance raised a few questions about
26        the sustainability of Yahoo's growth.  In particular, the growth in page
27        views was anemic, there was a loss of momentum in international search
28        revenue, and the margin guidance was lackluster.

- 151 -

1   **Management Seemed Disconnected from Reality**: Yahoo CEO

2   Terry Semel seemed to focus so much on the positives on Yahoo's

3   quarterly results that he seemed a bit disconnected from reality. We

4   wished there was some public acknowledgement of the company's

5   mixed results, but did not get such a reaction. We believe this approach

6   only served to make investors more frustrated, as the share price told a

7   different story.

8   • SG Cowen's January 18, 2006 report states: "***Yahoo's monetization efforts***

9   ***have been slow to materialize***. . . . Yahoo is losing market share in paid search

10  . . . the gap with peers could widen as its competitors continue to leverage their

11  existing strengths."

12      130.   As a result of defendants' partial disclosures and the fact that Yahoo!

13  missed its 4Q 05 estimates, and issued lower guidance for FY 2006 than expected by

14  investors, Yahoo!'s stock declined over 10% on 118 million shares – more than five

15  times Yahoo!'s normal trading volume. As analyst Safa Rashtchy from Piper Jaffray

16  stated on the January 17, 2006 conference call – "[y]our results in this quarter while

17  within your guidance show a marked deceleration from last quarter and your guidance

18  for '06 suggests even further deceleration." Another analyst from Needham issued a

19  report the next day stating "[g]uidance was mostly disappointing," and a Deutsche

20  Bank analyst also stated "[t]he big issue was '06 guidance lower." One of the reasons

21  for the earnings miss and lower guidance was deceleration in search growth, and

22  increased TAC that Yahoo! would be paying its partner websites. With click-fraud

23  lawsuits and increased media scrutiny, Yahoo! was being pressured to drop lower

24  quality websites from its network that were being utilized for click fraud that was also

25  benefiting Yahoo!  By taking on higher quality websites that demanded a higher

26  percentage of the revenues Yahoo! received from advertisers, Yahoo!'s future

27  revenues and margins would be lower. In fact, Yahoo! announced that it expected to

28  lose $70 million in revenue in 2006 from advertising partners because it would have to

1   share more advertising revenue with its partners and get rid of lower quality partners
2   that were contributing to click-fraud revenue. With investors pressuring Yahoo! to
3   implement a new search system to compete with Google, defendants now promised
4   investors that Project Panama would be in place by the second-half of 2006 to better
5   monetize searches and stop the bleeding of market share to Google. Prior to this
6   announcement, investors had expected the new search system to be in place in the first
7   half of 2006 – an Oppenheimer analyst report dated January 18, 2006 stated "[w]e
8   view this *delay* as a negative for the company as Google . . . continues to gain relative
9   share," and a Stanford Group report issued the same day stated "Yahoo management
10  indicated that *monetization gains in its search business could take longer to realize*
11  *than we had anticipated*, citing no meaningful impact until 2007." Bear Stearns
12  analysts stated in a January 18, 2006 report: "Concerns [–] Yahoo has a relatively
13  weak market position in search. Yahoo!'s monetization efforts lags Google and
14  translates into weaker revenue in this segment. *Benefits from improvements in*
15  *monetization may impact revenues later that [sic] the market perceives*."

16      131. Defendants' statements on January 18, 2006 (¶¶124-129) regarding
17  Yahoo!'s 4Q 05 and FY 2005 results, current business conditions and future growth
18  were false or misleading when made because defendants knew or recklessly
19  disregarded but failed to disclose the following:

20          (a)    Project Panama was so far behind schedule that a second half
21  implementation was not possible. According to CW1, who was assigned to lead
22  Project Panama in October 2005, none of the code had been written as of December
23  2005. CW1 updated Nazem once a week in meetings held in Burbank, California and
24  knows that Nazem met on a weekly basis with Semel, Decker and Rosensweig;

25          (b)    According to CW7, the "solving the blob" project that was a
26  precursor to Panama was delayed at this time and was not even complete when s/he
27  left Yahoo! in February 2006;

28

1          (c)     According to CW12, it was a big joke internally at the legacy
2   Overture facilities as to whether Panama would ever be launched.  Also, according to
3   CW12, Google was "absolutely kicking Yahoo!'s ass" and Yahoo!'s revenue was
4   suffering.  As a result of the Panama delays, and competition from Google, Yahoo!'s
5   revenues were declining each month in 4Q 05.  CW12 saw traffic forecasts that
6   showed this, and attended weekly Platinum customer service meetings, where it was
7   discussed that Yahoo! was missing it's 4Q 05 numbers by 10%-15%.  In order to meet
8   its 4Q 05 results, CW12 said that defendants would loosen the click-fraud detection
9   rules at the end of the fiscal quarter to increase revenues through click fraud.

10          (d)     As detailed in ¶¶202-210, during 4Q 05, Yahoo! improperly
11   recognized at least 10% of its paid search revenue – which constituted approximately
12   36% of the total marketing services revenue in 4Q 05 – attributable to click fraud or
13   $48 million because the revenue recognized via click fraud was not earned;

14          (e)     As detailed in ¶¶211-213, during 4Q 05, Yahoo! failed to properly
15   record a loss contingency in violation of GAAP, as set forth in SFAS No. 5,
16   *Accounting for Contingencies*;

17          (f)     As detailed in ¶¶214-227, during 4Q 05, Yahoo! failed to disclose,
18   as required by SEC Regulation S-K, known trends and uncertainties by not reporting
19   the practice of improperly recognizing revenue generated by click fraud and thereby
20   not disclosing Yahoo!'s actual financial performance;

21          (g)     As detailed in ¶¶214-227, during 4Q 05, Yahoo!'s publicly issued
22   financial statements violated fundamental accounting principles requiring that such
23   statements contain complete and reliable information, presented in a conservative
24   manner regarding how managers discharged their stewardship responsibilities of the
25   Company and the actual financial performance of the Company;

26          (h)     As detailed in ¶¶202-210, during the 4Q 05, as a consequence of
27   the aforementioned practices, the Company's revenues and net income were
28   artificially inflated and reported financial results were in violation of GAAP in that the

- 154 -

1  Company's revenue was inflated by $48 million and net income was overstated by
2  $0.03/per share;

3         (i)    The material adverse facts in ¶¶113 are incorporated herein.

4     132.  Defendants, who were concerned about Yahoo!'s stock decline in
5  January 2006, and any further decline in Yahoo!s stock price and its impact on the
6  value of their stock options, continued to issue false or misleading statements about its
7  business.

8     133.  On February 27, 2006, defendants Semel and Decker attended a Bear
9  Stearns media conference. According to a February 28, 2006 analyst report issued by
10 Bear Stearns:

11       CEO Terry Semel and CFO Sue Decker gave an upbeat
12       presentation and commented on the 2006 outlook, prospects for its
13       display (formerly branded) and search units, current ad trends and an
14       update on international.

15       Yahoo reiterated its 2006 guidance but did comment that they
16       hope to beat market growth (~25-30%) particularly in display advertising
17       where growth has been particularly impressive in recent quarters.
18       ***Search advertising growth is expected to be healthy and over the long***
19       ***run should benefit from improvements in search monetization which***
20       ***could begin in late 2006***.

21    134.  On April 5, 2006, *Dow Jones Newswire* issued an article entitled, "Yahoo
22 Search Advertisers Face Click-less Fraud" stating:

23       Yahoo Inc. (YHOO) search advertisers are being filched by a new
24       form of **click fraud** perpetrated without the use of any actual clicks,
25       according to spyware expert Ben Edelman.

26       In an online report published Tuesday, Edelman says spyware
27       makers are profiting by faking user clicks on Yahoo search ads. The
28       lawyer and Harvard doctoral candidate, who has made waves with his

1    spyware research in the past, urged the Internet giant to *vet its partner*
2    *network more thoroughly, prohibit its partners from resyndicating*
3    *Yahoo ads and step up its fraud-detection efforts*.

4        "Yahoo's problem results from bad partners within its network,"
5    Edelman says. "Yahoo syndicates ads to numerous partners, many of
6    whom syndicate ads to others, some of whom then syndicate ads still
7    further. *The net effect is that Yahoo does not know who it's dealing*
8    *with, and therefore cannot exercise meaningful supervision over how*
9    *its ads are displayed*."

10                        *    *    *

11       UBS analyst Benjamin A. Schachter said in a research note to
12   clients Wednesday that Edelman's report reinforced his concerns about
13   Yahoo's ability to police its partner network. Though he said the amount
14   of fraud occurring is probably small in dollar terms, the credibility of
15   Yahoo's network in advertisers' eyes is at risk and the problem could
16   spawn unwanted lawsuits and attention from prosecutors, he said.

17       135.  This article furthered media scrutiny on the issue of click fraud and
18   Yahoo!'s affiliate network.

19       136.  Because Yahoo!'s stock price had declined 20% in the first quarter of
20   2006, defendants knew they had to issue positive statements about Project Panama
21   and its search business when discussing Yahoo!'s 1Q 06 results. On April 18, 2006,
22   Yahoo! announced 1Q 06 results which met investor expectations, and issued positive
23   statements on the conference call regarding its search business and Project Panama.
24   As a result of these statements, Yahoo!'s stock price increased more than 7% from
25   $31.03 to $33.54.

26       137.  On April 18, 2006, Yahoo! issued a news release over the *Business Wire*
27   in which it reported Yahoo!'s financial results for 1Q 06. The release stated in
28   pertinent part as follows:

Yahoo! Inc. (Nasdaq: YHOO) today reported results for the first quarter ended March 31, 2006.

"Yahoo! had another strong performance this quarter. Our overall advertising business saw solid growth and our user numbers continued to climb," said Terry Semel, chairman and chief executive officer, Yahoo! "We believe that our business model and our focus on exploring new opportunities in emerging areas has set us apart from the competition and has enabled us to offer our users the best online experience and our advertisers the most value online."

### First Quarter 2006 Financial Results

- Revenues were $1,567 million for the first quarter of 2006, a 34 percent increase compared to $1,174 million for the same period of 2005.

  - Marketing services revenue was $1,381 million for the first quarter of 2006, a 35 percent increase compared to $1,025 million for the same period of 2005.

  - Fees revenue was $186 million for the first quarter of 2006, a 25 percent increase compared to $149 million for the same period of 2005.

- Revenues excluding traffic acquisition costs ("TAC") were $1,088 million for the first quarter of 2006, a 33 per-cent increase compared to $821 million for the same period of 2005.

138.  On the conference call held on April 18, 2006, defendants reinforced the idea that Project Panama would be done by year-end 2006 with revenue growth accelerating in 1Q 07, and that more detail would be provided at the analyst day on May 17th. Analysts were relieved that search monetization remained on track for a 2006 year-end implementation so that Yahoo! would not lose further ground to Google.

1 • William Blair & Company's April 19, 2006 report stated: "This dialogue and
2 the promise of much more at the analyst day on May 17 and beyond should
3 restore some investor confidence in the company. . . . management stated that
4 revenue growth from search monetization should accelerate once the new
5 system is in place."

6 • Think Equity Partners LLC's April 19, 2006 report stated: "Search
7 Monetization on Track."

8 • Deutsche Bank's April 19, 2006 report stated: "We acknowledge that Yahoo!'s
9 continued share losses to Google in search could pressure shares. However, *we*
10 *advise investors to remember that its new search monetization platform is on*
11 *track to launch in the 2H06 which should incrementally boost yield and*
12 *revenues in late 2006/early 2007*."

13 • Jefferies & Co., Inc.'s April 19, 2006 report stated: "Yahoo! results last night
14 should alleviate concerns over the company's growth prospects."

15 • Prudential Equity Group, Inc.'s April 18, 2006 report stated: "YHOO: Outlook
16 is brighter as the company moves closer to rolling out its new search platform."

17 • UBS Analyst Schacter on the conference call stated: "*First, congratulations*
18 *on keeping the monetizations efforts on track. I think we're all glad to hear*
19 *that*."

20 139. Defendants' statements on February 27, 2006 and April 18, 2006 (¶¶133-
21 138) were false or misleading when made because defendants knew or recklessly
22 disregarded but failed to disclose the following:

23 (a) Panama was not on track for a 3Q 06 launch and 4Q 06
24 finalization. According to CW1 who was in charge of Panama and reset the schedule
25 for Panama in December 2005, s/he told defendant Nazem at this time that the August
26 2006 launch was not going to happen and Nazem shared that information with
27 defendants Semel, Decker and Rosensweig. The August 2006 start date had slipped
28 because of 10 weeks of delays between October 2005 and April 2005. CW2 was an

- 158 -

1 inside sales manager who also confirmed that defendant Nazem visited the Overture
2 Pasadena facility in March 2005 to meet with sales management. During that meeting
3 Nazem confirmed that Yahoo! had committed extraordinary resources to Panama
4 since the fall of 2005, but Panama was still delayed because the back-end (the "blob")
5 was still not ready. Another former employee, CW4, a product manager who worked
6 on a component of Panama called "Cheetah," also confirmed that in February 2006,
7 when s/he left the Company that Yahoo! had not achieved important milestones for
8 backend components necessary to complete Panama. CW4 stated that Panama had
9 been plagued by excessive employee turnover and that even though advertisers
10 wanted a 3Q 06 rollout in advance of the 4Q 06 holiday season, it was not feasible.
11 Also, per CW11, a Yahoo! advertising manager, defendants' statements to the market
12 that Panama would be ready for a 3Q 06 launch and 4Q 06 finalization wer not
13 reasonable since the user interface was not ready and algorithm was uncertain in 2Q
14 06 when s/he participated in Panama usability studies in Pasadena. According to
15 CW7, the "solving the blob" project was delayed at this time and was not even
16 complete when s/he left Yahoo! in February 2006;

17          (b)     As detailed in ¶¶202-210, during 1Q 06, Yahoo! improperly
18 recognized at least 10% of its paid search revenue – which constituted approximately
19 37% of the total marketing services revenue in 1Q 06 – attributable to click fraud or
20 $51.4 million because the revenue recognized via click fraud was not earned;

21          (c)     As detailed in ¶¶211-213, during 1Q 06, Yahoo! failed to properly
22 record a loss contingency in violation of GAAP, as set forth in SFAS No. 5,
23 *Accounting for Contingencies*;

24          (d)     As detailed in ¶¶214-227, during 1Q 06, Yahoo! failed to disclose,
25 as required by SEC Regulation S-K, known trends and uncertainties by not reporting
26 the practice of improperly recognizing revenue generated by click fraud and thereby
27 not disclosing Yahoo!'s actual financial performance;

28

1    (e)    As detailed in ¶¶214-227, during 1Q 06, Yahoo!'s publicly issued
2    financial statements violated fundamental accounting principles requiring that such
3    statements contain complete and reliable information, presented in a conservative
4    manner regarding how managers discharged their stewardship responsibilities of the
5    Company and the actual financial performance of the Company;

6    (f)    As detailed in ¶¶202-210, during the 1Q 06, as a consequence of
7    the aforementioned practices, the Company's revenues and net income were
8    artificially inflated and reported financial results were in violation of GAAP in that the
9    Company's revenue was inflated by $51.4 million and net income was overstated by
10   $0.02/per share.

11   (g)    The material adverse facts in ¶¶113 are incorporated herein.

12   140.   On May 4, 2006, it was reported in *Techweb* that Yahoo! had been sued
13   by its advertisers for improperly charging them for ads that were placed into Spyware
14   programs and "fake" clicks on those ads. The lawsuit had been brought by Spyware
15   researcher ad attorney Ben Edelman, who had posted reports critical of Yahoo! on the
16   internet in August 2005 and April 2006, presenting findings that Yahoo! had engaged
17   in syndication fraud. The article stated:

18        Advertising service companies and industry experts put the
19        general prevalence of fraudulent clicks at somewhere between 14% and
20        30% overall.

21                         *    *    *

22        The allegations in this new case against Yahoo suggest that a
23        significant portion of search advertising profits come from illegal or
24        disreputable activities. They also echo criticisms leveled at Internet
25        service providers over the years to the effect that ISPs knowingly
26        profiting from similar shady practices, such as hosting spam servers.

27        According to Edelman, Yahoo has responded to some of his
28        earlier criticisms by terminating relationships with affiliates associated

- 160 -

1    with questionable practices. But it's not clear whether such steps or
2    pending lawsuits can adequately resolve these issues.

3        At the Ad:Tech Conference in San Francisco last week,
4    advertising industry panelists–whose companies sell click fraud
5    mitigation or reporting services – stressed that click fraud is a real issue
6    and criticized the lack of transparency in the search advertising industry.

7        Tom Cuthbert, president and CEO of click data analysis firm
8    ClickForensics, and one of the panelists at the conference, insists that
9    click fraud is not as well managed as search engines claim. Over the last
10   few months we've definitely seen an increase in the robotic generation of
11   clicks, he says. Clearly, that is a growing concern for advertisers.

12   141. On May 8, 2006, a *Dow Jones Newswire* article emphasized the
13   importance of Project Panama to Yahoo!'s future success:

14       Yahoo Inc. (YHOO) plans on Monday to reveal details of its
15   much-anticipated new system for search marketers, the success of which
16   is vital to the Internet giant's strategy for competing with archrival
17   Google Inc. (GOOG).

18       The Sunnyvale, Calif., company hopes the new system, *which it*
19   *expects to launch in the third quarter after more than a year in*
20   *development*, will improve advertiser satisfaction with its keyword-ad
21   service and attract new participants. Yahoo will release on Monday
22   technology details, known as APIs, or application program interfaces, to
23   third-party programmers in the advertising world who want to build
24   additional tools.

25                          *    *    *

26       The search-advertising market was worth $1.6 billion in the fourth
27   quarter of last year, up 44% from $1.1 billion the year-earlier period,
28   according    to    the    Interactive    Advertising    Bureau    and

- 161 -

1    PricewaterhouseCoopers. Google has been expanding its market share,

2    thanks largely to superior technology that has driven a revenue-growth

3    pace about double that of the market.

4    Yahoo's new technology for setting ad positions will use a quality

5    score that incorporates a "big basket of measures," including bid price

6    and the rate at which consumers click on ads, said Tim Cadogan,

7    Yahoo's vice president of search and sponsored search. To date, Yahoo

8    has ranked ads based on bid price alone, which hasn't allowed it to make

9    as much money as Google.

10    142. On May 5, 2006, Yahoo! issued its 1Q 06 10-Q signed by defendants

11   Semel and Decker, where it published the false financial information it disclosed with

12   its 1Q 06 results in April 2006.

13    143. On May 18, 2006, Yahoo! hosted an analyst day in San Francisco.

14   Defendants provided further detail regarding the full implementation of Project

15   Panama by year-end 2006. Defendants stated that Panama would launch in 3Q 06

16   with Phase 3 quality based ranking rolled out last in 4Q 06. A May 18, 2006

17   Deutsche Bank report stated "Yahoo! management indicated that search monetization

18   is on track for a late 3Q/4Q launch, which in turn should drive RPS in 2007." A May

19   18, 2006 Jefferies report stated "[t]op of mind at this year's Analyst Day was

20   Yahoo!'s new search advertising platform . . . *a meaningful financial lift will only*

21   *occur after the phase 3 rollout, which will include . . . quality based ranking . . . .*

22   *Phase 3 is expected in 4Q06.*"

23    144. Defendants' statements between May 5, 2006-May 18, 2006 (¶¶141-143)

24   were false or misleading because:

25    (a)    Yahoo! falsified its financial results due to recognizing revenue

26   due to click fraud, as described in the false financial section, ¶¶199-227,

27    (b)    As set forth in ¶131 above, according to CW1, who was in charge

28   of Panama and met with Nazem in April 2005 and told him that the Panama schedule

- 162 -

1  had slipped once again and a 3Q launch and 4Q 06 full implementation was not
2  possible. Nazem was in weekly contact with Semel, Rosensweig and Decker.

3      145. A June 1, 2006 article by *Prism Business Media* entitled, "Sizing up
4  Click Fraud," stated that "[s]ome monitoring firms have pegged the [click] fraud rate
5  as high as 30% to 35% of all pay-per-click ad clicks," with fraud rates at Yahoo! at
6  about 12%.

7      146. On June 6, 2006, defendants Semel and Decker attended an investor
8  meeting at Prudential Equity Group and reiterated that Panama was on track. A
9  June 7, 2006 Prudential report stated:

10      Management discussed its own Search monetization efforts, and it
11      appears that the marketplace component is on track for a broad launch in
12      4Q'06.

13  This statement was false or misleading for the same reasons set forth in ¶144.

14      147. On June 29, 2006, Yahoo! announced it had settled a click-fraud lawsuit
15  and would be providing advertisers with refunds for overcharges due to click fraud
16  going back to January 2004. Yahoo! also announced it would appoint a traffic quality
17  advocate and work with advertisers, including greater access for advertisers to its
18  click-through protection system.

19      148. A July 5, 2006 *CNET* article entitled, "Click fraud could threaten pay-
20  per-click model," increased media scrutiny on this issue. The article stated:

21      Online advertisers estimate that about 14.6 percent of the clicks on
22      ads for which they're billed are fraudulent, costing them about $800
23      million last year, according to a study released Wednesday.

24      The study, called "Click Fraud Reaches $1.3 billion, Dictates End
25      of 'Don't Ask, Don't Tell' Era" and released by research and advisory
26      firm Outsell, claims that "Google, Yahoo and MSN . . . are stonewalling
27      on click fraud, to their own and others' detriment."

28

- 163 -

1

2

3

          Search engines have refused to release figures on the amount of fraud in search advertising, most of which comes from Web sites boosting their revenue by clicking on ads on their own sites.

4

5

6

7

          A recent study from the Click Fraud Network put the click fraud rate at 14 percent, while other companies that sell click fraud detection and prevention services have pegged it at 20 percent to 30 percent. Search companies say it is much lower than that and is under control.

8

9

10

11

149.   On July 17, 2006, Click Forensics (an independent click fraud reporting service) issued a press release that stated that based on its findings, the overall industry average click fraud rate was 14.1% and Tier 1 providers such as Yahoo! had click fraud rates of 12.8%.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

150.   On July 18, 2006, Yahoo! issued its 2Q 06 results which missed revenue estimates, with Yahoo!'s search revenue falling 4% rather than rising 4%, and announced that Project Panama would be delayed yet once again. Investors punished Yahoo!'s stock, sending it down over 22% on 204 million shares – over 10 times its normal trading volume. Investors were troubled with defendants' non-explanation for yet another delay of Panama which was expected to produce more than $100 million in additional revenue each quarter. Analyst Safa Rashtchy stated "'I find it troubling'" that they gave a "'nonanswer'" to explain the delay. "Panamawful" stated a RBC report with "[m]anagement loses some credibility due to the delay." Another analyst (Pacific Crest) stated Panama was "***the company's most material project***" and the delay was "disappointing." The disappointing Panama delay news "was amplified by Q2's weaker than expected search results" stated a Bear Stearns analyst with "[s]earch was relatively weak" and "disappointing revenue per search." A CIBC analyst report stated "Reducing Outlook on Delays in New Platform Launch & Slowing Rev/Search Growth" with "disappointing search monetization and revenue per search were responsible for the weakness in US revenues." With a settlement of a click-fraud lawsuit brought by advertisers of Yahoo!, the filing of another lawsuit in

1   May 2006, and increased media scrutiny of the problem of click fraud, Yahoo! also
2   announced that its search revenue was lower and its TAC rates had increased as it was
3   forced to continue to get rid of affiliate websites that were contributing to click fraud.
4   (Semel – "we have recently terminated relationships with publishers that didn't drive
5   traffic that met our standards"). Yahoo!'s decision to acknowledge that it needed to
6   address the click-fraud issue it was previously benefiting from would result in lower
7   revenue and margin growth rates going forward. In response to an analyst question
8   about cutting off "poor traffic affiliates" hurting revenue growth, defendant Decker
9   admitted on the July 18, 2006 conference call that "the total effect on our rev[enue]
10  ex-TAC took about 2 points off of our overall growth" and "[w]e expect that roughly
11  200 basis points impact to continue for the back half."

12      151.  In a July 20, 2006 *Associated Press* story, Semel admitted that "we are
13  not monetizing as well and that it is costing us a lot of money."

14      152.  Other analysts also questioned Yahoo!'s results and believed part of the
15  shortfall was due to click fraud concerning losing revenue from affiliate sites. A July
16  19, 2006 Deutsche Bank report lowered its rating to "HOLD" and stated that the delay
17  with Panama "certainly raises question marks over the quality and/or management
18  oversight of the search engineers." With respect to click fraud, the report stated:

19          Housecleaning in Search to Improve Traffic Quality – *[w]e believe*
20          *the rising concerns over click fraud* and likely lower conversion rates
21          *prompted the move to terminate low quality traffic relationships in*
22          *Yahoo's search business*.

23      153.  After the Class Period, Yahoo! continued to issue poor results. On
24  September 19, 2006, Yahoo!'s Decker announced a further slow down in business and
25  analysts reduced FY06 earnings estimates. On October 17, 2006, Yahoo! announced
26  even weaker 3Q 06 results than expected by investors, with Yahoo!'s stock price
27  declining to $23 per share.

28

- 165 -

154.   As part of its settlement of the click-fraud lawsuit in June 2006, Yahoo! agreed to appoint a click-fraud czar.  In announcing the appointment of Reggie Davis to the position in March 2007, Yahoo! agreed that it would no longer bill advertisers 12%-15% of the clicks on its ads.  Yahoo! also agreed that it would give advertisers more control over where their ads appeared.  Davis later admitted in an October 2007 interview reported by Insider Chatter that customer complaints at Yahoo! had decreased significantly after the Class Period due to Yahoo! finally addressing the click-fraud problem.  Click-fraud claims by customers had decreased from 800 claims a month in October 2006 to 100 claims a month by October 2007.  Davis did not provide any further detail about the amount of claims during the Class Period.

## DEFENDANTS' KNOWLEDGE AND ADDITIONAL INDICIA OF SCIENTER

### Defendants' Knowledge of the Fraud

155.   Throughout the Class Period, defendants repeatedly held themselves out to investors and the market as the persons most knowledgeable at Yahoo! about the Company's advertising business, accounting, financial statements and business operations.  As described more fully herein, each of the Individual Defendants held one of the most senior positions at Yahoo! with responsibility for directing and managing the Company's business, accounting and financial reporting.  During the Class Period, the Individual Defendants specifically promoted Yahoo!'s "tradition of financial performance and level of candor in its disclosure to the investment community."

156.   The Individual Defendants also routinely communicated with analysts and investors during the Class Period and represented that they were informed of and knowledgeable about Yahoo!'s business and finances.  As described herein, each of these defendants participated in Yahoo!'s quarterly and annual conference calls with analysts and investors.  In the course of these calls, defendants presented information regarding Yahoo!'s revenue growth, market outlook and adaptation to changing

1   market factors. In addition, defendants represented that they had intimate knowledge
2   of these areas and responded to questions focused on issues such as the acquisition
3   and integration of Overture, Project Panama, click fraud, revenue growth and the
4   Company's accounting and financial reporting. Defendants consistently discussed
5   these areas in depth. For example, defendants described the acquisition and
6   integration of Overture as exceeding their expectations, and touted the technical
7   capabilities attained as well as the technical capabilities they were building as part of
8   Project Panama. Defendants described their relentless focus on delivering this
9   technology to provide the best search experience for users, and related their successes
10   on the technology front, including a seamless introduction of this technology,
11   emphasizing that the Company achieved strong growth. Defendants commented that
12   click fraud was not a significant issue because their filtering technology had it well
13   under control. At no time did any of the Individual Defendants respond that they were
14   uninformed about any material aspect of Yahoo!'s business.

15   **Overture**

16   157. Defendants had personal knowledge of the Overture acquisition and the
17   associated problems as they repeatedly told the media, investors and securities
18   analysts during interviews, quarterly conference calls and investor conferences, that
19   Yahoo! was able to achieve growth exceeding 50% following the acquisition of
20   Overture. Because of the importance of the Overture acquisition to Yahoo!'s overall
21   performance and the development of a new search platform, defendants were well-
22   informed about all aspects of the Overture acquisition. For example, because of the
23   importance of the development the new platform to integrate the separate systems
24   used to monitor and analyze click and search date, the defendants knew that a
25   significant culture clash occurred between the product and software engineers from
26   Yahoo! and Overture. Defendants knew that the Overture platform was overwhelmed
27   by the increased Yahoo! traffic after the acquisition and that the Overture engineers'
28   requests for additional resources to process the data necessary to provide advertising

- 167 -

1  customers with meaningful discard and conversion data were ignored. Furthermore,
2  according to CW12, Yahoo!'s decision to remove the most senior and knowledgeable
3  Overture engineers from the project to update the Overture platform known as Project
4  Panama and give that project to Yahoo! engineers had a disastrous impact to the
5  development schedule for that project. As a result, that project was delayed and
6  derailed. Notwithstanding these delays, defendants nonetheless assured investors that
7  the Overture acquisition was smooth. In addition, defendants assured investors that
8  Yahoo!'s introduction of its own search technology went well despite their knowledge
9  that the Overture platform was bursting at the seams and the development of the
10 search platform was plagued with delays and management and personnel turnover.

11       158.  Because of the importance of the new upgraded platform to Yahoo!'s
12 ability to compete with Google, defendants rebranded the project from Overture 2.0 to
13 Panama. Defendants replaced the senior Overture engineers with Phu Hoang who was
14 transferred to the Overture Pasadena facility. Defendants constantly monitored the
15 progress of the development of Panama and the necessary projects such as solving the
16 blob that had to be accomplished before Panama could be completed. Because of the
17 massive delays that occurred on solving "the blob" and Project Panama, defendants
18 were ultimately forced to take control of the projects away from the Pasadena facility
19 and remove control to Yahoo!'s Sunnyvale facility. In Sunnyvale, Nazem had control
20 of the project and gave updates regarding the progress to the other defendants.
21 Notwithstanding the massive delays in the development of these projects, defendants
22 continued to falsely assure investors and securities analysts, who were very concerned
23 when Yahoo! would begin to achieve revenue from the new search platform, that the
24 Company was on the verge of completing the project at the same time they knew the
25 project was delayed and that they had no basis to provide assurance when the project
26 would be complete.

27

28

**Project Panama**

159.    Defendant Nazem was intimate with the development of Project Panama. According to CW1, Nazem removed Executive Vice President of Engineering Phu Hoang from Panama after Hoang's efforts to lead Panama "failed miserably" in July or August 2005. Defendant Nazem selected CW1 to assume leadership of Panama as of October 2005, and placed CW1 under "a lot of pressure" to "get it [Panama] out there immediately." Defendant Nazem and other Yahoo! staff made Panama a high priority at that time and began to pull resources off other projects to support Panama. At the same time, Nazem took responsibility for Panama away from the legacy Overture facilities and based it out of the Company's headquarters in Sunnyvale.

160.    Defendant Nazem traveled to the Burbank facility to meet with CW1 every Wednesday for updates on Panama's progress. CW1 knows that defendant Nazem also met on a weekly basis with defendants Semel, Decker and Rosensweig in Sunnyvale, and stated that defendant Nazem provided updates on Panama in his weekly meetings with the other defendants because Nazem regularly said that Panama was the "number one priority" for Yahoo!. Beginning in December 2005, and continuing every day thereafter, CW1 assigned a "confidence number" to the likelihood of meeting Panama's August 2006 launch date. As of April 2006, the schedule for Panama had slipped yet again, and during their weekly Wednesday meeting in Burbank CW1 told defendant Nazem that the August 2006 launch date was not going to be met. Nazem in turn shared that information with defendants Semel, Decker and Rosensweig during their weekly meetings in Sunnyvale.

161.    CW2 recalled a visit by defendant Nazem to the Pasadena facility around March 2006 to meet with sales management. During that meeting, defendant Nazem confirmed that Yahoo! had committed extraordinary resources to Project Panama since the fall of 2005. CW2 also confirmed that Panama was delayed because the back-end systems were still not ready.

- 169 -

162.   CW4 stated that Project Panama was "going nowhere" until defendant Nazem and the Company devoted more resources to Panama and transferred control of it to the Company's headquarters in Sunnyvale in the fall of 2005.  At that time, Yahoo!'s management decided that leaving control of Panama in the Overture facility was not resulting in any clear progress.  CW4 recalled that Panama's delays weren't a result of which location controlled Panama, as much as they were a result of the extreme turnover of personnel.  CW4 himself had seven different managers in the 18 months before control of Panama was turned over to the Company's headquarters in Sunnyvale.  CW4 confirmed that Project Panama was run out of defendant Nazem's office in Sunnyvale after control was transferred there in the fall of 2005.

163.   CW7 related that as a necessary precursor to Project Panama, all of the back-end systems had to be integrated onto a single platform, and this precursor was known internally as "solving the blob."  Originally, "solving the blob" was scheduled for completion in Q3 or Q4 2005, however the blob had not yet been solved, and this precursor was not yet completed, when CW7 left Yahoo! in February 2006.

164.   CW10 described "solving the blob" as a necessary effort to integrate very separate software systems (*e.g.*, CRM, Oracle Financials, click detection, etc.) onto a single platform, in order to improve the Company's data-handling capabilities in advance of Panama.  "Solving the blob" was necessary in order for Yahoo! to meet the SLAs it had with advertisers.   As CW10 explained, Yahoo!'s contracts with advertisers included SLAs which required Yahoo! to post the previous day's click data on the Business Information intranet by a specific time the next day for the advertisers to review and analyze.  This click data was supposed to be filtered so that non-billable clicks were eliminated.   However, as Yahoo! increased the traffic on the legacy Overture systems, these overburdened systems could not handle the data volume and Yahoo! was not meeting the SLAs.  At the time CW10 left Yahoo! in February 2005, this "solving the blob" project was extremely far behind, which resulted in delays to Panama's schedule.  CW10 confirmed that the "solving the blob" project was delayed

1  due to Yahoo! firing or alienating the Overture engineers most knowledgeable about
2  the disparate systems which needed to be integrated.

3  165. CW11 confirms this, and reported that the Overture platform was
4  "bursting at the seams" after Yahoo! acquired Overture. In the view of CW11, this
5  increased traffic was making the system literally self destruct, by causing down time,
6  reporting problems, account access problems, and new product failures.

7  166. CW12 described a project Overture initiated in 2003, under the direction
8  of then-CEO Ted Meisel, known internally as Overture 2.0. This project was aimed to
9  take Overture off the "duct tape and bailing wire" systems that had sustained Overture
10 as a startup, and consisted of a new customer interface, a new algorithm, and a new
11 revenue-generating process that emphasized relevance over bid amounts in ranking
12 results. CW12 stated that Overture 2.0 was scheduled to be completed in two years,
13 however when Yahoo! acquired Overture, it took control of the project away from
14 Meisel and the Overture engineers. Yahoo! "rebranded" Overture 2.0 as Project
15 Panama, and put it under the direction of Executive Vice President of Engineering Phu
16 Hoang. Hoang came to the Overture facility in late 2004, but instead of driving
17 Panama, Hoang alienated legacy Overture technical heads. CW12 participated in a
18 meeting in early 2006 where defendant Nazem announced that Project Symphony was
19 being scratched so that all of its resources could be redirected to Panama. In CW12's
20 view, Project Panama was not well managed by Yahoo!, causing the schedule to slip.
21 In the January to February 2006 timeframe, there was a "big joke" at the Overture
22 facilities as to whether Panama would ever be launched.

23 167. CW13 stated that the leadership of Project Panama changed three times
24 during the course of the project. There was a "matrix" team which consisted of senior
25 management leaders from Engineering, Project Management, Marketing,
26 Communications and Finance. The designated leader of the all-important Engineering
27 group changed three times and the lead of Project Management changed twice.
28

1  Throughout Panama, the "matrix" team was responsible for briefing defendant Semel
2  on a weekly basis.

3      168.   CW15 sat in on numerous management meetings where Project Panama
4  was discussed, as well as the fact that the legacy Overture system could not handle the
5  volume of data Yahoo! ran through it.  Additionally, CW15 attended meetings led by
6  defendant Nazem, who was the chief executive in charge of Project Panama.  In the
7  summer of 2004, a decision was made at Yahoo!'s highest levels to redesign the
8  technical platform so it could include multiple algorithms for relevancy, in order to
9  compete with Google.  This redesign, which became part of Panama, was to be
10  completed by the end of 2005.  However, according to CW15, there were massive
11  delays, requiring Yahoo! to commit more resources to the project in the latter part of
12  2005.

13  **Systems and Controls**

14      169.   The Individual Defendants constantly monitored the performance of
15  Yahoo! via their access to the information systems in use by the Business Information
16  Systems group at the Overture facility in Pasadena.  These systems include billing
17  systems, a click-fraud detection system, and a search servicing system, which
18  supported Yahoo!'s sponsored search project, contextual advertisement programs, one
19  or two domain match products, and Yahoo!'s local match product, according to CW3.

20      170.   Another system the Individual Defendants used was called Cheetah.  A
21  sub-system of Panama, Cheetah gathered and collated click-impression information
22  which was used to credit advertiser's ads resulting in the placement, position and price
23  per click associated with the advertisement.    This information was invaluable to
24  Yahoo!'s Oracle accounting system, which was used to invoice Yahoo!'s advertising
25  customers.  Additionally, the Individual Defendants relied on Yahoo!'s CRM system.
26  CW9 was told that defendant Decker reviewed the notes of his interactions with a
27  customer on the CRM system.  Defendant Decker was upset over CW9's handling of
28  a click-fraud complaint by a customer whose $20 per day of typical charges had

1    spiked to $8,000 in one day.  Defendant Decker was unhappy that Yahoo! was going
2    to have to refund the $8,000 to this customer, blamed CW9 for the refund, and
3    ultimately fired CW9 for the way CW9 handled this click-fraud complaint.

4       171.  The Individual Defendants were each aware of the immense amount of
5    data that had to be processed in order for Yahoo! to function properly.  This work was
6    accomplished by the teams in the Yahoo! Search Marketing Business Information
7    Systems Group: the click fraud analytic team, the data reporting team and the data
8    operations team.  All of these teams were focused on processing data related to
9    searches and clicks, and reported to CW10.  For example, some of the data was
10   analyzed to determine whether it related to non-billable clicks.  Other data related to
11   gross revenue was uploaded to Yahoo!'s Oracle Financial system.  Other data was
12   related to specific advertisers that was filtered and loaded onto the Business
13   Information website so the advertising customer could access its click data as called
14   for by Yahoo!'s SLAs.

15      172.  Yahoo! had a "CVS code log" system in place which provides a method
16   to track any changes to software code.  This Code Versioning System ("CVS") was
17   used by Yahoo! to track changes to the software or rules which determined whether a
18   click was billable.  These rules, for example, would not allow two clicks in a row from
19   the same source and IP address to be billable.  A CVS system is one way in which a
20   company can implement some of the controls called for by Sarbanes-Oxley.
21   Typically CVS is used by a company and its auditors to control and track changes
22   made to software code.  In signing the requisite SOX certifications, defendants Semel
23   and Decker certified that they had access to and were familiar with the controls of the
24   CVS system.

25      173.  CW10 was also responsible for granting access to the revenue reporting
26   system at the Overture Pasadena facility and gave defendant Decker access.  CW10
27   confirmed that Yahoo!'s CRM system kept track of refunds provided to advertisers,
28   consistent with CW9's experience with defendant Decker.

1       174.  CW12, stated that defendant Rosensweig was aware of the failure of
2 Project Symphony and the impact this would have on Project Panama.

3 **Click Fraud**

4       175.  CW3 led the click-fraud detection team and stated that Yahoo!
5 management decided in late 2004 to "relax" the business rules and filters which were
6 coded into the click-fraud detection system for Yahoo!'s advertising partners, in
7 particular Yahoo!'s content match partners, also known as "contextual ad partners."
8 The business rules incorporated into the click-fraud detection system were designed to
9 track clicks and eliminate clicks that exceeded a certain, specified maximum number
10 of clicks in a given time period.  The relaxation of the click-fraud rules allowed
11 Yahoo! to generate additional revenues by allowing for the counting of additional
12 improper clicks on the content match partner sites.  Because these rules and filters
13 were software code, all changes to these rules were logged and tracked by Yahoo!'s
14 CVS system.  In signing the requisite SOX certifications, defendants Semel and
15 Decker certified that they had access to and were familiar with the controls of the
16 CVS system.

17      176.  CW6, had regular communication with customers who complained about
18 click fraud.  The nature of the complaints was consistent – poor sales results while
19 experiencing large volumes of clicks which depleted the customers' ad budgets.
20 CW6's sales peers had the same experiences with their customers.  The main cause of
21 complaints was "bad mapping," which was customer ads appearing in results of non-
22 relevant search terms and was mainly in the content match area.  These customer
23 complaints were all logged in Yahoo!'s CRM system, which defendant Decker
24 reviewed, consistent with CW10 and CW9.

25      177.  After the click-fraud class action suit was filed against Yahoo! in 2005,
26 CW8 met with defendant Decker to discuss the click-fraud issue at Yahoo! and CW8
27 emphasized that defendant Decker was "definitely aware of the issue" of click fraud.

28

1    178. Defendant Semel held regular, weekly meetings with a "random dozen"
2  Yahoo! employees throughout his tenure. CW14 was among the "random dozen"
3  selected to attend a meeting with Semel in August 2005. At that meeting, with 11
4  engineers from CW14's group, a fellow engineer asked Semel about the increase in
5  ads appearing in search results, and the entire group of engineers voiced their concern
6  about this negatively impacting Yahoo!'s users. Defendant Semel promised to look
7  into the issue, but never got back to the group.

8  **Additional Indicia of Scienter**

9    179. As detailed herein, defendants acted with scienter during the Class Period
10  in that they either had actual knowledge of the misrepresentations and omissions of
11  material facts set forth, or acted with reckless disregard for the truth by failing to
12  ascertain and disclose the true facts, even though such facts were readily available to
13  them. In addition to their orchestration of the fraudulent scheme, defendants' scienter
14  is evidenced by the following: (a) in excess of $879 million in insider trading by the
15  Individual Defendants that was suspicious in nature; (b) the Individual Defendants'
16  self-interested motivation to preserve their lucrative employment agreements and
17  secure more than $484 million in incentive-based compensation; and (c) the
18  manipulation of the Company's financial results to meet revenue and earnings
19  estimates.

20  **The Individual Defendants and Corporate Insiders**
    **Personally Profited from the Fraudulent Scheme**
21

22    180. While defendants were issuing the fraudulent statements identified herein
23  about Yahoo!'s financial results and business, the Individual Defendants sold at least
     26,694,443 shares of Yahoo! stock – typically only days after issuing favorable, albeit
24
     false, statements about the Company – for insider trading proceeds of over $879
25
26  million. Notwithstanding the Individual Defendants' knowledge about the ongoing
27  fraud and their duties as officers and directors of the Company to disclose adverse
28  material facts before trading in Yahoo! stock, the Individual Defendants personally

- 175 -

1  profited from the artificial inflation in Yahoo!'s stock price which their fraudulent
2  scheme created.

3        181.  Defendant Semel personally sold 17,766,786 shares of Yahoo! stock for
4  insider trading proceeds of at least $577 million, thereby profiting from the artificial
5  inflation in Yahoo!'s stock price which defendants' fraudulent scheme had created.

6        182.  Semel's insider trading was not part of any general or specific pre-
7  planned pattern of stock sales, but was timed to profit from the artificial inflation in
8  Yahoo!'s stock price. He sold at an average share price of $32.50, 20% higher than
9  the average trading price of the Company's stock after the fraud was revealed. In the
10  2¼ years prior to the Class Period, Semel sold just 2,126,400 shares of Yahoo! stock
11  for proceeds of just $40 million, only 7% of his Class Period sales. Based on
12  defendant Semel's Form 4s filed with the SEC, as of Semel's final Class Period trade,
13  he had sold 90% of his Yahoo! stock holdings.

14        183.  Defendant Decker personally sold 2,303,333 shares of Yahoo! stock for
15  insider trading proceeds of at least $73.8 million, thereby profiting from the artificial
16  inflation in Yahoo!'s stock price which defendants' fraudulent scheme had created.

17        184.  Decker's insider trading was not part of any general or specific pre-
18  planned pattern of stock sales, but was timed to profit from the artificial inflation in
19  Yahoo!'s stock price. She sold at an average share price of $33.53, 20% higher than
20  the average trading price of the Company's stock after the fraud was revealed. In the
21  2¼ years prior to the Class Period, Decker sold just 360,000 shares of Yahoo! stock
22  for proceeds of just $6.7 million, only 9% of her Class Period sales. Based on
23  defendant Decker's Form 4s filed with the SEC, as of Decker's final Class Period
24  trade, she had sold 84% of her Yahoo! stock holdings.

25        185.  Defendant Rosensweig personally sold 2,101,000 shares of Yahoo! stock
26  for insider trading proceeds of at least $70.6 million, thereby profiting from the
27  artificial inflation in Yahoo!'s stock price which defendants' fraudulent scheme had
28  created.

1    186.   Rosensweig's insider trading was not part of any general or specific pre-
2  planned pattern of stock sales, but was timed to profit from the artificial inflation in
3  Yahoo!'s stock price. He sold at an average share price of $33.62, 20% higher than
4  the average trading price of the Company's stock after the fraud was revealed.  In the
5  2¼ years prior to the Class Period, Rosensweig sold just 598,250 shares of Yahoo!
6  stock for proceeds of just $5.5 million, only 8% of his Class Period sales. Based on
7  defendant Rosensweig's Form 4s filed with the SEC, as of Rosensweig's final Class
8  Period trade, he had sold 84% of his Yahoo! stock holdings.

9    187.   Defendant Nazem personally sold 4,623,324 shares of Yahoo! stock for
10  insider trading proceeds of at least $157.4 million, thereby profiting from the artificial
11  inflation in Yahoo!'s stock price which defendants' fraudulent scheme had created.

12    188.   Nazem's insider trading was not part of any general or specific pre-
13  planned pattern of stock sales, but was timed to profit from the artificial inflation in
14  Yahoo!'s stock price. He sold at an average share price of $34.06, 20% higher than
15  the average trading price of the Company's stock after the fraud was revealed.  In the
16  2¼ years prior to the Class Period, Nazem sold just 4,559,084 shares of Yahoo! stock
17  for proceeds of just $61.3 million, only 39% of his Class Period sales. Based on
18  defendant Nazem's Form 4s filed with the SEC, as of Nazem's final Class Period
19  trade, he had sold 88% of his Yahoo! stock holdings.

20  **Executive Compensation**

21    189.   In addition to the strong motivation provided by lucrative insider selling,
22  the Individual Defendants were highly motivated by the terms of Yahoo!'s equity
23  compensation plans,[1] which tied the overwhelming majority of their compensation
24  directly to Yahoo!'s reported financial results and the performance of the Company's

25

26  [1]    Including the Company's 1995 Stock Plan, as amended, the Company's
27  Amended and Restated 1996 Employee Stock Purchase Plan and the Company's 1996
   Directors' Stock Option Plan.

28

- 177 -

stock. The bulk of each of the Individual Defendants' compensation package was dependent upon Yahoo! posting favorable financial results. In addition to maintaining their employment positions, the personal wealth of each of the Individual Defendants was dramatically enhanced by the reported business and business performance of Yahoo!, as well as the Company's stock price and market capitalization, all of which were inflated by defendants' misleading statements and material omissions. Defendant Semel alone pocketed more than $319 million in total compensation from FY 2004 through FY 2006. Defendant Decker pocketed over $58 million and defendant Rosensweig reaped more than $52 million. Defendant Nazem was rewarded with more than $54 million for his role in the scheme. In total, the Individual Defendants took in more than $484 million in incentive-based compensation during the Class Period.

190. Pursuant to Yahoo!'s FY 2004 Proxy dated April 9, 2004, the Board of Directors, acting via its Compensation Committee, established a fixed policy relating to executive compensation, declaring, "[t]he Company has in the past and continues to emphasize the award of stock options in its executive compensation policy." Among the principle purposes served by that policy was "to link executive compensation to improvements in company performance and increases in stockholder value as measured principally by the trading price of the Company's Common stock." Primary, of course, was continuing to report strong growth and added value for shareholders.

191. In other words, other than a base salary, virtually all of the Individual Defendants' compensation was based on maintaining Yahoo!'s inflated stock price and thus contingent on covering-up the Company's increasingly dismal financial performance and failure to adequately combat click fraud. Based on the reported performance of Yahoo!, the Individual Defendants each received the maximum possible incentive compensation, through salary, cash bonuses and options during the Class Period.

1    192.   In May 2006, as disclosed in the Company's corresponding Proxy, "[t]he

2  Compensation Committee decided to use primarily stock options as the pay-for-

3  performance vehicle to best achieve the underlying business objectives."   This

4  decision resulted in Semel's agreement to accept a base salary of a single dollar,

5  resulting in 100% of his compensation being performance-based and thus tied directly

6  to the trading price of the Company's Common stock.  Similarly, the other Individual

7  Defendants each ended up with over 90% of their compensation being performance-

8  based and thus tied directly to the trading price of the Company's common stock after

9  May 2006.

10    193.   Defendant Semel reaped an astounding $319 million in total

11  compensation from the Company during FY 2004 to FY 2006. His salary was a mere

12  $1.5 million of that, ***less than one-half of a percent of his total compensation*** during

13  the Class Period:

| Year | Salary | Bonus and Non-Equity Incentives | Other Compensation ("Stock Awards") | Options Awarded (estimated value)[2] | All Other Compensation | Total Compensation (including option value) |
|------|--------|--------|--------|--------|--------|--------|
| 2004 | $600,000 | $0 | $0 | $192,082,520 | $1,980 | $192,684,500 |
| 2005 | $600,000 | $0 | $8,687,500 | $77,236,639 | $1,980 | $86,526,119 |
| 2006 | $250,001 | $0 | $2,895,833 | $36,678,679 | $125 | $39,824,638 |

19    194.   Indeed, in a May 5, 2005 Proxy Analysis, Institutional Shareholder

20  Services, Inc. ("ISS") voiced concern with the magnitude of defendant Semel's

21  compensation, stating that "since May 2001, [he] has catapulted into the ranks of the

22  highest paid CEOs in corporate America."  ISS continued, "[t]he size of his aggregate

23  pay package over a multi-year period and the multiple grant pattern within a short

_____

[2]    The value of the Options Awarded in these tables is based on either the mean of
the potential realizable value, or the dollar amount recognized for financial statement
reporting purposes, as reported by Yahoo! in the Company's corresponding Proxy
statements.

1 time period are concerning. . . . The internal pay equity is widely disparate with Mr.
2 Semel being paid 481 percent and 1,188 percent higher than the second highest paid
3 executive in 2004 and 2003, respectively. . . . ISS is concerned with the actions of the
4 Compensation Committee, which continues to award Mr. Semel with mega-option
5 grants. . . . However, there is little disclosure in the 2005 proxy statement on the
6 following: the rationale for the magnitude of the pay, the reasoning for multiple grants
7 within a short time period, and the purpose of the grants (performance versus
8 retention). . . . Based on the size of his option grants, Mr. Semel will receive a large
9 payout, even if the company's performance were to be marginally positive."
10 Ultimately, ISS reached the rare conclusion that shareholders should withhold votes
11 from Compensation Committee members to send a message about defendant Semel's
12 exorbitant compensation, "ISS recommends that shareholders withhold votes from
13 Compensation Committee members for their troubling practice of continuously
14 awarding excessive option grants to the CEO, coupled with the absence of their
15 rationale for the awards. With this magnitude of pay, shareholders deserve an
16 explanation for the inspiration behind these awards."

17      195.   In sum, defendant Semel received more than $319 million in cash and
18 stock from Yahoo! during the Class Period, virtually all incentive-based and above
19 and beyond his standard salary.

20      196.   As the charts below demonstrate, the other Individual Defendants were
21 also rewarded well beyond their base salaries as a result of their role in the fraudulent
22 scheme and Yahoo!'s reported results and stock performance during the Class Period:

**Susan L. Decker**

| Year | Salary | Bonus and Non-Equity Incentives | Other Compensation ("Stock Awards") | Options Awarded (estimated value) | All Other Comp'n | Total Compensation (including option value) |
|---|---|---|---|---|---|---|
| 2004 | $500,000 | $900,000 | $1,854,000 | $6,181,154 | $3,550 | $9,438,704 |
| 2005 | $500,000 | $1,000,000 | $7,246,500 | $24,687,242 | $3,800 | $33,437,542 |
| 2006 | $500,000 | $850,000 | $4,833,646 | $9,734,140 | $41,937 | $15,959,723 |

### Farzad Nazem

| Year | Salary | Bonus and Non-Equity Incentives | Other Compensation ("Stock Awards") | Options Awarded (estimated value) | All Other Comp'n | Total Compensation (including option value) |
|---|---|---|---|---|---|---|
| 2004 | $450,000 | $700,000 | $1,854,000 | $6,181,154 | $3,550 | $9,188,704 |
| 2005 | $450,000 | $800,000 | $7,246,500 | $24,687,242 | $3,800 | $33,187,542 |
| 2006 | $479,167 | $700,000 | $4,632,698 | $6,617,280 | $4,050 | $12,433,195 |

### Daniel L. Rosensweig

| Year | Salary | Bonus and Non-Equity Incentives | Other Compensation ("Stock Awards") | Options Awarded (estimated value) | All Other Comp'n | Total Compensation (including option value) |
|---|---|---|---|---|---|---|
| 2004 | $500,000 | $1,425,000 | $1,854,000 | $6,181,154 | $1,259 | $9,961,413 |
| 2005 | $500,000 | $1,150,000 | $7,246,500 | $24,687,242 | $3,800 | $33,587,542 |
| 2006 | $500,000 | $1,050,000 | $1,658,853 | $5,422,290 | $3,995 | $8,635,138 |

197.  In total, defendants Semel, Decker, Nazem and Rosensweig collected more than $484 million in incentive-based compensation while perpetrating their fraud on the investing public.

**GAAP Violations**

198.` As detailed herein, the defendants' violations of GAAP, are further evidence of the defendants' scienter.

### YAHOO!'S MISLEADING FINANCIAL STATEMENTS AND DISCLOSURES

199.  Yahoo!'s financial statements and related disclosures during the Class Period were materially false and misleading due to the Company's failure to properly disclose and account for revenue and earnings it had obtained arising from click fraud described herein, and failed to timely and adequately disclose refunds it would have to grant to customers due to click fraud.  Defendants knew that material amounts of Yahoo!'s marketing revenues, revenues attributed to searches and earnings were the result of click fraud.  Yet contrary to accounting and SEC rules, Yahoo! failed to disclose this key aspect of its earnings.  These practices made Yahoo!'s reported

1  operating results not indicative of the true nature of Yahoo!'s underlying business nor
2  of the business trends investors could expect based on those results. Yahoo!'s failure
3  to properly account for and disclose the impact of click fraud on its results was a
4  violation of GAAP and SEC rules.

5     200.   GAAP are those principles recognized by the accounting profession as
6  the conventions, rules and procedures necessary to define accepted accounting
7  practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states
8  that financial statements filed with the SEC which are not prepared in compliance
9  with GAAP are presumed to be misleading and inaccurate, despite note or other
10 disclosure. Regulation S-X requires that interim financial statements must also
11 comply with GAAP, with the exception that interim financial statements need not
12 include disclosure which would be duplicative of disclosures accompanying annual
13 financial statements.  17 C.F.R. §210.10-01(a).

14     201.   Yahoo!'s reported financial results for F04-F06 are set forth below:

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 182 -

1
2

**YAHOO! INC.**
**Quarterly Results**
**in thousands, except EPS (EPS is split-adjusted)**

3
4
5
6
7

| | 2004 | | | | |
| | 31-Mar | 30-Jun | 30-Sep | 31-Dec | Year |
|---|---|---|---|---|---|
| Total Revenues | $757,786 | $832,299 | $906,715 | $1,077,717 | $3,574,517 |
| Marketing Revenues | $635,468 | $690,634 | $765,112 | $910,563 | $3,001,777 |
| Net Income | $101,212 | $112,512 | $253,305 | $372,524 | $839,553 |
| Earnings Per Share | $0.08 | $0.08 | $0.19 | $0.27 | $0.62 |

8
9
10
11
12

| | 2005 | | | | |
| | 31-Mar | 30-June | 30-Sep | 31-Dec | Year |
|---|---|---|---|---|---|
| Total Revenues | $1,173,742 | $1,252,997 | $1,329,929 | $1,501,000 | $5,257,668 |
| Marketing Revenues | $1,024,796 | $1,094,301 | $1,159,572 | $1,315,303 | $4,593,972 |
| Net Income | $204,560 | $754,689 | $253,773 | $683,208 | $1,896,230 |
| Earnings Per Share | $0.15 | $0.54 | $0.18 | $0.49 | $1.35 |

13
14
15
16

| | 2006 | | | | |
| | 31-Mar | 30-Jun | 30-Sep | 31-Dec | Year |
|---|---|---|---|---|---|
| Net Revenues | $1,567,055 | $1,575,854 | $1,580,322 | $1,702,448 | $6,425,679 |
| Marketing Revenues | $1,380,854 | $1,386,245 | $1,370,374 | $1,489,734 | $5,627,207 |
| Net Income | $159,859 | $164,330 | $158,529 | $268,673 | $751,391 |
| Earnings Per Share | $0.11 | $0.12 | $0.12 | $0.19 | $0.54 |

17
18

**Yahoo!'s Failure to Properly Account for Marketing Revenues**

19     202.   GAAP, as set forth in FASB Statement of Concepts ("Concepts") No. 5,

20   requires that revenues only be recorded when both earned and when collectible. *See*

21   Concepts No. 5, ¶¶83-84.

22     203.   During the Class Period, Yahoo! reported at least $387 million in revenue

23   attributed to click fraud, out of $3.878 billion in sponsored search revenue. This

24   minimum amount of false revenue is based on industry experts and analysts who have

25   determined that click fraud amounts to at least 10% and as much as 30% of all pay-

26   per-click clicks and is corroborated by CW3 and CW6.

27
28

1   204.   A March 10, 2005 article for *Wired Magazine* stated that businesses
2   paying Google or Yahoo!'s Overture to appear as the No. 1 or No. 2 ad experience
3   click fraud with "*as much as 35% of their traffic*."

4   205.   During June 2005, *Marketing Experiments Journal* conducted research
5   into the amount of click fraud. It published the results of that research in an article on
6   June 30, 2005, and stated that: "Our research indicates that *as much as 30% of paid*
7   *search traffic may be fraudulent*."

8   206.   A June 1, 2006 article in *DIRECT* magazine, entitled, "Sizing Up Click
9   Fraud" summarized that, "[s]ome monitoring firms have *pegged the [click] fraud rate*
10  *as high as 30% to 35% of all pay-per-click ad clicks*." This article also stated that a
11  "December 2005 report by the Search Engine Marketing Professional Organization
12  found that 40% of online advertisers say they've discovered fraud among their clicks,
13  *16% more than the previous year*." The article also discussed the efforts of "click
14  auditing firm Click Forensics," which found that "*fraud rates ran at 12.1% of clicks*
15  *on the top-tier search engines Google and Yahoo!, and 21.3% on second-tier*
16  *engines* such as Ask.com and MSN Search."

17  207.   On July 17, 2006, Click Forensics issued a press release, "Industry
18  Average Click Fraud Rate Climbs in Second Quarter 2006." The press release stated
19  that "*[t]he overall industry average click fraud rate was 14.1 percent, slightly higher*
20  *than the average of 13.7 percent for Q1*." They also found that "*Tier 1 search*
21  *providers, such as Yahoo! and Google was 12.8 percent vs. 12.1 percent in Q1*."

22  208.   Finally, Fair Isaac Corporation, a company with years of experience
23  detecting fraud, issued a press release on May 18, 2007, announcing preliminary
24  results of its research study into click-fraud rates in pay-per-click advertising: "Early
25  results indicate that *fraudulent clicks can amount to 10-15 percent of advertisers'*
26  *billed click traffic*." Even after a search engine's filters have purportedly removed all
27  fraudulent clicks, 10%-15% of the advertiser's billed clicks are attributable to click
28  fraud.

209.    By falsely reporting sponsored search revenue to the tune of at least $387 million, Yahoo! further misled the investing public into believing that Yahoo! attained at least an extra 17 cents in basic earnings per share during the Class Period. Moreover, Yahoo! falsely reported at least one penny of basic earnings per share in each and every quarter of the Class Period, as shown in the following charts:

|  | Q1'04 | Q2'04 | Q3'04 | Q4'04 |
|---|---|---|---|---|
| **Sponsored Search Revenue** | 263,300 | 272,000 | 301,000 | 359,000 |
| *10% of Sponsored Search is Improper Revenue* | 26,330 | 27,200 | 30,100 | 35,900 |
| **Basic EPS** | $  0.08 | $  0.08 | $  0.19 | $  0.27 |
| *Basic EPS Without Improper Revenue* | $  0.06 | $  0.07 | $  0.17 | $  0.25 |

|  | Q1'05 | Q2'05 | Q3'05 | Q4'05 |
|---|---|---|---|---|
| **Sponsored Search Revenue** | 387,000 | 391,000 | 420,000 | 480,000 |
| *10% of Sponsored Search is Improper Revenue* | 38,700 | 39,100 | 42,000 | 48,000 |
| **Basic EPS** | $  0.15 | $  0.54 | $  0.18 | $  0.49 |
| *Basic EPS without Improper Revenue* | $  0.13 | $  0.52 | $  0.16 | $  0.46 |

|  | Q1'06 | Q2'06 |
|---|---|---|
| **Sponsored Search Revenue** | 514,000 | 491,000 |
| *10% of Sponsored Search is Improper Revenue* | 51,400 | 49,100 |
| **Basic EPS** | $  0.11 | $  0.12 |
| *Basic EPS Without Improper Revenue* | $  0.09 | $  0.10 |

|  | FY'04 | FY'05 | 1H'06 | CP Total |
|---|---|---|---|---|
| **Sponsored Search Revenue** | 1,195,300 | 1,678,000 | 1,005,000 | 3,878,300 |
| *10% of Sponsored Search is Improper Revenue* | 119,530 | 167,800 | 100,500 | 387,830 |
| **Basic EPS** | $  0.62 | $  1.35 | $  0.23 | $  2.20 |
| *Basic EPS Without Improper Revenue* | $  0.56 | $  1.28 | $  0.19 | $  2.03 |

Numbers in 000s, except EPS.
Sources: YHOO SEC Filings; Jefferies & Company and Deutsche Bank analyst reports.

210.    Ultimately, the Company has settled litigation and been forced to issue refunds and credits to its advertising customers, but Yahoo! has never publicly disclosed the true amount of these refunds and credits.

**Yahoo!'s Failure to Accrue Liabilities for
Obligations Arising from Click Fraud**

211.    GAAP, as set forth in Concepts No. 5, requires loss be recorded when an asset becomes impaired or liability accrued without corresponding benefit. *See* Concepts No. 5, ¶87. According to GAAP, as set forth in Statement of Financial Accounting Standard ("SFAS") No. 5, *Accounting for Contingencies*, an entity shall

1  record a loss contingency when information available prior to the issuance of the
2  financial statements indicates (a) it is probable an asset is impaired or a liability has
3  occurred, and (b) the amount of loss can be reasonably estimated. *See* SFAS No. 5,
4  ¶8.

5  212. A significant contingency under both GAAP (as per SFAS No. 5) and for
6  Yahoo!'s business was obligations related to amounts its customers were charged for
7  advertising based on clicks on customers' advertisements, which in fact were due to
8  click fraud.

9  213. In fact, Yahoo! did not adequately accrue these refunds which were likely
10 to be incurred when the click fraud was exposed. This later led to an undisclosed
11 amount of refunds and credits to account for significant unaccrued-for liabilities for
12 click fraud.

13 **Yahoo! Failed to Make Required Disclosures About the
   Impact of Click Fraud on Its Results**

14
15 214. Given the significance of advertising to Yahoo!'s reported financial
16 results, the level of click fraud and corresponding impact on earnings was required by
   GAAP and SEC rules to be disclosed.

17
18 215. Given the uncertainty of how long this practice could continue, investors
19 were denied a full picture of Yahoo!'s financial statements and the predictive value of
   the financial statements by Yahoo!'s concealment of the impact of the click fraud.

20
21 216. The SEC requires that, as to annual and interim financial statements filed
22 with the SEC, registrants include a management's discussion and analysis section
   which provides information with respect to the results of operations and "also shall
23 provide such other information that the registrant believes to be necessary to an
24 understanding of its financial condition, changes in financial condition and results of
25 operations." *See* Regulation S-K, 17 C.F.R. §229.303(a). Regulation S-K states that,
26 as to annual results, the management's discussion and analysis section shall:

27
28

1
2
3
4
5
6
7

      (3)    Results of operations.   (i)   Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

8
9
10
11
12
13
14

      (ii)    Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

15
16
17
18
19
20
21
22

217.   The SEC also requires that interim period financial statements filed with the SEC include a management's discussion and analysis of the financial condition and results of operations so as to enable the reader to assess material changes in financial condition and results of operations. Regulation S-K, 17 C.F.R. §229.303(b), states that: "The discussion and analysis shall include a discussion of material changes in those items specifically listed in paragraph (a) of this Item [as set forth above], except that the impact of inflation and changing prices on operations for interim periods need not be addressed." As one court noted:

23
24
25
26
27

      Item 303(a)(3)(ii) essentially says to a registrant: If there has been an important change in your company's business or environment that significantly or materially decreases the predictive value of your reported results, explain this change in the prospectus. The obvious focus is on preventing the latest reported results from misleading potential investors,

28

1        thereby promoting a more accurate picture of the registrant's future
2        prospects.

3  *See Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1192 (11th Cir. 2002).

4        218.  During the Class Period, Yahoo! failed to truthfully and adequately
5  disclose the impact of click fraud on its financial results.

6        219.  Moreover, GAAP requires that financial information be useful to
7  potential investors and creditors.  GAAP, as described by Concepts No. 1, ¶37, states:

8        Financial reporting should provide information to help present and
9        potential investors and creditors and other users in assessing the
10        amounts, timing, and uncertainty of prospective cash receipts from
11        dividends or interest and the proceeds from the sale, redemption, or
12        maturity of securities or loans. . . .  Thus, financial reporting should
13        provide information to help investors, creditors, and others assess the
14        amounts, timing, and uncertainty of prospective net cash inflows to the
15        related enterprise.

16        220.  In April 2006, Harvard researcher Ben Edelman disseminated his
17  research information on Yahoo!'s problem with click fraud.  His research indicated
18  that some spyware programs actually simulate the click itself – with the result that
19  advertisers may have been paying Yahoo! for fake clicks.  Edelman stated in part:

20        I see six distinct problems with the Yahoo practices and partners at
21        issue.

22        • **Click fraud**. Through these improper ad displays, Yahoo charges
23        advertisers for "clicks" that didn't actually occur. This violates the
24        core premise of pay-per-click advertising, i.e. that an advertiser
25        only pays if a user affirmatively shows interest in the advertiser's
26        ad. Yahoo promises: "Pay only when a customer clicks on your
27        listing." But that's just not true here. Instead, through click fraud,

28

- 188 -

1
2

advertisers are asked to pay for spyware-delivered traffic, whether or not users actually click.

3
4
5
6
7
8
9
10

- **Untargeted traffic**. Premium prices for PPC advertising reflect, in part, the extreme targeting of PPC leads: PPC ads are only supposed to be shown to users actively searching for the specified product, service, or term. Yahoo promises: "Advertise only to customers who are already interested in your products or services." That's also untrue in some of my examples. [I]n fact spyware-delivered PPC results show Yahoo PPC ads to users with no interest in advertisers' products or services.

11
12
13
14
15
16
17
18
19
20
21

- **Self-targeting traffic**. Spyware-delivered PPC ads often target advertisers with their own ads. For example, in August I reported a user browsing the Dell site, then receiving spyware-delivered Yahoo PPC advertising promising "up to 1/3 off" if a user clicked a prominent link. But clicking that link didn't actually provide any discounts or savings beyond Dell's usual prices. However, each time a user clicked the link, Dell had to pay Yahoo a PPC advertising fee that I estimate at $3.30. That's a bad deal for Dell: These users were already at Dell's site, and there's no reason why Dell should pay Yahoo or a spyware vendor just to keep them there. Same for self-targeting of SmartBargains, reported above.

22
23
24
25
26
27
28

- **Failure to label sponsored links as such**. Through spyware syndication, Yahoo PPC ads often appear on users' screens without appropriate labeling. When unlabeled ads appear in or adjacent to search engine results, these ads risk violating the FTC's 2002 instructions for advertising disclosures at search engines. See my prior SideFind example, where SideFind justifies bona fide search results with Yahoo PPC ads, without labeling

1  Yahoo's ads as such. Unlabeled ads also prevent users from
2  understanding the nature of the linked content: For example, recall
3  my Qklinkserver example. Seeing unlabeled text links inserted
4  into ordinary web pages, users reasonably expect that such links
5  were chosen by the sites users were visiting, when in fact such
6  links were unilaterally inserted by unrelated spyware installed
7  without user consent.

8  • **Low-quality traffic**. Advertisers pay Yahoo a premium to reach
9  desirable users at Yahoo.com – sophisticated users, users who are
10  actively engaged in search. In contrast, spyware sends advertisers
11  low-quality users, including users who are less likely to make a
12  purchase. This traffic is not worth the premium price Yahoo
13  charges. Consider: 180solutions sells popups for as little as $0.015
14  (one and a half cents) per ad display. In contrast, Yahoo charges a
15  minimum of $0.10 – more than six times as much. Yahoo harms
16  advertisers when Yahoo charges advertisers its premium prices for
17  ads ultimately shown through low-quality low-cost channels like
18  180solutions.

19  • **Unethical spyware-sourced traffic**. Industry norms, litigation,
20  and instructions from policy makers (1, 2) all tell advertisers to
21  keep their ads out of spyware. Discomfort with spyware reflects
22  concerns about installation methods (misleading and
23  nonconsensual installations), privacy effects, other harms to
24  consumers, and harms to other web sites. For these and other
25  reasons, many advertisers make a serious good-faith effort to stay
26  away from spyware. These same advertisers also buy PPC ads
27  from Yahoo – a standard, reasonable practice for anyone buying
28  online advertising. Unfortunately, these Yahoo PPC ad purchases

1
2
3
4
5

inevitably and automatically put advertisers into notorious spyware, including the programs reported above. By allowing these improper ad placements, Yahoo endangers its advertisers' good names, and risks putting them in violation of best practices and policy-makers' guidance.

6    221.  As a result of this and the subsequent resolution of litigation, Yahoo! was
7  increasingly unable to continue its recognition of income from click fraud, adversely
8  affecting its future results.

9    222.  Due to these accounting improprieties, the Company presented its
10  financial results and statements in a manner which violated GAAP, including the
11  following fundamental accounting principles:

12    (a)  The principle that "financial reporting should provide information
13  about how management of an enterprise has discharged its stewardship responsibility
14  to owners (stockholders) for the use of enterprise resources entrusted to it" was
15  violated.  To the extent that management offers securities of the enterprise to the
16  public, it voluntarily accepts wider responsibilities for accountability to prospective
17  investors and to the public in general (Concepts No. 1, ¶50);

18    (b)  The principle that "financial reporting should provide information
19  about an enterprise's financial performance during a period" was violated.  Investors
20  and creditors often use information about the past to help in assessing the prospects of
21  an enterprise.  Thus, although investment and credit decisions reflect investors'
22  expectations about future enterprise performance, those expectations are commonly
23  based at least partly on evaluations of past enterprise performance (Concepts No. 1,
24  ¶42);

25    (c)  The principle that financial reporting should be reliable in that it
26  represents what it purports to represent was violated.  "That information should be
27  reliable as well as relevant is a notion that is central to accounting" (Concepts No. 2,
28  ¶¶58-59);

1          (d)    The principle of completeness, which means that nothing is left out

2 of the information that may be necessary to insure that it validly represents underlying

3 events and conditions was violated (Concepts No. 2, ¶79); and

4          (e)    The principle that conservatism be used as a prudent reaction to

5 uncertainty to try to ensure that uncertainties and risks inherent in business situations

6 are adequately considered was violated. The best way to avoid injury to investors is to

7 try to ensure that what is reported represents what it purports to represent (Concepts

8 No. 2, ¶¶95, 97).

9    223.   Further, the undisclosed adverse information concealed by defendants

10 during the Class Period is the type of information which, because of SEC regulations,

11 regulations of the national stock exchanges and customary business practice, is

12 expected by investors and securities analysts to be disclosed and is known by

13 corporate officials and their legal and financial advisors to be the type of information

14 which is expected to be and must be disclosed.

15 **Defendants Certified False and Misleading Financial Results**

16    224.   Defendants Semel and Decker knowingly certified false and misleading

17 financial statements. Defendants Semel and Decker certified the following financial

18 statements during the Class Period:

19

| SCHEDULE OF CERTIFIED FINANCIAL STATEMENTS | | | | |
|---|---|---|---|---|
| Financial Statement Filed | Filing Period | Filing Date | Signed/Certified by | |
| | | | CEO | CFO |
| Form 10-Q | March 31, 2004 | May 7, 2004 | Terry Semel | Susan Decker |
| Form 10-Q | June 30, 2004 | Aug. 9, 2004 | Terry Semel | Susan Decker |
| Form 10-Q | Sept. 30, 2004 | Oct. 29, 2004 | Terry Semel | Susan Decker |
| Form 10-K | Dec. 31, 2004 | March 11, 2005 | Terry Semel | Susan Decker |
| Form 10-Q | March 31, 2005 | May 6, 2005 | Terry Semel | Susan Decker |
| Form 10-Q | June 30, 2005 | Aug. 5, 2005 | Terry Semel | Susan Decker |
| Form 10-Q | Sept. 30, 2005 | Nov. 4, 2005 | Terry Semel | Susan Decker |
| Form 10-K | Dec. 31, 2005 | March 3, 2006 | Terry Semel | Susan Decker |
| Form 10-Q | March 31, 2006 | May 5, 2006 | Terry Semel | Susan Decker |

26 These financial statements were not in accordance with GAAP and SEC rules.

27    225.   Section 302 of the Sarbanes-Oxley Act of 2002 and SEC Rules 13a-14(a)

28 and 15d-14(a) of the 1934Act required defendants Semel, as CEO, and Decker, as

1 CFO, to certify each quarterly and annual report to both the SEC and investors as
2 follows:

3     I, Terry Semel, the Chief Executive Officer / Susan Decker, the
4 Chief Financial Officer of Yahoo! Inc., certify that:

5     1.    I have reviewed this annual report on Form 10-K / quarterly
6 report on Form 10-Q of Yahoo! Inc.;

7     2.    Based on my knowledge, this report does not contain any
8 untrue statement of a material fact or omit to state a material fact
9 necessary to make the statements made, in light of the circumstances
10 under which such statements were made, not misleading with respect to
11 the period covered by this report;

12     3.    Based on my knowledge, the financial statements, and other
13 financial information included in this report, fairly present in all material
14 respects the financial condition, results of operations and cash flows of
15 the registrant as of, and for, the periods presented in this annual report;

16     4.    The registrant's other certifying officer and I are responsible
17 for establishing and maintaining disclosure controls and procedures (as
18 defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal
19 control over financial reporting (as defined in Exchange Act Rules 13a-
20 15(f) and 15d-15(f)) for the registrant and have:

21     (a)    Designed such disclosure controls and procedures, or
22 caused such disclosure controls and procedures to be designed under our
23 supervision, to ensure that material information relating to the registrant,
24 including its consolidated subsidiaries, is made known to us by others
25 within those entities, particularly during the period in which this annual
26 report is being prepared;

27     (b)    Designed such internal control over financial
28 reporting, or caused such internal control over financial reporting to be

- 193 -

1    designed under our supervision, to provide reasonable assurance
2    regarding the reliability of financial reporting and the preparation of
3    financial statements for external purposes in accordance with generally
4    accepted accounting principles;

5    (c)    Evaluated the effectiveness of the registrant's
6    disclosure controls and procedures and presented in this report our
7    conclusions about the effectiveness of the disclosure controls and
8    procedures, as of the end of the period covered by this report based on
9    such evaluation; and

10    (d)    Disclosed in this report any change in the registrant's
11    internal control over financial reporting that occurred during the
12    registrant's most recent fiscal quarter (the registrant's fourth quarter in
13    the case of an annual report)  that has materially affected or is reasonably
14    likely to materially affect, the registrant's internal control over financial
15    reporting; and

16    5.    The registrant's other certifying officer and I have
17    disclosed, based on our most recent evaluation of internal control over
18    financial reporting, to the registrant's auditors and the audit committee of
19    the registrant's board of directors (or persons performing the equivalent
20    functions):

21    (a)    All significant deficiencies and material weaknesses
22    in the design or operation of internal control over financial reporting
23    which are reasonably likely to adversely affect the registrant's ability to
24    record, process, summarize and report financial information; and

25    (b)    Any fraud, whether or not material, that involves
26    management or other employees who have a significant role in the
27    registrant's internal control over financial reporting.

28

1    226.   At the time defendants Semel and Decker signed these certifications, they
2  knew or recklessly disregarded that they were false for the reasons alleged herein.

3    227.   Additionally, on the dates noted in the Schedule of Certified Financial
4  Statements above, defendants Semel and Decker signed and filed with the SEC
5  certifications under SEC Rules 13a-14(a)/15d-14(a) of the 1934 Act and §906 of
6  Sarbanes-Oxley attesting to the accuracy and truthfulness of the corresponding Forms
7  10-K and 10-Q for Yahoo!.  At the time defendants Semel and Decker signed these
8  certifications, they knew or recklessly disregarded that they were false for the reasons
9  alleged herein.

10              **PROXIMATE LOSS CAUSATION/ECONOMIC LOSS**

11    228.   During the Class Period, as detailed herein, defendants engaged in a
12  scheme to deceive investors and the market and a course of conduct that artificially
13  inflated Yahoo!'s stock price and operated as a fraud or deceit on Class Period
14  purchasers of Yahoo! stock by misrepresenting the Company's financial results,
15  business success, integration of Overture, performance of Yahoo!'s new search
16  technology, developmental initiatives such as the status of Project Panama, its click-
17  fraud issues, and its future business prospects.  Defendants achieved this façade of
18  success, growth and strong future business prospects by misrepresenting Yahoo!'s
19  Marketing Revenue and its search engine capabilities, including the status of Project
20  Panama.  Over nine consecutive quarters, defendants improperly inflated Yahoo!'s
21  reported Marketing Revenue by more than $387 million.  Later, however, when
22  defendants' prior misrepresentations and fraudulent conduct was disclosed and
23  became apparent to the market, Yahoo! stock fell precipitously as the prior artificial
24  inflation came out of Yahoo!'s stock price.  As a result of their purchases of Yahoo!
25  stock during the Class Period, Lead Plaintiffs and other members of the Class suffered
26  economic loss, *i.e.*, damages, under the federal securities laws.

27    229.   By improperly reporting click-fraud revenues in its Marketing
28  Revenues – a key factor in evaluating Yahoo!'s financial health and success – the

1 defendants presented a misleading picture of Yahoo!'s business and prospects. Thus,
2 instead of truthfully disclosing during the Class Period that Yahoo!'s track record of
3 growth and business success was fading and they were losing further ground to
4 Google, defendants caused Yahoo! to falsely report growth rates in Marketing
5 Revenue as evidence of Yahoo!'s thriving advertising business and adaptation to
6 changing market conditions.    Defendants also misrepresented their search
7 monetization efforts (Project Panama).

8     230.   Defendants' false and misleading statements had the intended effect and
9 caused Yahoo! stock to trade at artificially inflated levels up to $43.66 per share
10 throughout the Class Period.

11     231.   Beginning January 18, 2006 and continuing through July 18, 2006,
12 defendants were forced to publicly disclose that:

13         (a)    Yahoo!'s revenues were not growing as fast due to its being forced
14 to terminate relationships with affiliate Websites who were contributing to click fraud;
15 and

16         (b)    Yahoo! was delaying implementation of Project Panama which
17 was necessary for Yahoo! to close the monetization gap with Google.

18     232.   As a direct result of defendants' public revelations regarding the truth
19 about Yahoo!'s search business and its actual business prospects going forward, and
20 partial disclosure about the delay in Panama, Yahoo!'s stock price plummeted over
21 12%, on five times normal trading volume on January 18, 2006.  Yahoo!'s stock also
22 declined 21% on July 19, 2006 on ten times normal trading volume when defendants
23 announced Project Panama was delayed once again, and search revenues were light
24 partly due to Yahoo! terminating relationships with affiliate websites engaged in click
25 fraud.  These drops removed the inflation from Yahoo!'s stock price, causing real
26 economic loss to investors who had purchased the stock during the Class Period.
27 Analysts following the Company were shocked by these adverse revelations.

28

233. With respect to the January 18, 2006 partial disclosure that affiliate website terminations would reduce revenues in 2006, analyst Safa Rashtchy from Piper Jaffray stated on the January 17, 2006 conference call – "[y]our results in this quarter while within your guidance show a marked deceleration from last quarter and your guidance for '06 suggests even further deceleration." Another analyst from Needham issued a report the next day stating "[g]uidance was mostly disappointing," and a Deutsche Bank analyst also stated "[t]he big issue was '06 guidance lower." Regarding the partial disclosure that Panama was delayed, an Oppenheimer analyst report dated January 18, 2006, stated, "[w]e view this *delay* as a negative for the company as Google . . . continues to gain relative share." A Stanford Group report issued the same day stated, "Yahoo management indicated that *monetization gains in its search business could take longer to realize than we had anticipated*." Bear Stearns analysts stated in a January 18, 2006 report: "Concerns [–] Yahoo has a relatively weak market position in search. Yahoo!'s monetization efforts lags Google and translates into weaker revenue in this segment. Benefits from *improvements in monetization may impact revenues later that [sic] the market perceives*." Regarding the announcement of the Panama delay on July 18, 2006, analyst Safa Rashtchy stated "'I find it troubling'" that they gave a "'nonanswer'" to explain they delay. "Panamawful" stated a RBC report with "[m]anagement loses some credibility due to the delay." Another analyst (Pacific Crest) stated Panama was "the company's *most material* project" and the delay was "disappointing." The July 18th revenue shortfall was also criticized. The disappointing Panama delay news "was amplified by Q2's weaker than expected search results" stated a Bear Stearns analyst with "[s]earch was relatively weak" and "disappointing revenue per search." A CIBC analyst report stated "Reducing Outlook on Delays in New Platform Launch & Slowing Rev/Search Growth" with "disappointing search monetization and revenue per search were responsible for the weakness in US revenues." Regarding the acknowledgement that click fraud had helped Yahoo!'s prior results and in response to an analyst question

1    about cutting off "poor traffic affiliates" hurting revenue growth, defendant Decker
2    admitted on the July 18, 2006 conference call that "the total effect on our rev[enue]
3    ex-TAC took about 2 points off of our overall growth" and "[w]e expect that roughly
4    200 basis points impact to continue for the back half." A July 19, 2006 Deutsche
5    Bank report believed part of the shortfall was due to click fraud "the rising concerns
6    over click fraud . . . prompted the move to terminate low quality traffic relationships
7    in Yahoo!'s search business." In sum, as the truth about Yahoo!'s actual financial
8    business performance was revealed, the Company's stock price plummeted, the
9    artificial inflation came out of the stock and Lead Plaintiffs and other members of the
10   Class were damaged, suffering economic losses.

11   234. The decline in Yahoo!'s stock price near and at the end of the Class
12   Period was a direct result of the nature and extent of defendants' prior misstatements
13   and fraudulent conduct finally being revealed to investors and the market. The timing
14   and magnitude of Yahoo!'s stock price declines negate any inference that the loss
15   suffered by Lead Plaintiffs and other Class members was caused by changed market
16   conditions, macroeconomic or industry factors or Company-specific facts unrelated to
17   the defendants' fraudulent conduct. On January 18, 2006, Yahoo!'s stock price
18   declined 12.29% while the S&P index declined less than a half percent and the
19   Goldman Sachs Internet index declined 2.39%. On July 19, 2006, Yahoo!'s stock
20   price declined 21.83%, while the S&P increased 1.8% and the Goldman Sachs index
21   declined less than 1%. Thus, the specific disclosures by Yahoo! on these two dates,
22   (with the January 18th date being a partial disclosure) removed inflation from
23   Yahoo!'s stock price due to Company-specific disclosures. The economic loss, *i.e.*,
24   damages, suffered by Lead Plaintiffs and other members of the Class, was a direct
25   result of defendants' fraudulent scheme to artificially inflate Yahoo!'s stock price and
26   the subsequent significant decline in the value of Yahoo!'s stock when defendants'
27   prior misrepresentations and other fraudulent conduct was revealed through the true
28   business conditions of the Company (*i.e.*, loss causation).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

235.   At all relevant times, the market for Yahoo!'s securities was an efficient market for the following reasons, among others:

(b)   Yahoo!'s stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(c)   As a regulated issuer, Yahoo! filed periodic public reports with the SEC and the NYSE;

(d)   Yahoo! regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)   Yahoo! was followed by numerous securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of those reports was publicly available and entered the public marketplace.

236.   As a result of the foregoing, the market for Yahoo!'s securities promptly digested current information regarding Yahoo! from all publicly available sources and reflected such information in Yahoo!'s stock price.  Under these circumstances, all purchasers of Yahoo!'s common stock during the Class Period suffered similar injury through their purchase of Yahoo!'s common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS**

237.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The specific statements pleaded herein either were not identified as "forward-looking statements" when made or were not accompanied by meaningful

1  cautionary statements identifying important factors that could cause actual results to
2  differ materially from those in the purportedly forward-looking statements.
3  Alternatively, to the extent that the statutory safe harbor does apply to any forward-
4  looking statements pleaded herein, defendants are liable for those false forward-
5  looking statements because at the time each of those forward-looking statements was
6  made, the particular speaker knew that the particular forward-looking statement was
7  false, and/or the forward-looking statement was authorized and/or approved by an
8  executive officer of Yahoo! who knew that those statements were false when made.

9  ## LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

10  238.   Lead Plaintiffs bring this action as a class action pursuant to Fed. R. Civ.
11  P. 23(a) and (b)(3) on behalf of a class consisting of purchasers of Yahoo!'s publicly
12  traded securities during the Class Period who were damaged by defendants' fraud (the
13  "Class").  Excluded from the Class are defendants, the officers and directors of the
14  Company, members of their immediate families and their legal representatives, heirs,
15  successors or assigns and any entity in which defendants have or had a controlling
16  interest.

17  239.   The members of the Class are so numerous that joinder of all members is
18  impracticable.  Throughout the Class Period, Yahoo!'s common stock was actively
19  traded on the NASDAQ.  While the exact number of Class members is unknown to
20  Lead Plaintiffs at this time and can only be ascertained through appropriate discovery,
21  Lead Plaintiffs believe that there are thousands of members in the proposed Class.
22  Record owners and other members of the Class may be identified from records
23  maintained by Yahoo! or its transfer agent and may be notified of the pendency of this
24  action by mail, using the form of notice similar to that customarily used in securities
25  class actions.

26  240.   Lead Plaintiffs' claims are typical of the claims of the members of the
27  Class as all members of the Class were similarly affected by defendants' wrongful
28  conduct in violation of federal law that is complained of herein.

- 200 -

1    241.  Lead Plaintiffs will fairly and adequately protect the interests of the
2    members of the Class and have retained counsel competent and experienced in class
3    action and securities litigation.

4    242.  Common questions of law and fact exist as to all members of the Class
5    and predominate over any questions solely affecting individual members of the Class.
6    Among the questions of law and fact common to the Class are:

7         (a)  Whether the federal securities laws were violated by defendants'
8    acts as alleged herein;

9         (b)  Whether statements made by defendants to the investing public
10   during the Class Period misrepresented and omitted material facts about the business,
11   operations and financial results of Yahoo!; and

12        (c)  To what extent the members of the Class have sustained damages
13   and the proper measure of damages.

14   243.  A class action is superior to all other available methods for the fair and
15   efficient adjudication of this controversy since joinder of all members is
16   impracticable.  Furthermore, as the damages suffered by individual Class members
17   may be relatively small, the expense and burden of individual litigation make it
18   impossible for members of the Class to individually redress the wrongs done to them.
19   There will be no difficulty in the management of this action as a class action.

20   **COUNT I**

21   **Violation of §10(b) of the 1934 Act and Rule 10b-5
     Promulgated Thereunder Against All Defendants**

22
23   244.  Lead Plaintiffs repeat and reallege each and every allegation contained
     above as if fully set forth herein.
24
25   245.  During the Class Period, defendants, and each of them, carried out a plan,
26   scheme and course of conduct which was intended to and, throughout the Class
27   Period, did: (a) deceive the investing public, including Lead Plaintiffs and other Class
     members, as alleged herein; (b) artificially inflate and maintain the market price of
28

- 201 -

1 Yahoo!'s securities; and (c) cause Lead Plaintiffs and other members of the Class to
2 purchase Yahoo!'s securities at artificially inflated prices and, as a result, suffer
3 economic losses when the truth about defendants' fraud was revealed. In furtherance
4 of this unlawful scheme, plan and course of conduct, defendants, and each of them,
5 took the actions set forth herein.

6      246.   Defendants: (a) employed devices, schemes and artifices to defraud; (b)
7 made untrue statements of material fact and/or omitted to state material facts
8 necessary to make the statements not misleading; and (c) engaged in acts, practices
9 and a course of business which operated as a fraud and deceit upon the purchasers of
10 the Company's securities in an effort to maintain artificially high market prices for
11 Yahoo!'s securities in violation of §10(b) of the 1934 Act and Rule 10b-5. All
12 defendants are sued either as primary participants in the wrongful and illegal conduct
13 charged herein or as controlling persons as alleged below.

14      247.   In addition to the duties of full disclosure imposed on defendants as a
15 result of their making of affirmative statements and reports, or participation in the
16 making of affirmative statements and reports to the investing public, defendants had a
17 duty to promptly disseminate truthful information that would be material to investors
18 in compliance with the integrated disclosure provisions of the SEC as embodied in
19 SEC Regulation S-X, 17 C.F.R. §§210.01, *et. seq.*, and Regulation S-K, 17 C.F.R.
20 §§229.10, *et. seq.*, and other SEC regulations, including accurate and truthful
21 information with respect to the Company's operations, financial condition, revenue
22 and earnings so that the market price of the Company's securities would be based on
23 truthful, complete and accurate information.

24      248.   Defendants, individually and in concert, directly and indirectly, by the
25 use, means or instrumentalities of interstate commerce and/or of the mails, engaged
26 and participated in a continuous course of conduct to conceal adverse material
27 information about the business, operations and future prospects of Yahoo! as specified
28 herein.

- 202 -

1   249.  These defendants employed devices, schemes and artifices to defraud,
2 while in possession of material adverse non-public information and engaged in acts,
3 practices and a course of conduct as alleged herein in an effort to assure investors of
4 Yahoo!'s value and performance and continued substantial growth, which included
5 the making of, or the participation in the making of, untrue statements of material
6 facts and omitting to state material facts necessary in order to make the statements
7 made about Yahoo! and its business operations and future prospects in the light of the
8 circumstances under which they were made, not misleading, as set forth more
9 particularly herein, and engaged in transactions, practices and a course of business
10 which operated as a fraud and deceit upon the purchasers of Yahoo!'s securities
11 during the Class Period.

12   250.  The Individual Defendants' primary liability, and controlling person
13 liability, arises from the following facts: (a) the Individual Defendants were high-level
14 executives and directors at the Company during the Class Period; (b) the Individual
15 Defendants were privy to and participated in the creation, development and reporting
16 of the Company's internal budgets, plans, projections and/or reports; and (c) the
17 Individual Defendants were aware of the Company's dissemination of information to
18 the investing public which they knew or recklessly disregarded was materially false
19 and misleading.

20   251.  The defendants had actual knowledge of the misrepresentations and
21 omissions of material facts set forth herein, or acted with reckless disregard for the
22 truth in that they failed to ascertain and to disclose such facts, even though such facts
23 were available to them. Such defendants' material misrepresentations and omissions
24 were done knowingly or recklessly and for the purpose and effect of concealing
25 Yahoo!'s financial results, operating condition and business prospects from the
26 investing public and supporting the artificially inflated price of its securities. As
27 demonstrated by defendants' misstatements and omissions regarding the Company's
28 financial results and operations throughout the Class Period, defendants, if they did

1   not have actual knowledge of the misrepresentations and omissions alleged, were
2   reckless in failing to obtain such knowledge by deliberately refraining from taking
3   those steps necessary to discover whether those statements were false or misleading.

4         252.   As a result of the dissemination of the materially false and misleading
5   information and failure to disclose material facts, as set forth above, the market price
6   of Yahoo!'s securities was artificially inflated during the Class Period.  In ignorance
7   of the fact that market prices of Yahoo!'s publicly traded securities were artificially
8   inflated, and relying directly or indirectly on the false and misleading statements made
9   by defendants, or upon the integrity of the market in which the securities trade and/or
10  on the absence of material adverse information that was known to or recklessly
11  disregarded by defendants, but not disclosed in public statements by defendants during
12  the Class Period, Lead Plaintiffs and the other members of the Class acquired Yahoo!
13  securities during the Class Period at artificially inflated prices and were damaged
14  thereby.

15        253.   At the time of said misrepresentations and omissions, Lead Plaintiffs and
16  other members of the Class were ignorant of their falsity, and believed them to be
17  true.  Had Lead Plaintiffs and the other members of the Class and the marketplace
18  known of the true financial condition and business prospects of Yahoo!, which were
19  not disclosed by defendants, Lead Plaintiffs and other members of the Class would not
20  have purchased or otherwise acquired their Yahoo! securities, or, if they had acquired
21  such securities during the Class Period, they would not have done so at the artificially
22  inflated prices which they paid.

23        254.   By virtue of the foregoing, defendants have violated §10(b) of the 1934
24  Act, and Rule 10b-5 promulgated thereunder.

25        255.   As a direct and proximate result of defendants' wrongful conduct, Lead
26  Plaintiffs and the other members of the Class suffered damages in connection with
27  their respective purchases and sales of the Company's securities during the Class
28  Period.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT II

### Violation of §20(a) of the 1934 Act
### Against All Defendants

256. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

257. The Individual Defendants acted as controlling persons of Yahoo! within the meaning of §20(a) of the 1934 Act as alleged herein. Yahoo! controlled all of its employees and each of the Individual Defendants. By virtue of their high-level positions, and their ownership and contractual rights, participation in and awareness of the Company's operations and intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

258. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

259. As set forth above, Yahoo! and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the! defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of these defendants'

- 205 -

1  wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in

2  connection with their purchases of the Company's securities during the Class Period.

3  ## COUNT III

4  **Insider Trading Under §20A of the 1934 Act**
   **Against the Individual Defendants**

5

6  260.  Plaintiffs repeat and reallege each of the allegations set forth in the

7  foregoing paragraphs.

8  261.  This claim is asserted by plaintiffs under §20A of the 1934 Act against

   the Individual Defendants, on behalf of all persons who purchased Yahoo! common
9
   stock contemporaneously with the sale of Yahoo! common stock by these defendants.
10
11  262.  During the Class Period, each of the Individual Defendants occupied a

12  position with Yahoo! which made him or her privy to confidential information

13  concerning the Company, its operations, finances, financial condition and future

14  business prospects, including, but not limited to, the material adverse information

15  concerning click fraud and Project Panama set forth herein.

16  263.  Notwithstanding their duty to refrain from trading in Yahoo! common

17  stock unless they disclosed the foregoing material adverse facts, and in violation of

18  their fiduciary duties to plaintiffs and other members of the Class, the Individual

19  Defendants sold in the aggregate millions of dollars worth of Yahoo! common stock

20  during the Class Period contemporaneously with plaintiffs' and other Class members'

21  purchases of Yahoo! common stock.

22  264.  The Individual Defendants sold their shares of Yahoo! common stock, as

23  alleged above, at market prices artificially inflated by the nondisclosure and

24  misrepresentations of material adverse facts in the public statements released during

25  the Class Period.

26  265.  Sales that were made by the Individual Defendants contemporaneously

27  with Yahoo! common stock purchases by at least one or more of the Lead Plaintiffs or

28  plaintiff members of the Class are set forth in the following chart:

- 206 -

| Purchaser | Date | Shares Purchased | Share Price | Total Cost |
|---|---|---|---|---|
| Pompano Beach Police & Firefighters' Retirement System | September 1, 2004 | 40 | $ 28.93 | $ 1,157.20 |
| Pension Trust Fund for Operating Engineers | November 1, 2004 | 31,500 | $ 36.20 | $ 1,140,350.40 |
| Pension Trust Fund for Operating Engineers | May 2, 2005 | 24,200 | $ 34.80 | $ 842,239.86 |
| Pompano Beach Police & Firefighters' Retirement System | October 28, 2005 | 20,500 | $ 35.46 | $ 726,858.25 |
| Pension Trust Fund for Operating Engineers | November 1, 2005 | 116,777 | $ 35.45 | $ 4,139,195.80 |
| Pension Trust Fund for Operating Engineers | November 2, 2005 | 5,385 | $ 35.45 | $ 190,923.02 |
| Pension Trust Fund for Operating Engineers | February 15, 2006 | 1,000 | $ 32.25 | $ 32,253.20 |

| Inside Seller | Date | Shares Sold | Average Price | Total Proceeds |
|---|---|---|---|---|
| Rosensweig | September 1, 2004 | 75,000 | $ 28.22 | $ 2,145,000.00 |
| Nazem | November 1, 2004 | 100,000 | $ 36.95 | $ 3,695,000.00 |
| Rosensweig | November 1, 2004 | 76,000 | $ 36.27 | $ 2,756,830.00 |
| Rosensweig | May 2, 2005 | 76,000 | $ 34.42 | $ 2,615,582.00 |
| Semel | October 28, 2005 | 500,000 | $ 35.60 | $ 17,799,384.00 |
| Nazem | November 1, 2005 | 111,052 | $ 38.09 | $ 4,230,263.00 |
| Rosensweig | November 1, 2005 | 76,000 | $ 36.94 | $ 2,807,440.00 |
| Decker | November 2, 2005 | 104,167 | $ 38.01 | $ 3,959,753.00 |
| Semel | February 15, 2006 | 400,000 | $ 33.18 | $ 13,273,719.00 |

266. The Individual Defendants knew that they were in possession of material adverse information which was not known to the investing public, including plaintiffs and other members of the Class. Before selling their stock to the public, they were obligated to disclose that information to plaintiffs and other members of the Class.

267. By reason of the foregoing, the Individual Defendants, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of the national securities exchanges, employed devices, schemes, and artifices to defraud, and engaged in acts and transactions and a course of business which operated as a fraud or deceit upon members of the investing public who purchased Yahoo! common stock contemporaneously with the sale of such stock by defendants.

268. Plaintiffs and other members of the Class who purchased shares of Yahoo! common stock contemporaneously with the Individual Defendants' sales of

- 207 -

1  Yahoo! common stock: (1) have suffered substantial damages because they relied
2  upon the integrity of the market and paid artificially inflated prices for Yahoo!
3  common stock as a result of the violations of §10(b) and Rule 10b-5 alleged herein;
4  and (2) would not have purchased Yahoo! common stock at the prices they paid, or at
5  all, if they had been aware that the market prices had been artificially and falsely
6  inflated by defendants' misleading statements and concealment. At the time of the
7  purchases by plaintiffs and members of the Class, the fair and true value of Yahoo!
8  common stock was substantially less than the prices paid by them.

9      269.  This action was commenced within five years after the sales by the
10  Individual Defendants while in possession of material, non-public information.

11     270.  As a result of the foregoing, plaintiffs and the other members of the Class
12  have suffered substantial damages.

13                                 **PRAYER**

14     WHEREFORE, plaintiff prays for relief and judgment, as follows:

15     A.  Determining that this action is a proper class action, certifying plaintiffs
16  as class representatives under Rule 23 of the Federal Rules of Civil Procedure and
17  designating this Complaint as the operable complaint for class purposes;

18     B.  Awarding compensatory damages in favor of plaintiffs and the other
19  Class members against all defendants, jointly and severally, for all damages sustained
20  as a result of defendants' wrongdoing, in an amount to be proven at trial, including
21  interest thereon;

22     C.  Awarding extraordinary, equitable and/or injunctive relief as permitted
23  by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules
24  64 and 65 to assure that the Class has an effective remedy;

25     D.  Ordering defendants to disgorge their insider trading proceeds, including
26  a constructive trust over those proceeds;

27     E.  Awarding plaintiffs and the Class their reasonable costs and expenses
28  incurred in this action, including counsel fees and expert fees; and

1    F.    Awarding such other and further relief as the Court may deem just and

2  proper.

3                        **JURY TRIAL DEMANDED**

4    Plaintiff hereby demands a trial by jury.

5  DATED: December 21, 2007                COUGHLIN STOIA GELLER
                                           RUDMAN & ROBBINS LLP
6                                          SPENCER A. BURKHOLZ
                                           HENRY ROSEN
7                                          ANNE L. BOX
                                           MARY K. BLASY
8                                          NATHAN W. BEAR

9

10                                         *Spencer a. Burkholz /*
                                           SPENCER A. BURKHOLZ  *Jea*
11                                                        *in authorization*

12                                         655 West Broadway, Suite 1900
                                           San Diego, CA 92101
                                           Telephone: 619/231-1058
13                                         619/231-7423 (fax)

14                                         Lead Counsel for Plaintiffs

15                                         SUGARMAN & SUSSKIND
                                           ROBERT SUGARMAN
16                                         100 Miracle Mile, Suite 300
                                           Coral Gables, FL 33134
17                                         Telephone: 305/529-2801
                                           305/447-8115 (fax)

18                                         Additional Counsel for Plaintiff

19

20  S:\CasesSD\Yahoo\CPT00047299-Amd Consol_3.doc

21

22

23

24

25

26

27

28

- 209 -

1    DECLARATION OF SERVICE BY MAIL

2    I, the undersigned, declare:

3    1.    That declarant is and was, at all times herein mentioned, a resident of the
4    County of Los Angeles, over the age of 18 years, and not a party to or interested party
5    in the within action; that declarant's business address is 9601 Wilshire Blvd., Suite
6    510, Los Angeles, California 90210.

7    2.    That on December 21, 2007, declarant served the CONSOLIDATED
8    AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
9    LAWS by depositing a true copy thereof in a United States mailbox at Los Angeles,
10   California in a sealed envelope with postage thereon fully prepaid and addressed to
11   the parties listed on the attached Service List.

12   3.    That there is a regular communication by mail between the place of
13   mailing and the places so addressed.

14   I declare under penalty of perjury that the foregoing is true and correct.
15   Executed on December 21, 2007, at Los Angeles, California.

16

17                                    ALLISON ROMERO

18

19

20

21

22

23

24

25

26

27

28

210

YAHOO! INC.

Service List - 9/21/2007    (07-0099)

Page 1 of 1

## Counsel For Defendant(s)

Anna Erickson White
Morrison & Foerster LLP
755 Page Mill Road
Palo Alto, CA 94304
  650/813-5600
  650/494-0792(Fax)

Jordan D. Eth
Judson E. Lobdell
Mark Foster
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
  415/268-7000
  415/268-7522(Fax)

## Counsel For Plaintiff(s)

Darren J. Robbins
Anne L. Box
Mary K. Blasy
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
  619/231-1058
  619/231-7423(Fax)

Arthur L. Shingler III
Nicholas J. Licato
Scott + Scott LLP
600 B Street, Suite 1500
San Diego, CA 92101
  619/233-4565
  619/233-0508(Fax)

David R. Scott
Scott + Scott LLP
108 Norwich Avenue
Colchester, CT 06415
  860/537-5537
  860/537-4432(Fax)

hereby attest and certify on
that the foregoing document is a full, true
and correct copy of the original on file in
my office, and in my legal custody.

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

By _Bray Vo_ Deputy

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**                    **JS-6**

| | | | |
|---|---|---|---|
| Case No. | CV 07-3125 CAS (FMOx) c/w: CV07-3902-CAS(FMOx) | Date | March 10, 2008 |

| | |
|---|---|
| Title | IN RE: YAHOO! INC. |

---

Present: The Honorable    CHRISTINA A. SNYDER

| CATHERINE JEANG | LAURA ELIAS | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Anne Box Spencer Burkholz | Judson Lobdell Jordon Eth |

**Proceedings:**    DEFENDANTS' MOTION TO TRANSFER VENUE UNDER 28
USC § 1404(a) (filed 02/12/08)    **E-filing**

*MHP*

## I.    INTRODUCTION

CV  08    2150

On August 20, 2007, the Court consolidated two related class actions against defendants Yahoo!, Inc. ("Yahoo!"), Terry S. Semel ("Semel"), and Susan L. Decker ("Decker") and appointed the Pension Trust Fund for Operating Engineers ("Operating Engineers") and the Pompano Beach Policy & Firefighters' Retirement System ("Pompano Beach") (collectively, "the Pension Funds") as lead plaintiffs.[1]  Docket 19.

On December 21, 2007, plaintiffs filed a consolidated amended complaint ("CAC") on behalf of all persons who purchased or otherwise acquired Yahoo! common stock between April 8, 2004 and July 18, 2006 ("the Class Period") against Yahoo!, Semel, Decker, Daniel L. Rosensweig ("Rosensweig"), and Farzad Nazem ("Nazem").[2]

---

[1] These two actions were Case No. CV 07-3125 CAS (FMOx), filed by Ellen Rosenthal Brodsky on May 11, 2007, and Case No. CV 07-3902 CAS (FMOx), filed by Manfred Hacker on June 15, 2007.

[2] The CAC alleges that the four individual defendants were Yahoo!'s "top four officers" during the Class Period.  CAC ¶ 1.  According to the CAC, Semel was chairman of the board and chief executive officer, Rosensweig was chief operating officer, Nazem was executive vice president and chief technology officer, and Decker was executive vice president of finance and administration and chief financial officer.  Id. at ¶¶ 15-18.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                            **JS-6**

| Case No. | CV 07-3125 CAS (FMOx)<br>c/w: CV07-3902-CAS(FMOx) | Date | March 10, 2008 |
|---|---|---|---|

| Title | IN RE: YAHOO! INC. |
|---|---|

CAC ¶ 1.  Plaintiffs allege that defendants made false and misleading statements regarding Yahoo!'s business model, financial results, continued sales, and earnings growth.  Specifically, plaintiffs allege that defendants made misrepresentations regarding the acquisition and integration of Overture Services, Inc. ("Overture"), a company based in Pasadena, California, and the development and implementation of a new Internet search engine ("Project Panama").  Id. at ¶¶ 157-74.  Plaintiffs further allege that defendants overstated Yahoo!'s revenues and growth rate by improperly recognizing revenue derived from "click fraud" in which Yahoo!'s Internet advertising customers allegedly made improper payments to Yahoo!.  Id. at ¶¶ 175-78, 199-210.  Additionally, plaintiffs allege that defendants, in order to manipulate Yahoo!'s quarterly revenues, altered Yahoo!'s click fraud detection system in order to pass along to advertising customers additional click fraud related charges.  See, e.g., id. at ¶ 56(f).  Plaintiffs allege that they relied on defendants' false and misleading statements in deciding to purchase Yahoo! stock during the Class Period and suffered economic losses when Yahoo!'s stock declined.  Plaintiffs allege violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78j(b) and 78t(a) ("the 1934 Act"), and Rule 10b-5 promulgated thereunder.

On February 12, 2008, defendants filed the instant motion to transfer this case to the United States District Court for the Northern District of California.  On February 25, 2008, plaintiffs filed an opposition thereto.  Defendants filed a reply on March 3, 2008.

On March 5, 2008, plaintiffs filed an *ex parte* application for leave to file a response to defendants' reply brief pursuant to Local Rule 7-10.  Defendants filed an opposition thereto on March 6, 2008.  Having reviewed the respective arguments of the parties in regard to plaintiffs' *ex parte* application, the Court GRANTS this application.  Plaintiffs surreply, which was attached as exhibit one to plaintiffs' *ex parte* application, is deemed filed with the Court on March 6, 2008.

A hearing was held on March 10, 2008.  After carefully considering the arguments set forth by the parties, the Court finds and concludes as follows.

## II.   LEGAL STANDARD

In deciding a motion to transfer, the Court must consider the following three

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    **JS-6**

| Case No. | CV 07-3125 CAS (FMOx) c/w: CV07-3902-CAS(FMOx) | Date | March 10, 2008 |
|----------|-----------|------|------|

| Title | IN RE: YAHOO! INC. | | |

factors: (1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the interests of justice. 28 U.S.C. § 1404(a); see Los Angeles Mem'l Coliseum Comm'n v. NFL, 89 F.R.D. 497, 499 (C.D. Cal. 1981).

In analyzing the "interests of justice," a number of factors are relevant, including the following: (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof. Stewart Org. v. Ricoh Corp., 487 U.S. 22, 29-30 (1988); Jones v. GNC Franchising, Inc., 211 F.3d 495, 498-99 (9th Cir. 2000). Other factors that can be considered are: the enforceability of the judgment; the relative court congestion in the two forums; and which forum would better serve judicial economy. 17 MOORE'S FEDERAL PRACTICE § 111.13[1][c] (3d ed. 1997).

Generally, "[s]ubstantial weight is accorded to the plaintiff's choice of forum, and a court should not order a transfer unless the 'convenience' and 'justice' factors set forth above weigh heavily in favor of venue elsewhere." Catch Curve, Inc. v. Venali, Inc., 2006 U.S. Dist. LEXIS 96379, *3-4 (C.D. Cal. 2006).

The party seeking to transfer venue bears the burden of showing that convenience and justice require transfer. Commodity Futures Trading Comm'n v. Savage, 611 F.2d 270, 278-279 (9th Cir. 1979); Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 843 (9th Cir. 1986) ("The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum."). The decision to transfer lies within the sound discretion of the trial judge. See Sparling v. Hoffman Constr. Co., 864 F.2d 635, 639 (9th Cir. 1988).

## III. DISCUSSION

### A. Convenience of the Parties

Defendants contend that it is more convenient for them to litigate this case in the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                               **JS-6**

| Case No. | CV 07-3125 CAS (FMOx)<br>c/w: CV07-3902-CAS(FMOx) | Date | March 10, 2008 |
|----------|---------------------------------------------------|------|----------------|

| Title | IN RE: YAHOO! INC. |
|-------|--------------------|

Northern District of California because Yahoo!'s headquarters, in Sunnyvale, California, is located there and that is where Decker, Rosensweig, and Nazem reside. Declaration of Ceming Chao ("Chao Decl.") ¶¶ 2, 4(c), 4(j), 4(l). Defendants argue that Semel is the only defendant who lives in the Central District. Id. at ¶ 4(m). Additionally, defendants argue that one of the two lead plaintiffs, Operating Engineers, is administered in the Northern District, and therefore, this plaintiff would not be inconvenienced were the action to be transferred there. Declaration of Jordan Eth ("Eth Decl.") Ex. 13, at ¶ 7 (complaint filed by Operating Engineers and other parties in the Northern District of California alleging that Operating Engineers is administered in the Northern District).

Plaintiffs respond that compelling the individual defendants to litigate in this judicial district would only minimally inconvenience them because plaintiffs would agree to depose Decker, Rosensweig, and Nazem in the Northern District. Plaintiffs further argue that Yahoo! maintains offices in the Central District of California, and therefore, it would not be burdensome to compel Yahoo! to litigate in this forum.

While plaintiffs correctly note that transfer must not "merely shift rather than eliminate the inconvenience" to the parties, Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 843 (9th Cir. 1986), plaintiffs have set forth no reasons why they would be inconvenienced if this action were transferred to the Northern District. Plaintiffs do not claim that any of them reside in this district or that this district is for some other reason especially convenient for them. Plaintiffs do not dispute defendants' contention that one of the two lead plaintiffs is administered in the Northern District. Moreover, the putative class, which plaintiffs define as all persons who purchased Yahoo! common stock within the Class Period, presumably consists of persons residing throughout the United States. Additionally, plaintiffs do not dispute that three of the four individual defendants reside in the Northern District of California and that Yahoo! is headquartered there. Therefore, the convenience of the parties factor weighs in favor of transfer.

The Court is also persuaded by defendants' contention that the location of the defendants is a weighty consideration in deciding whether this securities class action is properly transferred because plaintiffs' allegations focus on defendants' conduct and do not appear to implicate involved questions of fact regarding plaintiffs' behavior. See In re Hanger Orthopedic Group, Inc., 418 F. Supp. 2d 164, 169 (E.D.N.Y. 2006) ("because

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                                JS-6

| Case No. | CV 07-3125 CAS (FMOx) c/w: CV07-3902-CAS(FMOx) | Date | March 10, 2008 |
|----------|--------------------------------------------------|------|----------------|

| Title | IN RE: YAHOO! INC. |
|-------|--------------------|

'trials in securities class actions focus almost entirely on the defendants' conduct,' defendants' presence at trial is crucial, while 'matters within any particular plaintiff's individual knowledge would not be particularly relevant to the claims and likely defenses.") (quoting In re Nematron Corp. Secs. Litig., 30 F. Supp. 2d 397, 402 (S.D.N.Y. 1998)).

## B. Convenience of the Witnesses

The convenience of the witnesses is usually the most important factor to consider in deciding whether to transfer an action. Ironworkers Local Union No. 68 & Participating Employers Health and Welfare Fund v. Amgen, Inc., 2008 U.S. Dist. LEXIS 8740, at *14 (C.D. Cal. 2008). "'Convenience of witnesses' includes both non-party witnesses outside the scope of the Court's subpoena power and the geographic location of any witnesses likely to testify in this case." Costco Wholesale Corp. v. Liberty Mut. Ins. Co., 472 F. Supp. 2d 1183, 1193 (S.D. Cal. 2007). However, it is often the convenience of the non-party witnesses that figures most prominently in this analysis. Flotsam of Cal., Inc. v. Huntington Beach Conf. & Visitors Bureau, 2007 U.S. Dist. LEXIS 31762, *9 (N.D. Cal. 2007); Saleh v. Titan Corp, 361 F. Supp. 2d 1152, 1161 (S.D. Cal. 2005). A court must consider "not simply how many witnesses each side has and the location of each, but also the importance of the witnesses." Costco Wholesale Corp., 472 F. Supp. 2d at 1193 (quoting Saleh, 361 F. Supp. 2d at 1157).

Defendants maintain that the majority of the potential witnesses work at Yahoo!'s headquarters in Silicon Valley or reside in the vicinity. Defendants aver that Yahoo!'s "management team" was responsible for the subject matter raised by the allegations in the CAC. According to defendants, eight non-defendant members of the management team reside in the Northern District and are presently employed by Yahoo!. Chao Decl. ¶¶ 4(b), 4(d), 4(g), 4(h), 4(i), 4(k), 4(n), 4(o). Defendants also aver that Yahoo!'s staff responsible for accounting, financial analysis, financial reporting, and investor communications work in Yahoo!'s Silicon Valley headquarters. Declaration of Aman Kothari ("Kothari Decl.") ¶¶ 3-8.

Defendants further assert that of the three non-defendant members of the management team who are no longer employed by Yahoo!, one resides in the Central

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    **JS-6**

| Case No. | CV 07-3125 CAS (FMOx) c/w: CV07-3902-CAS(FMOx) | Date | March 10, 2008 |
|----------|-----------------|------|----------------|

| Title | IN RE: YAHOO! INC. | | |
|-------|--------------------|--|--|

District and two reside in the Northern District. Chao Decl. ¶¶ 4(a), 4(e), 4(f).[3] Additionally, defendants assert that Yahoo!'s independent auditors during the Class Period are based in the San Jose office of PricewaterhouseCoopers, in the Northern District. Kothari Decl. ¶ 15.

Plaintiffs respond that the allegations in the CAC are based on information provided by fifteen confidential witnesses, thirteen of whom worked in the Central District either for Yahoo! or Overture -- a Yahoo! subsidiary -- during the Class period. Declaration of Spencer Burkholz ("Burkholz Decl.") ¶ 4. The CAC alleges that these fifteen confidential witnesses include former Yahoo! employees and customers. CAC ¶¶ 19-34. Plaintiffs assert that nine of these fifteen individuals presently reside in the Central District. Burkholz Decl. ¶ 5. Plaintiffs also state that they have identified eleven former Overture or Yahoo! employees who have knowledge of facts relevant to this action and who reside in the Central District. Id. ¶ 6.

Because plaintiffs do not identify the eleven former Overture or Yahoo! employees who, according to plaintiffs, may offer relevant testimony, or specify how their testimony might be relevant to the issues raised in this action, plaintiffs' assertion that these witnesses reside in the Central District is of no consequence. See Salah, 361 F. Supp. 2d at 1164 (declining to consider the convenience of potential witnesses proffered by the plaintiffs where the plaintiffs did not identify these individuals or specify how they might provide important testimony). Moreover, while plaintiffs assert that nine of the fifteen confidential witnesses live in the Central District, plaintiffs do not state how many of these nine witnesses are presently employed by Yahoo! or Overture. Thus, to the extent that plaintiffs' confidential witnesses are current employees of Yahoo! or its subsidiary Overture, their convenience is a less weighty consideration because they are party witnesses. Id. at 1163-64 (noting that the convenience of witnesses employed by the defendants was a less weighty consideration in the transfer analysis, even where these witnesses were proffered by the plaintiffs).

---

[3] Defendants have set forth the names and capacities of the members of the management team, including those who are presently employed by Yahoo! and those who are no longer so employed.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                                    **JS-6**

| Case No. | CV 07-3125 CAS (FMOx)<br>c/w: CV07-3902-CAS(FMOx) | Date | March 10, 2008 |
|----------|---------------------------------------------------|------|----------------|

| Title | IN RE: YAHOO! INC. |
|-------|--------------------|

Furthermore, although the CAC sets forth allegations bearing on the potential testimony of each of plaintiffs' confidential witnesses, plaintiffs do not state where each of these witnesses is presently located in a manner that would enable the Court to evaluate the importance of the potential testimony of each of plaintiffs' nine purportedly local confidential witnesses. Plaintiffs simply state that nine of its fifteen confidential witnesses reside in the Central District, but do not state what information possessed by these nine individuals would be pertinent to the issues raised in this case.

In any event, defendants have identified numerous other party and non-party witnesses for whom the litigation of this action in the Northern District would be more convenient. See Chao Decl. ¶ 4; Kothari Decl. ¶ 15. Defendants persuasively argue that these witnesses, including individuals no longer employed by Yahoo! who were formerly on Yahoo!'s management team and Yahoo!'s third-party auditors, are likely to provide important testimony in this securities class action, in which it appears from plaintiffs' allegations that the state of mind and the actions of Yahoo!'s senior officers regarding Yahoo!'s policies, management, decision-making, and accounting practices will be prominent issues. In considering the witnesses and the evidence proffered by both sides, the Court finds and concludes that defendants have made the stronger showing and that the convenience of the witnesses factor weighs in favor of transfer.

## C.    Interests of Justice

### 1.    Plaintiffs' Choice of Forum

The parties argue at length regarding the weight to be accorded the plaintiffs' choice of forum. As plaintiffs' point out, where relevant factors do not strongly favor transfer, "the plaintiff's choice of forum should rarely be disturbed." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947). However, the Ninth Circuit has held that "when an individual brings a derivative suit or represents a class, the named plaintiff's choice of forum is given less weight." Lou v. Belzberg, 834 F.2d 730, 739 (9th Cir. 1987); accord Forrand v. Fed. Express Corp., 2008 U.S. Dist. LEXIS 10858, at *7 (N.D. Cal. 2008); Ironworkers Local Union No. 68 & Participating Employers Health and Welfare Fund v. Amgen, Inc., 2008 U.S. Dist. LEXIS 8740, at *11 (C.D. Cal. 2008); Flores v. Zale Del., Inc., 2007 U.S. Dist. LEXIS 95095, at *6 (N.D. Cal. 2007); Ray v. BlueHippo Funding, LLC, 2007 U.S. Dist. LEXIS 91060, at *7 (N.D. Cal. 2007); Gerin v. Aegon USA, Inc.,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    **JS-6**

| Case No. | CV 07-3125 CAS (FMOx)<br>c/w: CV07-3902-CAS(FMOx) | Date | March 10, 2008 |
|----------|---------------------------------------------------|------|----------------|

| Title | IN RE: YAHOO! INC. | | |
|-------|--------------------|--|--|

2007 U.S. Dist. LEXIS 28049, at *20 (N.D. Cal. 2007).

Plaintiffs note that <u>Lou</u> also stated that relevant considerations in determining how much weight to place on the plaintiffs choice of forum include whether the operative facts occurred within the forum and whether the forum has an interest in the parties or the subject matter of the litigation. <u>Lou</u>, 834 F.2d at 739. Plaintiffs contend that their choice of forum should control because their claims relating to Overture and Project Panama involve facts that occurred in the Central District and Yahoo! and Overture employees who worked in the Central District. However, while some of the relevant facts appear to have occurred in this forum, many other relevant facts relating to plaintiffs claims undisputably occurred in the Northern District, where Yahoo! is headquartered. It cannot be said that the Central District has a greater connection to the parties or the subject matter of this case than does the Northern District, especially where defendants are mostly based in the Northern District and no named plaintiffs appear to reside in the Central District.

Because plaintiffs do not reside in this forum and because this case is a class action, the usual reasons for deferring to a plaintiff's choice of forum do not apply. <u>See Koster v. (Am.) Lumbermens Mut. Casualty Co.</u>, 330 U.S. 518, 524 (1947) ( "where there are hundreds of potential plaintiffs, all equally entitled voluntarily to invest themselves with the corporation's cause of action and all of whom could with equal show of right go into their many home courts, the claim of any one plaintiff that a forum is appropriate merely because it is his home forum is considerably weakened."); <u>Baird v. California Faculty Ass'n</u>, 2000 U.S. Dist. LEXIS 6145, at *4 (N.D. Cal. 2000) (eschewing "mechanistic adherence" to the traditional rule giving the plaintiff's choice of forum substantial deference "in a class action in which plaintiffs are dispersed throughout the state."); <u>Shulof v. Westinghouse Elec. Corp.</u>, 402 F. Supp. 1262, 1263 (S.D.N.Y. 1975) ("While it is axiomatic that a plaintiff's choice of forum is entitled to great consideration, the adage has little weight in stockholder class actions . . ."); <u>see also</u> <u>Williams v. Bowman</u>, 157 F. Supp. 2d 1103, 1106 (N.D. Cal. 2001) (noting that the degree to which courts defer to the plaintiff's choice of forum is "substantially reduced" where the plaintiff is a nonresident); <u>accord</u> <u>Forrand v. Fed. Express Corp.</u>, 2008 U.S. Dist. LEXIS 10858, at *7 (N.D. Cal. 2008). Moreover, this action appears to have at least as many connections to the Northern District as it does to the Central District. Furthermore, plaintiffs' choice of the Central District is far less compelling because the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                                    **JS-6**

| Case No. | CV 07-3125 CAS (FMOx) c/w: CV07-3902-CAS(FMOx) | Date | March 10, 2008 |
|----------|-----------------------------------------------|------|----------------|

| Title | IN RE: YAHOO! INC. |
|-------|--------------------|

Northern District is also in the Ninth Circuit. Under these circumstances, there is no reason to accord plaintiffs' choice of forum special deference.

Plaintiffs further argue that because this action is a securities action, it is subject to the special venue provision of 15 U.S.C. § 78aa which, according to plaintiffs, requires a court to defer to a plaintiff's choice of forum.[4]  In this regard, plaintiffs rely on Sec. Investor Protection Corp. v. Vigman, 764 F.2d 1309 (9th Cir. 1985), in which the Ninth Circuit stated, "the intent of the venue and jurisdictional provisions of the securities laws is to grant potential plaintiffs liberal choice in their selection of a forum, and unless the balance of factors is strongly in favor of the defendants, the plaintiff's choice of forum should rarely be disturbed." Id. at 1317 (quoting Ritter v. Zuspan, 451 F. Supp. 926, 928 (E.D. Mich. 1978)).

There is authority for plaintiffs' contention that the fact that this case arises under the 1934 Act counsels in favor of granting plaintiffs' choice of venue additional deference. See SEC v. Rose Fund, LLC, 2004 U.S. Dist. LEXIS 22491, at *4-5 (N.D. Cal. 2004) (in an civil enforcement action brought by the SEC, stating that the general rule affording the plaintiff's choice of forum is afforded substantial weight "applies even more so here where Congress has enacted a special venue provision for actions under the

---

[4] Section 78aa provides, in pertinent part, that

> [a]ny criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred.  Any suit or action to enforce any liability or duty created by [the 1934 Act] or rules and regulations thereunder, or to enjoin any violation of [the 1934 Act] or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

15 U.S.C. § 78aa.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL                    JS-6

| Case No. | CV 07-3125 CAS (FMOx) c/w: CV07-3902-CAS(FMOx) | Date | March 10, 2008 |
|---|---|---|---|

| Title | IN RE: YAHOO! INC. | | |

federal securities laws."); Stanley Works v. Kain, 833 F. Supp. 134, 137 (D. Conn. 1993)
("The breadth of . . . [§78aa] arguably strengthens [the presumption favoring the
plaintiff's choice of forum] in securities actions. 'The venue provision of the 1934 Act
represents an affirmative congressional policy choice to allow plaintiffs in securities
cases the widest possible choice of forums in which to sue.'") (quoting SEC v. Elecs.
Warehouse, Inc., 689 F. Supp. 53, 74 (D. Conn. 1988)); Lemberger v. Westinghouse
Elec. Corp., 1976 U.S. Dist. LEXIS 12506, at *13-*14 (E.D.N.Y. 1976) ("The weight
attached to a plaintiff's choice of forum is particularly great where, as here, the applicable
venue provision is designed to serve a national policy underlying the Securities Exchange
Act: the policy of allowing a plaintiff the widest possible number of choices of a district
in which to sue. If transfers were granted in securities cases with too much abandon, the
effect would be to undermine Congressional efforts to enforce securities laws by
minimizing burdens on plaintiffs in civil suits."); see also Ellis v. Costco Wholesale
Corp., 372 F. Supp. 2d 530, 537-38 (N.D. Cal. 2005) (finding that the plaintiff's choice
of forum was entitled to greater deference in light of Title VII's special venue provision);
accord Berry v. Potter, 2006 U.S. Dist. LEXIS 6756, at *11-12 (D. Ariz. 2006).

However, the special venue provision of § 78aa and the above-quoted language
from Vigman do not change the foregoing analysis regarding the deference to which
plaintiffs' choice of forum is entitled. Nothing in § 78aa prevents the Court from
determining whether this action should be transferred under § 1404(a). Section 1404(a)
applies to "any civil action," including actions governed by special venue provisions. Ex
parte Collett, 337 U.S. 55, 58-59 (1949); Commodity Futures Trading Com. v. Savage,
611 F.2d 270, 279 (9th Cir. 1979). Thus, while under § 78aa, plaintiffs are free to lay
venue in the forum of their choice, that choice of forum must be measured by the
standards of § 1404(a). In re Nematron Corp. Secs. Litig., 30 F. Supp. 2d 397, (S.D.N.Y.
1998) (stating that the securities acts' special venue provisions "do not prohibit, by their
own terms, a court from entertaining a motion to transfer under § 1404(a) or from
transferring an action to a more convenient forum. They also do not alter the standard
employed in deciding whether transfer is appropriate.") (citation omitted); Blumental v.
Management Assistance, Inc., 480 F. Supp. 470, 472 (N.D. Ill. 1979).

None of the cases relied upon by plaintiffs, including Vigman, holds that in a
securities class action, the usual deference to the plaintiff's choice of forum applies by
virtue of the securities acts' special venue provisions. The majority of decisions that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                           **JS-6**

| Case No. | CV 07-3125 CAS (FMOx) c/w: CV07-3902-CAS(FMOx) | Date | March 10, 2008 |
|----------|------------------------------------------------|------|----------------|

| Title | IN RE: YAHOO! INC. |
|-------|---------------------|

have considered the securities acts' special venue provisions against the line of cases
rejecting deference to the plaintiff's choice of forum in class and derivative actions hold
that, where the class plaintiffs are not residents of the chosen forum, their chosen forum
deserves no special treatment. See In re Amkor Tech., Inc. Sec. Litig., 2006 U.S. Dist.
LEXIS 93931, at *11-*12 (E.D. Pa. 2006) (holding that the co-lead plaintiffs' choice of
forum should not receive great deference where they were non-residents and they alleged
a large number of unknown plaintiffs potentially located nationwide); Collier v. Stuart-
James Co., 1990 U.S. Dist. LEXIS 4896, at *9-*10 (S.D.N.Y. 1990) (rejecting the
plaintiffs' reliance on the securities acts' venue provisions and stating, "plaintiffs' choice
of forum in a class action is given little weight 'because in such a case, there will be
numerous potential plaintiffs, each possibly able to make a showing that a particular
forum is best suited for the adjudication of the class' claim.'") (quoting Eichenhotlz v.
Brennan, 677 F. Supp. 198, 202 (S.D.N.Y. 1988)); Blumenthal, 480 F. Supp. at 472
(holding, in a securities class action, "[b]ecause this case is a class action, plaintiffs'
choice of forum cannot be accorded great weight. The fact that the action was brought
under a special venue statute does not change that result."); see also In re Nematron, 30 F.
Supp. 2d at 405-07 (in granting the transfer of a securities class action, noting that even if
the plaintiff's choice of forum were entitled to substantial deference by virtue of the
security acts' special venue provisions, "[i]n isolation, given its nature as a class action
brought under the federal securities law, the [plaintiff's choice of forum] weighs
moderately" in favor of transfer); Job Haines Home for the Aged v. Young, 936 F. Supp.
223, 229 (D. N.J. 1996) (granting motion to transfer a securities class action despite the
plaintiff's invocation of §77aa where the convenience and justice factors favored
transfer).

In light of these authorities, plaintiffs' reliance on Vigman, which was not a class
action case, is inapposite. Because this is a class action and because plaintiffs do not
reside in this forum, plaintiffs choice of forum is entitled to only minimal weight, §77aa
notwithstanding.

## 2.    Additional Considerations

Plaintiffs argue that the instant action involves allegations that "directly relate" to
two class actions that were previously heard in this Court -- Checkmate Strategic Group,
Inc. v. Yahoo!, Inc., CV-05-4588 CAS (FMOx), and Online Merchant Sys. LLC v.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL                                         JS-6

| Case No. | CV 07-3125 CAS (FMOx) c/w: CV07-3902-CAS(FMOx) | Date | March 10, 2008 |
|----------|--------------------------------------------------|------|----------------|

| Title | IN RE: YAHOO! INC. |
|-------|--------------------|

Overture Servs., Inc., CV-05-4833 RGK (MANx) -- and one class action that is currently pending in this Court -- In re Yahoo! Litig., CV-06-2737 CAS (FMOx). Opp'n 2. Plaintiffs argue that because these actions share common facts with the instant action, transferring this action to the Northern District would increase the risk of inconsistent rulings and waste judicial resources and the parties' time.

This argument is without merit. Although the cases referenced by plaintiffs are class actions brought against Yahoo!, involving alleged click fraud and other types of online adverting fraud, plaintiffs overlook the substantial differences between these cases and the case at bar. Unlike the instant case, the cases referenced by plaintiffs are not securities class actions. While the plaintiffs in this case are stockholders who allege that defendants injured them by unlawfully manipulating Yahoo! stock price and making material misrepresentations about the company upon which they relied in deciding to purchase Yahoo! shares, in the foregoing cases referenced by plaintiffs, the plaintiffs are *advertisers* who allege that Yahoo! defrauded them by engaging in various schemes to inflate their advertising charges. Thus, the factual and legal questions raised in this case on the one hand, and these other cases, on the other hand, are wholly different. The presence of these other class actions in the Central District do not militate against the transfer of the instant action.[5]

Other considerations bearing on the interests of justice favor transfer. Because this is a securities fraud action, plaintiffs' claims are based on defendants' alleged misrepresentations and omissions, which "are deemed to 'occur' in the district where they are transmitted or withheld, not where they are received." In re Nematron Corp. Secs. Litig., 30 F. Supp. 2d 397, 404 (S.D.N.Y. 1998); In re Hanger Orthopedic Group, Inc., 418 F. Supp. 2d 164, 169 (E.D.N.Y. 2006). Plaintiffs contend that their claims give rise to contacts in the Central District because their allegations are based on the failed efforts to integrate Overture into Yahoo!'s business, the problems with Project Panama, and the click fraud that occurred at Overture -- all of which allegedly occurred in the Central

---

[5] Although on May 31, 2007, the Court consented to the transfer of this action as one related to In re Yahoo!, CV-06-2737 CAS (FMOx), the Court did so based on the representation of counsel that the case is related. At that time, the Court did not consider the application of the § 1404(a) factors.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    JS-6

| Case No. | CV 07-3125 CAS (FMOx)<br>c/w: CV07-3902-CAS(FMOx) | Date | March 10, 2008 |
|---|---|---|---|

| Title | IN RE: YAHOO! INC. | | |

District. However, plaintiffs do not dispute that the defendants' allegedly false public statements regarding Yahoo!'s revenues and performance predominantly occurred in the Northern District.

While evidence involving Project Panama, Overture, and its employees is likely to play a role in this action, this case turns on the allegedly false public statements and the decisions made by Yahoo!'s senior management, which indisputably occurred at Yahoo!'s headquarters. Because Yahoo!'s headquarters is the "factual center of this case, and the locus of all relevant decisionmaking," plaintiffs' claims have stronger contacts with the Northern District. In re AtheroGenics Sec. Litig., 2006 U.S. Dist. LEXIS 15786, at *12 (S.D.N.Y. 2006); In re Connetics Sec. Litig., 2007 U.S. Dist. LEXIS 38480, at *23 (S.D.N.Y. 2007) ("the operative facts are centered around the Northern District of California, wherein the defendants allegedly issued the misrepresentations that constitute the basis of this litigation. Thus, the location of the operative facts weighs heavily in favor of a transfer of venue."); Wojtunik v. Kealy, 2003 U.S. Dist. LEXIS 14734, at *17, n.7 (E.D. Pa. 2003) ("the nature of the action occurred in Arizona, where [the defendant] was based, since the misrepresentations and fraud would have occurred at [the defendant's] headquarters in Arizona, not where the engineering group was located."); see also In re Hanger Orthopedic, 418 F. Supp. 2d at *8-*9 (noting that while there is no "*per se* rule requiring or presumptively favoring the transfer of a securities-fraud action to the district where the issuer is headquartered," nevertheless, "as a practical matter, such transfers are routine.").

Additionally, considerations regarding access to sources of proof weigh in favor of transfer. Defendants assert that Yahoo!'s corporate books and records are kept at is headquarters, including most of its documents relating to financial reporting. Kothari Decl. ¶¶ 5-7, 9, 10, 12-13. Defendants further assert that Yahoo!'s financial database and records regarding insiders' stock transactions in Yahoo! stock are maintained at its headquarters. Id. ¶ 14. By contrast, plaintiffs state that relevant documents are located in the Central District, but they do not identify these documents or discuss how they are important to this action. "Although the location of relevant documents may be of less significance in light of modern copying and reproduction technologies, it nonetheless retains at least some relevance to the venue inquiry." In re Connetics, 2007 U.S. Dist. LEXIS 38480, at *16.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL** JS-6

| Case No. | CV 07-3125 CAS (FMOx)<br>c/w: CV07-3902-CAS(FMOx) | Date | March 10, 2008 |
|----------|---------------------------------------------------|------|----------------|

| Title | IN RE: YAHOO! INC. |
|-------|--------------------|

On balance, the Court, in its discretion, finds and concludes that the interests of justice weigh in favor of transferring this action. Likewise, the convenience of the parties and the witnesses factors favor granting defendants' motion to transfer. The Court GRANTS defendants' motion to transfer this action to the Northern District of California.

## III. CONCLUSION

In accordance with the foregoing, the Court GRANTS defendants' motion to transfer this action to the Northern District of California.

IT IS SO ORDERED.

00  :  05

Initials of Preparer   CMJ