1  JORDAN ETH (BAR NO. 121617)
   JEth@mofo.com
2  JUDSON E. LOBDELL (BAR NO. 146041)
   JLobdell@mofo.com
3  MARK R.S. FOSTER (BAR NO. 223682)
   MFoster@mofo.com
4  MORRISON & FOERSTER LLP
   425 Market Street
5  San Francisco, California  94105
   Telephone:     415-268-7000
6  Facsimile:     415-268-7522

7  ANNA ERICKSON WHITE (BAR NO. 161385)
   AWhite@mofo.com
8  MORRISON & FOERSTER LLP
   755 Page Mill Road
9  Palo Alto, California 94304
   Telephone:     650-813-5600
10 Facsimile:     650-494-0792

11 Attorneys for Defendants YAHOO! INC., TERRY S. SEMEL,
   SUSAN L. DECKER, DANIEL L. ROSENSWEIG, and
12 FARZAD NAZEM

13                  UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                       OAKLAND DIVISION

16 | IN RE: YAHOO! INC. | **CLASS ACTION** |
| --- | --- |
| 17 ELLEN ROSENTHAL BRODSKY, on Behalf of Herself and All Others Similarly Situated, | Case No. CV-08-2150-CW |
| 18 | **DECLARATION OF MARK R.S.** |
| 19 Plaintiffs, v. | **FOSTER IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'** |
| 20 YAHOO! INC., TERRY S. SEMEL, SUSAN L. DECKER, FARZAD NAZEM, and DANIEL | **CONSOLIDATED AMENDED COMPLAINT** |
| 21 ROSENSWEIG, | |
| 22 Defendants. | Hearing:     September 18, 2008 Time:        2:00 p.m. |
| 23 . | Courtroom: 2, 4th Floor Judge:       Hon. Claudia Wilken |
| 24 | |
| 25 This Document Relates To:  All Actions | |
| 26 | |
| 27 | |
| 28 | |

I, MARK R.S. FOSTER, hereby declare:

1.      I am an attorney licensed to practice law in the State of California and am admitted to practice before this Court.  I am an associate in the law firm of Morrison & Foerster LLP, counsel of record for Defendants Yahoo!, Inc. ("Yahoo!"), Terry S. Semel, Susan L. Decker, Farzad Nazem, and Daniel Rosensweig (collectively "Defendants").  I submit this Declaration in support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint, filed on June 20, 2008.  I make this Declaration based on personal knowledge, except where otherwise indicated. All capitalized and abbreviated terms used herein have the same meanings set forth in the Motion to Dismiss.  If called as a witness, I would testify to the facts listed below.  My Declaration authenticates 51 exhibits, which are listed below in chronological order within each identified category of exhibits.

## I.      SEC FILINGS

2.      Attached as **Exhibit 1** to this Declaration are true and correct copies of Forms 4 and 5 filed with the SEC by Susan Decker on February 9, 2001, September 10, 2001, and December 13, 2002.

3.      Attached as **Exhibit 2** to this Declaration are true and correct copies of Form 4s filed with the SEC by Farzad Nazem on or about November 6, 2001, December 13, 2002, and December 12, 2003.

4.      Attached as **Exhibit 3** to this Declaration are true and correct copies of Form 4s filed with the SEC by Daniel Rosensweig on December 13, 2002 and December 12, 2003.

5.      Attached as **Exhibit 4** to this Declaration are true and correct copies of Forms 3, 4, and 5 filed with the SEC by Terry Semel on May 10, 2001, February 12, 2002, December 13, 2002, and March 12, 2004.

6.      Attached as **Exhibit 5** to this Declaration is an excerpt from a true and correct copy of Yahoo!'s annual report for the fiscal year ended December 31, 2003 on Form 10-K, as filed with the SEC on February 27, 2004.  This document is cited in CAC paragraph 45.

7.      Attached as **Exhibit 6** to this Declaration is an excerpt from a true and correct copy of Yahoo!'s Schedule 14A Definitive Proxy Statement as filed with the SEC on April 9,

1    2004.  This document is cited in CAC paragraph 190.

2         8.    Attached as **Exhibit 7** to this Declaration is an excerpt from a true and correct

3    copy of Yahoo!'s quarterly report for the quarterly period ended March 31, 2004 on Form 10-Q,

4    as filed with the SEC on May 7, 2004.  This document is cited in CAC paragraphs 55 and 224.

5         9.    Attached as **Exhibit 8** to this Declaration is an excerpt from a true and correct

6    copy of Yahoo!'s quarterly report for the quarterly period ended June 30, 2004 on Form 10-Q, as

7    filed with the SEC on August 9, 2004.  This document is cited in CAC paragraphs 68 and 224.

8         10.    Attached as **Exhibit 9** to this Declaration is an excerpt from a true and correct

9    copy of Yahoo!'s quarterly report for the quarterly period ended September 30, 2004 on Form 10-

10    Q, as filed with the SEC on October 29, 2004.  This document is cited in CAC paragraphs 78 and

11    224.

12         11.    Attached as **Exhibit 10** to this Declaration is an excerpt from a true and correct

13    copy of Yahoo!'s annual report for the fiscal year ended December 31, 2004 on Form 10-K, as

14    filed with the SEC on March 11, 2005.  This document is cited in CAC paragraphs 15–18, 84,

15    86–87, and 89.

16         12.    Attached as **Exhibit 11** to this Declaration is an excerpt from a true and correct

17    copy of Yahoo!'s quarterly report for the quarterly period ended March 31, 2005 on Form 10-Q,

18    as filed with the SEC on May 6, 2005.  This document is cited in CAC paragraphs 101 and 224.

19         13.    Attached as **Exhibit 12** to this Declaration is an excerpt from a true and correct

20    copy of Yahoo!'s quarterly report for the quarterly period ended June 30, 2005 on Form 10-Q, as

21    filed with the SEC on August 5, 2005.  This document is cited in CAC paragraphs 112 and 224.

22         14.    Attached as **Exhibit 13** to this Declaration is an excerpt from a true and correct

23    copy of Yahoo!'s quarterly report for the quarterly period ended September 30, 2005 on Form 10-

24    Q, as filed with the SEC on November 4, 2005.  This document is cited in CAC paragraphs 122

25    and 224.

26         15.    Attached as **Exhibit 14** to this Declaration is an excerpt from a true and correct

27    copy of Yahoo!'s annual report for the fiscal year ended December 31, 2005 on Form 10-K, as

28    filed with the SEC on March 3, 2006.  This document is cited in CAC paragraphs 15–18 and 224.

16.    Attached as **Exhibit 15** to this Declaration is an excerpt from a true and correct copy of Yahoo!'s Schedule 14A Definitive Proxy Statement as filed with the SEC on April 14, 2006.

17.    Attached as **Exhibit 16** to this Declaration is an excerpt from a true and correct copy of Yahoo!'s quarterly report for the quarterly period ended March 31, 2006 on Form 10-Q, as filed with the SEC on May 5, 2006.  This document is cited in CAC paragraphs 142 and 224.

18.    Attached as **Exhibit 17** to this Declaration is an excerpt from a true and correct copy of Yahoo!'s quarterly report for the quarterly period ended June 30, 2006 on Form 10-Q, as filed with the SEC on August 4, 2006.  This document is cited in CAC paragraph 209.

19.    Attached as **Exhibit 18** to this Declaration are true and correct copies of Form 4s filed with the SEC by Susan Decker between April 8, 2004 and July 18, 2006.  The Form 4s in Exhibit 18 are in chronological order based on transaction date and evidence the following transactions, which have had prices and amounts adjusted to reflect a May 11, 2004 Yahoo! stock split:

| Date | Shares Sold: | **Price:** (if multiple sales occurred on the same day at different prices, price given is the average sale price) |
|---|---|---|
| 5/24/2004 | 600,000 | $29.4282 |
| 9/8/2004 | 200,000 | $30.20 |
| 9/9/2004 | 250,000 | $30.42 |
| 9/10/2004 | 150,000 | $30.67 |
| 5/23/2005 | 300,000 | $37.00 |
| 5/26/2005 | 300,000 | $37.0734 |
| 11/2/2005 | 104,167 | $38.0134 |
| 11/10/2005 | 104,167 | $38.52 |
| 11/16/2005 | 194,999 | $39.9408 |
| 11/17/2005 | 55,000 | $41.04 |

20.    Attached as **Exhibit 19** to this Declaration are true and correct copies of Form 4s filed with the SEC by Farzad Nazem between April 8, 2004 and July 18, 2006.  The Form 4s in

1  Exhibit 19 are in chronological order based on transaction date and evidence the following

2  transactions, which have had prices and amounts adjusted to reflect a May 11, 2004 Yahoo! stock

3  split:

| Date | Shares Sold: | Price: (if multiple sales occurred on the same day at different prices, price given is the average sale price) |
|---|---|---|
| 4/12/2004 | 100,000 | $27.515 |
| 4/19/2004 | 100,000 | $27.815 |
| 4/22/2004 | 200,000 | $28.415 |
| 5/11/2004 | 100,000 | $26.765 |
| 5/19/2004 | 50,000 | $28.78 |
| 5/24/2004 | 50,000 | $29.57 |
| 5/25/2004 | 100,000 | $29.88 |
| 5/27/2004 | 100,000 | $30.56 |
| 5/28/2004 | 50,000 | $31.02 |
| 7/13/2004 | 100,000 | $30.3153 |
| 8/25/2004 | 50,000 | $29.40 |
| 8/31/2004 | 100,000 | $28.30 |
| 10/15/2004 | 100,000 | $34.80 |
| 10/19/2004 | 100,000 | $35.55 |
| 10/21/2004 | 100,000 | $35.68 |
| 10/27/2004 | 200,000 | $35.91 |
| 11/1/2004 | 100,000 | $36.95 |
| 11/2/2004 | 100,000 | $38.03 |
| 11/29/2004 | 100,000 | $38.05 |
| 4/22/2005 | 100,000 | $35.27 |
| 4/25/2005 | 100,000 | $35.50 |
| 5/4/2005 | 262,272 | $35.30 |
| 5/16/2005 | 100,000 | $35.40 |
| 5/20/2005 | 50,000 | $36.49 |
| 5/23/2005 | 100,000 | $36.73 |
| 5/26/2005 | 50,000 | $36.49 |
| 5/27/2005 | 50,000 | $36.58 |
| 8/18/2005 | 100,000 | $34.43 |

| Date | Shares Sold: | Price: (if multiple sales occurred on the same day at different prices, price given is the average sale price) |
|------|--------------|-----------|
| 8/29/2005 | 100,000 | $36.65 |
| 10/26/2005 | 100,000 | $35.49 |
| 10/31/2005 | 200,000 | $35.285 |
| 11/1/2005 | 111,052 | $38.03 |
| 11/10/2005 | 100,000 | $38.53 |
| 11/16/2005 | 200,000 | $39.705 |
| 11/23/2005 | 100,000 | $42.94 |
| 2/22/2006 | 100,000 | $33.25 |
| 4/24/2006 | 100,000 | $33.14 |
| 4/25/2006 | 100,000 | $31.95 |
| 4/26/2006 | 100,000 | $32.93 |
| 4/27/2006 | 100,000 | $33.20 |
| 5/5/2006 | 100,000 | $32.57 |
| 5/8/2006 | 100,000 | $33.31 |
| 5/10/2006 | 100,000 | $32.05 |
| 5/25/2006 | 100,000 | $32.95 |

21.     Attached as **Exhibit 20** to this Declaration are true and correct copies of Form 4s filed with the SEC by Daniel Rosensweig between April 8, 2004 and July 18, 2006.  The Form 4s in Exhibit 20 are in chronological order based on transaction date and evidence the following transactions, which have had prices and amounts adjusted to reflect a May 11, 2004 Yahoo! stock split:

| Date | Shares Sold: | Price: (if multiple sales occurred on the same day at different prices, price given is the average sale price) |
|------|--------------|-----------|
| 4/13/2004 | 166,000 | $27.0583 |
| 7/16/2004 | 20,000 | $29.913 |
| 7/19/2004 | 91,000 | $27.758 |
| 8/2/2004 | 76,000 | $30.44885 |
| 9/1/2004 | 76,000 | $28.23 |
| 10/1/2004 | 76,000 | $34.72 |

| Date | Shares Sold: | Price: (if multiple sales occurred on the same day at different prices, price given is the average sale price) |
|---|---|---|
| 11/1/2004 | 76,000 | $36.2695 |
| 12/1/2004 | 76,000 | $37.7678 |
| 1/3/2005 | 76,000 | $38.1885 |
| 2/1/2005 | 76,000 | $34.8648 |
| 3/1/2005 | 76,000 | $32.20 |
| 4/1/2005 | 76,000 | $34.583 |
| 5/2/2005 | 76,000 | $34.41 |
| 6/1/2005 | 76,000 | $38.252 |
| 7/1/2005 | 76,000 | $34.46 |
| 8/1/2005 | 76,000 | $33.573 |
| 9/1/2005 | 76,000 | $33.18 |
| 10/3/2005 | 76,000 | $33.93 |
| 11/1/2005 | 76,000 | $36.94 |
| 12/1/2005 | 76,000 | $40.8321 |
| 1/3/2006 | 76,000 | $39.43 |
| 2/1/2006 | 76,000 | $34.5025 |
| 3/1/2006 | 76,000 | $32.14 |
| 4/3/2006 | 76,000 | $32.3617 |
| 5/1/2006 | 76,000 | $32.7888 |
| 6/1/2006 | 76,000 | $31.565 |
| 7/3/2006 | 76,000 | $33.03 |

22.    Attached as **Exhibit 21** to this Declaration are true and correct copies of Form 4s filed with the SEC by Terry Semel between April 8, 2004 and July 18, 2006. The Form 4s in Exhibit 21 are in chronological order based on transaction date and evidence the following transactions, which have had prices and amounts adjusted to reflect a May 11, 2004 Yahoo! stock split:

| Date | Shares Sold: | Price: (if multiple sales occurred on the same day at different prices, price given is the average sale price) |
|---|---|---|
| 4/12/2004 | 3,000,000 | $27.60 |

| Date | Shares Sold: | **Price:** (if multiple sales occurred on the same day at different prices, price given is the average sale price) |
|---|---|---|
| 4/15/2004 | 440,000 | $27.25 |
| 4/16/2004 | 560,000 | $27.23 |
| 7/13/2004 | 1,632,500 | $30.37 |
| 7/14/2004 | 367,500 | $30.51 |
| 7/27/2004 | 1,000,000 | $29.95 |
| 10/19/2004 | 900,000 | $35.15 |
| 10/20/2004 | 167,000 | $34.26 |
| 10/21/2004 | 1,383,000 | $35.42 |
| 10/22/2004 | 550,000 | $36.06 |
| 2/4/2005 | 21,000 | $35.20 |
| 2/7/2005 | 2900 | $35.09 |
| 4/22/2005 | 880,000 | $34.96 |
| 4/25/2005 | 620,000 | $34.87 |
| 4/26/2005 | 550,000 | $35.18 |
| 4/27/2005 | 200,000 | $35.05 |
| 5/4/2005 | 750,000 | $35.26 |
| 7/26/2005 | 200,000 | $34.1739275 |
| 7/27/2005 | 200,000 | $34.27000 |
| 8/19/2005 | 542,886 | $34.32 |
| 10/24/2005 | 913,150 | $35.18 |
| 10/25/2005 | 639,218 | $35.14 |
| 10/26/2005 | 447,632 | $35.36 |
| 10/27/2005 | 500,000 | $35.42 |
| 10/28/2005 | 500,000 | $35.60 |
| 2/15/2006 | 400,000 | $33.18 |
| 2/16/2006 | 100,000 | $33.29 |
| 2/17/2006 | 200,000 | $33.07 |
| 2/21/2006 | 50,000 | $33.01 |
| 2/22/2006 | 250,000 | $33.05 |

Foster Decl. I/S/O Mot. to Dismiss CAC
Master File No. CV-08-2150-CW
sf-2530223

5

## II.    TRANSCRIPTS OF YAHOO! INVESTOR COMMUNICATIONS

23.    Attached as **Exhibit 22** to this Declaration is a true and correct copy of a transcript entitled "Q1 2004 Yahoo, Inc. Earnings Conference Call" from *FD (Fair Disclosure) Wire*, dated April 7, 2004.  This call is cited in CAC paragraph 50.

24.    Attached as **Exhibit 23** to this Declaration is a true and correct copy of a transcript entitled "Q2 2004 Yahoo, Inc. Earnings Conference Call" from *FD (Fair Disclosure) Wire*, dated July 7, 2004.  This call is cited in CAC paragraph 62.

25.    Attached as **Exhibit 24** to this Declaration is a true and correct copy of a transcript entitled "Q3 2004 Yahoo, Inc. Earnings Conference Call" from *FD (Fair Disclosure) Wire*, dated October 12, 2004.  This call is cited in CAC paragraph 76.

26.    Attached as **Exhibit 25** to this Declaration is a true and correct copy of a transcript entitled "Q4 2004 Yahoo, Inc. Earnings Conference Call" from *FD (Fair Disclosure) Wire*, dated January 18, 2005.  This call is cited in CAC paragraph 82.

27.    Attached as **Exhibit 26** to this Declaration is a true and correct copy of a transcript entitled "Q1 2005 Yahoo, Inc. Earnings Conference Call" from *FD (Fair Disclosure) Wire*, dated April 19, 2005.  This call is cited in CAC paragraph 94.

28.    Attached as **Exhibit 27** to this Declaration is a true and correct copy of a transcript entitled "Q2 2005 Yahoo, Inc. Earnings Conference Call" from *FD (Fair Disclosure) Wire*, dated July 19, 2005.  This call is cited in CAC paragraph 104.

29.    Attached as **Exhibit 28** to this Declaration is a true and correct copy of a transcript entitled "Q3 2005 Yahoo, Inc. Earnings Conference Call" from *FD (Fair Disclosure) Wire*, dated October 18, 2005.  This call is cited in CAC paragraphs 115–16.

30.    Attached as **Exhibit 29** to this Declaration is a true and correct copy of a transcript entitled "Q4 2005 Yahoo, Inc. Earnings Conference Call" from *FD (Fair Disclosure) Wire*, dated January 17, 2006.  This call is cited in CAC paragraphs 6, 125, and 130.

31.    Attached as **Exhibit 30** to this Declaration is a true and correct copy of a transcript entitled "Q1 2006 Yahoo, Inc. Earnings Conference Call" from *FD (Fair Disclosure) Wire*, dated April 18, 2006.  This call is cited in CAC paragraphs 8, 136, 138, and 233.

32.    Attached as **Exhibit 31** to this Declaration is a true and correct copy of a transcript entitled "YHOO – Yahoo, Inc. Analyst Day: Final Transcript," from *Thompson Financial*, dated May 17, 2006.  The transcript contains the statements identified in CAC paragraphs 8 and 143.

33.    Attached as **Exhibit 32** to this Declaration is a true and correct copy of a transcript entitled "Q2 2006 Yahoo, Inc. Earnings Conference Call" from *FD (Fair Disclosure) Wire*, dated July 18, 2006.  This call is cited in CAC paragraphs 10, 150, and 233.

34.    Attached as **Exhibit 33** to this Declaration is a true and correct copy of a transcript entitled "Q3 2006 Yahoo, Inc. Earnings Conference Call" from *FD (Fair Disclosure) Wire*, dated Oct. 17, 2006.  This call is cited in CAC paragraph 153.

## III.    ANALYST REPORTS

35.    Attached as **Exhibit 34** to this Declaration is a true and correct copy of an analyst report by Credit Suisse First Boston regarding Yahoo!, entitled "Solid Q3 Results," dated October 18, 2005.  This document is cited in CAC paragraph 119.

36.    Attached as **Exhibit 35** to this Declaration is a true and correct copy of an analyst report by Prudential Equity Group, LLC, entitled "YHOO: Nice 3Q, With Top and Bottom Line Outperformance; Raising Estimates as Online Advertising Trends are Strong Heading Into 4Q," dated October 18, 2005.  This document is cited in CAC paragraph 120.

37.    Attached as **Exhibit 36** to this Declaration is a true and correct copy of an analyst report by Deutsche Bank Securities Inc., entitled "Analyst day themes: China, BT & Search Monetization," dated May 17, 2006.  This document is cited in CAC paragraph 143.

38.    Attached as **Exhibit 37** to this Declaration is a true and correct copy of an analyst report by Jefferies & Company, Inc., entitled "Time for Yahoo! Search to Catch up!," dated May 18, 2006.  This document is cited in CAC paragraph 143.

## IV.    STOCK PRICE DATA

39.    Attached as **Exhibit 38** to this Declaration is a spreadsheet created in Microsoft Excel that contains the true and correct daily close price, adjusted for dividends and splits, of Yahoo!'s publicly traded stock  (stock symbol "YHOO"), for the period of March 10, 2004 to August 31, 2006, downloaded from Yahoo! Finance, http://finance.yahoo.com/q/hp?s=YHOO.

1  **Exhibit 38** also contains a true and correct record of each sale of Yahoo! stock by Defendants

2  Susan Decker, Farzad Nazem, Daniel Rosensweig, and Terry Semel from March 10, 2004 to

3  August 31, 2006, as evidenced in their respective Form 4s, attached to this Declaration as

4  **Exhibits 18 through 21**.  Some of the prices and amounts of Defendants' stock sales have been

5  adjusted to reflect a May 11, 2004 Yahoo! stock split.

6       40.     The data contained in **Exhibits 38** and **18 through 21** were used to prepare four

7  charts, attached as **Appendix A** to Defendants' Motion to Dismiss Plaintiff's Consolidated

8  Complaint.  These charts are combination line and bar graphs that I created using the Microsoft

9  Excel program.  **Chart 1 of Appendix A**, entitled "Decker: Shares Sold & Stock Price By

10  Month" illustrates Yahoo!'s adjusted closing price (left-hand y-axis) and the number of shares

11  sold by Defendant Susan Decker (right-hand y-axis) from March 10, 2004 to August 31, 2006.

12  **Chart 2 of Appendix A**, entitled "Nazem: Shares Sold & Stock Price By Month" illustrates

13  Yahoo!'s adjusted closing price (left-hand y-axis) and the number of shares sold by Defendant

14  Farzad Nazem (right-hand y-axis) from March 10, 2004 to August 31, 2006.  **Chart 3 of**

15  **Appendix A**, entitled "Rosensweig: Shares Sold & Stock Price By Month" illustrates Yahoo!'s

16  adjusted closing price (left-hand y-axis) and the number of shares sold by Defendant Daniel

17  Rosensweig (right-hand y-axis) from March 10, 2004 to August 31, 2006.  **Chart 4 of Appendix**

18  **A**, entitled "Semel: Shares Sold & Stock Price By Month" illustrates Yahoo!'s adjusted closing

19  price (left-hand y-axis) and the number of shares sold by Defendant Terry Semel (right-hand y-

20  axis) from March 10, 2004 to August 31, 2006.

21  **V.**    **YAHOO! PRESS RELEASES**

22       41.     Attached as **Exhibit 39** to this Declaration is a true and correct copy of a press

23  release issued by Yahoo!, entitled "Yahoo! Reports First Quarter 2004 Financial Results," dated

24  April 7, 2004.  This press release is cited in CAC paragraph 49.

25       42.     Attached as **Exhibit 40** to this Declaration is a true and correct copy of a press

26  release issued by Yahoo!, entitled "Yahoo! Reports Second Quarter 2004 Financial Results,"

27  dated July 7, 2004.  This press release is cited in CAC paragraph 61.

28       43.     Attached as **Exhibit 41** to this Declaration is a true and correct copy of a press

1  release issued by Yahoo!, entitled "Yahoo! Reports Second Quarter 2005 Financial Results,"

2  dated July 19, 2005.  This press release is cited in CAC paragraph 103.

3          44.      Attached as **Exhibit 42** to this Declaration is a true and correct copy of a press

4  release issued by Yahoo!, entitled "Yahoo! Reports Third Quarter 2005 Financial Results," dated

5  October 18, 2005.  This press release is cited in CAC paragraph 114.

6          45.      Attached as **Exhibit 43** to this Declaration is a true and correct copy of a press

7  release issued by Yahoo!, entitled "Yahoo! and Click Fraud: Our Commitment to Protecting

8  Advertisers," issued on June 28, 2006.  This press release contains statements referenced in CAC

9  paragraphs 147 and 154.

10          46.      Attached as **Exhibit 44** to this Declaration is a true and correct copy of a press

11  release issued by Yahoo!, entitled "Yahoo! To Launch New Search Marketing Ranking Model in

12  the U.S. On February 5," dated January 23, 2007.

13  **VI.    NEWS ARTICLES & THIRD-PARTY PRESS RELEASES**

14          47.      Attached as **Exhibit 45** to this Declaration is a true and correct copy of an article

15  written by Adam L. Penenberg, entitled, "Click Fraud: Problem and Paranoia" from *Wired*

16  magazine, dated March 10, 2005.  This article contains statements cited in CAC paragraph 204.

17          48.      Attached as **Exhibit 46** to this Declaration is a true and correct copy of an article

18  by the *Marketing Experiments Journal*, entitled, "Click Fraud - Our research," dated June 30,

19  2005.  This article contains statements cited in CAC paragraph 205.

20          49.      Attached as **Exhibit 47** to this Declaration is a true and correct copy of an article

21  written by Brian Quinton, entitled, "Sizing Up Click Fraud" from *Direct* magazine, dated June 1,

22  2006.  This article contains statements cited in CAC paragraph 206.

23          50.      Attached as **Exhibit 48** to this Declaration is a true and correct copy of a press

24  release issued by Click Forensics(TM), LLC, entitled, "Industry Average Click Fraud Rate

25  Climbs in Second Quarter 2006; Click Fraud Rate for High-Priced Search Terms Tops 20.2

26  Percent" from *Business Wire*, dated July 17, 2006.  This press release contains statements cited in

27  CAC paragraph 207.

28          51.      Attached as **Exhibit 49** to this Declaration is a true and correct copy of a press

1    release issued by Fair Isaac Corporation, entitled, "New Fair Isaac Research Indicates Click Fraud

2    is Potentially Large Problem in Parts of Search Engine Advertising," dated May 18, 2007.  This

3    press release contains statements cited in CAC paragraph 208.

4         52.    Attached as **Exhibit 50** to this Declaration is a true and correct copy of an article

5    written by Eric Auchard, entitled, "Yahoo Names Executive to Combat Online Ad Fraud" from

6    *Dow Jones Factiva*, dated March 22, 2007.  This interview contains statements cited in CAC

7    paragraph 154.

8    **VII.    COURT DOCUMENTS**

9         53.    Attached as **Exhibit 51** to this Declaration is a true and correct copy of the

10   Stipulation and Settlement Agreement in *Checkmate Strategic Group, Inc. v. Yahoo!, Inc. et al.*,

11   No. CV-05-4588-CAS, as filed in the United States District Court for the Central District of

12   California on June 28, 2006.  This document is cited in paragraphs 5 and 154 of Plaintiff's

13   Consolidated Amended Complaint ("CAC").

14        I declare under penalty of perjury under the laws of the United States of America that the

15   foregoing is true and correct and that this Declaration was executed in San Francisco, California,

16   on this 20th day of June, 2008.

17

18   Dated:  June 20, 2008                    By:    /s/  Mark R.S. Foster  [e-filing signature]

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ECF ATTESTATION**

I, Mark R.S. Foster, am the ECF User whose ID and Password are being used to file this:

**DECLARATION OF MARK R.S. FOSTER IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**

Dated:  June 20, 2008        MORRISON & FOERSTER LLP

By:____/s/ Mark R.S. Foster [e-filing signature]

1

**INDEX OF EXHIBITS**

2

| Ex # | EXHIBIT DESCRIPTION |
|---|---|

3

**SEC FILINGS**

4
5

| 1 | Forms 4 and 5 filed by Susan Decker on February 9, 2001, September 10, 2001, and December 13, 2002. |
|---|---|
| 2 | Form 4s filed by Farzad Nazem on or about November 6, 2001, December 13, 2002, and December 12, 2003. |
| 3 | Form 4s filed by Daniel Rosensweig on December 13, 2002 and December 12, 2003. |
| 4 | Forms 3, 4, and 5 filed by Terry Semel on May 10, 2001, February 12, 2002, December 13, 2002 and March 12, 2004. |
| 5 | Yahoo! Form 10-K, filed Feb. 27, 2004. |
| 6 | Yahoo! DEF 14A Proxy Statement, filed April 9, 2004. |
| 7 | Yahoo! Form 10-Q, filed May 7, 2004 (Q1 2004). |
| 8 | Yahoo! Form 10-Q, filed Aug. 9, 2004 (Q2 2004). |
| 9 | Yahoo! Form 10-Q, filed Oct. 29, 2004 (Q3 2004). |
| 10 | Yahoo! Form 10-K, filed Mar. 11, 2005. |
| 11 | Yahoo! Form 10-Q, filed May 6, 2005 (Q1 2005). |
| 12 | Yahoo! Form 10-Q, filed Aug. 5, 2005 (Q2 2005). |
| 13 | Yahoo! Form 10-Q, filed Nov. 4, 2005 (Q3 2005). |
| 14 | Yahoo! Form 10-K, filed Mar. 3, 2006. |
| 15 | Yahoo! DEF 14A Proxy Statement, filed April 14, 2006. |
| 16 | Yahoo! Form 10-Q, filed May 5, 2006 (Q1 2006). |
| 17 | Yahoo! Form 10-Q, filed Aug. 4, 2006 (Q2 2006). |
| 18 | Form 4s filed by Susan Decker between April 8, 2004 and July 18, 2006. |
| 19 | Form 4s filed by Farzad Nazem between April 8, 2004 and July 18, 2006. |
| 20 | Form 4s filed by Daniel Rosensweig between April 8, 2004 and July 18, 2006. |

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| 21 | Form 4s filed by Terry Semel between April 8, 2004 and July 18, 2006. |
|----|---|

**TRANSCRIPTS OF YAHOO! INVESTOR COMMUNICATIONS**

| 22 | FD (Fair Disclosure) Wire, *Q1 2004 Yahoo, Inc. Earnings Conference Call*, April 7, 2004. |
|----|---|
| 23 | FD (Fair Disclosure) Wire, *Q2 2004 Yahoo, Inc. Earnings Conference Call*, July 7, 2004. |
| 24 | FD (Fair Disclosure) Wire, *Q3 2004Yahoo, Inc. Earnings Conference Call*, Oct. 12, 2004. |
| 25 | FD (Fair Disclosure) Wire, *Q4 2004 Yahoo, Inc. Earnings Conference Call*, Jan. 18, 2005. |
| 26 | FD (Fair Disclosure) Wire, *Q1 2005 Yahoo, Inc. Earnings Conference Call*, Apr. 19, 2005. |
| 27 | FD (Fair Disclosure) Wire, *Q2 2005 Yahoo, Inc. Earnings Conference Call*, Jul. 19, 2005. |
| 28 | FD (Fair Disclosure) Wire, *Q3 2005 Yahoo, Inc. Earnings Conference Call*, Oct. 18, 2005. |
| 29 | FD (Fair Disclosure) Wire, *Q4 2005 Yahoo, Inc. Earnings Conference Call*, Jan. 17, 2006. |
| 30 | FD (Fair Disclosure) Wire, *Q1 2006 Yahoo, Inc. Earnings Conference Call – Final*, Apr. 18, 2006 |
| 31 | Thomson StreetEvents, *YHOO – Yahoo, Inc. Analyst Day: Final Transcript*, May 17, 2006. |
| 32 | FD (Fair Disclosure) Wire, *Q2 2006 Yahoo, Inc. Earnings Conference Call*, July 18, 2006. |
| 33 | FD (Fair Disclosure) Wire, *Q3 2006 Yahoo, Inc. Earnings Conference Call*, Oct. 17, 2006. |

**ANALYST REPORTS**

| 34 | Credit Suisse First Boston, *Solid Q3 Results*, Oct. 18, 2005. |
|----|---|
| 35 | Prudential Equity Group, LLC, *YHOO: Nice 3Q, With Top and Bottom Line Outperformance; Raising Estimates as Online Advertising Trends are Strong Heading Into 4Q*, Oct. 18, 2005. |
| 36 | Deutsche Bank Securities, Inc., *Analyst day themes: China, BT & Search* |

| | |
|---|---|
| | *Monetization*, May 17, 2006 |
| 37 | Jefferies & Company, Inc., *Time for Yahoo! Search to Catch up!*, May 18, 2006. |

| | **YAHOO! STOCK DATA** |
|---|---|
| 38 | Yahoo! Stock Price Data from Yahoo! Finance, March 10, 2004 to August 31, 2006 |

| | **YAHOO! PRESS RELEASES** |
|---|---|
| 39 | Yahoo!, *Yahoo! Reports First Quarter 2004 Financial Results*, April 7, 2004. |
| 40 | Yahoo!, *Yahoo! Reports Second  Quarter 2004 Financial Results*, July 7, 2004. |
| 41 | Yahoo!, *Yahoo! Reports Second  Quarter 2005 Financial Results*, July 19, 2005. |
| 42 | Yahoo!, *Yahoo! Reports Third  Quarter 2005 Financial Results*, Oct. 18, 2005. |
| 43 | Yahoo!, *Yahoo! and Click Fraud: Our Commitment to Protecting Advertisers*, June 28, 2006. |
| 44 | Yahoo!, *Yahoo! To Launch New Search Marketing Ranking Model in the U.S. On February 5,* Jan. 23, 2007. |

| | **News Articles & Third-Party Press Releases** |
|---|---|
| 45 | Adam L. Penenberg, *Click Fraud: Problem and Paranoia*, WIRED, Mar. 10, 2005. |
| 46 | *Click Fraud - Our Research*, MARKETING EXPERIMENTS J., June 30, 2005. |
| 47 | Brian Quinton, *Sizing Up Click Fraud*, DIRECT, June 1, 2006. |
| 48 | Click Forensics, LLC, *Industry Average Click Fraud Rate Climbs in Second Quarter 2006; Click Fraud Rate for High-Priced Search Terms Tops 20.2 Percent*, BUSINESS WIRE, July 17, 2006. |
| 49 | Fair Isaac Corp., *New Fair Isaac Research Indicates Click Fraud is Potentially Large Problem in Parts of Search Engine Advertising*, May 18, 2007. |
| 50 | Eric Auchard, *Yahoo Names Executive to Combat Online Ad Fraud*, DOW JONES FACTIVA, March 22, 2007. |

| | **COURT DOCUMENTS** |
|---|---|
| 51 | Stipulation & Settlement Agreement, *Checkmate Strategic Group, Inc., v. Yahoo!, Inc. et al.*, No. CV-05-4588-CAS (FMOx) (C.D. Cal. filed June 28, 2006) |

Exhibit 1

# FORM 5

o  Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See Instruction 1(b).*

o  Form 3 Holdings Reported

o  Form 4 Transactions Reported

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## ANNUAL STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

OMB APPROVAL
OMB Number: 3235-0362
Expires: December 31, 2001
Estimated average burden hours per response.... 1.0

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | | 6. Relationship of Reporting Person(s) to Issuer (Check all applicable) | |
|---|---|---|---|---|
| Decker     Susan     Lynne | Yahoo! Inc. (YHOO) | | ___ Director | ___ 10% Owner |
| (Last)     (First)     (Middle) | 3. IRS Identification Number of Reporting Person, if an entity (Voluntary) | 4. Statement for Month/Year  December 31, 2000 | _X_ Officer (give title below) | ___ Other (specify below) |
| c/o Yahoo! Inc. 3420 Central Expressway | | | C.F.O. and Sr. V.P., Finance and Admin | |
| | | 5. If Amendment, Date of Original (Month/Year) | 7. Individual or Joint/Group Reporting (check applicable line) | |
| Santa Clara,     CA     95051 | | | _X_ Form filed by One Reporting Person | |
| (City)     (State)     (Zip) | | | ___ Form filed by More than One Reporting Person | |

Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 3. Transaction Code (Instr. 8) | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at end of Issuer's Fiscal Year (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|
| | | | Amount | (A) or (D) | Price | | | |
| Common Stock | | | | | | 201(1) | D | |

(1) Includes 201 shares purchased under the YHOO stock purchase plan December 2000.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

FORM 5 (continued)

**Table II — Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned at End of Month (Instr. 4) | 10. Ownership or Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $139.50 | 6/13/00 | A | 500,000 | | (1) | 6/13/10 | Common Stock | 500,000 | | 500,000 | D | |
| Employee Stock Option (right to buy) | $60.00 | 10/13/00 | A | 125,000 | | (2) | 10/13/10 | Common Stock | 125,000 | | 125,000 | D | |
| Total Employee Stock Option (right to buy) | | | | | | | | | | | 625,000 | D | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

**Explanation of Responses:**

(1) This option becomes exercisable at the rate of ¼ of the securities underlying the option on 6/9/01 and 1/48 of the securities underlying the option on each monthly anniversary thereafter.

(2) This option becomes exercisable at the rate of 5/48 of the securities underlying the option on the date of 6/9/01 and 1/48 of the securities underlying the option become exercisable on the 13th of each monthly anniversary following the initial vesting date of 6/9/01.

** Intentional misstatements or omissions of facts constitute Federal Crime Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

**Signature of Reporting Person

Date

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.

# FORM 4

RECD C.D.
SEP 1 0 2001
OTR

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

| OMB APPROVAL | |
| --- | --- |
| OMB Number: | 3235-0287 |
| Expires: | December 31, 2001 |
| Estimated average burden hours per response . . . . . . 0.5 | |

☐ **Check this box if no longer**
**subject to Section 16. Form 4 or**
**Form 5 obligations may continue.**
*See Instruction 1(b).*
(Print or Type Responses)

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility
Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | | | 2. Issuer Name and Ticker or Trading Symbol | | 6. Relationship of Reporting Person(s) to Issuer (Check all applicable) | |
| --- | --- | --- | --- | --- | --- | --- |
| Decker | Susan | Lynne | Yahoo! Inc. (YHOO) | | Director | 10% Owner |
| (Last) | (First) | (Middle) | 3. IRS Identification Number of Reporting Person, if an entity (Voluntary) | 4. Statement for Month/Year | X   Officer (give title below) | Other (specify below) |
| c/o Yahoo! Inc. 701 First Avenue | | | | August 2001 | C.F.O. and Sr. V.P., Finance and Admin | |
| (Street) | | | 5. If Amendment, Date of Original (Month/Year) | | 7. Individual or Joint/Group Filing (Check Applicable) | |
| Sunnyvale, | CA | 94089 | | | X Form filed by One Reporting Person | |
| (City) | (State) | (Zip) | | | Form filed by More than One Reporting Person | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/ Day/ Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at End of Month (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 8/31/01 | P | | 3,100 | A | $11.65 | | | |
| Common Stock | 8/31/01. | P | | 1,400 | A | $11.64 | | | |
| Common Stock | 8/31/01 | P | | 500 | A | $11.66 | 6,032 | D | |

(1) Includes 831 shares purchased under the YHOO stock purchase plan June 2001.

**Reminder:** Report on a separate line for each class of securities beneficially owned directly or indirectly.
\* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

(Over)
SEC 1474 (3-99)

Potential persons who are to respond to the collection of
information contained in this form are not required to respond
unless the form displays a currently valid OMB control number.

3148 7635

**FORM 4 (continued)**

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 4. Transaction Code (Inst. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned at End of Month (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $26.5625 | 1/12/01 | A | V | 250,000 | | (2) | 1/12/11 | Common Stock | 250,000 | | 250,000 | D | |
| Employee Stock Option (Total right to buy) | | | | | | | | | | | | 875,000 | D | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

Explanation of Responses:

(2) This option becomes exercisable at the rate of 4/48th's of the securities underlying the option on 6/9/01 and then 1/48th of the securities underlying the option become exercisable on the 1st of each monthly anniversary following the initial Vesting Date of 6/9/01.

** Intentional misstatements or omissions of facts constitute Federal Crime Violations.
*See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.

**Signature of Reporting Person** _____    9/6/01 Date

Page 2

09/07/2001 14:32 FAX 408 349 3414

# FORM 4

□ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

(Print or Type Responses)

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

**OMB APPROVAL**

| OMB Number | 3235-0287 |
|---|---|
| Expires: | January 31, 2005 |
| Estimated average burden hours per response | 0.5 |

Received
Thomson Corp

| 1. Name and Address of Reporting Person*. | | | 2. Issuer Name and Ticker and Trading Symbol | | 6. Relationship of Reporting Person(s) to Issuer: (Check all applicable) | |
|---|---|---|---|---|---|---|
| Decker     Susan     Lynne | | | Yahoo! Inc.  YHOO | | ___ Director | ___ 10% Owner |
| (Last)       (First)       (middle) | | | 3. IRS Identification Number of Reporting Person, if an entity (Voluntary) | 4. Statement for Month/Day/Year 12/11/02 | x Officer (give title below) | ___ Other (specify below) |
| C/o Yahoo! Inc. 701 First Avenue (Street) | | | | | **Executive Vice President, Chief Financial Officer** | |
| Sunnyvale        CA        94089 | | | 5. If Amendment, Date of Original (Month/Day/Year) | | 7. Individual or Joint/Group Filing (Check applicable line) | |
| (City)       (State)       (Zip Code) | | | | | x Form Filed by One Reporting Person ___ Form Filed by More than One Reporting Person | |

**Table I – Non-Derivative Securities Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed (D) (Instr. 3, 4 and 5)) | | | 5. Amount of Securities Beneficially Owned Following reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4(b)(v).

SEC 1473 (3-99)

1 of 3

83066.01-Palo Alto Server 1A

DEC 13 2002

31783985

**FORM 4 (continued)    Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Securities Beneficially Owned at End of Month (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( Right to buy) | $14.35 | 4/25/02 | | A | V | 500,000 | | (1) | 4/25/12 | Common Stock | 500,000 | | 500,000 | D | |
| Employee Stock Option ( Right to buy) | $15.65 | 6/20/02 | | A | V | 500,000 | | (2) | 6/20/12 | Common Stock | 500,000 | | 500,000 | D | |
| Employee Stock Option ( Right to buy) | $16.46 | 12/11/02 | | A | | 350,000 | | (3) | 12/11/12 | Common Stock | 350,000 | | 350,000 | D | |
| Total Employee Stock Option ( right to buy) | | | | | | | | | | | | | 2,725,000 | D | |
| | | | | | | | | | | | | | | | |

**Explanation of Responses:**
(1) This option becomes exercisable at a rate of 1/48th of the securities underlying the option on the each monthly anniversary of the vesting commencement date of 4/25/02.
(2) This option becomes exercisable at a rate of 1/48th of the securities underlying the option on the each monthly anniversary of the vesting commencement date of 6/20/02.
(3) This option becomes exercisable at a rate of 1/48th of the securities underlying the option on the each monthly anniversary of the vesting commencement date of 12/11/02.

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
* If the form is filed by more than one reporting person, see Instruction 4(b)(v).
** Intentional misstatements or omissions of facts constitute Federal Criminal Violations. See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).
Note: File three copies of this Form, one of which must be manually signed. If space provided is insufficient, See Instruction 6 for procedure.

By: _____
** Signature of Reporting Person

Michael Callahan    Date 12/13/02
POA

Page 2
SEC

SEC 1475 (08-02) Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

83066.01-Palo Alto Server 1A

Exhibit 2

# FORM 4

OMB APPROVAL

| OMB Number: | 3235-0287 |
|---|---|
| Expires: | December 31, 2001 |

Estimated average burden
hours per response . . . . . . 0.5

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See Instruction 1(b).*
(Print or Type Responses)

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 6. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Nazem          Farzad | Yahoo Inc. (YHOO) | ☐ Director          ☐ 10% Owner |
| (Last)          (First)          (Middle) | 3. IRS Identification Number of Reporting Person, if an entity (Voluntary) | ☒ Officer (give title below)    ☐ Other (specify below) |
| c/o Yahoo Inc. 701 First Avenue | 4. Statement for Month/Year | Sr. VP, Product Development and Operations and Chief Technology Officer |
| (Street) | October 2001 | 7. Individual or Joint/Group Filing (Check Applicable) |
| Sunnyvale,     CA          94089 | 5. If Amendment, Date of Original (Month/Year) | ☒ Form filed by One Reporting Person ☐ Form filed by More than One Reporting Person |
| (City)          (State)          (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at End of Month (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|
| | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/17/01 | M | | 27,500 | A | $.58333 | | | |
| Common Stock | 10/17/01 | S | | 27,500 | D | $11.72 | | | |
| Common Stock | 10/23/01 | M | | 72,500 | A | $.58333 | | | |
| Common Stock | 10/23/01 | S | | 72,500 | D | $11.87 | | | |
| Common Stock | 10/26/01 | M | | 100,000 | A | $.58333 | | | |
| Common Stock | 10/26/01 | S | | 100,000 | D | $12.249 | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

(Over)
SEC 1474 (3-99)

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

11/08/2001 13:13 FAX 408 349 5414    11/05/2001 22:47 FAX 408 349 5838    YAHOO!    Y A H O O !

31513962

002    @005

Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 4. Transaction Code (Inst. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned at End of Month (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $.58333 | 10/17/01 | M | | | 27,500 | (1) | 3/10/06 | Common Stock | 27,500 | | 3,353,636 | | |
| Employee Stock Option (right to buy) | $.58333 | 10/23/01 | M | | | 72,500 | (1) | 3/10/06 | Common Stock | 72,500 | | 3,281,136 | | |
| Employee Stock Option (right to buy) | $.58333 | 10/26/01 | M | | | 100,000 | (1) | 3/10/06 | Common Stock | 100,000 | | 3,181,136 | | |
| Employee Stock Option (right to buy) | $9.24 | 10/2/01 | A | V | 400,000 | | (2) | 10/2/11 | Common Stock | 400,000 | | 400,000 | | |
| Employee Stock Option (right to buy) | $9.24 | 10/2/01 | A | V | 50,000 | | (2) | 10/2/11 | Common Stock | 50,000 | | 50,000 | | |
| Total Employee Stock Options (right to buy) | | | | | | | | | | | | 5,621,136 | D | |

Explanation of Responses:

(1) This option becomes exercisable at the rate of ¼ of the securities underlying the option on the first anniversary of the Vesting Commencement Date of 3/29/96 and 1/48 of the securities underlying the option on each monthly anniversary thereafter.

(2) This option becomes exercisable at the rate of 1/48[th] of the securities underlying the option on each monthly anniversary of the Vesting Commencement Date of 10/2/01.

** Intentional misstatements or omissions of facts constitute Federal Crime Violations.
*See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Signature of Reporting Person _____    11/6/01
                                                            Date

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.

# FORM 4

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

(Print or Type Responses)

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number | 3235-0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response...... | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker and Trading Symbol | 6. Relationship of Reporting Person(s) to Issuer (Check all applicable) | | |
|---|---|---|---|---|
| Nazem          Farzad | Yahoo! Inc.  YHOO | ___ Director | | ___ 10% Owner |
| (Last)   (First)   (middle) | 3. IRS Identification Number of Reporting Person, if an entity (Voluntary) | 4. Statement for Month/Day/Year  **12/11/02** | x Officer (give title below) | ___ Other (specify below) |
| C/o Yahoo! Inc. 701 First Avenue (Street) | | | Executive Vice President and Chief Technology Officer | |
| Sunnyvale   CA   94089 | | 5. If Amendment, Date of Original (Month/Day/Year) | 7. Individual or Joint/Group Filing (Check applicable line) | |
| (City)   (State)   (Zip Code) | | | x Form Filed by One Reporting Person | |
| | | | ___ Form Filed by More than One Reporting Person | |

**Table I – Non-Derivative Securities Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

RECD S.E.C.
DEC 1 3 2002
1086

Received Thomson Corp



**Reminder:** Report on a separate line for each class of securities beneficially owned directly or indirectly.
* If the form is filed by more than one reporting person, see Instruction 4(b)(v).

SEC 1473 (3-99)

83066.01-Palo Alto Server 1A

12/13/2002 09:39 FAX 408 349 5414   YAHOO!   Ø015

**FORM 4 (continued)**    **Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Deriva-tive Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Securities Beneficially Owned at End of Month (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( Right to buy) | $16.46 | 12/11/02 | . | A | | 300,000 | | (1) | 12/11/12 | Common Stock | 300,000 | | 300,000 | D | |
| Total Employee Stock Option (right to buy) | | | | | | | | | | | | | 5,571,136 | D | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |

Explanation of Responses:

(1)  This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 12/11/02.

Reminder:  Report on a separate line for each class of securities beneficially owned directly or indirectly.
* If the form is filed by more than one reporting person, see Instruction 4(b)(v).
** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
  *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).
Note:  File three copies of this Form, one of which must be manually signed.  If space provided is insufficient, *See* Instruction 6 for procedure.

By: _M. T. ___

** Signature of Reporting Person

Michael Calkehon    Date 12/13/02
POA

Page 2
SEC

SEC 1475 (08-02) Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

83066.01-Palo Alto Server 1A

# FORM 4

| OMB APPROVAL |
| --- |
| OMB Number: 3235-0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

(Print or Type Responses)

| 1. Name and Address of Reporting Person NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
| --- | --- | --- |
| (Last)    (First)    (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 12/10/2003 | ___ Director    ___ 10% Owner _X_ Officer (give title    ___ Other (specify below) below) EVP & Chief Technology Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/10/2003 | | A | | 45,000(1) | A | $ 0 | 149,580 | D | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $41.16 | 12/10/2003 | | A | | 125,000 | | (2) | 12/10/2013 | Common Stock | 125,000 | $ 0 | 125,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
| --- | --- | --- | --- | --- |
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

## Explanation of Responses:

(1)    Shares of restricted Common Stock acquired under the Yahoo! Inc. 1995 Stock Plan.

(2)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/10/03 and 1/16th of the option on each quarterly anniversary of the vesting commencement date thereafter, such that the option is fully vested on 12/10/07.

**Signatures**

| | |
|---|---|
| /s/ Farzad Nazem | 12/12/2003 |
| **Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

Exhibit 3

# FORM 4

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

(Print or Type Responses)

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

**OMB APPROVAL**

| | |
|---|---|
| OMB Number | 3235-0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response..................... | 0.5 |

| 1    Name and Address of Reporting Person*. | 2.    Issuer Name and Ticker and Trading Symbol | 6.    Relationship of Reporting Person(s) to Issuer: |
|---|---|---|

**Rosensweig        Daniel**

(Last)              (First)          (middle)

C/o Yahoo! Inc.
701 First Avenue
(Street)

Sunnyvale        CA            94089

(City)            (State)          (Zip Code)

| 2.    Issuer Name and Ticker and Trading Symbol |
|---|
| **Yahoo! Inc.  YHOO** |

| 3.    IRS Identification Number of Reporting Person, if an entity (Voluntary) | 4.    Statement for Month/Day/Year  **12/11/02** |
|---|---|
| 5.    If Amendment, Date of Original (Month/Day/Year) | |

**6.    Relationship of Reporting Person(s) to Issuer:**
(Check all applicable)

| | | |
|---|---|---|
| ____  Director | | ____  10% Owner |
| __x__  Officer (give title below) | | ____  Other (specify below) |

**Chief Operating Officer**

**7.    Individual or Joint/Group Filing  (Check applicable line)**

__x__   Form Filed by One Reporting Person

____   Form Filed by More than One Reporting Person

**Table I – Non-Derivative Securities Beneficially Owned**

| 1.    Title of Security (Instr. 3) | 2.    Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3.    Transaction Code (Instr. 8) | | 4.    Securities Acquired (A) or Disposed (D) (Instr. 3, 4 and 5)) | | | 5.    Amount of Securities Beneficially Owned Following reported Transaction(s) (Instr. 3 and 4) | 6.    Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7.    Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

NASD S.E.C.

DEC 1 3 2002

1083

Received
Thomson Corp

Reminder:  Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4(b)(v).

SEC 1473 (3-

83066.01-Palo Alto Server 1A

1 of 3

12/13/2002 09:45 FAX 408 349 5414    Y A H O O !    @026

31783979

FORM 4 (continued)    Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Deriva-tive Security (Instr. 3) | 2. Conversi on or Exercise Price of Derivative Security | 3. Trans-action Date (Month / Day/Ye ar) | 3A. Deeme d Executi on Date, if any (Month / Day/ Year) | 4.Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/ Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Deri va-tive Secu r-ity (Inst r. 5) | 9. Numbe r of Derivativ e Securities Beneficia lly Owned Following Reported Trans-action(s) (Instr. 4) | 10. Ownershi p Form of Derivativ e Securities Beneficia lly Owned at End of Month (Instr. 4) | 11. Nature of Indirect Benefic ial Owner-ship (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercis-able | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( Right to buy) | $14.61 | 4/24/02 | | A | V | 1,250,000 | | (1) | 4/24/12 | Common Stock | 1,250,000 | | 1,250,000 | D | |
| Employee Stock Option ( Right to buy) | $16.46 | 12/11/02 | | A | | 350,000 | | (2) | 12/11/12 | Common Stock | 350,000 | | 350,000 | D | |
| Total Employee Stock Option (right to buy) | | | | | | | | | | | | | 1,600,000 | D | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |

Explanation of Responses:

(1) This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

(2) This option becomes exercisable at a rate of 4/48th of the securities underlying the option on 4/24/03 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 12/11/02 thereafter.

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
    *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:    File three copies of this Form, one of which must be manually signed.  If space provided is insufficient,
    *See* Instruction 6 for procedure.

By: _____

** Signature of Reporting Person    Date 12/13/02

Michael Callahan
POA

SEC 1475 (08-02) Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

83066.01-Palo Alto Server 1A

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires:           January 31, 2005 |
| Estimated average burden hours per response...        0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)        (First)        (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) 12/10/2003 | (Check all applicable) |
| C/O YAHOO! INC., 701 FIRST AVENUE | | ____ Director                    ____ 10% Owner<br>__X__ Officer (give title below)   ____ Other (specify below)<br>Chief Operating Officer |
| (Street) | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| SUNNYVALE, CA 94089 | | __X__ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |
| (City)     (State)     (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/10/2003 | | A | | 45,000(1) | A | $ 0 | 45,000 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(*e.g.*, puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $41.16 | 12/10/2003 | | A | | 125,000 | | (2) | 12/10/2013 | Common Stock | 125,000 | $ 0 | 125,000 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)     Shares of restricted Common Stock acquired under the Yahoo! Inc. 1995 Stock Plan.

(2)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/10/03 and 1/16th of the option on each quarterly anniversary of the vesting commencement date thereafter, such that the option is fully vested on 12/10/07.

**Signatures**

| | |
|---|---|
| <u>/s/ Daniel Rosensweig</u> | <u>12/12/2003</u> |
| \*\*Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

Exhibit 4

FORM 3

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## INITIAL STATEMENT OF BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility
Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940.

OMB APPROVAL
OMB Number:        3235-0104
Expires:    December 31, 2001
Estimated average burden
hours per response . . . . . 0.5

(Print or Type Responses)

| 1. Name and Address of Reporting Person* | 2. Date of Event Requiring Statement (Month/Day/Year) | 4. Issuer Name and Ticker or Trading Symbol | 6. If Amendment, Date of Original (Month/Day/Year) |
|---|---|---|---|
| Semel    Terry | | Yahoo! Inc. (YHOO) | |
| (Last)      (First)      (Middle) | 5/1/01 | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) | 7. Individual or Joint/Group Filing (Check Applicable Line) |
| c/o Yahoo! Inc. 701 First Avenue | 3. IRS Identification Number of Reporting Person, if an entity (Voluntary) | X  Director _____  10% Owner _____  X  Officer (give title below)  Other (specify below) | x Form Filed by One Reporting Person _ Form Filed by More than One Reporting Person |
| (Street) Sunnyvale,   CA   94089 | | Chairman and CEO | |
| (City)      (State)      (Zip) | | | |

### Table I - Non-Derivative Securities Beneficially Owned

| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I)  (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|
| Common Stock | 1,000,000 | D | |
| Common Stock | 380 | I | By Wife for daughters (1) |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.    (Over)
* If the form is filed by more than one reporting person, see Instruction 5(b)(v).    SEC 1473 (3-99)

Potential persons who are to respond to the collection of information contained in this form
are not required to respond unless the form displays a currently valid OMB control number.

| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | | 4. Conversion or Exercise Price of Derivative Security | 5. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|---|---|---|---|
| | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | |
| Employee Stock Option (right to buy) | (2) | 4/16/11 | Common | 5,000,000 | $17.62 | D | |
| Employee Stock Option (right to buy) | (3) | 4/16/11 | Common | 2,500,000 | $30.00 | D | |
| Employee Stock Option (right to buy) | (4) | 4/16/11 | Common | 1,500,000 | $60.00 | D | |
| Employee Stock Option (right to buy) | (5) | 4/16/11 | Common | 1,000,000 | $75.00 | D | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Explanation of Responses:

(1) Shares owned by wife as custodian for daughters under the Uniform Transfer to Minors Act.

(2) This option becomes exercisable at a rate of ½ of the securities underlying the option on the first anniversary of the Vesting Commencement Date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter.

(3) This option becomes exercisable at a rate of 1/12th of the securities underlying the option on each monthly anniversary of the Vesting Commencement Date of 4/16/03.

(4) This option becomes exercisable at a rate of 208,333 of the securities underlying the option on each monthly anniversary of the Vesting Commencement Date of 4/16/04 up to 11/16/04 and then 41,669 of the securities underlying the option on 12/16/04.

(5) This option becomes exercisable at a rate of 166,664 of the securities underlying the option on 12/16/04, then 208,333 of the securities underlying the option on 1/16/05, 2/16/05, 3/16/05 and 208,337 of the securities underlying the option on 4/16/05.

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
*See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

_____   5/9/01
Signature of Reporting Person        Date

Note:   File three copies of this Form, one of which must be manually signed.  If space is insufficient,
        *See* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not
required to respond unless the form displays a currently valid OMB Number.

## FORM 5

O   Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See Instruction 1(b).*

O   Form 3 Holdings Reported

O   Form 4 Transactions Reported

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**ANNUAL STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility
Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

RECD S.E.C.

FEB 1 2 2002

086

OMB APPROVAL

OMB Number: 3235-0362
Expires: December 31, 2001
Estimated average burden
hours per response . . . . 1.0

PAGE. 03

408 349 5414

| 1. Name and Address of Reporting Person* | | | 2. Issuer Name and Ticker or Trading Symbol | | 6. Relationship of Reporting Person(s) to Issuer (Check all applicable) | |
|---|---|---|---|---|---|---|
| Semel | Terry | S | Yahoo! Inc. (YHOO) | | X   Director | 10% Owner |
| (Last) | (First) | (Middle) | 3. IRS Identification Number of Reporting Person, if an entity (Voluntary) | 4. Statement for Month/Year | X   Officer (give title below) | Other (specify below) |
| C/o Yahoo! Inc.. 701 First Avenue | | | | December 31, 2001 | Chairman and Chief Executive Officer | |
| Sunnyvale, | CA | 94089 | | 5. If Amendment, Date of Original (Month/Year) | 7. Individual or Joint/Group Reporting (check applicable line) X   Form filed by One Reporting Person _____ Form filed by More than One Reporting Person | |
| (City) | (State) | (Zip) | | | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 3. Transaction Code (Instr. 8) | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at end of Issuer's Fiscal Year (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|
| | | | Amount | (A) or (D) | Price | | | |
| Common Stock | | | | | | 1,000,000 | D | |
| Common Stock | | | | | | 380 | I | By Wife for daughters |
| | | | | | | | | |
| | | | | | | | | |

f the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**Potential persons who are to respond to the collection of information
contained in this form are not required to respond unless the
form displays a currently valid OMB control number.**

(Over)
SEC 2270 (3-99)



31576262

FORM 5 (continued)

## Table II — Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned at End of Month (Instr. 4) | 10. Ownership of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $9.24 | 10/2/01 | A | 1,000,000 | | (1) | 10/2/11 | Common Stock | 1,000,000 | | 1,000,000 | D | |
| Total Employee Stock Option (right to buy) | | | | | | | | | | | 11,000,000 | D | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

**Explanation of Responses:**

(1) This option becomes exercisable at a rate of 1/8th of the securities underlying the option on 4/16/02 and 1/48th of the securities underlying the option on each monthly anniversary of the Vesting Commencement Date thereafter.

**     Intentional misstatements or omissions of facts constitute Federal Crime Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

_____   _____

**Signature of Reporting Person            Date

Note:  File three copies of this Form, one of which must be manually signed.  If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.

Page 2

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

(Print or Type Responses)

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

**OMB APPROVAL**

| | |
|---|---|
| OMB Number | 3235-0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response...................... | 0.5 |

Received
Thomson

| 1. Name and Address of Reporting Person*. | 2. Issuer Name and Ticker and Trading Symbol | 6. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| Semel        Terry        S | **Yahoo! Inc.**   YHOO | (Check all applicable) |

| | | |
|---|---|---|
| (Last)        (First)        (middle) | 3. IRS Identification Number of Reporting Person, if an entity (Voluntary) | 4. Statement for Month/Day/Year  12/11/02 |

| C/o Yahoo! Inc. 701 First Avenue (Street) | 5. If Amendment, Date of Original (Month/Day/Year) |
|---|---|

| Relationship | | |
|---|---|---|
| X | Director | 10% Owner |
| X | Officer (give title below) | Other (specify below) |

**Chairman & Chief Executive Officer**

| Sunnyvale     ·CA        94089 |
|---|
| (City)        (State)        (Zip Code) |

7. Individual or Joint/Group Filing (Check applicable line)

X    Form Filed by One Reporting Person

    Form Filed by More than One Reporting Person

### Table I – Non-Derivative Securities Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed (D) (Instr. 3, 4 and 5)) | | | 5. Amount of Securities Beneficially Owned Following reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, see Instruction 4(b)(v).

SEC 1473 (3-99)

DEC 1 3 2002
1030

83066.01-Palo Alto Server 1A

1 of 3

12/13/2002 09:33 FAX 408 349 5414     Y A H O O !     ☒003

FORM 4 (continued)    Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Deriva-tive Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans-action Date (Month / Day/Year) | 3A. Deemed Execution Date, if any (Month / Day/ Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/ Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Deriva-tive Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Trans-action(s) (Instr. 4) | 10. Ownership Form of Derivative Securities Beneficially Owned at End of Month (Instr. 4) | 11. Nature of Indirect Beneficial Owner-ship (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercis-able | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( Right to buy) | $12.92 | 7/11/02 | | A | V | 2,000,000 | | (1) | 7/11/12 | Common Stock | 2,000,000 | | 2,000,000 | D | |
| Employee Stock Option ( Right to buy) | $16.46 | 12/11/02 | | A | | 800,000 | | (2) | 12/11/12 | Common Stock | 800,000 | | 800,000 | D | |
| Total Employee Stock Option (right to buy) | | | | | | | | | | | | | 13,800,000 | D | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |

Explanation of Responses:
(1) This option becomes exercisable at a rate of 1/24[th] of the securities underlying the option on each monthly anniversary of the vesting commencement date of 7/11/02.
(2) This option becomes exercisable at a rate of 1/48[th] of the securities underlying the option on each monthly anniversary of the vesting commencement date of 12/11/02.

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
  • If the form is filed by more than one reporting person, see Instruction 4(b)(v).
  •• Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
    *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).
Note:    File three copies of this Form, one of which must be manually signed.  If space provided is insufficient,
    *See* Instruction 6 for procedure.

By: _M Tull_____

•• Signature of Reporting Person

Michael Callahan
POA

Date 12/13/02

SEC

SEC 1475 (08-02) Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

12/13/2002 09:33 FAX 408 349 5414    Y A H O O !    ☒ 004

2 of 3

83066.01-Palo Alto Server 1A

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

OMB APPROVAL

OMB Number: 3235–0287
Expires: January 31, 2005
Estimated average burden hours per response... 0.5

(Print or Type Responses)

| 1. Name and Address of Reporting Person SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| (Last) (First) (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 03/10/2004 | _X_ Director    ___ 10% Owner<br>_X_ Officer (give title below)    ___ Other (specify below)<br>Chairman & CEO |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City) (State) (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy) | $41.7 | 03/10/2004 | | A | | 2,000,000 | | (1) | 03/10/2014 | Common Stock | 2,000,000 | $ 0 | 2,000,000 | D | |
| Employee Stock Option ( right to buy) | $41.7 | 03/10/2004 | | A | | 900,000 | | 03/10/2004 | 03/10/2014 | Common Stock | 900,000 | $ 0 | 900,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1) This option becomes exercisable on the 4th anniversary of the vesting commencement date of 3/10/04. The vesting of this option is subject to acceleration for satisfaction of certain performance criteria regarding the operating performance of the company.

**Signatures**

| | |
|---|---|
| /s/ Michael J. Callahan, attorney−in−fact for Terry S. Semel | 03/12/2004 |
| \*\*Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

Exhibit 5

# SECURITIES AND EXCHANGE COMMISSION

### Washington, D.C. 20549

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

### For the fiscal year ended December 31, 2003

### Commission File Number 0-28018

# YAHOO! INC.

(Exact name of Registrant as specified in its charter)

| **Delaware** | **77-0398689** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

### 701 First Avenue
### Sunnyvale, California 94089

(Address of principal executive offices)

Registrant's telephone number, including area code: **(408) 349-3300**

Securities registered pursuant to Section 12(b) of the Act:

### None

Securities registered pursuant to Section 12(g) of the Act:

### Common Stock, $.001 par value

(Title of Class)

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ☒    No ☐

As of June 30, 2003, the aggregate market value of voting stock held by non-affiliates of the Registrant, based upon the closing sales price for the Registrant's Common Stock, as reported in the NASDAQ National Market System, was $15,444,607,992. Shares of Common Stock held by each officer and director and by each person who owns five percent or more of the outstanding Common Stock have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for any other purpose.

The number of shares of the Registrant's Common Stock outstanding as of February 25, 2004 was 665,159,934.

### DOCUMENTS INCORPORATED BY REFERENCE

The following documents (or parts thereof) are incorporated by reference into the following parts of this Form 10-K:

(1)   Proxy Statement for the 2004 Annual Meeting of Stockholders – Part III Items 10, 11, 12, 13 and 14.

the payment to affiliates. This revenue is reported gross primarily due to the fact that we are the primary obligor to the customers of the pay-for-performance search services.

Periodically, we engage in barter transactions for marketing services. Barter revenue is recognized over the periods in which we complete our obligations under the arrangement. We recognize barter revenue in accordance with Emerging Issues Task Force No. 99-17 ("EITF 99-17"), "Accounting for Advertising Barter Transactions," which requires advertising barter transactions to be valued based on similar cash transactions that have occurred within six months prior to the barter transaction, and also Accounting Principles Board No. 29 ("APB 29") "Accounting for Nonmonetary Transactions," which requires nonmonetary transactions to be based on the fair values involved, similar to monetary transactions. Barter revenues represented 1 percent, 2 percent, and 7 percent of total revenues for 2003, 2002, and 2001, respectively. During 2003, 2002, and 2001, we delivered approximately 4.3 billion, 3.5 billion, and 1.6 billion impressions, respectively, under advertising barter arrangements where fair value was not determinable under EITF 99-17, and accordingly revenue was not recognized.

Fees revenue consists of revenues generated from a variety of consumer and business fee-based services, including SBC Yahoo! DSL and Dial, Yahoo! Personals, Small Business Services, Yahoo! Mail, and Yahoo! Enterprise Solutions, including Yahoo! Portal Solutions. With the exception of Yahoo! Portal Solutions, revenue is recognized in the month in which the services are performed, provided that no significant obligations remain and collection of the resulting receivable is reasonably assured. Revenue from Yahoo! Portal Solutions consists of software license and service revenues, which are principally platform and maintenance services. Yahoo! Portal Solutions revenue is recognized in accordance with Statement of Position ("SOP") No. 97-2, "Software Revenue Recognition" and Statement of Position 98-9, "Modification of SOP No. 97-2 with Respect to Certain Transactions." License revenues are recognized when persuasive evidence of arrangement exists, delivery of the license has occurred, the fee is fixed or determinable, and collection is probable. License revenue from Portal Solutions was not material to Yahoo!, as it represented less than one percent of total revenue for all periods presented. Platform services are sold as a subscription and are recognized ratably over the subscription period. Platform services are priced based

on the specific content or service purchased by the customer. These services are optional and renewable annually at fixed renewal rates. Maintenance is generally sold under annual contracts with fixed renewal rates. Maintenance revenue is recognized ratably over the contract period. Yahoo! Portal Solutions revenues have represented less than 10 percent of total revenues in all periods presented.

Listings revenue consists of revenues generated from a variety of consumer and business listings-based services, including access to the HotJobs database and classifieds, such as Yahoo! Autos, Yahoo! Real Estate and other search services. Revenues are recognized in the month in which the services are performed, provided that no significant obligations remain and collection of the resulting receivable is reasonably assured.

## Results of Operations

**Revenues.** Revenues by groups of similar service were as follows (dollars in thousands):

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2001** | (1) | **2002** | (1) | **2003** | (1) |
| Marketing services | $570,977 | 79% | $651,568 | 68% | $1,199,733 | 74% |
| Fees | 119,090 | 17% | 207,941 | 22% | 298,192 | 18% |
| Listings | 27,355 | 4% | 93,558 | 10% | 127,172 | 8% |
| Total revenues | $717,422 | 100% | $953,067 | 100% | $1,625,097 | 100% |

(1) Percent of total revenues.

**Marketing Services Revenue.** Marketing services revenue for the year ended December 31, 2003 increased by approximately $548 million, or 84 percent as compared to the prior year. The increase was partly due to approximately $279 million of incremental revenue contribution from our 2003 acquisitions. The remainder of the increase was due to growth in the balance of our global legacy marketing services revenue across the entire Yahoo! network, including revenues from our relationship with Overture prior to the acquisition, which occurred in the fourth quarter of 2003. Including the effects of the Overture acquisition, the combined number of impressions and click-throughs increased by approximately 75 percent as compared to 2002, while the combined average price yield per impression and click-through delivered increased by approximately 7 percent. Approximately half of the increase in volume was attributed to Overture, whereas the change in price yield was not materially affected. The

increase in legacy volume primarily resulted from the addition of smaller-sized advertising units to certain of our properties, which increased the number of ads per page and inventory available for sale, as well as from an overall increase in total page views. The increase in legacy average price per unit primarily resulted from an overall increase in the price achieved for our network inventory. Marketing services revenue for the year ended December 31, 2002 increased by approximately $81 million, or 14 percent as compared to the prior year. The increase was due to increased revenue of approximately $131 million realized through our worldwide pay-for-performance search services and transactions revenue of approximately $38 million or 117 percent compared to the prior year. The increases were partially offset by a decrease in barter revenues of approximately $36 million, and a decrease of approximately $52 million in renewals of previous advertising arrangements. The number of impressions and click-throughs delivered under advertising arrangements in 2002 increased by approximately 95 percent on a combined basis as compared to 2001, while the average price yield per impression and click-through delivered, also on a combined basis, declined approximately 40 percent for the same period. During the period, our focus remained on obtaining overall advertising dollars rather than maximizing price per unit.

For the year ended December 31, 2003, over 110,000 direct and indirect customers advertised on the Yahoo! network, compared to more than 85,000 during 2002 and more than 53,000 in 2001.

**Fees Revenue.** Fees revenue in 2003 increased approximately $90 million, or 43 percent, as compared to 2002. Approximately $100 million was associated with an increase in the number of paying users for our fee-based services, which were approximately 4.9 million at December 31, 2003 compared to approximately 2.2 million at December 31, 2002. Average revenue per paying user per month declined from approximately $7 per user per month in 2002 to approximately $5 per user per month in 2003 as a result of faster subscriber growth in some of the lower priced offerings, and the introduction of lower priced fee-based products offered in 2003. As the volume of users who subscribe to lower-priced products increases and as we continue to introduce products at lower average prices, we expect the average revenue per paying user to decrease in 2004 as compared to 2003. The increase in revenues as a result of the increase in paying users was partially offset by an approximate $11 million decline in

our enterprise revenue business as a result of our reduced Yahoo! Portal Solutions and Broadcast Solutions efforts during the year. For the year ended December 31, 2002, fees revenue increased approximately $89 million, or 75 percent, as compared to the prior year. The increases were attributable to an increase in the number of paying users for our fee-based services, which were approximately 2.2 million at December 31, 2002 compared to approximately 0.4 million at December 31, 2001. Average revenue per paying user per month declined from approximately $22 per user per month to approximately $7 per user per month as a result of the introduction of new, lower-priced consumer fee-based products, which weren't offered in the previous year, as compared with a mix weighted toward higher priced services in 2001.

**Listings Revenue.** For the year ended December 31, 2003, listings revenue increased approximately $34 million, or 36 percent, as compared to the prior year, primarily from our Search & Marketplace listings. For the year ended December 31, 2002, listings revenue increased approximately $66 million, or 242 percent, as compared to the prior year, approximately $65 million of which was associated with acquisitions completed in 2002.

Overall, we currently expect total combined revenues for marketing services, fees, and listings to increase in absolute dollars for 2004 compared to 2003.

**Costs and Expenses:** Primary operating costs and expenses were as follows (dollars in thousands):

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2001** | (1) | **2002** | (1) | **2003** | (1) |
| Cost of revenues | $157,001 | 22% | $162,881 | 17% | $358,103 | 22% |
| Sales and marketing | 383,854 | 54% | 429,968 | 45% | 530,613 | 33% |
| Product development | 121,475 | 17% | 141,766 | 15% | 207,285 | 13% |
| General and administrative | 77,960 | 11% | 100,676 | 11% | 157,027 | 10% |
| Stock compensation expense | 9,096 | 1% | 8,402 | 1% | 22,029 | 1% |
| Amortization of intangibles | 64,085 | 9% | 21,186 | 2% | 54,374 | 3% |

(1) Percent of total revenues.

**Cost of Revenues.** Cost of revenues consists of traffic acquisition costs ("TAC") and other expenses associated with the production and usage of the Yahoo! network.

*Traffic Acquisition Costs.* Traffic acquisition costs consist of payments made to our affiliates that have integrated our pay-for-performance search service into their sites. We enter into agreements of varying durations with affiliates that integrate our pay-for-performance search service into their sites. There are generally three economic structures of the affiliate agreements: fixed payments based on a guaranteed minimum amount of traffic delivered, which often carry reciprocal performance guarantees from the affiliate, variable payments based on a percentage of our revenue or based on a certain metric, such as number of searches or paid clicks, or a combination of the two. We expense traffic acquisition costs under two methods; agreements with fixed payments are expensed pro-rata over the term the fixed payment covers, and agreements based on a percentage of revenue, number of paid introductions, number of searches, or other metric are expensed based on the volume of the underlying activity or revenue multiplied by the agreed-upon price or rate.

*Other cost of revenues.* Other cost of revenues consist of fees paid to third parties for content included on our online media properties, Internet connection charges, equipment depreciation, technology license fees and compensation related expenses.

Cost of revenues for the year ended December 31, 2003 increased approximately $195 million, or 120 percent, as compared to the prior year. This reflects approximately $182 million of incremental cost of revenue related to acquisitions completed in 2003, of which, approximately $153 million related to traffic acquisition costs. The remainder of the increase represented increased search serving, royalties and other content-related costs, as well as increased costs for growing network usage and premium services. Cost of revenues for the year ended December 31, 2002 increased approximately $6 million, or four percent, as compared to the prior year. This reflects approximately $7 million of additional expense due to our 2002 acquisitions, approximately $12 million associated with increased royalties and other content-related costs, as well as increased costs for growing network usage and premium services. The increase in 2002 was partially offset by savings of approximately $13 million from more favorable bandwidth pricing and more efficient bandwidth utilization during 2002.

Cost of revenues was 22 percent, 17 percent, and 22 percent of revenues in 2003, 2002, and 2001, respectively. Cost of revenues as a percentage of revenues does not directly correlate to revenues as many of our service offerings are free.

We currently anticipate that cost of revenues will continue to increase in absolute dollars in 2004 compared to 2003, as network usage is expected to increase and we expect to incur costs relating to introduction of additional content for new and enhanced services. In addition, we believe we will incur higher costs, including TAC, in 2004 as compared to 2003, due to acquisitions made in 2003.

**Sales and Marketing.** Sales and marketing expenses consist primarily of advertising and other marketing related expenses, compensation related expenses, sales commissions and travel costs.

Sales and marketing expenses for the year ended December 31, 2003, increased approximately $101 million, or 23 percent, as compared to the prior year. Sales and marketing expenses increased by approximately $37 million due to incremental costs related to acquisitions completed in 2003. The remainder of the increase was due to approximately $43 million of increased compensation related and professional services expenses and approximately $21 million in increased advertising spending. Sales and marketing expenses for the year ended December 31, 2002, increased approximately $46 million, or 12 percent, as compared to the prior year. Sales and marketing expenses increased by approximately $57 million due to incremental costs related to our 2002 acquisitions, and approximately $22 million due to increased compensation related expenses, but was partially offset by approximately $34 million in savings from our overall effort to manage discretionary costs and a decrease in barter related expenses. Sales and marketing expenses in 2003, 2002 and 2001 as a percentage of revenues were 33 percent, 45 percent and 54 percent, respectively, and decreased as a result of the overall increase in revenues, and savings as a result of our overall effort to manage discretionary costs.

We currently anticipate that sales and marketing expenses will increase in absolute dollars in 2004 compared to 2003, as the company continues to grow and we will incur incremental costs in 2004 related to acquisitions made in 2003.

**Product Development.** Product development expenses consist primarily of compensation related expenses incurred for enhancements to and maintenance of the Yahoo! network, classification and organization of listings within Yahoo!

properties, research and development expenses, and other operating costs.

Product development expenses for the year ended December 31, 2003, increased approximately $66 million, or 46 percent, as compared to the prior year. Product development expenses increased by approximately $35 million due to incremental costs related to acquisitions completed in 2003. The remainder of the increase was due to approximately $38 million of increases in our total compensation expense related to engineers that develop and enhance properties and services throughout the Yahoo! network. Product development expenses for the year ended December 31, 2002, increased approximately $20 million, or 17 percent, as compared to the prior year. Product development expenses increased by approximately $12 million due to incremental costs related to our 2002 acquisitions, as well as overall increases of approximately $7 million in our total compensation expense related to engineers that develop and enhance properties and services throughout the Yahoo! network. Product development expenses in 2003, 2002 and 2001 as a percentage of revenues were 13 percent, 15 percent and 17 percent, respectively, and decreased as a result of the overall increase in revenues, and savings as a result of our overall effort to manage discretionary costs.

We believe that continued investments in product development are required to remain competitive, and we will incur incremental costs in 2004 related to acquisitions completed in 2003. Consequently, we currently anticipate that product development costs in absolute dollars will increase in 2004 compared to 2003.

**General and Administrative.** General and administrative expenses consist primarily of compensation related expenses and fees for professional services.

General and administrative expenses for the year ended December 31, 2003, increased approximately $56 million, or 56 percent, as compared to the prior year. General and administrative expenses increased by approximately $17 million due to incremental costs related to acquisitions completed in 2003. The remainder of the increase was primarily due to approximately $19 million of increases in professional services expenses and approximately $12 million of increased compensation-related expenses. General and administrative expenses for the year ended December 31, 2002, increased approximately $23 million, or 29 percent, as compared to the prior year.

The increases are attributable to approximately $14 million of increases in compensation related expense and incremental general and administrative expenses, and approximately $13 million of increases in incremental costs related to our 2002 acquisitions. General and administrative expenses as a percentage of sales remained relatively consistent in 2003 compared with 2002 and 2001.

We currently believe that general and administrative expenses in absolute dollars will increase in 2004 compared to 2003, as the company continues to grow, and we expect to incur incremental costs in 2004 related to acquisitions completed in 2003.

**Stock Compensation.** Stock compensation expense relates to the amortization of the intrinsic value of Yahoo! stock options issued in connection with acquisitions we have completed and other equity-based awards. This expense is being recorded using an accelerated amortization method.

Stock compensation expense for the year ended December 31, 2003, was approximately $22 million, an increase of approximately $14 million, or 162 percent, as compared to the prior year. Stock compensation expense increased in connection with the acquisitions completed in 2003. Stock compensation expense for the year ended December 31, 2002, was approximately $8 million, compared to approximately $9 million for the year ended December 31, 2001. Stock compensation expense is allocated as follows (in thousands):

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2001** | **2002** | **2003** |
| Sales and marketing | $3,090 | $1,424 | $ 5,785 |
| Product development | 4,615 | 1,702 | 10,526 |
| General and administrative | 1,391 | 5,276 | 5,718 |
| Total stock compensation expense | $9,096 | $8,402 | $22,029 |

We currently believe that stock compensation expenses in absolute dollars will increase in 2004 compared to 2003.

**Amortization of Intangibles.** From time to time we have purchased, and expect to continue purchasing, assets or businesses, which may result in the creation of intangible assets.

Amortization of intangibles was approximately $54 million, or three percent of revenues for the year ended December 31, 2003, an increase of approximately $33 million compared to $21 million or two percent of revenues for 2002. The year-over-year increase in amortization of intangibles was the result of completed acquisitions. Amortization of intangibles was $21 million, or two percent of revenues for the year ended December 31, 2002, a decrease of approximately $43 million compared to $64 million or nine percent of revenues for 2001 as a result of the cessation of goodwill amortization in connection with the adoption of Statement of Financial Accounting Standards No. 142 ("SFAS 142"), "Goodwill and Other Intangible Assets."

**Restructuring Costs.** During 2001, we announced restructuring programs to balance our investment in growth areas with the desire to modify our near-term business plan to reflect the current economic and capital market slowdown. These restructuring programs included worldwide workforce reductions, consolidation of excess facilities and other charges. As a result of these restructuring programs, we recorded restructuring costs of approximately $57 million classified as operating expenses in 2001.

*Worldwide Workforce Reduction.* The restructuring programs resulted in a workforce reduction of approximately 660 employees across certain business functions, operating units, and geographic regions. The worldwide workforce reductions were substantially completed within 2001. We recorded a workforce reduction charge of approximately $15 million in 2001 relating primarily to severance and fringe benefits.

*Consolidation of Excess Facilities and Other Charges.* We recorded a restructuring charge of approximately $42 million in 2001 relating to the consolidation of excess facilities and other charges. Of this charge, approximately $31 million was primarily for excess facilities relating to lease terminations and non-cancelable lease costs. This charge included estimated sub-lease income based on current comparable rates for leases in the respective markets. If facilities rental rates continue to decrease in these markets or if it takes longer than expected to sublease these facilities, the maximum amount the actual loss could exceed the original

estimate is approximately $2 million. Property and equipment that was disposed of or removed from operations resulted in a net charge of approximately $9 million and consisted primarily of furniture and fixtures, servers, leasehold improvements, and computer equipment. We also recorded other restructuring costs of approximately $2 million relating primarily to payments for professional fees incurred with the restructuring program.

A summary of the restructuring costs is as follows (in thousands):

| | Workforce reduction | Consolidation of excess facilities and other charges | Total |
|---|---|---|---|
| Total charge | $15,137 | $ 42,334 | $ 57,471 |
| Noncash charges | (5,411) | (9,380) | (14,791) |
| Cash payments | (5,901) | (7,279) | (13,180) |
| Restructuring accrual at December 31, 2001 | 3,825 | 25,675 | 29,500 |
| Cash payments | (3,825) | (13,930) | (17,755) |
| Restructuring accrual at December 31, 2002 | – | 11,745 | 11,745 |
| Cash payments | – | (4,286) | (4,286) |
| Restructuring accrual at December 31, 2003 | $    – | $  7,459 | $  7,459 |

The restructuring accrual is included on the balance sheet in accrued expenses and other current liabilities. Amounts related to the net lease expense due to the consolidation of facilities will be paid over the respective lease terms through December 2012.

**Other Income, Net.** Other income, net was as follows (in thousands):

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2001** | **2002** | **2003** |
| Interest and investment income | $ 91,931 | $63,200 | $47,202 |
| Investment gains (losses), net | (26,623) | 2,189 | (1,223) |
| Contract termination fees | 9,000 | 1,661 | 750 |
| Other | (1,526) | 2,237 | 777 |
| Total other income, net | $ 72,782 | $69,287 | $47,506 |

Other income, net decreased approximately $22 million in 2003 compared to 2002, primarily as a result of decreased interest and investment income, as a result of reduced interest rates on investments. Interest rates decreased from

an average of approximately 3.9 percent in 2002 to 2.3 percent in 2003. Other income, net decreased approximately $3 million in 2002, as compared to 2001. Interest and investment income decreased as a result of lower average investment balances and declining interest rates in 2002 as compared to 2001. Interest rates decreased from an average of approximately 5.6 percent in 2001 to 3.9 percent in 2002. In addition, the Company recorded $9 million of income in 2001 related to early termination of a long-term advertising contract, whereby the customer terminated the remaining portion of its original agreement and agreed to pay the Company a negotiated termination fee to settle the commitment. The Company did not provide the advertising related to the cancelled commitment, and therefore recorded the termination fee as other income. These decreases were partially offset by gains of approximately $2 million on investments in 2002, compared to losses of approximately $27 million on investments in 2001.

Other income, net in future periods may fluctuate as a result of changes in our average investment balances held, changes in market rates or the sale of investments, and investment impairments.

**Earnings in Equity Interests.** Earnings in equity interests was approximately $48 million for the year ended December 31, 2003 compared to approximately $22 million in 2002 and approximately $4 million in 2001, as a result of our investment in Yahoo! Japan. See Note 8 – "Joint Ventures" in the Financial Statements for Yahoo! Japan's condensed financial information.

**Minority Interests in Operations of Consolidated Subsidiaries.** Minority interests in operations of consolidated subsidiaries represents the minority partners' percentage share of income or losses from such subsidiaries in which we hold a majority ownership interest, but less than 100 percent, and consolidate the subsidiaries' results in our financial statements.

Minority interests in income from operations of consolidated subsidiaries was approximately $6 million, $2 million, and $1 million for 2003, 2002, and 2001, respectively. The change from 2002 to 2003 was due to income in Europe in 2003, compared to losses in 2002, and increased income in Korea. The change from 2001 to 2002 was due to increased income in Korea and reduced losses in Europe. See Note 8 – "Joint Ventures."

**Income Taxes.** The provision for income taxes for 2003, 2002 and 2001 differs from the amount computed by applying the statutory federal rate principally due to foreign losses for which no tax benefit was provided, nondeductible stock-based compensation charges, tax credits, increased valuation allowance related to impairment write-downs of equity investments, and nondeductible costs related to acquisitions.

The increase in the provision for income taxes in 2003 from 2002 of approximately $76 million was primarily a result of increases in Federal and State income taxes, driven by higher pretax income in 2003 compared to 2002. This increase included approximately $9 million of valuation allowance for 2003 compared to approximately $7 million for 2002. The change in valuation allowance from 2002 to 2003 was driven by an increase of foreign losses for which no tax benefit was provided for 2003 as compared to 2002. The effective tax rate for 2003 was 38 percent compared to 40 percent in 2002. The increase in the provision for income taxes in 2002 from 2001 of approximately $60 million was primarily a result of increases in Federal and State income taxes, driven by pretax income for 2002 compared to pretax loss in 2001. This increase was partially offset by non-deductible acquisition related charges in 2001 that did not occur in 2002, which had a tax effect of approximately $20 million, as well as approximately $7 million of increase in the valuation allowance for 2002 compared to approximately $24 million of increases for 2001. The change in valuation allowance from 2001 to 2002 was driven by a significant reduction in impairment write-downs and foreign losses not benefited for 2002 as compared to 2001. The effective tax rate for 2002 was 40 percent compared to a benefit of 13 percent in 2001.

## Business Segment Results

We manage our business geographically. Our primary areas of measurement and decision-making are the United States and International. Management relies on an internal management reporting process that provides revenue and segment operating income (loss) before depreciation and amortization for making financial decisions and allocating resources. Segment operating income (loss) before depreciation and amortization, previously referred to as "Segment EBITDA," includes income (loss) from operations before depreciation, amortization of intangible assets and amortization of stock compensation expense. Management believes that segment operating income (loss) before

# Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused the report to be signed on its behalf by the undersigned, thereunto duly authorized, on the 27th day of February, 2004.

YAHOO! INC.

By:    _____/s/ SUSAN DECKER_____

Susan Decker
*Executive Vice President, Finance and Administration, and Chief Financial Officer*

# Power of Attorney

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Terry Semel and Susan Decker, his/her attorneys-in-fact, each with the power of substitution, for him/her in any and all capacities, to sign any amendments to this Report on Form 10-K, and to file the same, with Exhibits thereto and other documents in connection therewith with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or substitute or substitutes may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ TERRY SEMEL <br> Terry Semel | Chairman and Chief Executive Officer (Principal Executive Officer) | February 27, 2004 |
| /s/ SUSAN DECKER <br> Susan Decker | Executive Vice President, Finance and Administration, and Chief Financial Officer (Principal Financial Officer) | February 27, 2004 |
| /s/ PATRICIA CUTHBERT <br> Patricia Cuthbert | Vice President and Corporate Controller (Principal Accounting Officer) | February 27, 2004 |
| /s/ ROY BOSTOCK <br> Roy Bostock | Director | February 27, 2004 |
| /s/ RONALD W. BURKLE <br> Ronald W. Burkle | Director | February 27, 2004 |
| /s/ ERIC HIPPEAU <br> Eric Hippeau | Director | February 27, 2004 |

| Signature | Title | Date |
| --- | --- | --- |
| /s/  ARTHUR KERN  _____  Arthur Kern | Director | February 27, 2004 |
| /s/  ROBERT KOTICK  _____  Robert Kotick | Director | February 27, 2004 |
| /s/  EDWARD KOZEL  _____  Edward Kozel | Director | February 27, 2004 |
| /s/  GARY WILSON  _____  Gary Wilson | Director | February 27, 2004 |
| /s/  JERRY YANG  _____  Jerry Yang | Director | February 27, 2004 |

EXHIBIT 31

# Certification of CEO Pursuant to
## Securities Exchange Act Rules 13a-14(a) and 15d-14(a)
## as Adopted Pursuant to
## Section 302 of the Sarbanes-Oxley Act of 2002

I, Terry Semel, the Chief Executive Officer of Yahoo! Inc., certify that:

1.  I have reviewed this annual report on Form 10-K of Yahoo! Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 27, 2004                    By:    /s/  TERRY SEMEL
                                            _____
                                            Terry Semel
                                            Chief Executive Officer

# Certification of CFO Pursuant to
## Securities Exchange Act Rules 13a-14 and 15d-14
## as Adopted Pursuant to
## Section 302 of the Sarbanes-Oxley Act of 2002

I, Susan Decker, the Chief Financial Officer of Yahoo! Inc., certify that:

1.  I have reviewed this annual report on Form 10-K of Yahoo! Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (c) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (d) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (e) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 27, 2004                    By:     /s/  SUSAN DECKER
                                                    _____
                                                    Susan Decker
                                                    Chief Financial Officer

EXHIBIT 32

# Certification of CEO and CFO Pursuant to
# 18 U.S.C. Section 1350,
# as Adopted Pursuant to
# Section 906 of the Sarbanes-Oxley Act of 2002

In connection with the Annual Report on Form 10-K of Yahoo! (the "Company") for the year ended December 31, 2003 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Terry Semel, as Chief Executive Officer of the Company, and Susan Decker, as Chief Financial Officer of the Company, each hereby certifies, pursuant to 18 U.S.C. §1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, to the best of his and her knowledge, respectively, that:

  (1)   The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

  (2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ TERRY SEMEL
_____

Name: Terry Semel
Title: Chief Executive Officer
Dated: February 27, 2004


/s/ SUSAN DECKER
_____

Name: Susan Decker
Title: Chief Financial Officer
Dated: February 27, 2004


A signed original of this written statement required by Section 906 of the Sarbanes-Oxley Act of 2002 has been provided to Yahoo! Inc. and will be retained by Yahoo! Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 6

DEF 14A 1 a2133092zdef14a.htm DEF 14A
QuickLinks -- Click here to rapidly navigate through this document

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No.         )

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐    Preliminary Proxy Statement

☐    **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒    Definitive Proxy Statement

☐    Definitive Additional Materials

☐    Soliciting Material Pursuant to §240.14a-12

**YAHOO! INC.**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒    No fee required.

☐    Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11.

(1)    Title of each class of securities to which transaction applies:

(2)    Aggregate number of securities to which transaction applies:

(3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4)    Proposed maximum aggregate value of transaction:

(5)    Total fee paid:

☐    Fee paid previously with preliminary materials.

☐    Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)    Amount Previously Paid:

_____

(2)    Form, Schedule or Registration Statement No.:

_____

(3)    Filing Party:

_____

(4)    Date Filed:

_____

**Persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.**



## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
### To Be Held May 21, 2004

---

We will hold the Annual Meeting of Stockholders of Yahoo! Inc., a Delaware corporation (the "Company", "Yahoo!" or "us"), at the Santa Clara Marriott Hotel, located at 2700 Mission College Boulevard, Santa Clara, California, on Friday, May 21, 2004, at 10:00 a.m. local time (the "Annual Meeting"), for the following purposes:

1.    To elect nine directors of the Company to serve until the 2005 Annual Meeting of Stockholders or until their respective successors are elected and qualified;

2.    To amend the Company's Amended and Restated 1996 Employee Stock Purchase Plan to increase the number of shares available for issuance under the plan by an aggregate of 7,400,000 shares to 15,000,000 shares (and by an aggregate of 14,800,000 shares to 30,000,000 shares after giving effect to the two for one stock split announced on April 7, 2004);

3.    To ratify the appointment of PricewaterhouseCoopers LLP as the independent auditors of the Company for the fiscal year ending December 31, 2004;

4.    To vote upon one proposal submitted by a stockholder, if properly presented at the meeting; and

5.    To transact such other business as may properly come before the Annual Meeting and any adjournment or postponement thereof.

The foregoing items of business, including the nominees for directors, are more fully described in the Proxy Statement which is attached to and made a part of this Notice.

The board of directors has fixed the close of business on March 25, 2004 as the record date for determining the

stockholders entitled to notice of and to vote at the Annual Meeting and any adjournment or postponement thereof.

All stockholders are cordially invited to attend the Annual Meeting in person. However, whether or not you plan to attend the Annual Meeting in person, you are urged to mark, date, sign and return the enclosed proxy card as promptly as possible in the postage-prepaid envelope provided, or vote electronically through the Internet or by telephone, to ensure your representation and the presence of a quorum at the Annual Meeting. If you submit your proxy and then decide to attend the Annual Meeting to vote your shares in person, you may still do so. Your proxy is revocable in accordance with the procedures set forth in the Proxy Statement. Only stockholders of record as of the close of business on March 25, 2004 are entitled to receive notice of, to attend and to vote at the meeting.

By Order of the Board of Directors,

Michael J. Callahan
*Senior Vice President, General Counsel and Secretary*

Sunnyvale, California
April 9, 2004



701 First Avenue
Sunnyvale, CA 94089

## PROXY STATEMENT

### General

This Proxy Statement is furnished in connection with the solicitation by the board of directors of Yahoo! Inc., a Delaware corporation (the "Company", "Yahoo!" or "us"), of proxies for use in voting at the Annual Meeting of Stockholders, to be held at the Santa Clara Marriott Hotel, located at 2700 Mission College Boulevard, Santa Clara, California, on Friday, May 21, 2004, at 10:00 a.m., local time (the "Annual Meeting"), and any adjournment or postponement thereof.

On or about April 9, 2004, this Proxy Statement, the enclosed proxy card and the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2003 are being mailed to stockholders entitled to vote at the Annual Meeting.

### Revocability of Proxies

Any proxy given pursuant to this solicitation may be revoked by the person giving it at any time before its use by delivering to the Company (Attention: Secretary) a written notice of revocation or an authorized proxy bearing a later date (including a proxy by telephone or over the Internet), or by attending the Annual Meeting and voting in person.

**Record Date; Attending the Annual Meeting**

The close of business on March 25, 2004 has been fixed as the record date (the "Record Date") for determining the holders of shares of common stock, par value $0.001 per share (the "Common Stock"), of the Company entitled to notice of and to vote at the Annual Meeting. At the close of business on the Record Date, the Company had 666,022,533 shares of Common Stock outstanding. After giving effect to the two for one stock split described below, which was announced April 7, 2004 and will be effective May 11, 2004, there would have been 1,332,045,066 shares of Common Stock outstanding on the Record Date. Unless otherwise noted, any references to share numbers or share prices, as appropriate, of Common Stock in this Proxy Statement have not been adjusted to give effect to the two for one stock split announced on April 7, 2004 and described below.

If you are a stockholder of record, you will need to bring the attached proxy card with you to the meeting.

If you own shares in street name, tell your broker bank that you are planning to attend the Annual Meeting and would like a legal proxy. You will need to bring the legal proxy with you to the meeting and valid picture identification such as a driver's license or passport in addition to documentation indicating share ownership. If you do not receive the legal proxy in time, bring with you to the meeting your most recent brokerage account statement showing that you owned Yahoo! stock as of the record date. We can use that to verify your ownership of Common Stock and admit you to the Annual Meeting; however, you will not be able to vote your shares at the meeting without a legal proxy. Please note that if you own shares in street name and you request a legal proxy, any previously executed proxy will be revoked, and your vote will not be counted unless you appear at the meeting and vote in person.

**Voting and Solicitation**

Each outstanding share of Common Stock on the Record Date is entitled to one vote on all matters, subject to the conditions described below. A list of stockholders entitled to vote at the Annual Meeting will be available during ordinary business hours at the Company's offices at 701 First Avenue, Sunnyvale, CA 94089 for a period of at least 10 days prior to the Annual Meeting.

Votes cast by proxy or in person at the Annual Meeting will be tabulated by the Inspector of Elections, which is the Company's transfer agent. The Inspector of Elections will also determine whether or not a quorum is present at the Annual Meeting. The presence of a quorum is required to transact the business proposed to be transacted at the Annual Meeting. The presence in person or by proxy of holders of a majority of the outstanding shares of Common Stock entitled to vote will constitute a quorum for the transaction of business at the Annual Meeting. Directors will be elected by a plurality of the votes cast by the holders of the Company's Common Stock voting in person or by proxy at the Annual Meeting. Proposals 2, 3 and 4 will require the affirmative vote of a majority of the votes represented by the shares of Common Stock present in person or represented by proxy at the Annual Meeting. Abstentions and broker non-votes will be counted for purposes of determining the presence or absence of a quorum. Abstentions will have the same practical effect as a negative vote but broker non-votes will not be counted for any purpose in determining whether a matter has been approved.

The shares represented by the proxies received, properly marked, dated, and signed, or submitted via the Internet or by telephone by following the instructions on the proxy card, and not revoked will be voted at the Annual Meeting.

Where such proxies specify a choice with respect to any matter to be acted upon, the shares will be voted in accordance with the specifications made. Where no choice has been specified, the proxy will be voted FOR the election of each of the nine nominees for director named below (Proposal No. 1), FOR amendment of the Company's Amended and Restated 1996 Employee Stock Purchase Plan to increase the number of shares available for issuance under the plan by an aggregate of 7,400,000 shares to 15,000,000 shares (and by an aggregate of 14,800,000 shares to 30,000,000 shares after giving effect to the two for one stock split announced on April 7, 2004) (Proposal No. 2), FOR ratification of PricewaterhouseCoopers LLP as the independent auditors of the Company for the fiscal year ending December 31, 2004 (Proposal No. 3), AGAINST the proposal submitted by the stockholder (Proposal No. 4), and as the proxy holders deem advisable on other matters that may come before the Annual Meeting. If a broker indicates on the enclosed proxy or its substitute that it does not have discretionary authority as to certain shares to vote on a particular matter ("broker non-votes"), those shares will not be considered as voting with respect to that matter. The Company believes that the tabulation procedures to be followed by the Inspector of Elections are consistent with the general requirements of applicable law concerning voting of shares and determination of a quorum.

The solicitation of proxies will be conducted by mail, and the Company will bear all attendant costs. These costs will include the expense of preparing and mailing proxy solicitation materials for the Annual Meeting and reimbursements paid to brokerage firms and others for their expenses incurred in forwarding solicitation materials regarding the Annual Meeting to beneficial owners of the Company's Common Stock. The Company may conduct further solicitation personally, telephonically, through the Internet or by facsimile through its officers, directors and employees, none of whom will receive additional compensation for assisting with the solicitation. The Company has retained Georgeson Shareholder Communications, Inc. to assist in the solicitation of proxies, for a fee estimated to be approximately $20,000. The Company may generate other expenses in connection with the solicitation of proxies for the Annual Meeting.

**Recent Events**

On April 7, 2004, the Company announced a two for one stock split to stockholders of record as of the close of business on April 26, 2004. The stock split will be effected in the form of a dividend on May 11, 2004. Unless otherwise noted, any references to share numbers or share prices, as appropriate, of Common Stock in this Proxy Statement have not been adjusted to give effect to this two for one stock split.

2

---

**PROPOSAL NO. 1**
**ELECTION OF DIRECTORS**

**Nominees**

At the Annual Meeting, the stockholders will elect nine directors to serve until the 2005 Annual Meeting of Stockholders or until their respective successors are elected and qualified. The authorized number of directors is currently ten. The Company believes leaving a vacancy on the board will provide the directors with flexibility during the year to appoint an additional member to the board when and if an individual whose services would be beneficial to the Company and its stockholders is identified. Unless marked otherwise, proxies received will be voted FOR the election of the nine nominees named below. If additional persons are nominated for election as directors, the proxy holders intend to vote all proxies received by them in such a manner as will ensure the election of as many of the nominees listed below as possible, and in such an event, the specific nominees to be voted for will be determined by the proxy holders.

Assuming a quorum is present, the nine nominees receiving the highest number of affirmative votes of shares entitled to be voted for them will be elected as directors of the Company. Stockholders are not entitled to cumulate votes in the election of directors. All nominees have consented to serve as directors, if elected. If any nominee is unable or unwilling to serve as a director at the time of the Annual Meeting, the persons who are designated as proxies intend to vote, in their discretion, for such other persons, if any, as may be designated by the board of directors. As of the date of this Proxy Statement, the board of directors has no reason to believe that any of the persons named below will be unable or unwilling to serve as a nominee or as a director if elected.

The names of the nominees, their ages as of February 17, 2004, and certain other information about them are set forth below:

| Name | Age | Position |
|------|-----|----------|
| Terry S. Semel | 60 | Chairman and Chief Executive Officer |
| Jerry Yang | 35 | Chief Yahoo! and Director |
| Roy J. Bostock(2)(3) | 63 | Director |
| Ronald W. Burkle(3) | 51 | Director |
| Eric Hippeau | 52 | Director |
| Arthur H. Kern(1)(2)(3) | 57 | Director |
| Robert A. Kotick(1) | 40 | Director |
| Edward R. Kozel(2) | 48 | Director |
| Gary L. Wilson(1)(2) | 64 | Director |

(1)     Member of the Compensation Committee

(2)     Member of the Audit Committee

(3)     Member of the Nominating and Corporate Governance Committee

Each of the director nominees listed above was elected to be a director at the Company's Annual Meeting of Stockholders held on May 16, 2003. There are no family relationships among any of the directors or executive officers of the Company. Our board of directors has determined that each of Messrs. Bostock, Burkle, Hippeau, Kern, Kotick, Kozel and Wilson meet the independence requirements of the listing standards of the National Association of Securities Dealers (the "NASD").

Mr. Semel was appointed as the Company's Chairman of the board of directors and Chief Executive Officer on May 1, 2001. Since September 1999, Mr. Semel has also served as Chairman and Chief Executive Officer of Windsor Media, Inc. From March 1994 to September 1999, Mr. Semel served as Chairman of the board of directors and Co-Chief Executive Officer of Warner Bros. and Warner Music

3

Group, entertainment and media companies. Mr. Semel also serves as a director of Polo Ralph Lauren Corporation and Revlon, Inc. Mr. Semel holds a B.S. degree in accounting from Long Island University.

Mr. Yang, a founder of the Company and Chief Yahoo!, has served as a member of the board of directors and an officer of the Company since March 1995. Mr. Yang co-developed Yahoo! in 1994 while he was working towards his Ph.D. in electrical engineering at Stanford University. As Chief Yahoo!, Mr. Yang reports to Chairman and Chief Executive Officer, Terry Semel. Mr. Yang is involved in guiding the Company's vision, is involved in many key aspects of the business at a strategic and operational level, and serves as a stalwart of the Company's employee culture and morale. Mr. Yang also serves as a director of Yahoo! Japan Corporation and Cisco Systems, Inc. Mr. Yang holds B.S. and M.S. degrees in electrical engineering from Stanford University.

Mr. Bostock has served as a member of the board of directors since May 2003. Mr. Bostock has been Chairman Emeritus of BCom3 Group, Inc., an advertising and marketing services firm, since September 2002 and served as Chairman from January 2000 to September 2002. From July 1990 to January 2000, Mr. Bostock served as Chairman and Chief Executive Officer of MacManus Group, Inc., an advertising and marketing services firm. Mr. Bostock is Chairman of the Partnership for a Drug-Free America, a not-for-profit corporation creating advertising to reduce the use of illicit drugs in the United States. Mr. Bostock holds a Bachelor's degree from Duke University and an M.B.A. from Harvard University.

Mr. Burkle has served as a member of the board of directors since November 2001. Mr. Burkle is managing partner of The Yucaipa Companies, a private investment firm, which he co-founded in 1986. Mr. Burkle also serves as a director of Yucaipa Equity Partners, L.P., Occidental Petroleum Corp. and KB Home Corporation.

Mr. Hippeau has served as a member of the board of directors since January 1996. Mr. Hippeau has been a Managing Partner of SOFTBANK Capital Partners, a technology oriented venture capital firm, since 2000. Before joining SOFTBANK Capital Partners, from 1993-2000, Mr. Hippeau served as Chairman and CEO of Ziff-Davis, Inc. an integrated media and marketing services company serving the technology community. Mr. Hippeau joined Ziff-Davis, Inc. in 1989 as Publisher of PC Magazine and held several senior executive positions before becoming Chairman and CEO. His experience prior to Ziff-Davis includes senior executive positions at International Data Group and as an international technology business investor and media leader. Mr. Hippeau also serves as a director of Starwood Hotels and Resorts WorldWide, Inc.

Mr. Kern has served as a member of the board of directors since January 1996. Mr. Kern is an investor in several media and marketing companies. Prior to that, Mr. Kern was co-founder and Chief Executive Officer of American Media, a group owner of commercial radio stations sold to AMFM (now part of Clear Channel Communications, Inc.) in October 1994. Mr. Kern also serves as a director of Digitas, Inc. Mr. Kern is a graduate of Yale University.

Mr. Kotick has been a director of the Company since March 2003. Since February 1991, Mr. Kotick has been the

Chairman and Chief Executive Officer of Activision, Inc., a publisher of interactive entertainment software products.

*Mr. Kozel* has served as a member of the board of directors since October 2000. Mr. Kozel is a managing director of Integrated Finance Ltd. He has been the managing member of Open Range Ventures, a venture capital firm, since January 2000. Between October 2000 and March 2001, Mr. Kozel was the Chief Technology Officer, Service Provider Line of Business of Cisco Systems, Inc., a network and communications company. Prior to that time, he was Senior Vice President, Corporate Development at Cisco from April 1998 to January 2000 and Senior Vice President and Chief Technical Officer from January 1996 to April 1998. Mr. Kozel also serves as a director of Reuters Group PLC. Mr. Kozel holds a B.S. degree in electrical engineering from the University of California, Davis.

4

---

*Mr. Wilson* has served as a member of the board of directors since November 2001. Mr. Wilson has served as Chairman of the board of directors of Northwest Airlines Corporation, the parent of Northwest Airlines, Inc. since April 1997. Mr. Wilson also serves as a director of The Walt Disney Company, where he worked for 15 years, and as a director of CB Richard Ellis, Inc. and On Command Corp. Mr. Wilson holds a Bachelor's degree from Duke University and an M.B.A. from Wharton Graduate School of Business.

**Meetings and Committees of the Board of Directors**

During fiscal 2003, the board of directors held ten meetings and took action by unanimous written consent on four occasions. During fiscal 2003 no incumbent director then in office attended fewer than 75% of the aggregate total number of meetings of the board of directors held during the period in which he was a director and of the total number of meetings held by all of the committees of the board of directors on which he served. The board of directors has an Audit Committee, a Compensation Committee, and a Nominating and Corporate Governance Committee.

**Audit Committee.**   The Audit Committee is comprised of four of the Company's non-employee directors: Messrs. Kozel (Chair), Bostock, Kern and Wilson. It met five times during fiscal 2003. The Audit Committee is responsible for the appointment, retention and termination of a firm of independent auditors and monitors the effectiveness of the audit effort, the Company's financial and accounting organization and its system of internal accounting and disclosure controls. Each member of the Audit Committee is independent within the meaning of SEC Regulations and the NASD listing standards, and the board has determined that Mr. Wilson qualifies as an audit committee financial expert within the meaning of SEC regulations.

**Compensation Committee.**   The Compensation Committee consists of three of the Company's non-employee directors: Messrs. Kotick (Chair), Kern and Wilson, each of whom is an independent director under the NASD listing standards. The Compensation Committee held five meetings and took action by unanimous written consent on twenty-nine occasions during fiscal 2003. The Compensation Committee's functions are to establish and administer the Company's policies regarding compensation. The Compensation Committee also administers the Company's 1995 Stock Plan, as amended (the "1995 Stock Plan"), and the Company's Amended and Restated 1996 Employee Stock Purchase Plan.

**Nominating and Corporate Governance Committee.**   The Company has a Nominating and Corporate Governance Committee (the "Nominating/Governance Committee"). The functions of the Nominating/Governance Committee include (i) identifying and recommending to the board of directors individuals qualified to serve as directors of the Company and on the committees of the board; (ii) advising the board with respect to matters of board composition, procedures and committees; (iii) developing and recommending to the board a set of corporate governance principles applicable to the Company and overseeing corporate governance matters generally; and (iv) overseeing the annual evaluation of the board and the Company's management.

The Nominating/Governance Committee is governed by a charter, a current copy of which is available on our corporate website at *www.yahoo.com*. The charter may be found as follows: From our main Web page, first click on "Company Info" at the bottom of the page and then on "Investor Relations." Next click on "Corporate Governance", then "Board Committees" and "Nominating & Corporate Governance Committee Charter."

The members of the Nominating/Governance Committee are Messrs. Kern (Chairman), Bostock and Burkle, each of whom is an independent director under the NASD listing standards. The Nominating/Governance Committee charter was

adopted by the board on June 19, 2003, and the Nominating/Governance Committee met twice during 2003.

The Nominating/Governance Committee will consider director candidates recommended by stockholders. In considering candidates submitted by stockholders, the Nominating/Governance Committee will take into consideration the needs of the board and the qualifications of the candidate. The

5

---

Nominating/Governance Committee may also take into consideration the number of shares held by the recommending stockholder and the length of time that such shares have been held. To have a candidate considered by the Nominating/Governance Committee, a stockholder must submit the recommendation in writing and must include the following information:

- The name of the stockholder and evidence of the person's ownership of Company stock, including the number of shares owned and the length of time of ownership; and

- The name of the candidate, the candidate's resume or a listing of his or her qualifications to be a director of the Company and the person's consent to be named as a director if selected by the Nominating/Governance Committee and nominated by the Board.

The stockholder recommendation and information described above must be sent to the Corporate Secretary at 701 First Avenue, Sunnyvale, California 94089 and must be received by the Corporate Secretary not less than 120 days prior to the anniversary date of the Company's most recent annual meeting of stockholders.

The Nominating/Governance Committee believes that the minimum qualifications for service as a director of the Company are that a nominee possess an ability, as demonstrated by recognized success in his or her field, to make meaningful contributions to the board's oversight of the business and affairs of the Company and an impeccable reputation of integrity and competence in his or her personal or professional activities. The Nominating/Governance Committee's evaluation of potential candidates shall be consistent with the board's criteria for selecting new directors. Such criteria include an understanding of the Company's business environment and the possession of such knowledge, skills, expertise and diversity of experience so as to enhance the board's ability to manage and direct the affairs and business of the Company, including when applicable, to enhance the ability of committees of the board to fulfill their duties and/or satisfy any independence requirements imposed by law, regulation or listing requirements.

The Nominating/Governance Committee may receive suggestions from current board members, company executive officers or other sources, which may be either unsolicited or in response to requests from the Nominating/Governance Committee for such candidates. The Nominating/Governance Committee also, from time to time, may engage firms that specialize in identifying director candidates. As described above, the Nominating/Governance Committee will also consider candidates recommended by stockholders.

Once a person has been identified by the Nominating/Governance Committee as a potential candidate, the Nominating/Governance Committee may collect and review publicly available information regarding the person to assess whether the person should be considered further. If the Nominating/Governance Committee determines that the candidate warrants further consideration, the Chairman or another member of the Nominating/Governance Committee may contact the person. Generally, if the person expresses a willingness to be considered and to serve on the board, the Nominating/Governance Committee may request information from the candidate, review the person's accomplishments and qualifications and may conduct one or more interviews with the candidate. The Nominating/Governance Committee may consider all such information in light of information regarding any other candidates that the Nominating/Governance Committee might be evaluating for membership on the board. In certain instances, Nominating/Governance Committee members may contact one or more references provided by the candidate or may contact other members of the business community or other persons that may have greater first-hand knowledge of the candidate's accomplishments. The Nominating/Governance Committee's evaluation process does not vary based on whether or not a candidate is recommended by a stockholder, although, as stated above, the board may take into consideration the number of shares held by the recommending stockholder and the length of time that such shares have been held.

**Communications with Directors**

The board has established a process to receive communications from stockholders. Stockholders and other interested parties may contact any member (or all members) of the board, or the non-management

6

---

directors as a group, any board committee or any chair of any such committee by mail or electronically. To communicate with the board of directors, any individual directors or any group or committee of directors, correspondence should be addressed to the board of directors or any such individual directors or group or committee of directors by either name or title. All such correspondence should be sent "c/o Corporate Secretary" at 701 First Avenue, Sunnyvale, California 94089. To communicate with any of our directors electronically, stockholders should send an email to CorporateSecretary@yahoo-inc.com.

All communications received as set forth in the preceding paragraph will be opened by the Corporate Secretary for the sole purpose of determining whether the contents represent a message to our directors. Any contents that are not in the nature of advertising, promotions of a product or service, patently offensive material or matters deemed inappropriate for the board of directors will be forwarded promptly to the addressee. In the case of communications to the board or any group or committee of directors, the Corporate Secretary will make sufficient copies (or forward such information in the case of e-mail) of the contents to send to each director who is a member of the group or committee to which the envelope or e-mail is addressed.

It is the Company's policy that directors are invited and encouraged to attend the Annual Meeting. Eight of our directors were in attendance at the 2003 Annual Meeting.

**Director Compensation**

The Company does not pay fees to its directors for performance of their duties as directors of the Company. The Company does reimburse its directors for their out-of-pocket expenses incurred in connection with attendance at board, committee and stockholder meetings of the Company. The Company's 1996 Directors' Stock Option Plan, as amended (the "Directors' Plan"), provides that each person who becomes a non-employee director of the Company will be granted a nonqualified stock option to purchase 100,000 shares of Common Stock on the date on which the optionee first becomes a non-employee director of the Company. These options become exercisable monthly, ratably over the 48-month period following the date of grant. Thereafter, on the date of each annual meeting of the Company's stockholders at which such director is elected, each such non-employee director shall be granted an additional option to purchase 50,000 shares of Common Stock if, on such date, he or she shall have served on the board of directors for at least six months of the preceding twelve months. These options become exercisable as to 25% of the options on the first anniversary of the date of grant, and the remainder of the options becomes exercisable monthly, ratably over the 36-month period following the first anniversary of the date of grant. All options will become exercisable upon the occurrence of a change of control event, as described in the Directors' Plan. Each of the non-employee nominees for director named in this Proxy Statement will have served for more than six months of the preceding twelve months at the time of the Annual Meeting, and will therefore be granted an option to purchase 50,000 shares of the Company's Common Stock under the Directors' Plan if they are reelected to the board of directors at the Annual Meeting. The exercise price of all stock options granted under the Directors' Plan is equal to the closing sale price of a share of the Company's Common Stock on the Nasdaq National Market on the date of grant of the option.

**Recommendation of the Board of Directors**

**THE BOARD RECOMMENDS A VOTE FOR THE ELECTION OF ALL NOMINEES NAMED ABOVE.**

7

---

**PROPOSAL NO. 2**
**APPROVAL OF INCREASE OF SHARES OF COMMON STOCK UNDER THE**
**AMENDED AND RESTATED 1996 EMPLOYEE STOCK PURCHASE PLAN**

We are asking the Company's stockholders to approve an amendment to the Amended and Restated 1996 Employee Stock Purchase Plan (the "Purchase Plan") that will increase the maximum number of shares of Common Stock authorized for issuance under the Purchase Plan by 7,400,000 shares (or 14,800,000 shares after giving effect to the two for one stock split announced on April 7, 2004). The increase in shares will be effective and contingent upon receipt of stockholder approval, and, following approval of this amendment, the maximum aggregate number of shares reserved for future issuance under the Purchase Plan shall not exceed 15,000,000 shares (or 30,000,000 shares after giving effect to the two for one stock split announced on April 7, 2004).

The Company believes that operation of the Purchase Plan is important in attracting and retaining employees in a competitive labor market, which is essential to the Company's long-term growth and success. The Company believes that this amendment, which was adopted by the board in April 2004 to increase the number of shares of Common Stock authorized for issuance under the Purchase Plan, is necessary to ensure that a sufficient reserve of Common Stock is available under the Purchase Plan in light of the increased number of Company employees hired in 2003 and acquired in connection with the Company's recent acquisitions.

The essential features of the Purchase Plan, including this proposed amendment, are summarized below. This summary does not purport to be a complete description of all the provisions of the Purchase Plan, and is subject to and qualified in its entirety by reference to the complete text of the amended Purchase Plan, which has been filed with the Securities and Exchange Commission with this Proxy Statement. Any stockholder of the Company who wishes to obtain a copy of the actual Purchase Plan document may do so upon written request to the Secretary at the Company's principal executive offices.

## General

The Purchase Plan is intended to qualify under Section 423 of the Internal Revenue Code. It is not a tax-qualified, deferred compensation plan under Section 401(a) of the Code, nor is it subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA). The purpose of the Purchase Plan is to provide employees (including officers and employee directors) of the Company with an opportunity to purchase Common Stock of the Company at a discount to market price through payroll deductions.

## Administration

The Purchase Plan is administered by the board of directors of the Company or a committee appointed by the Board. All questions of interpretation or application of the Purchase Plan are determined by the board of directors or its appointed committee, and its decisions are final, conclusive and binding upon all participants.

## Eligibility and Participation

Employees (including officers and employee directors) who are customarily employed for at least 20 hours per week and more than 5 months per calendar year with the Company or any designated subsidiary of the Company are eligible to participate in the Purchase Plan, subject to certain limitations imposed by the Internal Revenue Code and certain other limitations set forth in the Purchase Plan. Eligible employees become participants in the Purchase Plan by filing with the stock administration department of the Company a subscription agreement authorizing payroll deductions prior to the applicable offering date, unless the administrator sets a later time for filing the subscription agreement. A

8

---

participant's subscription agreement continues to be effective for each consecutive offering period until the participant withdraws from the Purchase Plan or ceases to be eligible to participate in the Purchase Plan.

As of December 31, 2003, approximately 5,400 employees, including 5 executive officers, were eligible to participate in the Purchase Plan. Members of the Company's board of directors who are not employees and other non-employees such as consultants are not eligible to participate. The actual benefits, if any, to participants in the Purchase Plan are not determinable prior to the purchase of shares thereunder as the value, if any, of such shares to their holders is represented by the difference between the market price of a share of the Company's Common Stock on the date of the purchase and the purchase price of the shares, as described below, and the Company cannot determine participation levels and rates of deferral under the Purchase Plan. As of April 6, 2004 the fair market value of one share of the Company's Common Stock was $48.77 (without

giving effect to the two for one stock split announced on April 7, 2004).

**Offering Periods; Purchase Price**

Beginning on July 1, 2001, the structure of the Purchase Plan was changed so that instead of six-month offering periods, the Purchase Plan would be implemented by a series of consecutive offering periods of approximately 24 months duration. The administrator approved this new structure in February 2001 after determining that many of the companies with whom Yahoo! competes for employees offer purchase plans with 24-month offering periods.

Four purchases are made during each 24-month offering period, as each such offering period consists of four six-month purchase periods commencing on each May 1 and November 1 and ending on April 30 and October 31, respectively. The purchases are made for participants on each April 30 and October 31 by applying payroll deductions accumulated over the preceding six months towards such purchases. The price at which these purchases are made equal 85% of the lesser of the fair market value of the Common Stock as of the first day of the offering period (*i.e.*, the offering date) or the fair market value on the last day of the applicable purchase period occurring within the offering period (*i.e.*, the purchase date). For example, if an employee who enrolls in the offering period beginning on May 1, 2004 continues in the Purchase Plan through the end of that period, he or she will make a final purchase of stock on April 30, 2006 at 85% of the lesser of the fair market value of the stock on May 1, 2004 or the fair market value on April 30, 2006 (having made three earlier purchases on October 31, 2004, April 30, 2005, and October 31, 2005 at the applicable purchase prices for each of those dates). The purchase price of the stock will be adjusted to the extent appropriate to give effect to the two for one stock split announced on April 7, 2004, for all purchase periods that are ongoing as of the effective date of the split.

Employees who join the Company during an ongoing offering period, or who are otherwise not yet participating in the Purchase Plan, will be given the opportunity to enroll in the Purchase Plan twice a year, on each May 1 and November 1. For employees who begin participating in the Purchase Plan after the beginning of an offering period, the offering date will be the first day of the first purchase period in which such employees participate within the offering period. Such employees will purchase stock at 85% of the lesser of the fair market value of the stock on such offering date or on the purchase date, and will be participating in a proportionately shorter offering period than those joining the Purchase Plan at the beginning of the 24-month offering period.

If the fair market value of a share of the Company's Common Stock on a purchase date within a 24-month offering period is lower than the fair market value of a share of the Company's Common Stock at the beginning of the 24-month period, then that offering period will terminate immediately after the purchase of shares for participants and a new 24-month offering period will begin on the following day (either May 1 or November 1). A similar re-set mechanism applies for employees who join the Purchase Plan following the first day of the offering period.

The applicable price at which shares may be purchased under the Purchase Plan may be adjusted in the event that shares must be added (through board and stockholder approval) to the Purchase Plan during

an ongoing offering period in order to satisfy purchase requirements. If this happens and the fair market value of a share on the date of such stockholder approval is higher than the fair market value of a share on the offering date for any such offering period, then the applicable purchase price for these newly added shares would equal 85% of the lesser of the fair market value on the date of stockholder approval or the fair market value on the purchase date. The Company is under no obligation to cause shares to be added to the Purchase Plan at any time.

**Limitations on Participation**

Employees are permitted to have up to 15% of their compensation accumulated and applied toward purchases of shares under the Purchase Plan. The board of directors may change this maximum participation rate at any time before the beginning of an offering period. The compensation that can be accumulated and applied toward purchase of shares under the Purchase Plan, as amended effective May 1, 2004, generally includes, salary, commissions, bonuses and other compensation paid by the Company, but excludes referral and hiring bonuses, income received in connection with stock options and other equity based awards and reimbursements. An employee may not participate in the Purchase Plan if, immediately after he or she joined, he or she (or any other person whose stock would be attributed to such employee under stock attribution rules of

the Internal Revenue Code) would own stock and/or hold rights to purchase stock possessing 5% or more of the total combined voting power or value of all classes of stock of the Company or of any subsidiary of the Company. The Purchase Plan also limits an employee's rights to purchase stock under all employee stock purchase plans (those subject to Section 423 of the Code) of the Company and its subsidiaries so that such rights may accrue at a rate that does not exceed $25,000 of fair market value of such stock (determined at the time the employee begins participating in the offering period) for each calendar year in which such right to purchase stock is outstanding at any time. In addition, no employee may purchase more than 5,000 shares (or 10,000 shares after giving effect to the two for one stock split announced on April 7, 2004) of Common Stock under the Purchase Plan in any one six-month purchase period.

The Company may make a pro rata allocation of the shares remaining available for stock purchase if the total number of shares that would otherwise be subject to stock purchase rights granted at the beginning of an offering period exceeds the number of remaining available shares in the Purchase Plan. Employees may withdraw from the Purchase Plan and receive back their accumulated payroll deductions, without interest, at any time prior to a purchase date (April 30 and October 31). If any employee does not withdraw prior to the end of an offering period, he or she will continue to participate in the next offering period that begins following the end of that offering period.

**Payroll Deductions**

The purchase price of the shares to be acquired under the Purchase Plan is accumulated by payroll deductions over an offering period. The deductions may not be at a rate of less than 1% or more than 15% of a participant's compensation on each payday during the offering period. The administrator may change the maximum amount that a participant can contribute at any time before the beginning of an offering period. A participant may change his or her rate of contribution as of the beginning of each six-month purchase period and, on one occasion only during a six-month purchase period, may decrease his or her rate of payroll deductions. A participant may discontinue his or her participation in the Purchase Plan by withdrawing at any time. When a participant withdraws, he or she receives back the payroll deductions accumulated under the Purchase Plan, but does not receive interest on such amounts. Amounts contributed to the Purchase Plan are part of the Company's general funds and are not required to be segregated. Payroll deductions for a participant begin with the first full payroll following the date he or she joins the Purchase Plan. To the extent necessary to comply with Internal Revenue Code provisions and certain purchase limitations of the Purchase Plan, a participant's payroll deductions may be decreased to 0%.

10

**Termination of Employment or Loss of Eligibility**

Termination of a participant's employment for any reason, including retirement or death, or the failure of the participant to remain in the continuous employ of the Company for at least 20 hours per week during an offering period (unless on an approved leave of absence or a temporary reduction of hours), causes the employee to become ineligible to participate in the Purchase Plan. In such event, payroll deductions credited to the participant's account will be returned to him or her or, in the case of death, to the person or persons entitled thereto as provided in the Purchase Plan, without interest.

**Capital Changes**

In the event any change is made in the Company's capitalization during an offering period, such as a stock split or stock dividend, that results in an increase or decrease in the number of shares of Common Stock outstanding without receipt of consideration by the Company, appropriate adjustment will be made to the purchase price and to the number of shares subject to stock purchase under the Purchase Plan, to the number of shares authorized for issuance under the Purchase Plan, and to the maximum number of shares that may be purchased by an employee during any six-month purchase period.

In the event of a merger of the Company with or into another corporation or a sale of substantially all of the Company's assets, each right to purchase stock under the Purchase Plan will be assumed or an equivalent right substituted by the successor corporation unless the successor corporation refuses to assume or substitute for outstanding rights to stock purchases, in which case the offering period will be shortened so that employees' rights to purchase stock under the Purchase Plan will be automatically exercised prior to the merger or sale of assets (unless the participant has withdrawn prior to that date). In the event of the proposed dissolution or liquidation of the Company, the offering period will terminate immediately prior to the consummation of such proposed action unless otherwise provided by the board of directors.

**Amendment and Termination of the Purchase Plan**

The board of directors may at any time amend or terminate the Purchase Plan, except that any such termination cannot affect rights to purchase stock previously granted nor may an amendment, in general, make any change in an outstanding right to purchase stock which adversely affects the rights of any participant, provided that, the Purchase Plan or an offering or purchase period may be terminated if the board of directors determines that termination is in the best interests of the Company and the stockholders or if continuation of the Purchase Plan and/or the offering period would cause the Company to incur adverse accounting charges.

If not terminated earlier, the Purchase Plan will terminate in 2016.

**Tax Information**

The Purchase Plan, and the right of participants to make purchases thereunder, is intended to qualify under the provisions of Section 421 and 423 of the Code. Under these provisions, no income will be taxable to a participant until the shares purchased under the Purchase Plan are sold or otherwise disposed of. If a participant disposes of his or her shares of Common Stock within the later of two years from the offering date that applies to the shares or within one year from the purchase date of the shares, a transaction referred to as a "disqualifying disposition," the participant will realize ordinary income in the year of such disposition equal to the amount by which the fair market value of the stock on the purchase date exceeded the purchase price. In such instances, the amount of such ordinary income will be added to the participant's basis in the shares, and any additional gain or resulting loss recognized on the disposition of the shares after such basis adjustment will be a capital gain or loss. A capital gain or loss will be long-term if the participant holds the shares of Common Stock for more than one year after the purchase date.

11

If the participant disposes of his or her shares of Common Stock more than two years after the offering date of such right to purchase stock under the Purchase Plan and more than one year after the purchase date of such stock purchase right, the participant will realize ordinary income in the year of such disposition equal to the lesser of (i) the excess of the fair market value of the shares on the date of disposition over the purchase price or (ii) 15% of the fair market value of the shares on the offering date of such stock purchase right. The amount of such ordinary income will be added to the participant's basis in the shares, and any additional gain recognized on the disposition of the shares after such basis adjustment will be long-term capital gain. If the fair market value of the shares on the date of disposition is less than the purchase price, there will be no ordinary income and any loss recognized will be a capital loss.

The Company will generally be entitled to a deduction in the year of a disqualifying disposition equal to the amount of ordinary income recognized by the participant as a result of such disposition. In all other cases, no deduction is allowed the Company.

The foregoing is only a summary of the effect of federal income taxation upon the participants and the Company with respect to participation in the Purchase Plan and does not purport to be complete. Furthermore, the foregoing does not discuss the income tax laws of any municipality, state or foreign country in which a participant may reside. Participants should consult their own tax advisors with respect to the tax consequences of participation in the Purchase Plan for their particular situations.

**Recommendation of the Board of Directors**

**THE BOARD RECOMMENDS A VOTE FOR THE AMENDMENT TO THE AMENDED AND RESTATED 1996 EMPLOYEE STOCK PURCHASE PLAN.**

12

## PROPOSAL NO. 3
## RATIFICATION OF APPOINTMENT OF INDEPENDENT AUDITORS

PricewaterhouseCoopers LLP has served as the Company's independent auditors since February 1996 and has been appointed by the Audit Committee to continue as the Company's independent auditors for the fiscal year ending December 31, 2004. In the event that ratification of this selection of auditors is not approved by a majority of the shares of Common Stock of the Company voting at the Annual Meeting in person or by proxy, the Audit Committee and the board of directors will review the Audit Committee's future selection of auditors.

Representatives of PricewaterhouseCoopers LLP will be present at the Annual Meeting. The Representatives will have an opportunity to make a statement and will be available to respond to appropriate questions.

**Recommendation of the Board of Directors**

**THE BOARD RECOMMENDS A VOTE FOR RATIFICATION OF THE APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE COMPANY'S INDEPENDENT AUDITORS FOR THE FISCAL YEAR ENDING DECEMBER 31, 2004.**

13

---

## PROPOSAL NO. 4
## STOCKHOLDER PROPOSAL

United Brotherhood of Carpenters and Joiners of America, 101 Constitution Ave., N.W., Washington, D.C. 20001, a beneficial owner of 10,200 shares of the Company's common stock, has notified the Company that it intends to present the following proposal at the Annual Meeting:

Resolved, that the shareholders of Yahoo Inc. ("Company") hereby request that the Company's Board of Directors establish a policy of expensing in the Company's annual income statement the cost of all future stock options issued by the Company.

**Statement in Support of Proposal**

Current accounting rules give companies the choice of reporting stock option expenses annually in the company income statement or as a footnote in the annual report (See: Financial Accounting Standards Board Statement 123). Most companies, including ours, report the cost of stock options as a footnote in the annual report, rather than include the option costs in determining operating income. We believe that expensing stock options would more accurately reflect a company's operational earnings.

Stock options are an important component of our Company's executive compensation program. We believe that the lack of option expensing can promote excessive use of options in a company's compensation plans, obscure and understate the cost of executive compensation and promote the pursuit of corporate strategies designed to promote short-term stock price rather than long-term corporate value.

"The failure to expense stock option grants has introduced a significant distortion in reported earnings," stated Federal Reserve Board Chairman Greenspan. "Reporting stock options as expenses is a sensible and positive step toward a clearer and more precise accounting of a company's worth." *Globe and Mail*, "Expensing Options is a Bandwagon Worth Joining," Aug. 16, 2002.

Warren Buffett wrote in a *New York Times* Op-Ed piece on July 24, 2002:

There is a crisis of confidence today about corporate earnings reports and the credibility of chief executives. And it's justified.

For many years, I've had little confidence in the earnings numbers reported by most corporations. I'm not talking about Enron and WorldCom—examples of outright crookedness. Rather, I am referring to the legal, but improper, accounting methods used by chief executives to inflate reported earnings…

Options are a huge cost for many corporations and a huge benefit to executives. No wonder, then, that they have fought ferociously to avoid making a charge against their earnings. Without blushing, almost all CEOs have told their shareholders that options are cost-free…

When a company gives something of value to its employees in return for their services, it is clearly a compensation expense. And if expenses don't belong in the earnings statement, where in the world do they belong?

Bear Stearns recently reported that 356 companies are expensing stock options or have indicated their intention to do so. 101 of these companies are S&P 500 companies, representing 39% of the index based on market capitalization. *See* Bear Stearns Equity Research, Sept. 4, 2003, "More Companies Voluntarily Adopt Fair Value Expensing of Employee Stock Options."

This Fund, along with other Building Trades' union pension funds, sponsored this expensing proposal last proxy season and received majority votes at 25 companies, including Fluor, Calpine, Georgia-Pacific, U.S. Bancorp, Thermo Electron, Veritas Software, Apple Computer and Allow. Of the shares voted at the Company's 2003 Annual Meeting regarding the Fund's 2003 proposal to expense stock options, 34% (143,340,227) voted for, 64% (273,141,978) voted against and 2% (9,344,645) abstained. We urge your support for this important reform.

14

---

## The Company's Statement in Opposition to Stockholder Proposal No. 4

**The Board of Directors believes this proposal does not serve the best interests of the Company or its stockholders and recommends a vote AGAINST it.**

The board of directors understands and shares the Company's stockholders' need for a conservative and accurate picture of the Company's operational earnings and the true cost of executive compensation programs. At the same time, we believe that investors have an equally compelling need for financial statements that allow accurate comparisons between companies of similar size or within an industry and that accounting should be a good proxy for underlying economics if it is to add transparency to investors. The board of directors believes that the Company should not adopt the fair value method of accounting at this time for several important reasons that conflict with the above stated objectives. First, the lack of a uniform method for computing fair value makes financial statements calculated under this methodology confusing as a comparative tool for investors, and secondly, the fair value method could require the Company to take an expense grossly disproportionate to the actual cost of its stock option compensation. Furthermore, the board of directors believes that the more significant issue of stock option compensation is the actual number of options granted by the Company rather than the accounting treatment related to such grants, and the Company has given a great deal of weight to this matter in formulating its equity compensation policies.

Current accounting rules give companies the choice of accounting for stock options using the intrinsic value method of accounting, which generally results in no expense for stock option awards, or the fair value method of accounting, which generally results in expense recognition. If the intrinsic value method is used, however, the accounting rules nonetheless require that the impact of the fair value method of accounting be disclosed in the footnotes to the financial statements. We account for our stock-based employee compensation, including stock options, using the intrinsic value method of accounting prescribed by Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB No. 25"). The "intrinsic value" of the option is the amount by which the quoted market price of the stock exceeds the exercise price of the option on the date of grant. Historically, our option awards have had zero intrinsic value on the date of grant as the exercise price is set to be equal to the market price of the stock on that date, and as a result, we have recorded no expense for such stock option awards.

The fair value method, prescribed by Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation," ("SFAS No. 123") computes compensation expense based on the fair value of the option at the date of grant. "Fair value" is determined using an option-pricing model that takes into account various factors in estimating the value

of the option. However, no single methodology is mandated for computing fair value and the provisions of SFAS No. 123 related to the fair value calculation are subject to a range of reasonable interpretations and assumptions which can have a material impact on the calculation of the estimated compensation expense of an option grant. The board of directors believes that the lack of a consistent methodology in this regard would make the economic impact of fair value accounting upon the Company's financial statements confusing to investors, particularly when compared to the financial statements of companies that adopt different methodologies for computing fair value or that continue to use intrinsic value accounting.

Furthermore, the Company believes that there are serious shortcomings in the methodologies currently available for computing fair value which would negatively impact the Company relative to other companies and may not reflect the true economic cost to the Company of this form of compensation. For example, application of the widely used Black-Scholes method would result in a stock compensation expense to the Company of approximately $332 million in fiscal 2003. However, approximately twenty percent of this stock compensation expense relates to options that have an exercise price greater than thirty percent over the share price at the end of 2003, so the impact of this accounting method would artificially impact the Company's financial condition.

15

While we will endeavor to identify and implement the most appropriate and beneficial accounting methodology for the Company, we believe our disclosures already provide full information on the implications of the accounting expense of options and that a more significant concern for our stockholders is the actual number of stock options granted each year, rather than the accounting treatment of such options. To this end, the Company substantially reduced the number of stock options it granted (net of cancellations) in fiscal 2002 (relative to its total number of shares outstanding) as compared to fiscal year 2001—from approximately 6% to approximately 2% of the total number of shares of Company stock then outstanding and maintained this level of grants in 2003, consistent with the expectations we shared with our investors with respect to such grant levels. We are committed to implementing a prudent and conservative stock option policy, both in the initial grant of stock options as well as at the level of their accounting.

**Recommendation of the Board of Directors**

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "AGAINST" THIS PROPOSAL FOR THE REASONS DESCRIBED ABOVE. PROXIES SOLICITED BY THE BOARD OF DIRECTORS WILL BE VOTED "AGAINST" THIS PROPOSAL UNLESS A STOCKHOLDER HAS INDICATED OTHERWISE IN VOTING THE PROXY.**

16

## INFORMATION REGARDING BENEFICIAL OWNERSHIP OF
## PRINCIPAL STOCKHOLDERS AND MANAGEMENT

The following table sets forth certain information that has been provided to the Company with respect to beneficial ownership of shares of the Company's Common Stock as of February 17, 2004 for (i) each person who is known by the Company to own beneficially more than five percent of the outstanding shares of Common Stock, (ii) each director and nominee for director of the Company, (iii) each of the current or former executive officers of the Company named in the Summary Compensation Table of this Proxy Statement (the "Named Executive Officers"), and (iv) all directors and executive officers of the Company as a group. The share numbers in the table and related footnotes have not been adjusted to give effect to the two for one stock split announced on April 7, 2004.

| Beneficial Owner | Amount and Nature of Beneficial Ownership (1) | Percent of Common Stock Outstanding (2) |
|---|---|---|

FMR Corp. (3)                                          48,603,799              7.3
333 South Hope Street
Los Angeles, CA 90071

Terry S. Semel (4)                                      10,054,911             1.5
c/o Yahoo! Inc.
701 First Avenue
Sunnyvale, CA 94089

David Filo (5)                                         45,801,563              6.9
c/o Yahoo! Inc.
701 First Avenue
Sunnyvale, CA 94089

Jerry Yang (6)                                         37,127,580              5.6
c/o Yahoo! Inc.
701 First Avenue
Sunnyvale, CA 94089

Farzad Nazem (7)                                        3,361,865               *
c/o Yahoo! Inc.
701 First Avenue
Sunnyvale, CA 94089

Susan L. Decker (8)                                     1,450,580               *
c/o Yahoo! Inc.
701 First Avenue
Sunnyvale, CA 94089

Arthur H. Kern (9)                                       861,940                *
c/o Yahoo! Inc.
701 First Avenue
Sunnyvale, CA 94089

Eric Hippeau (10)                                       524,742                 *
c/o Softbank Inc.
28 East 28th Street
New York, NY 10016

17

Daniel L. Rosensweig (11)                               461,499                 *
c/o Yahoo! Inc.
701 First Avenue
Sunnyvale, CA 94089

Gregory Coleman (12)                                     234,577                 *
c/o Yahoo! Inc.
701 First Avenue
Sunnyvale, CA 94089

Michael J. Callahan (13)                                118,641                 *
c/o Yahoo! Inc.
701 First Avenue
Sunnyvale, CA 94089

Ronald W. Burkle (14)                                    60,416                 *

c/o Yucaipa Companies LLC
9130 West Sunset Blvd.
Los Angeles, CA 90069

| | | |
|---|---|---|
| Edward R. Kozel (15)<br>c/o Yahoo! Inc.<br>701 First Avenue<br>Sunnyvale, CA 94089 | 56,500 | * |
| Gary L. Wilson (16)<br>c/o Yahoo! Inc.<br>701 First Avenue<br>Sunnyvale, CA 94089 | 28,816 | * |
| Robert A. Kotick (17)<br>c/o Yahoo! Inc.<br>701 First Avenue<br>Sunnyvale, CA 94089 | 27,123 | * |
| Roy J. Bostock (18)<br>c/o Yahoo! Inc.<br>701 First Avenue<br>Sunnyvale, CA 94089 | 22,916 | * |
| All directors and executive officers as a group (14 persons) (19) | 99,959,092 | 15.0 |

*      Less than one percent.

(1)    The number of shares beneficially owned by each person or group as of February 17, 2004 includes shares of Common Stock that such person or group had the right to acquire on or within 60 days after February 17, 2004, including, but not limited to, upon the exercise of options. To our knowledge, except as indicated in the footnotes to this table and pursuant to applicable community property laws, the stockholder named in the table has sole voting and investment power with respect to the shares set forth opposite such stockholder's name.

(2)    For each person and group included in the table, percentage ownership is calculated by dividing the number of shares beneficially owned by such person or group as described above by the sum of the

664,719,437 shares of Common Stock outstanding on February 17, 2004 and the number of shares of Common Stock that such person or group had the right to acquire on or within 60 days of February 17, 2004, including, but not limited to, upon the exercise of options.

(3)    The Schedule 13G filed by FMR Corp. with the Securities and Exchange Commission on February 17, 2004 indicates that it was the beneficial owner of 48,603,799 shares of Common Stock with sole dispositive power with respect to all such shares of Common Stock and sole voting power with respect to 5,454,304 shares of Common Stock.

(4)    Includes 9,078,466 shares issuable upon exercise of options exercisable within 60 days of February 17, 2004 under the Company's 1995 Stock Plan. Also includes 380 shares held by his children, of which Mr. Semel disclaims beneficial ownership.

(5)    Includes 414,583 shares issuable upon exercise of options exercisable within 60 days of February 17, 2004 under the Company's 1995 Stock Plan.

(6)    Includes 414,583 shares issuable upon exercise of options exercisable within 60 days of February 17, 2004 under the

Company's 1995 Stock Plan. Also includes 3,155 shares held by Mr. Yang's wife, of which he disclaims beneficial ownership.

(7)    Includes 3,212,285 shares issuable upon exercise of options exercisable within 60 days of February 17, 2004 and 45,000 shares of restricted stock, which are subject to repurchase unless certain conditions are met, under the Company's 1995 Stock Plan.

(8)    Includes 1,399,163 shares issuable upon exercise of options exercisable within 60 days of February 17, 2004 and 45,000 shares of restricted stock, which are subject to repurchase unless certain conditions are met, under the Company's 1995 Stock Plan.

(9)    Represents 623,816 shares issuable upon exercise of an option exercisable within 60 days of February 17, 2004 under the Company's 1995 Stock Plan and 238,124 shares issuable upon exercise of options exercisable within 60 days of February 17, 2004 under the Company's Directors' Plan.

(10)    Includes 285,360 shares issuable upon exercise of an option exercisable within 60 days of February 17, 2004, which option was granted by SOFTBANK. Mr. Hippeau serves as a Managing Partner of SOFTBANK Capital Partners, a venture fund and affiliate of SOFTBANK. Also includes 238,124 shares issuable upon exercise of options exercisable within 60 days of February 17, 2004 under the Company's Directors' Plan.

(11)    Includes 416,499 shares issuable upon exercise of options exercisable within 60 days of February 17, 2004 and 45,000 shares of restricted stock, which are subject to repurchase unless certain conditions are met, under the Company's 1995 Stock Plan.

(12)    Includes 230,533 shares issuable upon exercise of options exercisable within 60 days of February 17, 2004 under the Company's 1995 Stock Plan. Also includes 1,747 shares held by Mr. Coleman's children, of which he disclaims beneficial ownership.

(13)    Includes 117,937 shares issuable upon exercise of options exercisable within 60 days of February 17, 2004 under the Company's 1995 Stock Plan.

(14)    Includes 60,416 shares issuable upon exercise of options exercisable within 60 days of February 17, 2004 under the Directors' Plan.

(15)    Includes 48,125 shares issuable upon exercise of options exercisable within 60 days of February 17, 2004 under the Directors' Plan.

(16)    Includes 28,816 shares issuable upon exercise of options exercisable within 60 days of February 17, 2004 under the Directors' Plan.

(17)    Includes 27,083 shares issuable upon exercise of options exercisable within 60 days of February 17, 2004 under the Directors' Plan. Also includes 40 shares held by Mr. Kotick's wife, of which he disclaims beneficial ownership.

(18)    Includes 22,916 shares issuable upon exercise of options exercisable within 60 days of February 17, 2004 under the Directors' Plan.

(19)    Includes 16,340,936 shares issuable upon exercise, by certain directors and executive officers, of options exercisable within 60 days of February 17, 2004, and 285,360 shares held by SOFTBANK that are subject to options held by Mr. Hippeau.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the Company's directors, executive officers and persons who own more than

10% of the Company's Common Stock (collectively, "Reporting Persons") to file with the Securities and Exchange Commission (the "SEC") initial reports of ownership and changes in ownership of the Company's Common Stock. Reporting Persons are required by SEC regulations to furnish the Company with copies of all Section 16(a) reports they file. To the Company's knowledge, based solely on its review of the copies of such reports received or written representations from certain Reporting Persons that no other reports were required, the Company believes that during its fiscal year ended December 31, 2003, all Reporting Persons complied with all applicable filing requirements.

### Equity Compensation Plan Information

The following table sets forth information as of December 31, 2003 with respect to shares of the Company's common stock that may be issued under the Company's existing equity compensation plans, including our 1995 Stock Plan, the Purchase Plan and the Directors' Plan. The share numbers and share prices in the table and related footnotes have not been adjusted to give effect to the two for one stock split announced on April 7, 2004.

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights | Weighted Average Exercise Price of Outstanding Options, Warrants and Rights | Number of Securities Remaining Available for Future Issuance |
|---|---|---|---|
| Equity compensation plans approved by security holders (1) | 113,510,000 | $ 39.21 | 37,828,000(2) |

(1)     Does not include options to purchase an aggregate of 10,306,000 shares of the Company's common stock that the Company assumed through acquisitions as of December 31, 2003. The weighted average exercise price of those outstanding options is $32.29 per share.

(2)     Includes 2,505,000 shares of our common stock remaining available for future issuance under the Purchase Plan, as of December 31, 2003.

20

---

### EXECUTIVE OFFICER COMPENSATION AND OTHER MATTERS

### Summary Compensation Table

The following table sets forth certain information concerning the compensation earned, during the last three completed fiscal years, by (i) Terry Semel, the Company's Chief Executive Officer, (ii) the four other most highly compensated individuals who served as executive officers of the Company at the end of the fiscal year ended December 31, 2003 and (iii) one other individual who would have been among the most highly compensated executive officers in 2003 but for the fact that he was not an executive officer at the end of 2003 (such officers collectively referred to as the "Named Executive Officers"). The share numbers and share prices in the table and related footnotes have not been adjusted to give effect to the two for one stock split announced on April 7, 2004.

| Name and Principal Position | Annual Compensation | | | Long-Term Compensation | | All Other Compensation ($) (2) |
|---|---|---|---|---|---|---|
| | | | | Awards | | |
| | Year | Salary($) | Bonus($) | Restricted Stock Awards($) | Securities Underlying Options(#) | |
| Terry S. Semel | 2003 | 600,000 | — | — | —(1) | 1,980 |
| Chairman and Chief Executive | 2002 | 450,000 | 895,500 | — | 2,800,000 | 1,290 |

| Name and Title | Year | Salary | Bonus | | Options | All Other Comp. |
|---|---|---|---|---|---|---|
| Officer | 2001 | 254,853 | — | — | 11,000,000 | 128,679 |
| Susan L. Decker | 2003 | 500,000 | 700,000 | 1,852,200(6) | 125,000 | 3,300 |
| Executive Vice President, | 2002 | 425,000 | 518,750 | — | 1,350,000 | 3,050 |
| Finance and Administration, and Chief Financial Officer | 2001 | 295,000 | — | — | 750,000 | 3,081 |
| Daniel L. Rosensweig (3) | 2003 | 500,000 | 1,375,000(5) | 1,852,200(6) | 125,000 | 84,768 |
| Chief Operating Officer | 2002 | 342,949 | 500,000 | — | 1,600,000 | 87,738 |
| | 2001 | — | — | — | — | — |
| Farzad Nazem | 2003 | 450,000 | 560,000 | 1,852,200(6) | 125,000 | 3,300 |
| Chief Technical Officer and | 2002 | 425,000 | 406,250 | — | 300,000 | 3,050 |
| Executive Vice President, Engineering and Site Operations | 2001 | 301,250 | — | — | 620,000 | 2,925 |
| Michael J. Callahan (4) Senior Vice President, General Counsel and Secretary | 2003 | 221,667 | 140,000 | — | 70,000 | 3,270 |
| Gregory Coleman | 2003 | 462,500 | 150,000 | — | 50,000 | 26,450 |
| Executive Vice President, | 2002 | 500,000 | 562,500 | — | 100,000 | 117,112 |
| Media and Sales | 2001 | 519,712 | 1,250,000 | — | 650,000 | 59,262 |

(1)    As further described in the Report of the Compensation Committee of the Board of Directors contained in this Proxy Statement, in March 2004, Mr. Semel was granted an option to purchase 2,900,000 shares of Common Stock (of which 900,000 were granted in lieu of a cash bonus) in connection with services performed in 2003. The exercise price for these stock options is $41.70 per share, which was the closing market price of the Company's Common Stock on the date of grant.

(2)    Represents for Mr. Semel, relocation payments of $127,766 for 2001 and group term life insurance premiums of $1,980 for 2003, $1,290 for 2002 and $913 for 2001; for Ms. Decker, Company contributions under the Company's 401(k) Plan of $3,000 for 2003, $2,750 for 2002 and $2,625 for 2001, group term life insurance premiums of $300 for 2003, $300 for 2002 and $270 for 2001, and

health club reimbursement of $186 for 2001; for Mr. Rosensweig, relocation payment of $84,468 for 2003 and $87,525 for 2002 and group term life insurance premiums of $300 for 2003 and $213 for 2002; for Mr. Nazem, Company contributions under the Company's 401(k) Plan of $3,000 for 2003, $2,750 for 2002 and $2,625 for 2001, group term life insurance premiums of $300 for 2003, $300 for 2002 and $300 for 2001; for Mr. Callahan, Company contributions under the Company's 401(k) Plan of $3,000 for 2003 and group term life insurance premium of $270 for 2003; and for Mr. Coleman, Company contributions under the Company's 401(k) Plan of $3,000 for 2003 and $2,750 for 2002, group term life insurance premiums of $450 for 2003, $450 for 2002 and $319 for 2001, and relocation payments of $23,000 for 2003, $113,912 for 2002 and $58,943 for 2001.

(3)    Mr. Rosensweig joined the Company as an executive officer in April 2002.

(4)    Mr. Callahan became an executive officer of the Company in September 2003.

(5)    Includes a retention bonus of $675,000 payable on the first anniversary of Mr. Rosensweig's employment with the Company, for which payment was deferred at Mr. Rosensweig's election until the fourth anniversary of Mr. Rosensweig's employment with the Company or upon the termination of his employment with the Company.

(6)    Represents 45,000 shares of Common Stock, based on a per share value of $41.16, which was the closing market price of the Company's Common Stock on the date of grant. As of December 31, 2003, the restricted stock had an aggregate value of $2,206,350, based on the closing market price of $45.03 per share. The restrictions on 35,000 of these shares will lapse on the third anniversary of the date of grant, and the restrictions on 10,000 of these shares will lapse upon the satisfaction of certain performance-based objectives, but will in no event lapse prior to the first anniversary of the date of grant.

## Option Grants in Last Fiscal Year

The following table provides certain information with respect to stock options granted to the Named Executive Officers during the fiscal year ended December 31, 2003. In addition, as required by SEC rules, the table sets forth the hypothetical gains that would exist for the shares subject to such options based on assumed annual compounded rates of stock price appreciation during the option term. The share numbers and share prices in the table and related footnotes have not been adjusted to give effect to the two for one stock split announced on April 7, 2004.

| | Individual Grants | | | | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation For Option Term(3) | |
| Name | Number of Securities Underlying Options Granted(#)(2) | Percent of Total Options Granted to Employees in Fiscal Year(%)(4) | Exercise Price Per Share ($/sh) | Expiration Date | 5%($) | 10%($) |
|---|---|---|---|---|---|---|
| Terry S. Semel | —(1) | — | — | — | — | — |
| Susan L. Decker | 125,000(5) | .61 | 41.16 | 12/10/13 | 3,235,662 | 8,199,804 |
| Daniel L. Rosensweig | 125,000(5) | .61 | 41.16 | 12/10/13 | 3,235,662 | 8,199,804 |
| Farzad Nazem | 125,000(5) | .61 | 41.16 | 12/10/13 | 3,235,662 | 8,199,804 |
| Michael J. Callahan | 70,000(5) | .34 | 41.16 | 12/10/13 | 1,811,971 | 4,591,890 |
| Gregory Coleman | 50,000(5) | .24 | 41.16 | 12/10/13 | 1,294,265 | 3,279,921 |

22

(1)    As further described in the Report of the Compensation Committee of the Board of Directors contained in this Proxy Statement, in March 2004, Mr. Semel was granted an option to purchase 2,900,000 shares of Common Stock (of which 900,000 were granted in lieu of a cash bonus (the "Bonus Option")) in connection with services performed in 2003. The exercise price for these stock options is $41.70 per share, which was the closing market price of the Company's Common Stock on the date of grant. The Bonus Option was fully vested and exercisable as of the grant date, and the other 2,000,000 options will vest upon the fourth anniversary of the grant date, subject to acceleration upon the achievement of certain performance conditions.

(2)    Upon the occurrence of certain change in control events (as described in the 1995 Stock Plan), outstanding options that are not assumed or substituted will become vested.

(3)    The potential realizable value illustrates value that might be realized upon exercise of the options immediately prior to the expiration of their terms, assuming the specified compounded rates of appreciation of the market price per share from the date of grant to the end of the option term. Actual gains, if any, on stock option exercise are dependent upon a number of factors, including the future performance of the Common Stock and the timing of option exercises, as well as the optionee's continued employment through the vesting period. The gains shown are net of the option

exercise price, but do not include deductions for taxes and other expenses payable upon the exercise of the option or for sale of underlying shares of Common Stock. There can be no assurance that the amounts reflected in this table will be achieved.

(4)    The Company granted stock options representing approximately 20,606,000 shares of Common Stock to employees in the fiscal year ended December 31, 2003, and does not include stock options representing approximately 10,815,000 shares of Common Stock assumed by the Company in connection with its acquisitions of Inktomi Corporation and Overture Services, Inc.

(5)    One-fourth of the shares subject to the option vests on the first anniversary of the date of grant with remainder of the option vesting ratably each quarter thereafter.

23

## Aggregated Option Exercises in Last Fiscal Year and Fiscal Year End Option Values

The following table sets forth certain information with respect to stock options exercised by the Named Executive Officers during the fiscal year ended December 31, 2003. In addition, the table sets forth the number of shares covered by unexercised stock options held by the Named Executive Officers as of December 31, 2003, and the value of "in-the-money" stock options, which represents the positive spread between the exercise price of a stock option and the market price of the shares subject to such option as of December 31, 2003. The share numbers and share prices in the table and related footnotes have not been adjusted to give effect to the two for one stock split announced on April 7, 2004.

| Name | Number of Shares Acquired on Exercise (#) | Value Realized ($)(1) | Number of Securities Underlying Unexercised Options at Fiscal Year-End (#) | | Value of Unexercised In-the-Money Options at Fiscal Year-End ($)(2) | |
|---|---|---|---|---|---|---|
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Terry S. Semel | 1,000,000 | 25,405,002 | 7,824,998 | 4,975,002 | 199,329,359 | 64,801,638 |
| Susan L. Decker | 280,000 | 6,574,300 | 1,192,915 | 1,377,085 | 17,591,953 | 35,565,271 |
| Daniel L. Rosensweig | 219,125 | 4,063,450 | 389,208 | 1,116,667 | 11,677,832 | 30,164,635 |
| Farzad Nazem | 1,839,474 | 48,033,335 | 3,223,119 | 633,543 | 102,056,148 | 15,144,003 |
| Michael J. Callahan | 38,108 | 661,290 | 101,285 | 154,174 | 412,394 | 2,661,261 |
| Gregory Coleman | 224,675 | 4,270,176 | 189,908 | 385,417 | 4,314,728 | 10,349,574 |

(1)    The value realized represents the difference between the per share closing price of the Company's Common Stock on the day of exercise and the exercise price of the options, and does not necessarily indicate that the optionee sold such stock.

(2)    Value is based on the $45.03 per share closing price of the Company's Common Stock on the Nasdaq Stock Market on December 31, 2003, less the exercise price.

## Employment Contracts, Termination of Employment and Change in Control Arrangements

The Company has entered into an agreement with Mr. Nazem, our Executive Vice President, Engineering and Chief Technical Officer, that provides, in the event of certain change-in-control transactions, for the acceleration of options held by Mr. Nazem whereby each such option shall become exercisable to the extent of the number of shares that would otherwise vest if Mr. Nazem remained employed by the Company or its successor for two years after the effective date of the transaction, subject to certain conditions, including the optionee's acceptance of a comparable two-year employment contract with the acquiring party and certain non-competition agreements. The Company is party to an employment agreement with Mr. Coleman, pursuant to which, in lieu of a previously-granted mortgage subsidy, Mr. Coleman is entitled to a payment of $23,000 upon the first anniversary, $16,000 upon the second anniversary and $8,000 upon the third anniversary, of his closing escrow on the purchase of a home in the Bay Area. The payments will be grossed up with respect to taxes payable by Mr. Coleman and are conditioned upon the continued employment of Mr. Coleman with the Company. In April 2002, the Company entered into an employment agreement with Mr. Rosensweig to become Chief Operating Officer of the Company. Under the terms of the agreement, Mr. Rosensweig was to receive a base salary of at least $550,000 for the calendar year 2004. In 2003, Mr. Rosensweig waived his right to the $550,000 base salary for 2004, and the Compensation Committee has instead approved a base salary of $500,000 for 2004. In addition, Mr. Rosensweig received reimbursement of relocation expenses, including a loan from the Company to purchase a principal residence in the Bay Area in the principal amount of $1,000,000 (further described in "Certain Transactions" below) and a mortgage subsidy. The agreement also provides that, subject to certain conditions, Mr. Rosensweig will be entitled to an amount equal to 24 months of his then

24

base salary and a pro rata portion of his minimum annual bonus, in the event Mr. Rosensweig's employment with the Company is terminated prior to the second anniversary of his date of employment, without Cause, or Mr. Rosensweig terminates his employment for Good Reason, as such terms are defined in the agreement (Mr. Rosensweig's employment agreements were filed as an exhibit to the Company's quarterly report on Form 10-Q for the period ended June 30, 2002). In April 2002, we entered into a special retention bonus plan with Mr. Rosensweig under which Mr. Rosensweig will receive a $675,000 annual bonus payment in April 2003, a $525,000 annual bonus payment in April 2004 and a $150,000 annual bonus in April 2005 and 2006, if he is then employed by us. If, prior to the fourth anniversary of employment with the Company, Mr. Rosensweig's employment with the Company is terminated without Cause or Mr. Rosensweig terminates his employment for Good Reason, as such terms are defined in Mr. Rosensweig's employment agreement, Mr. Rosensweig will, subject to certain conditions, be entitled to receive the remaining retention bonus, which would have been available to him had Mr. Rosensweig remained employed through his fourth anniversary of employment with the Company. Mr. Rosensweig has elected to defer payment of each of these retention bonus payments until the fourth anniversary of his employment with the Company.

25

*Notwithstanding anything to the contrary set forth in any of the Company's filings under the Securities Act of 1933, as amended (the "Securities Act"), or the Securities Exchange Act of 1934, as amended (the "Exchange Act"), that might incorporate future filings, including this Proxy Statement, in whole or in part, the following Report of the Compensation Committee, the Audit Committee Report and the Stock Performance Graph which follows shall not be deemed to be "Soliciting Material," is not deemed "filed" with the SEC and shall not be incorporated by reference into any filings under the Securities Act or Exchange Act whether made before or after the date hereof and irrespective of any general incorporation language in such filing except to the extent that the Company specifically requests that the information be treated as soliciting material or specifically incorporates it by reference into a document filed under the Securities Act or the Exchange Act.*

## REPORT OF THE COMPENSATION COMMITTEE
## OF THE BOARD OF DIRECTORS ON EXECUTIVE COMPENSATION

During 2003, the Compensation Committee of the Company's board of directors consisted of Arthur H. Kern, Gary L. Wilson, and Eric Hippeau, who served as Chairman and was replaced by Robert A. Kotick in October 2003 as a member and Chairman of the Compensation Committee. The Compensation Committee, which is composed of non-employee directors, reviews, recommends and approves changes to the Company's compensation policies and benefits programs, administers the Company's stock option plans, including approving stock option grants, and otherwise seeks to ensure that the Company's

compensation philosophy is consistent with the Company's best interests and is properly implemented. During 2003 option grants for all executive officers were independently reviewed and approved by the Executive Officer Compensation Subcommittee of the board of directors, which consisted of Messrs. Kern and Wilson.

**Compensation Philosophy and Review**

The Company's compensation philosophy for executive officers serves two principal purposes: (i) to provide a total compensation package for executive officers that is competitive with the current market for executive talent and enables the Company to attract and retain key executive and employee talent needed to achieve the Company's business objectives and (ii) to link executive compensation to improvements in Company performance and increases in stockholder value as measured principally by the trading price of the Company's Common Stock.

To assist in the determination of executive compensation levels at the annual compensation review in December 2003, the Compensation Committee retained Frederic W. Cook & Co., an independent consulting firm, to advise the Compensation Committee on, among other matters, proprietary surveys and publicly available compensation information with respect to comparable Internet-related companies and other relevant companies. The Compensation Committee did not determine it necessary to, and did not attempt to, specifically analyze compensation levels at companies included in the index under the caption, "Performance Graph."

**Elements of Executive Officer Compensation**

The Company's executive compensation consists primarily of salary, incentive bonuses, a 401(k) plan, health insurance and similar benefits, and the award of stock options and restricted stock grants. The Company has in the past and continues to emphasize the award of stock options in its executive compensation policy. The Compensation Committee believes that in the highly competitive, emerging markets in which the Company operates, equity-based compensation is an important incentive for outstanding executive performance and encourages the alignment of management and stockholder long-term interests.

26

---

*Executive Officer Compensation.*

Base salaries are evaluated annually for all executive officers, including the Chief Executive Officer. In determining the appropriate salary levels for such officers, the Compensation Committee considers, among other factors, the officer's scope of responsibility, prior experience, past performance and data on prevailing compensation levels in relevant markets for executive talent. To determine annual bonus payments, the Compensation Committee considers individual performance as well as the extent to which the Company achieved its overall financial goals.

In determining Mr. Semel's compensation, the Compensation Committee reviewed Mr. Semel's compensation package in comparison with the compensation packages of Chief Executive Officers of selected technology and media companies. In March 2004, the Compensation Committee awarded Mr. Semel a bonus nonstatutory stock option grant for 900,000 shares of Common Stock in lieu of a cash bonus (the "Bonus Option"). The grant of the Bonus Option was based on the board's positive assessment of Mr. Semel's performance during the year and was also intended to provide incentive for future performance. The Bonus Option was fully vested and exercisable as of the grant date.

The Compensation Committee believes that the base salary levels and bonus payments to executive officers, including Mr. Semel's, during the year 2003 were at or below the median of base salary and bonus levels for comparable companies considered in the survey data and informal information reviewed by the Compensation Committee.

*Stock Option and Restricted Stock Grants.*

As noted above, the Company has in the past relied substantially on long-term equity-based compensation as an important means of compensating and incentivizing its executive officers. It is the Company's practice to set option exercise prices for officers at not less than 100% of the fair market value of the Common Stock on the date of grant. Thus, the value of the stockholders' investment in the Company must appreciate before an optionee receives any financial benefit from the

option. Options are generally granted for a term of ten years.

In determining the number of shares subject to the stock option grants to executive officers, the Compensation Committee considers various subjective factors primarily relating to the responsibilities of the individual officers, and relating to their expected future contributions, and the number of shares owned by the officer or which continue to be subject to vesting under outstanding options previously granted to such officer. In addition, the Compensation Committee examines the quantity and type of equity incentives held by each officer relative to the other officers' equity positions and their tenure, responsibilities, experience, and value to the Company. As part of the 2003 annual compensation review the Compensation Committee approved a grant to Mr. Semel of options to purchase 2,000,000 shares of the Company's Common Stock (the "Focal Option"), based upon, among other factors, the Compensation Committee's positive assessment of Mr. Semel's performance during 2003. The Compensation Committee noted in particular the Company's redefinition of its search business; the strengthening of the Company's core businesses, including premium services and advertising; the completion of a number of strategic alliances and acquisitions both domestically and internationally, including the acquisitions of Overture Services, Inc., Inktomi Corporation and 3721 Network Software Company Limited; and the Company's enhanced financial performance. The Focal Options will vest upon the fourth anniversary of the grant date; however, vesting may be accelerated upon the achievement of certain performance conditions.

Also as part of the 2003 annual compensation review, the Compensation Committee granted all of the Named Executive Officers of the Company as a group (excluding Mr. Semel) additional options to purchase an aggregate of 495,000 shares of the Company's Common Stock. These options generally vest ratably over a four-year period. The Compensation Committee also granted restricted stock awards of 45,000 shares of the Company's Common Stock each to three of the Company's executive officers. The restricted stock is subject to the Company's repurchase option, which lapses for each of the executive

27

officers, with respect to 35,000 shares, on the third anniversary of the grant date, and with respect to the remaining 10,000 shares, upon the satisfaction of certain performance-based objectives, but in no event prior to the first anniversary of the grant date.

## Policy on Deductibility of Compensation

Section 162(m) of the Internal Revenue Code limits the tax deductibility by a corporation of compensation in excess of $1 million paid to its Chief Executive Officer and any other of its four most highly compensated executive officers. However, compensation which qualifies as "performance-based" is excluded from the $1 million limit if, among other requirements, the compensation is payable only upon attainment of pre-established, objective performance goals under a plan approved by the corporation's stockholders.

It is the Company's policy to qualify, to the extent reasonable, its executive officers' compensation for deductibility under applicable tax law. However, the Company intends to retain the flexibility necessary to provide total cash compensation in line with competitive practice, the Company's compensation philosophy, and the Company's best interests and may from time to time pay compensation to its executive officers that may not be deductible.

By the Compensation Committee of the Board of Directors,

Robert A. Kotick (Chairman)
Arthur H. Kern
Gary L. Wilson

28

## AUDIT COMMITTEE REPORT

The audit committee of the Company's board of directors (the "Audit Committee") consists of four non-employee directors, Edward R. Kozel, as chairman, Roy J. Bostock, Arthur H. Kern and Gary L. Wilson, each of whom has been determined to be independent under the National Association of Securities Dealers' Listing Standards. The Audit Committee is a standing committee of the board of directors and operates under a written charter adopted by the board of directors, which is available on our website, *www.yahoo.com*. From our main Web page, first click on "Company Info" at the bottom of the page and then on "Investor Relations." Next click on "Corporate Governance" then "Board Committees" and "Audit Committee Charter." Among its other functions, the Audit Committee, subject to stockholder ratification, has the authority and responsibility to retain and terminate the engagement of the Company's independent auditors.

Management is responsible for the Company's internal controls and the financial reporting process. The independent auditors are responsible for performing an independent audit of the Company's consolidated financial statements in accordance with auditing standards generally accepted in the United States and to issue a report thereon. The Audit Committee's responsibility is to monitor and oversee these processes.

During fiscal 2003, at each of its meetings, the Audit Committee met with the senior members of the Company's financial management team and the independent auditors. The Audit Committee's agenda is established by the Audit Committee's chairman and senior members of the Company's financial management team. The Audit Committee met in private sessions with the Company's independent auditors at certain of its meetings, and also separately with the Company's head of internal audit, without management representation, to discuss financial management, accounting and internal control issues. The Audit Committee has reviewed with management and the independent auditors the audited consolidated financial statements in the Company's Annual Report on Form 10-K for the year ended December 31, 2003, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments and the clarity of disclosures in the consolidated financial statements. Management represented to the Audit Committee that the Company's consolidated financial statements were prepared in accordance with generally accepted accounting principles. The Audit Committee discussed with the independent auditors matters required to be discussed by Statement on Auditing Standards No. 61, "Communication with Audit Committees."

The Company's independent auditors also provided to the Audit Committee the written disclosures and the letter required by Independence Standards Board Standard No. 1, "Independence Discussions with Audit Committees." The Committee discussed with the independent auditors that firm's independence and considered whether the non-audit services provided by the independent auditors are compatible with maintaining its independence.

Based on the Audit Committee's discussion with management and the independent auditors, and the Audit Committee's review of the representation of management and the report of the independent auditors to the Audit Committee, the Audit Committee recommended that the board of directors include the audited consolidated financial statements in the Company's Annual Report on Form 10-K for the year ended December 31, 2003 filed with the Securities and Exchange Commission.

Submitted by the Audit Committee of the Company's Board of Directors,

Edward R. Kozel (Chairman)
Roy J. Bostock
Arthur H. Kern
Gary L. Wilson

29

---

## FEES BILLED FOR SERVICES RENDERED BY PRINCIPAL AUDITORS

For the fiscal year ended December 31, 2003, PricewaterhouseCoopers LLP, our independent auditors, billed the approximate fees set forth below.

### Audit Fees

Aggregate fees consist of fees billed for professional services rendered for the audit of Yahoo!'s consolidated financial statements and review of the interim condensed consolidated financial statements included in quarterly filings and services

that are normally provided by PricewaterhouseCoopers LLP in connection with statutory and regulatory filings or engagements, except those not required by statute or regulation. Aggregate fees for audit services were $3.4 million and $1.8 million during the years ended December 31, 2003 and 2002, respectively.

**Audit-Related Fees**

Audit-related fees consist of fees billed for assurance and related services that are reasonably related to the performance of the audit or review of Yahoo!'s consolidated financial statements and are not reported under "Audit Fees." These services include accounting consultations and due diligence in connection with acquisitions and consultations concerning financial accounting and reporting standards. Aggregate fees for audit-related services were $1.2 million and $0.9 million during the years ended December 31, 2003 and 2002, respectively.

**Tax Fees**

Tax fees consist of fees billed for professional services related to federal, state and international tax compliance, assistance with tax audits and appeals and assistance related to the impact of acquisitions. Aggregate fees for tax services were $1.9 million and $0.9 million during the years ended December 31, 2003 and 2002, respectively.

**All Other Fees**

All other fees consist of fees for all other services other than those reported above. Aggregate fees for services other than those reported in the above three categories were $0 and $30,000 (principally relating to financial information systems design and implementation), during the years ended December 31, 2003 and 2002, respectively.

The Audit Committee has adopted certain policies and procedures regarding permitted audit and non-audit services and the annual pre-approval of such services. Each year, the Audit Committee will ratify the types of audit and non-audit services to which the Company management may wish to avail itself, subject to pre-approval of specific services. Each year, management and the independent auditors will jointly submit a pre-approval request, which will list each known and/or anticipated audit and non-audit service for the upcoming calendar year and which will include associated budgeted fees. The Audit Committee will review the requests and approve a list of annual pre-approved non-audit services. The Audit Committee will also designate a member (currently Mr. Kozel, the Audit Committee Chairman) to have the authority to pre-approve interim requests for additional non-audit services that were not contained in the annual pre-approval request. Such member shall approve or reject any interim non-audit service requests and report any interim service pre-approvals at the following Audit Committee meeting.

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

The following non-employee directors serve on the Compensation Committee: Arthur H. Kern, Robert A. Kotick and Gary L. Wilson. None of the members of the Compensation Committee during fiscal 2003 was (i) an officer or employee of the Company or any of its subsidiaries (ii) was formerly an officer of

30

the Company or any of its subsidiaries or (iii) had any relationships requiring disclosure by the Company under the SEC's rules requiring disclosure of related party transactions.

**Yahoo! Japan**

SOFTBANK America, Inc. is a wholly-owned subsidiary of SOFTBANK Holdings, which is a wholly-owned subsidiary of SOFTBANK Corp. ("SOFTBANK"). In April 1996, the Company and SOFTBANK signed a joint venture agreement, which was amended in September 1997, whereby Yahoo! Japan Corporation ("Yahoo! Japan") was formed to develop and operate a version of the Yahoo! Internet Guide localized for Japan. As of September 30, 2003, the Company owned approximately 34% and SOFTBANK owned approximately 42% of the equity of Yahoo! Japan. Yahoo! Japan became a public company in November 1997. Contemporaneous with entering into the joint venture agreement, in

April 1996, the Company entered into a license agreement with Yahoo! Japan, whereby the Company licenses certain uses of the Yahoo! brand and business model to Yahoo! Japan on an exclusive basis in Japan in exchange for licensing fees. Pursuant to the terms of the license agreement, Yahoo! Japan pays to the Company a fixed percentage of Yahoo! Japan net revenues. During 2003, the Company received payments from Yahoo! Japan totaling approximately $13.4 million under the licensing agreement. Jerry Yang, (an executive officer and a Director of the Company) is a member of the board of directors of Yahoo! Japan. In 2003, as an outside director of Yahoo! Japan, Mr. Yang received options to purchase 10 shares of common stock of Yahoo! Japan and approximately $90,000 for the performance of his duties as a director.

In May 2003, the Company entered into a consulting services agreement with Yahoo! Japan, pursuant to which Yahoo! Japan paid the Company approximately $57,330 in 2003.

In November 2002, a subsidiary of Overture, which was acquired by the Company in October 2003, entered into a contract with Yahoo! Japan pursuant to which Overture provides Yahoo! Japan with paid search listings and pays to Yahoo! Japan a share of the revenues generated from the listings. In 2003, Overture paid Yahoo! Japan approximately $8.8 million under this agreement.

**Yahoo! Korea**

In August 1997, the Company, Yahoo! Japan, Softbank Korea and SOFTBANK entered into a joint venture agreement whereby Yahoo! Korea Corporation ("Yahoo! Korea") was formed to develop and operate a version of the Yahoo! Internet Guide localized for Korea, develop related online navigational services, and conduct related business. The Company owns approximately 67% of Yahoo! Korea. In addition to the joint venture agreement, in November 1997, the Company entered into a license agreement with Yahoo! Korea, whereby the Company licenses certain uses of the Yahoo! brand and business model to Yahoo! Korea on an exclusive basis in Korea in exchange for licensing fees. Pursuant to the terms of the license agreement, Yahoo! Korea pays to the Company a fixed percentage of Yahoo! Korea net revenues. During 2003, the Company received payments from Yahoo! Korea totaling approximately $2.3 million under the licensing agreement.

**Yahoo! Europe**

The Company and SOFTBANK Europe Holdings, Inc. ("SOFTBANK EU HOLDINGS") entered into a joint venture agreement, dated November 1996, whereby Yahoo! UK Ltd. ("Yahoo! UK"), Yahoo! France SAS ("Yahoo! France") and Yahoo! Deutschland Gmbh ("Yahoo! Deutschland") were formed to create localized versions of the Yahoo! Internet Guide for European users. Contemporaneous with entering into the joint venture agreement in November 1996, the Company entered into licensing agreements with Yahoo! UK, Yahoo! France and Yahoo! Deutschland, whereby the Company licenses certain uses of the Yahoo! brand and business model to Yahoo! UK, Yahoo! France and Yahoo! Deutschland, in their respective markets on an exclusive basis in exchange for a fixed annual payment. The Company owns approximately 70% of Yahoo! UK, Yahoo! France and Yahoo! Deutschland.

31

**Other Information**

Investment funds affiliated with Sequoia Capital are stockholders of Internet Wire Incorporated ("Internet Wire") and Google Inc. ("Google"). Michael Moritz, a general partner of Sequoia Capital, serves as a director of Google and served as a director of Yahoo! until March 2003. The Company engaged in the following transactions with these companies in 2003:

In June 2000, the Company entered into an agreement with Google, which was subsequently extended in June 2002 and amended in July 2002 and April 2003, pursuant to which Google provided web search services and the Company provided branding and promotional services. The Company paid Google approximately $13.2 million in 2003 in connection with this agreement.

In August 2000, the Company entered into an agreement with Internet Wire pursuant to which Internet Wire distributes content to the Company. This agreement was amended in June 2003. Under these agreements, Internet Wire paid the Company approximately $234,000 in 2003.

Mr. Burkle, one of our directors, is the founder and managing partner of The Yucaipa Companies. The Yucaipa Companies is a stockholder of the Alliance Entertainment Corp., which is affiliated with AEC One Stop Group, Inc. ("AEC"). In November 1999, the Company and AEC entered into a content license agreement, which was amended in May, October and December of 2001 and in March 2003, pursuant to which the Company paid AEC approximately $231,000 in 2003.

Mr. Hippeau, one of our directors, is a Managing Partner of SOFTBANK Capital Partners, an affiliate of SOFTBANK. In March 2004, SOFTBANK and the Company entered into an agreement that provided that, so long as SOFTBANK directly or indirectly owns or controls any shares of Company Common Stock, SOFTBANK shall, at the Company's direction, either vote or cause to be voted such shares of Company Common Stock in accordance with any written voting recommendation of the Company's Board of Directors or grant a proxy to the Company entitling the Company to vote or cause to be voted such shares in proportion to the votes cast by the other stockholders of the Company.

See Proposal No. 1 "Election of Directors" for a discussion of certain information with respect to all outside directors, including directors serving on the Compensation Committee.

The Company believes that all of the transactions set forth above were made on terms no less favorable to the Company than terms that could have been obtained from unaffiliated third parties. Consistent with applicable law, the Company has established a policy that requires that all transactions between the Company and its officers, directors and principal stockholders and their affiliates must be approved by an independent body of the board of directors and will be on terms no less favorable to the Company than could be obtained from unaffiliated third parties.

## LEGAL PROCEEDINGS

As disclosed in our annual report on Form 10-K for the year ended December 31, 2003, filed with the SEC on February 27, 2004, on or about February 4, 2004, a shareholder derivative action was filed in the Court of Chancery of the State of Delaware in and for New Castle County, against the Company (as nominal defendant) and certain of its current and former officers and directors, including current directors Jerry Yang, Eric Hippeau, Arthur H. Kern and Edward R. Kozel (the "Derivative Defendants"). Two similar shareholder derivative actions were filed in the California Superior Court for the County of San Mateo on February 13, 2004. The complaints generally allege breaches of fiduciary duties by the Derivative Defendants related to the alleged purchase of shares in initial public offerings or the alleged acquiescence in such conduct. The complaints seek unspecified monetary damages and other relief purportedly on behalf of the Company from the Derivative Defendants. The Company understands the Derivative Defendants deny any impropriety and intend to defend the lawsuits vigorously. The Company does not believe that the ultimate costs to resolve these matters will have a material adverse effect on its financial condition, results of operations or cash flows. In addition, the Company believes there are procedural defects to permitting these complaints to proceed on its behalf.

## PERFORMANCE GRAPH

The following graph compares, for the five year period ending December 31, 2003, the cumulative total stockholder return for the Company, the Nasdaq Stock Market (U.S. companies) Index (the "Nasdaq Market Index"), the Goldman Sachs Internet Index (the "GIN") and the Standard & Poor's 500 Stock Index (the "S&P 500 Stock Index"). Measurement points are the last trading day of each of the Company's fiscal years ended December 31, 1998, December 31, 1999, December 29, 2000, December 31, 2001, December 31, 2002 and December 31, 2003. The graph assumes that $100 was invested on December 31, 1998 in the Common Stock of the Company, the Nasdaq Market Index, the GIN and the S&P 500 Stock Index and assumes reinvestment of any dividends. The stock price performance on the following graph is not necessarily indicative of future stock price performance.



| Measurement Point | Yahoo! Inc. | Nasdaq Market Index | GIN | S&P 500 Index |
|---|---|---|---|---|
| 12/31/1998 | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 |
| 12/31/1999 | $ 365.23 | $ 185.59 | $ 210.31 | $ 119.53 |
| 12/29/2000 | $ 50.75 | $ 112.67 | $ 53.62 | $ 107.41 |
| 12/31/2001 | $ 29.95 | $ 88.95 | $ 30.98 | $ 93.40 |
| 12/31/2002 | $ 27.60 | $ 60.91 | $ 22.05 | $ 71.57 |
| 12/31/2003 | $ 76.02 | $ 91.37 | $ 42.71 | $ 90.46 |

33

---

## CERTAIN TRANSACTIONS

The Company has entered into indemnification agreements with each of its directors and executive officers. These agreements require the Company to indemnify such individuals, to the fullest extent permitted by Delaware law, for certain liabilities to which they may become subject as a result of their affiliation with the Company.

In April 2002, in connection with his relocation to California as a result of his joining Yahoo!, Mr. Rosensweig, our Chief Operating Officer, entered into a non-interest bearing term loan with us in the principal amount of $1,000,000. The loan to Mr. Rosensweig is secured by his principal place of residence. Payment of the entire principal of $1,000,000 is due on April 30, 2006. The maximum indebtedness of Mr. Rosensweig to us during 2003 was $1,000,000.

In December 2003, each of Ms. Decker and Messrs. Rosensweig and Nazem entered into agreements with the Company pursuant to which such individuals received 45,000 shares of the Company's Common Stock, subject to the Company's right of repurchase (the "Restricted Stock"). Each agreement provides that the Company's right of repurchase shall lapse (1) with

respect to 35,000 shares of the Restricted Stock, on the third anniversary of the grant date and (2) with respect to the remaining 10,000 shares of Restricted Stock, upon the satisfaction of certain performance-based objectives, but in no event prior to the first anniversary of the grant date.

Certain other transactions are described under the caption "Compensation Committee Interlocks and Insider Participation."

## STOCKHOLDER PROPOSALS FOR 2005 ANNUAL STOCKHOLDERS' MEETING

Proposals of stockholders intended to be included in the Company's Proxy Statement for the Company's 2005 Annual Meeting of Stockholders pursuant to Rule 14a-8 under the Exchange Act must be received by Yahoo! Inc., Attn: Secretary at 701 First Avenue, Sunnyvale, California 94089 no later than December 10, 2004. In order for proposals of stockholders made outside of Rule 14a-8 under the Exchange Act to be considered "timely" within the meaning of Rule 14a-4(c) under the Exchange Act, such proposals must be received by the Secretary at the above address by February 23, 2005. The Company's Bylaws require that proposals of stockholders intended to be considered at the 2005 Annual Meeting of Stockholders but not included in the Company's Proxy Statement for that meeting be received by the Company at the above address no earlier than February 20, 2005 and no later than March 22, 2005; provided, however, if the 2005 Annual Meeting is held earlier than April 21, 2005 or later than July 20, 2005, proposals must be received no earlier than the 90th day prior to the date of the 2005 Annual Meeting and no later than the 60th day prior to the date of the 2005 Annual Meeting or the 10th day following the day on which public announcement of the date of the 2005 Annual Meeting is first made.

## HOUSEHOLDING

As permitted by applicable law, only one copy of this Proxy Statement is being delivered to stockholders residing at the same address, unless such stockholders have notified the Company of their desire to receive multiple copies of the Proxy Statement.

The Company will promptly deliver, upon oral or written request, a separate copy of the Proxy Statement to any stockholder residing at an address to which only one copy was mailed. Requests for additional copies should be directed to Investor Relations, Yahoo! Inc., 701 First Avenue, Sunnyvale, California 94089 or by telephone at (408) 349-3300.

Stockholders who share an address can request the delivery of a single copy of this Proxy Statement or a single copy of the Company's annual report upon written request. Such request should be directed to Investor Relations, Yahoo! Inc., 701 First Avenue, Sunnyvale, California 94089.

34

## OTHER MATTERS

The board of directors knows of no other business that will be presented at the Annual Meeting. If any other business is properly brought before the Annual Meeting, proxies in the enclosed form will be voted in respect thereof as the proxy holders deem advisable.

It is important that the proxies be returned promptly and that your shares be represented. Stockholders are urged to mark, date, sign and promptly return the accompanying proxy card in the enclosed envelope or vote their shares by telephone or over the Internet.

The form of proxy and this Proxy Statement have been approved by the board of directors and are being mailed and delivered to stockholders by its authority.

By Order of the Board of Directors,

Michael J. Callahan
*Senior Vice President, General Counsel and Secretary*

Sunnyvale, California
April 9, 2004

35

---

**YAHOO! INC.**
**AMENDED AND RESTATED**
**1996 EMPLOYEE STOCK PURCHASE PLAN**

**(as amended and restated February 27, 2001 and subsequently amended and restated April 1, 2004, and after giving effect to the two for one stock split announced on April 7, 2004)**

The following constitute the provisions of the Amended and Restated 1996 Employee Stock Purchase Plan of Yahoo! Inc., as amended and restated April 1, 2004.

1.  *Purpose.*   The purpose of the Plan is to provide employees of the Company and its Designated Subsidiaries with an opportunity to purchase Common Stock of the Company. It is the intention of the Company to have the Plan qualify as an "Employee Stock Purchase Plan" under Section 423 of the Internal Revenue Code of 1986, as amended. The provisions of the Plan shall, accordingly, be construed so as to extend and limit participation in a manner consistent with the requirements of that section of the Code.

2.  *Definitions.*

   (a)   "*Board*" shall mean the Board of Directors of the Company.

   (b)   "*Code*" shall mean the Internal Revenue Code of 1986, as amended.

   (c)   "*Common Stock*" shall mean the Common Stock of the Company.

   (d)   "*Company*" shall mean Yahoo! Inc., a Delaware corporation.

   (e)   "*Compensation*" shall mean, effective as of May 1, 2004, the total compensation paid to an Employee, including all salary, wages (including amounts elected to be deferred by the Employee, that would otherwise have been paid, under any cash or deferred arrangement or other deferred compensation program established by the Company), overtime pay, commissions, bonuses, and other remuneration paid directly to the Employee, but excluding referral and hiring bonuses, profit sharing, the cost of employee benefits paid for by the Company, education, tuition or other similar reimbursements, imputed income arising under any Company group insurance or benefit program, traveling expenses, business and moving expense reimbursements, income received in connection with stock options, restricted stock grants, or other equity based awards, contributions made by the Company under any employee benefit plan, and similar items of compensation. For all periods prior to May 1, 2004, "Compensation" shall mean all regular straight time gross earnings and commissions, and shall not include payments for overtime, shift premium, incentive compensation, incentive payments, bonuses and other compensation.

(f)    "*Continuous Status as an Employee*" shall mean the absence of any interruption or termination of service as an Employee. Continuous Status as an Employee shall not be considered interrupted in the case of a leave of absence agreed to in writing by the Company, provided that such leave is for a period of not more than 90 days or reemployment upon the expiration of such leave is guaranteed by contract or statute.

(g)    "*Contributions*" shall mean all amounts credited to the account of a participant pursuant to the Plan.

(h)    "*Designated Subsidiaries*" shall mean the Subsidiaries which have been designated by the Board from time to time in its sole discretion as eligible to participate in the Plan.

(i)    "*Employee*" shall mean any person, including an Officer, who is customarily employed for at least twenty (20) hours per week and more than five (5) months in a calendar year by the Company or one of its Designated Subsidiaries.

A-1

---

(j)    "*Exchange Act*" shall mean the Securities Exchange Act of 1934, as amended.

(k)    "*Fair Market Value*" shall have the meaning set forth in Section 7(b).

(l)    "*Offering Date*" shall mean the first business day of each Offering Period of the Plan, except that in the case of an individual who becomes an eligible Employee or who begins to participate in an Offering Period after the first business day of an Offering Period, the term "Offering Date" with respect to such individual means the first business day of the first Purchase Period in which such individual participates within the Offering Period. Options granted after the first business day of an Offering Period will be subject to the same terms and conditions as the options granted on the first business day of such Offering Period except that they will have a different grant date (and thus, potentially, a different Purchase Price) and, because they expire at the same time as the options granted on the first business day of such Offering Period, a shorter term.

(m)    "*Offering Period*" shall mean, with respect to Offering Periods beginning prior to July 1, 2001, a period of six (6) months commencing on January 1 and July 1 of each year, except for the first Offering Period as set forth in Section 4(a). The Offering Period commencing on July 1, 2001 shall end on April 30, 2003 and thereafter Offering Periods shall commence on May 1 and end on the April 30 twenty-four (24) months thereafter; provided, however, that if the Fair Market Value of the Common Stock on a Purchase Date is lower than the Fair Market Value of the Common Stock on the first business day of the Offering Period, the Offering Period then in progress will terminate and a new Offering Period shall commence on the next May 1 or November 1, as applicable, and shall extend for a twenty-four (24) month period ending on April 30 or October 31, as applicable.

(n)    "*Officer*" shall mean a person who is an officer of the Company within the meaning of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder.

(o)    "*Plan*" shall mean this Employee Stock Purchase Plan.

(p)    "*Purchase Date*" shall mean, with respect to Offering Periods beginning prior to July 1, 2001, the last business day of each Offering Period of the Plan and shall mean, with respect to Offering Periods beginning after such date, the last business day of each Purchase Period occurring within the Offering Period.

(q)    "*Purchase Period*" shall mean, with respect to Offering Periods beginning prior to July 1, 2001, a period of six (6) months coincident with the Offering Period, except for the first Purchase Period of the first Offering Period as set forth in Section 4(b) which Purchase Period shall be coincident with such first Offering Period, and with respect to Offering Periods commencing on and after July 1, 2001, a period of six (6) months within an Offering Period commencing on each May 1 and November 1 and ending on October 31 and April 30 respectively, except for the first Purchase Period within the Offering Period commencing on July 1, 2001, which Purchase Period shall commence on July 1, 2001 and end on October 31, 2001.

(r)  "*Purchase Price*" shall mean, (i) with respect to Offering Periods beginning prior to July 1, 2001, an amount equal to 85% of the Fair Market Value of a Share of Common Stock on the Offering Date or on the Purchase Date, whichever is lower; and (ii) with respect to a Purchase Period occurring in an Offering Period beginning on and after July 1, 2001, an amount equal to 85% of the Fair Market Value of a Share of Common Stock on the Offering Date or on the Purchase Date, whichever is lower, provided however that in the event (A) of any increase in the number of Shares available for issuance under the Plan as a result of a stockholder-approved amendment to the Plan, and (B) all or a portion of such additional Shares are to be issued with respect to an Offering Period that is underway at the time of such increase ("*Additional Shares*"), and (C) the Fair Market Value of a Share of Common Stock on the date of such stockholder approval (the "*Approval Date Fair Market Value*") is higher than the Fair Market Value on the Offering Date for any such Offering Period, then in such instance the Purchase Price with respect to Additional Shares shall be 85% of the Approval Date Fair Market

A-2

---

Value or the Fair Market Value of a Share of Common Stock on the Purchase Date, whichever is lower.

(s)  "*Share*" shall mean a share of Common Stock, as adjusted in accordance with Section 19 of the Plan.

(t)  "*Subsidiary*" shall mean a corporation, domestic or foreign, of which not less than 50% of the voting shares are held by the Company or a Subsidiary, whether or not such corporation now exists or is hereafter organized or acquired by the Company or a Subsidiary.

3.  *Eligibility.*

(a)  Any person who is an Employee as of the beginning of any Purchase Period of a given Offering Period shall be eligible to participate in such Offering Period under the Plan, subject to the requirements of Section 5(a) and the limitations imposed by Section 423(b) of the Code.

(b)  Any provisions of the Plan to the contrary notwithstanding, no Employee shall be granted an option under the Plan (i) if, immediately after the grant, such Employee (or any other person whose stock would be attributed to such Employee pursuant to Section 424(d) of the Code) would own stock and/or hold outstanding options to purchase stock possessing five percent (5%) or more of the total combined voting power or value of all classes of stock of the Company or of any subsidiary of the Company, or (ii) if such option would permit his or her rights to purchase stock under all employee stock purchase plans (described in Section 423 of the Code) of the Company or its Subsidiaries to accrue at a rate which exceeds Twenty-Five Thousand Dollars ($25,000) of Fair Market Value of such stock (determined at the time such option is granted) for each calendar year in which such option is outstanding at any time.

4.  *Offering Periods and Purchase Periods.*

(a)  *Offering Periods.*

(i)  With respect to Offering Periods beginning prior to July 1, 2001, the Plan was implemented by a series of Offering Periods of six (6) months duration, other than the first Offering Period, with new Offering Periods commencing on or about January 1 and July 1 of each year (or at such other time or times as may have been determined by the Board of Directors). The first Offering Period during this period commenced on the beginning of the effective date of the Registration Statement on Form S-1 for the initial public offering of the Company's Common Stock (the "IPO Date") and continued until December 31, 1996.

(ii)  With respect to Offering Periods beginning on and after July 1, 2001, the Plan shall be implemented by a series of Offering Periods of approximately twenty-four (24) months duration, other than the Offering Period commencing on July 1, 2001. The Offering Period commencing July 1, 2001 had a duration of approximately twenty-two (22) months and continued until April 30, 2003.

(iii)  The Plan shall continue until terminated in accordance with Section 19 hereof. The Board of

Directors of the Company shall have the power to change the duration and/or the frequency of Offering Periods with respect to future offerings without shareholder approval if such change is announced at least fifteen (15) days prior to the scheduled beginning of the first Offering Period to be affected.

(b)   *Purchase Periods.*   Each Offering Period beginning prior to July 1, 2001 had a six (6) month Purchase Period coincident with such Offering Period. Each Offering Period commencing on and after July 1, 2001 shall consist of four (4) consecutive Purchase Periods of approximately six (6) months' duration commencing on May 1 and November 1 of each year, except the first Purchase Period of the Offering Period that commenced on July 1, 2001, which was of approximately four (4) months

A-3

duration commencing on July 1, 2001 and ending on October 31, 2001. The last business day of each Purchase Period shall be the Purchase Date for such Purchase Period. A Purchase Period commencing on May 1 shall end on the next October 31 and a Purchase Period commencing on November 1 shall end on the next April 30. The Board of Directors of the Company shall have the power to change the duration and/or frequency of Purchase Periods with respect to future purchases without stockholder approval if such change is announced at least five (5) days prior to the scheduled beginning of the first Purchase Period to be affected.

5.   *Participation.*

(a)   An eligible Employee may become a participant in the Plan by completing a subscription agreement on the form provided by the Company and filing it with the Company's payroll office prior to the applicable Offering Date, unless a later time for filing the subscription agreement is set by the Board for all eligible Employees with respect to a given offering. The subscription agreement shall set forth the percentage of the participant's Compensation (subject to Section 6(a) below) to be paid as Contributions pursuant to the Plan.

(b)   Payroll deductions shall commence on the first payroll following the Offering Date and shall end on the last payroll paid on or prior to the Purchase Date of the Offering Period to which the subscription agreement is applicable, unless the Employee's participation is sooner terminated as provided in Section 10.

6.   *Method of Payment of Contributions.*

(a)   The participant shall elect to have payroll deductions made on each payday during the Offering Period in an amount not less than one percent (1%) and not more than fifteen percent (15%) of such participant's Compensation on each such payday (or such other maximum percentage as the Board may establish from time to time before an Offering Date). All payroll deductions made by a participant shall be credited to his or her account under the Plan. A participant may not make any additional payments into such account.

(b)   A participant may discontinue his or her participation in the Plan as provided in Section 10, or, on one occasion only during the Offering Period (in the case of Offering Periods beginning prior to July 1, 2001) or during the Purchase Period (in the case of Offering Periods beginning on and after July 1, 2001), may decrease the rate of his or her Contributions during the applicable Period by completing and filing with the Company a new subscription agreement. The change in rate shall be effective as of the beginning of the next calendar month following the date of filing of the new subscription agreement, if the agreement is filed at least ten (10) business days prior to such date and, if not, as of the beginning of the next succeeding calendar month. For Offering Periods beginning on and after July 1, 2001, a participant may change the rate of his or her Contributions effective as of the beginning of any Purchase Period within such Offering Period by filing a new subscription agreement at least ten (10) business days prior to the beginning of such Purchase Period.

(c)   Notwithstanding the foregoing, to the extent necessary to comply with Section 423(b)(8) of the Code and Section 3(b) herein, a participant's payroll deductions may be decreased to 0% at any time during an Offering or Purchase Period, as applicable. Payroll deductions shall re-commence at the rate provided in such participant's subscription Agreement at the beginning of the first Offering or Purchase Period, as applicable, which is scheduled to end in the following calendar year, unless the participant's participation is terminated as provided in Section 10. In addition, a participant's payroll deductions may be decreased by the Company to 0% at any time during a Purchase

Period in order to avoid unnecessary payroll contributions as a result of application of the maximum Share limit set forth in Section 7(a), or as a result of the limitations set forth in Section 3(b), in which case payroll deductions shall re-commence at the rate provided in such participant's subscription agreement at the beginning of the next Purchase Period, unless terminated by the participant as provided in Section 10.

A-4

(d)   At the time the option is exercised, in whole or in part, or at the time some or all of the Company's Common Stock issued under the Plan is disposed of, the participant must make adequate provision for the Company's federal, state, or other tax withholding obligations, if any, which arise upon the exercise of the option or the disposition of the Common Stock. At any time, the Company may, but shall not be obligated to, withhold from the participant's compensation the amount necessary for the Company to meet applicable withholding obligations, including any withholding required to make available to the Company any tax deductions or benefits attributable to sale or early disposition of Common Stock by the participant.

7.   *Grant of Option.*

(a)   On the Offering Date of each Offering Period, each eligible Employee participating in such Offering Period shall be granted an option to purchase on any Purchase Date occurring within the Offering Period a number of Shares determined by dividing such Employee's Contributions accumulated prior to such Purchase Date and retained in the participant's account as of the Purchase Date by the applicable Purchase Price; provided however, that the maximum number of Shares an Employee may purchase during each Offering Period (with respect to Offering Periods beginning prior to July 1, 2001) and each Purchase Period (with respect to Offering Periods beginning on and after July 1, 2001) shall be in each case 10,000 Shares, subject to adjustment as provided in Section 18, and provided further that such purchase shall be subject to the limitations set forth in Sections 3(b) and 12.

(b)   The fair market value of the Company's Common Stock on a given date (the "*Fair Market Value*") means, as of any date, the value of Common Stock determined by the Board in its discretion provided that, to the extent the Common Stock is trading on the Nasdaq National Market (or a stock exchange), (A) the Fair Market Value as of an Offering Date shall be the closing sales price of the Common Stock as reported by the Nasdaq National Market (or the closing sales price on such stock exchange) for the last business day immediately preceding the Offering Date, and (B) the Fair Market Value of the Common Stock as of a Purchase Date shall be the closing sales price of the Common Stock as reported on the Nasdaq National Market (or the closing sales price on such stock exchange) for the Purchase Date, in each case as reported in *The Wall Street Journal*. For purposes of the Offering Date under the first Offering Period under the Plan, the Fair Market Value of a Share shall be the Price to the public as set forth in the final prospectus filed with the Securities and Exchange Commission pursuant to Rule 424 under the Securities Act of 1933, as amended.

8.   *Exercise of Option.*

(a)   Unless a participant's participation is terminated as provided in Section 10, his or her option for the purchase of Shares will be exercised automatically on each applicable Purchase Date of an Offering Period, and the maximum number of full Shares subject to the option will be purchased at the applicable Purchase Price with the accumulated Contributions in his or her account (subject to such limitations as are specified in the Plan). The Shares purchased upon exercise of an option hereunder shall be deemed to be transferred to the participant on the Purchase Date. During his or her lifetime, a participant's option to purchase Shares hereunder is exercisable only by him or her.

(b)   No fractional Shares shall be purchased. Any payroll deductions accumulated in a participant's account which are not sufficient to purchase a full Share shall be retained in the participant's account for the subsequent Purchase Period or Offering Period, subject to earlier withdrawal by the participant or termination of such participant's participation as provided in Section 10 below. Any other amounts left over in a participant's account after a Purchase Date shall be returned to the participant.

9.   *Delivery.*   As promptly as practicable after each Purchase Date of each Offering Period, the Company shall arrange the delivery to each participant, as appropriate, of a certificate representing the

A-5

---

Shares purchased upon exercise of his or her option. Notwithstanding the foregoing, the Board may require that all Shares purchased under the Plan be held in an account (the participant's "*ESPP Stock Account*") established in the name of the participant (or in the name of the participant and his or her spouse, as designated by the participant on his or her subscription agreement), subject to such rules as determined by the Board and uniformly applied to all participants, including designation of a brokerage or other financial services firm (an "*ESPP Broker*") to hold such Shares for the participant's ESPP Stock Account with registration of such Shares in the name of such ESPP Broker for the benefit of the participant (or for the benefit of the participant and his or her spouse, as designated by the participant on his or her subscription agreement).

10.    *Voluntary Withdrawal; Termination of Employment.*

(a)    A participant may withdraw all but not less than all the Contributions credited to his or her account under the Plan at any time prior to the Purchase Date of the Offering Period by giving written notice to the Company. All of the participant's Contributions credited to his or her account will be paid to him or her promptly after receipt of his or her notice of withdrawal and his or her option for the current period will be automatically terminated, and no further Contributions for the purchase of Shares will be made during the Offering Period.

(b)    Upon termination of the participant's Continuous Status as an Employee prior to the Purchase Date of an Offering Period for any reason, including retirement or death, the Contributions credited to his or her account will be returned to him or her or, in the case of his or her death, to the person or persons entitled thereto under Section 14, and his or her option will be automatically terminated.

(c)    In the event an Employee fails to remain in Continuous Status as an Employee of the Company for at least twenty (20) hours per week during the Offering Period in which the Employee is a participant, unless such Employee is on an approved leave of absence or a temporary reduction of hours, he or she will be deemed to have elected to withdraw from the Plan and the Contributions credited to his or her account will be returned to him or her and his or her option terminated.

(d)    A participant's withdrawal from an offering will not have any effect upon his or her eligibility to participate in a succeeding offering or in any similar plan which may hereafter be adopted by the Company.

(e)    *Automatic Withdrawal*. With respect to Offering Periods commencing on and after July 1, 2001, and to the extent permitted by any applicable laws, regulations or stock exchange rules, if the Fair Market Value of the Shares on a Purchase Date within an Offering Period then in progress is lower than was the Fair Market Value of the Shares on the first business day of such Offering Period, then every participant in such Offering Period shall automatically be deemed (i) to have withdrawn from such Offering Period at the close of the Purchase Period ending on such Purchase Date, and (ii) to have enrolled in a new Offering Period commencing on the next November 1 or May 1, as applicable, in accordance with Section 2(m). In addition, if the Fair Market Value of the Shares on a Purchase Date within an Offering Period then in progress is lower than the Fair Market Value of the Shares on the Offering Date with respect to an individual who began participation in an Offering Period after the first business day of an Offering Period, such individual shall be automatically deemed (x) to have withdrawn from such Offering Period at the close of the Purchase Period ending on such Purchase Date, and (ii) to have enrolled in the Plan as of the beginning of the next Purchase Period to commence within such Offering Period, with such individual having a new Offering Date in accordance with Section 2(l).

A-6

---

11.    *Interest.*    No interest shall accrue on the Contributions of a participant in the Plan.

12.    *Stock.*

(a)   Subject to adjustment as provided in Section 18, the maximum number of Shares of the Company's Common Stock which shall be made available for sale under the Plan shall be 30,000,000 Shares.

(b)   If the Board determines that, on a given Purchase Date, the number of Shares with respect to which options are to be exercised may exceed (i) the number of Shares that were available for sale under the Plan on the Offering Date of the applicable Offering Period, or (ii) the number of Shares available for sale under the Plan on such Purchase Date, the Board may in its sole discretion provide (x) that the Company shall make a pro rata allocation of the Shares of Common Stock available for purchase on such Offering Date or Purchase Date, as applicable, in as uniform a manner as shall be practicable and as it shall determine in its sole discretion to be equitable among all participants exercising options to purchase Common Stock on such Purchase Date, and continue all Offering Periods then in effect, or (y) that the Company shall make a pro rata allocation of the Shares available for purchase on such Offering Date or Purchase Date, as applicable, in as uniform a manner as shall be practicable and as it shall determine in its sole discretion to be equitable among all participants exercising options to purchase Common Stock on such Purchase Date, and terminate any or all Offering Periods then in effect pursuant to Section 19 below. The Company may make pro rata allocation of the Shares available on the Offering Date of any applicable Offering Period pursuant to the preceding sentence, notwithstanding any authorization of additional Shares for issuance under the Plan by the Company's stockholders subsequent to such Offering Date.

(c)   The participant will have no interest or voting right in Shares covered by his or her option until such option has been exercised.

(d)   Shares to be delivered to a participant under the Plan will be registered in the name of the participant or in the name of the participant and his or her spouse, as designated by the participant in his or her subscription agreement; provided that if the Board has determined that Shares shall be held in an ESPP Stock Account held by an ESPP Broker in accordance with Section 9. Shares shall be registered in the name of such ESPP Broker for the benefit of the participant or the participant and his or her spouse, as designated by the participant in his or her subscription agreement.

13.   *Administration.*   The Board, or a committee named by the Board, shall supervise and administer the Plan and shall have full power to adopt, amend and rescind any rules deemed desirable and appropriate for the administration of the Plan and not inconsistent with the Plan, to construe and interpret the Plan, and to make all other determinations necessary or advisable for the administration of the Plan.

14.   *Designation of Beneficiary.*

(a)   A participant may file a written designation of a beneficiary who is to receive any Shares and cash, if any, from the participant's account under the Plan in the event of such participant's death subsequent to the end of an Offering or Purchase Period, as applicable, but prior to delivery to him or her of such Shares and/or cash. In addition, a participant may file a written designation of a beneficiary who is to receive any cash from the participant's account under the Plan in the event of such participant's death prior to the Purchase Date of an Offering Period. If a participant is married and the designated beneficiary is not the spouse, spousal consent shall be required for such designation to be effective.

(b)   Such designation of beneficiary may be changed by the participant (and his or her spouse, if any) at any time by written notice. In the event of the death of a participant and in the absence of a beneficiary validly designated under the Plan who is living at the time of such participant's death, the Company shall deliver such Shares and/or cash to the executor or administrator of the estate of the

A-7

participant, or if no such executor or administrator has been appointed (to the knowledge of the Company), the Company, in its discretion, may deliver such Shares and/or cash to the spouse or to any one or more dependents or relatives of the participant, or if no spouse, dependent or relative is known to the Company, then to such other person as the Company may designate.

15.   *Transferability.*   Neither Contributions credited to a participant's account nor any rights with regard to the exercise of an option or to receive Shares under the Plan may be assigned, transferred, pledged or otherwise disposed of in any way (other than by will, the laws of descent and distribution, or as provided in Section 13) by the participant. Any such attempt at assignment, transfer, pledge or other disposition shall be without effect, except that the Company may treat such act as an election to withdraw funds in accordance with Section 10.

16.   *Use of Funds.*   All Contributions received or held by the Company under the Plan may be used by the Company for any corporate purpose, and the Company shall not be obligated to segregate such Contributions.

17.   *Reports.*   Individual accounts will be maintained for each participant in the Plan. Statements of account will be given to participating Employees promptly following the Purchase Date, which statements will set forth the amounts of Contributions, the per Share Purchase Price, the number of Shares purchased and the remaining cash balance, if any.

18.   *Adjustments Upon Changes in Capitalization; Corporate Transactions.*

(a)   *Adjustment*. Subject to any required action by the stockholders of the Company, the number of Shares covered by each option under the Plan which has not yet been exercised and the number of Shares which have been authorized for issuance under the Plan but have not yet been placed under option (collectively, the "*Reserves*"), the maximum number of Shares an Employee may purchase during each Offering Period or each Purchase Period, as well as the price per Share covered by each option under the Plan which has not yet been exercised, shall be proportionately adjusted for any increase or decrease in the number of issued Shares resulting from a stock split, reverse stock split, stock dividend, combination or reclassification of the Common Stock, or any other increase or decrease in the number of Shares effected without receipt of consideration by the Company; provided, however, that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration." Such adjustment shall be made by the Board, whose determination in that respect shall be final, binding and conclusive. Except as expressly provided herein, no issue by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of Shares subject to an option.

(b)   *Corporate Transactions*. In the event of the proposed dissolution or liquidation of the Company, any Offering Period and Purchase Period then in progress will terminate immediately prior to the consummation of such proposed action, unless otherwise provided by the Board. In the event of a proposed sale of all or substantially all of the assets of the Company, or the merger of the Company with or into another corporation, unless otherwise determined by the Board, each option under the Plan shall be assumed or an equivalent option shall be substituted by such successor corporation or a parent or subsidiary of such successor corporation, or, if not so assumed or substituted, the Offering Period then in progress shall be shortened and the Board shall set a new Purchase Date (the "New Purchase Date"). The New Purchase Date shall be on or before the date of consummation of the transaction and the Board shall notify each participant in writing, at least ten (10) days prior to the New Purchase Date, that the Purchase Date for his or her option has been changed to the New Purchase Date and that his or her option will be exercised automatically on the New Purchase Date, unless prior to such date he or she has withdrawn from the Offering Period as provided in Section 10. For purposes of this paragraph, an option granted under the Plan shall be deemed to be assumed if, following the sale of assets or merger, the option confers the right to purchase, for each Share subject

A-8

to the option immediately prior to the sale of assets or merger, the consideration (whether stock, cash or other securities or property) received in the sale of assets or merger by holders of Common Stock for each Share held on the effective date of the transaction (and if such holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares of Common Stock); provided, however, that if such consideration received in the sale of assets or merger was not solely common stock of the successor corporation or its parent (as defined in Section 424(e) of the Code), the Board may, with the consent of the successor corporation and the participant, provide for the consideration to be received upon exercise of the option to be solely common stock of the successor corporation or its parent equal in Fair Market Value to the per Share consideration received by holders of Common Stock and the sale of assets or merger.

The Board may, if it so determines in the exercise of its sole discretion, also make provision for adjusting the Reserves, as well as the price per Share covered by each outstanding option, in the event that the Company effects one or more reorganizations, recapitalizations, rights offerings or other increases or reductions of shares of its outstanding Common Stock, and in the event of the Company being consolidated with or merged into any other corporation.

19.    *Amendment or Termination.*

(a)    The Board may at any time and for any reason terminate or amend the Plan. Except as provided in Section 18, no such termination of the Plan may affect options previously granted, provided that the Plan or an Offering Period may be terminated by the Board on a Purchase Date or by the Board's setting a new Purchase Date with respect to an Offering Period and Purchase Period then in progress if the Board determines that termination of the Plan and/or the Offering Period is in the best interests of the Company and the stockholders or if continuation of the Plan and/or the Offering Period would cause the Company to incur adverse accounting charges as a result of a change after the effective date of the Plan in the generally accepted accounting rules applicable to the Plan. Except as provided in Section 18 and in this Section 19, no amendment to the Plan shall make any change in any option previously granted which adversely affects the rights of any participant. In addition, to the extent necessary to comply with Rule 16b-3 under the Exchange Act, or under Section 423 of the Code (or any successor rule or provision or any applicable law or regulation), the Company shall obtain stockholder approval in such a manner and to such a degree as so required.

(b)    Without stockholder consent and without regard to whether any participant rights may be considered to have been adversely affected, the Board shall be entitled to change the Offering Periods and Purchase Periods, limit the frequency and/or number of changes in the amount withheld during an Offering Period, establish the exchange ratio applicable to amounts withheld in a currency other than U.S. dollars, permit payroll withholding in excess of the amount designated by a participant in order to adjust for delays or mistakes in the Company's processing of properly completed withholding elections, establish reasonable waiting and adjustment periods and/or accounting and crediting procedures to ensure that amounts applied toward the purchase of Shares for each participant properly correspond with amounts withheld from the participant's Compensation, and establish such other limitations or procedures as the Board determines in its sole discretion advisable which are consistent with the Plan.

20.    *Notices.*    All notices or other communications by a participant to the Company under or in connection with the Plan shall be deemed to have been duly given when received in the form specified by the Company at the location, or by the person, designated by the Company for the receipt thereof.

21.    *Conditions Upon Issuance of Shares.*    The Company shall have no obligation to issue Shares with respect to an option unless the exercise of such option and the issuance and delivery of such Shares pursuant thereto shall comply with all applicable provisions of law, domestic or foreign, including, without limitation, the Securities Act of 1933, as amended, the Exchange Act, the rules and regulations promulgated thereunder, and the requirements of any stock exchange upon which the Shares may then be

A-9

---

listed, and shall be further subject to the approval of counsel for the Company with respect to such compliance.

As a condition to the exercise of an option, the Company may require the person exercising such option to represent and warrant at the time of any such exercise that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares if, in the opinion of counsel for the Company, such a representation is required by any of the aforementioned applicable provisions of law.

22.    *Term of Plan; Effective Date.*    The Plan shall become effective upon the earlier to occur of its adoption by the Board of Directors or its approval by the stockholders of the Company. It shall continue in effect for a term of twenty (20) years unless sooner terminated under Section 19.

23.    *Additional Restrictions of Rule 16b-3.*    The terms and conditions of options granted hereunder to, and the purchase of Shares by, persons subject to Section 16 of the Exchange Act shall comply with the applicable provisions of

Rule 16b-3. This Plan shall be deemed to contain, and such options shall contain, and the Shares issued upon exercise thereof shall be subject to, such additional conditions and restrictions as may be required by Rule 16b-3 to qualify for the maximum exemption from Section 16 of the Exchange Act with respect to Plan transactions.

A-10

---

# YAHOO! INC.

## AMENDED AND RESTATED
## 1996 EMPLOYEE STOCK PURCHASE PLAN
## SUBSCRIPTION AGREEMENT

New Election ═══════

Change of Election ═══════

1.    I,                    , hereby elect to participate in the Yahoo! Inc. Amended and Restated 1996 Employee Stock Purchase Plan (the "Plan") commencing with the Offering Period                    , 20   to                    , 20   , and subscribe to purchase Shares of the Company's Common Stock in accordance with this Subscription Agreement and the Plan. Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

2.    I elect to have Contributions in the amount of        % of my Compensation applied to this purchase. I understand that this amount must not be less than 1% and not more than 15% of my Compensation during an Offering Period. (Please note that no fractional percentages are permitted).

3.    I hereby authorize payroll deductions from each paycheck during the Offering Periods at the rate stated in Item 2 of this Subscription Agreement. I understand that all payroll deductions made by me shall be credited to my account under the Plan and that I may not make any additional payments into such account. I understand that all payments made by me shall be accumulated for the purchase of Shares at the applicable purchase price determined in accordance with the Plan. I further understand that, except as otherwise set forth in the Plan, Shares will be purchased for me automatically on the Purchase Date of each Offering Period unless I otherwise withdraw from the Plan by giving written notice to the Company for such purpose.

4.    I understand that I may discontinue at any time prior to the Purchase Date my participation in the Plan as provided in Section 10 of the Plan. I also understand that I can decrease the rate of my Contributions on one occasion only during any Purchase Period by completing and filing a new Subscription Agreement with such decrease taking effect as of the beginning of the calendar month following the date of filing of the new Subscription Agreement, if filed at least ten (10) business days prior to the beginning of such month. Further, I may change the rate of deductions for future Purchase Periods by filing a new Subscription Agreement, and any such change will be effective as of the beginning of the next Purchase Period. In addition, I acknowledge that, unless I discontinue my participation in the Plan as provided in Section 10 of the Plan, my election will continue to be effective for each successive Offering Period.

5.    I have received a copy of the Company's most recent description of the Plan and a copy of the complete "Yahoo! Inc. Amended and Restated 1996 Employee Stock Purchase Plan." I understand that my participation in the Plan is in all respects subject to the terms of the Plan.

6.    Shares purchased for me under the Plan should be issued in the name(s) of (name of employee or employee and spouse only):

═══════════════════════

═══════════════════════

A-11

7.    In the event of my death, I hereby designate the following as my beneficiary(ies) to receive all payments and Shares due to me under the Plan:

NAME: (Please print)

_____

(First)    (Middle)    (Last)

_____

(Relationship)

(Address)

8.    I understand that if I dispose of any Shares received by me pursuant to the Plan within 2 years after the Offering Date (the first day of the Offering Period during which I purchased such Shares or, if I joined the Plan after such date, the first business day of the Purchase Period with respect to which I joined the Plan during such Offering Period) or within 1 year after the Purchase Date, I will be treated for federal income tax purposes as having received ordinary compensation income at the time of such disposition in an amount equal to the excess of the Fair Market Value of the Shares on the Purchase Date over the price which I paid for the Shares, regardless of whether I disposed of the Shares at a price less than their Fair Market Value at the Purchase Date. The remainder of the gain or loss, if any, recognized on such disposition will be treated as capital gain or loss.

*I hereby agree to notify the Company in writing within 30 days after the date of any such disposition, and I will make adequate provision for federal, state or other tax withholding obligations, if any, which arise upon the such disposition of the Shares.* The Company may, but will not be obligated to, withhold from my compensation the amount necessary to meet any applicable withholding obligation including any withholding necessary to make available to the Company any tax deductions or benefits attributable to the sale or early disposition of Shares by me.

9.    If I dispose of such Shares at any time after expiration of the 2-year and 1-year holding periods, I understand that I will be treated for federal income tax purposes as having received compensation income only to the extent of an amount equal to the lesser of (1) the excess of the Fair Market Value of the Shares at the time of such disposition over the purchase price which I paid for the Shares under the option, or (2) 15% of the Fair Market Value of the Shares on the Offering Date. The remainder of the gain or loss, if any, recognized on such disposition will be treated as capital gain or loss.

*I understand that this tax summary is only a summary and is subject to change.* I further understand that I should consult a tax advisor concerning the tax implications of the purchase and sale of stock under the Plan.

10.    I hereby agree to be bound by the terms of the Plan. The effectiveness of this Subscription Agreement is dependent upon my eligibility to participate in the Plan.

SIGNATURE:    _____

SOCIAL SECURITY  #:    _____

DATE:    _____

SPOUSE'S SIGNATURE (necessary
if beneficiary is not spouse):

_____

(Signature)

_____

(Print name)

A-12

**YAHOO! INC.**

**AMENDED AND RESTATED
1996 EMPLOYEE STOCK PURCHASE PLAN
NOTICE OF WITHDRAWAL**

     I, _____, hereby elect to withdraw my participation in the Yahoo! Inc. Amended and Restated 1996 Employee Stock Purchase Plan (the "Plan") for the Offering Period commencing _____, 20__. This withdrawal covers all Contributions credited to my account and is effective on the date designated below. Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

     I understand that all Contributions credited to my account will be paid to me within ten (10) business days of receipt by the Company of this Notice of Withdrawal and that my option for the current period will automatically terminate, and that no further Contributions for the purchase of Shares can be made by me during the Offering Period.

     The undersigned further understands and agrees that he or she shall be eligible to participate in succeeding offering periods only by delivering to the Company a new Subscription Agreement.

Dated: _____

_____

_____
Signature of Employee

_____
Social Security Number

A-13

---

**PROXY**

**YAHOO!**

**THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS
OF YAHOO! INC. FOR THE ANNUAL MEETING OF STOCKHOLDERS
To Be Held May 21, 2004**

     The undersigned stockholders of Yahoo! Inc. (the "Company"), a Delaware corporation, hereby acknowledges receipt of the Notice of Annual Meeting of Stockholders and Proxy Statement, each dated April 9, 2004, and hereby appoints Michael J. Callahan and Susan L. Decker, and each or either of them, as proxies, with full power of substitution, on behalf and in the name of the undersigned to represent the undersigned at the 2004 Annual Meeting of Stockholders of the Company to be held on Friday, May 21, 2004, at 10:00 a.m., local time, at the Santa Clara Marriott Hotel, located at 2700 Mission College Boulevard, Santa Clara, California and at any postponement or adjournment thereof, and to vote all shares of Common Stock which the undersigned would be entitled to cast if personally present, on the reverse side.

     **ANY STOCKHOLDER COMPLETING THIS PROXY THAT FAILS TO MARK ONE OF THE BOXES FOR THE PROPOSAL WILL BE DEEMED TO HAVE GIVEN THE PROXY HOLDERS COMPLETE DISCRETION IN VOTING HIS, HER, OR ITS SHARES FOR SUCH PROPOSAL AT THE MEETING, OR, IN THE CASE OF ELECTION OF DIRECTORS, FOR EACH OF THE LISTED NOMINEES. IF A BOX IS CHECKED, YOUR SHARES SHALL BE VOTED IN ACCORDANCE WITH YOUR INSTRUCTIONS.**

**CONTINUED AND TO BE SIGNED ON REVERSE SIDE**

**SEE
REVERSE
SIDE**

**SEE
REVERSE
SIDE**

**YAHOO! INC.**
**c/o EQUISERVE TRUST COMPANY, N.A.**
**P.O. BOX 8694**
**EDISON, NJ 08818-8694**

**Your vote is important. Please vote immediately.**

**VOTE-by-INTERNET**                    OR     **VOTE-by-TELEPHONE**

                                                **Call toll-free**
**Log on to the Internet and go to http://www.eproxyvote.com/yhoo**     **1-877-PRX-VOTE (1-877-779-8683)**

**If you vote over the Internet or by telephone, please do not mail your card.**

DETACH HERE IF YOU ARE RETURNING YOUR PROXY CARD BY MAIL

☒     **Please mark**
      **votes as in**
      **this example.**

**The Company's Board of Directors recommends a vote FOR each of the directors listed below and a vote FOR proposals 2 and 3 and AGAINST proposal 4.**

**The Board of Directors recommends a vote FOR**   **The Board of Directors recommends a vote AGAINST proposal 4.**
**proposals 1, 2 and 3.**

1. Election of Directors. **Nominees:**
(01) Terry S. Semel, (02) Jerry Yang, (03) Roy J.
Bostock, (04) Ronald Burkle, (05) Eric Hippeau,
(06) Arthur H. Kern, (07) Robert A. Kotick,
(08) Edward R. Kozel, (09) Gary L. Wilson.

|  | FOR | AGAINST | ABSTAIN |
|---|---|---|---|
| 4. Stockholder proposal regarding the expensing of options. | ☐ | ☐ | ☐ |

|  | **WITHHOLD** |
|---|---|
| **FOR** | **AUTHORITY** |
| **ALL** | **FROM ALL** |
| **NOMINEES** | **NOMINEES** |
| ☐ | ☐ |

For all nominees, except vote withheld as noted
above.

In their discretion, the proxies are authorized to vote upon such other
business as may properly come before the Annual Meeting and any
adjournment or postponement thereof.

2. Amendment of the Amended and Restated 1996
Employee Stock Purchase Plan.

| **FOR** | **AGAINST** | **ABSTAIN** |
|---|---|---|
| ☐ | ☐ | ☐ |

**MARK HERE**                    **MARK HERE**
**IF YOU PLAN**                  **FOR ADDRESS**
**TO ATTEND**                    **CHANGE AND**
**THE MEETING**                  **NOTE AT LEFT**
☐                               ☐

3. Ratification of appointment of Independent
Auditors.

| **FOR** | **AGAINST** | **ABSTAIN** |
|---|---|---|

☐          ☐          ☐

Please sign exactly as your name(s) appear(s) hereon. All holders must sign. When signing in a fiduciary capacity, please indicate full title as such. If a corporation or partnership, please sign in full corporate or partnership name by authorized person.

Signature: _____     Date: _____     Signature: _____     Date: _____

QuickLinks

PROXY STATEMENT
PROPOSAL NO. 1 ELECTION OF DIRECTORS
PROPOSAL NO. 2 APPROVAL OF INCREASE OF SHARES OF COMMON STOCK UNDER THE AMENDED AND RESTATED 1996 EMPLOYEE STOCK PURCHASE PLAN
PROPOSAL NO. 3 RATIFICATION OF APPOINTMENT OF INDEPENDENT AUDITORS
PROPOSAL NO. 4 STOCKHOLDER PROPOSAL
INFORMATION REGARDING BENEFICIAL OWNERSHIP OF PRINCIPAL STOCKHOLDERS AND MANAGEMENT
EXECUTIVE OFFICER COMPENSATION AND OTHER MATTERS
REPORT OF THE COMPENSATION COMMITTEE OF THE BOARD OF DIRECTORS ON EXECUTIVE COMPENSATION
AUDIT COMMITTEE REPORT
FEES BILLED FOR SERVICES RENDERED BY PRINCIPAL AUDITORS
COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION
LEGAL PROCEEDINGS
PERFORMANCE GRAPH
CERTAIN TRANSACTIONS
STOCKHOLDER PROPOSALS FOR 2005 ANNUAL STOCKHOLDERS' MEETING
HOUSEHOLDING
OTHER MATTERS

Annex A

YAHOO! INC. AMENDED AND RESTATED 1996 EMPLOYEE STOCK PURCHASE PLAN

Exhibit 7

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
### For the quarterly period ended March 31, 2004
### OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the transition period from          to
### Commission File Number 0-28018

# YAHOO! INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **77-0398689** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

### 701 First Avenue
### Sunnyvale, California 94089
### (Address of principal executive offices)

Registrant's telephone number, including area code: **(408) 349-3300**

Indicate by check mark whether the Registrant (1) has filed all reports required by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days: Yes ☒    No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). Yes ☒    No ☐

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Class | Outstanding at May 3, 2004 |
|---|---|
| Common stock, $0.001 par value | 673,364,167 |

As of May 3, 2004 there were 673,364,167 shares (or 1,346,728,334 shares after giving retroactive effect to the registrant's two-for-one stock split, payable in the form of a stock dividend, having a record date of April 26, 2004 and taking effect as of May 11, 2004) of the registrant's common stock, $0.001 par value, outstanding.

**RISK FACTORS**

*If our competitors are more successful in attracting and retaining customers and users, then our revenues could decline.*

We compete with many other providers of online navigation, Web search, commercial search, information, entertainment, business, recruitment, community, electronic commerce and Internet access services. As we expand the scope of our Internet offerings, we will compete directly with a greater number of Internet sites, media companies, and companies providing business services across a wide range of different online services, including:

- companies offering communications, Web search, commercial search, information, community and entertainment services and Internet access either on a stand alone basis or integrated into other products and media properties;
- vertical markets where competitors may have advantages in expertise, brand recognition, available financial and other resources, and other factors;
- online employment recruiting companies; and
- online merchant hosting services.

In order to compete effectively, we may need to expend significant internal engineering resources or acquire other technologies and companies to provide or enhance our capabilities.  If we are unable to maintain or expand our customer and user base in the future, our revenues may decline.

*We face significant competition from companies such as Time Warner's AOL, Microsoft and Google.*

We face significant competition from companies that have combined a variety of services under one brand name in a manner similar to Yahoo!, including Time Warner's America Online business ("AOL" or America Online"), Microsoft Corporation ("Microsoft" or "MSN") and Google Inc. ("Google").  The combination of America Online and Time Warner provides America Online with content from Time Warner's movie and television, music, books and periodicals, news, sports and other media holdings; access to a network of cable and other broadband delivery technologies; and considerable resources for future growth and expansion. The America Online/Time Warner combination also provides America Online with access to a broad potential customer base consisting of Time Warner's current customers and subscribers of its various media properties.  Many of these competitors are developing new technologies, allocating extensive resources to product development and marketing and expanding their offerings which may be competitive with our offerings.  For example, Google has recently announced the development of a consumer email service and has launched shopping services that may be competitive with services that we offer and Microsoft has announced plans to develop its own search services.  In certain of these cases, most notably AOL and MSN, our competition has a direct billing relationship with a greater number of their users through access and other services than we have with our users through certain of our premium services. This relationship permits our competitors to have several potential advantages including the potential to be more effective than us in targeting services and advertisements to the specific taste of their users.

*Our acquisitions of Inktomi and Overture expose our business to greater competition in the area of algorithmic Web search and paid inclusion services.*

In March 2003 we completed our acquisition of Inktomi Corporation ("Inktomi"), a provider of algorithmic Web search and paid inclusion services.  In addition, we completed our acquisition of Overture Services, Inc. ("Overture") in October 2003, increasing our algorithmic Web search and paid inclusion business through Overture's Alta Vista and Fast Search & Transfer Web search businesses.  As a result of these acquisitions, we compete directly with other providers of Web search and related search services, including, among others, AskJeeves, Inc., Google, and LookSmart, Ltd.  Some of these competitors may have longer operating histories focusing on providing Web search services, larger customer or user bases and greater brand recognition for their Web search businesses.  In addition to the general acquisition risks highlighted in these risk factors, we are subject to the risk that other companies with greater operational, strategic, financial, personnel or other resources may choose to enter the Web search or paid inclusion spaces by acquisition or internal development, and may create greater competition for advertisers, customers and users.

***If we are unable to provide search technologies and services which generate significant traffic to our Web sites, our business could be harmed.***

We recently deployed our own web search technology to provide web search results on our network. We have limited experience in operating our own search service. Web search is characterized by rapidly changing technology, significant competition, evolving industry standards, and frequent enhancements. We must continually invest in improving user experience, search relevance, speed, our operational infrastructure and other aspects of our search technology to continue to attract, retain and expand our user base. If we are unable to provide search technologies and services which generate significant traffic to our Web sites, our business could be harmed.

***If Overture fails to maintain its advertiser, user, business and affiliate constituencies, our revenues could significantly decline and our business could be adversely affected.***

Overture's pay-for-performance search service is comprised of advertiser-generated listings, which are screened for relevance and accessed by users and businesses through the Yahoo! properties and through Overture's affiliates, a network of other Web properties that have integrated Overture's search service into their sites or that direct user traffic to Overture's sites. The search listings are ranked according to the advertiser's bid; that is, the higher the bid, the higher the ranking. Advertisers pay Overture the bid price for clicks on the advertiser's search listing (also known as a paid introduction, click-through or a paid click). Overture's success in pay-for-performance search services depends in part on the maintenance of a critical mass of advertisers, users, and traffic generated by the Yahoo! properties and Overture's affiliates. Such a critical mass encourages increased participation in Overture's paid placement search marketplace. To the extent Overture experiences a decline in the number of any of these constituents, the value of Overture's paid placement service could be harmed, and our revenues or business could be adversely affected.

***Our recent acquisition of Overture exposes our business to greater competition with providers of pay-for-performance advertising search services.***

As a result of our acquisition of Overture, we compete directly with other providers of pay-for-performance advertising services that are similar to Overture's, including Espotting Media, Inc. (which is under agreement to be acquired by FindWhat), FindWhat.com, Google Inc., LookSmart, Ltd., and Terra Lycos. In addition, we believe it is likely that there will be additional entrants to the pay-for-performance search market. Some of these entrants may have greater operational, strategic, financial, personnel or other resources than we do, as well as greater brand recognition. These competitors compete against Overture for affiliate arrangements and could cause Overture to enter into affiliate arrangements with less favorable terms, lose current affiliates or not acquire new affiliates, which could reduce the number of click-throughs, increase the amount of revenue shared with affiliates, and reduce total revenues and thereby harm our business, operating results and financial condition.

***Acquisitions could result in operating difficulties.***

As part of our business strategy, we acquired Overture in October 2003, 3721 Network Software Company Limited ("3721") in January 2004, Kelkoo S.A. ("Kelkoo") in April 2004 and have completed several other acquisitions since inception. We expect to enter into additional business combinations and acquisitions in the future. Acquisitions may result in dilutive issuances of equity securities, use of our cash resources, incurrence of debt and amortization of expenses related to intangible assets. The acquisitions of Overture, 3721 and Kelkoo were accompanied by a number of risks, including:

- the difficulty of assimilating the operations and personnel of our acquired companies with and into Yahoo!'s operations;
- the potential disruption of our ongoing business and distraction of management;
- the difficulty of incorporating acquired technology and rights into our products and unanticipated expenses related to such integration;
- the failure to further successfully develop acquired technology resulting in the impairment of amounts currently capitalized as intangible assets;

- the impairment of relationships with customers of the acquired companies or our own customers as a result of any integration of operations;
- the impairment of relationships with employees of the acquired companies or our own business as a result of any integration of new management personnel;
- in the case of 3721 and Kelkoo, uncertainty regarding foreign laws and regulations and difficulty integrating operations and systems as a result of cultural, systems and operational differences; and
- the potential unknown liabilities associated with the acquired companies.

We may experience similar risks in connection with our future acquisitions.  We may not be successful in addressing these risks or any other problems encountered in connection with the acquisitions of Overture, 3721 and Kelkoo or that we could encounter in future acquisitions, which would harm our business or cause us to fail to realize the anticipated benefits of our acquisitions.

***We may be subject to intellectual property infringement claims, which are costly to defend and could limit our ability to provide certain content or use certain technologies in the future.***

Many parties are actively developing search, indexing, electronic commerce and other Web-related technologies, as well as a variety of online business models and methods. We believe that these parties will continue to take steps to protect these technologies, including, but not limited to, seeking patent protection. As a result, disputes regarding the ownership of these technologies and rights associated with online business are likely to arise in the future. In addition to existing patents and intellectual property rights, we anticipate that additional third-party patents related to our services will be issued in the future. From time to time, parties assert patent infringement claims against us in the form of letters, lawsuits and other forms of communications. Currently, we are engaged in several lawsuits regarding patent issues and have been notified of a number of other potential disputes. We expect that we will increasingly be subject to patent litigation as our services expand.

In addition to patent claims, third parties have asserted and most likely will continue to assert claims against us alleging infringement of copyrights, trademark rights, trade secret rights or other proprietary rights, or alleging unfair competition or violations of privacy rights. Currently, our subsidiary LAUNCH Media, Inc. ("LAUNCH") is engaged in a lawsuit regarding copyright issues that commenced prior to our acquisition of LAUNCH.  In addition, Overture is in litigation with several companies, each of which has claimed that allowing advertisers to bid on certain search terms constitutes trademark infringement.

In the event that there is a determination that we have infringed third-party proprietary rights such as patents, copyrights, trademark rights, trade secret rights or other third party rights such as publicity and privacy rights, we could incur substantial monetary liability, be required to enter into costly royalty or licensing agreements, if available, or be prevented from using the rights, which could require us to change our business practices in the future.  We may also incur substantial expenses in defending against third-party infringement claims regardless of the merit of such claims. As a result, these claims could harm our business.

***Our intellectual property rights are valuable and any inability to protect them could dilute our brand image or harm our business.***

We regard our copyrights, patents, trademarks, trade dress, trade secrets, and similar intellectual property, including our rights to certain domain names, as important to Yahoo!'s success.  Effective trademark, patent, copyright, and trade secret protection may not be available in every country in which our products and media properties are distributed or made available through the Internet.  Further, the efforts we have taken to protect our proprietary rights may not be sufficient or effective. If we are unable to protect our trademarks from unauthorized use, our brand image may be harmed. While we attempt to ensure that the quality of our brand is maintained by our licensees, our licensees may take actions that could impair the value of our proprietary rights or the reputation of our products and media properties. We are aware that third parties have, from time to time, copied significant content available on Yahoo! for use in competitive Internet services. Protection of the distinctive elements of Yahoo! may not be available under copyright law. Any impairment of our brand image could harm our business and cause our stock price to decline. In addition, protecting our intellectual property and other proprietary rights can be expensive. Any increase in the unauthorized use of our intellectual property could make it more expensive to do business and consequently harm our operating results. In turn, this could harm the results of our business and lower our stock price.

32

*Our international segment competes with local Internet service providers that may have a competitive advantage.*

On an international level, we compete directly with local Internet Service Providers ("ISPs"); they may have several advantages, including greater knowledge about the particular country or local market and access to significant financial or strategic resources in such local markets. We must continue to improve our product offerings, obtain more knowledge about our users and their preferences, deepen our relationships with our users as well as increase our branding and other marketing activities in order to remain competitive and strengthen our international market position.

*Financial results for any particular period will not predict results for future periods.*

There can be no assurance that the purchasing pattern of customers advertising on the Yahoo! network will not continue to fluctuate, that advertisers will not make smaller and shorter-term purchases, or that market prices for online advertising will not decrease due to competitive or other factors. In addition, there can be no assurance that the volume of searches conducted, the amounts bid by advertisers for search listings or the number of advertisers that bid on the Overture service will not vary widely from period to period. As revenues from sources other than advertising increase, it may become more difficult to predict our financial results based on historical performance. Because of the rapidly changing market we serve, period-to-period comparisons of operating results are not likely to be meaningful. You should not rely on the results for any period as an indication of future performance.

*We expect our operating expenses to continue to increase as we attempt to expand the Yahoo! brand, fund product development, develop media properties and acquire other businesses.*

Yahoo! currently expects that its operating expenses will continue to increase as we expand our operations in areas of expected growth, continue to develop and extend the Yahoo! brand, fund greater levels of product development, develop and commercialize additional media properties and premium services, and acquire and integrate complementary businesses and technologies. If our expenses increase at a greater pace than our revenues, our operating results could be harmed.

*We may be required to record a significant charge to earnings if we must reassess our goodwill or amortizable intangible assets.*

We are required under generally accepted accounting principles to review our amortizable intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Goodwill is required to be tested for impairment at least annually. Factors that may be considered a change in circumstances indicating that the carrying value of our amortizable intangible assets may not be recoverable include a decline in stock price and market capitalization, and slower growth rates in our industry. We may be required to record a significant charge to earnings in our financial statements during the period in which any impairment of our goodwill or amortizable intangible assets is determined. At March 31, 2004, our goodwill and amortizable intangible assets were $2.3 billion. In the first quarter of 2002, we recorded a transitional impairment charge of $64 million as a cumulative effect of an accounting change, upon the adoption of Statement of Financial Accounting Standards No. 142 "Goodwill and Other Intangible Assets."

*The majority of our revenues are derived from marketing services. Demand from our current and potential clients for online advertising is difficult to forecast accurately.*

For the quarter ended March 31, 2004, approximately 84 percent of our total revenues came from marketing services. Our ability to continue to achieve substantial advertising revenue depends upon:

- growth of our user base, including through our email and other communications services;
- broadening our relationships with advertisers to small and medium size businesses;
- our user base being attractive to advertisers;
- demand for our commercial search services by advertisers, users and businesses, including prices paid by advertisers, the number of searches performed by users and the rate at which they click-through to commercial search results;
- our ability to maintain our affiliate program for our commercial search services;
- our ability to generate significant traffic to our Websites;
- our ability to derive better demographic and other information from our users; and
- continued acceptance of the Web by advertisers as an advertising medium.

Our agreements with advertisers and sponsors generally have terms of three years or less and, in many cases, the terms are one year or less or, in the case of Overture's business, may be immediately terminable by the advertiser. The agreements often have payments contingent on usage or "click-through" levels. Accordingly, it is difficult to forecast these revenues accurately. However, our expense levels are based in part on expectations of future revenues, include guaranteed minimum payments to our affiliates in connection with our pay-for-performance advertising services, and are fixed over the short-term with respect to certain categories. We may be unable to adjust spending quickly enough to compensate for any unexpected revenue shortfall.

***Overture depends on a limited number of sources to direct users and businesses to its service to conduct searches.***

The users and businesses that conduct searches on Overture's service come from a limited number of sources. In addition to the Yahoo! properties, sources for users conducting searches are members of Overture's affiliate network, including portals, browsers, and other affiliates. Overture's agreements with affiliates vary in duration, and depending on the agreement, provide varying levels of discretion to the affiliate in the implementation of the Overture service, including the degree to which affiliates can modify the presentation of the Overture search results on their websites or integrate the Overture services with their own services, and may be terminable upon the occurrence of certain events, including failure to meet certain service levels, material breaches of agreement terms, changes in control (including the change of control of Overture that occurred with Yahoo!'s acquisition of Overture) or in some instances, at will. Overture may not be successful in renewing any of its affiliate agreements, or if they are renewed, they may not be on as favorable terms. The loss of any of these affiliates or adverse change in implementation of the Overture service by any of our affiliates could harm our ability to generate revenue and our operating results.

***Decreases or delays in advertising spending due to general economic downturns could harm our ability to generate advertising revenue.***

Expenditures by advertisers tend to be cyclical, reflecting overall economic conditions as well as budgeting and buying patterns. In the past, the overall market for advertising, including Internet advertising, was generally characterized by softness of demand and the reduction of marketing and advertising budgets or the delay in spending of budgeted resources. As a result, advertising spending decreased. Since Yahoo! derives a large part of its revenues from advertising fees, any decreases in or delays of advertising spending could reduce our revenues or negatively impact our ability to grow our revenues. Even as economic conditions improve, marketing budgets and advertising spending may not increase from current levels.

***Due to intense competition, we may not be able to generate substantial revenues from the Internet access market.***

In 2002 we launched SBC Yahoo! DSL and SBC Yahoo! Dial, an Internet access service provided through an alliance with SBC Communications Inc. In 2003 we launched BT Yahoo! Internet, a range of broadband and dial-up Internet access services provided in the United Kingdom through an alliance with British Telecommunications plc ("BT"). These access services combine customized content and services from Yahoo! (including browser and other communications services) and Internet access from SBC Internet Services (an affiliate of SBC Communications Inc.) and BT. In January 2004, we announced a similar alliance with Rogers Cable Communications Inc. ("Rogers") to provide cable broadband Internet access service in Canada. These Internet access services compete with many large companies, some of which may have substantially greater market presence (including an existing user base), financial, technical, marketing or other resources than those committed to the product offerings with SBC, BT and Rogers. In the United States, these services primarily compete directly or indirectly with established Internet services, such as AOL and MSN; other national telecommunications companies and regional Bell operating companies; and broadband Internet access providers such as Earthlink, Inc., Comcast Corporation, and other cable broadband providers. In the United Kingdom, these services primarily compete directly or indirectly with established Internet services, such as AOL and Freeserve plc; other major UK Internet service providers; and cable broadband providers such as NTL Incoporated and Telewest Communications. In Canada, these services primarily compete with Bell Canada's Sympatico and Aliant Inc. As a result of these and other competitive factors, these services may not be able to attract, grow or retain a customer base, which would negatively impact our ability to sell customized content and services through this channel.

***Our success in the Internet access market will depend on technical and customer service issues, which we have a limited ability to control.***

Internet access services, including SBC Yahoo! DSL, SBC Yahoo! Dial and BT Yahoo! Internet, are susceptible to natural or man-made disasters such as earthquakes, floods, fires, power loss, or sabotage, as well as interruptions from technology malfunctions, computer viruses or hacker attacks. Other potential service interruptions may result from unanticipated demands on network infrastructure, increased traffic or problems in customer service to our access customers. Our ability to control technical and customer service issues is further limited by our dependence on SBC and BT for connectivity, customer service, joint marketing and technical integration of aspects of our access service. Significant disruptions in our access service could harm our goodwill, the Yahoo! brand and ultimately could significantly and negatively impact the amount of revenue we may earn from our service.

*Some of our sponsorship arrangements may not generate anticipated revenues.*

A key element of our strategy is to generate marketing services revenue through sponsored services and placements by third parties in our online media properties in addition to banner advertising. We typically receive sponsorship fees or a portion of transactions revenue in return for minimum levels of user impressions to be provided by us. These arrangements expose us to potentially significant financial risks in the event our usage levels decrease, including the following:

- the fees we are entitled to receive may be adjusted downwards;
- we may be required to "make good" on our obligations by providing alternative services;
- the sponsors may not renew the arrangements or may renew at lower rates; and
- the arrangements may not generate anticipated levels of shared transactions revenue, or sponsors may default on the payment commitments in such agreements as has occurred in the past.

Accordingly, any leveling off or decrease of our user base (or usage by our existing base) or the failure to generate anticipated levels of shared transactions revenue could result in a significant decrease in our revenues.

*We may not be successful in expanding the number of users of our electronic commerce services.*

We have focused, and intend to continue to focus, significant resources on the development and enhancement of our electronic commerce properties, such as Yahoo! Shopping. The success of our electronic commerce properties depends on, among other things, our ability to attract and retain well-known brands among our network of retailers, the ability to generate traffic to our commerce properties, and, in some cases, the rate at which users click through to search results. Through our electronic commerce properties, we do not establish a direct billing relationship with our users as a result of any purchases they may make with the retailers. The revenue that we derive from our electronic commerce properties is typically in the form of lead-based fees, wherein retailers pay a fee based on the number of times a user clicks on a link to their site, transaction fees, and advertising fees. Users who had a favorable buying experience with a particular retailer may contact that retailer directly for future purchases rather than through our service. If our users bypass our electronic commerce properties, such as Yahoo! Shopping, and contact retailers directly, our revenue could decline. Competing providers of online shopping, including merchants with whom we have relationships, may provide a more convenient and comprehensive online shopping experience due to their singular focus on electronic commerce. As a result, we may have difficulty competing with those merchants for users of electronic commerce services and as a consequence our revenue could decline or we could fail to generate significant revenues from electronic commerce.

*We will continue to operate in international markets in which we have limited experience and are faced with relatively higher costs and are exposed to greater risks.*

A key part of our strategy is to develop Yahoo!-branded online properties and expand our commercial search offerings in international markets. We have developed, through joint ventures, subsidiaries and branch offices, localized properties in over 20 international countries. We also provide search services in 15 international countries. To date, we have only limited experience in marketing and operating our products and services internationally, and we rely on the efforts and abilities of our foreign business partners in such activities.

We believe that in light of substantial competition, we need to expand our operations in international markets quickly in order to obtain market share effectively. However, in a number of international markets, especially those in Europe, we face substantial competition from ISPs that offer or may offer their own navigational services and from other companies that provide commercial search services. Many of these companies have a dominant market share in their territories. Furthermore, foreign providers of competing online services may have a substantial advantage over us in attracting users in their country due to more established branding in that country, greater knowledge with respect to the tastes and preferences of users residing in that country and/or their focus on a single market. We have experienced and expect to continue to experience higher costs as a percentage of revenues in connection with the development and maintenance of our international online properties relative to our domestic experience. We have selected international markets that may not develop at a rate that supports our level of investment. In particular, certain international markets may be slower than domestic markets in adopting the Internet as an advertising and commerce medium.

*Our international operations are subject to increased risks.*

In addition to uncertainty about our ability to continue to generate revenues from our foreign operations and expand our international presence, there are certain risks inherent in doing business on an international level, including:

- trade barriers and unexpected changes in regulatory requirements;
- difficulties in developing, staffing and simultaneously managing a large number of unique foreign operations as a result of distance, language and cultural differences;
- longer payment cycles;
- currency exchange rate fluctuations;
- political or social unrest or economic instability;
- import or export restrictions;
- seasonal reductions in business activity;
- risks related to government regulation including those more fully described below; and
- potentially adverse tax consequences.

One or more of these factors could harm our future international operations and consequently, could harm our business, operating results, and financial condition.

***If key personnel leave unexpectedly and are not replaced, we may not be able to execute our business plan.***

We are substantially dependent on the continued services of our key personnel, including our two founders, our chief executive officer, chief financial officer, chief operating officer, chief technical officer, and our executive and senior vice presidents. These individuals have acquired specialized knowledge and skills with respect to Yahoo! and its operations.  In addition, as part of our integration of Overture's personnel and operations, we may lose key employees of Overture.  If any of these individuals were to leave unexpectedly, we could face substantial difficulty in hiring qualified successors and could experience a loss in productivity while any such successor obtains the necessary training and experience. Many of our management personnel have reached or will soon reach the four-year anniversary of their Yahoo! hiring date and, as a result, have become or will shortly become fully vested in their initial stock option grants. While management personnel are typically granted additional stock options subsequent to their hire date, which will usually vest over a period of four years to provide additional incentive to remain at Yahoo!, the initial option grant is typically the largest for a given position, and an employee may be more likely to leave Yahoo! upon completion of the vesting period for the initial option grant.

***If we are unable to hire qualified personnel in designated growth areas, we may not be able to execute our business plan.***

We expect that we will need to hire additional personnel in designated growth areas. The competition for qualified personnel can be intense, particularly in the San Francisco Bay Area, where our corporate headquarters are located. At times, we have experienced difficulties in hiring personnel with the right training or experience, particularly in technical areas. If we do not succeed in attracting new personnel, or retaining and motivating existing personnel, we may be unable to meet our business plan and as a result our stock price may decline.

*We may have difficulty scaling and adapting our existing architecture to accommodate increased traffic and technology advances or customer requirements.*

Yahoo! is one of the most highly trafficked Websites on the Internet and is regularly serving numbers of users and delivering daily page views which are beyond previous standards for Internet usage. In addition, the services offered by Yahoo!, and popular with users and customers, have changed significantly in the past, are expected to change rapidly in the future, and are difficult to predict. Rapid increases in the levels or types of use of our online properties and services could result in delays or interruptions in our service. In particular, the architectures utilized for our services are highly complex and may not provide satisfactory service in the future, especially as the usage levels of email and certain other services increase, the rate of unsolicited email continues to increase in volume and complexity and the number of advertisers utilizing the Overture service increases. In the future, we may be required to make significant changes to our architectures, including moving to completely new architectures. If we are required to switch architectures, we may incur substantial costs and experience delays or interruptions in our service. These delays or interruptions in our service may cause users and customers to become dissatisfied with our service and move to competing providers of online services. Further, to the extent that demand for our services increases, we will need to expand our infrastructure, including the capacity of our hardware servers and the sophistication of our software. This expansion is likely to be expensive and complex, and require additional technical expertise. As we acquire users who rely upon us for a wide variety of services, it becomes more technologically complex and costly to retrieve, store and integrate data that will enable us to track each user's preferences. An unanticipated loss of traffic, increased costs, inefficiencies or failures to adapt to new technologies or user requirements and the associated adjustments to our architecture could harm our operating results and financial condition.

*Our competitors often provide Internet access or computer hardware to our users, and our competitors could make it difficult for our users to access our services, which in turn, could reduce the number of our users.*

Our users must access our services through an Internet access provider, including providers of cable and DSL Internet access, with which the user establishes a direct billing relationship using a personal computer or other access device. To the extent that an access provider (other than those with which we have a relationship), such as AOL or MSN, or a computer or computing device manufacturer offers online services or properties that are competitive with those of Yahoo!, the user may find it more convenient to use the services or properties of that access provider or manufacturer. In addition, the access provider or manufacturer may make it difficult to access our services by not listing them in the access provider's or manufacturer's own directory. Also, because the access provider gathers information from the user in connection with the establishment of the billing relationship, the access provider may be more effective than us in tailoring services and advertisements to the specific tastes of the user. To the extent that a user opts to use the services offered by an access provider (other than those with which we have a relationship) or those offered by computer or computing device manufacturers rather than the services provided by us, our revenues may decline.

*More individuals are utilizing non-PC devices to access the Internet, and versions of our service developed or optimized for these devices may not gain widespread adoption by users of such devices.*

The number of individuals who access the Internet through devices other than a personal computer, such as personal digital assistants, mobile telephones and television set-top devices, has increased dramatically. Our services were originally designed for rich, graphical environments such as those available on desktop and laptop computers. The lower resolution, functionality and memory associated with alternative devices may make the use of our services through such devices difficult, and the versions of our service developed for these devices may not be compelling to users of alternative devices. As we have limited experience to date in operating versions of our service developed or optimized for users of alternative devices, it is difficult to predict the problems we may encounter in doing so, and we may need to devote significant resources to the creation, support and maintenance of such versions. If we are unable to attract and retain a substantial number of alternative device users to our online services, we will fail to capture a sufficient share of an increasingly important portion of the market for online services.

*We rely on the value of the Yahoo! brand, and the costs of maintaining and enhancing our brand awareness are increasing.*

We believe that maintaining and expanding the Yahoo! brand (and our other brands, including HotJobs, Inktomi, LAUNCH, and Overture) is an important aspect of our efforts to attract and expand our user and advertiser base. We also believe that the importance of brand recognition will increase due to the relatively low barriers to entry. We have spent considerable money and resources to date on the establishment and maintenance of the Yahoo! brands. We will spend increasing amounts of money on, and devote greater resources to advertising, marketing and other brand-building efforts to preserve and enhance consumer awareness of the Yahoo! brands. We may not be able to successfully maintain or enhance consumer awareness of the Yahoo! brands and, even if we are successful in our branding efforts, such efforts may not be cost-effective. If we are unable to maintain or enhance customer awareness of the Yahoo! brands in a cost effective manner, our business, operating results and financial condition would be harmed.

37

***The successful operation of our business depends upon the supply of critical elements from other companies and any interruption in that supply could cause service interruptions or reduce the quality of our product offerings.***

We depend upon third parties, to a substantial extent, for several critical elements of our business, including various technology, infrastructure, content development, software and distribution components.

**Technology and Infrastructure.**  We rely on private third-party providers for our principal Internet connections, co-location of a significant portion of our data servers and network access.  Any disruption in the Internet or network access or co-location services provided by these third-party providers or any failure of these third-party providers to handle current or higher volumes of use could significantly harm our business, operating results and financial condition.  Any financial difficulties for our providers may have negative effects on our business, the nature and extent of which we cannot predict.  We license technology and related databases from third parties for certain elements of our properties, including, among others, technology underlying the delivery of news, stock quotes and current financial information, chat services, street mapping and telephone listings, streaming capabilities and similar services. We have experienced and expect to continue to experience interruptions and delays in service and availability for such elements.  We also rely on a third-party manufacturer for key components of our email service.  Furthermore, we depend on hardware and software suppliers for prompt delivery, installation and service of servers and other equipment to deliver our products and services. Any errors, failures, interruptions, or delays experienced in connection with these third-party technologies and information services could negatively impact our relationship with users and adversely affect our brand and our business and could expose us to liabilities to third parties.

**Distribution Relationships.**  In addition to our relationships with access providers such as SBC and BT, to increase traffic for our online properties and services and make them more available and attractive to advertisers and consumers, we have certain distribution agreements and informal relationships with, operators of online networks and leading Websites, electronics companies, and computer manufacturers. These distribution arrangements typically are not exclusive and do not extend over a significant amount of time. Further, some of our distributors are competitors or potential competitors who may not renew their distribution contracts with us. Potential distributors may not offer distribution of our properties and services on reasonable terms, or at all. In addition, as new methods for accessing the Web become available, including through alternative devices, we may need to enter into additional distribution relationships. If we fail to obtain distribution or to obtain distribution on terms that are reasonable, we may not be able to fully execute our business plan.

**Streaming Media Software.**  We rely on the two leading providers of streaming media products, RealNetworks, Inc. and Microsoft, to license the software necessary to broadcast streaming audio and video content to our users. There can be no assurance that these providers will continue to license these products to us on reasonable terms, or at all. Our users are currently able to electronically download copies of the software to play streaming media free of charge, but providers of streaming media products may begin charging users for copies of their player software or otherwise change their business model in a manner that slows the widespread acceptance of these products. In order for our rich media services to be successful, there must be a large base of users of these streaming media products. We have limited or no control over the availability or acceptance of streaming media software, and to the extent that any of these circumstances occur, our business will be adversely affected.

**Content.**  Our future success depends upon our ability to aggregate compelling content and deliver that content through our online properties. We license much of the content that attracts users to our online properties, such as news items, stock quotes, weather reports, maps and audio and video content from third parties. In particular, our music and entertainment properties rely on major sports organizations, radio and television stations, record labels, cable networks, businesses, colleges and universities, film producers and distributors, and other organizations for a large portion of the content available on our properties. Our ability to maintain and build relationships with third-party content providers will be critical to our success. We may be unable to enter into or preserve relationships with the third parties whose content we seek to obtain. Many of our current licenses for third-party content extend for a period of less than two years and there can be no guarantee that they will be renewed upon their expiration. In addition, as competition for compelling content increases both domestically and abroad, our content providers may increase the prices at which they offer their content to us and potential content providers may not offer their content on terms agreeable to us. An increase in the prices charged to us by third-party content providers could harm our operating results and financial condition. Further, many of our content licenses with third parties are non-exclusive. Accordingly, other Webcasters may be able to offer similar or identical content. Likewise, most sports and entertainment content available on our online properties are also available on other media like radio or television. These media are currently, and for the foreseeable future will be, much more widely adopted for listening or viewing such content than the Web. These factors also increase the importance of our ability to deliver compelling editorial content and personalization of this content for users in order to differentiate Yahoo! from other businesses. If we are unable to license or acquire compelling content, if other companies broadcast content that is similar to or the same as that provided by Yahoo!, or if we do not develop compelling editorial content or personalization services, the number of users on our online properties may not grow at all or may grow at a slower rate than anticipated, which would harm our operating results.

*As we provide more audio and video content, particularly music, we may be required to spend significant amounts of money on content acquisition and content broadcasts.*

In the past, the majority of the content that we provided to our users was in print, picture or graphical format and was either created internally or licensed to us by third parties for little or no charge. However, we have been providing and intend to continue to provide increasing amounts of audio and video content to our users, such as the broadcast of music, film content, speeches, news footage, concerts and other special events, through our media and entertainment properties. We believe that users of Internet services such as the Yahoo! online properties will increasingly demand high-quality audio and video content. Such content may require us to make substantial payments to third parties from whom we license or acquire such content.

For example, in order to broadcast music through our online properties, we are currently required to pay royalties both on the copyright in the musical compositions and the copyright in the actual sound recordings of the music to be broadcast. The revenue we receive as a result of our audio and video broadcasts may not justify the costs of providing such broadcasts.

*Our failure to manage growth and diversification of our business could harm us.*

We have experienced dramatic growth in personnel since inception and expect to continue to hire additional personnel in selected areas. This growth requires significant time and resource commitments from us and our senior management. Further, as a result of recent acquisitions and international expansion, more than one-half of our employees are based outside of our Sunnyvale, California headquarters. If we are unable to effectively manage a large and geographically dispersed group of employees or anticipate our future growth, our business will be adversely affected.

Additionally, our business relies on our financial reporting and data systems (including our systems for billing users of our fee-based services), which have grown increasingly complex in the recent past due to acquisitions and the diversification and complexity of our business.  Our ability to operate our business efficiently depends on these systems and if we are unable to adapt to these changes, our business will be adversely affected.

*We are subject to U.S. and foreign government regulation of the Internet, the impact of which is difficult to predict.*

We are subject to general business regulations and laws, as well as regulations and laws directly applicable to the Internet. As we continue to expand the scope of our properties and service offerings, the application of existing laws and regulations to Yahoo! relating to issues such as user privacy, defamation, pricing, advertising, taxation, gambling, sweepstakes, promotions, financial market regulation, consumer protection, content regulation, quality of products and services, and intellectual property ownership and infringement can be unclear. In addition, we will also be subject to new laws and regulations directly applicable to our activities.  Further, the application of existing laws to Yahoo! or our subsidiaries regulating or requiring licenses for certain businesses of our advertisers including, for example, distribution of pharmaceuticals, alcohol, tobacco or firearms, as well as insurance and securities brokerage and legal services, can be unclear.  Any existing or new legislation applicable to us could expose us to substantial liability, including significant expenses necessary to comply with such laws and regulations, and dampen the growth in use of the Web.

Several federal laws, including the following, could have an impact on our business. The Digital Millennium Copyright Act is intended, in part, to limit the liability of eligible online service providers for listing or linking to third-party Websites that include materials that infringe copyrights or other rights of others. The Children's Online Protection Act and the Children's Online Privacy Protection Act are intended to restrict the distribution of certain materials deemed harmful to children and impose additional restrictions on the ability of online services to collect user information from minors. In addition, the Protection of Children From Sexual Predators Act of 1998 requires online service providers to report evidence of violations of federal child pornography laws under certain circumstances. Such legislation may impose significant additional costs on our business or subject us to additional liabilities.

We post our privacy policies and practices concerning the use and disclosure of user data. In addition, GeoCities, a company we acquired in 1999, is required to comply with a consent order between it and the Federal Trade Commission (the "FTC"), which imposes certain obligations and restrictions with respect to information collected from users. Any failure by us to comply with our posted privacy policies, the consent order, FTC requirements or other privacy-related laws and regulations could result in proceedings by the FTC or others which could potentially have an adverse effect on our business, results of operations and financial condition. In this regard, there are a large number of legislative proposals before the United States Congress and various state legislative bodies regarding privacy issues related to our business. It is not possible to predict whether or when such legislation may be adopted, and certain proposals, if adopted, could materially and adversely affect our business through a decrease in user registrations and revenues. This could be caused by, among other possible provisions, the required use of disclaimers or other requirements before users can utilize our services.

Due to the nature of the Web, it is possible that the governments of other states and foreign countries might attempt to regulate Web transmissions or prosecute us for violations of their laws. We might unintentionally violate such laws, such laws may be modified and new laws may be enacted in the future. Any such developments (or developments stemming from enactment or modification of other laws) could increase the costs of regulatory compliance for us or force us to change our business practices.

***We may be subject to legal liability for online services.***

We host a wide variety of services that enable individuals to exchange information, generate content, conduct business and engage in various online activities on an international basis, including public message posting and services relating to online auctions and homesteading. The law relating to the liability of providers of these online services for activities of their users is currently unsettled both within the United States and abroad. Claims have been threatened and have been brought against us for defamation, negligence, copyright or trademark infringement, unlawful activity, tort, including personal injury, fraud, or other theories based on the nature and content of information that we provide links to or that may be posted online or generated by our users or with respect to auctioned materials. In addition, Yahoo! was the subject of a claim brought by certain entities in a French court regarding, among other things, the availability of certain content within our services which was alleged to violate French law. Due to the unsettled nature of the law in this area, we may be subject to similar actions in domestic or other international jurisdictions in the future. Our defense of any such actions could be costly and involve significant distraction of our management and other resources. In addition, we are aware that governmental agencies are currently investigating the conduct of online auctions.

We also periodically enter into arrangements to offer third-party products, services, or content under the Yahoo! brand or via distribution on various Yahoo! properties, including stock quotes and trading information. We may be subject to claims concerning these products, services or content by virtue of our involvement in marketing, branding, broadcasting or providing access to them, even if we do not ourselves host, operate, provide, or provide access to these products, services or content. While our agreements with these parties often provide that we will be indemnified against such liabilities, such indemnification may not be adequate.

It is also possible that, if any information provided directly by us contains errors or is otherwise negligently provided to users, third parties could make claims against us. For example, we offer Web-based email services, which expose us to potential risks, such as liabilities or claims resulting from unsolicited email, lost or misdirected messages, illegal or fraudulent use of email, or interruptions or delays in email service. Investigating and defending any of these types of claims is expensive, even to the extent that the claims do not ultimately result in liability.

***We issued $750 million of zero coupon senior convertible notes due April 2008 which we may not be able to repay in cash and could result in dilution of our earnings per share.***

In April 2003, we issued $750 million of zero coupon senior convertible notes due April 1, 2008. The notes are convertible into our common stock at a conversion price of $20.50 per share (split-adjusted), which would result in the issuance of an aggregate of 37 million shares (split-adjusted), subject to adjustment upon the occurrence of specified events. Therefore, each $1,000 principal amount of the notes will initially be convertible into 48.7804 shares (split-adjusted) of our common stock prior to April 1, 2008 if the sale price of our common stock issuable upon conversion of the notes reaches a specified threshold or specified corporate transactions have occurred. The specified thresholds for conversion prior to the maturity date are (1) the closing sale price of our common stock for at least 20 trading days in the 30 trading-day period ending on the last trading day of the immediately preceding fiscal quarter exceeds 110 percent of the conversion price in effect on that 30th trading day, and (2) during the period beginning January 1, 2008 through the maturity date, the closing sale price of our common stock on the previous trading day was 110 percent or more of the then current conversion price. We may be required to repurchase all of the notes at face value following a fundamental change of the Company, such as a change of control, prior to maturity. Following a fundamental change of the Company, we may choose to pay the purchase price of the notes in cash, shares of our common stock, shares of common stock of the surviving corporation, or a combination of cash and shares of the applicable common stock. We may not have enough cash on hand or have the ability to access cash to pay the notes if presented on a fundamental change or at maturity. In addition, the purchase of our notes with shares of our common stock or the conversion of the notes into our common stock could result in dilution of our earnings per share.

40

*Our stock price has been volatile historically and may continue to be volatile.*

The trading price of our common stock has been and may continue to be subject to wide fluctuations. During the first quarter of 2004, the closing sale prices of our common stock on the Nasdaq ranged from $20.83 to $24.87 per share (split-adjusted) and the closing sale price on May 3, 2004 was $26.15 per share (split-adjusted). Our stock price may fluctuate in response to a number of events and factors, such as quarterly variations in operating results; announcements of technological innovations or new products and media properties by us or our competitors; changes in financial estimates and recommendations by securities analysts; the operating and stock price performance of other companies that investors may deem comparable to us; the operating performance and stock price of companies in which we have an equity investment, including Yahoo! Japan; and news reports relating to trends in our markets or general economic conditions.

In addition, the stock market in general, and the market prices for Internet-related companies in particular, have experienced volatility that often has been unrelated to the operating performance of such companies. These broad market and industry fluctuations may adversely affect the price of our stock, regardless of our operating performance. Additionally, volatility or a lack of positive performance in our stock price may adversely affect our ability to retain key employees, all of whom have been granted stock options.

*Our operations could be significantly hindered by the occurrence of a natural disaster or other catastrophic event.*

Our operations are susceptible to outages due to fire, floods, power loss, telecommunications failures, break-ins and similar events. In addition, a significant portion of our network infrastructure is located in Northern California, an area susceptible to earthquakes. We do not have multiple site capacity for all of our services in the event of any such occurrence. In an effort to reduce the likelihood of a geographical or other disaster impacting our business, we have distributed and intend to continue distributing our servers among additional data centers located around the world. Failure to execute these changes properly or in a timely manner could result in delays or interruptions to our service. In addition, despite our implementation of network security measures, our servers are vulnerable to computer viruses, physical and electronic break-ins, and similar disruptions from unauthorized tampering with our computer systems.

*Technological or other assaults on our service could harm our business.*

We are vulnerable to coordinated attempts to overload our systems with data, resulting in denial or reduction of service to some or all of our users for a period of time. We have experienced a coordinated denial of service attack in the past, and may experience such attempts in the future. We may not carry sufficient business interruption insurance to compensate us for losses that may occur as a result of any of these events. Any such event could reduce our revenue and harm our operating results and financial condition.

*Anti-takeover provisions could make it more difficult for a third party to acquire us.*

We have adopted a stockholder rights plan and initially declared a dividend distribution of one right for each outstanding share of common stock to stockholders of record as of March 20, 2001. As a result of our two-for-one stock split effective May 11, 2004, each share of common stock will now be associated with one-half of one right. Each right entitles the holder to purchase one unit consisting of one one-thousandth of a share of our Series A Junior Participating Preferred Stock for $250 per unit. Under certain circumstances, if a person or group acquires 15 percent or more of our outstanding common stock, holders of the rights (other than the person or group triggering their exercise) will be able to purchase, in exchange for the $250 exercise price, shares of our common stock or of any company into which we are merged having a value of $500. The rights expire on March 1, 2011 unless extended by our board of directors. Because the rights may substantially dilute the stock ownership of a person or group attempting to take us over without the approval of our board of directors, our rights plan could make it more difficult for a third party to acquire us (or a significant percentage of our outstanding capital stock) without first negotiating with our board of directors regarding such acquisition.

In addition, our board of directors has the authority to issue up to 10,000,000 shares of Preferred Stock (of which 2,000,000 shares have been designated as Series A Junior Participating Preferred Stock) and to determine the price, rights, preferences, privileges and restrictions, including voting rights, of those shares without any further vote or action by the stockholders.

The rights of the holders of our common stock may be subject to, and may be adversely affected by, the rights of the holders of any Preferred Stock that may be issued in the future. The issuance of Preferred Stock may have the effect of delaying, deterring or preventing a change of control of Yahoo! without further action by the stockholders and may adversely affect the voting and other rights of the holders of our common stock. Further, certain provisions of our charter documents, including provisions eliminating the ability of stockholders to take action by written consent and limiting the ability of stockholders to raise matters at a meeting of stockholders without giving advance notice, may have the effect of delaying or preventing changes in control or management of Yahoo!, which could have an adverse effect on the market price of our stock. In addition, our charter documents do not permit cumulative voting, which may make it more difficult for a third party to gain control of our Board of Directors. Further, we are subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law, which will prohibit us from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder, even if such combination is favored by a majority of stockholders, unless the business combination is approved in a prescribed manner. The application of Section 203 also could have the effect of delaying or preventing a change of control or management.

***Terrorist attacks and the recent hostilities in Iraq have contributed to economic instability in the United States and internationally, which could lead to reduced advertising spending by our customers.***

On September 11, 2001, the United States was the target of terrorist attacks of unprecedented scope, and in March 2003, the United States became involved in hostilities with Iraq. These events, coupled with political instability elsewhere in the world have caused volatility in the financial markets and uncertainty in the global economy.  Under these circumstances, there is a risk that our existing and potential customers may decrease spending, particularly for marketing services.  Because marketing services continue to constitute a majority of our revenues, any such decrease in expenditures could materially and adversely affect our operating results and financial condition.  In addition, the political and economic conditions described above may contribute to increased volatility in stock prices, which may cause our stock price to decline.

***Special note regarding forward-looking statements.***

Some of the statements in this Report constitute forward-looking statements.  In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "intend," "expect," "plan," "anticipate," "believe," "estimate," "predict," "potential," or "continue" or the negative of such terms or other comparable terminology.   This Report includes, among others for fiscal 2004, statements regarding our:

- primary operating costs and expenses;
- capital expenditures;
- use of funds from the sale of convertible notes, together with cash and investments;
- operating lease arrangements;
- evaluation of possible acquisitions of, or investments in business, products and technologies; and
- existing cash and investments being sufficient to meet operating requirements.

These statements involve known and unknown risks, uncertainties, and other factors that may cause our or our industry's results, levels of activity, performance, or achievements to be materially different from any future results, levels of activity, performance, or achievements expressed or implied by such forward-looking statements.  Such factors include, among others, those listed in these "Risk Factors" and elsewhere in this Report.  Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, events, levels of activity, performance, or achievements.  We do not assume responsibility for the accuracy and completeness of the forward-looking statements.  We do not intend to update any of the forward-looking statements after the date of this Report to conform them to actual results.

**Signatures**

     In accordance with the requirements of the Exchange Act, the Registrant has caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

YAHOO! INC.

|  |  |
|---|---|
| Dated:  May 7, 2004 | By:  /s/  SUSAN DECKER<br>Susan Decker<br>Executive Vice President, Finance and Administration, and<br>Chief Financial Officer (Principal Financial Officer) |
| Dated:  May 7, 2004 | By:  /s/  PATRICIA CUTHBERT<br>Patricia Cuthbert<br>Vice President and Corporate Controller (Principal Accounting Officer) |

48

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

YAHOO! INC.

By:      /s/ Michael J. Callahan
Name:    Michael J. Callahan
Title:    SVP, General Counsel and Secretary


SOFTBANK CORP.

By:      /s/ Masayoshi Son
Name:    Masayoshi Son
Title:    President & CEO

3

---

Exhibit 31.1

**Certification of CEO Pursuant to
Securities Exchange Act Rules 13a-14(a) and 15d-14(a)
as Adopted Pursuant to
Section 302 of the Sarbanes-Oxley Act of 2002**

I, Terry Semel, the Chief Executive Officer of Yahoo! Inc., certify that:

1.      I have reviewed this quarterly report on Form 10-Q of Yahoo! Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (c)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of registrant's board of directors (or persons performing the equivalent function):

   (a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Terry Semel
Chief Executive Officer

1

---

**Exhibit 31.2**

### Certification of CFO Pursuant to
### Securities Exchange Act Rules 13a-14(a) and 15d-14(a)
### as Adopted Pursuant to
### Section 302 of the Sarbanes-Oxley Act of 2002

I, Susan Decker, the Chief Financial Officer of Yahoo! Inc., certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Yahoo! Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

    (c)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of registrant's board of directors (or persons performing the equivalent function):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: May 7, 2004                    By:    /s/ SUSAN DECKER
                                              Susan Decker
                                              Chief Financial Officer

1

---

**Exhibit 32**

### Certification of CEO and CFO Pursuant to
### 18 U.S.C. Section 1350,
### as Adopted Pursuant to
### Section 906 of the Sarbanes-Oxley Act of 2002

In connection with the Quarterly Report on Form 10-Q of Yahoo! Inc. (the "Company") for the quarter ended March 31, 2004 as filed with the

Securities and Exchange Commission on the date hereof (the "Report"), Terry Semel, as Chief Executive Officer of the Company, and Susan Decker, as Chief Financial Officer of the Company, each hereby certifies, pursuant to 18 U.S.C. §1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, to the best of his and her knowledge, respectively, that:

(1)    The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: May 7, 2004

By:    /s/ TERRY SEMEL
Terry Semel
Chief Executive Officer

Dated: May 7, 2004

By:    /s/ SUSAN DECKER
Susan Decker
Chief Financial Officer

A signed original of this written statement required by Section 906 of the Sarbanes-Oxley Act of 2002 has been provided to Yahoo! Inc. and will be retained by Yahoo! Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

1

**End of Filing**

Powered By 

**© 2005 | EDGAR Online, Inc.**

Exhibit 8

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-Q

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2004**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**Commission File Number 0-28018**

# YAHOO! INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **77-0398689** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**701 First Avenue**
**Sunnyvale, California 94089**
(Address of principal executive offices)

Registrant's telephone number, including area code: **(408) 349-3300**

Indicate by check mark whether the Registrant (1) has filed all reports required by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days: Yes ☒   No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). Yes ☒   No ☐

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Class | Outstanding at July 30, 2004 |
|---|---|
| Common stock, $0.001 par value | 1,360,577,284 |

**Contractual Obligations.**  Contractual obligations at June 30, 2004 are as follows (in millions):

| | | Payments due by period | | | |
|---|---|---|---|---|---|
| | Total | Due in 2004 | Due in 2005-2006 | Due in 2007-2008 | Due in 2009 or after |
| Long-term debt (1) | $ 750 | $ — | $ — | $ 750 | $ — |
| Operating lease obligations, net of sublease income | 232 | 19 | 63 | 45 | 105 |
| Affiliate commitments (2) | 419 | 81 | 335 | 3 | — |
| Noncancelable purchase obligations | 84 | 27 | 56 | 1 | — |
| Total contractual obligations | $ 1,485 | $ 127 | $ 454 | $ 799 | $ 105 |

(1)   The long-term debt matures in April 2008, unless converted into Yahoo! common stock at a conversion price of $20.50 per share, subject to adjustment upon the occurrence of certain events.  Upon conversion, Yahoo! has the right to deliver cash in lieu of common stock.  See Note 8 – "Long-Term Debt" for further information related to the long-term debt.

(2)   Represents fixed payments that we are obligated to make fixed under contracts to provide search services to our third party affiliates, which represent traffic acquisition costs.

At June 30, 2004 and 2003, we did not have any relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance or special purpose entities, which would have been established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes. As such, we are not exposed to any financing, liquidity, market or credit risk that could arise if we had engaged in such relationships.

## RISK FACTORS

*We face significant competition from companies such as Time Warner's AOL, Microsoft and Google.*

We face significant competition from companies that have combined a variety of services under one brand name in a manner similar to Yahoo!, including Time Warner's America Online business ("AOL" or "America Online"), Google Inc. ("Google"), and Microsoft Corporation ("Microsoft" or "MSN").  The combination of America Online and Time Warner provides America Online with content from Time Warner's movie and television, music, books and periodicals, news, sports and other media holdings; access to a network of cable and other broadband delivery technologies; and considerable resources for future growth and expansion. The America Online/Time Warner combination also provides America Online with access to a broad potential customer base consisting of Time Warner's current customers and subscribers of its various media properties.  Many of these competitors are developing new technologies, allocating extensive resources to product development and marketing and expanding their offerings which may be competitive with our offerings.  For example, Google has announced the development of a consumer email service and has launched shopping services that may be competitive with services that we offer and Microsoft has announced plans to develop its own search services.  In certain of these cases, most notably AOL and MSN, our competition has a direct billing relationship with a greater number of their users through access and other services than we have with our users through certain of our premium services. This relationship permits our competitors to have several potential advantages including the potential to be more effective than us in targeting services and advertisements to the specific taste of their users.

*If our competitors are more successful in attracting and retaining customers and users, then our revenues could decline.*

We also compete for customers and users with many other providers of online navigation, Web search, commercial search, information, entertainment, business, recruitment, community, electronic commerce and Internet access services. As we expand the scope of our Internet offerings, we will compete directly with a greater number of Internet sites, media companies, and companies providing business services across a wide range of different online services, including:

- companies offering communications, Web search, commercial search, information, community and entertainment services and Internet access either on a stand alone basis or integrated into other products and media properties;

- vertical markets where competitors may have advantages in expertise, brand recognition, available financial and other resources, and other factors;

- online employment recruiting companies; and

- online merchant hosting services.

In order to compete effectively, we may need to expend significant internal engineering resources or acquire other technologies and companies to provide or enhance our capabilities.  If we are unable to maintain or expand our customer and user base in the future, our revenues may decline.

***Our acquisitions of Inktomi and Overture expose our business to greater competition in the area of Web search and paid inclusion services.***

In March 2003 we completed our acquisition of Inktomi Corporation ("Inktomi"), a provider of Web search and paid inclusion services.  In addition, we completed our acquisition of Overture Services, Inc. ("Overture") in October 2003, increasing our Web search and paid inclusion business through Overture's Alta Vista and Fast Search & Transfer Web search businesses.  As a result of these acquisitions, we compete directly with other providers of Web search and related search services, including, among others, AskJeeves, Inc., Google, and LookSmart, Ltd.  Some of these competitors may have longer operating histories focusing on providing Web search services, larger customer or user bases and greater brand recognition for their Web search businesses.  In addition to the general acquisition risks highlighted in these risk factors, we are subject to the risk that other companies with greater operational, strategic, financial, personnel or other resources may choose to enter the Web search or paid inclusion spaces by acquisition or internal development, and may create greater competition for advertisers, customers and users.

***If we are unable to provide search technologies and services which generate significant traffic to our Web sites, our business could be harmed.***

We recently deployed our own Web search technology to provide Web search results on our network.  We have limited experience in operating our own search service.  Web search is characterized by rapidly changing technology, significant competition, evolving industry standards, and frequent enhancements.  We must continually invest in improving user experience, search relevance, speed, our operational infrastructure and other aspects of our search technology to continue to attract, retain and expand our user base.  If we are unable to provide search technologies and services which generate significant traffic to our Web sites, our business could be harmed.

***If Overture fails to maintain its advertiser, user, business and affiliate constituencies, our revenues could significantly decline and our business could be adversely affected.***

Overture's pay-for-performance search service is comprised of advertiser-generated listings, which are screened for relevance and accessed by users and businesses through the Yahoo! properties and through Overture's affiliates, a network of other Web properties that have integrated Overture's search service into their sites or that direct user traffic to Overture's sites.  The search listings are ranked according to the advertiser's bid; that is, the higher the bid, the higher the ranking. Advertisers pay Overture the bid price for clicks on the advertiser's search listing (also known as a paid introduction, click-through or a paid click).  Overture's success in pay-for-performance search services depends in part on the maintenance of a critical mass of advertisers, users, and traffic generated by the Yahoo! properties and Overture's affiliates.  Such a critical mass encourages increased participation in Overture's paid placement search marketplace.  To the extent Overture experiences a decline in the number of any of these constituents, the value of Overture's paid placement service could be harmed, and our revenues or business could be adversely affected.

***Our acquisition of Overture exposes our business to greater competition with providers of pay-for-performance advertising search services.***

As a result of our acquisition of Overture, we compete directly with other providers of pay-for-performance advertising services that are similar to Overture's, including FindWhat.com (which recently acquired Esspotting Media, Inc.), Google, LookSmart, Ltd., and Terra Lycos.  In addition, we believe it is likely that there will be additional entrants to the pay-for-performance search market.  Some of these entrants may have greater operational, strategic, financial, personnel or other resources than we do, as well as greater brand recognition.  These competitors compete against Overture for affiliate arrangements and could cause Overture to enter into affiliate arrangements with less favorable terms, lose current affiliates or not acquire new affiliates, which could reduce the number of click-throughs, increase the amount of revenue shared with affiliates, and reduce total revenues and thereby harm our business, operating results and financial condition.

*Acquisitions could result in operating difficulties.*

As part of our business strategy, we have made strategic acquisitions, including Overture in October 2003, 3721 Network Software Company Limited ("3721") in January 2004, and Kelkoo S.A. ("Kelkoo") in April 2004. We expect to enter into additional business combinations and acquisitions in the future. Acquisitions may result in dilutive issuances of equity securities, use of our cash resources, incurrence of debt and amortization of expenses related to intangible assets. Our acquisitions to date were accompanied by a number of risks, including:

- the difficulty of assimilating the operations and personnel of our acquired companies with and into Yahoo!'s operations;

- the potential disruption of our ongoing business and distraction of management;

- the difficulty of incorporating acquired technology and rights into our products and unanticipated expenses related to such integration;

- the failure to further successfully develop acquired technology resulting in the impairment of amounts currently capitalized as intangible assets;

- the impairment of relationships with customers of the acquired companies or our own customers as a result of any integration of operations;

- the impairment of relationships with employees of the acquired companies or our own business as a result of any integration of new management personnel;

- in the case of 3721 and Kelkoo, uncertainty regarding foreign laws and regulations and difficulty integrating operations and systems as a result of cultural, systems and operational differences; and

- the potential unknown liabilities associated with the acquired companies.

We may experience similar risks in connection with our future acquisitions. We may not be successful in addressing these risks or any other problems encountered in connection with our acquisitions or that we could encounter in future acquisitions, which would harm our business or cause us to fail to realize the anticipated benefits of our acquisitions.

***We may be subject to intellectual property infringement claims, which are costly to defend and could limit our ability to provide certain content or use certain technologies in the future.***

Many parties are actively developing search, indexing, electronic commerce and other Web-related technologies, as well as a variety of online business models and methods. We believe that these parties will continue to take steps to protect these technologies, including, but not limited to, seeking patent protection. As a result, disputes regarding the ownership of these technologies and rights associated with online business are likely to arise in the future. In addition to existing patents and intellectual property rights, we anticipate that additional third-party patents related to our services will be issued in the future. From time to time, parties assert patent infringement claims against us in the form of letters, lawsuits and other forms of communications. Currently, we are engaged in several lawsuits regarding patent issues and have been notified of a number of other potential disputes. We expect that we will increasingly be subject to patent litigation as our services expand.

In addition to patent claims, third parties have asserted and most likely will continue to assert claims against us alleging infringement of copyrights, trademark rights, trade secret rights or other proprietary rights, or alleging unfair competition or violations of privacy rights. Currently, our subsidiary LAUNCH Media, Inc. ("LAUNCH") is engaged in a lawsuit regarding copyright issues that commenced prior to our acquisition of LAUNCH. In addition, Overture is in litigation with several companies, each of which has claimed that allowing advertisers to bid on certain search terms constitutes trademark infringement.

In the event that there is a determination that we have infringed third-party proprietary rights such as patents, copyrights, trademark rights, trade secret rights or other third party rights such as publicity and privacy rights, we could incur substantial monetary liability, be required to enter into costly royalty or licensing agreements, if available, or be prevented from using the rights, which could require us to change our business practices in the future. We may also incur substantial expenses in defending against third-party infringement claims regardless of the merit of such claims. As a result, these claims could harm our business.

34

***Our intellectual property rights are valuable and any inability to protect them could dilute our brand image or harm our business.***

We regard our copyrights, patents, trademarks, trade dress, trade secrets, and similar intellectual property, including our rights to certain domain names, as important to Yahoo!'s success. Effective trademark, patent, copyright, and trade secret protection may not be available in every country in which our products and media properties are distributed or made available through the Internet. Further, the efforts we have taken to protect our proprietary rights may not be sufficient or effective. If we are unable to protect our trademarks from unauthorized use, our brand image may be harmed. While we attempt to ensure that the quality of our brand is maintained by our licensees, our licensees may take actions that could impair the value of our proprietary rights or the reputation of our products and media properties. We are aware that third parties have, from time to time, copied significant content available on Yahoo! for use in competitive Internet services. Protection of the distinctive elements of Yahoo! may not be available under copyright law. Any impairment of our brand image could harm our business and cause our stock price to decline. In addition, protecting our intellectual property and other proprietary rights can be expensive. Any increase in the unauthorized use of our intellectual property could make it more expensive to do business and consequently harm our operating results. In turn, this could harm the results of our business and lower our stock price.

***Our international segment competes with local Internet service providers that may have a competitive advantage.***

On an international level, we compete directly with local Internet Service Providers ("ISPs"). These ISPs may have several advantages, including greater knowledge about the particular country or local market and access to significant financial or strategic resources in such local markets. We must continue to improve our product offerings, become more knowledgeable about our local users and their preferences, deepen our relationships with our local users as well as increase our branding and other marketing activities in order to remain competitive and strengthen our international market position.

***Financial results for any particular period will not predict results for future periods.***

There can be no assurance that the purchasing pattern of customers advertising on the Yahoo! network will not continue to fluctuate, that advertisers will not make smaller and shorter-term purchases, or that market prices for online advertising will not decrease due to competitive or other factors. In addition, there can be no assurance that the volume of searches conducted, the amounts bid by advertisers for search listings or the number of advertisers that bid on the Overture service will not vary widely from period to period. As revenues from sources other than advertising increase, it may become more difficult to predict our financial results based on historical performance. Because of the rapidly changing market we serve, period-to-period comparisons of operating results are not likely to be meaningful. You should not rely on the results for any period as an indication of future performance.

***We expect our operating expenses to continue to increase as we attempt to expand the Yahoo! brand, fund product development, develop media properties and acquire other businesses.***

Yahoo! currently expects that its operating expenses will continue to increase as we expand our operations in areas of expected growth, continue to develop and extend the Yahoo! brand, fund greater levels of product development, develop and commercialize additional media properties and premium services, and acquire and integrate complementary businesses and technologies. If our expenses increase at a greater pace than our revenues, our operating results could be harmed.

***We may be required to record a significant charge to earnings if we must reassess our goodwill or amortizable intangible assets.***

We are required under generally accepted accounting principles to review our amortizable intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Goodwill is required to be tested for impairment at least annually. Factors that may be considered a change in circumstances indicating that the carrying value of our amortizable intangible assets may not be recoverable include a decline in stock price and market capitalization, and slower growth rates in our industry. We may be required to record a significant charge to earnings in our financial statements during the period in which any impairment of our goodwill or amortizable intangible assets is determined. At June 30, 2004, our goodwill and amortizable intangible assets were $2.8 billion. In the first quarter of 2002, we recorded a transitional impairment charge of $64 million as a cumulative effect of an accounting change, upon the adoption of Statement of Financial Accounting Standards No. 142 "Goodwill and Other Intangible Assets."

**The majority of our revenues are derived from marketing services. Demand from our current and potential clients for online advertising is difficult to forecast accurately.**

For the quarter ended June 30, 2004, approximately 83 percent of our total revenues came from marketing services. Our ability to continue to achieve substantial advertising revenue depends upon:

- growth of our user base, including through our email and other communications services;

- broadening our relationships with advertisers to small and medium size businesses;

- our user base being attractive to advertisers;

- demand for our commercial search services by advertisers, users and businesses, including prices paid by advertisers, the number of searches performed by users and the rate at which they click-through to commercial search results;

- our ability to maintain our affiliate program for our commercial search services;

- our ability to generate significant traffic to our Websites;

- our ability to derive better demographic and other information from our users; and

- continued acceptance of the Web by advertisers as an advertising medium.

Our agreements with advertisers and sponsors generally have terms of three years or less and, in many cases, the terms are one year or less or, in the case of Overture's business, may be immediately terminable by the advertiser. The agreements often have payments contingent on usage or click-through levels. Accordingly, it is difficult to forecast these revenues accurately. However, our expense levels are based in part on expectations of future revenues, include guaranteed minimum payments to our affiliates in connection with our pay-for-performance advertising services, and are fixed over the short-term with respect to certain categories. We may be unable to adjust spending quickly enough to compensate for any unexpected revenue shortfall.

**Overture depends on a limited number of sources to direct users and businesses to its service to conduct searches.**

The users and businesses that conduct searches on Overture's service come from a limited number of sources. In addition to the Yahoo! properties, sources for users conducting searches are members of Overture's affiliate network, including portals, browsers, and other affiliates. Overture's agreements with affiliates vary in duration, and depending on the agreement, provide varying levels of discretion to the affiliate in the implementation of the Overture service, including the degree to which affiliates can modify the presentation of the Overture search results on their websites or integrate the Overture services with their own services, and may be terminable upon the occurrence of certain events, including failure to meet certain service levels, material breaches of agreement terms, changes in control (including the change of control of Overture which occurred with Yahoo!'s acquisition of Overture) or in some instances, at will. Overture may not be successful in renewing any of its affiliate agreements, or if they are renewed, they may not be on as favorable terms. The loss of any of these affiliates or adverse change in implementation of the Overture service by any of our affiliates could harm our ability to generate revenue and our operating results.

**Decreases or delays in advertising spending due to general economic downturns could harm our ability to generate advertising revenue.**

Expenditures by advertisers tend to be cyclical, reflecting overall economic conditions as well as budgeting and buying patterns. In the past, the overall market for advertising, including Internet advertising, was generally characterized by softness of demand and the reduction of marketing and advertising budgets or the delay in spending of budgeted resources. As a result, advertising spending decreased. Since Yahoo! derives a large part of its revenues from advertising fees, any decreases in or delays of advertising spending could reduce our revenues or negatively impact our ability to grow our revenues. Even as economic conditions improve, marketing budgets and advertising spending may not increase from current levels.

**We have dedicated considerable resources to provide a variety of premium services, which may not prove to be successful in generating significant revenue for us.**

We offer fee-based enhancements to many of our free services, including email, instant messaging, personals, finance, games and sports. The development cycles for these technologies are long and generally require significant investment by us. We must continue to provide new services that are compelling to our users while continuing to develop an effective method for generating revenues for such services. If we cannot generate revenues from these services that are greater than the cost of providing such services, our operating results will be harmed.

***Due to intense competition, we may not be able to generate substantial revenues from the Internet access market.***

Through alliances with Internet access providers, we offer access services that combine customized content and services from Yahoo! (including browser and other communications services) and Internet access from the third party access providers. These Internet access services compete with many large companies such as AOL, MSN, Comcast Corporation and other established Internet access providers. In certain of these cases, our competition has substantially greater market presence (including an existing user base), and financial, technical, marketing or other resources than those committed to our product offerings. As a result of these and other competitive factors, these services may not be able to attract, grow or retain a customer base, which would negatively impact our ability to sell customized content and services through this channel.

***Our success in the Internet access market will depend on technical and customer service issues, which we have a limited ability to control.***

Internet access services, including those we provide through alliances with access providers, are susceptible to natural or man-made disasters such as earthquakes, floods, fires, power loss, or sabotage, as well as interruptions from technology malfunctions, computer viruses or hacker attacks. Other potential service interruptions may result from unanticipated demands on network infrastructure, increased traffic or problems in customer service to our access customers. Our ability to control technical and customer service issues is further limited by our dependence on the access provider for connectivity, customer service, joint marketing and technical integration of aspects of our access service. Significant disruptions in our access service could harm our goodwill, the Yahoo! brand and ultimately could significantly and negatively impact the amount of revenue we may earn from our service.

***Some of our sponsorship arrangements may not generate anticipated revenues.***

A key element of our strategy is to generate marketing services revenue through sponsored services and placements by third parties in our online media properties in addition to banner advertising. We typically receive sponsorship fees or a portion of transactions revenue in return for minimum levels of user impressions to be provided by us. These arrangements expose us to potentially significant financial risks in the event our usage levels decrease, including the following:

- the fees we are entitled to receive may be adjusted downwards;

- we may be required to "make good" on our obligations by providing alternative services;

- the sponsors may not renew the arrangements or may renew at lower rates; and

- the arrangements may not generate anticipated levels of shared transactions revenue, or sponsors may default on the payment commitments in such agreements as has occurred in the past.

Accordingly, any leveling off or decrease of our user base (or usage by our existing base) or the failure to generate anticipated levels of shared transactions revenue could result in a significant decrease in our revenues.

***We may not be successful in expanding the number of users of our electronic commerce services.***

We have focused, and intend to continue to focus, significant resources on the development and enhancement of our electronic commerce properties, such as Yahoo! Shopping. The success of our electronic commerce properties depends on, among other things, our ability to attract and retain well-known brands among our network of retailers, the ability to generate traffic to our commerce properties, and, in some cases, the rate at which users click through to search results. Through our electronic commerce properties, we do not establish a direct billing relationship with our users as a result of any purchases they may make with the retailers. The revenue that we derive from our electronic commerce properties is typically in the form of lead-based fees, wherein retailers pay a fee based on the number of times a user clicks on a link to their site, transaction fees, and advertising fees. Users who had a favorable buying experience with a particular retailer may contact that retailer directly for future purchases rather than through our service. If our users bypass our electronic commerce properties, such as Yahoo! Shopping, and contact retailers directly, our revenue could decline. Competing providers of online shopping, including merchants with whom we have relationships, may provide a more convenient and comprehensive online shopping experience due to their singular focus on electronic commerce. As a result, we may have difficulty competing with those merchants for users of electronic commerce services and as a consequence our revenue could decline or we could fail to generate significant revenues from electronic commerce.

***We will continue to operate in international markets in which we have limited experience and are faced with relatively higher costs and are exposed to greater risks.***

A key part of our strategy is to develop Yahoo!-branded online properties and expand our commercial search offerings in international markets. We have developed, through joint ventures, subsidiaries and branch offices, localized properties and search services in over 20 international countries.  To date, we have only limited experience in marketing and operating our products and services internationally, and we rely on the efforts and abilities of our foreign business partners in such activities.

We believe that in light of substantial competition, we need to expand our operations in international markets quickly in order to obtain market share effectively. However, in a number of international markets, especially those in Europe, we face substantial competition from ISPs that offer or may offer their own navigational services and from other companies that provide commercial search services. Many of these companies have a dominant market share in their territories. Furthermore, foreign providers of competing online services may have a substantial advantage over us in attracting users in their country due to more established branding in that country, greater knowledge with respect to the tastes and preferences of users residing in that country and/or their focus on a single market. We have experienced and expect to continue to experience higher costs as a percentage of revenues in connection with the development and maintenance of our international online properties relative to our domestic experience. Our operations in international markets may not develop at a rate that supports our level of investment. In particular, certain international markets may be slower than domestic markets in adopting the Internet as an advertising and commerce medium.

***Our international operations are subject to increased risks.***

In addition to uncertainty about our ability to continue to generate revenues from our foreign operations and expand our international presence, there are certain risks inherent in doing business on an international level, including:

- trade barriers and unexpected changes in regulatory requirements;

- difficulties in developing, staffing and simultaneously managing a large number of unique foreign operations as a result of distance, language and cultural differences;

- longer payment cycles;

- currency exchange rate fluctuations;

- political or social unrest or economic instability;

- import or export restrictions;

- seasonal reductions in business activity;

- risks related to government regulation including those more fully described below; and

- potentially adverse tax consequences.

One or more of these factors could harm our future international operations and consequently, could harm our business, operating results, and financial condition.

***If key personnel leave unexpectedly and are not replaced, we may not be able to execute our business plan.***

We are substantially dependent on the continued services of our key personnel, including our two founders, our chief executive officer, chief financial officer, chief operating officer, chief technical officer, and our executive and senior vice presidents. These individuals have acquired specialized knowledge and skills with respect to Yahoo! and its operations.  If any of these individuals were to leave unexpectedly, we could face substantial difficulty in hiring qualified successors and could experience a loss in productivity while any such successor obtains the necessary training and experience. Many of our management personnel have reached or will soon reach the four-year anniversary of their Yahoo! hiring date and, as a result, have become or will shortly become fully vested in their initial stock option grants. While management personnel are typically granted additional stock options subsequent to their hire date, which will usually vest over a period of four years to provide additional incentive to remain at Yahoo!, the initial option grant is typically the largest for a given position, and an employee may be more likely to leave Yahoo! upon completion of the vesting period for the initial option grant.

***If we are unable to hire qualified personnel in designated growth areas, we may not be able to execute our business plan.***

We expect that we will need to hire additional personnel in designated growth areas. The competition for qualified personnel can be intense, particularly in the San Francisco Bay Area, where our corporate headquarters are located. At times, we have experienced difficulties in hiring personnel with the right training or experience, particularly in technical areas. If we do not succeed in attracting new personnel, or retaining and motivating existing personnel, we may be unable to meet our business plan and as a result our stock price may decline.

***We may have difficulty scaling and adapting our existing architecture to accommodate increased traffic and technology advances or customer requirements.***

Yahoo! is one of the most highly trafficked Websites on the Internet and is regularly serving numbers of users and delivering daily page views which are beyond previous standards for Internet usage. In addition, the services offered by Yahoo!, and popular with users and customers, have changed significantly in the past, are expected to change rapidly in the future, and are difficult to predict. Rapid increases in the levels or types of use of our online properties and services could result in delays or interruptions in our service. In particular, the architectures utilized for our services are highly complex and may not provide satisfactory service in the future, especially as the usage levels of email and certain other services increase, the rate of unsolicited email continues to increase in volume and complexity and the number of advertisers utilizing the Overture service increases. In the future, we may be required to make significant changes to our architectures, including moving to completely new architectures. If we are required to switch architectures, we may incur substantial costs and experience delays or interruptions in our service. These delays or interruptions in our service may cause users and customers to become dissatisfied with our service and move to competing providers of online services. Further, to the extent that demand for our services increases, we will need to expand our infrastructure, including the capacity of our hardware servers and the sophistication of our software. This expansion is likely to be expensive and complex, and require additional technical expertise. As we acquire users who rely upon us for a wide variety of services, it becomes more technologically complex and costly to retrieve, store and integrate data that will enable us to track each user's preferences. Any difficulties experienced in adapting our architectures and infrastructure to accommodate increased traffic and user preferences and the associated costs and potential loss of traffic could harm our operating results and financial condition.

***More individuals are utilizing non-PC devices to access the Internet, and versions of our service developed or optimized for these devices may not gain widespread adoption by users of such devices.***

The number of individuals who access the Internet through devices other than a personal computer, such as personal digital assistants, mobile telephones and television set-top devices, has increased dramatically. Our services were originally designed for rich, graphical environments such as those available on desktop and laptop computers. The lower resolution, functionality and memory associated with alternative devices may make the use of our services through such devices difficult, and the versions of our service developed for these devices may not be compelling to users of alternative devices. As we have limited experience to date in operating versions of our service developed or optimized for users of alternative devices, it is difficult to predict the problems we may encounter in doing so, and we may need to devote significant resources to the creation, support and maintenance of such versions. If we are unable to attract and retain a substantial number of alternative device users to our online services, we will fail to capture a sufficient share of an increasingly important portion of the market for online services.

***Our competitors often provide Internet access or computer hardware to our users, and our competitors could make it difficult for our users to access our services, which in turn, could reduce the number of our users.***

Our users must access our services through an Internet access provider, including providers of cable and DSL Internet access. To the extent that an access provider (other than those with which we have a relationship), such as AOL or MSN, or a computer or computing device manufacturer offers online services or properties that are competitive with those of Yahoo!, the user may find it more convenient to use the services or properties of that access provider or manufacturer. In addition, the access provider or manufacturer may make it difficult to access our services by not listing them in the access provider's or manufacturer's own directory.  To the extent that a user opts to use the services offered by an access provider (other than those with which we have a relationship) or those offered by computer or computing device manufacturers rather than the services provided by us, our revenues may decline.

*We rely on the value of the Yahoo! brand, and the costs of maintaining and enhancing our brand awareness are increasing.*

We believe that maintaining and expanding the Yahoo! brand (and our other brands, including HotJobs, Inktomi, LAUNCH, and Overture) is an important aspect of our efforts to attract and expand our user and advertiser base. We also believe that the importance of brand recognition will increase due to the relatively low barriers to entry. We have spent considerable money and resources to date on the establishment and maintenance of the Yahoo! brands. We will spend increasing amounts of money on, and devote greater resources to advertising, marketing and other brand-building efforts to preserve and enhance consumer awareness of the Yahoo! brands. We may not be able to successfully maintain or enhance consumer awareness of the Yahoo! brands and, even if we are successful in our branding efforts, such efforts may not be cost-effective. If we are unable to maintain or enhance customer awareness of the Yahoo! brands in a cost effective manner, our business, operating results and financial condition would be harmed.

*The successful operation of our business depends upon the supply of critical elements from other companies and any interruption in that supply could cause service interruptions or reduce the quality of our product offerings.*

We depend upon third parties, to a substantial extent, for several critical elements of our business, including various technology, infrastructure, content development, software and distribution components.

**Technology and Infrastructure.** We rely on private third-party providers for our principal Internet connections, co-location of a significant portion of our data servers and network access. Any disruption in the Internet or network access or co-location services provided by these third-party providers or any failure of these third-party providers to handle current or higher volumes of use could significantly harm our business, operating results and financial condition. Any financial difficulties experienced by our providers may have negative effects on our business, the nature and extent of which we cannot predict. We license technology and related databases from third parties for certain elements of our properties, including, among others, technology underlying the delivery of news, stock quotes and current financial information, chat services, street mapping and telephone listings, streaming capabilities and similar services. We have experienced and expect to continue to experience interruptions and delays in service and availability for such elements. We also rely on a third-party manufacturer for key components of our email service. Furthermore, we depend on hardware and software suppliers for prompt delivery, installation and service of servers and other equipment to deliver our products and services. Any errors, failures, interruptions, or delays experienced in connection with these third-party technologies and information services could negatively impact our relationship with users and adversely affect our brand and our business and could expose us to liabilities to third parties.

**Distribution Relationships.** In addition to our relationships with Internet access providers, to increase traffic for our online properties and services and make them more available and attractive to advertisers and consumers, we have certain distribution agreements and informal relationships with, operators of online networks and leading Websites, electronics companies, and computer manufacturers. These distribution arrangements typically are not exclusive and do not extend over a significant amount of time. Further, some of our distributors are competitors or potential competitors who may not renew their distribution contracts with us. Potential distributors may not offer distribution of our properties and services on reasonable terms, or at all. In addition, as new methods for accessing the Web become available, including through alternative devices, we may need to enter into additional distribution relationships. If we fail to obtain distribution or to obtain distribution on terms that are reasonable, we may not be able to fully execute our business plan.

**Streaming Media Software.** We rely on the two leading providers of streaming media products, RealNetworks, Inc. and Microsoft, to license the software necessary to broadcast streaming audio and video content to our users. There can be no assurance that these providers will continue to license these products to us on reasonable terms, or at all. Our users are currently able to electronically download copies of the software to play streaming media free of charge, but providers of streaming media products may begin charging users for copies of their player software or otherwise change their business model in a manner that slows the widespread acceptance of these products. In order for our rich media services to be successful, there must be a large base of users of these streaming media products. We have limited or no control over the availability or acceptance of streaming media software, and to the extent that any of these circumstances occur, our business will be adversely affected.

**Content.** Our future success depends upon our ability to aggregate compelling content and deliver that content through our online properties. We license much of the content that attracts users to our online properties, such as news items, stock quotes, weather reports, maps and audio and video content from third parties. In particular, our music and entertainment properties rely on major sports organizations, radio and television stations, record labels, cable networks, businesses, colleges and universities, film producers and distributors, and other organizations for a large portion of the content available on our properties. Our ability to maintain and build relationships with third-party content providers will be critical to our success. We may be unable to enter into or preserve relationships with the third parties whose content we seek to obtain. Many of our current licenses for third-party content extend for a period of less than two years and there can be no guarantee that they will be renewed upon their expiration. In addition, as competition for compelling content increases both domestically and abroad, our content providers may increase the prices at which they offer their content to us and potential content providers may not offer their content on terms agreeable to us. An increase in the prices charged to us by third-party content

providers could harm our operating results and financial condition. Further, many of our content licenses with third parties are non-exclusive. Accordingly, other Webcasters may be able to offer similar or identical content. Likewise, most sports and entertainment content available on our online properties are also available on other media like radio or television. These media are currently, and for the foreseeable future will be, much more widely adopted for listening or viewing such content than the Web. These factors also increase the importance of our ability to deliver compelling editorial content and personalization of this content for users in order to differentiate Yahoo! from other businesses. If we are unable to license or acquire compelling content, if other companies broadcast content that is similar to or the same as that provided by Yahoo!, or if we do not develop compelling editorial content or personalization services, the number of users on our online properties may not grow at all or may grow at a slower rate than anticipated, which would harm our operating results.

***As we provide more audio and video content, particularly music, we may be required to spend significant amounts of money on content acquisition and content broadcasts.***

In the past, the majority of the content that we provided to our users was in print, picture or graphical format and was either created internally or licensed to us by third parties for little or no charge. However, we have been providing and intend to continue to provide increasing amounts of audio and video content to our users, such as the broadcast of music, film content, speeches, news footage, concerts and other special events, through our media and entertainment properties. We believe that users of Internet services such as the Yahoo! online properties will increasingly demand high-quality audio and video content. Such content may require us to make substantial payments to third parties from whom we license or acquire such content.

For example, in order to broadcast music through our online properties, we are currently required to pay royalties both on the copyright in the musical compositions and the copyright in the actual sound recordings of the music to be broadcast. The revenue we receive as a result of our audio and video broadcasts may not justify the costs of providing such broadcasts.

***Our failure to manage growth and diversification of our business could harm us.***

We have experienced dramatic growth in personnel since inception and expect to continue to hire additional personnel in selected areas. This growth requires significant time and resource commitments from us and our senior management.  Further, as a result of recent acquisitions and international expansion, more than one-half of our employees are based outside of our Sunnyvale, California headquarters. If we are unable to effectively manage a large and geographically dispersed group of employees or anticipate our future growth, our business will be adversely affected.

Additionally, our business relies on our financial reporting and data systems and controls (including our systems for billing users of our fee-based services), which have grown increasingly complex in the recent past due to acquisitions and the diversification and complexity of our business.  To effectively manage this growth, we will need to continue to improve our operational, financial and management controls and our reporting systems and procedures.  If we are unable to adapt to these changes, our business will be adversely affected.

***We are subject to U.S. and foreign government regulation of the Internet, the impact of which is difficult to predict.***

We are subject to general business regulations and laws, as well as regulations and laws directly applicable to the Internet. As we continue to expand the scope of our properties and service offerings, the application of existing laws and regulations to Yahoo! relating to issues such as user privacy, defamation, pricing, advertising, taxation, gambling, sweepstakes, promotions, financial market regulation, consumer protection, content regulation, quality of products and services, and intellectual property ownership and infringement can be unclear. In addition, we will also be subject to new laws and regulations directly applicable to our activities.  Further, the application of existing laws to Yahoo! or our subsidiaries regulating or requiring licenses for certain businesses of our advertisers including, for example, distribution of pharmaceuticals, alcohol, tobacco or firearms, as well as insurance and securities brokerage and legal services, can be unclear.  Any existing or new legislation applicable to us could expose us to substantial liability, including significant expenses necessary to comply with such laws and regulations, and dampen the growth in use of the Web.

Several federal laws, including the following, could have an impact on our business. The Digital Millennium Copyright Act is intended, in part, to limit the liability of eligible online service providers for listing or linking to third-party Websites that include materials that infringe copyrights or other rights of others. The Children's Online Protection Act and the Children's Online Privacy Protection Act are intended to restrict the distribution of certain materials deemed harmful to children and impose additional restrictions on the ability of online services to collect user information from minors. In addition, the Protection of Children From Sexual Predators Act of 1998 requires online service providers to report evidence of violations of federal child pornography laws under certain circumstances. Such legislation may impose significant additional costs on our business or subject us to additional liabilities.

We post our privacy policies and practices concerning the use and disclosure of user data. In addition, GeoCities, a company we acquired in 1999, is required to comply with a consent order between it and the Federal Trade Commission (the "FTC"), which imposes certain obligations and restrictions with respect to information collected from users. Any failure by us to comply with our posted privacy policies, the consent order, FTC requirements or other privacy-related laws and regulations could result in proceedings by the FTC or others which could potentially have an adverse effect on our business, results of operations and financial condition. In this regard, there are a large number of legislative proposals before the United States Congress and various state legislative bodies regarding privacy issues related to our business. It is not possible to predict whether or when such legislation may be adopted, and certain proposals, if adopted, could materially and adversely affect our business through a decrease in user registrations and revenues. This could be caused by, among other possible provisions, the required use of disclaimers or other requirements before users can utilize our services.

Due to the nature of the Web, it is possible that the governments of other states and foreign countries might attempt to regulate Web transmissions or prosecute us for violations of their laws. Any such developments (or developments stemming from enactment or modification of other laws) could increase the costs of regulatory compliance for us or force us to change our business practices.

***We may be subject to legal liability for online services.***

We host a wide variety of services that enable individuals to exchange information, generate content, conduct business and engage in various online activities on an international basis, including public message posting and services relating to online auctions and homesteading. The law relating to the liability of providers of these online services for activities of their users is currently unsettled both within the United States and abroad. Claims have been threatened and have been brought against us for defamation, negligence, copyright or trademark infringement, unlawful activity, tort, including personal injury, fraud, or other theories based on the nature and content of information that we provide links to or that may be posted online or generated by our users or with respect to auctioned materials. In addition, Yahoo! was the subject of a claim brought by certain entities in a French court regarding, among other things, the availability of certain content within our services which was alleged to violate French law. Due to the unsettled nature of the law in this area, we may be subject to similar actions in domestic or other international jurisdictions in the future. Our defense of any such actions could be costly and involve significant distraction of our management and other resources. In addition, we are aware that governmental agencies are currently investigating the conduct of online auctions.

We also periodically enter into arrangements to offer third-party products, services, or content under the Yahoo! brand or via distribution on various Yahoo! properties, including stock quotes and trading information. We may be subject to claims concerning these products, services or content by virtue of our involvement in marketing, branding, broadcasting or providing access to them, even if we do not ourselves host, operate, provide, or provide access to these products, services or content. While our agreements with these parties often provide that we will be indemnified against such liabilities, such indemnification may not be adequate.

It is also possible that, if any information provided directly by us contains errors or is otherwise negligently provided to users, third parties could make claims against us. For example, we offer Web-based email services, which expose us to potential risks, such as liabilities or claims resulting from unsolicited email, lost or misdirected messages, illegal or fraudulent use of email, or interruptions or delays in email service. Investigating and defending any of these types of claims is expensive, even to the extent that the claims do not ultimately result in liability.

***Our stock price has been volatile historically and may continue to be volatile regardless of our operating performance.***

The trading price of our common stock has been and may continue to be subject to wide fluctuations. During the second quarter of 2004, the closing sale prices of our common stock on the Nasdaq ranged from $24.17 to $36.40 per share and the closing sale price on August 4, 2004 was $27.91 per share. Our stock price may fluctuate in response to a number of events and factors, such as quarterly variations in operating results; announcements of technological innovations or new products and media properties by us or our competitors; changes in financial estimates and recommendations by securities analysts; the operating and stock price performance of other companies that investors may deem comparable to us; the operating performance and stock price of companies in which we have an equity investment, including Yahoo! Japan; and news reports relating to trends in our markets or general economic conditions.

In addition, the stock market in general, and the market prices for Internet-related companies in particular, have experienced volatility that often has been unrelated to the operating performance of such companies. These broad market and industry fluctuations may adversely affect the price of our stock, regardless of our operating performance. Additionally, volatility or a lack of positive performance in our stock price may adversely affect our ability to retain key employees, all of whom have been granted stock options.

*Our operations could be significantly hindered by the occurrence of a natural disaster or other catastrophic event.*

Our operations are susceptible to outages due to fire, floods, power loss, telecommunications failures, break-ins and similar events. In addition, a significant portion of our network infrastructure is located in Northern California, an area susceptible to earthquakes.  We do not have multiple site capacity for all of our services in the event of any such occurrence.  In an effort to reduce the likelihood of a geographical or other disaster impacting our business, we have distributed and intend to continue distributing our servers among additional data centers located around the world.  Failure to execute these changes properly or in a timely manner could result in delays or interruptions to our service. In addition, despite our implementation of network security measures, our servers are vulnerable to computer viruses, physical and electronic break-ins, and similar disruptions from unauthorized tampering with our computer systems.

*Technological or other assaults on our service could harm our business.*

We are vulnerable to coordinated attempts to overload our systems with data, resulting in denial or reduction of service to some or all of our users for a period of time. We have experienced a coordinated denial of service attack in the past, and may experience such attempts in the future. We may not carry sufficient business interruption insurance to compensate us for losses that may occur as a result of any of these events. Any such event could reduce our revenue and harm our operating results and financial condition.

*Anti-takeover provisions could make it more difficult for a third party to acquire us.*

We have adopted a stockholder rights plan and initially declared a dividend distribution of one right for each outstanding share of common stock to stockholders of record as of March 20, 2001.  As a result of our two-for-one stock split effective May 11, 2004, each share of common stock is now associated with one-half of one right.  Each right entitles the holder to purchase one unit consisting of one one-thousandth of a share of our Series A Junior Participating Preferred Stock for $250 per unit. Under certain circumstances, if a person or group acquires 15 percent or more of our outstanding common stock, holders of the rights (other than the person or group triggering their exercise) will be able to purchase, in exchange for the $250 exercise price, shares of our common stock or of any company into which we are merged having a value of $500. The rights expire on March 1, 2011 unless extended by our board of directors. Because the rights may substantially dilute the stock ownership of a person or group attempting to take us over without the approval of our board of directors, our rights plan could make it more difficult for a third party to acquire us (or a significant percentage of our outstanding capital stock) without first negotiating with our board of directors regarding such acquisition.

In addition, our board of directors has the authority to issue up to 10,000,000 shares of Preferred Stock (of which 2,000,000 shares have been designated as Series A Junior Participating Preferred Stock) and to determine the price, rights, preferences, privileges and restrictions, including voting rights, of those shares without any further vote or action by the stockholders.

The rights of the holders of our common stock may be subject to, and may be adversely affected by, the rights of the holders of any Preferred Stock that may be issued in the future. The issuance of Preferred Stock may have the effect of delaying, deterring or preventing a change of control of Yahoo! without further action by the stockholders and may adversely affect the voting and other rights of the holders of our common stock. Further, certain provisions of our charter documents, including provisions eliminating the ability of stockholders to take action by written consent and limiting the ability of stockholders to raise matters at a meeting of stockholders without giving advance notice, may have the effect of delaying or preventing changes in control or management of Yahoo!, which could have an adverse effect on the market price of our stock. In addition, our charter documents do not permit cumulative voting, which may make it more difficult for a third party to gain control of our Board of Directors. Further, we are subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law, which will prohibit us from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder, even if such combination is favored by a majority of stockholders, unless the business combination is approved in a prescribed manner. The application of Section 203 also could have the effect of delaying or preventing a change of control or management.

*Terrorist attacks and the recent hostilities in Iraq have contributed to economic instability in the United States and internationally, which could lead to reduced advertising spending by our customers.*

On September 11, 2001, the United States was the target of terrorist attacks of unprecedented scope, and in March 2003, the United States became involved in hostilities with Iraq. These events, coupled with political instability elsewhere in the world have caused volatility in the financial markets and uncertainty in the global economy.  Under these circumstances, there is a risk that our existing and potential customers may decrease spending, particularly for marketing services.  Because marketing services continue to constitute a majority of our revenues, any such decrease in expenditures could materially and adversely affect our operating results and financial condition.  In addition, the political and economic conditions described above may contribute to increased volatility in stock prices, which may cause our stock price to decline.

43

*Special note regarding forward-looking statements.*

Some of the statements in this Report constitute forward-looking statements. In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "intend," "expect," "plan," "anticipate," "believe," "estimate," "predict," "potential," or "continue" or the negative of such terms or other comparable terminology. This Report includes, among others for fiscal 2004, statements regarding our:

- primary operating costs and expenses;

- capital expenditures;

- operating lease arrangements;

- evaluation of possible acquisitions of, or investments in business, products and technologies; and

- existing cash and investments being sufficient to meet operating requirements.

These statements involve known and unknown risks, uncertainties, and other factors that may cause our or our industry's results, levels of activity, performance, or achievements to be materially different from any future results, levels of activity, performance, or achievements expressed or implied by such forward-looking statements. Such factors include, among others, those listed in these "Risk Factors" and elsewhere in this Report. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, events, levels of activity, performance, or achievements. We do not assume responsibility for the accuracy and completeness of the forward-looking statements. We do not intend to update any of the forward-looking statements after the date of this Report to conform them to actual results.

## Item 3 . Quantitative and Qualitative Disclosures About Market Risk

We are exposed to the impact of interest rate changes, foreign currency fluctuations, and changes in the market values of our investments.

**Interest Rate Risk.** Our exposure to market rate risk for changes in interest rates relates primarily to our investment portfolio. We have not used derivative financial instruments to hedge our investment portfolio. We invest excess cash in debt instruments of the U.S. Government and its agencies, and in high-quality corporate issuers and, by policy, limit the amount of credit exposure to any one issuer. We protect and preserve invested funds by limiting default, market and reinvestment risk.

Investments in both fixed rate and floating rate interest earning instruments carry a degree of interest rate risk. Fixed rate securities may have their fair market value adversely impacted due to a rise in interest rates, while floating rate securities may produce less income than expected if interest rates fall. Due in part to these factors, our future investment income may fall short of expectations due to changes in interest rates or we may suffer losses in principal if forced to sell securities which have declined in market value due to changes in interest rates. As of June 30, 2004 we had investments in debt securities with maturities between three months and one year of approximately $829 million. Such investments had a weighted-average yield of approximately 2.18 percent. Investments in debt securities with maturities between one and five years of approximately $1.1 billion had a weighted-average yield of approximately 2.59 percent. A hypothetical 100 basis point increase in interest rates would result in approximately $27 million decrease (approximately one percent) in the fair value of our available-for-sale securities at June 30, 2004.

The fair market value of our zero coupon senior convertible notes is subject to interest rate risk. Generally the fair market value of fixed interest rate debt will increase as interest rates fall and decrease as interest rates rise. The interest changes affect the fair market value but do not impact our financial position, cash flows or results of operations. As of June 30, 2004, the fair value of the zero coupon senior convertible notes was approximately $1.4 billion based on quoted market prices.

**Foreign Currency Risk.** International revenues from our foreign subsidiaries accounted for approximately 25 percent and 23 percent of total revenues during the three and six months ended June 30, 2004. International sales are made mostly from our foreign sales subsidiaries in their respective countries and are typically denominated in the local currency of each country. These subsidiaries also incur most of their expenses in the local currency. Accordingly, all foreign subsidiaries use the local currency as their functional currency.

Our international business is subject to risks, including, but not limited to differing economic conditions, changes in political climate, differing tax structures, other regulations and restrictions, and foreign exchange rate volatility when compared to the United States. Accordingly, our future results could be materially adversely impacted by changes in these or other factors.

**Signatures**

     In accordance with the requirements of the Exchange Act, the Registrant has caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

YAHOO! INC.

| | By: | /s/ SUSAN DECKER |
|---|---|---|
| Dated: August 9, 2004 | | Susan Decker |
| | | Executive Vice President, Finance and Administration, and Chief Financial Officer (Principal Financial Officer) |

| | By: | /s/ PATRICIA CUTHBERT |
|---|---|---|
| Dated: August 9, 2004 | | Patricia Cuthbert |
| | | Vice President and Corporate Controller (Principal Accounting Officer) |

50

**YAHOO! INC.**

**AMENDED AND RESTATED**

**1996 EMPLOYEE STOCK PURCHASE PLAN**

**NOTICE OF WITHDRAWAL**

I, _____, hereby elect to withdraw my participation in the Yahoo! Inc. Amended and Restated 1996 Employee Stock Purchase Plan (the "Plan") for the Offering Period commencing _____, 20__. This withdrawal covers all Contributions credited to my account and is effective on the date designated below. Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

I understand that all Contributions credited to my account will be paid to me within ten (10) business days of receipt by the Company of this Notice of Withdrawal and that my option for the current period will automatically terminate, and that no further Contributions for the purchase of Shares can be made by me during the Offering Period.

The undersigned further understands and agrees that he or she shall be eligible to participate in succeeding offering periods only by delivering to the Company a new Subscription Agreement.

Dated: _____

_____
Signature of Employee

_____
Social Security Number

1

---

**Exhibit 31.1**

**Certification of CEO Pursuant to**
**Securities Exchange Act Rules 13a-14(a) and 15d-14(a)**
**as Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Terry Semel, the Chief Executive Officer of Yahoo! Inc., certify that:

1.      I have reviewed this quarterly report on Form 10-Q of Yahoo! Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of registrant's board of directors (or persons performing the equivalent function):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: August 9, 2004                                                    By:    /s/  TERRY SEMEL

                                                                                    Terry Semel
                                                                                    Chief Executive Officer

1

Exhibit 31.2

**Certification of CFO Pursuant to**
**Securities Exchange Act Rules 13a-14(a) and 15d-14(a)**
**as Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Susan Decker, the Chief Financial Officer of Yahoo! Inc., certify that:

1.       I have reviewed this quarterly report on Form 10-Q of Yahoo! Inc.;

2.       Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.       Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.       The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

(c)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.       The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of registrant's board of directors (or persons performing the equivalent function):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: August 9, 2004                                                    By:    /s/  SUSAN DECKER

                                                                                    Susan Decker
                                                                                    Chief Financial Officer

1

Exhibit 32

**Certification of CEO and CFO Pursuant to
18 U.S.C. Section 1350,
as Adopted Pursuant to
Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Quarterly Report on Form 10-Q of Yahoo! Inc. (the "Company") for the quarter ended June 30, 2004 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Terry Semel, as Chief Executive Officer of the Company, and Susan Decker, as Chief Financial Officer of the Company, each hereby certifies, pursuant to 18 U.S.C. §1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, to the best of his and her knowledge, respectively, that:

    (1)    The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

    (2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated:  August 9, 2004

By:  /s/  TERRY SEMEL

Terry Semel
Chief Executive Officer

Dated:  August 9, 2004

By:  /s/  SUSAN DECKER

Susan Decker
Chief Financial Officer

A signed original of this written statement required by Section 906 of the Sarbanes-Oxley Act of 2002 has been provided to Yahoo! Inc. and will be retained by Yahoo! Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

1

**End of Filing**

Powered By  EDGAR Online

© 2005 | EDGAR Online, Inc.

Exhibit 9

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 10-Q

☒  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2004**

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____
Commission File Number 0-28018

# YAHOO! INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **77-0398689** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**701 First Avenue**
**Sunnyvale, California 94089**
(Address of principal executive offices)

Registrant's telephone number, including area code: **(408) 349-3300**

Indicate by check mark whether the Registrant (1) has filed all reports required by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days: Yes ☒  No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). Yes ☒  No ☐

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Class | Outstanding at October 27, 2004 |
|---|---|
| Common stock, $0.001 par value | 1,374,819,307 |

RISK FACTORS

*We face significant competition from companies such as Time Warner's AOL, Google and Microsoft.*

We face significant competition from companies that have combined a variety of services under one brand name in a manner similar to Yahoo!, including Time Warner's America Online business ("AOL" or "America Online"), Google Inc. ("Google"), and Microsoft Corporation ("Microsoft" or "MSN"). The combination of America Online and Time Warner provides America Online with content from Time Warner's movie and television, music, books and periodicals, news, sports and other media holdings; access to a network of cable and other broadband delivery technologies; and considerable resources for future growth and expansion. The America Online/Time Warner combination also provides America Online with access to a broad potential customer base consisting of Time Warner's current customers and subscribers of its various media properties. Many of these competitors are developing new technologies, allocating extensive resources to product development and marketing and expanding their offerings which may be competitive with our offerings. For example, Google has launched a consumer email service and shopping services that may be competitive with services that we offer and Microsoft is testing its own search services. In certain of these cases, most notably AOL and MSN, our competition has a direct billing relationship with a greater number of their users through access and other services than we have with our users through certain of our premium services. This relationship permits our competitors to have several potential advantages including the potential to be more effective than us in targeting services and advertisements to the specific taste of their users.

*If our competitors are more successful in attracting and retaining customers and users, then our revenues could decline.*

We also compete for customers and users with many other providers of online navigation, Web search, commercial search, information, entertainment, business, recruitment, community, electronic commerce and Internet access services. As we expand the scope of our Internet offerings, we will compete directly with a greater number of Internet sites, media companies, and companies providing business services across a wide range of different online services, including:

- companies offering communications, Web search, commercial search, information, community and entertainment services and Internet access either on a stand alone basis or integrated into other products and media properties;

- vertical markets where competitors may have advantages in expertise, brand recognition, available financial and other resources, and other factors;

- online employment recruiting companies; and

- online merchant hosting services.

In order to compete effectively, we may need to expend significant internal engineering resources or acquire other technologies and companies to provide or enhance our capabilities. If we are unable to maintain or expand our customer and user base in the future, our revenues may decline.

*Our acquisitions of Inktomi and Overture expose our business to greater competition in the area of Web search services.*

As a result of our acquisitions of Inktomi and Overture in 2003, we compete directly with other providers of Web search and related search services, including paid inclusion services, such as AskJeeves, Inc., Google, and LookSmart, Ltd. Some of these competitors may have longer operating histories focusing on providing Web search services, larger customer or user bases and greater brand recognition for their Web search businesses. In addition to the general acquisition risks highlighted in these risk factors, we are subject to the risk that other companies with greater operational, strategic, financial, personnel or other resources may choose to enter the Web search or paid inclusion spaces by acquisition or internal development, and may create greater competition for advertisers, customers and users.

*If we are unable to provide search technologies and services which generate significant traffic to our Web sites, our business could be harmed.*

We recently deployed our own Web search technology to provide Web search results on our network. We have limited experience in operating our own search service. Web search is characterized by rapidly changing technology, significant competition, evolving industry standards, and frequent enhancements. We must continually invest in improving user experience, search relevance, speed, our operational infrastructure and other aspects of our search technology to continue to attract, retain and expand our user base. If we are unable to provide search technologies and services which generate significant traffic to our Web sites, our business could be harmed.

***If Overture fails to maintain its advertiser, user, business and affiliate constituencies, our revenues could significantly decline and our business could be adversely affected.***

Overture's pay-for-performance search service is comprised of advertiser-generated listings, which are screened for relevance and accessed by users and businesses through the Yahoo! properties and through Overture's affiliates, a network of other Web properties that have integrated Overture's search service into their sites or that direct user traffic to Overture's sites. Advertisers pay Overture the bid price for clicks on the advertiser's search listing (also known as a paid introduction, click-through or a paid click). Overture's success in pay-for-performance search services depends in part on the maintenance of a critical mass of advertisers, users, and traffic generated by the Yahoo! properties and Overture's affiliates. Such a critical mass encourages increased participation in Overture's paid placement search marketplace. To the extent Overture experiences a decline in the number of any of these constituents, the value of Overture's paid placement service could be harmed, and our revenues or business could be adversely affected.

***Our acquisition of Overture exposes our business to greater competition with providers of pay-for-performance advertising search services.***

As a result of our acquisition of Overture, we compete directly with other providers of pay-for-performance advertising services that are similar to Overture's, including FindWhat.com (which recently acquired Espotting Media, Inc.), Google, LookSmart, Ltd., and Terra Lycos. In addition, we believe it is likely that there will be additional entrants to the pay-for-performance search market. Some of these entrants may have greater operational, strategic, financial, personnel or other resources than we do, as well as greater brand recognition. These competitors compete against Overture for affiliate arrangements and could cause Overture to enter into affiliate arrangements with less favorable terms, lose current affiliates or not acquire new affiliates, which could reduce the number of click-throughs, increase the amount of revenue shared with affiliates, and reduce total revenues and thereby harm our business, operating results and financial condition.

***Acquisitions could result in operating difficulties.***

As part of our business strategy, we have made strategic acquisitions, including Overture in October 2003, 3721 in January 2004, Kelkoo in April 2004, and Musicmatch in October 2004. We expect to enter into additional business combinations and acquisitions in the future. Acquisitions may result in dilutive issuances of equity securities, use of our cash resources, incurrence of debt and amortization of expenses related to intangible assets. Our acquisitions to date were accompanied by a number of risks, including:

- the difficulty of assimilating the operations and personnel of our acquired companies with and into Yahoo!'s operations;

- the potential disruption of our ongoing business and distraction of management;

- the difficulty of incorporating acquired technology and rights into our products and unanticipated expenses related to such integration;

- the failure to further successfully develop acquired technology resulting in the impairment of amounts currently capitalized as intangible assets;

- the impairment of relationships with customers of the acquired companies or our own customers as a result of any integration of operations;

- the impairment of relationships with employees of the acquired companies or our own business as a result of any integration of new management personnel;

- in the case of 3721 and Kelkoo, uncertainty regarding foreign laws and regulations and difficulty integrating operations and systems as a result of cultural, systems and operational differences; and

- the potential unknown liabilities associated with the acquired companies.

We may experience similar risks in connection with our future acquisitions. We may not be successful in addressing these risks or any other problems encountered in connection with our acquisitions or that we could encounter in future acquisitions, which would harm our business or cause us to fail to realize the anticipated benefits of our acquisitions.

***We may be subject to intellectual property infringement claims, which are costly to defend and could limit our ability to provide certain content or use certain technologies in the future.***

Many parties are actively developing search, indexing, electronic commerce and other Web-related technologies, as well as a variety of online business models and methods. We believe that these parties will continue to take steps to protect these technologies, including, but not limited to, seeking patent protection. As a result, disputes regarding the ownership of these technologies and rights associated with online business are likely to arise in the future. In addition to existing patents and intellectual property rights, we anticipate that additional third-party patents related to our services will be issued in the future. From time to time, parties assert patent infringement claims against us in the form of letters, lawsuits and other forms of communications. Currently, we are engaged in several lawsuits regarding patent issues and have been notified of a number of other potential disputes. We expect that we will increasingly be subject to patent litigation as our services expand.

In addition to patent claims, third parties have asserted and most likely will continue to assert claims against us alleging infringement of copyrights, trademark rights, trade secret rights or other proprietary rights, or alleging unfair competition or violations of privacy rights. Currently, our subsidiary LAUNCH is engaged in a lawsuit regarding copyright issues that commenced prior to our acquisition of LAUNCH.  In addition, Overture is in litigation with several companies, each of which has claimed that allowing advertisers to bid on certain search terms constitutes trademark infringement.

In the event that there is a determination that we have infringed third-party proprietary rights such as patents, copyrights, trademark rights, trade secret rights or other third party rights such as publicity and privacy rights, we could incur substantial monetary liability, be required to enter into costly royalty or licensing agreements, if available, or be prevented from using the rights, which could require us to change our business practices in the future.  We may also incur substantial expenses in defending against third-party infringement claims regardless of the merit of such claims. As a result, these claims could harm our business.

***Our intellectual property rights are valuable and any inability to protect them could dilute our brand image or harm our business.***

We regard our copyrights, patents, trademarks, trade dress, trade secrets, and similar intellectual property, including our rights to certain domain names, as important to Yahoo!'s success.  Effective trademark, patent, copyright, and trade secret protection may not be available in every country in which our products and media properties are distributed or made available through the Internet.  Further, the efforts we have taken to protect our proprietary rights may not be sufficient or effective. If we are unable to protect our trademarks from unauthorized use, our brand image may be harmed. While we attempt to ensure that the quality of our brand is maintained by our licensees, our licensees may take actions that could impair the value of our proprietary rights or the reputation of our products and media properties. We are aware that third parties have, from time to time, copied significant content available on Yahoo! for use in competitive Internet services. Protection of the distinctive elements of Yahoo! may not be available under copyright law. Any impairment of our brand image could harm our business and cause our stock price to decline. In addition, protecting our intellectual property and other proprietary rights can be expensive. Any increase in the unauthorized use of our intellectual property could make it more expensive to do business and consequently harm our operating results. In turn, this could harm the results of our business and lower our stock price.

***Our international segment competes with local Internet service providers that may have a competitive advantage.***

On an international level, we compete directly with local Internet Service Providers ("ISPs").  These ISPs may have several advantages, including greater knowledge about the particular country or local market and access to significant financial or strategic resources in such local markets. We must continue to improve our product offerings, become more knowledgeable about our local users and their preferences, deepen our relationships with our local users as well as increase our branding and other marketing activities in order to remain competitive and strengthen our international market position.

***Financial results for any particular period will not predict results for future periods.***

There can be no assurance that the purchasing pattern of customers advertising on the Yahoo! network will not continue to fluctuate, that advertisers will not make smaller and shorter-term purchases, or that market prices for online advertising will not decrease due to competitive or other factors.  In addition, there can be no assurance that the volume of searches conducted, the amounts bid by advertisers for search listings or the number of advertisers that bid on the Overture service will not vary widely from period to period.  As revenues from sources other than advertising increase, it may become more difficult to predict our financial results based on historical performance.  Because of the rapidly changing market we serve, period-to-period comparisons of operating results are not likely to be meaningful.  You should not rely on the results for any period as an indication of future performance.

37

***We expect our operating expenses to continue to increase as we attempt to expand the Yahoo! brand, fund product development, develop media properties and acquire other businesses.***

Yahoo! currently expects that its operating expenses will continue to increase as we expand our operations in areas of expected growth, continue to develop and extend the Yahoo! brand, fund greater levels of product development, develop and commercialize additional media properties and premium services, and acquire and integrate complementary businesses and technologies.  If our expenses increase at a greater pace than our revenues, our operating results could be harmed.

***We may be required to record a significant charge to earnings if we must reassess our goodwill or amortizable intangible assets.***

We are required under generally accepted accounting principles to review our amortizable intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Goodwill is required to be tested for impairment at least annually.  Factors that may be considered a change in circumstances indicating that the carrying value of our amortizable intangible assets may not be recoverable include a decline in stock price and market capitalization, and slower growth rates in our industry.  We may be required to record a significant charge to earnings in our financial statements during the period in which any impairment of our goodwill or amortizable intangible assets is determined.  At September 30, 2004, our goodwill and amortizable intangible assets were $2.8 billion. In the first quarter of 2002, we recorded a transitional impairment charge of $64 million as a cumulative effect of an accounting change, upon the adoption of Statement of Financial Accounting Standards No. 142 "Goodwill and Other Intangible Assets."

***The majority of our revenues are derived from marketing services. Demand from our current and potential clients for online advertising is difficult to forecast accurately.***

For the quarter ended September 30, 2004, approximately 84 percent of our total revenues came from marketing services.  Our ability to continue to achieve substantial advertising revenue depends upon:

- growth of our user base, including through our email and other communications services;
- broadening our relationships with advertisers to small and medium size businesses;
- our user base being attractive to advertisers;
- demand for our commercial search services by advertisers, users and businesses, including prices paid by advertisers, the number of searches performed by users and the rate at which they click-through to commercial search results;
- our ability to maintain our affiliate program for our commercial search services;
- our ability to generate significant traffic to our Websites;
- our ability to derive better demographic and other information from our users; and
- continued acceptance of the Web by advertisers as an advertising medium.

Our agreements with advertisers and sponsors generally have terms of three years or less and in, many cases, the terms are one year or less or, in the case of Overture's business, may be immediately terminable by the advertiser.  The agreements often have payments contingent on usage or click-through levels.  Accordingly, it is difficult to forecast these revenues accurately. However, our expense levels are based in part on expectations of future revenues, include guaranteed minimum payments to our affiliates in connection with our pay-for-performance advertising services, and are fixed over the short-term with respect to certain categories. We may be unable to adjust spending quickly enough to compensate for any unexpected revenue shortfall.

***Overture depends in certain markets on a limited number of sources to direct a significant percentage of users and businesses to its service to conduct searches.***

A significant percentage of users and businesses that conduct searches on Overture's service, come from a limited number of sources in certain markets.  In addition to the Yahoo! properties, sources for users conducting searches are members of Overture's affiliate network, including portals, browsers, and other affiliates.  Overture's agreements with affiliates vary in duration, and depending on the agreement, provide varying levels of discretion to the affiliate in the implementation of the Overture service, including the degree to which affiliates can modify the presentation of the Overture search results on their websites or integrate the Overture services with their own services, and may be terminable upon the occurrence of certain events, including failure to meet certain service levels, material breaches of agreement terms, changes in control (including the change of control of Overture which occurred with Yahoo!'s acquisition of Overture) or in some instances, at will.  Overture may not be successful in renewing any of its affiliate agreements, or if they are renewed, they may not be on as favorable terms.  The loss of any of its affiliates providing significant users or businesses or an adverse change in implementation of the Overture service by any of these affiliates could harm our ability to generate revenue and our operating results

*Decreases or delays in advertising spending due to general economic downturns could harm our ability to generate advertising revenue.*

Expenditures by advertisers tend to be cyclical, reflecting overall economic conditions as well as budgeting and buying patterns. In the past, the overall market for advertising, including Internet advertising, was generally characterized by softness of demand and the reduction of marketing and advertising budgets or the delay in spending of budgeted resources. As a result, advertising spending decreased. Since Yahoo! derives a large part of its revenues from advertising fees, any decreases in or delays of advertising spending could reduce our revenues or negatively impact our ability to grow our revenues. Even if economic conditions improve, marketing budgets and advertising spending may not increase from current levels.

*We have dedicated considerable resources to provide a variety of premium services, which may not prove to be successful in generating significant revenue for us.*

We offer fee-based enhancements to many of our free services, including email, instant messaging, personals, finance, games and sports. The development cycles for these technologies are long and generally require significant investment by us. We must continue to provide new services that are compelling to our users while continuing to develop an effective method for generating revenues for such services. If we cannot generate revenues from these services that are greater than the cost of providing such services, our operating results will be harmed.

*Due to intense competition, we may not be able to generate substantial revenues from the Internet access market.*

Through alliances with Internet access providers, we offer access services that combine customized content and services from Yahoo! (including browser and other communications services) and Internet access from the third party access providers. These Internet access services compete with many large companies such as AOL, MSN, Comcast Corporation and other established Internet access providers. In certain of these cases, our competition has substantially greater market presence (including an existing user base), and financial, technical, marketing or other resources than those committed to our product offerings. As a result of these and other competitive factors, these services may not be able to attract, grow or retain a customer base, which would negatively impact our ability to sell customized content and services through this channel.

*Our success in the Internet access market will depend on technical and customer service issues, which we have a limited ability to control.*

Internet access services, including those we provide through alliances with access providers, are susceptible to natural or man-made disasters such as earthquakes, floods, fires, power loss, terrorist attacks, or sabotage, as well as interruptions from technology malfunctions, computer viruses or hacker attacks. Other potential service interruptions may result from unanticipated demands on network infrastructure, increased traffic or problems in customer service to our access customers. Our ability to control technical and customer service issues is further limited by our dependence on the access provider for connectivity, customer service, joint marketing and technical integration of aspects of our access service. Significant disruptions in our access service could harm our goodwill, the Yahoo! brand and ultimately could significantly and negatively impact the amount of revenue we may earn from our service.

*Some of our sponsorship arrangements may not generate anticipated revenues.*

A key element of our strategy is to generate marketing services revenue through sponsored services and placements by third parties in our online media properties in addition to banner advertising. We typically receive sponsorship fees or a portion of transactions revenue in return for minimum levels of user impressions to be provided by us. These arrangements expose us to potentially significant financial risks in the event our usage levels decrease, including the following:

- the fees we are entitled to receive may be adjusted downwards;

- we may be required to "make good" on our obligations by providing alternative services;

- the sponsors may not renew the arrangements or may renew at lower rates; and

- the arrangements may not generate anticipated levels of shared transactions revenue, or sponsors may default on the payment commitments in such agreements as has occurred in the past.

Accordingly, any leveling off or decrease of our user base (or usage by our existing base) or the failure to generate anticipated levels of shared transactions revenue could result in a significant decrease in our revenues.

*We may not be successful in expanding the number of users of our online shopping services.*

The success of our online shopping service depends on our ability to generate traffic to Yahoo! Shopping and related services and, the rate at which users click through to search results. The revenue that we derive from Yahoo! Shopping and related services is typically in the form of lead-based fees, wherein retailers pay a fee based on the number of times a user clicks on a link to their site, transaction fees, and advertising fees.  Users who had a favorable buying experience with a particular retailer may contact that retailer directly for future purchases rather than through our services. Competing providers of online shopping, including retailers, with whom we have relationships, may provide a more convenient and comprehensive online shopping experience due to their singular focus on shopping.  If our users bypass Yahoo! Shopping and related services, and contact competing providers directly, our revenue could decline.

*We will continue to operate in international markets in which we have limited experience and are faced with relatively higher costs and are exposed to greater risks.*

A key part of our strategy is to develop Yahoo!-branded online properties and expand our commercial search offerings in international markets. We have developed, through joint ventures, subsidiaries and branch offices, localized properties and search services in over 20 international countries.  To date, we have only limited experience in marketing and operating our products and services internationally, and we rely on the efforts and abilities of our foreign business partners in such activities.

We believe that in light of substantial competition, we need to expand our operations in international markets quickly in order to obtain market share effectively. However, in a number of international markets, especially those in Europe, we face substantial competition from ISPs that offer or may offer their own navigational services and from other companies that provide commercial search services. Many of these companies have a dominant market share in their territories. Furthermore, foreign providers of competing online services may have a substantial advantage over us in attracting users in their country due to more established branding in that country, greater knowledge with respect to the tastes and preferences of users residing in that country and/or their focus on a single market. We have experienced and expect to continue to experience higher costs as a percentage of revenues in connection with the development and maintenance of our international online properties relative to our domestic experience. Our operations in international markets may not develop at a rate that supports our level of investment. In particular, certain international markets may be slower than domestic markets in adopting the Internet as an advertising and commerce medium.

*Our international operations are subject to increased risks.*

In addition to uncertainty about our ability to continue to generate revenues from our foreign operations and expand our international presence, there are certain risks inherent in doing business on an international level, including:

- trade barriers and unexpected changes in regulatory requirements;

- difficulties in developing, staffing and simultaneously managing a large number of unique foreign operations as a result of distance, language and cultural differences;

- longer payment cycles;

- currency exchange rate fluctuations;

- political or social unrest or economic instability;

- import or export restrictions;

- seasonal reductions in business activity;

- risks related to government regulation including those more fully described below; and

- potentially adverse tax consequences.

One or more of these factors could harm our future international operations and consequently, could harm our business, operating results, and financial condition.

*If key personnel leave unexpectedly and are not replaced, we may not be able to execute our business plan.*

We are substantially dependent on the continued services of our key personnel, including our two founders, our chief executive officer, chief financial officer, chief operating officer, chief technical officer, and our executive and senior vice presidents. These individuals have acquired specialized knowledge and skills with respect to Yahoo! and its operations.  If any of these individuals were to leave unexpectedly, we could face substantial difficulty in hiring qualified successors and could experience a loss in productivity while any such successor obtains the necessary training and experience. Many of our management personnel have reached or will soon reach the four-year anniversary of their Yahoo! hiring date and, as a result, have become or will shortly become fully vested in their initial stock option grants. While management personnel are typically granted additional stock options subsequent to their hire date, which will usually vest over a period of four years to provide additional incentive to remain at Yahoo!, the initial option grant is typically the largest for a given position, and an employee may be more likely to leave Yahoo! upon completion of the vesting period for the initial option grant.

*If we are unable to hire qualified personnel in designated growth areas, we may not be able to execute our business plan.*

We expect that we will need to hire additional personnel in designated growth areas. The competition for qualified personnel can be intense, particularly in the San Francisco Bay Area, where our corporate headquarters are located. At times, we have experienced difficulties in hiring personnel with the right training or experience, particularly in technical areas. If we do not succeed in attracting new personnel, or retaining and motivating existing personnel, we may be unable to meet our business plan and as a result our stock price may decline.

*We may have difficulty scaling and adapting our existing architecture to accommodate increased traffic and technology advances or customer requirements.*

Yahoo! is one of the most highly trafficked Websites on the Internet and is regularly serving numbers of users and delivering daily page views which are beyond previous standards for Internet usage. In addition, the services offered by Yahoo!, and popular with users and customers, have changed significantly in the past, are expected to change rapidly in the future, and are difficult to predict. Rapid increases in the levels or types of use of our online properties and services could result in delays or interruptions in our service. In particular, the architectures utilized for our services are highly complex and may not provide satisfactory service in the future, especially as the usage levels of email and certain other services increase, the rate of unsolicited email continues to increase in volume and complexity and the number of advertisers utilizing the Overture service increases. In the future, we may be required to make significant changes to our architectures, including moving to completely new architectures. If we are required to switch architectures, we may incur substantial costs and experience delays or interruptions in our service. These delays or interruptions in our service may cause users and customers to become dissatisfied with our service and move to competing providers of online services. Further, to the extent that demand for our services increases, we will need to expand our infrastructure, including the capacity of our hardware servers and the sophistication of our software. This expansion is likely to be expensive and complex, and require additional technical expertise. As we acquire users who rely upon us for a wide variety of services, it becomes more technologically complex and costly to retrieve, store and integrate data that will enable us to track each user's preferences. Any difficulties experienced in adapting our architectures and infrastructure to accommodate increased traffic and user preferences and the associated costs and potential loss of traffic could harm our operating results and financial condition.

*More individuals are utilizing non-PC devices to access the Internet, and versions of our service developed or optimized for these devices may not gain widespread adoption by users of such devices.*

The number of individuals who access the Internet through devices other than a personal computer, such as personal digital assistants, mobile telephones and television set-top devices, has increased dramatically. Our services were originally designed for rich, graphical environments such as those available on desktop and laptop computers. The lower resolution, functionality and memory associated with alternative devices may make the use of our services through such devices difficult, and the versions of our service developed for these devices may not be compelling to users of alternative devices. As we have limited experience to date in operating versions of our service developed or optimized for users of alternative devices, it is difficult to predict the problems we may encounter in doing so, and we may need to devote significant resources to the creation, support and maintenance of such versions. If we are unable to attract and retain a substantial number of alternative device users to our online services, we will fail to capture a sufficient share of an increasingly important portion of the market for online services.

*Our competitors often provide Internet access or computer hardware to our users, and our competitors could make it difficult for our users to access our services, which in turn, could reduce the number of our users.*

Our users must access our services through an Internet access provider, including providers of cable and DSL Internet access. To the extent that an access provider (other than those with which we have a relationship), such as AOL or MSN, or a computer or computing device manufacturer offers online services or properties that are competitive with those of Yahoo!, the user may find it more convenient to use the services or properties of that access provider or manufacturer. In addition, the access provider or manufacturer may make it difficult to access our services by not listing them in the access provider's or manufacturer's own directory. To the extent that a user opts to use the services offered by an access provider (other than those with which we have a relationship) or those offered by computer or computing device manufacturers rather than the services provided by us, our revenues may decline.

*We rely on the value of the Yahoo! brand, and the costs of maintaining and enhancing our brand awareness are increasing.*

We believe that maintaining and expanding the Yahoo! brand (and our other brands, including HotJobs, Inktomi, LAUNCH, Kelkoo, Musicmatch and Overture) is an important aspect of our efforts to attract and expand our user and advertiser base. We also believe that the importance of brand recognition will increase due to the relatively low barriers to entry. We have spent considerable money and resources to date on the establishment and maintenance of the Yahoo! brands. We will spend increasing amounts of money on, and devote greater resources to advertising, marketing and other brand-building efforts to preserve and enhance consumer awareness of the Yahoo! brands. We may not be able to successfully maintain or enhance consumer awareness of the Yahoo! brands and, even if we are successful in our branding efforts, such efforts may not be cost-effective. If we are unable to maintain or enhance customer awareness of the Yahoo! brands in a cost effective manner, our business, operating results and financial condition would be harmed.

*The successful operation of our business depends upon the supply of critical elements from other companies and any interruption in that supply could cause service interruptions or reduce the quality of our product offerings.*

We depend upon third parties, to a substantial extent, for several critical elements of our business, including various technology, infrastructure, content development, software and distribution components.

**Technology and Infrastructure.** We rely on private third-party providers for our principal Internet connections, co-location of a significant portion of our data servers and network access. Any disruption in the Internet or network access or co-location services provided by these third-party providers or any failure of these third-party providers to handle current or higher volumes of use could significantly harm our business, operating results and financial condition. Any financial difficulties experienced by our providers may have negative effects on our business, the nature and extent of which we cannot predict. We license technology and related databases from third parties for certain elements of our properties, including, among others, technology underlying the delivery of news, stock quotes and current financial information, chat services, street mapping and telephone listings, streaming capabilities and similar services. We have experienced and expect to continue to experience interruptions and delays in service and availability for such elements. We also rely on a third-party manufacturer for key components of our email service. Furthermore, we depend on hardware and software suppliers for prompt delivery, installation and service of servers and other equipment to deliver our products and services. Any errors, failures, interruptions, or delays experienced in connection with these third-party technologies and information services could negatively impact our relationship with users and adversely affect our brand and our business and could expose us to liabilities to third parties.

**Distribution Relationships.** In addition to our relationships with Internet access providers, to increase traffic for our online properties and services and make them more available and attractive to advertisers and consumers, we have certain distribution agreements and informal relationships with, operators of online networks and leading Websites, electronics companies, and computer manufacturers. These distribution arrangements typically are not exclusive and do not extend over a significant amount of time. Further, some of our distributors are competitors or potential competitors who may not renew their distribution contracts with us. Potential distributors may not offer distribution of our properties and services on reasonable terms, or at all. In addition, as new methods for accessing the Web become available, including through alternative devices, we may need to enter into additional distribution relationships. If we fail to obtain distribution or to obtain distribution on terms that are reasonable, we may not be able to fully execute our business plan.

**Streaming Media Software.** We rely on the two leading providers of streaming media products, RealNetworks, Inc. and Microsoft, to license the software necessary to broadcast streaming audio and video content to our users. There can be no assurance that these providers will continue to license these products to us on reasonable terms, or at all. Our users are currently able to electronically download copies of the software to play streaming media free of charge, but providers of streaming media products may begin charging users for copies of their player software or otherwise change their business model in a manner that slows the widespread acceptance of these products. In order for our rich media services to be successful, there must be a large base of users of these streaming media products. We have limited or no control over the availability or acceptance of streaming media software, and to the extent that any of these circumstances occur, our business will be adversely affected.

**Content.** Our future success depends upon our ability to aggregate compelling content and deliver that content through our online properties. We license much of the content that attracts users to our online properties, such as news items, stock quotes, weather reports, maps and audio and video content from third parties. In particular, our music and entertainment properties rely on major sports organizations, radio and television stations, record labels, cable networks, businesses, colleges and universities, film producers and distributors, and other organizations for a large portion of the content available on our properties. Our ability to maintain and build relationships with third-party content providers will be critical to our success. We may be unable to enter into or preserve relationships with the third parties whose content we seek to obtain. Many of our current licenses for third-party content extend for a period of less than two years and there can be no guarantee that they will be renewed upon their expiration. In addition, as competition for compelling content increases both domestically and abroad, our content providers may increase the prices at which they offer their content to us and potential content providers may not offer their content on terms agreeable to us. An increase in the prices charged to us by third-party content providers could harm our operating results and financial condition. Further, many of our content licenses with third parties are non-exclusive. Accordingly, other Webcasters may be able to offer similar or identical content. Likewise, most sports and entertainment content available on our online properties are also available on other media like radio or television. These media are currently, and for the foreseeable future will be, much more widely adopted for listening or viewing such content than the Web. These factors also increase the importance of our ability to deliver compelling editorial content and personalization of this content for users in order to differentiate Yahoo! from other businesses. If we are unable to license or acquire compelling content, if other companies broadcast content that is similar to or the same as that provided by Yahoo!, or if we do not develop compelling editorial content or personalization services, the number of users on our online properties may not grow at all or may grow at a slower rate than anticipated, which would harm our operating results.

*As we provide more audio and video content, particularly music, we may be required to spend significant amounts of money on content acquisition and content broadcasts.*

In the past, the majority of the content that we provided to our users was in print, picture or graphical format and was either created internally or licensed to us by third parties for little or no charge. However, we have been providing and intend to continue to provide increasing amounts of audio and video content to our users, such as the broadcast of music, film content, speeches, news footage, concerts and other special events, through our media and entertainment properties. We believe that users of Internet services such as the Yahoo! online properties will increasingly demand high-quality audio and video content. Such content may require us to make substantial payments to third parties from whom we license or acquire such content.

For example, in order to broadcast music through our online properties, we are currently required to pay royalties both on the copyright in the musical compositions and the copyright in the actual sound recordings of the music to be broadcast. The revenue we receive as a result of our audio and video broadcasts may not justify the costs of providing such broadcasts.

*Our failure to manage growth and diversification of our business could harm us.*

We are continuing to grow and diversify our business both in the U.S. and internationally. As a result, we must expand and adapt our operational infrastructure and increase the number of our personnel in certain areas. Our business relies on our data systems, billing systems for our fee based and other services, and other operational and financial reporting and control systems. All of these systems have become increasingly complex in the recent past due to the growing diversification and complexity of our business and to acquisitions of new businesses with different systems. To effectively manage this growth, we will need to continue to upgrade and improve our data systems, billing systems, and other operational and financial systems, procedures and controls. These upgrades and improvements will require a dedication of resources and in some cases are likely to be complex. If we are unable to adapt our systems in a timely manner to accommodate our growth, our business may be adversely affected.

Additionally, we have experienced recent growth in personnel numbers and expect to continue to hire additional personnel in selected areas. This growth requires significant time and resource commitments from our senior management. Further, as a result of recent acquisitions and international expansion, more than one-half of our employees are based outside of our Sunnyvale, California headquarters. If we are unable to effectively manage a large and geographically dispersed group of employees or to anticipate our future growth and personnel needs, our business may be adversely affected.

*We are subject to U.S. and foreign government regulation of the Internet, the impact of which is difficult to predict.*

We are subject to general business regulations and laws, as well as regulations and laws directly applicable to the Internet. As we continue to expand the scope of our properties and service offerings, the application of existing laws and regulations to Yahoo! relating to issues such as user privacy, defamation, pricing, advertising, taxation, gambling, sweepstakes, promotions, financial market regulation, consumer protection, content regulation, quality of products and services, and intellectual property ownership and infringement can be unclear. In addition, we will also be subject to new laws and regulations directly applicable to our activities.  Further, the application of existing laws to Yahoo! or our subsidiaries regulating or requiring licenses for certain businesses of our advertisers including, for example, distribution of pharmaceuticals, alcohol, tobacco or firearms, as well as insurance and securities brokerage and legal services, can be unclear.  Any existing or new legislation applicable to us could expose us to substantial liability, including significant expenses necessary to comply with such laws and regulations, and dampen the growth in use of the Web.

Several federal laws, including the following, could have an impact on our business. The Digital Millennium Copyright Act is intended, in part, to limit the liability of eligible online service providers for listing or linking to third-party Websites that include materials that infringe copyrights or other rights of others. The Children's Online Protection Act and the Children's Online Privacy Protection Act are intended to restrict the distribution of certain materials deemed harmful to children and impose additional restrictions on the ability of online services to collect user information from minors. In addition, the Protection of Children From Sexual Predators Act of 1998 requires online service providers to report evidence of violations of federal child pornography laws under certain circumstances. Such legislation may impose significant additional costs on our business or subject us to additional liabilities.

We post our privacy policies and practices concerning the use and disclosure of user data. In addition, GeoCities, a company we acquired in 1999, is required to comply with a consent order between it and the Federal Trade Commission (the "FTC"), which imposes certain obligations and restrictions with respect to information collected from users. Any failure by us to comply with our posted privacy policies, the consent order, FTC requirements or other privacy-related laws and regulations could result in proceedings by the FTC or others which could potentially have an adverse effect on our business, results of operations and financial condition. In this regard, there are a large number of legislative proposals before the United States Congress and various state legislative bodies regarding privacy issues related to our business. It is not possible to predict whether or when such legislation may be adopted, and certain proposals, if adopted, could materially and adversely affect our business through a decrease in user registrations and revenues. This could be caused by, among other possible provisions, the required use of disclaimers or other requirements before users can utilize our services.

Due to the nature of the Web, it is possible that the governments of other states and foreign countries might attempt to regulate Web transmissions or prosecute us for violations of their laws. Any such developments (or developments stemming from enactment or modification of other laws) could increase the costs of regulatory compliance for us or force us to change our business practices.

*We may be subject to legal liability for online services.*

We host a wide variety of services that enable individuals to exchange information, generate content, conduct business and engage in various online activities on an international basis, including public message posting and services relating to online auctions and homesteading. The law relating to the liability of providers of these online services for activities of their users is currently unsettled both within the United States and abroad. Claims have been threatened and have been brought against us for defamation, negligence, copyright or trademark infringement, unlawful activity, tort, including personal injury, fraud, or other theories based on the nature and content of information that we provide links to or that may be posted online or generated by our users or with respect to auctioned materials.  In addition, Yahoo! was the subject of a claim brought by certain entities in a French court regarding, among other things, the availability of certain content within our services which was alleged to violate French law. Due to the unsettled nature of the law in this area, we may be subject to similar actions in domestic or other international jurisdictions in the future. Our defense of any such actions could be costly and involve significant distraction of our management and other resources. In addition, we are aware that governmental agencies are currently investigating the conduct of online auctions.

We also periodically enter into arrangements to offer third-party products, services, or content under the Yahoo! brand or via distribution on various Yahoo! properties, including stock quotes and trading information. We may be subject to claims concerning these products, services or content by virtue of our involvement in marketing, branding, broadcasting or providing access to them, even if we do not ourselves host, operate, provide, or provide access to these products, services or content. While our agreements with these parties often provide that we will be indemnified against such liabilities, such indemnification may not be adequate.

It is also possible that, if any information provided directly by us contains errors or is otherwise negligently provided to users, third parties could make claims against us. For example, we offer Web-based email services, which expose us to potential risks, such as liabilities or claims resulting from unsolicited email, lost or misdirected messages, illegal or fraudulent use of email, or interruptions or delays in email service. Investigating and defending any of these types of claims is expensive, even to the extent that the claims do not ultimately result in liability.

*Our stock price has been volatile historically and may continue to be volatile regardless of our operating performance.*

The trading price of our common stock has been and may continue to be subject to wide fluctuations. During the third quarter of 2004, the closing sale prices of our common stock on the Nasdaq ranged from $25.70 to $34.30 per share and the closing sale price on October 27, 2004 was $36.18 per share. Our stock price may fluctuate in response to a number of events and factors, such as quarterly variations in operating results; announcements of technological innovations or new products and media properties by us or our competitors; changes in financial estimates and recommendations by securities analysts; the operating and stock price performance of other companies that investors may deem comparable to us; the operating performance and stock price of companies in which we have an equity investment, including Yahoo! Japan; and news reports relating to trends in our markets or general economic conditions.

In addition, the stock market in general, and the market prices for Internet-related companies in particular, have experienced volatility that often has been unrelated to the operating performance of such companies. These broad market and industry fluctuations may adversely affect the price of our stock, regardless of our operating performance. Additionally, volatility or a lack of positive performance in our stock price may adversely affect our ability to retain key employees, all of whom have been granted stock options.

*Our operations could be significantly hindered by the occurrence of a natural disaster or other catastrophic event.*

Our operations are susceptible to outages due to fire, floods, power loss, telecommunications failures, break-ins, terrorists and similar events. In addition, a significant portion of our network infrastructure is located in Northern California, an area susceptible to earthquakes. We do not have multiple site capacity for all of our services in the event of any such occurrence. In an effort to reduce the likelihood of a geographical or other disaster impacting our business, we have distributed and intend to continue distributing our servers among additional data centers located around the world. Failure to execute these changes properly or in a timely manner could result in delays or interruptions to our service. In addition, despite our implementation of network security measures, our servers are vulnerable to computer viruses, physical and electronic break-ins, and similar disruptions from unauthorized tampering with our computer systems.

*Technological or other assaults on our service could harm our business.*

We are vulnerable to coordinated attempts to overload our systems with data, resulting in denial or reduction of service to some or all of our users for a period of time. We have experienced a coordinated denial of service attack in the past, and may experience such attempts in the future. We may not carry sufficient business interruption insurance to compensate us for losses that may occur as a result of any of these events. Any such event could reduce our revenue and harm our operating results and financial condition.

*Anti-takeover provisions could make it more difficult for a third party to acquire us.*

We have adopted a stockholder rights plan and initially declared a dividend distribution of one right for each outstanding share of common stock to stockholders of record as of March 20, 2001. As a result of our two-for-one stock split effective May 11, 2004, each share of common stock is now associated with one-half of one right. Each right entitles the holder to purchase one unit consisting of one one-thousandth of a share of our Series A Junior Participating Preferred Stock for $250 per unit. Under certain circumstances, if a person or group acquires 15 percent or more of our outstanding common stock, holders of the rights (other than the person or group triggering their exercise) will be able to purchase, in exchange for the $250 exercise price, shares of our common stock or of any company into which we are merged having a value of $500. The rights expire on March 1, 2011 unless extended by our board of directors. Because the rights may substantially dilute the stock ownership of a person or group attempting to take us over without the approval of our board of directors, our rights plan could make it more difficult for a third party to acquire us (or a significant percentage of our outstanding capital stock) without first negotiating with our board of directors regarding such acquisition.

In addition, our board of directors has the authority to issue up to 10,000,000 shares of Preferred Stock (of which 2,000,000 shares have been designated as Series A Junior Participating Preferred Stock) and to determine the price, rights, preferences, privileges and restrictions, including voting rights, of those shares without any further vote or action by the stockholders.

The rights of the holders of our common stock may be subject to, and may be adversely affected by, the rights of the holders of any Preferred Stock that may be issued in the future. The issuance of Preferred Stock may have the effect of delaying, deterring or preventing a change of control of Yahoo! without further action by the stockholders and may adversely affect the voting and other rights of the holders of our common stock. Further, certain provisions of our charter documents, including provisions eliminating the ability of stockholders to take action by written consent and limiting the ability of stockholders to raise matters at a meeting of stockholders without giving advance notice, may have the effect of delaying or preventing changes in control or management of Yahoo!, which could have an adverse effect on the market price of our stock. In addition, our charter documents do not permit cumulative voting, which may make it more difficult for a third party to gain control of our Board of Directors. Further, we are subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law, which will prohibit us from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder, even if such combination is favored by a majority of stockholders, unless the business combination is approved in a prescribed manner. The application of Section 203 also could have the effect of delaying or preventing a change of control or management.

***Special note regarding forward-looking statements.***

Some of the statements in this Report constitute forward-looking statements.  In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "intend," "expect," "plan," "anticipate," "believe," "estimate," "predict," "potential," or "continue" or the negative of such terms or other comparable terminology.   This Report includes, among others for fiscal 2004, statements regarding our:

- revenues;

- primary operating costs and expenses;

- capital expenditures;

- operating lease arrangements;

- evaluation of possible acquisitions of, or investments in business, products and technologies; and

- existing cash and investments being sufficient to meet operating requirements.

These statements involve known and unknown risks, uncertainties, and other factors that may cause our or our industry's results, levels of activity, performance, or achievements to be materially different from any future results, levels of activity, performance, or achievements expressed or implied by such forward-looking statements.  Such factors include, among others, those listed in these "Risk Factors" and elsewhere in this Report.  Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, events, levels of activity, performance, or achievements.  We do not assume responsibility for the accuracy and completeness of the forward-looking statements.  We do not intend to update any of the forward-looking statements after the date of this Report to conform them to actual results.

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

YAHOO! INC.

|  | By: | /s/  SUSAN DECKER |
|---|---|---|
| Dated:  October 29, 2004 |  | Susan Decker |
|  |  | Executive Vice President, Finance and Administration, and |
|  |  | Chief Financial Officer (Principal Financial Officer) |
|  | By: | /s/  PATRICIA CUTHBERT |
| Dated:  October 29, 2004 |  | Patricia Cuthbert |
|  |  | Vice President and Corporate Controller (Principal Accounting |
|  |  | Officer) |

**YAHOO! INC.**
**Index to Exhibits**

| Exhibit Number | Description |
| --- | --- |
| 3.1 | Amended and Restated Certificate of Incorporation of Registrant (Filed as Exhibit 3.1 to the June 30, 2000 10-Q and incorporated herein by reference). |
| 3.2 | Amended Bylaws of Registrant (Filed as Exhibit 4.9 to the Registrant's Registration Statement on Form S-8 filed on March 5, 2002 and incorporated herein by reference). |
| 4.1 | Form of Senior Indenture (Filed as Exhibit 4.1 to the Registrant's Registration Statement on Form S-3, Registration No. 333-46458, filed September 22, 2000 and incorporated herein by reference). |
| 4.2 | Form of Subordinated Indenture (Filed as Exhibit 4.2 to the September 22, 2000 Form S-3 and incorporated herein by reference). |
| 4.3** | Form of Senior Note. |
| 4.4** | Form of Subordinated Note. |
| 4.5** | Form of Certificate of Designation for preferred stock (together with preferred stock certificate). |
| 4.6 | Form of Deposit Agreement (together with Depository Receipt) (Filed as Exhibit 4.6 to the September 22, 2000 Form S-3 and incorporated herein by reference). |
| 4.7** | Form of Warrant Agreement (together with form of Warrant Certificate). |
| 4.8 | Rights Agreement, dated as of March 15, 2001, between the Registrant and Equiserve Trust Company, N.A., as Rights Agent, including the form of Rights Certificate as Exhibit B and the summary of Rights to Purchase Preferred Stock as Exhibit C (Filed as Exhibit 4.1 to the Registrant's Current Report on Form 8-K, filed March 19, 2001 and incorporated herein by reference). |
| 4.9 | Indenture, dated as of April 9, 2003 by and between the Registrant and U.S. Bank National Association (Filed as Exhibit 4.1 to the Registrant's Current Report on Form 8-K, filed April 10, 2003 and incorporated herein by reference). |
| 4.10 | Registration Rights Agreement, dated as of April 9, 2003, among the Registrant and Credit Suisse First Boston LLC (Filed as Exhibit 4.2 to the April 10, 2003 Form 8-K and incorporated herein by reference). |
| 31.1* | Certificate of Chief Executive Officer pursuant to Securities Exchange Act Rules 13a-14(a) and 15d-14(a) as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 dated October 29, 2004. |
| 31.2* | Certificate of Chief Financial Officer pursuant to Securities Exchange Act Rules 13a-14(a) and 15d-14(a) as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 dated October 29, 2004. |
| 32* | Certificate of Chief Executive Officer and Chief Financial Officer pursuant to section 18 U.S.C. section 1350 dated October 29, 2004. |

_____

\*      Filed herewith.

\*\*      To be filed by a report on Form 8-K pursuant to Item 601 of Regulation S-K or, where applicable, incorporated herein by reference from a subsequent filing in accordance with Section 305(b)(2) of the Trust Indenture Act of 1939.

Exhibit 31.1

**Certification of CEO Pursuant to
Securities Exchange Act Rules 13a-14(a) and 15d-14(a)
as Adopted Pursuant to
Section 302 of the Sarbanes-Oxley Act of 2002**

I, Terry Semel, the Chief Executive Officer of Yahoo! Inc., certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Yahoo! Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of registrant's board of directors (or persons performing the equivalent function):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: October 29, 2004                    By:    /s/  TERRY SEMEL
                                                   Terry Semel
                                                   Chief Executive Officer

Exhibit 31.2

**Certification of CFO Pursuant to
Securities Exchange Act Rules 13a-14(a) and 15d-14(a)
as Adopted Pursuant to
Section 302 of the Sarbanes-Oxley Act of 2002**

I, Susan Decker, the Chief Financial Officer of Yahoo! Inc., certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Yahoo! Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

    (c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of registrant's board of directors (or persons performing the equivalent function):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated:  October 29, 2004                    By:     /s/  SUSAN DECKER
                                                    Susan Decker
                                                    Chief Financial Officer

Exhibit 10

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2004**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from                    to**

**Commission File Number 0-28018**

---

# YAHOO! INC.
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **77-0398689** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**701 First Avenue
Sunnyvale, California 94089**
(Address of principal executive offices)

Registrant's telephone number, including area code: **(408) 349-3300**

Securities registered pursuant to Section 12(b) of the Act:

**None**

Securities registered pursuant to Section 12(g) of the Act:

**Common Stock, $.001 par value**
(Title of Class)

---

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

*We face significant competition from companies such as Time Warner's AOL, Google and Microsoft.*

We face significant competition from companies that have combined a variety of services under one brand name in a manner similar to Yahoo!, including AOL, Google, and Microsoft. AOL has access to content from Time Warner's movie, television, music, books, periodicals, news, sports and other media holdings; access to a network of cable and other broadband users and delivery technologies; and considerable resources for future growth and expansion. Google, in addition to search, offers many other services that directly compete with our services, including a consumer email service, desktop search, local search, photos, maps, shopping services and Internet advertising solutions. Microsoft has introduced its own search service and has announced plans to develop features that may make web search a more integrated part of its Windows operating system. We expect these competitors increasingly to use their financial and engineering resources to compete with us. In certain of these cases, most notably AOL, our competition has a direct billing relationship with a greater number of their users through access and other services than we have with our users through our premium services. This relationship may permit these competitors to be more effective than us in targeting services and advertisements to the specific preferences of their users thereby giving them a competitive advantage. If our competitors are more successful than us in attracting users and customers, our business and revenues could be adversely affected.

*We also face competition from other Internet service providers, including destination websites and Internet access providers.*

We also compete for customers and users with many other providers of online services, including online navigation, Web search, commercial search, information, entertainment, recruiting, community, electronic commerce and Internet access services. Some of our competitors in specific areas, particularly in specific vertical markets or commerce services, such as shopping, auctions or travel, may have longer operating histories in the market, larger customer or user bases, and more brand recognition in the specific market.

Our users must access our services through an Internet access provider, including providers of cable and DSL Internet access. To the extent that an access provider or a computer or computing device manufacturer offers online services that are competitive with those of Yahoo!, the user may find it more convenient to use the services or properties of that access provider or manufacturer. In addition, the access provider or manufacturer may make it difficult to access our services by not listing them in the access provider's or manufacturer's own directory. Further, through their direct billing relationship with users, access providers may be better able to target services and advertisements to the preferences of their users.

In addition, smaller competitors may consolidate with larger competitors or with each other and become more competitive. New competitors may also enter the market. If our competitors are more successful in attracting and retaining customers and users, then our revenues could decline.

*We face competition from other providers of sponsored search advertising services which could affect our operating results.*

We compete directly with other providers of sponsored search advertising services, including FindWhat.com, Google, LookSmart, Ltd., and Lycos Inc. In addition, we believe it is likely that there will be additional entrants to this advertising market. Some of the existing competitors and possible additional entrants may have greater operational, strategic, financial, personnel or other resources than we do, as well as greater brand recognition. These competitors compete against us for affiliate arrangements and could cause us to have to enter into affiliate arrangements with less favorable terms, to lose current affiliates or to fail to acquire new affiliates. The loss of affiliates or a reduction in the revenue from affiliate arrangements could harm our business, operating results, and cash flows from operations.

*We face significant competition from traditional media companies which could affect our operating results .*

We also compete with traditional media companies for advertising. Most advertisers currently spend only a small portion of their advertising budgets on Internet advertising. If we fail to persuade existing advertisers to retain and grow their spending with us and if we fail to persuade new advertisers to spend a portion of their budget on advertising with us, our business and revenues could be adversely affected.

12

***If we are unable to provide search technologies and services which generate significant traffic to our Web sites, our business could be harmed, causing our revenues to decline.***

We have deployed our own Web search technology to provide Web search results on our network. We have limited experience in operating our own search service. Web search is characterized by rapidly changing technology, significant competition, evolving industry standards, and frequent product and service enhancements. We must continually invest in improving our user's experience, including search relevance, speed, and services responsive to their needs and preferences to continue to attract, retain and expand our user base. If we are unable to provide search technologies and services which generate significant traffic to our Web sites, our business could be harmed, causing our revenues to decline.

***The majority of our revenues are derived from marketing services and the reduction in spending by or loss of current or potential customers would cause our revenues to decline.***

For the year ended December 31, 2004, approximately 88 percent of our total revenues came from marketing services. Our ability to continue to retain and grow marketing services revenue depends upon:

- growing our user base;

- broadening our relationships with advertisers to small and medium size businesses;

- attracting advertisers to our user base;

- increasing demand for our marketing services by advertisers, users and businesses, including prices paid by advertisers, the number of searches performed by users and the rate at which they click-through to commercial search results;

- maintaining our affiliate program for our sponsored search offerings;

- deriving better demographic and other information from our users; and

- driving continued acceptance of the Web by advertisers as an advertising medium.

Our agreements with advertisers have terms of up to three years, and in the majority of cases, the terms are one year or less, or, in the case of our sponsored search advertising services, may be terminated at any time by the advertiser. The agreements often have payments contingent upon on usage or click-through levels. Accordingly, it is difficult to forecast marketing services revenues accurately. However, our expense levels are based in part on expectations of future revenues, include guaranteed minimum payments in connection with our sponsored search advertising services, and are fixed over the short-term with respect to certain categories. Any reduction in spending by or loss of existing or potential future customers would cause our revenues to decline. Further, we may be unable to adjust spending quickly enough to compensate for any unexpected revenue shortfall.

***In certain markets we depend on a limited number of sources to direct a significant percentage of users and businesses to our service to conduct searches and a loss of these sources could harm our operating results.***

A significant percentage of users and businesses that conduct searches using our sponsored search service, come from a limited number of sources in certain markets. In addition to the Yahoo! Network, sources for users conducting searches are members of our affiliate network, including portals, browsers, and other affiliates. Our agreements with affiliates vary in duration, and depending on the agreement, provide varying levels of discretion to the affiliate in the implementation of the sponsored search service, including the degree to which affiliates can modify the presentation of the search results on their websites or integrate the sponsored search services with their own services. The agreements may be terminable upon the occurrence of certain events, including failure to meet certain service levels, material breaches of agreement terms, changes in control or in some instances, at will. We may not be successful in renewing our affiliate agreements, or

13

if they are renewed, they may not be renewed on as favorable terms. The loss of affiliates providing significant users or businesses or an adverse change in implementation of the sponsored search service by any of these affiliates could harm our ability to generate revenue, our operating results, and cash flows from operations.

***Some of our shared revenue arrangements may not generate anticipated revenues.***

We typically receive co-branded revenue through revenue sharing arrangements and sponsorship fees or a portion of transactions revenue in return for minimum levels of user impressions to be provided by us. These arrangements expose us to potentially significant financial risks in the event our usage levels decrease, including the following:

- the revenue we are entitled to receive may be adjusted downwards;

- we may be required to "make good" on our obligations by providing additional or alternative services;

- the sponsors or co-brand services may not renew the arrangements or may renew at lower rates; and

- the arrangements may not generate anticipated levels of shared transactions revenue, or sponsors may default on the payment commitments in such agreements as has occurred in the past.

Accordingly, any leveling off or decrease of our user base (or usage by our existing base) or the failure to generate anticipated levels of shared transactions revenue could result in a significant decrease in our revenues.

***Decreases or delays in advertising spending due to general economic conditions could harm our ability to generate advertising revenue.***

Expenditures by advertisers tend to be cyclical, reflecting overall economic conditions as well as budgeting and buying patterns. Since we derive the majority of our revenues from advertising, any decreases in or delays in advertising spending due to general economic conditions could reduce our revenues or negatively impact our ability to grow our revenues.

***Financial results for any particular period will not predict results for future periods.***

There can be no assurance that the purchasing pattern of customers advertising on the Yahoo! Network will not continue to fluctuate, that advertisers will not make smaller and shorter-term purchases, or that market prices for online advertising will not decrease due to competitive or other factors. In addition, there can be no assurance that the volume of searches conducted, the amounts bid by advertisers for search listings or the number of advertisers that bid on our sponsored search service will not vary widely from period to period. As revenues from new sources increase, it may become more difficult to predict our financial results based on historical performance. You should not rely on the results for any period as an indication of future performance.

***We may not be able to generate substantial revenues from our alliances with Internet access providers.***

Through alliances with Internet access providers, we offer access services that combine customized content and services from Yahoo! (including browser and other communications services) and Internet access from the third party access providers. We may not be able to retain the alliances with our existing Internet access providers or to obtain new alliances with Internet access providers on terms that are reasonable. In addition, these Internet access services compete with many large companies such as AOL, MSN, Comcast Corporation and other established Internet access providers. In certain of these cases, our competition has substantially greater market presence (including an existing user base) and greater financial, technical, marketing or other resources. As a result of these and other competitive factors, these Internet access providers may not be able to attract, grow or retain a customer base, which would negatively impact our ability to sell customized content and services through this channel. Any negative impact on our ability to sell content and services through our alliances with Internet access providers could negatively impact our business and anticipated revenues from our alliances.

14

***We have dedicated considerable resources to provide a variety of premium services, which may not prove to be successful in generating significant revenue for us.***

We offer fee-based enhancements to many of our free services, including email, personals, finance, games, music, and sports. The development cycles for these technologies are long and generally require significant investment by us. We have previously discontinued certain non-profitable premium services. We must however continue to provide new services that are compelling to our users while continuing to develop an effective method for generating revenues for such services. If we cannot generate revenues from these services that are greater than the cost of providing such services, our operating results may be harmed.

***We expect our operating expenses to continue to increase as we attempt to expand the Yahoo! brand, fund product development, develop media properties and acquire other businesses which could harm our operating results.***

We currently expect that our operating expenses will continue to increase as we expand our operations in areas of expected growth, continue to develop and extend the Yahoo! brand, fund greater levels of product development, develop and commercialize additional media properties and premium services, and acquire and integrate complementary businesses and technologies. If our expenses increase at a greater pace than our revenues, our operating results could be harmed.

***If we are unable to license or acquire compelling content at reasonable costs or if we do not develop compelling content, the number of users of our services may not grow as anticipated which could harm our operating results.***

Our future success depends in part upon our ability to aggregate compelling content and deliver that content through our online properties. We license much of the content on our online properties, such as news items, stock quotes, weather reports, maps and audio and video content from third parties. We have been providing increasing amounts of audio and video content to our users and we believe that users will increasingly demand high-quality audio and video content, such as the broadcast of music, film content, speeches, news footage, concerts and other special events. Such content may require us to make substantial payments to third parties from whom we license or acquire such content. For example, our music and entertainment properties rely on major sports organizations, radio and television stations, record labels, cable networks, businesses, colleges and universities, film producers and distributors, and other organizations for a large portion of the content available on our properties. Our ability to maintain and build relationships with third-party content providers will be critical to our success. In addition, as new methods for accessing the Web become available, including through alternative devices, we may need to enter into amended content agreements with existing third-party content providers to cover the new devices. We may be unable to enter into new, or preserve existing, relationships with the third parties whose content we seek to obtain. In addition, as competition for compelling content increases both domestically and internationally, our content providers may increase the prices at which they offer their content to us and potential content providers may not offer their content on terms agreeable to us. An increase in the prices charged to us by third-party content providers could harm our operating results and financial condition. Further, many of our content licenses with third parties are non-exclusive. Accordingly, other Webcasters and other media such as radio or television may be able to offer similar or identical content. This increases the importance of our ability to deliver compelling editorial content and personalization of this content for users in order to differentiate Yahoo! from other businesses. If we are unable to license or acquire compelling content at reasonable prices, if other companies broadcast content that is similar to or the same as that provided by Yahoo!, or if we do not develop compelling editorial content or personalization services, the number of users of our services may not grow at all or may grow at a slower rate than anticipated, which could harm our operating results.

***Our intellectual property rights are valuable and any inability to protect them could reduce the value of our brand image and harm our business and our operating results.***

We regard our copyrights, patents, trademarks, trade dress, trade secrets, and similar intellectual property, including our rights to certain domain names, as important to Yahoo!'s brand and success. While we attempt to protect and stop any unauthorized use of our proprietary rights, the efforts we have taken to protect our proprietary rights may not be

15

sufficient or effective. In addition, effective trademark, patent, copyright, and trade secret protection may not be available in every country in which our products and media properties are distributed or made available through the Internet. Further, while we attempt to ensure that the quality of our brand is maintained by our licensees, our licensees may take actions that could impair the value of our brand, our proprietary rights or the reputation of our products and media properties. We are aware that third parties have, from time to time, copied significant content available on Yahoo! for use in competitive Internet services. Protection of the distinctive elements of Yahoo! may not be available under copyright law. If we are unable to protect our proprietary rights from unauthorized use, the value of our brand image may be reduced. Any impairment of our brand could negatively impact our business. In addition, protecting our intellectual property and other proprietary rights is expensive and time consuming. Any increase in the unauthorized use of our intellectual property could make it more expensive to do business and consequently harm our operating results.

*We rely on the value of the Yahoo! brand, and a failure to maintain or enhance the Yahoo! brand in a cost effective manner could harm our operating results.*

We believe that maintaining and expanding the Yahoo! brand is an important aspect of our efforts to attract and expand our user and advertiser base. We also believe that the importance of brand recognition will increase due to the relatively low barriers to entry. We have spent considerable money and resources to date on the establishment and maintenance of the Yahoo! brands. We will spend increasing amounts of money on, and devote greater resources to advertising, marketing and other brand-building efforts to preserve and enhance consumer awareness of the Yahoo! brands. We may not be able to successfully maintain or enhance consumer awareness of the Yahoo! brands and, even if we are successful in our branding efforts, such efforts may not be cost-effective. If we are unable to maintain or enhance customer awareness of the Yahoo! brands in a cost effective manner, our business, operating results and financial condition would be harmed.

*We are, and may in the future be, subject to intellectual property infringement claims, which are costly to defend, could result in damage awards, and could limit our ability to provide certain content or use certain technologies in the future.*

Internet, technology and media companies often hold a significant number of patents. Further, many of these companies and other parties are actively developing search, indexing, electronic commerce and other Web-related technologies, as well as a variety of online business models and methods. We believe that these parties will continue to take steps to protect these technologies, including, but not limited to, seeking patent protection. As a result, disputes regarding the ownership of technologies and rights associated with online business are likely to continue to arise in the future. From time to time, parties assert patent infringement claims against us. Currently, we are engaged in several lawsuits regarding patent issues and have been notified of a number of other potential disputes.

In addition to patent claims, third parties have asserted, and are likely in the future to assert, claims against us alleging infringement of copyrights, trademark rights, trade secret rights or other proprietary rights, or alleging unfair competition or violations of privacy rights or failure to maintain confidentiality of user data. Currently, our subsidiary LAUNCH Media, Inc. ("LAUNCH") is engaged in a lawsuit regarding copyright issues that commenced prior to our acquisition of LAUNCH. In addition, Overture Services Inc. ("Overture") is in litigation involving claims that allowing advertisers to bid on certain search terms and Overture's display of search results triggered by those search terms constitutes trademark infringement. A court in France recently held Overture SARL and Overture liable for displaying search results triggered by certain trademarked keywords. Overture SARL has appealed, and Overture intends to appeal, this decision.

As we expand our business and develop new technologies, products and services, we may become increasingly subject to intellectual property infringement claims. In the event that there is a determination that we have infringed third-party proprietary rights such as patents, copyrights, trademark rights, trade secret rights or other third party rights such as publicity and privacy rights, we could incur substantial monetary liability, be required to enter into costly royalty or licensing agreements or be prevented from using the rights, which could require us to change our business practices in the future and limit our ability to compete effectively. We may also incur substantial expenses in defending against third-party infringement claims regardless of the merit of such claims. In addition, many of our agreements with our customers or affiliates require us to indemnify them for certain third-party intellectual property infringement claims, which could

16

increase our costs in defending such claims and our damages. The occurrence of any of these results could harm our brand and negatively impact our operating results.

***Acquisitions could result in operating difficulties and unanticipated liabilities.***

We have made strategic acquisitions, including Inktomi Corporation ("Inktomi") in March 2003, Overture in October 2003, 3721 in January 2004, Kelkoo in April 2004, and Musicmatch in October 2004. We expect to enter into additional business combinations and acquisitions in the future. Acquisitions may result in dilutive issuances of equity securities, use of our cash resources, incurrence of debt and amortization of expenses related to intangible assets. Our acquisitions to date were accompanied by a number of risks, including:

- the difficulty of assimilating the operations and personnel of our acquired companies into our operations;

- the potential disruption of our ongoing business and distraction of management;

- the difficulty of integrating acquired technology and rights into our services and unanticipated expenses related to such integration;

- the failure to successfully further develop acquired technology resulting in the impairment of amounts currently capitalized as intangible assets;

- the potential for patent and trademark infringement claims against the acquired company;

- the impairment of relationships with customers and partners of the acquired companies or our customers and partners as a result of the integration of acquired operations;

- the impairment of relationships with employees of the acquired companies or our employees as a result of integration of new management personnel;

- the difficulty of integrating the acquired company's accounting, management information, human resources and other administrative systems;

- in the case of foreign acquisitions, uncertainty regarding foreign laws and regulations and difficulty integrating operations and systems as a result of cultural, systems and operational differences; and

- the impact of known potential liabilities or unknown liabilities associated with the acquired companies.

We are likely to experience similar risks in connection with our future acquisitions. Our failure to be successful in addressing these risks or other problems encountered in connection with our past or future acquisitions could cause us to fail to realize the anticipated benefits of our acquisitions, incur unanticipated liabilities and harm our business generally.

***Our failure to manage growth and diversification of our business could harm us.***

We are continuing to grow and diversify our business both in the United States and internationally. As a result, we must expand and adapt our operational infrastructure and increase the number of our personnel in certain areas. Our business relies on our data systems, billing systems for our fee based and other services, and other operational and financial reporting and control systems. All of these systems have become increasingly complex in the recent past due to the growing diversification and complexity of our business and to acquisitions of new businesses with different systems. To effectively manage this growth, we will need to continue to upgrade and improve our data systems, billing systems, and other operational and financial systems, procedures and controls. In particular, as our premium and other services for which we bill users grow, any failure of our billing systems to accommodate the increasing number of transactions and accurately bill users could adversely affect our business and ability to collect revenue. These upgrades and improvements

17

will require a dedication of resources and in some cases are likely to be complex. If we are unable to adapt our systems in a timely manner to accommodate our growth, our business may be adversely affected.

Additionally, we have experienced recent growth in personnel numbers and expect to continue to hire additional personnel in selected areas. This growth requires significant time and resource commitments from our senior management. Further, as a result of recent acquisitions and international expansion, more than one-half of our employees are based outside of our Sunnyvale, California headquarters. If we are unable to effectively manage a large and geographically dispersed group of employees or to anticipate our future growth and personnel needs, our business may be adversely affected.

***If we are unable to retain our existing senior management and key personnel and hire new highly skilled personnel, we may not be able to execute our business plan.***

We are substantially dependent on the continued services of our senior management, including our two founders, our chief executive officer, chief financial officer, chief operating officer, chief technical officer, and our executive and senior vice presidents. These individuals have acquired specialized knowledge and skills with respect to Yahoo! and its operations. The loss of any of these individuals could harm our business. Our business is also dependent on our ability to retain, hire and motivate talented, highly skilled personnel. The competition for such highly skilled personnel can be intense, particularly in the San Francisco Bay Area, where our corporate headquarters is located. Many of our management and key personnel have reached or will soon reach the four-year anniversary of their Yahoo! hiring date and, as a result, have become or will shortly become fully vested in their initial stock option grants. Although employees receive additional grants, an employee may be more likely to leave Yahoo! upon completion of the vesting period for the initial option grant which is generally the largest. If we do not succeed in retaining and motivating our existing key employees and attracting new key personnel, we may be unable to meet our business plan and as a result our stock price may decline.

***More individuals are utilizing non-PC devices to access the Internet, and versions of our service developed or optimized for these devices may not gain widespread adoption by users of such devices.***

The number of individuals who access the Internet through devices other than a personal computer, such as personal digital assistants, mobile telephones and television set-top devices, has increased dramatically. Our services were originally designed for rich, graphical environments such as those available on desktop and laptop computers. The lower resolution, functionality and memory associated with alternative devices currently available may make the use of our services through such devices difficult, and the versions of our service developed for these devices may not be compelling to users of alternative devices. As we have limited experience to date in operating versions of our service developed or optimized for users of alternative devices, it is difficult to predict the problems we may encounter in doing so, and we may need to devote significant resources to the creation, support and maintenance of such versions. If we are unable to attract and retain a substantial number of alternative device users to our online services, we may fail to capture a sufficient share of an increasingly important portion of the market for online services and may fail to attract advertisers.

***We may be required to record a significant charge to earnings if our goodwill or amortizable intangible assets become impaired.***

We are required under generally accepted accounting principles to review our amortizable intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Goodwill is required to be tested for impairment at least annually. Factors that may be considered a change in circumstances indicating that the carrying value of our amortizable intangible assets may not be recoverable include a decline in stock price and market capitalization, and slower growth rates in our industry. We may be required to record a significant charge to earnings in our financial statements during the period in which any impairment of our goodwill or amortizable intangible assets is determined. This may adversely impact our results of operations. As of December 31, 2004, our goodwill and amortizable intangible assets were $3 billion.

18

***We plan to continue to operate in international markets in which we may have limited experience or rely on business partners, and in which we are faced with relatively higher costs.***

We plan to expand Yahoo! branded online properties and search offerings in international markets. We have currently developed, through joint ventures, subsidiaries and branch offices, localized offerings in over 20 countries outside of the United States. As we expand to new international markets, we will have only limited experience in marketing and operating our products and services in such markets and we may rely on the efforts and abilities of foreign business partners in such markets. We have experienced and expect to continue to experience higher costs as a percentage of revenues in connection with the development and maintenance of our international online properties relative to our domestic experience. Certain international markets may be slower than domestic markets in adopting the Internet as an advertising and commerce medium and so our operations in international markets may not develop at a rate that supports our level of investment.

***In international markets we compete with local Internet service providers that may have competitive advantages.***

In a number of international markets, especially those in Asia, Europe, and Latin America, we face substantial competition from local Internet service providers and other portals that offer search, communications and other commercial services. Many of these companies have a dominant market share in their territories and are owned by local telecommunication providers which give them a competitive advantage. Local providers of competing online services may also have a substantial advantage over us in attracting users in their country due to more established branding in that country, greater knowledge with respect to the tastes and preferences of users residing in that country and/or their focus on a single market. Further, the local providers may have greater regulatory and operational flexibility than Yahoo! due to the fact that we are subject to both domestic and foreign regulatory requirements. We must continue to improve our local offerings, become more knowledgeable about our local users and their preferences, deepen our relationships with our local users as well as increase our branding and other marketing activities in order to remain competitive and strengthen our international market position.

***Our international operations are subject to increased risks which could harm our business, operating results and financial condition.***

In addition to uncertainty about our ability to continue to generate revenues from our foreign operations and expand our international market position, there are certain risks inherent in doing business internationally, including:

- trade barriers and changes in trade regulations;

- difficulties in developing, staffing and simultaneously managing a large number of varying foreign operations as a result of distance, language and cultural differences;

- stringent local labor laws and regulations;

- longer payment cycles;

- currency exchange rate fluctuations;

- political or social unrest or economic instability;

- import or export restrictions;

- seasonal volatility in business activity;

- risks related to government regulation including those more fully described below; and

19

potentially adverse tax consequences.

One or more of these factors could harm our future international operations and consequently, could harm our business, operating results, and financial condition.

***We are subject to U.S. and foreign government regulation of the Internet which could subject us to claims and remedies including monetary liabilities and limitations on our business practices.***

We are subject to regulations and laws directly applicable to providers of Internet services both domestically and internationally. The application of existing domestic and international laws and regulations to Yahoo! relating to issues such as user privacy and data protection, defamation, pricing, advertising, taxation, gambling, sweepstakes, promotions, financial market regulation, consumer protection, content regulation, quality of services, and intellectual property ownership and infringement in many instances is unclear or unsettled. In addition, we will also be subject to any new laws and regulations directly applicable to our activities. Further, the application of existing laws to Yahoo! or our subsidiaries regulating or requiring licenses for certain businesses of our advertisers including, for example, distribution of pharmaceuticals, alcohol, adult content, tobacco or firearms, as well as insurance and securities brokerage and legal services, can be unclear. Internationally, we may also be subject to foreign laws and regulations that are inconsistent from country to country. We may incur substantial liabilities for expenses necessary to comply with these laws and regulations or penalties for any failure to comply. Compliance with these laws and regulations may also cause us to have to change or limit our business practices in a manner adverse to our business.

A number of federal laws, including those referenced below impact our business. The Digital Millennium Copyright Act ("DMCA") is intended, in part, to limit the liability of eligible online service providers for listing or linking to third-party Websites that include materials that infringe copyrights or other rights of others. Portions of the Communications Decency Act ("CDA") are intended to provide statutory protections to online service providers who distribute third party content. Yahoo! relies on the protections provided by both the DMCA and CDA in conducting its business. Any changes in these laws or judicial interpretations narrowing their protections will subject us to greater risk of liability and may increase our costs of compliance with these regulations or limit our ability to operate certain lines of business. The Children's Online Protection Act and the Children's Online Privacy Protection Act are intended to restrict the distribution of certain materials deemed harmful to children and impose additional restrictions on the ability of online services to collect user information from minors. In addition, the Protection of Children From Sexual Predators Act of 1998 requires online service providers to report evidence of violations of federal child pornography laws under certain circumstances. The costs of compliance with these regulations may increase in the future as a result of changes in the regulations or the interpretation of them. Further any failures on our part to comply with these regulations may subject us to significant liabilities.

There are federal, state and international laws regarding privacy and protection of user data. We post, on our website, our privacy policies and practices concerning the use and disclosure of user data. Any failure by us to comply with our posted privacy policies, any consent orders from time to time entered into by us, Federal Trade Commission requirements or other federal, state or international privacy-related laws and regulations could result in proceedings against us by governmental entities or others which could potentially have an adverse effect on our business, results of operations and financial condition. In this regard, there are a large number of legislative proposals before the United States Congress and various state legislative bodies regarding privacy issues related to our business. It is not possible to predict whether or when such legislation may be adopted, and certain proposals, if adopted, could impose requirements which may result in a decrease our user registrations and revenues. In addition, the interpretation and application of user data protection laws in Europe and other international jurisdictions is unclear and in a state of flux. There is a risk that these laws may be interpreted and applied inconsistently from country to country and with our current data protection practices. Complying with these varying international requirements could cause us to incur substantial costs and to have to change our business practices. Further, any failure by us to protect users privacy and data, could result in a loss of user confidence in our services and ultimately in a loss of users which could adversely affect our business.

20

*We may be subject to legal liability for online services.*

We host a wide variety of services that enable individuals and businesses to exchange information, generate content, advertise products and services, conduct business and engage in various online activities on an international basis. The law relating to the liability of providers of these online services for activities of their users is currently unsettled both within the United States and internationally. Claims have been threatened and have been brought against us for defamation, negligence, copyright or trademark infringement, unlawful activity, tort, including personal injury, fraud, or other theories based on the nature and content of information that we provide links to or that may be posted online or generated by our users or with respect to auctioned materials. In addition, Yahoo! was the subject of a claim brought by certain entities in a French court regarding, among other things, the availability of certain content within our services which was alleged to violate French law. We may be subject to similar actions in domestic or other international jurisdictions in the future. Our defense of any such actions could be costly and involve significant time and attention of our management and other resources.

We also periodically enter into arrangements to offer third-party products, services, or content under the Yahoo! brand or via distribution on various Yahoo! properties, including stock quotes and trading information. We may be subject to claims concerning these products, services or content by virtue of our involvement in marketing, branding, broadcasting or providing access to them, even if we do not ourselves host, operate, provide, or provide access to these products, services or content. While our agreements with these parties often provide that we will be indemnified against such liabilities, such indemnification may not be adequate.

It is also possible that, if any information provided directly by us contains errors or is otherwise negligently provided to users, third parties could make claims against us. For example, we offer Web-based email services, which expose us to potential risks, such as liabilities or claims resulting from unsolicited email, lost or misdirected messages, illegal or fraudulent use of email, or interruptions or delays in email service. Investigating and defending any of these types of claims is expensive, even to the extent that the claims do not ultimately result in liability.

*We may have difficulty scaling and adapting our existing technology architecture to accommodate increased traffic and technology advances or customer requirements.*

Yahoo! is one of the most highly trafficked Websites on the Internet and is regularly serving an increased number of users and delivering an increased number of daily page views. For example, the usage levels of email and the number and complexity of advertisers utilizing our sponsored search offerings have increased. In addition, the products and services offered by Yahoo! have expanded and changed significantly and are expected to continue to expand and change rapidly in the future. There is also an increased use of rich media content such as audio and video. Rapid increases in the levels or types of use of our online properties and services could result in delays or interruptions in our service. In particular, the technology architectures utilized for our services are highly complex and may not provide satisfactory support in the future, as usage increases and products and services expand, change and become more complex. In the future, we may be required to make significant changes to our architectures, including moving to completely new architectures. If we are required to switch architectures, we may incur substantial costs and experience delays or interruptions in our service. These delays or interruptions in our service may cause users and customers to become dissatisfied with our service and move to competing providers of online services. Further, to the extent that demands for our services increase, we will need to expand our infrastructure, including the capacity of our hardware servers and the sophistication of our software. This expansion is likely to be expensive and complex, and require additional technical expertise. As we acquire users who rely upon us for a wide variety of services, it becomes more technologically complex and costly to retrieve, store and integrate data that will enable us to track each user's preferences. Any difficulties experienced in adapting our architectures and infrastructure to accommodate increased traffic, to store user data and track user preferences, together with the associated costs and potential loss of traffic, could harm our operating results, cash flows from operations and financial condition.

21

*We may not be successful in expanding the number of users of our e-commerce offerings which could result in a decline in our revenues.*

The success of our e-commerce offerings depends on our ability to generate traffic to Yahoo! Shopping, and similar services and the rate at which users either purchase products or click through to search results. The revenue that we derive from Yahoo! Shopping and related services is typically in the form of lead-based fees, where retailers pay a fee based on the number of times a user clicks on a link to their site, transaction fees, and advertising fees. Users who had a favorable buying experience with a particular retailer may contact that retailer directly for future purchases rather than through our services. Competing providers of e-commerce offerings, including retailers with whom we have relationships, may provide a more convenient and comprehensive online customer experience due to their singular focus on e-commerce. Retailers may also establish exclusive relationships with our competitors. If our users bypass our e-commerce offerings and related services and contact competing providers or retailers directly, our revenue could decline.

*New technologies could block our ads, which would harm our operating results.*

Technologies have been developed and are likely to continue to be developed that can block the display of our ads. Most of our revenues are derived from fees paid to us by advertisers in connection with the display of ads on web pages. As a result, ad-blocking technology could, in the future, adversely affect our operating results.

*We rely on third party providers for our principal Internet connections and technologies, databases and services critical to our properties and services and any errors, failures or disruption in the services provided by these third parties could significantly harm our business and operating results.*

We rely on private third-party providers for our principal Internet connections, co-location of a significant portion of our data servers and network access. Any disruption, from natural disasters, technology malfunctions, sabotage or other factors, in the Internet or network access or co-location services provided by these third-party providers or any failure of these third-party providers to handle current or higher volumes of use could significantly harm our business, operating results and financial condition. We have little control over these third-party providers which increases our vulnerability to disruptions or problems with their services. Any financial difficulties experienced by our providers may have negative effects on our business, the nature and extent of which we cannot predict. We license technology and related databases from third parties for certain elements of our properties, including, among others, technology underlying the delivery of news, stock quotes and current financial information, chat services, street mapping and telephone listings, streaming capabilities and similar services. We have experienced and expect to continue to experience interruptions and delays in service and availability for such elements. We also rely on a third-party provider for key components of our email service. Furthermore, we depend on hardware and software suppliers for prompt delivery, installation and service of servers and other equipment to deliver our services. Any errors, failures, interruptions, or delays experienced in connection with these third-party technologies and information services could negatively impact our relationship with users and adversely affect our brand, our business and operating results.

*We rely on distribution agreements and relationships with various third parties and any failure to obtain or maintain such distribution relationships on reasonable terms could impair our ability to fully execute our business plan.*

In addition to our relationships with Internet access providers, to increase traffic for our offerings and make them more available and attractive to advertisers and users, we have certain distribution agreements and informal relationships with, operators of online networks and leading Websites, software companies, electronics companies, and computer manufacturers. Depending on the distributor and the agreement, these distribution arrangements may not be exclusive and may only have a short term. Some of our distributors, particularly distributors who are also competitors or potential competitors, may not renew their distribution agreements with us. In addition, as new methods for accessing the Web become available, including through alternative devices, we may need to enter into amended distributions agreements with existing distributors to cover the new devices and agreements with additional distributors. In the future, existing and potential distributors may not offer distribution of our properties and services to us on reasonable terms, or at all. If we

22

fail to obtain distribution or to obtain distribution on terms that are reasonable, we may not be able to fully execute our business plan.

***We rely on third party providers of streaming media products to broadcast streaming audio and video content to our users and any change in the licensing terms, costs or user acceptance of these products could adversely affect our business.***

We rely on leading providers of streaming media products to license the software necessary to broadcast streaming audio and video content to our users. There can be no assurance that these providers will continue to license these products to us on reasonable terms, or at all. Our users are currently able to electronically download copies of the software to play streaming media free of charge, but providers of streaming media products may begin charging users for copies of their player software or otherwise change their business model in a manner that slows the widespread acceptance of these products. In order for our rich media services to be successful, there must be a large base of users of these streaming media products. We have limited or no control over the availability or acceptance of streaming media software, and to the extent that any of these circumstances occur, our business may be adversely affected.

***If we fail to detect click-through fraud, we could lose the confidence of our advertisers, thereby causing a loss of advertisers and revenue.***

We are exposed to the risk of fraudulent clicks on our ads by persons seeking to increase advertising fees. Click-through fraud occurs when a person clicks on one of our advertiser's listings displayed on a web site in order to generate a payment rather than to view the underlying content. If this fraudulent activity occurs and we are unable to stop it, we will have to provide refunds of revenue that our advertisers have paid to us and that was later attributed to click-through fraud. These types of fraudulent activities could damage our brand. If fraudulent clicks are not detected, the affected advertisers may experience a reduced return on their investment in our advertising programs because the fraudulent clicks will not lead to potential revenue for the advertisers. This could lead the advertisers to become dissatisfied with our advertising programs, which could lead to loss of advertisers and revenue.

***Interruptions, delays or failures in the provision of our services could damage our brand and harm our operating results.***

Our operations are susceptible to outages due to fire, floods, power loss, telecommunications failures, terrorist attacks and similar events. In addition, a significant portion of our network infrastructure is located in Northern California, an area subject to earthquakes. Despite our implementation of network security measures, our servers are vulnerable to computer viruses, worms, physical and electronic break-ins, sabotage and similar disruptions from unauthorized tampering with our computer systems. For example, we are vulnerable to coordinated attempts to overload our systems with data, resulting in denial or reduction of service to some or all of our users for a period of time. We have experienced a coordinated denial of service attack in the past, and may experience such attempts in the future. We do not have multiple site capacity for all of our services and some of our systems are not fully redundant in the event of any such occurrence. In an effort to reduce the likelihood of a geographical or other disaster impacting our business, we have distributed and intend to continue distributing our servers among additional data centers located around the world. Failure to execute these changes properly or in a timely manner could result in delays or interruptions to our service. We may not carry sufficient business interruption insurance to compensate us for losses that may occur as a result of any of these events which cause interruptions in our service and could result in damage to our brand if users believe are systems are unreliable and could adversely affect are operating results.

***Our stock price has been volatile historically and may continue to be volatile regardless of our operating performance.***

The trading price of our common stock has been and may continue to be subject to wide fluctuations. During 2004, the closing sale prices of our common stock on the Nasdaq ranged from $20.83 to $39.14 per share and the closing sale price on March 4, 2005 was $32.36 per share. Our stock price may fluctuate in response to a number of events and factors, such as quarterly variations in operating results; announcements of technological innovations or new services and media properties by us or our competitors; changes in financial estimates and recommendations by securities analysts; the operating and stock price performance of other companies that investors may deem comparable to us; the operating

performance and stock price of companies in which we have an equity investment, including Yahoo! Japan; and news reports relating to trends in our markets or general economic conditions.

In addition, the stock market in general, and the market prices for Internet-related companies in particular, have experienced volatility that often has been unrelated to the operating performance of such companies. These broad market and industry fluctuations may adversely affect the price of our stock, regardless of our operating performance. Additionally, volatility or a lack of positive performance in our stock price may adversely affect our ability to retain key employees, all of whom have been granted stock options.

***Anti-takeover provisions could make it more difficult for a third party to acquire us.***

We have adopted a stockholder rights plan and initially declared a dividend distribution of one right for each outstanding share of common stock to stockholders of record as of March 20, 2001. As a result of our two-for-one stock split effective May 11, 2004, each share of common stock is now associated with one-half of one right. Each right entitles the holder to purchase one unit consisting of one one-thousandth of a share of our Series A Junior Participating Preferred Stock for $250 per unit. Under certain circumstances, if a person or group acquires 15 percent or more of our outstanding common stock, holders of the rights (other than the person or group triggering their exercise) will be able to purchase, in exchange for the $250 exercise price, shares of our common stock or of any company into which we are merged having a value of $500. The rights expire on March 1, 2011, unless extended by our Board of Directors. Because the rights may substantially dilute the stock ownership of a person or group attempting to take us over without the approval of our board of directors, our rights plan could make it more difficult for a third party to acquire us (or a significant percentage of our outstanding capital stock) without first negotiating with our board of directors regarding such acquisition.

In addition, our Board of Directors has the authority to issue up to 10,000,000 shares of Preferred Stock (of which 2,000,000 shares have been designated as Series A Junior Participating Preferred Stock) and to determine the price, rights, preferences, privileges and restrictions, including voting rights, of those shares without any further vote or action by the stockholders.

The rights of the holders of our common stock may be subject to, and may be adversely affected by, the rights of the holders of any Preferred Stock that may be issued in the future. The issuance of Preferred Stock may have the effect of delaying, deterring or preventing a change of control of Yahoo! without further action by the stockholders and may adversely affect the voting and other rights of the holders of our common stock. Further, certain provisions of our charter documents, including provisions eliminating the ability of stockholders to take action by written consent and limiting the ability of stockholders to raise matters at a meeting of stockholders without giving advance notice, may have the effect of delaying or preventing changes in control or management of Yahoo!, which could have an adverse effect on the market price of our stock. In addition, our charter documents do not permit cumulative voting, which may make it more difficult for a third party to gain control of our Board of Directors. Further, we are subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law, which will prohibit us from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder, even if such combination is favored by a majority of stockholders, unless the business combination is approved in a prescribed manner. The application of Section 203 also could have the effect of delaying or preventing a change of control or management.

24

**Results of Operations**

The following table sets forth selected information on our results of operations as a percentage of revenues for the periods indicated:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2002** | **2003** | **2004** |
| Revenues | 100% | 100% | 100% |
| Cost of revenues | 17 | 22 | 36 |
| Gross profit | 83 | 78 | 64 |
| Operating expenses: | | | |
|    Sales and marketing | 45 | 33 | 22 |
|    Product development | 15 | 13 | 11 |
|    General and administrative | 11 | 10 | 7 |
|    Stock compensation expense | 1 | 1 | 1 |
|    Amortization of intangibles | 2 | 3 | 4 |
|      Total operating expenses | 74 | 60 | 45 |
| Income from operations | 9 | 18 | 19 |
| Other income, net | 7 | 3 | 14 |
| Income before income taxes, earnings in equity interests, minority interests and cumulative effect of accounting change | 16 | 21 | 33 |
| Provision for income taxes | (7) | (9) | (12) |
| Earnings in equity interests | 2 | 3 | 2 |
| Minority interests in operations of consolidated subsidiaries | 0 | 0 | 0 |
| Net income before cumulative effect of accounting change | 11 | 15 | 23 |
| Cumulative effect of accounting change | (7) | – | – |
| Net income | 4% | 15% | 23% |

**Revenues.**  Revenues by groups of similar services were as follows (dollars in thousands):

| | Years Ended December 31, | | | | | | 2002-2003 % Change | 2003-2004 % Change |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2002** | **(1)** | **2003** | **(1)** | **2004** | **(1)** | | |
| Marketing services [2] | $ 745,126 | 78% | $ 1,326,905 | 82% | $ 3,148,941 | 88% | 78% | 137% |
| Fees | 207,941 | 22% | 298,192 | 18% | 425,576 | 12% | 43% | 43% |
|    Total revenues | $ 953,067 | 100% | $ 1,625,097 | 100% | $ 3,574,517 | 100% | 71% | 120% |

(1)    Percent of total revenues

(2)    Marketing Services revenues include revenues previously classified as listings revenues of $94 million, $127 million, and $147 million for the years ended December 31, 2002, 2003, and 2004, respectively.

**Marketing Services Revenue.**  Marketing Services revenue for the year ended December 31, 2004 increased by approximately $1,822 million, or 137 percent as compared to the prior year. Marketing Services revenue for the year ended December 31, 2003 increased by approximately $582 million, or 78 percent as compared to the prior year. The successive year-over-year growth in our marketing services revenue can be attributed to a combination of acquisitions and organic growth. Incremental revenue from acquisitions contributed approximately $1,230 million and $285 million to the increases in the years ended December 31, 2004 and 2003, respectively. The remainder of the increase, approximately $592 million in 2004 and $297 million in 2003, is from organic growth in advertising across the entire Yahoo! Network.

This growth in our marketing services revenues is driven by our growing number of users, advertisers and inventory. As our user base increases and users spend more time on the Yahoo! Network, they drive a higher number of page views, which we view as inventory, and a higher number of search queries which result in a higher number of impressions and paid clicks. This increased level of engagement on the Yahoo! Network attracts more advertisers to our advertising services which also contributes to the growth in our marketing services revenue.

On the Yahoo! Network, our number of unique users worldwide as of December 31, 2004 was approximately 31 percent higher than the number of unique users as of December 31, 2003 which was 24 percent higher than December 31, 2002. Unique users are the estimated number of people who visited the Yahoo! Network in a given time period.

The combined number of page views and searches, including those from our affiliate network, in 2004 and including the effects of acquisitions, increased by approximately 50 percent as compared to 2003 with approximately 10 percent of the increase in volume attributable to acquisitions. The combined number of page views and searches in 2003, including the effects of acquisitions, increased by approximately 35 percent as compared to 2002 with approximately 5 percent of the increase in volume attributable to acquisitions. The increase in the organic volume of page views and searches resulted from the combined effect of an increased number of users, an expanded offering of properties which increases our inventory of page views and the introduction of new sponsored search offerings. The combined average yield per page view and search increased by approximately 55 percent in 2004 compared to 2003, of which approximately one-half is attributable to acquisitions. The combined average yield per page view and search increased by approximately 30 percent in 2003 compared to 2002, of which approximately 20 percent is attributable to acquisitions. The increase in organic yield per page view and search is primarily due to a sales mix change towards higher yielding properties and advertising services.

The average user is also spending more time on our Yahoo! Network. We believe this increase can be attributed to our expanding offerings as well as our enhanced algorithmic search technology which provides a new level of personalization to the search experience. We also believe this trend makes our network more attractive to advertisers and increases their spending on our properties. Further, we believe the growth in users on the Yahoo! Network and on the Internet overall is reflective of the increasing acceptance, importance and dependence of users on the Internet. As a result of this trend of an increased on-line audience, advertisers are shifting more of their spending from traditional media to the Internet to reach this growing audience.

**Fees Revenue.**  Fees revenue in 2004 increased approximately $127 million, or 43 percent, as compared to 2003 of which $10 million relates to acquisitions. Approximately $115 million was primarily associated with an increase in the number of paying users for our fee-based services, which were 8.4 million at December 31, 2004 compared to 4.9 million at December 31, 2003. Our increasing base of fee paying users is due to a greater penetration of our services with our existing users as well as our continued expansion of service offerings including new business relationships with BT and Rogers for fee based services. These fee-based services include Internet broadband and dial-up services, our premium mail, music and personals offerings as well as our services for small businesses. Average revenue per paying user per month declined to approximately $4 in 2004 from $5 in 2003 as a result of faster subscriber growth in some of the lower priced offerings, and the introduction of lower priced fee-based services.

For the year ended December 31, 2003, fees revenue increased approximately $90 million, or 43 percent, as compared to the prior year. Approximately $100 million was associated with an increase in the number of paying users for our fee-based services, which were 4.9 million at December 31, 2003 compared to 2.2 million at December 31, 2002. Average revenue per paying user per month declined to approximately $5 in 2003 from $7 in 2002 as a result of faster subscriber growth in some of the lower priced offerings, and the introduction of lower priced fee-based services in 2003.

We currently expect combined revenues for marketing services and fees to increase in absolute dollars for 2005 compared to 2004 as we seek to increase users and traffic on our Yahoo! Network and benefit from expected growth in the on-line advertising market.

33

Costs and Expenses:   Primary operating costs and expenses were as follows (dollars in thousands):

**Costs and Expenses:**   Primary operating costs and expenses were as follows (dollars in thousands):

|  | | | Years Ended December 31, | | | | 2002-2003 % Change | 2003-2004 % Change |
|---|---|---|---|---|---|---|---|---|
|  | **2002** | **(1)** | **2003** | **(1)** | **2004** | **(1)** | | |
| Cost of revenues | $ 162,881 | 17% | $ 358,103 | 22% | $ 1,298,559 | 36% | 120% | 263% |
| Sales and marketing | 429,968 | 45% | 530,613 | 33% | 778,029 | 22% | 23% | 47% |
| Product development | 141,766 | 15% | 207,285 | 13% | 368,760 | 11% | 46% | 78% |
| General and administrative | 100,676 | 11% | 157,027 | 10% | 262,602 | 7% | 56% | 67% |
| Stock compensation expense | 8,402 | 1% | 22,029 | 1% | 32,290 | 1% | 162% | 47% |
| Amortization of intangibles | 21,186 | 2% | 54,374 | 3% | 145,696 | 4% | 157% | 168% |

(1)      Percent of total revenues.

**Cost of Revenues.**  Cost of revenues consists of traffic acquisition costs and other expenses associated with the production and usage of the Yahoo! Network.

*Traffic Acquisition Costs ("TAC").*  TAC consists of payments made to affiliates that have integrated our sponsored search offerings into their websites and payments made to companies that direct consumer and business traffic to the Yahoo! website. TAC payments commenced following our acquisition of Overture in October 2003 when we began offering sponsored search services. We enter into agreements of varying duration that involve TAC. There are generally three economic structures of the affiliate agreements: fixed payments based on a guaranteed minimum amount of traffic delivered, which often carry reciprocal performance guarantees from the affiliate; variable payments based on a percentage of our revenue or based on a certain metric, such as number of searches or paid clicks; or a combination of the two. We expense TAC under two methods. Agreements with fixed payments are expensed ratably over the term the fixed payment covers, and agreements based on a percentage of revenue, number of paid introductions, number of searches, or other metrics are expensed based on the volume of the underlying activity or revenue multiplied by the agreed-upon price or rate.

*Other cost of revenues.*  Other cost of revenues consists of fees paid to third parties for content included on our online media properties, Internet connection charges, server equipment depreciation, technology license fees and compensation related expenses.

Cost of revenues for the year ended December 31, 2004 increased approximately $940 million, or 263 percent, as compared to 2003. This reflects approximately $769 million of incremental cost of revenue related to acquisitions of which, approximately $703 million related to TAC associated with the Overture acquisition. The remainder of the increase represented increased costs for search serving, royalties and content, as well as increased costs for growing network usage and premium services. Cost of revenues for the year ended December 31, 2003 increased approximately $195 million, or 120 percent, as compared to 2002 of which $182 million was due to acquisitions, including $153 million associated with TAC.

Cost of revenues was 36 percent, 22 percent, and 17 percent of revenues in 2004, 2003, and 2002, respectively. The year over year increases mainly relate to the additional TAC described above.

We currently anticipate that cost of revenues will continue to increase in absolute dollars in 2005 compared to 2004. TAC, which is the largest component of our cost of revenues, increases as our sponsored search revenues increase. Additionally, we expect increased network usage which will drive higher internet connection charges and higher costs relating to the introduction of additional content for new and enhanced services.

**Sales and Marketing.**  Sales and marketing expenses consist primarily of advertising and other marketing related expenses, compensation related expenses, sales commissions and travel costs.

34

## Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused the report to be signed on its behalf by the undersigned, thereunto duly authorized, on the 11th day of March, 2005.

YAHOO! INC.

By:                      /s/ SUSAN DECKER
_____

Susan Decker
*Executive Vice President, Finance and*
*Administration, and Chief Financial Officer*

## Power of Attorney

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Terry Semel and Susan Decker, his/her attorneys-in-fact, each with the power of substitution, for him/her in any and all capacities, to sign any amendments to this Report on Form 10-K, and to file the same, with Exhibits thereto and other documents in connection therewith with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or substitute or substitutes may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ TERRY SEMEL _____ Terry Semel | Chairman and Chief Executive Officer (Principal Executive Officer) | March 11, 2005 |
| /s/ SUSAN DECKER _____ Susan Decker | Executive Vice President, Finance and Administration, and Chief Financial Officer (Principal Financial Officer) | March 11, 2005 |
| /s/ MICHAEL MURRAY _____ Michael Murray | Senior Vice President, Finance (Principal Accounting Officer) | March 11, 2005 |
| /s/ ROY BOSTOCK _____ Roy Bostock | Director | March 11, 2005 |
| /s/ RONALD BURKLE _____ Ronald W. Burkle | Director | March 11, 2005 |
| /s/ ERIC HIPPEAU _____ Eric Hippeau | Director | March 11, 2005 |

| /s/ ARTHUR KERN | Director | March 11, 2005 |
| --- | --- | --- |
| Arthur Kern | | |
| | Director | March 11, 2005 |
| Robert Kotick | | |
| /s/ EDWARD KOZEL | Director | March 11, 2005 |
| Edward Kozel | | |
| /s/ GARY WILSON | Director | March 11, 2005 |
| Gary Wilson | | |
| /s/ JERRY YANG | Director | March 11, 2005 |
| Jerry Yang | | |

97

QuickLinks

EXHIBIT 21.1

QuickLinks -- Click here to rapidly navigate through this document

EXHIBIT 23.1

# Consent of Independent Registered Public Accounting Firm

We hereby consent to the incorporation by reference in the Registration Statements on Form S-3 (No. 333-105766, No. 333-34364, No. 333-46458), the Registration Statements on Form S-8 (No. 333-12099, No. 333-118093, No. 333-18088, No. 333-118067, No. 333-112596, No. 333-109914, No. 333-104137, No. 333-3694, No. 333-39105, No. 333-46492, No. 333-54426, No. 333-56781, No. 333-60828, No. 333-66067, No. 333-76995, No. 333-79675, No. 333-80227, No. 333-81635, No. 333-83770, No. 333-89948, No. 333-93497) and the Registration Statement on Form S-4 (No. 333-62694) of Yahoo! Inc. of our report dated March 11, 2005 relating to the financial statements, financial statement schedule, management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/  PRICEWATERHOUSECOOPERS LLP

PricewaterhouseCoopers LLP
San Jose, California
March 11, 2005

QuickLinks

EXHIBIT 23.1

Consent of Independent Registered Public Accounting Firm

QuickLinks -- Click here to rapidly navigate through this document

EXHIBIT 31.1

# Certification of CEO Pursuant to
## Securities Exchange Act Rules 13a-14(a) and 15d-14(a)
## as Adopted Pursuant to
## Section 302 of the Sarbanes-Oxley Act of 2002

I, Terry Semel, the Chief Executive Officer of Yahoo! Inc., certify that:

1.   I have reviewed this annual report on Form 10-K of Yahoo! Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   (b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.


Dated: March 11, 2005                                   By:      /s/   TERRY SEMEL

                                                                 Terry Semel
                                                                 Chief Executive Officer

QuickLinks

EXHIBIT 31.1

Certification of CEO Pursuant to Securities Exchange Act Rules 13a-14(a) and 15d-14(a) as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

QuickLinks -- Click here to rapidly navigate through this document

EXHIBIT 31.2

Certification of CFO Pursuant to
Securities Exchange Act Rules 13a-14 and 15d-14
as Adopted Pursuant to
Section 302 of the Sarbanes-Oxley Act of 2002

I, Susan Decker, the Chief Financial Officer of Yahoo! Inc., certify that:

1.    I have reviewed this annual report on Form 10-K of Yahoo! Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: March 11, 2005                          By:      /s/   SUSAN DECKER

                                                        Susan Decker
                                                        Chief Financial Officer

QuickLinks

EXHIBIT 31.2

Certification of CFO Pursuant to Securities Exchange Act Rules 13a-14 and 15d-14 as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

QuickLinks -- Click here to rapidly navigate through this document

**EXHIBIT 32**

## Certification of CEO and CFO Pursuant to
## 18 U.S.C. Section 1350,
## as Adopted Pursuant to
## Section 906 of the Sarbanes-Oxley Act of 2002

In connection with the Annual Report on Form 10-K of Yahoo! (the "Company") for the year ended December 31, 2004 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Terry Semel, as Chief Executive Officer of the Company, and Susan Decker, as Chief Financial Officer of the Company, each hereby certifies, pursuant to 18 U.S.C. §1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, to the best of his and her knowledge, respectively, that:

     (1)  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

     (2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/  TERRY SEMEL

Name: Terry Semel
Title: Chief Executive Officer
Dated: March 11, 2005

/s/  SUSAN DECKER

Name: Susan Decker
Title: Chief Financial Officer
Dated: March 11, 2005

This certification accompanies the above described Report and is being furnished pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not be deemed filed by the Company as part of the Report.

Exhibit 11

Use these links to rapidly review the document
Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-Q

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2005**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from                    to**

**Commission File Number 0-28018**

---

# YAHOO! INC.
(Exact name of Registrant as specified in its charter)

| **Delaware** | **77-0398689** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**701 First Avenue**
**Sunnyvale, California 94089**
(Address of principal executive offices)

Registrant's telephone number, including area code: **(408) 349-3300**

---

Indicate by check mark whether the Registrant (1) has filed all reports required by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days: Yes ☒     No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). Yes ☒     No ☐

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| **Class** | **Outstanding at May 2, 2005** |
|---|---|
| Common stock, $0.001 par value | 1,396,455,983 |

RISK FACTORS

***We face significant competition from companies such as Time Warner's AOL, Google and Microsoft.***

We face significant competition from companies, including AOL, Google, and Microsoft, that have combined a variety of services under one brand name in a manner similar to Yahoo!. AOL has access to content from Time Warner's movie, television, music, book, periodical, news, sports and other media holdings; access to a network of cable and other broadband users and delivery technologies; and considerable resources for future growth and expansion. Google, in addition to a Web search service, offers many other services that directly compete with our services, including a consumer email service, desktop search, local search, photos, maps, shopping services and Internet advertising solutions. Microsoft has introduced its own Web search service and has announced plans to develop features that may make Web searching capabilities a more integrated part of its Windows operating system. We expect these competitors increasingly to use their financial and engineering resources to compete with us. In certain of these cases, most notably AOL, our competition has a direct billing relationship with a greater number of their users through Internet access and other services than we have with our users through our premium services. This relationship may permit these competitors to be more effective than us in targeting services and advertisements to the specific preferences of their users thereby giving them a competitive advantage. If our competitors are more successful than we are in attracting users and customers, our revenues could decline.

***We also face competition from other Internet service providers, including destination websites and Internet access providers.***

We also compete for customers and users with many other providers of online services, including online navigation, Web search, commercial search, information, entertainment, recruiting, community, electronic commerce and Internet access services. Some of our competitors in specific areas, particularly in specific vertical markets or commerce services, such as shopping, auctions or travel, may have longer operating histories in the market, larger customer or user bases, and more brand recognition in the specific market.

Our users must access our services through an Internet access provider, including providers of cable and DSL Internet access. To the extent that an access provider or a computer or computing device manufacturer offers online services that are competitive with those of Yahoo!, the user may find it more convenient to use the services or properties of that access provider or manufacturer. In addition, the access provider or manufacturer may make it difficult to access our services by not listing them in the access provider's or manufacturer's own directory. Further, through their direct billing relationship with users, access providers may be better able to target services and advertisements to the preferences of their users.

In addition, smaller competitors may consolidate with larger competitors or with each other and become more competitive. New competitors may also enter the market. If our competitors are more successful than we are in attracting and retaining customers and users, then our revenues could decline.

***We face competition from other providers of sponsored search advertising services which could affect our operating results.***

We compete directly with other providers of sponsored search advertising services, including FindWhat.com, Google, LookSmart, Ltd., and Lycos Inc. In addition, we believe it is likely that there will be additional entrants to this advertising market. Some of the existing competitors and possible additional entrants may have greater operational, strategic, financial, personnel or other resources than we do, as well as greater brand recognition. These competitors compete against us for affiliate arrangements and could cause us to have to enter into affiliate arrangements with less favorable terms, to lose current affiliates or to fail to acquire new affiliates. The loss of affiliates or a reduction in the

revenue from affiliate arrangements could harm our business, operating results, and cash flows from operations.

***We face significant competition from traditional media companies which could affect our operating results.***

We also compete with traditional media companies for advertising. Most advertisers currently spend only a small portion of their advertising budgets on Internet advertising. If we fail to persuade existing advertisers to retain and increase their spending with us and if we fail to persuade new advertisers to spend a portion of their budget on advertising with us, our business and revenues could be adversely affected.

***If we are unable to provide search technologies and services which generate significant traffic to our Web sites, our business could be harmed, causing our revenues to decline.***

We have deployed our own Web search technology to provide Web search results on our network. We have limited experience in operating our own search service. Web search is characterized by rapidly changing technology, significant competition, evolving industry standards, and frequent product and service enhancements. We must continually invest in improving our users' experience, including search relevance, speed, and services responsive to their needs and preferences to continue to attract, retain and expand our user base. If we are unable to provide search technologies and services which generate significant traffic to our Web sites, our business could be harmed, causing our revenues to decline.

***The majority of our revenues are derived from marketing services and the reduction in spending by or loss of current or potential customers would cause our revenues to decline.***

For the first quarter of 2005, approximately 87 percent of our total revenues came from marketing services. Our ability to continue to retain and grow marketing services revenue depends upon:

- growing our user base;

- broadening our relationships with advertisers to small and medium size businesses;

- attracting advertisers to our user base;

- increasing demand for our marketing services by advertisers, users and businesses, including prices paid by advertisers, the number of searches performed by users and the rate at which users click-through to commercial search results;

- maintaining our affiliate program for our sponsored search offerings;

- deriving better demographic and other information from our users; and

- driving continued acceptance of the Web by advertisers as an advertising medium.

Our agreements with advertisers have terms of up to three years, and in the majority of cases, the terms are one year or less, or, in the case of our sponsored search advertising services, may be terminated at any time by the advertiser. The agreements often have payments contingent on usage or click-through levels. Accordingly, it is difficult to forecast marketing services revenues accurately. However, our expense levels are based in part on expectations of future revenues, include guaranteed minimum payments to our affiliates in connection with our sponsored search advertising services, and are fixed over the short-term with respect to certain categories. Any reduction in spending by or loss of existing or potential future customers would cause our revenues to decline. Further, we may be unable to adjust spending quickly enough to compensate for any unexpected revenue shortfall.

34

***In certain markets we depend on a limited number of sources to direct a significant percentage of users and businesses to our service to conduct searches and a loss of these sources could harm our operating results.***

A significant percentage of users and businesses that conduct searches using our sponsored search service, come from a limited number of sources in certain markets. In addition to the Yahoo! Network, sources for users conducting searches are members of our affiliate network, including portals, browsers, and other affiliates. Our agreements with affiliates vary in duration, and depending on the agreement, provide varying levels of discretion to the affiliate in the implementation of the sponsored search service, including the degree to which affiliates can modify the presentation of the search results on their websites or integrate the sponsored search services with their own services. The agreements may be terminable upon the occurrence of certain events, including failure to meet certain service levels, material breaches of agreement terms, changes in control or in some instances, at will. We may not be successful in renewing our affiliate agreements on as favorable terms or at all. The loss of affiliates providing significant users or businesses or an adverse change in implementation of the sponsored search service by any of these affiliates could harm our ability to generate revenue, our operating results, and cash flows from operations.

***Some of our shared revenue arrangements may not generate anticipated revenues.***

We typically receive co-branded revenue through revenue sharing arrangements and sponsorship fees or a portion of transactions revenue in return for minimum levels of user impressions to be provided by us. These arrangements expose us to potentially significant financial risks in the event our usage levels decrease, including the following:

- the revenue we are entitled to receive may be adjusted downwards;

- we may be required to "make good" on our obligations by providing additional or alternative services;

- the sponsors or co-brand services may not renew the arrangements or may renew at lower rates; and

- the arrangements may not generate anticipated levels of shared transactions revenue, or sponsors may default on the payment commitments in such agreements as has occurred in the past.

Accordingly, any leveling off or decrease of our user base (or usage by our existing base) or the failure to generate anticipated levels of shared transactions revenue could result in a significant decrease in our revenues.

***Decreases or delays in advertising spending due to general economic conditions could harm our ability to generate advertising revenue.***

Expenditures by advertisers tend to be cyclical, reflecting overall economic conditions as well as budgeting and buying patterns. Since we derive the majority of our revenues from advertising, any decreases in or delays in advertising spending due to general economic conditions could reduce our revenues or negatively impact our ability to grow our revenues.

***Financial results for any particular period will not predict results for future periods.***

There can be no assurance that the purchasing pattern of customers advertising on the Yahoo! Network will not fluctuate, that advertisers will not make smaller and shorter-term purchases, or that market prices for online advertising will not decrease due to competitive or other factors. In addition, there can be no assurance that the volume of searches conducted, the amounts bid by advertisers for search listings or the number of advertisers that bid on our sponsored search service will not vary widely from

35

period to period. As revenues from new sources increase, it may become more difficult to predict our financial results based on historical performance. You should not rely on the results for any period as an indication of future performance.

***We may not be able to generate substantial revenues from our alliances with Internet access providers.***

Through alliances with Internet access providers, we offer access services that combine customized content and services from Yahoo! (including browser and other communications services) and Internet access from the third party access providers. We may not be able to retain the alliances with our existing Internet access providers or to obtain new alliances with Internet access providers on terms that are reasonable. In addition, these Internet access services compete with many large companies such as AOL, MSN, Comcast Corporation and other established Internet access providers. In certain of these cases, our competition has substantially greater market presence (including an existing user base) and greater financial, technical, marketing or other resources. As a result of these and other competitive factors, the Internet access providers with which we have formed alliances, may not be able to attract, grow or retain their customer bases, which would negatively impact our ability to sell customized content and services through this channel and, in turn, reduce our anticipated revenues from our alliances.

***We have dedicated considerable resources to provide a variety of premium services, which may not prove to be successful in generating significant revenue for us.***

We offer fee-based enhancements to many of our free services, including email, personals, finance, games, music, and sports. The development cycles for these technologies are long and generally require significant investment by us. We have previously discontinued certain non-profitable premium services. We must however continue to provide new services that are compelling to our users while continuing to develop an effective method for generating revenues for such services. If we cannot generate revenues from these services that are greater than the cost of providing such services, our operating results could be harmed.

***We expect our operating expenses to continue to increase as we attempt to expand the Yahoo! brand, fund product development, develop media properties and acquire other businesses which could harm our operating results.***

We currently expect that our operating expenses will continue to increase as we expand our operations in areas of expected growth, continue to develop and extend the Yahoo! brand, fund greater levels of product development, develop and commercialize additional media properties and premium services, and acquire and integrate complementary businesses and technologies. If our expenses increase at a greater pace than our revenues, our operating results could be harmed.

***If we are unable to license or acquire compelling content at reasonable costs or if we do not develop compelling content, the number of users of our services may not grow as anticipated which could harm our operating results.***

Our future success depends in part upon our ability to aggregate compelling content and deliver that content through our online properties. We license much of the content on our online properties, such as news items, stock quotes, weather reports, maps and audio and video content from third parties. We have been providing increasing amounts of audio and video content to our users and we believe that users will increasingly demand high-quality audio and video content, such as the broadcast of music, film content, speeches, news footage, concerts and other special events. Such content may require us to make substantial payments to third parties from whom we license or acquire such content. For example, our music and entertainment properties rely on major sports organizations, radio and television stations, record labels, cable networks, businesses, colleges and universities, film producers

36

and distributors, and other organizations for a large portion of the content available on our properties. Our ability to maintain and build relationships with third-party content providers will be critical to our success. In addition, as new methods for accessing the Web become available, including through alternative devices, we may need to enter into amended content agreements with existing third-party content providers to cover the new devices. We may be unable to enter into new, or preserve existing, relationships with the third parties whose content we seek to obtain. In addition, as competition for compelling content increases both domestically and internationally, our content providers may increase the prices at which they offer their content to us and potential content providers may not offer their content on terms agreeable to us. An increase in the prices charged to us by third-party content providers could harm our operating results and financial condition. Further, many of our content licenses with third parties are non-exclusive. Accordingly, other Webcasters and other media such as radio or television may be able to offer similar or identical content. This increases the importance of our ability to deliver compelling editorial content and personalization of this content for users in order to differentiate Yahoo! from other businesses. If we are unable to license or acquire compelling content at reasonable prices, if other companies broadcast content that is similar to or the same as that provided by Yahoo!, or if we do not develop compelling editorial content or personalization services, the number of users of our services may not grow at all or may grow at a slower rate than anticipated, which could harm our operating results.

***Our intellectual property rights are valuable and any inability to protect them could reduce the value of our brand image and harm our business and our operating results.***

We regard our copyrights, patents, trademarks, trade dress, trade secrets, and similar intellectual property, including our rights to certain domain names, as important to Yahoo!'s brand and success. The efforts we have taken to protect our proprietary rights may not be sufficient or effective at stopping any unauthorized use of our proprietary rights. In addition, effective trademark, patent, copyright, and trade secret protection may not be available in every country in which our products and media properties are distributed or made available through the Internet. Further, while we attempt to ensure that the quality of our brand is maintained by our licensees, our licensees may take actions that could impair the value of our brand, our proprietary rights or the reputation of our products and media properties. We are aware that third parties have, from time to time, copied significant content available on Yahoo! for use in competitive Internet services. Protection of the distinctive elements of Yahoo! may not be available under copyright law. If we are unable to protect our proprietary rights from unauthorized use, the value of our brand image may be reduced. Any impairment of our brand could negatively impact our business. In addition, protecting our intellectual property and other proprietary rights is expensive and time consuming. Any increase in the unauthorized use of our intellectual property could make it more expensive to do business and consequently harm our operating results.

***We rely on the value of the Yahoo! brand, and a failure to maintain or enhance the Yahoo! brand in a cost effective manner could harm our operating results.***

We believe that maintaining and enhancing the Yahoo! brand is an important aspect of our efforts to attract and expand our user and advertiser base. We also believe that the importance of brand recognition will increase due to the relatively low barriers to entry. We have spent considerable money and resources to date on the establishment and maintenance of the Yahoo! brands. We will therefore need to spend increasing amounts of money on, and devote greater resources to advertising, marketing and other brand-building efforts to preserve and enhance consumer awareness of the Yahoo! brands. We may not be able to successfully maintain or enhance consumer awareness of the Yahoo! brands and, even if we are successful in our branding efforts, these efforts may not be cost-effective. If we are unable to maintain or enhance customer awareness of the Yahoo! brands in a cost effective manner, our business, operating results and financial condition would be harmed.

***We are, and may in the future be, subject to intellectual property infringement claims, which are costly to defend, could result in damage awards, and could limit our ability to provide certain content or use certain technologies in the future.***

Internet, technology and media companies often hold a significant number of patents. Further, many of these companies and other parties are actively developing search, indexing, electronic commerce and other Web-related technologies, as well as a variety of online business models and methods. We believe that these parties will continue to take steps to protect these technologies, including, but not limited to, seeking patent protection. As a result, disputes regarding the ownership of technologies and rights associated with online business are likely to continue to arise in the future. From time to time, parties assert patent infringement claims against us. Currently, we are engaged in several lawsuits regarding patent issues and have been notified of a number of other potential disputes.

In addition to patent claims, third parties have asserted, and are likely in the future to assert, claims against us alleging infringement of copyrights, trademark rights, trade secret rights or other proprietary rights, or alleging unfair competition or violations of privacy rights or failure to maintain confidentiality of user data. Currently, our subsidiary LAUNCH Media, Inc. ("LAUNCH") is engaged in a lawsuit regarding copyright issues that commenced prior to our acquisition of LAUNCH. In addition, Overture is in litigation involving claims that allowing advertisers to bid on certain search terms and Overture's display of search results triggered by those search terms constitutes trademark infringement. A court in France recently held Overture SARL and Overture liable for displaying search results triggered by certain trademarked keywords.

As we expand our business and develop new technologies, products and services, we may become increasingly subject to intellectual property infringement claims. In the event that there is a determination that we have infringed third-party proprietary rights such as patents, copyrights, trademark rights, trade secret rights or other third party rights such as publicity and privacy rights, we could incur substantial monetary liability, be required to enter into costly royalty or licensing agreements or be prevented from using the rights, which could require us to change our business practices in the future and limit our ability to compete effectively. We may also incur substantial expenses in defending against third-party infringement claims regardless of the merit of such claims. In addition, many of our agreements with our customers or affiliates require us to indemnify them for certain third-party intellectual property infringement claims, which could increase our costs in defending such claims and our damages. The occurrence of any of these results could harm our brand and negatively impact our operating results.

***Acquisitions could result in operating difficulties and unanticipated liabilities.***

We have made strategic acquisitions, including Inktomi Corporation ("Inktomi") in March 2003, Overture in October 2003, 3721 in January 2004, Kelkoo in April 2004, and Musicmatch in October 2004. We expect to enter into additional business combinations and acquisitions in the future. Acquisitions may result in dilutive issuances of equity securities, use of our cash resources, incurrence of debt and amortization of expenses related to intangible assets. Our acquisitions to date were accompanied by a number of risks, including:

- the difficulty of assimilating the operations and personnel of our acquired companies into our operations;

- the potential disruption of our ongoing business and distraction of management;

- the difficulty of integrating acquired technology and rights into our services and unanticipated expenses related to such integration;

- the failure to successfully further develop acquired technology resulting in the impairment of amounts currently capitalized as intangible assets;

38

- the potential for patent and trademark infringement claims against the acquired company;

- the impairment of relationships with customers and partners of the acquired companies or our customers and partners as a result of the integration of acquired operations;

- the impairment of relationships with employees of the acquired companies or our employees as a result of integration of new management personnel;

- the difficulty of integrating the acquired company's accounting, management information, human resources and other administrative systems;

- in the case of foreign acquisitions, uncertainty regarding foreign laws and regulations and difficulty integrating operations and systems as a result of cultural, systems and operational differences; and

- the impact of known potential liabilities or unknown liabilities associated with the acquired companies.

We are likely to experience similar risks in connection with our future acquisitions. Our failure to be successful in addressing these risks or other problems encountered in connection with our past or future acquisitions could cause us to fail to realize the anticipated benefits of our acquisitions, incur unanticipated liabilities and harm our business generally.

***Our failure to manage growth and diversification of our business could harm us.***

We are continuing to grow and diversify our business both in the United States and internationally. As a result, we must expand and adapt our operational infrastructure and increase the number of our personnel in certain areas. Our business relies on our data systems, billing systems for our fee based and other services, and other operational and financial reporting and control systems. All of these systems have become increasingly complex in the recent past due to the growing diversification and complexity of our business and to acquisitions of new businesses with different systems. To effectively manage this growth, we will need to continue to upgrade and improve our data systems, billing systems, and other operational and financial systems, procedures and controls. In particular, as our premium and other services for which we bill users grow, any failure of our billing systems to accommodate the increasing number of transactions and accurately bill users could adversely affect our business and ability to collect revenue. These upgrades and improvements will require a dedication of resources and in some cases are likely to be complex. If we are unable to adapt our systems in a timely manner to accommodate our growth, our business may be adversely affected.

Additionally, we have experienced recent growth in personnel numbers and expect to continue to hire additional personnel in selected areas. This growth requires significant time and resource commitments from our senior management. Further, as a result of recent acquisitions and international expansion, more than one-half of our employees are based outside of our Sunnyvale, California headquarters. If we are unable to effectively manage a large and geographically dispersed group of employees or to anticipate our future growth and personnel needs, our business may be adversely affected.

***If we are unable to retain our existing senior management and key personnel and hire new highly skilled personnel, we may not be able to execute our business plan.***

We are substantially dependent on the continued services of our senior management, including our two founders, our chief executive officer, chief financial officer, chief operating officer, chief technical officer, and our executive and senior vice presidents. These individuals have acquired specialized knowledge and skills with respect to Yahoo! and its operations. The loss of any of these individuals could harm our business. Our business is also dependent on our ability to retain, hire and motivate talented, highly skilled personnel. The competition for such highly skilled personnel can be intense, particularly in the San Francisco Bay Area, where our corporate headquarters is located. Many of our

management and key personnel have reached or will soon reach the four-year anniversary of their Yahoo! hiring date and, as a result, have become or will shortly become fully vested in their initial stock option grants. Although employees receive additional grants, an employee may be more likely to leave Yahoo! upon completion of the vesting period for the initial option grant which is generally the largest option grant an employee receives. If we do not succeed in retaining and motivating our existing key employees and attracting new key personnel, we may be unable to meet our business plan and as a result our stock price may decline.

*More individuals are utilizing non-PC devices to access the Internet, and versions of our service developed or optimized for these devices may not gain widespread adoption by users of such devices.*

The number of individuals who access the Internet through devices other than a personal computer, such as personal digital assistants, mobile telephones and television set-top devices, has increased dramatically. Our services were originally designed for rich, graphical environments such as those available on desktop and laptop computers. The lower resolution, functionality and memory associated with alternative devices currently available may make the use of our services through such devices difficult, and the versions of our service developed for these devices may not be compelling to users of alternative devices. As we have limited experience to date in operating versions of our service developed or optimized for users of alternative devices, it is difficult to predict the problems we may encounter in doing so, and we may need to devote significant resources to the creation, support and maintenance of such versions. If we are unable to attract and retain a substantial number of alternative device users to our online services, we may fail to capture a sufficient share of an increasingly important portion of the market for online services and may fail to attract advertisers.

*We may be required to record a significant charge to earnings if our goodwill or amortizable intangible assets become impaired.*

We are required under generally accepted accounting principles to review our amortizable intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Goodwill is required to be tested for impairment at least annually. Factors that may be considered a change in circumstances indicating that the carrying value of our amortizable intangible assets may not be recoverable include a decline in stock price and market capitalization, and slower growth rates in our industry. We may be required to record a significant charge to earnings in our financial statements during the period in which any impairment of our goodwill or amortizable intangible assets is determined. This may adversely impact our results of operations. As of March 31, 2005, our goodwill and amortizable intangible assets were $3.1 billion.

*We plan to expand operations in international markets in which we may have limited experience or rely on business partners, and in which we are faced with relatively higher costs.*

We plan to expand Yahoo! branded online properties and search offerings in international markets. We have currently developed, through joint ventures, subsidiaries and branch offices, localized offerings in over 20 countries outside of the United States. As we expand to new international markets, we will have only limited experience in marketing and operating our products and services in such markets and we may rely on the efforts and abilities of foreign business partners in such markets. We have experienced and expect to continue to experience higher costs as a percentage of revenues in connection with the development and maintenance of our international online properties relative to our domestic experience. Certain international markets may be slower than domestic markets in adopting the Internet as an advertising and commerce medium and so our operations in international markets may not develop at a rate that supports our level of investment.

40

*In international markets we compete with local Internet service providers that may have competitive advantages.*

In a number of international markets, especially those in Asia, Europe, and Latin America, we face substantial competition from local Internet service providers and other portals that offer search, communications and other commercial services. Many of these companies have a dominant market share in their territories and are owned by local telecommunications providers which give them a competitive advantage. Local providers of competing online services may also have a substantial advantage over us in attracting users in their country due to more established branding in that country, greater knowledge with respect to the tastes and preferences of users residing in that country and/or their focus on a single market. Further, the local providers may have greater regulatory and operational flexibility than Yahoo! due to the fact that we are subject to both domestic and foreign regulatory requirements. We must continue to improve our local offerings, become more knowledgeable about our local users and their preferences, deepen our relationships with our local users as well as increase our branding and other marketing activities in order to remain competitive and strengthen our international market position.

***Our international operations are subject to increased risks which could harm our business, operating results and financial condition.***

In addition to uncertainty about our ability to continue to generate revenues from our foreign operations and expand our international market position, there are certain risks inherent in doing business internationally, including:

- trade barriers and changes in trade regulations;

- difficulties in developing, staffing and simultaneously managing a large number of varying foreign operations as a result of distance, language and cultural differences;

- stringent local labor laws and regulations;

- longer payment cycles;

- currency exchange rate fluctuations;

- political or social unrest or economic instability;

- import or export restrictions;

- seasonal volatility in business activity;

- risks related to government regulation including those more fully described below; and

- potentially adverse tax consequences.

One or more of these factors could harm our future international operations and consequently, could harm our business, operating results, and financial condition.

***We are subject to U.S. and foreign government regulation of the Internet which could subject us to claims and remedies including monetary liabilities and limitations on our business practices.***

We are subject to regulations and laws directly applicable to providers of Internet services both domestically and internationally. The application of existing domestic and international laws and regulations to Yahoo! relating to issues such as user privacy and data protection, defamation, pricing, advertising, taxation, gambling, sweepstakes, promotions, financial market regulation, consumer protection, content regulation, quality of services, and intellectual property ownership and infringement in many instances is unclear or unsettled. In addition, we will also be subject to any new laws and regulations directly applicable to our activities. Further, the application of existing laws to Yahoo! or our subsidiaries regulating or requiring licenses for certain businesses of our advertisers including, for

41

example, distribution of pharmaceuticals, alcohol, adult content, tobacco or firearms, as well as insurance and securities brokerage and legal services, can be unclear. Internationally, we may also be subject to foreign laws and regulations that are inconsistent from country to country. We may incur substantial liabilities for expenses necessary to comply with these laws and regulations or penalties for any failure to comply. Compliance with these laws and regulations may also cause us to change or limit our business practices in a manner adverse to our business.

A number of federal laws, including those referenced below, impact our business. The Digital Millennium Copyright Act ("DMCA") is intended, in part, to limit the liability of eligible online service providers for listing or linking to third-party Websites that include materials that infringe copyrights or other rights of others. Portions of the Communications Decency Act ("CDA") are intended to provide statutory protections to online service providers who distribute third party content. Yahoo! relies on the protections provided by both the DMCA and CDA in conducting its business. Any changes in these laws or judicial interpretations narrowing their protections will subject us to greater risk of liability and may increase our costs of compliance with these regulations or limit our ability to operate certain lines of business. The Children's Online Protection Act and the Children's Online Privacy Protection Act are intended to restrict the distribution of certain materials deemed harmful to children and impose additional restrictions on the ability of online services to collect user information from minors. In addition, the Protection of Children From Sexual Predators Act of 1998 requires online service providers to report evidence of violations of federal child pornography laws under certain circumstances. The costs of compliance with these regulations may increase in the future as a result of changes in the regulations or the interpretation of them. Further, any failures on our part to comply with these regulations may subject us to significant liabilities.

There are federal, state and international laws regarding privacy and protection of user data. We post, on our website, our privacy policies and practices concerning the use and disclosure of user data. Any failure by us to comply with our posted privacy policies, any consent orders from time to time entered into by us, Federal Trade Commission requirements or other federal, state or international privacy-related laws and regulations could result in proceedings against us by governmental entities or others which could potentially have an adverse effect on our business, results of operations and financial condition. In this regard, there are a large number of legislative proposals before the United States Congress and various state legislative bodies regarding privacy issues related to our business. It is not possible to predict whether or when such legislation may be adopted, and certain proposals, if adopted, could impose requirements which may result in a decrease in our user registrations and revenues. In addition, the interpretation and application of user data protection laws in Europe and other international jurisdictions is unclear and in a state of flux. There is a risk that these laws may be interpreted and applied inconsistently from country to country and with our current data protection practices. Complying with these varying international requirements could cause us to incur substantial costs and to have to change our business practices. Further, any failure by us to protect users' privacy and data could result in a loss of user confidence in our services and ultimately in a loss of users which could adversely affect our business.

***We may be subject to legal liability for online services.***

We host a wide variety of services that enable individuals and businesses to exchange information, generate content, advertise products and services, conduct business and engage in various online activities on an international basis. The law relating to the liability of providers of these online services for activities of their users is currently unsettled both within the United States and internationally. Claims have been threatened and have been brought against us for defamation, negligence, copyright or trademark infringement, unlawful activity, tort, including personal injury, fraud, or other theories based on the nature and content of information that we provide links to or that may be posted online or generated by our users or with respect to auctioned materials. In addition, Yahoo! was the subject of a

42

claim brought by certain entities in a French court regarding, among other things, the availability of certain content within our services which was alleged to violate French law. We may be subject to similar actions in domestic or other international jurisdictions in the future. Our defense of any such actions could be costly and involve significant time and attention of our management and other resources.

We also periodically enter into arrangements to offer third-party products, services, or content under the Yahoo! brand or via distribution on various Yahoo! properties, including stock quotes and trading information. We may be subject to claims concerning these products, services or content by virtue of our involvement in marketing, branding, broadcasting or providing access to them, even if we do not ourselves host, operate, provide, or provide access to these products, services or content. While our agreements with respect to these products, services and content, often provide that we will be indemnified against such liabilities, the ability to receive such indemnification depends on the financial resources of the other party to the agreement and any amounts received may not be adequate to cover our liabilities.

It is also possible that, if any information provided directly by us contains errors or is otherwise negligently provided to users, third parties could make claims against us. For example, we offer Web-based email services, which expose us to potential risks, such as liabilities or claims resulting from unsolicited email, lost or misdirected messages, illegal or fraudulent use of email, or interruptions or delays in email service. Investigating and defending any of these types of claims is expensive, even to the extent that the claims are without merit or do not ultimately result in liability.

***We may have difficulty scaling and adapting our existing technology architecture to accommodate increased traffic and technology advances or customer requirements.***

Yahoo! is one of the most highly trafficked Websites on the Internet and is regularly serving an increased number of users and delivering an increased number of daily page views. For example, the usage levels of email and the number and complexity of advertisers utilizing our sponsored search offerings have increased. In addition, the products and services offered by Yahoo! have expanded and changed significantly and are expected to continue to expand and change rapidly in the future. There is also an increased use of rich media content such as audio and video. Rapid increases in the levels or types of use of our online properties and services could result in delays or interruptions in our service. In particular, the technology architectures utilized for our services are highly complex and may not provide satisfactory support in the future, as usage increases and products and services expand, change and become more complex. In the future, we may be required to make significant changes to our architectures, including moving to completely new architectures. If we are required to switch architectures, we may incur substantial costs and experience delays or interruptions in our service. These delays or interruptions in our service may cause users and customers to become dissatisfied with our service and move to competing providers of online services. Further, to the extent that demands for our services increase, we will need to expand our infrastructure, including the capacity of our hardware servers and the sophistication of our software. This expansion is likely to be expensive and complex, and require additional technical expertise. As we acquire users who rely upon us for a wide variety of services, it becomes more technologically complex and costly to retrieve, store and integrate data that will enable us to track each user's preferences. Any difficulties experienced in adapting our architectures and infrastructure to accommodate increased traffic, to store user data and track user preferences, together with the associated costs and potential loss of traffic, could harm our operating results, cash flows from operations and financial condition.

43

***We may not be successful in expanding the number of users of our e-commerce offerings which could result in a decline in our revenues.***

The success of our e-commerce offerings depends on our ability to generate traffic to Yahoo! Shopping and similar services and the rate at which users either purchase products or click through to search results. The revenue that we derive from Yahoo! Shopping and related services is typically in the form of lead-based fees, where retailers pay a fee based on the number of times a user clicks on a link to their site, transaction fees, and advertising fees. Users who had a favorable buying experience with a particular retailer may contact that retailer directly for future purchases rather than through our services. Competing providers of e-commerce offerings, including retailers with whom we have relationships, may provide a more convenient and comprehensive online customer experience due to their singular focus on e-commerce. Retailers may also establish exclusive relationships with our competitors. If our users bypass our e-commerce offerings and related services and contact competing providers or retailers directly, our revenue could decline.

***New technologies could block our ads, which would harm our operating results.***

Technologies have been developed and are likely to continue to be developed that can block the display of our ads. Most of our revenues are derived from fees paid to us by advertisers in connection with the display of ads on web pages. As a result, ad-blocking technology could, in the future, reduce the number of ads that we are able to deliver and, in turn, our advertising revenues.

***We rely on third party providers for our principal Internet connections and technologies, databases and services critical to our properties and services and any errors, failures or disruption in the services provided by these third parties could significantly harm our business and operating results.***

We rely on private third-party providers for our principal Internet connections, co-location of a significant portion of our data servers and network access. Any disruption, from natural disasters, technology malfunctions, sabotage or other factors, in the Internet or network access or co-location services provided by these third-party providers or any failure of these third-party providers to handle current or higher volumes of use could significantly harm our business, operating results and financial condition. We have little control over these third-party providers which increases our vulnerability to disruptions or problems with their services. Any financial difficulties experienced by our providers may have negative effects on our business, the nature and extent of which we cannot predict. We license technology and related databases from third parties for certain elements of our properties, including, among others, technology underlying the delivery of news, stock quotes and current financial information, chat services, street mapping and telephone listings, streaming capabilities and similar services. We have experienced and expect to continue to experience interruptions and delays in service and availability for such elements. We also rely on a third-party provider for key components of our email service. Furthermore, we depend on hardware and software suppliers for prompt delivery, installation and service of servers and other equipment to deliver our services. Any errors, failures, interruptions, or delays experienced in connection with these third-party technologies and information services could negatively impact our relationship with users and adversely affect our brand, our business and operating results.

***We rely on distribution agreements and relationships with various third parties and any failure to obtain or maintain such distribution relationships on reasonable terms could impair our ability to fully execute our business plan.***

In addition to our relationships with Internet access providers, to increase traffic for our offerings and make them more available and attractive to advertisers and users, we have certain distribution agreements and informal relationships with operators of online networks and leading Websites, software companies, electronics companies, and computer manufacturers. Depending on the distributor and the

44

agreement, these distribution arrangements may not be exclusive and may only have a short term. Some of our distributors, particularly distributors who are also competitors or potential competitors, may not renew their distribution agreements with us. In addition, as new methods for accessing the Web become available, including through alternative devices, we may need to enter into amended distributions agreements with existing distributors to cover the new devices and agreements with additional distributors. In the future, existing and potential distributors may not offer distribution of our properties and services to us on reasonable terms, or at all. If we fail to obtain distribution or to obtain distribution on terms that are reasonable, we may not be able to fully execute our business plan.

***We rely on third party providers of streaming media products to broadcast streaming audio and video content to our users and any change in the licensing terms, costs or user acceptance of these products could adversely affect our business.***

We rely on leading providers of streaming media products to license the software necessary to broadcast streaming audio and video content to our users. There can be no assurance that these providers will continue to license these products to us on reasonable terms, or at all. Our users are currently able to electronically download copies of the software to play streaming media free of charge, but providers of streaming media products may begin charging users for copies of their player software or otherwise change their business model in a manner that slows the widespread acceptance of these products. In order for our rich media services to be successful, there must be a large base of users of these streaming media products. We have limited or no control over the availability or acceptance of streaming media software, and to the extent that any of these circumstances occur, our business may be adversely affected.

***If we fail to detect click-through spam, we could lose the confidence of our advertisers, thereby causing a loss of advertisers and revenue.***

We are exposed to the risk of clicks on our ads by persons seeking to increase the fees paid by our advertisers. Click-through spam occurs when a person clicks on one of our advertiser's listings displayed on a web site in order to generate a payment rather than to view the underlying content. If this activity occurs and we are unable to stop it, we will have to provide refunds of revenue that our advertisers have paid to us and that was later attributed to click-through spam. These types of activities could damage our brand. If click-through spam is not detected, the affected advertisers may experience a reduced return on their investment in our advertising programs because those clicks will not lead to potential revenue for the advertisers. This could lead the advertisers to become dissatisfied with our advertising programs, which could lead to loss of advertisers and revenue.

***Interruptions, delays or failures in the provision of our services could damage our brand and harm our operating results.***

Our operations are susceptible to outages due to fire, floods, power loss, telecommunications failures, terrorist attacks and similar events. In addition, a significant portion of our network infrastructure is located in Northern California, an area subject to earthquakes. Despite our implementation of network security measures, our servers are vulnerable to computer viruses, worms, physical and electronic break-ins, sabotage and similar disruptions from unauthorized tampering with our computer systems. For example, we are vulnerable to coordinated attempts to overload our systems with data, resulting in denial or reduction of service to some or all of our users for a period of time. We have experienced a coordinated denial of service attack in the past, and may experience such attempts in the future. We do not have multiple site capacity for all of our services and some of our systems are not fully redundant in the event of any such occurrence. In an effort to reduce the likelihood of a geographical or other disaster impacting our business, we have distributed and intend to continue distributing our servers among additional data centers located around the world. Failure to execute these changes properly or

45

in a timely manner could result in delays or interruptions to our service, which could result in a loss of users and damage to our brand. We may not carry sufficient business interruption insurance to compensate us for losses that may occur as a result of any events which cause interruptions in our service.

***Our stock price has been volatile historically and may continue to be volatile regardless of our operating performance.***

The trading price of our common stock has been and may continue to be subject to wide fluctuations. During the first quarter of 2005, the closing sale prices of our common stock on the Nasdaq ranged from $30.87 to $38.18 per share and the closing sale price on May 2, 2005 was $34.38 per share. Our stock price may fluctuate in response to a number of events and factors, such as quarterly variations in operating results; announcements of technological innovations or new services and media properties by us or our competitors; changes in financial estimates and recommendations by securities analysts; the operating and stock price performance of other companies that investors may deem comparable to us; the operating performance and stock price of companies in which we have an equity investment, including Yahoo! Japan; and news reports relating to trends in our markets or general economic conditions.

In addition, the stock market in general, and the market prices for Internet-related companies in particular, have experienced volatility that often has been unrelated to the operating performance of such companies. These broad market and industry fluctuations may adversely affect the price of our stock, regardless of our operating performance. Additionally, volatility or a lack of positive performance in our stock price may adversely affect our ability to retain key employees, all of whom have been granted stock options.

***Anti-takeover provisions could make it more difficult for a third party to acquire us.***

We have adopted a stockholder rights plan and initially declared a dividend distribution of one right for each outstanding share of common stock to stockholders of record as of March 20, 2001. As a result of our two-for-one stock split effective May 11, 2004, each share of common stock is now associated with one-half of one right. Each right entitles the holder to purchase one unit consisting of one one-thousandth of a share of our Series A Junior Participating Preferred Stock for $250 per unit. Under certain circumstances, if a person or group acquires 15 percent or more of our outstanding common stock, holders of the rights (other than the person or group triggering their exercise) will be able to purchase, in exchange for the $250 exercise price, shares of our common stock or of any company into which we are merged having a value of $500. The rights expire on March 1, 2011, unless extended by our Board of Directors. Because the rights may substantially dilute the stock ownership of a person or group attempting to take us over without the approval of our Board of Directors, our rights plan could make it more difficult for a third party to acquire us (or a significant percentage of our outstanding capital stock) without first negotiating with our Board of Directors regarding that acquisition.

In addition, our Board of Directors has the authority to issue up to 10,000,000 shares of Preferred Stock (of which 2,000,000 shares have been designated as Series A Junior Participating Preferred Stock) and to determine the price, rights, preferences, privileges and restrictions, including voting rights, of those shares without any further vote or action by the stockholders.

The rights of the holders of our common stock may be subject to, and may be adversely affected by, the rights of the holders of any Preferred Stock that may be issued in the future. The issuance of Preferred Stock may have the effect of delaying, deterring or preventing a change of control of Yahoo! without further action by the stockholders and may adversely affect the voting and other rights of the holders of our common stock. Further, certain provisions of our charter documents, including

46

provisions eliminating the ability of stockholders to take action by written consent and limiting the ability of stockholders to raise matters at a meeting of stockholders without giving advance notice, may have the effect of delaying or preventing changes in control or management of Yahoo!, which could have an adverse effect on the market price of our stock. In addition, our charter documents do not permit cumulative voting, which may make it more difficult for a third party to gain control of our Board of Directors. Further, we are subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law, which will prohibit us from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder, even if such combination is favored by a majority of stockholders, unless the business combination is approved in a prescribed manner. The application of Section 203 also could have the effect of delaying or preventing a change of control or management.

47

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

YAHOO! INC.

By:    /s/  SUSAN DECKER

Dated: May 6, 2005

Susan Decker
Executive Vice President, Finance and Administration, and
Chief Financial Officer (Principal Financial Officer)

By:    /s/  MICHAEL MURRAY

Dated: May 6, 2005

Michael Murray
Senior Vice President, Finance (Principal Accounting Officer)

55

QuickLinks

Exhibit 10.32

Summary of Compensation Payable to Named Executive Officers

QuickLinks -- Click here to rapidly navigate through this document

Exhibit 31.1

**Certification of CEO Pursuant to**
**Securities Exchange Act Rules 13a-14(a) and 15d-14(a)**
**as Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Terry Semel, the Chief Executive Officer of Yahoo! Inc., certify that:

1.   I have reviewed this quarterly report on Form 10-Q of Yahoo! Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of registrant's board of directors (or persons performing the equivalent function):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: May 6, 2005                          By:        /s/   TERRY SEMEL

                                                      Terry Semel

Chief Executive Officer

QuickLinks

Exhibit 31.1

Certification of CEO Pursuant to Securities Exchange Act Rules 13a-14(a) and 15d-14(a) as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

QuickLinks -- Click here to rapidly navigate through this document

Exhibit 31.2

### Certification of CFO Pursuant to
### Securities Exchange Act Rules 13a-14(a) and 15d-14(a)
### as Adopted Pursuant to
### Section 302 of the Sarbanes-Oxley Act of 2002

I, Susan Decker, the Chief Financial Officer of Yahoo! Inc., certify that:

1. I have reviewed this quarterly report on Form 10-Q of Yahoo! Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of registrant's board of directors (or persons performing the equivalent function):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: May 6, 2005                              By:        /s/  SUSAN DECKER

Susan Decker
Chief Financial Officer

QuickLinks

Exhibit 31.2

Certification of CFO Pursuant to Securities Exchange Act Rules 13a-14(a) and 15d-14(a) as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

QuickLinks -- Click here to rapidly navigate through this document

**Exhibit 32**

**Certification of CEO and CFO Pursuant to**
**18 U.S.C. Section 1350,**
**as Adopted Pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Quarterly Report on Form 10-Q of Yahoo! Inc. (the "Company") for the quarter ended March 31, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Terry Semel, as Chief Executive Officer of the Company, and Susan Decker, as Chief Financial Officer of the Company, each hereby certifies, pursuant to 18 U.S.C. §1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, to the best of his and her knowledge, respectively, that:

    (1)   The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

    (2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

|  | By: | /s/  TERRY SEMEL |
|---|---|---|
| Dated: May 6, 2005 | | Terry Semel<br>Chief Executive Officer |
|  | By: | /s/  SUSAN DECKER |
| Dated: May 6, 2005 | | Susan Decker<br>Chief Financial Officer |

QuickLinks

Exhibit 32

Certification of CEO and CFO Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

**End of Filing**

Powered By 

© 2005 | EDGAR Online, Inc.

Exhibit 12

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2005**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**Commission File Number 0-28018**

---

# YAHOO!  INC.
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **77-0398689** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**701 First Avenue**
**Sunnyvale, California 94089**
(Address of principal executive offices)

Registrant's telephone number, including area code: **(408) 349-3300**

---

Indicate by check mark whether the Registrant (1) has filed all reports required by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days: Yes ☒    No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). Yes ☒    No ☐

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Class | Outstanding at August 2, 2005 |
|---|---|
| Common stock, $0.001 par value | 1,408,953,447 |

**RISK FACTORS**

***We face significant competition from companies such as Time Warner's AOL, Google and Microsoft.***

We face significant competition from companies, including AOL, Google, and Microsoft, that have combined a variety of services under one brand name in a manner similar to Yahoo!.  AOL has access to content from Time Warner's movie, television, music, book, periodical, news, sports and other media holdings; access to a network of cable and other broadband users and delivery technologies; and considerable resources for future growth and expansion.  Google, in addition to a Web search service, offers many other services that directly compete with our services, including a consumer email service, desktop search, local search, photos, maps, shopping services and Internet advertising solutions.  Microsoft has introduced its own Web search service and has announced plans to develop features that may make Web searching capabilities a more integrated part of its Windows operating system.  We expect these competitors increasingly to use their financial and engineering resources to compete with us.  In certain of these cases, most notably AOL, our competition has a direct billing relationship with a greater number of their users through Internet access and other services than we have with our users through our premium services.  This relationship may permit these competitors to be more effective than us in targeting services and advertisements to the specific preferences of their users thereby giving them a competitive advantage.  If our competitors are more successful than we are in attracting users and customers, our revenues could decline.

***We also face competition from other Internet service providers, including destination websites and Internet access providers.***

We also compete for customers and users with many other providers of online services, including online navigation, Web search, commercial search, information, entertainment, recruiting, community, electronic commerce and Internet access services.  Some of our competitors in specific areas, particularly in specific vertical markets or commerce services, such as shopping, auctions or travel, may have longer operating histories in the market, larger customer or user bases, and more brand recognition in the specific market.

Our users must access our services through an Internet access provider, including providers of cable and DSL Internet access.  To the extent that an access provider or a computer or computing device manufacturer offers online services that are competitive with those of Yahoo!, the user may find it more convenient to use the services or properties of that access provider or manufacturer.  In addition, the access provider or manufacturer may make it difficult to access our services by not listing them in the access provider's or manufacturer's own directory.  Further, through their direct billing relationship with users, access providers may be better able to target services and advertisements to the preferences of their users.

In addition, smaller competitors may consolidate with larger competitors or with each other and become more competitive.  New competitors may also enter the market.  If our competitors are more successful than we are in attracting and retaining customers and users, then our revenues could decline.

***We face competition from other providers of sponsored search advertising services which could affect our operating results.***

We compete directly with other providers of sponsored search advertising services, including FindWhat.com, Google, LookSmart, Ltd., and Lycos Inc.  In addition, we believe it is likely that there will be additional entrants to this advertising market.  Some of the existing competitors and possible additional entrants may have greater operational, strategic, financial, personnel or other resources than we do, as well as greater brand recognition.  These competitors compete against us for affiliate arrangements and could cause us to have to enter into affiliate arrangements with less favorable terms, to lose current affiliates or to fail to acquire new affiliates.  The loss of affiliates or a reduction in the revenue from affiliate arrangements could harm our business, operating results, and cash flows from operations.

***We face significant competition from traditional media companies which could affect our operating results* .**

We also compete with traditional media companies for advertising.  Most advertisers currently spend only a small portion of their advertising budgets on Internet advertising.  If we fail to persuade existing advertisers to retain and increase their spending with us and if we fail to persuade new advertisers to spend a portion of their budget on advertising with us, our business and revenues could be adversely affected.

***If we are unable to provide search technologies and services which generate significant traffic to our websites, our business could be harmed, causing our revenues to decline.***

We have deployed our own Web search technology to provide Web search results on our network. We have limited experience in operating our own search service. Web search is characterized by rapidly changing technology, significant competition, evolving industry standards, and frequent product and service enhancements. We must continually invest in improving our users' experience, including search relevance, speed, and services responsive to their needs and preferences to continue to attract, retain and expand our user base. If we are unable to provide search technologies and services which generate significant traffic to our websites, our business could be harmed, causing our revenues to decline.

***The majority of our revenues are derived from marketing services and the reduction in spending by or loss of current or potential customers would cause our revenues to decline.***

For the second quarter of 2005, 87 percent of our total revenues came from marketing services. Our ability to continue to retain and grow marketing services revenue depends upon:

- growing our user base;

- broadening our relationships with advertisers to small and medium size businesses;

- attracting advertisers to our user base;

- increasing demand for our marketing services by advertisers, users and businesses, including prices paid by advertisers, the number of searches performed by users and the rate at which users click-through to commercial search results;

- maintaining our affiliate program for our sponsored search offerings;

- deriving better demographic and other information from our users; and

- driving continued acceptance of the Web by advertisers as an advertising medium.

In the majority of cases, our agreements with advertisers have terms of one year or less, or, in the case of our sponsored search advertising services, may be terminated at any time by the advertiser. Sponsored search agreements often have payments contingent on usage or click-through levels. Accordingly, it is difficult to forecast marketing services revenues accurately. However, our expense levels are based in part on expectations of future revenues, include guaranteed minimum payments to our affiliates in connection with our sponsored search advertising services, and are fixed over the short-term with respect to certain categories. Any reduction in spending by or loss of existing or potential future customers would cause our revenues to decline. Further, we may be unable to adjust spending quickly enough to compensate for any unexpected revenue shortfall.

***In certain markets we depend on a limited number of sources to direct a significant percentage of users and businesses to our service to conduct searches and a loss of these sources could harm our operating results.***

A significant percentage of users and businesses that conduct searches using our sponsored search service, come from a limited number of sources in certain markets. In addition to the Yahoo! Network, sources for users conducting searches are members of our affiliate network, including portals, browsers, and other affiliates. Our agreements with affiliates vary in duration, and depending on the agreement, provide varying levels of discretion to the affiliate in the implementation of the sponsored search service, including the degree to which affiliates can modify the presentation of the search results on their websites or integrate the sponsored search services with their own services. The agreements may be terminable upon the occurrence of certain events, including failure to meet certain service levels, material breaches of agreement terms, changes in control or in some instances, at will. We may not be successful in renewing our affiliate agreements on as favorable terms or at all. The loss of affiliates providing significant users or businesses or an adverse change in implementation of the sponsored search service by any of these affiliates could harm our ability to generate revenue, our operating results, and cash flows from operations.

***Some of our shared revenue arrangements may not generate anticipated revenues.***

We typically receive co-branded revenue through revenue sharing arrangements and sponsorship fees or a portion of transactions revenue in return for minimum levels of user impressions to be provided by us. These arrangements expose us to potentially significant financial risks in the event our usage levels decrease, including the following:

- the revenue we are entitled to receive may be adjusted downwards;

- we may be required to "make good" on our obligations by providing additional advertising or alternative services;

- the sponsors or co-brand services may not renew the arrangements or may renew at lower rates; and

- the arrangements may not generate anticipated levels of shared transactions revenue, or sponsors may default on the payment commitments in such agreements as has occurred in the past.

Accordingly, any leveling off or decrease of our user base (or usage by our existing base) or the failure to generate anticipated levels of shared transactions revenue could result in a significant decrease in our revenues.

***Decreases or delays in advertising spending due to general economic conditions could harm our ability to generate advertising revenue.***

Expenditures by advertisers tend to be cyclical, reflecting overall economic conditions as well as budgeting and buying patterns. Since we derive the majority of our revenues from advertising, any decreases in or delays in advertising spending due to general economic conditions could reduce our revenues or negatively impact our ability to grow our revenues.

***Financial results for any particular period will not predict results for future periods.***

There can be no assurance that the purchasing pattern of customers advertising on the Yahoo! Network will not fluctuate, that advertisers will not make smaller and shorter-term purchases, or that market prices for online advertising will not decrease due to competitive or other factors. In addition, there can be no assurance that the volume of searches conducted, the amounts bid by advertisers for search listings or the number of advertisers that bid on our sponsored search service will not vary widely from period to period. As revenues from new sources increase, it may become more difficult to predict our financial results based on historical performance. You should not rely on the results for any period as an indication of future performance.

***We may not be able to generate substantial revenues from our alliances with Internet access providers.***

Through alliances with Internet access providers, we offer access services that combine customized content and services from Yahoo! (including browser and other communications services) and Internet access from the third party access providers. We may not be able to retain the alliances with our existing Internet access providers or to obtain new alliances with Internet access providers on terms that are reasonable. In addition, these Internet access services compete with many large companies such as AOL, MSN, Comcast Corporation and other established Internet access providers. In certain of these cases, our competition has substantially greater market presence (including an existing user base) and greater financial, technical, marketing or other resources. As a result of these and other competitive factors, the Internet access providers with which we have formed alliances, may not be able to attract, grow or retain their customer bases, which would negatively impact our ability to sell customized content and services through this channel and, in turn, reduce our anticipated revenues from our alliances.

***We have dedicated considerable resources to provide a variety of premium services, which may not prove to be successful in generating significant revenue for us.***

We offer fee-based enhancements to many of our free services, including email, personals, finance, games, music, and sports. The development cycles for these technologies are long and generally require significant investment by us. We have previously discontinued certain non-profitable premium services. We must however continue to provide new services that are compelling to our users while continuing to develop an effective method for generating revenues for such services. If we cannot generate revenues from these services that are greater than the cost of providing such services, our operating results could be harmed.

***We expect our operating expenses to continue to increase as we attempt to expand the Yahoo! brand, fund product development, develop media properties and acquire other businesses which could harm our operating results.***

We currently expect that our operating expenses will continue to increase as we expand our operations in areas of expected growth, continue to develop and extend the Yahoo! brand, fund greater levels of product development, develop and commercialize additional media properties and premium services, and acquire and integrate complementary businesses and technologies. If our expenses increase at a greater pace than our revenues, our operating results could be harmed.

*If we are unable to license or acquire compelling content at reasonable costs or if we do not develop compelling content, the number of users of our services may not grow as anticipated which could harm our operating results.*

Our future success depends in part upon our ability to aggregate compelling content and deliver that content through our online properties. We license much of the content on our online properties, such as news items, stock quotes, weather reports, maps and audio and video content from third parties. We have been providing increasing amounts of audio and video content to our users and we believe that users will increasingly demand high-quality audio and video content, such as the broadcast of music, film content, speeches, news footage, concerts and other special events. For example, our music and entertainment properties rely on major sports organizations, radio and television stations, record labels, cable networks, businesses, colleges and universities, film producers and distributors, and other organizations for a large portion of the content available on our properties. Our ability to maintain and build relationships with third-party content providers will be critical to our success. In addition, as new methods for accessing the Web become available, including through alternative devices, we may need to enter into amended content agreements with existing third-party content providers to cover the new devices. Also, to the extent that Yahoo! develops content of its own, Yahoo!'s current and potential third-party content providers may view our services as competitive with their own and this may adversely affect their willingness to contract with us. We may be unable to enter into new, or preserve existing, relationships with the third parties whose content we seek to obtain. In addition, as competition for compelling content increases both domestically and internationally, our content providers may increase the prices at which they offer their content to us and potential content providers may not offer their content on terms agreeable to us. An increase in the prices charged to us by third-party content providers could harm our operating results and financial condition. Further, many of our content licenses with third parties are non-exclusive. Accordingly, other webcasters and other media such as radio or television may be able to offer similar or identical content. This increases the importance of our ability to deliver compelling editorial content and personalization of this content for users in order to differentiate Yahoo! from other businesses. If we are unable to license or acquire compelling content at reasonable prices, if other companies broadcast content that is similar to or the same as that provided by Yahoo!, or if we do not develop compelling editorial content or personalization services, the number of users of our services may not grow at all or may grow at a slower rate than anticipated, which could harm our operating results.

*Our intellectual property rights are valuable and any inability to protect them could reduce the value of our brand image and harm our business and our operating results.*

We regard our copyrights, patents, trademarks, trade dress, trade secrets, and similar intellectual property, including our rights to certain domain names, as important to Yahoo!'s brand and success. The efforts we have taken to protect our proprietary rights may not be sufficient or effective at stopping any unauthorized use of our proprietary rights. In addition, effective trademark, patent, copyright, and trade secret protection may not be available or cost-effective in every country in which our products and media properties are distributed or made available through the Internet. Further, while we attempt to ensure that the quality of our brand is maintained by our licensees, our licensees may take actions that could impair the value of our brand, our proprietary rights or the reputation of our products and media properties. We are aware that third parties have, from time to time, copied significant content available on Yahoo! for use in competitive Internet services. Protection of the distinctive elements of Yahoo! may not be available under copyright law. If we are unable to protect our proprietary rights from unauthorized use, the value of our brand image may be reduced. Any impairment of our brand could negatively impact our business. In addition, protecting our intellectual property and other proprietary rights is expensive and time consuming. Any increase in the unauthorized use of our intellectual property could make it more expensive to do business and consequently harm our operating results.

*We rely on the value of the Yahoo! brand, and a failure to maintain or enhance the Yahoo! brand in a cost effective manner could harm our operating results.*

We believe that maintaining and enhancing the Yahoo! brand is an important aspect of our efforts to attract and expand our user and advertiser base. We also believe that the importance of brand recognition will increase due to the relatively low barriers to entry. We have spent considerable money and resources to date on the establishment and maintenance of the Yahoo! brands. We will therefore need to spend increasing amounts of money on, and devote greater resources to, advertising, marketing and other brand-building efforts to preserve and enhance consumer awareness of the Yahoo! brands. We may not be able to successfully maintain or enhance consumer awareness of the Yahoo! brands and, even if we are successful in our branding efforts, these efforts may not be cost-effective. If we are unable to maintain or enhance customer awareness of the Yahoo! brands in a cost effective manner, our business, operating results and financial condition would be harmed.

***We are, and may in the future be, subject to intellectual property infringement claims, which are costly to defend, could result in damage awards, and could limit our ability to provide certain content or use certain technologies in the future.***

Internet, technology, media companies and patent holding companies often possess a significant number of patents. Further, many of these companies and other parties are actively developing search, indexing, electronic commerce and other Web-related technologies, as well as a variety of online business models and methods. We believe that these parties will continue to take steps to protect these technologies, including, but not limited to, seeking patent protection. As a result, disputes regarding the ownership of technologies and rights associated with online business are likely to continue to arise in the future. From time to time, parties assert patent infringement claims against us. Currently, we are engaged in several lawsuits regarding patent issues and have been notified of a number of other potential disputes.

In addition to patent claims, third parties have asserted, and are likely in the future to assert, claims against us alleging infringement of copyrights, trademark rights, trade secret rights or other proprietary rights, or alleging unfair competition or violations of privacy rights or failure to maintain confidentiality of user data. Currently, our subsidiary LAUNCH Media, Inc. ("LAUNCH") is engaged in a lawsuit regarding copyright issues that commenced prior to our acquisition of LAUNCH. In addition, Overture is in litigation involving claims that allowing advertisers to bid on certain search terms and Overture's display of search results triggered by those search terms constitutes trademark infringement. A court in France recently held Overture SARL and Overture liable for displaying search results triggered by certain trademarked keywords.

As we expand our business and develop new technologies, products and services, we may become increasingly subject to intellectual property infringement claims. In the event that there is a determination that we have infringed third-party proprietary rights such as patents, copyrights, trademark rights, trade secret rights or other third party rights such as publicity and privacy rights, we could incur substantial monetary liability, be required to enter into costly royalty or licensing agreements or be prevented from using the rights, which could require us to change our business practices in the future and limit our ability to compete effectively. We may also incur substantial expenses in defending against third-party infringement claims regardless of the merit of such claims. In addition, many of our agreements with our customers or affiliates require us to indemnify them for certain third-party intellectual property infringement claims, which could increase our costs in defending such claims and our damages. The occurrence of any of these results could harm our brand and negatively impact our operating results.

***Acquisitions could result in operating difficulties and unanticipated liabilities.***

We have made strategic acquisitions, including Inktomi Corporation ("Inktomi") in March 2003, Overture in October 2003, 3721 in January 2004, Kelkoo in April 2004, and Musicmatch in October 2004. We expect to enter into additional business combinations and acquisitions in the future. Acquisitions may result in dilutive issuances of equity securities, use of our cash resources, incurrence of debt and amortization of expenses related to intangible assets. Our acquisitions to date were accompanied by a number of risks, including:

- the difficulty of assimilating the operations and personnel of our acquired companies into our operations;

- the potential disruption of our ongoing business and distraction of management;

- the difficulty of integrating acquired technology and rights into our services and unanticipated expenses related to such integration;

- the failure to successfully further develop acquired technology resulting in the impairment of amounts currently capitalized as intangible assets;

- the potential for patent and trademark infringement claims against the acquired company;

- the impairment of relationships with customers and partners of the acquired companies or our customers and partners as a result of the integration of acquired operations;

- the impairment of relationships with employees of the acquired companies or our employees as a result of integration of new management personnel;

- the difficulty of integrating the acquired company's accounting, management information, human resources and other administrative systems;

- in the case of foreign acquisitions, uncertainty regarding foreign laws and regulations and difficulty integrating operations and systems as a result of cultural, systems and operational differences; and

- the impact of known potential liabilities or unknown liabilities associated with the acquired companies.

We are likely to experience similar risks in connection with our future acquisitions. Our failure to be successful in addressing these risks or other problems encountered in connection with our past or future acquisitions could cause us to fail to realize the anticipated benefits of our acquisitions, incur unanticipated liabilities and harm our business generally.

***Our failure to manage growth and diversification of our business could harm us.***

We are continuing to grow and diversify our business both in the United States and internationally. As a result, we must expand and adapt our operational infrastructure and increase the number of our personnel in certain areas. Our business relies on our data systems, billing systems for our fee based and other services, and other operational and financial reporting and control systems. All of these systems have become increasingly complex in the recent past due to the growing diversification and complexity of our business and to acquisitions of new businesses with different systems. To effectively manage this growth, we will need to continue to upgrade and improve our data systems, billing systems, and other operational and financial systems, procedures and controls. In particular, as our premium and other services for which we bill users grow, any failure of our billing systems to accommodate the increasing number of transactions and accurately bill users could adversely affect our business and ability to collect revenue. These upgrades and improvements will require a dedication of resources and in some cases are likely to be complex. If we are unable to adapt our systems in a timely manner to accommodate our growth, our business may be adversely affected.

Additionally, we have experienced recent growth in personnel numbers and expect to continue to hire additional personnel in selected areas. This growth requires significant time and resource commitments from our senior management. Further, as a result of recent acquisitions and international expansion, more than one-half of our employees are based outside of our Sunnyvale, California headquarters. If we are unable to effectively manage a large and geographically dispersed group of employees or to anticipate our future growth and personnel needs, our business may be adversely affected.

***If we are unable to retain our existing senior management and key personnel and hire new highly skilled personnel, we may not be able to execute our business plan.***

We are substantially dependent on the continued services of our senior management, including our two founders, our chief executive officer, chief financial officer, chief operating officer, chief technical officer, and our executive and senior vice presidents. These individuals have acquired specialized knowledge and skills with respect to Yahoo! and its operations. The loss of any of these individuals could harm our business. Our business is also dependent on our ability to retain, hire and motivate talented, highly skilled personnel. The competition for such highly skilled personnel can be intense, particularly in the San Francisco Bay Area, where our corporate headquarters is located. Many of our management and key personnel have reached or will soon reach the four-year anniversary of their Yahoo! hiring date and, as a result, have become or will shortly become fully vested in their initial stock option grants. Although employees receive additional grants, an employee may be more likely to leave Yahoo! upon completion of the vesting period for the initial option grant which is generally the largest option grant an employee receives. If we do not succeed in retaining and motivating our existing key employees and attracting new key personnel, we may be unable to meet our business plan and as a result our stock price may decline.

***More individuals are utilizing non-PC devices to access the Internet, and versions of our service developed or optimized for these devices may not gain widespread adoption by users of such devices.***

The number of individuals who access the Internet through devices other than a personal computer, such as personal digital assistants, mobile telephones and television set-top devices, has increased dramatically. Our services were originally designed for rich, graphical environments such as those available on desktop and laptop computers. The lower resolution, functionality and memory associated with alternative devices currently available may make the use of our services through such devices difficult, and the versions of our service developed for these devices may not be compelling to users of alternative devices. As we have limited experience to date in operating versions of our service developed or optimized for users of alternative devices, it is difficult to predict the problems we may encounter in doing so, and we may need to devote significant resources to the creation, support and maintenance of such versions. If we are unable to attract and retain a substantial number of alternative device users to our online services, we may fail to capture a sufficient share of an increasingly important portion of the market for online services and may fail to attract advertisers.

37

***We may be required to record a significant charge to earnings if our goodwill or amortizable intangible assets become impaired.***

We are required under generally accepted accounting principles to review our amortizable intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Goodwill is required to be tested for impairment at least annually. Factors that may be considered a change in circumstances indicating that the carrying value of our amortizable intangible assets may not be recoverable include a decline in stock price and market capitalization, and slower growth rates in our industry. We may be required to record a significant charge to earnings in our consolidated financial statements during the period in which any impairment of our goodwill or amortizable intangible assets is determined. This may adversely impact our results of operations. As of June 30, 2005, our goodwill and amortizable intangible assets were $3.1 billion.

***We plan to expand operations in international markets in which we may have limited experience or rely on business partners, and in which we are faced with relatively higher costs.***

We plan to expand Yahoo! branded online properties and search offerings in international markets. We have currently developed, through joint ventures, subsidiaries and branch offices, localized offerings in over 20 countries outside of the United States. As we expand to new international markets, we will have only limited experience in marketing and operating our products and services in such markets and we may rely on the efforts and abilities of foreign business partners in such markets. We have experienced and expect to continue to experience higher costs as a percentage of revenues in connection with the development and maintenance of our international online properties relative to our domestic experience. Certain international markets may be slower than domestic markets in adopting the Internet as an advertising and commerce medium and so our operations in international markets may not develop at a rate that supports our level of investment.

***In international markets we compete with local Internet service providers that may have competitive advantages.***

In a number of international markets, especially those in Asia, Europe, and Latin America, we face substantial competition from local Internet service providers and other portals that offer search, communications and other commercial services. Many of these companies have a dominant market share in their territories and are owned by local telecommunications providers which give them a competitive advantage. Local providers of competing online services may also have a substantial advantage over us in attracting users in their country due to more established branding in that country, greater knowledge with respect to the tastes and preferences of users residing in that country and/or their focus on a single market. Further, the local providers may have greater regulatory and operational flexibility than Yahoo! due to the fact that we are subject to both domestic and foreign regulatory requirements. We must continue to improve our local offerings, become more knowledgeable about our local users and their preferences, deepen our relationships with our local users as well as increase our branding and other marketing activities in order to remain competitive and strengthen our international market position.

***Our international operations are subject to increased risks which could harm our business, operating results and financial condition.***

In addition to uncertainty about our ability to continue to generate revenues from our foreign operations and expand our international market position, there are certain risks inherent in doing business internationally, including:

- trade barriers and changes in trade regulations;

- difficulties in developing, staffing and simultaneously managing a large number of varying foreign operations as a result of distance, language and cultural differences;

- stringent local labor laws and regulations;

- longer payment cycles;

- currency exchange rate fluctuations;

- political or social unrest or economic instability;

- import or export restrictions;

- seasonal volatility in business activity;

- risks related to government regulation including those more fully described below; and

- potentially adverse tax consequences.

One or more of these factors could harm our future international operations and consequently, could harm our business, operating results, and financial condition.

***We are subject to U.S. and foreign government regulation of the Internet and Voice over Internet Protocol which could subject us to claims and remedies including monetary liabilities and limitations on our business practices.***

We are subject to regulations and laws directly applicable to providers of Internet and Voice over Internet Protocol services both domestically and internationally. The application of existing domestic and international laws and regulations to Yahoo! relating to issues such as user privacy and data protection, defamation, pricing, advertising, taxation, gambling, sweepstakes, promotions, financial market regulation, consumer protection, content regulation, quality of services, and intellectual property ownership and infringement in many instances is unclear or unsettled. In addition, we will also be subject to any new laws and regulations directly applicable to our activities. Further, the application of existing laws to Yahoo! or our subsidiaries regulating or requiring licenses for certain businesses of our advertisers including, for example, distribution of pharmaceuticals, alcohol, adult content, tobacco or firearms, as well as insurance and securities brokerage and legal services, can be unclear. Internationally, we may also be subject to foreign laws and regulations that are inconsistent from country to country. We may incur substantial liabilities for expenses necessary to comply with these laws and regulations or penalties for any failure to comply. Compliance with these laws and regulations may also cause us to change or limit our business practices in a manner adverse to our business.

A number of federal laws, including those referenced below, impact our business. The Digital Millennium Copyright Act ("DMCA") is intended, in part, to limit the liability of eligible online service providers for listing or linking to third-party Websites that include materials that infringe copyrights or other rights of others. Portions of the Communications Decency Act ("CDA") are intended to provide statutory protections to online service providers who distribute third party content. Yahoo! relies on the protections provided by both the DMCA and CDA in conducting its business. Any changes in these laws or judicial interpretations narrowing their protections will subject us to greater risk of liability and may increase our costs of compliance with these regulations or limit our ability to operate certain lines of business. The Children's Online Protection Act and the Children's Online Privacy Protection Act are intended to restrict the distribution of certain materials deemed harmful to children and impose additional restrictions on the ability of online services to collect user information from minors. In addition, the Protection of Children From Sexual Predators Act of 1998 requires online service providers to report evidence of violations of federal child pornography laws under certain circumstances. The costs of compliance with these regulations may increase in the future as a result of changes in the regulations or the interpretation of them. Further, any failures on our part to comply with these regulations may subject us to significant liabilities.

There are federal, state and international laws regarding privacy and protection of user data. We post, on our website, our privacy policies and practices concerning the use and disclosure of user data. Any failure by us to comply with our posted privacy policies, any consent orders from time to time entered into by us, Federal Trade Commission requirements or other federal, state or international privacy-related laws and regulations could result in proceedings against us by governmental entities or others which could potentially have an adverse effect on our business, results of operations and financial condition. In this regard, there are a large number of legislative proposals before the United States Congress and various state legislative bodies regarding privacy issues related to our business. It is not possible to predict whether or when such legislation may be adopted, and certain proposals, if adopted, could impose requirements which may result in a decrease in our user registrations and revenues. In addition, the interpretation and application of user data protection laws in Europe and other international jurisdictions is unclear and in a state of flux. There is a risk that these laws may be interpreted and applied inconsistently from country to country and with our current data protection practices. Complying with these varying international requirements could cause us to incur substantial costs and to have to change our business practices. Further, any failure by us to protect users' privacy and data could result in a loss of user confidence in our services and ultimately in a loss of users which could adversely affect our business.

***We may be subject to legal liability for online services.***

We host a wide variety of services that enable individuals and businesses to exchange information, generate content, advertise products and services, conduct business and engage in various online activities on an international basis. The law relating to the liability of providers of these online services for activities of their users is currently unsettled both within the United States and internationally. Claims have been threatened and have been brought against us for defamation, negligence, copyright or trademark infringement, unlawful activity, tort, including personal injury, fraud, or other theories based on the nature and content of information that we provide links to or that may be posted online or generated by our users or with respect to auctioned

39

materials.  In addition, Yahoo! was the subject of a claim brought by certain entities in a French court regarding, among other things, the availability of certain content within our services which was alleged to violate French law.  We may be subject to similar actions in domestic or other international jurisdictions in the future.  Our defense of any such actions could be costly and involve significant time and attention of our management and other resources.

We also periodically enter into arrangements to offer third-party products, services, or content under the Yahoo! brand or via distribution on various Yahoo! properties, including stock quotes and trading information.  We may be subject to claims concerning these products, services or content by virtue of our involvement in marketing, branding, broadcasting or providing access to them, even if we do not ourselves host, operate, provide, or provide access to these products, services or content.  While our agreements with respect to these products, services and content, often provide that we will be indemnified against such liabilities, the ability to receive such indemnification depends on the financial resources of the other party to the agreement and any amounts received may not be adequate to cover our liabilities.

It is also possible that, if any information provided directly by us contains errors or is otherwise negligently provided to users, third parties could make claims against us.  For example, we offer Web-based email services, which expose us to potential risks, such as liabilities or claims resulting from unsolicited email, lost or misdirected messages, illegal or fraudulent use of email, or interruptions or delays in email service.  Investigating and defending any of these types of claims is expensive, even to the extent that the claims are without merit or do not ultimately result in liability.

***We may have difficulty scaling and adapting our existing technology architecture to accommodate increased traffic and technology advances or customer requirements.***

Yahoo! is one of the most highly trafficked Websites on the Internet and is regularly serving an increased number of users and delivering an increased number of daily page views.  For example, the usage levels of email and the number and complexity of advertisers utilizing our sponsored search offerings have increased.  In addition, the products and services offered by Yahoo! have expanded and changed significantly and are expected to continue to expand and change rapidly in the future.  There is also an increased use of rich media content such as audio and video.  Rapid increases in the levels or types of use of our online properties and services could result in delays or interruptions in our service.  In particular, the technology architectures utilized for our services are highly complex and may not provide satisfactory support in the future, as usage increases and products and services expand, change and become more complex.  In the future, we may be required to make significant changes to our architectures, including moving to completely new architectures.  If we are required to switch architectures, we may incur substantial costs and experience delays or interruptions in our service.  These delays or interruptions in our service may cause users and customers to become dissatisfied with our service and move to competing providers of online services.  Further, to the extent that demands for our services increase, we will need to expand our infrastructure, including the capacity of our hardware servers and the sophistication of our software.  This expansion is likely to be expensive and complex, and require additional technical expertise.  As we acquire users who rely upon us for a wide variety of services, it becomes more technologically complex and costly to retrieve, store and integrate data that will enable us to track each user's preferences.  Any difficulties experienced in adapting our architectures and infrastructure to accommodate increased traffic, to store user data and track user preferences, together with the associated costs and potential loss of traffic, could harm our operating results, cash flows from operations and financial condition.

***We may not be successful in expanding the number of users of our e-commerce offerings which could result in a decline in our revenues.***

The success of our e-commerce offerings depends on our ability to generate traffic to Yahoo! Shopping and similar services and the rate at which users either purchase products or click through to search results.  The revenue that we derive from Yahoo! Shopping and related services is typically in the form of lead-based fees, where retailers pay a fee based on the number of times a user clicks on a link to their site, transaction fees, and advertising fees.  Users who had a favorable buying experience with a particular retailer may contact that retailer directly for future purchases rather than through our services.  Competing providers of e-commerce offerings, including retailers with whom we have relationships, may provide a more convenient and comprehensive online customer experience due to their singular focus on e-commerce.  Retailers may also establish exclusive relationships with our competitors.  If our users bypass our e-commerce offerings and related services and contact competing providers or retailers directly, our revenue could decline.

***New technologies could block our ads, which would harm our operating results.***

Technologies have been developed and are likely to continue to be developed that can block the display of our ads.  Most of our revenues are derived from fees paid to us by advertisers in connection with the display of ads on web pages.  As a result, ad-

blocking technology could, in the future, reduce the number of ads that we are able to deliver and, in turn, our advertising revenues.

***We rely on third party providers for our principal Internet connections and technologies, databases and services critical to our properties and services and any errors, failures or disruption in the services provided by these third parties could significantly harm our business and operating results.***

We rely on private third-party providers for our principal Internet connections, co-location of a significant portion of our data servers and network access. Any disruption, from natural disasters, technology malfunctions, sabotage or other factors, in the Internet or network access or co-location services provided by these third-party providers or any failure of these third-party providers to handle current or higher volumes of use could significantly harm our business, operating results and financial condition. We have little control over these third-party providers which increases our vulnerability to disruptions or problems with their services. Any financial difficulties experienced by our providers may have negative effects on our business, the nature and extent of which we cannot predict. We license technology and related databases from third parties for certain elements of our properties, including, among others, technology underlying the delivery of news, stock quotes and current financial information, chat services, street mapping and telephone listings, streaming capabilities and similar services. We have experienced and expect to continue to experience interruptions and delays in service and availability for such elements. We also rely on a third-party provider for key components of our email service. Furthermore, we depend on hardware and software suppliers for prompt delivery, installation and service of servers and other equipment to deliver our services. Any errors, failures, interruptions, or delays experienced in connection with these third-party technologies and information services could negatively impact our relationship with users and adversely affect our brand, our business and operating results.

***We rely on distribution agreements and relationships with various third parties and any failure to obtain or maintain such distribution relationships on reasonable terms could impair our ability to fully execute our business plan.***

In addition to our relationships with Internet access providers, to increase traffic for our offerings and make them more available and attractive to advertisers and users, we have certain distribution agreements and informal relationships with operators of online networks and leading Websites, software companies, electronics companies, and computer manufacturers. Depending on the distributor and the agreement, these distribution arrangements may not be exclusive and may only have a short term. Some of our distributors, particularly distributors who are also competitors or potential competitors, may not renew their distribution agreements with us. In addition, as new methods for accessing the Web become available, including through alternative devices, we may need to enter into amended distributions agreements with existing distributors to cover the new devices and agreements with additional distributors. In the future, existing and potential distributors may not offer distribution of our properties and services to us on reasonable terms, or at all. If we fail to obtain distribution or to obtain distribution on terms that are reasonable, we may not be able to fully execute our business plan.

***We rely on third party providers of streaming media products to broadcast streaming audio and video content to our users and any change in the licensing terms, costs or user acceptance of these products could adversely affect our business.***

We rely on leading providers of streaming media products to license the software necessary to broadcast streaming audio and video content to our users. There can be no assurance that these providers will continue to license these products to us on reasonable terms, or at all. Our users are currently able to electronically download copies of the software to play streaming media free of charge, but providers of streaming media products may begin charging users for copies of their player software or otherwise change their business model in a manner that slows the widespread acceptance of these products. In order for our rich media services to be successful, there must be a large base of users of these streaming media products. We have limited or no control over the availability or acceptance of streaming media software, and to the extent that any of these circumstances occur, our business may be adversely affected.

***If we fail to detect click-through spam, we could lose the confidence of our advertisers, thereby causing a loss of advertisers and revenue.***

We are exposed to the risk of clicks on our ads by persons seeking to increase the fees paid by our advertisers. Click-through spam occurs when a click is generated on one of our advertiser's listings displayed on a website in order to generate a payment rather than to view the underlying content. If this activity occurs and we are unable to stop it, we will have to provide refunds of revenue that our advertisers have paid to us and that was later attributed to click-through spam. These types of activities could damage our brand. If click-through spam is not detected, the affected advertisers may perceive a reduced return on their investment in our advertising programs because those clicks will not lead to potential revenue for the advertisers. This could lead the advertisers to become dissatisfied with our advertising programs, which could lead to loss of advertisers and revenue.

41

*Interruptions, delays or failures in the provision of our services could damage our brand and harm our operating results.*

Our operations are susceptible to outages due to fire, floods, power loss, telecommunications failures, terrorist attacks and similar events.  In addition, a significant portion of our network infrastructure is located in Northern California, an area subject to earthquakes.  Despite our implementation of network security measures, our servers are vulnerable to computer viruses, worms, physical and electronic break-ins, sabotage and similar disruptions from unauthorized tampering with our computer systems.  For example, we are vulnerable to coordinated attempts to overload our systems with data, resulting in denial or reduction of service to some or all of our users for a period of time.  We have experienced a coordinated denial of service attack in the past, and may experience such attempts in the future.  We do not have multiple site capacity for all of our services and some of our systems are not fully redundant in the event of any such occurrence.  In an effort to reduce the likelihood of a geographical or other disaster impacting our business, we have distributed and intend to continue distributing our servers among additional data centers located around the world.  Failure to execute these changes properly or in a timely manner could result in delays or interruptions to our service, which could result in a loss of users and damage to our brand.  We may not carry sufficient business interruption insurance to compensate us for losses that may occur as a result of any events which cause interruptions in our service.

*Our stock price has been volatile historically and may continue to be volatile regardless of our operating performance.*

The trading price of our common stock has been and may continue to be subject to wide fluctuations.  During the second quarter of 2005, the closing sale price of our common stock on the Nasdaq ranged from $32.46 to $38.52 per share and the closing sale price on August 2, 2005 was $33.88 per share.  Our stock price may fluctuate in response to a number of events and factors, such as quarterly variations in operating results; announcements of technological innovations or new services and media properties by us or our competitors; changes in financial estimates and recommendations by securities analysts; the operating and stock price performance of other companies that investors may deem comparable to us; the operating performance and stock price of companies in which we have an equity investment, including Yahoo! Japan; and news reports relating to trends in our markets or general economic conditions.

In addition, the stock market in general, and the market prices for Internet-related companies in particular, have experienced volatility that often has been unrelated to the operating performance of such companies.  These broad market and industry fluctuations may adversely affect the price of our stock, regardless of our operating performance.  Additionally, volatility or a lack of positive performance in our stock price may adversely affect our ability to retain key employees, all of whom have been granted stock options.

*Anti-takeover provisions could make it more difficult for a third party to acquire us.*

We have adopted a stockholder rights plan and initially declared a dividend distribution of one right for each outstanding share of common stock to stockholders of record as of March 20, 2001.  As a result of our two-for-one stock split effective May 11, 2004, each share of common stock is now associated with one-half of one right.  Each right entitles the holder to purchase one unit consisting of one one-thousandth of a share of our Series A Junior Participating Preferred Stock for $250 per unit.  Under certain circumstances, if a person or group acquires 15 percent or more of our outstanding common stock, holders of the rights (other than the person or group triggering their exercise) will be able to purchase, in exchange for the $250 exercise price, shares of our common stock or of any company into which we are merged having a value of $500.  The rights expire on March 1, 2011, unless extended by our Board of Directors.  Because the rights may substantially dilute the stock ownership of a person or group attempting to take us over without the approval of our Board of Directors, our rights plan could make it more difficult for a third party to acquire us (or a significant percentage of our outstanding capital stock) without first negotiating with our Board of Directors regarding that acquisition.

In addition, our Board of Directors has the authority to issue up to 10,000,000 shares of Preferred Stock (of which 2,000,000 shares have been designated as Series A Junior Participating Preferred Stock) and to determine the price, rights, preferences, privileges and restrictions, including voting rights, of those shares without any further vote or action by the stockholders.

The rights of the holders of our common stock may be subject to, and may be adversely affected by, the rights of the holders of any Preferred Stock that may be issued in the future.  The issuance of Preferred Stock may have the effect of delaying, deterring or preventing a change of control of Yahoo! without further action by the stockholders and may adversely affect the voting and other rights of the holders of our common stock.  Further, certain provisions of our charter documents, including provisions eliminating the ability of stockholders to take action by written consent and limiting the ability of stockholders to raise matters at a meeting of stockholders without giving advance notice, may have the effect of delaying or preventing changes in control or management of Yahoo!, which could have an adverse effect on the market price of our stock.  In addition, our charter documents

do not permit cumulative voting, which may make it more difficult for a third party to gain control of our Board of Directors.  Further, we are subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law, which will prohibit us from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder, even if such combination is favored by a majority of stockholders, unless the business combination is approved in a prescribed manner.  The application of Section 203 also could have the effect of delaying or preventing a change of control or management.

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

YAHOO! INC.

By:    /s/ SUSAN DECKER

Dated: August 5, 2005

Susan Decker
Executive Vice President, Finance and Administration, and Chief Financial Officer (Principal Financial Officer)

By:    /s/ MICHAEL MURRAY

Dated: August 5, 2005

Michael Murray
Senior Vice President, Finance (Principal Accounting Officer)

49

**EXHIBIT A**

**PERFORMANCE-BASED OBJECTIVES AND CONDITIONS**

A-1

---

**Exhibit 31.1**

**Certification of CEO Pursuant to**
**Securities Exchange Act Rules 13a-14(a) and 15d-14(a)**
**as Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Terry Semel, the Chief Executive Officer of Yahoo! Inc., certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Yahoo! Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of registrant's board of directors (or persons performing the equivalent function):

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: August 5, 2005                    By:    /s/ TERRY SEMEL

                                               Terry Semel
                                               Chief Executive Officer

---

**Exhibit 31.2**

**Certification of CFO Pursuant to**
**Securities Exchange Act Rules 13a-14(a) and 15d-14(a)**
**as Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Susan Decker, the Chief Financial Officer of Yahoo! Inc., certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Yahoo! Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of registrant's board of directors (or persons performing the equivalent function):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: August 5, 2005                    By:    /s/ SUSAN DECKER

                                                        Susan Decker
                                                        Chief Financial Officer

**Exhibit 32**

**Certification of CEO and CFO Pursuant to
18 U.S.C. Section 1350,
as Adopted Pursuant to
Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Quarterly Report on Form 10-Q of Yahoo! Inc. (the "Company") for the quarter ended June 30, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Terry Semel, as Chief Executive Officer of the Company, and Susan Decker, as Chief Financial Officer of the Company, each hereby certifies, pursuant to 18 U.S.C. §1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, to the best of his and her knowledge, respectively, that:

    (1)    The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

    (2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

                                     By:    /s/ TERRY SEMEL

Dated: August 5, 2005

Terry Semel
Chief Executive Officer

By:    /s/ SUSAN DECKER

Susan Decker
Chief Financial Officer

Dated: August 5, 2005

---

**End of Filing**

Powered By 

© 2005 | EDGAR Online, Inc.

Exhibit 13

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-Q

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2005**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from     to**

**Commission File Number 0-28018**

---

# YAHOO! INC.
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **77-0398689** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**701 First Avenue**
**Sunnyvale, California 94089**
(Address of principal executive offices)

Registrant's telephone number, including area code: **(408) 349-3300**

---

Indicate by check mark whether the Registrant (1) has filed all reports required by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days: Yes ☒    No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act).
Yes ☒    No ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐    No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Class | Outstanding at November 1, 2005 |
|---|---|
| Common stock, $0.001 par value | 1,418,736,194 |

During the three months ended June 30, 2005 the Company acquired three companies which were each accounted for as business combinations. The total estimated purchase price for the three acquisitions was approximately $37 million and consisted of $32 million in cash consideration, $3 million related to stock options exchanged, and $2 million of incurred liabilities and direct transaction costs. The total cash consideration of approximately $32 million less cash acquired of $1 million resulted in a net cash outlay of $31 million. Of the total estimated purchase price, approximately $32 million was allocated to goodwill, $6 million to amortizable intangible assets and $1 million to net assumed liabilities. Less than $1 million has been allocated to in-process research and development and recorded in product development expenses. Goodwill represents the excess of the purchase price over the fair value of the net tangible and intangible assets acquired, and is not deductible for tax purposes.

The purchase price allocations for these acquisitions are preliminary and subject to revision as more detailed analyses are completed and additional information on the fair value of assets and liabilities becomes available. Any change in the fair value of the net assets of the acquired companies will change the amount of the purchase price allocable to goodwill.

Pro forma results of operations have not been presented for the acquisitions completed during the nine months ended September 30, 2004 or September 30, 2005 as the results of the acquired companies either individually or in the aggregate were not material to the Company.

### Note 4—Goodwill

The changes in the carrying amount of goodwill for the nine months ended September 30, 2005 are as follows (in thousands):

|  | United States | International | Total |
|---|---|---|---|
| Balance as of January 1, 2005 | $1,673,419 | $877,538 | $2,550,957 |
| Acquisitions and other* | 30,864 | 21,283 | 52,147 |
| Foreign currency translation adjustments | — | (39,031) | (39,031) |
| Balance as of September 30, 2005 | $1,704,283 | $859,790 | $2,564,073 |

\* Other primarily includes certain purchase price adjustments that affect existing goodwill.

### Note 5—Intangible Assets, Net

The following table summarizes the Company's intangible assets, net (in thousands):

|  | December 31, 2004 | September 30, 2005 | | |
|---|---|---|---|---|
|  | Net | Gross carrying amount | Accumulated amortization* | Net |
| Trademark, trade name and domain name | $103,796 | $134,000 | $(51,732) | $82,268 |
| Customer, affiliate, and advertiser related relationships | 205,032 | 323,062 | (166,363) | 156,699 |
| Developed technology and patents | 171,838 | 311,146 | (99,095) | 212,051 |
| Total intangible assets, net | $480,666 | $768,208 | $(317,190) | $451,018 |

\* Foreign currency translation adjustments, reflecting movement in the currencies of the underlying entities, totaled approximately $2 million as of September 30, 2005.

The Company recognized amortization expense for intangible assets of approximately $37 million and $41 million for the three months ended September 30, 2004 and 2005, respectively. The Company recognized amortization expense for intangible assets of approximately $104 million and $123 million for the nine months ended September 30, 2004 and 2005, respectively. Based on the current amount of intangibles subject to amortization, the estimated amortization expense for each of the succeeding five years is as follows: three months ending December 31, 2005: $41 million; 2006: $171 million; 2007: $126 million; 2008: $76 million, and 2009: $24 million and 2010: $13 million.

### Note 6—Other Income, Net

Other income, net is comprised of (in thousands):

|  | Three Months Ended | | Nine Months Ended | |
|  | September 30, 2004 | September 30, 2005 | September 30, 2004 | September 30, 2005 |
|---|---|---|---|---|
| Interest and investment income | $14,962 | $37,676 | $40,978 | $88,548 |
| Investment gains (losses), net | 110,268 | 26,948 | 107,780 | 995,231 |
| Other | (1,949) | 1,371 | 2,080 | 11,946 |
| Total other income, net | $123,281 | $65,995 | $150,838 | $1,095,725 |

Investment gains (losses), net include realized investment gains, realized investment losses, realized gains on derivatives, and impairment charges related to declines in values of privately held companies judged to be other than temporary. Investment gains (losses) include gains in the amounts of $105 million in the three and nine months ended September 30, 2004 and $27 million and $987 million in the three and nine months ended September 30, 2005, respectively, related to the sale of non-strategic marketable equity security investments.

## Note 7—Comprehensive Income

Comprehensive income, net of taxes, is comprised of (in thousands):

|  | Three Months Ended | | Nine Months Ended | |
|  | September 30, 2004 | September 30, 2005 | September 30, 2004 | September 30, 2005 |
|---|---|---|---|---|
| Net income | $253,305 | $253,773 | $467,029 | $1,213,022 |
| Other comprehensive income (loss): | | | | |
| Change in net unrealized gains (losses) on available-for-sale securities before tax, net of reclassification adjustments | 760,488 | (52,641) | 740,958 | (824,790) |
| Tax impact of change in net unrealized gains (losses) | (304,205) | 21,057 | (296,387) | 329,915 |
| Change in net unrealized gains (losses) on available-for-sale securities, net of tax and reclassification adjustments | 456,283 | (31,584) | 444,571 | (494,875) |
| Foreign currency translation adjustment | 9,893 | (3,942) | (2,366) | (52,933) |
| Other comprehensive income (loss) | 466,176 | (35,526) | 442,205 | (547,808) |
| Comprehensive income | $719,481 | $218,247 | $909,234 | $665,214 |

The following table summarizes the components of accumulated other comprehensive income (loss) (in thousands):

|  | December 31, 2004 | September 30, 2005 |
|---|---|---|
| Unrealized gains (losses) on available-for-sale securities, net of tax | $475,314 | $(19,561) |
| Cumulative foreign currency translation adjustment | 60,422 | 7,489 |
| Accumulated other comprehensive income (loss) | $535,736 | $(12,072) |

12

**RISK FACTORS**

*We face significant competition from companies such as Time Warner's AOL, Google and Microsoft.*

We face significant competition from companies, including AOL, Google, and Microsoft that have combined a variety of services under one brand name in a manner similar to Yahoo!. AOL has access to content from Time Warner's movie, television, music, book, periodical, news, sports and other media holdings; access to a network of cable and other broadband users and delivery technologies; and considerable resources for future growth and expansion. Google, in addition to a Web search service, offers many other services that directly compete with our services, including a consumer email service, desktop search, local search, photos, maps, shopping services and Internet advertising solutions. Microsoft has introduced its own Web search service and has announced plans to develop features that may make Web searching capabilities a more integrated part of its Windows operating system. We expect these competitors increasingly to use their financial and engineering resources to compete with us, individually, and potentially in combination with each other. In certain of these cases, most notably AOL, our competition has a direct billing relationship with a greater number of their users through Internet access and other services than we have with our users through our premium services. This relationship may permit these competitors to be more effective than us in targeting services and advertisements to the specific preferences of their users thereby giving them a competitive advantage. If our competitors are more successful than we are in attracting users and customers, our revenues could decline.

*We also face competition from other Internet service providers, including destination websites and Internet access providers.*

We also compete for customers and users with many other providers of online services, including online navigation, Web search, commercial search, information, entertainment, recruiting, community, electronic commerce and Internet access services. Some of our competitors in specific areas, particularly in specific vertical markets or commerce services, such as shopping, auctions or travel, may have longer operating histories in the market, larger customer or user bases, and more brand recognition in the specific market.

Our users must access our services through an Internet access provider, including wireless providers and providers of cable and DSL Internet access. To the extent that an access provider or a telephone, computer or computing device manufacturer offers online services that are competitive with those of Yahoo!, the user may find it more convenient to use the services or properties of that access provider or manufacturer. In addition, the access provider or manufacturer may make it difficult to access our services by not listing them in the access provider's or manufacturer's own directory or by providing Yahoo! with less prominent listings than the access provider, manufacturer, or a competitor's offerings. Further, through their direct billing relationship with users, access providers may be better able to target services and advertisements to the preferences of their users.

In addition, smaller competitors may consolidate with larger competitors or with each other and become more competitive. New competitors may also enter the market. If our competitors are more successful than we are in attracting and retaining customers and users, then our revenues could decline.

*We face competition from other providers of sponsored search advertising services which could affect our operating results.*

We compete directly with other providers of sponsored search advertising services, including MIVA (formerly FindWhat.com), Google, LookSmart, Ltd., and Lycos Inc. In addition, we believe it is likely that there will be additional entrants to this advertising market. Some of the existing competitors and possible additional entrants may have greater operational, strategic, financial, personnel or other resources than we do, as well as greater brand recognition. These competitors compete against us for affiliate arrangements and could cause us to have to enter into affiliate arrangements with less favorable terms, to lose current affiliates or to fail to acquire new affiliates. The loss of affiliates or a reduction in the revenue from affiliate arrangements could harm our business, operating results, and cash flows from operations.

*We face significant competition from traditional media companies which could affect our operating results .*

We also compete with traditional media companies for advertising. Most advertisers currently spend only a small portion of their advertising budgets on Internet advertising. If we fail to persuade existing advertisers to retain and increase their spending with us and if we fail to persuade new advertisers to spend a portion of their budget on advertising with us, our business and revenues could be adversely affected.

*If we are unable to provide search technologies and services which generate significant traffic to our websites, our business could be harmed, causing our revenues to decline.*

31

We have deployed our own Web search technology to provide Web search results on our network.  We have more limited experience in operating our own search service than do some of our competitors.  Web search is characterized by rapidly changing technology, significant competition, evolving industry standards, and frequent product and service enhancements.  We must continually invest in improving our users' experience, including search relevance, speed, and services responsive to their needs and preferences to continue to attract, retain and expand our user base.  If we are unable to provide search technologies and services which generate significant traffic to our websites, our business could be harmed, causing our revenues to decline.

***The majority of our revenues are derived from marketing services and the reduction in spending by or loss of current or potential customers would cause our revenues to decline.***

For the third quarter of 2005, 87 percent of our total revenues came from marketing services.  Our ability to continue to retain and grow marketing services revenue depends upon:

- growing our user base;

- broadening our relationships with advertisers to small and medium size businesses;

- attracting advertisers to our user base;

- increasing demand for our marketing services by advertisers, users and businesses, including prices paid by advertisers, the number of searches performed by users and the rate at which users click-through to commercial search results;

- maintaining our affiliate program for our sponsored search offerings;

- deriving better demographic and other information from our users; and

- driving continued acceptance of the Web by advertisers as an advertising medium.

In the majority of cases, our agreements with advertisers have terms of one year or less, or, in the case of our sponsored search advertising services, may be terminated at any time by the advertiser.  Sponsored search agreements often have payments contingent on usage or click-through levels.  Accordingly, it is difficult to forecast marketing services revenues accurately.  However, our expense levels are based in part on expectations of future revenues, include guaranteed minimum payments to our affiliates in connection with our sponsored search advertising services, and are fixed over the short-term with respect to certain categories.  Any reduction in spending by or loss of existing or potential future customers would cause our revenues to decline.  Further, we may be unable to adjust spending quickly enough to compensate for any unexpected revenue shortfall.

***In certain markets we depend on a limited number of sources to direct a significant percentage of users and businesses to our service to conduct searches and a loss of any of these sources could harm our operating results.***

A significant percentage of users and businesses that conduct searches using our sponsored search service, come from a limited number of sources in certain markets.  In addition to the Yahoo! Network, sources for users conducting searches are members of our affiliate network, including portals, browsers, and other affiliates.  Our agreements with affiliates vary in duration, and depending on the agreement, provide varying levels of discretion to the affiliate in the implementation of the sponsored search service, including the degree to which affiliates can modify the presentation of the search results on their websites or integrate the sponsored search services with their own services.  The agreements may be terminable upon the occurrence of certain events, including failure to meet certain service levels, material breaches of agreement terms, changes in control or in some instances, at will.  We may not be successful in renewing our affiliate agreements on as favorable terms or at all.  The loss of affiliates providing significant users or businesses or an adverse change in implementation of the sponsored search service by any of these affiliates could harm our ability to generate revenue, our operating results, and cash flows from operations.

***Some of our shared revenue arrangements may not generate anticipated revenues.***

We typically receive co-branded revenue through revenue sharing arrangements and sponsorship fees or a portion of transactions revenue in return for minimum levels of user impressions to be provided by us.  These arrangements expose us to potentially significant financial risks in the event our usage levels decrease, including the following:

- the revenue we are entitled to receive may be adjusted downwards;

- we may be required to "make good" on our obligations by providing additional advertising or alternative services;

- the sponsors or co-brand services may not renew the arrangements or may renew at lower rates; and

- the arrangements may not generate anticipated levels of shared transactions revenue, or sponsors may default on the payment commitments in such agreements as has occurred in the past.

Accordingly, any leveling off or decrease of our user base (or usage by our existing base) or the failure to generate anticipated levels of shared transactions revenue could result in a significant decrease in our revenues.

### Decreases or delays in advertising spending by our advertisers due to general economic conditions could harm our ability to generate advertising revenue.

Expenditures by advertisers tend to be cyclical, reflecting overall economic conditions and budgeting and buying patterns.  Since we derive the majority of our revenues from advertising, any decreases in or delays in advertising spending due to general economic conditions could reduce our revenues or negatively impact our ability to grow our revenues.

### Financial results for any particular period will not predict results for future periods.

There can be no assurance that the purchasing pattern of customers advertising on the Yahoo! Network will not fluctuate, that advertisers will not make smaller and shorter-term purchases, or that market prices for online advertising will not decrease due to competitive or other factors.  In addition, there can be no assurance that the volume of searches conducted, the amounts bid by advertisers for search listings or the number of advertisers that bid on our sponsored search service will not vary widely from period to period.  As revenues from new sources increase, it may become more difficult to predict our financial results based on historical performance.  You should not rely on the results for any period as an indication of future performance.

### We may not be able to generate substantial revenues from our alliances with Internet access providers.

Through alliances with Internet access providers, we offer access services that combine customized content and services from Yahoo! (including browser and other communications services) and Internet access from the third party access providers.  We may not be able to retain the alliances with our existing Internet access providers or to obtain new alliances with Internet access providers on terms that are reasonable.  In addition, these Internet access services compete with many large companies such as AOL, MSN, Comcast Corporation and other established Internet access providers.  In certain of these cases, our competition has substantially greater market presence (including an existing user base) and greater financial, technical, marketing or other resources.  As a result of these and other competitive factors, the Internet access providers with which we have formed alliances, may not be able to attract, grow or retain their customer bases, which would negatively impact our ability to sell customized content and services through this channel and, in turn, reduce our anticipated revenues from our alliances.

### We have dedicated considerable resources to provide a variety of premium services, which may not prove to be successful in generating significant revenue for us.

We offer fee-based enhancements to many of our free services, including email, personals, finance, games, music, and sports.  The development cycles for these technologies are long and generally require significant investment by us.  We have previously discontinued certain non-profitable premium services.  We must however continue to provide new services that are compelling to our users while continuing to develop an effective method for generating revenues for such services.  If we cannot generate revenues from these services that are greater than the cost of providing such services, our operating results could be harmed.

### We expect our operating expenses to continue to increase as we attempt to expand the Yahoo! brand, fund product development, develop media properties and acquire other businesses which could harm our operating results.

We currently expect that our operating expenses will continue to increase as we expand our operations in areas of expected growth, continue to develop and extend the Yahoo! brand, fund greater levels of product development, develop and commercialize additional media properties and premium services, and acquire and integrate complementary businesses and technologies.  If our expenses increase at a greater pace than our revenues, our operating results could be harmed.

### If we are unable to license or acquire compelling content at reasonable costs or if we do not develop compelling content, the number of users of our services may not grow as anticipated which could harm our operating results.

Our future success depends in part upon our ability to aggregate compelling content and deliver that content through our online properties.  We license much of the content on our online properties, such as news items, stock quotes, weather reports, maps and audio and video content from third parties.  We have been providing increasing amounts of audio and video content to our users

and we believe that users will increasingly demand high-quality audio and video content, such as the broadcast of music, film content, speeches, news footage, concerts and other special events. Such content may require us to make substantial payments to third parties from whom we license or acquire such content. For example, our music and entertainment properties rely on major sports organizations, radio and television stations, record labels, cable networks, businesses, colleges and universities, film producers and distributors, and other organizations for a large portion of the content available on our properties. Our ability to maintain and build relationships with third-party content providers will be critical to our success. In addition, as new methods for accessing the Web become available, including through alternative devices, we may need to enter into amended content agreements with existing third-party content providers to cover the new devices. Also, to the extent that Yahoo! develops content of its own, Yahoo!'s current and potential third-party content providers may view our services as competitive with their own and this may adversely affect their willingness to contract with us. We may be unable to enter into new, or preserve existing, relationships with the third parties whose content we seek to obtain. In addition, as competition for compelling content increases both domestically and internationally, our content providers may increase the prices at which they offer their content to us and potential content providers may not offer their content on terms agreeable to us. An increase in the prices charged to us by third-party content providers could harm our operating results and financial condition. Further, many of our content licenses with third parties are non-exclusive. Accordingly, other webcasters and other media such as radio or television may be able to offer similar or identical content. This increases the importance of our ability to deliver compelling editorial content and personalization of this content for users in order to differentiate Yahoo! from other businesses. If we are unable to license or acquire compelling content at reasonable prices, if other companies broadcast content that is similar to or the same as that provided by Yahoo!, or if we do not develop compelling editorial content or personalization services, the number of users of our services may not grow at all or may grow at a slower rate than anticipated, which could harm our operating results.

***Our intellectual property rights are valuable and any inability to protect them could reduce the value of our brand image and harm our business and our operating results.***

We regard our copyrights, patents, trademarks, trade dress, trade secrets, and similar intellectual property, including our rights to certain domain names, as important to Yahoo!'s brand and success. The efforts we have taken to protect our proprietary rights may not be sufficient or effective at stopping any unauthorized use of our proprietary rights. In addition, effective trademark, patent, copyright, and trade secret protection may not be available or cost-effective in every country in which our products and media properties are distributed or made available through the Internet. Further, while we attempt to ensure that the quality of our brand is maintained by our licensees, our licensees may take actions that could impair the value of our brand, our proprietary rights or the reputation of our products and media properties. We are aware that third parties have, from time to time, copied significant content available on Yahoo! for use in competitive Internet services. Protection of the distinctive elements of Yahoo! may not be available under copyright law. If we are unable to protect our proprietary rights from unauthorized use, the value of our brand image may be reduced. Any impairment of our brand could negatively impact our business. In addition, protecting our intellectual property and other proprietary rights is expensive and time consuming. Any increase in the unauthorized use of our intellectual property could make it more expensive to do business and consequently harm our operating results.

***We rely on the value of the Yahoo! brand, and a failure to maintain or enhance the Yahoo! brand in a cost effective manner could harm our operating results.***

We believe that maintaining and enhancing the Yahoo! brand is an important aspect of our efforts to attract and expand our user and advertiser base. We also believe that the importance of brand recognition will increase due to the relatively low barriers to entry. We have spent considerable money and resources to date on the establishment and maintenance of the Yahoo! brands. We will therefore need to spend increasing amounts of money on, and devote greater resources to advertising, marketing and other brand-building efforts to preserve and enhance consumer awareness of the Yahoo! brands. We may not be able to successfully maintain or enhance consumer awareness of the Yahoo! brands and, even if we are successful in our branding efforts, these efforts may not be cost-effective. If we are unable to maintain or enhance customer awareness of the Yahoo! brands in a cost effective manner, our business, operating results and financial condition would be harmed.

***We are, and may in the future be, subject to intellectual property infringement claims, which are costly to defend, could result in damage awards, and could limit our ability to provide certain content or use certain technologies in the future.***

Internet, technology, media companies and patent holding companies often possess a significant number of patents. Further, many of these companies and other parties are actively developing or purchasing search, indexing, electronic commerce and other Web-related technologies, as well as a variety of online business models and methods. We believe that these parties will continue to take steps to protect these technologies, including, but not limited to, seeking patent protection. As a result, disputes regarding the ownership of technologies and rights associated with online business are likely to continue to arise in the future. From time to time, parties assert patent infringement claims against us. Currently, we are engaged in several lawsuits regarding patent issues and have been notified of a number of other potential disputes.

In addition to patent claims, third parties have asserted, and are likely in the future to assert, claims against us alleging infringement of copyrights, trademark rights, trade secret rights or other proprietary rights, or alleging unfair competition or violations of privacy rights or failure to maintain confidentiality of user data.  Currently, our subsidiary LAUNCH Media, Inc. ("LAUNCH") is engaged in a lawsuit regarding copyright issues that commenced prior to our acquisition of LAUNCH.  In addition, Overture is in litigation involving claims that allowing advertisers to bid on certain search terms and Overture's display of search results triggered by those search terms constitutes trademark infringement.  A court in France recently held Overture SARL and Overture liable for displaying search results triggered by certain trademarked keywords.

As we expand our business and develop new technologies, products and services, we may become increasingly subject to intellectual property infringement claims.  In the event that there is a determination that we have infringed third-party proprietary rights such as patents, copyrights, trademark rights, trade secret rights or other third party rights such as publicity and privacy rights, we could incur substantial monetary liability, be required to enter into costly royalty or licensing agreements or be prevented from using the rights, which could require us to change our business practices in the future and limit our ability to compete effectively.  We may also incur substantial expenses in defending against third-party infringement claims regardless of the merit of such claims.  In addition, many of our agreements with our customers or affiliates require us to indemnify them for certain third-party intellectual property infringement claims, which could increase our costs in defending such claims and our damages.  The occurrence of any of these results could harm our brand and negatively impact our operating results.

***Acquisitions could result in operating difficulties and unanticipated liabilities.***

We have made acquisitions in the past including Overture in October 2003, Kelkoo in April 2004 and Musicmatch in October 2004 and expect to enter into additional business combinations and acquisitions in the future.  Acquisitions may result in dilutive issuances of equity securities, use of our cash resources, incurrence of debt and amortization of expenses related to intangible assets.  Our acquisitions to date were accompanied by a number of risks, including:

- the difficulty of assimilating the operations and personnel of our acquired companies into our operations;

- the potential disruption of our ongoing business and distraction of management;

- the difficulty of integrating acquired technology and rights into our services and unanticipated expenses related to such integration;

- the failure to successfully further develop acquired technology resulting in the impairment of amounts currently capitalized as intangible assets;

- the potential for patent and trademark infringement claims against the acquired company;

- the impairment of relationships with customers and partners of the acquired companies or our customers and partners as a result of the integration of acquired operations;

- the impairment of relationships with employees of the acquired companies or our employees as a result of integration of new management personnel;

- the difficulty of integrating the acquired company's accounting, management information, human resources and other administrative systems;

- in the case of foreign acquisitions, uncertainty regarding foreign laws and regulations and difficulty integrating operations and systems as a result of cultural, systems and operational differences; and

- the impact of known potential liabilities or unknown liabilities associated with the acquired companies.

We are likely to experience similar risks in connection with our future acquisitions.  Our failure to be successful in addressing these risks or other problems encountered in connection with our past or future acquisitions could cause us to fail to realize the anticipated benefits of our acquisitions, incur unanticipated liabilities and harm our business generally.

***Our failure to manage growth and diversification of our business could harm us.***

We are continuing to grow and diversify our business both in the United States and internationally.  As a result, we must expand and adapt our operational infrastructure and increase the number of our personnel in certain areas.  Our business relies on our data

systems, billing systems for our fee based and other services, and other operational and financial reporting and control systems. All of these systems have become increasingly complex in the recent past due to the growing diversification and complexity of our business and to acquisitions of new businesses with different systems. To effectively manage this growth, we will need to continue to upgrade and improve our data systems, billing systems, and other operational and financial systems, procedures and controls. In particular, as our premium and other services for which we bill users grow, any failure of our billing systems to accommodate the increasing number of transactions and accurately bill users could adversely affect our business and ability to collect revenue. These upgrades and improvements will require a dedication of resources and in some cases are likely to be complex. If we are unable to adapt our systems in a timely manner to accommodate our growth, our business may be adversely affected.

Additionally, we have experienced recent growth in personnel numbers and expect to continue to hire additional personnel in selected areas. This growth requires significant time and resource commitments from our senior management. Further, as a result of recent acquisitions and international expansion, more than one-half of our employees are based outside of our Sunnyvale, California headquarters. If we are unable to effectively manage a large and geographically dispersed group of employees or to anticipate our future growth and personnel needs, our business may be adversely affected.

### If we are unable to retain our existing senior management and key personnel and hire new highly skilled personnel, we may not be able to execute our business plan.

We are substantially dependent on the continued services of our senior management, including our two founders, our chief executive officer, chief financial officer, chief operating officer, chief technical officer, and our executive and senior vice presidents. These individuals have acquired specialized knowledge and skills with respect to Yahoo! and its operations. The loss of any of these individuals could harm our business. Our business is also dependent on our ability to retain, hire and motivate talented, highly skilled personnel. The competition for such highly skilled personnel can be intense, particularly in the San Francisco Bay Area, where our corporate headquarters is located. Many of our management and key personnel have reached or will soon reach the four-year anniversary of their Yahoo! hiring date and, as a result, have become or will shortly become fully vested in their initial stock option grants. Although employees receive additional grants, an employee may be more likely to leave Yahoo! upon completion of the vesting period for the initial option grant which is generally the largest option grant an employee receives. If we do not succeed in retaining and motivating our existing key employees and attracting new key personnel, we may be unable to meet our business plan and as a result our stock price may decline.

### More individuals are utilizing non-PC devices to access the Internet, and versions of our service developed or optimized for these devices may not gain widespread adoption by users of such devices.

The number of individuals who access the Internet through devices other than a personal computer, such as personal digital assistants, mobile telephones and television set-top devices, has increased dramatically. Our services were originally designed for rich, graphical environments such as those available on desktop and laptop computers. The lower resolution, functionality and memory associated with alternative devices currently available may make the use of our services through such devices difficult, and the versions of our service developed for these devices may not be compelling to users of alternative devices. As we have limited experience to date in operating versions of our service developed or optimized for users of alternative devices, and as new devices and new platforms are continually being released, it is difficult to predict the problems we may encounter in doing so, and we may need to devote significant resources to the creation, support and maintenance of such versions. If we are unable to attract and retain a substantial number of alternative device users to our online services, we may fail to capture a sufficient share of an increasingly important portion of the market for online services and may fail to attract advertisers.

### We may be required to record a significant charge to earnings if our goodwill or amortizable intangible assets become impaired.

We are required under generally accepted accounting principles to review our amortizable intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Goodwill is required to be tested for impairment at least annually. Factors that may be considered a change in circumstances indicating that the carrying value of our amortizable intangible assets may not be recoverable include a decline in stock price and market capitalization, and slower growth rates in our industry. We may be required to record a significant charge to earnings in our consolidated financial statements during the period in which any impairment of our goodwill or amortizable intangible assets is determined. This may adversely impact our results of operations. As of September 30, 2005, our goodwill and amortizable intangible assets were $3.0 billion.

### We plan to expand operations in international markets in which we may have limited experience or rely on business partners, and in which we are faced with relatively higher costs.

36

We plan to expand Yahoo! branded online properties and search offerings in international markets. We have currently developed, through joint ventures, subsidiaries and branch offices, localized offerings in over 20 countries outside of the United States. As we expand to new international markets, we will have only limited experience in marketing and operating our products and services in such markets and we may rely on the efforts and abilities of foreign business partners in such markets. We have experienced and expect to continue to experience higher costs as a percentage of revenues in connection with the development and maintenance of our international online properties relative to our domestic experience. Certain international markets may be slower than domestic markets in adopting the Internet as an advertising and commerce medium and so our operations in international markets may not develop at a rate that supports our level of investment.

***In international markets we compete with local Internet service providers that may have competitive advantages.***

In a number of international markets, especially those in Asia, Europe, and Latin America, we face substantial competition from local Internet service providers and other portals that offer search, communications and other commercial services. Many of these companies have a dominant market share in their territories and are owned by local telecommunications providers which give them a competitive advantage. Local providers of competing online services may also have a substantial advantage over us in attracting users in their country due to more established branding in that country, greater knowledge with respect to the tastes and preferences of users residing in that country and/or their focus on a single market. Further, the local providers may have greater regulatory and operational flexibility than Yahoo! due to the fact that we are subject to both domestic and foreign regulatory requirements. We must continue to improve our local offerings, become more knowledgeable about our local users and their preferences, deepen our relationships with our local users as well as increase our branding and other marketing activities in order to remain competitive and strengthen our international market position.

***Our international operations are subject to increased risks which could harm our business, operating results and financial condition.***

In addition to uncertainty about our ability to continue to generate revenues from our foreign operations and expand our international market position, there are certain risks inherent in doing business internationally, including:

- trade barriers and changes in trade regulations;

- difficulties in developing, staffing and simultaneously managing a large number of varying foreign operations as a result of distance, language and cultural differences;

- stringent local labor laws and regulations;

- longer payment cycles;

- currency exchange rate fluctuations;

- political or social unrest or economic instability;

- import or export restrictions;

- seasonal volatility in business activity;

- risks related to government regulation including those more fully described below; and

- potentially adverse tax consequences.

One or more of these factors could harm our future international operations and consequently, could harm our business, operating results, and financial condition.

***We are subject to U.S. and foreign government regulation of the Internet and Voice over Internet Protocol which could subject us to claims and remedies including monetary liabilities and limitations on our business practices.***

We are subject to regulations and laws directly applicable to providers of Internet and Voice over Internet Protocol services both domestically and internationally. The application of existing domestic and international laws and regulations to Yahoo! relating to issues such as user privacy and data protection, defamation, pricing, advertising, taxation, gambling, sweepstakes, promotions, financial market regulation, consumer protection, content regulation, quality of services, telecommunications and intellectual

property ownership and infringement in many instances is unclear or unsettled. In addition, we will also be subject to any new laws and regulations directly applicable to our activities. Further, the application of existing laws to Yahoo! or our subsidiaries regulating or requiring licenses for certain businesses of our advertisers including, for example, distribution of pharmaceuticals, alcohol, adult content, tobacco or firearms, as well as insurance and securities brokerage and legal services, can be unclear. Internationally, we may also be subject to foreign laws and regulations that are inconsistent from country to country. We may incur substantial liabilities for expenses necessary to comply with these laws and regulations or penalties for any failure to comply. Compliance with these laws and regulations may also cause us to change or limit our business practices in a manner adverse to our business.

A number of federal laws, including those referenced below, impact our business. The Digital Millennium Copyright Act ("DMCA") is intended, in part, to limit the liability of eligible online service providers for listing or linking to third-party Websites that include materials that infringe copyrights or other rights of others. Portions of the Communications Decency Act ("CDA") are intended to provide statutory protections to online service providers who distribute third party content. Yahoo! relies on the protections provided by both the DMCA and CDA in conducting its business. Any changes in these laws or judicial interpretations narrowing their protections will subject us to greater risk of liability and may increase our costs of compliance with these regulations or limit our ability to operate certain lines of business. The Children's Online Protection Act and the Children's Online Privacy Protection Act are intended to restrict the distribution of certain materials deemed harmful to children and impose additional restrictions on the ability of online services to collect user information from minors. In addition, the Protection of Children From Sexual Predators Act of 1998 requires online service providers to report evidence of violations of federal child pornography laws under certain circumstances. The costs of compliance with these regulations may increase in the future as a result of changes in the regulations or the interpretation of them. Further, any failures on our part to comply with these regulations may subject us to significant liabilities.

There are federal, state and international laws regarding privacy and protection of user data. We post, on our website, our privacy policies and practices concerning the use and disclosure of user data. Any failure by us to comply with our posted privacy policies, any consent orders from time to time entered into by us, Federal Trade Commission requirements or other federal, state or international privacy-related laws and regulations could result in proceedings against us by governmental entities or others which could potentially have an adverse effect on our business, results of operations and financial condition. In this regard, there are a large number of legislative proposals before the United States Congress and various state legislative bodies regarding privacy issues related to our business. It is not possible to predict whether or when such legislation may be adopted, and certain proposals, if adopted, could impose requirements which may result in a decrease in our user registrations and revenues. In addition, the interpretation and application of user data protection laws in Europe and other international jurisdictions is unclear and in a state of flux. There is a risk that these laws may be interpreted and applied inconsistently from country to country and with our current data protection practices. Complying with these varying international requirements could cause us to incur substantial costs or require us to change our business practices. Further, any failure by us to protect users' privacy and data could result in a loss of user confidence in our services and ultimately in a loss of users which could adversely affect our business.

***We may be subject to legal liability for online services.***

We host a wide variety of services that enable individuals and businesses to exchange information, generate content, advertise products and services, conduct business and engage in various online activities on an international basis. The law relating to the liability of providers of these online services for activities of their users is currently unsettled both within the United States and internationally. Claims have been threatened and have been brought against us for defamation, negligence, copyright or trademark infringement, unlawful activity, tort, including personal injury, fraud, or other theories based on the nature and content of information that we provide links to or that may be posted online or generated by our users or with respect to auctioned materials. In addition, Yahoo! was the subject of a claim brought by certain entities in a French court regarding, among other things, the availability of certain content within our services which was alleged to violate French law. We may be subject to similar actions in domestic or other international jurisdictions in the future. Our defense of any such actions could be costly and involve significant time and attention of our management and other resources.

We also periodically enter into arrangements to offer third-party products, services, or content under the Yahoo! brand or via distribution on various Yahoo! properties, including stock quotes and trading information. We may be subject to claims concerning these products, services or content by virtue of our involvement in marketing, branding, broadcasting or providing access to them, even if we do not ourselves host, operate, provide, or provide access to these products, services or content. While our agreements with respect to these products, services and content, often provide that we will be indemnified against such liabilities, the ability to receive such indemnification depends on the financial resources of the other party to the agreement and any amounts received may not be adequate to cover our liabilities.

It is also possible that, if any information provided directly by us contains errors or is otherwise negligently provided to users, third parties could make claims against us. For example, we offer Web-based email services, which expose us to potential risks,

such as liabilities or claims resulting from unsolicited email, lost or misdirected messages, illegal or fraudulent use of email, or interruptions or delays in email service. Investigating and defending any of these types of claims is expensive, even to the extent that the claims are without merit or do not ultimately result in liability.

***We may have difficulty scaling and adapting our existing technology architecture to accommodate increased traffic and technology advances or customer requirements.***

Yahoo! is one of the most highly trafficked Websites on the Internet and is regularly serving an increased number of users and delivering an increased number of daily page views and search results. For example, the usage levels of email and the number and complexity of our sponsored search offerings have increased. In addition, the products and services offered by Yahoo! have expanded and changed significantly and are expected to continue to expand and change rapidly in the future. There is also an increased use of rich media content such as audio and video. Rapid increases in the levels or types of use of our online properties and services could result in delays or interruptions in our service. In particular, the technology architectures utilized for our services are highly complex and may not provide satisfactory support in the future, as usage increases and products and services expand, change and become more complex. In the future, we may be required to make significant changes to our architectures, including moving to completely new architectures. If we are required to switch architectures, we may incur substantial costs and experience delays or interruptions in our service. These delays or interruptions in our service may cause users and customers to become dissatisfied with our service and move to competing providers of online services. Further, to the extent that demands for our services increase, we will need to expand our infrastructure, including the capacity of our hardware servers and the sophistication of our software. This expansion is likely to be expensive and complex, and require additional technical expertise. As we acquire users who rely upon us for a wide variety of services, it becomes more technologically complex and costly to retrieve, store and integrate data that will enable us to track each user's preferences. Any difficulties experienced in adapting our architectures and infrastructure to accommodate increased traffic, to store user data and track user preferences, together with the associated costs and potential loss of traffic, could harm our operating results, cash flows from operations and financial condition.

***We may not be successful in expanding the number of users of our e-commerce offerings which could result in a decline in our revenues.***

The success of our e-commerce offerings depends on our ability to generate traffic to Yahoo! Shopping and similar services and the rate at which users either purchase products or click through to search results. The revenue that we derive from Yahoo! Shopping and related services is typically in the form of lead-based fees, where retailers pay a fee based on the number of times a user clicks on a link to their site, transaction fees, and advertising fees. Users who had a favorable buying experience with a particular retailer may contact that retailer directly for future purchases rather than through our services. Competing providers of e-commerce offerings, including retailers with whom we have relationships, may provide a more convenient and comprehensive online customer experience due to their singular focus on e-commerce. Retailers may also establish exclusive relationships with our competitors. If our users bypass our e-commerce offerings and related services and contact competing providers or retailers directly, our revenue could decline.

***New technologies could block our ads, which would harm our operating results.***

Technologies have been developed and are likely to continue to be developed that can block the display of our ads. Most of our revenues are derived from fees paid to us by advertisers in connection with the display of ads on web pages. As a result, ad-blocking technology could, reduce the number of ads that we are able to deliver and, in turn, our advertising revenues.

***We rely on third party providers for our principal Internet connections and technologies, databases and services critical to our properties and services and any errors, failures or disruption in the services provided by these third parties could significantly harm our business and operating results.***

We rely on private third-party providers for our principal Internet connections, co-location of a significant portion of our data servers and network access. Any disruption, from natural disasters, technology malfunctions, sabotage or other factors, in the Internet or network access or co-location services provided by these third-party providers or any failure of these third-party providers to handle current or higher volumes of use could significantly harm our business, operating results and financial condition. We have little control over these third-party providers which increases our vulnerability to disruptions or problems with their services. Any financial difficulties experienced by our providers may have negative effects on our business, the nature and extent of which we cannot predict. We license technology and related databases from third parties for certain elements of our properties, including, among others, technology underlying the delivery of news, stock quotes and current financial information, chat services, street mapping and telephone listings, streaming capabilities and similar services. We have experienced and expect to continue to experience interruptions and delays in service and availability for such elements. We also rely on a third-party provider for key components of our email service. Furthermore, we depend on hardware and software suppliers for prompt delivery, installation and service of servers and other equipment to deliver our services. Any errors, failures, interruptions, or

delays experienced in connection with these third-party technologies and information services could negatively impact our relationship with users and adversely affect our brand, our business and operating results.

***We rely on distribution agreements and relationships with various third parties and any failure to obtain or maintain such distribution relationships on reasonable terms could impair our ability to fully execute our business plan.***

In addition to our relationships with Internet access providers, to increase traffic for our offerings and make them more available and attractive to advertisers and users, we have certain distribution agreements and informal relationships with operators of online networks and leading Websites, software companies, electronics companies, and computer manufacturers. Depending on the distributor and the agreement, these distribution arrangements may not be exclusive and may only have a short term. Some of our distributors, particularly distributors who are also competitors or potential competitors, may not renew their distribution agreements with us. In addition, as new methods for accessing the Web become available, including through alternative devices, we may need to enter into amended distributions agreements with existing distributors to cover the new devices and agreements with additional distributors. In the future, existing and potential distributors may not offer distribution of our properties and services to us on reasonable terms, or at all. If we fail to obtain distribution or to obtain distribution on terms that are reasonable, we may not be able to fully execute our business plan.

***We rely on third party providers of streaming media products to broadcast streaming audio and video content to our users and any change in the licensing terms, costs or user acceptance of these products could adversely affect our business.***

We rely on leading providers of streaming media products to license the software necessary to broadcast streaming audio and video content to our users. There can be no assurance that these providers will continue to license these products to us on reasonable terms, or at all. Our users are currently able to electronically download copies of the software to play streaming media free of charge, but providers of streaming media products may begin charging users for copies of their player software or otherwise change their business model in a manner that slows the widespread acceptance of these products. In order for our rich media services to be successful, there must be a large base of users of these streaming media products. We have limited or no control over the availability or acceptance of streaming media software, and to the extent that any of these circumstances occur, our business may be adversely affected.

***If we fail to detect click-through spam, we could lose the confidence of our advertisers, thereby causing a loss of advertisers and revenue.***

We are exposed to the risk of clicks on our ads by persons seeking to increase the fees paid by our advertisers. Click-through spam occurs when a click is generated on one of our advertiser's listings displayed on a website in order to generate a payment rather than to view the underlying content. If this activity occurs and we are unable to stop it, we will have to provide refunds of revenue that our advertisers have paid to us and that was later attributed to click-through spam. These types of activities could damage our brand. If click-through spam is not detected, the affected advertisers may perceive a reduced return on their investment in our advertising programs because those clicks will not lead to potential revenue for the advertisers. This could lead the advertisers to become dissatisfied with our advertising programs, which could lead to loss of advertisers and revenue.

***Interruptions, delays or failures in the provision of our services could damage our brand and harm our operating results.***

Our operations are susceptible to outages due to fire, floods, power loss, telecommunications failures, terrorist attacks and similar events. In addition, a significant portion of our network infrastructure is located in Northern California, an area subject to earthquakes. Despite our implementation of network security measures, our servers are vulnerable to computer viruses, worms, physical and electronic break-ins, sabotage and similar disruptions from unauthorized tampering with our computer systems. For example, we are vulnerable to coordinated attempts to overload our systems with data, resulting in denial or reduction of service to some or all of our users for a period of time. We have experienced a coordinated denial of service attack in the past, and may experience such attempts in the future. We do not have multiple site capacity for all of our services and some of our systems are not fully redundant in the event of any such occurrence. In an effort to reduce the likelihood of a geographical or other disaster impacting our business, we have distributed and intend to continue distributing our servers among additional data centers located around the world. Failure to execute these changes properly or in a timely manner could result in delays or interruptions to our service, which could result in a loss of users and damage to our brand. We may not carry sufficient business interruption insurance to compensate us for losses that may occur as a result of any events which cause interruptions in our service.

***Our stock price has been volatile historically and may continue to be volatile regardless of our operating performance.***

The trading price of our common stock has been and may continue to be subject to wide fluctuations. During the third quarter of 2005, the closing sale prices of our common stock on the Nasdaq ranged from $31.97 to $37.73 per share and the closing sale price on November 1, 2005 was $37.72 per share. Our stock price may fluctuate in response to a number of events and factors,

such as quarterly variations in operating results; announcements of technological innovations or new services and media properties by us or our competitors; changes in financial estimates and recommendations by securities analysts; the operating and stock price performance of other companies that investors may deem comparable to us; the operating performance and stock price of companies in which we have an equity investment, including Yahoo! Japan; and news reports relating to trends in our markets or general economic conditions.

In addition, the stock market in general, and the market prices for Internet-related companies in particular, have experienced volatility that often has been unrelated to the operating performance of such companies. These broad market and industry fluctuations may adversely affect the price of our stock, regardless of our operating performance. Additionally, volatility or a lack of positive performance in our stock price may adversely affect our ability to retain key employees, all of whom have been granted stock options.

### Anti-takeover provisions could make it more difficult for a third party to acquire us.

We have adopted a stockholder rights plan and initially declared a dividend distribution of one right for each outstanding share of common stock to stockholders of record as of March 20, 2001. As a result of our two-for-one stock split effective May 11, 2004, each share of common stock is now associated with one-half of one right. Each right entitles the holder to purchase one unit consisting of one one-thousandth of a share of our Series A Junior Participating Preferred Stock for $250 per unit. Under certain circumstances, if a person or group acquires 15 percent or more of our outstanding common stock, holders of the rights (other than the person or group triggering their exercise) will be able to purchase, in exchange for the $250 exercise price, shares of our common stock or of any company into which we are merged having a value of $500. The rights expire on March 1, 2011, unless extended by our Board of Directors. Because the rights may substantially dilute the stock ownership of a person or group attempting to take us over without the approval of our Board of Directors, our rights plan could make it more difficult for a third party to acquire us (or a significant percentage of our outstanding capital stock) without first negotiating with our Board of Directors regarding that acquisition.

In addition, our Board of Directors has the authority to issue up to 10,000,000 shares of Preferred Stock (of which 2,000,000 shares have been designated as Series A Junior Participating Preferred Stock) and to determine the price, rights, preferences, privileges and restrictions, including voting rights, of those shares without any further vote or action by the stockholders.

The rights of the holders of our common stock may be subject to, and may be adversely affected by, the rights of the holders of any Preferred Stock that may be issued in the future. The issuance of Preferred Stock may have the effect of delaying, deterring or preventing a change of control of Yahoo! without further action by the stockholders and may adversely affect the voting and other rights of the holders of our common stock. Further, certain provisions of our charter documents, including provisions eliminating the ability of stockholders to take action by written consent and limiting the ability of stockholders to raise matters at a meeting of stockholders without giving advance notice, may have the effect of delaying or preventing changes in control or management of Yahoo!, which could have an adverse effect on the market price of our stock. In addition, our charter documents do not permit cumulative voting, which may make it more difficult for a third party to gain control of our Board of Directors. Further, we are subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law, which will prohibit us from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder, even if such combination is favored by a majority of stockholders, unless the business combination is approved in a prescribed manner. The application of Section 203 also could have the effect of delaying or preventing a change of control or management.

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

YAHOO! INC.

|  | By: | /s/ SUSAN DECKER |
|---|---|---|
| Dated: November 4, 2005 |  | Susan Decker |
|  |  | Executive Vice President, Finance and Administration, and Chief Financial Officer (Principal Financial Officer) |
|  | By: | /s/ MICHAEL MURRAY |
| Dated: November 4, 2005 |  | Michael Murray |
|  |  | Senior Vice President, Finance (Principal Accounting Officer) |

47

**YAHOO! INC.**
**Index to Exhibits**

| Exhibit Number | Description |
|---|---|
| 2.1 | Stock Purchase and Contribution Agreement, dated as of August 10, 2005, by and between Yahoo! Inc. and Alibaba.com Corporation (filed as Exhibit 2.1 to the Registrant's Current Report on Form 8-K, filed August 16, 2005 and incorporated herein by reference). |
| 2.2 | Amendment to the Stock Purchase and Contribution Agreement, dated as of October 24, 2005, by and between Yahoo! Inc. and Alibaba.com Corporation (filed as Exhibit 2.2 to the Registrant's Current Report on Form 8-K, filed October 27, 2005 [the October 27, 2005 Form 8-K] and incorporated herein by reference). |
| 2.3 | Tao Bao Share Purchase Agreement, dated as of October 24, 2005, by and among Yahoo! Inc., SOFTBANK CORP. and SB TB Holding Limited (filed as Exhibit 2.3 to the October 27, 2005 Form 8-K and incorporated herein by reference). |
| 2.4 | Secondary Share Purchase Agreement, dated as of October 24, 2005, by and among Yahoo! Inc. and certain shareholders of Alibaba.com (filed as Exhibit 2.4 to the October 27, 2005 Form 8-K and incorporated herein by reference). |
| 2.5 | Shareholders Agreement, dated as of October 24, 2005, by and among Alibaba.com Corporation, Yahoo! Inc., SOFTBANK CORP., the Management Members, and the other shareholders named therein (filed as Exhibit 2.5 to the October 27, 2005 Form 8-K and incorporated herein by reference). |
| 3.1 | Amended and Restated Certificate of Incorporation of Registrant (Filed as Exhibit 3.1 to the Registrant's Quarterly Report on From 10-Q for the quarter ended June 30, 2000 and incorporated herein by reference). |
| 3.2 | Amended Bylaws of Registrant (Filed as Exhibit 4.9 to the Registrant's Registration Statement on Form S-8 filed on March 5, 2002 and incorporated herein by reference). |
| 4.1 | Form of Senior Indenture (Filed as Exhibit 4.1 to the Registrant's Registration Statement on Form S-3, Registration No. 333-46458, filed September 22, 2000 [the September 22, 2000 Form S-3] and incorporated herein by reference). |
| 4.2 | Form of Subordinated Indenture (Filed as Exhibit 4.2 to the September 22, 2000 Form S-3 and incorporated herein by reference). |
| 4.3** | Form of Senior Note. |
| 4.4** | Form of Subordinated Note. |
| 4.5** | Form of Certificate of Designation for preferred stock (together with preferred stock certificate). |
| 4.6 | Form of Deposit Agreement (together with Depository Receipt) (Filed as Exhibit 4.6 to the September 22, 2000 Form S-3 and incorporated herein by reference). |
| 4.7** | Form of Warrant Agreement (together with form of Warrant Certificate). |
| 4.8 | Amended and Restated Rights Agreement, dated as of April 1, 2005, between the Registrant and Equiserve Trust Company, N.A., as Rights Agent, including the form of Rights Certificate as Exhibit B and the summary of Rights to Purchase Preferred Stock as Exhibit C (Filed as Exhibit 4.1 to the Registrant's Current Report on Form 8-K, filed April 4, 2005 and incorporated herein by reference). |
| 4.9 | Indenture, dated as of April 9, 2003 by and between the Registrant and U.S. Bank National Association (Filed as Exhibit 4.1 to the Registrant's Current Report on Form 8-K, filed April 10, 2003 [the April 10, 2003 Form 8-K] and incorporated herein by reference). |
| 4.10 | Registration Rights Agreement, dated as of April 9, 2003, among the Registrant and Credit Suisse First Boston LLC (Filed as Exhibit 4.2 to the April 10, 2003 Form 8-K and incorporated herein by reference). |
| 31.1* | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rules 13a-14(a) and 15d-14(a) as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 dated November 4, 2005. |
| 31.2* | Certification of Chief Financial Officer pursuant to Securities Exchange Act Rules 13a-14(a) and 15d-14(a) as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 dated November 4, 2005. |
| 32* | Certification of Chief Executive Officer and Chief Financial Officer pursuant to section 18 U.S.C. section 1350 dated November 4, 2005. |

\*    Filed herewith.

\*\*    To be filed by a report on Form 8-K pursuant to Item 601 of Regulation S-K or, where applicable, incorporated herein by reference from a subsequent filing in accordance with Section 305(b)(2) of the Trust Indenture Act of 1939.

**Exhibit 31.1**

**Certification of CEO Pursuant to**
**Securities Exchange Act Rules 13a-14(a) and 15d-14(a)**
**as Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Terry Semel, the Chief Executive Officer of Yahoo! Inc., certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Yahoo! Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

      (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

      (b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      (c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

      (d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of registrant's board of directors (or persons performing the equivalent function):

      (a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      (b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: November 4, 2005                          By:      / s / TERRY SEMEL
                                                          _____
                                                          Terry Semel
                                                          Chief Executive Officer

**Exhibit 31.2**

**Certification of CFO Pursuant to**
**Securities Exchange Act Rules 13a-14(a) and 15d-14(a)**
**as Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Susan Decker, the Chief Financial Officer of Yahoo! Inc., certify that:

1.      I have reviewed this quarterly report on Form 10-Q of Yahoo! Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

      (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under

our supervision, to ensure that material information relating to the registrant including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of registrant's board of directors (or persons performing the equivalent function):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: November 4, 2005

By:    / s / SUSAN DECKER
       Susan Decker
       Chief Financial Officer

---

Exhibit 32

**Certification of CEO and CFO Pursuant to
18 U.S.C. Section 1350,
as Adopted Pursuant to
Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Quarterly Report on Form 10-Q of Yahoo! Inc. (the "Company") for the quarter ended September 30, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Terry Semel, as Chief Executive Officer of the Company, and Susan Decker, as Chief Financial Officer of the Company, each hereby certifies, pursuant to 18 U.S.C. §1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, to the best of his and her knowledge, respectively, that:

(1)      The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

(2)      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

By:    /s/ TERRY SEMEL
Dated: November 4, 2005          Terry Semel
       Chief Executive Officer

By:    /s/ SUSAN DECKER
Dated: November 4, 2005          Susan Decker
       Chief Financial Officer

---

**End of Filing**



© 2005 | EDGAR Online, Inc.

Exhibit 14

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2005**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from        to

**Commission File Number 0-28018**

# YAHOO! INC.

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **77-0398689** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**701 First Avenue**
**Sunnyvale, California 94089**
(Address of principal executive offices)

Registrant's telephone number, including area code: **(408) 349-3300**

Securities registered pursuant to Section 12(b) of the Act:
**None**
Securities registered pursuant to Section 12(g) of the Act:

**Common stock, $.001 par value**
(Title of Class)

Indicate by check mark if the Registrant is a well-known seasoned issuer as defined in Rule 405 of the Securities Act.  Yes ☒  No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐  No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer.  See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.  (Check one):

Large accelerated filer ☒                    Accelerated filer ☐                    Non-accelerated filer ☐

Indicate by check mark whether the Registrant is a shell company (as defined by Rule 12b-2 of the Exchange Act). Yes ☐  No ☒

As of June 30, 2005, the aggregate market value of voting stock held by non-affiliates of the Registrant, based upon the closing sales price for the Registrant's common stock, as reported in the NASDAQ National Market System was $43,726,484,063.  Shares of common stock held by each officer and director and by each person who owns 10 percent or more of the outstanding common stock have been excluded in that such persons may be deemed to be affiliates.  This determination of affiliate status is not necessarily a conclusive determination for any other purpose.

The number of shares of the Registrant's common stock outstanding as of February 28, 2006 was 1,417,852,971.

### DOCUMENTS INCORPORATED BY REFERENCE

The following documents (or parts thereof) are incorporated by reference into the following parts of this Form 10-K:

(1)   Proxy Statement for the 2006 Annual Meeting of Stockholders — Part III Items 10, 11, 12, 13 and 14.

**Item 1A. Risk Factors**

***We face significant competition from large-scale Internet content, product and service aggregators, principally Time Warner's AOL, Google and Microsoft.***

We face significant competition from companies, principally AOL, Google, and Microsoft, that have aggregated a variety of Internet products, services and content in a manner similar to Yahoo!. AOL has access to content from Time Warner's movie, television, music, book, periodical, news, sports and other media holdings; access to a network of cable and other broadband users and delivery technologies; and considerable resources for future growth and expansion. Google, in addition to an Internet search service, offers many other services that directly compete with our services, including a consumer e-mail service, desktop search, local search, instant messaging, photos, maps, shopping services and advertising solutions. Microsoft has introduced its own Internet search service and has announced plans to develop both paid search and features that may make Internet searching capabilities a more integrated part of its Windows operating system. We expect these competitors increasingly to use their financial and engineering resources to compete with us, individually, and potentially in combination with each other. In certain of these cases, most notably AOL, our competition has a direct billing relationship with a greater number of their users through Internet access and other services than we have with our users through our premium services. This relationship may permit these competitors to be more effective than us in targeting services and advertisements to the specific preferences of their users thereby giving them a competitive advantage. If our competitors are more successful than we are in developing compelling products or attracting and retaining users or advertisers, then our revenues and growth rates could decline.

***We also face competition from other Internet service companies, including Internet access providers, device manufacturers offering online services and destination websites.***

Our users must access our services through Internet access providers, including wireless providers and providers of cable and broadband Internet access. To the extent that an access provider or device manufacturer offers online services competitive with those of Yahoo!, the user may elect to use the services or properties of that access provider or manufacturer. In addition, the access provider or manufacturer may make it difficult to access our services by not listing them in the access provider's or manufacturer's own directory or by providing Yahoo! with less prominent listings than the access provider, manufacturer, or a competitor's offerings. Such access providers and manufacturers may prove better able to target services and advertisements to the preferences of their users. If such access providers and device manufacturers are more successful than we are in developing compelling products or attracting and retaining customers, users or advertisers, then our revenues could decline. Further, to the extent that Internet access providers, mobile service providers or network providers increase the costs of service to users or restrict Yahoo!'s ability to deliver products, services and content to end users or increase our costs of doing so, our revenues could decline.

We also compete for customers, users and advertisers with many other providers of online services, including destination websites. Some of these competitors may have more expertise in a particular segment of the market, and within such segment, have longer operating histories, larger advertiser or user bases, and more brand recognition or technological features than we offer.

In the future, competitors may acquire additional competitive offerings or consolidate with each other to become more competitive, and new competitors may enter the market. If our competitors are more successful than we are in developing compelling products or attracting and retaining users, advertisers or customers, then our revenues and growth rates could decline.

***We face competition from other providers of search marketing that could affect our operating results.***

We compete directly with other providers of search marketing, including Google, LookSmart, Ltd., Lycos Inc., Microsoft, and MIVA (formerly FindWhat.com).  In addition, we believe it is likely that there will be additional entrants to this advertising market.  Some of the existing competitors and possible additional entrants may have greater operational, strategic, financial, personnel or other resources than we do, as well as greater brand recognition.  These competitors compete against us for affiliate and advertiser arrangements and could cause us to have to enter into such arrangements with less favorable terms, to lose current affiliates or advertisers or to fail to acquire new affiliates or advertisers.  The loss of affiliates or advertisers or a reduction in the revenue from such arrangements could harm our business and operating results.

***We face significant competition from traditional media companies which could adversely affect our future operating results.***

We also compete with traditional media companies for advertising.  Most advertisers currently spend only a small portion of their advertising budgets on Internet advertising.  If we fail to persuade existing advertisers to retain and increase their spending with us and if we fail to persuade new advertisers to spend a portion of their budget on advertising with us, our revenues could decline and our future operating results could be adversely affected.

***If we are unable to provide search technologies and other services which generate significant traffic to our websites, or we are unable to enter into distribution relationships which drive significant traffic to our websites, our business could be harmed, causing our revenues to decline.***

We have deployed our own Internet search technology to provide search results on our network.  We have more limited experience in operating our own search service than do some of our competitors.  Internet search is characterized by rapidly changing technology, significant competition, evolving industry standards and frequent product and service enhancements.  We must continually invest in improving our users' experience, including search relevance, speed and services responsive to their needs and preferences, to continue to attract, retain and expand our user base.  If we are unable to provide search technologies and other services which generate significant traffic to our websites, or if we are unable to enter into distribution relationships that continue to drive significant traffic to our websites, our business could be harmed, causing our revenues to decline.

***The majority of our revenues are derived from marketing services, and the reduction in spending by or loss of current or potential advertisers would cause our revenues and operating results to decline.***

For the year ended December 31, 2005, 87 percent of our total revenues came from marketing services.  Our ability to continue to retain and grow marketing services revenue depends upon:

- maintaining our user base;

- broadening our relationships with advertisers to small and medium size businesses;

- attracting advertisers to our user base;

- increasing demand for our marketing services by advertisers, users and businesses, including prices paid by advertisers, the number of searches performed by users and the rate at which users click-through to commercial search results;

- the effectiveness, and acceptance by advertisers, of our systems improvements to increase monetization of our search marketing;

- maintaining our affiliate program for our search marketing;

- deriving better demographic and other information from our users; and

- driving continued acceptance of the web by advertisers as an advertising medium.

In many cases, our agreements with advertisers have terms of one year or less, or, in the case of search marketing, may be terminated at any time by the advertiser. Search marketing agreements often have payments contingent upon usage or click-through levels. Accordingly, it is difficult to forecast marketing services revenues accurately. However, our expense levels are based in part on expectations of future revenues, including occasional guaranteed minimum payments to our affiliates in connection with search marketing, and are fixed over the short-term with respect to certain categories. Any reduction in spending by or loss of existing or potential future advertisers would cause our revenues to decline. Further, we may be unable to adjust spending quickly enough to compensate for any unexpected revenue shortfall.

***In certain markets, we depend on a limited number of sources to direct a significant percentage of users and businesses to our service to conduct searches and a loss of any of these sources could harm our operating results.***

A significant percentage of users and businesses that conduct searches and access our search marketing listings comes from a limited number of sources in certain markets. In addition to the Yahoo! Properties, sources for users are members of our affiliate network, including portals, browsers and other affiliates. Our agreements with affiliates vary in duration, and depending on the agreement, provide varying levels of discretion to the affiliate in the implementation of search marketing, including the degree to which affiliates can modify the presentation of the search marketing listings on their websites or integrate search marketing with their own services. The agreements may be terminable upon the occurrence of certain events, including failure to meet certain service levels, material breaches of agreement terms, changes in control or in some instances, at will. We may not be successful in renewing our affiliate agreements on as favorable terms or at all. The loss of affiliates providing significant users or businesses or an adverse change in implementation of search marketing by any of these affiliates could harm our ability to generate revenue, our operating results and cash flows from operations.

***We may not be able to generate substantial revenues from our alliances with Internet access providers.***

Through alliances with Internet access providers, we offer access services that combine customized content and services from Yahoo! (including browser and other communications services) and Internet access from the third party access providers. We may not be able to retain the alliances with our existing Internet access providers or to obtain new alliances with Internet access providers on terms that are reasonable. In addition, these Internet access services compete with many large companies such as AOL, Microsoft, Comcast Corporation and other established Internet access providers. In certain of these cases, our competition has substantially greater market presence (including an existing user base) and greater financial, technical, marketing or other resources. As a result of these and other competitive factors, the Internet access providers with which we have formed alliances may not be able to attract, grow or retain their customer bases, which would negatively impact our ability to sell customized content and services through this channel and, in turn, reduce our anticipated revenues from our alliances.

***Some of our shared revenue arrangements may not generate anticipated revenues.***

We typically receive co-branded revenue through revenue sharing arrangements or a portion of transactions revenue. In some cases, our revenue arrangements require that minimum levels of user impressions be provided by us. These arrangements expose us to potentially significant financial risks in the event our usage levels decrease, including the following:

- the revenue we are entitled to receive may be adjusted downwards;

- we may be required to "make good" on our obligations by providing additional advertising or alternative services;

- the partners or co-brand services may not renew the arrangements or may renew at lower rates; and

- the arrangements may not generate anticipated levels of shared transactions revenue, or partners may default on the payment commitments in such agreements as has occurred in the past.

Accordingly, any leveling off or decrease of our user base (or usage by our existing base) or the failure to generate anticipated levels of shared transactions revenue could result in a significant decrease in our revenues.

***Decreases or delays in advertising spending by our advertisers due to general economic conditions could harm our ability to generate advertising revenue.***

Expenditures by advertisers tend to be cyclical, reflecting overall economic conditions and budgeting and buying patterns. Since we derive the majority of our revenues from advertising, any decreases in or delays in advertising spending due to general economic conditions could reduce our revenues or negatively impact our ability to grow our revenues.

***Financial results for any particular period do not predict results for future periods.***

There can be no assurance that the purchasing pattern of advertisers on the Yahoo! Properties will not fluctuate, that advertisers will not make smaller and shorter-term purchases, or that market prices for online advertising will not decrease due to competitive or other factors. In addition, there can be no assurance that the volume of searches conducted, the amounts bid by advertisers for search marketing listings or the number of advertisers that bid in our search marketing marketplace will not vary widely from period to period. As revenues from new sources increase, it may become more difficult to predict our financial results based on historical performance. You should not rely on the results for any period as an indication of future performance.

***We rely on the value of the Yahoo! brands, and a failure to maintain or enhance the Yahoo! brands in a cost-effective manner could harm our operating results.***

We believe that maintaining and enhancing the Yahoo! brands is an important aspect of our efforts to attract and expand our user and advertiser base. We also believe that the importance of brand recognition will increase due to the relatively low barriers to entry in the Internet market. We have spent considerable money and resources to date on the establishment and maintenance of the Yahoo! brands, and we anticipate spending increasing amounts of money on, and devoting greater resources to, advertising, marketing and other brand-building efforts to preserve and enhance consumer awareness of the Yahoo! brands. We may not be able to successfully maintain or enhance consumer awareness of the Yahoo! brands and, even if we are successful in our branding efforts, these efforts may not be cost-effective. If we are unable to maintain or enhance customer awareness of the Yahoo! brands in a cost-effective manner, our business, operating results and financial condition could be harmed.

***If we are unable to license or acquire compelling content at reasonable costs or if we do not develop compelling content, the number of users of our services may not grow as anticipated, or may decline, which could harm our operating results.***

Our future success depends in part upon our ability to aggregate compelling content and deliver that content through our online properties. We license much of the content on our online properties, such as news items, stock quotes, weather reports, maps and audio and video content from third parties. We have been providing increasing amounts of audio and video content to our users, and we believe that users will

increasingly demand high-quality audio and video content, such as music, film, speeches, news footage, concerts and other special events. Such content may require us to make substantial payments to third parties from whom we license or acquire such content. For example, our music and entertainment properties rely on major sports organizations, radio and television stations, record labels, music publishers, cable networks, businesses, colleges and universities, film producers and distributors, and other organizations for a large portion of the content available on our properties. Our ability to maintain and build relationships with third-party content providers will be critical to our success. In addition, as new methods for accessing the Internet become available, including through alternative devices, we may need to enter into amended content agreements with existing third-party content providers to cover the new devices. Also, to the extent that Yahoo! develops content of its own, Yahoo!'s current and potential third-party content providers may view our services as competitive with their own, and this may adversely affect their willingness to contract with us. We may be unable to enter into new, or preserve existing, relationships with the third parties whose content we seek to obtain. In addition, as competition for compelling content increases both domestically and internationally, our content providers may increase the prices at which they offer their content to us, and potential content providers may not offer their content on terms agreeable to us. An increase in the prices charged to us by third-party content providers could harm our operating results and financial condition. Further, many of our content licenses with third parties are non-exclusive. Accordingly, other webcasters and other media such as radio or television may be able to offer similar or identical content. This increases the importance of our ability to deliver compelling editorial content and personalization of this content for users in order to differentiate Yahoo! from other businesses. If we are unable to license or acquire compelling content at reasonable prices, if other companies broadcast content that is similar to or the same as that provided by Yahoo!, or if we do not develop compelling editorial content or personalization services, the number of users of our services may not grow as anticipated, or may decline, which could harm our operating results.

***Our intellectual property rights are valuable, and any inability to protect them could reduce the value of our brand image and harm our business and our operating results.***

We create, own and maintain a wide array of intellectual property assets, including copyrights, patents, trademarks, trade dress, trade secrets and rights to certain domain names, which we believe are among our most valuable assets. We seek to protect our intellectual property assets through patent, copyright, trade secret, trademark and other laws of the United States and other countries of the world, and through contractual provisions. The efforts we have taken to protect our intellectual property and proprietary rights may not be sufficient or effective at stopping unauthorized use of those rights. In addition, effective trademark, patent, copyright and trade secret protection may not be available or cost-effective in every country in which our products and media properties are distributed or made available through the Internet. There may be instances where we are not able to fully protect or utilize our intellectual property assets in a manner to maximize competitive advantages. Further, while we attempt to ensure that the quality of our brand is maintained by our licensees, our licensees may take actions that could impair the value of our brand, our proprietary rights or the reputation of our products and media properties. We are aware that third parties have, from time to time, copied significant content available on Yahoo! for use in competitive Internet services. Protection of the distinctive elements of Yahoo! may not be available under copyright law. If we are unable to protect our proprietary rights from unauthorized use, the value of our brand image may be reduced. Any impairment of our brand could negatively impact our business. In addition, protecting our intellectual property and other proprietary rights is expensive and time consuming. Any increase in the unauthorized use of our intellectual property could make it more expensive to do business and consequently harm our operating results.

***We are, and may in the future be, subject to intellectual property infringement claims, which are costly to defend, could result in significant damage awards, and could limit our ability to provide certain content or use certain technologies in the future.***

Internet, technology, media companies and patent holding companies often possess a significant number of patents. Further, many of these companies and other parties are actively developing or purchasing search, indexing, electronic commerce and other Internet-related technologies, as well as a variety of online business models and methods. We believe that these parties will continue to take steps to protect these technologies, including, but not limited to, seeking patent protection. As a result, disputes regarding the ownership of technologies and rights associated with online business are likely to continue to arise in the future. From time to time, parties assert patent infringement claims against us. Currently, we are engaged in several lawsuits regarding patent issues and have been notified of a number of other potential disputes.

In addition to patent claims, third parties have asserted, and are likely in the future to assert, claims against us alleging infringement of copyrights, trademark rights, trade secret rights or other proprietary rights, or alleging unfair competition or violations of privacy rights or failure to maintain confidentiality of user data. Currently, our subsidiary LAUNCH Media, Inc. ("LAUNCH") is engaged in a lawsuit regarding copyright issues that commenced prior to our acquisition of LAUNCH. In addition, third parties have made, and may continue to make, trademark infringement and related claims against us over the display of search results triggered by search terms that include trademark terms. A court in France has held us liable for displaying search results triggered by certain trademarked terms, and we are appealing that decision.

As we expand our business and develop new technologies, products and services, we may become increasingly subject to intellectual property infringement claims. In the event that there is a determination that we have infringed third-party proprietary rights such as patents, copyrights, trademark rights, trade secret rights or other third party rights such as publicity and privacy rights, we could incur substantial monetary liability, be required to enter into costly royalty or licensing agreements or be prevented from using the rights, which could require us to change our business practices in the future and limit our ability to compete effectively. We may also incur substantial expenses in defending against third-party infringement claims regardless of the merit of such claims. In addition, many of our agreements with our customers or affiliates require us to indemnify them for certain third-party intellectual property infringement claims, which could increase our costs in defending such claims and our damages. The occurrence of any of these results could harm our brand and negatively impact our operating results.

***We are subject to United States and foreign government regulation of the Internet and Voice over Internet Protocol services which could subject us to claims and remedies including monetary liabilities and limitations on our business practices.***

We are subject to regulations and laws directly applicable to providers of Internet and Voice over Internet Protocol services both domestically and internationally. The application of existing domestic and international laws and regulations to Yahoo! relating to issues such as user privacy and data protection, defamation, pricing, advertising, taxation, gambling, sweepstakes, promotions, financial market regulation, consumer protection, content regulation, quality of services, telecommunications and intellectual property ownership and infringement in many instances is unclear or unsettled. In addition, we will also be subject to any new laws and regulations directly applicable to our domestic and international activities. Further, the application of existing laws to Yahoo! or our subsidiaries regulating or requiring licenses for certain businesses of our advertisers including, for example, distribution of pharmaceuticals, alcohol, adult content, tobacco or firearms, as well as insurance and securities brokerage and legal services, can be unclear. Internationally, we may also be subject to domestic laws regulating our activities in foreign countries and to foreign laws and regulations that are inconsistent from country to country. We may incur substantial liabilities for expenses necessary to comply with these laws and regulations or penalties for any

failure to comply.  Compliance with these laws and regulations may also cause us to change or limit our business practices in a manner adverse to our business.

A number of federal laws, including those referenced below, impact our business.  The Digital Millennium Copyright Act ("DMCA") is intended, in part, to limit the liability of eligible online service providers for listing or linking to third-party websites that include materials that infringe copyrights or other rights of others.  Portions of the Communications Decency Act ("CDA") are intended to provide statutory protections to online service providers who distribute third party content.  Yahoo! relies on the protections provided by both the DMCA and CDA in conducting its business.  Any changes in these laws or judicial interpretations narrowing their protections will subject us to greater risk of liability and may increase our costs of compliance with these regulations or limit our ability to operate certain lines of business.  The Children's Online Protection Act and the Children's Online Privacy Protection Act are intended to restrict the distribution of certain materials deemed harmful to children and impose additional restrictions on the ability of online services to collect user information from minors.  In addition, the Protection of Children From Sexual Predators Act of 1998 requires online service providers to report evidence of violations of federal child pornography laws under certain circumstances.  The costs of compliance with these regulations may increase in the future as a result of changes in the regulations or the interpretation of them.  Further, any failures on our part to comply with these regulations may subject us to significant liabilities.

***Changes in regulations or user concerns regarding privacy and protection of user data could adversely affect our business.***

Federal, state and international laws and regulations may govern the collection, use, sharing and security of data that we receive from our users and partners.  In addition, we have and post on our website our own privacy policies and practices concerning the collection, use and disclosure of user data.  Any failure, or perceived failure, by us to comply with our posted privacy policies or with any data-related consent orders, Federal Trade Commission requirements or other federal, state or international privacy-related laws and regulations could result in proceedings or actions against us by governmental entities or others, which could potentially have an adverse effect on our business.

Further, failure or perceived failure to comply with our policies or applicable requirements related to the collection, use, sharing or security of personal information or other privacy-related matters could result in a loss of user confidence in us and ultimately in a loss of users, partners or advertisers, which could adversely affect our business.

There are a large number of legislative proposals pending before the United States Congress, various state legislative bodies and foreign governments concerning privacy issues related to our business.  It is not possible to predict whether or when such legislation may be adopted.  Certain proposals, if adopted, could impose requirements that may result in a decrease in our user registrations and revenues.  In addition, the interpretation and application of user data protection laws are in a state of flux.  These laws may be interpreted and applied inconsistently from country to country and inconsistently with our current data protection policies and practices.  Complying with these varying international requirements could cause us to incur substantial costs or require us to change our business practices in a manner adverse to our business.

***Acquisitions and strategic investments could result in adverse impacts on our operations and in unanticipated liabilities.***

We have acquired, and made strategic investments in, a number of companies (including through joint ventures) in the past and expect to make additional acquisitions and strategic investments in the future.  Such transactions may result in dilutive issuances of equity securities, use of our cash resources, incurrence

of debt and amortization of expenses related to intangible assets. Our acquisitions and strategic investments to date were accompanied by a number of risks, including:

- the difficulty of assimilating the operations and personnel of our acquired companies into our operations;

- the potential disruption of our ongoing business and distraction of management;

- additional operating losses and expenses of the businesses we acquired or in which we invested;

- the difficulty of integrating acquired technology and rights into our services and unanticipated expenses related to such integration;

- the failure to successfully further develop acquired technology resulting in the impairment of amounts currently capitalized as intangible assets;

- the potential for patent and trademark infringement claims against the acquired company;

- the impairment of relationships with customers and partners of the companies we acquired or in which we invested or our customers and partners as a result of the integration of acquired operations;

- the impairment of relationships with employees of the acquired companies or our employees as a result of integration of new management personnel;

- the difficulty of integrating the acquired company's accounting, management information, human resources and other administrative systems;

- our lack of, or limitations on, our control over the operations of our joint venture companies;

- in the case of foreign acquisitions, uncertainty regarding foreign laws and regulations and difficulty integrating operations and systems as a result of cultural, systems and operational differences; and

- the impact of known potential liabilities or unknown liabilities associated with the companies we acquired or in which we invested.

We are likely to experience similar risks in connection with our future acquisitions and strategic investments. Our failure to be successful in addressing these risks or other problems encountered in connection with our past or future acquisitions and strategic investments could cause us to fail to realize the anticipated benefits of such acquisitions or investments, incur unanticipated liabilities and harm our business generally.

***Our failure to manage growth and diversification of our business could harm us.***

We are continuing to grow and diversify our business both in the United States and internationally. As a result, we must expand and adapt our operational infrastructure and increase the number of our personnel in certain areas. Our business relies on our data systems, billing systems for our fee based and other services, and other operational and financial reporting and control systems. All of these systems have become increasingly complex in the recent past due to the growing diversification and complexity of our business and to acquisitions of new businesses with different systems. To effectively manage this growth, we will need to continue to upgrade and improve our data systems, billing systems, and other operational and financial systems, procedures and controls. In particular, as our premium and other services for which we bill users grow, any failure of our billing systems to accommodate the increasing number of transactions and accurately bill users could adversely affect our business and ability to collect revenue. These upgrades and improvements will require a dedication of resources and in some cases are likely to be complex. If we

are unable to adapt our systems in a timely manner to accommodate our growth, our business may be adversely affected.

Additionally, we have experienced recent growth in personnel numbers and expect to continue to hire additional personnel in selected areas. This growth requires significant time and resource commitments from our senior management. Further, as a result of recent acquisitions and international expansion, more than one-half of our employees are based outside of our Sunnyvale, California headquarters. If we are unable to effectively manage a large and geographically dispersed group of employees or to anticipate our future growth and personnel needs, our business may be adversely affected.

***We have dedicated considerable resources to provide a variety of premium services, which may not prove to be successful in generating significant revenue for us.***

We offer fee-based enhancements to many of our free services, including e-mail, personals, finance, games, music and sports. The development cycles for these technologies are long and generally require significant investment by us. We have previously discontinued certain non-profitable premium services. We must however continue to provide new services that are compelling to our users while continuing to develop an effective method for generating revenues for such services. General economic conditions may affect users' willingness to pay for such services. If we cannot generate revenues from these services that are greater than the cost of providing such services, our operating results could be harmed.

***We expect our operating expenses to continue to increase as we attempt to expand the Yahoo! brand, fund product development, develop media properties and acquire other businesses or technologies, which could harm our operating results.***

We currently expect that our operating expenses will continue to increase as we expand our operations in areas of expected growth, continue to develop and extend the Yahoo! brand, fund greater levels of product development, develop and commercialize additional media properties and premium services, and acquire and integrate complementary businesses and technologies. If our expenses increase at a greater pace than our revenues, our operating results could be harmed.

***If we are unable to retain our existing senior management and key personnel and hire new highly skilled personnel, we may not be able to execute our business plan.***

We are substantially dependent on the continued services of our senior management, including our two founders, our chief executive officer, chief financial officer, chief operating officer, chief technical officer, and our executive and senior vice presidents. These individuals have acquired specialized knowledge and skills with respect to Yahoo! and its operations. The loss of any of these individuals could harm our business. Our business is also dependent on our ability to retain, hire and motivate talented, highly skilled personnel. The competition for such highly skilled personnel can be intense, particularly in the San Francisco Bay Area, where our corporate headquarters is located. Many of our management and key personnel have reached or will soon reach the four-year anniversary of their Yahoo! hiring date and, as a result, have become or will shortly become fully vested in their initial stock option grants. Although employees receive additional grants, an employee may be more likely to leave Yahoo! upon completion of the vesting period for the initial option grant, which is generally the largest option grant an employee receives. If we do not succeed in retaining and motivating our existing key employees and in attracting new key personnel, we may be unable to meet our business plan and as a result, our stock price may decline.

24

***More individuals are utilizing non-PC devices to access the Internet, and versions of our service developed or optimized for these devices may not gain widespread adoption by users, manufacturers or distributors of such devices.***

The number of individuals who access the Internet through devices other than a personal computer, such as personal digital assistants, mobile telephones and television set-top devices, has increased dramatically. Our services were originally designed for rich, graphical environments such as those available on desktop and laptop computers. The lower resolution, functionality and memory associated with alternative devices currently available may make the use of our services through such devices difficult, and the versions of our service developed for these devices may not be compelling to users, manufacturers or distributors of alternative devices. As we have limited experience to date in operating versions of our service developed or optimized for users of alternative devices, and as new devices and new platforms are continually being released, it is difficult to predict the problems we may encounter in doing so, and we may need to devote significant resources to the creation, support and maintenance of such versions. If we are unable to attract and retain a substantial number of alternative device users to our online services, we may fail to capture a sufficient share of an increasingly important portion of the market for online services and may fail to attract both advertisers and premium service subscribers.

***We plan to expand operations in international markets in which we may have limited experience or rely on business partners, and in which we are faced with relatively higher costs.***

We plan to expand Yahoo! branded online properties and search offerings in international markets. We have currently developed, through joint ventures, strategic investments, subsidiaries and branch offices, localized offerings in over 20 countries outside of the United States. As we expand into new international markets, we will have only limited experience in marketing and operating our products and services in such markets. In other instances, including our strategic investment in Alibaba, we may rely on the efforts and abilities of foreign business partners in such markets. We have experienced and expect to continue to experience higher costs as a percentage of revenues in connection with the development and maintenance of our international online properties relative to our domestic experience. Certain international markets may be slower than domestic markets in adopting the Internet as an advertising and commerce medium and so our operations in international markets may not develop at a rate that supports our level of investment.

***In international markets we compete with local Internet service providers that may have competitive advantages.***

In a number of international markets, especially those in Asia, Europe and Latin America, we face substantial competition from local Internet service providers and other portals that offer search, communications and other commercial services. Many of these companies have a dominant market share in their territories and are owned by local telecommunications providers which give them a competitive advantage. Local providers of competing online services may also have a substantial advantage over us in attracting users in their country due to more established branding in that country, greater knowledge with respect to the tastes and preferences of users residing in that country and/or their focus on a single market. Further, the local providers may have greater regulatory and operational flexibility than Yahoo! due to the fact that we are subject to both United States and foreign regulatory requirements. We must continue to improve our local offerings, become more knowledgeable about our local users and their preferences, deepen our relationships with our local users as well as increase our branding and other marketing activities in order to remain competitive and strengthen our international market position.

***Our international operations are subject to increased risks which could harm our business, operating results and financial condition.***

In addition to uncertainty about our ability to continue to generate revenues from our foreign operations and expand our international market position, there are certain risks inherent in doing business internationally, including:

- trade barriers and changes in trade regulations;

- difficulties in developing, staffing and simultaneously managing a large number of varying foreign operations as a result of distance, language and cultural differences;

- stringent local labor laws and regulations;

- longer payment cycles;

- currency exchange rate fluctuations;

- political or social unrest or economic instability;

- import or export restrictions;

- seasonal volatility in business activity;

- risks related to government regulation or required compliance with local laws in certain jurisdictions, including those more fully described above; and

- potentially adverse tax consequences.

One or more of these factors could harm our future international operations and consequently, could harm our brand, business, operating results and financial condition.

***We may be subject to legal liability for online services.***

We host a wide variety of services that enable individuals and businesses to exchange information, generate content, advertise products and services, conduct business and engage in various online activities on an international basis. The law relating to the liability of providers of these online services for activities of their users is currently unsettled both within the United States and internationally. Claims have been threatened and have been brought against us for defamation, negligence, copyright or trademark infringement, unlawful activity, tort, including personal injury, fraud, or other theories based on the nature and content of information that we provide links to or that may be posted online or generated by our users or with respect to auctioned materials. In addition, Yahoo! was the subject of a claim brought by certain entities in a French court regarding, among other things, the availability of certain content within our services which was alleged to violate French law. We may be subject to similar actions in domestic or other international jurisdictions in the future. Our defense of any such actions could be costly and involve significant time and attention of our management and other resources.

We also periodically enter into arrangements to offer third-party products, services or content under the Yahoo! brand or via distribution on the Yahoo! Properties, including stock quotes and trading information. We may be subject to claims concerning these products, services or content by virtue of our involvement in marketing, branding, broadcasting or providing access to them, even if we do not ourselves host, operate, provide, or provide access to these products, services or content. While our agreements with respect to these products, services and content, often provide that we will be indemnified against such liabilities, the ability to receive such indemnification depends on the financial resources of the other party to the agreement and any amounts received may not be adequate to cover our liabilities.

It is also possible that, if any information provided directly by us contains errors or is otherwise negligently provided to users, third parties could make claims against us. For example, we offer web-based e-mail

26

services, which expose us to potential risks, such as liabilities or claims resulting from unsolicited e-mail, lost or misdirected messages, illegal or fraudulent use of e-mail, or interruptions or delays in e-mail service. Investigating and defending any of these types of claims is expensive, even to the extent that the claims are without merit or do not ultimately result in liability.

***We may have difficulty scaling and adapting our existing technology architecture to accommodate increased traffic and technology advances or requirements of our users and advertisers.***

As one of the most highly trafficked websites on the Internet, Yahoo! delivers a growing number of products, services and page views to an increasing number of users around the world.  In addition, the products and services offered by Yahoo! have expanded and changed significantly and are expected to continue to expand and change rapidly in the future to accommodate new technologies and new means of content delivery, such as rich media audio and video.  Our future success will depend on our ability to adapt to rapidly changing technologies, to adapt our products and services to evolving industry standards and to improve the performance and reliability of our products and services.  Rapid increases in the levels or types of use of our online properties and services could result in delays or interruptions in our service.

Widespread adoption of new Internet, networking or telecommunications technologies or other technological changes could require substantial expenditures to modify or adapt our services or infrastructure.  The technology architectures utilized for our services are highly complex and may not provide satisfactory support in the future, as usage increases and products and services expand, change and become more complex.  In the future, we may make significant changes to our architectures, including moving to completely new architectures and systems.  Such changes may be technologically challenging to develop and implement, may cause us to incur substantial costs or data loss, and may cause users and advertisers to experience delays or interruptions in our service.  These changes, delays or interruptions in our service may cause users and advertisers to become dissatisfied with our service and move to competing providers of online services.  Further, to the extent that demands for our services increase, we will need to expand our infrastructure, including the capacity of our hardware servers and the sophistication of our software.  This expansion is likely to be expensive and complex and require additional technical expertise.  As we acquire users who rely upon us for a wide variety of services, it becomes more technologically complex and costly to retrieve, store and integrate data that will enable us to track each user's preferences.  Any difficulties experienced in adapting our architectures and infrastructure to accommodate increased traffic, to store user data and track user preferences, together with the associated costs and potential loss of traffic, could harm our operating results, cash flows from operations and financial condition.

***Our business depends on the continued growth and maintenance of the Internet infrastructure.***

The success and the availability of our Internet-based products and services depends in part upon the continued growth and maintenance of the Internet infrastructure itself, including its protocols, architecture, network backbone, data capacity and security.  Spam, viruses, worms, spyware, denial of service attacks and other acts of malice may affect not only the Internet's speed, reliability and availability but also its continued desirability as a vehicle for commerce, information and user engagement.  If the Internet proves unable to meet the new threats and increased demands placed upon it, our business plans, user and advertiser relationships, site traffic and revenues could be adversely affected.

***New technologies could block our advertisements or our search marketing listings, which would harm our operating results.***

Technologies have been developed and are likely to continue to be developed that can block the display of our advertisements or our search marketing listings.  Most of our revenues are derived from fees paid to us by advertisers in connection with the display of advertisements or our search marketing listings on web

pages. As a result, advertisement-blocking technology could reduce the number of advertisements and search results that we are able to deliver and, in turn, our advertising revenues and operating results.

***We rely on third party providers for our principal Internet connections and technologies, databases and services critical to our properties and services, and any errors, failures or disruption in the services provided by these third parties could significantly harm our business and operating results.***

We rely on private third-party providers for our principal Internet connections, co-location of a significant portion of our data servers and network access. Any disruption, from natural disasters, technology malfunctions, sabotage or other factors, in the Internet or network access or co-location services provided by these third-party providers or any failure of these third-party providers to handle current or higher volumes of use could significantly harm our business, operating results and financial condition. We have little control over these third-party providers, which increases our vulnerability to disruptions or problems with their services. Any financial difficulties experienced by our providers may have negative effects on our business, the nature and extent of which we cannot predict. We license technology and related databases from third parties for certain elements of our properties, including, among others, technology underlying the delivery of news, stock quotes and current financial information, chat services, street mapping and telephone listings, streaming capabilities and similar services. We have experienced and expect to continue to experience interruptions and delays in service and availability for such elements. We also rely on a third-party provider for key components of our e-mail service. Furthermore, we depend on hardware and software suppliers for prompt delivery, installation and service of servers and other equipment to deliver our services. Any errors, failures, interruptions or delays experienced in connection with these third-party technologies and information services could negatively impact our relationship with users and adversely affect our brand, our business and operating results.

***We rely on distribution agreements and relationships with various third parties, and any failure to obtain or maintain such distribution relationships on reasonable terms could impair our ability to fully execute our business plan.***

In addition to our relationships with Internet access providers, to increase traffic for our offerings and make them more available and attractive to advertisers and users, we have certain distribution agreements and informal relationships with operators of online networks and leading websites, software companies, electronics companies, and computer manufacturers. Depending on the distributor and the agreement, these distribution arrangements may not be exclusive and may only have a short term. Some of our distributors, particularly distributors who are also competitors or potential competitors, may not renew their distribution agreements with us. In addition, as new methods for accessing the Internet become available, including through alternative devices, we may need to enter into amended distributions agreements with existing distributors to cover the new devices and agreements with additional distributors. In the future, existing and potential distributors may not offer distribution of our properties and services to us on reasonable terms, or at all. If we fail to obtain distribution or to obtain distribution on terms that are reasonable, we may not be able to fully execute our business plan.

***We rely on third party providers of streaming media products to stream audio and video content to our users, and any change in the licensing terms, costs, availability or user acceptance of these products could adversely affect our business.***

We rely on leading providers of streaming media products to license the software necessary to stream audio and video content to our users. There can be no assurance that these providers will continue to license these products to us on reasonable terms, or at all. Our users are currently able to electronically download copies of the software to play streaming media free of charge, but providers of streaming media products may begin charging users for copies of their player software or otherwise change their business

model in a manner that slows the widespread acceptance of these products. In order for our rich media services to be successful, there must be a large base of users of these streaming media products. We have limited or no control over the availability or acceptance of streaming media software, and to the extent that any of these circumstances occur, our business may be adversely affected.

***If we fail to detect click spam, we could lose the confidence of our advertisers, thereby causing a loss of advertisers and revenue.***

We are exposed to the risk of clicks on our advertisements by persons seeking to increase the fees paid by our advertisers. Click spam may occur when a click is generated on one of our advertiser's listings displayed on a website in order to generate a payment rather than to view the underlying content. This type of activity could damage our brand. If click spam is not detected, the affected advertisers may perceive a reduced return on their investment in our advertising programs because those clicks will not lead to potential revenue for the advertisers. This could lead the advertisers to become dissatisfied with our advertising programs, which could lead to loss of advertisers and revenue. If this activity occurs and we are unable to stop it, we may have to provide refunds of revenue that our advertisers have paid to us and that was later attributed to click spam, in order to prevent damage to our brand.

***Interruptions, delays or failures in the provision of our services could damage our brand and harm our operating results.***

Our operations are susceptible to outages due to fire, floods, power loss, telecommunications failures, terrorist attacks and similar events. In addition, a significant portion of our network infrastructure is located in Northern California, an area subject to earthquakes. Despite our implementation of network security measures, our servers are vulnerable to computer viruses, worms, physical and electronic break-ins, sabotage and similar disruptions from unauthorized tampering with our computer systems. For example, we are vulnerable to coordinated attempts to overload our systems with data, resulting in denial or reduction of service to some or all of our users for a period of time. We have experienced a coordinated denial of service attack in the past, and may experience such attempts in the future. We do not have multiple site capacity for all of our services and some of our systems are not fully redundant in the event of any such occurrence. In an effort to reduce the likelihood of a geographical or other disaster impacting our business, we have distributed and intend to continue distributing our servers among additional data centers located around the world. Failure to execute these changes properly or in a timely manner could result in delays or interruptions to our service, which could result in a loss of users and damage to our brand, and harm our operating results. We may not carry sufficient business interruption insurance to compensate us for losses that may occur as a result of any events, which cause interruptions in our service.

***We may be required to record a significant charge to earnings if our goodwill or amortizable intangible assets become impaired.***

We are required under generally accepted accounting principles to review our amortizable intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Goodwill is required to be tested for impairment at least annually. Factors that may be considered a change in circumstances indicating that the carrying value of our amortizable intangible assets may not be recoverable include a decline in stock price and market capitalization, and slower growth rates in our industry. We may be required to record a significant charge to earnings in our consolidated financial statements during the period in which any impairment of our goodwill or amortizable intangible assets is determined. This may adversely impact our results of operations.

***Our stock price has been volatile historically and may continue to be volatile regardless of our operating performance.***

The trading price of our common stock has been and may continue to be subject to wide fluctuations. During 2005, the closing sale prices of our common stock on the Nasdaq ranged from $30.87 to $42.50 per share and the closing sale price on February 28, 2006 was $32.06 per share. Our stock price may fluctuate in response to a number of events and factors, such as quarterly variations in operating results; announcements of technological innovations or new services and media properties to us or our competitors; changes in financial estimates and recommendations by securities analysts; the operating and stock price performance of other companies that investors may deem comparable to us; the operating performance of companies in which we have an equity investment, including Yahoo! Japan and Alibaba; the stock price of companies in which we have an equity investment, including Yahoo! Japan; and news reports relating to trends in our markets or general economic conditions.

In addition, the stock market in general, and the market prices for Internet-related companies in particular, have experienced volatility that often has been unrelated to the operating performance of such companies. These broad market and industry fluctuations may adversely affect the price of our stock, regardless of our operating performance. Additionally, volatility or a lack of positive performance in our stock price may adversely affect our ability to retain key employees, all of whom have been granted stock options or other equity-based awards.

***Anti-takeover provisions could make it more difficult for a third party to acquire us.***

We have adopted a stockholder rights plan and initially declared a dividend distribution of one right for each outstanding share of common stock to stockholders of record as of March 20, 2001. As a result of our two-for-one stock split effective May 11, 2004, each share of common stock is now associated with one-half of one right. Each right entitles the holder to purchase one unit consisting of one one-thousandth of a share of our Series A Junior Participating Preferred Stock for $250 per unit. Under certain circumstances, if a person or group acquires 15 percent or more of our outstanding common stock, holders of the rights (other than the person or group triggering their exercise) will be able to purchase, in exchange for the $250 exercise price, shares of our common stock or of any company into which we are merged having a value of $500. The rights expire on March 1, 2011, unless extended by our Board of Directors. Because the rights may substantially dilute the stock ownership of a person or group attempting to take us over without the approval of our Board of Directors, our rights plan could make it more difficult for a third party to acquire us (or a significant percentage of our outstanding capital stock) without first negotiating with our Board of Directors regarding that acquisition.

In addition, our Board of Directors has the authority to issue up to 10,000,000 shares of Preferred Stock (of which 2,000,000 shares have been designated as Series A Junior Participating Preferred Stock) and to determine the price, rights, preferences, privileges and restrictions, including voting rights, of those shares without any further vote or action by the stockholders.

The rights of the holders of our common stock may be subject to, and may be adversely affected by, the rights of the holders of any Preferred Stock that may be issued in the future. The issuance of Preferred Stock may have the effect of delaying, deterring or preventing a change of control of Yahoo! without further action by the stockholders and may adversely affect the voting and other rights of the holders of our common stock. Further, certain provisions of our charter documents, including provisions eliminating the ability of stockholders to take action by written consent and limiting the ability of stockholders to raise matters at a meeting of stockholders without giving advance notice, may have the effect of delaying or preventing changes in control or management of Yahoo!, which could have an adverse effect on the market price of our stock. In addition, our charter documents do not permit cumulative voting, which may make it more difficult for a third party to gain control of our Board of Directors. Further, we are subject

to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law, which will prohibit us from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder, even if such combination is favored by a majority of stockholders, unless the business combination is approved in a prescribed manner. The application of Section 203 also could have the effect of delaying or preventing a change of control or management.

### Item 1B. Unresolved Staff Comments

None.

### Item 2. Properties

Our headquarters is located in Sunnyvale, California and consists of owned and leased space aggregating approximately 1 million square feet. Office space is also leased in Amsterdam, Bangalore, Buenos Aires, Calgary, Copenhagen, Dublin, Dusseldorf, Echirolles, Hamburg, Hong Kong, London, Oslo, Madrid, Melbourne, Mexico City, Milan, Montreal, Mumbai, Munich, New Delhi, Osaka, Paris, São Paulo, Seoul, Singapore, Stockholm, Sydney, Taipei, Tokyo, Toronto and Trondheim. We also lease offices in various locations in the United States, including Atlanta, Berkeley, Boston, Chicago, Columbus, Dallas, Detroit, Hillsboro, the Los Angeles Area, Miami, New York, Orlando, Reston, the San Diego Area, the San Francisco Bay Area, the Seattle Area, and Washington, D.C. Our datacenters are operated in locations in the United States, Europe and Asia.

We believe that our existing facilities are adequate to meet current requirements, and that suitable additional or substitute space will be available as needed to accommodate any further physical expansion of operations and for any additional sales offices.

### Item 3. Legal Proceedings

From time to time, third parties assert patent infringement claims against Yahoo!. Currently, we are engaged in several lawsuits regarding patent issues and have been notified of a number of other potential patent disputes. In addition, from time to time we are subject to other legal proceedings and claims in the ordinary course of business, including claims of alleged infringement of trademarks, copyrights, trade secrets and other intellectual property rights, claims related to employment matters, and a variety of claims, including claims alleging defamation or invasion of privacy, arising in connection with our e-mail, message boards, auction sites, shopping services and other communications and community features.

On May 24, 2001, Arista Records, Inc., Bad Boy Records, BMG Music d/b/a The RCA Records Label, Capitol Records, Inc., Virgin Records America, Inc., Sony Music Entertainment, Inc., UMG Recordings, Inc., Interscope Records, Motown Record Company, L.P., and Zomba Recording Corporation filed a lawsuit alleging copyright infringement against LAUNCH in the United States District Court for the Southern District of New York. The plaintiffs allege, among other things, that the consumer-influenced portion of LAUNCH's LAUNCHcast service is "interactive" within the meaning of Section 114 of the Copyright Act and therefore does not qualify for the compulsory license provided for by the Copyright Act. The Complaint seeks declaratory and injunctive relief and damages for the alleged infringement. After the lawsuit was commenced, Yahoo! entered into an agreement to acquire LAUNCH. In June 2001, LAUNCH settled the LAUNCH litigation as to UMG Recordings, Inc. Our acquisition of LAUNCH closed in August 2001, and since that time LAUNCH has been a wholly owned subsidiary of Yahoo!. Yahoo! and LAUNCH do not believe that LAUNCH has infringed any rights of plaintiffs and intend to vigorously contest the lawsuit. In January 2003, LAUNCH settled the LAUNCH litigation as to Sony Music Entertainment, Inc. In October 2003, LAUNCH settled the litigation as to Capitol Records, Inc. and Virgin Records America, Inc. Accordingly, BMG Music d/b/a/ The RCA Records Label

approximately $4 in 2004 from $5 in 2003 due to faster subscriber growth in some of our lower priced offerings, and the introduction of lower priced fee-based services.

We currently expect marketing services revenue to increase in absolute dollars for 2006 compared to 2005 as we seek to increase users and traffic on our Yahoo! Properties and further benefit from expected growth in the online advertising market. We also currently expect fees revenue to increase in absolute dollars for 2006 compared to 2005 as we expect to increase our number of paying users in 2006.

**Costs and Expenses:**    Operating costs and expenses were as follows (dollars in thousands):

| | Years Ended December 31, | | | | | | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|
| | 2003 | (1) | 2004 | (1) | 2005 | (1) | % Change | % Change |
| Cost of revenues | $370,092 | 23% | $1,342,338 | 38% | $2,096,201 | 40% | 263% | 56% |
| Sales and marketing | $530,613 | 33% | $  778,029 | 22% | $1,025,249 | 20% | 47% | 32% |
| Product development | $207,285 | 13% | $  368,760 | 10% | $  547,137 | 10% | 78% | 48% |
| General and administrative | $157,027 | 10% | $  262,602 | 7% | $  319,690 | 6% | 67% | 22% |
| Stock compensation expense | $  22,029 | 1% | $   32,290 | 1% | $   52,471 | 1% | 47% | 62% |
| Amortization of intangibles | $  42,385 | 2% | $  101,917 | 3% | $  109,195 | 2% | 140% | 7% |

(1)    Percent of total revenues.

**Cost of Revenues.**    Cost of revenues consists of traffic acquisition costs and other expenses associated with the production and usage of the Yahoo! Properties, including amortization of developed technology and patents.

*Traffic Acquisition Costs ("TAC").*    TAC consists of payments made to affiliates that have integrated our search offerings into their websites and payments made to companies that direct consumer and business traffic to the Yahoo! Properties. We enter into agreements of varying duration that involve TAC. There are generally three economic structures of the affiliate agreements: fixed payments based on a guaranteed minimum amount of traffic delivered, which often carry reciprocal performance guarantees from the affiliate; variable payments based on a percentage of our revenue or based on a certain metric, such as number of searches or paid clicks; or a combination of the two. We expense TAC under two different methods. Agreements with fixed payments are expensed ratably over the term the fixed payment covers, and agreements based on a percentage of revenue, number of paid introductions, number of searches, or other metrics are expensed based on the volume of the underlying activity or revenue multiplied by the agreed-upon price or rate.

*Other Cost of Revenues.*    Other cost of revenues consists of fees paid to third parties for content included on our online media properties, Internet connection charges, data center costs, server equipment depreciation, technology license fees, amortization of developed technology and patents, and compensation related expenses.

Cost of revenues were as follows (dollars in thousands):

| | Years Ended December 31, | | | | | | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|
| | 2003 | (1) | 2004 | (1) | 2005 | (1) | % Change | % Change |
| TAC | $152,583 | 9% | $  974,814 | 27% | $1,561,737 | 30% | 539% | 60% |
| Other cost of revenues | 217,509 | 14% | 367,524 | 11% | 534,464 | 10% | 69% | 45% |
| Cost of revenues | $370,092 | 23% | $1,342,338 | 38% | $2,096,201 | 40% | 263% | 56% |

(1)    Percent of total revenues.

Cost of revenues for the year ended December 31, 2005 increased approximately $754 million, or 56 percent, compared to the prior year. The increase included $587 million of additional TAC, which represents the largest component of cost of revenues, as well as an increase of $64 million in content costs,

$39 million in depreciation expense, $27 million in Internet connection charges and data center costs, and $20 million in amortization of developed technology and patents. This year over year increase in TAC of 60 percent was driven by our 47 percent growth in marketing services revenue, higher average TAC rates and a product mix change toward revenue streams that have associated TAC. The increase in content costs was primarily from our expanded offerings some of which required content for new and enhanced services on Yahoo! Properties including music, sports, and games. The increase in depreciation expense and data center costs primarily resulted from the depreciation of additional information technology assets and data center costs required to manage our increasing user base, traffic, and new offerings on Yahoo! Properties. The increase in the amortization of developed technology and patents resulted from our continued acquisition activity.

Cost of revenues for the year ended December 31, 2004 increased approximately $972 million, or 263 percent, as compared to 2003. This reflected approximately $769 million of incremental cost of revenue related to acquisitions of which $703 million related to TAC associated with the Overture acquisition, and a $32 million increase in the amortization of technology and patents. The remainder of the increase represented increased costs for search serving, royalties and content, as well as increased costs for growing network usage and premium services.

Cost of revenues in 2005, 2004, and 2003 were 40 percent, 38 percent, and 23 percent of revenues, respectively. The year over year increases mainly related to the additional TAC described above.

We currently believe that cost of revenues will continue to increase in absolute dollars in 2006 compared to 2005. TAC, which is the largest component of our cost of revenues, is expected to increase as our marketing services revenue increases and as TAC rates increase in the competitive search market. Additionally, we expect to continue to increase our user base and offerings, which drive network usage and in turn higher Internet connection charges and data center costs. Further, we expect higher costs related to the introduction of additional content for new and enhanced services.

**Sales and Marketing.** Sales and marketing expenses consist primarily of advertising and other marketing related expenses, compensation related expenses, sales commissions and travel costs.

Sales and marketing expenses for the year ended December 31, 2005, increased approximately $247 million, or 32 percent, as compared to the prior year. Approximately $142 million of the increase was related to compensation expense as we increased our sales and marketing headcount to expand our presence in certain territories to service our expanding advertising business as well as support our growing advertiser base in existing regions. Additionally, year over year spending on marketing and distribution increased by $56 million, as we continued to invest in product branding and further develop our distribution channels. Sales and marketing expenses for the year ended December 31, 2004, increased approximately $247 million, or 47 percent, as compared to 2003. Sales and marketing expenses increased by approximately $136 million due to incremental costs related to acquisitions. The remainder of the increase was primarily due to increases of $25 million in marketing spending and $77 million in compensation and outside services expenses as we expanded our sales coverage model and increased our advertiser base and presence in certain territories.

Sales and marketing expenses in 2005, 2004, and 2003 as a percentage of revenues were 20 percent, 22 percent, and 33 percent, respectively, and decreased as a result of the overall increase in revenues, and savings as a result of our overall effort to manage discretionary costs.

We currently believe that sales and marketing expenses will increase in absolute dollars in 2006 compared to 2005, as we continue to grow and expand our reach to advertisers and users.

**Product Development.** Product development expenses consist primarily of compensation related expenses incurred for enhancements to and maintenance of the Yahoo! Properties, classification and

**Signatures**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused the report to be signed on its behalf by the undersigned, thereunto duly authorized, on the 3rd day of March 2006.

YAHOO! INC.

By:               /s/ SUSAN DECKER

                     Susan Decker
          *Executive Vice President, Finance and*
    *Administration and Chief Financial Officer*

**Power of Attorney**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Terry Semel and Susan Decker, his/her attorneys-in-fact, each with the power of substitution, for him/her in any and all capacities, to sign any amendments to this Report on Form 10-K and to file the same, with Exhibits thereto and other documents in connection therewith with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or substitute or substitutes may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ TERRY SEMEL<br>Terry Semel | Chairman and Chief Executive Officer (Principal Executive Officer) | March 3, 2006 |
| /s/ SUSAN DECKER<br>Susan Decker | Executive Vice President, Finance and Administration and Chief Financial Officer (Principal Financial Officer) | March 3, 2006 |
| /s/ MICHAEL MURRAY<br>Michael Murray | Senior Vice President, Finance and Chief Accounting Officer (Principal Accounting Officer) | March 3, 2006 |
| /s/ ROY BOSTOCK<br>Roy Bostock | Director | March 3, 2006 |
| /s/ RONALD BURKLE<br>Ronald Burkle | Director | March 3, 2006 |
| /s/ ERIC HIPPEAU<br>Eric Hippeau | Director | March 3, 2006 |
| /s/ VYOMESH JOSHI<br>Vyomesh Joshi | Director | March 3, 2006 |
| /s/ ARTHUR KERN<br>Arthur Kern | Director | March 3, 2006 |

| Signature | Title | Date |
|---|---|---|
| /s/ ROBERT KOTICK<br>Robert Kotick | Director | March 3, 2006 |
| /s/ EDWARD KOZEL<br>Edward Kozel | Director | March 3, 2006 |
| /s/ GARY WILSON<br>Gary Wilson | Director | March 3, 2006 |
| /s/ JERRY YANG<br>Jerry Yang | Director | March 3, 2006 |

**EXHIBIT 31.1**

**Certification of Chief Executive Officer Pursuant to**
**Securities Exchange Act Rules 13a-14(a) and 15d-14(a)**
**as Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Terry Semel, the Chief Executive Officer of Yahoo! Inc., certify that:

1.  I have reviewed this annual report on Form 10-K of Yahoo! Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: March 3, 2006                    By:  /s/ TERRY SEMEL
                                             _____
                                             Terry Semel
                                             Chief Executive Officer

**EXHIBIT 31.2**

**Certification of Chief Financial Officer Pursuant to
Securities Exchange Act Rules 13a-14(a) and 15d-14(a)
as Adopted Pursuant to
Section 302 of the Sarbanes-Oxley Act of 2002**

I, Susan Decker, the Chief Financial Officer of Yahoo! Inc., certify that:

1.  I have reviewed this annual report on Form 10-K of Yahoo! Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: March 3, 2006                    By:  /s/ SUSAN DECKER
                                             Susan Decker
                                             Chief Financial Officer

**EXHIBIT 32**

**Certification of Chief Executive Officer and Chief Financial Officer Pursuant to
18 U.S.C. Section 1350,
as Adopted Pursuant to
Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report on Form 10-K of Yahoo! (the "Company") for the year ended December 31, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Terry Semel, as Chief Executive Officer of the Company, and Susan Decker, as Chief Financial Officer of the Company, each hereby certifies, pursuant to 18 U.S.C. §1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, to the best of his and her knowledge, respectively, that:

     (1)  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

     (2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


/s/ TERRY SEMEL
Name: Terry Semel
Title: Chief Executive Officer
Dated: March 3, 2006

/s/ SUSAN DECKER
Name: Susan Decker
Title: Chief Financial Officer
Dated: March 3, 2006


The foregoing certification is being furnished pursuant to 18 U.S.C. Section 1350.  It is not being filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and it is not to be incorporated by reference into any filing of the Company, regardless of any general incorporation language in such filing.

Exhibit 15

DEF 14A 1 a2169174zdef14a.htm DEF 14A

QuickLinks -- Click here to rapidly navigate through this document

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐     Preliminary Proxy Statement

☐     **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒     Definitive Proxy Statement

☐     Definitive Additional Materials

☐     Soliciting Material Pursuant to §240.14a-12

**YAHOO! INC.**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒     No fee required.

☐     Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11.

    (1)      Title of each class of securities to which transaction applies:

    (2)      Aggregate number of securities to which transaction applies:

    (3)      Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    (4)      Proposed maximum aggregate value of transaction:

    (5)      Total fee paid:

☐  Fee paid previously with preliminary materials.

☐  Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)  Amount Previously Paid:

_____

(2)  Form, Schedule or Registration Statement No.:

_____

(3)  Filing Party:

_____

(4)  Date Filed:

_____

**Persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.**



701 First Avenue
Sunnyvale, CA 94089

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
### To Be Held May 25, 2006

---

We will hold the annual meeting of stockholders of Yahoo! Inc., a Delaware corporation (the "Company"), at the Santa Clara Convention Center, located at 5001 Great America Parkway, Santa Clara, California, on May 25, 2006, at 10:00 a.m., local time, for the following purposes:

1.  To elect ten directors of the Company to serve until the 2007 annual meeting of stockholders or until their respective successors are elected and qualified;

2.  To amend the Company's 1996 Directors' Stock Option Plan to, among other changes, reduce the levels of automatic grants of stock options to non-employee directors and provide for the grant of restricted stock units under the plan;

3.  To ratify the appointment of PricewaterhouseCoopers LLP as the independent registered public accounting firm for the Company for the fiscal year ending December 31, 2006; and

4.  To transact such other business as may properly come before the annual meeting and any adjournment or postponement thereof.

These items of business, including the nominees for directors, are more fully described in the proxy statement accompanying this Notice.

The board of directors has fixed the close of business on March 29, 2006 as the record date for determining the stockholders entitled to notice of and to vote at the annual meeting and any adjournment or postponement thereof.

All stockholders are cordially invited to attend the annual meeting in person. However, whether or not you plan to attend the annual meeting in person, you are urged to mark, date, sign and return the enclosed proxy card as promptly as possible in the postage-prepaid envelope provided, or vote electronically through the Internet or by telephone, to ensure your representation and the presence of a quorum at the annual meeting. If you submit your proxy and then decide to attend the annual meeting to vote your shares in person, you may still do so. Your proxy is revocable in accordance with the procedures set forth in the proxy statement. Only stockholders of record as of the close of business on March 29, 2006 are entitled to receive notice of, to attend and to vote at the meeting.

By Order of the Board of Directors,

Michael J. Callahan
*Senior Vice President, General Counsel and Secretary*

Sunnyvale, California
April 14, 2006



701 First Avenue
Sunnyvale, CA 94089

———————

# PROXY STATEMENT

———————

This proxy statement is furnished in connection with the solicitation by the board of directors of Yahoo! Inc., a Delaware corporation (the "Company," "Yahoo!," or "us"), of proxies for use in voting at the 2006 annual meeting of stockholders, to be held at the Santa Clara Convention Center, located at 5001 Great America Parkway, Santa Clara, California, on May 25, 2006, at 10:00 a.m., local time, and any adjournment or postponement thereof. On or about April 25, 2006, this proxy statement, the enclosed proxy card and the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2005 are being mailed to stockholders entitled to vote at the annual meeting.

## QUESTIONS AND ANSWERS ABOUT THE PROXY MATERIALS AND OUR 2006 ANNUAL MEETING

**Q:   Why am I receiving these materials?**

**A:**   The board of directors of Yahoo! is providing these proxy materials to you in connection with our 2006 annual meeting of stockholders, which will take place on May 25, 2006. As a stockholder, you are invited to attend the annual meeting and are entitled to and requested to vote on the proposals described in this proxy statement.

**Q:   What information is contained in these materials?**

**A:**   The information included in this proxy statement relates to the proposals to be voted on at the annual meeting, the voting process, the compensation of directors and our most highly paid executive officers, and certain other required information. The Company's 2005 Annual Report, which includes its audited consolidated financial statements, is also enclosed.

**Q:   What proposals will be voted on at the annual meeting?**

**A:**   Stockholders will vote on three proposals at the annual meeting:

- the election of ten directors to serve on our board of directors (Proposal No. 1);

- the approval of amendments to the Company's 1996 Directors' Stock Option Plan, as amended (the "Directors' Plan") to, among other changes, reduce the levels of automatic grants of stock options to non-employee directors and provide for the grant of restricted stock units under the plan (Proposal No. 2); and

- the ratification of the appointment of PricewaterhouseCoopers LLP as the independent registered public accounting firm of the Company for the fiscal year ending December 31, 2006 (Proposal No. 3).

We will also consider other business that properly comes before the annual meeting.

**Q:   How does the board recommend I vote on these proposals?**

**A:**   Yahoo!'s board of directors recommends that you vote your shares:

- "FOR" each of the nominees for director (Proposal No. 1);

- "FOR" the amendments to the Directors' Plan (Proposal No. 2); and

- "FOR" the ratification of the appointment of PricewaterhouseCoopers LLP as our independent registered public accounting firm (Proposal No. 3).

**Q:   Who is entitled to vote?**

**A:**   Stockholders of record as of the close of business on March 29, 2006, the record date, are entitled to notice of and to vote at the annual meeting.

**Q:   How many shares can vote?**

**A:**   At the close of business on the record date, 1,414,490,358 shares of common stock were outstanding and entitled to vote. (All references to numbers of shares and share or exercise prices in this proxy statement are presented after giving effect to our two-for-one stock split effected in May 2004.) We have no other class of stock outstanding.

**Q:   What shares can I vote?**

**A:**   You may vote all shares of Yahoo! common stock owned by you as of the close of business on the record date of March 29, 2006. You may cast one vote per share that you held on the record date. A list of stockholders entitled to vote at the annual meeting will be available during ordinary business hours at Yahoo!'s offices at 701 First Avenue, Sunnyvale, CA 94089 for a period of at least 10 days prior to the annual meeting.

**Q:   How can I vote my shares at the annual meeting?**

**A:**   If your shares are registered directly in your name with our transfer agent, Computershare Trust Company, N.A., you are considered the "stockholder of record" with respect to those shares, and the proxy materials and proxy card are being sent directly to you by Yahoo! As the stockholder of record, you have the right to vote in person at the meeting. If you choose to do so, you can bring the enclosed proxy card or vote using the ballot provided at the meeting. Most stockholders of Yahoo! hold their shares through a broker, bank or other nominee (that is, in "street name") rather than directly in their own name. If you hold your shares in street name, you are a "beneficial holder," and the proxy materials are being forwarded to you by your broker, bank or other nominee together with a voting instruction card. Because a beneficial holder is not the stockholder of record, you may not vote these shares in person at the meeting unless you obtain a "legal proxy" from the broker, bank or other nominee that holds your shares, giving you the right to vote the shares at the meeting. *Even if you plan to attend the annual meeting, we recommend that you vote your shares in advance as described below so that your vote will be counted if you later decide not to attend the annual meeting.*

**Q:   What do I need for admission to the annual meeting?**

**A:**   You are entitled to attend the annual meeting only if you are a stockholder of record or a beneficial owner as of March 29, 2006, or you hold a valid proxy for the annual meeting. You should be prepared to present photo identification for admittance. If you are the stockholder of record your name will be verified against the list of stockholders of record prior to your being admitted to the annual meeting. If you hold your shares in street name, you should provide proof of beneficial ownership on the record date, such as a brokerage account statement showing that you owned Yahoo! stock as of the record date, a copy of the voting instruction card provided by your broker, bank or other nominee, or other similar evidence of ownership as of the record date. If you do not provide photo identification or comply with the other procedures outlined above upon request, you will not be admitted to the annual meeting.

**Q:   How can I vote my shares without attending the annual meeting?**

**A:**   Whether you are the stockholder of record or hold your shares in street name, you may direct your vote without attending the annual meeting by completing and mailing your proxy card or voting instruction in the enclosed pre-paid envelope. In addition, if you are the stockholder of record, you may grant a proxy to vote your shares at the annual meeting by telephone, by calling 800-652-VOTE (1-800-652-8683) and following the simple recorded instructions, twenty-four hours a day, seven days a week, at any time prior to 2:00 a.m. Eastern Time the day of the annual meeting. Alternatively, as a stockholder of record, you may vote via the Internet at any time prior to 2:00 a.m. Eastern Time the day of the annual meeting, by going to

2

*http://www.computershare.com/expressvote* and following the instructions to create an electronic ballot. If you vote by telephone or the Internet, you will be required to provide the control number contained on your proxy card. If your shares are held in street name, your proxy card may contain instructions from your broker, bank or nominee that allow you to vote your shares using the Internet or by telephone. Please consult with your broker, bank or nominee if you have any questions regarding the electronic voting of shares held in street name. The granting of proxies electronically is allowed by Section 212 (c)(2) of the Delaware General Corporation Law. If you do not attend the annual meeting, you can listen to a webcast of the proceedings at Yahoo!'s investor relations site at *www.yahoo.com/info/investor.*

**Q:   What does it mean if I receive more than one proxy or voting instruction card?**

**A:**   It means your shares are registered differently or are in more than one account. Please provide voting instructions for all proxy and voting instruction cards you receive.

**Q:   How will my shares be voted if I return a blank proxy card?**

**A:**   If you are a stockholder of record, and you sign and return a proxy card without giving specific voting instructions, your shares will be voted as recommended by our board of directors on all matters and as the proxyholders may determine in their discretion with respect to any other matters properly presented for a vote before the meeting. If you hold your shares in street name and do not provide your broker with voting instructions (including by returning a blank voting instruction card), your shares may constitute "broker non-votes" and may not be counted in connection with certain matters (as described below).

**Q:   Can I change my vote or revoke my proxy?**

**A:**   You may change your vote or revoke your proxy at any time before your proxy is voted at the annual meeting. If you are a stockholder of record, you may change your vote or revoke your proxy by: (1) delivering to Yahoo! (Attention: Corporate Secretary) at the address on the first page of this proxy statement a written notice of revocation of your proxy; (2) delivering to Yahoo! an authorized proxy bearing a later date (including a proxy by telephone or over the Internet); or (3) attending the annual meeting and voting in person. Attendance at the meeting in and of itself, without voting in person at the meeting, will not cause your previously granted proxy to be revoked. For shares you hold in street name, you may change your vote by submitting new voting instructions to your broker, bank or other nominee or, if you have obtained a legal proxy from your broker, bank or other nominee giving you the right to vote your shares at the annual meeting, by attending the meeting and voting in person.

**Q:   How many shares must be present or represented to conduct business at the annual meeting?**

**A:**   The quorum requirement for holding the annual meeting and transacting business is that holders of a majority of the outstanding shares of common stock entitled to vote must be present in person or represented by proxy. Both abstentions and broker non-votes are counted for the purpose of determining the presence of a quorum.

**Q:   What if a quorum is not present at the meeting?**

**A:**   If a quorum is not present at the scheduled time of the annual meeting, we may adjourn the meeting, either with or without the vote of the stockholders. If we propose to have the stockholders vote whether to adjourn the meeting, the proxyholders will vote all shares for which they have authority in favor of the adjournment.

**Q:   What vote is required to approve each of the proposals?**

**A:**   In the election of directors, the ten persons receiving the highest number of "FOR" votes at the annual meeting will be elected. The proposals to approve the amendments to the Directors' Plan and to ratify the appointment of PricewaterhouseCoopers LLP require the affirmative "FOR" vote of a majority of those shares present in person or represented by proxy and entitled to vote on those proposals.

3

**Q:    What effect do abstentions and broker non-votes have on the proposals?**

**A:**    Abstentions have the same effect as votes "AGAINST" a matter. A broker is entitled to vote shares held for a beneficial owner on routine matters, such as the election of our directors and the ratification of the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm, without instructions from the beneficial owner of those shares. On the other hand, a broker may not be entitled to vote shares held for a beneficial owner on certain non-routine items, such as the amendment of the Directors' Plan, absent instructions from the beneficial owners of such shares. Broker non-votes count for purposes of determining whether a quorum exists but do not count as entitled to vote with respect to individual proposals. For the proposals requiring the affirmative vote of those shares present and entitled to vote, broker non-votes will not affect the outcome of the vote.

**Q:    What happens if additional matters are presented at the annual meeting?**

**A:**    Other than the three proposals described in this proxy statement, we are not aware of any other business to be acted upon at the annual meeting. If you grant a proxy, the persons named as proxyholders, Michael J. Callahan and Susan L. Decker, will have the discretion to vote your shares on any additional matters properly presented for a vote at the meeting.

**Q:    Who will count the votes?**

**A:**    A representative of Computershare Trust Company, N.A. will tabulate the votes and act as Inspector of Elections.

**Q:    Where can I find the voting results of the annual meeting?**

**A:**    Yahoo! will announce preliminary voting results at the annual meeting and publish final results in Yahoo!'s quarterly report on Form 10-Q for the second quarter of fiscal 2006.

**Q:    Who will bear the cost of soliciting votes for the annual meeting?**

**A:**    The solicitation of proxies will be conducted by mail, and Yahoo! will bear all attendant costs. These costs will include the expense of preparing and mailing proxy solicitation materials for the annual meeting and reimbursements paid to brokerage firms and others for their expenses incurred in forwarding solicitation materials regarding the annual meeting to beneficial owners of Yahoo! common stock. Yahoo! may conduct further solicitation personally, telephonically, through the Internet or by facsimile through its officers, directors and employees, none of whom will receive additional compensation for assisting with the solicitation. Yahoo! has retained Georgeson Shareholder Communications, Inc. to assist in the solicitation of proxies, for a fee estimated to be approximately $20,000 plus out of pocket expenses. Yahoo! may generate other expenses in connection with the solicitation of proxies for the annual meeting.

**Q:    May I propose actions for consideration at next year's annual meeting or nominate individuals to serve as directors?**

**A:**    Yes. The following requirements apply to stockholder proposals, including director nominations, for the 2007 annual meeting of stockholders.

**Requirements for Stockholder Proposals to be Considered for Inclusion in Proxy Materials:**

Stockholders interested in submitting a proposal for inclusion in the proxy materials distributed by us for the 2007 annual meeting of stockholders may do so by following the procedures prescribed in Rule 14a-8 promulgated by the Securities and Exchange Commission ("SEC"). To be eligible for inclusion, stockholder proposals must be received no later than December 15, 2006 and must comply with SEC regulations under Rule 14a-8 regarding the inclusion of stockholder proposals in company-sponsored proxy materials. Proposals should be sent to Yahoo!'s Corporate Secretary at 701 First Avenue, Sunnyvale, California 94089.

4

**Requirements for Stockholder Proposals Not Intended for Inclusion in Proxy Materials and for Nomination of Director Candidates:**

Stockholders who wish to nominate persons for election to the board of directors at the 2007 annual meeting of stockholders or who wish to present a proposal at the 2007 annual meeting of stockholders, but who do not intend for such proposal to be included in the proxy materials distributed by us for such meeting, must deliver written notice of the nomination or proposal to the Corporate Secretary at the above address no earlier than January 25, 2007 and no later than February 24, 2007 (provided, however, that if the 2007 annual meeting of stockholders is held earlier than April 30, 2007 or later than June 19, 2007, nominations and proposals must be received no later than the close of business on the 10th day following the day on which the notice or public announcement of the date of the 2007 annual meeting of stockholders is first mailed or made, whichever occurs first). The stockholder's written notice must include certain information concerning the stockholder and each nominee and proposal, as specified in Yahoo!'s bylaws. In addition, stockholders may propose director candidates for consideration by Yahoo!'s Nominating and Corporate Governance Committee by following the procedures set forth under "Nominating and Corporate Governance Committee" beginning on page 9 of this proxy statement.

**Copy of Bylaws:**

To obtain a copy of the bylaws at no charge, you may write to Yahoo!'s Corporate Secretary at the above address.

**Q:   How do I obtain a separate set of proxy materials if I share an address with other stockholders?**

**A:**   As permitted by applicable law, only one copy of this proxy statement is being delivered to stockholders residing at the same address, unless such stockholders have notified Yahoo! of their desire to receive multiple copies of the proxy statement. Yahoo! will promptly deliver, upon oral or written request, a separate copy of the proxy statement to any stockholder residing at an address to which only one copy was mailed. Requests for additional copies should be directed to Investor Relations, Yahoo! Inc., 701 First Avenue, Sunnyvale, California 94089 or by telephone at (408) 349-3382.

**Q:   May I elect to receive Yahoo! stockholder communications electronically rather than through the mail?**

**A:**   Yes. If you received your annual meeting materials by mail, we encourage you to help us to conserve natural resources, as well as significantly reduce Yahoo!'s printing and mailing costs, by signing up to receive your stockholder communications via e-mail. With electronic delivery, we will notify you via e-mail as soon as the annual report and the proxy statement are available on the Internet, and you can submit your stockholder votes online. Electronic delivery can also help reduce the number of bulky documents in your personal files and eliminate duplicate mailings. To sign up for electronic delivery:

1.   If you are a registered holder (*i.e.*, you hold your Yahoo! shares in your own name through our transfer agent, Computershare Trust Company, N.A., or you have stock certificates), visit *www.computershare.com/us/ecomms* to enroll.

2.   If you are a beneficial holder (*i.e.*, your shares are held by a brokerage firm, a bank or a trustee), visit *www.icsdelivery.com/yhoo* to enroll.

Your electronic delivery enrollment will be effective until you cancel it. If you have questions about electronic delivery, please contact Investor Relations, Yahoo! Inc., 701 First Avenue, Sunnyvale, California 94089 or by telephone at (408) 349-3382.

5

**PROPOSAL NO. 1**
**ELECTION OF DIRECTORS**

**Nominees**

At the annual meeting, the stockholders will elect ten directors to serve until the 2007 annual meeting of stockholders or until their respective successors are elected and qualified. Unless marked otherwise, proxies received will be voted "FOR" the election of the ten nominees named below.

Assuming a quorum is present, the ten nominees receiving the highest number of affirmative votes of shares entitled to be voted for them will be elected as directors of the Company. Stockholders are not entitled to cumulate votes in the election of directors. All nominees have consented to serve as directors, if elected. If any nominee is unable or unwilling to serve as a director at the time of the annual meeting, the persons who are designated as proxies intend to vote, in their discretion, for such other persons, if any, as may be designated by the board of directors. As of the date of this proxy statement, the board of directors has no reason to believe that any of the persons named below will be unable or unwilling to serve as a nominee or as a director if elected.

The names of the nominees, their ages as of March 29, 2006 and certain other information about them are set forth below:

| Name | Age | Position |
| --- | --- | --- |
| Terry S. Semel | 63 | Chairman and Chief Executive Officer |
| Jerry Yang | 37 | Chief Yahoo! and Director |
| Roy J. Bostock (1)(3) | 65 | Director |
| Ronald W. Burkle (1) | 53 | Director |
| Eric Hippeau | 54 | Director |
| Vyomesh Joshi (2)(3) | 52 | Director |
| Arthur H. Kern (1)(2) | 59 | Director |
| Robert A. Kotick (3) | 43 | Director |
| Edward R. Kozel (2) | 50 | Director |
| Gary L. Wilson (2) | 66 | Director |

(1)     Member of the Compensation Committee

(2)     Member of the Audit Committee

(3)     Member of the Nominating and Corporate Governance Committee

Each of the director nominees listed above, with the exception of Mr. Joshi, was elected to be a director at the Company's annual meeting of stockholders held on May 19, 2005. Mr. Joshi was appointed to the board on July 21, 2005 to fill a vacancy on the board. There are no family relationships among any of the directors or executive officers of the Company. Our board of directors has affirmatively determined that each of Messrs. Bostock, Burkle, Hippeau, Joshi, Kern, Kotick, Kozel and Wilson is an independent director as defined in the rules of The Nasdaq Stock Market ("Nasdaq").

*Mr. Semel* was appointed as the Company's Chairman of the board of directors and Chief Executive Officer on May 1, 2001. Since September 1999, Mr. Semel has also served as Chairman and Chief Executive Officer of Windsor Media, Inc. From March 1994 to September 1999, Mr. Semel served as Chairman of the board of directors and Co-Chief Executive Officer of Warner Bros. and Warner Music Group, entertainment and media companies. Mr. Semel also serves as a director of Polo Ralph Lauren Corporation. Mr. Semel holds a B.S. degree in accounting from Long Island University.

*Mr. Yang*, a founder of the Company and Chief Yahoo!, has served as a member of the board of directors and an officer of the Company since March 1995. Mr. Yang co-developed Yahoo! in 1994 while

6

he was working towards his Ph.D. in electrical engineering at Stanford University. As Chief Yahoo!, Mr. Yang reports to the Chairman and Chief Executive Officer, Terry Semel. Mr. Yang is involved in guiding the Company's vision, is involved in many key aspects of the business at a strategic and operational level, and serves as a stalwart of the Company's employee culture and morale. Mr. Yang also serves as a director of Yahoo! Japan Corporation and Cisco Systems, Inc. Mr. Yang holds B.S. and M.S. degrees in electrical engineering from Stanford University.

*Mr. Bostock* has served as a member of the board of directors since May 2003. Mr. Bostock served as Chairman of BCom3 Group, Inc., a global advertising agency group, from January 2000 to mid 2001. From July 1990 to January 2000, Mr. Bostock served as Chairman and Chief Executive Officer of D'Arcy Masius Benton & Bowles, Inc. and its successor company, The MacManus Group, Inc., an advertising and marketing services firm. Mr. Bostock is Chairman of the Partnership for a Drug-Free America, a not-for-profit corporation creating advertising to reduce the use of illicit drugs in the United States, and also serves as a director of Morgan Stanley and Northwest Airlines Corporation. Mr. Bostock holds a Bachelor's degree from Duke University and an M.B.A. from Harvard University.

*Mr. Burkle* has served as a member of the board of directors since November 2001. Mr. Burkle is managing partner of The Yucaipa Companies, a private investment firm, which he co-founded in 1986. Mr. Burkle also serves as a director of Yucaipa Equity Partners, L.P., Occidental Petroleum Corp., and KB Home Corporation.

*Mr. Hippeau* has served as a member of the board of directors since January 1996. Mr. Hippeau has been a Managing Partner of SOFTBANK Capital, a technology oriented venture capital firm, since 2000. Before joining SOFTBANK Capital, from 1993 to 2000, Mr. Hippeau served as Chairman and CEO of Ziff-Davis, Inc., an integrated media and marketing services company serving the technology community. Mr. Hippeau joined Ziff-Davis, Inc. in 1989 as Publisher of PC Magazine and held several senior executive positions before becoming Chairman and CEO. His experience prior to Ziff-Davis includes senior executive positions at International Data Group and as an international technology business investor and media leader. Mr. Hippeau also serves as a director of Starwood Hotels and Resorts WorldWide, Inc. and Odimo Incorporated.

*Mr. Joshi* has served as a member of the board of directors since July 2005. Mr. Joshi was elected Executive Vice President of the Imaging and Printing Group at Hewlett-Packard Company in 2002 after serving as Vice President since January 2001. Mr. Joshi also served as Chairman of Phogenix Imaging LLC, a joint venture between HP and Kodak, from 2000 until May 2003. Prior to that Mr. Joshi was Vice President and General Manager of Inkjet Systems. Mr. Joshi holds a master's degree in electrical engineering from Ohio State University.

*Mr. Kern* has served as a member of the board of directors since January 1996. Mr. Kern is an investor in several media and marketing companies. Mr. Kern was also co-founder and Chief Executive Officer of American Media, a group owner of commercial radio stations sold to AMFM (now part of Clear Channel Communications, Inc.) in October 1994. Mr. Kern also serves as a director of Digitas, Inc. Mr. Kern is a graduate of Yale University.

*Mr. Kotick* has been a director of the Company since March 2003. Since February 1991, Mr. Kotick has been the Chairman and Chief Executive Officer of Activision, Inc., a publisher of interactive entertainment software products.

*Mr. Kozel* has served as a member of the board of directors since October 2000. He has been Chief Executive Officer of cRight, Inc. since March 2006 and has been the managing member of Open Range Ventures, a venture capital firm, since January 2000. Between January 2004 and December 2004, Mr. Kozel was a managing director of Integrated Finance Ltd. Between October 2000 and March 2001, Mr. Kozel was the Chief Technology Officer, Service Provider Line of Business of Cisco Systems, Inc. Prior to that time, he was Senior Vice President, Corporate Development at Cisco from April 1998 to

7

January 2000, and Senior Vice President and Chief Technical Officer from January 1996 to April 1998. Mr. Kozel also serves as a director of Reuters Group PLC and Red Hat Linux, Inc. Mr. Kozel holds a B.S. degree in electrical engineering from the University of California, Davis.

*Mr. Wilson* has served as a member of the board of directors since November 2001. Mr. Wilson has served as Chairman of the board of directors of Northwest Airlines Corporation, the parent of Northwest Airlines, Inc. since April 1997. Mr. Wilson also serves as a director of The Walt Disney Company, where he worked for 15 years, and as a director of CB Richard Ellis Group, Inc. Mr. Wilson holds a Bachelor's degree from Duke University and an M.B.A. from the Wharton Graduate School of Business.

8

# CORPORATE GOVERNANCE

## Meetings and Committees of the Board of Directors

During fiscal 2005, the board of directors held seven meetings and took action by unanimous written consent on five occasions. During fiscal 2005, each incumbent director then in office attended at least 75% of the aggregate of the total number of meetings of the board of directors held during the period in which he was a director and the total number of meetings held by all of the committees of the board of directors on which he served. Independent directors of our board of directors meet in regularly scheduled sessions without management. The chair of the executive session rotates among the chairs of the board committees. The board of directors has an Audit Committee, a Compensation Committee, and a Nominating and Corporate Governance Committee (the "Nominating/Governance Committee").

**Audit Committee.**    The Audit Committee is comprised of four of the Company's non-employee directors: Messrs. Kozel (Chair), Joshi, Kern and Wilson. Mr. Bostock served as a member of the Audit Committee until October 28, 2005, when Mr. Joshi was elected to the Audit Committee. It met eight times during fiscal 2005. The Audit Committee is responsible for the appointment, retention and termination of a firm of independent registered public accountants and monitors the effectiveness of the audit effort, the Company's financial and accounting organization and its system of internal accounting and disclosure controls. Each member of the Audit Committee is independent within the meaning of the rules of the SEC and Nasdaq. The board has determined that Mr. Wilson qualifies as an audit committee financial expert within the meaning of SEC rules.

The Audit Committee is governed by a charter, which was amended on February 2, 2006. The amended charter is attached to this proxy statement as *Annex A*, and is also available on our corporate website at *www.yahoo.com*. The charter may be found on our website as follows: From our main web page, first click on "Company Info" at the bottom of the page and then on "Investor Relations." Next, click on "Corporate Governance," then "Board Committees" and "Audit Committee Charter."

**Compensation Committee; Compensation Committee Interlocks and Insider Participation.** The Compensation Committee consists of three of the Company's non-employee directors: Messrs. Kern (Chair), Bostock and Burkle. Mr. Kotick and Mr. Wilson served as members of the Committee, with Mr. Kotick serving as the Chair of the Compensation Committee, until October 28, 2005 when Mr. Bostock and Mr. Burkle were elected to the Committee. Each of the members of the Compensation Committee is an independent director as defined in Nasdaq rules. The Compensation Committee held nine meetings and took action by unanimous written consent on 29 occasions during fiscal 2005. The Compensation Committee's functions are to establish and administer the Company's policies regarding compensation. The Compensation Committee also administers the Company's Amended and Restated 1995 Stock Plan and the Company's Amended and Restated 1996 Employee Stock Purchase Plan.

None of the members of the Compensation Committee (i) was an officer or employee of the Company or any of its subsidiaries during the fiscal year, (ii) was formerly an officer of the Company or any of its subsidiaries, or (iii) had any relationships requiring disclosure by the Company under the SEC's rules requiring disclosure of certain relationships and related party transactions. None of our executive officers serves as a member of the board of directors or compensation committee of any entity that has one or more executive officers serving on our board of directors or Compensation Committee.

The Compensation Committee is governed by a charter, which is available on our corporate website at *www.yahoo.com*. The charter may be found as follows: From our main web page, first click on "Company Info" at the bottom of the page and then on "Investor Relations." Next, click on "Corporate Governance," then "Board Committees" and "Compensation Committee Charter."

**Nominating and Corporate Governance Committee.**    The members of the Nominating/Governance Committee are Messrs. Kotick (Chair), Bostock and Joshi, each of whom is an independent director as defined in Nasdaq rules. Mr. Kern and Mr. Burkle served as members of the Committee, with Mr. Kern

9

serving as Chair of the Committee, until October 28, 2005 when Mr. Kotick and Mr. Joshi were elected to the Committee. The Nominating/Governance Committee met three times during 2005.

The functions of the Nominating/Governance Committee include (i) identifying and recommending to the board of directors individuals qualified to serve as directors of the Company and on the committees of the board; (ii) advising the board with respect to matters of board composition, procedures and committees; (iii) developing and recommending to the board a set of corporate governance principles applicable to the Company and overseeing corporate governance matters generally; and (iv) overseeing the annual evaluation of the board and its committees.

The Nominating/Governance Committee will consider director candidates recommended by stockholders. In evaluating candidates submitted by stockholders, the Nominating/Governance Committee will consider (in addition to the criteria applicable to all director candidates described below) the needs of the board and the qualifications of the candidate, and may also take into consideration the number of shares held by the recommending stockholder and the length of time that such shares have been held. To have a candidate considered by the Nominating/Governance Committee, a stockholder must submit the recommendation in writing and must include the following information:

- The name of the stockholder and evidence of the person's ownership of Company stock, including the number of shares owned and the length of time of ownership; and

- The name of the candidate, the candidate's resume or a listing of his or her qualifications to be a director of the Company and the person's consent to be named as a director if selected by the Nominating/Governance Committee and nominated by the board.

The stockholder recommendation and information described above must be sent to the Corporate Secretary at 701 First Avenue, Sunnyvale, California 94089.

The Nominating/Governance Committee believes that the minimum qualifications for service as a director of the Company are that a nominee possess (i) an ability, as demonstrated by recognized success in his or her field, to make meaningful contributions to the board's oversight of the business and affairs of the Company, and (ii) an impeccable reputation of integrity and competence in his or her personal or professional activities. Pursuant to its charter, the Nominating/Governance Committee's evaluation of potential candidates is consistent with the board's criteria for selecting new directors. Such criteria include an understanding of the Company's business environment and the possession of such knowledge, skills, expertise and diversity of experience as may enhance the board's ability to manage and direct the affairs and business of the Company and, where applicable, improve the ability of board committees to fulfill their duties. The Committee also takes into account, as applicable, the satisfaction of any independence requirements imposed by any applicable laws, regulations or rules and the Company's Corporate Governance Guidelines.

The Nominating/Governance Committee may receive suggestions from current board members, company executive officers or other sources, which may be either unsolicited or in response to requests from the Nominating/Governance Committee for such candidates. The Nominating/Governance Committee also, from time to time, may engage firms that specialize in identifying director candidates. As described above, the Nominating/Governance Committee will also consider candidates recommended by stockholders.

After a person has been identified by the Nominating/Governance Committee as a potential candidate, the Nominating/Governance Committee may collect and review publicly available information regarding the person to assess whether the person should be considered further. If the Nominating/Governance Committee determines that the candidate warrants further consideration, the Chairman or another member of the Nominating/Governance Committee may contact the person. Generally, if the person expresses a willingness to be considered and to serve on the board, the Nominating/Governance Committee may request information from the candidate, review the person's accomplishments and

10

qualifications and may conduct one or more interviews with the candidate. The Nominating/Governance Committee may consider all such information in light of information regarding any other candidates that the Nominating/Governance Committee might be evaluating for membership on the board. In certain instances, Nominating/Governance Committee members may contact one or more references provided by the candidate or may contact other members of the business community or other persons that may have greater first-hand knowledge of the candidate's accomplishments. The Nominating/Governance Committee's evaluation process does not vary based on whether or not a candidate is recommended by a stockholder, although, as stated above, in the case of such a candidate the board may take into consideration the number of shares held by the recommending stockholder and the length of time that such shares have been held.

The Nominating/Governance Committee is governed by a charter, a current copy of which is available on our corporate website at *www.yahoo.com*. The charter may be found as follows: From our main web page, first click on "Company Info" at the bottom of the page and then on "Investor Relations." Next, click on "Corporate Governance," then "Board Committees" and "Nominating & Corporate Governance Committee Charter."

### Corporate Governance Guidelines

Our board of directors, on the recommendation of the Nominating/Governance Committee, has adopted our Corporate Governance Guidelines (the "Guidelines") to assist the board of directors in the discharge of its duties and to serve the interests of the Company and its stockholders. The Guidelines can be found on our corporate website at *www.yahoo.com*. From our main web page, first click on "Company Info" at the bottom of the page then on "Investor Relations." Next, click on "Corporate Governance." Finally, click on "Corporate Governance Guidelines."

### Code of Ethics

Our board of directors has adopted a code of ethics that applies to our chief executive officer, chief financial officer, principal accounting officer and controller. This code of ethics is posted on our corporate website at *www.yahoo.com*. The code of ethics may be found as follows: From our main web page, first click on "Company Info" at the bottom of the page and then on "Investor Relations." Next, click on "Corporate Governance." Finally, click on "Code of Ethics." We intend to satisfy the disclosure requirement under Item 10 of Form 8-K regarding any amendment to, or waiver from, a provision of this code of ethics by posting such information on our website, at the address and location specified above.

### Communications with Directors

The board has established a process to receive communications from stockholders. Stockholders and other interested parties may contact any member (or all members) of the board, or the non-management directors as a group, any board committee or any chair of any such committee by mail or electronically. To communicate with the board of directors, any individual directors or any group or committee of directors, correspondence should be addressed to the board of directors or any such individual directors or group or committee of directors by either name or title. All such correspondence should be sent "c/o Corporate Secretary" at 701 First Avenue, Sunnyvale, California 94089. To communicate with any of our directors electronically, stockholders should send an email to CorporateSecretary@yahoo-inc.com.

All communications received as set forth in the preceding paragraph will be opened by the Corporate Secretary for the sole purpose of determining whether the contents represent a message to our directors. The Corporate Secretary will forward copies of all correspondence that, in the opinion of the Corporate Secretary, deals with the functions of the board of directors or its committees or that he or she otherwise determines requires the attention of any member, group or committee of the board of directors.

11

It is the Company's policy that directors are invited and encouraged to attend the annual meeting. Eight of our directors were in attendance at the 2005 annual meeting.

**Director Compensation**

Currently, the Company does not pay fees to its directors for performance of their duties as directors of the Company. The Company does reimburse its directors for their out-of-pocket expenses incurred in connection with attendance at board, committee and stockholder meetings, and other business of the Company. The Directors' Plan currently provides that each newly appointed or elected non-employee director of the Company will be granted a nonqualified stock option to purchase 100,000 shares of common stock on the date on which he or she first becomes a director. This initial option is scheduled to vest ratably over the 48-month period following the date of grant. Thereafter, on the date of each annual meeting of the Company's stockholders at which such non-employee director is elected, he or she will be granted an additional option to purchase 50,000 shares of common stock if, on such date, he or she shall have served on the board of directors for at least six months of the preceding 12 months. This annual option is scheduled to vest as to 25% of the options on the first anniversary of the date of grant, and the remainder of the option will vest ratably over the 36-month period following the first anniversary of the date of grant. The exercise price of all stock options granted under the Directors' Plan is equal to the fair market value of a share of the Company's common stock on the date of grant of the option. All options will become exercisable upon the occurrence of a change of control event, as described in the Directors' Plan.

If the stockholders approve the proposed amendments to the Directors' Plan (Proposal No. 2), the Company will modify the compensation package for its non-employee directors to reduce the levels of automatic grants. Each newly appointed or elected non-employee director of the Company will be granted a nonqualified stock option to purchase 30,000 shares of common stock and an award of 10,000 restricted stock units on the date on which he or she first becomes a director. Thereafter, on the date of each annual meeting of the Company's stockholders at which such non-employee director is elected, he or she will be granted an additional option to purchase 15,000 shares of common stock and an additional award of 5,000 restricted stock units if, on such date, he or she shall have served on the board of directors for at least six months of the preceding 12 months. If the director has served on the board of directors for less than six of the preceding 12 months, he or she will receive a pro rata portion of such option and restricted stock units based on number of days served during such six month period. The options and restricted stock units granted to non-employee directors are scheduled to vest in equal quarterly installments over the one-year period following the date of grant. The restricted stock units granted under the Directors' Plan will be paid in an equivalent number of shares of common stock on the earlier of the date the non-employee directors' service terminates and the third anniversary of the date of grant, subject to any election by the non-employee director to defer the payment date.

In addition, if the stockholders approve the proposed amendments to the Directors' Plan, the Company will pay an additional annual fee to a non-employee director who serves as the chairperson of a committee of the board of directors. The fee is $35,000 for the chairperson of the Audit Committee and $15,000 for the chairperson of each of the other committees. These fees are payable in cash, but the director may elect to have his or her fee converted into an award of either stock options or restricted stock units granted under the Directors' Plan. If the director elects a stock option, the option would cover a number of shares of the Company's common stock determined by multiplying his or her fee by three and dividing the product by the fair market value of a share of the Company's common stock on the grant date. If the director elects a restricted stock unit award, he or she would be credited with a number of restricted stock units equal to the amount of his or her fee divided by the fair market value of a share of the Company's common stock on the grant date. The exercise price of the stock option would be equal to the fair market value of a share of the Company's common stock on the grant date. Any stock option or restricted stock unit award granted on conversion of chairperson fees would be fully vested on the grant date.

12

Each of the non-employee nominees for director named in this proxy statement will have served for more than six months of the preceding 12 months at the time of the annual meeting, and will therefore be granted an option to purchase 15,000 shares of the Company's common stock and 5,000 restricted stock units under the Directors' Plan if they are reelected to the board of directors at the annual meeting and if the Company's stockholders approve the proposed amendments to the Directors' Plan. If the Company's stockholders do not approve the proposed amendments to the Directors' Plan, each of the non-employee nominees for director will be granted an option to purchase 50,000 shares of the Company's common stock (and no restricted stock units) under the Directors' Plan if they are reelected to the board of directors at the annual meeting.

### Non-Employee Director Compensation Table

| Name | Stock Underlying Options Granted During 2005 |
|---|---|
| Roy J. Bostock | 50,000 |
| Ronald W. Burkle | 50,000 |
| Eric Hippeau | 50,000 |
| Vyomesh Joshi | 100,000 |
| Arthur H. Kern | 50,000 |
| Robert A. Kotick | 50,000 |
| Edward R. Kozel | 50,000 |
| Gary L. Wilson | 50,000 |

**Required Vote**

Directors are elected by a plurality of the votes of the shares present in person or by proxy at the annual meeting and entitled to vote on the election of directors. The ten persons receiving the highest number of "FOR" votes at the annual meeting will be elected as directors.

**Recommendation of the Board of Directors**

**THE BOARD RECOMMENDS A VOTE "FOR" THE ELECTION OF ALL NOMINEES NAMED ABOVE.**

13

**PROPOSAL NO. 2**
**APPROVAL OF AMENDMENTS TO THE 1996 DIRECTORS' STOCK OPTION PLAN**

The Company's board of directors has determined that it would be appropriate to modify the equity-based awards granted annually to non-employee directors as described above under "Director Compensation." Specifically, on March 31, 2006, the board of directors approved, subject to stockholder approval, an amended and restated version of the Company's 1996 Directors' Stock Option Plan, which would be renamed the 1996 Directors' Stock Plan (the "Directors' Plan") and would include the following amendments:

- **Reduction in Option Grants.** The proposed amendments would reduce the number of shares of the Company's common stock subject to annual grants of stock options to continuing non-employee directors from 50,000 shares to 15,000 shares and would reduce the number of shares subject to stock options granted to newly elected or appointed non-employee directors from 100,000 shares to 30,000 shares.

- **Vesting of Options.** Stock options granted under the Directors' Plan would vest in equal quarterly installments over a one-year period following the date of grant.

- **Reduction of Option Term.** The proposed amendments would also reduce the term of options granted under the plan from ten years to seven years.

- **Extension of Option Exercise Period.** The proposed amendments would increase the period in which a non-employee director may exercise the vested portion of his or her option following the director's termination of service from 90 days to one year.

- **Awards of Restricted Stock Units.** Under the proposed amendments, the Company would grant restricted stock units to non-employee directors. Continuing non-employee directors would be granted 5,000 restricted stock units each year. Newly appointed or elected non-employee directors would be granted 10,000 restricted stock units. The restricted stock units would vest in equal quarterly installments over a one-year period following the date of grant and would generally be paid in an equal number of shares of the Company's common stock on the earlier of the third anniversary of the grant date or the date the director ceased being a member of the board.

- **Share-Counting Rules for Restricted Stock Units.** Under the proposed amendments, any shares of the Company's common stock issued in payment of restricted stock units granted under the plan will be counted against the plan's share limit as 1.75 shares for every one share actually issued in payment of the restricted stock units. For example, if 100 shares were issued in payment of stock units granted under the plan, 175 shares would be charged against the plan's share limit.

The board of directors approved these amendments based upon an evaluation of the compensation provided to the non-employee directors under the existing Director Plan and an evaluation of director compensation provided by comparable companies. An independent consultant was engaged to assist with this evaluation and make recommendations. Based on this evaluation and the recommendations of the independent consultant, the Company determined that it was most desirable to compensate its non-employee directors with a combination of cash (in the case of committee chairpersons), stock options and restricted stock units. The Company believes these amendments and the changes to its overall director compensation package will allow the Company to continue to attract and retain the highest quality directors, which is essential to the Company's long-term growth and success, while also significantly reducing the number of shares subject to initial and annual equity grants to non-employee directors.

The Company is not seeking an increase in the aggregate number of shares available for award grant purposes under the Directors' Plan.

14

**SUMMARY DESCRIPTION OF THE DIRECTORS' PLAN**

The principal features of the Directors' Plan, including the proposed amendments, are summarized below. The following summary of the Directors' Plan does not purport to be complete, and is subject to and qualified in its entirety by reference to the complete text of the amended and restated Directors' Plan, which has been filed as *Annex B* with the SEC with this Proxy Statement. Any stockholder of the Company who wishes to obtain a copy of the amended and restated Directors' Plan document may do so upon written request to the Secretary at the Company's principal executive offices.

**General**

The Directors' Plan was adopted by the board of directors in March 1996 and approved by the stockholders in April 1996. The maximum number of shares of the Company's common stock that may be issued or transferred pursuant to awards granted under the Directors' Plan is 8,800,000 shares, of which 5,096,668 shares remain available for issuance. The Directors' Plan provides for the grant of nonqualified stock options to non-employee directors of the Company. If stockholders approve the proposed amendments to the Directors' Plan, the Directors' Plan will also provide for the grant of restricted stock units to non-employee directors. Any shares of the Company's common stock issued in payment of restricted stock units granted under the Directors' Plan will be counted against the plan's share limit as 1.75 shares for every one share actually issued in payment of the restricted stock units. As described above under "Director Compensation," non-employee directors will also be permitted to elect an award of stock units or a stock option under the Directors' Plan in lieu of a cash payment of fees for serving as chairperson of a board committee. The Directors' Plan is designed to work automatically and not to require administration; however, to the extent administration is necessary, it will be provided by the board of directors.

**Purpose**

The purpose of the Directors' Plan is to provide an incentive for directors to continue to serve the Company as directors and to assist the Company in recruiting highly qualified individuals when vacancies occur on the board of directors. The executive officers and other employees of the Company are not eligible to be granted awards under the Directors' Plan.

**Grant and Exercise of Options**

Currently, the Directors' Plan provides that each person who first becomes a non-employee director after the effective date of the Directors' Plan, whether through election by the stockholders of the Company or appointment by the board of directors to fill a vacancy, shall be automatically granted an initial option to purchase 100,000 shares of the Company's common stock on the date on which such person first becomes a non-employee director (an "initial option"). The Directors' Plan also provides that a subsequent option to purchase 50,000 shares of the Company's common stock will be automatically granted to each non-employee director on the date of each annual meeting of the stockholders at which such non-employee director is elected, provided that on that date the non-employee director has served on the board of directors for at least six months (a "subsequent option"). The Directors' Plan provides that each initial option shall vest in equal monthly installments over the 48-month period commencing at the end of the first month following the date of grant thereunder becomes exercisable in installments cumulatively as to $1/48$ of the shares subject to the initial option at the end of each month following the date of grant of the initial option. With respect to subsequent option grants, 25% of such options vest on the first anniversary of the date of grant, with the remaining options vesting in equal monthly installments over the remaining 36-month period thereafter.

If stockholders approve the proposed amendments to the Directors' Plan, the number of shares subject to initial option grants and subsequent option grants will be reduced to 30,000 and 15,000 shares,

15

respectively, and all of the options will vest in equal quarterly installments over a one-year period following the date of grant. The subsequent option grant will be prorated if the non-employee director has served on the board of directors for less than six months as of the date of the annual meeting based on the number of days served during the six-month period.

The exercise price of all stock options granted under the Directors' Plan will be equal to the fair market value of a share of the Company's common stock on the date of grant of the option. The fair market value of a share of the Company's common stock for plan purposes is generally defined to be the closing sale price of the Company's common stock on the Nasdaq Stock Market on the relevant date. The purchase price payable upon exercise of the options may be paid by cash, check, other shares of the Company's common stock (which, if acquired from the Company, have been held for at least six months), delivery of a properly executed exercise notice together with irrevocable instructions to a broker to deliver to the Company the amount of sale or loan proceeds required to pay the exercise price, a combination of the foregoing, or any other consideration or method permitted under applicable law.

Currently, options granted under the Directors' Plan have a term of ten years. If stockholders approve the proposed amendments to the Directors' Plan, options granted under the Directors' Plan on and after the date of the annual meeting will have a term of seven years.

Currently, options granted under the Directors' Plan remain exercisable as to the vested portion for up to 90 days following the optionee's termination of service as a director of the Company, unless such termination is a result of disability, in which case the options remain exercisable for a six-month period (or such other period of time not exceeding 12 months as is determined by the board of directors) following the date of such termination, or death, in which case the options remain exercisable by the beneficiary of such options and continue to vest for a six-month period (or such lesser period as determined by the board of directors) following the date of death. If an optionee dies within three months after termination of service as a director, the options may be exercised by the inheritor of such options at any time within six months of the date of the optionee's death.

If stockholders approve the proposed amendments to the Directors' Plan, options granted under the plan on or after the 2006 annual meeting will remain exercisable as to the vested portion for up to one year following the optionee's termination of service as a director of the Company for any reason. Notwithstanding the foregoing, in no event may an option be exercised after the expiration of its term.

**Restricted Stock Units**

If stockholders approve the proposed amendments to the Directors' Plan, the Directors' Plan will provide for grants of restricted stock units to non-employee directors. Each person who first becomes a non-employee director after the 2006 annual meeting, whether through election by the stockholders of the Company or appointment by the board of directors to fill a vacancy, will be automatically granted 10,000 restricted stock units on the date on which such person first becomes a non-employee director. The Directors' Plan will also provide that 5,000 restricted stock units will be automatically granted to each non-employee director on the date of each annual meeting of the stockholders at which the non-employee director is elected if on that date, the non-employee director has served on the board of directors for at least the preceding six months. Otherwise the director will receive a pro-rata portion of such restricted stock units based on the number of days served during such six month period. These restricted stock units will vest in equal quarterly installments over a one-year period following the date of grant. Restricted stock units granted under the Directors' Plan will generally be paid in an equal number of shares of the Company's common stock on the earlier of the third anniversary of the grant date or the date the director ceases being a member of the board of directors, subject to an election by the director to defer payment of the units until a later date. Directors are also entitled to receive dividend equivalents with respect to their outstanding and unpaid restricted stock units. Dividend equivalents, if any, are paid in the form of a credit

16

of additional restricted stock units credited under the Directors' Plan and are subject to the same vesting, payment and other provisions as the underlying restricted stock units.

**Non-Transferability of Awards**

Awards granted under the Directors' Plan are not transferable by the award recipient other than by will or the laws of descent or distribution or pursuant to the terms of a qualified domestic relations order (as defined by the Code). Each option is exercisable, during the lifetime of the optionee, only by the optionee.

**Merger or Sale of Assets**

In the event of the dissolution or liquidation of the Company, a sale of all or substantially all of the assets of the Company, or the merger or consolidation of the Company with or into another corporation in which the Company is not the surviving corporation or any other capital reorganization in which more than 50% of the shares of the Company entitled to vote are exchanged, both options and restricted stock units granted under the Directors' Plan will become fully vested. The Company will provide each optionee either a reasonable time within which to exercise his or her outstanding options or a substitute option with comparable terms as to an equivalent number of shares of stock of the corporation succeeding the Company or acquiring its business by reason of such corporate transaction. Restricted stock units that are outstanding at the time of the transaction will generally be paid in shares of the Company's common stock immediately prior to the transaction.

**Adjustments Upon Changes in Capitalization**

In the event any change, such as a stock split or stock dividend, is made in the Company's capitalization that results in an increase or decrease in the number of outstanding shares of common stock without receipt of consideration by the Company, appropriate adjustment will be made in the exercise price of each outstanding option, the number of shares subject to each outstanding option and restricted stock unit and the number of shares available for issuance under the Directors' Plan.

**No Limit on Other Authority**

The Directors' Plan does not limit the authority of the board of directors or any committee to grant awards or authorize any other compensation, with or without reference to the Company's common stock, under any other plan or authority.

**Amendment and Termination**

The board of directors may amend or terminate the Directors' Plan or any portion thereof at any time; provided, that no such amendment or termination will be made without stockholder approval if such approval is necessary to comply with any tax, securities or regulatory law or requirement or any applicable stock exchange requirement with which the board of directors intends the Directors' Plan to comply. In addition, stockholder approval will be required for any amendment of the Directors' Plan that (i) materially increases the benefits accruing to participants under the plan, (ii) materially increases the number of securities that may be issued under the plan, (iii) materially modifies the requirements for participation in the plan, or (iv) is otherwise deemed a material amendment by the board of directors pursuant to applicable law or accounting or stock exchange rules. However, no action by the board of directors or stockholders may adversely affect the rights of any recipient of an award granted under the Directors' Plan without the consent of the recipient. If the plan is not earlier terminated by the board, the plan will terminate on April 1, 2015.

17

**Plan Benefits**

The following table sets forth information with respect to the stock options previously granted under the Directors' Plan to the eight non-employee directors of the Company as of March 29, 2006.

| Name | Number of Shares Subject to Options Granted Under the 1996 Stock Plan | Weighted Average Exercise Price Per Share ($) |
|---|---|---|
| Roy J. Bostock | 300,000 | 20.13 |
| Ronald W. Burkle | 400,000 | 15.12 |
| Eric Hippeau | 740,000 | 19.03 |
| Vyomesh Joshi | 100,000 | 32.94 |
| Arthur H. Kern | 740,000 | 19.03 |
| Robert A. Kotick | 300,000 | 17.20 |
| Edward Kozel | 440,000 | 22.85 |
| Gary L. Wilson | 400,000 | 15.12 |

**Specific Benefits**

None of the Company's executive officers (including any of the Named Executive Officers) will be eligible to receive award grants under the Directors' Plan (subject to any future amendments to the Directors' Plan). If stockholders approve the Directors' Plan proposal, the number of stock options and restricted stock units that will be allocated, based on the following assumptions, to the Company's eight non-employee directors as a group pursuant to the formulaic annual award grants is 1,200,000 (15,000 × 8 × 10) stock options and 400,000 (5,000 × 8 × 10) restricted stock units. This represents the aggregate number of shares that would be subject to the annual grants under the Directors' Plan for calendar years 2006 through 2015 (the 10 remaining years in the term of the plan), assuming, among other future variables, that there are no new eligible directors, there continue to be eight eligible directors seated and there are no changes to the types of annual awards and the number of shares subject to each annual award (15,000 stock options and 5,000 restricted stock units) granted under the Directors' Plan. The actual number of shares that will be subject to stock options and restricted stock units for initial one-time grants to new directors under the Directors' Plan and the number of other awards to any of the foregoing persons or groups is not determinable.

**Federal Income Tax Aspects of Directors' Plan**

This summary of the general U.S. federal income tax principles applicable to the Directors' Plan under current federal law, which is subject to change, is not intended to be exhaustive and, among other considerations, does not describe state, local, or international tax consequences.

As noted above, if stockholders' approve the proposed amendments to the Directors' Plan, both nonqualified stock options and restricted stock unit awards would be granted under the Directors' Plan. With respect to nonqualified stock options, the Company is generally entitled to deduct as an expense and the optionee recognizes taxable income in an amount equal to the difference between the option exercise price and the fair market value of the shares at the time of exercise. With respect to restricted stock unit awards, the Company is generally entitled to deduct as an expense and the award recipient recognizes taxable income in an amount equal to the fair market value of the shares distributed in payment of the restricted stock units at the time of payment.

18

**Required Vote**

The affirmative vote of the holders of a majority of the Company's common stock present at the annual meeting in person or by proxy and entitled to vote is required to approve the proposed amendments to the Directors' Plan.

**Recommendation of the Board of Directors**

**THE BOARD RECOMMENDS A VOTE "FOR" THE APPROVAL OF THE AMENDMENTS TO THE 1996 DIRECTORS' STOCK OPTION PLAN.**

19

**PROPOSAL NO. 3**
**RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED**
**PUBLIC ACCOUNTING FIRM**

PricewaterhouseCoopers LLP has served as the Company's independent registered public accounting firm since February 1996 and has been appointed by the Audit Committee to continue as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2006. In the event that ratification of this selection is not approved by a majority of the shares of common stock of the Company represented at the annual meeting in person or by proxy and entitled to vote on the matter, the Audit Committee and the board of directors will review the Audit Committee's future selection of an independent registered public accounting firm.

Representatives of PricewaterhouseCoopers LLP will be present at the annual meeting. The representatives will have an opportunity to make a statement and will be available to respond to appropriate questions.

**Required Vote**

The affirmative vote of the holders of a majority of the Company's common stock present at the annual meeting in person or by proxy and entitled to vote on this proposal is required to approve the ratification of the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the current fiscal year.

**Recommendation of the Board of Directors**

**THE BOARD RECOMMENDS A VOTE "FOR" RATIFICATION OF THE APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE COMPANY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR THE FISCAL YEAR ENDING DECEMBER 31, 2006.**

20

## INFORMATION REGARDING BENEFICIAL OWNERSHIP OF
## PRINCIPAL STOCKHOLDERS AND MANAGEMENT

The following table sets forth certain information that has been provided to the Company with respect to beneficial ownership of shares of the Company's common stock as of March 10, 2006 (except where another date is indicated) for (i) each person who is known by the Company to own beneficially more than five percent of the outstanding shares of common stock, (ii) each director and nominee for director of the Company, (iii) each of the Named Executive Officers (as defined below under the caption "Executive Officer Compensation and Other Matters"), and (iv) all directors and executive officers of the Company as a group.

| Beneficial Owner | Amount and Nature of Beneficial Ownership (1) | Percent of Common Stock Outstanding (2) |
|---|---|---|
| FMR Corp. (3)<br>82 Devonshire Street<br>Boston, MA 02109 | 108,511,516 | 7.6% |
| AXA Financial, Inc. and affiliates (4)<br>1290 Avenue of the Americas<br>New York, NY 10104 | 80,509,539 | 5.9% |
| David Filo (5) | 84,120,894 | 5.9% |
| Jerry Yang (6) | 57,172,267 | 4.0% |
| Terry S. Semel (7) | 18,394,357 | 1.3% |
| Farzad Nazem (8) | 4,026,660 | * |
| Susan L. Decker (9) | 3,893,993 | * |
| Daniel L. Rosensweig (10) | 1,167,562 | * |
| Eric Hippeau (11) | 890,104 | * |
| Arthur H. Kern (12) | 636,874 | * |
| Ronald W. Burkle (13) | 296,874 | * |
| Michael J. Callahan (14) | 267,799 | * |
| Gary L. Wilson (15) | 210,074 | * |
| Edward R. Kozel (16) | 153,942 | * |
| Robert A. Kotick (17) | 122,150 | * |
| Roy J. Bostock (18) | 102,986 | * |
| Vyomesh Joshi (19) | 18,750 | * |
| All directors and executive officers as a group (16 persons) (20) | 171,564,184 | 11.9% |

\*      Less than one percent.

(1)     The number of shares beneficially owned by each person or group as of March 10, 2006 includes shares of common stock that such person or group had the right to acquire on or within 60 days after that date, including, but not limited to, upon the exercise of options. To our knowledge, except as otherwise indicated in the footnotes to this table and subject to applicable community property laws,

21

the stockholder named in the table has sole voting and investment power with respect to the shares set forth opposite such stockholder's name.

(2)     For each person and group included in the table, percentage ownership is calculated by dividing the number of shares beneficially owned by such person or group as described above by the sum of the 1,414,018,664 shares of common stock outstanding on March 10, 2006 and the number of shares of common stock that such person or group had the right to acquire on or within 60 days of that date, including, but not limited to, upon the exercise of options.

(3)     Beneficial and percentage ownership information is based on information contained in Amendment No. 5 to Schedule 13G filed with the SEC on February 14, 2006 by FMR Corp. on behalf of itself and affiliated persons and entities. The schedule contains the following information regarding beneficial ownership of the shares: (a) Fidelity Management & Research Company (a wholly owned subsidiary of FMR Corp.) is the beneficial owner of 103,333,970 shares; (b) Fidelity Management Trust Company (a wholly owned subsidiary of FMR Corp.) is the beneficial owner of 2,558,229 shares (of which Edward C. Johnson III and FMR Corp. each has sole power to dispose of 2,558,229 shares and sole power to vote or direct the voting of 2,331,055 shares; (c) Strategic Advisers, Inc. (a wholly owned subsidiary of FMR Corp.) is the beneficial owner of 891,853 shares, of which FMR Corp. has sole power to dispose and vote or direct the disposition or voting; and (d) Fidelity International Limited, of which Mr. Johnson is chairman but which is a separate corporate entity from FMR Corp., is the beneficial owner of 1,727,464 shares. Members of Mr. Johnson's family are the predominant owners of Class B shares of FMR Corp. representing 49% of the voting power of FMR Corp. and all Class B shareholders have entered into a shareholders' agreement under which all Class B shares will be voted in accordance with the majority vote of Class B shares. As such, members of Mr. Johnson's family may be deemed to be members of a controlling group with respect to FMR Corp. FMR Corp. and FIL are of the view that they are not acting as a group and that they are not otherwise required to attribute beneficial ownership of the Company's common stock to one another.

(4)     Beneficial and percentage ownership information is based on information contained in a Schedule 13G filed with the SEC on February 14, 2006 by AXA Financial, Inc. ("Financial") on behalf of itself and affiliated entities. According to the schedule, the shares are also beneficially owned by the following French affiliates of Financial: AXA Assurances I.A.R.D. Mutuelle; AXA Assurances Vie Mutuelle; AXA Courtage Assurance Mutuelle; and AXA (collectively with Financial, the "AXA Group"). Of the reported shares, the AXA Group reports that it has sole voting power with respect to 50,771,983 shares, that it shares voting power with respect to 269,077 shares, that is has sole dispositive power with respect to 80,436,896, shares, and that it shares dispositive power with respect to 72,643 shares.

(5)     Includes 1,566,666 shares issuable upon exercise of options exercisable within 60 days of March 10, 2006 under the Company's 1995 Stock Plan. Mr. Filo's business address is c/o Yahoo! Inc., 701 First Avenue, Sunnyvale, CA 94089.

(6)     Includes 1,166,666 shares issuable upon exercise of options exercisable within 60 days of March 10, 2006 under the Company's 1995 Stock Plan. Also includes 6,310 shares held by Mr. Yang's wife, of which he disclaims beneficial ownership.

(7)     Includes 16,568,597 shares issuable upon exercise of options exercisable within 60 days of March 10, 2006 and 250,000 shares of restricted stock, which are subject to repurchase unless certain conditions are met, under the Company's 1995 Stock Plan. Also includes 760 shares held by his children, of which Mr. Semel disclaims beneficial ownership.

(8)     Includes 3,514,298 shares issuable upon exercise of options exercisable within 60 days of March 10, 2006 and 255,000 shares of restricted stock, which are subject to repurchase unless certain conditions are met, under the Company's 1995 Stock Plan.

22

(9)     Includes 3,595,000 shares issuable upon exercise of options exercisable within 60 days of March 10, 2006 and 255,000 shares of restricted stock, which are subject to repurchase unless certain conditions are met, under the Company's 1995 Stock Plan. The restrictions on 105,000 shares of restricted stock lapsed on March 31, 2006. See the Report of the Compensation Committee on page 31.

(10)    Includes 875,583 shares issuable upon exercise of options exercisable within 60 days of March 10, 2006 and 255,000 shares of restricted stock, which are subject to repurchase unless certain conditions are met, under the Company's 1995 Stock Plan.

(11)    Includes 250,714 shares issuable upon exercise of an option exercisable within 60 days of March 10, 2006, which option was granted by SOFTBANK. Mr. Hippeau serves as a Managing Partner of SOFTBANK Capital Partners, a venture fund and affiliate of SOFTBANK. Also includes 636,874 shares issuable upon exercise of options exercisable within 60 days of March 10, 2006 under the Directors' Plan.

(12)    Represents 636,874 shares issuable upon exercise of an option exercisable within 60 days of March 10, 2006 under the Directors' Plan.

(13)    Represents 296,874 shares issuable upon exercise of options exercisable within 60 days of March 10, 2006 under the Directors' Plan.

(14)    Includes 229,104 shares issuable upon exercise of options exercisable within 60 days of March 10, 2006 and 35,000 shares of restricted stock, which are subject to repurchase unless certain conditions are met, under the Company's 1995 Stock Plan.

(15)    Represents 210,074 shares issuable upon exercise of options exercisable within 60 days of March 10, 2006 under the Directors' Plan.

(16)    Includes 151,042 shares issuable upon exercise of options exercisable within 60 days of March 10, 2006 under the Directors' Plan.

(17)    Represents 122,070 shares issuable upon exercise of options exercisable within 60 days of March 10, 2006 under the Directors' Plan. Also includes 80 shares held by Mr. Kotick's wife, of which he disclaims beneficial ownership.

(18)    Includes 100,986 shares issuable upon exercise of options exercisable within 60 days of March 10, 2006 under the Directors' Plan.

(19)    Represents 18,750 shares issuable upon exercise of options exercisable within 60 days of March 10, 2006 under the Directors' Plan.

(20)    Includes 29,726,958 shares issuable upon exercise, by certain directors and executive officers, of options exercisable within 60 days of March 10, 2006, and 250,714 shares held by SOFTBANK that are subject to options held by Mr. Hippeau.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the Company's directors, executive officers and persons who own more than 10 percent of the Company's common stock (collectively, "Reporting Persons") to file with the SEC initial reports of ownership and changes in ownership of the Company's common stock. Reporting Persons are required by SEC regulations to furnish the Company with copies of all Section 16(a) reports they file. To the Company's knowledge, based solely on its review of the copies of such reports received or written representations from certain Reporting Persons that no other reports were required, the Company believes that during its fiscal year ended December 31, 2005, all filing requirements applicable to the Reporting Persons were timely met, with the exception of the reporting of a single gift of common stock by Ms. Decker in fiscal 2004, which was filed on a Form 4 during fiscal 2005.

**Equity Compensation Plan Information**

    The following table sets forth information as of December 31, 2005 with respect to shares of the Company's common stock that may be issued under the Company's existing equity compensation plans, including the 1995 Stock Plan, the Directors' Plan, and the 1996 Employee Stock Purchase Plan, as amended (the "ESPP").

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights | Weighted Average Exercise Price of Outstanding Options, Warrants and Rights | Number of Securities Remaining Available for Future Issuance |
|---|---|---|---|
| Equity compensation plans approved by security holders (1) | 178,577,000(2) | $28.49(3) | 107,844,000(4) |

(1)    Does not include options to purchase an aggregate of 6,822,000 shares of the Company's common stock that the Company assumed through acquisitions as of December 31, 2005. The weighted average exercise price of those outstanding options is $18.35 per share.

(2)    Includes 2,706,000 shares of the Company's common stock that are subject to outstanding restricted stock unit awards. Does not include 4,959,000 shares of the Company's common stock issued and outstanding pursuant to unvested restricted stock awards.

(3)    Calculated exclusive of outstanding restricted stock unit awards.

(4)    Of these shares, 87,658,000 were available for award grant purposes under the 1995 Stock Plan, 5,097,000 were available for award grant purposes under the Directors' Plan, and 15,089,000 were available under the ESPP, as of December 31, 2005. Subject to certain express limits of the 1995 Stock Plan, shares available under the 1995 Stock Plan generally may be used for any type of award authorized under that plan including options, stock appreciation rights, restricted stock and other forms of awards granted or denominated in shares of our common stock or units of our common stock. Shares that are issued in respect of any "full-value awards" (awards other than option and stock appreciation rights with an exercise or base price that is no less than the fair market value of a share of common stock on the date the award is granted) under the 1995 Stock Plan count against the plan's aggregate share limit as 1.75 shares for every one share actually issued in connection with the award.

24

## OUR EXECUTIVE OFFICERS

Executive officers are elected by and serve at the discretion of the board. Set forth below is information regarding our executive officers as of March 29, 2006.

| Name | Age | Position |
|------|-----|----------|
| Terry S. Semel | 63 | Chairman and Chief Executive Officer |
| Jerry Yang | 37 | Chief Yahoo! and Director |
| David Filo | 39 | Chief Yahoo! |
| Susan L. Decker | 43 | Executive Vice President, Finance and Administration and Chief Financial Officer |
| Daniel L. Rosensweig | 44 | Chief Operating Officer |
| Farzad Nazem | 44 | Executive Vice President, Engineering and Site Operations and Chief Technology Officer |
| Michael J. Callahan | 37 | Senior Vice President, General Counsel and Secretary |
| Michael A. Murray | 49 | Senior Vice President, Finance and Chief Accounting Officer |

*Mr. Semel*'s biography is set forth under the heading "Proposal 1—Election of Directors."

*Mr. Yang*'s biography is set forth under the heading "Proposal 1—Election of Directors."

*Mr. Filo*, a founder of Yahoo! and Chief Yahoo!, has served as an officer of Yahoo! since March 1995, and served as a director of Yahoo! from its founding through February 1996. Mr. Filo reports to Chairman and Chief Executive Officer, Terry Semel. He is involved in guiding Yahoo!'s vision, is involved in many key aspects of the business at a strategic and operational level, and is a stalwart of the Company's employee culture and morale. Mr. Filo co-developed Yahoo! in 1994 while working towards his Ph.D. in electrical engineering at Stanford University, and co-founded Yahoo! in 1995.

*Ms. Decker* has served as Yahoo!'s Chief Financial Officer since June 2000 and as Executive Vice President, Finance and Administration since January 2002. Prior to that, Ms. Decker served as Senior Vice President, Finance and Administration from June 2000 to January 2002. From August 1986 to May 2000, Ms. Decker held several positions for Donaldson, Lufkin & Jenrette, including Director of Global Research from 1998 to 2000. Prior to 1998, she was a Publishing & Advertising Equity Securities Analyst for 12 years. Ms. Decker also serves as a director of Pixar and Costco Wholesale Corporation.

*Mr. Rosensweig* has served as Chief Operating Officer since April 2002. Prior to joining Yahoo!, Mr. Rosensweig was President of CNET Networks from October 2000. Prior to that, Mr. Rosensweig served as Chief Executive Officer of ZDNet, Inc. from January 1999 and President of ZDNet, Inc. from 1997 to July 2000. Mr. Rosensweig served as President of Ziff-Davis Internet Publishing Group from 1996 to 1997.

*Mr. Nazem* has served as Executive Vice President, Engineering and Site Operations since May 2002 and Chief Technology Officer since January 1998. Prior to that, from February 2001 to January 2002, Mr. Nazem served as Senior Vice President, Communications and Technical Services and Chief Technology Officer. From January 1998 to February 2001, Mr. Nazem served as Chief Technology Officer. Prior to that, he served as Yahoo!'s Senior Vice President, Product Development and Site Operations from March 1996 to January 1998. From 1985 to 1996, Mr. Nazem held a number of technical and executive management positions at Oracle Corporation, including Vice President of Oracle's Media and Web Server Division and member of the Product Division Management Committee.

*Mr. Callahan* has served as Senior Vice President, General Counsel and Secretary since September 2003. Prior to that, Mr. Callahan served as Deputy General Counsel and Assistant Secretary from June 2001 to September 2003 and served in various other positions in the Yahoo! legal department from December 1999 to June 2001. Prior to joining Yahoo! in December 1999, Mr. Callahan held positions with Electronics for Imaging Inc. and the law firm of Skadden, Arps, Slate, Meagher & Flom LLP.

*Mr. Murray* has served as Senior Vice President, Finance and Chief Accounting Officer since October 2004. Prior to joining Yahoo!, Mr. Murray held several positions with Sun Microsystems, Inc., including Vice President, Global Financial Services and Treasurer from July 2002, Treasurer from July 2001 to June 2002 and Vice President Finance, Sun Services from April 1998 to July 2001.

## EXECUTIVE OFFICER COMPENSATION AND OTHER MATTERS

### Summary Compensation Table

The following table sets forth certain information concerning the compensation earned during the last three completed fiscal years by (i) Terry Semel, the Company's Chief Executive Officer, and (ii) the four other most highly compensated individuals who served as executive officers of the Company as of the end of the fiscal year ended December 31, 2005 (such officers collectively referred to as the "Named Executive Officers").

| | | Annual Compensation | | Long-Term Compensation | | |
| | | | | Awards | | |
| Name and Principal Position | Year | Salary ($) | Bonus ($) | Restricted Stock Awards ($) | Securities Underlying Options (#) | All Other Compensation ($) (1) |
|---|---|---|---|---|---|---|
| Terry S. Semel | 2005 | 600,000 | — | 8,687,500(2) | 3,300,000(3) | 1,980 |
| Chairman and Chief Executive | 2004 | 600,000 | — | — | 7,200,000(4) | 1,980 |
| Officer | 2003 | 600,000 | — | — | — | 1,980 |
| Susan L. Decker | 2005 | 500,000 | 1,000,000 | 7,246,500(5) | 675,000 | 3,800 |
| Executive Vice President, | 2004 | 500,000 | 900,000 | 1,854,000(6) | 150,000 | 3,550 |
| Finance and Administration, and Chief Financial Officer | 2003 | 500,000 | 700,000 | 1,852,200(7) | 250,000 | 3,300 |
| Daniel L. Rosensweig | 2005 | 500,000 | 1,150,000(8) | 7,246,500(5) | 675,000 | 3,800 |
| Chief Operating Officer | 2004 | 500,000 | 1,425,000(8) | 1,854,000(9) | 150,000 | 1,259 |
| | 2003 | 500,000 | 1,375,000(8) | 1,852,200(10) | 250,000 | 84,768 |
| Farzad Nazem | 2005 | 450,000 | 800,000 | 7,246,500(5) | 675,000 | 3,800 |
| Executive Vice President, | 2004 | 450,000 | 700,000 | 1,854,000(9) | 150,000 | 3,550 |
| Engineering and Site Operations, and Chief Technical Officer | 2003 | 450,000 | 560,000 | 1,852,200(10) | 250,000 | 3,300 |
| Michael J. Callahan | 2005 | 300,000 | 225,000 | 1,826,450(11) | 130,000 | 3,770 |
| Senior Vice President, General | 2004 | 275,000 | 175,000 | — | 65,000 | 3,520 |
| Counsel and Secretary | 2003 | 221,667 | 140,000 | — | 140,000 | 3,270 |

(1)    Represents for Mr. Semel, group term life insurance premiums valued at $1,980 for 2005, $1,980 for 2004, and $1,980 for 2003; for Ms. Decker, Company contributions under the Company's 401(k) Plan of $3,500 for 2005, $3,250 for 2004 and $3,000 for 2003, and group term life insurance premiums valued at $300 for 2005, $300 for 2004, and $300 for 2003; for Mr. Rosensweig, relocation payment of $84,468 for 2003, Company contributions under the Company's 401(k) Plan of $3,500 for 2005 and $209 for 2004, group term life insurance premiums valued at $300 for 2005, $300 for 2004 and $300 for 2003, and a patent bonus of $750 for 2004; for Mr. Nazem, Company contributions under the Company's 401(k) Plan of $3,500 for 2005, $3,250 for 2004, and $3,000 for 2003, and group term life insurance premiums valued at $300 for 2005, $300 for 2004, and $300 for 2003; and for Mr. Callahan, Company contributions under the Company's 401(k) Plan of $3,500 for 2005, $3,250 for 2004 and $3,000 for 2003 and group term life insurance premiums valued at $270 for 2005, $270 for 2004 and $270 for 2003.

(2)     Represents 250,000 shares of common stock, based on a per share value of $34.75 which was the closing market price of the Company's common stock on the date of grant. As of December 30, 2005, the restricted stock had an aggregate value of $9,795,000, based on the closing market price of $39.18 per share. The restrictions on these shares will lapse on the third anniversary of the date of grant.

26

(3)    Includes a fully vested bonus option to purchase 1,300,000 shares of common stock granted to Mr. Semel in March 2006 in lieu of a cash bonus for 2005.

(4)    Includes a bonus option to purchase 1,800,000 shares of common stock and an annual review option to purchase 4,000,000 shares of common stock granted to Mr. Semel in March 2004 in connection with services performed in 2003.

(5)    Represents 50,000 restricted stock unit (RSU) awards, based on a per share value of $40.68, which was the closing market price of the Company's common stock on the date of grant of the RSUs, and 150,000 shares of common stock, based on a per share value of $34.75 which was the closing market price of the Company's common stock on the date of grant of the restricted stock. As of December 30, 2005, the RSUs had an aggregate value of $1,959,000 and the restricted stock had an aggregate value of $5,877,000, based in each case on the closing market price of $39.18 per share. The restrictions on 35,000 of the RSUs will lapse on the third anniversary of the date of grant, and the restrictions on 15,000 of the RSUs will lapse upon the satisfaction of certain performance-based objectives, but will in no event lapse prior to the first anniversary of the date of grant. The restrictions on the 150,000 shares of restricted stock will lapse on the third anniversary of the date of grant.

(6)    Represents 50,000 shares of common stock, based on a per share value of $37.08, which was the closing market price of the Company's common stock on the date of grant. As of December 30, 2005, the restricted stock had an aggregate value of $1,959,000, based on the closing market price of $39.18 per share. The restrictions on 15,000 of these shares lapsed in January 2006 upon the satisfaction of certain performance-based objectives. The restrictions on 35,000 of these shares lapsed on March 31, 2006. See the Report of the Compensation Committee on page 31.

(7)    Represents 90,000 shares of common stock, based on a per share value of $20.58, which was the closing market price of the Company's common stock on the date of grant. As of December 30, 2005, the restricted stock had an aggregate value of $3,526,200, based on the closing market price of $39.18 per share. The restrictions on 20,000 of these shares lapsed in January 2005 upon the satisfaction of certain performance-based objectives. The restrictions on 70,000 of these shares lapsed on March 31, 2006. See the Report of the Compensation Committee on page 31.

(8)    The 2003, 2004 and 2005 amounts include retention bonuses of $675,000, $525,000 and $150,000, respectively, that became payable on the first, second and third anniversaries of Mr. Rosensweig's employment with the Company. Payment of these bonuses was deferred at Mr. Rosensweig's election until the fourth anniversary of Mr. Rosensweig's employment with the Company or upon the termination of his employment with the Company.

(9)    Represents 50,000 shares of common stock, based on a per share value of $37.08, which was the closing market price of the Company's common stock on the date of grant. As of December 30, 2005, the restricted stock had an aggregate value of $1,959,000, based on the closing market price of $39.18 per share. The restrictions on 35,000 of these shares will lapse on the third anniversary of the date of grant, and the restrictions on 15,000 of these shares lapsed in January 2006 upon the satisfaction of certain performance-based objectives.

(10)   Represents 90,000 shares of common stock, based on a per share value of $20.58, which was the closing market price of the Company's common stock on the date of grant. As of December 30, 2005, the restricted stock had an aggregate value of $3,526,200, based on the closing market price of $39.18 per share. The restrictions on 70,000 of these shares will lapse on the third anniversary of the date of grant, and the restrictions on 20,000 of these shares lapsed in January 2005 upon the satisfaction of certain performance-based objectives.

(11)   Represents 15,000 restricted stock unit (RSU) awards, based on a per share value of $40.68, which was the closing market price of the Company's common stock on the date of grant of the RSUs, and 35,000 shares of common stock, based on a per share value of $34.75 which was the closing market price of the Company's common stock on the date of grant of the restricted stock. As of December 30, 2005, the RSUs had an aggregate value of $587,700 and the restricted stock had an aggregate value of $1,371,300, based in each case on the closing market price of $39.18 per share. The restrictions on RSUs and on the shares of restricted stock will lapse on the third anniversary of their respective dates of grant.

27

**Option Grants in Last Fiscal Year**

The following table provides certain information with respect to stock options granted to the Named Executive Officers during the fiscal year ended December 31, 2005. In addition, as required by SEC rules, the table sets forth the hypothetical gains that would exist for the shares subject to such options based on assumed annual compounded rates of stock price appreciation during the option term.

| | Individual Grants | | | | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation For Option Term (3) | |
| | Number of Securities Underlying Options Granted(#) (1) | Percent of Total Options Granted to Employees in Fiscal Year(%) (2) | Exercise Price Per Share ($/sh) | Expiration Date | | |
| Name | | | | | 5% ($) | 10% ($) |
| --- | --- | --- | --- | --- | --- | --- |
| Terry S. Semel | 2,000,000(4) | 6.07 | 34.75 | 2/1/15 | 43,708,177 | 110,765,101 |
| Susan L. Decker | 550,000(5) | 1.67 | 34.75 | 2/1/15 | 12,019,749 | 30,460,403 |
| Susan L. Decker | 125,000(6) | 0.38 | 40.68 | 12/20/12 | 2,070,106 | 4,824,226 |
| Daniel L. Rosensweig | 550,000(7) | 1.67 | 34.75 | 2/1/15 | 12,019,749 | 30,460,403 |
| Daniel L. Rosensweig | 125,000(6) | 0.38 | 40.68 | 12/20/12 | 2,070,106 | 4,824,226 |
| Farzad Nazem | 550,000(7) | 1.67 | 34.75 | 2/1/15 | 12,019,749 | 30,460,403 |
| Farzad Nazem | 125,000(6) | 0.38 | 40.68 | 12/20/12 | 2,070,106 | 4,824,226 |
| Michael J. Callahan | 100,000(7) | 0.30 | 34.75 | 2/1/15 | 2,185,409 | 5,538,255 |
| Michael J. Callahan | 30,000(6) | 0.09 | 40.68 | 12/20/12 | 496,825 | 1,157,814 |

(1)  Upon the occurrence of certain change in control events (as described in the 1995 Stock Plan), outstanding options that are not assumed or substituted will become vested.

(2)  The Company granted stock options representing approximately 32,952,976 shares of common stock to employees in the fiscal year ended December 31, 2005. This amount does not include stock options representing approximately 193,000 shares of common stock assumed by the Company in connection with acquisitions.

(3)  The potential realizable value illustrates value that might be realized upon exercise of the options immediately prior to the expiration of their terms, assuming the specified compounded rates of appreciation of the market price per share from the date of grant to the end of the option term. Actual gains, if any, on stock option exercise are dependent upon a number of factors, including the future performance of the common stock and the timing of option exercises, as well as the optionee's continued employment through the vesting period. The gains shown are net of the option exercise price, but do not include deductions for taxes and other expenses payable upon the exercise of the option or for sale of underlying shares of common stock. There can be no assurance that the amounts reflected in this table will be achieved.

(4)  In February 2005, Mr. Semel was granted a retention option to purchase 2,000,000 shares of common stock. One-half of the shares subject to the option vested in January 2006 upon the satisfaction of certain performance criteria regarding the operating performance of the Company in the fiscal year ending December 31, 2005. The remaining one-half of the shares subject to the option will vest on the fourth anniversary of the date of grant, subject to 100% accelerated vesting upon satisfaction of certain performance criteria regarding the operating performance of the Company in the fiscal year ending December 31, 2006.

28

(5) Under the terms of the original grant, one-third of the shares subject to the option were scheduled to vest on the third anniversary of the date of grant with the remainder of the option vesting on the fourth anniversary of the date of grant. These options were accelerated and became fully vested as of March 31, 2006. See the Report of the Compensation Committee on page 31.

(6) One-fourth of the shares subject to the option vest on the first anniversary of the date of grant with the remainder of the option vesting in six equal installments over the three year period beginning on the first anniversary of the date of grant.

(7) One-third of the shares subject to the option vest on the third anniversary of the date of grant with the remainder of the option vesting on the fourth anniversary of the date of grant.

**Aggregated Option Exercises in Last Fiscal Year and Fiscal Year End Option Values**

The following table sets forth certain information with respect to stock options exercised by the Named Executive Officers during the fiscal year ended December 31, 2005. In addition, the table sets forth the number of shares covered by unexercised stock options held by the Named Executive Officers as of December 31, 2005, and the value of "in-the-money" stock options, which represents the positive spread between the exercise price of a stock option and the market price of the shares subject to such option as of December 31, 2005.

| Name | Number of Shares Acquired on Exercise (#) | Value Realized ($) (1) | Number of Securities Underlying Unexercised Options at Fiscal Year-End (#) | | Value of Unexercised In-the-Money Options at Fiscal Year-End ($) (2) | |
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
|---|---|---|---|---|---|---|
| Terry S. Semel | 7,000,836 | 173,599,602 | 15,122,764 | 2,550,000 | 214,589,769 | 21,555,000 |
| Susan L. Decker | 1,003,333 | 30,885,876 | 2,465,833 | 1,295,834 | 35,112,433 | 17,000,480 |
| Daniel L. Rosensweig | 912,000 | 25,616,416 | 811,916 | 1,295,834 | 22,618,260 | 17,054,646 |
| Farzad Nazem | 1,836,526 | 63,767,496 | 3,539,298 | 1,062,500 | 82,645,515 | 9,640,250 |
| Michael J. Callahan | 151,709 | 3,283,404 | 210,459 | 266,250 | 999,381 | 2,389,000 |

(1) The value realized represents the difference between the fair market value of the Company's common stock on the day of exercise and the exercise price of the options, and does not necessarily indicate that the optionee sold such stock.

(2) Value is based on the $39.18 per share closing price of the Company's common stock on Nasdaq on December 30, 2005, less the exercise price.

**Employment Contracts, Termination of Employment and Change in Control Arrangements**

In April 2001, the Company entered into an employment letter agreement with Mr. Semel, our Chief Executive Officer. The agreement provided for a base salary of $310,000, subject to discretionary increases through annual reviews. Pursuant to the agreement, as part of his compensation, Mr. Semel was initially granted a total of four stock options to purchase an aggregate of 20,000,000 shares, as follows: 10,000,000 shares at fair market value on the date of grant, 5,000,000 shares at $15 per share, 3,000,000 shares at $30 per share, and 2,000,000 shares at $37.50 per share. The first option became exercisable as to 5,000,000 shares on the first anniversary of the grant. The options on the remaining 15,000,000 shares became exercisable in equal monthly installments (of 416,666 shares) over the next three years in order of exercise beginning with the lowest exercise price and were fully vested as of April 2005. These options may be exercised for a period of three years after the date of any termination of employment (although in no event later than 10 years after the grant date).

In April 2002, the Company entered into an employment agreement with Mr. Rosensweig to become Chief Operating Officer of the Company. The agreement provided for minimum base salaries of $500,000 for each of calendar years 2002 and 2003, $550,000 for calendar year 2004 and $600,000 for calendar year 2005. (In 2003, Mr. Rosensweig waived his right to the $550,000 base salary for 2004, and the Compensation Committee instead approved a base salary of $500,000 for 2004.) In addition, Mr. Rosensweig received reimbursement of relocation expenses, including a loan from the Company to purchase a principal residence in the San Francisco Bay Area in the principal amount of $1,000,000 (further described in "Certain Transactions" below) and a mortgage subsidy. In April 2002, the Company entered into a special retention bonus plan with Mr. Rosensweig under which Mr. Rosensweig received a $675,000 annual bonus payment in April 2003, a $525,000 annual bonus payment in April 2004 and a $150,000 annual bonus in April 2005, and will receive a $150,000 annual bonus in April 2006 if he continues to be employed by the Company on that date. If, prior to the fourth anniversary of employment with the Company, Mr. Rosensweig's employment is terminated by the Company without Cause or Mr. Rosensweig terminates his employment for Good Reason, as those terms are defined in his employment agreement, Mr. Rosensweig will be entitled to receive the remaining retention bonus which would have been available to him had he remained employed through his fourth anniversary of employment with the Company. Mr. Rosensweig has elected to defer payment of each of these retention bonus payments until the fourth anniversary of his employment with the Company.

In 1996, the Company entered into an agreement with Mr. Nazem, our Executive Vice President, Engineering and Chief Technical Officer, that provides, in the event of certain change-in-control transactions, for the acceleration of options held by Mr. Nazem whereby each such option shall become exercisable to the extent of the number of shares that would otherwise vest if Mr. Nazem remained employed by the Company or its successor for two years after the effective date of the transaction, subject to certain conditions, including Mr. Nazem's acceptance of a comparable two-year employment contract with the acquiring party and his entering into certain non-competition agreements.

30

*Notwithstanding anything to the contrary set forth in any of the Company's filings under the Securities Act of 1933, as amended (the "Securities Act"), or the Exchange Act that might incorporate future filings, including this Proxy Statement, in whole or in part, the following Report of the Compensation Committee, the Audit Committee Report and the Stock Performance Graph which follows shall not be deemed to be "Soliciting Material," are not deemed "filed" with the SEC and shall not be incorporated by reference into any filings under the Securities Act or Exchange Act whether made before or after the date hereof and irrespective of any general incorporation language in such filing except to the extent that the Company specifically requests that the information be treated as soliciting material or specifically incorporates it by reference into a document filed under the Securities Act or the Exchange Act.*

## REPORT OF THE COMPENSATION COMMITTEE
## OF THE BOARD OF DIRECTORS ON EXECUTIVE COMPENSATION

From January 1, 2005 through October 27, 2005, the Compensation Committee of the Company's board of directors consisted of Arthur H. Kern, Gary L. Wilson, and Robert A. Kotick, as Chairman of the Compensation Committee. Beginning on October 28, 2005, the membership consisted of Roy J. Bostock, Ronald W. Burkle and Arthur H. Kern, as Chairman of the Compensation Committee. The Compensation Committee is composed of independent non-employee directors and reviews, recommends and approves changes to the Company's compensation policies and benefits programs, administers the Company's equity incentive plans and otherwise seeks to ensure that the Company's compensation philosophy is consistent with the Company's best interests and is properly implemented. The Compensation Committee operates under a written charter, originally adopted by the Board of Directors as of March 19, 2004, and amended thereafter, including as of February 2, 2006 (which version of the charter appears on the Company's website). During 2005, the Compensation Committee met nine times and took action by unanimous written consent on 29 occasions.

### Compensation Philosophy and Review

The Company's compensation philosophy for executive officers is intended to achieve two principal purposes: (i) to provide a total compensation package that is competitive with the current market for executive talent and enables the Company to attract and retain key executive and employee talent needed to achieve the Company's business objectives, and (ii) to link executive compensation to improvements in Company performance and increases in stockholder value as measured principally by the trading price of the Company's common stock.

The Compensation Committee has retained an independent consulting firm (the "Independent Consultant"), to advise the Compensation Committee on compensation matters. The Compensation Committee has also retained independent attorneys to advise it on compensation matters. To assist in the determination of executive compensation levels, the Compensation Committee reviewed, with input from the Independent Consultant, among other materials, information compiled from proprietary surveys and publicly available compensation information with respect to selected Internet-related, technology and media companies and other relevant companies. The Compensation Committee did not determine it necessary to, and did not attempt to, specifically analyze compensation levels at companies included in the index under the caption, "Performance Graph." Instead, the Compensation Committee focused more specifically on direct potential competitors for executive talent.

### Elements of Executive Officer Compensation

The Company's executive compensation consists primarily of salary, incentive bonuses, a 401(k) plan, health insurance and similar benefits, and equity incentive awards. There are no retirement plans (other than the 401(k) plan) and no supplemental executive retirement plans ("SERPs") or other material perquisites granted to the executive officers. The Company has in the past and at present continues to emphasize equity incentive awards in its executive compensation policy, combined with relatively modest

31

cash compensation. The Compensation Committee believes that in the highly competitive markets in which the Company operates, equity-based compensation is an important incentive for outstanding executive performance and encourages the alignment of management and stockholder long-term interests. The Compensation Committee continues to believe that stock options, restricted stock and restricted stock units are an effective way to compensate for superior performance, enhance retention, increase executive ownership, and align the interests of shareholders and executives. In 2005, the Compensation Committee awarded the Company's executive officers a combination of stock options, restricted stock and restricted stock units. The greater use of restricted stock and restricted stock units reflects the recent changes in accounting standards for equity-based compensation and a desire to limit shareholder dilution as a result of equity incentive awards. The Committee has also started to focus on awarding equity incentive grants based on total value transferred, rather than the total number of shares granted.

*Base Salary and Bonus.*

Base salaries are evaluated annually for all executive officers, including the Chief Executive Officer. In determining the appropriate salary levels for such officers, the Compensation Committee considers, among other factors, the officer's scope of responsibility, prior experience, past performance and data on prevailing compensation levels in relevant markets for executive talent. To determine annual bonus payments, the Compensation Committee considers individual performance as well as the extent to which the Company achieved its overall financial plan.

The Compensation Committee has determined that the base salary levels and bonus payments to executive officers, including Mr. Semel, during the year 2005 were at or below the median of base salary and bonus levels for comparable companies considered in the survey data and other information reviewed by the Compensation Committee. The Compensation Committee believes this to be especially true based on the Company's relative financial performance and shareholder returns during 2005. Increased bonuses for 2005 (as compared to those for 2004) were generally given to various executive officers based on performance. Mr. Semel's 2005 bonus took the form of a stock option grant and is discussed below. Base salaries for the Named Executive Officers for 2006 were maintained at the 2005 levels, with the exception of Mr. Callahan, whose base salary for 2006 was increased from $300,000 to $325,000.

*Stock Option, Restricted Stock and Restricted Stock Unit Grants.*

As noted above, the Company has in the past relied substantially on long-term equity-based compensation as an important means of compensating and motivating its executive officers. It is the Company's practice to set option exercise prices for executive officers at not less than 100% of the fair market value of the common stock on the date of grant. Thus, the value of the stockholders' investment in the Company must appreciate before an optionee receives any financial benefit from the option. Options have historically been granted for a maximum term of ten years. The Company's amended stock plan, approved by the stockholders at the May 19, 2005 annual meeting, reduced the term of all options granted after such date to seven years. The Company generally makes annual grants of options to a large number of its employees, including its executive officers, in December of each year after conducting its annual compensation review process. In December 2005, the Company also began making grants of restricted stock units to its employees as part of its annual review process.

In determining the number of shares subject to grants of stock options, restricted stock and restricted stock units to executive officers, the Compensation Committee considers various subjective factors primarily relating to the responsibilities of the individual officer and the officer's expected future contributions. The Compensation Committee also considers the officer's historic total compensation, including prior equity grants and exercise history, as well as the number and value of shares owned by the officer or which continue to be subject to vesting under outstanding equity grants previously made to such officer. The Committee considers, with the assistance of its Independent Consultant, the value of the stock options, restricted stock and restricted stock units proposed to be granted to an individual officer using the

32

Black-Scholes methodology. In addition, the Compensation Committee examines the quantity and type of equity incentives held by each executive officer relative to the other executive officers' equity positions and their tenure, responsibilities, experience and value to the Company.

As part of the annual compensation review for performance in 2005, the Compensation Committee in December 2005 granted the Named Executive Officers of the Company (other than Mr. Semel, whose equity incentive awards for 2005 are described below) options which have a term of seven years. The options vest over a period of four years, 25% after one year, and then ratably thereafter over a period of three additional years in equal semi-annual installments.

Also as part of its annual compensation review for performance in 2005, the Compensation Committee in December 2005 granted restricted stock units. Each unit represents the right to receive one share of the Company's common stock, subject to satisfaction of vesting conditions. The Compensation Committee granted restricted stock units in respect of 50,000 shares of the Company's common stock each to three of the Company's Named Executive Officers, Ms. Decker, Mr. Rosensweig and Mr. Nazem. These restricted stock units vest with respect to 15,000 units upon the satisfaction of certain performance-based objectives, but in no event prior to the first anniversary of the date of grant, and with respect to the remaining 35,000 units on the third anniversary of the date of grant. The performance criteria include the Company meeting specified operating cash flow and revenue targets.

As reported in last year's report, to enhance the retention incentives for certain executives of the Company into 2009, the Compensation Committee in February 2005 granted additional options and shares of restricted stock to such executives, including the Named Executive Officers. To provide a substantial retention incentive, these retention options (other than the options granted to Mr. Semel which are described below) vest with regard to one third of the covered shares on the third anniversary of the grant date and with regard to the remaining two thirds of the covered shares on the fourth anniversary of the grant date. The restricted shares vest in full on the third anniversary of the grant date. The restricted shares are subject to accelerated vesting in the event of death on a pro rata basis. In deciding to make these 2005 retention incentive grants, the Compensation Committee considered, among other things, the performance of the executives, the importance of their retention to the Company, prior equity awards, prior option exercise history, and the vesting dates of the recipients' other outstanding equity grants.

Over the summer of 2005, the Committee reviewed Ms. Decker's overall performance, value to the Company, employment terms, retention and expectations. In particular, the Committee noted that Ms. Decker has assumed a significant role in determining the strategic direction of the Company over the course of her almost five years of employment with the Company. Based on this review and consultation with the full Board of Directors, in September 2005, the Committee provided that if Ms. Decker remained with the Company through March 31, 2006, the vesting of 893,750 of her stock options and 105,000 shares of her restricted stock would accelerate and become fully vested on such date. In addition, the Committee extended the post termination exercise period of 950,000 and 1,000,000 of Ms. Decker's options to three years and four years, respectively, after any termination. Approximately 90% of the options subject to the extended exercise periods had exercise prices above the then current fair market value of the stock.

**Compensation of Chief Executive Officer**

The Compensation Committee believes that Mr. Semel's leadership has and continues to contribute meaningfully to the Company's operating and financial performance and creation of shareholder value. In 2005, under the leadership of Mr. Semel, the Company accomplished a number of goals important to enhancing the Yahoo! brand and creating shareholder value. In particular, in 2005, the Company significantly strengthened its international presence, introduced social and community tools and expanded its offerings and content on its online properties and services, and established new alliances with industry partners. Specifically, significant accomplishments of the Company included: entering into a significant strategic alliance with Alibaba in China and Seven Networks Limited in Australia; acquiring the remaining

33

interests in its joint ventures in France, Germany, the United Kingdom and Yahoo! Korea; making a number of strategic acquisitions including Verdisoft, Flickr and del.icio.us; and introducing Yahoo! 360, Yahoo! Answers, the next generation Yahoo! Messenger (including PC-to-PC calling and interactive photo sharing), Yahoo! Music Unlimited, and new exclusive content.

The Compensation Committee also believes that Mr. Semel's unique skills, experience spanning the Internet and media industries, and repeated past success make him an attractive candidate to competing organizations. In view of his attractiveness to competing organizations, the Compensation Committee believes it has been and remains important to provide Mr. Semel with retention as well as performance equity awards to provide him with substantial incentives to remain with the Company.

In determining Mr. Semel's compensation, with the assistance and advice of the Independent Consultant, the Compensation Committee, in addition to considering the goals described above, reviewed Mr. Semel's compensation package in comparison to the compensation packages of chief executive officers of selected Internet-related, technology and media companies. The awards made to Mr. Semel were designed to place him in the top quartile of chief executive officers of major global-companies provided that the Company is in the top quartile of shareholder value creation and Mr. Semel remains employed by the Company.

Based on its evaluation of Mr. Semel's performance and its goals with respect to Mr. Semel described above, the Compensation Committee made the following determinations and awards to him in 2005. With regard to base compensation, the Compensation Committee did not increase Mr. Semel's $600,000 base salary for 2005 and, although still under consideration, has not done so for 2006, despite finding it to be lower than that of comparable companies. This determination is consistent with the Compensation Committee's philosophy of emphasizing equity incentives and more modest cash compensation.

With regard to equity incentive awards, the Compensation Committee made equity grants to Mr. Semel in February 2005 as part of the retention awards made to certain key executives discussed above (which awards were initially reported in last year's committee report) and one grant in March 2006. As with other executives of the Company, the Compensation Committee gave consideration to Mr. Semel's total historic compensation, including prior equity grants, prior exercise history, and the remaining vesting dates of Mr. Semel's prior grants. The February 2005 grants consisted of 2,000,000 stock options and 250,000 shares of restricted shares. The terms of the 2005 option grant provide performance and retention features, and the 2005 restricted share award was principally designed as a retention award. The February 2005 option was scheduled to become exercisable on the fourth anniversary of the grant date, subject to acceleration with regard to 1,000,000 of the covered shares following December 31, 2005, and with regard to the remaining 1,000,000 covered shares on the following December 31, 2006, if certain performance criteria regarding the Company's operating cash flow are satisfied during the prior-year periods. The performance criteria in respect of the period ending December 31, 2005 have been satisfied, and the option has become vested with respect to the associated 1,000,000 covered shares. The restrictions on the February 2005 restricted shares grant lapse in full on the third anniversary of the grant date, subject to pro rata accelerated vesting in the event of death. The grant made in March 2006 was for 1.3 million stock options and was made in lieu of a cash bonus for Mr. Semel's performance in 2005. This option was fully vested as of the date of grant and has an exercise price of $40.68 per share, which is the same price at which the annual option grants to employees were made by the Company in December and 33% higher than the closing trading price of the Company's Common Stock on the date of grant. The Compensation Committee believes that the above market strike price of the March 2006 option grant serves to provide both performance and retention incentives to Mr. Semel. These options have a term of seven years and a post termination exercise period of three years.

34

**Policy on Deductibility of Compensation**

Section 162(m) of the Internal Revenue Code limits the tax deductibility by a corporation of compensation in excess of $1 million paid to its Chief Executive Officer and any other of its four most highly compensated executive officers. However, compensation which qualifies as "performance-based" is excluded from the $1 million limit if, among other requirements, the compensation is payable only upon attainment of pre-established, objective performance goals under a plan approved by the corporation's stockholders.

It is the Company's policy to qualify, to the extent reasonable, its executive officers' compensation for deductibility under applicable tax law. However, the Company intends to retain the flexibility necessary to provide total cash compensation in line with competitive practice, the Company's compensation philosophy, and the Company's best interests. It therefore may from time to time pay compensation to its executive officers that may not be deductible. However, the Compensation Committee believes that the realized gains on nonqualified stock options at time of exercise are fully deductible under the terms of the Company's shareholder-approved stock plan.

By the Compensation Committee of the Board of Directors,

As constituted through October 27, 2005
Robert A. Kotick (Chairman)
Arthur H. Kern
Gary L. Wilson

As constituted beginning October 28, 2005
Arthur H. Kern (Chairman)
Roy J. Bostock
Ronald W. Burkle

35

**AUDIT COMMITTEE REPORT**

The audit committee of the Company's board of directors (the "Audit Committee") consists of four non-employee directors, Edward R. Kozel, as chairman, Vyomesh Joshi, Arthur H. Kern and Gary L. Wilson, each of whom the board of directors has determined to be independent directors as defined in the rules of Nasdaq. The Audit Committee is a standing committee of the board of directors and operates under a written charter adopted by the board of directors, which is available on our website, *www.yahoo.com*. From our main web page, first click on "Company Info" at the bottom of the page and then on "Investor Relations." Next, click on "Corporate Governance," then "Board Committees" and "Audit Committee Charter." Among its other functions, the Audit Committee has the authority and responsibility to retain and terminate the engagement of the Company's independent registered public accounting firm ("independent auditors").

Management is responsible for the Company's internal controls and the financial reporting process. The independent auditors are responsible for performing an independent audit of the Company's consolidated financial statements and internal control over financial reporting in accordance with the auditing standards of the Public Company Accounting Oversight Board (United States) and to issue a report thereon. The Audit Committee's responsibility is to monitor and oversee these processes.

During fiscal 2005, at each of its meetings, the Audit Committee met with the senior members of the Company's financial management team and the independent auditors. The Audit Committee's agenda is established by the Audit Committee's chairman and senior members of the Company's financial management team. The Audit Committee met in private sessions with the Company's independent auditors at certain of its meetings, and also separately with the Company's head of internal audit, without management representation, to discuss financial management, accounting and internal control issues. The Audit Committee has reviewed and discussed with management and the independent auditors the audited consolidated financial statements in the Company's Annual Report on Form 10-K for the year ended December 31, 2005, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments and the clarity of disclosures in the consolidated financial statements. Management represented to the Audit Committee that the Company's consolidated financial statements were prepared in accordance with generally accepted accounting principles. The Audit Committee discussed with the independent auditors matters required to be discussed by Statement on Auditing Standards No. 61, "Communication with Audit Committees."

The Company's independent auditors also provided to the Audit Committee the written disclosures and the letter required by Independence Standards Board Standard No. 1, "Independence Discussions with Audit Committees." The Committee discussed with the independent auditors that firm's independence and considered whether the non-audit services provided by the independent auditors are compatible with maintaining their independence.

Based on the Audit Committee's discussion with management and the independent auditors, and the Audit Committee's review of the representation of management and the report of the independent auditors to the Audit Committee, the Audit Committee recommended that the board of directors include the audited consolidated financial statements in the Company's Annual Report on Form 10-K for the year ended December 31, 2005 filed with the Securities and Exchange Commission.

Submitted by the Audit Committee of the Company's Board of Directors,

Edward R. Kozel (Chairman)
Vyomesh Joshi
Arthur H. Kern
Gary L. Wilson

36

**FEES BILLED FOR SERVICES RENDERED BY PRINCIPAL
REGISTERED PUBLIC ACCOUNTING FIRM**

For the fiscal year ended December 31, 2005, PricewaterhouseCoopers LLP, our independent registered public accounting firm, billed the approximate fees set forth below (in millions):

|                        | 2005      | 2004      |
|------------------------|-----------|-----------|
| Audit Fees (1)         | $    6.6  | $    7.1  |
| Audit-Related Fees (2) | 0.6       | 0.9       |
| Tax Fees (3)           | 0.9       | 1.4       |
| All Other Fees         | —         | —         |
| Total                  | $    8.1  | $    9.4  |

(1)    Aggregate audit fees consist of fees billed for professional services rendered for the audit of Yahoo!'s consolidated financial statements and review of the interim condensed consolidated financial statements included in quarterly filings and services that are normally provided by PricewaterhouseCoopers LLP in connection with statutory and regulatory filings or engagements, except those not required by statute or regulation.

(2)    Audit-related fees consist of fees billed for assurance and related services that are reasonably related to the performance of the audit or review of Yahoo!'s consolidated financial statements and are not reported under "Audit Fees." These services include accounting consultations and due diligence in connection with mergers and acquisitions, attest services related to financial reporting that are not required by statute or regulation and consultations concerning financial accounting and reporting standards.

(3)    Tax fees consist of fees billed for professional services related to federal, state and international tax compliance, tax advice, assistance with tax audits and appeals and advice related to mergers and acquisitions.

The Audit Committee has adopted certain policies and procedures regarding permitted audit and non-audit services and the annual pre-approval of such services. Each year, the Audit Committee will ratify the types of audit and non-audit services of which the Company management may wish to avail itself, subject to pre-approval of specific services. Each year, management and the independent registered public accounting firm will jointly submit a pre-approval request, which will list each known and/or anticipated audit and non-audit service for the upcoming calendar year and which will include associated budgeted fees. The Audit Committee will review the requests and approve a list of annual pre-approved non-audit services. The Audit Committee will also designate a member (currently Mr. Kozel, the Audit Committee Chairman) to have the authority to pre-approve interim requests for additional non-audit services that were not contained in the annual pre-approval request. Such member shall approve or reject any interim non-audit service requests and report any interim service pre-approvals at the following Audit Committee meeting.

All services provided by PricewaterhouseCoopers LLP during the fiscal year ended December 31, 2005 were approved by the Audit Committee.

37

**PERFORMANCE GRAPH**

The following graph compares, for the five year period ended December 31, 2005, the cumulative total stockholder return for the Company's common stock, the Nasdaq Stock Market (U.S. companies) Index (the "Nasdaq Market Index"), the Goldman Sachs Internet Index (the "GIN") and the Standard & Poor's 500 Stock Index (the "S&P 500 Index"). Measurement points are the last trading day of each of the Company's fiscal years ended December 31, 2000, December 31, 2001, December 31, 2002, December 31, 2003, December 31, 2004 and December 31, 2005. The graph assumes that $100 was invested on December 29, 2000 in the common stock of the Company, the Nasdaq Market Index, the GIN and the S&P 500 Stock Index and assumes reinvestment of any dividends. The stock price performance on the following graph is not necessarily indicative of future stock price performance.



| Measurement Point | Yahoo! Inc. | Nasdaq Market Index | GIN | S&P 500 Index |
|---|---|---|---|---|
| 12/29/2000 | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 |
| 12/31/2001 | 59.01 | 78.95 | 57.77 | 86.96 |
| 12/31/2002 | 54.39 | 54.06 | 41.12 | 66.64 |
| 12/31/2003 | 149.79 | 81.09 | 79.65 | 84.22 |
| 12/31/2004 | 250.68 | 88.06 | 98.16 | 91.79 |
| 12/30/2005 | 260.66 | 89.27 | 112.96 | 94.55 |

38

## CERTAIN TRANSACTIONS

The Company has entered into indemnification agreements with each of its directors and executive officers. These agreements require the Company to indemnify such individuals, to the fullest extent permitted by Delaware law, for certain liabilities to which they may become subject as a result of their affiliation with the Company.

In April 2002, in connection with his relocation to California as a result of his joining Yahoo!, Mr. Rosensweig, our Chief Operating Officer, entered into a non-interest bearing term loan with us in the principal amount of $1,000,000. The loan to Mr. Rosensweig is secured by his principal place of residence. Payment of the entire principal of $1,000,000 is due on April 30, 2006. The maximum indebtedness of Mr. Rosensweig to us during 2005 was $1,000,000.

## OTHER MATTERS

The board of directors knows of no other business that will be presented at the annual meeting. If any other business is properly brought before the annual meeting, proxies in the enclosed form will be voted in respect thereof as the proxyholders deem advisable.

It is important that the proxies be returned promptly and that your shares be represented. Stockholders are urged to mark, date, sign and promptly return the accompanying proxy card in the enclosed envelope or vote their shares by telephone or over the Internet.

The form of proxy and this proxy statement have been approved by the board of directors and are being mailed and delivered to stockholders by its authority.

By Order of the Board of Directors,

Michael J. Callahan
*Senior Vice President, General Counsel and Secretary*

Sunnyvale, California
April 14, 2006

39

Annex A

## YAHOO! INC.
### Charter for the Audit Committee
### of the Board of Directors

### As of February 2, 2006

## I.   PURPOSE OF THE COMMITTEE

The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Yahoo! Inc. (the "Company") shall be to assist Board oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditors' qualifications and independence, and (iv) the performance of the Company's internal audit function and independent auditors.

While the Committee has the duties and responsibilities set forth in this charter, the Committee is not responsible for planning or conducting the audit or determining whether the Company's financial statements are complete and accurate and are in accordance with generally accepted accounting principles. The Company's management is responsible for preparing the financial statements and the independent auditors are responsible for auditing those financial statements. The Committee does not itself prepare financial statements or perform audits or auditing services, and its members are not auditors, certifiers of the Company's financial statements or guarantors of the Company's independent auditors' reports. It is not the duty or responsibility of the Committee to ensure that the Company complies with all laws and regulations. Each member of the Committee shall be entitled to rely on (a) the integrity of those persons and organizations within and outside of the Company from which it receives information, (b) the accuracy of the financial and other information provided to the Committee by such persons or organizations absent actual knowledge to the contrary (which shall be promptly reported to the Board) and (c) representations made by management as to any audit and non-audit services provided by the independent auditors to the Company.

The independent auditors for the Company are accountable to the Board and the Committee, as representatives for the stockholders. The Committee has the ultimate authority and responsibility to retain and terminate the Company's independent auditors (subject, if applicable, to stockholder ratification) in connection with the provision of all audit and non-audit related services.

This Charter is intended as a component of the flexible governance framework within which the Board, assisted by its committees, directs the affairs of the Company. While it should be interpreted in the context of all applicable laws, regulations and listing requirements, as well as in the context of the Company's Certificate of Incorporation and Bylaws, it is not intended to establish by its own force any legally binding obligations.

## II.   COMPOSITION OF THE COMMITTEE

The Committee shall be comprised of at least three members of the Board each of whom has been affirmatively determined in the business judgment of the Board to qualify as independent directors ("Independent Directors") under (a) the rules of the National Association of Securities Dealers' Nasdaq Stock Market ("Nasdaq"), including, as applicable, the standards set forth under Rule 10A-3 ("Rule 10A-3") of the Securities Exchange Act of 1934 (the rules of Nasdaq and Rule 10A-3, taken together, "Applicable Listing Rules") and (b) the Company's Corporate Governance Guidelines. Such members will be elected by and serve at the pleasure of the Board.

Each member of the Committee shall be "financially literate" under the Applicable Listing Rules, as such qualifications are interpreted by the Board in its business judgment. At least one member of the

A-1

Committee shall have "accounting or related financial management expertise," under the Applicable Listing Rules, as such qualifications are interpreted by the Board in its business judgment. In addition, at least one member of the Committee should be an "audit committee financial expert," as such term is defined in the rules and regulations promulgated by the SEC. The name of the person(s) designated as "audit committee financial expert" (or, if no member of the Committee is an "audit committee financial expert," the reasons why the Committee does not have a member who is an "audit committee financial expert"), and whether such "audit committee financial expert(s)" are independent of management shall be disclosed in the Company's public filings and as otherwise required under Applicable Listing Rules and applicable law.

No director may serve as a member of the Committee if such director serves on the audit committees of more than two other public companies unless the Board determines that such simultaneous service would not impair the ability of such director to effectively serve on the Committee.

Vacancies on the Committee shall be filled by majority vote of the Board at the next meeting of the Board following the occurrence of the vacancy or by unanimous written consent of the Board. No member of the Committee shall be removed except by majority vote of the Board.

## III.   MEETINGS AND PROCEDURES OF THE COMMITTEE

The Committee may fix its own rules of procedure, which shall be consistent with the Bylaws of the Company and this Charter. The Committee shall meet at least once each quarter or more frequently as circumstances or such rules of procedure as it may adopt require. The Committee will meet with the independent auditors and the Company's internal auditor upon the completion of the annual audit to review the independent auditors' examination and any management letter issued by the independent auditors to the Company.

The Committee shall meet periodically with management, independent auditors and the Company's internal auditor of the Company to discuss any matters that the Committee or any of these persons or firms believes should be discussed privately.

The Board may designate one member of the Committee as its Chairperson and in the absence of any such designation by the Board, the Committee shall designate by majority vote of the full Committee one member of the Committee as its Chairperson. The Chairperson of the Committee or a majority of the members of the Committee may also call a special meeting of the Committee. A majority of the members of the Committee present in person or by means of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other shall constitute a quorum. In the event of a tie vote on any issues being voted on by the Committee, the Chairperson's vote shall decide the issue.

The Committee may request that any directors, officers or employees of the Company, or other persons whose advice and counsel are sought by the Committee, attend any meeting of the Committee to provide such pertinent information as the Committee requests.

The Committee shall regularly report to the Board on Committee findings, recommendations and other matters the Committee deems appropriate or the Board requests. The Committee shall keep written minutes of its meetings, which minutes shall be maintained with the books and records of the Company.

A-2

## IV.  COMMITTEE RESPONSIBILITIES

In carrying out its duties and responsibilities, the Committee's policies and procedures should remain flexible, so that it may be in a position to best react or respond to changing circumstances or conditions. The following are within the authority of the Committee:

**Supervise the Independent Audit**

1.    Appoint, compensate, retain, terminate and oversee, in its sole discretion, (subject, if applicable, to stockholder ratification), the work of any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing audit, review or attest services for the Company and its subsidiaries for each fiscal year and each such registered public accounting firm must report directly to the Committee (the registered public accounting firm engaged for the purpose of preparing or issuing an audit report for inclusion in the Company's Annual Report on Form 10-K is referred to herein as the "independent auditors").

2.    Review and, in its sole discretion, approve the Company's independent auditors' annual engagement letter, including all proposed fees contained therein, and pre-approve all audit and, as provided in the Sarbanes-Oxley Act of 2002 (the "Act") and the SEC rules and regulations promulgated thereunder, all permitted non-audit engagements and relationships between the Company and such independent auditors (which approval should be made after receiving input from the Company's management).

3.    Obtain at least annually from the Company's independent auditors and review a written report describing:

    (a)    the independent auditors' internal quality-control procedures;

    (b)    any material issues raised by the most recent internal quality-control review, or peer review, of the independent auditors, or by any inquiry or investigation by any governmental or professional authority, within the preceding five years, respecting one or more independent audits carried out by the independent auditors, and any steps taken to deal with any such issues; and

    (c)    all relationships between the independent auditors and the Company (including a description of each category of services provided by the independent auditors to the Company—including audit services and permitted non-audit services to be performed for the Company by the independent auditor).

4.    Oversee the independence of the Company's independent auditors by, among other things:

    (a)    review a formal written statement from the independent auditor delineating all relationships between the independent auditor and the Company, consistent with Independence Standards Board Standard No. 1 (as modified or supplemented);

    (b)    actively engaging in a dialogue with the independent auditors with respect to any disclosed relationships or services that may impact the objectivity and independence of the independent auditors, and taking appropriate action to satisfy itself of the auditors' independence; and

    (c)    considering whether, in addition to assuring the regular rotation of the lead audit partner as required by law, there should be a rotation of the Company's independent auditors.

5.    Present to the Board its conclusions regarding independence of the independent auditors and its evaluation of the independent auditor's lead audit partner. In assessing the qualifications, performance and independence of the lead audit partner and the independent auditors, the Committee shall take into account the opinions of management and the Company's internal auditor.

6.    Obtain and review the annual audit plan of the Company's independent auditors, including the scope of audit activities, and monitor such plan's progress and results during the year.

A-3

7.   Review the results of the year-end audit of the Company, including any comments or recommendations of the Company's independent auditors.

8.   Attempt to resolve any and all disagreements between the Company's independent auditors and management regarding financial reporting.

9.   Approve clear hiring policies by the Company for hiring employees or former employees of the Company's independent auditors.

**Oversee Internal Audit, Internal Controls and Risk Management**

10.  Review and discuss with management and the independent auditors, periodically, the following:

(a)   all significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, including any material weaknesses in internal controls identified by the Company's independent auditors;

(b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls; and

(c)   any significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses.

11.  Review:

(a)   the adequacy and effectiveness of the Company's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget and staffing of the Company's internal audit function, through inquiry and discussions with the Company's independent auditors, internal auditor and management of the Company; and

(b)   the yearly report prepared by management, and attested to by the Company's independent auditors, assessing the effectiveness of the Company's internal control structure and procedures for financial reporting and stating management's responsibility to establish and maintain such structure and procedures, prior to its inclusion in the Company's annual report.

12.  Review with management the Company's administrative, operational and accounting internal controls, including any special audit steps adopted in light of the discovery of any material weaknesses, and evaluate whether the Company is operating in accordance with its prescribed policies, procedures and codes of conduct.

13.  Discuss the process by which senior management of the Company and the relevant departments of the Company assess and manage the Company's exposure to financial risk and the steps management has taken to monitor and control such exposures.

14.  Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

**Oversee Financial Reporting**

15.  Review with management, the Company's independent auditors and the Company's internal auditor, the following:

(a)   the Company's annual audited financial statements and quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and any major issues related thereto; and

A-4

(b)     critical accounting policies and such other accounting policies of the Company as are deemed appropriate for review by the Committee prior to the filing of any annual or quarterly financial statements with the SEC or other regulatory body, including any financial reporting issues which could have a material impact on the Company's financial statements.

(c)     major issues regarding accounting principles and financial statements presentations, including (A) any significant changes in the Company's selection or application of accounting principles and (B) any analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the ramifications and effects of applying alternative accounting treatments within generally accepted accounting principles in the preparation of the Company's financial statements;

(d)     all alternative treatments of financial information that have been discussed by the independent auditors and management, ramifications of the use of such alternative disclosures and treatments within generally accepted accounting principles, and the treatment preferred by the auditors;

(e)     all other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences; and

(f)     the effect of regulatory and accounting initiatives on the financial statements of the Company, as well as any material financial or non-financial arrangements that are not disclosed in the financial statements of the Company.

16.     Review on a regular basis with the Company's independent auditors any problems or difficulties encountered by the independent auditors in the course of any audit work, including management's response with respect thereto, any restrictions on the scope of the independent auditors' activities or on access to requested information and any significant disagreements with management. In connection therewith, the Committee may consider reviewing with the independent auditors the following:

(a)     any accounting adjustments that were noted or proposed by the independent auditors but were rejected by management (as immaterial or otherwise);

(b)     any significant communications between the audit team and the independent auditors' national office respecting auditing or accounting issues presented by the engagement; and

(c)     any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the Company.

17.     Receive periodic reports from the Company's independent auditors and management of the Company to assess the impact on the Company of significant accounting or financial reporting developments that may have a bearing on the Company.

18.     Review the Company's earnings press releases, as well as financial information and earnings guidance provided by the Company to analysts and rating agencies (which review may be done generally (i.e., discussion of the types of information to be disclosed and type of presentations to be made), it being understood that the Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance).

**Oversee Legal & Ethical Compliance**

19.     Meet periodically with the General Counsel, and outside counsel when appropriate, to review legal and regulatory matters, including any matters that may have a material impact on the financial statements of the Company.

A-5

20.     Review the Company's program to monitor compliance with the Company's Code of Business Conduct and Ethics and its Code of Ethics for Senior Financial Officers, and meet periodically with the Company's General Counsel to discuss compliance with such Codes.

**Minutes and Reports**

21.     The Committee will, to the extent deemed appropriate, record summaries of its recommendations to the Board in written form that will be incorporated as a part of the minutes of the Board. In connection therewith, the Committee should review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors, or the performance of the internal audit function.

22.     The Committee will prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement.

## V.   EVALUATION OF THE COMMITTEE

The Committee shall, on an annual basis, evaluate its performance under this Charter and evaluate whether this Charter appropriately addresses the matters that are or should be within its scope. As part of its evaluation, the Committee shall address all matters that the Committee considers relevant to its performance, including at least the following: the adequacy, appropriateness and quality of the information and recommendations presented by the Committee to the Board, the manner in which they were discussed or debated, and whether the number and length of meetings of the Committee were adequate for the Committee to complete its work in a thorough and thoughtful manner.

The Committee shall deliver to the Board a report, orally or in writing, setting forth the results of its evaluations, including any recommended amendments to this Charter and any recommended changes to the Company's or the Board's policies or procedures.

## VI.   DELEGATION TO SUBCOMMITTEE

The Committee may form subcommittees for any purpose that the Committee deems appropriate and may delegate to such subcommittees such power and authority as the Committee deems appropriate; *provided*, *however*, that no subcommittee shall consist of fewer than two members; and *provided further* that the Committee shall not delegate to a subcommittee any power or authority required by any law, regulation or listing standard to be exercised by the Committee as a whole.

## VII.   INVESTIGATIONS AND STUDIES; OUTSIDE ADVISERS

The Committee may conduct or authorize investigations into or studies of matters within the Committee's scope of responsibilities, and may retain, at the Company's expense, such independent expert advice to the extent the Committee determines it to be appropriate, including retaining, with or without Board approval, independent counsel, accountants, consultants or others, to assist the Committee in fulfilling its duties and responsibilities.

## VIII.   AUTHORITY

The Committee of the Board is established pursuant to Article 4.1 of the Company's Amended Bylaws and Section 141 (c) of the Delaware General Corporation Law.

A-6

**Annex B**

**YAHOO! INC.**

**1996 DIRECTORS' STOCK PLAN**
**(AS AMENDED AND RESTATED                    , 2006)**
**(REFLECTING THE MAY 2004 STOCK SPLIT)**

1.  *Purposes of the Plan*.    The purposes of this Directors' 1996 Stock Plan are to attract and retain the best available personnel for service as Directors of the Company, to provide additional incentive to the Outside Directors of the Company to serve as Directors, and to encourage their continued service on the Board. Subject to approval of the amendments to the Plan reflected in this document by the Company's stockholders at the Company's 2006 Annual Meeting of stockholders, this version of the Plan is effective on and after the Effective Date, and awards granted in connection with the Company's 2006 Annual Meeting of stockholders shall be made under this version of the Plan and not under the Plan as previously in effect. For the terms and conditions of the Plan applicable to Awards granted under the Plan before the Effective Date, refer to the version of the Plan in effect as of the date such Award was granted.

2.  *Definitions*.    As used herein, the following definitions shall apply:

"Applicable Laws" means any legal requirements of all state and federal laws, including without limitation securities laws and the Code, relating to the administration of stock incentive plans such as the Plan.

"Award" means an award of Options or Restricted Stock Units (each as defined below).

"Board" shall mean the Board of Directors of the Company.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Common Stock" shall mean the Common Stock of the Company.

"Company" shall mean Yahoo! Inc., a Delaware corporation.

"Continuous Status as a Director" shall mean the absence of any interruption or termination of service as a Director.

"Director" shall mean a member of the Board.

"Director Fees" shall mean the amount of all compensation payable to a Director for services as a member of the Board (including service on any Board committee) that, but for any election made by such Director to receive such compensation in the form of an Award under Section 11 of the Plan, would have been payable in cash to such Director.

"Effective Date" shall mean May 25, 2006.

"Employee" shall mean any person, including officers and directors, employed by the Company or any Parent or Subsidiary of the Company. The payment of a director's fee by the Company shall not be sufficient in and of itself to constitute "employment" by the Company.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Fair Market Value" means, as of any date, the fair market value of Common Stock determined as follows:

(i)     If the Common Stock is listed on any established stock exchange or a national market system including without limitation the National Market of the National Association of Securities Dealers, Inc. Automated Quotation ("Nasdaq") System, its Fair Market Value shall be the closing sales price for such stock as quoted on such system on the date of determination (if

B-1

for a given day no sales were reported, the closing bid on that day shall be used), as such price is reported in The Wall Street Journal or such other source as the Board deems reliable;

(ii) If the Common Stock is quoted on the Nasdaq System (but not on the National Market thereof) or regularly quoted by a recognized securities dealer but selling prices are not reported, its Fair Market Value shall be the mean between the bid and asked prices for the Common Stock on the date of determination, as reported in The Wall Street Journal or such other source as the Board deems reliable; or

(iii) In the absence of an established market for the Common Stock, the Fair Market Value thereof shall be determined in good faith by the Board.

"Option" shall mean a stock option granted pursuant to the Plan. All Options shall be nonstatutory stock options (i.e., options that are not intended to qualify as incentive stock options under Section 422 of the Code).

"Outside Director" shall mean a Director who is not an Employee.

"Parent" shall mean a "parent corporation," whether now or hereafter existing, as defined in Section 424(e) of the Code.

"Participant" shall mean an Outside Director who receives an Award.

"Plan" shall mean this 1996 Directors' Stock Plan. Prior to the Effective Date, the name of the Plan was the "1996 Directors' Stock Option Plan."

"Restricted Stock Unit" shall mean the right to receive one Share, subject to the terms and conditions hereof.

"Share" shall mean a share of the Common Stock, as adjusted in accordance with Section 13 of the Plan.

"Stock Exchange" shall mean any stock exchange or consolidated stock price reporting system on which prices for the Common Stock are quoted at any given time.

"Subsidiary" shall mean a "subsidiary corporation," whether now or hereafter existing, as defined in Section 424(f) of the Code.

3. *Stock Subject to the Plan.*

(a) *Share Limits.* Subject to the provisions of Section 13 of the Plan, the maximum aggregate number of Shares which may be issued under the Plan (including Shares issued before the Effective Date) is 8,800,000 Shares (the "Pool") of Common Stock (after giving effect to the Company's two-for-one stock split in May 2004). The Shares may be authorized, but unissued, or reacquired Common Stock. Shares issued in payment of any Restricted Stock Units granted under the Plan shall be counted against the Pool as 1.75 shares for every one Share actually issued in payment of such Restricted Stock Units. (For example, if 100 Shares were issued in payment of Restricted Stock Units granted under the Plan, 175 Shares shall be charged against the Pool in connection with that payment.)

(b) *Reissue of Shares.* Shares that are subject to or underlie Awards which expire or for any reason are cancelled or terminated, are forfeited, fail to vest, or for any other reason are not paid or delivered under the Plan shall again be available for subsequent Awards under the Plan. If Shares which were acquired upon exercise or payment of an Award are subsequently repurchased by the Company, such Shares shall not in any event be returned to the Plan and shall not become available for future grant under the Plan.

B-2

4.    *Administration of and Grants of Awards Under the Plan*.

   (a)    *Administrator*.    Except as otherwise required herein, the Plan shall be administered by the Board.

   (b)    *Procedure for Grants*.    All grants of Awards hereunder shall be automatic and nondiscretionary and shall be made strictly in accordance with the following provisions:

      (i)    Subject to the Board's amendment authority pursuant to Section 15(a), no person shall have any discretion to select which Outside Directors shall be granted Awards or to determine the number of Shares to be covered by Awards granted to Outside Directors.

      (ii)    Each Outside Director who first becomes an Outside Director at any time on or after the Effective Date shall be automatically granted (A) an Option to purchase 30,000 Shares and (B) an Award of 10,000 Restricted Stock Units, on the date on which such person first becomes an Outside Director, whether through election by the stockholders of the Company or appointment by the Board to fill a vacancy.

      (iii)    Each Outside Director shall be automatically granted (A) an Option to purchase 15,000 Shares and (B) an Award of 5,000 Restricted Stock Units, on the date of each Annual Meeting of the Company's Stockholders which occurs on or after the Effective Date and immediately following which such Outside Director is serving on the Board, provided that, on such date, he or she shall have served on the Board for at least six (6) months prior to the date of such Annual Meeting. In the event that an Outside Director has not served on the Board for at least six months prior to the date of such Annual Meeting, the Outside Director's Option and Restricted Stock Unit Award granted on the date of such Annual Meeting shall be prorated by multiplying (x) the number of Shares covered by the Option or the number of Restricted Stock Units covered by the Restricted Stock Unit Award, as applicable, which such Outside Director would otherwise be granted, by (y) a fraction, the numerator of which shall be the number of days on which such Outside Director served as a member of the Board during the six-month period immediately preceding the date of the Annual Meeting, and the denominator of which shall be the total number of days in such six-month period.

      (iv)    Notwithstanding the provisions of subsections (ii) and (iii) hereof, in the event that the automatic grant of one or more Awards on any given date pursuant to such subsections would cause the number of Shares subject to outstanding Awards plus the number of Shares previously delivered in respect of Awards granted under the Plan to exceed the Pool, then the number of Shares to be subject to any Award granted on such date shall be determined by multiplying (A) the total number of Shares remaining available under the Plan before giving effect to any Award grants on such date, by (B) a fraction, the numerator of which shall be the number of shares that would otherwise be subject to such Award pursuant to subsection (ii) or (iii) hereof, as applicable, and the denominator of which shall be the number of shares that would otherwise be subject to all Awards automatically granted on such date pursuant to subsections (ii) and (iii) hereof. Any further automatic grants shall then be deferred until such time, if any, as additional Shares become available for grant under the Plan through action of the stockholders to increase the number of Shares which may be issued under the Plan or through cancellation or expiration of Awards previously granted hereunder.

      (v)    The terms of each Option and Restricted Stock Unit Award granted under subsection (ii) or subsection (iii) hereof shall be as follows:

         (1)    Any Option granted under such provisions shall be exercisable only while the Outside Director remains a Director of the Company, except as set forth in Section 9 hereof.

B-3

       (2)     The exercise price per Share of any Option granted under such provisions shall be 100% of the Fair Market Value per Share on the date of grant of the Option.

       (3)     Any Option granted under such provisions shall become exercisable in installments as to one-fourth of the Shares subject to the Option at the end of each quarter following the date of grant of the Option.

       (4)     Any Restricted Stock Unit Award granted under such provisions shall become non-forfeitable in installments as to one-fourth of the Restricted Stock Units subject to the Award at the end of each quarter following the date of grant of the Award and shall be paid in accordance with Section 10 of the Plan.

(c)    *Powers of the Board*.   Subject to the provisions and restrictions of the Plan, the Board shall have the authority, in its discretion: (i) to determine, upon review of relevant information and in accordance with the provisions hereof, the Fair Market Value of the Common Stock; (ii) to determine the exercise price per share of Options to be granted, which exercise price shall be determined in accordance with Section 8(a) of the Plan; (iii) to interpret the Plan; (iv) to prescribe, amend and rescind rules and regulations relating to the Plan; (v) to authorize any person to execute on behalf of the Company any instrument required to effectuate the grant of an Award previously granted hereunder; and (vi) to make all other determinations deemed necessary or advisable for the administration of the Plan. The Board has discretion to accelerate the vesting of any or all Awards granted under the Plan in such circumstances as it, in its discretion, deems appropriate.

(d)    *Effect of Board's Decision*.   All decisions, determinations and interpretations of the Board shall be final and binding on all Participants and any other holders of any Awards granted under the Plan.

(e)    *Suspension or Termination of Award*.   If the Board reasonably believes that a Participant has committed an act of misconduct, the Board may suspend the Participant's right to exercise any Option or otherwise receive any Shares or other payment in respect of any Award granted to such Participant pending a determination by the Board. If the Board (excluding the Participant accused of such misconduct) determines a Participant has committed an act of embezzlement, fraud, dishonesty, nonpayment of an obligation owed to the Company, breach of fiduciary duty or deliberate disregard of the Company rules resulting in loss, damage or injury to the Company, or if a Participant makes an unauthorized disclosure of any Company trade secret or confidential information, engages in any conduct constituting unfair competition, induces any Company customer to breach a contract with the Company or induces any principal for whom the Company acts as agent to terminate such agency relationship, neither the Participant nor his or her estate shall be entitled to exercise or receive payment of any Award whatsoever. In making such determination, the Board shall act fairly and shall give the Participant an opportunity to appear and present evidence on the Participant's behalf at a hearing before the Board or a committee of the Board.

5.    *Eligibility*.   Awards may be granted only to Outside Directors. Except as provided in Section 11, all Awards shall be automatically granted in accordance with the terms set forth in Section 4(b) hereof. An Outside Director who has been granted an Award may, if he or she is otherwise eligible, be granted an additional Award or Awards in accordance with such provisions. The Plan shall not confer upon any Outside Director any right with respect to continuation of service as a Director or nomination to serve as a Director, nor shall it interfere in any way with any rights which the Director or the Company may have to terminate his or her directorship at any time.

6.    *Term of Plan*.   The Plan shall continue in effect until April 1, 2015 unless sooner terminated under Section 15 of the Plan.

B-4

7.      *Term of Options.*    The term of each Option shall be seven (7) years from the date of grant thereof.

8.      *Option Exercise Price and Consideration.*

(a)     *Exercise Price.*    The per Share exercise price for the Shares to be issued pursuant to exercise of an Option shall be 100% of the Fair Market Value per Share on the date of grant of the Option.

(b)     *Form of Consideration.*    The consideration to be paid for the Shares to be issued upon exercise of an Option shall consist entirely of cash, check, other Shares of Common Stock having a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which said Option shall be exercised (which, if acquired from the Company, shall have been held for at least six months), delivery of a properly executed notice of exercise together with irrevocable instructions to a broker to deliver promptly to the Company the amount of sale or loan proceeds required to pay the exercise price, or any combination of such methods of payment and/or any other consideration or method of payment as shall be permitted under applicable corporate law.

9.      *Exercise of Option.*

(a)     *Procedure for Exercise; Rights as a Stockholder.*    Any Option granted hereunder shall be exercisable at such times as are set forth in Section 4(b) hereof. An Option may not be exercised for a fraction of a Share. An Option shall be deemed to be exercised when written notice of such exercise has been given to the Company (or such other administrative exercise procedures as the Board may implement from time to time have been completed) by the person entitled to exercise the Option and full payment for the Shares with respect to which the Option is exercised has been received by the Company. Full payment may consist of any consideration and method of payment allowable under Section 8(b) hereof. Until such Shares are actually issued to and held of record by the Participant, the Participant shall have no right to vote or receive dividends or any other rights as a stockholder with respect to such Shares, notwithstanding the exercise of the Option. The Company shall issue (or cause to be issued) such Shares as soon as practicable after exercise of the Option. No adjustment will be made for a dividend or other right for which the record date is prior to the date such Shares are issued, except as provided in Section 13. Exercise of an Option in any manner shall result in a decrease in the number of Shares which thereafter may be available, both for purposes of the Plan and for sale under the Option, by the number of Shares as to which the Option is exercised.

(b)     *Termination of Status as a Director.*    If an Outside Director ceases to serve as a Director for any reason, he or she may, but only within one (1) year after the date he or she ceases to be a Director of the Company, exercise his or her Option to the extent that he or she was entitled to exercise it at the date of such termination. Notwithstanding the foregoing, in no event may the Option be exercised after its term set forth in Section 7 has expired. To the extent that such Outside Director was not entitled to exercise an Option at the date of such termination, or does not exercise such Option (which he or she was entitled to exercise) within the time specified herein, the Option shall terminate.

10.     *Restricted Stock Units.*

(a)     *Lapse of Restrictions; Termination of Service.*    Subject to this Section 10(a), any Award of Restricted Stock Units granted hereunder shall become non-forfeitable at such times as are set forth in Section 4(b)(v)(4) hereof. In the event of the termination of a Participant's Continuous Service as a Director for any reason, any Restricted Stock Units held by such Participant as to which the restrictions in accordance with Section 4(b)(v) (4) hereof have not lapsed prior to the termination of the Participant's Continuous Service as a Director shall be

B-5

automatically forfeited by the Participant as of the date of such termination. Neither the Participant nor any of the Participant's successors, heirs, assigns or personal representatives shall have any rights or interests in any Restricted Stock Units that are so forfeited.

(b)    *No Rights as a Stockholder*.    Restricted Stock Units are bookkeeping entries only. A Participant who is awarded Restricted Stock Units shall possess no incidents of ownership with respect to such Restricted Stock Units, except as expressly provided in this Section 10(c) with respect to dividend equivalent rights.

(c)    *Dividend Equivalent Rights*.    As of any date that the Company pays an ordinary cash dividend on its Common Stock, each Participant shall automatically be granted under the Plan a number of additional Restricted Stock Units equal to (i) the per share cash dividend paid by the Company on its Common Stock on such date, multiplied by (ii) the number of outstanding and unpaid Restricted Stock Units (whether or not non-forfeitable) held by such Participant under the Plan as of the related dividend payment record date, divided by (iii) the Fair Market Value of a share of Common Stock on the date of payment of such dividend. Any Restricted Stock Units granted pursuant to the foregoing provisions of this Section 10(c) shall be subject to the same vesting, payment (including, without limitation, any election by the Participant to defer payment pursuant to Section 10(e)) and other terms, conditions and restrictions as the original Restricted Stock Units to which they relate.

(d)    *Timing and Manner of Payment of Restricted Stock Units*.    Subject to Sections 10(e) and 13(b) hereof, with respect to any Restricted Stock Units granted to a Participant that become non-forfeitable pursuant to the terms hereof, such Restricted Stock Units shall be paid on or as soon as practicable after the earlier of (i) the date such Participant's Continuous Service as a Director terminates, or (ii) the third anniversary of the date such Restricted Stock Units are granted (the "Payment Date"), such payment to be made by the Company delivering to the Participant a number of Shares equal to the number of the Restricted Stock Units being paid on the Payment Date. The Company shall issue the Shares either (i) in certificate form or (ii) in book entry form, registered in the name of the Participant. Delivery of any certificates will be made to the Participant's last address reflected on the books of the Company unless the Company is otherwise instructed in writing. Neither the Participant nor any of the Participant's successors, heirs, assigns or personal representatives shall have any further rights or interests in any Restricted Stock Units that are so paid.

(e)    *Deferral of Payment of Restricted Stock Units*.    Notwithstanding the first sentence of Section 10(d), a Participant granted an Award of Restricted Stock Units may elect, on a form and in a manner prescribed by the Company, that such Restricted Stock Units shall be paid on or as soon as practicable after any date elected by the Participant that is at least five (5) years after the original Payment Date; provided, however, that such election must be irrevocable and shall be effective only if such election is made at least twelve (12) months before the original Payment Date would have otherwise occurred. In the event of any such election, the new payment date timely elected by the Participant shall be the new "Payment Date" with respect to the Restricted Stock Units covered by the election.

11.    *Awards in Lieu of Cash Payment of Fees*.    Prior to the date on which any Director Fees become payable to an Outside Director, the Outside Director may elect, on a form and in manner (including the timing of the election) prescribed by the Company, to exchange the right to receive payment of such Director Fees in cash for the grant of an Award under this Plan pursuant to either Section 11(a) or 11(b) below.

(a)    *Stock Option*.    The Outside Director may elect to be granted an Option with respect to the number of Shares determined by dividing (i) three (3) times the amount of the Director Fees being exchanged for the Option, by (ii) the Fair Market Value of a Share as of the date of

B-6

such exchange. The Option shall be granted on the last day of the calendar quarter for which the applicable Director Fees would have otherwise been paid (or such other date as the Board may determine appropriate) and shall be exercisable immediately upon the date of grant. Except as expressly provided herein, any Option granted pursuant to this Section 11(a) shall be subject to all of the provisions of the Plan applicable to Options granted under the Plan.

(b)  *Restricted Stock Unit Award*.   The Outside Director may elect to be granted an Award of Restricted Stock Units. The number of Restricted Stock Units to be covered by such Award shall be determined by dividing (i) the amount of the Director Fees being exchanged for the Award, by (ii) the Fair Market Value of a Share as of the date of such exchange. The Restricted Stock Units shall be granted on the last day of the calendar quarter for which the applicable Director Fees would have otherwise been paid (or such other date as the Board may determine appropriate). Such Restricted Stock Units shall be fully non-forfeitable as of the date of grant. Except as expressly provided herein, any Restricted Stock Units granted pursuant to this Section 11(b) shall be subject to all of the provisions of the Plan applicable to Awards of Restricted Stock Units granted under the Plan.

12.   *Nontransferability of Awards*.   Awards granted under the Plan may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent or distribution or pursuant to a qualified domestic relations order (as defined by the Code or the rules thereunder). The designation of a beneficiary by a Participant does not constitute a transfer. An Option may be exercised during the lifetime of a Participant only by the Participant or a transferee permitted by this Section 12.

13.   *Adjustments upon Changes in Capitalization; Corporate Transactions*.

(a)   *Adjustments*.   Subject to any required action by the stockholders of the Company, the number of shares of Common Stock covered by each outstanding Award, and the number of shares of Common Stock which have been authorized for issuance under the Plan but as to which no Awards have yet been granted or which have been returned to the Plan upon cancellation or expiration of an Award, as well as the price per share of Common Stock covered by each outstanding Option, shall be proportionately adjusted for any increase or decrease in the number of issued shares of Common Stock resulting from a stock split, reverse stock split, stock dividend, combination or reclassification of the Common Stock, or any other increase or decrease in the number of issued shares of Common Stock effected without receipt of consideration by the Company; provided, however, that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration." Such adjustment shall be made by the Board, whose determination in that respect shall be final, binding and conclusive. Except as expressly provided herein, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of shares of Common Stock subject to any Award.

(b)   *Corporate Transactions*.   In the event of (i) a dissolution or liquidation of the Company, (ii) a sale of all or substantially all of the Company's assets, (iii) a merger or consolidation in which the Company is not the surviving corporation, or (iv) any other capital reorganization in which more than fifty percent (50%) of the shares of the Company entitled to vote are exchanged (a "Corporate Transaction"), at the time of adoption of the plan for such Corporate Transaction, the Company shall:

•   in the case of outstanding Options, provide for either a reasonable time thereafter within which to exercise the Option, including Shares as to which the Option would not be otherwise exercisable, prior to the effectiveness of such Corporate Transaction, at the end of which time the Option shall terminate, or the right to exercise the Option, including Shares

B-7

as to which the Option would not be otherwise exercisable (or receive a substitute option with comparable terms), as to an equivalent number of shares of stock of the corporation succeeding the Company or acquiring its business by reason of such Corporate Transaction; and

- in the case of outstanding Restricted Stock Units, provide that, immediately prior to the effectiveness of such Corporate Transaction, all such Restricted Stock Units (A) to the extent that such Restricted Stock Units are not then non-forfeitable, shall become non-forfeitable, and (B) shall be paid in an equivalent number of Shares; provided, however, that payment shall be made in respect of a Corporate Transaction pursuant to the foregoing clause (B) only if such Corporate Transaction constitutes a "change in the ownership or effective control" of the Company or a "change in the ownership of a substantial portion of the assets" of the Company within the meaning of Section 409A(a)(2)(A)(v) of the Code; and provided further, that in the event the foregoing proviso is not satisfied, payment shall be made at the time otherwise provided herein.

14.    *Time of Granting Awards*.    The date of grant of an Award shall, for all purposes, be the date determined in accordance with Section 4(b) or Section 11 hereof, as applicable. Notice of the determination shall be given to each Outside Director to whom an Award is so granted within a reasonable time after the date of such grant.

15.    *Amendment and Termination of the Plan*.

(a)    *Amendment and Termination*.    The Board may amend, alter, suspend, discontinue, or terminate the Plan or any portion thereof at any time; provided, that no such amendment, alteration, suspension, discontinuation or termination shall be made without stockholder approval if such approval is necessary to comply with any tax, securities or regulatory law or requirement or any applicable Stock Exchange requirement with which the Board intends the Plan to comply or if such amendment constitutes a "material amendment." For purposes of the Plan, a "material amendment" shall mean an amendment that (i) materially increases the benefits accruing to Participants under the Plan, (ii) materially increases the number of securities that may be issued under the Plan, (iii) materially modifies the requirements for participation in the Plan, or (iv) is otherwise deemed a material amendment by the Administrator pursuant to any Applicable Law or applicable accounting or Stock Exchange rules.

(b)    *Amendments to Awards*.    Without limiting any other express authority of the Board under (but subject to) the express limits of the Plan, the Board may waive conditions of or limitations on Awards that the Board in the prior exercise of its discretion has imposed, without the consent of the Award recipient, and (subject to the requirements of Section 15(c)) may make other changes to the terms and conditions of Awards; provided, however that in no case (except due to an adjustment contemplated by Section 13 or any repricing that may be approved by stockholders) shall such a waiver or change constitute a repricing (by amendment, cancellation and regrant, exchange or other means) of the per share exercise price of any Option.

(c)    *Limitations on Amendments to Plan and Awards*.    No amendment, suspension or termination of the Plan or change of or affecting any outstanding Award shall, without written consent of the Award recipient, affect in any manner materially adverse to such recipient any rights or benefits of such recipient or obligations of the Company under any Award granted under the Plan prior to the effective date of such change. Changes, settlements and other actions contemplated by Section 13 shall not be deemed to constitute changes or amendments for purposes of this Section 15(c).

B-8

16.   *Conditions upon Issuance of Shares*.    Shares shall not be issued pursuant to the exercise or payment of any Award granted under the Plan unless the exercise or payment of such Award and the issuance and delivery of such Shares pursuant thereto shall comply with all relevant provisions of law, including, without limitation, the Securities Act of 1933, as amended, the Exchange Act, the rules and regulations promulgated thereunder, state securities laws, and the requirements of any Stock Exchange, and shall be further subject to the approval of counsel for the Company with respect to such compliance. As a condition to the exercise or payment of any Award, the Company may require the person exercising or receiving payment of such Award to represent and warrant at the time of any such exercise or payment that the Shares are being acquired only for investment and without any present intention to sell or distribute such Shares, if, in the opinion of counsel for the Company, such a representation is required by any of the aforementioned relevant provisions of law.

17.   *Reservation of Shares*.    The Company, during the term of the Plan, will at all times reserve and keep available such number of Shares as shall be sufficient to satisfy the requirements of the Plan. Inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, shall relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority shall not have been obtained.

18.   *Award Agreement*.    Awards shall be evidenced by written award agreements in such form as the Board shall approve.

19.   *Unfunded Status of Plan*.    The Plan is intended to constitute an "unfunded" plan for incentive compensation. With respect to any payments not yet made to a participant by the Company, nothing contained herein shall give any such participant any rights that are greater than those of a general creditor of the Company.

20.   *Governing Law*.    The Plan and all determinations made and actions taken pursuant hereto shall be governed by the laws of the State of Delaware, without giving effect to the conflict of laws principles thereof.

21.   *Construction*.    The Plan and any agreement evidencing any Award granted hereunder shall be construed and interpreted to comply with Section 409A of the Code. The Company reserves the right to amend the Plan and any such agreement to the extent it reasonably determines is necessary in order to preserve the intended tax consequences of Awards granted hereunder in light of Section 409A of the Code and any regulations or other guidance promulgated thereunder.

B-9



☐  Mark this box with an X if you have made
   changes to your name or address details above.

## Annual Meeting Proxy Card

### PLEASE REFER TO THE REVERSE SIDE FOR INTERNET AND TELEPHONE VOTING INSTRUCTIONS.

**The Company's Board of Directors recommends a vote FOR all of the nominees listed below and a vote FOR proposals 2 and 3.**

### A Election of Directors

1.    Nominees:

| | For | Withhold | | For | Withhold | | For | Withhold |
|---|---|---|---|---|---|---|---|---|
| 01 - Terry S. Semel | ☐ | ☐ | 05 - Eric Hippeau | ☐ | ☐ | 09 - Edward R. Kozel | ☐ | ☐ |
| 02 - Jerry Yang | ☐ | ☐ | 06 - Arthur H. Kern | ☐ | ☐ | 10 - Gary L. Wilson | ☐ | ☐ |
| 03 - Roy J. Bostock | ☐ | ☐ | 07 - Vyomesh Joshi | ☐ | ☐ | | | |
| 04 - Ronald W. Burkle | ☐ | ☐ | 08 - Robert A. Kotick | ☐ | ☐ | | | |

### B Issues

|   | | For | Against | Abstain |
|---|---|---|---|---|
| 2. | Amendment of the 1996 Directors' Stock Option Plan. | ☐ | ☐ | ☐ |
| 3. | Ratification of appointment of Independent Registered Public Accounting Firm. | ☐ | ☐ | ☐ |

In their discretion, the proxies are authorized to vote upon such other business as may properly come before the Annual Meeting and any adjournment or postponement thereof.

Mark this box with an X if you plan to attend the meeting.  ☐

### C Authorized Signatures—Sign Here—This section must be completed for your instructions to be executed.

Please sign exactly as your name(s) appear(s) hereon. All holders must sign. When signing in a fiduciary capacity, please indicate full title as such. If a corporation or partnership, please sign in full corporate or partnership name by authorized person.

Signature 1—Please keep signature within the box          Signature 2—Please keep signature within the box          Date (mm/dd/yyyy)

**Proxy—Yahoo! Inc.**

**THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS
OF YAHOO! INC. FOR THE ANNUAL MEETING OF STOCKHOLDERS
To Be Held May 25, 2006**

The undersigned stockholder of Yahoo! Inc. (the "Company"), a Delaware corporation, hereby acknowledges receipt of the Notice of Annual Meeting of Stockholders and Proxy Statement, each dated April 14, 2006, and hereby appoints Michael J. Callahan and Susan L. Decker, and each or either of them, as proxies, with full power of substitution, on behalf and in the name of the undersigned to represent the undersigned at the 2006 Annual Meeting of Stockholders of the Company to be held on Thursday, May 25, 2006, at 10:00 a.m., local time, at the Santa Clara Convention Center, located at 5001 Great America Parkway, Santa Clara, California, and at any postponement or adjournment thereof, and to vote all shares of Common Stock which the undersigned would be entitled to vote if personally present, as indicated on the reverse side.

**ANY STOCKHOLDER COMPLETING THIS PROXY THAT FAILS TO MARK ONE OF THE BOXES FOR THE PROPOSAL WILL BE DEEMED TO HAVE GIVEN THE PROXY HOLDERS COMPLETE DISCRETION IN VOTING HIS, HER, OR ITS SHARES "FOR" SUCH PROPOSAL AT THE MEETING, OR, IN THE CASE OF ELECTION OF DIRECTORS, "FOR" EACH OF THE LISTED NOMINEES. IF A BOX IS CHECKED, YOUR SHARES SHALL BE VOTED IN ACCORDANCE WITH YOUR INSTRUCTIONS.**

**CONTINUED AND TO BE SIGNED ON REVERSE SIDE**

---

**RECEIVE FUTURE YAHOO! INC. PROXY MATERIALS VIA THE INTERNET!**
**Receive future Yahoo! Inc. annual reports and proxy materials in electronic form rather than in printed form. Next year when the annual report and proxy materials are available, we will send you an email with instructions which will enable you to review the materials online. To consent to electronic delivery, visit www.computershare.com/us/ecomms, or while voting via the Internet, just click the box to give your consent.**

**Accessing Yahoo! Inc. annual reports and proxy materials via the Internet may result in charges to you from your Internet service provider and/or telephone companies.**

**Telephone and Internet Voting Instructions**
**You can vote by telephone OR Internet! Available 24 hours a day 7 days a week!**
Instead of mailing your proxy, you may choose one of the two voting methods outlined below to vote your proxy.

**To vote using the Telephone (within U.S. and Canada)**

- Call toll free 1-800-652-VOTE (8683) in the United States or Canada any time on a touch tone telephone. There is **NO CHARGE** to you for the call.

- Follow the simple instructions provided by the recorded message.

**To vote using the Internet**

- Go to the following web site: **WWW.COMPUTERSHARE.COM/EXPRESSVOTE**

- Enter the information requested on your computer screen and follow the simple instructions.

**VALIDATION DETAILS ARE LOCATED ON THE FRONT OF THIS FORM IN THE COLORED BAR.**

**If you vote by telephone or the Internet, please DO NOT mail back this proxy card.**
**Proxies submitted by telephone or the Internet must be received by 1:00 a.m., Central Time, on May 25, 2006.**
**THANK YOU FOR VOTING**

QuickLinks

PROXY STATEMENT
QUESTIONS AND ANSWERS ABOUT THE PROXY MATERIALS AND OUR 2006 ANNUAL MEETING
PROPOSAL NO. 1 ELECTION OF DIRECTORS
PROPOSAL NO. 2 APPROVAL OF AMENDMENTS TO THE 1996 DIRECTORS' STOCK OPTION PLAN
PROPOSAL NO. 3 RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
INFORMATION REGARDING BENEFICIAL OWNERSHIP OF PRINCIPAL STOCKHOLDERS AND MANAGEMENT
OUR EXECUTIVE OFFICERS
EXECUTIVE OFFICER COMPENSATION AND OTHER MATTERS
REPORT OF THE COMPENSATION COMMITTEE OF THE BOARD OF DIRECTORS ON EXECUTIVE COMPENSATION
AUDIT COMMITTEE REPORT
FEES BILLED FOR SERVICES RENDERED BY PRINCIPAL REGISTERED PUBLIC ACCOUNTING FIRM
PERFORMANCE GRAPH
CERTAIN TRANSACTIONS
OTHER MATTERS
YAHOO! INC. CHARTER FOR THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS
YAHOO! INC. 1996 DIRECTORS' STOCK PLAN (AS AMENDED AND RESTATED , 2006) (REFLECTING THE MAY 2004 STOCK SPLIT)

Exhibit 16

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2006**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from     to**

**Commission File Number 0-28018**

---

# YAHOO! INC.
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **77-0398689** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**701 First Avenue**
**Sunnyvale, California 94089**
(Address of principal executive offices)

Registrant's telephone number, including area code: **(408) 349-3300**

---

Indicate by check mark whether the Registrant (1) has filed all reports required by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days: Yes ☒    No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer.  See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):
Large accelerated filer ☒         Accelerated filer ☐                    Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐    No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Class | Outstanding at May 2, 2006 |
|---|---|
| Common stock, $0.001 par value | 1,408,803,494 |

**Item 1A.  Risk Factors**

We have updated the risk factors previously disclosed in Part I Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2005, which was filed with the Securities and Exchange Commission on March 3, 2006, as set forth below.  We do not believe any of the changes constitute material changes to the risk factors.

***We face significant competition from large-scale Internet content, product and service aggregators, principally Time Warner's AOL, Google and Microsoft.***

We face significant competition from companies, principally AOL, Google, and Microsoft, that have aggregated a variety of Internet products, services and content in a manner similar to Yahoo!.  AOL has access to content from Time Warner's movie, television, music, book, periodical, news, sports and other media holdings; access to a network of cable and other broadband users and delivery technologies; and considerable resources for future growth and expansion.  Google, in addition to an Internet search service, offers many other services that directly compete with our services, including a consumer e-mail service, desktop search, local search, instant messaging, photos, maps, shopping services and advertising solutions.  Microsoft has introduced its own Internet search service and has announced plans to develop both paid search and features that may make Internet searching capabilities a more integrated part of its Windows operating system.  We expect these competitors increasingly to use their financial and engineering resources to compete with us, individually, and potentially in combination with each other.  In certain of these cases, most notably AOL, our competition has a direct billing relationship with a greater number of their users through Internet access and other services than we have with our users through our premium services.  This relationship may permit these competitors to be more effective than us in targeting services and advertisements to the specific preferences of their users thereby giving them a competitive advantage.  If our competitors are more successful than we are in developing compelling products or attracting and retaining users or advertisers, then our revenues and growth rates could decline.

***We also face competition from other Internet service companies, including Internet access providers, device manufacturers offering online services and destination websites.***

Our users must access our services through Internet access providers, including wireless providers and providers of cable and broadband Internet access.  To the extent that an access provider or device manufacturer offers online services competitive with those of Yahoo!, the user may elect to use the services or properties of that access provider or manufacturer.  In addition, the access provider or manufacturer may make it difficult to access our services by not listing them in the access provider's or manufacturer's own directory or by providing Yahoo! with less prominent listings than the access provider, manufacturer, or a competitor's offerings.  Such access providers and manufacturers may prove better able to target services and advertisements to the preferences of their users.  If such access providers and device manufacturers are more successful than we are in developing compelling products or attracting and retaining customers, users or advertisers, then our revenues could decline.  Further, to the extent that Internet access providers, mobile service providers or network providers increase the costs of service to users or restrict Yahoo!'s ability to deliver products, services and content to end users or increase our costs of doing so, our revenues could decline.

We also compete for customers, users and advertisers with many other providers of online services, including destination websites.  Some of these competitors may have more expertise in a particular segment of the market, and within each segment, have longer operating histories, larger advertiser or user bases, and more brand recognition or technological features than we offer.

In the future, competitors may acquire additional competitive offerings or consolidate with each other to become more competitive, and new competitors may enter the market.  If our competitors are more successful than we are in developing compelling products or attracting and retaining users, advertisers or customers, then our revenues and growth rates could decline.

***We face competition from other providers of search marketing that could affect our operating results.***

We compete directly with other providers of search marketing, including Google, LookSmart, Ltd., Lycos Inc., Microsoft, and MIVA (formerly FindWhat.com).  In addition, we believe it is likely that there will be additional entrants to this advertising market.  Some of the existing competitors and possible additional entrants may have greater operational, strategic, financial, personnel or other resources than we do, as well as greater brand recognition.  These competitors compete against us for affiliate and advertiser arrangements and could cause us to have to enter into such arrangements with less favorable terms, to lose current affiliates or advertisers or to fail to acquire new affiliates or advertisers.  The loss of affiliates or advertisers or a reduction in the revenue from such arrangements could harm our business and operating results.

***We face significant competition from traditional media companies which could adversely affect our future operating results.***

We also compete with traditional media companies for advertising.  Most advertisers currently spend only a small portion of their advertising budgets on Internet advertising.  If we fail to persuade existing advertisers to retain and increase their spending with us and if we fail to persuade new advertisers to spend a portion of their budget on advertising with us, our revenues could decline and our future operating results could be adversely affected.

***If we are unable to provide search technologies and other services which generate significant traffic to our websites, or we are unable to enter into distribution relationships which drive significant traffic to our websites, our business could be harmed, causing our revenues to decline.***

We have deployed our own Internet search technology to provide search results on our network.  We have more limited experience in operating our own search service than do some of our competitors.  Internet search is characterized by rapidly changing technology, significant competition, evolving industry standards and frequent product and service enhancements.  We must continually invest in improving our users' experience, including search relevance, speed and services responsive to their needs and preferences, to continue to attract, retain and expand our user base.  If we are unable to provide search technologies and other services which generate significant traffic to our websites, or if we are unable to enter into distribution relationships that continue to drive significant traffic to our websites, our business could be harmed, causing our revenues to decline.

***The majority of our revenues are derived from marketing services, and the reduction in spending by or loss of current or potential advertisers would cause our revenues and operating results to decline.***

For the quarter ended March 31, 2006, 88 percent of our total revenues came from marketing services.  Our ability to continue to retain and grow marketing services revenue depends upon:

- maintaining our user base;

- broadening our relationships with advertisers to small and medium size businesses;

- attracting advertisers to our user base;

- increasing demand for our marketing services by advertisers, users, businesses and affiliates, including prices paid by advertisers, the number of searches performed by users, the rate at which users click-through to commercial search results and advertiser perception of the quality of leads generated by our marketing services;

- the effectiveness, and acceptance by advertisers and affiliates of our systems improvements to increase monetization of our search marketing;

- maintaining our affiliate program for our search marketing;

- deriving better demographic and other information from our users; and

- driving acceptance of the web by advertisers as an advertising medium.

In many cases, our agreements with advertisers have terms of one year or less, or, in the case of search marketing, may be terminated at any time by the advertiser.  Search marketing agreements often have payments dependent upon usage or click-through levels.  Accordingly, it is difficult to forecast marketing services revenues accurately.  However, our expense levels are based in part on expectations of future revenues, including occasional guaranteed minimum payments to our affiliates in connection with search marketing, and are fixed over the short-term with respect to certain categories.  Any reduction in spending by or loss of existing or potential future advertisers would cause our revenues to decline.  Further, we may be unable to adjust spending quickly enough to compensate for any unexpected revenue shortfall.

***In certain markets, we depend on a limited number of sources to direct a significant percentage of users and businesses to our service to conduct searches and a loss of any of these sources could harm our operating results.***

A significant percentage of users and businesses that conduct searches and access our search marketing listings comes from a limited number of sources in certain markets.  In addition to the Yahoo! Properties, sources for users are members of our affiliate network, including portals, browsers and other affiliates.  Our agreements with affiliates vary in duration, and depending on the agreement, provide varying levels of discretion to the affiliate in the implementation of search marketing, including the degree to which affiliates can modify the presentation of the search marketing listings on their websites or integrate search marketing with their own services.  The agreements may be terminable upon the occurrence of certain events, including failure to meet certain service levels, material breaches of agreement terms, changes in control or in some instances, at will.  We may not be successful in renewing our affiliate agreements on as favorable terms or at all.  The loss of affiliates providing significant users or businesses or an adverse change in implementation of search marketing by any of these affiliates could harm our ability to generate revenue, our operating results and cash flows from operations.

***We may not be able to generate substantial revenues from our alliances with Internet access providers.***

Through alliances with Internet access providers, we offer access services that combine customized content and services from Yahoo! (including browser and other communications services) and Internet access from the third party access providers. We may not be able to retain the alliances with our existing Internet access providers or to obtain new alliances with Internet access providers on terms that are reasonable. In addition, these Internet access services compete with many large companies such as AOL, Microsoft, Comcast Corporation and other established Internet access providers. In certain of these cases, our competition has substantially greater market presence (including an existing user base) and greater financial, technical, marketing or other resources. As a result of these and other competitive factors, the Internet access providers with which we have formed alliances may not be able to attract, grow or retain their customer bases, which would negatively impact our ability to sell customized content and services through this channel and, in turn, reduce our anticipated revenues from our alliances.

***Some of our shared revenue arrangements may not generate anticipated revenues.***

We typically receive co-branded revenue through revenue sharing arrangements or a portion of transactions revenue. In some cases, our revenue arrangements require that minimum levels of user impressions be provided by us. These arrangements expose us to potentially significant financial risks in the event our usage levels decrease, including the following:

- the revenue we are entitled to receive may be adjusted downwards;

- we may be required to "make good" on our obligations by providing additional advertising or alternative services;

- the partners or co-brand services may not renew the arrangements or may renew at lower rates; and

- the arrangements may not generate anticipated levels of shared transactions revenue, or partners may default on the payment commitments in such agreements as has occurred in the past.

Accordingly, any leveling off or decrease of our user base (or usage by our existing base) or the failure to generate anticipated levels of shared transactions revenue could result in a significant decrease in our revenues.

***Decreases or delays in advertising spending by our advertisers due to general economic conditions could harm our ability to generate advertising revenue.***

Expenditures by advertisers tend to be cyclical, reflecting overall economic conditions and budgeting and buying patterns. Since we derive the majority of our revenues from advertising, any decreases in or delays in advertising spending due to general economic conditions could reduce our revenues or negatively impact our ability to grow our revenues.

***Financial results for any particular period do not predict results for future periods.***

There can be no assurance that the purchasing pattern of advertisers on the Yahoo! Properties will not fluctuate, that advertisers will not make smaller and shorter-term purchases, or that market prices for online advertising will not decrease due to competitive or other factors. In addition, there can be no assurance that the volume of searches conducted, the amounts bid by advertisers for search marketing listings or the number of advertisers that bid in our search marketing marketplace will not vary widely from period to period. As revenues from new sources increase, it may become more difficult to predict our financial results based on historical performance. You should not rely on the results for any period as an indication of future performance.

***We rely on the value of the Yahoo! brands, and a failure to maintain or enhance the Yahoo! brands in a cost-effective manner could harm our operating results.***

We believe that maintaining and enhancing the Yahoo! brands is an important aspect of our efforts to attract and expand our user and advertiser base. We also believe that the importance of brand recognition will increase due to the relatively low barriers to entry in the Internet market. We have spent considerable money and resources to date on the establishment and maintenance of the Yahoo! brands, and we anticipate spending increasing amounts of money on, and devoting greater resources to, advertising, marketing and other brand-building efforts to preserve and enhance consumer awareness of the Yahoo! brands. We may not be able to successfully maintain or enhance consumer awareness of the Yahoo! brands and, even if we are successful in our branding efforts, these efforts may not be cost-effective. If we are unable to maintain or enhance customer awareness of the Yahoo! brands in a cost-effective manner, our business, operating results and financial condition could be harmed.

***If we are unable to license or acquire compelling content at reasonable costs or if we do not develop compelling content, the number of users of our services may not grow as anticipated, or may decline, which could harm our operating results.***

Our future success depends in part upon our ability to aggregate compelling content and deliver that content through our online properties. We license much of the content on our online properties, such as news items, stock quotes, weather reports, maps

and audio and video content from third parties. We have been providing increasing amounts of audio and video content to our users, and we believe that users will increasingly demand high-quality audio and video content, such as music, film, speeches, news footage, concerts and other special events. Such content may require us to make substantial payments to third parties from whom we license or acquire such content. For example, our music and entertainment properties rely on major sports organizations, radio and television stations, record labels, music publishers, cable networks, businesses, colleges and universities, film producers and distributors, and other organizations for a large portion of the content available on our properties. Our ability to maintain and build relationships with third-party content providers will be critical to our success. In addition, as new methods for accessing the Internet become available, including through alternative devices, we may need to enter into amended content agreements with existing third-party content providers to cover the new devices. Also, to the extent that Yahoo! develops content of its own, Yahoo!'s current and potential third-party content providers may view our services as competitive with their own, and this may adversely affect their willingness to contract with us. We may be unable to enter into new, or preserve existing, relationships with the third parties whose content we seek to obtain. In addition, as competition for compelling content increases both domestically and internationally, our content providers may increase the prices at which they offer their content to us, and potential content providers may not offer their content on terms agreeable to us. An increase in the prices charged to us by third-party content providers could harm our operating results and financial condition. Further, many of our content licenses with third parties are non-exclusive. Accordingly, other webcasters and other media such as radio or television may be able to offer similar or identical content. This increases the importance of our ability to deliver compelling editorial content and personalization of this content for users in order to differentiate Yahoo! from other businesses. If we are unable to license or acquire compelling content at reasonable prices, if other companies broadcast content that is similar to or the same as that provided by Yahoo!, or if we do not develop compelling editorial content or personalization services, the number of users of our services may not grow as anticipated, or may decline, which could harm our operating results.

***Our intellectual property rights are valuable, and any inability to protect them could reduce the value of our brand image and harm our business and our operating results.***

We create, own and maintain a wide array of intellectual property assets, including copyrights, patents, trademarks, trade dress, trade secrets and rights to certain domain names, which we believe are among our most valuable assets. We seek to protect our intellectual property assets through patent, copyright, trade secret, trademark and other laws of the United States and other countries of the world, and through contractual provisions. The efforts we have taken to protect our intellectual property and proprietary rights may not be sufficient or effective at stopping unauthorized use of those rights. In addition, effective trademark, patent, copyright and trade secret protection may not be available or cost-effective in every country in which our products and media properties are distributed or made available through the Internet. There may be instances where we are not able to fully protect or utilize our intellectual property assets in a manner to maximize competitive advantages. Further, while we attempt to ensure that the quality of our brand is maintained by our licensees, our licensees may take actions that could impair the value of our brand, our proprietary rights or the reputation of our products and media properties. We are aware that third parties have, from time to time, copied significant content available on Yahoo! for use in competitive Internet services. Protection of the distinctive elements of Yahoo! may not be available under copyright law. If we are unable to protect our proprietary rights from unauthorized use, the value of our brand image may be reduced. Any impairment of our brand could negatively impact our business. In addition, protecting our intellectual property and other proprietary rights is expensive and time consuming. Any increase in the unauthorized use of our intellectual property could make it more expensive to do business and consequently harm our operating results.

***We are, and may in the future be, subject to intellectual property infringement claims, which are costly to defend, could result in significant damage awards, and could limit our ability to provide certain content or use certain technologies in the future.***

Internet, technology, media companies and patent holding companies often possess a significant number of patents. Further, many of these companies and other parties are actively developing or purchasing search, indexing, electronic commerce and other Internet-related technologies, as well as a variety of online business models and methods. We believe that these parties will continue to take steps to protect these technologies, including, but not limited to, seeking patent protection. As a result, disputes regarding the ownership of technologies and rights associated with online business are likely to continue to arise in the future. From time to time, parties assert patent infringement claims against us. Currently, we are engaged in several lawsuits regarding patent issues and have been notified of a number of other potential disputes.

In addition to patent claims, third parties have asserted, and are likely in the future to assert, claims against us alleging infringement of copyrights, trademark rights, trade secret rights or other proprietary rights, or alleging unfair competition or violations of privacy rights or failure to maintain confidentiality of user data. Currently, our subsidiary LAUNCH Media, Inc. ("LAUNCH") is engaged in a lawsuit regarding copyright issues that commenced prior to our acquisition of LAUNCH. In addition, third parties have made, and may continue to make, trademark infringement and related claims against us over the display of search results triggered by search terms that include trademark terms. A court in France has held us liable for displaying search results triggered by certain trademarked terms, and we are appealing that decision.

As we expand our business and develop new technologies, products and services, we may become increasingly subject to intellectual property infringement claims. In the event that there is a determination that we have infringed third-party proprietary rights such as patents, copyrights, trademark rights, trade secret rights or other third party rights such as publicity and privacy rights, we could incur substantial monetary liability, be required to enter into costly royalty or licensing agreements or be prevented from using the rights, which could require us to change our business practices in the future and limit our ability to compete effectively. We may also incur substantial expenses in defending against third-party infringement claims regardless of the merit of such claims. In addition, many of our agreements with our customers or affiliates require us to indemnify them for certain third-party intellectual property infringement claims, which could increase our costs in defending such claims and our damages. The occurrence of any of these results could harm our brand and negatively impact our operating results.

***We are subject to United States and foreign government regulation of the Internet and Voice over Internet Protocol services which could subject us to claims and remedies including monetary liabilities and limitations on our business practices.***

We are subject to regulations and laws directly applicable to providers of Internet and Voice over Internet Protocol services both domestically and internationally. The application of existing domestic and international laws and regulations to Yahoo! relating to issues such as user privacy and data protection, defamation, pricing, advertising, taxation, gambling, sweepstakes, promotions, electronic payments, real estate, consumer protection, content regulation, quality of services, telecommunications and intellectual property ownership and infringement in many instances is unclear or unsettled. In addition, we will also be subject to any new laws and regulations directly applicable to our domestic and international activities. Further, the application of existing laws to Yahoo! or our subsidiaries regulating or requiring licenses for certain businesses of our advertisers including, for example, distribution of pharmaceuticals, alcohol, adult content, tobacco or firearms, as well as insurance and securities brokerage and legal services, can be unclear. Internationally, we may also be subject to domestic laws regulating our activities in foreign countries and to foreign laws and regulations that are inconsistent from country to country. We may incur substantial liabilities for expenses necessary to comply with these laws and regulations or penalties for any failure to comply. Compliance with these laws and regulations may also cause us to change or limit our business practices in a manner adverse to our business.

A number of U.S. federal laws, including those referenced below, impact our business. The Digital Millennium Copyright Act ("DMCA") is intended, in part, to limit the liability of eligible online service providers for listing or linking to third-party websites that include materials that infringe copyrights or other rights of others. Portions of the Communications Decency Act ("CDA") are intended to provide statutory protections to online service providers who distribute third party content. Yahoo! relies on the protections provided by both the DMCA and CDA in conducting its business. Any changes in these laws or judicial interpretations narrowing their protections will subject us to greater risk of liability and may increase our costs of compliance with these regulations or limit our ability to operate certain lines of business. The Children's Online Protection Act and the Children's Online Privacy Protection Act are intended to restrict the distribution of certain materials deemed harmful to children and impose additional restrictions on the ability of online services to collect user information from minors. In addition, the Protection of Children From Sexual Predators Act of 1998 requires online service providers to report evidence of violations of federal child pornography laws under certain circumstances. The costs of compliance with these regulations may increase in the future as a result of changes in the regulations or the interpretation of them. Further, any failures on our part to comply with these regulations may subject us to significant liabilities.

***Changes in regulations or user concerns regarding privacy and protection of user data could adversely affect our business.***

Federal, state and international laws and regulations may govern the collection, use, sharing and security of data that we receive from our users and partners. In addition, we have and post on our website our own privacy policies and practices concerning the collection, use and disclosure of user data. Any failure, or perceived failure, by us to comply with our posted privacy policies or with any data-related consent orders, Federal Trade Commission requirements or other federal, state or international privacy-related laws and regulations could result in proceedings or actions against us by governmental entities or others, which could potentially have an adverse effect on our business.

Further, failure or perceived failure to comply with our policies or applicable requirements related to the collection, use, sharing or security of personal information or other privacy-related matters could result in a loss of user confidence in us and ultimately in a loss of users, partners or advertisers, which could adversely affect our business.

There are a large number of legislative proposals pending before the United States Congress, various state legislative bodies and foreign governments concerning privacy issues related to our business. It is not possible to predict whether or when such legislation may be adopted. Certain proposals, if adopted, could impose requirements that may result in a decrease in our user registrations and revenues. In addition, the interpretation and application of user data protection laws are in a state of flux. These laws may be interpreted and applied inconsistently from country to country and inconsistently with our current data protection policies and practices. Complying with these varying international requirements could cause us to incur substantial costs or require us to change our business practices in a manner adverse to our business.

***Acquisitions and strategic investments could result in adverse impacts on our operations and in unanticipated liabilities.***

We have acquired, and made strategic investments in, a number of companies (including through joint ventures) in the past and expect to make additional acquisitions and strategic investments in the future.  Such transactions may result in dilutive issuances of equity securities, use of our cash resources, incurrence of debt and amortization of expenses related to intangible assets.  Our acquisitions and strategic investments to date were accompanied by a number of risks, including:

- the difficulty of assimilating the operations and personnel of our acquired companies into our operations;

- the potential disruption of our ongoing business and distraction of management;

- additional operating losses and expenses of the businesses we acquired or in which we invested;

- the difficulty of integrating acquired technology and rights into our services and unanticipated expenses related to such integration;

- the failure to successfully further develop acquired technology resulting in the impairment of amounts currently capitalized as intangible assets;

- the potential for patent and trademark infringement claims against the acquired company;

- the impairment of relationships with customers and partners of the companies we acquired or in which we invested or our customers and partners as a result of the integration of acquired operations;

- the impairment of relationships with employees of the acquired companies or our employees as a result of integration of new management personnel;

- the difficulty of integrating the acquired company's accounting, management information, human resources and other administrative systems;

- our lack of, or limitations on, our control over the operations of our joint venture companies;

- in the case of foreign acquisitions, uncertainty regarding foreign laws and regulations and difficulty integrating operations and systems as a result of cultural, systems and operational differences; and

- the impact of known potential liabilities or unknown liabilities associated with the companies we acquired or in which we invested.

We are likely to experience similar risks in connection with our future acquisitions and strategic investments.  Our failure to be successful in addressing these risks or other problems encountered in connection with our past or future acquisitions and strategic investments could cause us to fail to realize the anticipated benefits of such acquisitions or investments, incur unanticipated liabilities and harm our business generally.

***Our failure to manage growth and diversification of our business could harm us.***

We are continuing to grow and diversify our business both in the United States and internationally.  As a result, we must expand and adapt our operational infrastructure and increase the number of our personnel in certain areas.  Our business relies on our data systems, billing systems for our fee based and other services, and other operational and financial reporting and control systems.  All of these systems have become increasingly complex in the recent past due to the growing diversification and complexity of our business and to acquisitions of new businesses with different systems.  To effectively manage this growth, we will need to continue to upgrade and improve our data systems, billing systems, and other operational and financial systems, procedures and controls.  In particular, as our premium and other services for which we bill users grow, any failure of our billing systems to accommodate the increasing number of transactions and accurately bill users could adversely affect our business and ability to collect revenue.  These upgrades and improvements will require a dedication of resources and in some cases are likely to be complex.  If we are unable to adapt our systems in a timely manner to accommodate our growth, our business may be adversely affected.

Additionally, we have experienced recent growth in personnel numbers and expect to continue to hire additional personnel in selected areas. This growth requires significant time and resource commitments from our senior management.  Further, as a result of recent acquisitions and international expansion, more than one-half of our employees are based outside of our Sunnyvale, California headquarters.  If we are unable to effectively manage a large and geographically dispersed group of employees or to anticipate our future growth and personnel needs, our business may be adversely affected.

***We have dedicated considerable resources to provide a variety of premium services, which may not prove to be successful in generating significant revenue for us.***

We offer fee-based enhancements to many of our free services, including e-mail, personals, finance, games, music and sports.  The development cycles for these technologies are long and generally require significant investment by us.  We have previously discontinued certain non-profitable premium services.  We must however continue to provide new services that are compelling to our users while continuing to develop an effective method for generating revenues for such services.  General economic conditions may affect users' willingness to pay for such services.  If we cannot generate revenues from these services that are greater than the cost of providing such services, our operating results could be harmed.

***We expect our operating expenses to continue to increase as we attempt to expand the Yahoo! brand, fund product development, develop media properties and acquire other businesses or technologies, which could harm our operating results.***

We currently expect that our operating expenses will continue to increase as we expand our operations in areas of expected growth, continue to develop and extend the Yahoo! brand, fund greater levels of product development, develop and commercialize additional media properties and premium services, and acquire and integrate complementary businesses and technologies.  If our expenses increase at a greater pace than our revenues, our operating results could be harmed.

***If we are unable to retain our existing senior management and key personnel and hire new highly skilled personnel, we may not be able to execute our business plan.***

We are substantially dependent on the continued services of our senior management, including our two founders, our chief executive officer, chief financial officer, chief operating officer, chief technical officer, and our executive and senior vice presidents.  These individuals have acquired specialized knowledge and skills with respect to Yahoo! and its operations.  The loss of any of these individuals could harm our business.  Our business is also dependent on our ability to retain, hire and motivate talented, highly skilled personnel.  The competition for such highly skilled personnel can be intense, particularly in the San Francisco Bay Area, where our corporate headquarters is located.  Many of our management and key personnel have reached or will soon reach the four-year anniversary of their Yahoo! hiring date and, as a result, have become or will shortly become fully vested in their initial stock option grants.  Although employees receive additional grants, an employee may be more likely to leave Yahoo! upon completion of the vesting period for the initial option grant, which is generally the largest option grant an employee receives.  If we do not succeed in retaining and motivating our existing key employees and in attracting new key personnel, we may be unable to meet our business plan and as a result, our stock price may decline

***More individuals are utilizing non-PC devices to access the Internet, and versions of our service developed or optimized for these devices may not gain widespread adoption by users, manufacturers or distributors of such devices.***

The number of individuals who access the Internet through devices other than a personal computer, such as personal digital assistants, mobile telephones and television set-top devices, has increased dramatically.  Our services were originally designed for rich, graphical environments such as those available on desktop and laptop computers.  The lower resolution, functionality and memory associated with alternative devices currently available may make the use of our services through such devices difficult, and the versions of our service developed for these devices may not be compelling to users, manufacturers or distributors of alternative devices.  As we have limited experience to date in operating versions of our service developed or optimized for users of alternative devices, and as new devices and new platforms are continually being released, it is difficult to predict the problems we may encounter in doing so, and we may need to devote significant resources to the creation, support and maintenance of such versions.  If we are unable to attract and retain a substantial number of alternative device users to our online services, we may fail to capture a sufficient share of an increasingly important portion of the market for online services and may fail to attract both advertisers and premium service subscribers.

***We plan to expand operations in international markets in which we may have limited experience or rely on business partners, and in which we are faced with relatively higher costs.***

We plan to expand Yahoo! branded online properties and search offerings in international markets.  We have currently developed, through joint ventures, strategic investments, subsidiaries and branch offices, localized offerings in over 20 countries outside of the United States.  As we expand into new international markets, we will have only limited experience in marketing and operating our products and services in such markets.  In other instances, including our strategic investment in Alibaba, we may rely on the efforts and abilities of foreign business partners in such markets.  We have experienced and expect to continue to experience higher costs as a percentage of revenues in connection with the development and maintenance of our international online properties relative to our domestic experience.  Certain international markets may be slower than domestic markets in adopting the Internet as an advertising and commerce medium and so our operations in international markets may not develop at a rate that supports our level of investment.

*In international markets we compete with local Internet service providers that may have competitive advantages.*

In a number of international markets, especially those in Asia, Europe and Latin America, we face substantial competition from local Internet service providers and other portals that offer search, communications and other commercial services. Many of these companies have a dominant market share in their territories and are owned by local telecommunications providers which give them a competitive advantage. Local providers of competing online services may also have a substantial advantage over us in attracting users in their country due to more established branding in that country, greater knowledge with respect to the tastes and preferences of users residing in that country and/or their focus on a single market. Further, the local providers may have greater regulatory and operational flexibility than Yahoo! due to the fact that we are subject to both United States and foreign regulatory requirements. We must continue to improve our local offerings, become more knowledgeable about our local users and their preferences, deepen our relationships with our local users as well as increase our branding and other marketing activities in order to remain competitive and strengthen our international market position.

*Our international operations are subject to increased risks which could harm our business, operating results and financial condition.*

In addition to uncertainty about our ability to continue to generate revenues from our foreign operations and expand our international market position, there are certain risks inherent in doing business internationally, including:

- trade barriers and changes in trade regulations;

- difficulties in developing, staffing and simultaneously managing a large number of varying foreign operations as a result of distance, language and cultural differences;

- stringent local labor laws and regulations;

- longer payment cycles;

- currency exchange rate fluctuations;

- political or social unrest or economic instability;

- import or export restrictions;

- seasonal volatility in business activity;

- risks related to government regulation or required compliance with local laws in certain jurisdictions, including those more fully described above; and

- potentially adverse tax consequences.

One or more of these factors could harm our future international operations and consequently, could harm our brand, business, operating results and financial condition.

*We may be subject to legal liability for online services.*

We host a wide variety of services that enable individuals and businesses to exchange information, generate content, advertise products and services, conduct business and engage in various online activities on an international basis. The law relating to the liability of providers of these online services for activities of their users is currently unsettled both within the United States and internationally. Claims have been threatened and have been brought against us for defamation, negligence, copyright or trademark infringement, unlawful activity, tort, including personal injury, fraud, or other theories based on the nature and content of information that we provide links to or that may be posted online or generated by our users or with respect to auctioned materials. In addition, Yahoo! was the subject of a claim brought by certain entities in a French court regarding, among other things, the availability of certain content within our services which was alleged to violate French law. We may be subject to similar actions in domestic or other international jurisdictions in the future. Our defense of any such actions could be costly and involve significant time and attention of our management and other resources.

We also periodically enter into arrangements to offer third-party products, services or content under the Yahoo! brand or via distribution on the Yahoo! Properties, including stock quotes and trading information. We may be subject to claims concerning these products, services or content by virtue of our involvement in marketing, branding, broadcasting or providing access to them, even if we do not ourselves host, operate, provide, or provide access to these products, services or content. While our agreements with respect to these products, services and content, often provide that we will be indemnified against such liabilities, the ability to receive such indemnification depends on the financial resources of the other party to the agreement and any amounts received may not be adequate to cover our liabilities.

It is also possible that, if any information provided directly by us contains errors or is otherwise negligently provided to users, third parties could make claims against us. For example, we offer web-based e-mail services, which expose us to potential risks, such as liabilities or claims resulting from unsolicited e-mail, lost or misdirected messages, illegal or fraudulent use of e-mail, or interruptions or delays in e-mail service. Investigating and defending any of these types of claims is expensive, even to the extent that the claims are without merit or do not ultimately result in liability.

***We may have difficulty scaling and adapting our existing technology architecture to accommodate increased traffic and technology advances or requirements of our users and advertisers.***

As one of the most highly trafficked websites on the Internet, Yahoo! delivers a growing number of products, services and page views to an increasing number of users around the world. In addition, the products and services offered by Yahoo! have expanded and changed significantly and are expected to continue to expand and change rapidly in the future to accommodate new technologies and new means of content delivery, such as rich media audio and video. Our future success will depend on our ability to adapt to rapidly changing technologies, to adapt our products and services to evolving industry standards and to improve the performance and reliability of our products and services. Rapid increases in the levels or types of use of our online properties and services could result in delays or interruptions in our service.

Widespread adoption of new Internet, networking or telecommunications technologies or other technological changes could require substantial expenditures to modify or adapt our services or infrastructure. The technology architectures utilized for our services are highly complex and may not provide satisfactory support in the future, as usage increases and products and services expand, change and become more complex. In the future, we may make significant changes to our architectures, including moving to completely new architectures and systems. Such changes may be technologically challenging to develop and implement, may cause us to incur substantial costs or data loss, and may cause users, advertisers, and affiliates to experience delays or interruptions in our service. These changes, delays or interruptions in our service may cause users, advertisers and affiliates to become dissatisfied with our service and move to competing providers of online services. Further, to the extent that demands for our services increase, we will need to expand our infrastructure, including the capacity of our hardware servers and the sophistication of our software. This expansion is likely to be expensive and complex and require additional technical expertise. As we acquire users who rely upon us for a wide variety of services, it becomes more technologically complex and costly to retrieve, store and integrate data that will enable us to track each user's preferences. Any difficulties experienced in adapting our architectures and infrastructure to accommodate increased traffic, to store user data and track user preferences, together with the associated costs and potential loss of traffic, could harm our operating results, cash flows from operations and financial condition.

***Our business depends on the continued growth and maintenance of the Internet infrastructure.***

The success and the availability of our Internet-based products and services depends in part upon the continued growth and maintenance of the Internet infrastructure itself, including its protocols, architecture, network backbone, data capacity and security. Spam, viruses, worms, spyware, denial of service attacks and other acts of malice may affect not only the Internet's speed, reliability and availability but also its continued desirability as a vehicle for commerce, information and user engagement. If the Internet proves unable to meet the new threats and increased demands placed upon it, our business plans, user and advertiser relationships, site traffic and revenues could be adversely affected.

***New technologies could block our advertisements or our search marketing listings, which would harm our operating results.***

Technologies have been developed and are likely to continue to be developed that can block the display of our advertisements or our search marketing listings. Most of our revenues are derived from fees paid to us by advertisers in connection with the display of advertisements or our search marketing listings on web pages. As a result, advertisement-blocking technology could reduce the number of advertisements and search results that we are able to deliver and, in turn, our advertising revenues and operating results.

***We rely on third party providers for our principal Internet connections and technologies, databases and services critical to our properties and services, and any errors, failures or disruption in the services provided by these third parties could significantly harm our business and operating results.***

We rely on private third-party providers for our principal Internet connections, co-location of a significant portion of our data servers and network access. Any disruption, from natural disasters, technology malfunctions, sabotage or other factors, in the Internet or network access or co-location services provided by these third-party providers or any failure of these third-party providers to handle current or higher volumes of use could significantly harm our business, operating results and financial condition. We have little control over these third-party providers, which increases our vulnerability to disruptions or problems with their services. Any financial difficulties experienced by our providers may have negative effects on our business, the nature and extent of which we cannot predict. We license technology and related databases from third parties for certain elements of our properties, including, among others, technology underlying the delivery of news, stock quotes and current financial information, chat services, street mapping and telephone listings, streaming capabilities and similar services. We have experienced and expect to continue to experience interruptions and delays in service and availability for such elements. We also rely on a third-party provider for key components of our e-mail service. Furthermore, we depend on hardware and software suppliers for prompt delivery, installation and service of servers and other equipment to deliver our services. Any errors, failures, interruptions or delays experienced in connection with these third-party technologies and information services could negatively impact our relationship with users and adversely affect our brand, our business and operating results.

***We rely on distribution agreements and relationships with various third parties, and any failure to obtain or maintain such distribution relationships on reasonable terms could impair our ability to fully execute our business plan.***

In addition to our relationships with Internet access providers, to increase traffic for our offerings and make them more available and attractive to advertisers and users, we have certain distribution agreements and informal relationships with operators of online networks and leading websites, software companies, electronics companies, and computer manufacturers. Depending on the distributor and the agreement, these distribution arrangements may not be exclusive and may only have a short term. Some of our distributors, particularly distributors who are also competitors or potential competitors, may not renew their distribution agreements with us. In addition, as new methods for accessing the Internet become available, including through alternative devices, we may need to enter into amended distributions agreements with existing distributors to cover the new devices and agreements with additional distributors. In the future, existing and potential distributors may not offer distribution of our properties and services to us on reasonable terms, or at all. If we fail to obtain distribution or to obtain distribution on terms that are reasonable, we may not be able to fully execute our business plan.

***We rely on third party providers of streaming media products to stream audio and video content to our users, and any change in the licensing terms, costs, availability or user acceptance of these products could adversely affect our business.***

We rely on leading providers of streaming media products to license the software necessary to stream audio and video content to our users. There can be no assurance that these providers will continue to license these products to us on reasonable terms, or at all. Our users are currently able to electronically download copies of the software to play streaming media free of charge, but providers of streaming media products may begin charging users for copies of their player software or otherwise change their business model in a manner that slows the widespread acceptance of these products. In order for our rich media services to be successful, there must be a large base of users of these streaming media products. We have limited or no control over the availability or acceptance of streaming media software, and to the extent that any of these circumstances occur, our business may be adversely affected.

***If we fail to detect click spam, we could lose the confidence of our advertisers, thereby causing a loss of advertisers and revenue.***

We are exposed to the risk of clicks on our advertisements by persons seeking to increase the fees paid by our advertisers. Click spam may occur when a click is generated on one of our advertiser's listings displayed on a website in order to generate a payment rather than to view the underlying content. This type of activity could damage our brand. If click spam is not detected, the affected advertisers may perceive a reduced return on their investment in our advertising programs because those clicks will not lead to potential revenue for the advertisers. This could lead the advertisers to become dissatisfied with our advertising programs, which could lead to loss of advertisers and revenue. If this activity occurs and we are unable to stop it, we may have to provide refunds of revenue that our advertisers have paid to us and that was later attributed to click spam, in order to prevent damage to our brand.

45

*Interruptions, delays or failures in the provision of our services could damage our brand and harm our operating results.*

Our operations are susceptible to outages due to fire, floods, power loss, telecommunications failures, terrorist attacks and similar events. In addition, a significant portion of our network infrastructure is located in Northern California, an area subject to earthquakes. Despite our implementation of network security measures, our servers are vulnerable to computer viruses, worms, physical and electronic break-ins, sabotage and similar disruptions from unauthorized tampering with our computer systems. For example, we are vulnerable to coordinated attempts to overload our systems with data, resulting in denial or reduction of service to some or all of our users for a period of time. We have experienced a coordinated denial of service attack in the past, and may experience such attempts in the future. We do not have multiple site capacity for all of our services and some of our systems are not fully redundant in the event of any such occurrence. In an effort to reduce the likelihood of a geographical or other disaster impacting our business, we have distributed and intend to continue distributing our servers among additional data centers located around the world. Failure to execute these changes properly or in a timely manner could result in delays or interruptions to our service, which could result in a loss of users and damage to our brand, and harm our operating results. We may not carry sufficient business interruption insurance to compensate us for losses that may occur as a result of any events, which cause interruptions in our service.

*We may be required to record a significant charge to earnings if our goodwill or amortizable intangible assets become impaired.*

We are required under generally accepted accounting principles to review our amortizable intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Goodwill is required to be tested for impairment at least annually. Factors that may be considered a change in circumstances indicating that the carrying value of our amortizable intangible assets may not be recoverable include a decline in stock price and market capitalization, and slower growth rates in our industry. We may be required to record a significant charge to earnings in our consolidated financial statements during the period in which any impairment of our goodwill or amortizable intangible assets is determined. This may adversely impact our results of operations.

*Our stock price has been volatile historically and may continue to be volatile regardless of our operating performance.*

The trading price of our common stock has been and may continue to be subject to wide fluctuations. During the quarter ended March 31 2006, the closing sale prices of our common stock on the Nasdaq ranged from $30.07 to $43.42 per share and the closing sale price on May 2, 2006 was $31.85 per share. Our stock price may fluctuate in response to a number of events and factors, such as quarterly variations in operating results; announcements of technological innovations or new services and media properties by us or our competitors; changes in financial estimates and recommendations by securities analysts; the operating and stock price performance of other companies that investors may deem comparable to us; the operating performance of companies in which we have an equity investment, including Yahoo! Japan and Alibaba; the stock price of companies in which we have an equity investment, including Yahoo! Japan; and news reports relating to trends in our markets or general economic conditions.

In addition, the stock market in general, and the market prices for Internet-related companies in particular, have experienced volatility that often has been unrelated to the operating performance of such companies. These broad market and industry fluctuations may adversely affect the price of our stock, regardless of our operating performance. Additionally, volatility or a lack of positive performance in our stock price may adversely affect our ability to retain key employees, all of whom have been granted stock options or other equity-based awards.

*Anti-takeover provisions could make it more difficult for a third party to acquire us.*

We have adopted a stockholder rights plan and initially declared a dividend distribution of one right for each outstanding share of common stock to stockholders of record as of March 20, 2001. As a result of our two-for-one stock split effective May 11, 2004, each share of common stock is now associated with one-half of one right. Each right entitles the holder to purchase one unit consisting of one one-thousandth of a share of our Series A Junior Participating Preferred Stock for $250 per unit. Under certain circumstances, if a person or group acquires 15 percent or more of our outstanding common stock, holders of the rights (other than the person or group triggering their exercise) will be able to purchase, in exchange for the $250 exercise price, shares of our common stock or of any company into which we are merged having a value of $500. The rights expire on March 1, 2011, unless extended by our Board of Directors. Because the rights may substantially dilute the stock ownership of a person or group attempting to take us over without the approval of our Board of Directors, our rights plan could make it more difficult for a third party to acquire us (or a significant percentage of our outstanding capital stock) without first negotiating with our Board of Directors regarding that acquisition.

In addition, our Board of Directors has the authority to issue up to 10,000,000 shares of Preferred Stock (of which 2,000,000 shares have been designated as Series A Junior Participating Preferred Stock) and to determine the price, rights, preferences, privileges and restrictions, including voting rights, of those shares without any further vote or action by the stockholders.

The rights of the holders of our common stock may be subject to, and may be adversely affected by, the rights of the holders of any Preferred Stock that may be issued in the future. The issuance of Preferred Stock may have the effect of delaying, deterring or preventing a change of control of Yahoo! without further action by the stockholders and may adversely affect the voting and other rights of the holders of our common stock. Further, certain provisions of our charter documents, including provisions eliminating the ability of stockholders to take action by written consent and limiting the ability of stockholders to raise matters at a meeting of stockholders without giving advance notice, may have the effect of delaying or preventing changes in control or management of Yahoo!, which could have an adverse effect on the market price of our stock. In addition, our charter documents do not permit cumulative voting, which may make it more difficult for a third party to gain control of our Board of Directors. Further, we are subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law, which will prohibit us from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder, even if such combination is favored by a majority of stockholders, unless the business combination is approved in a prescribed manner. The application of Section 203 also could have the effect of delaying or preventing a change of control or management.

## Item 2. Unregistered Sales of Equity Securities and Use of Proceeds

Share repurchase activity during the three months ended March 31, 2006 was as follows:

| Period | Total Number of Shares Purchased (1) | | Average Price Paid per Share | Total Number of Shares Purchased as Part of a Publicly Announced Program | | Approximate Dollar Value of Shares that May Yet be Purchased Under the Programs (in 000s) (1) (2) |
|---|---|---|---|---|---|---|
| January 1 - January 31, 2006 | 509,400 | $ | 35.15 | 509,400 | $ | 2,759,253 |
| February 1 - February 28, 2006 | 17,462,767 | $ | 34.34 | 17,462,767 | $ | 2,159,580 |
| March 1 - March 31, 2006 | 4,100,000 | $ | 32.03 | 4,100,000 | $ | 2,028,262 |
| Total | 22,072,167 | $ | 33.93 | 22,072,167 | | |

(1)    The shares repurchased in the three months ended March 31,2006 were under our stock repurchase program that was announced in March 2005 with an authorized level of $3 billion. This program will expire in March 2010.

(2)    As of March 31, 2006 we had unsettled structured stock transactions in the amount of $635 million. These transactions will mature in separate tranches in April, May, and July 2006. On each of the maturity dates, if the market price of Yahoo! common stock is above $33.99 for the $250 million tranche maturing in April 2006, $38.66 for the $135 million tranche maturing in May 2006, and $33.90 for the $50 million tranche maturing in July 2006, and at or above $34.50 for the $200 million tranche maturing in July 2006, we will have our investments returned with a premium. On each of the remaining maturity dates, if the market price of our common stock is at or below such pre-determined prices, (with the exception of the $200 million tranche where if the market price of our common stock at maturity is below such pre-determined price), we will repurchase our common stock, up to an aggregate of 20.1 million shares. Any repurchases under these structured stock repurchase transactions will be reported in the quarter or quarters in which they occur. While outstanding, these structured stock repurchase transactions reduce the dollar value of additional shares that may be repurchased under our current program to approximately $1.4 billion as of March 31, 2006.

## Item 3. Defaults Upon Senior Securities

None.

## Item 4. Submission of Matters to a Vote of Security Holders

None.

## Item 5. Other Information

None.

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

YAHOO! INC.

|  | By: | /s/ SUSAN DECKER |
|---|---|---|
| Dated: May 5, 2006 | | Susan Decker |
| | | Executive Vice President, Finance and Administration, and Chief Financial Officer (Principal Financial Officer) |
| | By: | /s/ MICHAEL MURRAY |
| Dated: May 5, 2006 | | Michael Murray |
| | | Senior Vice President, Finance (Principal Accounting Officer) |

49

**Certification of Chief Executive Officer Pursuant to
Securities Exchange Act Rules 13a-14(a) and 15d-14(a)
as Adopted Pursuant to
Section 302 of the Sarbanes-Oxley Act of 2002**

I, Terry Semel, the Chief Executive Officer of Yahoo! Inc., certify that:

1.   I have reviewed this quarterly report on Form 10-Q of Yahoo! Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: May 5, 2006                    By:    /s/ TERRY SEMEL
                                             Terry Semel
                                             Chief Executive Officer

**Certification of Chief Financial Officer Pursuant to**
**Securities Exchange Act Rules 13a-14(a) and 15d-14(a)**
**as Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Susan Decker, the Chief Financial Officer of Yahoo! Inc., certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Yahoo! Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: May 5, 2006                                              By:    /s/ SUSAN DECKER
                                                                              Susan Decker
                                                                              Chief Financial Officer

**Certification of Chief Executive Officer and Chief Financial Officer Pursuant to**
**18 U.S.C. Section 1350,**
**as Adopted Pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Quarterly Report on Form 10-Q of Yahoo! Inc. (the "Company") for the quarter ended March 31, 2006 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Terry Semel, as Chief Executive Officer of the Company, and Susan Decker, as Chief Financial Officer of the Company, each hereby certifies, pursuant to 18 U.S.C. §1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, to the best of his and her knowledge, respectively, that:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ TERRY SEMEL
Name: Terry Semel
Title: Chief Executive Officer
Dated: May 5, 2006

/s/ SUSAN DECKER
Name: Susan Decker
Title: Chief Financial Officer
Dated: May 5, 2006

The foregoing certification is being furnished pursuant to 18 U.S.C. Section 1350. It is not being filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and it is not to be incorporated by reference into any filing of the Company, regardless of any general incorporation language in such filing.

Exhibit 17

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-Q

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2006**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from     to**

**Commission File Number 0-28018**

---

# YAHOO! INC.
(Exact name of Registrant as specified in its charter)

| **Delaware** | **77-0398689** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**701 First Avenue**
**Sunnyvale, California 94089**
(Address of principal executive offices)

Registrant's telephone number, including area code: **(408) 349-3300**

---

Indicate by check mark whether the Registrant (1) has filed all reports required by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days: Yes ☒     No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer.  See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.  (Check one):
Large accelerated filer ☒          Accelerated filer ☐          Non-Accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐    No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| **Class** | **Outstanding at August 1, 2006** |
|---|---|
| Common stock, $0.001 par value | 1,381,175,598 |

**Item 1A.  Risk Factors**

We have updated the risk factors previously disclosed in Part II Item 1A of our Quarterly Report on Form 10-Q for the quarter ended March 31, 2006, which was filed with the Securities and Exchange Commission on May 5, 2006, as set forth below.  We do not believe any of the changes constitute material changes to the Risk Factors.

***We face significant competition from large-scale Internet content, product and service aggregators, principally Time Warner's America Online Business ("AOL"), Google Inc. (" Google") and Microsoft.***

We face significant competition from companies, principally AOL, Google, and Microsoft, that have aggregated a variety of Internet products, services and content in a manner similar to Yahoo!.  AOL has access to content from Time Warner's movie, television, music, book, periodical, news, sports and other media holdings; access to a network of cable and other broadband users and delivery technologies; and considerable resources for future growth and expansion.  Google, in addition to an Internet search service, offers many other services that directly compete with our services, including a consumer e-mail service, desktop search, local search, instant messaging, photos, maps, shopping services and advertising solutions.  Microsoft has introduced its own Internet search service and has announced plans to develop both paid search and features that may make Internet searching capabilities a more integrated part of its Windows operating system.  We expect these competitors increasingly to use their financial and engineering resources to compete with us, individually, and potentially in combination with each other.  In certain of these cases, most notably AOL, our competition has a direct billing relationship with a greater number of their users through Internet access and other services than we have with our users through our premium services.  This relationship may permit these competitors to be more effective than us in targeting services and advertisements to the specific preferences of their users thereby giving them a competitive advantage.  If our competitors are more successful than we are in developing compelling products or attracting and retaining users or advertisers, then our revenues and growth rates could decline.

***We also face competition from other Internet service companies, including Internet access providers, device manufacturers offering online services and destination websites.***

Our users must access our services through Internet access providers, including wireless providers and providers of cable and broadband Internet access.  To the extent that an access provider or device manufacturer offers online services competitive with those of Yahoo!, the user may elect to use the services or properties of that access provider or manufacturer.  In addition, the access provider or manufacturer may make it difficult to access our services by not listing them in the access provider's or manufacturer's own directory or by providing Yahoo! with less prominent listings than the access provider, manufacturer, or a competitor's offerings.  Such access providers and manufacturers may prove better able to target services and advertisements to the preferences of their users.  If such access providers and device manufacturers are more successful than we are in developing compelling products or attracting and retaining customers, users or advertisers, then our revenues could decline.  Further, to the extent that Internet access providers, mobile service providers or network providers increase the costs of service to users or restrict Yahoo!'s ability to deliver products, services and content to end users or increase our costs of doing so, our revenues could decline.

We also compete for customers, users and advertisers with many other providers of online services, including destination websites.  Some of these competitors may have more expertise in a particular segment of the market, and within such segment, have longer operating histories, larger advertiser or user bases, and more brand recognition or technological features than we offer.

In the future, competitors may acquire additional competitive offerings or consolidate with each other to become more competitive, and new competitors may enter the market.  If our competitors are more successful than we are in developing compelling products or attracting and retaining users, advertisers or customers, then our revenues and growth rates could decline.

***We face competition from other providers of search marketing that could affect our operating results.***

We compete directly with other providers of search marketing, including Google, LookSmart, Ltd., Lycos Inc., Microsoft, and MIVA (formerly FindWhat.com).  In addition, we believe it is likely that there will be additional entrants to this advertising market.  Some of the existing competitors and possible additional entrants may have greater operational, strategic, financial, personnel or other resources than we do, as well as greater brand recognition.  These competitors compete against us for affiliate and advertiser arrangements and could cause us to have to enter into such arrangements with less favorable terms, to lose current affiliates or advertisers or to fail to acquire new affiliates or advertisers.  The loss of affiliates or advertisers or a reduction in the revenue from such arrangements could harm our business and operating results.

39

*We face significant competition from traditional media companies which could adversely affect our future operating results.*

We also compete with traditional media companies for advertising.  Most advertisers currently spend only a small portion of their advertising budgets on Internet advertising.  If we fail to persuade existing advertisers to retain and increase their spending with us and if we fail to persuade new advertisers to spend a portion of their budget on advertising with us, our revenues could decline and our future operating results could be adversely affected.

*If we are unable to provide search technologies and other services which generate significant traffic to our websites, or we are unable to enter into distribution relationships which drive significant traffic to our websites, our business could be harmed, causing our revenues to decline.*

We have deployed our own Internet search technology to provide search results on our network.  We have more limited experience in operating our own search service than do some of our competitors.  Internet search is characterized by rapidly changing technology, significant competition, evolving industry standards and frequent product and service enhancements.  We must continually invest in improving our users' experience, including search relevance, speed and services responsive to their needs and preferences, to continue to attract, retain and expand our user base.  If we are unable to provide search technologies and other services which generate significant traffic to our websites, or if we are unable to enter into distribution relationships that continue to drive significant traffic to our websites, our business could be harmed, causing our revenues to decline.

*The majority of our revenues are derived from marketing services, and the reduction in spending by or loss of current or potential advertisers would cause our revenues and operating results to decline.*

For the quarter ended June 30, 2006, 88 percent of our total revenues came from marketing services.  Our ability to continue to retain and grow marketing services revenue depends upon:

- maintaining our user base;

- broadening our relationships with advertisers to small and medium size businesses;

- attracting advertisers to our user base;

- increasing demand for our marketing services by advertisers, users, businesses and affiliates, including prices paid by advertisers, the number of searches performed by users, the rate at which users click-through to commercial search results and advertiser perception of the quality of leads generated by our marketing services;

- the effectiveness, and acceptance by advertisers and affiliates of our systems improvements to increase monetization of our search marketing;

- maintaining our affiliate program for our search marketing;

- deriving better demographic and other information from our users; and

- driving acceptance of the web by advertisers as an advertising medium.

In many cases, our agreements with advertisers have terms of one year or less, or, in the case of search marketing, may be terminated at any time by the advertiser.  Search marketing agreements often have payments dependent upon usage or click-through levels.  Accordingly, it is difficult to forecast marketing services revenues accurately.  However, our expense levels are based in part on expectations of future revenues, including occasional guaranteed minimum payments to our affiliates in connection with search marketing, and are fixed over the short-term with respect to certain categories.  Any reduction in spending by or loss of existing or potential future advertisers would cause our revenues to decline.  Further, we may be unable to adjust spending quickly enough to compensate for any unexpected revenue shortfall.

*In certain markets, we depend on a limited number of sources to direct a significant percentage of users and businesses to our service to conduct searches and a loss of any of these sources could harm our operating results.*

A significant percentage of users and businesses that conduct searches and access our search marketing listings comes from a limited

number of sources in certain markets. In addition to the Yahoo! Properties, sources for users are members of our affiliate network, including portals, browsers and other affiliates. Our agreements with affiliates vary in duration, and depending on the agreement, provide varying levels of discretion to the affiliate in the implementation of search marketing, including the degree to which affiliates can modify the presentation of the search marketing listings on their websites or integrate search marketing with their own services. The agreements may be terminable upon the occurrence of certain events, including failure to meet certain service levels, material breaches of agreement terms, changes in control or in some instances, at will. We may not be successful in renewing our affiliate agreements on as favorable terms or at all. The loss of affiliates providing significant users or businesses or an adverse change in implementation of search marketing by any of these affiliates could harm our ability to generate revenue, our operating results and cash flows from operations.

*We may not be able to generate substantial revenues from our alliances with Internet access providers.*

Through alliances with Internet access providers, we offer access services that combine customized content and services from Yahoo! (including browser and other communications services) and Internet access from the third party access providers. We may not be able to retain the alliances with our existing Internet access providers or to obtain new alliances with Internet access providers on terms that are reasonable. In addition, these Internet access services compete with many large companies such as AOL, Microsoft, Comcast Corporation and other established Internet access providers. In certain of these cases, our competition has substantially greater market presence (including an existing user base) and greater financial, technical, marketing or other resources. As a result of these and other competitive factors, the Internet access providers with which we have formed alliances may not be able to attract, grow or retain their customer bases, which would negatively impact our ability to sell customized content and services through this channel and, in turn, reduce our anticipated revenues from our alliances.

*Some of our shared revenue arrangements may not generate anticipated revenues.*

We typically receive co-branded revenue through revenue sharing arrangements or a portion of transactions revenue. In some cases, our revenue arrangements require that minimum levels of user impressions be provided by us. These arrangements expose us to potentially significant financial risks in the event our usage levels decrease, including the following:

- the revenue we are entitled to receive may be adjusted downwards;

- we may be required to "make good" on our obligations by providing additional advertising or alternative services;

- the partners or co-brand services may not renew the arrangements or may renew at lower rates; and

- the arrangements may not generate anticipated levels of shared transactions revenue, or partners may default on the payment commitments in such agreements as has occurred in the past.

Accordingly, any leveling off or decrease of our user base (or usage by our existing base) or the failure to generate anticipated levels of shared transactions revenue could result in a significant decrease in our revenues.

*Decreases or delays in advertising spending by our advertisers due to general economic conditions could harm our ability to generate advertising revenue.*

Expenditures by advertisers tend to be cyclical, reflecting overall economic conditions and budgeting and buying patterns. Since we derive the majority of our revenues from advertising, any decreases in or delays in advertising spending due to general economic conditions could reduce our revenues or negatively impact our ability to grow our revenues.

*Financial results for any particular period do not predict results for future periods.*

There can be no assurance that the purchasing pattern of advertisers on the Yahoo! Properties will not fluctuate, that advertisers will not make smaller and shorter-term purchases, or that market prices for online advertising will not decrease due to competitive or other factors. In addition, there can be no assurance that the volume of searches conducted, the amounts bid by advertisers for search marketing listings or the number of advertisers that bid in our search marketing marketplace will not vary widely from period to period. As revenues from new sources increase, it may become more difficult to predict our financial results based on historical performance.

You should not rely on the results for any period as an indication of future performance.

***We rely on the value of the Yahoo! brands, and a failure to maintain or enhance the Yahoo! brands in a cost-effective manner could harm our operating results.***

We believe that maintaining and enhancing the Yahoo! brands is an important aspect of our efforts to attract and expand our user and advertiser base.  We also believe that the importance of brand recognition will increase due to the relatively low barriers to entry in the Internet market.  We have spent considerable money and resources to date on the establishment and maintenance of the Yahoo! brands, and we anticipate spending increasing amounts of money on, and devoting greater resources to, advertising, marketing and other brand-building efforts to preserve and enhance consumer awareness of the Yahoo! brands.  We may not be able to successfully maintain or enhance consumer awareness of the Yahoo! brands and, even if we are successful in our branding efforts, these efforts may not be cost-effective.  If we are unable to maintain or enhance customer awareness of the Yahoo! brands in a cost-effective manner, our business, operating results and financial condition could be harmed.

***If we are unable to license or acquire compelling content at reasonable costs or if we do not develop compelling content, the number of users of our services may not grow as anticipated, or may decline, which could harm our operating results.***

Our future success depends in part upon our ability to aggregate compelling content and deliver that content through our online properties.  We license much of the content on our online properties, such as news items, stock quotes, weather reports, maps and audio and video content from third parties.  We have been providing increasing amounts of audio and video content to our users, and we believe that users will increasingly demand high-quality audio and video content, such as music, film, speeches, news footage, concerts and other special events.  Such content may require us to make substantial payments to third parties from whom we license or acquire such content.  For example, our music and entertainment properties rely on major sports organizations, radio and television stations, record labels, music publishers, cable networks, businesses, colleges and universities, film producers and distributors, and other organizations for a large portion of the content available on our properties.  Our ability to maintain and build relationships with third-party content providers will be critical to our success.  In addition, as new methods for accessing the Internet become available, including through alternative devices, we may need to enter into amended content agreements with existing third-party content providers to cover the new devices.  Also, to the extent that Yahoo! develops content of its own, Yahoo!'s current and potential third-party content providers may view our services as competitive with their own, and this may adversely affect their willingness to contract with us.  We may be unable to enter into new, or preserve existing, relationships with the third parties whose content we seek to obtain.  In addition, as competition for compelling content increases both domestically and internationally, our content providers may increase the prices at which they offer their content to us, and potential content providers may not offer their content on terms agreeable to us.  An increase in the prices charged to us by third-party content providers could harm our operating results and financial condition.  Further, many of our content licenses with third parties are non-exclusive.  Accordingly, other webcasters and other media such as radio or television may be able to offer similar or identical content.  This increases the importance of our ability to deliver compelling editorial content and personalization of this content for users in order to differentiate Yahoo! from other businesses.  If we are unable to license or acquire compelling content at reasonable prices, if other companies broadcast content that is similar to or the same as that provided by Yahoo!, or if we do not develop compelling editorial content or personalization services, the number of users of our services may not grow as anticipated, or may decline, which could harm our operating results.

***Our intellectual property rights are valuable, and any inability to protect them could reduce the value of our brand image and harm our business and our operating results.***

We create, own and maintain a wide array of intellectual property assets, including copyrights, patents, trademarks, trade dress, trade secrets and rights to certain domain names, which we believe are among our most valuable assets.  We seek to protect our intellectual property assets through patent, copyright, trade secret, trademark and other laws of the United States and other countries of the world, and through contractual provisions.  The efforts we have taken to protect our intellectual property and proprietary rights may not be sufficient or effective at stopping unauthorized use of those rights.  In addition, effective trademark, patent, copyright and trade secret protection may not be available or cost-effective in every country in which our products and media properties are distributed or made available through the Internet.  There may be instances where we are not able to fully protect or utilize our intellectual property assets in a manner to maximize competitive advantages.  Further, while we attempt to ensure that the quality of our brand is maintained by our licensees, our licensees may take actions that could impair the value of our brand, our proprietary rights or the reputation of our products and media properties.  We are aware that third parties have, from time to time, copied significant content available on Yahoo! for use in competitive Internet services.  Protection of the distinctive elements of Yahoo! may not be available under copyright law or trademark law.  If we are unable to protect our proprietary rights from unauthorized use, the value of our brand image may be reduced.  Any impairment of our brand could negatively impact our business.  In addition, protecting our intellectual property and other proprietary rights is expensive and time consuming.  Any increase in the unauthorized use of our intellectual property could make it more expensive

42

to do business and consequently harm our operating results.

***We are, and may in the future be, subject to intellectual property infringement claims, which are costly to defend, could result in significant damage awards, and could limit our ability to provide certain content or use certain technologies in the future.***

Internet, technology, media companies and patent holding companies often possess a significant number of patents.  Further, many of these companies and other parties are actively developing or purchasing search, indexing, electronic commerce and other Internet-related technologies, as well as a variety of online business models and methods.  We believe that these parties will continue to take steps to protect these technologies, including, but not limited to, seeking patent protection.  As a result, disputes regarding the ownership of technologies and rights associated with online business are likely to continue to arise in the future.  From time to time, parties assert patent infringement claims against us.  Currently, we are engaged in several lawsuits regarding patent issues and have been notified of a number of other potential disputes.

In addition to patent claims, third parties have asserted, and are likely in the future to assert, claims against us alleging infringement of copyrights, trademark rights, trade secret rights or other proprietary rights, or alleging unfair competition or violations of privacy rights or failure to maintain confidentiality of user data.  Currently, our subsidiary LAUNCH Media, Inc. ("LAUNCH") is engaged in a lawsuit regarding copyright issues that commenced prior to our acquisition of LAUNCH.  In addition, third parties have made, and may continue to make, trademark infringement and related claims against us over the display of search results triggered by search terms that include trademark terms.  A court in France has held us liable for displaying search results triggered by certain trademarked terms, and we are appealing that decision.

As we expand our business and develop new technologies, products and services, we may become increasingly subject to intellectual property infringement claims.  In the event that there is a determination that we have infringed third-party proprietary rights such as patents, copyrights, trademark rights, trade secret rights or other third party rights such as publicity and privacy rights, we could incur substantial monetary liability, be required to enter into costly royalty or licensing agreements or be prevented from using the rights, which could require us to change our business practices in the future and limit our ability to compete effectively.  We may also incur substantial expenses in defending against third-party infringement claims regardless of the merit of such claims.  In addition, many of our agreements with our customers or affiliates require us to indemnify them for certain third-party intellectual property infringement claims, which could increase our costs in defending such claims and our damages.  The occurrence of any of these results could harm our brand and negatively impact our operating results.

***We are subject to United States and foreign government regulation of Internet and Voice over Internet Protocol services which could subject us to claims and remedies including monetary liabilities and limitations on our business practices.***

We are subject to regulations and laws directly applicable to providers of Internet and Voice over Internet Protocol services both domestically and internationally.  The application of existing domestic and international laws and regulations to Yahoo! relating to issues such as user privacy and data protection, defamation, pricing, advertising, taxation, gambling, sweepstakes, promotions, electronic payments, real estate, consumer protection, content regulation, quality of services, telecommunications, mobile and intellectual property ownership and infringement in many instances is unclear or unsettled.  In addition, we will also be subject to any new laws and regulations directly applicable to our domestic and international activities.  Further, the application of existing laws to Yahoo! or our subsidiaries regulating or requiring licenses for certain businesses of our advertisers including, for example, distribution of pharmaceuticals, alcohol, adult content, tobacco or firearms, as well as insurance and securities brokerage and legal services, can be unclear.  Internationally, we may also be subject to domestic laws regulating our activities in foreign countries and to foreign laws and regulations that are inconsistent from country to country.  We may incur substantial liabilities for expenses necessary to comply with these laws and regulations or penalties for any failure to comply.  Compliance with these laws and regulations may also cause us to change or limit our business practices in a manner adverse to our business.

A number of U.S. federal laws, including those referenced below, impact our business.  The Digital Millennium Copyright Act ("DMCA") is intended, in part, to limit the liability of eligible online service providers for listing or linking to third-party websites that include materials that infringe copyrights or other rights of others.  Portions of the Communications Decency Act ("CDA") are intended to provide statutory protections to online service providers who distribute third party content.  Yahoo! relies on the protections provided by both the DMCA and CDA in conducting its business.  Any changes in these laws or judicial interpretations narrowing their protections will subject us to greater risk of liability and may increase our costs of compliance with these regulations or limit our ability to operate certain lines of business.  The Children's Online Protection Act and the Children's Online Privacy Protection Act are intended

43

to restrict the distribution of certain materials deemed harmful to children and impose additional restrictions on the ability of online services to collect user information from minors. In addition, the Protection of Children From Sexual Predators Act of 1998 requires online service providers to report evidence of violations of federal child pornography laws under certain circumstances. The costs of compliance with these regulations may increase in the future as a result of changes in the regulations or the interpretation of them. Further, any failures on our part to comply with these regulations may subject us to significant liabilities.

***Changes in regulations or user concerns regarding privacy and protection of user data could adversely affect our business.***

Federal, state and international laws and regulations may govern the collection, use, retention, sharing and security of data that we receive from our users and partners. In addition, we have and post on our website our own privacy policies and practices concerning the collection, use and disclosure of user data. Any failure, or perceived failure, by us to comply with our posted privacy policies or with any data-related consent orders, Federal Trade Commission requirements or other federal, state or international privacy-related laws and regulations could result in proceedings or actions against us by governmental entities or others, which could potentially have an adverse effect on our business.

Further, failure or perceived failure to comply with our policies or applicable requirements related to the collection, use, sharing or security of personal information or other privacy-related matters could result in a loss of user confidence in us and ultimately in a loss of users, partners or advertisers, which could adversely affect our business.

There are a large number of legislative proposals pending before the United States Congress, various state legislative bodies and foreign governments concerning data privacy and retention issues related to our business. It is not possible to predict whether or when such legislation may be adopted. Certain proposals, if adopted, could impose requirements that may result in a decrease in our user registrations and revenues. In addition, the interpretation and application of user data protection laws are in a state of flux. These laws may be interpreted and applied inconsistently from country to country and inconsistently with our current data protection policies and practices. Complying with these varying international requirements could cause us to incur substantial costs or require us to change our business practices in a manner adverse to our business.

***Acquisitions and strategic investments could result in adverse impacts on our operations and in unanticipated liabilities.***

We have acquired, and made strategic investments in, a number of companies (including through joint ventures) in the past and expect to make additional acquisitions and strategic investments in the future. Such transactions may result in dilutive issuances of equity securities, use of our cash resources, incurrence of debt and amortization of expenses related to intangible assets. Our acquisitions and strategic investments to date were accompanied by a number of risks, including:

- the difficulty of assimilating the operations and personnel of our acquired companies into our operations;

- the potential disruption of our ongoing business and distraction of management;

- additional operating losses and expenses of the businesses we acquired or in which we invested;

- the difficulty of integrating acquired technology and rights into our services and unanticipated expenses related to such integration;

- the failure to successfully further develop acquired technology resulting in the impairment of amounts currently capitalized as intangible assets;

- the potential for patent and trademark infringement claims against the acquired company;

- the impairment of relationships with customers and partners of the companies we acquired or in which we invested or our customers and partners as a result of the integration of acquired operations;

- the impairment of relationships with employees of the acquired companies or our employees as a result of integration of new management personnel;

- the difficulty of integrating the acquired company's accounting, management information, human resources and other administrative systems;

- our lack of, or limitations on, our control over the operations of our joint venture companies;

- in the case of foreign acquisitions, uncertainty regarding foreign laws and regulations and difficulty integrating operations and systems as a result of cultural, systems and operational differences; and

- the impact of known potential liabilities or unknown liabilities associated with the companies we acquired or in which we invested.

We are likely to experience similar risks in connection with our future acquisitions and strategic investments. Our failure to be successful in addressing these risks or other problems encountered in connection with our past or future acquisitions and strategic investments could cause us to fail to realize the anticipated benefits of such acquisitions or investments, incur unanticipated liabilities and harm our business generally.

*Our failure to manage growth and diversification of our business could harm us.*

We are continuing to grow and diversify our business both in the United States and internationally. As a result, we must expand and adapt our operational infrastructure and increase the number of our personnel in certain areas. Our business relies on our data systems, billing systems for our fee based and other services, and other operational and financial reporting and control systems. All of these systems have become increasingly complex in the recent past due to the growing diversification and complexity of our business and to acquisitions of new businesses with different systems. To effectively manage this growth, we will need to continue to upgrade and improve our data systems, billing systems, and other operational and financial systems, procedures and controls. In particular, as our premium and other services for which we bill users grow, any failure of our billing systems to accommodate the increasing number of transactions and accurately bill users could adversely affect our business and ability to collect revenue. These upgrades and improvements will require a dedication of resources and in some cases are likely to be complex. If we are unable to adapt our systems in a timely manner to accommodate our growth, our business may be adversely affected.

Additionally, we have experienced recent growth in personnel numbers and expect to continue to hire additional personnel in selected areas. This growth requires significant time and resource commitments from our senior management. Further, as a result of recent acquisitions and international expansion, more than one-half of our employees are based outside of our Sunnyvale, California headquarters. If we are unable to effectively manage a large and geographically dispersed group of employees or to anticipate our future growth and personnel needs, our business may be adversely affected.

*We have dedicated considerable resources to provide a variety of premium services, which may not prove to be successful in generating significant revenue for us.*

We offer fee-based enhancements to many of our free services, including e-mail, personals, finance, games, music and sports. The development cycles for these technologies are long and generally require significant investment by us. We have previously discontinued certain non-profitable premium services. We must however continue to provide new services that are compelling to our users while continuing to develop an effective method for generating revenues for such services. General economic conditions may affect users' willingness to pay for such services. If we cannot generate revenues from these services that are greater than the cost of providing such services, our operating results could be harmed.

*We expect our operating expenses to continue to increase as we attempt to expand the Yahoo! brand, fund product development, develop media properties and acquire other businesses or technologies, which could harm our operating results.*

We currently expect that our operating expenses will continue to increase as we expand our operations in areas of expected growth, continue to develop and extend the Yahoo! brand, fund greater levels of product development, develop and commercialize additional media properties and premium services, and acquire and integrate complementary businesses and technologies. If our expenses increase at a greater pace than our revenues, our operating results could be harmed.

*If we are unable to retain our existing senior management and key personnel and hire new highly skilled personnel, we may not be able to execute our business plan.*

We are substantially dependent on the continued services of our senior management, including our two founders, our chief executive

45

officer, chief financial officer, chief operating officer, chief technical officer, and our executive and senior vice presidents. These individuals have acquired specialized knowledge and skills with respect to Yahoo! and its operations. The loss of any of these individuals could harm our business. Our business is also dependent on our ability to retain, hire and motivate talented, highly skilled personnel. The competition for such highly skilled personnel can be intense, particularly in the San Francisco Bay Area, where our corporate headquarters is located. Many of our management and key personnel have reached or will soon reach the four year anniversary of their Yahoo! hiring date and, as a result, have become or will shortly become fully vested in their initial stock option grants. Although employees receive additional grants, an employee may be more likely to leave Yahoo! upon completion of the vesting period for the initial option grant, which is generally the largest option grant an employee receives. If we do not succeed in retaining and motivating our existing key employees and in attracting new key personnel, we may be unable to meet our business plan and as a result, our stock price may decline

### *More individuals are utilizing non-PC devices to access the Internet, and versions of our service developed or optimized for these devices may not gain widespread adoption by users, manufacturers or distributors of such devices.*

The number of individuals who access the Internet through devices other than a personal computer, such as personal digital assistants, mobile telephones and television set-top devices, has increased dramatically. Our services were originally designed for rich, graphical environments such as those available on desktop and laptop computers. The lower resolution, functionality and memory associated with alternative devices currently available may make the use of our services through such devices difficult, and the versions of our service developed for these devices may not be compelling to users, manufacturers or distributors of alternative devices. As we have limited experience to date in operating versions of our service developed or optimized for users of alternative devices, and as new devices and new platforms are continually being released, it is difficult to predict the problems we may encounter in doing so, and we may need to devote significant resources to the creation, support and maintenance of such versions. If we are unable to attract and retain a substantial number of alternative device users to our online services, we may fail to capture a sufficient share of an increasingly important portion of the market for online services and may fail to attract both advertisers and premium service subscribers.

### *We plan to expand operations in international markets in which we may have limited experience or rely on business partners, and in which we are faced with relatively higher costs.*

We plan to expand Yahoo! branded online properties and search offerings in international markets. We have currently developed, through joint ventures, strategic investments, subsidiaries and branch offices, localized offerings in over 20 countries outside of the United States. As we expand into new international markets, we will have only limited experience in marketing and operating our products and services in such markets. In other instances, including our strategic investment in Alibaba, we may rely on the efforts and abilities of foreign business partners in such markets. We have experienced and expect to continue to experience higher costs as a percentage of revenues in connection with the development and maintenance of our international online properties relative to our domestic experience. Certain international markets may be slower than domestic markets in adopting the Internet as an advertising and commerce medium and so our operations in international markets may not develop at a rate that supports our level of investment.

### *In international markets we compete with local Internet service providers that may have competitive advantages.*

In a number of international markets, especially those in Asia, Europe and Latin America, we face substantial competition from local Internet service providers and other portals that offer search, communications and other commercial services. Many of these companies have a dominant market share in their territories and are owned by local telecommunications providers which give them a competitive advantage. Local providers of competing online services may also have a substantial advantage over us in attracting users in their country due to more established branding in that country, greater knowledge with respect to the tastes and preferences of users residing in that country and/or their focus on a single market. Further, the local providers may have greater regulatory and operational flexibility than Yahoo! due to the fact that we are subject to both United States and foreign regulatory requirements. We must continue to improve our local offerings, become more knowledgeable about our local users and their preferences, deepen our relationships with our local users as well as increase our branding and other marketing activities in order to remain competitive and strengthen our international market position.

### *Our international operations are subject to increased risks which could harm our business, operating results and financial condition.*

In addition to uncertainty about our ability to continue to generate revenues from our foreign operations and expand our international

46

market position, there are certain risks inherent in doing business internationally, including:

- trade barriers and changes in trade regulations;

- difficulties in developing, staffing and simultaneously managing a large number of varying foreign operations as a result of distance, language and cultural differences;

- stringent local labor laws and regulations;

- longer payment cycles;

- currency exchange rate fluctuations;

- political or social unrest or economic instability;

- import or export restrictions;

- seasonal volatility in business activity;

- risks related to government regulation or required compliance with local laws in certain jurisdictions, including those more fully described above; and

- potentially adverse tax consequences.

One or more of these factors could harm our future international operations and consequently, could harm our brand, business, operating results and financial condition.

### *We may be subject to legal liability for online services.*

We host a wide variety of services that enable individuals and businesses to exchange information, generate content, advertise products and services, conduct business and engage in various online activities on an international basis. The law relating to the liability of providers of these online services for activities of their users is currently unsettled both within the United States and internationally. Claims have been threatened and have been brought against us for defamation, negligence, copyright or trademark infringement, unlawful activity, tort, including personal injury, fraud, or other theories based on the nature and content of information that we provide links to or that may be posted online or generated by our users or with respect to auctioned materials. In addition, Yahoo! was the subject of a claim brought by certain entities in a French court regarding, among other things, the availability of certain content within our services which was alleged to violate French law. We may be subject to similar actions in domestic or other international jurisdictions in the future. Our defense of any such actions could be costly and involve significant time and attention of our management and other resources.

We also periodically enter into arrangements to offer third-party products, services or content under the Yahoo! brand or via distribution on the Yahoo! Properties, including stock quotes and trading information. We may be subject to claims concerning these products, services or content by virtue of our involvement in marketing, branding, broadcasting or providing access to them, even if we do not ourselves host, operate, provide, or provide access to these products, services or content. While our agreements with respect to these products, services and content, often provide that we will be indemnified against such liabilities, the ability to receive such indemnification depends on the financial resources of the other party to the agreement and any amounts received may not be adequate to cover our liabilities.

It is also possible that, if any information provided directly by us contains errors or is otherwise negligently provided to users, third parties could make claims against us. For example, we offer web-based e-mail services, which expose us to potential risks, such as liabilities or claims resulting from unsolicited e-mail, lost or misdirected messages, illegal or fraudulent use of e-mail, or interruptions or delays in e-mail service. Investigating and defending any of these types of claims is expensive, even to the extent that the claims are without merit or do not ultimately result in liability.

47

***We may have difficulty scaling and adapting our existing technology architecture to accommodate increased traffic and technology advances or requirements of our users and advertisers.***

As one of the most highly trafficked websites on the Internet, Yahoo! delivers a growing number of products, services and page views to an increasing number of users around the world. In addition, the products and services offered by Yahoo! have expanded and changed significantly and are expected to continue to expand and change rapidly in the future to accommodate new technologies and new means of content delivery, such as rich media audio and video. Our future success will depend on our ability to adapt to rapidly changing technologies, to adapt our products and services to evolving industry standards and to improve the performance and reliability of our products and services. Rapid increases in the levels or types of use of our online properties and services could result in delays or interruptions in our service.

Widespread adoption of new Internet, networking or telecommunications technologies or other technological changes could require substantial expenditures to modify or adapt our services or infrastructure. The technology architectures utilized for our services are highly complex and may not provide satisfactory support in the future, as usage increases and products and services expand, change and become more complex. In the future, we may make changes to our architectures and systems, including moving to completely new architectures and systems. Such changes may be technologically challenging to develop and implement, may cause us to incur substantial costs or data loss, and may cause users, advertisers and affiliates to experience delays or interruptions in our service. These changes, delays or interruptions in our service may cause users, advertisers and affiliates to become dissatisfied with our service and move to competing providers of online services. Further, to the extent that demands for our services increase, we will need to expand our infrastructure, including the capacity of our hardware servers and the sophistication of our software. This expansion is likely to be expensive and complex and require additional technical expertise. As we acquire users who rely upon us for a wide variety of services, it becomes more technologically complex and costly to retrieve, store and integrate data that will enable us to track each user's preferences. Any difficulties experienced in adapting our architectures and infrastructure to accommodate increased traffic, to store user data and track user preferences, together with the associated costs and potential loss of traffic, could harm our operating results, cash flows from operations and financial condition.

***Our business depends on the continued growth and maintenance of the Internet infrastructure.***

The success and the availability of our Internet-based products and services depends in part upon the continued growth and maintenance of the Internet infrastructure itself, including its protocols, architecture, network backbone, data capacity and security. Spam, viruses, worms, spyware, denial of service attacks and other acts of malice may affect not only the Internet's speed, reliability and availability but also its continued desirability as a vehicle for commerce, information and user engagement. If the Internet proves unable to meet the new threats and increased demands placed upon it, our business plans, user and advertiser relationships, site traffic and revenues could be adversely affected.

***New technologies could block our advertisements or our search marketing listings, which would harm our operating results.***

Technologies have been developed and are likely to continue to be developed that can block the display of our advertisements or our search marketing listings. Most of our revenues are derived from fees paid to us by advertisers in connection with the display of advertisements or our search marketing listings on web pages. As a result, advertisement-blocking technology could reduce the number of advertisements and search results that we are able to deliver and, in turn, our advertising revenues and operating results.

48

***We rely on third party providers for our principal Internet connections and technologies, databases and services critical to our properties and services, and any errors, failures or disruption in the services provided by these third parties could significantly harm our business and operating results.***

We rely on private third-party providers for our principal Internet connections, co-location of a significant portion of our data servers and network access. Any disruption, from natural disasters, technology malfunctions, sabotage or other factors, in the Internet or network access or co-location services provided by these third-party providers or any failure of these third-party providers to handle current or higher volumes of use could significantly harm our business, operating results and financial condition. We have little control over these third-party providers, which increases our vulnerability to disruptions or problems with their services. Any financial difficulties experienced by our providers may have negative effects on our business, the nature and extent of which we cannot predict. We license technology and related databases from third parties for certain elements of our properties, including, among others, technology underlying the delivery of news, stock quotes and current financial information, chat services, street mapping and telephone listings, streaming capabilities and similar services. We have experienced and expect to continue to experience interruptions and delays in service and availability for such elements. We also rely on a third-party provider for key components of our e-mail service. Furthermore, we depend on hardware and software suppliers for prompt delivery, installation and service of servers and other equipment to deliver our services. Any errors, failures, interruptions or delays experienced in connection with these third-party technologies and information services could negatively impact our relationship with users and adversely affect our brand, our business and operating results.

***We rely on distribution agreements and relationships with various third parties, and any failure to obtain or maintain such distribution relationships on reasonable terms could impair our ability to fully execute our business plan.***

In addition to our relationships with Internet access providers, to increase traffic for our offerings and make them more available and attractive to advertisers and users, we have certain distribution agreements and informal relationships with operators of online networks and leading websites, software companies, electronics companies, and computer manufacturers. Depending on the distributor and the agreement, these distribution arrangements may not be exclusive and may only have a short term. Some of our distributors, particularly distributors who are also competitors or potential competitors, may not renew their distribution agreements with us. In addition, as new methods for accessing the Internet become available, including through alternative devices, we may need to enter into amended distributions agreements with existing distributors to cover the new devices and agreements with additional distributors. In the future, existing and potential distributors may not offer distribution of our properties and services to us on reasonable terms, or at all. If we fail to obtain distribution or to obtain distribution on terms that are reasonable, we may not be able to fully execute our business plan.

***We rely on third party providers of streaming media products to stream audio and video content to our users, and any change in the licensing terms, costs, availability or user acceptance of these products could adversely affect our business.***

We rely on leading providers of streaming media products to license the software necessary to stream audio and video content to our users. There can be no assurance that these providers will continue to license these products to us on reasonable terms, or at all. Our users are currently able to electronically download copies of the software to play streaming media free of charge, but providers of streaming media products may begin charging users for copies of their player software or otherwise change their business model in a manner that slows the widespread acceptance of these products. In order for our rich media services to be successful, there must be a large base of users of these streaming media products. We have limited or no control over the availability or acceptance of streaming media software, and to the extent that any of these circumstances occur, our business may be adversely affected.

***If we fail to detect click spam, we could lose the confidence of our advertisers, thereby causing a loss of advertisers and revenue.***

We are exposed to the risk of clicks on our advertisements by persons seeking to increase the fees paid by our advertisers. Click spam may occur when a click is generated on one of our advertiser's listings displayed on a website in order to generate a payment rather than to view the underlying content. This type of activity could damage our brand. If click spam is not detected, the affected advertisers may perceive a reduced return on their investment in our advertising programs because those clicks will not lead to potential revenue for the advertisers. This could lead the advertisers to become dissatisfied with our advertising programs, which could lead to loss of advertisers and revenue. If this activity occurs and we are unable to stop it, we may have to provide refunds of revenue that our advertisers have paid to us and that was later attributed to click spam, in order to prevent damage to our brand.

*Interruptions, delays or failures in the provision of our services could damage our brand and harm our operating results.*

Our operations are susceptible to outages due to fire, floods, power loss, telecommunications failures, terrorist attacks and similar events. In addition, a significant portion of our network infrastructure is located in Northern California, an area subject to earthquakes. Despite our implementation of network security measures, our servers are vulnerable to computer viruses, worms, physical and electronic break-ins, sabotage and similar disruptions from unauthorized tampering with our computer systems. For example, we are vulnerable to coordinated attempts to overload our systems with data, resulting in denial or reduction of service to some or all of our users for a period of time. We have experienced a coordinated denial of service attack in the past, and may experience such attempts in the future. We do not have multiple site capacity for all of our services and some of our systems are not fully redundant in the event of any such occurrence. In an effort to reduce the likelihood of a geographical or other disaster impacting our business, we have distributed and intend to continue distributing our servers among additional data centers located around the world. Failure to execute these changes properly or in a timely manner could result in delays or interruptions to our service, which could result in a loss of users and damage to our brand, and harm our operating results. We may not carry sufficient business interruption insurance to compensate us for losses that may occur as a result of any events, which cause interruptions in our service.

*We may be required to record a significant charge to earnings if our goodwill or amortizable intangible assets become impaired.*

We are required under generally accepted accounting principles to review our amortizable intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Goodwill is required to be tested for impairment at least annually. Factors that may be considered a change in circumstances indicating that the carrying value of our amortizable intangible assets may not be recoverable include a decline in stock price and market capitalization, and slower growth rates in our industry. We may be required to record a significant charge to earnings in our consolidated financial statements during the period in which any impairment of our goodwill or amortizable intangible assets is determined. This may adversely impact our results of operations.

*Our stock price has been volatile historically and may continue to be volatile regardless of our operating performance.*

The trading price of our common stock has been and may continue to be subject to wide fluctuations. During the quarter ended June 30, 2006, the closing sale prices of our common stock on the Nasdaq ranged from $29.00 to $33.54 per share and the closing sale price on August 1, 2006 was $26.94 per share. Our stock price may fluctuate in response to a number of events and factors, such as quarterly variations in operating results; announcements of technological innovations or new services and media properties by us or our competitors; changes in financial estimates and recommendations by securities analysts; the operating and stock price performance of other companies that investors may deem comparable to us; the operating performance of companies in which we have an equity investment, including Yahoo! Japan and Alibaba; the stock price of companies in which we have an equity investment, including Yahoo! Japan; and news reports relating to trends in our markets or general economic conditions.

In addition, the stock market in general, and the market prices for Internet-related companies in particular, have experienced volatility that often has been unrelated to the operating performance of such companies. These broad market and industry fluctuations may adversely affect the price of our stock, regardless of our operating performance. Additionally, volatility or a lack of positive performance in our stock price may adversely affect our ability to retain key employees, all of whom have been granted stock options or other stock-based awards.

*Anti-takeover provisions could make it more difficult for a third party to acquire us.*

We have adopted a stockholder rights plan and initially declared a dividend distribution of one right for each outstanding share of common stock to stockholders of record as of March 20, 2001. As a result of our two-for-one stock split effective May 11, 2004, each share of common stock is now associated with one-half of one right. Each right entitles the holder to purchase one unit consisting of a one one-thousandth of a share of our Series A Junior Participating Preferred Stock for $250 per unit. Under certain circumstances, if a person or group acquires 15 percent or more of our outstanding common stock, holders of the rights (other than the person or group triggering their exercise) will be able to purchase, in exchange for the $250 exercise price, shares of our common stock or of any company into which we are merged having a value of $500. The rights expire on March 1, 2011, unless extended by our Board of Directors. Because the rights may substantially dilute the stock ownership of a person or group attempting to take us over without the approval of our Board of Directors, our rights plan could make it more difficult for a third party to acquire us (or a significant percentage of our outstanding capital stock) without first negotiating with our Board of Directors regarding that acquisition.

In addition, our Board of Directors has the authority to issue up to 10 million shares of Preferred Stock (of which 2 million shares have been designated as Series A Junior Participating Preferred Stock) and to determine the price, rights, preferences, privileges and

restrictions, including voting rights, of those shares without any further vote or action by the stockholders.

The rights of the holders of our common stock may be subject to, and may be adversely affected by, the rights of the holders of any Preferred Stock that may be issued in the future. The issuance of Preferred Stock may have the effect of delaying, deterring or preventing a change of control of Yahoo! without further action by the stockholders and may adversely affect the voting and other rights of the holders of our common stock. Further, certain provisions of our charter documents, including provisions eliminating the ability of stockholders to take action by written consent and limiting the ability of stockholders to raise matters at a meeting of stockholders without giving advance notice, may have the effect of delaying or preventing changes in control or management of Yahoo!, which could have an adverse effect on the market price of our stock. In addition, our charter documents do not permit cumulative voting, which may make it more difficult for a third party to gain control of our Board of Directors. Further, we are subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law, which will prohibit us from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder, even if such combination is favored by a majority of stockholders, unless the business combination is approved in a prescribed manner. The application of Section 203 also could have the effect of delaying or preventing a change of control or management.

## Item 2.  Unregistered Sales of Equity Securities and Use of Proceeds

Share repurchase activity during the three months ended June 30, 2006 was as follows:

| Period | Total Number of Shares Purchased (1) | Average Price Paid per Share | Total Number of Shares Purchased as Part of a Publicly Announced Program | Approximate Dollar Value of Shares that May Yet be Purchased Under the Program (in 000s) (1) (2) |
|---|---|---|---|---|
| April 1 - April 30, 2006 | 8,251,715 | $ 30.30 | 8,251,715 | $ 1,778,262 |
| May 1 - May 31, 2006 | 5,545,865 | $ 33.59 | 5,545,865 | $ 1,591,951 |
| June 1 - June 30, 2006 | — | — | — | $ 1,591,951 |
| Total | 13,797,580 | $ 31.62 | 13,797,580 | |

(1)   The shares repurchased in the three months ended June 30, 2006 were under our stock repurchase program that was announced in March 2005 with an authorized level of $3 billion. This program will expire in March 2010.

(2)   As of June 30, 2006 we had unsettled structured stock transactions in the amount of $500 million. These transactions will mature in separate tranches in July and October 2006. On each of the maturity dates, if the market price of Yahoo! common stock is above $34.49 for the $200 million tranche maturing in July 2006, $33.90 for the $50 million tranche maturing in July 2006, and $32.53 for the $250 million tranche maturing in October 2006, we will have our investments returned with a premium. On each of the remaining maturity dates, if the market price of our common stock is at or below such pre-determined prices, we will repurchase our common stock, up to an aggregate of 16.5 million shares. Any repurchases under these structured stock repurchase transactions will be reported in the quarter or quarters in which they occur. While outstanding, these structured stock repurchase transactions reduce the dollar value of additional shares that may be repurchased under our current program to approximately $1.1 billion as of June 30, 2006.

## Item 3.  Defaults Upon Senior Securities

None.

## Item 4.  Submission of Matters to a Vote of Security Holders

On May 25, 2006, the Company held its Annual Meeting of Stockholders. At the meeting, the stockholders elected as directors Terry Semel (with 1,257,862,922 shares voting for and 18,312,679 withheld), Jerry Yang (with 1,265,312,510 shares voting for and 10,863,091 withheld), Roy Bostock (with 1,261,316,357 shares voting for and 14,859,244 withheld), Ronald Burkle (with 1,263,498,338 shares voting for and 12,677,263 shares withheld), Eric Hippeau (with 1,237,589,348 shares voting for and 38,586,253 shares withheld), Arthur Kern (with 1,263,125,567 shares voting for and 13,050,034 withheld), Vyomesh Joshi (with 1,265,270,571 shares voting for and 10,905,030 withheld), Robert Kotick (with 1,251,697,608 shares voting for and 24,477,993 withheld), Edward Kozel (with 1,265,289,862 shares voting for and 10,885,739 withheld) and Gary Wilson (with 1,259,061,343 shares voting for and 17,114,258 withheld).

The stockholders also approved an amendment to the Company's 1996 Director's Stock Option Plan (with 916,592,153 shares voting

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

|  |  |  |
|---|---|---|
|  | YAHOO! INC. |  |
|  | By: | /s/ SUSAN DECKER |
| Dated: August 4, 2006 |  | Susan Decker |
|  |  | Executive Vice President, Finance and Administration, and Chief Financial Officer (Principal Financial Officer) |
|  | By: | /s/ MICHAEL MURRAY |
| Dated: August 4, 2006 |  | Michael Murray |
|  |  | Senior Vice President, Finance (Principal Accounting Officer) |

54

**Certification of Chief Executive Officer Pursuant to**
**Securities Exchange Act Rules 13a-14(a) and 15d-14(a)**
**as Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Terry Semel, the Chief Executive Officer of Yahoo! Inc., certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Yahoo! Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: August 4, 2006                    By:    /s/ TERRY SEMEL
                                                Terry Semel
                                                Chief Executive Officer

**Certification of Chief Financial Officer Pursuant to
Securities Exchange Act Rules 13a-14(a) and 15d-14(a)
as Adopted Pursuant to
Section 302 of the Sarbanes-Oxley Act of 2002**

I, Susan Decker, the Chief Financial Officer of Yahoo! Inc., certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Yahoo! Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: August 4, 2006                              By:    /s/ SUSAN DECKER
                                                          Susan Decker
                                                          Chief Financial Officer

**Certification of Chief Executive Officer and Chief Financial Officer Pursuant to
18 U.S.C. Section 1350,
as Adopted Pursuant to
Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Quarterly Report on Form 10-Q of Yahoo! Inc. (the "Company") for the quarter ended June 30, 2006 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Terry Semel, as Chief Executive Officer of the Company, and Susan Decker, as Chief Financial Officer of the Company, each hereby certifies, pursuant to 18 U.S.C. §1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, to the best of his and her knowledge, respectively, that:

      (1)      The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

      (2)      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ TERRY SEMEL
Name: Terry Semel
Title: Chief Executive Officer
Dated: August 4, 2006

/s/ SUSAN DECKER
Name: Susan Decker
Title: Chief Financial Officer
Dated: August 4, 2006

The foregoing certification is being furnished pursuant to 18 U.S.C. Section 1350. It is not being filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and it is not to be incorporated by reference into any filing of the Company, regardless of any general incorporation language in such filing.

Exhibit 18

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires:         January 31, 2005 |
| Estimated average burden hours per response...    0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>DECKER SUSAN L | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)        (First)        (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>05/24/2004 | (Check all applicable)<br><br>____ Director                 ____ 10% Owner<br>_X_ Officer (give title      ____ Other (specify below)<br>below)<br>EVP & Chief Financial Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/24/2004 | | S | | 600 | D | $29.37 | 455,978 | D | |
| Common Stock | 05/24/2004 | | S | | 24,900 | D | $29.4 | 431,078 | D | |
| Common Stock | 05/24/2004 | | S | | 100 | D | $29.44 | 430,978 | D | |
| Common Stock | 05/24/2004 | | S | | 46,821 | D | $29.45 | 384,157 | D | |
| Common Stock | 05/24/2004 | | S | | 29,350 | D | $29.46 | 354,807 | D | |
| Common Stock | 05/24/2004 | | S | | 22,456 | D | $29.47 | 332,351 | D | |
| Common Stock | 05/24/2004 | | S | | 3,373 | D | $29.48 | 328,978 | D | |
| Common Stock | 05/24/2004 | | S | | 20,800 | D | $29.5 | 308,178 | D | |
| Common Stock | 05/24/2004 | | S | | 5,600 | D | $29.51 | 302,578 | D | |
| Common Stock | 05/24/2004 | | S | | 33,200 | D | $29.52 | 269,378 | D | |
| Common Stock | 05/24/2004 | | S | | 7,000 | D | $29.54 | 262,378 | D | |
| Common Stock | 05/24/2004 | | S | | 1,300 | D | $29.55 | 261,078 | D | |
| Common Stock | 05/24/2004 | | S | | 18,200 | D | $29.56 | 242,878 | D | |
| Common Stock | 05/24/2004 | | S | | 4,500 | D | $29.57 | 238,378 | D | |
| Common Stock | 05/24/2004 | | S | | 2,000 | D | $29.58 | 236,378 | D | |
| Common Stock | 05/24/2004 | | S | | 23,200 | D | $29.6 | 213,178 | D | |
| Common Stock | 05/24/2004 | | S | | 24,141 | D | $29.61 | 189,037 | D | |
| Common Stock | 05/24/2004 | | S | | 26,509 | D | $29.62 | 162,528 | D | |
| Common Stock | 05/24/2004 | | S | | 4,150 | D | $29.65 | 158,378 | D | |
| Common Stock | 05/24/2004 | | S | | 3,400 | D | $29.66 | 154,978 | D | |
| Common Stock | 05/24/2004 | | S | | 1,000 | D | $29.67 | 153,978 | D | |
| Common Stock | 05/24/2004 | | S | | 8,600 | D | $29.68 | 145,378 | D | |
| Common Stock | 05/24/2004 | | S | | 1,000 | D | $29.69 | 144,378 | D | |

| Common Stock | 05/24/2004 | | S | | 23,000 | D | $29.7 | 121,378 | D | |
| Common Stock | 05/24/2004 | | S | | 5,000 | D | $29.71 | 116,378 | D | |
| Common Stock | 05/24/2004 | | S | | 12,200 | D | $29.72 | 104,178 | D | |
| Common Stock | 05/24/2004 | | S | | 200 | D | $29.73 | 103,978[(1)(2)(3)] | D | |

## Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| DECKER SUSAN L C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | EVP & Chief Financial Officer | |

## Explanation of Responses:

(1)  All figures shown reflect the 2 for 1 stock split that was effective on May 11, 2004.

(2)  All shares reported sold on this form 4 were sold pursuant to a 10b5-1 trading plan.

(3)  Includes 1,144 shares acquired through the Yahoo! Employee Stock Purchase Plan on April 30, 2004.

## Signatures

/s/ Susan L. Decker                                    05/25/2004
** Signature of Reporting Person                        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, see Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person <u>*</u><br>DECKER SUSAN L | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)      (First)      (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>05/24/2004 | (Check all applicable)<br><br>___ Director        ___ 10% Owner<br>_X_ Officer (give title    ___ Other (specify below)<br>below)<br><br>EVP & Chief Financial Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br><br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/24/2004 | | M | | 145,833 | A | $4.62 | 249,811 | D | |
| Common Stock | 05/24/2004 | | M | | 440,000 | A | $7.175 | 689,811 | D | |
| Common Stock | 05/24/2004 | | M | | 14,167 | A | $7.825 | 703,978 | D | |
| Common Stock | 05/24/2004 | | S | | 100 | D | $29.01 | 703,878 | D | |
| Common Stock | 05/24/2004 | | S | | 1,000 | D | $29.06 | 702,878 | D | |
| Common Stock | 05/24/2004 | | S | | 900 | D | $29.07 | 701,978 | D | |
| Common Stock | 05/24/2004 | | S | | 3,140 | D | $29.09 | 698,838 | D | |
| Common Stock | 05/24/2004 | | S | | 16,860 | D | $29.1 | 681,978 | D | |
| Common Stock | 05/24/2004 | | S | | 1,000 | D | $29.14 | 680,978 | D | |
| Common Stock | 05/24/2004 | | S | | 15,300 | D | $29.2 | 665,678 | D | |
| Common Stock | 05/24/2004 | | S | | 1,000 | D | $29.21 | 664,678 | D | |
| Common Stock | 05/24/2004 | | S | | 1,100 | D | $29.23 | 663,578 | D | |
| Common Stock | 05/24/2004 | | S | | 20,700 | D | $29.24 | 642,878 | D | |
| Common Stock | 05/24/2004 | | S | | 48,900 | D | $29.25 | 593,978 | D | |
| Common Stock | 05/24/2004 | | S | | 5,400 | D | $29.26 | 588,578 | D | |
| Common Stock | 05/24/2004 | | S | | 2,600 | D | $29.27 | 585,978 | D | |
| Common Stock | 05/24/2004 | | S | | 1,020 | D | $29.27 | 584,958 | D | |
| Common Stock | 05/24/2004 | | S | | 5,000 | D | $29.28 | 579,958 | D | |
| Common Stock | 05/24/2004 | | S | | 23,380 | D | $29.29 | 556,578 | D | |
| Common Stock | 05/24/2004 | | S | | 57,900 | D | $29.3 | 498,678 | D | |
| Common Stock | 05/24/2004 | | S | | 5,600 | D | $29.31 | 493,078 | D | |
| Common Stock | 05/24/2004 | | S | | 9,500 | D | $29.32 | 483,578 | D | |
| Common Stock | 05/24/2004 | | S | | 600 | D | $29.33 | 482,978 | D | |

| Common Stock | 05/24/2004 | | S | | 2,000 | D | $29.34 | 480,978 | D | |
| Common Stock | 05/24/2004 | | S | | 12,758 | D | $29.35 | 468,220 | D | |
| Common Stock | 05/24/2004 | | S | | 11,642 | D | $29.36 | 456,578[(1)(2)] | D | |

## Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $4.62 | 05/24/2004 | | M | | | 145,833 | [(3)] | 10/02/2011 | Common Stock | 145,833 | $ 0 | 354,167 | D | |
| Employee Stock Option ( right to buy ) | $7.175 | 05/24/2004 | | M | | | 440,000 | [(4)] | 04/25/2012 | Common Stock | 440,000 | $ 0 | 500,000 | D | |
| Employee Stock Option ( right to buy ) | $7.825 | 05/24/2004 | | M | | | 14,167 | [(5)] | 06/20/2012 | Common Stock | 14,167 | $ 0 | 985,833 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| DECKER SUSAN L C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | EVP & Chief Financial Officer | |

## Explanation of Responses:

(1)  All figures shown reflect the 2 for 1 stock split that was effective on May 11, 2004.

(2)  All shares reported sold on this form 4 were sold pursuant to a 10b5−1 trading plan.

(3)  This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 10/2/01.

(4)  This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 4/25/02.

(5)  This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 6/20/02.

## Signatures

/s/ Susan L. Decker                                    05/25/2004

** Signature of Reporting Person                          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*    If the form is filed by more than one reporting person, see Instruction 4(b)(v).

**   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person - DECKER SUSAN L | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)        (First)        (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 09/08/2004 | (Check all applicable) _____ Director _____ 10% Owner _X_ Officer (give title below) _____ Other (specify below) EVP & Chief Financial Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person _____ Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

**Table I – Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 09/08/2004 | | M | | 83,333 | A | $4.62 | 187,311 | D | |
| Common Stock | 09/08/2004 | | M | | 83,333 | A | $7.175 | 270,644 | D | |
| Common Stock | 09/08/2004 | | M | | 33,334 | A | $7.825 | 303,978 | D | |
| Common Stock | 09/08/2004 | | S | | 5,000 | D | $30 | 298,978 | D | |
| Common Stock | 09/08/2004 | | S | | 5,000 | D | $30.03 | 293,978 | D | |
| Common Stock | 09/08/2004 | | S | | 3,277 | D | $30.1 | 290,701 | D | |
| Common Stock | 09/08/2004 | | S | | 15,523 | D | $30.11 | 275,178 | D | |
| Common Stock | 09/08/2004 | | S | | 4,700 | D | $30.12 | 270,478 | D | |
| Common Stock | 09/08/2004 | | S | | 6,200 | D | $30.13 | 264,278 | D | |
| Common Stock | 09/08/2004 | | S | | 3,750 | D | $30.14 | 260,528 | D | |
| Common Stock | 09/08/2004 | | S | | 4,743 | D | $30.15 | 255,785 | D | |
| Common Stock | 09/08/2004 | | S | | 3,650 | D | $30.16 | 252,135 | D | |
| Common Stock | 09/08/2004 | | S | | 7,200 | D | $30.17 | 244,935 | D | |
| Common Stock | 09/08/2004 | | S | | 35,357 | D | $30.18 | 209,578 | D | |
| Common Stock | 09/08/2004 | | S | | 7,500 | D | $30.19 | 202,078 | D | |
| Common Stock | 09/08/2004 | | S | | 17,003 | D | $30.2 | 185,075 | D | |
| Common Stock | 09/08/2004 | | S | | 23,900 | D | $30.21 | 161,175 | D | |
| Common Stock | 09/08/2004 | | S | | 12,800 | D | $30.22 | 148,375 | D | |
| Common Stock | 09/08/2004 | | S | | 6,900 | D | $30.23 | 141,475 | D | |
| Common Stock | 09/08/2004 | | S | | 2,497 | D | $30.24 | 138,978 | D | |
| Common Stock | 09/08/2004 | | S | | 5,000 | D | $30.25 | 133,978 | D | |
| Common Stock | 09/08/2004 | | S | | 5,000 | D | $30.3 | 128,978 | D | |
| Common Stock | 09/08/2004 | | S | | 5,000 | D | $30.32 | 123,978 | D | |

| Common Stock | 09/08/2004 | | S | | 15,000 | D | $30.36 | 108,978 | | D | |
| Common Stock | 09/08/2004 | | S | | 5,000 | D | $30.38 | 103,978[1] | | D | |

### Table II — Derivative Securities Acquired, Disposed of, or Beneficially Owned
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $4.62 | 09/08/2004 | | M | | | 83,333 | [2] | 10/02/2011 | Common Stock | 83,333 | $ 0 | 270,834 | D | |
| Employee Stock Option ( right to buy ) | $7.175 | 09/08/2004 | | M | | | 83,333 | [3] | 04/25/2012 | Common Stock | 83,333 | $ 0 | 416,667 | D | |
| Employee Stock Option ( right to buy ) | $7.825 | 09/08/2004 | | M | | | 33,334 | [4] | 06/20/2012 | Common Stock | 33,334 | $ 0 | 952,499 | D | |

### Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| DECKER SUSAN L C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | EVP & Chief Financial Officer | |

### Explanation of Responses:

(1) All shares reported sold on this form 4 were sold pursuant to a 10b5−1 trading plan.

(2) This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 10/2/01.

(3) This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 4/25/02.

(4) This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 6/20/02.

### Signatures

/s/ Susan L. Decker                                    09/09/2004
** Signature of Reporting Person                        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

□ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>DECKER SUSAN L | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)        (First)        (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>09/09/2004 | (Check all applicable)<br><br>____ Director      ____ 10% Owner<br>_X_ Officer (give title below)  ____ Other (specify below)<br><br>EVP & Chief Financial Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 09/09/2004 | | M | | 250,000 | A | $7.825 | 353,978 | D | |
| Common Stock | 09/09/2004 | | S | | 40,000 | D | $30.3 | 313,978 | D | |
| Common Stock | 09/09/2004 | | S | | 15,300 | D | $30.31 | 298,678 | D | |
| Common Stock | 09/09/2004 | | S | | 3,700 | D | $30.32 | 294,978 | D | |
| Common Stock | 09/09/2004 | | S | | 2,100 | D | $30.33 | 292,878 | D | |
| Common Stock | 09/09/2004 | | S | | 7,610 | D | $30.34 | 285,268 | D | |
| Common Stock | 09/09/2004 | | S | | 15,300 | D | $30.35 | 269,968 | D | |
| Common Stock | 09/09/2004 | | S | | 11,500 | D | $30.36 | 258,468 | D | |
| Common Stock | 09/09/2004 | | S | | 10,290 | D | $30.37 | 248,178 | D | |
| Common Stock | 09/09/2004 | | S | | 5,428 | D | $30.38 | 242,750 | D | |
| Common Stock | 09/09/2004 | | S | | 2,472 | D | $30.4 | 240,278 | D | |
| Common Stock | 09/09/2004 | | S | | 2,200 | D | $30.41 | 238,078 | D | |
| Common Stock | 09/09/2004 | | S | | 13,700 | D | $30.42 | 224,378 | D | |
| Common Stock | 09/09/2004 | | S | | 10,997 | D | $30.43 | 213,381 | D | |
| Common Stock | 09/09/2004 | | S | | 19,203 | D | $30.44 | 194,178 | D | |
| Common Stock | 09/09/2004 | | S | | 8,200 | D | $30.45 | 185,978 | D | |
| Common Stock | 09/09/2004 | | S | | 5,000 | D | $30.46 | 180,978 | D | |
| Common Stock | 09/09/2004 | | S | | 7,000 | D | $30.48 | 173,978 | D | |
| Common Stock | 09/09/2004 | | S | | 600 | D | $30.49 | 173,378 | D | |
| Common Stock | 09/09/2004 | | S | | 14,400 | D | $30.52 | 158,978 | D | |
| Common Stock | 09/09/2004 | | S | | 10,000 | D | $30.54 | 148,978 | D | |
| Common Stock | 09/09/2004 | | S | | 25,000 | D | $30.55 | 123,978 | D | |
| Common Stock | 09/09/2004 | | S | | 10,000 | D | $30.57 | 113,978 | D | |

| Common Stock | 09/09/2004 | | S | 10,000 | D | $30.58 | 103,978[1] | D | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $7.825 | 09/09/2004 | | M | | | 250,000 | (2) | 06/20/2012 | Common Stock | 250,000 | $ 0 | 702,499 | D | |

### Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| DECKER SUSAN L<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Financial Officer | |

### Explanation of Responses:

(1)  All shares reported sold on this form 4 were sold pursuant to a 10b5-1 trading plan.

(2)  This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 6/20/02.

### Signatures

/s/ Susan L. Decker                09/10/2004

\*\* Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF
SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person <br> DECKER SUSAN L | 2. Issuer Name **and** Ticker or Trading Symbol <br> YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)   (First)   (Middle) <br><br> C/O YAHOO! INC., 701 FIRST AVENUE <br><br> (Street) | 3. Date of Earliest Transaction (Month/Day/Year) <br> 09/10/2004 | (Check all applicable) <br><br> ___ Director   ___ 10% Owner <br> _X_ Officer (give title below)   ___ Other (specify below) <br><br> EVP & Chief Financial Officer |
| SUNNYVALE, CA 94089 <br> (City)   (State)   (Zip) | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) <br> _X_ Form filed by One Reporting Person <br> ___ Form filed by More than One Reporting Person |

## Table I – Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 09/10/2004 | | M | | 150,000 | A | $7.825 | 253,978 | D | |
| Common Stock | 09/10/2004 | | S | | 10,000 | D | $30.352 | 243,978 | D | |
| Common Stock | 09/10/2004 | | S | | 10,000 | D | $30.4019 | 233,978 | D | |
| Common Stock | 09/10/2004 | | S | | 10,000 | D | $30.5 | 223,978 | D | |
| Common Stock | 09/10/2004 | | S | | 10,000 | D | $30.5688 | 213,978 | D | |
| Common Stock | 09/10/2004 | | S | | 10,000 | D | $30.6133 | 203,978 | D | |
| Common Stock | 09/10/2004 | | S | | 10,000 | D | $30.6486 | 193,978 | D | |
| Common Stock | 09/10/2004 | | S | | 10,000 | D | $30.672 | 183,978 | D | |
| Common Stock | 09/10/2004 | | S | | 4,683 | D | $30.7 | 179,295 | D | |
| Common Stock | 09/10/2004 | | S | | 10,000 | D | $30.71 | 169,295 | D | |
| Common Stock | 09/10/2004 | | S | | 10,000 | D | $30.7572 | 159,295 | D | |
| Common Stock | 09/10/2004 | | S | | 10,000 | D | $30.8024 | 149,295 | D | |
| Common Stock | 09/10/2004 | | S | | 10,000 | D | $30.8074 | 139,295 | D | |
| Common Stock | 09/10/2004 | | S | | 10,000 | D | $30.8111 | 129,295 | D | |
| Common Stock | 09/10/2004 | | S | | 5,317 | D | $30.8173 | 123,978 | D | |
| Common Stock | 09/10/2004 | | S | | 10,000 | D | $30.834 | 113,978 | D | |
| Common Stock | 09/10/2004 | | S | | 10,000 | D | $30.8397 | 103,978[1] | D | |

## Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | 6. Date Exercisable and Expiration Date (Month/Day/Year) | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee Stock Option ( right to buy ) | $7.825 | 09/10/2004 | | M | | | 150,000 | (2) | 06/20/2012 | Common Stock | 150,000 | $ 0 | 552,499 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| DECKER SUSAN L C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | EVP & Chief Financial Officer | |

## Explanation of Responses:

(1)  All shares reported sold on this form 4 were sold pursuant to a 10b5-1 trading plan.

(2)  This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 6/20/02.

## Signatures

_/s/ Susan L. Decker_                                          09/10/2004

<u>**</u>Signature of Reporting Person                                  Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF**
**SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires:    January 31, 2005 |
| Estimated average burden hours per response...    0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person −<br>DECKER SUSAN L | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)          (First)          (Middle)<br><br>C/O YAHOO! INC., 701 FIRST<br>AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>12/16/2004 | (Check all applicable)<br><br>___ Director          ___ 10% Owner<br>_X_ Officer (give title          ___ Other (specify below)<br>below)<br>EVP & Chief Financial Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check<br>Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)          (State)          (Zip) | | |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security<br>(Instr. 3) | 2. Transaction Date<br>(Month/Day/Year) | 2A. Deemed<br>Execution Date, if<br>any<br>(Month/Day/Year) | 3. Transaction<br>Code<br>(Instr. 8) | | 4. Securities Acquired (A) or<br>Disposed of (D)<br>(Instr. 3, 4 and 5) | | | 5. Amount of<br>Securities<br>Beneficially<br>Owned Following<br>Reported<br>Transaction(s)<br>(Instr. 3 and 4) | 6. Ownership<br>Form: Direct (D)<br>or Indirect (I)<br>(Instr. 4) | 7. Nature of<br>Indirect Beneficial<br>Ownership<br>(Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/16/2004 | | A | | 50,000[(1)] | A | $ 0 | 153,978 | D | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
#### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of<br>Derivative<br>Security<br>(Instr. 3) | 2.<br>Conversion<br>or Exercise<br>Price of<br>Derivative<br>Security | 3. Transaction Date<br>(Month/Day/Year) | 3A. Deemed<br>Execution Date, if<br>any<br>(Month/Day/Year) | 4. Transaction<br>Code<br>(Instr. 8) | | 5. Number of<br>Derivative<br>Securities<br>Acquired (A) or<br>Disposed of (D)<br>(Instr. 3, 4, and<br>5) | | 6. Date Exercisable and<br>Expiration Date<br>(Month/Day/Year) | | 7. Title and Amount of<br>Underlying Securities<br>(Instr. 3 and 4) | | 8. Price of<br>Derivative<br>Security<br>(Instr. 5) | 9. Number of<br>Derivative<br>Securities<br>Beneficially<br>Owned<br>Following<br>Reported<br>Transaction(s)<br>(Instr. 4) | 10.<br>Ownership<br>Form of<br>Derivative<br>Security:<br>Direct (D)<br>or Indirect<br>(I)<br>(Instr. 4) | 11. Nature<br>of Indirect<br>Beneficial<br>Ownership<br>(Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date<br>Exercisable | Expiration Date | Title | Amount or<br>Number of<br>Shares | | | | |
| Stock<br>Option (<br>right to<br>buy ) | $37.08 | 12/16/2004 | | A | | 150,000 | | [(2)] | 12/16/2014 | Common<br>Stock | 150,000 | $ 0 | 150,000 | D | |

### Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| DECKER SUSAN L<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Financial Officer | |

### Explanation of Responses:

(1)    These shares represent shares of restricted stock granted under the Yahoo! 1995 Stock Plan, 35,000 of which will vest three years from the
date of grant and 15,000 of which will vest upon the satisfaction of certain performance objectives, in each case as long as the officer remains
employed by the company as of the vesting date.

(2)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting
commencement date of 12/16/04 and 1/16th of the securities underlying the option in quarterly installments thereafter, such that the option is
fully vested on 12/16/08.

**Signatures**

<u>/s/ Susan L. Decker</u>                                    <u>12/20/2004</u>

<sup>**</sup>Signature of Reporting Person                                    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires:  January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>DECKER SUSAN L | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
|---|---|---|
| (Last)     (First)     (Middle)<br><br>C/O YAHOO! INC., 701 FIRST<br>AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>02/01/2005 | ___ Director  ___ 10% Owner<br>_X_ Officer (give title  ___ Other (specify below)<br>below)<br>EVP & Chief Financial Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)     (State)     (Zip) | | |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 02/01/2005 | | A | | 150,000$^{(1)}$ | A | $ 0 | 303,978 | D | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $34.75 | 02/01/2005 | | A | | 550,000 | | $^{(2)}$ | 02/01/2015 | Common Stock | 550,000 | $ 0 | 550,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| DECKER SUSAN L<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Financial Officer | |

## Explanation of Responses:

(1)     These shares represent shares of restricted stock granted under the Yahoo! Inc. 1995 Stock Plan. These shares will vest three years from the date of grant of 2/1/05 as long as the officer remains in the service of the company as of the vesting date.

(2)     This option becomes exercisable at a rate of 1/3 of the securities underlying the option on the third anniversary of the grant date of 2/1/05 and 2/3 of the securities underlying the option on the fourth anniversary of the grant date such that the option is fully vested on 2/1/09.

**Signatures**

/s/ Susan L. Decker                                                02/02/2005

⁕⁕Signature of Reporting Person                                   Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires:          January 31, 2005 |
| Estimated average burden hours per response...          0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| DECKER SUSAN L | YAHOO INC [YHOO] | (Check all applicable) |
| (Last)      (First)      (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) 05/23/2005 | ___ Director      ___ 10% Owner |
| C/O YAHOO! INC., 701 FIRST AVENUE | | _X_ Officer (give title below)      ___ Other (specify below) |
| (Street) | | EVP & Chief Financial Officer |
| SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| (City)      (State)      (Zip) | | _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |

### Table I – Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/23/2005 | | M | | 166,667 | A | $4.62 | 471,790 | D | |
| Common Stock | 05/23/2005 | | M | | 133,333 | A | $7.175 | 605,123 | D | |
| Common Stock | 05/23/2005 | | S | | 300,000 | D | $37 | 305,123[3] | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $4.62 | 05/23/2005 | | M | | | 166,667 | [1] | 10/02/2011 | Common Stock | 166,667 | $ 0 | 104,167 | D | |
| Stock Option ( right to buy ) | $7.175 | 05/23/2005 | | M | | | 133,333 | [2] | 04/25/2012 | Common Stock | 133,333 | $ 0 | 283,334 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| DECKER SUSAN L C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | EVP & Chief Financial Officer | |

**Explanation of Responses:**

(1)  This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 10/2/01.

(2)  This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 4/25/02.

(3)  Includes 1145 shares acquired through the Yahoo! Inc. Employee Stock Purchase Plan in April 2005.

**Signatures**

<u>/s/ Michael J. Callahan, attorney−in−fact for, Susan L. Decker</u>                 <u>05/24/2005</u>

<sup>**</sup>Signature of Reporting Person                                                          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person - DECKER SUSAN L | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| (Last)   (First)   (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 05/26/2005 | ___ Director     ___ 10% Owner  _X_ Officer (give title below)   ___ Other (specify below) EVP & Chief Financial Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)   (State)   (Zip) | | |

## Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/26/2005 | | M | | 245,833 | A | $7.825 | 550,956 | D | |
| Common Stock | 05/26/2005 | | M | | 54,167 | A | $7.175 | 605,123 | D | |
| Common Stock | 05/26/2005 | | S | | 89,722 | D | $37.05 | 515,401 | D | |
| Common Stock | 05/26/2005 | | S | | 60,100 | D | $37.012 | 455,301 | D | |
| Common Stock | 05/26/2005 | | S | | 50,178 | D | $37.066 | 405,123 | D | |
| Common Stock | 05/26/2005 | | S | | 25,000 | D | $37.165 | 380,123 | D | |
| Common Stock | 05/26/2005 | | S | | 25,000 | D | $37.14 | 355,123 | D | |
| Common Stock | 05/26/2005 | | S | | 24,698 | D | $37.125 | 330,425 | D | |
| Common Stock | 05/26/2005 | | S | | 25,302 | D | $37.11 | 305,123 | D | |

## Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $7.825 | 05/26/2005 | | M | | | 245,833 | [1] | 06/20/2012 | Common Stock | 245,833 | $ 0 | 306,666 | D | |
| Stock Option ( right to buy ) | $7.175 | 05/26/2005 | | M | | | 54,167 | [2] | 04/25/2012 | Common Stock | 54,167 | $ 0 | 229,167 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| DECKER SUSAN L<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Financial Officer | |

**Explanation of Responses:**

(1) This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 6/20/02.

(2) This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 4/25/02.

**Signatures**

/s/ Susan L. Decker                                           05/31/2005

**\*\*** Signature of Reporting Person                         Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235-0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>DECKER SUSAN L | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)        (First)        (Middle) | 3. Date of Earliest Transaction (Month/Day/Year)<br>11/02/2005 | (Check all applicable)<br><br>____ Director        ____ 10% Owner<br>_X_ Officer (give title        ____ Other (specify below)<br>below)<br>EVP & Chief Financial Officer |
| C/O YAHOO! INC., 701 FIRST AVENUE | | |
| (Street) | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |
| SUNNYVALE, CA 94089 | | |
| (City)        (State)        (Zip) | | |

## Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 06/23/2004 | | G | V | 2,470 | D | $ 0 | 302,653 | D | |
| Common Stock | 06/15/2005 | | G | V | 3,720 | D | $ 0 | 298,993 | D | |
| Common Stock | 11/02/2005 | | M | | 104,167 | A | $4.62 | 403,160 | D | |
| Common Stock | 11/02/2005 | | S | | 79,917 | D | $38.01 | 323,243 | D | |
| Common Stock | 11/02/2005 | | S | | 12,000 | D | $38.02 | 311,243 | D | |
| Common Stock | 11/02/2005 | | S | | 2,600 | D | $38.025 | 308,643 | D | |
| Common Stock | 11/02/2005 | | S | | 9,600 | D | $38.03 | 299,043 | D | |
| Common Stock | 11/02/2005 | | S | | 50 | D | $38.035 | 298,993 | D | |

## Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $4.62 | 11/02/2005 | | M | | | 104,167 | (1) | 10/02/2011 | Common Stock | 104,167 | (2) | 0 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| | | | EVP & Chief Financial Officer | |

| DECKER SUSAN L | | | | |
|---|---|---|---|---|
| C/O YAHOO! INC. | | | | |
| 701 FIRST AVENUE | | | | |
| SUNNYVALE, CA 94089 | | | | |

**Explanation of Responses:**

(1)    This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 10/2/01.

(2)    Not applicable.

**Signatures**

| /s/ Michael Murray, attorney−in−fact for, Susan L. Decker | 11/04/2005 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
| --- |
| OMB Number: 3235-0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person * DECKER SUSAN L | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
| --- | --- | --- |
| (Last)    (First)    (Middle)  C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 11/10/2005 | (Check all applicable)  ___ Director    ___ 10% Owner  _X_ Officer (give title below)    ___ Other (specify below)  EVP & Chief Financial Officer |
| (Street)  SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)  _X_ Form filed by One Reporting Person  ___ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 11/10/2005 | | M | | 104,167 | A | $7.175 | 403,160 | D | |
| Common Stock | 11/10/2005 | | S | | 66,511 | D | $38.51 | 336,649 | D | |
| Common Stock | 11/10/2005 | | S | | 14,388 | D | $38.52 | 322,261 | D | |
| Common Stock | 11/10/2005 | | S | | 12,234 | D | $38.53 | 310,027 | D | |
| Common Stock | 11/10/2005 | | S | | 4,634 | D | $38.54 | 305,393 | D | |
| Common Stock | 11/10/2005 | | S | | 6,400 | D | $38.55 | 298,993 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $7.175 | 11/10/2005 | | M | | | 104,167 | (1) | 04/25/2012 | Common Stock | 104,167 | (2) | 125,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
| --- | --- | --- | --- | --- |
| | Director | 10% Owner | Officer | Other |
| DECKER SUSAN L C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | EVP & Chief Financial Officer | |

**Explanation of Responses:**

(1)   This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 4/25/02.

(2)   Not applicable.

**Signatures**

| | |
|---|---|
| /s/ Michael J. Callahan, attorney−in−fact for, Susan L. Decker | 11/14/2005 |
| <u>**</u>Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

□ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL |
OMB Number: 3235-0287
Expires: January 31, 2005
Estimated average burden hours per response... 0.5

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>DECKER SUSAN L | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)          (First)          (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>11/16/2005 | (Check all applicable)<br><br>____ Director          ____ 10% Owner<br>_X_ Officer (give title          ____ Other (specify below)<br>below)<br>EVP & Chief Financial Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check<br>Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |
| (City)          (State)          (Zip) | | |

### Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security<br>(Instr. 3) | 2. Transaction Date<br>(Month/Day/Year) | 2A. Deemed<br>Execution Date, if<br>any<br>(Month/Day/Year) | 3. Transaction<br>Code<br>(Instr. 8) | | 4. Securities Acquired (A) or Disposed<br>of (D)<br>(Instr. 3, 4 and 5) | | | 5. Amount of<br>Securities<br>Beneficially<br>Owned Following<br>Reported<br>Transaction(s)<br>(Instr. 3 and 4) | 6. Ownership<br>Form: Direct (D)<br>or Indirect (I)<br>(Instr. 4) | 7. Nature of<br>Indirect Beneficial<br>Ownership<br>(Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 11/16/2005 | | M | | 139,999 | A | $7.825 | 438,992 | D | |
| Common Stock | 11/16/2005 | | S | | 136,199 | D | $39.51 | 302,793 | D | |
| Common Stock | 11/16/2005 | | S | | 3,800 | D | $39.52 | 298,993 | D | |
| Common Stock | 11/17/2005 | | M | | 55,000 | A | $13.2812 | 353,993 | D | |
| Common Stock | 11/17/2005 | | S | | 26,178 | D | $41.01 | 327,815 | D | |
| Common Stock | 11/17/2005 | | S | | 400 | D | $41.02 | 327,415 | D | |
| Common Stock | 11/17/2005 | | S | | 3,300 | D | $41.03 | 324,115 | D | |
| Common Stock | 11/17/2005 | | S | | 2,800 | D | $41.04 | 321,315 | D | |
| Common Stock | 11/17/2005 | | S | | 1,500 | D | $41.05 | 319,815 | D | |
| Common Stock | 11/17/2005 | | S | | 8,000 | D | $41.06 | 311,815 | D | |
| Common Stock | 11/17/2005 | | S | | 4,322 | D | $41.07 | 307,493 | D | |
| Common Stock | 11/17/2005 | | S | | 8,500 | D | $41.08 | 298,993 | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
#### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1.Title of<br>Derivative<br>Security<br>(Instr. 3) | 2. Conversion<br>or Exercise<br>Price of<br>Derivative<br>Security | 3. Transaction Date<br>(Month/Day/Year) | 3A. Deemed<br>Execution Date, if<br>any<br>(Month/Day/Year) | 4. Transaction<br>Code<br>(Instr. 8) | | 5. Number of<br>Derivative<br>Securities<br>Acquired (A) or<br>Disposed of (D)<br>(Instr. 3, 4, and<br>5) | | 6. Date Exercisable and<br>Expiration Date<br>(Month/Day/Year) | | 7. Title and Amount of<br>Underlying Securities<br>(Instr. 3 and 4) | | 8. Price of<br>Derivative<br>Security<br>(Instr. 5) | 9. Number of<br>Derivative<br>Securities<br>Beneficially<br>Owned<br>Following<br>Reported<br>Transaction(s)<br>(Instr. 4) | 10.<br>Ownership<br>Form of<br>Derivative<br>Security:<br>Direct (D)<br>or Indirect<br>(I)<br>(Instr. 4) | 11. Nature<br>of Indirect<br>Beneficial<br>Ownership<br>(Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date<br>Exercisable | Expiration Date | Title | Amount or<br>Number of<br>Shares | | | | |
| Stock<br>Option (<br>right to<br>buy ) | $7.825 | 11/16/2005 | | M | | | 139,999 | (1) | 06/20/2012 | Common<br>Stock | 139,999 | (2) | 166,667 | D | |
| | $13.2812 | 11/17/2005 | | M | | | 55,000 | (1) | 01/12/2011 | | 55,000 | (2) | 445,000 | D | |

| Stock Option ( right to buy ) | | | | | | | | Common Stock | | | | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| DECKER SUSAN L<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Financial Officer | |

## Explanation of Responses:

(1)   This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 6/20/02.

(2)   not applicable

(3)   This option becomes exercisable at a rate of 1/12th of the securities underlying the option on 6/9/01 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 1/12/01 thereafter.

## Signatures

| /s/ Michael J. Callahan, attorney-in-fact for, Susan Decker | 11/18/2005 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person ⁎ DECKER SUSAN L | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)          (First)          (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 12/20/2005 | (Check all applicable)  ___ Director      ___ 10% Owner  _X_ Officer (give title below)   ___ Other (specify below) EVP & Chief Financial Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/20/2005 | | A | | 15,000<sup>(1)</sup> | A | $ 0 | 313,993 | D | |
| Common Stock | 12/20/2005 | | A | | 35,000<sup>(2)</sup> | A | $ 0 | 348,993 | D | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $40.68 | 12/20/2005 | | A | | 125,000 | | <sup>(3)</sup> | 12/20/2012 | Common Stock | 125,000 | <sup>(4)</sup> | 125,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| DECKER SUSAN L C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | EVP & Chief Financial Officer | |

## Explanation of Responses:

(1)   These shares represent restricted stock units granted under the Yahoo! 1995 Stock Plan. Each restricted stock unit represents the contingent right to receive, upon the satisfaction of certain performance based objectives, one share of Yahoo! common stock as long as the officer remains in the service of the company through the vesting date.

(2) These shares represent restricted stock units granted under the Yahoo! 1995 Stock Plan. Each restricted stock unit represents the contingent right to receive, upon vesting of the unit, one share of Yahoo! common stock. These units are scheduled to vest three years from the date of grant as long as the officer remains in the service of the company through the vesting date.

(3) This option is scheduled to become exercisable at a rate of 1/4 of the securities underlying the option on the first anniversary of the grant date of 12/20/05 and 1/8 of the securities underlying the option bi–annually thereafter, such that the option is fully vested on 12/20/09.

(4) Not applicable.

## Signatures

| | |
|---|---|
| /s/ Michael J. Callahan, attorney–in–fact for, Susan L. Decker | 12/22/2005 |
| ٭٭Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

٭    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

٭٭    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>DECKER SUSAN L | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable) |
|---|---|---|
| (Last)        (First)        (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>05/31/2006 | ___ Director        ___ 10% Owner<br>_X_ Officer (give title        ___ Other (specify below)<br>below)<br>EVP & Chief Financial Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

### Table I — Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/31/2006 | | A | | 50,000[(1)] | A | $ 0 | 399,639[(4)] | D | |

### Table II — Derivative Securities Acquired, Disposed of, or Beneficially Owned
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $31.59 | 05/31/2006 | | A | | 2,100,000 | | [(3)] | 05/31/2013 | Common Stock | 2,100,000 | [(2)] | 2,100,000 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| DECKER SUSAN L<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Financial Officer | |

**Explanation of Responses:**

(1) These shares represent restricted stock units granted under the Yahoo! 1995 Stock Plan. Each restricted stock unit represents the contingent right to receive, upon the satisfaction of certain performance based objectives, but in no event prior to the first anniversary of the grant date, one share of Yahoo! common stock as long as the officer remains in the service of the company through the vesting date.

(2) Not applicable.

(3)

This option becomes exercisable according to the following schedule. 600,000 of the securities underlying the option becomes exercisable on the first anniversary of the grant date. 300,000 of the securities underlying the option becomes exercisable on the second anniversary of the grant date. 600,000 of the securities underlying the option becomes exercisable on the third anniversary of the grant date. The remaining 600,000 of the securities underlying the option becomes exercisable on the fourth anniversary of the grant date.

(4) Includes 646 shares acquired through the Yahoo! Inc. Employee Stock Purchase Plan in May 2006.

## Signatures

| /s/ Michael J. Callahan, attorney–in–fact for, Susan L. Decker | 06/02/2006 |
|---|---|
| **Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

Exhibit 19

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |  |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person ÷ NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)        (First)        (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 04/12/2004 | (Check all applicable) ___ Director   ___ 10% Owner _X_ Officer (give title below)   ___ Other (specify below) EVP & Chief Technology Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 04/12/2004 | | M | | 50,000 | A | $0.5833 | 199,580 | D | |
| Common Stock | 04/12/2004 | | S | | 50,000 | D | $55.03 | 149,580 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $0.5833 | 04/12/2004 | | M | | | 50,000 | 03/29/1997[1] | 03/10/2006 | Common Stock | 50,000 | $ 0 | 1,081,136 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

## Explanation of Responses:

(1)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 3/29/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

<u>/s/ Farzad Nazem</u>                                      <u>04/13/2004</u>

<u>**</u>Signature of Reporting Person                                      Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
| --- | --- |
| OMB Number: 3235−0287 | |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person ⁎ NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
| --- | --- | --- |
| (Last)        (First)        (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 04/19/2004 | (Check all applicable) ___ Director        ___ 10% Owner _X_ Officer (give title        ___ Other (specify below) below) EVP & Chief Technology Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 04/19/2004 | | M | | 50,000 | A | $0.5833 | 199,580 | D | |
| Common Stock | 04/19/2004 | | S | | 50,000 | D | $55.63 | 149,580 | D | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
#### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $0.5833 | 04/19/2004 | | M | | | 50,000 | 03/29/1997[1] | 03/10/2006 | Common Stock | 50,000 | $ 0 | 1,031,136 | D | |

### Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
| --- | --- | --- | --- | --- |
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

### Explanation of Responses:

(1)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 3/29/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

<u>/s/ Farzad Nazem</u>                                              <u>04/21/2004</u>

<span style="font-size:smaller">**</span>Signature of Reporting Person                                              Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235–0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person ˙<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)          (First)          (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>04/22/2004 | (Check all applicable)<br><br>\_\_\_\_ Director          \_\_\_\_ 10% Owner<br>\_X\_ Officer (give title          \_\_\_\_ Other (specify below)<br>below)<br><br>EVP & Chief Technology Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>\_X\_ Form filed by One Reporting Person<br>\_\_\_ Form filed by More than One Reporting Person |
| (City)          (State)          (Zip) | | |

### Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 04/22/2004 | | M | | 100,000 | A | $0.5833 | 249,580 | D | |
| Common Stock | 04/22/2004 | | S | | 50,000 | D | $56.13 | 199,580 | D | |
| Common Stock | 04/22/2004 | | S | | 50,000 | D | $57.53 | 149,580 | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
#### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy) | $0.5833 | 04/22/2004 | | M | | | 100,000 | 03/29/1997[1] | 03/10/2006 | Common Stock | 100,000 | $ 0 | 931,136 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

**Explanation of Responses:**

(1)      This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 3/29/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

/s/ Farzad Nazem                                             04/23/2004

\*\*Signature of Reporting Person                                 Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *  NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol  YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)    (First)    (Middle)  C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)  05/11/2004 | (Check all applicable)  ___ Director  _X_ Officer (give title below)  ___ 10% Owner  ___ Other (specify below)  EVP & Chief Technology Officer |
| (Street)  SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)  _X_ Form filed by One Reporting Person  ___ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/11/2004 | | M | | 50,000 | A | $0.5833 | 199,580 | D | |
| Common Stock | 05/11/2004 | | S | | 50,000 | D | $53.53 | 149,580 | D | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
#### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $0.5833 | 05/11/2004 | | M | | | 50,000 | 03/29/1997[1] | 03/10/2006 | Common Stock | 50,000 | $ 0 | 881,136 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD  C/O YAHOO! INC.  701 FIRST AVENUE  SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

## Explanation of Responses:

(1)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 3/29/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

<u>/s/ Farzad Nazem</u>                                                     <u>05/11/2004</u>

<u>**</u>Signature of Reporting Person                                        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235-0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
|---|---|---|
| (Last)  (First)  (Middle)<br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>05/19/2004 | ___ Director  ___ 10% Owner<br>_X_ Officer (give title below)  ___ Other (specify below)<br>EVP & Chief Technology Officer |
| (Street)<br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)  (State)  (Zip) | | |

## Table I — Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/19/2004 | | M | | 50,000 | A | $0.2917 | 349,160 | D | |
| Common Stock | 05/19/2004 | | S | | 50,000 | D | $28.78 | 299,160[1] | D | |

## Table II — Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $0.2917 | 05/19/2004 | | M | | | 50,000 | 03/29/1997[2] | 03/10/2006 | Common Stock | 50,000 | $ 0 | 1,712,272[1] | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

## Explanation of Responses:

(1)  All figures shown reflect the 2 for 1 stock split that was effective on May 11, 2004.

(2)  This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 3/29/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement

date thereafter.

## Signatures

<u>/s/ Farzad Nazem</u>                                    <u>05/20/2004</u>

‡‡Signature of Reporting Person                          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
| --- |
| OMB Number: 3235−0287 |
| Expires:               January 31, 2005 |
| Estimated average burden hours per response...        0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person : NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
| --- | --- | --- |
| (Last)        (First)        (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 05/24/2004 | (Check all applicable) ___ Director       _X_ Officer (give title below)   ___ 10% Owner   ___ Other (specify below) EVP & Chief Technology Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/24/2004 | | M | | 50,000 | A | $0.2917 | 349,160 | D | |
| Common Stock | 05/24/2004 | | S | | 50,000 | D | $29.67 | 299,160 | D | |
| Common Stock | 05/25/2004 | | M | | 100,000 | A | $0.2917 | 399,160 | D | |
| Common Stock | 05/25/2004 | | S | | 50,000 | D | $29.78 | 349,160 | D | |
| Common Stock | 05/25/2004 | | S | | 50,000 | D | $29.98 | 299,160[(1)] | D | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $0.2917 | 05/24/2004 | | M | | | 50,000 | 03/29/1997[(2)] | 03/10/2006 | Common Stock | 50,000 | $ 0 | 1,662,272 | D | |
| Employee Stock Option ( right to buy ) | $0.2917 | 05/25/2004 | | M | | | 100,000 | 03/29/1997[(2)] | 03/10/2006 | Common Stock | 100,000 | $ 0 | 1,562,272[(1)] | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
| --- | --- | --- | --- | --- |
| | Director | 10% Owner | Officer | Other |

| NAZEM FARZAD C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |
|---|---|---|---|---|

## Explanation of Responses:

(1)    All figures shown reflect the 2 for 1 stock split that was effective on May 11, 2004.

(2)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 3/29/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

## Signatures

/s/ Farzad Nazem                                                05/25/2004

**Signature of Reporting Person                          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235–0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD<br><br>(Last)      (First)      (Middle)<br>C/O YAHOO! INC., 701 FIRST AVENUE<br>(Street)<br>SUNNYVALE, CA 94089<br>(City)    (State)    (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO]<br><br>3. Date of Earliest Transaction (Month/Day/Year)<br>05/27/2004<br><br>4. If Amendment, Date Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable)<br><br>____ Director      ____ 10% Owner<br>_X_ Officer (give title      ____ Other (specify below)<br>below)<br>EVP & Chief Technology Officer<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/27/2004 | | M | | 100,000 | A | $0.2917 | 399,160 | D | |
| Common Stock | 05/27/2004 | | S | | 50,000 | D | $30.4 | 349,160 | D | |
| Common Stock | 05/27/2004 | | S | | 50,000 | D | $30.72 | 299,160 | D | |
| Common Stock | 05/28/2004 | | M | | 50,000 | A | $0.2917 | 349,160 | D | |
| Common Stock | 05/28/2004 | | S | | 50,000 | D | $31.02 | 299,160 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1.Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $0.2917 | 05/27/2004 | | M | | | 100,000 | 03/29/1997[1] | 03/10/2006 | Common Stock | 100,000 | $ 0 | 1,462,272 | D | |
| Employee Stock Option ( right to buy ) | $0.2917 | 05/28/2004 | | M | | | 50,000 | 03/29/1997[1] | 03/10/2006 | Common Stock | 50,000 | $ 0 | 1,412,272 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |

| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

**Explanation of Responses:**

(1)   This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 3/29/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

## Signatures

/s/ Farzad Nazem                         05/28/2004

\*\*Signature of Reporting Person                Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235-0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD<br><br>(Last)  (First)  (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE<br>(Street)<br><br>SUNNYVALE, CA 94089<br>(City)  (State)  (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO]<br><br>3. Date of Earliest Transaction (Month/Day/Year)<br>07/13/2004<br><br>4. If Amendment, Date Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable)<br><br>___ Director  ___ 10% Owner<br>_X_ Officer (give title below)  ___ Other (specify below)<br>EVP & Chief Technology Officer<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |

## Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 07/13/2004 | | M | | 100,000 | A | $0.2917 | 399,160 | D | |
| Common Stock | 07/13/2004 | | S | | 88,512 | D | $30.3 | 310,648 | D | |
| Common Stock | 07/13/2004 | | S | | 9,966 | D | $30.316 | 300,682 | D | |
| Common Stock | 07/13/2004 | | S | | 1,522 | D | $30.33 | 299,160 | D | |

## Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $0.2917 | 07/13/2004 | | M | | | 100,000 | 03/29/1997[1] | 03/10/2006 | Common Stock | 100,000 | $ 0 | 1,312,272 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

**Explanation of Responses:**

(1)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 3/29/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

| | |
|---|---|
| /s/ Michael J. Callahan, attorney-in-fact for, Farzad Nazem | 07/15/2004 |
| **Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235–0287 |
| Expires:  January 31, 2005 |
| Estimated average burden hours per response...  0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)      (First)      (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>08/25/2004 | (Check all applicable)<br><br>___ Director     ___ 10% Owner<br>_X_ Officer (give title below)     ___ Other (specify below)<br><br>EVP & Chief Technology Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

### Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 08/25/2004 | | M | | 50,000 | A | $0.2917 | 349,160 | D | |
| Common Stock | 08/25/2004 | | S | | 50,000 | D | $29.4 | 299,160 | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
#### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $0.2917 | 08/25/2004 | | M | | | 50,000 | 03/29/1997[1] | 03/10/2006 | Common Stock | 50,000 | $ 0 | 1,262,272 | D | |

### Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

### Explanation of Responses:

(1)      This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 3/29/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

<u>/s/ Farzad Nazem</u>                                                         <u>08/27/2004</u>

\*\*Signature of Reporting Person                                              Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires:         January 31, 2005 |
| Estimated average burden hours per response...          0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person<br>NAZEM FARZAD<br><br>(Last)    (First)    (Middle)<br>C/O YAHOO! INC., 701 FIRST AVENUE<br>(Street)<br>SUNNYVALE, CA 94089<br>(City)    (State)    (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO]<br><br>3. Date of Earliest Transaction (Month/Day/Year)<br>08/31/2004<br><br>4. If Amendment, Date Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable)<br><br>___ Director    ___ 10% Owner<br>_X_ Officer (give title below)   ___ Other (specify below)<br>EVP & Chief Technology Officer<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 08/31/2004 | | M | | 100,000 | A | $0.2917 | 399,160 | D | |
| Common Stock | 08/31/2004 | | S | | 50,000 | D | $28.38 | 349,160 | D | |
| Common Stock | 08/31/2004 | | S | | 50,000 | D | $28.22 | 299,160 | D | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1.Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $0.2917 | 08/31/2004 | | M | | | 100,000 | 03/29/1997[1] | 03/10/2006 | Common Stock | 100,000 | $ 0 | 1,162,272 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

**Explanation of Responses:**

(1)      This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 3/29/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

/s/ Farzad Nazem                                                                 09/01/2004

**Signature of Reporting Person                                       Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires:        January 31, 2005 |
| Estimated average burden hours per response...        0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *  NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol  YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)        (First)        (Middle)  C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)  10/15/2004 | (Check all applicable)  _____ Director    _X_ Officer (give title below)    _____ 10% Owner    _____ Other (specify below)  EVP & Chief Technology Officer |
| (Street)  SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)  _X_ Form filed by One Reporting Person  ___ Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/15/2004 | | M | | 100,000 | A | $0.2917 | 399,160 | D | |
| Common Stock | 10/15/2004 | | S | | 100,000 | D | $34.8 | 299,160 | D | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
#### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $0.2917 | 10/15/2004 | | M | | | 100,000 | 03/29/1997[1] | 03/10/2006 | Common Stock | 100,000 | $ 0 | 1,062,272 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD  C/O YAHOO! INC.  701 FIRST AVENUE  SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

## Explanation of Responses:

(1)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 3/29/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

| | |
|---|---|
| /s/ Michael J. Callahan, attorney−in−fact for, Farzad Nazem | 10/19/2004 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235–0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)          (First)          (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 10/19/2004 | (Check all applicable)  ____ Director          ____ 10% Owner  _X_ Officer (give title below)   ____ Other (specify below)  EVP & Chief Technology Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)  _X_ Form filed by One Reporting Person  ____ Form filed by More than One Reporting Person |
| (City)     (State)     (Zip) | | |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) Code | V | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) Amount | (A) or (D) | Price | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| Common Stock | 10/19/2004 | | M | | 100,000 | A | $0.2917 | 399,160 | D | |
| Common Stock | 10/19/2004 | | S | | 100,000 | D | $35.55 | 299,160 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) Code | V | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) (A) | (D) | 6. Date Exercisable and Expiration Date (Month/Day/Year) Date Exercisable | Expiration Date | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) Title | Amount or Number of Shares | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee Stock Option ( right to buy ) | $0.2917 | 10/19/2004 | | M | | | 100,000 | 03/29/1997[1] | 03/10/2006 | Common Stock | 100,000 | $ 0 | 962,272 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

**Explanation of Responses:**

(1)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 3/29/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

/s/ Farzad Nazem                                                   10/20/2004

\*\*Signature of Reporting Person                                         Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: 3235−0287 | |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person − NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| (Last)         (First)         (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 10/21/2004 | ___ Director   ___ 10% Owner  _X_ Officer (give title below)   ___ Other (specify below) EVP & Chief Technology Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/21/2004 | | M | | 100,000 | A | $0.2917 | 399,160 | D | |
| Common Stock | 10/21/2004 | | S | | 100,000 | D | $35.68 | 299,160 | D | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $0.2917 | 10/21/2004 | | M | | | 100,000 | 03/29/1997[1] | 03/10/2006 | Common Stock | 100,000 | $ 0 | 862,272 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

**Explanation of Responses:**

(1)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 3/29/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

| /s/ Michael J. Callahan, attorney—in—fact for, Farzad Nazem | 10/22/2004 |
|---|---|

\*\*Signature of Reporting Person    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235–0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last) (First) (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>10/27/2004 | (Check all applicable)<br>___ Director ___ 10% Owner<br>_X_ Officer (give title below) ___ Other (specify below)<br>EVP & Chief Technology Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City) (State) (Zip) | | |

## Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/27/2004 | | M | | 200,000 | A | $0.2917 | 499,160 | D | |
| Common Stock | 10/27/2004 | | S | | 100,000 | D | $35.58 | 399,160 | D | |
| Common Stock | 10/27/2004 | | S | | 100,000 | D | $36.24 | 299,160 | D | |

## Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $0.2917 | 10/27/2004 | | M | | | 200,000 | 03/29/1997[1] | 03/10/2006 | Common Stock | 200,000 | $ 0 | 662,272 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

**Explanation of Responses:**

(1)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 3/29/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

/s/ Farzad Nazem                                                    10/28/2004

** Signature of Reporting Person                                    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

OMB APPROVAL

OMB Number: 3235-0287
Expires:      January 31, 2005
Estimated average burden hours per response...     0.5

(Print or Type Responses)

| 1. Name and Address of Reporting Person | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| NAZEM FARZAD | YAHOO INC [YHOO] | (Check all applicable) |
| (Last)   (First)   (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | ___ Director   ___ 10% Owner |
| C/O YAHOO! INC., 701 FIRST AVENUE | 11/01/2004 | _X_ Officer (give title below)   ___ Other (specify below) |
| (Street) | | EVP & Chief Technology Officer |
| SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| (City)   (State)   (Zip) | | _X_ Form filed by One Reporting Person   ___ Form filed by More than One Reporting Person |

**Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 11/01/2004 | | M | | 100,000 | A | $0.2917 | 399,160 | D | |
| Common Stock | 11/01/2004 | | S | | 100,000 | D | $36.95 | 299,160 | D | |
| Common Stock | 11/02/2004 | | M | | 100,000 | A | $0.2917 | 399,160 | D | |
| Common Stock | 11/02/2004 | | S | | 100,000 | D | $38.03 | 299,160 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1.Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $0.2917 | 11/01/2004 | | M | | | 100,000 | 03/29/1997[i] | 03/10/2006 | Common Stock | 100,000 | $ 0 | 562,272 | D | |
| Employee Stock Option ( right to buy ) | $0.2917 | 11/02/2004 | | M | | | 100,000 | 03/29/1997[i] | 03/10/2006 | Common Stock | 100,000 | $ 0 | 462,272 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| | | | EVP & Chief Technology Officer | |

| NAZEM FARZAD C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | | |
|---|---|---|---|---|

**Explanation of Responses:**

(1)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 3/29/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

/s/ Farzad Nazem                                                   11/03/2004

\*\*Signature of Reporting Person                                   Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235-0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| (Last)       (First)       (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 11/29/2004 | ___ Director        ___ 10% Owner  _X_ Officer (give title below)   ___ Other (specify below) EVP & Chief Technology Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)     (State)     (Zip) | | |

**Table I — Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 11/29/2004 | | M | | 100,000 | A | $24.75 | 399,160 | D | |
| Common Stock | 11/29/2004 | | S | | 100,000 | D | $38.05 | 299,160 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $24.75 | 11/29/2004 | | M | | | 100,000 | 12/15/1999[1] | 12/15/2008 | Common Stock | 100,000 | $ 0 | 460,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

## Explanation of Responses:

(1)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/15/98 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

<u>/s/ Farzad Nazem</u>                                                        <u>11/30/2004</u>

\*\*Signature of Reporting Person                                              Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

OMB APPROVAL

| OMB Number: | 3235-0287 |
|---|---|
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)  (First)  (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>12/16/2004 | (Check all applicable)<br><br>___ Director  ___ 10% Owner<br>_X_ Officer (give title below)  ___ Other (specify below)<br>EVP & Chief Technology Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)  (State)  (Zip) | | |

### Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/16/2004 | | A | | 50,000[1] | A | $ 0 | 349,160 | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy) | $37.08 | 12/16/2004 | | A | | 150,000 | | [2] | 12/16/2014 | Common Stock | 150,000 | $ 0 | 150,000 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

**Explanation of Responses:**

(1)  These shares represent shares of restricted stock granted under the Yahoo! 1995 Stock Plan, 35,000 of which will vest three years from the date of grant and 15,000 of which will vest upon the satisfaction of certain performance objectives, in each case as long as the officer remains employed by the company as of the vesting date.

(2)  This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/16/04 and 1/16th of the securities underlying the option in quarterly installments thereafter, such that the option is fully vested on 12/16/08.

**Signatures**

<u>/s/ Farzad Nazem</u>                                                    <u>12/20/2004</u>

<span style="font-size:small">**</span>Signature of Reporting Person                                              Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person · NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| (Last)      (First)      (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 02/01/2005 | ___ Director      ___ 10% Owner _X_ Officer (give title below) ___ Other (specify below) EVP & Chief Technology Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

## Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 02/01/2005 | | A | | 150,000[(1)] | A | $ 0 | 499,160 | D | |

## Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $34.75 | 02/01/2005 | | A | | 550,000 | | [(2)] | 02/01/2015 | Common Stock | 550,000 | $ 0 | 550,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

## Explanation of Responses:

(1)    These shares represent shares of restricted stock granted under the Yahoo! Inc. 1995 Stock Plan. These shares will vest three years from the date of grant of 2/1/05 as long as the officer remains in the service of the company as of the vesting date.

(2)    This option becomes exercisable at a rate of 1/3 of the securities underlying the option on the third anniversary of the grant date of 2/1/05 and 2/3 of the securities underlying the option on the fourth anniversary of the grant date such that the option is fully vested on 2/1/09.

**Signatures**

<u>/s/ Farzad Nazem</u>                                                      <u>02/02/2005</u>

<u>**</u>Signature of Reporting Person                                              Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL |
| --- |
| OMB Number: 3235−0287 |
| Expires:         January 31, 2005 |
| Estimated average burden hours per response...      0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable) |
|---|---|---|
| (Last)        (First)        (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>04/22/2005 | ___ Director              ___ 10% Owner<br>_X_ Officer (give title      ___ Other (specify below)<br>below)<br>EVP & Chief Technology Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

## Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 04/22/2005 | | M | | 100,000 | A | $0.2917 | 599,160 | D | |
| Common Stock | 04/22/2005 | | S | | 100,000 | D | $35.27 | 499,160 | D | |
| Common Stock | 04/25/2005 | | M | | 100,000 | A | $0.2917 | 599,160 | D | |
| Common Stock | 04/25/2005 | | S | | 100,000 | D | $35.5 | 499,160 | D | |

## Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $0.2917 | 04/22/2005 | | M | | | 100,000 | 03/29/1997[1] | 03/10/2006 | Common Stock | 100,000 | $ 0 | 362,272 | D | |
| Stock Option ( right to buy ) | $0.2917 | 04/25/2005 | | M | | | 100,000 | 03/29/1997[1] | 03/10/2006 | Common Stock | 100,000 | $ 0 | 262,272 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE | | | EVP & Chief Technology Officer | |

SUNNYVALE, CA 94089

**Explanation of Responses:**

(1)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 3/29/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

/s/ Farzad Nazem                                                        04/25/2005

**‾‾**Signature of Reporting Person                                                      Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

□ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person −<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)    (First)    (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>05/04/2005 | (Check all applicable)<br><br>___ Director   ___ 10% Owner<br>_X_ Officer (give title   ___ Other (specify below)<br>below)<br>   EVP & Chief Technology Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/04/2005 | | M | | 262,272 | A | $0.2917 | 761,432 | D | |
| Common Stock | 05/04/2005 | | S | | 262,272 | D | $35.3 | 499,160 | D | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $0.2917 | 05/04/2005 | | M | | | 262,272 | 03/29/1997[1] | 03/10/2006 | Common Stock | 262,272 | $ 0 | 0 | D | |

### Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

**Explanation of Responses:**

(1)   This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 3/29/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

| /s/ Michael J. Callahan, attorney−in−fact for, Farzad Nazem | 05/06/2005 |
| --- | --- |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

 *    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

 **   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires:          January 31, 2005 |
| Estimated average burden hours per response...      0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)        (First)        (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>05/16/2005 | (Check all applicable)<br><br>_____ Director        _____ 10% Owner<br>_X_ Officer (give title        _____ Other (specify below)<br>below)<br>EVP & Chief Technology Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>_____ Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/16/2005 | | M | | 100,000 | A | $0.7083 | 599,160 | D | |
| Common Stock | 05/16/2005 | | S | | 100,000 | D | $35.4 | 499,160 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $0.7083 | 05/16/2005 | | M | | | 100,000 | 12/20/1997[1] | 12/20/2006 | Common Stock | 100,000 | $ 0 | 660,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

**Explanation of Responses:**

(1)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/20/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

<u>/s/ Michael J. Callahan, attorney−in−fact for, Farzad Nazem</u>                                                    <u>05/18/2005</u>

<sub>**</sub>Signature of Reporting Person                                                                                                      Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

  *    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

 **   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

OMB APPROVAL

OMB Number: 3235–0287
Expires:    January 31, 2005
Estimated average burden hours per response...    0.5

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
|---|---|---|
| (Last)    (First)    (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>05/20/2005 | ____ Director    ____ 10% Owner<br>_X_ Officer (give title below)    ____ Other (specify below)<br>EVP & Chief Technology Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/20/2005 | | M | | 50,000 | A | $0.7083 | 549,160 | D | |
| Common Stock | 05/20/2005 | | S | | 50,000 | D | $36.49 | 499,160 | D | |
| Common Stock | 05/23/2005 | | M | | 100,000 | A | $0.7083 | 599,160 | D | |
| Common Stock | 05/23/2005 | | S | | 50,000 | D | $36.58 | 549,160 | D | |
| Common Stock | 05/23/2005 | | S | | 50,000 | D | $36.88 | 499,160 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $0.7083 | 05/20/2005 | | M | | | 50,000 | 12/20/1997[1] | 12/20/2006 | Common Stock | 50,000 | $ 0 | 610,000 | D | |
| Stock Option ( right to buy ) | $0.7083 | 05/23/2005 | | M | | | 100,000 | 12/20/1997[1] | 12/20/2006 | Common Stock | 100,000 | $ 0 | 510,000 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC. | | | EVP & Chief Technology Officer | |

| 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | | |
|---|---|---|---|---|

**Explanation of Responses:**

(1)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/20/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

/s/ Farzad Nazem                                                        05/23/2005

\*\*Signature of Reporting Person                                    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF**
**SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: 3235-0287 | |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
|---|---|---|
| (Last)          (First)          (Middle)<br><br>C/O YAHOO! INC., 701 FIRST<br>AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>05/26/2005 | ____ Director          ____ 10% Owner<br>_X_ Officer (give title          ____ Other (specify below)<br>below)<br>EVP & Chief Technology Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check<br>Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |
| (City)          (State)          (Zip) | | |

### Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/26/2005 | | M | | 50,000 | A | $0.7083 | 549,160 | D | |
| Common Stock | 05/26/2005 | | S | | 50,000 | D | $36.98 | 499,160 | D | |
| Common Stock | 05/27/2005 | | M | | 50,000 | A | $0.7083 | 549,160 | D | |
| Common Stock | 05/27/2005 | | S | | 50,000 | D | $37.18 | 499,160 | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $0.7083 | 05/26/2005 | | M | | | 50,000 | 12/20/1997[(1)] | 12/20/2006 | Common Stock | 50,000 | $ 0 | 460,000 | D | |
| Stock Option ( right to buy ) | $0.7083 | 05/27/2005 | | M | | | 50,000 | 12/20/1997[(1)] | 12/20/2006 | Common Stock | 50,000 | $ 0 | 410,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE | | | EVP & Chief Technology Officer | |

SUNNYVALE, CA 94089

**Explanation of Responses:**

(1)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/20/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

/s/ Farzad Nazem                                    05/31/2005

͏͏Signature of Reporting Person                          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235–0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD<br><br>(Last)      (First)      (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE<br>(Street)<br><br>SUNNYVALE, CA 94089<br>(City)      (State)      (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO]<br><br>3. Date of Earliest Transaction (Month/Day/Year)<br>08/18/2005<br><br>4. If Amendment, Date Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable)<br><br>___ Director      ___ 10% Owner<br>_X_ Officer (give title      ___ Other (specify below)<br>below)<br>EVP & Chief Technology Officer<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |

## Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 08/18/2005 | | M | | 100,000 | A | $0.7083 | 599,160 | D | |
| Common Stock | 08/18/2005 | | S | | 100,000 | D | $34.43 | 499,160 | D | |

## Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1.Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $0.7083 | 08/18/2005 | | M | | | 100,000 | 12/20/1997[1] | 12/20/2006 | Common Stock | 100,000 | [2] | 310,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

## Explanation of Responses:

(1)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/20/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

(2)    not applicable

**Signatures**

/s/ Michael Murray, attorney-in-fact for, Farzad Nazem                08/22/2005

**Signature of Reporting Person                                                  Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF
SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person ⁻<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable) |
|---|---|---|
| (Last)      (First)      (Middle)<br><br>C/O YAHOO! INC., 701 FIRST<br>AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>08/29/2005 | ___ Director          ___ 10% Owner<br>_X_ Officer (give title    ___ Other (specify below)<br>below)<br>EVP & Chief Technology Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 08/29/2005 | | M | | 100,000 | A | $0.7083 | 599,160 | D | |
| Common Stock | 08/29/2005 | | S | | 100,000 | D | $33.65 | 499,160 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g.,* puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $0.7083 | 08/29/2005 | | M | | | 100,000 | 12/20/1997[1] | 12/20/2006 | Common Stock | 100,000 | [2] | 210,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

**Explanation of Responses:**

(1)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/20/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

(2)    not applicable

**Signatures**

/s/ Farzad Nazem                                        08/30/2005

‥Signature of Reporting Person                          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF**
**SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires:       January 31, 2005 |
| Estimated average burden hours per response...     0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)          (First)          (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>10/26/2005 | (Check all applicable)<br><br>_____ Director          _____ 10% Owner<br>__X__ Officer (give title     _____ Other (specify below)<br>below)<br>EVP & Chief Technology Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)       (State)       (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/26/2005 | | M | | 100,000 | A | $0.7083 | 599,160 | D | |
| Common Stock | 10/26/2005 | | S | | 100,000 | D | $35.49 | 499,160 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $0.7083 | 10/26/2005 | | M | | | 100,000 | 12/20/1997[1] | 12/20/2006 | Common Stock | 100,000 | [2] | 110,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

## Explanation of Responses:

(1)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/20/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

(2)     not applicable

**Signatures**

| /s/ Michael J. Callahan, attorney−in−fact for, Farzad Nazem | 10/27/2005 |
|---|---|
| **Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

   \*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

 \*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: 3235–0287 | |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *  NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol  YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)      (First)      (Middle) | 3. Date of Earliest Transaction (Month/Day/Year)  10/31/2005 | (Check all applicable)  ___ Director    ___ 10% Owner  _X_ Officer (give title below)    ___ Other (specify below)  EVP & Chief Technology Officer |
| C/O YAHOO! INC., 701 FIRST AVENUE | | |
| (Street) | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)  _X_ Form filed by One Reporting Person  ___ Form filed by More than One Reporting Person |
| SUNNYVALE, CA 94089 | | |
| (City)      (State)      (Zip) | | |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/31/2005 | | M | | 110,000 | A | $0.7083 | 609,160 | D | |
| Common Stock | 10/31/2005 | | M | | 90,000 | A | $10.8047 | 699,160 | D | |
| Common Stock | 10/31/2005 | | S | | 110,000 | D | $36.59 | 589,160 | D | |
| Common Stock | 10/31/2005 | | S | | 90,000 | D | $36.98 | 499,160 | D | |
| Common Stock | 11/01/2005 | | M | | 90,304 | A | $3.3672 | 589,464 | D | |
| Common Stock | 11/01/2005 | | M | | 20,748 | A | $10.8047 | 610,212 | D | |
| Common Stock | 11/01/2005 | | S | | 90,304 | D | $38.13 | 519,908 | D | |
| Common Stock | 11/01/2005 | | S | | 20,748 | D | $37.93 | 499,160 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $0.7083 | 10/31/2005 | | M | | | 110,000 | 12/20/1997[1] | 12/20/2006 | Common Stock | 110,000 | [2] | 0 | D | |
| Stock Option ( right to buy ) | $10.8047 | 10/31/2005 | | M | | | 90,000 | 07/02/1999[3] | 07/02/2008 | Common Stock | 90,000 | [2] | 20,748 | D | |
| Stock Option ( right to | $10.8047 | 11/01/2005 | | M | | | 20,748 | 07/02/1999[3] | 07/02/2008 | Common Stock | 20,748 | [2] | 0 | D | |

| buy ) | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Stock Option ( right to buy ) | $3.3672 | 11/01/2005 | | M | | | 90,304 | 12/03/1998[4] | 12/03/2007 | Common Stock | 90,304 | [2] | 1,000,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | . |

## Explanation of Responses:

(1)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/20/96 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

(2)     not applicable

(3)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 7/2/98 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

(4)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/3/97 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

## Signatures

/s/ Michael Murray, attorney-in-fact for, Farzad Nazem            11/02/2005

<u>**</u>Signature of Reporting Person            Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

OMB APPROVAL

OMB Number: 3235-0287
Expires:        January 31, 2005
Estimated average burden hours per response...        0.5

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
|---|---|---|
| (Last)    (First)    (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>11/10/2005 | ___ Director    ___ 10% Owner<br>_X_ Officer (give title    ___ Other (specify below)<br>below)<br>EVP & Chief Technology Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

### Table I – Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 11/10/2005 | | M | | 100,000 | A | $3.3672 | 599,160 | D | |
| Common Stock | 11/10/2005 | | S | | 100,000 | D | $38.53 | 499,160 | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
#### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $3.3672 | 11/10/2005 | | M | | | 100,000 | 12/03/1998[(2)] | 12/03/2007 | Common Stock | 100,000 | (1) | 900,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

### Explanation of Responses:

(1)    not applicable

(2)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/3/97 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

_/s/ Michael J. Callahan, attorney-in-fact for, Farzad Nazem_                                    11/14/2005

\*\*Signature of Reporting Person                                                                                   Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*     If the form is filed by more than one reporting person, _see_ Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. _See_ 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, _see_ Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

OMB APPROVAL

| OMB Number: | 3235–0287 |
|---|---|
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *  NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol  YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer  (Check all applicable) |
|---|---|---|
| (Last)  (First)  (Middle)  C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)  11/16/2005 | ___ Director   ___ 10% Owner   _X_ Officer (give title below)   ___ Other (specify below)  EVP & Chief Technology Officer |
| (Street)  SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)  _X_ Form filed by One Reporting Person  ___ Form filed by More than One Reporting Person |
| (City)  (State)  (Zip) | | |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of(D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 11/16/2005 | | M | | 200,000 | A | $3.3672 | 699,160 | D | |
| Common Stock | 11/16/2005 | | S | | 100,000 | D | $39.43 | 599,160 | D | |
| Common Stock | 11/16/2005 | | S | | 100,000 | D | $39.98 | 499,160 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $3.3672 | 11/16/2005 | | M | | | 200,000 | 12/03/1998[2] | 12/03/2007 | Common Stock | 200,000 | [1] | 700,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD  C/O YAHOO! INC.  701 FIRST AVENUE  SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

**Explanation of Responses:**

(1)  not applicable

(2)  This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/3/97 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement

date thereafter.

## Signatures

| | |
|---|---|
| /s/ Michael J. Callahan, attorney—in—fact for, Farzad Nazem | 11/18/2005 |
| \*\*Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

□ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF**
**SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: 3235−0287 | |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable)<br><br>_____ Director _____ 10% Owner<br>__X__ Officer (give title _____ Other (specify below)<br>below)<br>EVP & Chief Technology Officer |
|---|---|---|
| (Last)      (First)      (Middle)<br><br>C/O YAHOO! INC., 701 FIRST<br>AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>11/23/2005 | |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check<br>Applicable Line)<br>__X__ Form filed by One Reporting Person<br>_____ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 11/23/2005 | | M | | 100,000 | A | $3.3672 | 599,160 | D | |
| Common Stock | 11/23/2005 | | S | | 100,000 | D | $42.94 | 499,160 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $3.3672 | 11/23/2005 | | M | | | 100,000 | 12/03/1998[2] | 12/03/2007 | Common Stock | 100,000 | [1] | 600,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

## Explanation of Responses:

(1)     not applicable

(2)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting
commencement date of 12/3/97 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement
date thereafter.

**Signatures**

/s/ Farzad Nazem                                    11/28/2005

** Signature of Reporting Person                                    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

   *     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

  **   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235-0287 |
| Expires:         January 31, 2005 |
| Estimated average burden hours per response...    0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD<br><br>(Last)      (First)      (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE<br>(Street)<br><br>SUNNYVALE, CA 94089<br>(City)      (State)      (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO]<br><br>3. Date of Earliest Transaction (Month/Day/Year)<br>12/07/2005<br><br>4. If Amendment, Date Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable)<br><br>____ Director     ____ 10% Owner<br>_X_ Officer (give title     ____ Other (specify below)<br>below)<br>        EVP & Chief Technology Officer<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |

**Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/07/2005 | | M | | 7,090 | A | $13.2813 | 506,250 | D | |
| Common Stock | 12/07/2005 | | M | | 3,332 | A | $30 | 509,582 | D | |
| Common Stock | 12/07/2005 | | M | | 2,780 | A | $35.9531 | 512,362 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $13.2813 | 12/07/2005 | | M | | | 7,090 | (3) | 01/12/2011 | Common Stock | 7,090 | (1) | 332,910 | D | |
| Stock Option ( right to buy ) | $30 | 12/07/2005 | | M | | | 3,332 | (4) | 10/13/2010 | Common Stock | 3,332 | (1) | 296,668 | D | |
| Stock Option ( right to buy ) | $35.9531 | 12/07/2005 | | M | | | 2,780 | (2) | 08/30/2009 | Common Stock | 2,780 | (1) | 497,220 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |

| | | | | |
|---|---|---|---|---|
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

## Explanation of Responses:

(1)   not applicable

(2)   This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 8/30/99 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

(3)   This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 1/12/01

(4)   This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 10/13/00.

## Signatures

<u>/s/ Farzad Nazem</u>                                                            <u>12/07/2005</u>

**\*\*Signature of Reporting Person                                              Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: 3235−0287 | |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
|---|---|---|
| (Last)        (First)        (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>12/20/2005 | ___ Director        ___ 10% Owner<br>_X_ Officer (give title below)   ___ Other (specify below)<br>EVP & Chief Technology Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/20/2005 | | A | | 15,000[(1)] | A | $ 0 | 527,362 | D | |
| Common Stock | 12/20/2005 | | A | | 35,000[(2)] | A | $ 0 | 562,362 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $40.68 | 12/20/2005 | | A | | 125,000 | | [(3)] | 12/20/2012 | Common Stock | 125,000 | [(4)] | 125,000 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

**Explanation of Responses:**

(1) These shares represent restricted stock units granted under the Yahoo! 1995 Stock Plan. Each restricted stock unit represents the contingent right to receive, upon the satisfaction of certain performance based objectives, one share of Yahoo! common stock as long as the officer remains in the service of the company through the vesting date.

(2) These shares represent restricted stock units granted under the Yahoo! 1995 Stock Plan. Each restricted stock unit represents the contingent right to receive, upon vesting of the unit, one share of Yahoo! common stock. These units are scheduled to vest three years from the date of grant as long as the officer remains in the service of the company through the vesting date.

(3) This option is scheduled to become exercisable at a rate of 1/4 of the securities underlying the option on the first anniversary of the grant date of 12/20/05 and 1/8 of the securities underlying the option bi−annually thereafter, such that the option is fully vested on 12/20/09.

(4) Not applicable.

## Signatures

| /s/ Michael J. Callahan, attorney−in−fact for, Farzad Nazem | 12/22/2005 |
| --- | --- |
| **Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person – NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)    (First)    (Middle) <br> C/O YAHOO! INC., 701 FIRST AVENUE <br> (Street) | 3. Date of Earliest Transaction (Month/Day/Year) 02/22/2006 | (Check all applicable) <br> ___ Director    ___ 10% Owner <br> _X_ Officer (give title below)    ___ Other (specify below) <br> EVP & Chief Technology Officer |
| SUNNYVALE, CA 94089 <br> (City)    (State)    (Zip) | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) <br> _X_ Form filed by One Reporting Person <br> ___ Form filed by More than One Reporting Person |

### Table I – Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) Code | V | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) Amount | (A) or (D) | Price | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| Common Stock | 02/22/2006 | | M | | 100,000 | A | $3.3672 | 662,362 | D | |
| Common Stock | 02/22/2006 | | S | | 100,000 | D | $33.25 | 562,362 | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) Code | V | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) (A) | (D) | 6. Date Exercisable and Expiration Date (Month/Day/Year) Date Exercisable | Expiration Date | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) Title | Amount or Number of Shares | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Stock Option ( right to buy ) | $3.3672 | 02/22/2006 | | M | | | 100,000 | 12/03/1998[2] | 12/03/2007 | Common Stock | 100,000 | [1] | 500,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD <br> C/O YAHOO! INC. <br> 701 FIRST AVENUE <br> SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

## Explanation of Responses:

(1)    not applicable

(2)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/3/97 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

**Signatures**

/s/ Michael J. Callahan, attorney−in−fact for, Farzad Nazem                    02/23/2006

\*\*Signature of Reporting Person                                              Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
|---|---|---|
| (Last)          (First)          (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>04/24/2006 | ____ Director          ____ 10% Owner<br>_X_ Officer (give title below)   ____ Other (specify below)<br>EVP & Chief Technology Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |
| (City)     (State)     (Zip) | | |

## Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 04/24/2006 | | M | | 100,000 | A | $3.3672 | 662,362 | D | |
| Common Stock | 04/24/2006 | | S | | 100,000 | D | $33.14 | 562,362 | D | |
| Common Stock | 04/25/2006 | | M | | 100,000 | A | $3.3672 | 662,362 | D | |
| Common Stock | 04/25/2006 | | S | | 100,000 | D | $31.95 | 562,362 | D | |

## Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $3.3672 | 04/24/2006 | | M | | | 100,000 | 12/03/1998[2] | 12/03/2007 | Common Stock | 100,000 | [1] | 400,000 | D | |
| Stock Option ( right to buy ) | $3.3672 | 04/25/2006 | | M | | | 100,000 | 12/03/1998[2] | 12/03/2007 | Common Stock | 100,000 | [1] | 300,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE | | | EVP & Chief Technology Officer | |

| SUNNYVALE, CA 94089 | | | | | |
|---|---|---|---|---|---|

**Explanation of Responses:**

(1)    not applicable

(2)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/3/97 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

## Signatures

<u>/s/ Farzad Nazem</u>                                                       <u>04/25/2006</u>

<sup>**</sup>Signature of Reporting Person                                               Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last) (First) (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>04/26/2006 | (Check all applicable)<br><br>___ Director ___ 10% Owner<br>_X_ Officer (give title below) ___ Other (specify below)<br>EVP & Chief Technology Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City) (State) (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 04/26/2006 | | M | | 100,000 | A | $3.3672 | 662,362 | D | |
| Common Stock | 04/26/2006 | | S | | 100,000 | D | $32.93 | 562,362 | D | |
| Common Stock | 04/27/2006 | | M | | 100,000 | A | $3.3672 | 662,362 | D | |
| Common Stock | 04/27/2006 | | S | | 100,000 | D | $33.2 | 562,362 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $3.3672 | 04/26/2006 | | M | | | 100,000 | 12/03/1998[2] | 12/03/2007 | Common Stock | 100,000 | (1) | 200,000 | D | |
| Stock Option ( right to buy ) | $3.3672 | 04/27/2006 | | M | | | 100,000 | 12/03/1998[2] | 12/03/2007 | Common Stock | 100,000 | (1) | 100,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE | | | EVP & Chief Technology Officer | |

| SUNNYVALE, CA 94089 | | | | | |
|---|---|---|---|---|---|

**Explanation of Responses:**

(1)     not applicable

(2)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/3/97 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

## Signatures

<u>/s/ Farzad Nazem</u>                                                                                                 <u>04/27/2006</u>

<u>**</u>Signature of Reporting Person                                                                              Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235–0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)    (First)    (Middle) | 3. Date of Earliest Transaction (Month/Day/Year)<br>05/05/2006 | (Check all applicable)<br>____ Director    ____ 10% Owner<br>_X_ Officer (give title below)    ____ Other (specify below)<br>EVP & Chief Technology Officer |
| C/O YAHOO! INC., 701 FIRST AVENUE | | |
| (Street) | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |
| SUNNYVALE, CA 94089 | | |
| (City)    (State)    (Zip) | | |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/05/2006 | | M | | 100,000 | A | $3.3672 | 662,362 | D | |
| Common Stock | 05/05/2006 | | S | | 100,000 | D | $32.57 | 562,362 | D | |
| Common Stock | 05/08/2006 | | M | | 100,000 | A | $4.62 | 662,362 | D | |
| Common Stock | 05/08/2006 | | S | | 100,000 | D | $33.31 | 562,362 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $3.3672 | 05/05/2006 | | M | | | 100,000 | (2) | 12/03/2007 | Common Stock | 100,000 | (1) | 0 | D | |
| Stock Option ( right to buy ) | $4.62 | 05/08/2006 | | M | | | 100,000 | (3) | 10/02/2011 | Common Stock | 100,000 | (1) | 700,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE | | | EVP & Chief Technology Officer | |

SUNNYVALE, CA 94089

**Explanation of Responses:**

(1)     not applicable

(2)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/3/97 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date thereafter.

(3)     This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 10/2/01.

## Signatures

/s/ Farzad Nazem                                                                05/08/2006

\*\*Signature of Reporting Person                                              Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

 \*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

 \*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
|---|---|---|
| (Last)       (First)       (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>05/10/2006 | ____ Director       ____ 10% Owner<br>_X_ Officer (give title below)   ____ Other (specify below)<br>EVP & Chief Technology Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

**Table I – Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/10/2006 | | M | | 100,000 | A | $4.62 | 662,362 | D | |
| Common Stock | 05/10/2006 | | S | | 100,000 | D | $32.05 | 562,362 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $4.62 | 05/10/2006 | | M | | | 100,000 | (1) | 10/02/2011 | Common Stock | 100,000 | (2) | 600,000 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

**Explanation of Responses:**

(1) This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 10/2/01.

(2) not applicable

**Signatures**

| /s/ Farzad Nazem | 05/11/2006 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires:     January 31, 2005 |
| Estimated average burden hours per response...    0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person ÷ NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)       (First)       (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 05/25/2006 | (Check all applicable) ___ Director       ___ 10% Owner _X_ Officer (give title below)  ___ Other (specify below) EVP & Chief Technology Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)     (State)     (Zip) | | |

### Table I – Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/25/2006 | | M | | 100,000 | A | $4.62 | 662,362 | D | |
| Common Stock | 05/25/2006 | | S | | 100,000 | D | $32.95 | 562,362 | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $4.62 | 05/25/2006 | | M | | | 100,000 | (1) | 10/02/2011 | Common Stock | 100,000 | (2) | 500,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

## Explanation of Responses:

(1)    This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 10/2/01.

(2)    not applicable

**Signatures**

| | |
|---|---|
| /s/ Farzad Nazem | 05/26/2006 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

OMB APPROVAL

OMB Number: 3235–0287
Expires:          January 31, 2005
Estimated average burden hours per response...        0.5

(Print or Type Responses)

| 1. Name and Address of Reporting Person \*<br>NAZEM FARZAD | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
|---|---|---|
| (Last)    (First)    (Middle)<br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>05/31/2006 | ___ Director          ___ 10% Owner<br>_X_ Officer (give title below)    ___ Other (specify below)<br>EVP & Chief Technology Officer |
| (Street)<br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

## Table I — Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/31/2006 | | A | | 50,000(1) | A | $ 0 | 612,362 | D | |

## Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $31.59 | 05/31/2006 | | A | | 900,000 | | (2) | 05/31/2013 | Common Stock | 900,000 | (1) | 900,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| NAZEM FARZAD<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | EVP & Chief Technology Officer | |

**Explanation of Responses:**

(1)    These shares represent restricted stock units granted under the Yahoo! 1995 Stock Plan. Each restricted stock unit represents the contingent right to receive, upon the satisfaction of certain performance based objectives, but in no event prior to the first anniversary of the grant date, one share of Yahoo! common stock as long as the officer remains in the service of the company through the vesting date.

(2)    This option is scheduled to become exercisable according to the following schedule: 600,000 of the securities underlying the option becomes exercisable on the first anniversary of the grant date. The remaining 300,000 of the securities underlying the option becomes exercisable on the

second anniversary of the grant date.

(3)    Not applicable.

## Signatures

/s/ Michael J. Callahan, attorney–in–fact for, Farzad Nazem                    06/02/2006

\*\*Signature of Reporting Person                                                                          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

    \*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

    \*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

Exhibit 20

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF
SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235–0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person - ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)  (First)  (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) 04/13/2004 | (Check all applicable) |
| C/O YAHOO! INC., 701 FIRST AVENUE | | ___ Director    ___ 10% Owner  _X_ Officer (give title ___ Other (specify below) below)  Chief Operating Officer |
| (Street) | 4. If Amendment, Date Original Filed (Month/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| SUNNYVALE, CA 94089 | | _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)  (State)  (Zip) | | |

## Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) Code | V | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) Amount | (A) or (D) | Price | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| Common Stock | 04/13/2004 | | M | | 83,000 | A | $14.61 | 128,000 | D | |
| Common Stock | 04/13/2004 | | S | | 60,000 | D | $54.05 | 68,000 | D | |
| Common Stock | 04/13/2004 | | S | | 10,000 | D | $54.1 | 58,000 | D | |
| Common Stock | 04/13/2004 | | S | | 13,000 | D | $54.2 | 45,000 | D | |

## Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) Code | V | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) (A) | (D) | 6. Date Exercisable and Expiration Date (Month/Day/Year) Date Exercisable | Expiration Date | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) Title | Amount or Number of Shares | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee Stock Option ( right to buy ) | $14.61 | 04/12/2004 | | M | | | 83,000 | (1) | 04/24/2012 | Common Stock | 83,000 | $ 0 | 867,875 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)   This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

**Signatures**

| /s/ Michael J. Callahan, Attorney-in-fact for, Daniel Rosensweig | 04/14/2004 |
|---|---|
| \*\*Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See Instruction 1(b).*

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235-0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)          (First)          (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>04/13/2004 | (Check all applicable)<br><br>___ Director        ___ 10% Owner<br>_X_ Officer (give title below)    ___ Other (specify below)<br>Chief Operating Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year)<br>04/14/2004 | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)          (State)          (Zip) | | |

### Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 04/13/2004 | | M | | 83,000 | A | $14.61 | 128,000 | D | |
| Common Stock | 04/13/2004 | | S | | 60,000 | D | $54.05 | 68,000 | D | |
| Common Stock | 04/13/2004 | | S | | 10,000 | D | $54.1 | 58,000 | D | |
| Common Stock | 04/13/2004 | | S | | 13,000 | D | $54.2 | 45,000 | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1.Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $14.61 | 04/13/2004[2] | | M | | | 83,000 | [1] | 04/24/2012 | Common Stock | 83,000 | $ 0 | 867,875 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1) This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

(2) Amendment to Form 4 accession # 0001179110−04−008034 that incorrectly reported the option exercise date as 4/12/04 when the actual option exercise date was 4/13/04.

## Signatures

/s/ Michael J. Callahan, Attorney−in−fact for, Daniel Rosensweig                    04/14/2004

<u>**</u>Signature of Reporting Person                                                                      Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See Instruction* 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person −<br>ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)      (First)      (Middle)<br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>07/16/2004 | (Check all applicable)<br>___ Director      ___ 10% Owner<br>_X_ Officer (give title      ___ Other (specify below)<br>below)<br>Chief Operating Officer |
| (Street)<br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 07/16/2004 | | M | | 20,000 | A | $7.305 | 110,000 | D | |
| Common Stock | 07/16/2004 | | S | | 10,000 | D | $29.9 | 100,000 | D | |
| Common Stock | 07/16/2004 | | S | | 4,500 | D | $29.92 | 95,500 | D | |
| Common Stock | 07/16/2004 | | S | | 5,500 | D | $29.95 | 90,000[1] | D | |
| Common Stock | 07/19/2004 | | M | | 91,000 | A | $7.305 | 181,000 | D | |
| Common Stock | 07/19/2004 | | S | | 10,000 | D | $27.75 | 171,000 | D | |
| Common Stock | 07/19/2004 | | S | | 10,000 | D | $28 | 161,000 | D | |
| Common Stock | 07/19/2004 | | S | | 5,000 | D | $28.05 | 156,000 | D | |
| Common Stock | 07/19/2004 | | S | | 5,000 | D | $28.08 | 151,000 | D | |
| Common Stock | 07/19/2004 | | S | | 5,000 | D | $28.1 | 146,000 | D | |
| Common Stock | 07/19/2004 | | S | | 5,000 | D | $28.13 | 141,000 | D | |
| Common Stock | 07/19/2004 | | S | | 11,000 | D | $28.136 | 130,000 | D | |
| Common Stock | 07/19/2004 | | S | | 10,000 | D | $28.15 | 120,000 | D | |
| Common Stock | 07/19/2004 | | S | | 5,000 | D | $28.22 | 115,000 | D | |
| Common Stock | 07/19/2004 | | S | | 25,000 | D | $28.25 | 90,000[1] | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| | $7.305 | 07/16/2004 | | M | | | 20,000 | [2] | 04/24/2012 | | 20,000 | $ 0 | 1,715,750[1] | D | |

| Employee Stock Option ( right to buy ) | | | | | | | | | Common Stock | | | | | |
| Employee Stock Option ( right to buy ) | $7.305 | 07/19/2004 | | M | | | 91,000 | (2) | 04/24/2012 | Common Stock | 91,000 | $ 0 | 1,624,750[1] | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
| --- | --- | --- | --- | --- |
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | . | Chief Operating Officer | |

## Explanation of Responses:

(1)     All figures shown reflect the 2 for 1 stock split that was effective on May 11, 2004.

(2)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

## Signatures

/s/ Michael J. Callahan, Attorney-in-fact for, Daniel Rosensweig                                      07/19/2004

**Signature of Reporting Person                                                                                          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF**
**SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person ⁻ ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)       (First)       (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 08/02/2004 | (Check all applicable) _____ Director              _____ 10% Owner _X_ Officer (give title below)  _____ Other (specify below) Chief Operating Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person _____ Form filed by More than One Reporting Person |
| (City)       (State)       (Zip) | | |

### Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 08/02/2004 | | M | | 76,000 | A | $7.305 | 166,000 | D | |
| Common Stock | 08/02/2004 | | S | | 36,000⁽¹⁾ | D | $30.4489 | 130,000 | D | |
| Common Stock | 08/02/2004 | | S | | 40,000⁽¹⁾ | D | $30.4488 | 90,000 | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $7.305 | 08/02/2004 | | M | | | 76,000 | ⁽²⁾ | 04/24/2012 | Common Stock | 76,000 | $ 0 | 1,548,750 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)     All shares reported sold on this Form 4 were sold pursuant to a 10b5-1 trading program.

(2)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

**Signatures**

<u>/s/ Daniel Rosensweig</u>                                     <u>08/02/2004</u>

<u>**</u>Signature of Reporting Person                                     Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See Instruction 1(b).*

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
| --- | --- |
| OMB Number: | 3235–0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *ROSENSWEIG DANIEL* | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
| --- | --- | --- |
| (Last)      (First)      (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 09/01/2004 | (Check all applicable)  ___ Director      ___ 10% Owner _X_ Officer (give title below)  ___ Other (specify below) Chief Operating Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

### Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 09/01/2004 | | M | | 76,000 | A | $7.305 | 166,000 | D | |
| Common Stock | 09/01/2004 | | S | | 26,000[(1)] | D | $28.25 | 140,000 | D | |
| Common Stock | 09/01/2004 | | S | | 50,000[(1)] | D | $28.2115 | 90,000 | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $7.305 | 09/01/2004 | | M | | | 76,000 | [(2)] | 04/24/2012 | Common Stock | 76,000 | $ 0 | 1,472,750 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
| --- | --- | --- | --- | --- |
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)     All shares reported sold on this Form 4 were sold pursuant to a 10b5–1 trading program.

(2)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

**Signatures**

<u>/s/ Michael J. Callahan, attorney–in–fact for, Daniel Rosensweig</u>                     <u>09/02/2004</u>

<u>**</u>Signature of Reporting Person                                                                        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235–0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person ⁎ ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)        (First)        (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 10/01/2004 | (Check all applicable) ___ Director            ___ 10% Owner _X_ Officer (give title below)   ___ Other (specify below) Chief Operating Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/01/2004 | | M | | 76,000 | A | $7.305 | 166,000 | D | |
| Common Stock | 10/01/2004 | | S | | 10,000 | D | $34.32 | 156,000 | D | |
| Common Stock | 10/01/2004 | | S | | 10,000 | D | $34.4 | 146,000 | D | |
| Common Stock | 10/01/2004 | | S | | 10,000 | D | $34.705 | 136,000 | D | |
| Common Stock | 10/01/2004 | | S | | 10,000 | D | $34.88 | 126,000 | D | |
| Common Stock | 10/01/2004 | | S | | 10,000 | D | $34.89 | 116,000 | D | |
| Common Stock | 10/01/2004 | | S | | 10,000 | D | $34.91 | 106,000 | D | |
| Common Stock | 10/01/2004 | | S | | 16,000[1] | D | $34.935 | 90,000 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $7.305 | 10/01/2004 | | M | | | 76,000 | [2] | 04/24/2012 | Common Stock | 76,000 | $ 0 | 1,396,750 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |

| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |
|---|---|---|---|---|

**Explanation of Responses:**

(1)     All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

(2)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

**Signatures**

/s/ Daniel Rosensweig                                              10/04/2004

\*\*Signature of Reporting Person                                      Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See Instruction* 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)　(First)　(Middle) | 3. Date of Earliest Transaction (Month/Day/Year)<br>11/01/2004 | (Check all applicable)<br>＿＿ Director　　＿＿ 10% Owner<br>_X_ Officer (give title below)　＿＿ Other (specify below)<br>Chief Operating Officer |
| C/O YAHOO! INC., 701 FIRST AVENUE | | |
| (Street) | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>＿＿ Form filed by More than One Reporting Person |
| SUNNYVALE, CA 94089 | | |
| (City)　(State)　(Zip) | | |

## Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 11/01/2004 | | M | | 76,000 | A | $7.305 | 166,989 | D | |
| Common Stock | 11/01/2004 | | S | | 26,000 | D | $36.5824 | 140,989 | D | |
| Common Stock | 11/01/2004 | | S | | 25,000 | D | $36.2263 | 115,989 | D | |
| Common Stock | 11/01/2004 | | S | | 25,000[(1)(3)] | D | $36 | 90,989 | D | |

## Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $7.305 | 11/01/2004 | | M | | | 76,000 | [(2)] | 04/24/2012 | Common Stock | 76,000 | $ 0 | 1,320,750 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)     All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

(2)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

(3)     Includes 989 shares acquired through the Yahoo! Inc. Employee Stock Purchase Plan.

## Signatures

/s/ Daniel Rosensweig                                      11/02/2004

**\*\*Signature of Reporting Person                                      Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
| --- |
| OMB Number: 3235−0287 |
| Expires:                    January 31, 2005 |
| Estimated average burden hours per response...           0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
| --- | --- | --- |
| (Last)      (First)      (Middle)  C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 12/01/2004 | _____ Director                     _____ 10% Owner  _X_ Officer (give title below)    _____ Other (specify below)  Chief Operating Officer |
| (Street)  SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/01/2004 | | M | | 76,000 | A | $7.305 | 166,989 | D | |
| Common Stock | 12/01/2004 | | S | | 5,000 | D | $37.59 | 161,989 | D | |
| Common Stock | 12/01/2004 | | S | | 5,000 | D | $37.6 | 156,989 | D | |
| Common Stock | 12/01/2004 | | S | | 10,000 | D | $37.65 | 146,989 | D | |
| Common Stock | 12/01/2004 | | S | | 10,000 | D | $37.695 | 136,989 | D | |
| Common Stock | 12/01/2004 | | S | | 10,000 | D | $37.81 | 126,989 | D | |
| Common Stock | 12/01/2004 | | S | | 10,000 | D | $37.86 | 116,989 | D | |
| Common Stock | 12/01/2004 | | S | | 10,000 | D | $37.8655 | 106,989 | D | |
| Common Stock | 12/01/2004 | | S | | 6,000 | D | $37.87 | 100,989 | D | |
| Common Stock | 12/01/2004 | | S | | 10,000 [2] | D | $37.97 | 90,989 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11.Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $7.305 | 12/01/2004 | | M | | | 76,000 | [1] | 04/24/2012 | Common Stock | 76,000 | $ 0 | 1,244,750 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

(2)     All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

**Signatures**

/s/ Daniel Rosensweig                                               12/02/2004
<u>**Signature of Reporting Person</u>                                          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235-0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person * ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| (Last)        (First)        (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 12/16/2004 | ____ Director        ____ 10% Owner _X_ Officer (give title below)    ____ Other (specify below) Chief Operating Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ____ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/16/2004 | | A | | 50,000[1] | A | $ 0 | 140,989 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $37.08 | 12/16/2004 | | A | | 150,000 | | [2] | 12/16/2014 | Common Stock | 150,000 | $ 0 | 150,000 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)   These shares represent shares of restricted stock granted under the Yahoo! 1995 Stock Plan, 35,000 of which will vest three years from the date of grant and 15,000 of which will vest upon the satisfaction of certain performance objectives, in each case as long as the officer remains employed by the company as of the vesting date.

(2)   This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/16/04 and 1/16th of the securities underlying the option in quarterly installments thereafter, such that the option is fully vested on 12/16/08.

**Signatures**

| | |
|---|---|
| /s/ Daniel Rosensweig | 12/20/2004 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235–0287 |
| Expires:          January 31, 2005 |
| Estimated average burden hours per response...          0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)          (First)          (Middle)<br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>01/03/2005 | (Check all applicable)<br>___ Director          ___ 10% Owner<br>_X_ Officer (give title below)   ___ Other (specify below)<br>Chief Operating Officer |
| (Street)<br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)          (State)          (Zip) | | |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 01/03/2005 | | M | | 76,000 | A | $7.305 | 216,989 | D | |
| Common Stock | 01/03/2005 | | S | | 7,500 | D | $38.48 | 209,489 | D | |
| Common Stock | 01/03/2005 | | S | | 10,000 | D | $38.4 | 199,489 | D | |
| Common Stock | 01/03/2005 | | S | | 7,500 | D | $38.35 | 191,989 | D | |
| Common Stock | 01/03/2005 | | S | | 7,500 | D | $38.205 | 184,489 | D | |
| Common Stock | 01/03/2005 | | S | | 8,500 | D | $38.2 | 175,989 | D | |
| Common Stock | 01/03/2005 | | S | | 7,500 | D | $38.19 | 168,489 | D | |
| Common Stock | 01/03/2005 | | S | | 7,500 | D | $38.16 | 160,989 | D | |
| Common Stock | 01/03/2005 | | S | | 5,000 | D | $38.1 | 155,989 | D | |
| Common Stock | 01/03/2005 | | S | | 7,500 | D | $37.91 | 148,489 | D | |
| Common Stock | 01/03/2005 | | S | | 7,500[2] | D | $37.89 | 140,989 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $7.305 | 01/03/2005 | | M | | | 76,000 | [1] | 04/24/2012 | Common Stock | 76,000 | $ 0 | 1,168,750 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option in quarterly installments thereafter.

(2)     All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

**Signatures**

/s/ Daniel Rosensweig                                                                  01/05/2005

<u>**</u>Signature of Reporting Person                                                    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

OMB APPROVAL

OMB Number: 3235-0287
Expires:         January
                 31, 2005
Estimated
average
burden hours
per response...        0.5

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
|---|---|---|
| (Last)      (First)      (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>02/01/2005 | ___ Director            ___ 10% Owner<br>_X_ Officer (give title      ___ Other (specify below)<br>below)<br>Chief Operating Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 02/01/2005 | | A | | 150,000(1) | A | $ 0 | 290,989 | D | |
| Common Stock | 02/01/2005 | | M | | 76,000 | A | $7.305 | 366,989 | D | |
| Common Stock | 02/01/2005 | | S | | 1,000 | D | $35.23 | 365,989 | D | |
| Common Stock | 02/01/2005 | | S | | 400 | D | $35.22 | 365,589 | D | |
| Common Stock | 02/01/2005 | | S | | 1,000 | D | $35.21 | 364,589 | D | |
| Common Stock | 02/01/2005 | | S | | 1,400 | D | $35.2 | 363,189 | D | |
| Common Stock | 02/01/2005 | | S | | 1,400 | D | $35.19 | 361,789 | D | |
| Common Stock | 02/01/2005 | | S | | 3,400 | D | $35.18 | 358,389 | D | |
| Common Stock | 02/01/2005 | | S | | 1,000 | D | $35.17 | 357,389 | D | |
| Common Stock | 02/01/2005 | | S | | 300 | D | $35.16 | 357,089 | D | |
| Common Stock | 02/01/2005 | | S | | 1,900 | D | $35.15 | 355,189 | D | |
| Common Stock | 02/01/2005 | | S | | 3,065 | D | $35.14 | 352,124 | D | |
| Common Stock | 02/01/2005 | | S | | 1,135 | D | $35.13 | 350,989 | D | |
| Common Stock | 02/01/2005 | | S | | 300 | D | $35.12 | 350,689 | D | |
| Common Stock | 02/01/2005 | | S | | 3,900 | D | $35.11 | 346,789 | D | |
| Common Stock | 02/01/2005 | | S | | 2,400 | D | $35.1 | 344,389 | D | |
| Common Stock | 02/01/2005 | | S | | 3,400 | D | $35.09 | 340,989 | D | |
| Common Stock | 02/01/2005 | | S | | 500 | D | $35.06 | 340,489 | D | |
| Common Stock | 02/01/2005 | | S | | 200 | D | $35.04 | 340,289 | D | |
| Common Stock | 02/01/2005 | | S | | 1,300 | D | $35.03 | 338,989 | D | |
| Common Stock | 02/01/2005 | | S | | 1,900 | D | $35.02 | 337,089 | D | |
| Common Stock | 02/01/2005 | | S | | 300(4) | D | $35 | 336,789 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $34.75 | 02/01/2005 | | A | | 550,000 | | (2) | 02/01/2015 | Common Stock | 550,000 | $ 0 | 550,000 | D | |
| Stock Option ( right to buy ) | $7.305 | 02/01/2005 | | M | | | 76,000 | (3) | 04/24/2012 | Common Stock | 76,000 | $ 0 | 1,092,750 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

## Explanation of Responses:

| (1) | These shares represent shares of restricted stock granted under the Yahoo! Inc. 1995 Stock Plan. These shares will vest three years from the date of grant of 2/1/05 as long as the officer remains in the service of the company as of the vesting date. |
|---|---|
| (2) | This option becomes exercisable at a rate of 1/3 of the securities underlying the option on the third anniversary of the grant date of 2/1/05 and 2/3 of the securities underlying the option on the fourth anniversary of the grant date such that the option is fully vested on 2/1/09. |
| (3) | This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option in quarterly installments thereafter. |
| (4) | All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program. |

## Signatures

| /s/ Daniel Rosensweig | 02/02/2005 |
|---|---|
| <u>**</u> Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See Instruction* 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)        (First)        (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) 02/01/2005 | (Check all applicable) |
| C/O YAHOO! INC., 701 FIRST AVENUE | | ___ Director      ___ 10% Owner  _X_ Officer (give title below)  ___ Other (specify below) |
| (Street) | 4. If Amendment, Date Original Filed (Month/Day/Year) | Chief Operating Officer |
| SUNNYVALE, CA 94089 | | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 02/01/2005 | | S | | 2,100 | D | $34.99 | 334,689 | D | |
| Common Stock | 02/01/2005 | | S | | 800 | D | $34.98 | 333,889 | D | |
| Common Stock | 02/01/2005 | | S | | 1,400 | D | $34.96 | 332,489 | D | |
| Common Stock | 02/01/2005 | | S | | 700 | D | $34.95 | 331,789 | D | |
| Common Stock | 02/01/2005 | | S | | 1,500 | D | $34.94 | 330,289 | D | |
| Common Stock | 02/01/2005 | | S | | 1,500 | D | $34.93 | 328,789 | D | |
| Common Stock | 02/01/2005 | | S | | 800 | D | $34.9 | 327,989 | D | |
| Common Stock | 02/01/2005 | | S | | 600 | D | $34.89 | 327,389 | D | |
| Common Stock | 02/01/2005 | | S | | 600 | D | $34.8 | 326,789 | D | |
| Common Stock | 02/01/2005 | | S | | 400 | D | $34.78 | 326,389 | D | |
| Common Stock | 02/01/2005 | | S | | 900 | D | $34.77 | 325,489 | D | |
| Common Stock | 02/01/2005 | | S | | 1,000 | D | $34.76 | 324,489 | D | |
| Common Stock | 02/01/2005 | | S | | 1,000 | D | $34.75 | 323,489 | D | |
| Common Stock | 02/01/2005 | | S | | 3,000 | D | $34.74 | 320,489 | D | |
| Common Stock | 02/01/2005 | | S | | 1,000 | D | $34.72 | 319,489 | D | |
| Common Stock | 02/01/2005 | | S | | 1,400 | D | $34.71 | 318,089 | D | |
| Common Stock | 02/01/2005 | | S | | 1,800 | D | $34.7 | 316,289 | D | |
| Common Stock | 02/01/2005 | | S | | 700 | D | $34.69 | 315,589 | D | |
| Common Stock | 02/01/2005 | | S | | 1,300 | D | $34.68 | 314,289 | D | |
| Common Stock | 02/01/2005 | | S | | 700[1] | D | $34.67 | 313,589 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

## Explanation of Responses:

(1)   All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

## Signatures

<u>/s/ Daniel Rosensweig</u>                                                            <u>02/02/2005</u>

<sup>**</sup>Signature of Reporting Person                                           Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See Instruction*
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF
SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235–0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person ⁻ ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)    (First)    (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 02/01/2005 | (Check all applicable) ___ Director    ___ 10% Owner _X_ Officer (give title below)    ___ Other (specify below) Chief Operating Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 02/01/2005 | | S | | 1,100 | D | $34.66 | 312,489 | D | |
| Common Stock | 02/01/2005 | | S | | 500 | D | $34.65 | 311,989 | D | |
| Common Stock | 02/01/2005 | | S | | 2,900 | D | $34.64 | 309,089 | D | |
| Common Stock | 02/01/2005 | | S | | 2,400 | D | $34.61 | 306,689 | D | |
| Common Stock | 02/01/2005 | | S | | 1,600 | D | $34.59 | 305,089 | D | |
| Common Stock | 02/01/2005 | | S | | 1,000 | D | $34.57 | 304,089 | D | |
| Common Stock | 02/01/2005 | | S | | 5,200 | D | $34.55 | 298,889 | D | |
| Common Stock | 02/01/2005 | | S | | 2,500 | D | $34.54 | 296,389 | D | |
| Common Stock | 02/01/2005 | | S | | 1,000 | D | $34.53 | 295,389 | D | |
| Common Stock | 02/01/2005 | | S | | 1,100 | D | $34.52 | 294,289 | D | |
| Common Stock | 02/01/2005 | | S | | 400 | D | $34.51 | 293,889 | D | |
| Common Stock | 02/01/2005 | | S | | 1,300 | D | $34.5 | 292,589 | D | |
| Common Stock | 02/01/2005 | | S | | 1,300 | D | $34.49 | 291,289 | D | |
| Common Stock | 02/01/2005 | | S | | 300[1] | D | $34.48 | 290,989 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)   All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

**Signatures**

/s/ Daniel Rosensweig                                                  02/02/2005

<u>\*\*</u>Signature of Reporting Person                                                    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See Instruction*
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF
SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *‐*<br>ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)          (First)          (Middle)<br><br>C/O YAHOO! INC., 701 FIRST<br>AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>03/01/2005 | (Check all applicable)<br><br>\_\_\_\_ Director          \_\_\_\_\_ 10% Owner<br>\_X\_ Officer (give title          \_\_\_\_\_ Other (specify below)<br>below)<br>          Chief Operating Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check<br>Applicable Line)<br>\_X\_ Form filed by One Reporting Person<br>\_\_\_ Form filed by More than One Reporting Person |
| (City)          (State)          (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 03/01/2005 | | M | | 76,000 | A | $7.305 | 366,989 | D | |
| Common Stock | 03/01/2005 | | S | | 800 | D | $32.09 | 366,189 | D | |
| Common Stock | 03/01/2005 | | S | | 700 | D | $32.105 | 365,489 | D | |
| Common Stock | 03/01/2005 | | S | | 700 | D | $32.11 | 364,789 | D | |
| Common Stock | 03/01/2005 | | S | | 1,400 | D | $32.13 | 363,389 | D | |
| Common Stock | 03/01/2005 | | S | | 700 | D | $32.14 | 362,689 | D | |
| Common Stock | 03/01/2005 | | S | | 1,000 | D | $32.145 | 361,689 | D | |
| Common Stock | 03/01/2005 | | S | | 800 | D | $32.16 | 360,889 | D | |
| Common Stock | 03/01/2005 | | S | | 1,500 | D | $32.17 | 359,389 | D | |
| Common Stock | 03/01/2005 | | S | | 600 | D | $32.18 | 358,789 | D | |
| Common Stock | 03/01/2005 | | S | | 1,500 | D | $32.19 | 357,289 | D | |
| Common Stock | 03/01/2005 | | S | | 900 | D | $32.2 | 356,389 | D | |
| Common Stock | 03/01/2005 | | S | | 900 | D | $32.205 | 355,489 | D | |
| Common Stock | 03/01/2005 | | S | | 1,700 | D | $32.21 | 353,789 | D | |
| Common Stock | 03/01/2005 | | S | | 1,200 | D | $32.215 | 352,589 | D | |
| Common Stock | 03/01/2005 | | S | | 1,300 | D | $32.22 | 351,289 | D | |
| Common Stock | 03/01/2005 | | S | | 1,100 | D | $32.23 | 350,189 | D | |
| Common Stock | 03/01/2005 | | S | | 500 | D | $32.235 | 349,689 | D | |
| Common Stock | 03/01/2005 | | S | | 800 | D | $32.24 | 348,889 | D | |
| Common Stock | 03/01/2005 | | S | | 900 | D | $32.245 | 347,989 | D | |
| Common Stock | 03/01/2005 | | S | | 1,600 | D | $32.25 | 346,389 | D | |
| Common Stock | 03/01/2005 | | S | | 1,700 | D | $32.26 | 344,689 | D | |
| Common Stock | 03/01/2005 | | S | | 3,300 | D | $32.28 | 341,389 | D | |

| Common Stock | 03/01/2005 | | S | | 2,500[2] | D | $32.29 | 338,889 | | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g.,* puts, calls, warrants, options, convertible securities*)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | | |
| Stock Option ( right to buy ) | $7.305 | 03/01/2005 | | M | | | 76,000 | [1] | 04/24/2012 | Common Stock | 76,000 | $ 0 | 1,016,750 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1) This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying on each monthly anniversary thereafter.

(2) All shares reported sold on this Form 4 were sold pursuant to a 10b5-1 trading program.

**Signatures**

/s/ Daniel Rosensweig           03/02/2005

**<sup>**</sup> Signature of Reporting Person         Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person −<br>ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)          (First)          (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>03/01/2005 | (Check all applicable)<br><br>___ Director                         ___ 10% Owner<br>_X_ Officer (give title below)    ___ Other (specify below)<br>Chief Operating Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)       (State)       (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 03/01/2005 | | S | | 600 | D | $32.3 | 338,289 | D | |
| Common Stock | 03/01/2005 | | S | | 7,000 | D | $32.31 | 331,289 | D | |
| Common Stock | 03/01/2005 | | S | | 2,300 | D | $32.32 | 328,989 | D | |
| Common Stock | 03/01/2005 | | S | | 1,700 | D | $32.33 | 327,289 | D | |
| Common Stock | 03/01/2005 | | S | | 300 | D | $32.34 | 326,989 | D | |
| Common Stock | 03/01/2005 | | S | | 4,600 | D | $32.35 | 322,289 | D | |
| Common Stock | 03/01/2005 | | S | | 3,900 | D | $32.36 | 318,489 | D | |
| Common Stock | 03/01/2005 | | S | | 2,200 | D | $32.37 | 316,289 | D | |
| Common Stock | 03/01/2005 | | S | | 1,000 | D | $32.38 | 315,289 | D | |
| Common Stock | 03/01/2005 | | S | | 1,600 | D | $32.39 | 313,689 | D | |
| Common Stock | 03/01/2005 | | S | | 400 | D | $32.4 | 313,289 | D | |
| Common Stock | 03/01/2005 | | S | | 2,700 | D | $32.41 | 310,589 | D | |
| Common Stock | 03/01/2005 | | S | | 7,200 | D | $32.42 | 303,389 | D | |
| Common Stock | 03/01/2005 | | S | | 3,300 | D | $32.43 | 300,089 | D | |
| Common Stock | 03/01/2005 | | S | | 1,000 | D | $32.44 | 299,089 | D | |
| Common Stock | 03/01/2005 | | S | | 700 | D | $32.45 | 298,389 | D | |
| Common Stock | 03/01/2005 | | S | | 2,700 | D | $32.46 | 295,689 | D | |
| Common Stock | 03/01/2005 | | S | | 1,000 | D | $32.47 | 294,689 | D | |
| Common Stock | 03/01/2005 | | S | | 1,200 | D | $32.48 | 293,489 | D | |
| Common Stock | 03/01/2005 | | S | | 500 | D | $32.49 | 292,989 | D | |
| Common Stock | 03/01/2005 | | S | | 600 | D | $32.51 | 292,389 | D | |
| Common Stock | 03/01/2005 | | S | | 300 | D | $32.52 | 292,089 | D | |
| Common Stock | 03/01/2005 | | S | | 1,000 | D | $32.53 | 291,089 | D | |

| Common Stock | 03/01/2005 | | S | | 100(1) | D | | $32.57 | 290,989 | | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)    All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

**Signatures**

/s/ Daniel Rosensweig                                    03/02/2005
** Signature of Reporting Person                          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See Instruction* 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
| --- |
| OMB Number: 3235−0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *−* <br> ROSENSWEIG DANIEL <br><br> (Last)   (First)   (Middle) <br><br> C/O YAHOO! INC., 701 FIRST AVENUE <br><br> (Street) <br><br> SUNNYVALE, CA 94089 <br><br> (City)   (State)   (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol <br> YAHOO INC [YHOO] <br><br> 3. Date of Earliest Transaction (Month/Day/Year) <br> 04/01/2005 <br><br> 4. If Amendment, Date Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer <br><br> (Check all applicable) <br><br> ___ Director   ___ 10% Owner <br> _X_ Officer (give title below)   ___ Other (specify below) <br> Chief Operating Officer <br><br> 6. Individual or Joint/Group Filing (Check Applicable Line) <br> _X_ Form filed by One Reporting Person <br> ___ Form filed by More than One Reporting Person |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 04/01/2005 | | M | | 76,000 | A | $7.305 | 366,989 | D | |
| Common Stock | 04/01/2005 | | S | | 1,063 | D | $34.19 | 365,926 | D | |
| Common Stock | 04/01/2005 | | S | | 137 | D | $34.2 | 365,789 | D | |
| Common Stock | 04/01/2005 | | S | | 2,000 | D | $34.23 | 363,789 | D | |
| Common Stock | 04/01/2005 | | S | | 1,000 | D | $34.25 | 362,789 | D | |
| Common Stock | 04/01/2005 | | S | | 4,400 | D | $34.26 | 358,389 | D | |
| Common Stock | 04/01/2005 | | S | | 2,400 | D | $34.27 | 355,989 | D | |
| Common Stock | 04/01/2005 | | S | | 100 | D | $34.275 | 355,889 | D | |
| Common Stock | 04/01/2005 | | S | | 4,400 | D | $34.28 | 351,489 | D | |
| Common Stock | 04/01/2005 | | S | | 3,200 | D | $34.3 | 348,289 | D | |
| Common Stock | 04/01/2005 | | S | | 500 | D | $34.31 | 347,789 | D | |
| Common Stock | 04/01/2005 | | S | | 2,900 | D | $34.32 | 344,889 | D | |
| Common Stock | 04/01/2005 | | S | | 1,400 | D | $34.33 | 343,489 | D | |
| Common Stock | 04/01/2005 | | S | | 3,200 | D | $34.35 | 340,289 | D | |
| Common Stock | 04/01/2005 | | S | | 1,900 | D | $34.36 | 338,389 | D | |
| Common Stock | 04/01/2005 | | S | | 3,300 | D | $34.37 | 335,089 | D | |
| Common Stock | 04/01/2005 | | S | | 600 | D | $34.38 | 334,489 | D | |
| Common Stock | 04/01/2005 | | S | | 500 | D | $34.39 | 333,989 | D | |
| Common Stock | 04/01/2005 | | S | | 400 | D | $34.4 | 333,589 | D | |
| Common Stock | 04/01/2005 | | S | | 300 | D | $34.41 | 333,289 | D | |
| Common Stock | 04/01/2005 | | S | | 600 | D | $34.42 | 332,689 | D | |
| Common Stock | 04/01/2005 | | S | | 1,000 | D | $34.43 | 331,689 | D | |
| Common Stock | 04/01/2005 | | S | | 400 | D | $34.45 | 331,289 | D | |

| Common Stock | 04/01/2005 | | S | 900[2] | D | $34.46 | 330,389 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $7.305 | 04/01/2005 | | M | | | 76,000 | [1] | 04/24/2012 | Common Stock | 76,000 | $ 0 | 940,750 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1) This option becomes exercisble at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

(2) All shares reported sold on this Form 4 were sold pursuant to a 10b5-1 trading program.

**Signatures**

/s/ Daniel Rosensweig                           04/04/2005
** Signature of Reporting Person                 Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See Instruction* 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
|---|---|---|
| (Last)          (First)          (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>04/01/2005 | _____ Director                    _____ 10% Owner<br>_X_ Officer (give title below)   _____ Other (specify below)<br><br>Chief Operating Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)          (State)          (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 04/01/2005 | | S | | 500 | D | $34.47 | 329,889 | D | |
| Common Stock | 04/01/2005 | | S | | 2,200 | D | $34.48 | 327,689 | D | |
| Common Stock | 04/01/2005 | | S | | 700 | D | $34.49 | 326,989 | D | |
| Common Stock | 04/01/2005 | | S | | 1,200 | D | $34.5 | 325,789 | D | |
| Common Stock | 04/01/2005 | | S | | 2,300 | D | $34.51 | 323,489 | D | |
| Common Stock | 04/01/2005 | | S | | 1,700 | D | $34.52 | 321,789 | D | |
| Common Stock | 04/01/2005 | | S | | 3,300 | D | $34.53 | 318,489 | D | |
| Common Stock | 04/01/2005 | | S | | 3,200 | D | $34.54 | 315,289 | D | |
| Common Stock | 04/01/2005 | | S | | 3,400 | D | $34.55 | 311,889 | D | |
| Common Stock | 04/01/2005 | | S | | 3,600 | D | $34.56 | 308,289 | D | |
| Common Stock | 04/01/2005 | | S | | 3,700 | D | $34.57 | 304,589 | D | |
| Common Stock | 04/01/2005 | | S | | 900 | D | $34.58 | 303,689 | D | |
| Common Stock | 04/01/2005 | | S | | 2,200 | D | $34.59 | 301,489 | D | |
| Common Stock | 04/01/2005 | | S | | 2,700 | D | $34.61 | 298,789 | D | |
| Common Stock | 04/01/2005 | | S | | 200 | D | $34.615 | 298,589 | D | |
| Common Stock | 04/01/2005 | | S | | 1,100 | D | $34.62 | 297,489 | D | |
| Common Stock | 04/01/2005 | | S | | 2,000 | D | $34.63 | 295,489 | D | |
| Common Stock | 04/01/2005 | | S | | 900 | D | $34.64 | 294,589 | D | |
| Common Stock | 04/01/2005 | | S | | 500 | D | $34.66 | 294,089 | D | |
| Common Stock | 04/01/2005 | | S | | 1,000 | D | $34.67 | 293,089 | D | |
| Common Stock | 04/01/2005 | | S | | 1,500 | D | $34.68 | 291,589 | D | |
| Common Stock | 04/01/2005 | | S | | 600[1] | D | $34.69 | 290,989 | D | |

## Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

### Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

### Explanation of Responses:

(1)    All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

### Signatures

| /s/ Daniel Rosensweig | 04/04/2005 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See Instruction*
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires:                 January 31, 2005 |
| Estimated average burden hours per response...        0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)          (First)          (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>05/02/2005 | (Check all applicable)<br><br>___ Director                          ___ 10% Owner<br>_X_ Officer (give title        ___ Other (specify below)<br>below)<br>                    Chief Operating Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)          (State)          (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/02/2005 | | M | | 76,000 | A | $7.305 | 366,989 | D | |
| Common Stock | 05/02/2005 | | S | | 700 | D | $34.05 | 366,289 | D | |
| Common Stock | 05/02/2005 | | S | | 700 | D | $34.07 | 365,589 | D | |
| Common Stock | 05/02/2005 | | S | | 2,000 | D | $34.08 | 363,589 | D | |
| Common Stock | 05/02/2005 | | S | | 3,000 | D | $34.09 | 360,589 | D | |
| Common Stock | 05/02/2005 | | S | | 3,000 | D | $34.11 | 357,589 | D | |
| Common Stock | 05/02/2005 | | S | | 1,900 | D | $34.12 | 355,689 | D | |
| Common Stock | 05/02/2005 | | S | | 1,200 | D | $34.13 | 354,489 | D | |
| Common Stock | 05/02/2005 | | S | | 1,000 | D | $34.14 | 353,489 | D | |
| Common Stock | 05/02/2005 | | S | | 2,800 | D | $34.16 | 350,689 | D | |
| Common Stock | 05/02/2005 | | S | | 800 | D | $34.17 | 349,889 | D | |
| Common Stock | 05/02/2005 | | S | | 300 | D | $34.2 | 349,589 | D | |
| Common Stock | 05/02/2005 | | S | | 2,300 | D | $34.22 | 347,289 | D | |
| Common Stock | 05/02/2005 | | S | | 300 | D | $34.23 | 346,989 | D | |
| Common Stock | 05/02/2005 | | S | | 1,100 | D | $34.24 | 345,889 | D | |
| Common Stock | 05/02/2005 | | S | | 2,500 | D | $34.25 | 343,389 | D | |
| Common Stock | 05/02/2005 | | S | | 400 | D | $34.27 | 342,989 | D | |
| Common Stock | 05/02/2005 | | S | | 300 | D | $34.28 | 342,689 | D | |
| Common Stock | 05/02/2005 | | S | | 600 | D | $34.29 | 342,089 | D | |
| Common Stock | 05/02/2005 | | S | | 2,900 | D | $34.3 | 339,189 | D | |
| Common Stock | 05/02/2005 | | S | | 2,600 | D | $34.33 | 336,589 | D | |
| Common Stock | 05/02/2005 | | S | | 2,800 | D | $34.34 | 333,789 | D | |
| Common Stock | 05/02/2005 | | S | | 1,500 | D | $34.35 | 332,289 | D | |

| Common Stock | 05/02/2005 | | S | | 900 | D | $34.36 | 331,389 | D | |
| Common Stock | 05/02/2005 | | S | | 1,200(2) | D | $34.48 | 330,189 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $7.305 | 05/02/2005 | | M | | | 76,000 | (1) | 04/24/2012 | Common Stock | 76,000 | $ 0 | 864,750 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1) This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

(2) All shares reported sold on this Form 4 were sold pursuant to a 10b5-1 trading program.

**Signatures**

/s/ Michael J. Callahan, attorney-in-fact for, Daniel Rosensweig                         05/03/2005

‾‾Signature of Reporting Person                                                          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*       If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF**
**SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person – ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| (Last)      (First)      (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) 05/02/2005 | ___ Director        ___ 10% Owner <br> _X_ Officer (give title below)   ___ Other (specify below) |
| C/O YAHOO! INC., 701 FIRST AVENUE | | Chief Operating Officer |
| (Street) | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) <br> _X_ Form filed by One Reporting Person <br> ___ Form filed by More than One Reporting Person |
| SUNNYVALE, CA 94089 | | |
| (City)      (State)      (Zip) | | |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/02/2005 | | S | | 3,100 | D | $34.37 | 327,089 | D | |
| Common Stock | 05/02/2005 | | S | | 700 | D | $34.38 | 326,389 | D | |
| Common Stock | 05/02/2005 | | S | | 600 | D | $34.39 | 325,789 | D | |
| Common Stock | 05/02/2005 | | S | | 700 | D | $34.41 | 325,089 | D | |
| Common Stock | 05/02/2005 | | S | | 800 | D | $34.42 | 324,289 | D | |
| Common Stock | 05/02/2005 | | S | | 2,100 | D | $34.43 | 322,189 | D | |
| Common Stock | 05/02/2005 | | S | | 1,500 | D | $34.44 | 320,689 | D | |
| Common Stock | 05/02/2005 | | S | | 700 | D | $34.46 | 319,989 | D | |
| Common Stock | 05/02/2005 | | S | | 900 | D | $34.49 | 319,089 | D | |
| Common Stock | 05/02/2005 | | S | | 1,500 | D | $34.5 | 317,589 | D | |
| Common Stock | 05/02/2005 | | S | | 1,300 | D | $34.52 | 316,289 | D | |
| Common Stock | 05/02/2005 | | S | | 800 | D | $34.55 | 315,489 | D | |
| Common Stock | 05/02/2005 | | S | | 900 | D | $34.56 | 314,589 | D | |
| Common Stock | 05/02/2005 | | S | | 2,300 | D | $34.58 | 312,289 | D | |
| Common Stock | 05/02/2005 | | S | | 900 | D | $34.61 | 311,389 | D | |
| Common Stock | 05/02/2005 | | S | | 1,000 | D | $34.63 | 310,389 | D | |
| Common Stock | 05/02/2005 | | S | | 1,500 | D | $34.68 | 308,889 | D | |
| Common Stock | 05/02/2005 | | S | | 2,500 | D | $34.69 | 306,389 | D | |
| Common Stock | 05/02/2005 | | S | | 3,000 | D | $34.7 | 303,389 | D | |
| Common Stock | 05/02/2005 | | S | | 2,200 | D | $34.71 | 301,189 | D | |
| Common Stock | 05/02/2005 | | S | | 3,400 | D | $34.72 | 297,789 | D | |
| Common Stock | 05/02/2005 | | S | | 1,100 | D | $34.73 | 296,689 | D | |
| Common Stock | 05/02/2005 | | S | | 500 | D | $34.75 | 296,189 | D | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Common Stock | 05/02/2005 | | S | | 1,000 | D | $34.76 | 295,189 | D | |
| Common Stock | 05/02/2005 | | S | | 2,700 | D | $34.79 | 292,489 | D | |
| Common Stock | 05/02/2005 | | S | | 1,500[1] | D | $34.82 | 290,989 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)   All shares reported sold on this Form 4 were sold pursuant to a 10b5-1 trading program.

## Signatures

/s/ Michael J. Callahan, attorney−in−fact for, Daniel Rosensweig          05/03/2005

**\*\***Signature of Reporting Person                                                                 Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

OMB APPROVAL

OMB Number: 3235-0287
Expires:            January 31, 2005
Estimated average burden hours per response...        0.5

(Print or Type Responses)

| 1. Name and Address of Reporting Person : ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)         (First)         (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) 06/01/2005 | (Check all applicable) |
| C/O YAHOO! INC., 701 FIRST AVENUE | | _____ Director          _____ 10% Owner  _X_ Officer (give title          _____ Other (specify below) below)   Chief Operating Officer |
| (Street) | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| SUNNYVALE, CA 94089 | | _X_ Form filed by One Reporting Person  ___ Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

**Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 06/01/2005 | | M | | 76,000 | A | $7.305 | 366,989 | D | |
| Common Stock | 06/01/2005 | | S | | 1,200 | D | $37.25 | 365,789 | D | |
| Common Stock | 06/01/2005 | | S | | 1,200 | D | $37.48 | 364,589 | D | |
| Common Stock | 06/01/2005 | | S | | 100 | D | $37.5 | 364,489 | D | |
| Common Stock | 06/01/2005 | | S | | 1,200 | D | $37.72 | 363,289 | D | |
| Common Stock | 06/01/2005 | | S | | 200 | D | $37.73 | 363,089 | D | |
| Common Stock | 06/01/2005 | | S | | 1,600 | D | $37.82 | 361,489 | D | |
| Common Stock | 06/01/2005 | | S | | 1,400 | D | $37.83 | 360,089 | D | |
| Common Stock | 06/01/2005 | | S | | 300 | D | $37.88 | 359,789 | D | |
| Common Stock | 06/01/2005 | | S | | 1,200 | D | $37.89 | 358,589 | D | |
| Common Stock | 06/01/2005 | | S | | 1,500 | D | $37.95 | 357,089 | D | |
| Common Stock | 06/01/2005 | | S | | 1,200 | D | $37.98 | 355,889 | D | |
| Common Stock | 06/01/2005 | | S | | 300 | D | $38 | 355,589 | D | |
| Common Stock | 06/01/2005 | | S | | 1,300 | D | $38.01 | 354,289 | D | |
| Common Stock | 06/01/2005 | | S | | 1,100 | D | $38.02 | 353,189 | D | |
| Common Stock | 06/01/2005 | | S | | 1,200 | D | $38.03 | 351,989 | D | |
| Common Stock | 06/01/2005 | | S | | 1,200 | D | $38.06 | 350,789 | D | |
| Common Stock | 06/01/2005 | | S | | 1,100 | D | $38.09 | 349,689 | D | |
| Common Stock | 06/01/2005 | | S | | 3,100 | D | $38.1 | 346,589 | D | |
| Common Stock | 06/01/2005 | | S | | 1,100 | D | $38.11 | 345,489 | D | |
| Common Stock | 06/01/2005 | | S | | 1,000 | D | $38.12 | 344,489 | D | |
| Common Stock | 06/01/2005 | | S | | 1,200 | D | $38.13 | 343,289 | D | |
| Common Stock | 06/01/2005 | | S | | 900 | D | $38.16 | 342,389 | D | |

| Common Stock | 06/01/2005 | | S | | 1,200 | D | $38.17 | 341,189 | D | |
| Common Stock | 06/01/2005 | | S | | 1,200(2) | D | $38.19 | 339,989 | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $7.305 | 06/01/2005 | | M | | | 76,000 | (1) | 04/24/2012 | Common Stock | 76,000 | $ 0 | 788,750 | D | |

### Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

### Explanation of Responses:

(1)  This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

(2)  All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

### Signatures

/s/ Daniel Rosensweig                                      06/02/2005

** Signature of Reporting Person                           Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF
SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235–0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person [*]<br>ROSENSWEIG DANIEL<br><br>(Last)    (First)    (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE<br><br>(Street)<br><br>SUNNYVALE, CA 94089<br>(City)   (State)   (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO]<br><br>3. Date of Earliest Transaction (Month/Day/Year)<br>06/01/2005<br><br>4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable)<br><br>  Director          10% Owner<br>_X_ Officer (give title    _____ Other (specify below)<br>below)<br>        Chief Operating Officer<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>_____ Form filed by More than One Reporting Person |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 06/01/2005 | | S | | 1,600 | D | $38.23 | 338,389 | D | |
| Common Stock | 06/01/2005 | | S | | 600 | D | $38.24 | 337,789 | D | |
| Common Stock | 06/01/2005 | | S | | 1,200 | D | $38.25 | 336,589 | D | |
| Common Stock | 06/01/2005 | | S | | 800 | D | $38.26 | 335,789 | D | |
| Common Stock | 06/01/2005 | | S | | 1,900 | D | $38.27 | 333,889 | D | |
| Common Stock | 06/01/2005 | | S | | 500 | D | $38.275 | 333,389 | D | |
| Common Stock | 06/01/2005 | | S | | 4,200 | D | $38.28 | 329,189 | D | |
| Common Stock | 06/01/2005 | | S | | 3,900 | D | $38.29 | 325,289 | D | |
| Common Stock | 06/01/2005 | | S | | 1,800 | D | $38.3 | 323,489 | D | |
| Common Stock | 06/01/2005 | | S | | 800 | D | $38.31 | 322,689 | D | |
| Common Stock | 06/01/2005 | | S | | 1,600 | D | $38.32 | 321,089 | D | |
| Common Stock | 06/01/2005 | | S | | 1,900 | D | $38.33 | 319,189 | D | |
| Common Stock | 06/01/2005 | | S | | 800 | D | $38.36 | 318,389 | D | |
| Common Stock | 06/01/2005 | | S | | 3,200 | D | $38.37 | 315,189 | D | |
| Common Stock | 06/01/2005 | | S | | 3,400 | D | $38.39 | 311,789 | D | |
| Common Stock | 06/01/2005 | | S | | 1,900 | D | $38.4 | 309,889 | D | |
| Common Stock | 06/01/2005 | | S | | 1,200 | D | $38.41 | 308,689 | D | |
| Common Stock | 06/01/2005 | | S | | 3,200 | D | $38.42 | 305,489 | D | |
| Common Stock | 06/01/2005 | | S | | 1,300 | D | $38.43 | 304,189 | D | |
| Common Stock | 06/01/2005 | | S | | 500 | D | $38.46 | 303,689 | D | |
| Common Stock | 06/01/2005 | | S | | 1,200 | D | $38.52 | 302,489 | D | |
| Common Stock | 06/01/2005 | | S | | 400 | D | $38.56 | 302,089 | D | |
| Common Stock | 06/01/2005 | | S | | 1,000 | D | $38.57 | 301,089 | D | |

| Common Stock | 06/01/2005 | | S | | 400 | D | $38.58 | 300,689 | D | |
| Common Stock | 06/01/2005 | | S | | 1,400[1] | D | $38.64 | 299,289 | D | |

## Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)    All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

## Signatures

/s/ Daniel Rosensweig                                    06/02/2005

\*\*Signature of Reporting Person                          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, see Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *ROSENSWEIG DANIEL* | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)      (First)      (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 06/01/2005 | (Check all applicable)   ___ Director          ___ 10% Owner   _X_ Officer (give title below)   ___ Other (specify below)   Chief Operating Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)   _X_ Form filed by One Reporting Person   ___ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 06/01/2005 | | S | | 900 | D | $38.66 | 298,389 | D | |
| Common Stock | 06/01/2005 | | S | | 1,400 | D | $38.74 | 296,989 | D | |
| Common Stock | 06/01/2005 | | S | | 600 | D | $38.75 | 296,389 | D | |
| Common Stock | 06/01/2005 | | S | | 1,400 | D | $38.76 | 294,989 | D | |
| Common Stock | 06/01/2005 | | S | | 1,300 | D | $38.77 | 293,689 | D | |
| Common Stock | 06/01/2005 | | S | | 1,600 | D | $38.79 | 292,089 | D | |
| Common Stock | 06/01/2005 | | S | | 400 | D | $38.81 | 291,689 | D | |
| Common Stock | 06/01/2005 | | S | | 400 | D | $38.82 | 291,289 | D | |
| Common Stock | 06/01/2005 | | S | | 300[(1)] | D | $38.83 | 290,989 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)   All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

**Signatures**

/s/ Daniel Rosensweig                                            06/02/2005

<u>**</u>Signature of Reporting Person                                            Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person * ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)          (First)          (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 07/01/2005 | (Check all applicable) ___ Director        ___ 10% Owner _X_ Officer (give title below)   ___ Other (specify below) Chief Operating Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)          (State)          (Zip) | | |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 07/01/2005 | | M | | 76,000 | A | $7.305 | 367,979 | D | |
| Common Stock | 07/01/2005 | | S | | 600 | D | $34.24 | 367,379 | D | |
| Common Stock | 07/01/2005 | | S | | 1,100 | D | $34.25 | 366,279 | D | |
| Common Stock | 07/01/2005 | | S | | 700 | D | $34.26 | 365,579 | D | |
| Common Stock | 07/01/2005 | | S | | 600 | D | $34.27 | 364,979 | D | |
| Common Stock | 07/01/2005 | | S | | 500 | D | $34.3 | 364,479 | D | |
| Common Stock | 07/01/2005 | | S | | 700 | D | $34.32 | 363,779 | D | |
| Common Stock | 07/01/2005 | . | S | | 1,200 | D | $34.33 | 362,579 | D | |
| Common Stock | 07/01/2005 | | S | | 1,300 | D | $34.34 | 361,279 | D | |
| Common Stock | 07/01/2005 | | S | | 300 | D | $34.35 | 360,979 | D | |
| Common Stock | 07/01/2005 | | S | | 1,300 | D | $34.37 | 359,679 | D | |
| Common Stock | 07/01/2005 | | S | | 3,300 | D | $34.38 | 356,379 | D | |
| Common Stock | 07/01/2005 | | S | | 400 | D | $34.39 | 355,979 | D | |
| Common Stock | 07/01/2005 | | S | | 7,200 | D | $34.4 | 348,779 | D | |
| Common Stock | 07/01/2005 | | S | | 4,200 | D | $34.41 | 344,579 | D | |
| Common Stock | 07/01/2005 | | S | | 4,000 | D | $34.42 | 340,579 | D | |
| Common Stock | 07/01/2005 | | S | | 2,500 | D | $34.43 | 338,079 | D | |
| Common Stock | 07/01/2005 | | S | | 11,700 | D | $34.44 | 326,379 | D | |
| Common Stock | 07/01/2005 | | S | | 5,000 | D | $34.45 | 321,379 | D | |
| Common Stock | 07/01/2005 | | S | | 2,100 | D | $34.46 | 319,279 | D | |
| Common Stock | 07/01/2005 | | S | | 3,000 | D | $34.47 | 316,279 | D | |
| Common Stock | 07/01/2005 | | S | | 3,000 | D | $34.48 | 313,279 | D | |
| Common Stock | 07/01/2005 | | S | | 3,600 | D | $34.49 | 309,679 | D | |

| Common Stock | 07/01/2005 | | S | | 2,800 | D | $34.5 | 306,879 | D | |
| Common Stock | 07/01/2005 | | S | | 300[(2)] | D | $34.51 | 306,579[(3)] | D | |

## Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $7.305 | 07/01/2005 | | M | | | 76,000 | [(1)] | 04/24/2012 | Common Stock | 76,000 | $ 0 | 712,750 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

## Explanation of Responses:

(1) This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

(2) All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

(3) Includes 990 shares acquired through the Yahoo! Inc. Employee Stock Purchase Plan in April 2005.

## Signatures

| /s/ Michael Murray, attorney−in−fact for, Daniel Rosensweig | 07/05/2005 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *
ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol
YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)          (First)          (Middle)
C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)
07/01/2005 | (Check all applicable)
_____ Director                         _____ 10% Owner
_X_ Officer (give title below)    _____ Other (specify below)
Chief Operating Officer |
| (Street)
SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed
(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)
_X_ Form filed by One Reporting Person
_____ Form filed by More than One Reporting Person |
| (City)          (State)          (Zip) | | |

### Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 07/01/2005 | | S | | 1,200 | D | $34.52 | 305,379 | D | |
| Common Stock | 07/01/2005 | | S | | 3,500 | D | $34.53 | 301,879 | D | |
| Common Stock | 07/01/2005 | | S | | 1,400 | D | $34.54 | 300,479 | D | |
| Common Stock | 07/01/2005 | | S | | 1,500 | D | $34.55 | 298,979 | D | |
| Common Stock | 07/01/2005 | | S | | 2,800 | D | $34.58 | 296,179 | D | |
| Common Stock | 07/01/2005 | | S | | 300 | D | $34.6 | 295,879 | D | |
| Common Stock | 07/01/2005 | | S | | 1,400 | D | $34.61 | 294,479 | D | |
| Common Stock | 07/01/2005 | | S | | 1,200 | D | $34.71 | 293,279 | D | |
| Common Stock | 07/01/2005 | | S | | 1,300[1] | D | $34.72 | 291,979 | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
*(e.g.,* puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL
C/O YAHOO! INC.
701 FIRST AVENUE
SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)   All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

**Signatures**

<u>/s/ Michael Murray, attorney−in−fact for, Daniel Rosensweig</u>                    <u>07/05/2005</u>

<sup>**</sup>Signature of Reporting Person                                                                                                     Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2005
Estimated average burden hours per response... 0.5

(Print or Type Responses)

| 1. Name and Address of Reporting Person<br>ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
|---|---|---|
| (Last) (First) (Middle)<br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>08/01/2005 | ___ Director  ___ 10% Owner<br>_X_ Officer (give title below)  ___ Other (specify below)<br>Chief Operating Officer |
| (Street)<br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City) (State) (Zip) | | |

**Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 08/01/2005 | | M | | 76,000 | A | $7.305 | 367,979 | D | |
| Common Stock | 08/01/2005 | | S | | 50,000 | D | $33.57 | 317,979 | D | |
| Common Stock | 08/01/2005 | | S | | 26,000(2) | D | $33.58 | 291,979 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $7.305 | 08/01/2005 | | M | | | 76,000 | (1) | 04/24/2012 | Common Stock | 76,000 | (1) | 636,750 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

## Explanation of Responses:

(1) This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

(2) All shares reported sold on this Form 4 were sold pursuant to a 10b5-1 trading program.

(3)  not applicable

**Signatures**

<u>/s/ Michael Murray, attorney−in−fact for, Daniel Rosensweig</u>                    <u>08/02/2005</u>

<u>**</u>Signature of Reporting Person                                                                              Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235–0287 |
| Expires:          January 31, 2005 |
| Estimated average burden hours per response...          0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person – ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)          (First)          (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 09/01/2005 | (Check all applicable) ____ Director          ____ 10% Owner _X_ Officer (give title          ____ Other (specify below) below) Chief Operating Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ____ Form filed by More than One Reporting Person |
| (City)          (State)          (Zip) | | |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 09/01/2005 | | M | | 76,000 | A | $7.305 | 367,979 | D | |
| Common Stock | 09/01/2005 | | S | | 51,000 | D | $33.23 | 316,979 | D | |
| Common Stock | 09/01/2005 | | S | | 25,000(2) | D | $33.09 | 291,979 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $7.305 | 09/01/2005 | | M | | | 76,000 | (1) | 04/24/2012 | Common Stock | 76,000 | (1) | 560,750 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

## Explanation of Responses:

(1) This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

(2) All shares reported sold on this Form 4 were sold pursuant to a 10b5–1 trading program.

(3) not applicable

## Signatures

<u>/s/ Michael Murray, attorney–in–fact for, Daniel Rosensweig</u>                  <u>09/06/2005</u>

<sup>**</sup>Signature of Reporting Person                                     Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF
SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *  ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol  YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer  (Check all applicable) |
|---|---|---|
| (Last)    (First)    (Middle)  C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)  10/03/2005 | ___ Director         ___ 10% Owner  _X_ Officer (give title    ___ Other (specify below) below)  Chief Operating Officer |
| (Street)  SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)  _X_ Form filed by One Reporting Person  ___ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/03/2005 | | M | | 76,000 | A | $7.305 | 367,979 | D | |
| Common Stock | 10/03/2005 | | S | | 1,200 | D | $34.11 | 366,779 | D | |
| Common Stock | 10/03/2005 | | S | | 1,900 | D | $34.1 | 364,879 | D | |
| Common Stock | 10/03/2005 | | S | | 2,600 | D | $34.09 | 362,279 | D | |
| Common Stock | 10/03/2005 | | S | | 800 | D | $34.08 | 361,479 | D | |
| Common Stock | 10/03/2005 | | S | | 800 | D | $34.07 | 360,679 | D | |
| Common Stock | 10/03/2005 | | S | | 1,500 | D | $34.05 | 359,179 | D | |
| Common Stock | 10/03/2005 | | S | | 3,500 | D | $34.03 | 355,679 | D | |
| Common Stock | 10/03/2005 | | S | | 1,500 | D | $34.02 | 354,179 | D | |
| Common Stock | 10/03/2005 | | S | | 4,300 | D | $34.01 | 349,879 | D | |
| Common Stock | 10/03/2005 | | S | | 1,800 | D | $34 | 348,079 | D | |
| Common Stock | 10/03/2005 | | S | | 3,700 | D | $33.98 | 344,379 | D | |
| Common Stock | 10/03/2005 | | S | | 2,600 | D | $33.97 | 341,779 | D | |
| Common Stock | 10/03/2005 | | S | | 620 | D | $33.965 | 341,159 | D | |
| Common Stock | 10/03/2005 | | S | | 2,180 | D | $33.96 | 338,979 | D | |
| Common Stock | 10/03/2005 | | S | | 2,000 | D | $33.95 | 336,979 | D | |
| Common Stock | 10/03/2005 | | S | | 2,800 | D | $33.94 | 334,179 | D | |
| Common Stock | 10/03/2005 | | S | | 2,700 | D | $33.93 | 331,479 | D | |
| Common Stock | 10/03/2005 | | S | | 2,800 | D | $33.92 | 328,679 | D | |
| Common Stock | 10/03/2005 | | S | | 5,500 | D | $33.91 | 323,179 | D | |
| Common Stock | 10/03/2005 | | S | | 2,600 | D | $33.9 | 320,579 | D | |
| Common Stock | 10/03/2005 | | S | | 1,500 | D | $33.89 | 319,079 | D | |
| Common Stock | 10/03/2005 | | S | | 3,100 | D | $33.88 | 315,979 | D | |

| Common Stock | 10/03/2005 | | S | | 2,100 | D | $33.87 | 313,879 | D | |
| Common Stock | 10/03/2005 | | S | | 2,400[2] | D | $33.86 | 311,479 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $7.305 | 10/03/2005 | | M | | | 76,000 | [1] | 04/24/2012 | Common Stock | 76,000 | [3] | 484,750 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

## Explanation of Responses:

(1)  This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

(2)  All shares reported sold on this Form 4 were sold pursuant to a 10b5-1 trading program.

(3)  not applicable

## Signatures

| /s/ Michael J. Callahan attorney-in-fact for, Daniel Rosensweig | 10/05/2005 |
|---|---|
| \*\*Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*   If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person − ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)       (First)       (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 10/03/2005 | (Check all applicable) ___ Director        ___ 10% Owner _X_ Officer (give title below)   ___ Other (specify below) below) Chief Operating Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/03/2005 | | S | | 3,600 | D | $33.85 | 307,879 | D | |
| Common Stock | 10/03/2005 | | S | | 1,200 | D | $33.84 | 306,679 | D | |
| Common Stock | 10/03/2005 | | S | | 7,800 | D | $33.82 | 298,879 | D | |
| Common Stock | 10/03/2005 | | S | | 1,100 | D | $33.81 | 297,779 | D | |
| Common Stock | 10/03/2005 | | S | | 2,100 | D | $33.8 | 295,679 | D | |
| Common Stock | 10/03/2005 | | S | | 1,200 | D | $33.79 | 294,479 | D | |
| Common Stock | 10/03/2005 | | S | | 1,300 | D | $33.75 | 293,179 | D | |
| Common Stock | 10/03/2005 | | S | | 1,200[1] | D | $33.72 | 291,979 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1) All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

**Signatures**

/s/ Michael J. Callahan attorney−in−fact for, Daniel Rosensweig    10/05/2005

‾‾Signature of Reporting Person    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235–0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *:<br>ROSENSWEIG DANIEL<br><br>(Last)  (First)  (Middle)<br>C/O YAHOO! INC., 701 FIRST AVENUE<br>(Street)<br>SUNNYVALE, CA 94089<br>(City)  (State)  (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO]<br><br>3. Date of Earliest Transaction (Month/Day/Year)<br>11/01/2005<br><br>4. If Amendment, Date Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable)<br>___ Director  ___ 10% Owner<br>_X_ Officer (give title below)  ___ Other (specify below)<br>Chief Operating Officer<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |

## Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 11/01/2005 | | M | | 76,000 | A | $7.305 | 367,979 | D | |
| Common Stock | 11/01/2005 | | S | | 76,000[1] | D | $36.94 | 291,979 | D | |

## Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $7.305 | 11/01/2005 | | M | | | 76,000 | [2] | 04/24/2012 | Common Stock | 76,000 | [1] | 408,750 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)  All shares reported sold on this Form 4 were sold pursuant to a 10b5–1 trading program.

(2)  This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

(3)  not applicable

**Signatures**

| | |
|---|---|
| /s/ Michael Murray, attorney−in−fact for, Daniel Rosensweig | 11/02/2005 |
| ⁑Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See Instruction*
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF**
**SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)        (First)        (Middle)<br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>12/01/2005 | (Check all applicable)<br>___ Director                    ___ 10% Owner<br>_X_ Officer (give title below)    ___ Other (specify below)<br><br>Chief Operating Officer |
| (Street)<br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/01/2005 | | M | | 76,000 | A | $7.305 | 367,979 | D | |
| Common Stock | 12/01/2005 | | S | | 20,000 | D | $40.73 | 347,979 | D | |
| Common Stock | 12/01/2005 | | S | | 11,000 | D | $40.8384 | 336,979 | D | |
| Common Stock | 12/01/2005 | | S | | 25,000 | D | $40.86 | 311,979 | D | |
| Common Stock | 12/01/2005 | | S | | 20,000(1) | D | $40.9 | 291,979 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(*e.g.*, puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $7.305 | 12/01/2005 | | M | | | 76,000 | (2) | 04/24/2012 | Common Stock | 76,000 | (1) | 332,750 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)        All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

(2)        This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

(3)        not applicable

**Signatures**

<u>/s/ Michael Murray, attorney−in−fact for, Daniel Rosensweig</u>                                    <u>12/02/2005</u>

<u>**</u>Signature of Reporting Person                                                                                      Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

   *    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

   **   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See Instruction*
1(b).

### UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235–0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *ᐱ* ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| (Last)       (First)       (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 12/20/2005 | ____ Director          ____ 10% Owner X_ Officer (give title below)   ____ Other (specify below) Chief Operating Officer |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)       (State)       (Zip) | | |

### Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/20/2005 | | A | | 15,000[(1)] | A | $ 0 | 306,979 | D | |
| Common Stock | 12/20/2005 | | A | | 35,000[(2)] | A | $ 0 | 341,979 | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $40.68 | 12/20/2005 | | A | | 125,000 | | [3] | 12/20/2012 | Common Stock | 125,000 | [4] | 125,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

## Explanation of Responses:

(1)   These shares represent restricted stock units granted under the Yahoo! 1995 Stock Plan. Each restricted stock unit represents the contingent right to receive, upon the satisfaction of certain performance based objectives, one share of Yahoo! common stock as long as the officer remains in the service of the company through the vesting date.

(2) These shares represent restricted stock units granted under the Yahoo! 1995 Stock Plan. Each restricted stock unit represents the contingent right to receive, upon vesting of the unit, one share of Yahoo! common stock. These units are scheduled to vest three years from the date of grant as long as the officer remains in the service of the company through the vesting date.

(3) This option is scheduled to become exercisable at a rate of 1/4 of the securities underlying the option on the first anniversary of the grant date of 12/20/05 and 1/8 of the securities underlying the option bi−annually thereafter, such that the option is fully vested on 12/20/09.

(4) Not applicable.

## Signatures

<u>/s/ Michael J. Callahan, attorney−in−fact for, Daniel Rosensweig</u>                    <u>12/22/2005</u>

<sup>**</sup>Signature of Reporting Person                                                       Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235-0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
|---|---|---|
| (Last)      (First)      (Middle)<br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>01/03/2006 | ___ Director        ___ 10% Owner<br>_X_ Officer (give title below)  ___ Other (specify below)<br>Chief Operating Officer |
| (Street)<br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

### Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 01/03/2006 | | M | | 76,000 | A | $7.305 | 417,979 | D | |
| Common Stock | 01/03/2006 | | S | | 15,000 | D | $39.3 | 402,979 | D | |
| Common Stock | 01/03/2006 | | S | | 30,000 | D | $39.4 | 372,979 | D | |
| Common Stock | 01/03/2006 | | S | | 15,000 | D | $39.47 | 357,979 | D | |
| Common Stock | 01/03/2006 | | S | | 16,000[(1)] | D | $39.55 | 341,979 | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
#### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1.Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $7.305 | 01/03/2006 | | M | | | 76,000 | [(2)] | 04/24/2012 | Common Stock | 76,000 | [(1)] | 256,750 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)     All shares reported sold on this Form 4 were sold pursuant to a 10b5-1 trading program.

(2)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

(3)     not applicable

**Signatures**

<u>/s/ Michael Murray, attorney-in-fact for, Daniel Rosensweig</u>                    <u>01/04/2006</u>

<u>**</u>Signature of Reporting Person                                                     Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See Instruction 1(b).*

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person <br> ROSENSWEIG DANIEL <br> (Last)　(First)　(Middle) <br> C/O YAHOO! INC., 701 FIRST AVENUE <br> (Street) <br> SUNNYVALE, CA 94089 <br> (City)　(State)　(Zip) | 2. Issuer Name **and** Ticker or Trading Symbol <br> YAHOO INC [YHOO] <br><br> 3. Date of Earliest Transaction (Month/Day/Year) <br> 02/01/2006 <br><br> 4. If Amendment, Date Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer <br> (Check all applicable) <br> ___ Director ___ 10% Owner <br> _X_ Officer (give title below) ___ Other (specify below) <br> Chief Operating Officer <br><br> 6. Individual or Joint/Group Filing (Check Applicable Line) <br> _X_ Form filed by One Reporting Person <br> ___ Form filed by More than One Reporting Person |

## Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) Code | V | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) Amount | (A) or (D) | Price | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| Common Stock | 02/01/2006 | | M | | 76,000 | A | $7.305 | 417,979 | D | |
| Common Stock | 02/01/2006 | | S | | 15,000 | D | $34.45 | 402,979 | D | |
| Common Stock | 02/01/2006 | | S | | 26,000 | D | $34.48 | 376,979 | D | |
| Common Stock | 02/01/2006 | | S | | 20,000 | D | $34.5 | 356,979 | D | |
| Common Stock | 02/01/2006 | | S | | 15,000[1] | D | $34.58 | 341,979 | D | |

## Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) Code | V | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) (A) | (D) | 6. Date Exercisable and Expiration Date (Month/Day/Year) Date Exercisable | Expiration Date | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) Title | Amount or Number of Shares | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Stock Option ( right to buy ) | $7.305 | 02/01/2006 | | M | | | 76,000 | [2] | 04/24/2012 | Common Stock | 76,000 | [3] | 180,750 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL <br> C/O YAHOO! INC. <br> 701 FIRST AVENUE <br> SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)     All shares reported sold on this Form 4 were sold pursuant to a 10b5-1 trading program.

(2)     This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

(3)     not applicable

**Signatures**

/s/ Michael J. Callahan, attorney-in-fact for, Daniel Rosensweig                    02/01/2006

\*\*Signature of Reporting Person                                                                              Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF
SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235–0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
|---|---|---|
| (Last)    (First)    (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>03/01/2006 | ___ Director        ___ 10% Owner<br>_X_ Officer (give title    ___ Other (specify below)<br>below)<br>Chief Operating Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 03/01/2006 | | M | | 76,000 | A | $7.305 | 417,979 | D | |
| Common Stock | 03/01/2006 | | S | | 26,000 | D | $32.04 | 391,979 | D | |
| Common Stock | 03/01/2006 | | S | | 50,000[(1)] | D | $32.24 | 341,979 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $7.305 | 03/01/2006 | | M | | | 76,000 | [(2)] | 04/24/2012 | Common Stock | 76,000 | [(3)] | 104,750 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)    All shares reported sold on this Form 4 were sold pursuant to a 10b5–1 trading program.

(2)    This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 4/24/02 and 1/48th of the securities underlying the option on each monthly anniversary thereafter.

(3)      not applicable

## Signatures

<u>/s/ Michael Murray, attorney–in–fact for, Daniel Rosensweig</u>                    <u>03/01/2006</u>

<sup>**</sup>Signature of Reporting Person                                                                                    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person * <br> ROSENSWEIG DANIEL <br><br> (Last)    (First)    (Middle) <br> C/O YAHOO! INC., 701 FIRST AVENUE <br><br> (Street) <br><br> SUNNYVALE, CA 94089 <br> (City)    (State)    (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol <br> YAHOO INC [YHOO] <br><br> 3. Date of Earliest Transaction (Month/Day/Year) <br> 04/03/2006 <br><br><br> 4. If Amendment, Date Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer <br><br> (Check all applicable) <br><br> ___ Director    ___ 10% Owner <br> _X_ Officer (give title below)    ___ Other (specify below) <br> Chief Operating Officer <br><br> 6. Individual or Joint/Group Filing (Check Applicable Line) <br> _X_ Form filed by One Reporting Person <br> ___ Form filed by More than One Reporting Person |

**Table I – Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) Code | V | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) Amount | (A) or (D) | Price | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| Common Stock | 04/03/2006 | | M | | 76,000 | A | $8.23 | 417,979 | D | |
| Common Stock | 04/03/2006 | | S | | 25,000 | D | $32.4194 | 392,979 | D | |
| Common Stock | 04/03/2006 | | S | | 26,000 | D | $32.3408 | 366,979 | D | |
| Common Stock | 04/03/2006 | | S | | 25,000[1] | D | $32.3249 | 341,979 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) Code | V | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) (A) | (D) | 6. Date Exercisable and Expiration Date (Month/Day/Year) Date Exercisable | Expiration Date | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) Title | Amount or Number of Shares | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Stock Option ( right to buy ) | $8.23 | 04/03/2006 | | M | | | 76,000 | [2] | 12/11/2012 | Common Stock | 76,000 | [1] | 624,000 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL <br> C/O YAHOO! INC. <br> 701 FIRST AVENUE <br> SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)  All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

(2)  This option becomes exercisable at a rate of 4/48th of the securities underlying the option on 4/24/03 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 12/11/02 thereafter.

(3)  not applicable

## Signatures

<u>/s/ Michael Murray, attorney−in−fact for, Daniel Rosensweig</u>                    <u>04/04/2006</u>

<sup>\*\*</sup>Signature of Reporting Person                                                                    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*  Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person −<br>ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
|---|---|---|
| (Last)    (First)    (Middle)<br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>05/01/2006 | _____ Director      _____ 10% Owner<br>_X_ Officer (give title below)   _____ Other (specify below)<br>Chief Operating Officer |
| (Street)<br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>_____ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/01/2006 | | M | | 76,000 | A | $8.23 | 417,979 | D | |
| Common Stock | 05/01/2006 | | S | | 26,000 | D | $32.75 | 391,979 | D | |
| Common Stock | 05/01/2006 | | S | | 50,000(1) | D | $32.8277 | 341,979 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(*e.g.*, puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $8.23 | 05/01/2006 | | M | | | 76,000 | (2) | 12/11/2012 | Common Stock | 76,000 | (1) | 548,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1)  All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

(2)  This option becomes exercisable at a rate of 4/48th of the securities underlying the option on 4/24/03 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 12/11/02 thereafter.

(3) not applicable

**Signatures**

/s/ Michael Murray, attorney—in—fact for, Daniel Rosensweig                    05/03/2006

**\*\***Signature of Reporting Person                                                                            Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person ·<br>ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)         (First)         (Middle)<br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>05/31/2006 | (Check all applicable)<br>____ Director     ____ 10% Owner<br>_X_ Officer (give title below)   ____ Other (specify below)<br>Chief Operating Officer |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |
| (City)     (State)     (Zip) | | |

## Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/31/2006 | | A | | 50,000(4) | A | $ 0 | 392,625 | D | |
| Common Stock | 06/01/2006 | | M | | 76,000 | A | $8.23 | 468,625 | D | |
| Common Stock | 06/01/2006 | | S | | 50,000(1) | D | $31.5429 | 418,625 | D | |
| Common Stock | 06/01/2006 | | S | | 26,000(1) | D | $31.587 | 392,625(6) | D | |

## Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $31.59 | 05/31/2006 | | A | | 2,100,000 | | (5) | 05/31/2013 | Common Stock | 2,100,000 | (1) | 2,100,000 | D | |
| Employee Stock Option ( right to buy ) | $8.23 | 06/01/2006 | | M | | | 76,000 | (2) | 12/11/2012 | Common Stock | 76,000 | (1) | 472,000 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL C/O YAHOO! INC. | | | Chief Operating Officer | |

701 FIRST AVENUE
SUNNYVALE, CA 94089

**Explanation of Responses:**

(1)     All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

(2)     This option becomes exercisable at a rate of 4/48th of the securities underlying the option on 4/24/03 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 12/11/02 thereafter.

(3)     Not applicable.

(4)     These shares represent restricted stock units granted under the Yahoo! 1995 Stock Plan. Each restricted stock unit represents the contingent right to receive, upon the satisfaction of certain performance based objectives, but in no event prior to the first anniversary of the grant date, one share of Yahoo! common stock as long as the officer remains in the service of the company through the vesting date.

(5)     This option becomes exercisable according to the following schedule. 600,000 of the securities underlying the option becomes exercisable on the first anniversary of the grant date. 300,000 of the securities underlying the option becomes exercisable on the second anniversary of the grant date. 600,000 of the securities underlying the option becomes exercisable on the third anniversary of the grant date. The remaining 600,000 of the securities underlying the option becomes exercisable on the fourth anniversary of the grant date.

(6)     Includes 646 shares acquired through the Yahoo! Inc. Employee Stock Purchase Plan in May 2006

**Signatures**

| /s/ Michael J. Callahan, attorney−in−fact for, Daniel Rosensweig | 06/02/2006 |
| --- | --- |
| ‥Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF
SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL |
| --- |
| OMB Number: 3235-0287 |
| Expires:          January 31, 2005 |
| Estimated average burden hours per response...          0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>ROSENSWEIG DANIEL | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
| --- | --- | --- |
| (Last)          (First)          (Middle)<br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>07/03/2006 | ____ Director          ____ 10% Owner<br>_X_ Officer (give title below)          ____ Other (specify below)<br>          Chief Operating Officer |
| (Street)<br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |
| (City)          (State)          (Zip) | | |

**Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 07/03/2006 | | M | | 76,000 | A | $8.23 | 468,625 | D | |
| Common Stock | 07/03/2006 | | S | | 25,000 | D | $33.07 | 443,625 | D | |
| Common Stock | 07/03/2006 | | S | | 25,000 | D | $33.03 | 418,625 | D | |
| Common Stock | 07/03/2006 | | S | | 26,000[(1)] | D | $32.99 | 392,625 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $8.23 | 07/03/2006 | | M | | | 76,000 | [(2)] | 12/11/2012 | Common Stock | 76,000 | [(1)] | 396,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
| --- | --- | --- | --- | --- |
| | Director | 10% Owner | Officer | Other |
| ROSENSWEIG DANIEL<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | | | Chief Operating Officer | |

**Explanation of Responses:**

(1) All shares reported sold on this Form 4 were sold pursuant to a 10b5−1 trading program.

(2) This option becomes exercisable at a rate of 4/48th of the securities underlying the option on 4/24/03 and 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 12/11/02 thereafter.

(3) not applicable

**Signatures**

| /s/ Michael J. Callahan, attorney−in−fact for, Daniel Rosensweig | 07/05/2006 |
|---|---|
| \*\*Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

Exhibit 21

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235-0287 |
| Expires:      January 31, 2005 |
| Estimated average burden hours per response...      0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable) |
|---|---|---|
| (Last)        (First)        (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>04/12/2004 | _X_ Director            ____ 10% Owner<br>_X_ Officer (give title            ____ Other (specify below)<br>below)<br>Chairman & CEO |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

## Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 04/12/2004 | | M | | 61,800 | A | $9.24 | 1,037,865 | D | |
| Common Stock | 04/12/2004 | | M | | 100,000 | A | $16.46 | 1,137,865 | D | |
| Common Stock | 04/12/2004 | | M | | 1,338,200 | A | $12.92 | 2,476,065 | D | |
| Common Stock | 04/12/2004 | | S | | 50,000 | D | $54.885 | 2,426,065 | D | |
| Common Stock | 04/12/2004 | | S | | 50,000 | D | $54.9 | 2,376,065 | D | |
| Common Stock | 04/12/2004 | | S | | 25,000 | D | $54.92 | 2,351,065 | D | |
| Common Stock | 04/12/2004 | | S | | 50,000 | D | $54.93 | 2,301,065 | D | |
| Common Stock | 04/12/2004 | | S | | 50,000 | D | $54.98 | 2,251,065 | D | |
| Common Stock | 04/12/2004 | | S | | 25,000 | D | $54.99 | 2,226,065 | D | |
| Common Stock | 04/12/2004 | | S | | 25,000 | D | $55 | 2,201,065 | D | |
| Common Stock | 04/12/2004 | | S | | 25,000 | D | $55.01 | 2,176,065 | D | |
| Common Stock | 04/12/2004 | | S | | 25,000 | D | $55.03 | 2,151,065 | D | |
| Common Stock | 04/12/2004 | | S | | 50,000 | D | $55.04 | 2,101,065 | D | |
| Common Stock | 04/12/2004 | | S | | 100,000 | D | $55.045 | 2,001,065 | D | |
| Common Stock | 04/12/2004 | | S | | 75,000 | D | $55.05 | 1,926,065 | D | |
| Common Stock | 04/12/2004 | | S | | 125,000 | D | $55.07 | 1,801,065[(1)] | D | |

## Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

| Employee Stock Option ( right to buy ) | $9.24 | 04/12/2004 | | M | | | 61,800 | (2) | 10/02/2011 | Common Stock | 61,800 | $ 0 | 375,000 | D | |
| Employee Stock Option ( right to buy ) | $16.46 | 04/12/2004 | | M | | | 100,000 | (3) | 12/11/2012 | Common Stock | 100,000 | $ 0 | 533,334 | D | |
| Employee Stock Option ( right to buy ) | $12.92 | 04/12/2004 | | M | | | 1,338,200 | (4) | 07/11/2012 | Common Stock | 1,338,200 | $ 0 | 328,466 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1) Does not include 380 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act. Additional sales on 4/12/04 reported on subsequent Form 4 filed on 4/14/04.

(2) This option becomes exercisable at a rate of 1/8th of the securities underlying the option on 4/16/02 and thereafter at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 10/2/01 such that the option will be fully vested on 10/2/05.

(3) This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 12/11/02 such that the option will be fully vested on 12/11/06.

(4) This option becomes exercisable at a rate of 1/24th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 7/11/02.

## Signatures

<u>/s/ Michael J. Callahan, attorney–in–fact, for Terry Semel</u>          <u>04/14/2004</u>

<sup>**</sup> Signature of Reporting Person                                          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

OMB APPROVAL

OMB Number: 3235−0287
Expires: January 31, 2005
Estimated average burden hours per response... 0.5

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY<br><br>(Last)    (First)    (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE<br>(Street)<br><br>SUNNYVALE, CA 94089<br>(City)    (State)    (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO]<br><br>3. Date of Earliest Transaction (Month/Day/Year)<br>04/12/2004<br><br>4. If Amendment, Date Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable)<br>_X_ Director    ___ 10% Owner<br>_X_ Officer (give title  ___ Other (specify below)<br>below)<br>Chairman & CEO<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 04/12/2004 | | S | | 25,000 | D | $55.08 | 1,776,065 | D | |
| Common Stock | 04/12/2004 | | S | | 25,000 | D | $55.09 | 1,751,065 | D | |
| Common Stock | 04/12/2004 | | S | | 50,000 | D | $55.1 | 1,701,065 | D | |
| Common Stock | 04/12/2004 | | S | | 25,000 | D | $55.11 | 1,676,065 | D | |
| Common Stock | 04/12/2004 | | S | | 25,000 | D | $55.26 | 1,651,065 | D | |
| Common Stock | 04/12/2004 | | S | | 25,000 | D | $55.28 | 1,626,065 | D | |
| Common Stock | 04/12/2004 | | S | | 25,000 | D | $55.29 | 1,601,065 | D | |
| Common Stock | 04/12/2004 | | S | | 150,000 | D | $55.3 | 1,451,065 | D | |
| Common Stock | 04/12/2004 | | S | | 75,000 | D | $55.31 | 1,376,065 | D | |
| Common Stock | 04/12/2004 | | S | | 50,000 | D | $55.34 | 1,326,065 | D | |
| Common Stock | 04/12/2004 | | S | | 100,000 | D | $55.4 | 1,226,065 | D | |
| Common Stock | 04/12/2004 | | S | | 50,000 | D | $55.42 | 1,176,065 | D | |
| Common Stock | 04/12/2004 | | S | | 50,000 | D | $55.53 | 1,126,065 | D | |
| Common Stock | 04/12/2004 | | S | | 25,000 | D | $55.55 | 1,101,065 | D | |
| Common Stock | 04/12/2004 | | S | | 75,000 | D | $55.56 | 1,026,065 | D | |
| Common Stock | 04/12/2004 | | S | | 25,000 | D | $55.6 | 1,001,065 | D | |
| Common Stock | 04/12/2004 | | S | | 25,000 | D | $55.65 | 976,065[1] | D | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
#### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | 6. Date Exercisable and Expiration Date (Month/Day/Year) | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|

| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | (Instr. 4) | (Instr. 4) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1)   Does not include 380 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

## Signatures

| /s/ Michael J. Callahan, attorney-in-fact, for Terry Semel | 04/14/2004 |
|---|---|
| **Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires:           January 31, 2005 |
| Estimated average burden hours per response...        0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)          (First)          (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>04/15/2004 | (Check all applicable)<br><br>__X__  Director           _____ 10% Owner<br>__X__  Officer (give title           _____ Other (specify below)<br>below)<br>Chairman & CEO |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>__X__ Form filed by One Reporting Person<br>_____ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

## Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 04/15/2004 | | M | | 78,466 | A | $12.92 | 1,054,531 | D | |
| Common Stock | 04/15/2004 | | M | | 141,534 | A | $17.62 | 1,196,065 | D | |
| Common Stock | 04/15/2004 | | S | | 50,000 | D | $54.35 | 1,146,065 | D | |
| Common Stock | 04/15/2004 | | S | | 80,000 | D | $54.5 | 1,066,065 | D | |
| Common Stock | 04/15/2004 | | S | | 25,000 | D | $54.55 | 1,041,065 | D | |
| Common Stock | 04/15/2004 | | S | | 25,000 | D | $54.57 | 1,016,065 | D | |
| Common Stock | 04/15/2004 | | S | | 15,000 | D | $54.6 | 1,001,065 | D | |
| Common Stock | 04/15/2004 | | S | | 25,000 | D | $54.7 | 976,065[3] | D | |
| Common Stock | 04/16/2004 | | M | | 280,000 | A | $17.62 | 1,256,065 | D | |
| Common Stock | 04/16/2004 | | S | | 25,000 | D | $54.29 | 1,231,065 | D | |
| Common Stock | 04/16/2004 | | S | | 25,000 | D | $54.3 | 1,206,065 | D | |
| Common Stcok | 04/16/2004 | | S | | 25,000 | D | $54.35 | 1,181,065 | D | |
| Common Stock | 04/16/2004 | | S | | 25,000 | D | $54.37 | 1,156,065 | D | |
| Common Stock | 04/16/2004 | | S | | 25,000 | D | $54.38 | 1,131,065 | D | |
| Common Stock | 04/16/2004 | | S | | 40,000 | D | $54.4 | 1,091,065 | D | |
| Common Stock | 04/16/2004 | | S | | 24,500 | D | $54.5 | 1,066,565 | D | |
| Common Stock | 04/16/2004 | | S | | 25,000 | D | $54.51 | 1,041,565 | D | |
| Common Stock | 04/16/2004 | | S | | 15,000 | D | $54.63 | 1,026,565 | D | |
| Common Stock | 04/16/2004 | | S | | 25,500 | D | $54.64 | 1,001,065 | D | |
| Common Stock | 04/16/2004 | | S | | 25,000 | D | $54.7 | 976,065[3] | D | |

## Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative | 2. Conversion | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if | 4. Transaction Code | 5. Number of Derivative | 6. Date Exercisable and Expiration Date | 7. Title and Amount of Underlying Securities | 8. Price of Derivative | 9. Number of Derivative | 10. Ownership | 11. Nature of Indirect |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Security (Instr. 3) | or Exercise Price of Derivative Security | any (Month/Day/Year) | (Instr. 8) | | Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | (Month/Day/Year) | | (Instr. 3 and 4) | | Security (Instr. 5) | Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $12.92 | 04/15/2004 | M | | | 78,466 | (1) | 07/11/2012 | Common Stock | 78,466 | $ 0 | 250,000 | D | |
| Employee Stock Option ( right to buy ) | $17.62 | 04/15/2004 | M | | | 141,534 | (2) | 04/16/2011 | Common Stock | 141,534 | $ 0 | 4,858,466 | D | |
| Employee Stock Option ( right to buy ) | $17.62 | 04/16/2004 | M | | | 280,000 | (2) | 04/16/2011 | Common Stock | 280,000 | $ 0 | 4,578,466 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1)  This option becomes exercisable at a rate of 1/24th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 7/11/02.

(2)  This option becomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option is fully vested on 4/16/03.

(3)  Does not include 380 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

## Signatures

/s/ Michael J. Callahan, attorney-in-fact for Terry S. Semel                          04/19/2004

\*\*Signature of Reporting Person                                                                          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person <sup>*</sup><br>SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)    (First)    (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>05/21/2004 | (Check all applicable)<br><br>_X_ Director    ____ 10% Owner<br>_X_ Officer (give title    ____ Other (specify below)<br>below)<br><br>Chairman & CEO |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

## Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/21/2004 | | G | V | 350,900$^{(1)(2)}$ | D | $ 0 | 1,601,230$^{(2)(3)}$ | D | |

## Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1)    Voluntary early reporting of charitable gift.

(2)    All figures shown reflect the 2 for 1 stock split that was effective on May 11, 2004.

(3)    Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

## Signatures

/s/ Michael J. Callahan, attorney-in-fact for, Terry S. Semel                    06/08/2004

<sup>**</sup>Signature of Reporting Person                                                         Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235–0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY<br><br>(Last)        (First)        (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE<br>(Street)<br><br>SUNNYVALE, CA 94089<br>(City)        (State)        (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO]<br><br>3. Date of Earliest Transaction (Month/Day/Year)<br>07/13/2004<br><br>4. If Amendment, Date Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable)<br><br>_X_ Director          ___ 10% Owner<br>_X_ Officer (give title          ___ Other (specify below)<br>below)<br>Chairman & CEO<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |

## Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 07/13/2004 | | M | | 100,000 | A | $8.23 | 1,701,230 | D | |
| Common Stock | 07/13/2004 | | M | | 500,000 | A | $6.46 | 2,201,230 | D | |
| Common Stock | 07/13/2004 | | M | | 125,000 | A | $4.62 | 2,326,230 | D | |
| Common Stock | 07/13/2004 | | M | | 907,500 | A | $8.81 | 3,233,730 | D | |
| Common Stock | 07/13/2004 | | S | | 25,000 | D | $30.01 | 3,208,730 | D | |
| Common Stock | 07/13/2004 | | S | | 12,500 | D | $30.03 | 3,196,230 | D | |
| Common Stock | 07/13/2004 | | S | | 25,000 | D | $30.04 | 3,171,230 | D | |
| Common Stock | 07/13/2004 | | S | | 25,000 | D | $30.05 | 3,146,230 | D | |
| Common Stock | 07/13/2004 | | S | | 12,500 | D | $30.06 | 3,133,730 | D | |
| Common Stock | 07/13/2004 | | S | | 15,000 | D | $30.09 | 3,118,730 | D | |
| Common Stock | 07/13/2004 | | S | | 25,000 | D | $30.11 | 3,093,730 | D | |
| Common Stock | 07/13/2004 | | S | | 60,000 | D | $30.12 | 3,033,730 | D | |
| Common Stock | 07/13/2004 | | S | | 12,500 | D | $30.13 | 3,021,230 | D | |
| Common Stock | 07/13/2004 | | S | | 37,500 | D | $30.14 | 2,983,730 | D | |
| Common Stock | 07/13/2004 | | S | | 100,000 | D | $30.15 | 2,883,730 | D | |
| Common Stock | 07/13/2004 | | S | | 25,000 | D | $30.16 | 2,858,730 | D | |
| Common Stock | 07/13/2004 | | S | | 137,500 | D | $30.3 | 2,721,230 | D | |
| Common Stock | 07/13/2004 | | S | | 100,000 | D | $30.31 | 2,621,230 | D | |
| Common Stock | 07/13/2004 | | S | | 75,000 | D | $30.33 | 2,546,230 | D | |
| Common Stock | 07/13/2004 | | S | | 50,000 | D | $30.34 | 2,496,230 | D | |
| Common Stock | 07/13/2004 | | S | | 125,000 | D | $30.35 | 2,371,230 | D | |
| Common Stock | 07/13/2004 | | S | | 50,000 | D | $30.37 | 2,321,230 | D | |
| Common Stock | 07/13/2004 | | S | | 107,500 | D | $30.4 | 2,213,730[1)(6) | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $8.23 | 07/13/2004 | | M | | | 100,000 | (2) | 12/11/2012 | Common Stock | 100,000 | $ 0 | 966,668[1] | D | |
| Employee Stock Option ( right to buy ) | $6.46 | 07/13/2004 | | M | | | 500,000 | (3) | 07/11/2012 | Common Stock | 500,000 | $ 0 | 0 | D | |
| Employee Stock Option ( right to buy ) | $4.62 | 07/13/2004 | | M | | | 125,000 | (4) | 10/02/2011 | Common Stock | 125,000 | $ 0 | 625,000 | D | |
| Employee Stock Option ( right to buy ) | $8.81 | 07/13/2004 | | M | | | 907,500 | (5) | 04/16/2011 | Common Stock | 907,500 | $ 0 | 8,249,432 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

**Explanation of Responses:**

(1)    All figures shown reflect the 2 for 1 stock split that was effective on May 11, 2004.

(2)    This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 12/11/02 such that the option will be fully vested on 12/11/06.

(3)    This option becomes exercisable at a rate of 1/24th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 7/11/02 such that the option was fully vested on 7/11/04.

(4)    This option becomes exercisable at a rate of 1/8th of the securities underlying the option on 4/16/02 and thereafter at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date such that the option will be fully vested on 10/2/05.

(5)    This option becomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option was fully vested on 4/16/03.

(6)    Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

**Signatures**

/s/ Michael J. Callahan, attorney−in−fact for Terry S. Semel                    07/14/2004

\*\*Signature of Reporting Person                                              Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

OMB APPROVAL

OMB Number: 3235−0287
Expires: January 31, 2005
Estimated average burden hours per response... 0.5

(Print or Type Responses)

| 1. Name and Address of Reporting Person − SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| (Last)     (First)     (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 07/13/2004 | _X_ Director         ____ 10% Owner  _X_ Officer (give title         ____ Other (specify below) below)         Chairman & CEO |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ____ Form filed by More than One Reporting Person |
| (City)     (State)     (Zip) | | |

**Table I – Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 07/13/2004 | | S | | 25,000 | D | $30.41 | 2,188,730 | D | |
| Common Stock | 07/13/2004 | | S | | 62,500 | D | $30.43 | 2,126,230 | D | |
| Common Stock | 07/13/2004 | | S | | 50,000 | D | $30.45 | 2,076,230 | D | |
| Common Stock | 07/13/2004 | | S | | 50,000 | D | $30.46 | 2,026,230 | D | |
| Common Stock | 07/13/2004 | | S | | 25,000 | D | $30.54 | 2,001,230 | D | |
| Common Stock | 07/13/2004 | | S | | 10,000 | D | $30.57 | 1,991,230 | D | |
| Common Stock | 07/13/2004 | | S | | 60,000 | D | $30.58 | 1,931,230 | D | |
| Common Stock | 07/13/2004 | | S | | 10,000 | D | $30.59 | 1,921,230 | D | |
| Common Stock | 07/13/2004 | | S | | 25,000 | D | $30.6 | 1,896,230 | D | |
| Common Stock | 07/13/2004 | | S | | 110,000 | D | $30.61 | 1,786,230 | D | |
| Common Stock | 07/13/2004 | | S | | 35,000 | D | $30.63 | 1,751,230 | D | |
| Common Stock | 07/13/2004 | | S | | 60,000 | D | $30.67 | 1,691,230 | D | |
| Common Stock | 07/13/2004 | | S | | 10,000 | D | $30.69 | 1,681,230 | D | |
| Common Stock | 07/13/2004 | | S | | 10,000 | D | $30.7 | 1,671,230 | D | |
| Common Stock | 07/13/2004 | | S | | 50,000 | D | $30.71 | 1,621,230 | D | |
| Common Stock | 07/13/2004 | | S | | 10,000 | D | $30.73 | 1,611,230 | D | |
| Common Stock | 07/13/2004 | | S | | 10,000 | D | $30.75 | 1,601,230[1][2] | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | 6. Date Exercisable and Expiration Date (Month/Day/Year) | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | (Instr. 4) | (Instr. 4) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1)   All figures shown reflect the 2 for 1 stock split that was effective on May 11, 2004.

(2)   Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

## Signatures

| /s/ Michael J. Callahan, attorney−in−fact for, Terry S. Semel | 07/14/2004 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235-0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY<br><br>(Last)          (First)          (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE<br><br>(Street)<br><br>SUNNYVALE, CA 94089<br><br>(City)          (State)          (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO]<br><br>3. Date of Earliest Transaction (Month/Day/Year)<br>07/14/2004<br><br>4. If Amendment, Date Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable)<br><br>_X_ Director          ____ 10% Owner<br>_X_ Officer (give title          ____ Other (specify below)<br>below)<br>          Chairman & CEO<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |

### Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 07/14/2004 | | M | | 367,500 | A | $8.81 | 1,968,730 | D | |
| Common Stock | 07/14/2004 | | S | | 25,000 | D | $30.49 | 1,943,730 | D | |
| Common Stock | 07/14/2004 | | S | | 75,000 | D | $30.45 | 1,868,730 | D | |
| Common Stock | 07/14/2004 | | S | | 50,000 | D | $30.48 | 1,818,730 | D | |
| Common Stock | 07/14/2004 | | S | | 75,000 | D | $30.5 | 1,743,730 | D | |
| Common Stock | 07/14/2004 | | S | | 25,000 | D | $30.53 | 1,718,730 | D | |
| Common Stock | 07/14/2004 | | S | | 92,500 | D | $30.55 | 1,626,230 | D | |
| Common Stock | 07/14/2004 | | S | | 25,000 | D | $30.58 | 1,601,230[(1)] | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $8.81 | 07/14/2004 | | M | | | 367,500 | [(2)] | 04/16/2011 | Common Stock | 367,500 | $ 0 | 7,881,932 | D | |

### Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |

| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | X | | Chairman & CEO | |
|---|---|---|---|---|

**Explanation of Responses:**

(1)    Does not include 760 shares owned by wife for children under the Uniform Transfer to Minors Act.

(2)    This option becomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option was fully vested on 4/16/03.

**Signatures**

<u>/s/ Michael J. Callahan, attorney−in−fact for, Terry S. Semel</u>        <u>07/14/2004</u>

\*\*Signature of Reporting Person        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)      (First)      (Middle) | 3. Date of Earliest Transaction (Month/Day/Year)<br>07/27/2004 | (Check all applicable)<br>_X_ Director       ___ 10% Owner<br>_X_ Officer (give title       ___ Other (specify below)<br>below)<br>Chairman & CEO |
| C/O YAHOO! INC., 701 FIRST AVENUE | | |
| (Street) | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| SUNNYVALE, CA 94089 | | |
| (City)      (State)      (Zip) | | |

## Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 07/27/2004 | | M | | 1,000,000 | A | $8.81 | 2,601,230 | D | |
| Common Stock | 07/27/2004 | | S | | 25,000 | D | $29.85 | 2,576,230 | D | |
| Common Stock | 07/27/2004 | | S | | 25,000 | D | $29.87 | 2,551,230 | D | |
| Common Stock | 07/27/2004 | | S | | 100,000 | D | $29.88 | 2,451,230 | D | |
| Common Stock | 07/27/2004 | | S | | 25,000 | D | $29.89 | 2,426,230 | D | |
| Common Stock | 07/27/2004 | | S | | 50,000 | D | $29.9 | 2,376,230 | D | |
| Common Stock | 07/27/2004 | | S | | 125,000 | D | $29.91 | 2,251,230 | D | |
| Common Stock | 07/27/2004 | | S | | 75,000 | D | $29.92 | 2,176,230 | D | |
| Common Stock | 07/27/2004 | | S | | 25,000 | D | $29.93 | 2,151,230 | D | |
| Common Stock | 07/27/2004 | | S | | 100,000 | D | $29.94 | 2,051,230 | D | |
| Common Stock | 07/27/2004 | | S | | 125,000 | D | $29.95 | 1,926,230 | D | |
| Common Stock | 07/27/2004 | | S | | 75,000 | D | $30 | 1,851,230 | D | |
| Common Stock | 07/27/2004 | | S | | 150,000 | D | $30.02 | 1,701,230 | D | |
| Common Stock | 07/27/2004 | | S | | 25,000 | D | $30.03 | 1,676,230 | D | |
| Common Stock | 07/27/2004 | | S | | 25,000 | D | $30.04 | 1,651,230 | D | |
| Common Stock | 07/27/2004 | | S | | 50,000 | D | $30.05 | 1,601,230[1] | D | |

## Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

| Employee Stock Option ( right to buy ) | $8.81 | 07/27/2004 | | M | | | 1,000,000 | (2) | 04/16/2011 | Common Stock | 1,000,000 | $ 0 | 6,881,932 | D | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1)     Does not include 760 shares owned by wife for children under the Uniform Transfer to Minors Act.

(2)     This option becomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option was fully vested on 4/16/03.

## Signatures

/s/ Terry S. Semel                                                          07/27/2004

** Signature of Reporting Person                                    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*       If the form is filed by more than one reporting person, see Instruction 4(b)(v).

**      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person ‐ SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| (Last)        (First)        (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 10/19/2004 | X  Director          ___ 10% Owner<br>X  Officer (give title below)  ___ Other (specify below)<br>Chairman & CEO |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>X  Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/19/2004 | | M | | 100,001 | A | $8.23 | 1,701,231 | D | |
| Common Stock | 10/19/2004 | | M | | 125,000 | A | $4.62 | 1,826,231 | D | |
| Common Stock | 10/19/2004 | | M | | 674,999 | A | $8.81 | 2,501,230 | D | |
| Common Stock | 10/19/2004 | | S | | 225,000 | D | $35 | 2,276,230 | D | |
| Common Stock | 10/19/2004 | | S | | 50,000 | D | $35.02 | 2,226,230 | D | |
| Common Stock | 10/19/2004 | | S | | 25,000 | D | $35.03 | 2,201,230 | D | |
| Common Stock | 10/19/2004 | | S | | 25,000 | D | $35.05 | 2,176,230 | D | |
| Common Stock | 10/19/2004 | | S | | 25,000 | D | $35.07 | 2,151,230 | D | |
| Common Stock | 10/19/2004 | | S | | 50,000 | D | $35.1 | 2,101,230 | D | |
| Common Stock | 10/19/2004 | | S | | 60,000 | D | $35.25 | 2,041,230 | D | |
| Common Stock | 10/19/2004 | | S | | 12,500 | D | $35.27 | 2,028,730 | D | |
| Common Stock | 10/19/2004 | | S | | 52,500 | D | $35.28 | 1,976,230 | D | |
| Common Stock | 10/19/2004 | | S | | 100,000 | D | $35.3 | 1,876,230 | D | |
| Common Stock | 10/19/2004 | | S | | 75,000 | D | $35.32 | 1,801,230 | D | |
| Common Stock | 10/19/2004 | | S | | 25,000 | D | $35.4 | 1,776,230 | D | |
| Common Stock | 10/19/2004 | | S | | 50,000 | D | $35.41 | 1,726,230 | D | |
| Common Stock | 10/19/2004 | | S | | 50,000 | D | $35.42 | 1,676,230 | D | |
| Common Stock | 10/19/2004 | | S | | 25,000 | D | $35.45 | 1,651,230 | D | |
| Common Stock | 10/19/2004 | | S | | 15,000 | D | $35.5 | 1,636,230 | D | |
| Common Stock | 10/19/2004 | | S | | 10,000 | D | $35.52 | 1,626,230 | D | |
| Common Stock | 10/19/2004 | | S | | 25,000 | D | $35.53 | 1,601,230[(4)] | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $8.23 | 10/19/2004 | | M | | | 100,001 | (1) | 12/11/2012 | Common Stock | 100,001 | $ 0 | 866,667 | D | |
| Employee Stock Option ( right to buy ) | $4.62 | 10/19/2004 | | M | | | 125,000 | (2) | 10/02/2011 | Common Stock | 125,000 | $ 0 | 500,000 | D | |
| Employee Stock Option ( right to buy ) | $8.81 | 10/19/2004 | | M | | | 674,999 | (3) | 04/16/2011 | Common Stock | 674,999 | $ 0 | 6,206,933 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1)     This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 12/11/02 such that the option will be fully vested on 12/11/06.

(2)     This option becomes exercisable at a rate of 1/8th of the securities underlying the option on 4/16/02 and thereafter at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date such that the option will be fully vested on 10/2/05.

(3)     This option becomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option was fully vested on 4/16/03.

(4)     Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

## Signatures

| /s/ Michael J. Callahan, attorney-in-fact for Terry S. Semel | 10/20/2004 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

OMB APPROVAL

OMB Number: 3235–0287
Expires:          January
                  31, 2005
Estimated
average
burden hours
per response...      0.5

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY<br><br>(Last)          (First)          (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE<br><br>(Street)<br><br>SUNNYVALE, CA 94089<br>(City)          (State)          (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO]<br><br>3. Date of Earliest Transaction (Month/Day/Year)<br>10/20/2004<br><br>4. If Amendment, Date Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable)<br><br>_X_ Director              ____ 10% Owner<br>_X_ Officer (give title    ____ Other (specify below)<br>below)<br>Chairman & CEO<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |

### Table I — Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) Code | V | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) Amount | (A) or (D) | Price | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| Common Stock | 10/20/2004 | | M | | 167,000 | A | $8.81 | 1,768,230 | D | |
| Common Stock | 10/20/2004 | | S | | 10,000 | D | $34.15 | 1,758,230 | D | |
| Common Stock | 10/20/2004 | | S | | 12,000 | D | $34.17 | 1,746,230 | D | |
| Common Stock | 10/20/2004 | | S | | 15,000 | D | $34.18 | 1,731,230 | D | |
| Common Stock | 10/20/2004 | | S | | 15,000 | D | $34.19 | 1,716,230 | D | |
| Common Stock | 10/20/2004 | | S | | 10,000 | D | $34.2 | 1,706,230 | D | |
| Common Stock | 10/20/2004 | | S | | 3,000 | D | $34.22 | 1,703,230 | D | |
| Common Stock | 10/20/2004 | | S | | 10,000 | D | $34.24 | 1,693,230 | D | |
| Common Stock | 10/20/2004 | | S | | 12,500 | D | $34.25 | 1,680,730 | D | |
| Common Stock | 10/20/2004 | | S | | 27,500 | D | $34.26 | 1,653,230 | D | |
| Common Stock | 10/20/2004 | | S | | 12,500 | D | $34.27 | 1,640,730 | D | |
| Common Stock | 10/20/2004 | | S | | 22,500 | D | $34.28 | 1,618,230 | D | |
| Common Stock | 10/20/2004 | | S | | 17,000 | D | $34.5 | 1,601,230[2] | D | |

### Table II — Derivative Securities Acquired, Disposed of, or Beneficially Owned
#### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) Code | V | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) (A) | (D) | 6. Date Exercisable and Expiration Date (Month/Day/Year) Date Exercisable | Expiration Date | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) Title | Amount or Number of Shares | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee Stock Option ( right to | $8.81 | 10/20/2004 | | M | | | 167,000 | [1] | 04/16/2011 | Common Stock | 167,000 | $ 0 | 6,039,933 | D | |

buy )

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1)    This option becomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option was fully vested on 4/16/03.

(2)    Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

## Signatures

/s/ Michael J. Callahan, attorney-in-fact for Terry S. Semel                      10/21/2004

** Signature of Reporting Person                                                                        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person − SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| (Last)      (First)      (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 10/21/2004 | X Director ___ 10% Owner X Officer (give title below) ___ Other (specify below) Chairman & CEO |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) X Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

## Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/21/2004 | | M | | 1,383,000 | A | $8.81 | 2,984,230 | D | |
| Common Stock | 10/21/2004 | | S | | 50,000 | D | $35.1 | 2,934,230 | D | |
| Common Stock | 10/21/2004 | | S | | 57,500 | D | $35.11 | 2,876,730 | D | |
| Common Stock | 10/21/2004 | | S | | 15,000 | D | $35.12 | 2,861,730 | D | |
| Common Stock | 10/21/2004 | | S | | 52,500 | D | $35.13 | 2,809,230 | D | |
| Common Stock | 10/21/2004 | | S | | 37,500 | D | $35.14 | 2,771,730 | D | |
| Common Stock | 10/21/2004 | | S | | 12,500 | D | $35.15 | 2,759,230 | D | |
| Common Stock | 10/21/2004 | | S | | 82,500 | D | $35.2 | 2,676,730 | D | |
| Common Stock | 10/21/2004 | | S | | 15,000 | D | $35.21 | 2,661,730 | D | |
| Common Stock | 10/21/2004 | | S | | 40,000 | D | $35.22 | 2,621,730 | D | |
| Common Stock | 10/21/2004 | | S | | 55,000 | D | $35.23 | 2,566,730 | D | |
| Common Stock | 10/21/2004 | | S | | 22,500 | D | $35.24 | 2,544,230 | D | |
| Common Stock | 10/21/2004 | | S | | 87,500 | D | $35.25 | 2,456,730 | D | |
| Common Stock | 10/21/2004 | | S | | 62,500 | D | $35.27 | 2,394,230 | D | |
| Common Stock | 10/21/2004 | | S | | 10,000 | D | $35.28 | 2,384,230 | D | |
| Common Stock | 10/21/2004 | | S | | 25,000 | D | $35.29 | 2,359,230 | D | |
| Common Stock | 10/21/2004 | | S | | 75,000 | D | $35.3 | 2,284,230 | D | |
| Common Stock | 10/21/2004 | | S | | 95,000 | D | $35.5 | 2,189,230 | D | |
| Common Stock | 10/21/2004 | | S | | 45,000 | D | $35.51 | 2,144,230 | D | |
| Common Stock | 10/21/2004 | | S | | 25,000 | D | $35.53 | 2,119,230 | D | |
| Common Stock | 10/21/2004 | | S | | 10,000 | D | $35.55 | 2,109,230 | D | |
| Common Stock | 10/21/2004 | | S | | 25,000 | D | $35.59 | 2,084,230[2] | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $8.81 | 10/21/2004 | | M | | | 1,383,000 | (1) | 04/16/2011 | Common Stock | 1,383,000 | $ 0 | 4,656,933 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1)     This option becomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option was fully vested on 4/16/03.

(2)     Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

## Signatures

/s/ Michael J. Callahan, attorney-in-fact for Terry S. Semel                              10/21/2004

** Signature of Reporting Person                                                                                     Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)　　　(First)　　　(Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>10/21/2004 | (Check all applicable)<br><br>　X　Director　　　　　10% Owner<br>　X　Officer (give title　　　　Other (specify below)<br>below)<br>　　　　Chairman & CEO |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>　X　Form filed by One Reporting Person<br>　　　Form filed by More than One Reporting Person |
| (City)　　(State)　　(Zip) | | |

**Table I – Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/21/2004 | | S | | 62,500 | D | $35.6 | 2,021,730 | D | |
| Common Stock | 10/21/2004 | | S | | 50,000 | D | $35.61 | 1,971,730 | D | |
| Common Stock | 10/21/2004 | | S | | 37,500 | D | $35.62 | 1,934,230 | D | |
| Common Stock | 10/21/2004 | | S | | 50,000 | D | $35.63 | 1,884,230 | D | |
| Common Stock | 10/21/2004 | | S | | 45,000 | D | $35.64 | 1,839,230 | D | |
| Common Stock | 10/21/2004 | | S | | 15,000 | D | $35.65 | 1,824,230 | D | |
| Common Stock | 10/21/2004 | | S | | 15,000 | D | $35.66 | 1,809,230 | D | |
| Common Stock | 10/21/2004 | | S | | 65,000 | D | $35.7 | 1,744,230 | D | |
| Common Stock | 10/21/2004 | | S | | 10,000 | D | $35.71 | 1,734,230 | D | |
| Common Stock | 10/21/2004 | | S | | 12,500 | D | $35.73 | 1,721,730 | D | |
| Common Stock | 10/21/2004 | | S | | 33,000 | D | $35.75 | 1,688,730 | D | |
| Common Stock | 10/21/2004 | | S | | 37,500 | D | $35.76 | 1,651,230 | D | |
| Common Stock | 10/21/2004 | | S | | 25,000 | D | $35.77 | 1,626,230 | D | |
| Common Stock | 10/21/2004 | | S | | 25,000 | D | $35.8 | 1,601,230[1] | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

**Explanation of Responses:**

(1)  Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

**Signatures**

/s/ Michael J. Callahan, attorney—in—fact for Terry S. Semel                                    10/21/2004

**Signature of Reporting Person                                                                    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See Instruction
1(b).*

### UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF
### SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

OMB APPROVAL

OMB Number: 3235-0287
Expires:      January
              31, 2005
Estimated
average
burden hours
per response...    0.5

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY | 2. Issuer **name** and Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable)<br><br>_X_ Director        ___ 10% Owner<br>_X_ Officer (give title   ___ Other (specify below)<br>below)<br>Chairman & CEO |
|---|---|---|
| (Last)       (First)       (Middle)<br><br>C/O YAHOO! INC., 701 FIRST<br>AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>10/22/2004 | |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check<br>Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)       (State)       (Zip) | | |

### Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security<br>(Instr. 3) | 2. Transaction Date<br>(Month/Day/Year) | 2A. Deemed<br>Execution Date, if<br>any<br>(Month/Day/Year) | 3. Transaction<br>Code<br>(Instr. 8) | | 4. Securities Acquired (A) or<br>Disposed of (D)<br>(Instr. 3, 4 and 5) | | | 5. Amount of<br>Securities<br>Beneficially Owned<br>Following Reported<br>Transaction(s)<br>(Instr. 3 and 4) | 6. Ownership Form:<br>Direct (D) or<br>Indirect (I)<br>(Instr. 4) | 7. Nature of<br>Indirect Beneficial<br>Ownership<br>(Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A)<br>or<br>(D) | Price | | | |
| Common Stock | 10/22/2004 | | M | | 550,000 | A | $8.81 | 2,151,230 | D | |
| Common Stock | 10/22/2004 | | S | | 15,000 | D | $35.6 | 2,136,230 | D | |
| Common Stock | 10/22/2004 | | S | | 25,000 | D | $35.62 | 2,111,230 | D | |
| Common Stock | 10/22/2004 | | S | | 50,000 | D | $35.64 | 2,061,230 | D | |
| Common Stock | 10/22/2004 | | S | | 15,000 | D | $35.65 | 2,046,230 | D | |
| Common Stock | 10/22/2004 | | S | | 25,000 | D | $35.66 | 2,021,230 | D | |
| Common Stock | 10/22/2004 | | S | | 25,000 | D | $35.7 | 1,996,230 | D | |
| Common Stock | 10/22/2004 | | S | | 25,000 | D | $35.72 | 1,971,230 | D | |
| Common Stock | 10/22/2004 | | S | | 45,000 | D | $35.75 | 1,926,230 | D | |
| Common Stock | 10/22/2004 | | S | | 15,000 | D | $35.77 | 1,911,230 | D | |
| Common Stock | 10/22/2004 | | S | | 25,000 | D | $35.78 | 1,886,230 | D | |
| Common Stock | 10/22/2004 | | S | | 15,000 | D | $35.79 | 1,871,230 | D | |
| Common Stock | 10/22/2004 | | S | | 20,000 | D | $35.8 | 1,851,230 | D | |
| Common Stock | 10/22/2004 | | S | | 50,000 | D | $36.4 | 1,801,230 | D | |
| Common Stock | 10/22/2004 | | S | | 25,000 | D | $36.44 | 1,776,230 | D | |
| Common Stock | 10/22/2004 | | S | | 25,000 | D | $36.47 | 1,751,230 | D | |
| Common Stock | 10/22/2004 | | S | | 100,000 | D | $36.5 | 1,651,230 | D | |
| Common Stock | 10/22/2004 | | S | | 25,000 | D | $36.53 | 1,626,230 | D | |
| Common Stock | 10/22/2004 | | S | | 12,500 | D | $36.55 | 1,613,730 | D | |
| Common Stock | 10/22/2004 | | S | | 12,500 | D | $36.6 | 1,601,230[2] | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of<br>Derivative | 2.<br>Conversion | 3. Transaction Date<br>(Month/Day/Year) | 3A. Deemed<br>Execution Date, if | 4. Transaction<br>Code | 5. Number of<br>Derivative | 6. Date Exercisable and<br>Expiration Date | 7. Title and Amount of<br>Underlying Securities | 8. Price of<br>Derivative | 9. Number of<br>Derivative | 10.<br>Ownership | 11. Nature<br>of Indirect |
|---|---|---|---|---|---|---|---|---|---|---|

| Security (Instr. 3) | or Exercise Price of Derivative Security | any (Month/Day/Year) | (Instr. 8) | | | Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | (Month/Day/Year) | | (Instr. 3 and 4) | | Security (Instr. 5) | Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $8.81 | 10/22/2004 | | M | | | 550,000 | (1) | 04/16/2011 | Common Stock | 550,000 | $ 0 | 4,106,933 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1) This option becomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option was fully vested on 4/16/03.

(2) Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

## Signatures

/s/ Michael J. Callahan, attorney-in-fact for Terry S. Semel                    10/25/2004

** Signature of Reporting Person                                                        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: 3235−0287 | |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)        (First)        (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>12/16/2004 | (Check all applicable)<br>X__ Director          ____ 10% Owner<br>_X__ Officer (give title<br>below)          ____ Other (specify below)<br>Chairman & CEO |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)     (State)     (Zip) | | |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1.Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $37.08 | 12/16/2004 | | A | | 1,200,000 | | (1) | 12/16/2014 | Common Stock | 1,200,000 | $ 0 | 1,200,000 | D | |
| Stock Option ( right to buy ) | $37.08 | 12/16/2004 | | A | | 200,000 | | (2) | 12/16/2014 | Common Stock | 200,000 | $ 0 | 1,400,000 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

**Explanation of Responses:**

(1) This option is fully vested and exercisable on 12/16/04.

(2) This option becomes exercisable at a rate of 1/4th of the securities underlying the option on the first anniversary of the vesting commencement date of 12/16/04 and 1/16th of the securities underlying the option in quarterly installments thereafter, such that the option is fully vested on 12/16/08.

**Signatures**

<u>/s/ Michael J. Callahan, attorney–in–fact for, Terry S. Semel</u>          <u>12/20/2004</u>

<sub>**</sub>Signature of Reporting Person                        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
|---|---|---|
| (Last)        (First)        (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>01/24/2005 | _X_ Director          ____ 10% Owner<br>_X_ Officer (give title below)     ____ Other (specify below)<br>Chairman & CEO |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 01/24/2005 | | M | | 22,700 | A | $8.81 | 1,623,930 | D | |
| Common Stock | 01/24/2005 | | M | | 11,350 | A | $15 | 1,635,280 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $8.81 | 01/24/2005 | | M | | 22,700 | | (1) | 04/16/2011 | Common Stock | 22,700 | $ 0 | 4,084,233 | D | |
| Employee Stock Option ( right to buy ) | $15 | 01/24/2005 | | M | | 11,350 | | (2) | 04/16/2011 | Common Stock | 11,350 | $ 0 | 4,988,650 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

**Explanation of Responses:**

(1)     This option becomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option was fully vested on 4/16/03.

(2)     This option becomes exercisable at a rate of 1/12th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 4/16/03.

## Signatures

/s/ Michael J. Callahan, attorney−in−fact for, Terry S. Semel                    01/25/2005

**\*\***Signature of Reporting Person                                                                                      Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235–0287 |
| Expires:          January 31, 2005 |
| Estimated average burden hours per response...          0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)      (First)      (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 01/24/2005 | (Check all applicable) X  Director          10% Owner X  Officer (give title below)          Other (specify below) Chairman & CEO |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) 01/26/2005 | 6. Individual or Joint/Group Filing (Check Applicable Line) X  Form filed by One Reporting Person      Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 01/24/2005 | | M | | 22,700 | A | $8.81 | 1,623,930 | D | |
| Common Stock | 01/24/2005 | | M | | 11,350 | A | $15 | 1,635,280 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $8.81 | 01/24/2005 | | M | | | 22,700 | (1) | 04/16/2011 | Common Stock | 22,700 | $ 0 | 4,084,233 | D | |
| Employee Stock Option ( right to buy ) | $15 | 01/24/2005 | | M | | | 11,350 | (2) | 04/16/2011 | Common Stock | 11,350 | $ 0 | 4,988,650 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

**Explanation of Responses:**

(1)      This option becomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option was fully vested on 4/16/03.

(2)      This option becomes exercisable at a rate of 1/12th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 4/16/03.

## Signatures

<u>/s/ Michael J. Callahan, attorney-in-fact for, Terry S. Semel</u>          <u>02/25/2005</u>

<sup>**</sup>Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY<br><br>(Last)    (First)    (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE<br>(Street)<br><br>SUNNYVALE, CA 94089<br>(City)    (State)    (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO]<br><br>3. Date of Earliest Transaction (Month/Day/Year)<br>02/01/2005<br><br>4. If Amendment, Date Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable)<br>_X_ Director          ___ 10% Owner<br>_X_ Officer (give title    ___ Other (specify below)<br>below)<br>          Chairman & CEO<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 02/01/2005 | | A | | 250,000(1) | A | $ 0 | 1,885,280 | D | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $34.75 | 02/01/2005 | | A | | 2,000,000 | | (2) | 02/01/2015 | Common Stock | 2,000,000 | $ 0 | 2,000,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1) These shares represent shares of restricted stock granted under the Yahoo! Inc. 1995 Stock Plan. These shares will vest three years from the date of grant of 2/1/05 as long as the officer remains in the service of the company as of the vesting date.

(2) This option becomes exercisable on the 4th anniversary of the grant date of 2/1/05. The vesting of this option is subject to acceleration for satisfaction of certain performance criteria regarding the operating performance of the company.

**Signatures**

| | |
|---|---|
| /s/ Michael J. Callahan, attorney–in–fact for, Terry S. Semel | 02/02/2005 |
| **\*\***Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
| --- | --- |
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person * SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
| --- | --- | --- |
| (Last)   (First)   (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 02/04/2005 | X___ Director     ___ 10% Owner X___ Officer (give title below)   ___ Other (specify below) Chairman & CEO |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) X___ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)   (State)   (Zip) | | |

## Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 02/04/2005 | | M | | 21,000 | A | $4.62 | 1,906,280 | D | |
| Common Stock | 02/04/2005 | | S | | 2,500 | D | $35.23 | 1,903,780 | D | |
| Common Stock | 02/04/2005 | | S | | 2,500 | D | $35.22 | 1,901,280 | D | |
| Common Stock | 02/04/2005 | | S | | 5,000 | D | $35.21 | 1,896,280 | D | |
| Common Stock | 02/04/2005 | | S | | 10,000 | D | $35.19 | 1,886,280 | D | |
| Common Stock | 02/04/2005 | | S | | 1,000 | D | $35.19 | 1,885,280 | D | |
| Common Stock | 02/07/2005 | | M | | 2,900 | A | $4.62 | 1,888,180 | D | |
| Common Stock | 02/07/2005 | | S | | 2,900 | D | $35.09 | 1,885,280 | D | |

## Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $4.62 | 02/04/2005 | | M | | | 21,000 | (1) | 10/02/2011 | Common Stock | 21,000 | $ 0 | 479,000 | D | |
| Stock Option ( right to buy ) | $4.62 | 02/07/2005 | | M | | | 2,900 | (1) | 10/02/2011 | Common Stock | 2,900 | $ 0 | 476,100 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

**Explanation of Responses:**

(1)     This option becomes exercisable at a rate of 1/8th of the securities underlying the option on 4/16/02 and thereafter at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date such that the option will be fully vested on 10/2/05.

**Signatures**

/s/ Michael J. Callahan, attorney–in–fact for, Terry S. Semel                    02/08/2005

\*\*Signature of Reporting Person                                                                    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable) |
|---|---|---|
| (Last)          (First)          (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>04/22/2005 | X  Director                    ___ 10% Owner<br>X  Officer (give title  ___ Other (specify below)<br>below)<br>                Chairman & CEO |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>X  Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)     (State)     (Zip) | | |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 04/22/2005 | | M | | 226,100 | A | $4.62 | 2,111,380 | D | |
| Common Stock | 04/22/2005 | | M | | 200,000 | A | $8.23 | 2,311,380 | D | |
| Common Stock | 04/22/2005 | | M | | 453,900 | A | $8.81 | 2,765,280 | D | |
| Common Stock | 04/22/2005 | | S | | 50,000 | D | $34.856 | 2,715,280 | D | |
| Common Stock | 04/22/2005 | | S | | 50,000 | D | $34.87 | 2,665,280 | D | |
| Common Stock | 04/22/2005 | | S | | 180,000 | D | $34.9 | 2,485,280 | D | |
| Common Stock | 04/22/2005 | | S | | 50,000 | D | $34.91 | 2,435,280 | D | |
| Common Stock | 04/22/2005 | | S | | 50,000 | D | $34.914 | 2,385,280 | D | |
| Common Stock | 04/22/2005 | | S | | 50,000 | D | $34.92 | 2,335,280 | D | |
| Common Stock | 04/22/2005 | | S | | 100,000 | D | $35 | 2,235,280 | D | |
| Common Stock | 04/22/2005 | | S | | 50,000 | D | $35.01 | 2,185,280 | D | |
| Common Stock | 04/22/2005 | | S | | 100,000 | D | $35.065 | 2,085,280 | D | |
| Common Stock | 04/22/2005 | | S | | 100,000 | D | $35.2185 | 1,985,280 | D | |
| Common Stock | 04/22/2005 | | S | | 100,000 | D | $35.3105 | 1,885,280 | D | |
| Common Stock | 04/25/2005 | | M | | 620,000 | A | $8.81 | 2,505,280 | D | |
| Common Stock | 04/25/2005 | | S | | 100,000 | D | $34.67 | 2,405,280 | D | |
| Common Stock | 04/25/2005 | | S | | 100,000 | D | $34.8 | 2,305,280 | D | |
| Common Stock | 04/25/2005 | | S | | 100,000 | D | $34.85 | 2,205,280 | D | |
| Common Stock | 04/25/2005 | | S | | 50,000 | D | $34.86 | 2,155,280 | D | |
| Common Stock | 04/25/2005 | | S | | 50,000 | D | $34.9 | 2,105,280 | D | |
| Common Stock | 04/25/2005 | | S | | 50,000 | D | $34.95 | 2,055,280 | D | |
| Common Stock | 04/25/2005 | | S | | 170,000 | D | $35 | 1,885,280 | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $4.62 | 04/22/2005 | | M | | | 226,100 | (1) | 10/02/2011 | Common Stock | 226,100 | $ 0 | 250,000 | D | |
| Stock Option ( right to buy ) | $8.81 | 04/22/2005 | | M | | | 453,900 | (2) | 04/16/2011 | Common Stock | 453,900 | $ 0 | 3,630,333 | D | |
| Stock Option ( right to buy ) | $8.23 | 04/22/2005 | | M | | | 200,000 | (3) | 12/11/2012 | Common Stock | 200,000 | $ 0 | 666,667 | D | |
| Stock Option ( right to buy ) | $8.81 | 04/25/2005 | | M | | | 620,000 | (2) | 04/16/2011 | Common Stock | 620,000 | $ 0 | 3,010,333 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1)  This option becomes exercisable at a rate of 1/8th of the securities underlying the option on 4/16/02 and thereafter at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date such that the option will be fully vested on 10/2/05.

(2)  This option becomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option was fully vested on 4/16/03.

(3)  This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 12/11/02 such that the option will be fully vested on 12/11/06.

## Signatures

/s/ Terry S. Semel                                    04/25/2005

** Signature of Reporting Person                Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) |
|---|---|---|
| (Last)        (First)        (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>04/26/2005 | _X_ Director          ____ 10% Owner<br>_X_ Officer (give title     ____ Other (specify below)<br>below)<br>Chairman & CEO |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 04/26/2005 | | M | | 550,000 | A | $8.81 | 2,435,280 | D | |
| Common Stock | 04/26/2005 | | S | | 100,000 | D | $35 | 2,335,280 | D | |
| Common Stock | 04/26/2005 | | S | | 50,000 | D | $35.06 | 2,285,280 | D | |
| Common Stock | 04/26/2005 | | S | | 50,000 | D | $35.1 | 2,235,280 | D | |
| Common Stock | 04/26/2005 | | S | | 50,000 | D | $35.21 | 2,185,280 | D | |
| Common Stock | 04/26/2005 | | S | | 50,000 | D | $35.23 | 2,135,280 | D | |
| Common Stock | 04/26/2005 | | S | | 100,000 | D | $35.25 | 2,035,280 | D | |
| Common Stock | 04/26/2005 | | S | | 75,000 | D | $35.27 | 1,960,280 | D | |
| Common Stock | 04/26/2005 | | S | | 35,000 | D | $35.3 | 1,925,280 | D | |
| Common Stock | 04/26/2005 | | S | | 15,000 | D | $35.31 | 1,910,280 | D | |
| Common Stock | 04/26/2005 | | S | | 25,000 | D | $35.32 | 1,885,280 | D | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
#### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $8.81 | 04/26/2005 | | M | | | 550,000 | (1) | 04/16/2011 | Common Stock | 550,000 | $ 0 | 2,460,333 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

**Explanation of Responses:**

(1)     This option becomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option was fully vested on 4/16/03.

**Signatures**

<u>/s/ Terry S. Semel</u>                                    <u>04/26/2005</u>

**Signature of Reporting Person                          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: 3235−0287 | |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person <sup>*</sup><br>SEMEL TERRY | | | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable) |
|---|---|---|---|---|
| (Last) | (First) | (Middle) | 3. Date of Earliest Transaction (Month/Day/Year)<br>04/27/2005 | _X_ Director _____ 10% Owner<br>_X_ Officer (give title _____ Other (specify below)<br>below)<br>Chairman & CEO |
| C/O YAHOO! INC., 701 FIRST AVENUE | | | | |
| (Street) | | | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| SUNNYVALE, CA 94089 | | | | |
| (City) | (State) | (Zip) | | |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 04/27/2005 | | M | | 200,000 | A | $8.81 | 2,085,280 | D | |
| Common Stock | 04/27/2005 | | S | | 100,000 | D | $35 | 1,985,280 | D | |
| Common Stock | 04/27/2005 | | S | | 100,000 | D | $35.1 | 1,885,280 | D | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $8.81 | 04/27/2005 | | M | | | 200,000 | (1) | 04/16/2011 | Common Stock | 200,000 | $ 0 | 2,260,333 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1)  This option becomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement
date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option was fully
vested on 4/16/03.

**Signatures**

| | |
|---|---|
| /s/ Michael J. Callahan, attorney−in−fact for, Terry S. Semel | 04/28/2005 |
| **Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

| | |
|---|---|
| ☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b). | **UNITED STATES SECURITIES AND EXCHANGE COMMISSION**<br>**Washington, D.C. 20549**<br><br>**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**<br><br>Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940 |

| OMB APPROVAL |
|---|
| OMB Number: 3235-0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable) |
|---|---|---|
| (Last)    (First)    (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>05/04/2005 | _X_ Director          _____ 10% Owner<br>_X_ Officer (give title          _____ Other (specify below)<br>below)<br>Chairman & CEO |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>_____ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

**Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 05/04/2005 | | M | | 750,000 | A | $8.81 | 2,635,280 | D | |
| Common Stock | 05/04/2005 | | S | | 50,000 | D | $35.15 | 2,585,280 | D | |
| Common Stock | 05/04/2005 | | S | | 25,000 | D | $35.16 | 2,560,280 | D | |
| Common Stock | 05/04/2005 | | S | | 50,000 | D | $35.17 | 2,510,280 | D | |
| Common Stock | 05/04/2005 | | S | | 25,000 | D | $35.18 | 2,485,280 | D | |
| Common Stock | 05/04/2005 | | S | | 150,000 | D | $35.2 | 2,335,280 | D | |
| Common Stock | 05/04/2005 | | S | | 50,000 | D | $35.21 | 2,285,280 | D | |
| Common Stock | 05/04/2005 | | S | | 50,000 | D | $35.24 | 2,235,280 | D | |
| Common Stock | 05/04/2005 | | S | | 140,000 | D | $35.25 | 2,095,280 | D | |
| Common Stock | 05/04/2005 | | S | | 10,000 | D | $35.26 | 2,085,280 | D | |
| Common Stock | 05/04/2005 | | S | | 100,000 | D | $35.35 | 1,985,280 | D | |
| Common Stock | 05/04/2005 | | S | | 50,000 | D | $35.4 | 1,935,280 | D | |
| Common Stock | 05/04/2005 | | S | | 50,000 | D | $35.45 | 1,885,280 | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $8.81 | 05/04/2005 | | M | | | 750,000 | (1) | 04/16/2011 | Common Stock | 750,000 | $ 0 | 1,510,333 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

**Explanation of Responses:**

(1)    This option becomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option was fully vested on 4/16/03.

**Signatures**

| | |
|---|---|
| /s/ Michael J. Callahan, attorney−in−fact for, Terry S. Semel | 05/05/2005 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235-0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person \*<br>SEMEL TERRY<br><br>(Last)     (First)     (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE<br>(Street)<br><br>SUNNYVALE, CA 94089<br>(City)     (State)     (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO]<br><br>3. Date of Earliest Transaction (Month/Day/Year)<br>07/26/2005<br><br>4. If Amendment, Date Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable)<br><br>_X_ Director _____ 10% Owner<br>_X_ Officer (give title below) _____ Other (specify below)<br>Chairman & CEO<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |

**Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 07/26/2005 | | M | | 125,000 | A | $4.62 | 2,010,280 | D | |
| Common Stock | 07/26/2005 | | M | | 75,000 | A | $8.23 | 2,085,280 | D | |
| Common Stock | 07/26/2005 | | S | | 136,875 | D | $34.2 | 1,948,405 | D | |
| Common Stock | 07/26/2005 | | S | | 13,125 | D | $34.18 | 1,935,280 | D | |
| Common Stock | 07/26/2005 | | S | | 4,800 | D | $34.11 | 1,930,480 | D | |
| Common Stock | 07/26/2005 | | S | | 45,200 | D | $34.1 | 1,885,280[4] | D | |
| Common Stock | 07/27/2005 | | M | | 175,000 | A | $8.81 | 2,060,280 | D | |
| Common Stock | 07/27/2005 | | M | | 25,000 | A | $8.23 | 2,085,280 | D | |
| Common Stock | 07/27/2005 | | S | | 100,000 | D | $34.25 | 1,985,280 | D | |
| Common Stock | 07/27/2005 | | S | | 50,000 | D | $34.28 | 1,935,280 | D | |
| Common Stock | 07/27/2005 | | S | | 50,000 | D | $34.3 | 1,885,280[4] | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $8.23 | 07/26/2005 | | M | | | 75,000 | [1] | 12/11/2012 | Common Stock | 75,000 | [1] | 591,667 | D | |
| Stock Option ( right to | $4.62 | 07/26/2005 | | M | | | 125,000 | [2] | 10/02/2011 | Common stock | 125,000 | [1] | 125,000 | D | |

| buy ) | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Stock Option ( right to buy ) | $8.81 | 07/27/2005 | | M | | 175,000 | (5) | 04/16/2011 | Common Stock | 175,000 | (1) | 1,335,333 | D | |
| Stock Option ( right to buy ) | $8.23 | 07/27/2005 | | M | | 25,000 | (1) | 12/11/2012 | Common Stock | 25,000 | (1) | 566,667 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1) This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 12/11/02 such that the option was fully vested on 12/11/06.

(2) This option becomes exercisable at a rate of 1/8th of the securities underlying the option on 4/16/02 and thereafter at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date such that the option will be fully vested on 10/2/05.

(3) Not applicable

(4) Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

(5) This option becomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option was fully vested on 4/16/03.

## Signatures

| /s/ Michael J. Callahan, attorney-in-fact for, Terry S. Semel | 07/27/2005 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\** Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
| --- |
| OMB Number: 3235-0287 |
| Expires:    January 31, 2005 |
| Estimated average burden hours per response...    0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person · SEMEL TERRY | 2. Issuer **Name and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)    (First)    (Middle) C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 08/19/2005 | (Check all applicable)  _X_ Director        ____ 10% Owner _X_ Officer (give title    ____ Other (specify below) below)            Chairman & CEO |
| (Street) SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ____ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

## Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 08/19/2005 | | M | | 41,666 | A | $4.62 | 1,926,946 | D | |
| Common Stock | 08/19/2005 | | M | | 33,333 | A | $8.23 | 1,960,279 | D | |
| Common Stock | 08/19/2005 | | M | | 467,887 | A | $8.81 | 2,428,166 | D | |
| Common Stock | 08/19/2005 | | S | | 10 | D | $34.23 | 2,428,156 | D | |
| Common Stock | 08/19/2005 | | S | | 39,322 | D | $34.25 | 2,388,834 | D | |
| Common Stock | 08/19/2005 | | S | | 64,463 | D | $34.26 | 2,324,371 | D | |
| Common Stock | 08/19/2005 | | S | | 88,356 | D | $34.27 | 2,236,015 | D | |
| Common Stock | 08/19/2005 | | S | | 16,623 | D | $34.28 | 2,219,392 | D | |
| Common Stock | 08/19/2005 | | S | | 42,900 | D | $34.29 | 2,176,492 | D | |
| Common Stock | 08/19/2005 | | S | | 73,560 | D | $34.3 | 2,102,932 | D | |
| Common Stock | 08/19/2005 | | S | | 141,705 | D | $34.35 | 1,961,227 | D | |
| Common Stock | 08/19/2005 | | S | | 300 | D | $34.36 | 1,960,927 | D | |
| Common Stock | 08/19/2005 | | S | | 13,695 | D | $34.37 | 1,947,232 | D | |
| Common Stock | 08/19/2005 | | S | | 11,800 | D | $34.38 | 1,935,432 | D | |
| Common Stock | 08/19/2005 | | S | | 14,825 | D | $34.39 | 1,920,607 | D | |
| Common Stock | 08/19/2005 | | S | | 8,822 | D | $34.4 | 1,911,785 | D | |
| Common Stock | 08/19/2005 | | S | | 5,830 | D | $34.42 | 1,905,955 | D | |
| Common Stock | 08/19/2005 | | S | | 16,267 | D | $34.43 | 1,889,688 | D | |
| Common Stock | 08/19/2005 | | S | | 4,408 | D | $34.45 | 1,885,280[(1)] | D | |

## Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | 5. Number of Derivative Securities Acquired (A) or | 6. Date Exercisable and Expiration Date (Month/Day/Year) | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially | 10. Ownership Form of Derivative | 11. Nature of Indirect Beneficial Ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|

| | Derivative Security | | | Code | V | (A) | Disposed of (D) (Instr. 3, 4, and 5) (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | Owned Following Reported Transaction(s) (Instr. 4) | Security: Direct (D) or Indirect (I) (Instr. 4) | (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Stock Option ( right to buy ) | $8.23 | 08/19/2005 | | M | | | 33,333 | (1) | 12/11/2012 | Common Stock | 33,333 | (1) 533,334 | D | |
| Stock Option ( right to buy ) | $4.62 | 08/19/2005 | | M | | | 41,666 | (2) | 10/02/2011 | Common stock | 41,666 | (1) 83,334 | D | |
| Stock Option ( right to buy ) | $8.81 | 08/19/2005 | | M | | | 467,887 | (5) | 04/16/2011 | Common Stock | 467,887 | (1) 867,446 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1) This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 12/11/02 such that the option was fully vested on 12/11/06.

(2) This option becomes exercisable at a rate of 1/8th of the securities underlying the option on 4/16/02 and thereafter at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date such that the option will be fully vested on 10/2/05.

(3) Not applicable

(4) Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

(5) This option beomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option was fully vested on 4/16/03.

## Signatures

| /s/ Michael Murray, attorney–in–fact for, Terry S. Semel | 08/22/2005 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY | 2. Issuer **Name** and Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)          (First)          (Middle) | 3. Date of Earliest Transaction (Month/Day/Year)<br>10/24/2005 | (Check all applicable) |
| C/O YAHOO! INC., 701 FIRST AVENUE | | X   Director                    10% Owner<br>X   Officer (give title          Other (specify below)<br>below)<br>Chairman & CEO |
| (Street) | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| SUNNYVALE, CA 94089 | | X  Form filed by One Reporting Person<br>    Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 08/30/2005 | | G | V | 60,280 | D | $ 0 | 1,825,000 | D | |
| Common Stock | 10/24/2005 | | M | | 66,667 | A | $8.23 | 1,891,667 | D | |
| Common Stock | 10/24/2005 | | M | | 763,149 | A | $8.81 | 2,654,816 | D | |
| Common Stock | 10/24/2005 | | M | | 83,334 | A | $4.62 | 2,738,150 | D | |
| Common Stock | 10/24/2005 | | S | | 69,405 | D | $35 | 2,668,745 | D | |
| Common Stock | 10/24/2005 | | S | | 14,099 | D | $35.01 | 2,654,646 | D | |
| Common Stock | 10/24/2005 | | S | | 1,500 | D | $35.02 | 2,653,146 | D | |
| Common Stock | 10/24/2005 | | S | | 11,076 | D | $35.03 | 2,642,070 | D | |
| Common Stock | 10/24/2005 | | S | | 3,220 | D | $35.04 | 2,638,850 | D | |
| Common Stock | 10/24/2005 | | S | | 700 | D | $35.05 | 2,638,150 | D | |
| Common Stock | 10/24/2005 | | S | | 284,067 | D | $35.1 | 2,354,083 | D | |
| Common Stock | 10/24/2005 | | S | | 15,933 | D | $35.11 | 2,338,150 | D | |
| Common Stock | 10/24/2005 | | S | | 20,192 | D | $35.15 | 2,317,958 | D | |
| Common Stock | 10/24/2005 | | S | | 14,328 | D | $35.16 | 2,303,630 | D | |
| Common Stock | 10/24/2005 | | S | | 134,803 | D | $35.17 | 2,168,827 | D | |
| Common Stock | 10/24/2005 | | S | | 30,677 | D | $35.18 | 2,138,150 | D | |
| Common Stock | 10/24/2005 | | S | | 173,391 | D | $35.3 | 1,964,759 | D | |
| Common Stock | 10/24/2005 | | S | | 4,625 | D | $35.31 | 1,960,134 | D | |
| Common Stock | 10/24/2005 | | S | | 2,600 | D | $35.32 | 1,957,534 | D | |
| Common Stock | 10/24/2005 | | S | | 22,102 | D | $35.33 | 1,935,432 | D | |
| Common Stock | 10/24/2005 | | S | | 57,274 | D | $35.35 | 1,878,158 | D | |
| Common Stock | 10/24/2005 | | S | | 51,158 | D | $35.36 | 1,827,000 | D | |
| Common Stock | 10/24/2005 | | S | | 2,000 | D | $35.4 | 1,825,000[4] | D | |

## Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $8.23 | 10/24/2005 | | M | | | 66,667 | (1) | 12/11/2012 | Common Stock | 66,667 | (1) | 466,667 | D | |
| Stock Option ( right to buy ) | $4.62 | 10/24/2005 | | M | | | 83,334 | (2) | 10/02/2011 | Common stock | 83,334 | (1) | 0 | D | |
| Stock Option ( right to buy ) | $8.81 | 10/24/2005 | | M | | | 763,149 | (5) | 04/16/2011 | Common Stock | 763,149 | (1) | 104,297 | D | |

### Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

### Explanation of Responses:

(1) This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 12/11/02 such that the option was fully vested on 12/11/06.

(2) This option becomes exercisable at a rate of 1/8th of the securities underlying the option on 4/16/02 and thereafter at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date such that the option will be fully vested on 10/2/05.

(3) Not applicable

(4) Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

(5) This option beomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option was fully vested on 4/16/03.

### Signatures

| /s/ Michael J. Callahan, attorney−in−fact for, Terry S. Semel | 10/25/2005 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See Instruction 1(b).*

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires:  January 31, 2005 |
| Estimated average burden hours per response...  0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person −<br>SEMEL TERRY | 2. Issuer **name** and Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable) |
|---|---|---|
| (Last)    (First)    (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>10/25/2005 | _X_ Director        ____ 10% Owner<br>_X_ Officer (give title    ____ Other (specify below)<br>below)<br>      Chairman & CEO |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

**Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/25/2005 | | M | | 534,921 | A | $15 | 2,359,921 | D | |
| Common Stock | 10/25/2005 | | M | | 104,297 | A | $8.81 | 2,464,218 | D | |
| Common Stock | 10/25/2005 | | S | | 256,021 | D | $35.1 | 2,208,197 | D | |
| Common Stock | 10/25/2005 | | S | | 45,666 | D | $35.11 | 2,162,531 | D | |
| Common Stock | 10/25/2005 | | S | | 20,856 | D | $35.12 | 2,141,675 | D | |
| Common Stock | 10/25/2005 | | S | | 109,937 | D | $35.13 | 2,031,738 | D | |
| Common Stock | 10/25/2005 | | S | | 12,760 | D | $35.14 | 2,018,978 | D | |
| Common Stock | 10/25/2005 | | S | | 30,522 | D | $35.15 | 1,988,456 | D | |
| Common Stock | 10/25/2005 | | S | | 600 | D | $35.18 | 1,987,856 | D | |
| Common Stock | 10/25/2005 | | S | | 15,633 | D | $35.19 | 1,972,223 | D | |
| Common Stock | 10/25/2005 | | S | | 14,546 | D | $35.2 | 1,957,677 | D | |
| Common Stock | 10/25/2005 | | S | | 43,672 | D | $35.21 | 1,914,005 | D | |
| Common Stock | 10/25/2005 | | S | | 7,200 | D | $35.22 | 1,906,805 | D | |
| Common Stock | 10/25/2005 | | S | | 7,100 | D | $35.23 | 1,899,705 | D | |
| Common Stock | 10/25/2005 | | S | | 2,700 | D | $35.24 | 1,897,005 | D | |
| Common Stock | 10/25/2005 | | S | | 35,500 | D | $35.25 | 1,861,505 | D | |
| Common Stock | 10/25/2005 | | S | | 200 | D | $35.26 | 1,861,305 | D | |
| Common Stock | 10/25/2005 | | S | | 700 | D | $35.27 | 1,860,605 | D | |
| Common Stock | 10/25/2005 | | S | | 35,105 | D | $35.3 | 1,825,500 | D | |
| Common Stock | 10/25/2005 | | S | | 500 | D | $35.31 | 1,825,000[(2)] | D | |

**Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative | 2. Conversion | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if | 4. Transaction Code | 5. Number of Derivative | 6. Date Exercisable and Expiration Date | 7. Title and Amount of Underlying Securities | 8. Price of Derivative | 9. Number of Derivative | 10. Ownership | 11. Nature of Indirect |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Security (Instr. 3) | or Exercise Price of Derivative Security | any (Month/Day/Year) | (Instr. 8) | Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | | (Month/Day/Year) | | (Instr. 3 and 4) | | Security (Instr. 5) | Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $15 | 10/25/2005 | | M | | | 534,921 | (4) | 04/16/2011 | Common Stock | 534,921 | (1) | 4,453,729 | D | |
| Stock Option ( right to buy ) | $8.81 | 10/25/2005 | | M | | | 104,297 | (3) | 04/16/2011 | Common Stock | 104,297 | (1) | 0 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1) Not applicable

(2) Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

(3) This option beomes exercisable at a rate of 1/2 of the securities underlying the option on the first anniversary of the vesting commencement date of 4/16/01 and 1/24th of the securities underlying the option on each monthly anniversary thereafter, such that the option was fully vested on 4/16/03.

(4) This option becomes exercisable at a rate of 1/12th of the securities underlying the option on each monthly anniversary of the Vesting Commencement Date of 4/16/03.

## Signatures

| /s/ Michael J. Callahan, attorney–in–fact for, Terry S. Semel | 10/26/2005 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235−0287 |
| Expires: | January 31, 2005 |
| Estimated average burden hours per response... | 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable) |
|---|---|---|
| (Last)      (First)      (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>10/26/2005 | _X_ Director          ___ 10% Owner<br>_X_ Officer (give title ___ Other (specify below)<br>below)<br>Chairman & CEO |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

## Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/26/2005 | | M | | 447,632 | A | $15 | 2,272,632 | D | |
| Common Stock | 10/26/2005 | | S | | 46,320 | D | $35.05 | 2,226,312 | D | |
| Common Stock | 10/26/2005 | | S | | 1,500 | D | $35.06 | 2,224,812 | D | |
| Common Stock | 10/26/2005 | | S | | 200 | D | $35.07 | 2,224,612 | D | |
| Common Stock | 10/26/2005 | | S | | 1,680 | D | $35.08 | 2,222,932 | D | |
| Common Stock | 10/26/2005 | | S | | 300 | D | $35.09 | 2,222,632 | D | |
| Common Stock | 10/26/2005 | | S | | 5,689 | D | $35.18 | 2,216,943 | D | |
| Common Stock | 10/26/2005 | | S | | 25,000 | D | $35.19 | 2,191,943 | D | |
| Common Stock | 10/26/2005 | | S | | 19,311 | D | $35.2 | 2,172,632 | D | |
| Common Stock | 10/26/2005 | | S | | 50,000 | D | $35.22 | 2,122,632 | D | |
| Common Stock | 10/26/2005 | | S | | 93,500 | D | $35.4 | 2,029,132 | D | |
| Common Stock | 10/26/2005 | | S | | 5,700 | D | $35.41 | 2,023,432 | D | |
| Common Stock | 10/26/2005 | | S | | 800 | D | $35.42 | 2,022,632 | D | |
| Common Stock | 10/26/2005 | | S | | 50,000 | D | $35.44 | 1,972,632 | D | |
| Common Stock | 10/26/2005 | | S | | 97,900 | D | $35.5 | 1,874,732 | D | |
| Common Stock | 10/26/2005 | | S | | 2,100 | D | $35.51 | 1,872,632 | D | |
| Common Stock | 10/26/2005 | | S | | 29,112 | D | $35.56 | 1,843,520 | D | |
| Common Stock | 10/26/2005 | | S | | 3,900 | D | $35.57 | 1,839,620 | D | |
| Common Stock | 10/26/2005 | | S | | 14,620 | D | $35.58 | 1,825,000[2] | D | |

## Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | 5. Number of Derivative Securities Acquired (A) or | 6. Date Exercisable and Expiration Date (Month/Day/Year) | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially | 10. Ownership Form of Derivative | 11. Nature of Indirect Beneficial Ownership |
|---|---|---|---|---|---|---|---|---|---|---|

| | Derivative Security | | | Code | V | (A) | Disposed of (D) (Instr. 3, 4, and 5) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | Owned Following Reported Transaction(s) (Instr. 4) | Security: Direct (D) or Indirect (I) (Instr. 4) | (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (D) | | | | | | | | |
| Stock Option ( right to buy ) | $15 | 10/26/2005 | | M | | | 447,632 | (3) | 04/16/2011 | Common Stock | 447,632 | (1) | 4,006,097 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1) Not applicable

(2) Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

(3) This option becomes exercisable at a rate of 1/12th of the securities underlying the option on each monthly anniversary of the Vesting Commencement Date of 4/16/03.

## Signatures

| /s/ Michael J. Callahan, attorney-in-fact for, Terry S. Semel | 10/27/2005 |
|---|---|
| **Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235-0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY<br><br>(Last)       (First)       (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE<br>(Street)<br><br>SUNNYVALE, CA 94089<br>(City)       (State)       (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO]<br><br>3. Date of Earliest Transaction (Month/Day/Year)<br>10/27/2005<br><br>4. If Amendment, Date Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable)<br><br>X   Director          ____ 10% Owner<br>X   Officer (give title         ____ Other (specify below)<br>below)<br>          Chairman & CEO<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br>X Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |

## Table I – Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/27/2005 | | M | | 500,000 | A | $15 | 2,325,000 | D | |
| Common Stock | 10/27/2005 | | S | | 133,463 | D | $35.4 | 2,191,537 | D | |
| Common Stock | 10/27/2005 | | S | | 84,073 | D | $35.41 | 2,107,464 | D | |
| Common Stock | 10/27/2005 | | S | | 84,853 | D | $35.42 | 2,022,611 | D | |
| Common Stock | 10/27/2005 | | S | | 122,677 | D | $35.43 | 1,899,934 | D | |
| Common Stock | 10/27/2005 | | S | | 36,345 | D | $35.44 | 1,863,589 | D | |
| Common Stock | 10/27/2005 | | S | | 38,589 | D | $35.45 | 1,825,000[2] | D | |

## Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $15 | 10/27/2005 | | M | | | 500,000 | [3] | 04/16/2011 | Common Stock | 500,000 | [1] | 3,506,097 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE | X | | Chairman & CEO | |

| SUNNYVALE, CA 94089 | | | | | |
|---|---|---|---|---|---|

**Explanation of Responses:**

(1)  Not applicable

(2)  Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

(3)  This option becomes exercisable at a rate of 1/12th of the securities underlying the option on each monthly anniversary of the Vesting Commencement Date of 4/16/03.

**Signatures**

/s/ Michael J. Callahan, attorney—in—fact for, Terry S. Semel                 10/28/2005

**Signature of Reporting Person                                            Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires:  January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY<br><br>(Last)      (First)      (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE<br><br>(Street)<br><br>SUNNYVALE, CA 94089<br><br>(City)      (State)      (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO]<br><br>3. Date of Earliest Transaction (Month/Day/Year)<br>10/28/2005<br><br>4. If Amendment, Date Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable)<br><br>_X_ Director          ___ 10% Owner<br>_X_ Officer (give title          ___ Other (specify below)<br>below)<br>          Chairman & CEO<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |

## Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/28/2005 | | M | | 500,000 | A | $15 | 2,325,000 | D | |
| Common Stock | 10/28/2005 | | S | | 10,172 | D | $35.43 | 2,314,828 | D | |
| Common Stock | 10/28/2005 | | S | | 55,023 | D | $35.44 | 2,259,805 | D | |
| Common Stock | 10/28/2005 | | S | | 75,089 | D | $35.45 | 2,184,716 | D | |
| Common Stock | 10/28/2005 | | S | | 2,300 | D | $35.46 | 2,182,416 | D | |
| Common Stock | 10/28/2005 | | S | | 7,416 | D | $35.48 | 2,175,000 | D | |
| Common Stock | 10/28/2005 | | S | | 14,148 | D | $35.5 | 2,160,852 | D | |
| Common Stock | 10/28/2005 | | S | | 2,400 | D | $35.51 | 2,158,452 | D | |
| Common Stock | 10/28/2005 | | S | | 8,452 | D | $35.53 | 2,150,000 | D | |
| Common Stock | 10/28/2005 | | S | | 87,820 | D | $35.6 | 2,062,180 | D | |
| Common Stock | 10/28/2005 | | S | | 4,500 | D | $35.61 | 2,057,680 | D | |
| Common Stock | 10/28/2005 | | S | | 6,380 | D | $35.62 | 2,051,300 | D | |
| Common Stock | 10/28/2005 | | S | | 4,555 | D | $35.63 | 2,046,745 | D | |
| Common Stock | 10/28/2005 | | S | | 47,082 | D | $35.65 | 1,999,663 | D | |
| Common Stock | 10/28/2005 | | S | | 8,918 | D | $35.66 | 1,990,745 | D | |
| Common Stock | 10/28/2005 | | S | | 26,892 | D | $35.67 | 1,963,853 | D | |
| Common Stock | 10/28/2005 | | S | | 17,306 | D | $35.7 | 1,946,547 | D | |
| Common Stock | 10/28/2005 | | S | | 4,345 | D | $35.71 | 1,942,202 | D | |
| Common Stock | 10/28/2005 | | S | | 54,100 | D | $35.73 | 1,888,102 | D | |
| Common Stock | 10/28/2005 | | S | | 25,421 | D | $35.75 | 1,862,681 | D | |
| Common Stock | 10/28/2005 | | S | | 11,048 | D | $35.77 | 1,851,633 | D | |
| Common Stock | 10/28/2005 | | S | | 1,400 | D | $35.78 | 1,850,233 | D | |
| Common Stock | 10/28/2005 | | S | | 3,488 | D | $35.79 | 1,846,745 | D | |

| Common Stock | 10/28/2005 | | S | 21,745 | D | $35.8 | 1,825,000[2] | D | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $15 | 10/28/2005 | | M | | | 500,000 | [3] | 04/16/2011 | Common Stock | 500,000 | [1] | 3,006,097 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

### Explanation of Responses:

(1) Not applicable

(2) Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

(3) This option becomes exercisable at a rate of 1/12th of the securities underlying the option on each monthly anniversary of the Vesting Commencement Date of 4/16/03.

### Signatures

/s/ Michael Murray, attorney-in-fact for, Terry S. Semel                    10/31/2005

\*\* Signature of Reporting Person                                                        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box
if no longer
subject to
Section 16.
Form 4 or Form
5 obligations
may continue.
*See* Instruction
1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF**
**SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| OMB APPROVAL |
| --- |
| OMB Number: 3235–0287 |
| Expires:        January 31, 2005 |
| Estimated average burden hours per response...    0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable) |
| --- | --- | --- |
| (Last)      (First)      (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>02/15/2006 | X__ Director          ____ 10% Owner<br>_X__ Officer (give title<br>below)          ____ Other (specify below)<br>Chairman & CEO |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed<br>(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 02/15/2006 | | M | | 266,667 | A | $15 | 2,091,667 | D | |
| Common Stock | 02/15/2006 | | M | | 133,333 | A | $8.23 | 2,225,000 | D | |
| Common Stock | 02/15/2006 | | S | | 49,834 | D | $33.32 | 2,175,166 | D | |
| Common Stock | 02/15/2006 | | S | | 166 | D | $33.31 | 2,175,000 | D | |
| Common Stock | 02/15/2006 | | S | | 500 | D | $33.3 | 2,174,500 | D | |
| Common Stock | 02/15/2006 | | S | | 24,500 | D | $33.29 | 2,150,000 | D | |
| Common Stock | 02/15/2006 | | S | | 22,535 | D | $33.28 | 2,127,465 | D | |
| Common Stock | 02/15/2006 | | S | | 18,469 | D | $33.27 | 2,108,996 | D | |
| Common Stock | 02/15/2006 | | S | | 2,465 | D | $33.26 | 2,106,531 | D | |
| Common Stock | 02/15/2006 | | S | | 37,588 | D | $33.25 | 2,068,943 | D | |
| Common Stock | 02/15/2006 | | S | | 1,200 | D | $33.21 | 2,067,743 | D | |
| Common Stock | 02/15/2006 | | S | | 92,743 | D | $33.2 | 1,975,000 | D | |
| Common Stock | 02/15/2006 | | S | | 50,000 | D | $33.12 | 1,925,000 | D | |
| Common Stock | 02/15/2006 | | S | | 39,918 | D | $33.05 | 1,885,082 | D | |
| Common Stock | 02/15/2006 | | S | | 53,225 | D | $33.04 | 1,831,857 | D | |
| Common Stock | 02/15/2006 | | S | | 6,857 | D | $33.03 | 1,825,000[2] | D | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Stock Option ( right to buy ) | $15 | 02/15/2006 | | M | | | 266,667 | (3) | 04/16/2011 | Common Stock | 266,667 | ⊥ | 2,739,430 | D | |
| Stock Option ( right to buy ) | $8.23 | 02/15/2006 | | M | | | 133,333 | (4) | 12/11/2012 | Common Stock | 133,333 | ⊥ | 333,334 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

**Explanation of Responses:**

(1)     Not applicable

(2)     Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

(3)     This option becomes exercisable at a rate of 1/12th of the securities underlying the option on each monthly anniversary of the Vesting Commencement Date of 4/16/03.

(4)     This option becomes exercisable at a rate of 1/48th of the securities underlying the option on each monthly anniversary of the vesting commencement date of 12/11/02 such that the option was fully vested 12/11/06.

**Signatures**

| /s/ Michael Murray, attorney-in-fact for, Terry S. Semel | 02/16/2006 |
|---|---|
| **Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235–0287 |
| Expires:              January 31, 2005 |
| Estimated average burden hours per response...        0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)        (First)        (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) 02/16/2006 | (Check all applicable) |
| C/O YAHOO! INC., 701 FIRST AVENUE | | _X_ Director            ____ 10% Owner<br>_X_ Officer (give title        ____ Other (specify below)<br>below)<br>Chairman & CEO |
| (Street) | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| SUNNYVALE, CA 94089 | | _X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

## Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 02/16/2006 | | M | | 100,000 | A | $15 | 1,925,000 | D | |
| Common Stock | 02/16/2006 | | S | | 17,707 | D | $33.25 | 1,907,293 | D | |
| Common Stock | 02/16/2006 | | S | | 32,293 | D | $33.29 | 1,875,000 | D | |
| Common Stock | 02/16/2006 | | S | | 50,000 | D | $33.3 | 1,825,000 | D | |
| Common Stock | 02/17/2006 | | M | | 200,000 | A | $15 | 2,025,000 | D | |
| Common Stock | 02/17/2006 | | S | | 35,885 | D | $33.12 | 1,989,115 | D | |
| Common Stock | 02/17/2006 | | S | | 300 | D | $33.09 | 1,988,815 | D | |
| Common Stock | 02/17/2006 | | S | | 31,896 | D | $33.08 | 1,956,919 | D | |
| Common Stock | 02/17/2006 | | S | | 30,122 | D | $33.07 | 1,926,797 | D | |
| Common Stock | 02/17/2006 | | S | | 14,397 | D | $33.06 | 1,912,400 | D | |
| Common Stock | 02/17/2006 | | S | | 87,400 | D | $33.05 | 1,825,000[2] | D | |

## Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $15 | 02/16/2006 | | M | | | 100,000 | [3] | 04/16/2011 | Common Stock | 100,000 | (1) | 2,639,430 | D | |
| Stock Option ( right to | $15 | 02/17/2006 | | M | | | 200,000 | [3] | 04/16/2011 | Common Stock | 200,000 | (1) | 2,439,430 | D | |

| buy ) | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1)  Not applicable

(2)  Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

(3)  This option becomes exercisable at a rate of 1/12th of the securities underlying the option on each monthly anniversary of the Vesting Commencement Date of 4/16/03.

## Signatures

/s/ Michael J. Callahan, attorney-in-fact for, Terry S. Semel                                          02/21/2006

<u>**</u>Signature of Reporting Person                                              Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See Instruction 1(b).*

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235–0287 |
| Expires:            January 31, 2005 |
| Estimated average burden hours per response...        0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person *<br>SEMEL TERRY | 2. Issuer **Name and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)        (First)        (Middle)<br><br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>02/21/2006 | (Check all applicable)<br><br>_X_ Director          ___ 10% Owner<br>_X_ Officer (give title          ___ Other (specify below)<br>below)<br>Chairman & CEO |
| (Street)<br><br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

### Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 02/21/2006 | | M | | 50,000 | A | $15 | 1,875,000 | D | |
| Common Stock | 02/21/2006 | | S | | 21,505 | D | $33 | 1,853,495 | D | |
| Common Stock | 02/21/2006 | | S | | 18,495 | D | $33.01 | 1,835,000 | D | |
| Common Stock | 02/21/2006 | | S | | 10,000 | D | $33.05 | 1,825,000 | D | |
| Common Stock | 02/22/2006 | | M | | 250,000 | A | $15 | 2,075,000 | D | |
| Common Stock | 02/22/2006 | | S | | 11,425 | D | $33.1 | 2,063,575 | D | |
| Common Stock | 02/22/2006 | | S | | 4,300 | D | $33.09 | 2,059,275 | D | |
| Common Stock | 02/22/2006 | | S | | 5,480 | D | $33.08 | 2,053,795 | D | |
| Common Stock | 02/22/2006 | | S | | 25,077 | D | $33.07 | 2,028,718 | D | |
| Common Stock | 02/22/2006 | | S | | 27,751 | D | $33.06 | 2,000,967 | D | |
| Common Stock | 02/22/2006 | | S | | 64,203 | D | $33.05 | 1,936,764 | D | |
| Common Stock | 02/22/2006 | | S | | 15,240 | D | $33.04 | 1,921,524 | D | |
| Common Stock | 02/22/2006 | | S | | 96,524 | D | $33.03 | 1,825,000[2] | D | |

### Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $15 | 02/21/2006 | | M | | | 50,000 | [3] | 04/16/2011 | Common Stock | 50,000 | 山 | 2,389,430 | D | |

| Stock Option ( right to buy ) | $15 | 02/22/2006 | | M | | | 250,000 | (3) | 04/16/2011 | Common Stock | 250,000 | (1) | 2,139,430 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1)  Not applicable

(2)  Does not include 760 shares owned indirectly by wife for children under the Uniform Transfer to Minors Act.

(3)  This option becomes exercisable at a rate of 1/12th of the securities underlying the option on each monthly anniversary of the Vesting Commencement Date of 4/16/03.

## Signatures

/s/ Michael J. Callahan, attorney-in-fact for, Terry S. Semel                                    02/23/2006

** Signature of Reporting Person                                                                                              Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**   Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235−0287 |
| Expires: January 31, 2005 |
| Estimated average burden hours per response... 0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person <sup>*</sup><br>SEMEL TERRY | 2. Issuer **Name and** Ticker or Trading Symbol<br>YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer<br><br>(Check all applicable)<br>_X_ Director                     ____ 10% Owner<br>_X_ Officer (give title           ____ Other (specify below)<br>below)<br>            Chairman & CEO |
|---|---|---|
| (Last)        (First)        (Middle)<br>C/O YAHOO! INC., 701 FIRST AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>03/10/2006 | |
| (Street)<br>SUNNYVALE, CA 94089 | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

### Table I − Non−Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

### Table II − Derivative Securities Acquired, Disposed of, or Beneficially Owned
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option ( right to buy ) | $40.68 | 03/10/2006 | | A | | 1,300,000 | | [1] | 03/10/2013 | Common Stock | 1,300,000 | $ 0 | 1,300,000 | D | |

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY<br>C/O YAHOO! INC.<br>701 FIRST AVENUE<br>SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

## Explanation of Responses:

(1)    This option is fully vested and exercisable on 3/10/06.

## Signatures

/s/ Michael J. Callahan, attorney−in−fact for, Terry S. Semel                          03/13/2006

<sup>**</sup> Signature of Reporting Person                                                                          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235–0287 |
| Expires:  January 31, 2005 |
| Estimated average burden hours per response...   0.5 |

(Print or Type Responses)

| 1. Name and Address of Reporting Person \* SEMEL TERRY | 2. Issuer Name **and** Ticker or Trading Symbol YAHOO INC [YHOO] | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| (Last)  (First)  (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) 05/31/2006 | (Check all applicable) |
| C/O YAHOO! INC., 701 FIRST AVENUE | | _X_ Director   ____ 10% Owner<br>_X_ Officer (give title below)   ____ Other (specify below)<br>Chairman & CEO |
| (Street) | 4. If Amendment, Date Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| SUNNYVALE, CA 94089 | | _X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |
| (City)  (State)  (Zip) | | |

**Table I – Non–Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option ( right to buy ) | $31.59 | 05/31/2006 | | A | | 6,000,000 | | (1)  _ | 05/31/2013 | Common Stock | 6,000,000 | (2) | 6,000,000 | D | |

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SEMEL TERRY C/O YAHOO! INC. 701 FIRST AVENUE SUNNYVALE, CA 94089 | X | | Chairman & CEO | |

**Explanation of Responses:**

(1)  This option will become exercisable according to the following schedule: The securities underlying the option will become exercisable annually on the first three anniversaries of the date of grant at a rate of 25%, 35% and 40%, respectively.

(2)  Not Applicable.

**Signatures**

| /s/ Michael J. Callahan, attorney–in–fact for, Terry S. Semel | 06/02/2006 |
|---|---|
| \*\* Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

Exhibit 22

FOCUS - 46 of 53 DOCUMENTS

Copyright 2004 FDCHeMedia, Inc. All Rights Reserved
Copyright 2004 CCBN, Inc. All Rights Reserved
FD (Fair Disclosure) Wire

April 7, 2004 Wednesday

Transcript 040704ae.702

**LENGTH:** 9882 words

**HEADLINE:** Q1 2004 Yahoo, Inc. Earnings Conference Call - Final

**BODY:**

OPERATOR: Good afternoon, ladies and gentlemen, and welcome to the Yahoo! first quarter 2004 earnings conference call. At this time all participants are in a listen-only mode. Later we will conduct a question-and-answer session. Please note that this conference is being recorded. I would now like to turn the call over to Mr. Paul Hollerbach, vice president of financial planning and investor relations. Mr. Hollerbach, you may begin.

PAUL HOLLERBACH (ph), VP, FINANCIAL PLANNING AND INVESTOR RELATIONS, YAHOO, INC.: Thank you. And good afternoon. Welcome to Yahoo!'s first quarter earnings conference call. On the call today are Terry Semel, our chairman and CEO, Sue Decker, our chief financial Officer, Dan Rosensweig, our chief operating officer, and Jerry Yang, chief Yahoo!.

Before we begin, I'd like to remind you that matters discussed on this call contain forward-looking statements that involve risks and uncertainties concerning Yahoo!'s expected financial performance as well as Yahoo!'s strategic and operational plans. Actual results may differ materially from the predicted results, and recorded results should not be considered as an indication of future performance. The potential risks and uncertainties include, among others: Decreases or delays in marketing services spending, including performance of the Yahoo!'s -- of the company's newly-acquired businesses, acceptance of products and services, and risks related to the integration of recent acquisitions. All information discussed in this call is as of April 7th and Yahoo! undertakes no duty to update this information. Other potential factors that could affect the company's business or financial results are included in the company's annual and quarterly reports, which are on file with the SEC and available at their website.

In this call we will also discuss some non-GAAP financial measures in talking about the company's performance, including operating income before D & A, which we will refer to as operating cash flow, revenue, excluding traffic acquisition costs, and free cash flow. Reconciliations of those measures to GAAP measures can be found on our IR website located at yahoo.com.

Terry will begin the call with some business highlights followed by Sue who will provide more detail on our financial results and our business outlook. The prepared remarks will be followed by a brief Q & A session. Now I'd like to turn the call over to Terry.

TERRY SEMEL, CHAIRMAN, CEO, YAHOO, INC.: Good afternoon, everybody. If you're wondering, I have a big smile on my face. I'm very excited to announce that this is by far the most successful quarter in Yahoo!'s history.

Our impressive performance shows that our company really hit its stride on two fronts. On the technology front we hit the ball out of the park. Our new products and services were innovative and cutting edge, and I'm really proud of the technology and product groups who did an extraordinary job this quarter. On the business side, our two core businesses both had a terrific quarter, led by

Q1 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 7, 2004 Wednesday

continued growth in marketing services and a robust increase in paid subscriptions. This quarter is a great example of something I've said before, great products and services lead to a great business. As the following numbers suggest, we have seen increasing momentum in our strategy and the resulting impact on our business.

In the first quarter, Yahoo! generated $758 million in revenue, our fourth straight quarter of record revenues and up 168% compared to $283 million in the first quarter of last year. Operating income before depreciation and amortization was $211 million, almost a 150% year-over-year increase. Yahoo! delivered GAAP earnings per share of 14 cents in the quarter compared to 8 cents per share in the first quarter of '03. And as a result of our continued, strong performance, we have upwardly revised our full-year business outlook, which Sue will provide more details on shortly.

Everything that we have achieved is the result of a very deliberate and focused strategy. It's what we have been systemically been working towards since we laid out our plan over 2 1/2 years ago when we said our mission was to be the most essential Internet service for our consumers and businesses worldwide. As we have progressed, Yahoo!'s increasing ability to scale and leverage has enabled us to enter new businesses, launch new products and services, and extend our strategy globally. We have also created an efficient operating model in which all of the interconnected pieces, including search, content, commerce, communications and access, are starting to support each other's performance, essentially making the whole greater than the sum of its parts. As a result of external factors, which have also improved, such as the increase in on-line advertising spending by both big and small advertisers, and the growing demand for fee-based services, Yahoo! has been well-positioned to take a disproportionate share.

I'd now like to review some of the factors I believe have helped us get to this point, and which we will continue to focus on each quarter ahead. First, we have a single-minded approach to creating the best user experience on the web, which is central to everything we do. To that end, in the first quarter we continued to make across-the-board improvements in Yahoo! services. Our most significant launch was the seamless introduction of Yahoo! search technology in 18 countries, which received overwhelmingly positive reviews from users and industry experts alike. In the span of a few months, we went from having no search products of our own to creating the best ever search experience on Yahoo!. Remember, this is just the beginning. We will continue to expand search technology to all regions of Yahoo! and focus increasingly on personalization.

In addition to search, other highlights to improve our user experience include: The creation of a new and innovative way for people to search for local information on-line through the launch of Smartview on Yahoo! Maps. Our continued technology, legislative and related efforts to help reduce spam, and the re-launch of Yahoo! Autos, which provides consumers better tools for car research and shopping and offers advertising -- advertisers more ways to attract perspective buyers. As a result, we continue to be rewarded with more uses -- users who visit more frequently, consume more pages and use more services, both free and fee-based.

We ended the quarter with approximately 274 million unique users, up 18% from approximately 232 million this time last year. Growing even faster is our active registered users, now at approximately 141 million, up more than 26% year-over-year. The demand for fee-based services also continues to grow as we have provided more value to consumers. We ended the quarter with approximately 5.8 million unique paying relationships, up approximately 900,000 from the previous quarter and doubling year-over-year from approximately 2.9 million. This group remains the fastest-growing sub set group of users on the Yahoo! Network. Content, bundled with access was the most significant contributor to our subscriber growth.

The SBC Yahoo! relationship continues to pay dividends, with it being the only broadband service in the U.S. to experience ten consecutive quarters of double-digit subscriber growth. In the UK we experienced similar success in our

Q1 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 7, 2004 Wednesday

partnership with BT. The migration of existing BT users to our co-branded prod-
ucts was completed on schedule, and we're now very impressed with the new sign-
up rate for BT Yahoo! Internet and BT Yahoo! broadband. Yahoo! Personals also
had its most successful quarter in signing new-paying relationships, driven by
the integration of our search-matching technology and international expansion.

To build deeper relationships with current users and to attract new users, we
are rolling out a new advertising campaign tomorrow, supporting the Yahoo! brand
and celebrating how Yahoo! adds so much value to our consumers' lives, high-
lighting services such as Search, Music, and Shopping. Our user relationship
across both free and fee-based services are also key to the building of a power-
ful and high-impact advertising environment. Our marketing services business
achieved a 235% year-over-year increase in revenue to $635 million due to both
dramatic growth in our organic business and incremental revenue from acquisi-
tions. Last quarter we said that we expected Yahoo!'s organic marketing services
business, excluding acquisitions, to grow in the range of 25 to 30% for the year
2004. Based on our first quarter, we now believe our organic growth rate could
approach 35% for the year, implying we are gaining share in an industry that is
also gaining traction.

As a brand medium, we believe the Internet and Yahoo! in particular will con-
tinue to become a more integral part of more advertisers' overall marketing cam-
paign. Even in a seasonally weak quarter, Yahoo!'s brand business performed
above our expectations. Fueling the potential for change is a clear transforma-
tion in media consumption patterns, whereby the Internet continues to attract
increased usage from the demographic groups most attractive to advertisers. To
take advantage of this opportunity, Yahoo! is focused on providing the best en-
vironment for advertisers by driving increased creativity, taking advantage of
the growing adoption of broadband, providing general -- genuine consumer in-
sights to our advertisers and creating relevant industry-specific programs.

In the broader area of pay-for-performance advertising, we experienced rapid
growth as businesses of all sizes took advantage of this affordable channel to
acquire customers. The major driver of this segment was the strong double-digit
growth in volume of search queries on a worldwide basis. This was aided by our
global introduction of Yahoo! Search Technology, an expansion of sponsored re-
sults across key verticals. Also contributing to the growth was the introduction
of new products such as content match across the Yahoo! network and to Over-
ture's distribution partners. Additionally, Overture's worldwide advertiser base
and the number of paid introductions through their distribution network in-
creased.

To sum up our marketing services business, we have built an attractive adver-
tising platform made up of the world's largest and most engaged on-line audi-
ence. We have established a leadership position in key verticals and with criti-
cal demographic audiences. And we have the most diversified suite of marketing
services, with broad exposure to an array of clients from small and medium-sized
businesses to bluechip advertisers. We are in a unique position as a full-
service advertiser provider with the ability to offer branding capabilities,
lead generation advertising, or for that matter, a combination of both. Each re-
inforces the other because of our ultimate ability to help marketers meet their
objectives from creating brand awareness through to the actual closing of a
sale.

Let me turn to our international business for a moment. The strategy we laid
out 2 1/2 years ago was truly a global one. As we have progressed, Yahoo!'s in-
creasing scale has enabled us to take advantage of the tremendous growth oppor-
tunities outside of the United States. Where appropriate, we have pursued ini-
tiatives to introduce core offerings globally, including Web Search, Commerce,
Communications, Personals and Access and also focus on large local opportuni-
ties, such as Wireless and Auctions. We have integrated Overture into our inter-
national properties, expanding our position as the largest on-line advertising
platform on the Web. Results this quarter demonstrate our initiatives are truly
paying off. Revenue from our international businesses grew 257% year-over-year,
and even more significant, profitability almost tripled on a year-over-year ba-
sis.

Q1 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 7, 2004 Wednesday

We also continue to position ourselves for the future. During the first quarter we acquired 3721, a key word search business in China, and signed a joint venture with a leading Chinese portal INA to support an auctions business. This week we also closed our acquisition of Kelkoo, Europe's leading on-line shopping comparison service. I would like to extend the warm welcome to all of our newest team members in both Asia and Europe. Each of these initiatives complement Yahoo!'s existing strategies and help us provide a more comprehensive user experience.

In closing, I am extremely proud of Yahoo!'s performance during the first quarter. The numbers speak for themselves, so let's have Sue start speaking.

SUE DECKER, CFO, YAHOO, INC.: Thanks, Terry, and thanks to all of you for joining us today. We're off to a great start in 2004. The assets that we've assembled and are integrating, along with our on-going commitment to internally develop great products and services, are collectively allowing us to participate in some really extraordinary growth opportunities. While this quarter certainly illustrates this Renaissance in action, even more strongly than previous quarters, we are well aware that our challenge is not simply to deliver strong returns for one or two years, but to make the appropriate investments and capital allocation decisions over the long-term. We still have a lot of work to do, but the best part of where we sit today is that we believe we are well positioned to achieve our goal to deliver to shareholders consistent, sustainable, and powerful free cash flow growth over the long-term.

Before we look at the highlights from our first quarter results, let me start with two housekeeping items. First is a reminder during the first year of owning a significant acquired company, our practice has been to disaggregate the results and disclose the impact on our growth rates. This is somewhat unnatural from a management perspective because our past acquisitions are integrated into Yahoo! and managed in a way that is different than as stand-alone entities. However, our goal with this disclosure is to provide you with transparency into our underlying organic growth rate as distinct from any material impact from acquired growth, both in the past and also as expected in our business outlook.

In this quarter three acquisitions in aggregate materially contributed to reported growth. First, the last incremental quarter of Inktomi; second, the first incremental quarter of 3721; and third, most significantly, the second incremental quarter of Overture. Beginning in the second quarter of 2004 we will have anniversaried Inktomi, but will begin to include the Kelkoo deal.

The second housekeeping item is that as we indicated to you last quarter, our Q1 '04 revenue, operating cash flow and free cash flow benefited from a $10 million pre-tax one-time gain from unredeemed, third-party loyalty program points that have now expired. GAAP requires that we take this into our consolidated results, but considering it's not a recurring item, we've excluded it from our normalized results in our supplemental statements and will exclude this from the figures in the comments I'll make shortly.

Okay, back to the financial highlights. I'd like to point out three in particular. First, normalized free cash flow for the quarter was $194 million, more than doubling from a year ago and bringing our trailing 12 months normalized free cash flow to approach $500 million, a testament to the exceptionally high cash productivity of our business model. Second, organic growth rates in all supporting financials that drive free cash flow were strong this quarter, and we expect acquired operations to continue to leverage those growth rates in the long-term. Specifically on an organic basis, revenue, excluding traffic acquisition costs or TACs, advanced 41%, and operating cash flow grew almost 90%, representing more than a 50% flow-through of incremental revenue to operating cash flow. And third, equally important to the strong absolute growth in those figures, is that on a relative basis our top-line and our operating cash flow each advanced faster than our underlying base of users and employees. This trend both demonstrates the network effect of our revenue model as well as the underlying productivity driving the margin expansion since our investment in our talented employee base is the primary driver of the cost of organic growth.

Q1 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 7, 2004 Wednesday

Let's talk now about Q1 results in a little more detail. Free cash flow really encapsulates all of the P&L and balance sheet movements that we believe are important to value creation, and maximizing long-term free cash flow is therefore our most important financial objective. We define free cash flow as cash generated from operations which is net of expenses for taxes, capital spending, and investments in working capital. The $194 million in free cash flow in the quarter was our highest ever and represented 36% of revenue ex-TAC and approximately 96% of operating cash flow.

While it's very tough to predict the free cash to operating cash flow ratio in any one quarter due to interim timing swings and working capital items, we currently believe shareholders can continue to look forward to a large portion of operating cash flowing into free cash, and we are maintaining our 60 to 80% longer-term target. Q1 was obviously well above this range and the reason was primarily because we made some good progress on our days sales outstanding or DSO, in accounts receivable, improving from 39 days to 34 days, which provided a strong contribution of cash from working capital. While we're very pleased with this progress, we would caution against an expectation for significant further gains in DSO because it's already close to the industry-leading level for our business mix, and changes in proportional growth rates of our business lines can cause it to fluctuate within a few-day range from quarter to quarter.

So, what do we do with all that cash? Well, in the first quarter of 2004, we closed on the acquisition of 3721 in China for about $44 million net of cash required. Remember that this is the first installment of the acquisition price. There's an earn-out for up to $70 million to be paid if certain financial and operating targets are achieved in 2004 and 2005. Our other major use of cash in the quarter was entering into a $50 million structured stock re-purchase transaction which matures in six months. At maturity, depending on the price of our stock, we will have either re-purchased shares or received our $50 million investment back, plus a premium through this transaction.

Notwithstanding those uses of close to $100 million, our cash and marketable securities balance still rose by $219 million to $2,790 million. This cash includes the $750 million in convertible notes issued last year. These notes have not yet converted, but based on GAAP requirements, all of the shares which would be issuable upon conversion of the notes are included in our diluted shares outstanding for this quarter. Our strong increase in cash then was largely free cash driven. We discussed the close to $200 million in free cash flow from operations, and we also generated $92 million from the exercise of employee options, which largely offset the cash expenditures for 3721 and the structured re-purchase transaction. These funds provide ample flexibility to drive future value for shareholders through acquisitions such as the Kelkoo deal, which closed in Q2, and the funds will have been expended as of Monday, through acquisitions, investments and share re-purchase activity.

Moving now to the P&L, the overall summary is that consistent with our financial strategy, we are successfully supporting a massive and growing base of more revenue-productive users without a commensurate increase in costs. The first quarter revenue ex-TAC, and ex-the one-time points gain, came in at $540 million, advancing 91% over year-ago figures and actually up 6% from the seasonally-high fourth quarter 2003 level, benefiting in particular from strong marketing services growth, both organic and acquired. Underlying organic revenue ex-TAC for Yahoo! as a whole grew just over 41% in the quarter year-over-year, and the effective acquisitions added another 50% to reported revenue net of tax. This organic revenue growth out-paced our also strong 18% growth in global users, implying we are successfully finding more ways to monetize our user base due to the network effect of Yahoo!'s products and services, as consistent with our strategy.

Global marketing, our largest service, generated $418 million of revenue ex-TAC, up 120% year-over-year. Excluding acquisitions, Marketing Services grew 48% on a marketing business and advanced comparable to the BC year-ago fourth quarter growth. This was a function of double-barreled power, one barrel from marketers seeking branded solutions to drive overall awareness and differentiation

Q1 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 7, 2004 Wednesday

and the other barrel from businesses looking for an immediate return on market-
ing commitments in the form of converted sales and transactions.

Turning to fees, we produced $88 million of revenue, up 39% from year-ago
levels. The primary driver of this business line is our premium offerings, in
which consumers and businesses pay us for our services. We exited the quarter
with approximately 5.8 million paid relationships, doubling from a year ago and
advancing about 900,000 from the fourth quarter level. It's important to note
this increase includes the more rapid migration of BT Dial and DSL, continuous
subscribers than originally expected, and our outlook for the balance of the
year assumes these migrations are now essentially completed. Partially offset-
ting the one-time benefit from BT migrations was a very tough comparison in Fan-
tasy Sports, which were seasonally low in Q1 due to the impact of the end of the
football season.

The last revenue line is Listings. Listings revenue increased 16% from year-
ago levels, resulting from solid results at Hot Jobs, the largest contributor to
the line, along with solid growth in the other classified categories.

In addition to making good progress on our revenue monetization objectives,
we are also making strong headway on our productivity goal, which is leveraging
operating and free cash flow. So let's turn now to some of the details behind
our strong and growing profitability. Specifically, normalized operating cash
flow came in at $201 million, up 137% year-over-year and well above expecta-
tions. Also up 13% from the seasonally-high Q4 level of $178 million. This means
that 45% of incremental year-over-year revenue ex-TAC flowed through to operat-
ing cash flow or actually 50% on a pro forma basis, had we owned acquired compa-
nies in both years. Consequently, global operating cash flow margins were 37%
for a seasonally-soft quarter in spite of acquiring several companies that have
historically operated at lower profitability margins than Yahoo!. We recognize
that in this quarter we broke out above the 32 to 35% long-range operating cash
flow margin target that we provided a little over a year ago, and we plan to
provide an update to this range at our analyst day in May, 2004.

The major driver of margin leverage is compensation costs, our largest ex-
pense, which continues to grow slower than revenue. Head count ended the quarter
at close to 5900, up about 400 from year-end levels, of which about half the in-
crease was from the 3721 acquisition. Consequently, revenue ex-TAC per employee
stood at $379,000 in the quarter, advancing from the December quarter level and
up 20% year-over-year. We're really pleased with our progress on this metric as
an indicator of the productive and strategic allocation of resources within our
properties, particularly considering acquisitions brought into the mix that op-
erate at lower revenue per employee levels than the Yahoo! averages.

As indicated last quarter, we continue to expect further modest improvement
in this measure in 2004 while also investing in key talent to drive our search
business and selected other rapid growth opportunities. We currently see the ROI
as exceptionally favorable by making these operating investments, considering
that we expect each point of market share gain and search to be worth more for
shareholders.

Turning to profitability by segment, our Q1 operating cash flow margins on
revenue ex-TAC in the U.S. were 41%, while our international operations came in
at 20%. Not only was Yahoo!'s organic business solidly profitable overseas, but
Overture was profitable internationally in Q1 several quarters faster than
originally expected. Top-line growth remains very robust internationally,
boosted by strong secular growth in sponsored search, the incremental contribu-
tion of acquired companies, plus favorable movements in currencies. On an or-
ganic basis and holding currencies constant, our international revenue increased
33% year-over-year, benefiting from many of the seeds planted over the last cou-
ple of years.

Finishing up the P&L with the bottom line, these results allow Yahoo! to
achieve fully-diluted, normalized earnings per share, or EPS, of 13 cents in Q1,
up 62% from 8 cents a year ago. The earnings were 14 cents on a reported basis,
including the points gain. One very interesting relationship is to compare our

earnings to our free cash flow. Q1 normalized free cash flow for the quarter was over double our normalized GAAP earnings, whereas for the majority of companies, free cash flow is actually less than earnings.

Speaking of first share measures, our Board of Directors has concluded that a stock split is an appropriate step to take to make the shares more accessible to a broad range of investors. As a result, they have approved a 2-for-1 split of our common shares in the form of a stock dividend becoming effective on May 11th, 2004 to shareholders of record on April 26th, 2004. Consequently, future presentations will reflect a higher share base.

Let's turn now to our business outlook which we are significantly upwardly revising due to better-than-expected results. In addition, beginning in this quarter, our business outlook will include the expected contributions from the acquisition of Kelkoo, which closed earlier this week on Monday.

Starting with the second quarter, we expect revenue ex-TAC to come in at a range of $580 to $615 million, up 80 to 91% from year-ago levels. We believe newly-acquired companies will contribute roughly $140 to $160 million of second quarter 2004 revenue ex-TAC, implying organic year-over-year growth of 37 to 42%. Turning to profitability, we anticipate second quarter operating cash flow to come in at a range of $210 to $235 million, up 114 to 139% from a year ago. Of this, we expect acquired companies to contribute $35 to $45 million, implying organic growth of around 90%.

For the full year of 2004, we expect revenue ex-TAC to range from $2.405 billion to $2.520 billion, up 67% from year-ago levels at mid-point. Companies we acquired since early 2003 should contribute roughly $580 to $630 million in 2004, implying organic growth of about 34%. Contributing to the top line growth will be our paid non-advertising relationships with consumers and businesses. Last quarter we indicated we expected the 4.9 million paying relationships we had at the end of calendar 2003 to grow to 7 to 7.5 million paid relationships by year-end 2004. Based on our first quarter experience, we are now raising this range to 7.5 to 8.0 million paying relationships by year-end, and we expect them to reduce an RPU of $3 to $5 a month, consistent with what we said last quarter.

Turning to operating cash flow, for the full year we're raising our 2004 range to $890 million to $970 million. Companies owned for less than one year are expected to contribute a range of $150 to $180 million in operating cash flow. Importantly, on a pro forma basis, had we owned all-acquired companies for the full year of 2003, we expect our flow-through of incremental revenue ex-TAC to operating cash flow to remain close to 50%. On a reported basis, as we absorb lower margin results from these companies into Yahoo!, the flow-through should be about 45%, higher than the 40% we indicated on the last conference call.

Looking at Overture specifically within these figures, as we mentioned last time, the underlying strategic fit with Yahoo! and financial upside to our network has surpassed our original expectations. Consequently, we now believe the $1.8 billion purchase price will be reduced to a multiple of 11 to 13 times the operating cash flow in its first year of operation. This is really heartening because we believe the primary product innovation driver is attracting us to Overture represents future upsides beyond 2004's operating cash flow.

And last, but not least on the financial outlook, we're upwardly revising our 2004 free cash flow range to $665 million to $735 million, more than double the $339 million we generated in 2003. These estimates contemplate capital spending for 2004 of approximately $175 to $205 million, including both acquired company incremental requirements of roughly $40 to $55 million and moderate growth in Yahoo!'s core Cap Ex.

To sum up, as we take stock of our financial vital signs for the first quarter, we feel we're off to a great start this year. Even before considering the increment from Kelkoo, which was included in the ranges I previously provided, we're raising our business outlook by more than $200 million in revenue ex-TAC and $150 million in operating cash flow. We see this revision as validation of our belief that we're well-positioned to take advantage of the best growth opportunities on the web.

Q1 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 7, 2004 Wednesday

At the middle of our ranges, our outlook indicates a third consecutive year of more than 30% in organic revenue growth, delivering close to 50% of that to the operating cash flow line and yielding more than 70% of that to free cash flow. This means that on a reported basis, we should be approaching a $3.5 billion revenue company in 2004 and a $1 billion operating cash flow company compared to generating losses during the dot com transition only two years ago. And the best part is, considering that we feel our chips are on the right tables and the transforming impact of our recent acquisitions in the U.S., Asia and Europe, we believe there is much further upside ahead.

With that, I'd like to turn it back to Terry.

TERRY SEMEL: Thank you, Sue. In a few weeks I will actually be celebrating three years as chairman and CEO of Yahoo!, and what a three years it has been. Looking back, I am excited about how much we have achieved in a relatively short period of time, but I've really been blessed to have such a talented team of executives throughout the world who never say never, but rather always work tirelessly to help us accomplish our goals. We are totally determined to make the next three years even more fruitful. We will stay in focus, stay flexible, and remain humble while we attempt to accomplish even greater things together. So, on that note, I'd like to open it up to questions. I'd like to point out that our COO, Dan Rosensweig, is joining Sue and I, as well as Jerry Yang, our chief Yahoo!.

OPERATOR: Thank you. We will now begin the question-and-answer session. If you have a question, you will need to press star, then 1 on your touch-tone phone. You will hear an acknowledgement that you've been placed in queue. If you wish to be removed from the queue, please press pound. To insure that all participants are able to ask a question, please limit yourself to one question. Once you ask your question, you will be immediately placed back in the conference. If you are using a speakerphone, please pick up the handset before pushing the numbers. Our first question comes from Safa Rashtchy, U.S. Bancorp Piper Jaffray.

SAFA RASHTCHY, ANALYST, U.S. BANCORP PIPER JAFFRAY: Good afternoon, Terry, Sue, Jerry, Dan. Great quarter, congratulations. A couple of questions for you. You know, we've always focused on the advertising growth, and it has been tremendous, but I can't help noticing that the growth in your user base is really continuing to amaze us. The assumption from most of us, and I think from you as well, was that the user base growth will moderate. Can you talk about what is driving this pretty significant user base growth and to what degree international expansion of your content is responsible for it and where can we see it mature? You're getting to pretty high numbers that logically we can't assume much higher percentage.

And the second part would have to do with the incremental operating margin. Sue, you reported something like over 80% incremental operating margin, if we exclude amortization charges. This is more than double what you have ever had in the past four or five quarters. What happened that most of that dropped to the bottom line, even excluding the one-time benefit you had and what degree can this level of flow-through to the operating income level, not the cash flow, can be sustained? Thank you.

TERRY SEMEL: This is Terry. I'm gonna begin. Thank you first for your congratulations. I'd say in general, the theory that we've been living with for quite some time, as you know, is in short that great products equal great business, and we've put our consumers in the forefront of every decision that we make, what's best for our consumers, how will it affect their experience, will it make them happy or will it provide more of the things they've been asking us for in the different research projects that we've done with them. So, I think this is clearly paying off. This has been a company that focused almost, you know, right at the front, every time we come up with a question or decision, it's what are the consumers gonna feel, how will this affect them, is this what they're asking for?

Q1 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 7, 2004 Wednesday

So, I think first and foremost, we feel lucky about that and fortunate about that. And people are responding and more and more people are coming aboard, and you're right in saying more people than we have have anticipated a year or two ago, but I think too, if you follow what is happening, and it's that whole funnel effect we've talked about a lot, so those are the unique users keep growing and even more importantly, the active registered users keep growing in dramatic fashion. We're very, very excited with them and they're of course a large number of them will spend more time with Yahoo!, also make up the backbone, if not the large majority of the now 5.8 unique paying relationships that we have. So, the concepts that we follow, treat them well, do what they need and take care of them and they will come, and in fact they are coming and continue to come and continue to spend more and more time on Yahoo!.

SUE DECKER: Great, and this is Sue to finish up with a couple of the financials. Yes, the numbers continue to be great, overall user's up 18% and active registers up 26%. As you pointed out, international is actually growing faster than domestic, but some of the good news here is that domestic's also growing very, very nicely within that mix. So, although we have thought that the user growth might moderate a little bit in focusing on both revenue per user and user growth, the fact that we've been able to achieve some of our revenue per user goals on a much higher user base only implies a much bigger business long-term than we originally outlined.

In terms of the incremental operating margins from quarter to quarter, we encourage you to look at that on a year-over-year basis because there are seasonal swings in our business and sometimes we plan the timing of our expenses, particularly in marketing around that. So you'll notice that our marketing ratios, you know, we planned a little bit less marketing in Q1 than we planned for the balance for the year. In fact, we're kicking off the campaign beginning in Q2 for the rest of the year that's quite exciting. So I would stick with the numbers I outlined in my formal comments of about a 50% pro forma incremental margin for the year.

OPERATOR: Next question comes from Anthony Noto from Goldman Sachs. Please go ahead.

ANTHONY NOTO, ANALYST, GOLDMAN SACHS: Thank you very much. Terry and Sue and Dan, as we sort of track the progress in the quarter, there's an interesting trend that we found in that after about three-quarters of the quarter we saw an acceleration in activity towards the end of the quarter where we would have normally seen somewhat of a deceleration on both the activity on the branded side as well as pricing. I was wondering if you could comment on a little benefit activity towards the end of the quarter. Was it the realization that the medium is starting to be a much more cost-effective and efficient way to reach consumers in a branded way or some other sort of underlying trend that may have caused that, if in fact you saw it?

And then you mentioned 35% growth on the branded side for the full year. Is that basically an acceleration or in line to where you were the first quarter? And last, Sue, if I look at the international incremental operating margins sequentially in your view they'll quite dramatic, which leads me to believe there's a fair amount of productivity savings and operating leverage, I was just wondering how much productivity, absolute dollar reduction there would be internationally going forward? Thanks.

TERRY SEMEL: It's Terry, I'm gonna start and then my colleagues will join. Just in short, I think that we've been saying for quite some time now that the demographics, that demographics that people have kinda' been clamming for or advertisers look for, that demographics has been moving more and more rapidly towards the Internet. Those folks are spending more and more time on the Internet and on Yahoo! of course, and I think that we've just become a -- as we go forward, we've become more and more an integral part of the overall marketing campaign as opposed to something that perhaps two years ago people would just buy a little something and kinda' throw it in line. So we've become part of the strategy of more and more advertisers as they go forward. We're blessed with a lot of strong vertical categories that play right into the not only demographics, but

Q1 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 7, 2004 Wednesday

the strengths of the audiences that many of those advertisers are looking for,
so I think in general, the marketplace is getting stronger and we're experienc-
ing it as well. So as far as timing, Dan will try it and then Sue.

DANIEL ROSENSWEIG, COO, YAHOO, INC.: Hi, Anthony. I think Terry laid it out-
right and I think the other macro trend is that as marketers need to get more
efficient with their marketing dollars, and the success that we've had with mar-
keting programs, our renewal rates are getting higher, the contract lengths are
getting longer, at the amounts people are spending are increasing significantly,
so there isn't any more a question of whether or not it's a good or bad medium
for the core marketers, but how to use it more effectively. Yahoo! happens to be
one of the few places where you can actually go broad across the network to
reach large groups of people with reach and specific vertical categories and
demographics capabilities, so new ad technology, new formation, the site is
working well for people, users have tremendous engagement. The value of their
dollars spent here versus other places they can spend it, and the speed which
they can impact with it are changing the way people think about marketing and
we're the beneficiary right now.

SUE DECKER: Okay, Anthony, let me finish up here. You asked about the 35%
growth that we could approach in our marketing services line organically in 2004
in Terry's comments. That is what we now believe we can do for the full year.
That compares with the 48% number that I identified for the first quarter. So,
and again, that is our combined sponsored search and our more traditional,
branded marketing, collectively together on an organic basis. So, we are looking
for a continuation of robust growth in spite of facing increasingly tough com-
parisons as the year goes on, and that has led us to be comfortable putting out
a number for the full year of 35% that is higher than the 25 to 30% range we put
out earlier.

In terms of the international side on operating margins, we were very pleased
with our performance in Q1. We actually think for the full year international
operating cash flow margins could operate at close to 20%, similar to our first
quarter. That's up from 16% last year and another factor that should help us
achieve that is that when we fold in the Kelkoo deal, as we indicated to you
when we announced the deal a couple weeks ago, it's operating at close to 30%
operating cash flow margin, so that should help reduce the overall total.

OPERATOR: The next question comes from Heath Terry from Credit Suisse First
Boston. Please go ahead.

HEATH TERRY, ANALYST, CSFB: Thanks. I was hoping for both the sponsored
search and impression ad part of the business you could give us an idea of the
impact of pricing and volume in the out-performance in the quarter and the in-
crease in guidance.

SUE DECKER: Okay, Heath, I'm gonna take that, as we've indicated for the last
couple of quarters, consistent with the practice in our industry, we're not
gonna break the two component pieces out, but it's fair to say that if you
looked at again, our organic marketing line, which contains both sponsored and
more traditional branded revenue, looking just at revenue yield per page view,
it was up more than 15% year-over-year in the quarter and we saw it fairly com-
parable to the increase we saw last quarter and the pricing increases were
pretty balanced between our CPM or branded-based offerings and sponsored clicks.
The only other additional comment I'd make, as you look at the sponsored click
side, is that we're primarily focused on revenue per search. And revenue per
search kinda' collapses several of the key monetization methods including price
per click, coverage per click. And one of the things happening industry-wide in
our business is that Overture has come up with interesting ways for affiliates,
including us, to increase coverage levels, meaning we could bring in new verti-
cals or key words, which could have a different price per click than the overall
average. So, that process of doing that has kept the overall price per click
relatively stable for the last couple of quarters, although year-over-year it's
still growing nicely at double digits. And the important thing is that overall
impact on paid clicks has been very, very strong as you can see in our results.

Q1 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 7, 2004 Wednesday

OPERATOR: Our next question comes from Lanny Baker from Citigroup. Please go ahead.

LANNY BAKER, ANALYST, CITIGROUP: Thanks a lot. I was wondering if you could talk a little bit about where relative to your expectations for this quarter and for this year, the business is sort of most importantly better than what you thought it was gonna be 90 days ago. What was -- put your finger on the one piece of the operation in enterprise that's really running ahead of your earlier expectations. And kind of related to that, I was wondering if you could compare the growth of the Yahoo!-sponsored search business to the growth rate that you're seeing your partners generate, and I guess there are a lot of different components to that, but both you know, sort of -- the core Yahoo! franchise keeping up with or growing better than some of the larger partners? And also, can you give us an update on attrition and additions to the third party side of the network?

TERRY SEMEL: Hi, Lanny, it's Terry. I'm just gonna start. You asked which piece; I'd say three. I'd say our collective marketing services, which embodies you know, in total one of our businesses, but two pieces, and if I had a third or a second, I'd say subscriber growth rate. And a third would be increased movement internationally in terms of our both revenues and profitabilities, even pre-acquisition. So when you look across the board, you'd say 90 days ago we would not have thought we would do as well in branded advertising and not as well in sponsored search, not as well in subscription numbers and not as well in international. Sue's gonna take the second piece.

SUE DECKER: Okay, Lanny, yeah, on the growth of Yahoo!-sponsored versus the Overture partners, I think I know what you're getting at and let me try to address the question this way. Now, if you separated our business into the revenue net of tax that we received from all of our affiliates and everything else, the everything else being Yahoo!'s core, all of its businesses, including sponsored search, is outgrowing the revenue net to affiliates, but an important observation there is that the revenue net to affiliates is actually up double digits, in the teens, is our expectation for the year. So both are growing very, very nicely, and as you saw that we announced earlier this week a combination of signing CNN, ESPN, Wall Street Journal and we signed affiliates we haven't publicly announced, so I think the important thing there is that a lot of reason we bought the company as we explained about trying to create more value on the Yahoo! network by adding invasion is now being shared by affiliates and we've been very successful at being able to sign new ones.

OPERATOR: Our next question comes from Mark Rowen from Prudential Securities. Please go ahead.

MARK ROWEN, ANALYST, PRUDENTIAL SECURITIES: Thank you very much. A couple of questions. Number one, Sue, you mentioned that pricing on sponsored search has been stable for the last couple of quarters, but up double digits year-over-year. When do you start lapping that and when does that sort of normalize out? Do you think it can go higher from the level that it's been at the last couple of quarters based on what you're seeing? And second, in the fee segment, it looks like your subs increased by 18%, but revenue in -- that's sequentially by the way -- but revenue in that segment only increased by 4%. Can you talk about what's going on there and what caused that? Thank you.

SUE DECKER: Let me start on the pricing side. I think that the most important thing here is that a lot of the variables in sponsored search are not independent, they are interdependent and they affect each other, so to the question could PCC rise on an overall weighted average business, including apples and oranges, all the terms we're including, absolutely, depending on the choices we've made. The goal though, Overture's made a choice to focus on paid clicks and driving overall revenue per search up, and that's why it's introduced a number of new products, content match being one, along with new verticals and expanded its coverage, so the overall volume of clicks that we're seeing is very, very significant increase, and that's a strategy we plan to have in place for the foreseeable future. In terms of the increase in subs versus revenue, if you just take as a single point estimate the end of Q1 versus Q4, the timing of the BT

Q1 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 7, 2004 Wednesday

subs were throughout the quarter. Fantasy football came off very early in the quarter, and don't forget some of the de-emphasis of the enterprise business that we have undergone over the last few years, so that 39% year-over-year growth in fees was actually after absorbing negative comparison in some of the enterprise stuff on an underlying basis, it's up 60% year-over-year.

OPERATOR: Next question comes from Jeetil Patel of Deutsche Banc Securities.

JEETIL PATEL, ANALYST, DEUTSCHE BANC SECURITIES: If you look at the three major markets out there, U.S., Asia PAC and Europe, can you characterize you know, how long -- how big the opportunities are or where is the next leg of growth between the three specific markets in general in and then secondly, if you look at the number of users in the network of now approaching almost 300 million, can you talk about revenues per user and monetization, international verses domestic, how do you deploy some of the cash or invest internationally. Is it mainly through acquisition to monetize this user base today?

DANIEL ROSENSWEIG: This is Dan. On the outside the U.S. opportunities, what we see is that there's significant opportunities everywhere outside the U.S. So in Asia we've made some great investments both organically in our own products, where we're a significant, major player in places like Korea, Taiwan, with our auctions business and obviously Terry talked a bit about what we're doing in China. We see all of those marketplaces being very robust, some being tremendous user growth ahead of us, places like China. Some being where the users are increasingly devouring things available on the Internet, like Taiwan and Korea.

So, in Europe, that marketplace we feel is about 18 months behind where the U.S. marketplace is. We see incredible usage growth of our sites and our opportunities, the acquisition of Kelkoo will provide us an opportunity to have between search and product search and commerce, the third most used Internet activity, which is commerce, in addition to our search and email, so we feel we're in a very strong position in those marketplaces. Right now the primary business in most of those markets are advertising and search and sponsored search and those are growing very nicely. We're beginning to deploy paid services, as you saw with BT. And you see that with our personals businesses outside the U.S. and Taiwan and in Europe. So we see a lot of the same strategy that we deployed here available to us outside the U.S. and we're in very good position in most of the big countries.

SUE DECKER: Yeah, I think Dan really said it well. I would only add that you know, you're right to note that our overall revenue per user international represents a significant opportunity relative to the domestic level, so that's sorta the quantification of what Dan just said. Essentially just playing out the strategy that Terry outlined in his comments that, we deployed in the U.S. Take the global cost structure that we have, figure out which incremental new businesses make the most sense for advertisers and for consumers directly and build multiple layers of revenue without a commensurate increase in cost. You saw what Japan did, saw what we did in the U.S. and some of our successful markets in international are deploying that strategy as well.

OPERATOR: Next question comes from Mary Meeker from Morgan Stanley. Please go ahead.

MARY MEEKER, ANALYST, MORGAN STANLEY: Thanks. I have just a couple questions. Your gross margin was flat sequentially, remained pretty strong. We've seen some data points that content prices in some areas are potentially going up with the Reuters move, the Major League Baseball move. Any thoughts on how we should think about content costs and gross margins on a go-forward basis? And then a second question really for Terry -- if you look at the Yahoo! site and user experience one year ago and you compare it with where you are today, you clearly have made major improvements in the search area, and that would probably be No. 1 in a user experience improvement list. If you look forward 12 months, do you think you'll have more innovation on the site and the user experience on a go-forward 12-month basis than you had in the previous 12 months? Thanks.

SUE DECKER: Mary, I'll start on the gross margins. They stayed healthy at 86%, as you pointed out, versus 87% last year quarter. They were up about $6

Q1 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 7, 2004 Wednesday

million sequentially. Most of the growth there was due to variable costs at
Overture and variable usage-related costs at the data center operations in band-
width to serve our increased traffic levels. We also have an increase in content
cost, as we're trying to enhance user experience in many media properties. On
that, I should say we continue to be diligent about how much we spend on content
and our usage-related costs, which are server depreciation and bandwidth, and
we're well in check, increase primarily from usage. As you're aware, most of the
cost and costs of goods sold are more variable with usage than revenue, so as
you look at the overall user number and compare that with our revenue, you could
get a sense for further leverage there.

TERRY SEMEL: Mary, if I had to look ahead another year, I'd say that the
changes to what the Yahoo! home page would look like and more importantly what a
number of the verticals would look like, would be more dramatic in the next 12
months than even perhaps the last 12 months. You'll see things, including per-
haps re-designs of what the home page itself actually looks like. You'll see
things like us taking further advantage of broadband and how broadband really
affects personalization, and how broadband affects our community and clubs.
You'll see many changes, and I think terrific changes, to our IM categories that
everyone's been working on a lot. You'll see lots of changes in a lot of our en-
tertainment segments, including games and music and movies. There's much more
ahead and on the drawing boards right now in the testing phases right now than
we actually had a year ago. So I'm gonna take one more question, if we can.

OPERATOR: Our next question comes from Gordon Hodge from Thomas Weisel Part-
ners. Please go ahead.

GORDON HODGE, ANALYST, THOMAS WEISEL PARTNERS: Hi, good afternoon. I was cu-
rious, Terry, if you could expand a little bit on the verticals, where you're
seeing -- or perhaps a question for Dan -- where you're seeing the most demand
on the site in terms of ad sales and also, if you could talk about whether you
still see a significant amount of un-monetized traffic that you might be able to
take advantage of you know, on a bundling basis or some other fashion as you go
forward? Thanks.

TERRY SEMEL: I just -- I think a number of the key verticals that we've often
talked about are really doing a great job. So, we talked about verticals in the
past, like autos and finance and entertainment, and God, I could go on and on.
There are a whole bunch of them that have been really hot, notwithstanding the
home beige page of course and sports and games and you name it. So we're about
eight or ten different verticals -- Dan will fill in when I'm done, but they're
really doing well.

As far as taking advantage, there are two or three things and I'll lay them
out and then Dan can go knock it over the fence. You know, when things started
for us at least three years ago, logically, people came to advertise on the home
page or came to advertise, if they're an autos company, they'd advertise in
autos and maybe the home page. Then people started to go from well, if it's
autos and the home page, where else are my demographics? Oh, I see, it's in
sports or games or entertainment, and vice versa. If they're advertising in en-
tertainment, where else are the demographics? So we're starting to see the abil-
ity to talk to people about let's not talk about one vertical, let's talk about
the demographics you're looking for, and let us help you find or reach that
demographic. They exist in huge numbers in multiple areas of Yahoo!, so we're
experiencing a lot of change, a lot of important progress by talking to people
about more than one place, about multiple places, and more importantly, about
how do you achieve your objective, which is really looking for specific demo-
graphics? Dan?

DANIEL ROSENSWEIG: Yeah, I think that lays out the basis for it. So, we, in
the traditional categories as we look as as big verticals, we've seen improve-
ments in categories like finance, which was slow, technologies made a little im-
provement. Most interestingly though, each of the categories have expanded, so
the kinds of players within entertainment, not just the movie guys, but the game
guys, the TV guys, music people. So increasingly, these categories are just get-

Q1 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 7, 2004 Wednesday

ting bigger. We're not just getting some players from those categories, but lots of the different sub-categories in it, and that's been extremely effective.

The second thing Terry alluded to is that our ability to serve a broadcast and a narrowcast, whether it be on a content vertical or a specific demographic, because of our large reach and our targeting capability, we've been able to deliver quite successfully on much larger campaigns. And then lastly, the effect that we have so many registered users and personalization and that kind of capability along with the new formats we have, whether they be graphical or broadband and now text-based. All of those things allow us to monetize each of the inventory we have more effectively and greater pieces of the inventory that we've never really been able to effectively use. So for all of those reasons, we just see a really long runway ahead here.

TERRY SEMEL: And finally, I think we're just at the beginning of the ability to talk to larger advertisers and satisfy a much greater need of theirs, which goes way beyond one or two places or one or two verticals on Yahoo!, and for us to -- and we have been -- to talk to them -- because we are, we're an Internet network and we have many places for them to find the concentration of the audience they're looking for. So with that, we thank you all for joining us today. We are gonna take a few minutes off to celebrate. Thank you.

[CCBN reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES CCBN ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS. Copyright 2004, CCBN, Inc. All Rights Reserved.]

**LOAD-DATE:** April 22, 2004

Exhibit 23

FOCUS - 43 of 53 DOCUMENTS

Copyright 2004 FDCHeMedia, Inc. All Rights Reserved
Copyright 2004 CCBN, Inc. All Rights Reserved
FD (Fair Disclosure) Wire

July 7, 2004 Wednesday

Transcript 070704ai.732

**LENGTH:** 9355 words

**HEADLINE:** Q2 2004 Yahoo, Inc. Earnings Conference Call - Final

**BODY:**

OPERATOR: Good afternoon, ladies and gentlemen and welcome to the Yahoo! second quarter, 2004 earnings conference call. At this time, all participants are in a listen-only mode. Later, we will conduct a question and answer session. Please note that this conference is being recorded. I would now like to turn the call over to Mr. Paul Hollerbach, vice president of financial planning and investor relations. Mr. Hollerbach, you may begin.

PAUL HOLLERBACH, VP-FINANCIAL PLANNING AND IR, YAHOO, INC.: Thank you and good afternoon. Welcome to all of you listening to Yahoo!'s second quarter earnings conference call. On the call today are Terry Semel, our chairman and CEO; Sue Decker, our Chief Financial Officer; Jerry Yang, Chief Yahoo; and Dan Rosensweig, our COO. Before I begin, I would like to remind you that matters discussed on this call contain forward-looking statements that involve risks and uncertainties concerning Yahoo!'s expected financial performance, as well as Yahoo!'s strategic and operational plan. Actual results may differ materially from the predicted results and reported results should not be considered as an indication of future performance. The potential risks and uncertainties include, among others, decreases or delays in marketing services spending, acceptance of new products and services, and risks related to the integration of recent acquisitions. All information discussed on this call is as of today, July 7th, and Yahoo! undertakes no duty to update this information. Other potential factors that could effect the company's business and financial results are included in the company's annual and quarterly reports, which are on file with the SEC.

In this call we will also discuss some non-GAAP financial measures in talking about the company's performance, including operating income before depreciation and amortization, which we will refer to as operating cash flow, revenue excluding traffic acquisition cost, and free cash flow. Reconciliations of those measures to GAAP measures can be found in the investor relations section of our website. Terry and Sue have prepared remarks that should last about 35 minutes. Then we will have a brief Q&A session. And now, I'd like to turn the call over to Terry.

TERRY SEMEL, CEO, YAHOO, INC.: I'm beginning to really love my opening. In Q2, we delivered the best quarter in Yahoo!'s history. This continues to be a very exciting and busy time for our company. In fact, the past year has been a period of unprecedented growth with this, our fifth straight quarter of record revenues. We are demonstrating the consistency and growth of Yahoo!'s business strategy and it continues to be a time of significant opportunity. We have an extremely healthy and diversified business model and our two core businesses, advertising and premium consumer services, are both performing very well. Yahoo! is clearly on the move. Let's start with a brief recap of some of our key financials that demonstrate the increasing momentum in our strategy. In the second quarter, Yahoo! generated a record $832 million in revenue, up 159% compared to 321 million in the second quarter of last year. Yahoo! is benefiting from the diversity within both of our core businesses of advertising and premium consumer

Q2 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 7, 2004 Wednesday

services, which has enabled us to deliver consistent and sustainable growth over
the past year.

Operating income before depreciation and amortization was $234 million in the
quarter, more than double last year's quarterly performance. Yahoo! delivered
GAAP earnings per share of 8 cents in the quarter, compared to 4 cents per share
in the second quarter of 2003. And as a result of our continued strong perform-
ance, we have again upwardly revised our full year business outlook which Sue
will provide more details on shortly. As excited as we are about our financials,
we are even more excited about the user response to the new products we have
launched. We have launched existing services, we have improved and the acquired
products that we have enhanced and integrated into the Yahoo! network. We thrive
on the belief that great products are the key to great business and we are very
pleased with the pace and success of Yahoo!'s global product renaissance.

Some of the highlights of this past quarter in major areas such as search,
commerce and communications, include: well, we extended the international roll-
out of Yahoo! search technology with the inclusion of Yahoo! Japan and ESO, our
stand alone search portal in China, which has received an extraordinary amount
of search queries in the two weeks since it's inception. With implementation in
Taiwan in the coming week, we will have fully deployed Yahoo! search technology
globally in just five short months. We introduced a new streamlined look and
feel to Yahoo! search results pages in the U.S. and our preliminary testing
shows that the new pages increase retention and enhanced user satisfaction;
critical metrics as we continue our focus on improving our position. We contin-
ued the integration of Kelkoo into our European operation. We introduced Kelkoo
product search results on Yahoo! in France, Spain and Italy, we began cross mar-
keting Kelkoo and Yahoo! shopping, and combined advertising opportunities be-
tween Kelkoo and Overture, providing greater relevance for online shoppers.

The all new Yahoo! messenger launched during the second quarter, was posi-
tively received by our users, and it is a fantastic example of Yahoo!'s innova-
tion and ability to provide deep integration with services across the network
such as games, music, and search. We also began our international rollout, which
will be completed by the end of this summer. And though the global relaunch of
Yahoo! mail provided our users with a streamlined interface, faster search
within mail, the availability of 50 million new Yahoo! ID's, no graphical ads
for premium users, and significantly increased storage; while also continuing to
lead the industry efforts to combat spam. Since the rollout, we have seen a
meaningful pickup in new mail registrations. What you have seen so far for mail
is only the beginning and our users should expect to see some really cool addi-
tions in the next few months. Our product road map for the second half of this
year is even more dynamic, with new innovations in broadband, wireless, music,
search, local, travel, games, personalization, and community. So stay tuned.

The union of creativity, excellence, innovation, quality and shared produc-
tivity has helped create an environment in which we are releasing the best ser-
vices in Yahoo!'s history. All for the benefit of our consumers. As a result of
the investment in our products and services, we continue to be rewarded with
more users. We ended the quarter with approximately 300 million unique users, up
27% from approximately 236 million this last quarter. Excuse me. This quarter
last year. Our active registered users now stand at approximately 146 million,
up 26% year-over-year from 116 million. The fastest growing subset of users one
Yahoo! Network work continues to be our paying subscribers. We ended the quarter
with approximately 6.4 million unique paying relationships, up approximately
600,000 from the previous quarter and up more than 80% year-over-year from ap-
proximately 3.5 million. In the next few weeks, we're also looking forward to
the launch of fantasy football and our joint offering with Rogers Cable in Can-
ada. It's a win-win equation.

With great products and services, we really accomplish two things. We provide
better choices to our existing consumers, which encourages them to spend more
time on Yahoo!, using both our free and paid services. Second, these products
and services act as a magnet to attract new consumers to our network. As this
cycle continues, we expand our truly unique and effective advertising platform
supported by the world's largest and most engaged online audience.

Q2 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 7, 2004 Wednesday

So let's now focus on our marketing services business, which achieved a 215% year-over-year increase to $691 million in revenue due to both dramatic growth in our organic business and incremental revenue from acquisitions. We believe we are in a position of strength as a full service advertising provider with the ability to offer branding capabilities, lead generation advertising, or a combination of both. As advertisers look to shift their dollars to the internet, which is projected to be the fastest growing advertising medium in 2004, Yahoo! is extending its leadership position as we meet our advertiser's needs and become more essential to their media mix. Yahoo! has become synonymous with advertising on the internet. When marketers think about buying advertising online, they think about Yahoo!. Our brand advertising business performed extremely well during the quarter. We may be seeing the beginnings of what is commonly referred to as the tipping point, as more top advertisers participate in the online brand advertising opportunity. The repeat rate for Yahoo!'s top 200 U.S. brand customers from Q1 to Q2 was greater than 90%.

Our focus on specific verticals is also paying off with strong performances in certain categories. Yahoo! is currently doing business with all of the top 10 consumer package goods companies. The financial services category experienced strong growth among brokerage, bank and insurance advertisers. Consumer telecom was an area of significant revenue growth. And entertainment marketers also continue to become more enthusiastic and engaged as research highlights the internet's enormous influence in consumers' movie choices. In our lead generation business, Yahoo!'s Overture division further expanded its search implementations throughout the Yahoo! network, including autos, finance, news, health, shopping, and travel. Additionally, Overture grew its network with new distribution partners such as 9 MSN in Australia and WEB.DE in Germany. Overture also signed a relationship with Navor in Korea, giving us monetization relationships with all four of the leading portals in that country.

One of the most important new developments was the introduction of Overture's Local Match, its new sponsored search product that delivers local search listings for both on and off line businesses. The reaction since our launch last week has been very favorable among both advertisers and the search community. According to industry estimates, approximately 25% of the commercial searches are currently local in nature and we believe we are in a strong position as consumers increasingly turn to search to find local products and services. To sum up our marketing services business, last quarter we said we were comfortable that our organic marketing services business, which excludes acquisitions, would approach 35% growth for the year on a year-over-year basis. We now believe that number will exceed 35% implying that we expect to continue to gain share in a segment that is also gaining traction.

Turning to our international business, the strategy we laid out two and a half years ago has now enabled us to take advantage of tremendous growth opportunities outside of the U.S. Results this quarter demonstrate our global initiatives are clearly paying off. Reported revenue from our international business grew 316% year-over-year in the quarter. Even more significant, profitability in the quarter is almost five times greater on a year-over-year basis. We have experienced terrific growth in both of our core advertising businesses. In addition, the investments we're making in premium services, such as our BT relationship, and products such as personals are beginning to pay off. With the success we've had, we're on track to achieve the goal we laid out for international to be 21-22% of Yahoo!'s total revenues for the year and we believe there is even greater opportunities longer term.

So in conclusion, I think we have a fantastic long-term growth potential ahead. Our aspirations don't stop with record financial quarters. Our mission to be the most essential global internet service for consumers and businesses remains unchanged. When consumers think of the internet, more than ever, they are thinking about Yahoo!. When marketers think of the internet, more than ever, they are thinking about Yahoo!. Tying all this together is our commitment to product leadership through which we will attract and retain consumers and the marketers who want to reach our expanding audience. We have created a clear framework for our business and I am thrilled with how we have been executing

Q2 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 7, 2004 Wednesday

against our vision and excited about what's ahead. With that, I'd like to turn
the call over to Sue to review our financial highlights.

SUE DECKER, CFO, YAHOO, INC.: Thanks, Terry. Thanks for joining us today.
We're really pleased with our second quarter results because they clearly under-
score two fundamental business strengths of the products we have assembled.
Namely, extraordinary growth, and great balance and diversity. We see this as a
great combination and it's not an accident. We have been careful, deliberate and
persistent about committing the appropriate investment into both external acqui-
sitions and internal product development. We believe those investments are pay-
ing off and are responsible for the product renaissance that Terry described,
which is significantly benefiting both consumers and shareholders. We still have
a lot of work to do, but the best part of where we sit today is that while cur-
rent returns are very attractive, we have a lot of pokers in the fire and we be-
lieve future results could be even more compelling.

Before we look at the highlights from our Q2 results, let me start with two
housekeeping items. First, as a reminder, during our first year of owning a sig-
nificant acquired company, our practice has been to disaggregate the results and
disclose the impact on our growth rate. This is somewhat unnatural from a man-
agement perspective because our past acquisitions have been integrated into Ya-
hoo! and managed in a way that is different from how they operate as a stand
alone entity. However, our goal with this disclosure is to provide you with
transparency into underlying organic growth rate, as distinct from any material
impact from acquired growth, both in the past and also as expected in our busi-
ness outlook. In this quarter, three acquisitions in aggregate, materially con-
tributed to reported growth. First, the first incremental quarter of Kelkoo;
second, the second incremental of 3721; and third, and most significantly, the
third incremental quarter of Overture.

The second housekeeping item is that the market price conditions for con-
vertibility of our convertible bonds issued in April, 2003 was met as of the end
of Q2; meaning holders can convert their bonds into shares during Q3. Unless, or
until, there are conversions, we will continue to reflect both the underlying 37
million shares in our fully diluted share count and also the full value of the
bonds on the balance sheet as long-term debt. As holders convert, the shares
they receive will be added to the basic share count and long-term debt will be
reduced accordingly. That being said, we view our converts as equity at this
point. Okay, back to the financial highlights.

I'd like to point out three in particular. First, free cash flow for the
quarter was $194 million, more than doubling from a year ago and bringing our
trailing 12 month normalized free cash flow to close to $600 million, a testa-
ment of the exceptionally high cash productivity of our business model. Second
the organic growth rates and the fundamentals that drive free cash flow were
also very strong this quarter and we expect acquired operations to continue to
leverage these growth rates in the long-term. Specifically, on an organic basis,
revenue excluding traffic acquisition costs, or TAC, increased 42%; a tad better
than what we saw in Q1 and operating cash flow grew 85%, representing well more
than a 50% flow through of incremental revenues to operating cash flow. Third,
and equally important to the strong absolute growth in those figures, is that on
a relative basis, our top line and operating cash flow each advanced faster than
our underlying base of users and employees. These relative trends demonstrate
the network effect of our revenue model, as well as the underlying productivity
driving margin expansion; because our investment in talented employee base is
the primary driver of the organic cost of growth.

Let's talk now about the results in Q2 in a little bit more detail. Free cash
flow really encapsulates all of the P&L and balance sheet movements that we be-
lieve are important to value creation and maximizing long-term free cash flow
is, therefore, our most important financial objective. We define free cash flow
as cash generated from operations, which includes cash costs for taxes and
changes in working capital less cap spending. The 194 million of free cash flow
in the quarter represented 32% of revenue ex-TAC and 83% of operating cash flow.
It's very tough to predict the free cash flow to operating cash flow in any
given quarter due to the interim timing swing in working capital items, but we

Q2 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 7, 2004 Wednesday

currently believe shareholders can continue to look forward to a significant portion of operating cash flowing into free cash and we are maintaining our 60-80% longer term target.

So what do we do with that cash? In the second quarter of 2004, we closed on the acquisition of Kelkoo for about $535 million, net of cash acquired; notwithstanding that outflow and other uses amounting to about 30 million, our cash and marketable securities balance only dropped by 140 million to $2,650,000,000 because we generated close to 194 million in free cash from operations and we also generated 225 million from the exercise of employee options; which largely offset the cash expenditures for Kelkoo. These funds provide ample flexibility to drive value for shareholders through acquisitions, investments and share repurchase activity in the future.

Moving now to the P&L, our overall summary is that, consistent with our financial strategy, we are successfully supporting a massive and growing base of more revenue productive users without a commensurate increase in costs. Second quarter revenue ex-TAC came in at $609 million, advancing 90% over year ago figures and up 13% from Q1 '04 levels; benefiting incrementally from the Kelkoo deal. Underlying organic revenue ex-TAC for Yahoo! as a whole grew 42% in the quarter, year-over-year, well above our longer term target of 30% and the effect of acquisitions added close to 50% to reported growth for the quarter. This organic revenue ex-TAC growth outpaced our also strong 27% growth in global users, or 21% before including the new 3721 users for the first time. Indicating that we are successfully finding more ways to monetize our user base due to the network effect of Yahoo!'s product and services.

Looking at the individual lines of business, global marketing, our largest service, generated $467 million of revenue ex-TAC for the quarter, up 113% year-over-over. Excluding acquisitions, marketing services grew a healthy 45% on an organic basis. This strength was a function of double barreled power, one barrel from marketers seeking branded solutions to drive overall awareness and differentiation and the other barrel from businesses looking for an immediate return on their marketing commitments in the form of converted sales and transactions.

Turning to fees, we produced $104 million of revenue, up 49% from year ago levels. The primary driver of this business line is our premium offerings in which consumers and businesses pay us for our services. We exited the quarter with approximately 6.4 million paid relationships, almost doubling from a year ago, and advancing about 600,000 from the first quarter level. This increase includes more migration from BT dial and DSL continuous subscribers than originally anticipated. Looking forward, based on our current run rates and outlook for the rest of the year, we expect our paid non-advertising relationships with consumers and businesses to trend toward the high end of the 7.5-8 million business outlook range that we upwardly revised in first quarter by the end of the year; and to produce an ARPU of 3 to $5 per month. Our outlook for the balance of the year assumes that BT migrations are completed, anticipates the benefits from the rollout of the Rogers deal in Q3, and also assumes normal organic growth.

The last revenue line is listings. Listings revenue of $38 million increased 17% from year ago levels, resulting from solid results at HotJobs, the largest contributor to the line, along with solid growth in our other classified categories. In addition to making good progress on our revenue monetization objectives, we're making strong headway on our productivity goals; which are leveraging operating and free cash flow. Let's turn now to some of the details behind our strong and growing profitability.

Specifically, operating cash flow came in at $234 million, up 138% year-over-year and near the high end of our business outlook that we substantially increased after our strong Q1 results. This means that 47% of incremental year-over-year revenue ex-TAC flowed through to operating cash flow, or greater than 50% on a pro forma basis; had we owned acquired companies in first quarter. Consequently, global operating cash flow margins were 38% in spite of acquiring several companies that historically have operated at lower profitability margins than Yahoo!. The major driver of margin leverage is compensation costs, our

Q2 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 7, 2004 Wednesday

largest expense, which continues to grow slower than revenue. Head count ended
the quarter at just over 6,500, up about 600 from Q1 levels; of which 250 joined
us from Kelkoo and the balance was from growth in the remainder of our busi-
nesses as we invest in selected opportunities to strengthen our market position
and extend new verticals and support our growing business. Consequently, average
annualized revenue ex-TAC per employee stood at 385,000 in the quarter, advanc-
ing from the Q1 level and up 13% year-over-year.

We are very pleased with our progress on this metric as an indicator of the
productive and strategic allocations of resources within our properties. Par-
ticularly considering acquisitions brought into the mix that initially operate
at lower RP levels than the Yahoo! averages, but have become more profitable un-
der our ownership. As indicated last quarter, we continue to expect further mod-
est improvement in revenue per employee in 2004, while also investing in key
talent to drive our search business and selected other rapid growth opportuni-
ties. Turning to profitability by segment, our Q2 operating cash flow margins on
revenue ex-TAC in the U.S. were 42%, while our international operations came in
at 26%, a hefty increase from the 20% level in the first quarter, in spite of
ongoing investments. We continue to believe we can operate for the full year in
a range of 20-25%, as we outlined at analyst day, as many of our countries are
turning profitability and our more established countries are reaching margins
levels comparable to the U.S.

Top line growth remained very robust internationally, boosted by strong secu-
lar growth in sponsor search, the incremental contribution of acquired compa-
nies, plus favorable movements from currency. On an organic base, and holding
currencies constant, our international revenue ex-TAC increased 42% year-over-
year, right in line with the U.S. increase, benefiting from many of the seeds
planted over the last couple of years and accelerating compared to Q1's pace.
International revenue ex-TAC represented 22% of total revenue, up 600 basis
points year-over-year and consistent with the trends we discussed at analyst day
of a full year range of 21-22% compared to 16% last year. As a reminder, as is
clear from our business outlook, we're entering a seasonally slower Q3 for our
international business, particularly in Europe, so our sequential growth and
margins may slow a bit from Q2 levels before rebounding in Q4 on the interna-
tional side. Finishing up with P&L with the bottom line, these results allowed
Yahoo! to achieve fully diluted earnings per share, or EPS, of 8 cents in Q2, up
100% from the 4 cents per share in the year ago period. One very interesting re-
lationship is to compare our earnings to our free cash flow. Q2 free cash flow
for the quarter was more than 50% larger than our GAAP earnings, whereas for
many companies free cash flow is less than earnings.

Let's turn now to our business outlook. We expect third quarter revenue ex-
TAC to be in a range of 610 to $650 million, up 71-82% from year ago levels. We
believe companies acquired in the past year will contribute roughly 145 to 165
million in the third quarter of 2004, revenue ex-TA C, implying organic year-
over-year growth of about 30-36%. At these revenue levels, we expect third quar-
ter operating cash flow to be in a range of 230 to $255 million, up about 95-
120% from a year ago. Of this, we expect acquired companies to contribute 45 to
55 million, implying organic growth of about 55-70%. Moving to the full year
2004, we are upwardly revising our business outlook for revenues ex-TAC and op-
erating cash flow from the one we provided three months ago to acknowledge that
our Q1 numbers were at the high end of our business outlook, notwithstanding the
very significant adjustment we made at that time. Specifically we now expect
revenue ex-TAC for the full year to range from 2.455 billion to 2.535 billion,
up about 70% from year ago levels at the midpoint.

We expect companies we have acquired in the past year to contribute roughly
600 to $630 million in 2004, implying organic revenue growth of about 36%. At
these revenue levels, we expect to be operating within a higher operating cash
flow range than discussed last quarter, so we're raising our full year 2004 out-
look range to 945 million to 995 million. Companies owned for less than one year
are expected to contribute a range of 190 to 210 million of the total. On a re-
ported basis, as we absorb lower margin results from these companies into Ya-
hoo!, the flow through should be around 45%, in line with what we indicated last

Q2 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 7, 2004 Wednesday

year. Importantly on a pro forma basis, had we owned all acquired companies for
the full year of 2003, we expect our flow through of incremental revenue ex-TAC
to operating cash flow to be north of 50%. Moving to our most important finan-
cial metric, free cash flow, we're upwardly revising our 2004 free cash flow
range to 730 to $780 million; more than double the 339 million we generated in
2003.

This outlook contemplates capital spending for 2004 of approximately 190 to
$215 million, including both acquired company incremental requirements of
roughly 40 to 55 million and moderate growth in Yahoo!'s core capex. This out-
look indicates an expectation that our capex will be in the range of 20-25% of
operating cash flow, consistent with the range we have operated within the last
two years. This range both allows strong free cash flow conversion and also pro-
active investments to drive our product strength and support our user growth.

To sum up, as we take stock of our financial vital sign for the second quar-
ter, we feel we are tracking very nicely in 2004. At the middle of our ranges,
our full year 2004 outlook suggests a financial model that is extremely attrac-
tive relative to most businesses. It calls for a third year, consecutively, of
more than 30% growth in organic revenue ex-TAC, it suggests delivering close to
50% of that to the operating cash flow line and it anticipates yielding more
than 70% of that to the free cash flow line. We're also delivering nice gains in
key metrics like average revenue per user and average revenue per employee,
leaving us well on track to meet our stated goals; and we're delivering balanced
growth across all of our contributors to revenue, whether measured by business
line or geographic region. The best part is that considering we feel our chips
are on the right tables and taking into account the transforming impact of our
recent acquisitions in the U.S., Asia and Europe, we believe there is much fur-
ther upside ahead. With that, I'd like to turn it back to Terry.

TERRY SEMEL: Thank you, Sue. Our long-term global strategy and blueprint is
clear and focused. At the same time, we remain flexible and capable of moving on
a dime. We are thriving with competition. It only makes us better. Yahoo! is on
the move with many or exciting opportunities ahead. So now I'd like to open up
the phone to calls.

OPERATOR: Thank you. We will now begin the question and answer session.
[Caller Instructions] Our first question comes from Mark Mahaney from American
Technology. Please go ahead.

MARK MAHANEY, ANALYST, AMERICAN TECHNOLOGY: Great. Thank you. Terry, you had
used the term tipping point in describing the branded advertising segment. Could
you provide a little bit more detail behind that? You did refer to the renewal
rates, but are there other things you're seeing that make you believe that you
are at a tipping point? Thank you.

TERRY SEMEL: Hi, Mark. Terry. For starters, I believe that we are probably
approaching tipping point. I didn't specifically say we were there because the
signs have been pretty terrific. If you go back to the end of '03, as an indus-
try, the internet accounted for about 3% of the overall advertising. That was
the precise number that began the real rise of cable when it represented about
3% and took it about 13-15 years, took the internet a much shorter period of
time. As well, we're really seeing an enormous difference, and I mentioned the
one that you reminded me of.

First of all, the internet is now becoming a more integral part to most large
companies ad budgets. As we talked in the past, it started off with small little
trials two years ago, became bigger trials a year ago, started to become more
aggressive in terms of the cross network in this past year. I think the fact
that we're saying now openly in more than 90% of the top 200 advertisers in the
U.S. have stayed consistently with us and we're seeing increases in many differ-
ent categories. I mentioned a few. We could add retail and autos to that bunch,
and probably pharma and others, frankly. So we're starting to see it more diver-
sified. We continue, of course, as a company, Yahoo! does, to outpace that mar-
ket. So we see, you know, real change and we see real improvement and it's
really becoming more and more consistent and more and more obvious.

Q2 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 7, 2004 Wednesday

OPERATOR: The next question comes from Lanny Baker from Smith Barney. Please go ahead.

LANNY BAKER, ANALYST, SMITH BARNEY: Thanks a lot. I'm on a terrible line, I don't know if you can hear me; but I had two questions. One, Sue, were there any non-recurring items in the quarter on the expense side or on the revenue side? And then, secondly, your fees revenue and it looks like the ARPU took a pretty nice leap from the second quarter-- from the first quarter to the second quarter. Do you think it continues to grow at that rate or was there something that made it a little bit lumpy in this quarter?

SUE DECKER: I think, Lanny, on the recurring, non-recurring side there was nothing material that largely offset each other a couple lines in the interest line that's in the detail. But nothing material positively or negatively. On the fee side, yes, we had nice incremental growth in the quarter versus last quarter. We did have a few million dollars of benefit from a couple of items. We contractually had a price increase in the, in the SBC agreement on dial that was effected this quarter and continues going forward. And we began recognizing revenue on the BT deal as well. So we did have a couple of things that incrementally added to growth in this quarter that contributed to the fees line.

OPERATOR: The next question comes from Marianne Wolk from Susquehanna. Please go ahead.

MARIANNE WOLK, ANALYST, SUSQUEHANNA: Yes, thank you very much. The mix is a little bit different than I expected, it looked like fees and listings was much above my forecast; but marketing, especially your acquired search revenues looked a little bit lighter. Are there any trends you could talk about in that acquired search business that might explain that? For example, I thought perhaps you might have lost one or two customers in the comparison.

SUE DECKER: Sure. I'll take that one, Marianne. I'm glad to hear that our fees and listings were a little better than your estimates. As far as the marketing side goes, and in particular I think you're talking about the Overture acquisition, we were very pleased with how Overture is doing. On the contrary, they've actually gained a number of affiliates and have done better than our expectations, in fact, in terms of competing with current incremental affiliate deals. Terry mentioned most recently the Navor deal that we won in Korea. In terms of the trends there, the--the sponsored search business is typically seasonally a little bit slower in Q2 in terms of query growth. That was true last year as well, industrywide queries were flat to down in Q2 a year ago and they were pretty flattish in our business in this quarter. Overall, we're seeing good trends on the same metrics we've talked to you about in the past in terms of driving RPS. Which has been a combination, in particular, of increasing coverage as we've offered more products to the advertising community.

OPERATOR: The next question comes from Safa Rashtchy from Piper Jaffray. Please go ahead.

SAFA RASHTCHY, ANALYST, PIPER JAFFRAY: Good afternoon. Terry, you mentioned the theme that you had talked about during the analyst day that the best is yet to come, yet the organic growth slowed down from first quarter, which I believe was 48% down to 45%. Obviously there is the law of large numbers at play, but given that last quarter you beat the guidance by nearly 45 million and this quarter you came in just within the guidance, help us, how do we reconcile that? Thanks.

TERRY SEMEL: I think actually I'm going have Sue answer this because the second part I wasn't quite sure about.

SUE DECKER: I'll start then, Safa, and if Terry wants to add, he can do that. The overall organic growth rate that you cited was marketing growth, which was 48%, 47-48 last quarter and 45 this quarter. The overall company total revenue growth, organically, actually picked up in this quarter, it was 42% versus 41% last quarter. As far as the marketing growth, this was very consistent with what we expected, in fact it was actually a little better, it was at the high range of a range that we very, very substantially increased last quarter. If you re-

Q2 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 7, 2004 Wednesday

member we moved our range up a couple hundred million on the top line, 150 mil-
lion on the EBITDA line to reflect a much more robust business outlook than we
even expected; and we were able to actually achieve toward the high end of that.
We've always been modeling a modest deceleration in growth as the year goes on
as we get to tougher comparisons in the marketing business, that's very consis-
tent with all the industry forecasts you've seen out there and we feel like it
was pretty extraordinary growth, actually, and a little above our expectation.

OPERATOR: The next question comes from Anthony Noto from Goldman Sachs.
Please go ahead.

ANTHONY NOTO, ANALYST, GOLDMAN SACHS: Thank you. Hi, Sue and Terry. Sue, if I
back out the search revenue, and I know that you're not recording that, but you
record TAC and so we can kind a -- if we assume TAC stays constant you can get
to a branded advertising number. And it looks like that could have grown about
55-60% year-over-year, which would be a substantial acceleration from the first
quarter. I was wondering if you could comment on the branded element side. I
know Terry had made some qualitative statements about that.

Then, secondly, if I look at your expenses in the quarter, they're a little
bit greater than we thought, excluding non-cash expenses by about $13 million. I
kind of marry that up with your guidance. You're increasing your guidance on a
midpoint of the range in revenue by about, you know, $32 million, you're in-
creasing your EBITDA by about $40 million. Even when I back out what you beat
your midpoint by on your guidance, you're still raising EBITDA by more than what
you beat the quarter by. So I'm trying to understand if that incremental in-
crease in EBITDA in the back half of the year, above your midpoint of the range
excluding what you beat by, is that due to costs or is that due to revenue or a
combination of both? Thanks. And then if you can comment on foreign currency is
that helper in the quarter?

SUE DECKER: Okay. Anthony, I'm going try to get through all of those. I
think, starting with the branded side, we had a terrific quarter on the branded
side. I think you may be a little aggressive at the ranges you just said, but it
was really strong. We also had solid, you know, very strong growth in the spon-
sor side. We don't break those out, as you know, but you're right you can get
some overall trends from some of the figures that we do release and they would
lead you towards very strong growth in both of the categories.

In terms of the expenses, I-- just trying to follow the--the ball there. I
think bottom line is that in terms if we look at our outlook, we have achieved a
year-over-year flow through of 45% in Q1. We achieved 47% in Q2. We're planning
for the balance of the year for similar flow through, which would lead to over-
all margins of 38-39% for the year and exiting the year at 38-40%. That's a lit-
tle better than what we had thought and I think that was sort of the thinking
behind the guidance. In terms of currencies, they did, they helped a little bit.
I want to say about $5 million overall and when I gave the international growth
rates, I gave those at 42% were both excluding acquisitions and currencies.

OPERATOR: The next question comes from Jeetil Patel from Deutsche Banc.
Please go ahead.

JEETIL PATEL, ANALYST, DEUTSCHE BANC: Hey, guys. Two questions. First of all,
if you look at your net marketing, your TAC, it grew by about 7% and the net
marketing services line grew about 9% sequentially. Just wanted to find, get a
sense of whether, you know, you thought the Overture business--kind of how did
it perform, did you see TAC come down in general, what were the kind of discrep-
ancy between those two lines? Second, on just your 36% growth rate for organic
for marketing for the, kind of all in for the year, you know, based on what
you've done close to mid-45, call it 45% plus; it looks like more like a 30-35%
growth rate for the back half year on the organic side. Is that a safe assump-
tion going backwards and what really drives that number in terms of, kind of,
your assumption?

SUE DECKER: Yeah, I'll start with the first question on TAC. Again, we don't
talk about that real specifically from quarter to quarter. We said when we
bought Overture, we expected that TAC rates would remain very competitive and

Q2 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 7, 2004 Wednesday

even get more competitive over time. That's probably been the general trend in this quarter, in particular. TAC was relatively stable, not much to comment on about there, Overture is performing very well and continues to get incremental deals. The actual rate of TAC can vary depending on how deals are structured and how quickly the ramp-up phase is in certain international markets, et cetera; but overall, relative stability.

In terms of the marketing growth rate, the overall growth rate for '04, as you pointed out, is around 36% and it just gets back to what we talked about earlier. We, in Q1, we performed at, you know, 47% versus the IAD of 38%. We significantly outperformed the industry. We think we outperformed the industry again in Q2 at 45%, kind of holding those very strong growth rates despite tougher comparison. For the rest of the year we're definitely trying contemplate. We think it would be responsible to contemplate tougher comparisons as we're cycling through and anniversarying very big double-digit gains last year and that's what's underlying our overall forecast, very consistent with what we said in the past.

OPERATOR: The next question comes from Mark Rowen from Prudential. Please go ahead.

MARK ROWEN, ANALYST, PRUDENTIAL: Thanks. Sue, last quarter you talked about pricing on sponsored search being up pretty significantly year-over-year, but flat sequentially. Do you see the same thing this quarter? Then related to that, can you talk, maybe Terry, could you talk a little bit about the environment for sponsored search? Are you still in a position where advertisers are coming to you to advertise in the format, or is it becoming more like the branded side where your sales force is having to go out and drive the sales? In other wards, is there any change in the selling environment? Thanks.

SUE DECKER: Mark, I'm going start and then I'm going to pass it on, actually, to Dan. In terms of the sponsored search pricing environment, we saw very similar trends. I think I probably said that overall PVC, and even more would emphasize RPS, of double-digits last quarter, also this quarter. The overall pricing environment for advertising in general remains strong. If you look at our revenue per page view of our marketing services line, it's up more than 20% this quarter. So we're seeing good growth in impressions. We're seeing good growth in pricing and in sponsored search, specifically, we're seeing a continuation of the strategy that we talked about in the past, which is to extend coverage where we can to drive people down into the multiple word queries, which is creating more and more liquidity in those queries, better value and, ultimately, we think will drive overall pricing higher. So, very consistent with the strategy, the PPC trends from quarter to quarter for the last three or four quarters have been relatively stable and we've really focused on RPS. I'll pass that on to Dan now.

DAN ROSENSWEIG, COO, YAHOO, INC.: Yeah, on the question of the sponsored search environment, what's the ad like, are they still coming to us or are we going them. Overture was actually structured with a sales force to start with and has actually been moving more aggressively into the self-serve environment because the demand continues to be very, very high. So we have multiple sales channels in which we deal with the largest advertisers face to face and over the phone and that's the way Overture was actually built on a global scale. And we've increased, pretty significantly, the amount of self-serve opportunities we get around the world as we open up new marketplaces and as the technology gets easier. So the environment for us remains very rich, very strong and we're actually making ourselves more available to a larger number of advertisers more rapidly. So we see terrific growth in that, in the area of marketers.

OPERATOR: The next question comes from Youssef Squali from Jefferies & Company. Please go ahead.

YOUSSEF SQUALI, ANALYST, JEFFERIES & COMPANY: Yes, thank you. Couple questions. Was there much more seasonality on the marketing services than you had anticipated? Can you just talk about seasonality, particularly as now we go into summer months and your international business continues to expand; and second, MSN has traditionally accounted for roughly a third of the Overture business. Is

that still more or less the case and second, and kind of as related, how is the
MSN announcement of coming out with their own search maybe sooner than expected
impacting your thinking for the relationship? Thanks.

SUE DECKER: Youssef, I'm going start on seasonality and pass it on to Terry
and Dan on the MSN side. In terms of seasonality, I wouldn't say more than we
anticipated. We anticipated that it would be a little bit seasonal in Q2. It's
interesting, in Q2 you have a benefit on the traditional marketing side, which
is seasonally good, and on the search side, queries typically are flatter--
actually flat to down last year for the industry, and relatively stable for us
in this last quarter. So you have one business seasonally benefiting one busi-
ness seasonally a little flatter. As you move into Q3, queries are also typi-
cally relatively flat in the search business and it's a little slower quarter
seasonally for the traditional business. Then in Q4, you get the double whammy
of good monetization quarter for the traditional business and good query growth
typically for the--and monetization for the search business. So those quarterly
dynamics have been relatively the same on a pro forma basis, but as we have com-
bined our business with Overture's that changes a little bit the combined dynam-
ics with the combined company. Let me pass that on to Terry.

TERRY SEMEL: Hi. I think on the MSN side, so obviously Yahoo! search contin-
ues to power MSN to the algorithmic side and Overture on the sponsored search
side as MSN has been a very valued partner and have done quite well together.
They have talked for quite sometime about their planned move into rhythmic
search. We have anticipated that almost from the onset, and, you know, if any-
thing, we wish them well. The more good competitors out there, the better. So,
it's something that we have always anticipated and it's something that we assume
that they are going to do. Sue, I'm going have to ask you, I don't know what
portion of the Inktomi side that MSN represents.

SUE DECKER: I think the question was on the sponsor side and, you know, we
wouldn't necessarily break out any customer now in terms of its overall impact,
but I would point out that whatever percentages you are applying to them, that
would be on our reported GAAP revenue, not our revenue ex-TAC. The revenue would
be substantially less than on our revenue ex-TAC in terms of the overall impact
financially.

OPERATOR: The next question comes from Alexia Quadrani from Bear Stearns.
Please go ahead.

ALEXIA QUADRANI, ANALYST, BEAR STEARNS: Hi. Good afternoon. Some of the buy-
ers we have spoken to have talked about demand ramping up so much for branded ad
space that sometimes their clients are booking several months in advance for
certain categories. Would you generally agree that lead time is getting longer
and if so, how does it impact your ability to continue to raise prices?

TERRY SEMEL: You have just set us up very well. Clearly, we are starting to
see a number of advertisers who know what their goals for reaching their consum-
ers are longer in advance to talk to our company longer in advance and start to
set in the different sites at Yahoo! that they're interested in and the kind of
volume they're interested in. So I think that's all a very, very healthy sign.
Fortunately, we start off with a lot of inventory in a lot of areas of Yahoo!
and, needless to say, the more demands for that inventory ultimately hopefully
the ability to have better pricing around that inventory. Dan, would you like to
add to that?

DAN ROSENSWEIG: Yeah, I would just add that it's interesting, which is there
are different points in the year where the buying, like in every market, gets
more aggressive. In the fourth quarter is an area where a lot of people have an
expectation for big growth and they know what their plans are and they know
they've been working with Yahoo!, as Terry said, the top 200 have renewed at
90%. So they know what works, they're beginning to spend more, they're willing
to pay more for those locations and they want to book some of the significant
areas in advance so they make sure that they get positions in the inventory that
they want. So we think that is a result of the hard work that we've been doing
the last two and a half years, to build a great site, add the right users, peo-

ple that respond well to advertising, make the products and services better, people spend more time and, therefore, marketing works better. As a result of that, we're beginning to see the benefits of that pretty nicely.

OPERATOR: Next question comes from Douglas Anmuth from Lehman Brothers. Please go ahead.

DOUGLAS ANMUTH, ANALYST, LEHMAN BROTHERS: Thank you. My first question is regarding sales and marketing spending. If your count is right, it looks like sales and marketing as a percentage of renew has declined sequentially for eight straight quarters, including the first quarter of this year, but it obviously increased in the second quarter. So I'm wondering what the key drivers are in that line item and how you see that tracking going forward. My second question is that you recently stated that growth among the top 200 advertising clients was 38% in the first quarter. And re you able to provide a similar type of number for 2Q? Thank you.

SUE DECKER: Doug, it's Sue. Let me start with your sales and marketing question. Yeah, it was actually 31% of revenue in both Q2 and Q1 but, in rounding, it was slightly higher than 31 and slightly below 31 in Q1. So there's a modest upward trend. This should be consist went what we talked about last quarter in terms of the timing of the life engine campaign that started in April. We also had the addition of Kelkoo into the overall totals there.

Those are the two factors that caused it to tick up just a tad versus-- as a percentage of revenue versus the last quarter. It should trend slightly lower as a percentage of sales through the balance of the year because the timing of the life engine campaign was more Q2 oriented than it is in the remaining quarters. In terms of the top 200 growth, that's one of the metrics that we provided at analyst day that we took the opportunity and wanted to provide some transparency into understanding--helping you understand why we're so excited and confident about the sustainability of our advertising growth. It's not a number that we probably will break out on an ongoing basis, but suffice it to say there was not a meaningful change from that quarter to quarter.

OPERATOR: The next question comes from Gordon Hodge from Thomas Weisel Partners. Please go ahead.

GORDON HODGE, ANALYST, THOMAS WEISEL PARTNERS: Yeah, good afternoon. Quick question, just curious if you could give us a sense for how you would evaluate the Yahoo! Plus campaign so far in terms of adding subs and whether it's starting to contribute meaningfully yet? Then also, Sue, on your free cash flow guidance for the year, I'm wondering in the back half of the year, are you assuming a steady state, sort of, stock option tax benefit in those numbers? Thanks. I think you had 60 million in the last quarter.

DAN ROSENSWEIG: I'll start with-- it's Dan. I'll start with Yahoo! Plus campaign. As we said from it's inception, Yahoo! Plus, we're able to build Yahoo! Plus as a result of built SPC Yahoo! and BT Yahoo! and we're about to launch Rogers. So we've been investing most of our time and energy in the partnership space because we have found that the integrated product, along with a great partner in the distribution area, providing the broadband, whether it's DSL or now, cable, with Rogers has been the most effective way to build a great product and reach marketers. So we're pleased with Yahoo! Plus product and we're pleased with what it's doing on the network, but our focus remains the partnerships because we feel we get the best opportunity to bring our product to market.

SUE DECKER: Secondly, Gordon, on the second question you asked on free cash flow second half, yes, we're assuming roughly the same cash tax rate that we had in the first half, which is, you know, is low because of the benefit of our NOL from options. We did factor in the free cash flow second half a little bit of working capital use just to be consistent with our past patterns where the first half is a source or flat and second half is a little bit of a use. That pattern seems to be true certainly for the first half of this year and that's where we, so we did contemplate a little bit of use in the back half. So now we're going to turn to our last question because I believe we're out of time.

Q2 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 7, 2004 Wednesday

OPERATOR: Thank you. The last question comes from Jordan Rohan from Schwab Soundview. Please go ahead.

JORDAN ROHAN, ANALYST, SCHWAB SOUNDVIEW: Thanks, guys. I was hoping you could comment on the broad secular growth trends affecting sponsored search and, you know, the data points you presented today get us to pricing and volume relatively flat second quarter, relatively flat in third quarter with a big fourth and first. Sounds to me like growth would be less than 30% by the time we reach the back half of the year in sponsored search. And one thing to add to that, it seems like the branded or core advertising might actually exceed that kind of growth rate. Do you think we're at a different tipping point here where branded advertising may actually exceed the growth rate of sponsored search? Thank you.

SUE DECKER: Okay. Jordan, I'll take that. We-- I don't really want to get too specific on the individual components and how much they contribute to growth. Both have been very, very strong and we have very, very optimistic expectations for their future. In terms of the individual components, again, you're gonna have--you have to run that math. We think the general trend that you said, that Q's 2 and 3 tend to be a little flatter seasonally and Q's 4 and 1 are where the biggest-- bigger step-ups in growth happen. That's been true, but that actually does lead to pretty significant year-over-year trends when you go through the math. Let me turn it back to Terry.

TERRY SEMEL: I would just add this is like an embarrassment of riches and I think at analyst day I talked about these two children that we have and they're both just brilliant and Yahoo!'s in these both businesses and they're both just brilliant and both have real upside and we're very, very excited. There's a place where our advertisers go for all sizes, whether small, medium or large and it's one of the reasons we're so excited about our business and about Yahoo!. So with that, we wish you all a good afternoon and thank you for joining us.

OPERATOR: This concludes today's teleconference. Thank you for participating. You may all disconnect at this time.

[CCBN reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES CCBN ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS. Copyright 2004, CCBN, Inc. All Rights Reserved. ]

**LOAD-DATE:** July 22, 2004

Exhibit 24

FOCUS - 41 of 53 DOCUMENTS

Copyright 2004 FDCHeMedia, Inc.
All Rights Reserved.
Copyright 2004 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

October 12, 2004 Tuesday

**TRANSCRIPT:** 101204ao.752

**LENGTH:** 9316  words

**HEADLINE:** Q3 2004 Yahoo, Inc. Earnings Conference Call - Final

**BODY:**

OPERATOR: Hello, good afternoon ladies and gentlemen and welcome to the Yahoo Q3 2004 earnings conference call. At this time all participants are in a listen-only mode. Later we will conduct a question and answer session. Please note that this conference is being recorded. I would now like to turn the call over to Mr. Paul Hollerbach, VP of Financial Planning and Investor Relations. Mr. Hollerbach, you may begin.

PAUL HOLLERBACH, VP, FINANCIAL PLANNING & IR, YAHOO, INC.: Thank you and good afternoon, everyone. Welcome to our third quarter conference call. On the call today are Terry Semel, our Chief Executive Officer, Susan Decker, our CFO, Jerry Yang our Chief Yahoo! and our COO, Daniel Rosensweig. . The call will contain risks and uncertainties about Yahoo's performance as well as Yahoo's strategic plans. Actual results may differ materially from the predicted results and reported results should not be considered as an indication of future performance. The potential risks and uncertainties include among others decreases or delays in marketing services, spending, acceptance of new products and services, and risks and uncertainties related to the integration of recent acquisitions. Other potential factors that could affect the Company's business and financial results are included in the Company's annual and quarterly reports which are on file with the SEC. In this call we will also discuss nonGAAP financial measures in talking about the Company's performance. Reconciliations of those measures to GAAP performance can be found on the Investor Relations section of our Web site. Terry and Sue have prepared remarks that should last about 35 minutes and then we will open the call up to Q&A. With that I'd like to turn the call over to Terry.

TERRY SEMEL, CHAIRMAN & CEO, YAHOO, INC.: Thank you, Paul, and good afternoon to everybody. So I'd like to begin. Yahoo has continued its run of exceptional growth with this being the sixth straight quarter of record revenues. Our relentless focus on consumers and continued investment in people and infrastructure have led to the increased product quality and powerful rate of innovation which are really both paying off. The list of accomplishments during the past quarter and this year for that matter is substantial. However, more importantly you are beginning to see the next phase in Yahoo's strategy reveal itself. Today's world is moving from mass media to digital media, a world in which the consumer is the programmer. Yahoo aspires to be even more essential in people's lives. To achieve that we know we must deliver what the consumers want, when they want it, how they want it, and where they want it. The future of Yahoo and the Internet is the powerful integration of search, community, personalization, and content. Because Yahoo is now a leader in all four of these platforms we believe we are best positioned to create the most value for consumers in the next phase of the Internet.

Q3 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 12, 2004 Tuesday

You have already seen some of our early efforts with the Beta release of the new front page, we've made it easier, lighter, and actually easier to navigate along with the ability to further customize the experience. The Beta release of My Yahoo integrates vertical search and opens up content to hundreds of thousands new RSS sources. Our personal search Beta gives users more control enabling them to effectively manage their search results by saving results with notes, block results they don't want to see and share results with others. A key part of the consumer experience on Yahoo local is through the community of user generated reviews along with the integration of search, maps, Yellow Pages, and third party content and our initial foray into branded content through our relationship with Mopfrinets (ph) hit reality TV show "The Apprentice", has demonstrated the tremendous power of future content relationships that take advantage of off-line and on-line media. Each of these efforts have received overwhelmingly positive reviews from consumers and critics alike. The more control we provide consumers to connect, program information, express themselves, and participate in their communities we believe the more they will use Yahoo.

We are creating a self reinforcing cycle with our consumers that we see as a key to Yahoo's future growth. Our user base and their level of engagement has grown tremendously over the past few years. Yahoo's next-generation of products and services should further grow our user commitment and loyalty which in turn enables us to provide deeper value to our consumers and marketers proving again the mantra that great products and services are the key to a great business. By executing against these principals we believe we are building a substantial competitive advantage that puts Yahoo in a leadership position that will enable us to continue to outpace the industry. The two best long-term measures of this are our financial results and our consumer metrics. So let's go right to them. Yahoo reported gross revenues of $907 million, up 154% compared to 357 million in the third quarter of last year. Yahoo is benefiting from the diversity within both of our core businesses of advertising and premium consumer services which has delivered consistently growing and sustainable results over the past year. Our operating income before depreciation and amortization was $260 million in the quarter, more than double last year's quarterly performance. And Yahoo delivered 9 cents earnings per share, excluding a gain from the sale of investments.

And once again we have upwardly revised our full year business outlook to reflect our current view of our stronger performance this quarter which Sue will provide more details on shortly. As a result of the investment in our products and services we continue to be rewarded with more users and greater user engagement. We ended the quarter with approximately 325 million unique users, up 33% from approximately 245 million this quarter last year. Our active registered users now stands at approximately 157 million, up 28% year-over-year from 123 million. The engagement of our users is also reflected in the wide variety of services they use on the Yahoo network. Yahoo is one of the top 2 in 15 verticals according to comp score Media Metrics and is the clear leader in services such as mail, movies, music, games, finance, and news, reflecting the depth of our communications and content offering. The fastest growing subset of users on the Yahoo network continues to be our paying subscribers. We ended the quarter with approximately 7.6 million unique paying relationships, up approximately 1.2 million from the previous quarter, and up 80% year-over-year from approximately 4.2 million last year. The biggest contributors to our growth was access bundled with content particularly because of the launch of Yahoo Rogers in Canada, our first cable relationship, personals, and Fantasy sports. In fact the growing success we've had in selling our Fantasy sports games is an excellent example of how we have become efficient and very effective direct marketers, leveraging a huge free consumer audience to market premium products and services. In Q3 the total sale of sports premium products grew 40% year-over-year. As our products get better we build deeper relationships with our consumers which in turn enables us to provide greater value to our marketers.

Let's now focus on our marketing services business which achieved more than 200% year-over-year growth to 765 million in revenue due to strong growth in both brand and sponsored search businesses. Our brand advertising business continues to go from strength to strength as marketers recognition of the benefits of on-line advertising grow. They choose to work with Yahoo due to our massive

Q3 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 12, 2004 Tuesday

engaged audience, leading content offerings and industry leadership in creativity and consumer insight. This past week I had the opportunity to speak at the Association of National Advertisers conference a gathering of the preeminent marketing leaders in this country. I was very excited to hear many of these marketing chiefs discuss the evolution of their consumer behavior, and then not one traditional solution can now satisfy their branding and marketing needs. My take away from that conference is that the Internet will clearly become a more vital part of their marketing solutions. In fact, we are seeing this evolution unfold with our brand advertisers in many of the categories on Yahoo. Media sales benefited from strong year-over-year growth across almost all sectors, particularly in autos, finance, telecom, travel, and entertainment.

For example, autos manufacturers continue to expand buys across the Yahoo network, not just in our autos channel , to reach a broader group of consumers. Yahoo now counts nine out of the top ten largest U.S. financial services marketers as customers. The travel sector continues to use on line as a successful consumer acquisition mediums. But we are now seeing them move up the marketing funnel to consider branding as a key part of their media plans. And entertainment marketers continue to develop more engaging adds as the broadband market matures, which allows Yahoo to play a larger role in their overall campaign. In our lead generation business we just celebrated the one year anniversary of the official union between Yahoo and Overture. So welcome aboard, guys, one year later. I'm happy to report we successfully integrated Overture services into Yahoo's network and in many cases exceeded the goals we set for ourselves. Yahoo's precision match, content match, and local match listings now appear on Yahoo properties including entertainment, news search, travel, sports, games, shopping, LAUNCH and the new Yahoo local. In total we have achieved more than 20 different Overture-Yahoo implementations to date.

We also continue to expand our sponsored search offerings internationally. Having launched in five new international markets in the past year and with announced plans to launch in five more including Taiwan, Brazil, Canada, China, and Hong Kong in the next several months. And we've seen the growth of new product opportunities. For example, since the launch of our local match sponsored search offering last quarter 40% of local match advertisers are new to Yahoo. That number has been trending upward indicating that businesses are increasingly seeking to advertise on-line to consumers who purchase off-line. To sum up our marketing services business, last quarter we said we were comfortable that our organic marketing services business which excludes acquisitions would exceed 35%. We now feel comfortable that number will be approaching 40% for the year, further validating that this medium is coming of age as a significant advertising platform. We believe we are in a position of strength as the leading on-line advertising provider that is a principal in both brand and graphical advertising as well as sponsored search. As advertisers look to shift more of their dollars to the Internet which is projected to be the fastest growing advertising medium over the next few years Yahoo is extending its leadership position as we meet our advertisers needs and become essential to their media mix. When marketers think about buying advertising on-line they think about Yahoo.

So now in conclusion I want to underscore just how excited I am about where Yahoo is going. You are beginning to see the future direction of our Company, one that takes advantage of the changing dynamics in the digital world. The future of Yahoo and the Internet is the powerful integration of search, community, personalization, and content in a way that puts the user in the driver's seat. It's very early days but that means there's plenty of room for us to do even better. We'll continue to develop new, innovative offerings, bring together our assets in a way that is unique to Yahoo and ultimately become even more essential to our consumers. So with that I'd like to turn it over to Sue to give you more of our financial highlights.

SUE DECKER, CFO, YAHOO, INC.: Thanks, Terry, and thanks to all of you for joining us today. We are very pleased to be able to report results that exceed all three of the key financial objectives that we have shared with you in the past. Those goals are, first, to reach 30% in organic revenue growth, second, to deliver 50% of incremental flow through to operating cash flow and third, to

Q3 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 12, 2004 Tuesday

convert 70% of operating cash flow to free cash. What's more important than ex-
ceeding any one of those targets however is the way in which we've achieved
them. These returns are flowing from a robust foundation. They are based on an
extraordinary breadth of product enhancements. They flow from an increasing
depth of differentiated functionality and they extend across a high quality and
diverse paying customer base. Our aim is to generate superior returns and build
value over many years which would not be possible if our source of strength were
a single product or if we were reliant on a narrow customer base. We still have
a lot of work to do but we feel we are well on our way toward fulfilling this
vision.

Before we review the highlights from the third quarter results let me start
with two housekeeping items. First as a reminder during the first year of owning
a significant acquired company our practice has to been to disaggregate the re-
sults and disclose the effect on our growth rates if that impact is material.
This is somewhat unnatural from a management perspective because our past acqui-
sitions have been integrated into Yahoo and are managed differently now from how
they operated as stand alone entities. However, our goal with this disclosure is
to provide you with transparency into our underlying organic growth rate as dis-
tinct from any material impact from acquired growth both in the past and also as
expected in our business outlook. In this quarter three acquisitions in aggre-
gate materially contributed to reported growth. The second incremental quarter
of Kelkoo (ph) the third incremental quarter of 3721 and most significantly the
fourth and final incremental quarter of Overture. The second housekeeping item
is that we sold just over 25% of our Google shares and their IPO which had sev-
eral balance sheet, cash flow, and P&L effects. On the balance sheet the remain-
ing investment is now included in short term marketable equity securities. We
mark-to-market through equity our remaining investment which also increased our
book value by an equivalent amount. The sale of a portion of this investment
also provided a cash inflow of $191 million. Last on the P&L we had an unusually
low tax rate in Q3 of 21% as we were able to utilize previously realized capital
losses to offset the capital gain realized on the partial sale of this invest-
ment. Excluding this one time item our earnings for the quarter were $124 mil-
lion, or 9 cents a share, up 80% from a year ago.

Let's now talk about the highlights from the quarter starting with free cash
flow. Free cash flow really encapsulates all of the P&L and balance sheet move-
ments that we believe are important to value creation and maximizing long-term
free cash flow per share is therefore our most important financial objective. As
a reminder, we define free cash flow as cash generated from operations which in-
cludes cash cost for taxes and changes in working capital less capital spending.
For the first time ever free cash flow for the quarter was north of $200 mil-
lion, more than doubling from a year ago and taking our trailing twelve-month
normalized free cash flow to over 700 million a testament of the exceptionally
high cash productivity of our business models. This represented 31% of our reve-
nue X TAC and a conversion rate of 78% of operating cash flow. While it's very
tough to predict the free cash flow to operating cash flow ratio in any one
quarter due to the interim timing swings in working capital items we currently
believe shareholders can continue to look forward to a significant portion of
operating cash flow flowing into free cash and we are maintaining our 60 to 80%
long-term conversion target. So what do we do with that cash and what happened
on our balance sheet? Our ending cash and marketable debt securities balance was
$3.1 billion, up about 425 million since last quarter. Please note that this
does not include the $762 million in investments and equity securities which are
not considered strategic to the Company and therefore will be disposed over time
as appropriate.

This increase was attributable to our free cash flow, the proceeds from the
partial sale of an equity investment mentioned previously, the generation of
$106 million from the exercise of employee stock options, and the receipt of $54
million back from the $50 million structured stock repurchase transaction we en-
tered earlier this year representing an annualized return on those funds of 17%.
Collectively these sources of cash amounted to more than 550 million, and were
partially offset by the use of $34 million for 2 small acquisitions, Fair Chase
and Odd Post and we spent $100 million on a structured stock repurchase transac-

Q3 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 12, 2004 Tuesday

tion which will mature in four tranches through March 31, 2005. At final maturity depending on the price of our stock we will have either repurchased up to 4.2 million shares or we will have received our initial, up to our initial $100 million investment plus a premium through this transaction. Although our cash balance continues to grow we have cumulatively spent close to $900 million in 2004 in acquisitions, assuming the Music Match deal closes in the fourth quarter and including the structured share repurchase, implying we are actively investing this cash. Looking forward we plan to continue to use our strong balance sheet and free cash flow to drive future value for shareholders through acquisitions, investments, and share repurchase activity as appropriate. As an example of the value created through our past investments, the proceeds from the Google shares we have sold plus our remaining investment value as of September 30, represents about $1billion.

That value would have financed close to half our aggregate investments in search acquisitions over the last couple of years. Moving now to the P&L the overall summary is that consistent with our financial strategy we are successfully supporting a massive and growing base of more revenue productive users without a commensurate increase in cost which has allowed us to meet or exceed both of our revenue and operating cash flow growth goals. Specifically third quarter revenue X TAC came in at 655 million, advancing 84% over year ago figures and up 8% from Q2, '04 levels. Notwithstanding seasonal factors in each of our core advertising businesses. The 84% overall year-over-year broke down into 34% of underlying organic revenue X TAC in the quarter in spite of tougher comparisons against strong year ago gains and acquisitions added another 50% to reported growth to get to the total of 84. This organic revenue growth outpaced our also strong 26% growth in organic global users indicating that we are successfully finding more ways to monetize our user base due to the network effect of Yahoo's products and services. Let's look now at the revenue breakdown by lines of business, global marketing our largest service generated $514 million of revenue X TAC for the quarter, up 110% year-over-year. Excluding acquisitions, marketing services grew a healthy 38% on an organic basis. This strength was a function of double-barreled power, one barrel for marketers seeking branded solutions to drive overall awareness in differentiation and the other barrel from businesses looking for an immediate return our their marketing commitments in the form of converted sales and transactions. Although both sources of marketing were as expected seasonally challenged from Q2 levels we did see higher organic volume in the search business than we previously anticipated and than we experienced a year ago.

Turning to fees we produced $104 million of revenue, up 31% from year ago levels. The primary driver of this business line is our premium offerings in which consumers and businesses pay us for our services. We exited the quarter with approximately 7.6 million paid relationships, up more than 80% from 4.2 million a year ago. And advancing about 1.2 million from the second quarter level. This increase is about twice the quarterly run rate that we have historically generated due to the inclusion of the Rogers subscribers for the first time and also to the seasonal strength of Fantasy Football. In Q4 we would expect to return to more normal sequential quarterly run rate before considering the potential incremental impact of the roughly 200,000 paid subscribers added to our pending acquisition of Music Match. Taking those factors into consideration we now expect our paid relationships with consumers and businesses to be modestly above the high-end of the 7.5 to 8 million range that we have previously provided. Specifically assuming closing of the Music Match deal we should end the year in a range of 8.2 to 8.3 million subscribers. Our last revenue line is listings.

Listings revenue of $37 million increased 15% from year ago levels, resulting from solid results at Hotjobs, the largest contributor to the line, along with growth from acquired companies. Sequential growth in this line was affected by normal quarter to quarter seasonality as experienced in the year ago quarter as well. Turning to revenue by segment, top line growth remained very robust internationally; boosted by secular growth in sponsored search, the incremental contribution of acquired companies plus favorable movements from currencies. On an organic basis and holding currencies constant our international revenue X TAC

Q3 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 12, 2004 Tuesday

increased 33% in the quarter benefiting from many of the seeds planted over the
last couple of years. International revenue X TAC represented 23% of total reve-
nue up 700 basis points year-over-year and consistent with the trends that we
discussed at analyst day of an expectation of full year range range of 21 to 22%
compared with 16% last year. Let's turn now to some of the details behind our
strong and growing profitability. In addition to making good progress on our
revenue monetization objectives we are making strong headway on our productivity
goals which are leveraging, operating, and free cash flow. Specifically, operat-
ing cash flow came in at $260 million, up 122% year-over-year and above the
high-end of our business outlook. This means that 38% -- 48% of incremental
year-over-year revenue X TAC flowed through to operating cash flow. On a pro
forma basis had we owned acquired companies for both years the flow through was
well above our 50% target.

Consequently global operating cash flow margins were 40% in spite of includ-
ing acquired companies that historically have operated at lower profitability
margins than Yahoo. The major driver of margin leverage is compensation cost,
our largest expense, which continues to yield productivity improvements relative
to growth in revenue and operating cash flow. Headcount ended the quarter at
just over 7,000 up about 500 from Q2 levels largely attributable to organic in-
vestments in selected products and infrastructure designed to improve our user
experience, strengthen our market position, extend new verticals, and support
our growing business. Consequently average annualized revenue X TAC per employee
stood at almost 387,000 in the quarter advancing from the Q2 level and also
year-over-year. We are very pleased with our progress on this metric as an indi-
cator of the productive and strategic allocations of resources within our prop-
erties. This is particularly impressive considering acquisitions brought into
the mix that initially operate at lower revenue per employee basis levels than
our Yahoo averages but have become more profitable under our ownership. As indi-
cated in the last two quarters we continue to expect further modest improvement
in average revenue per employee in the remainder of 2004, while also investing
in key talent to drive our search business and select other rapid growth oppor-
tunities.

Turning to profitability by geographic segment, our Q3 operating cash flow
margins on revenue X TAC in the U.S. were 44% while our international operations
came in at 24%, better than expected considering the usual international Q3 sea-
sonality in marketing. We continue to believe that we can operate for the full
year in an international margin range of 20 to 25% as we outlined at analyst
day. As many of our countries are turning profitable and our more established
country's experience enhanced profitability. Finishing up the P&L with the bot-
tom line excluding the impact of the partial sales investment these results al-
low Yahoo to achieve fully diluted earnings per share of 9 cents in Q3, up 80%
from the 5 cents a year ago. One very interesting relationship is to compare our
earnings to our free cash flow. Q3 free cash flow for the quarter was 60% larger
than our GAAP earnings excluding the impact of the sale whereas for most com-
pany's free cash flow is less than earnings. Let's turn now to our business out-
look which we are upwardly revising due to better than expected results. In ad-
dition beginning with this quarter our business outlook will include the ex-
pected contribution from our pending acquisition of Music Match. We have re-
ceived early termination of the HSR waiting period and expect to close the Music
Match transaction mid quarter subject to satisfaction of closing conditions.

On that basis we expect fourth quarter 2004 revenue excluding TAC, to come in
a range of 710, to $760 million; up 44% from a year ago at the midpoint. We be-
lieve companies acquired in the past year will contribute roughly 45 to $60 mil-
lion in the fourth quarter implying organic revenue year-over-year growth of
33%. At these revenue levels we expect to operate in an operating cash flow
range of 285 to $315 million in the fourth quarter, up 69% from a year ago at
the midpoint. Of this we expect acquired companies to contribute between 10 and
$15 million implying organic growth of about 65%. This Q4 outlook is expected to
drive a full year range for 2004 of 2.515 billion to $2.565 billion in revenue
X TAC, up about 72% from a year ago. Excluding the impact of acquisitions in the
past year our organic growth rate is expected to be about 37% for the year. On
the operating cash flow side combining our positive third quarter results with

Q3 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 12, 2004 Tuesday

our enhanced outlook for the balance of the year the full year operating cash
flow range now works out to an expected 980 million to $1.10 billion more than
doubling from a year ago.

Moving to our most important financial metric, free cash flow, we are upward-
ing revising our 2004 free cash flow range to 770 to $810 million, more than
double the normalized 382 million we generated last year. This outlook contem-
plates capital spending for 2004 of approximately 215 to $235 million, including
both acquired company incremental requirements of roughly 45 to 55 million, and
moderate growth in Yahoo's organic CapEx. Consequently capital spending is ex-
pected to be in the range of 20 to 25% of 2004 operating cash flow consistent
with the range we've operated within during the last two years. We think this
range both allows strong free cash flow conversion and also proactive investment
to drive our product strength and support our user growth. To sum up as we take
stock of our financial vital-signs for the third quarter we are pleased with how
the year is performing. At the middle of our range as our full year 2004 outlook
suggests a financial model that is extremely attractive relative to most busi-
nesses. It calls for a third consecutive year of more than 305 growth in organic
revenue X TAC, it suggests delivering close to 50% of that to the operating cash
flow line, and it anticipates yielding more than 70% of that to the free cash
flow line. We are also delivering nice gains in key metrics like average revenue
per user and average revenue per employee leaving us on track to meet our stated
goals and we are delivering balanced growth across all of our contributors to
revenue whether measured by lines of business or geographic region. We are proud
of these metrics but even prouder of what's driving them. We believe our con-
tinuous improvement in the breadth and depth of our mini consumer offerings
along with the business that accompanies this value proposition combine to form
a very sustainable growth story. And what makes this story really compelling is
that we are only at the beginning and as we turn the pages the adventure keeps
getting more and more exciting. With that I'd like to turn it back to the Cap-
tain of this adventure, Terry.

TERRY SEMEL: I would rather be General. How did I become a Captain? Sue, just
my own editorial. You know an outlook range of $1 billion -- a range of $1 bil-
lion in EBITDA is quite a thrill considering three years ago we had negative re-
sults for this Company. So Yahoo is definitely operating from an enviable posi-
tion with our experience, a strong management team, the strength of our network,
and the necessary resources to hit the ball out of the park. Yahoo is on the
move with many more exciting opportunities ahead and I think with that I would
like to turn it to the audience and allow you all to please ask questions. Okay.
If we would please start with the first question.

OPERATOR: Thank you. We will now begin the question and answer session. (OP-
ERATOR INSTRUCTIONS) Our first question comes from Imran Khan from JP Morgan.
Please go ahead.

IMRAN KHAN, ANALYST, JP MORGAN: Yes, hi guys. Congratulations, great quarter.
Terry, you know, looking at the search number it seems like your traffic acqui-
sition cost is up 13% sequentially, compared to 7% in Q2, is there such growth
in the quarter came from volume or from the growth in the pricing, could you
comment on that? Then I have a follow-up question.

TERRY SEMEL: Okay, Sue, I'd like you to take that.

SUE DECKER: Okay. Thank you. Yes, the TAC did increase by 13% quarter over
quarter and our overall TAC rate stays fairly stable, so that is representative
of the growth in the affiliate networks. In terms of the break down between vol-
ume and price, overall revenue per search showed sequential gains from last
quarter on a global basis and so year-over-year is up solidly in the U.S. and is
showing strong double-digit improvements internationally. In terms of the driv-
ers of RPS. We have talked about this before but the variables are somewhat in-
terdependent with coverage being the primary driver overall and an extension of
the strategy that we've talked about in the past to extend coverage where we
can't drive people down into multiple word queries which creates more liquidity
in the tail. In terms of volumes, we saw mid to high single digits on a volume
increase on a global basis, that's volume of queries which was led by interna-

Q3 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 12, 2004 Tuesday

tional but both U.S. and the international side were positive and that's before considering the incremental volume from our affiliate partners principally in Asia which boosted volume even more.

IMRAN KHAN: Okay. Thanks. In terms of branded advertisement sites, can you comment a little bit about what kind of trend you are seeing in the CPN prices and, you know, could you talk a little bit about what kind of, how much inventory sold out for Q4, or to branded advertisement? Thanks.

SUE DECKER: We are really pleased with our quarter both on the brand side and on the search side. In terms of the pricing, a decent proxy for pricing is our marketing revenue per page view excluding search revenue and search page used and on that basis it was up double digits and relatively consistent with what we saw in the past few quarters, we're also seeing good gains in volume because of the strong inventory gains in page views and growing attractiveness to the medium. So we saw good trends both in price and in volume. And we've seen similar sorts of up front commitment to our fourth quarter as we've seen in the past.

OPERATOR: Our next question comes from Lanny Baker from Citigroup. Please go ahead.

LANNY BAKER, ANALYST, CITIGROUP: Thanks a lot. I think you said that the organic growth rate internationally was 33% and the overall growth rate for the Company was 34% on revenue. Were those the right numbers?

SUE DECKER: Those are the right numbers but 33% is excluding currency equivalents, and the 34% is not. So if you were to look at the 33% organic X currency rate and compare that to domestic, domestic was 32%. So as has been true in the last quarter we are seeing a little bit of leverage on the international side.

OPERATOR: Our next question comes from Safa Rashtchy from Piper Jaffray. Please go ahead.

SAFA RASHTCHY, ANALYST, PIPER JAFFRAY: Hi. Good afternoon. Congratulations on a good quarter. A couple of questions for you, Terry and Jerry and Sue as well, the growth in the advertising is tremendous as you have noted. However, it does seem that the demand is actually exceeding the supply. Yet of course that's great news for you guys but up to a limit because prices can only increase so much. My question is really on the inventory shortage. I understand obviously you have billions of pay views but of course not all of them are monetizable and the highly prized ones certainly have been sold out for some time. So could you comment on, actually, both on branded and search side, what do you see in terms of the inventory shortage, how could it impact the growth rate for overall revenue and brand (INAUDIBLE) and what can do you to increase inventories?

TERRY SEMEL: Hi, it's Terry Semel. Boy, this is a high class problem. I don't want you to feel, to start with on the branded side, that we are facing any kind of significant inventory shortages. The good news is from time to time on certain sites we do find ourselves in a position of either being close to being sold out on a given period but not on an annual basis. So there's really no place at Yahoo that I'm sorry to say that we suffer from the problem of lack of inventory or the need of more inventory. And also what we are really seeing is almost across the board advertisers who used us in one place, call it Ordos (ph) or call it the home page, started to use us in two and three places and now are thinking more about us as a full network, so coming aboard, identifying the audience and/or the demographics that they are looking for and looking to Yahoo to take care of their needs in many different places. So they are continuing to spend more. We're continuing to have a greater source of inventory because more and more areas are coming into the factor. Dan, would you like to add?

DAN ROSENSWEIG, COO, YAHOO, INC.: Yeah. I would just add something to what Terry talked about at the very beginning which is our user metric. So we grew from 300 million to 325 million users quarter over quarter and year-over-year and that's nearly 30% growth. And we're seeing the success of the way we build products and the number of users that register which increases our ability to target. So the value that we can provide both in volume of inventory and our targeting ability across the network has increased dramatically in the last

Q3 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 12, 2004 Tuesday

year, so as Terry said, we are open for business, so we have plenty of opportunity to continue to grow.

OPERATOR: Our next question comes from Anthony Noto from Goldman Sachs. Please go ahead.

ANTHONY NOTO, ANALYST, GOLDMAN SACHS: Thank you very much a couple of questions. Terry, Yahoo in the last year has done two things within Search to kind of create vertical categories, you primarily had Web-based search, then you have Yahoo shopping which is search based technology, you have Fair Chase, which is obviously in travel. Have you begun to see consumer behavior where very specific searches that used to go to Web-based search are now occurring in those verticals? As an example a product search now is not going into the Web-based search but it's going to Yahoo shopping or a search on travel is going to Fair Chase? And then I have one follow up?

TERRY SEMEL: Anthony, for starters we like to let the user decide which way they should go or which way they care to go. So we are starting to see it happening in both directions if you will. Many people go to the general Web search, look for something like travel or shopping, go from there to the travel or shopping site that they are most interested in. We give them the choice of doing that of course, and that's why we're open and that's why I think so many people have started to and continue to use us. At the same time if you are looking specifically for shopping, it is certainly a one stop where you go bingo and you are right at Yahoo shopping which gives you every detail that you may or may not want relevant to shopping. So what we do is we spend more and more time knowing what the users want and frankly by listening to them or by following their action. So a lot what have we do is almost reactive to what they are doing.

OPERATOR: Our next question comes from Mark Mahaney from American Tech Research. Please go ahead.

MARK MAHANEY, ANALYST, AMERICAN TECHNOLOGY RESEARCH: Great. Two quick questions. Terry, anything more on the tipping point comment you made last quarter about branded advertising? Were there -- you've already gone through the numbers were there, but were there particular things you saw that made you more confident in that than last quarter? Thank you.

TERRY SEMEL: Well, I am going to start and let Dan to add in as well. What I referred to last time was obviously how excited I am and how pleased I am about the opportunities for Yahoo on this side if you will and, on the branded advertising side. I think that I talked about the other mediums and how when the audiences really started to grow dramatically in network television over a period of time, and then the audiences started to grow dramatically on cable television over a shorter period of time, what you started to see was a trend line of advertising dollars being spent. So -- and it started to really go, it really ramped up at a given time. Coincidentally as it related to cable that was about when cable hit about 3% of the overall domestic spending of advertising. And I looked back and saw that at the end of last year '03 the Internet basically represented about 3% but more importantly the Internet today represents a similar phenomenon. Audiences are flocking to the Internet in greater and greater numbers throughout the world, spending more and more of their time on the Internet and needless to say, as audiences shift in great numbers, advertisers follow and my last anecdote would be last week at the A&A convention listening to the largest advertisers in the world all talk about how there's no one way to reach their audience any more, in fact using the expression of mass, how they get to the masses it used to be one way basically, they are now talking about how they get to the masses by putting together the pieces of the puzzle by reaching the masses or their audience in a more uniform way having to take advantage of various mediums. Absolutely they are talking about the Internet and this is coming from many companies who two years ago probably weren't sure at all about if the Internet can be a piece of the puzzle or even existed as a piece of how they reach their audience. So it was amazing for me to participate in those conversations about how almost everyone believes that the Internet must be a piece of the level of marketing solutions piece.

Q3 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 12, 2004 Tuesday

OPERATOR: Our next question comes from Mary Meeker from Morgan Stanley. Please go ahead.

MARY MEEKER, ANALYST, MORGAN STANLEY: A couple questions, for Terry and Dan. Terry you talked about the new front page and my Yahoo. Can you give us any data, though it's early to tell, what the increase in video, the change in the layout and the easier to use RSSCs are doing for usage of the site? Are you seeing any usage list in those particular targeted areas? And to Safas question, how comfortable if you are seeing a list, does that make you feel about an increase in available advertising inventory related to that stuff? And then a last question, is you clearly are ramping up your video on the site in the movie area, in the music area, in the TV area. When do we start to see more in the news and sports area? Thanks.

TERRY SEMEL: Well, Mary, I am trying to remember all the questions.

MARY MEEKER: I'm sorry.

TERRY SEMEL: I am going to sort of work backwards because I remember the last one first and then Dan's going to pick up because hopefully he remembers the first ones first. Let's see. We are starting to use more video. There's no doubt that as broadband continues to become more and more prominent as Yahoo of course, both at home and at work represents such a large portion of the broadband usage throughout our country and many other countries that so many of our users now, in fact a very high percentage of our users now have broadband. We will continue to take advantage of broadband and that will include areas such as video. So I don't think we are going to stop just at the one or two places that you mentioned. I think you can look to the use of video and use of more diversified programming. Basically a wide range of outstanding content across our entire network. So that is our goal and I believe it's very achievable. Dan, do you want to comment on the first?

DAN ROSENSWEIG: Sure. On the question over the front page and My and the use of RSS and the initial results. As you know we launched these in Beta so they're in very limited distribution but we did extensive testing before we rolled them out and the entire opportunity was to create greater value for users so they can find more things, program them through Yahoo as Terry was talking about at the very beginning of today. And so far the success that we've had has frankly been extraordinary, which is users have responded overwhelmingly to both the percentage of users that are programming more things into My has grown enormously, the usage of RSS is what we expected, between RSS and BLOG (ph)--12 million people alone that are using BLOGs now so our ability to create an open platform that allowed people to program what they want through My Media allows them to look at Yahoo as a place to become more essential with. So right now we see all the statistics suggest that it was a right decision.

OPERATOR: Our next question comes from Mark Rowen from Prudential Securities. Please go ahead.

MARK ROWEN, ANALYST, PRUDENTIAL SECURITIES: Thanks. A couple quick questions. First for Terry or Sue, I'm trying to understand in the fee segment, Terry, you mentioned that you added 1.2 million subs sequentially and yet the revenue was flat. Can you just give us some detail on what's going on there, were other parts other than Rogers week in that segment or did you get lower fees or something? And then second, Sue, the sequential growth rates, can you give us a sense between Search advertising and branded? I think you mentioned that you were particularly happy with Search, but can you give us a little bit more detail on how they grew sequentially? And related to that, are you seeing your branded advertisers starting to spend more heavily in the Search market? Thanks.

SUE DECKER: Mark, this is Sue, I am going to take -- start with -- on the fees question, we did add 1.2 million pay relationships in the quarter but it's worth noting that many of them were added late in the quarter, namely the Rogers migrations and the Fantasy Football adds they had a relatively minimal impact on the revenue in the quarter. The other factor is -- it's something that we mentioned to you last quarter, we said in July that there were a few non-recurring items that benefited our Q2 fee's line. If you look at the Q2 comparison with

Q3 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 12, 2004 Tuesday

Q1, and also that impacted sequential movement to Q3. Those collectively had a 5 or $6 million effect positively to Q2. So if you actually looked at those, the linear effect from the beginning of the year, it's a pretty predictable trend line as we would expect to see normal growth in our Q4 sequentially. In terms of the sequential growth rates, we are not in a position to break out the sponsored piece from the branded piece overall. You saw the affiliate line in the -- from our TAC. But it's fair to say that the branded piece typically has a little bit more challenging seasonal quarter in Q3 versus Q2. But it's also fair to say both were better than what we had expected.

OPERATOR: Our next question comes from Gordon Hodge from Thomas Weisel Partners. Please go ahead.

GORDON HODGE, ANALYST, THOMAS WEISEL PARTNERS: Good afternoon. This is somewhat related. I'm just curious if through Content Match and rolling that out across the Yahoo platform was the Yahoo network able to generate more leads or grow faster in terms of the lead contribution through Overture than the affiliate base and then I had a question about your product development line, expenses were a little bit higher than we expected, I'm just curious should we expect that going forward and if you could share with us anything that you are working on in terms of future products? Thanks.

SUE DECKER: Hi Gordon, this is Sue again. In terms of the content Match rollout, we are really pleased with what we've been able to achieve by vertically adding the Content Match, not only to our own sites but to some large external customers. In terms of how we did versus our affiliates, that's not something that we typically break out but we -- it's fair to say we're really pleased with how we did on the Yahoo network both in terms of the Precision Match and in terms with Content Match and of course Terry talked a little bit about Local Match, so we're really feeling good about all of the implementations that we have been able to achieve on Yahoo's network from Overture. In terms of the product marketing, product marketing increased about 10 million quarter to quarter, 11%. Largely due to increase in engineers, about half of the 500 people we hired was in the engineering side primarily because we continue to invest in creating world class products and services for users. There is also a very small fixed asset write-off which contributed incrementally to the increase in the quarter which is in the product development line. You'll see that also in depreciation.

TERRY SEMEL: And Gordon, this is Terry. As a one liner, you asked a question, are more branded advertisers starting to use Sponsored search and the answer is, definitely, yes.

OPERATOR: Our next question comes from Mike Gallant from CIBC World Markets. Please go ahead.

MIKE GALLANT, ANALYST, CIBC WORLD MARKETS: Yeah. I was wondering if you could update us on kind of what the current thinking on the go to market strategy for Local Search and kind of what partnerships do you kind of need and where we are on those discussions if you need anything? Thanks.

DAN ROSENSWEIG: Yeah, this is Dan. The go to market strategy as we went with general release on October 4, to great critical reviews and great user reviews. As you know increasingly a large percentage of searches overall are local. The majority of dollars that are spent in the economy are locally spent so we think this is a huge opportunity for us. From our perspective, we are working with a number of content partners along with technology that we built on our own and being able to utilize Overture as an add selling mechanism. So our strategy overall is to be able to roll-out the best product which we feel that we have, get a great response which we have and then continue to build the marketplace for sellers and for marketers through Overture and through other sales capabilities that we have. So we may choose to partner in some of those areas or we may choose to continue -- and we will choose to continue our self service mechanism which is really sort of a long-term opportunity, a very high sales with very low cost. So we think that's the right long term opportunity.

Q3 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 12, 2004 Tuesday

TERRY SEMEL: I think as a final comment. So what Dan is really saying to sum it up a lot of what we are going to do in early days will be self service. We will make it as efficient and as effective as possible. We are continuing to use other forms of sales teams as we go forward. And we see this as such an enormous area of opportunity for our Company that I think we'll do it in stages and ultimately decide do we need more strength of our own in terms of more selling capabilities within Yahoo, certainly not now.

OPERATOR: Our next question comes from Jeetil Patel from Deutsche Bank Securities. Please go ahead.

JEETIL PATEL, ANALYST, DEUTSCHE BANK SECURITIES: You've done a great job of really driving that branded advertising line in general using personalization. I'm just curious as you look into '05, how much of an impact does behavioral targeting have on your business, you know, sort of the ability to basically market to your customers -- market to users outside of particular verticals, do you think that's going to be a big opportunity for you or does it help drive pricing and drive basically the sell out rate higher on inventory that may be deemed run of side or run of network at this point? And then second question just overall on the industry, it seems like you are seeing an increase across the board in, you know, existing advertiser budgets plus new advertisers coming on stream from State Farm and CPG, do you say -- what do you think kind of '05 market growth looks like in the industry as a whole, do you think it's sustainable of a 30 to 40% type of growth rate for the market as a whole, given these dynamics?

TERRY SEMEL: Listen, that's your job. Okay. Predicting where the marketplace is going in general is your job. I am just saying this, obviously there's no way that I could predict a number where I see the marketplace in general goes. We are clearly focused on what we are doing. And on what the opportunities for our Company are. As you also know we are not at this moment talking in terms of '05 and '05 forecast and projections but I think in general we see it as a very healthy opportunity for the Internet and for Yahoo. There is absolutely every reason to believe that things will continue to, in a normalized market, to continue to get better for the Internet and for Yahoo, and we're excited about the prospects, not just of the next number of months or the next year but hopefully for a number of years. Dan, you want to take the --

DAN ROSENSWEIG: Sure on the first part of the question which is our job, which is behavioral targeting and creating great value propositions for marketers, we see that increasingly becoming important on the network. We have built all of those capabilities over the last number of years. And the ability to create packages for marketers that allow them to create brands, get performance, reach people at the moment that they're buying within each of the vertical channels and then extend that to the different demographics or psychographics across the network, there's only a few places you can do that at our size and our scale. So from our perspective we see that becoming increasingly important and yes that will result in greater value for marketers which means our pricing will be representative of the fact that we are creating even greater value so we think that's a very big upside for us.

TERRY SEMEL: Terry again. I am going to just add to it. We feel very, very good about our capabilities in terms of targeting. At the same time most of the advertisers who we are now talking to and who we are now doing business with also have large budgets in which they in effect do an awful lot of "how do I reach my demographics?" So we want everyone to think of Yahoo to be hopefully really good at both functions, how they reach their demographics on our vast audience and large network on a global basis and at the same time how we helped them drill down further to be more branded in terms -- I'm sorry, more targeted in terms of specific people who have more interest in the one thing that perhaps they have interest in. So if we could, one more question, please.

OPERATOR: Our last question comes from Douglas Anmuth from Lehman Brothers. Please go ahead.

DOUGLAS ANMUTH, ANALYST, LEHMAN BROTHERS: Thank you. Sue, you mentioned in the Search space that coverage would be a primary driver going forward as you

Q3 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 12, 2004 Tuesday

extend two more multiple word queries. Wondering if you can talk a little bit about the impact of the roll-out Broad Match at the full option within paid search and what the potential increase could be on price per click going forward? And then also secondarily Music Match which is included in the guidance going forward if you are able to detail the contribution possibly in the fourth quarter? Thank you.

SUE DECKER: Sure. Starting with the coverage piece, the -- typically coverage, that's the primary place you'd see the metrics expand as a result of Broad Match and you'd see sometimes a small diminution in put-through. PPC is a little harder to call. At times it does increase the price of some of the incremental terms that are included that would have sold for less and other times it depends on the mix of terms within the match. So it's very hard to make a overall statement about the PPC effect of the increase. But overall we've seen really good trends. We're very pleased. The coverage isn't increasing and it's more than offsetting any impact on either of the other metrics. In terms of Music Match, I prefer not to break out the specifics there. We did give you in aggregate the total amount that we saw acquisitions adding into our fourth quarter. And we only have an incremental week of Overture in our fourth quarter. So most of that is attributable to Kelkoo and Music Match in 3721.

TERRY SEMEL: With that we want to thank you all for joining us and have a great day or evening, whatever time it may be. Thank you.

OPERATOR: Thank you. Ladies and gentlemen, this does conclude today's teleconference. Thank you for participating. You may now disconnect.

[CCBN reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES CCBN ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS. Copyright 2004, CCBN, Inc. All Rights Reserved.]

**LOAD-DATE:** October 27, 2004

Exhibit 25

FOCUS - 38 of 53 DOCUMENTS

Copyright 2005 Voxant, Inc.
All Rights Reserved.
Copyright 2005 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

January 18, 2005 Tuesday

**TRANSCRIPT:** 011805av.794

**LENGTH:** 10943 words

**HEADLINE:** Q4 2004 Yahoo, Inc. Earnings Conference Call - Final

**BODY:**

   OPERATOR: Good afternoon, ladies and gentlemen, and welcome to the Yahoo! fourth quarter 2004 earnings conference call. At this time all participants are in a listen-only mode. Later we will conduct a question and answer session. Please note that this conference is being recorded. I will now turn the call over to Mr. Paul Hollerbach, Vice President of Financial Planning and Investor Relations. Mr. Hollerbach, you may begin.

   PAUL HOLLERBACH, VP OF FINANCIAL PLANNING AND INVESTOR RELATIONS, YAHOO, INC.: Thank you and good afternoon, everyone. Welcome to our fourth quarter earnings conference call. On the call today are members of our executive team, Terry Semel, Sue Decker, Dan Rosensweig, and Jerry Yang. Before we begin I'd like to remind you that matters discussed in this call contain forward-looking statements that involve risks and uncertainties concerning Yahoo's! expected financial performances as well as Yahoo's! strategic and operational plan. Actual results may differ materially from the predicted results and reported results should not be considered as an indication of future performance. The potential risks and certainties include, among others, decreases or delays in marketing services spending, including performance of the Company's recently-acquired company, acceptance of new products and services, and risks related to the integration of recent acquisitions. All information discussed on this call is as of today, January 18, and Yahoo! undertakes no duty to update this information. Other potential factors that could affect the Company's business and financial results are included in the Company's annual and quarterly reports, which are on file with the SEC. In this call we will also discuss some non-GAAP financial measures in talking about the Company's performance, including operating income before depreciation and amortization which we will be referring to as operating cash flow, revenue excluding traffic acquisition costs and free cash flow. Reconciliations of those measures to Gaap measures can be found on the Investor Relations section of our website. Terry and Sue have prepared remarks that should last about 35 minutes. Then we'll have a brief Q&A session. Now I'd like to turn the call over to Terry.

   TERRY SEMEL, CHAIRMAN, CEO, YAHOO, INC.: Thank you, Paul. Yahoo! has delivered a terrific fourth quarter to cap off a remarkable year. We validated our strategy by further extending Yahoo!'s leadership position as the most comprehensive and valuable internet service for consumers and the most diversified and largest global on-line advertising platform. It was a year in which we relentlessly focused on our consumers, increased the rate of innovation and product development, and continued to invest in advanced technologies throughout the world. The list of accomplishments during this past year is too numerous for me to mention. However, among the hundreds of product launches and enhancements, there are a few that stand out as they have redefined their categories. Although we launched our Algorhythmic Search product just 10 months ago, today many analysts and critics already believe Yahoo! Search technology is now among the best

Q4 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 18, 2005 Tuesday

in the world. We quickly followed the global launch with an aggressive roll-out of unique and ground-breaking search solutions, such as My Yahoo! Search, award winning desktop search, the largest image search with more than 1 billion images, the first video search to be offered by a major search engine, and integration into vertical areas, such as news, shopping, local, mobile, and travel. The all new Yahoo! Messenger redefined the category of instant messaging by bringing together the best attributes of communication, personalization, community, and entertainment. Since the launch, we continue to gain share of users and have become the No. 1 service in terms of time spent.

The introduction of RSS fees on My Yahoo! gave our users one quick access to more than 250,000 content sources, revolutionizing the way users can find, use, and share content on the internet. Since the launch of My Yahoo!, we have further extended our leadership position by continuing to increase our share of users. The launch of our local product established Yahoo! as the preeminent way for users to find, use, and review local services by leveraging the integration of Search, Maps, Yellow Pages and third party content. And we expanded the way and the kinds of content users can access through Yahoo! via entertainment partnerships with Mark Brunette Productions, Paramount TV, and JibJab. And by the way check that out now, it's very timely, as well as the aggregation of BLOG coverage in Yahoo! News and the extension of our original content, such as the addition of 8 new sports analysts. Our high standards of quality and commitment to provide the best experience for our users permeated every one of our products and Yahoo's! break-neck pace resulted in more users on Yahoo!, consuming more services and spending more time than anywhere else on the internet. I believe this was also the year in which we witnessed the beginning of a tipping point in advertising in which marketers addressed the continued shift in consumers' changing media habits by investing more of their marketing dollars on-line. With the largest and most engaged audience and the most comprehensive and advanced advertising platforms, Yahoo! is the best-positioned internet Company to take advantage of this shift.

These factors translated into great financial results for the Company, but now let's take a quick look at the fourth quarter. Yahoo! reported gross revenue of $1.1 billion for the quarter, our seventh straight quarter of record revenues, and up 62 percent from the fourth quarter of the previous year. This makes our 2004 full-year gross revenue $3.6 billion, more than double the 1.6 billion in 2003. Overall, we are benefiting from the diversity within both of our core businesses of advertising and premium consumer services, which have delivered consistently growing and results over the past year. We continue to increase our levels of profitability while also investing in the business, demonstrating the leverage of our operating model. Operating income before depreciation and amortization in the fourth quarter was $327 million and more than $1 billion for the full year, more than doubling last year's performance. And Yahoo! delivered 13 cents earnings per diluted share, excluding gains from the sale of investments and 36 cents per diluted share for the full year, also excluding gains from the sale of investments, compared to 18 cents per diluted share in the year 2003. While I am thrilled with our financial results, I place just as much emphasis on our user metrics as a measure of our success. Our innovation and leadership in providing a valuable experience on the internet is really highlighted when you look at our key audience growth numbers. We ended the quarter with approximately 345 million unique users, up 24 percent from approximately 263 million last quarter -- this quarter last year. Our active registered users now stand at approximately 165 million, up 31 percent year-over-year from 133 million last year.

Our growth in users in share has been impressive and I must say, very exciting, but it is our growth in user engagement that really stands out. During the past year we grew both overall users, while the average amount of time they are spending with us outpaced growth of time spent in the industry. Yahoo!'s average monthly time spent per visitor increased 8 percent year-over-year according to Com Score Media Metrics. The engagement of our users is also reflected in the wide variety of services our users consume on our network. Yahoo! is one of the top 2 in 15 verticals, according to the same poll with Personals, Launch, Finance, News, Games, Mail, Travel, and Geocities, all ranked No. 1. The engage-

Q4 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 18, 2005 Tuesday

ment of our users is also reflected in the growth of our premium services. Our
paying subscribers are the fastest growing subset of users on the Yahoo! Net-
work. We ended the quarter with approximately 8.4 million unique-paying rela-
tionships, up approximately 800,000 from the previous quarter and up almost 3.5
million on a year-over-year basis. The biggest contributors to our growth were
the first full quarter of our relationship with Yahoo! Rogers in Canada, the ad-
dition of Musicmatch subscribers since the acquisition of course closed in mid-
October, and a strong performance in Fantasy Football. We have definitely lived
by the mantra that great products lead to a great business and our strong per-
formance on the user front has translated into better business by enabling us to
provide deeper value to our marketers. So let's look at marketing services.

In the fourth quarter, our Marketing Services business achieved more than 67
percent year-over-year growth to $911 million in gross revenues due to strong
growth in both our brand and sponsored search businesses. This contributed to a
remarkable $3 billion in marketing services gross revenue for the full year. Ac-
tually, a 150 percent increase over 2003. Yahoo!'s Marketing Services revenue
grew faster than the rapidly-growing internet advertising segment, indicating
that we continued to build share. Looking first at our Branded Advertising seg-
ment, the results speak for themselves. We were able to increase revenues from
existing customers as well as attract new customers. As one example, the aggre-
gate Q4 spendings by the ad age top 100 marketers on Yahoo! was 55 percent
higher in the fourth quarter than in the fourth quarter a year ago. Even more
extraordinary, their Q4 aggregate spend was the same number those companies
spent with us for the entire year of 2002. Our focus on building deeper rela-
tionships with our customers through our vertical category expertise has re-
sulted in double-digit growth across all 9 of our vertical categories with the
largest areas of growth in the fourth quarter coming from Teleco, Auto, Retail,
Financial Services, and CPG. In our sponsored search business, we achieved re-
cord revenue growth. Our team made it easier than ever for advertisers to par-
ticipate by allowing them to focus more on their marketing objectives and less
on key words and bidding.

In 2004 we launched several features and services to do just that, including
Advanced Match, Enhanced Budgeting, Local Targeting, and Search Optimizer, each
of which has met or exceeded our goals for adoption. In addition, we expanded
our industry-leading program to educate, certify, and support search engine mar-
keting agencies, which have played an important role in helping clients build
campaigns and expand the sector. Success in our marketing services business
overall is predicated on our ability to deliver the best quality audience, the
most comprehensive and effective set of advertising solutions, and the highest
impact results for our marketers. On March 2, Yahoo! will celebrate the 10th an-
niversary of its incorporation. I want to acknowledge both Jerry Yang and David
Filo and the many others who have worked with them over the past 10 years for
having the vision that brought Yahoo! and the internet to where it is today. Our
2004 results are a fantastic way to begin the next decade. Jerry and David's
original goal was to make the internet more useful for consumers. This remains
at the core of our mission today, which is to be the most essential global
internet service for consumers and business. With that in mind, I'd like to talk
about 4 major objectives for this year, 2005.

First, Yahoo! will focus on building deeper engagement with our users, as we
have discussed previously, the internet is rapidly moving to a world of My Me-
dia, where the user is the programmer. Yahoo!'s ability to leverage our 4 key
pillars of Search, Community, Personalization, and Content into a powerful plat-
form for users is a tremendous advantage as we look ahead. By providing the
place where users can find, create, share, and transact with the information,
content, and people they want, we are creating a self-reinforcing cycle that de-
livers outstanding value for our users and for Yahoo!. Our goal is the continued
growth of audience share and engagements across all digital devices in the con-
nected world. We believe that our focus on these key pillars will keep us in a
leadership position and enable us to outperform the industry. Second, Yahoo!
will seek to play a greater role in people's connected lives. The continued con-
vergence of broadband and wireless presents a big opportunity for Yahoo!. We be-
lieve that in the connected world, users expect their internet experience across

Q4 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 18, 2005 Tuesday

all devices to be seamlessly integrated and their content to be accessible and
personalized. Yahoo! is in a unique position to provide this valuable experience
to our users across the PC, broadband, and wireless internet. On the broadband
side, we continue to validate our successful partnership strategy of creating
tightly-integrated and co-branded experiences with leading broadband providers.
With SBC, our successful long-standing partner, we renewed and extended our re-
lationship to include Unified Communications and programming of their next gen-
eration interactive TV platform.

Furthermore, we announced yesterday a relationship with Verizon to offer a
range of services, including a co-branded portal.. With Verizon and SBC, Yahoo!
has the largest reach into a broadband subscriber base in the U.S. We obviously
welcome Verizon to a growing list of major global partners, including BT in the
UK and Rogers Cable in Canada. On the wireless side, while Yahoo! has already
deployed a number of our services with major carriers in the U.S., such as Cin-
gular, Sprint, and Verizon Wireless, we are just at the beginning. In 2005 Ya-
hoo! will be even more aggressive to help users mobilize their Yahoo! experi-
ence. Along with the PC, Yahoo! is committed to delivering the best broadband
and wireless experiences in order to aim to give users what they want, when they
want, and of course, how they want it. Third, we will continue to drive in-
creased international growth. 2004 set the stage for more significant interna-
tional growth for us. By following our principle of buy, build, or partner, we
launched Global Search, Mail, and Messenger platforms, made significant invest-
ments in Europe through the acquisition of Kelkoo and our access relationship
with BT, and strengthened our presence in China through the acquisition of 3721,
the launch of ESO and our joint auctions platform with Sena. However, we have a
lot more work to do.

In 2005, we will be even more aggressive about our growth plans internation-
ally. Look for us to compete aggressively in a number of countries, and in some
cases, product-by-product. The exciting part is, our opportunities internation-
ally have just begun and we are much better positioned to take advantage of them
now. Fourth, our goal is to further extend our leadership in advertising and
marketing services by providing the most engaged and valuable audiences and the
most innovative suite of interactive marketing solutions for both brand and
sponsored search ad partners. Both areas experienced great success in 2004 and
enter 2005 with tremendous momentum. Blue chip marketers are now shifting larger
percentages of their marketing budgets on-line as they recognize that they must
reach their audiences in their preferred environments. Yahoo! is investing for
our future in tools, formats, measurement capabilities, and data to lead the
next phase of internet brand advertising. Sponsored search also remains an enor-
mous opportunity for the internet and for Yahoo!, and we'll continue to make
significant investments in the areas of Advertising Tools, Matching Technology,
and New Products. And more countries around the world. We believe we will con-
tinue to provide the most valuable, integrated marketing solutions in the indus-
try, and as a result, Yahoo! is once again well positioned well positioned to
grow market share in a rapidly growing segment. Yahoo! has obviously had a phe-
nomenal year and I'd like to take this opportunity to thank all of our employees
throughout the world. And of course, as Yahoo! keeps getting bigger and better,
I'm very, very excited about our future. So I'd like to turn it to Sue Decker to
talk more about the financial success of our Company.

SUE DECKER, CFO, EXEC. VP-FIN. AND ADMIN., YAHOO, INC.: Thank you, Terry, and
thanks to all of you for joining us today. As we close 2004 and commence 2005,
we're very pleased to be able to report for the second consecutive year finan-
cial results that exceeded all 3 of the key objectives we had previously shared
with you. First, to reach 30 percent in organic revenue growth; second, to de-
liver 50 percent of incremental revenues to operating cash flow; and third, to
convert 70 percent of operating cash flow to free cash. This waterfall of lever-
age has produced very strong financial returns. While Yahoo! continues to extend
its reach to new users, we're also becoming better at serving the needs of ex-
isting users by listening to them and investing in more products and services.
The combined effect is producing a more engaged user base and it is this deepen-
ing usage that is the real magic behind the achievement of our financial objec-
tives. What's even more important than exceeding any one of our financial tar-

Q4 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 18, 2005 Tuesday

gets, however, is the way in which we've achieved them, and they do flow from a robust foundation. They're based on extraordinary breadth of product enhancements, they flow from increasing depth of differentiated functionality, and they extend across a high quality and diverse paying customer base.

Our aspiration is to generate superior returns and build value over the long-term, not just in a few quarters or a few years. This would not be possible if our source of strength were a single product or if we were reliant on a narrow customer base. We still have a lot of work to do, but we feel we're well on our way to fulfilling this ambition. Before we review the highlights of our fourth quarter results, let me start with 2 housekeeping items -- First, we sold 1. million shares from our stake in Google at an average price of $186 per share during the fourth quarter, bringing our year to date sales to 4 million shares. Our remaining investment of 4.2 million shares is included in short-term marketable equity securities. The sales of this investment produced a gain on sale per diluted share of 13 cents per share in the quarter and 22 cents for the year. If you exclude those investments, we earned 13 cents in the quarter and 36 cents per diluted share for the year. The second housekeeping item is that Q4, 2004 will be the last quarter in which we plan to break out listings as a separate line item. Going forward, it will be part of Marketing Services. The relevance of reporting listings as a separate line item from Marketing Services revenue has diminished as new business models have emerged, making the distinction between these lines less clear. We increasingly receive payments from customers that are split between these lines for fundamentally the same service, differing only by payment or contract terms. In addition, third party research firms include what we call listings in on-line Marketing Services for the purpose of determining market share. Consequently, the logic to support keeping this as a separate line item no longer seems compelling.

Let's talk now about the highlights from the quarter, starting with free cash flow. Free cash flow really encapsulates all of the P&L and balance sheet movements that we believe are important to value creation. Maximizing free cash flow per share is therefore our most important financial objective. As a reminder, we define free cash flow as cash generated from operations, which includes cash costs for taxes and changes in working capital, less capital spending. Free cash flow reached a new quarterly record for the quarter, coming in at $251 million, almost tripling from a year ago and taking our 12 months trailing free cash flow to over $830 million. This represented 32 percent of revenue ex-TAC and a conversion rate of 77 percent of operating cash flow, a testament to the exceptionally high cash productivity of our business model. While it's tough to predict the free cash flow to operating cash flow ratio in any 1 quarter, due to interim timing swings in working capital items, we currently believe that a significant portion of operating cash flow will flow into free cash and we are maintaining our 60 to 80 percent longer-term target. Let's look now at what we did with the cash and what happened to our balance sheet.

Our ending cash in marketable debt securities balance was 3.7 billion, up 670 million since last quarter. Please note that this does not include the 812 million in investments and equity securities, which are not considered strategic to the Company and therefore will be sold over time as appropriate. The increase in cash and related securities was attributable to 4 primary factors -- Our free cash flow of $251 million, the proceeds from a partial share, sale of the previously-mentioned equity investment of 310 million, the generation of $227 million from the exercise of employee options, and the receipt of 26 million back from the first traunch of an aggregate of $100 million in structured stock repurchase transactions we entered into in Q3 of 2004, representing an annualized return of 19 percent. Collectively, these sources of cash amounted to close to $815 million, partially offset by the use of 148 million for acquisitions, principally Musicmatch. Although our cash balance continues to grow, we did complete a number of acquisitions in 2004. Largely paying in cash for a collective total cash investment of more than $755 million net of cash required, so we are actively investing this cash. Looking forward, we plan to continue to use our strong balance sheet and free cash flow to drive future value for shareholders through acquisitions, investments, and share repurchase activity as appropriate.

Q4 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 18, 2005 Tuesday

Moving now to the P&L, the overall summary is that consistent with our finan-
cial strategy, we are successfully supporting a massive and growing base of more
revenue-productive users without a commensurate increase in costs, which has al-
lowed us to exceed both our revenue and operating cash flow growth goals. Spe-
cifically, fourth quarter revenue ex-TAC came in at $785 million advancing 54
percent over year-ago figures and up 20 percent from Q3 '04 levels, benefiting
from normal seasonality in our core marketing service business and from strong
organic growth. The 54 percent quarterly growth in revenue ex-TAC, when compared
with last year broke down into 42 percent growth in underlying organic revenue
in spite of tougher comparisons against strong gains a year ago and 12 percent
related to acquired companies owned for less than 1 year. Importantly, the or-
ganic growth rate represents an increase from our Q3 rate of 34 percent, re-
flecting the annualizing of the Overture acquisition, now owned for more than 1
year and whose superior growth is now included in our organic base. This organic
revenue growth outpaced our strong organic growth of global users of 24 percent,
indicating that we are successfully finding more ways to monetize our user base.
The network effect of Yahoo!'s products and services appears to be driving
deeper engagement and usage by our users around the globe. For the full year of
2004, the average revenue ex-TAC per user generated by Yahoo! consumers was 71
cents per month, up 40 percent from a year ago and ahead of the long term 3 to
5-year goal that we outlined at analyst day in 2001.

We're very pleased that we've been able to generate both impressive growth in
new users and also drive existing ones deeper into our network of services, cre-
ating value for them and for our shareholders. Let's look now at the revenue
breakdown by lines of business. Global Marketing our largest service generated
$618 million of revenue ex-TAC for the quarter, up 57 percent year-over-year.
Excluding acquisitions, marketing services grew a healthy 45 percent on an or-
ganic basis, representing an acceleration from the 38 percent last quarter. This
strength was nicely balanced across our various offerings to marketers from pay
for performance to branding, and also across our vertical product categories. In
addition, both sources of marketing benefited, as expected, from seasonal
strength. Let me share with you now a couple of anecdotes about our marketing
business in 2004 that illustrates some of the key client and industry trends
we're seeing, one in our branded business and one in Sponsored Search. First on
the branded side, consistent with our strategy, we've focused on getting deeper
with existing clients. As an example of the value they see in the Yahoo! Net-
work, the aggregate spending by the top 200 U.S. advertisers on Yahoo!'s Network
advanced 39 percent in Q4 of 2004, compared with the same period a year ago,
which is even faster than their full-year growth rate. We don't plan to provide
this as an on-going metric, but it does give you a sense for the extraordinary
growth and acceptance of the medium over the last year, particularly by the na-
tion's largest marketing company.

Second in Sponsored Search, we're seeing broader participation by more indus-
try categories, creating greater diversification and new growth opportunities.
For example in 2003, Travel was our biggest category by a reasonable margin.
With Retail and Financial being the other large categories. In 2004, we saw a
change in their relative contributions due to substantial growth in Retail and
Financial, compared with solid growth in Travel. This led to a rank order shift.
In 2004, Retail became the leading category with Travel and Financial close be-
hind for a more balanced mix among our largest three. The other noteworthy cli-
ent observation is that we saw broadening participation from some new categories
with significant growth and much more meaningful contributions from Auto, Tech-
nology, and Telecom. We're very pleased with the expanding roster of client in-
dustries finding value in the Yahoo! pay per performance network, validating the
medium and our positions. Turning to fees, we produced $129 million of revenue,
up 52 percent from a year ago. The primary driver of this business line is our
premium offerings, in which consumers and businesses pay us for our services. We
exited the quarter with approximately 8.4 million paid relationships, up more
than 70 percent from 4.9 million a year ago and up 800,000 from Q3. This Q4 in-
crease is ahead of our historical quarterly run rate, excluding acquired sub-
scribers, due to the inclusion of Musicmatch for the first time.

Q4 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 18, 2005 Tuesday

In Q1, 2005, we expect only modest growth in payed subscribers from the end-
ing level of 8.4 million, due to a tough comparison against the seasonal
strength of Fantasy Football, which benefited the second half of 2004 and also
because we do not expect any incremental benefit from new access deals or prod-
uct launches from the Q4 level. For the full year of 2005, combined organic
growth expectations with the new Verizon deal and various planned new product
launches all equate to a collective 2.6 to 3.1 million incremental subscribers
to achieve a target range of 11 to 11.5 million by year end. And on that range,
we expect to continue to operate within the 3 to $5 per month per sub range that
we've provided in the past. Our last revenue line is listings. Listings revenue
of $38 million increased 15 percent from a year ago, resulting from accelerated
year-over-year results at HotJobs, the largest contributor to the line, along
with strong growth from local listings. Dampening those trends both sequentially
and year-over-year were reductions in paid fees for directory inclusion, which
has transitioned as a business -- business model toward Sponsored Search and
represents a movement from the listings line to marketing services. This phe-
nomenon underscores our earlier comment that this line is better analyzed as
part of marketing services.

Turning to revenue by segment, top-line growth remained very robust interna-
tionally, boosted by secularly strong growth in Sponsored Search, traditional
marketing services, the incremental contribution of acquired companies, plus fa-
vorable movements from currencies.. On an organic basis and holding currencies
constant, our international revenue ex-TAC increased 66 percent in the quarter,
twice the run rate of last quarter, benefiting from many of the seeds planted
over the last couple of years and from the inclusion of Overture in the organic
base. International revenue ex-TAC represented 23 percent of total revenue in
the quarter, up close to 800 basis points from a year ago and representing 22
percent of total revenues for the year, consistent with the high end of the 21
to 22 percent forecast we provided at our May, 2004 analyst day. Let's turn now
to some of the details behind our strong and growing profitability. In addition
to making good progress on our revenue monetization objective, we're making
strong headway on our productivity goals, which are leveraging operating and
free cash flow. Specifically, operating cash flow came in at $327 million up 84
percent year-over-year and above the high end of our business outlook. This
means that 55 percent of incremental year-over-year revenue ex-TAC flowed
through to operating cash flow, slightly above our 50 percent target due to the
better-than-expected results on a seasonally large quarter. Consequently, global
operating cash flow margins were 42 percent, bringing our full-year total to 39
percent.

The major driver of margin leverage is compensation costs. Our largest ex-
pense, which continues to yield productivity improvements relative to growth in
revenue and operating cash flow. Headcount ended the quarter at just over 7,600,
up about 600 from Q3. Roughly 25 percent of this growth came from our new Mu-
sicmatch employees and the balance was attributable to organic investments in
key talent in selected products and infrastructure designed to improve our user
experience, strengthen our market position, extend new verticals, and support
our growing businesses. Consequently, average annualized revenue ex-TAC per em-
ployee stood at almost 424,000 in the quarter, advancing nicely from the Q3
level and by 13 percent year-over-year. We're really pleased with our progress
on this metric as an indicator of the productive and strategic allocations of
resources within our property. This is particularly impressive, considering ac-
quisitions brought into the mix that initially often operate at lower revenue
per employee levels than the Yahoo! averages, but that have become more profit-
able under our ownership. The observation that we've grown our employee base by
close to 40 percent over the last year, investing in and acquiring key talent to
enhance our consumer offerings while still seeing improvements in productivity
and margins is a testament to the network effect of our model and our focus on
key priority areas.

Turning to profitability by geographic segment, our Q4 operating cash flow
margins on revenue ex-TAC in the U.S. were 46 percent while our international
margins came in at 27 percent, both benefiting from strong business trends and
positive seasonality. The full-year international margin came in at 25 percent,

Q4 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 18, 2005 Tuesday

the high end of the 20 to 25 percent range we outlined at analyst day as many of
our countries are turning profitable and our more established countries are ex-
periencing enhanced profitability. Finishing up P&L with the bottom line, ex-
cluding the impact of the partial sale on investment these results allowed Ya-
hoo! to achieve fully diluted earnings per share, or EPS, of 13 cents up 160
percent from the 5 cents in the year-ago period. Let's turn now to our business
outlook for 2005. We are introducing operating ranges for both the first quarter
of 2005 and for the full year. Starting with the first quarter, we expect reve-
nue ex-TAC to be in a range of 765 to $805 million, up 45 percent from a year
ago at the mid-point of the range and reflecting normal seasonality compared
with the fourth quarter marketing services revenue. We believe companies ac-
quired in the last year will contribute roughly $40 million of first quarter
2005 revenue ex-TAC, implying organic year-over-year revenue of about 38 per-
cent. As a reminder, our Q1 '04 reported revenue in operating cash flow bene-
fited from a $10 million one-time gain of unredeemed third party loyalty program
points that have now expired. We're excluding that from our organic comparisons.

Turning to profitability, at these revenue levels, we expect to operate
within an operating cash flow range of 290 to $310 million in Q1, up 49 percent
from a year ago at the mid-point. Of this, we expect acquired companies to con-
tribute nominally, implying organic growth of above 50 percent. Q1 margins are
expected to decrease sequentially due to normal seasonality expected in our Me-
dia Ad business, together with continued investment in core products and ser-
vices and various planned product launches, for which we have budgeted marketing
expenditures. For the full year of 2005, we expect revenue ex-TAC to range from
3.365 billion to $3.565 billion, up about 34 percent from year-ago levels at the
mid point. Excluding the impact of acquisitions in the past year, our organic
growth rate is expected to be about 31 percent for the year, consistent with our
long-term goals. In addition, we expect to see further revenue growth leverage
from our international operations, expanding to represent approximately 25 per-
cent of our worldwide total revenue from 22 percent in 2004, assuming currency
rates at 12/31/04 for the full year. Full-year operating cash flow for 2005 is
expected to be in the range of $1.39 billion to $1.49 billion, representing
growth of 41 percent year-over-year and approaching our 50 percent flow-through
goal for incremental revenue conversions. If we achieve this profitability on
the previously-discussed revenue ex-TAC outlook, our overall margins will expand
from 39 to 42 percent. Our expectation is that this margin expansion will come
mostly from our international operations. Our domestic operations are now ap-
proaching an operating level that seems to strike close to the right balance be-
tween the appropriate level of current profitability and ongoing investment in
future growth relative to our business models.

Moving to our most important financial metric, free cash flow. If 2004 is de-
fined by the year we achieved more than $1 billion of operating cash flow, we
hope and expect 2005 to be the year Yahoo! exceeds $1 billion of free cash flow.
Specifically, we're introducing a range of 1 billion to 1.1 billion, represent-
ing an OCF flow-through of approximately 70 percent. This outlook contemplates
capital spending for 2005 of approximately 340 to $365 million, roughly 25 per-
cent of the OCF target that we have operated at for the last 3 years. We believe
this range both allows strong free cash flow conversion and also proactive in-
vestments to drive our product strength and support our user growth. To sum up,
as we reflect on 2004, we are pleased with how the year performed and as we look
ahead, we're even more excited. Financially, at the mid-point of the ranges, our
full-year 2005 outlook calls for a financial model that is extremely attractive.
It calls for a third consecutive year of at least 30 percent growth in organic
revenue ex-TAC. This is just delivering close to 50 percent of that to the oper-
ating cash flow line, and it anticipates yielding more than 70 percent of that
to free cash flow. This waterfall of operating leverage is really a metaphor for
the underlying waterfall of deepening consumer usage of our products and ser-
vices. The first 10 years of the internet's commercialization were characterized
more by breadth of users than by depth of usage. We think that's in the process
of changing and we see the next 5 to 10 years as increasingly characterized by
attracting a greater share of users' time each day as we and others increasingly
provide users with what they're looking for, use our 4 pillars of competitive

Q4 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 18, 2005 Tuesday

advantage to create stickiness and barriers to entry across our verticals and
become more essential to our users, this all leads to a very attractive finan-
cial opportunity and we hope a very sustainable growth story for investors. So
with that, I'd like to turn it back to Terry.

TERRY SEMEL: Thanks, Sue, thanks a lot. Look, I feel very fortunate. I work
with a seasoned and extremely talented management team, and an enthusiastic
global employee base that all want to help change the world. As a group, we have
no real time to look back. Since we spend our days busily trying to anticipate
and help create the future. I personally see more opportunities for Yahoo! now
than I've seen ever before. So with that, I'd like to turn it to you all for
questions. Thank you for your patience.

OPERATOR: Thank you. We will now begin the question and answer session. If
you have a question, please press star, then 1 on your touch-tone phone. If you
wish to be removed from the queue, please press the pound sign or the hash key.
To ensure that all participants are able to ask a question, please limit your-
self to one question. Once you have asked your question, you will be immediately
placed back into conference. If you're using a speaker phone, please pick up the
handset. Once again, if there are any questions, please press star, then 1 on
your touch-tone phone. The first question comes from Mark Mahaney from American
Technology Research. Please go ahead.

MARK MAHANEY, ANALYST, AMERICAN TECHNOLOGY RESEARCH: Two really quick ques-
tions. The margin guidance for the March quarter implies essentially no year-
over-year expansion. Are there any one-time items in there, is there anything
else besides these, now is there a particular product promotion that you plan on
pushing in that quarter? And secondly, any more comments on the international
rollout? Terry, several times you used the word "aggressive" can you be more
specific about what you can do to really ramp up international? Thank you.

SUE DECKER: Sure. So, Mark, I'll get started on the margin side and pass it
to Terry. Margins in Q1 are anticipated to be about 38 percent, this is a little
above the year-ago level, which is also seasonally light, and then we expect
them to ramp up throughout the year for a full-year margin of about 42 percent.
The factors driving that are a couple I mentioned on the call, which is growing
normal growth on the cost based on a seasonally challenged marketing quarter on
the branded side. In addition, we are earmarking some money for a particular
product launch in marketing. The other factor is the seasonal impact of payroll
taxes that does affect the Q1 levels. It's booked as not on accrual basis, but
as it comes through from exercise of options and before we cap out on those
amounts if Q1 gets hit unnaturally hard from that. Those are all contemplated in
our Q1 guidance as well as the impact on the full year.

TERRY SEMEL: I'll pick up the international question. More than a year ago we
put together a road map of the things we wanted to help accomplish internation-
ally to drive much greater growth. Obviously, now that '04 is over, we've talked
about the accomplishments and basically the platforms that we put together and
our basic critical services got the same results around the world, or the same
quality products around the world that we had right here in the U.S. as well as
a handful of partnerships and a handful of acquisitions. We have that same road
map that we will follow very closely this year. I think you will see a lot of
progress for us in a number of places and I really don't want to reveal that in
front, but just, you know, ask that question in another couple of quarters and
certainly before the end of the year give us your score card.

OPERATOR: The next question comes from Lauren Fine from Merrill Lynch. Please
go ahead.

LAUREN FINE, ANALYST, MERRILL LYNCH: Thank you. I guess I have 2 quick ones
also. The ex-TAC rate actually came down and I'm wondering if that is more a
function of a shift on Search between Yahoo! Network versus affiliates or if
it's just because of the extraordinary growth in branded? And then secondly, I'm
wondering if you could talk about change in stock option accounting in mid-June
and what your plans are for grant policies and programs and just how that af-
fects you I guess on the free cash flow calculation as well.

Q4 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 18, 2005 Tuesday

SUE DECKER: Okay, thanks, Lauren. Let me start there. The ex-TAC rate percentage that you're calculating is the ex-TAC payments on our total revenue and a lot of our revenue isn't, you know, is not eligible for ex-TAC payment, so just to give you a sense for what's actually happening on the Sponsored Search revenue, to which the ex-TAC is relevant, we can look at ex-TAC increased worldwide sequentially from the third quarter to the fourth quarter by about 16 percent, and that really did reflect roughly stable ex-TAC rates quarter-to-quarter, both in the U.S. and international. International ex-TAC you can see in volume of dollars was up about 19 percent due to the really strong growth in our affiliate business, which is especially noteworthy because there were not a lot of new significant affiliates in the quarter. So it's largely organic. And as a reminder, as you compare it to the last quarter sequential growth, we incrementally were aided by Neighbor and the increment of Yahoo! Japan which was up together, caused that to be up 36 percent. On the U.S. side, ex-TAC was up 14 percent. Again, these are dollars. The rates were broadly constant, and that's relatively representative of our net revenue increase in the U.S. Search side.

In terms of option expensing, you know, we -- our primary focus here has been the economic issue as opposed to the accounting issue. We, of course, have disclosed all the financial impact of options expense in our footnotes for many years so that's relatively consistent information. The thing that we've really been targeting in the last few years is trying to balance toward a net burn rate of less than 2 percent. We were able to achieve that for the third year in the year that just passed. So we've really been focused for a long time on trying to balance the right level of investment in our employees and equity participation with what's acceptable to shareholders, and the recent change in accounting policy wouldn't necessarily affect that. This has been a longer-term time frame. So in terms of free cash flow impact, we wouldn't really recognize any difference in free cash flow. We really focus on free cash flow per share and encourage you to do that as well so that you can take into account both our numerator and also the options that are reflected in the denominator.

OPERATOR: The next question comes from Mary Meeker from Morgan Stanley. Please go ahead.

MARY MEEKER, ANALYST, MORGAN STANLEY: Thanks a lot. We have a couple questions. Can you give us a little detail on how effective the Search bar has been on the Yahoo! Home page versus the My Yahoo! page versus throughout the site? And the second question is how comfortable do you feel about the outlook for advertising, inventory expansion, and pricing? Thanks.

DAN ROSENSWEIG, COO, YAHOO, INC.: Hi, Mary. I'll take this one. On the Search Bar, sort of an order of priority, the Home page generates the best My and then the different pages across the network. So most importantly, though, what we see is a continued improvement on the number of Yahoo! users using our Search across the network and in each particular vertical within the network, which was the plan we set out a year ago. So we've consistently been doing that. As we launched the new Home page with great success and the new My Yahoo! with also great success, we've seen an improvement not just in the number of users using the site, but on the number of Yahoo! services that they've been using including Search. So that's been very effective for us and we're extending that around the world.

SUE DECKER: Okay, Mary, I think your second question was on branded advertising and how are we seeing the impact of ad inventory expansion from page views on overall pricing. A good proxy for pricing on the CPN side of the business is to look at the marketing services revenue per page view and exclude Search revenue from the numerator and exclude Search pages from the denominator and just as an example, in the U.S. we saw that metric grow in the double digits year-over-year, which is pretty consistent with what we've seen in the last few quarters and we continue to see very nice growth in our overall inventory volume. As you can see from the page view gains, just due to the overall attractiveness of the medium.

OPERATOR: The next question comes from Heath Terry from Credit Suisse First Boston. Please go ahead.

Q4 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 18, 2005 Tuesday

HEATH TERRY, ANALYST, CREDIT SUISSE FIRST BOSTON: I was wondering if you could talk a little bit about -- we're hearing anecdotally about sold out conditions across various portions of the site through various points of the year and I was wondering if you could just maybe put some context around that. To what extent is that really an issue and to what degree does that give you confidence in your guidance for this year that you -- relative to the level of confidence that you may have had at the same point last year?

DAN ROSENSWEIG: Heath, this is Dan. I'll take that one. So on inventory, Yahoo!'s inventory continues to expand across the network or across the world and in all the key categories and year-over-year, as you saw from our user numbers and our engagement numbers, we could also suggest the same thing is happening with the number of page use generated on a per user basis as well. So organically, we continue to create significant new inventory around all the key verticals on the site. So we anticipate continued growth in those areas, number of users, time spent, inventory available, all of that helps the business of advertising, which is as Terry pointed out on the call, we're getting more advertisers spending larger contracts. They're also increasingly paying more fair market rates, so we feel in a very good position to capitalize that. In addition, we're creating new content categories all the time, as you saw with some of the announcements this year. We did with Apprentice, with Entertainment Tonight, there's an announcement with JibJab and again that same concept holds true around the world. So we think we're in very good shape.

TERRY SEMEL: Terry, I'm just going to add one thought to that. As large advertisers start to spend more money with us on our Network and engage more in our Network they are not concentrating on any one place in the Network so they are starting to think in terms of the way they and many of us have been trained to think, which is where is my audience on the Yahoo! Network? And instead of congregating in one area, they're looking to reach that audience simultaneously in many areas on the Yahoo! Network. So in effect, it doubles, triples, quadruples the amount of inventory available to any big buyer.

OPERATOR: The next question comes from Anthony Noto from Goldman Sachs. Please go ahead.

ANTHONY NOTO, ANALYST, GOLDMAN SACHS: Thank you. Terry, I was wondering if you could comment about paid search and where you think long-term pricing could end up in paid search? Specifically, I know that you do not set price in paid search and it's a function of the marketplace, but we continue to see private companies that are in the business of buying key words from you and then reselling them at a significant margin, which would imply that there's a significant opportunity to increase the efficiency of that market. One, do you agree with that, where do you see pricing going over the long-term; and are you developing technology tools for advertisers so they can better buy different day parts and understand conversion rates so they can be priced more efficiently? And then if you can just comment a little bit on Lloyd Braun's hire and specifically what areas of content he's working on? Thanks.

TERRY SEMEL: We'll work backwards, I'm going to let Sue go first, because if I give the information she doesn't want to give you she'll be very upset so go ahead.

SUE DECKER: Okay. I'm going to start and then pass it to Dan and Terry on the second part. So, I think you outlined it well, that ultimately, it'd be -- the user and advertiser determines where those rates go. We have been very focused on helping them buy more effectively and achieve better and more relevant performance for their key words and a lot of both the product initiatives last year and the product initiatives in 2005 are absolutely focused on that objective. We've talked before about the impact of that being largely to increase coverage in these early days, which is more than offsetting any adverse impact on either of the other variables, click-through or PPC in driving overall RPS up. So it's certainly our expectation that a lot of these investments are going to lead to further pricing improvement in RPS over time, and as you point out, there is a fair amount of arbitrage activity out there that would corroborate that.

Q4 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 18, 2005 Tuesday

DAN ROSENSWEIG: On the second part of that question, which was tools for more efficient pricing for advertisers, yes, in fact, Overture rolled out a series of tools and advancements this year, giving, as Terry pointed out in his presentation, the opportunity to focus more on where they wanted to buy, what the most efficient way to buy was, how to buy across a series of performance key words as well as new products and services and Content Matching and other areas, so you have a lot of tools available, they're going to create more tools that will allow us to create the most efficient marketplace, which is really what the goal is. So that's what we're doing in the Overture area. On the question of Lloyd, Lloyd first of all, we think is a wonderful example of the kinds of people that Yahoo! can attract. Here's somebody who's had great success in his career and he's come here to be able to leverage what Yahoo! has, which is a series of assets that nobody else has, to produce differentiated content, packaging, and experiences across the internet in multiple devices, that again, as Terry pointed out are the future of where all of this is going. So he's focusing on creating unique experiences across content, across all the different environments that Yahoo! will be participating in.

TERRY SEMEL: This is Terry, just adding to that, we all see Yahoo! which it is is a great distribution channel. We have an enormous global audience. We have always been both licensing and/or acquiring and in effect helping us buy/bill a partner on various content levels, so Lloyd's expertise will certainly help us move forward, he'll help us in ways that we are delivering better content, if you will, for our advertisers, and better content for our users and just help us come to the next level, and so we're very excited about it.

OPERATOR: The next question comes from Safa Rashtchy from Piper Jaffray. Please go ahead.

SAFA RASHTCHY, ANALYST, PIPER JAFFRAY: Terry, you mentioned in your prepared remarks that 1 of your 4 objectives is to extend your leadership in marketing services by offering, among other things, more and new solutions to the advertisers. Can you give us some examples of the areas you're looking for, and specifically what areas you feel you really have to work on to meet kind of the standards or the demands of the advertisers? And second, Sue, could you talk a little bit about the trends that you saw in paid search in terms of the growth in volume versus prices? Are you continuing to see increase in prices, is it more in terms of the volume increase or price increase that you saw such strong results this quarter? Thank you.

TERRY SEMEL: Safa, it's Terry. I'm going to start on the -- excuse me, I'm losing my voice at the same time. I'll start, Dan will pick it up on the sponsored search side and then Sue will come back on the last part of your question. There are many opportunities for us to increase our abilities to expand our advertising business, both for ourselves and for our advertisers, so I'm going to start with probably some of the easiest things. So as broadband today in the U.S. alone, more than 50 percent of the households and as you know, almost all workplaces, will have broadband by the end of this year, and it's a great opportunity for us to have more broadband-capable material, more video-type material. And as well to just use broadband as a way to present better products for advertisers for their own sites and for the sites that we put up for them. So, generally speaking, I'll answer it as it relates to broadband on that level of our business. There are many ways that we can be better and produce more content by just being more creative and taking advantage of more broadband households. Dan, you take Sponsored Search and then back to Sue for the end.

DAN ROSENSWEIG: Sure. In terms of the whole advertising opportunity, you can imagine that it's really predicated on matching the right offer to the right user in the right environment. So we are working on advanced tools and technologies as we have been all along, to be able to use data for better targeting, different formats, different pricing mechanisms, opportunity to serve as in the right areas within Local,Content Match, as Terry pointed out in broadband there's a number of opportunities with video, audio. So, in the RSS environments and in different devices. So we just think there's a very big opportunity, as long as we continue to extend our leadership, by focusing on making sure we have the right technology to match the right offer, the right price, the right time,

Q4 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 18, 2005 Tuesday

and the right format, with the right frequency, in the right location, to the right users. So everything we're doing is focusing on that.

SUE DECKER: Okay, thanks, Safa, we did have a very good quarter in Search both on our sites and also on the entire affiliate network. The gains that we experienced in the quarter were driven principally by volume in a fairly heavily commercial-oriented fourth quarter. Just taking apart the components on volume, Yahoo! sites and our affiliates experienced very healthy double-digit queries gains both sequentially from Q3 and also year-over-year and also both in the U.S. and internationally. So very strong queries across the board any way you slice it. On the RPS side, since country and product mix changes make it really difficult to review the trends in aggregate, I'm going to focus on the U.S. to hold the variables constant and just serve as one example of the trends that we're experiencing, which are fairly representative of what we're seeing around the world on a same country/same product basis, but RPS in the fourth quarter was relatively flat sequentially from Q3, which was what we expected, given the mix shift in terms toward more retail-oriented terms that tend to have a slightly lower PPC than some of the other categories with the different mix in other quarters. On our own network, we experienced stable RPS in the quarter on a sequential basis, but up strong double digits year-over-year, again, driven principally by our coverage initiatives. So relatively consistent trends from what we've been telling you in the last few quarters with the modest nuance of this being a strong quarter seasonally for queries but an adverse mixed quarter for the mix -- for the average PPC for the terms that grew the fastest in the quarter, if that makes sense.

OPERATOR: The next question comes from Lanny Baker from Smith Barney. Please go ahead.

LANNY BAKER, ANALYST, SMITH BARNEY: Thanks. Two questions. First, I was wondering, as you look at this year, can you just walk through the seasonality just, you know, directionally that you see in the two main ad businesses, say from the fourth quarter, first, second, third, back to the fourth, just so we can be prepared now to understand a bit better how user volume and in the Search business and I guess traditional marketer habits ought to affect seasonality. And the my second question is, I was wondering if you could compare the depths of usage on Yahoo! to the height of revenue productivity in the U.S. business versus the international? Give us a sense of how that 71 cent number on monthly ARPU shakes out U.S. versus overseas, would be very helpful.

SUE DECKER: Okay, in terms of the seasonality, I'm going to walk through it quarter-by-quarter in terms of what our expectation is and what we've learned. I'll say with a caveat up front, that, you know, we're early stage in the life of soft-sponsored search, and we're still as an industry and as a Company all still learning about the collective seasonality, which may change as new categories come into the mix and new countries come into the mix, but based on what we know now -- we'll start with branded. Q's 2 and 4 tend to be the strongest quarters and still Q's 1 and Q3 a little softer. On the sponsored side, Q1 tends to be strong and Q4 tends to be strong in query volume. So what that means when you add it together is that in Q1 we have some strength in sponsored and seasonal weakness in branded. The reverse situation in Q2. So one's strong in one week. Q3 they're both softer and in Q4 they're both strong, the quarter we just came off of. The only sort of caveat in the last year that we saw is Q3 actually was a little stronger than we expected, which we're not sure whether that says more about Q2 being a little weaker than what you might see on an on-going basis or if that's a slight change that Q3 is likely to see some seasonal growth in the future in queries. So hopefully that answers the seasonality question.

In terms of the second question, very good question. We have gotten to -- we originally outlined when we were at 35 cents per user, per month that our ambition was to double that, to get to 70 cents over 3 to 5 years. We've achieved that doubling on a much greater growth in the denominator of users than we expected, which is terrific and has really accounted for the massive increase in our revenue. How that varies by market really depends on the level of maturity in the market. U.S. is roughly a quarter of global users now. And so in a lot of the international markets we might be seeing more horizontal growth in users

Q4 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 18, 2005 Tuesday

than depth in monetization and in some of the more mature countries in terms of
users, the U.S. or Korea, or Japan, that equation might be slightly different.
So the overall average I give you is the doubling. We' probably see less pro-
gress on monetization in certain countries that are still expanding in users and
more in the countries that are slowing in user growth.

TERRY SEMEL: So one more question, please.

OPERATOR: The last question comes from Alexia Quadrani from Bear Stearns.
Please go ahead.

ALEXIA QUADRANI, ANALYST, BEAR STEARNS: Good afternoon, we continue to see
this impressive shift of traditional ad dollars moving on-line. Is there one
milestone ahead, perhaps the up front market when advertisers will be reassess-
ing how much money they'll be putting on TV versus other media. Where we may get
better data in terms of the rate of the shift or their allocation plans going
forward and secondly, just quickly, I may have missed this. Did you give us a
target for where you hope the international margins to be by the end of the
year?

DAN ROSENSWEIG: This is Dan, Alexia. I'll take the first one and then turn it
over to Sue for the international question. There is no particular milestone,
which is what makes this wonderful. Which is there's always a period of time
where marketers have to catch up with the user shift. So this user shift has
been happening for many, many years now. Yahoo!, as Terry pointed out, is going
to be 10 years old. So this has been happening at a very rapid clip. The growth
that Yahoo! has seen in users year-over-year is really phenomenal and it's hap-
pening around the world, so the growth of users will continue to grow faster
than the advertising growth for a little while. Having said that, as you've seen
from our numbers, that increasingly larger and larger percentages are coming on.
It's happening at a faster pace than it happened in other mediums over time, and
that's to our advantage. As a result of having the largest network, best quality
users, and the -- both ad capabilities, we're able to provide the best solu-
tions. So we've actually been gaining share against the rest of the market, we
expect to be able to continue to do that. So there is no particular milestone.
The up-front won't suggest anything for you, and the way we look at it is as
Terry pointed out, the number of advertisers that were in our top 200 have re-
mained with Yahoo! over the last year, almost all of them. And the bar to be in
the top 200 has grown significantly. So you're getting more advertisers. They
buy, they start off, they test, then they grow, then they buy bigger contracts,
and as Terry pointed out, they're using some of our advanced targeting capabili-
ties to reach more of our customers across the network. So no particular mile-
stone, more evolutionary than revolutionary.

TERRY SEMEL: This is Terry. I agree with what Dan said, I'd just add a word
or two. There's a tradition in advertising, and advertising bucks normally fol-
low audiences, so the audiences clearly have been moving in a very large and
rapid way in the last 3 or 4 or 5 years to the internet. Those numbers on a
global basis are increasing so dramatically that I think what Dan says is to-
tally correct; this is -- as other mediums continue to be either more expensive
and/or shrinkage of audience in those mediums, the internet per se is becoming a
more attractive place to absolutely have to include in your overall mix, if you
will, of your advertising budget, and a very good place to find your audience,
because they are spending a great deal and more and more of their time on the
internet as compared to perhaps some of the more traditional places. So, it's
moving and it's moving rapidly, and we anticipate that there's always a couple
of year lag between the audiences come first and the advertisers come after
them. And a very nice sense they're coming after them and we are happy recipi-
ents. Sue?

SUE DECKER: Okay, Alexia, on the question of did we provide a target for '05
international margins, we didn't provide a specific target, what we did say is
that our overall operating cash flow growth in '05 is expected to grow about 41
percent. That would lead our total corporate margins to go from 39 percent to 42
percent at the mid-point of the revenue ranges and the mid-point of the cash
flow ranges. So we are looking for margin expansion in 2005. We also said we

Q4 2004 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 18, 2005 Tuesday

thought that more of it would come from the international side, which exited the
year at about a 27 percent margin in the fourth quarter, up substantially from a
year ago at around 15 percent. Our U.S. margin exited the quarter at 46 percent,
up from about 39 percent a year ago. So our U.S. margin is very healthy by any
standard. We continue to operate toward that 50 percent incremental flow-through
that would cause our margins to tick up toward that level, but we really think
the most important incremental improvements from here will come from the inter-
national side.

TERRY SEMEL: We thank you all for joining us today. Have a wonderful evening
or afternoon, wherever you may be, and thank you all for being with us. Thanks.

OPERATOR: This concludes the Yahoo! fourth quarter 2004 earnings conference
call. Thank you for participating. You may all disconnect at this time.

[CCBN reserves the right to make changes to documents, content, or other in-
formation on this web site without obligation to notify any person of such
changes.

In the conference calls upon which Event Transcripts are based, companies may
make projections or other forward-looking statements regarding a variety of
items. Such forward-looking statements are based upon current expectations and
involve risks and uncertainties. Actual results may differ materially from those
stated in any forward-looking statement based on a number of important factors
and risks, which are more specifically identified in the companies' most recent
SEC filings. Although the companies may indicate and believe that the assump-
tions underlying the forward-looking statements are reasonable, any of the as-
sumptions could prove inaccurate or incorrect and, therefore, there can be no
assurance that the results contemplated in the forward-looking statements will
be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF
THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE
AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURA-
CIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES
CCBN ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED
UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS
ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE
APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECI-
SIONS. Copyright 2005, CCBN, Inc. All Rights Reserved.]

**LOAD-DATE:** February 2, 2005

Exhibit 26

FOCUS - 36 of 53 DOCUMENTS

Copyright 2005 Voxant, Inc.
All Rights Reserved.
Copyright 2005 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

April 19, 2005 Tuesday

**TRANSCRIPT:** 041905au.784

**LENGTH:** 9263 words

**HEADLINE:** Q1 2005 Yahoo, Inc. Earnings Conference Call - Final

**BODY:**

OPERATOR: Good afternoon, ladies and gentlemen, and welcome to the Yahoo! first quarter 2005 earnings conference call. At this time all participants are in a listen-only mode. Later, we will conduct a question-and-answer session. Please note that this conference is being recorded. I will now turn the call over to Mr. Paul Hollerbach, Vice President of Financial planning and Investor Relations. Mr. Hollerbach, you may begin.

PAUL HOLLERBACH, VP OF FINANCIAL PLANNING, IR, YAHOO! INC.: Thank you and good afternoon. And welcome to Yahoo!'s first quarter earnings conference call. On the call today are members of our executive team, Terry Semel, Sue Decker, Dan Rosenweig, and Jerry Yang. Before we begin, I would like to remind you that matters discussed in this call contain forward-looking statements and involve risks and uncertainties concerning Yahoo!'s expected financial performance, as well as Yahoo!'s strategic and operational plans. Actual results may differ materially from the predicted results, and reported results should not be considered as an indication of future performance. The potential risks and uncertainties include, among others, the Company's ability to compete with new or existing competitors, a reduction in spending by our marketing and premium services customers, and risks related to integration of recent acqui sitions. All information discussed in this call is as of today, April 19th, and Yahoo! undertakes no duty to update this information. Other potential factors that could affect the Company's business and financial results are included in the Company's annual and quarterly reports, which are on file with the SEC. Our final - - our financial release today includes some reclassifications of our revenue lines. You can find supplementary tables on our Investor Relations website that provide historical quarterly comparisons under the former and new format. On that call today, we will also discuss the non-GAAP financial measures in talking about the company's performance. Reconciliations of those measures to GAAP measures can also be found on our website. Terry and Sue have prepared remarks that should last about 30 minutes, and they will - - then we'll follow that with a brief Q-and-A session. And now I'd like to turn the call over to Terry.

TERRY SEMEL, CHAIRMAN, CEO, YAHOO INC.: Good afternoon. Yahoo! is off to a terrific start in 2005. We have raised the bar even higher in the first quarter. The pace of innovation and the appeal of our services has translated into deeper relationships with our users and continued growth for Yahoo! As Yahoo!'s relationships with its users grows stronger, the course we have chosen to build the world's largest global online network of integrated services is being further validated. Our intention is to continue capitalizing on our industry leading assets in order to deliver consistent and powerful growth over the long-term.

This is a very exciting time for us. We have a healthy business model, which is able to leverage our unique assets and take advantage of multiple growth opportunities. Our scalable technology platforms enable us to develop great prod-

Q1 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 19, 2005 Tuesday

ucts in an array of sectors, such as Search, Commerce, Media, and Communica-
tions. We are in an excellent position to take advantage of all forms of adver-
tising opportunities on the web. We appeal to a strong and diverse range of cus-
tomers, including hundreds of blue chip traditional marketers, hundreds of thou-
sands of small and medium-sized businesses, and hundreds of millions of consum-
ers. And we can extend these opportunities very, very rapidly on a global scale.
The opportunities before us have great long-term upside potential as rapid adop-
tion of the Internet, among consumers and advertisers, keeps growing, and Yahoo!
continues to form deeper relationships with both.

In the first quarter we reported revenue of $1.2 billion, our 8th quarter of
record revenue and up 55% from Q1 of last year. We achieved balanced growth with
contributions across the board, from our multiple lines of business and geo-
graphic regions. We also continued to demonstrate the leverage in our business
model, increasing our profitability, even while investing in and pursuing emerg-
ing opportunities. Operating income before depreciation and amortization in Q1
was $345 million, up 64% year-over-year.

And our acceleration of new and innovative products has resulted in more us-
ers on Yahoo!, consuming more services, and spending more time than anywhere
else on the Internet, which in turn enables Yahoo! to provide more value for our
users, our partners, and our shareholders. You've consistently heard me say that
great products lead to a great business. We ended the quarter with approximately
372 million unique users, of which 176 million are active registered users.
While we continue to extend our reach to new users, we are also becoming better
at serving the growing needs of our existing users, which is the driving force
behind our financial success. That's important, because while early Internet
success was driven by sheer numbers, we believe we've already begun the next
phase, which will be driven by depth of usage and it's beginning to pay off big
time. Our paying subscribers ended the quarter at 8.9 million unique paying re-
lationships. That's up 500,000 from the previous quarter and up approximately
3.1 million subscribers year-over-year. This, of course, is the fastest growing
subset of users on the Yahoo! network. How's this? In the month of March, Yahoo!
consumers utilized a record 100 billion page views; that's billion. Even I have
to remember that. That represented a 34% increase in daily average page views
year-over-year, as more people utilized more services and consume more content
on Yahoo!.

We've also seen noteworthy lift in our brand. According to a proprietary
study by AC Neilsen, Yahoo! has significantly higher awareness than the other
major Internet brands. In fact, Yahoo!'s unaided awareness in the U.S. increased
6 percentage points during this first quarter. Finally, though we are already
the largest site in terms of users, and total time spent, we continue to in-
crease our share in both. And Yahoo! now represents 13% of the total time spent
online. Helping us achieve this audience growth and engagement is some of the
most innovative thinkers in the world, who apply cutting-edge technology to cre-
ate the most relevant products for our users. Within Search, we were the first
to introduce comprehensive video search, which has proven to be very popular.
And YQ, a first-of-its-kind, contextual search technology that delivers related
search results on the page you are reading. These are just two of the latest
Search innovations that are getting widely recognized. In fact, Search Engine
Watch recently awarded Yahoo! Search its highest honor for outstanding search
service. Given that we've only been in the search business for one year, this is
quite a achievement, and one in which I would really like to congratulate our
entire team.

We greatly increased the accessibility and visibility of mobile services to
Yahoo! users, introducing Search, local and games to mobile devices, and an-
nouncing our first relationship with a mobile device manufacturer to offer pre-
loaded versions of Mail and Messenger on all new Blackberry devices. And we re-
defined social media through a number of activities, including the beta launch
of Yahoo! 360, that combines the power of blocking, sharing and communicating
into a innovative new service that keeps users connected to the people they care
most about. We also extended our RSS publishing platform to Yahoo! News and to
mobil devices. And we're really thrilled to have acquired Flicker, all of which

Q1 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 19, 2005 Tuesday

create additional value for our users by tying together individuals with the
people, community, and actions they value the most. Of course, these are just a
few of our great product achievements which helped drive our business. Looking
ahead, I'm even more excited about the many new products that we actually have
in our current pipeline.

So let's turn to marketing services. Building the best quality services to
attract the world's largest and most engaged online audience has enabled Yahoo!
to create what we believe is the best advertising environment on the Internet
today. Our marketing services business delivered just over $1 billion in revenue
in the quarter. Representing 54% year-over-year growth, as a result of strong
contributions by all forms of advertising. Yahoo!'s brand advertising offerings
continue to extend our partnerships with leading marketers in every category. We
are the industry leader, because of our reach and relationship with advertisers'
key audiences, our unique targeting capabilities, vertical industry expertise,
and ability to provide effective consumer insights that can be turned into ac-
tionable marketing campaigns. The Consumer Packaged Goods and Financial Services
categories experienced their best sales quarter ever on Yahoo! this past quar-
ter. We also experienced a major increase in demand for rich media advertising
as more advertisers take advantage of the growth of broadband and the popularity
of our media content. We continue to earn deeper participation in brand adver-
tisers' marketing budgets, as those that they - - that have already made real
investments in online advertising with Yahoo! are renewing and expanding, and we
see that same pattern from those marketers that are just starting out. This is
an important trend, as it really demonstrates the growing impact of Internet
brand advertising and Yahoo!'s global leadership in this space. Sponsored Search
is a equally exciting and huge opportunity for us. Yesterday we officially re-
branded Overture to be called Yahoo! Search Marketing and will bring together
our Sponsored Search and other self-service offerings to make it even easier for
marketers to take advantage of all of our services.

We believe Yahoo!'s tremendous brand equity will help bring the next genera-
tion of marketers to the Internet. To make that happen, we continue to invest
more in performance and ease of use in our existing search marketing products.
For example, we have improved our matching capabilities which create more oppor-
tunities for marketers to get their messages in front of consumers, at the mo-
ment they are interested, increasing coverage of ads and providing more ways for
advertisers to get high quality clicks. We also expanded our International
Search marketing business, launching in Hong Kong, increasing our capabilities
in Korea, and starting in market tests in China. In addition, we announced an
agreement to acquire TeRespondo, Brazil's leading provider of performance-based
online marketing solutions. Our International Search marketing teams have in-
creased advertise accounts and the number of new distribution deals, which has
contributed to the growth of Yahoo!'s overall international revenue. We believe
there is great upside for our existing sponsored Search offerings, given how
rapidly marketers around the world are embracing Search marketing and how effec-
tive it is proving to be. We also believe there are new opportunities for us
around content match and publisher focused products, which are currently being
tested and will be introduced to the marketplace very shortly.

Looking at our overall marketing services business, we believe we are in a
position of great strength. Today, some of the largest advertisers spend roughly
2 to 4% of their marketing budgets online, while consumers are spending 15%, and
by the way, that number continues to grow, of their media time on the Internet.
As marketing dollars continue to follow consumers, we are uniquely positioned
with a large and diverse audience, industry-leading geographic and demographic
targeting capabilities, and opportunities to open up new markets and introduce
new formats.

So in conclusion, this is a very exciting time for Yahoo!. Underscoring our
belief that the Internet will be a driving force in the revolution, from mass
media to my media; we're providing services around the world where users can
find, create, share, and transact with the information, content, and people they
want. It is our vast array of assets, effectively woven together, using the pil-
lars of search, community, personalization, and content, that is creating

unique, sustainable value for our consumers, and increasingly effective business opportunities for our marketing customers. In short, we have established a positive cycle of innovation, breadth and depth, and improved and expanded modernization opportunities that we believe positions us well for the future. The key metrics that underpin our business continue to grow at a very healthy pace, and we believe we have a terrific future ahead.

I'll now turn the call over to Sue Decker, who will review our key financial highlights.

SUE DECKER, CFO, EVP, ADMIN., YAHOO INC.: Thanks, Terry. And thanks to all of you for joining us today. We're off to a great start in 2005. The assets that we've assembled and are integrating, along with our ongoing commitment to internally develop great products and services, are collectively allowing us to participate in some really extraordinary growth opportunities. While this quarter certainly illustrated this alchemy even more strongly than previous quarters, we are well aware that our challenge is not simply to deliver strong returns for one year or two years, but to make the appropriate investments and capital allocation decisions to build value over the long-term. This would not be possible if our source of strength were a single product, or if we were reliant on a narrow customer base. We still have a lot of work to do. But we feel we are well on our way towards fulfilling this ambition for shareholders. Before we review Q1 highlights, let me start with two housekeeping items. The first item relates to our lines of revenue.

As indicated last quarter, we've reclassified previously reported listings revenues of marketing services, as business models have evolved in a way that makes the distinction between these lines less [ inaudible ] beginning this quarter we also reclassified certain revenue for digital entertainment services, from marketing services to fees, which better refines our revenue sources with the current classification definition. Second, we had several non-operating gains in the first quarter of both 2005 and 2004. In Q1 '05 Other Income includes $26 million pretax from gains on the sale of a few investments and a couple of settlements. In the year ago quarter, revenue operating cash flow and free cash flow benefited by $10 million from unredeemed and expired points related to a loyalty program. We have excluded these items from both of our quarters in the supplemental statements and from the comments that follow. On this basis, our earnings for the quarter were $189 million or $0.13 per diluted share, up about 100% from a year ago.

Let's talk now about the highlights from the quarter. Starting with free cash flow, which we consider to be our most important financial message[ph]. As a reminder, we define free cash flow as cash generated from operations, which includes cash costs for taxes and changes in working capital, less capital spending. Free cash flow reached a new quarterly record, coming in at $318 million, up 64% from a year ago, and taking our trailing 12 months free cash flow to nearly a billion dollars. This represented 39% of revenue ex-TAC and a conversion rate of 92% of operating cash flow, a testament to the exceptionally high cash productivity of our business model. One very interesting relationship is to compare our earnings to our free cash flow. Q1 free cash flow was 68% larger than GAAP earnings, whereas for most companies, free cash flow is less than earnings. As compared with many companies, we continue to benefit economically from large tax loss carry forwards even though our earnings are fully taxed for GAAP purposes, and from relatively limited requirements to invest in our balance sheet to grow.

Let's look now at what we did with that cash, and what happened to our balance sheet. Our ending cash and marketable securities balance was $3.9 billion, up 110 million since last quarter. Please note this does not include the 751 million in investments in equity securities, which are not considered strategic to the company and, therefore, will be sold over time as appropriate. In addition to our free cash flow, we had several other sources of cash, which collectively amounted to 172 million. These were primarily from the proceeds from the exercise of employee stock options, and the receipt of cash back from previously initiated structured share repurchases, on which we earned an annualized rate of almost 19%. We invested most of this increase in cash, or 484 million into three

Q1 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 19, 2005 Tuesday

transactions that we believe will yield investors substantial returns. First, we repurchased $165 million worth of Yahoo! stock at an average price of $33.60 per share. Second, we entered into a net of 150 million in structured stock repurchase transactions, which mature in three [inaudible] through August of 2005. At the final maturity, depending on the price of our stock, we will either have repurchased up to 5.3 million shares or have received up to our initial $150 million investment, plus a premium through this transaction. Third, we continue to acquire companies. To this end, we spent approximately $90 million in Q1, of which 54 million was financed with cash.

Looking forward, we plan to continue to use our strong balance sheet and free cash flow to enhance value for shareholders through acquisition, investments, and share repurchase activity as appropriate. Consequently in March of 2005, our board of directors authorized the repurchase of $3 billion of our stock over the next five years. The timing of this authorization corresponds to the completion in Q1 '05 of the $500 million previous authorizations that occurred four years ago. The thinking behind the stock repurchase authorization was that given our large cash position and our growing free cash generation, we currently believe we have sufficient cash resources to cover a wide range of operating needs and most acquisition requirements. Consequently, our intention is to invest excess cash in our own stock and in transactions that help us to monetize our stock's volatility. We believe these transactions will generate much higher returns than if we were to keep the cash on our balance sheet, creating value for shareholders.

Moving now to the P&L, our overall summary is that, consistent with our financial strategy, we are successfully supporting a massive and growing base of more revenue productive users, without a commencerate increase in our costs, allowing us to exceed both our revenue and operating cash flow expectations. Specifically, first quarter revenue ex-TAC came in at $821 million, advancing 52% over year ago figures and up 5% from Q4 '04 despite normal adverse seasonality in the brand side of the marketing services business. The 52% growth, broke down into 44% growth in underlying organic revenue, surprisingly strong considering tough comparisons against year ago gains and 8% related to acquired companies owned for less than one year. We are particularly pleased with what this revenue growth says about our deepening engagement of users. Not only is user breadth still growing rapidly, up 28% organically year-over-year, but depth is also increasing as measured by page views. Our revenue growth is outpacing both of those metrics due to the natural lag effect in monetization versus consumer engagement with the new medium.

Let's look now at the revenue breakdown by lines of business. Global marketing, our largest service, generated $672 million of revenue ex-TAC for the quarter, up 50% year-over-year. Excluding acquisitions, marketing services grew a healthy 43% on a organic basis. Representing an acceleration from the full year 39 to 40% growth rates that we experienced in both 2003 and 2004. This strength was nicely balanced across our various product offerings to advertisers, from paper performance to branding, and also across our vertical product categories.

Let me give a little color on our two major components of our marketing business. Since we already do business with most of the nation's largest marketers in the U.S., we are especially focused on depth over breadth; consequently, the key drivers in the brand side of our non-search marketings growth is revenue per advertiser. Last quarter we indicated to you that our revenue from our top 200 U.S. advertisers increased 39% year-over-year. And I'm happy to report Q1 realized an acceleration over that growth rate. What's most exciting about this is just how much more they can spend, not only in the U.S., where many of them spend just a few of their - - percent of their budgets online, but also internationals. A big focus going forward will be to help these large marketers begin to use the Internet more extensively outside the U.S., where they have large ad budgets but are underrepresented on the Internet in comparison with the U.S.

On the Sponsored Search side, growth is a function of both increasing the number of advertisers and of rising revenue per advertiser. In a nutshell, we're seeing broader and deeper industry adoptions of paid search. Advertisers are becoming more comfortable with the medium, and in turn, they are expanding their

Q1 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 19, 2005 Tuesday

overall commitment. This is particularly true for those advertisers that are al-
ready among the largest and most sophisticated users of Sponsored Search, a very
good indicator of the health of the business. At this stage of the industry's
development, we think these customer trends are more reliable indicators of the
health of the business than exactly how much revenue per average search yields.
This is because the averages are being influenced by mix issues across multiple
dimensions. For example, the large number of new advertisers that are joining
the network often buy an ever expanding mix of keywords that may differ from the
run rate mix. As well, new search inventory is rolled out into new countries and
new formats, many of which have different pricing characteristics from the core
base. Finally, the mix of keywords sold in any one quarter may vary for seasonal
reasons and carry different average prices. The net effect of these factors is
that most of the incremental funds are currently being allocated more towards
inventory versus higher priced inventory.

Turning to fees, we produced $149 million of revenue, up 61% from a year ago.
The primary driver of this business line is our premium offerings in which con-
sumers and businesses pay us for our services. We exited the quarter with ap-
proximately 8.9 million paid relationships, up more than 53% from 5.8 million a
year ago. This was actually somewhat better than we expected considering the
normal seasonal loss of most of our Fantasy Sports [inaudible] from Q4 to Q1.
Last quarter we indicated that we expected to grow our paid relationships to 11
to 11.5 million by year-end 2005. Based on our first quarter experience, we now
believe we're likely to come in closer to the high end of that range, possibly
approaching 12 million, and we expect them to produce an RPO of 3 to $4 per
month. Turning to revenue by geographic segment, top-line growth remained very
robust internationally, up 105% ex-TAC from the year ago quarter and boosted in
particular by strong secular growth in Sponsored Search and the final quarter of
incremental contributions from Telcu[ph]. On an organic basis, and holding cur-
rencies constant, our international revenue ex-TAC increased 67% in the quarter,
almost twice the strong 37% increase domestically. Consequently, international
revenue, ex-TAC represented 25% of our total revenue in the quarter, up over 600
basis points from a year ago, and consistent with our expectations.

Let's turn now to some of the details behind our strong and growing profit-
ability. Specifically, operating cash flow came in at $345 million, up 72% year-
over-year, and well above the high end of our business outlook. Consequently,
global OCF margins were 42%. Somewhat above what we planned, considering the
seasonality in the brand side of the marketing business. The reasons for this
higher than planned profitability were twofold. Our top line was better than we
expected in all of our business lines, and the flow-through on this operating -
- flow through on this increase caused operating cash flow to be 45 million
higher than the midpoint of our Q1 business outlook range; and, secondly, about
10 to 15 million in costs, and that we expected to incur in Q1 are now planned
for Q2. Specifically, we delayed our music launch from our original plan of late
Q1 '05 in order to add various product features that should lead to an even bet-
ter user experience. In addition, we had planned for higher taxes on option ex-
ercises than actually realized. As you know, the major driver of margin leverage
is compensation cost, our largest expense, which continued to yield productivity
improvements.

Head count into the quarter at just over 8,000, up above 400 from Q4 '04 lev-
els, most of this was attributable to planned organic investments in key talent
in various products and infrastructure, collectively designed to improve our
user experience, strengthen our market position, extend new verticals, and sup-
port our growing businesses. As a result, average annualized revenue ex-TAC per
employee, stood at almost 419,000 in the quarter, up 11% year-over-year. We're
very pleased with our progress on this metric as an indicator of the productive
and strategic allocations of resources within our properties. The observation
that we have grown our employee base by over 35% over the last year, investing
in and acquiring key talent to enhance our consumer offerings, while still see-
ing improvements in productivity and margins, is a testament to the network ef-
fect on our model and our focus on key priorities.

Turning to profitability by geographic segment, our Q1 operating cash flow margins on revenue ex-TAC in the U.S. were 44%, while our international operating margins came in at 37%, both benefiting from strong business trends. The higher than expected international margins reflects the observation that Search currently represents a larger percentage of our revenue overseas than it does in the U.S. This international mix issue and its positive effect on margins was particularly visible in Q1, which is seasonally stronger in Search. Looking forward, we plan to continue to invest in opportunities to gain market share internationally, and we expect the full-year margin in international to be in the mid-30% range. A large improvement from the 25% level of 2004 and consistent with our expectations detailed last quarter.

Let's turn now to the business outlook, which we are upwardly revising due to better than expected results. Starting with the second quarter, we expect revenue ex-TAC to be in the range of 855 to $895 million, up 44% from a year ago at the mid point and reflecting broadly similar seasonality compared with Q1 in marketing services. However, the brand side should be seasonally stronger, and the Search business comparatively weaker, as compared to Q1 where we saw the reverse situation. About 200 basis points of that growth is likely to be driven by acquired companies, principally, Musicmatch.

Turning to profitability, at these revenue levels, we expect to operate within an operating cash flow range of 340 to $360 million in the second quarter, up 50% from a year ago at the midpoint. Our Q2 business outlook includes the one-time cost associated with the launch of our new music service, currently planned for an early summer release. For the full year of 2005, we expect revenue ex-TAC to range from 3 billion 565 million to 3 billion 715 million dollars, up about 41% from year ago levels at the mid point, of which acquired companies are expected to account for about 300 basis points.

Turning to our full year 2005 operating cash flow, we expect to operate in a range of 1.5 billion to 1.575 billion, representing growth of 50% year-over-year and approaching our 50% flow-through goal for incremental revenue conversion. If we achieve this profitability on the previously discussed revenue ex-TAC outlook, our overall margins will expand from 39% in 2004 to 42% in 2005, with most of this margin expansion coming from our international operations. Our domestic operations are now approaching an operating level that seems to strike close to the right balance between the appropriate level of current profitability and ongoing investment and future growth relative to our business model.

Last, but not least, for the financial outlook, we are upwardly revising our 2005 pre-cash flow range from a little over $1 billion to a range of 1.1 to $1.175 billion, up 34% from a year ago at the midpoint and representing a OCF flow through of approximately 74%, consistent with our longer term target range of 60 to 80%. This outlook contemplates capital spending for 2005 of approximately 355 to $380 million, about 24% of operating cash flow and consistent with the 23 or 25% range in which we've operated for the last three years. We believe this range both allows strong free cash flow conversion and also proactive investments to drive our product [inaudible ] To sum up, as we take stock of our financial vital signs for Q1, we feel we are off to a great start. Just one quarter into the year, we're raising the midpoint of our outlook for revenue ex-TAC by $175 million, and we're raising the midpoint of our OCF outlook by nearly $100 million. We see these upward revisions as validation of our belief that we are well-positioned to take advantage of the best growth opportunities on the web. In addition, we are really seeing the financial waterfall of leverage in our business model at work. Our full year 2005 outlook suggests a third consecutive year of growing more than 30% in organic revenue ex-TAC, delivering close to 50% of that to the OCF line, and yielding more than 70% of that to the free cash flow line.

Last, and really the best part of the story, is that while Yahoo! is continuing to extend its reach to new users, we are also becoming better at serving the needs of existing users, by listening to them, and investing in better and more relative products and services. This deepening engagement is really the magic that is attracting advertisers to our global platforms and users to our premium

Q1 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 19, 2005 Tuesday

offerings. We expect this dynamic to continue to occur, creating sustainable growth for the foreseeable future.

With that, I'd like to turn it back to Terry.

TERRY SEMEL: Thanks, Sue. Sounded great. I'm excited. As I approach my fourth anniversary as Yahoo!'s CEO - - CEO, I see a Company loaded with great talent, passion, focus, and the drive needed to fulfill all of Yahoo!'s potential. The opportunities ahead have never looked more exciting, and I honestly still believe that we've only just begun. So with that I'd like to turn it to the audience for questions.

OPERATOR: Thank you. [OPERATOR INSTRUCTIONS] The first question comes from Safa Rashtchy from Piper Jaffray. Please go ahead.

SAFA RASHTCHY, ANALYST, PIPER JAFFRAY: Good afternoon. And congratulations on a great quarter. Hello?

TERRY SEMEL: Thank you.

SAFA RASHTCHY: Okay. I was not sure if I was getting through. Just a couple of quick questions, on the Search side, could you give us some color as to what is happening with the broadening of the customer base? Specifically is there a shift away from the online merchants and Ecommerce advertisers to off-line? If so, to what degree that played out or helped with the strong showing that you had. And second, on the Music side, if you could just give us some idea of what kind of platform are you hoping to launch with Music, whether it would continue to have subscription or downloads, or what role do you see for Yahoo! to play Music a year or so from now? Thank you.

SUE DECKER: Okay. Safa I will start with your first question and then Terry is going to take your second question. On the Search side, we are seeing continued expansion in both numbers of advertisers and also revenue per advertiser. The category is still primarily driven by Ecommerce companies, companies born of the web. But we are seeing more participation from OEMs and off-line companies; both OEM, major autos, and other manufacturing companies, as well as off-line retailers. So that's been an evolution over time. It is really just getting started. And when you consider the large direct-marketing budgets those companies have, we think there's a lot further to go.

TERRY SEMEL: And so, hi. It's Terry, on the Music launch, rather than me kind of pre-announce the launch, and therefore give you all the details, please accept the premise that Yahoo! has been and continues to be a major factor in online music. We have an enormous audience that spends a great deal of time on our site, and the - - the products that we will release will be all encompassing, and hopefully, we'll break some new ground as well. So look forward to it soon.

OPERATOR: The next question comes from Mary Meeker from Morgan Stanley. Please go ahead.

MARY MEEKER, ANALYST, MORGAN STANLEY: Thank you. You both talked about deeper engagement on the site. You talked about the strong page-view growth. Could you give us a little insight into exactly what users are doing more of, and if you could give us any insight into how many My Yahoo! users you might have, that would be great. Thank you.

DAN ROSENWEIG, COO, YAHOO! INC.: Okay. Hi, Mary, it is Dan.

MARY MEEKER: Hi, Dan.

DAN ROSENWEIG: Well, the good news is what they were doing, they are doing more of. So we'll just start with that. Which is more of the - - if they were using mail, they are using more of mail, if they were using news, they are using more of news. So just the ability to have it always on and always available, the quality of the site has increased their usage. In addition to that, what is really fascinating is we begin to integrate the products in ways that really advantage the user. Let them program for themselves, and allow them to program out. They are using more and more of each of their services and more services.

Q1 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 19, 2005 Tuesday

So the average number of services they are using is going up. They are going deeper with each one that they have and then more. In terms of My, we are not going to communicate the number of My users that we have, but if you look at the independent numbers that the third parties put out there, you can see we are continuing to grow that base and actually distance ourselves from anybody else in that category. So the launch - - the relaunch of My Yahoo! has been a big success, particularly with RSS and the rest.

OPERATOR: The next question comes from Youssef Squali from Jefferies & Co. Please go ahead.

YOUSSEF SQUALI, ANALYST, JEFFERIES & CO.: Yes, thank you very much. good afternoon. Two questions for Sue. it looks like international and Search Network, I guess, particularly on the international side as well, were very, very strong this quarter. Your domestic EBITDA[ph] was down sequentially to 270 from 278. Yet your revenues were up slightly. Can you explain what happened there? And then your TAC was up 20% sequentially. Well - - when the gross revenues were up only 9%. Can you also - - is that primarily driven by, again, Search international which may carry a higher TAC? Thanks?

SUE DECKER: Okay, thanks, Youssef. Let me try to address those as asked. First international and Search were very strong. Our overall international business is strong, and Search played an important role in that as we are becoming - - there is more and more of our markets that are rolling our [inaudible] and are also beginning to monetize. In terms of the margins in the U.S., what you see is the normal seasonality of margins from prior quarters, and the brand business, as you would expect, quarter-to-quarter is down in Q1, as we planned. So that's what's affecting the - - the U.S. side. On the TAC side, yes, the overall TAC expenditure was up just over 20% from last quarter, and that reflects both very strong growth from our various partners, as well as a modest increase in the TAC rate, which is very consistent with what we've been expecting in a very competitive marketplace. We do not break out the Search or branded mix as you know but were really pleased with the performance of both businesses in the quarter.

OPERATOR: The next question comes from Alexia Quadrani from Bear Stearns. Please go ahead.

ALEXIA QUADRANI, ANALYST, BEAR STEARNS: Hi, on -- on the branded side, just one question, traditional media clearly is stepping up their online efforts as their own off-line properties struggle with accelerating audience erosion, and these the TV and newspaper companies have benefited from cross-selling, or can benefit from cross-selling their off-line properties online. Are you - - could you maybe talk about the competitive dynamic you are seeing on the branded side? Are you seeing more competition from these traditional media companies with an online presence.

DAN ROSENWEIG: Hi, this is - - this is Dan. I'll take that one. Clearly there is a - - there is a movement from off-line to online with advertisers, as Terry mentioned. It's still very small, 2 to 4% of the budget, so it's not really competing for the money that exists. It is helping bring more money onto online to begin with, and so that is going to advantage Yahoo!, because as the leading marketplace for advertisers both branded and sponsored we have an opportunity to create more benefits from then than anybody else. In addition to that, there is very few sites that have the size, the scale, the technology platform to actually be able to deliver in a very meaningful way for these marketers,and so Yahoo! is really in a great position to benefit from all the marketing that comes online, and we continue to believe we're taking shares, so we think that's good news.

OPERATOR: The next question comes from Anthony Noto from Goldman Sachs. Please go ahead. Please go ahead.

ANTHONY NOTO, ANALYST, GOLDMAN SACHS: Thank you very much. I was wondering if you could comment a little bit on rich media inventory that are you selling now, vis-a-vis a year ago, or maybe even versus a fourth quarter, in terms of the percentage of inventory that advertisers are selling that is rich media related, and then I have a follow-up. Thanks.

Q1 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 19, 2005 Tuesday

DAN ROSENWEIG: Yes, this is Dan again. Obviously rich media is becoming a much more significant part of the overall campaigns that advertisers are buying. We have multiple format, multiple pricing, multiple capabilities to be able to deliver to sort of meet any of the needs online, in rich media, increasingly whether it is video content or the use of other technology within banners other formats that Yahoo! has created, is becoming a much more significant percentage, add that on to the targeting capabilities and we are seeing increased results on behalf of advertisers and increased relevancy for users. And so it is a really big positive for the Internet and for Yahoo!.

TERRY SEMEL: Next question please.

OPERATOR: Thank you. The next question comes from Lauren Fine from Merrill Lynch. Please go ahead.

LAUREN FINE, ANALYST, MERRILL LYNCH: Thank you. A couple of quick ones, I'm wondering if you could give us any update on the Verizon and SBC] or the Verizon partnership and the SEC [ph] extended alliance and whether some of the uptick in paid relationships, you know, can be directly attributed to that. And then also on the international side, could you give us any rank ordering of sort of where you saw - - which countries you saw the fastest growth in? And then third, do you see any near-term opportunity in working with advertisers on combining their search and branded efforts as they look at using the Internet?

DAN ROSENWEIG: I'll start and then one of my colleagues pick it up, because I'm not sure that I remembered all the pieces of your question, frankly. Okay, first, on the - - on - - on our Teleco relationship, bear in mind that our Verizon relationship, which is going to be wonderful, really does not launch until this summer. So we continue to produce the product if you will, and get ready for a summer launch and we're very, very excited about that. On the SBC side, and frankly Rogers, we continue to go deeper with our partners. Our - - our - - our deals and our needs, as broadband continues to grow, gives us an opportunity to do even more with them. So we are spending a good deal of our time helping to build for the future, thinking through other areas of distribution for them with DSL. And we're very excited about.

SUE DECKER: On the - - on the country side, probably wouldn't want to get into the specific countries, we had very strong growth both in Europe and in Asia. And really - - are really prioritizing a handful of countries as the most important that we're investing in.

DAN ROSENWEIG: On the last question, which is sponsored Search and branded working together, it works together extremely well in many ways. First of all, it creates a much more fertile environment within Yahoo! for advertising overall, and users benefit from it and marketers benefit from it. And second of all, as Terry mentioned earlier, we're seeing an increasing amount of large top 200 advertisers using all forms of advertising on the Internet from traditional branded, rich media, and sponsored Search. So, yes there is an opportunity for us to help them understand how to benefit from the Internet and put together unique business opportunities and marketing campaigns that allow them to do branding, to do direct marketing and to do influence marketing and so it has been a really big positive for us.

OPERATOR: The next question comes from Jeetil Patel from Deutsche Bank. Please go ahead.

JEETIL PATEL, ANALYST, DEUTSCHE BANK SECURITIES: Thank you very much. A couple of questions. Can you just give us - - if you look at last year first of all , branded grew sequentially from Q1 to Q2, obviously off of a tougher Q1 comp in terms of how strong it was, you know, maybe in the low to mid-teens percentaged sequentially, but if you look at normalization this past Q1, is it safe to assume that Q2 could be up in the low to mid-teens percentage, which is typical as you go into more of a seasonally stronger branded ad quarter or their dynamics that may actually push that number even higher in terms of pricing and kind of capacity constraints from a premium inventory standpoint? Second question is as it relates to the quarter, you never - - you haven't commented, I guess, on the old listings business, but if you kind of look at the mix of the business, it

Q1 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 19, 2005 Tuesday

may - - is it safe to assume that that business was sequentially down versus Q4 levels as you ramped down both the - - you know, the overall fees business and the listings business from the - - from the seasonal strength of Q4?

SUE DECKER: Okay, [inaudible] I'm going to take these. First, on the brand question. A very nice try, but I'm not going to break out the brand piece from the rest. But I will say that, when you look at the guidance that we provided for Q2, where it is up 42 - - 41% at the midpoint, and already it's already 5% at the high end. So we're actually expecting in Q2 relatively comparably strong growth as we saw in Q1, but we do expect the mix to differ in margin services to be consistent with what you said, that branded would be seasonally stronger, and by comparison with the seasonal strength in Q1 for Search, we would expect Search to be seasonally weaker. And those two factors are broadly offsetting and will create, at least in our expectations, standing here today, a fairly strong overall advertising quarter. On the listing side, actually the overall listings numbers were, if you look at the overall category, look at HotJobs in particular, it was up double digit year-over-year, roughly in line with what we have seen in the last couple of quarters. No material different trends from what appeared in the listings line in previous quarters.

TERRY SEMEL: Next question, please?

OPERATOR: Your next question comes from Douglas Anmuth from Lehman Brothers. Please go ahead

DOUGLAS ANMUTH, ANALYST, LEHMAN BROTHERS: Thank you. Can you talk in more detail about your efforts in monetizing Search better going forward? Do you expect to adjust the Search platform to be based more on relevancy? And when might this take affect. And then in terms of thinking about the bottom line impact, how much investment is really needed, specifically, towards this initiative around product development and engineering head count? Thank you.

DAN ROSENWEIG: This is Dan. I'll do my best to answer that. Obviously we're not going to speak specifically about the amount of investments, but we know what to do. And we know that there's an opportunity to continue to improve relevancy and matching and the way we deliver it and pricing. We're investing in all of those areas. It's already been improving, the business that we're in today around the world. And so we imagine to continue to make these investments to a very large payoff as we look forward. So it's a great platform where we think we can reinvest in the current businesses that we have and extend the platform into new areas, so it is a very worthwhile and positive investment.

SUE DECKER: I'll just add two things to that, which is that our first priority was really around getting the Algorhythmic business rolled out, integrating all these companies, getting it going, which we've just been doing for a little over a year. It has been part of the operating plan for a number of months to address monetization and other ways to increase and enhance revenue through affiliate partnerwork et cetera, those are all on the road map, as - - as Dan pointed out. All of the costs associated with those are contemplated in our current outlook and in our capital spending guidance.

TERRY SEMEL: Thank you. Next question, please?

OPERATOR: The next question comes from Imran Khan from J.P. Morgan. Please go ahead.

IMRAN KHAN, ANALYST, J.P. MORGAN: Hi, guys. Two questions. In terms of your page views, was very impressive. I was wondering if you could talk a little bit about your initiative to increase the content that could actually lead to higher page views growth. And secondly, you know, in terms of Mobile, you have been talking a lot about Mobile initiatives and it seems like that will bring the next network effect. Can you talk a little bit about your mobile initiative and when can we expect them? Thank you.

DAN ROSENWEIG: This is Dan. I'll - - I'll start in the categories of - - of - - of page view growth and content initiative, talk a little bit about Mobile, because they're all intertwined for us. So we have a strategy of give users what they want, where they want it, when they want it and how they want it. And so

for us and for our users, content takes on a very broad platform. We're the best aggregator in the world. We have the tools now, examples like 360 and other places through the site, My Yahoo! where social media is really beginning to taking off and a major role in terms of allowing users to be able to publish to themselves what they want and publish to others. And so it is a very big opportunity for us to combine third party content, user generated content and then content that we can create for them around entertainment areas together, and really extend our content lead on the Internet around the world. So that is a very big opportunity. You're beginning to see the results in terms of the page view growth. A hundred billion page user marks really represent users engaging deeper with what we provide. The Mobile environment, as I said, part of our strategy is to give them what they want when they want it, where they want. Where they want it is quite often mobile, around the world in particular, large percentages of Internet users really access through the mobile device rather than through the PC. We see that trend growing around the world, and in the U.S., and can you see all through the Yahoo! site the ability to take Yahoo! services with you. Our view is rather than rather than recreate the wheel and try to create environments where users have to do things differently in the mobile environments, rather we're trying to give them the opportunity to do things they are already doing in the tens and hundreds of millions on the mobile environment. We think it is a big opportunity for us. We have relationships with all the major carriers around the world and we continue to see more and more Yahoo! content to utilize and available through carriers and on the phones.

TERRY SEMEL: Thank you. Next question, please.

OPERATOR: The next question comes from Michael Gallon from CIBC World Markets. Please go ahead.

MICHAEL GALLON, ANALYST, CIBC WORLD MARKETS: Great, thanks. On the national advertising scene, one thing we're seeing in the off-line world, particularly in the last couple of months, is we're seeing some of the bigger advertisers, particularly retail, but also the auto and CPG[ph] categories. Really shifting money away from broadcast networks, more towards cable networks, mainly just from a more attractive ROI perspective. Given that Internet is probably the most attractive ROI medium right now, have you seen any change in trends particularly in the last couple of months as some of these dollars have been shifted around from the big advertisers? Thanks.

TERRY SEMEL: Yeah, hi. It is Terry. We really have a hard time knowing if the dollars are coming from some place else. But what we do know, and we have been saying for at least a year now, and it certainly would include this past quarter as well, the major advertisers all kind of put their little toe in the water, about two years ago, 18 months ago and started going deeper and deeper. And so that is a - - an ongoing theme. We see that with many, many of our largest advertisers, people who are trying it two years ago, got the gist of it a year ago, started to use it more and more as part of their overall marketing scheme, still a small piece of their overall budget but ever growing so the - - the learning process is behind most of the large companies. And - - and almost to a company announced to step up and utilize the Internet, utilize Yahoo! in a better way for their overall marketing campaign.

OPERATOR: Your next question comes from Heath Terry from Credit Suisse First Boston. Please go ahead.

HEATH TERRY, ANALYST, CREDIT SUISSE FIRST BOSTON: Great, thanks. You were talking a little bit about the fee-based revenue coming in better than you had expected, and Terry was talking about the growth that you had in paying users. Can you give us an idea of what was driving that growth? And how the segment - - how the users are breaking down now, along the various possible ways that they could be paying you?

SUE DECKER: Sure. The - - the growth rate was better than we expected. We had said last quarter we thought we would be flat to modestly up Q to Q, and we were actually up 500,000 subs. The reason we expected only modest growth was just normal seasonality with the Football Fantasy subs coming off in Q1, but we are

Q1 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 19, 2005 Tuesday

continuing to see access as the overall - - the biggest category, continuing to grow very, very well, really across the board. And we also saw particularly strong growth from small business this quarter. And - - and a number of other services. So we're - - we're feeling really good about - - about that category as a whole, and overall our pre-trend[ph] is holding up very nicely as well.

TERRY SEMEL: So this would be the last question, please.

OPERATOR: Thank you. The final question comes from Mark Maheney from American Technology. Please go ahead.

MARK MAHENEY, ANALYST, AMERICAN TECHNOLOGY: Great, thank you very much. Could you address the issue of click fraud to what extent the incident has been increasing and to what extent it is an increasing cost to business in the search industry.

DAN ROSENWEIG: Yes, this is Dan. And I think Sue and I will tackle that one together. In the - - in the category of click fraud or click spam, clearly there has been a lot of press around it lately. In any emerging and dynamic marketplace these kinds of obstacles and issues are inevitable, it has happened through the first ten years of the Internet, whether it was Spam or privacy or commerce related issues. And Yahoo! has always been a leader in learning about these things, identifying them, fighting them. We use technology and human resources on this. Overture had really been a leader in really focusing on this, and we built numerous layers of defense against it. It's not a big issue. At this point we've been able to contain it. We take it very, very seriously. And so we're going to continue to invest and make sure that it is a regular cost of business for us. So, I don't know, Sue?

SUE DECKER: Yes, Mark, I do not have a lot to add. I think that Dan really covered it. It is one of these things that Overture had addressed for many years and is very very capable and continues to, to [ Inaudible ] Algorithms that fight this, that filter out the clicks. We see it almost immediately, so it is very straightforward to filter them out, and we continue to improve our process and the fight is getting better and better, and we feel like it is well under control.

DAN ROSENWEIG: So with that folks, I want to thank you all for joining us today and have a good either afternoon or evening. And thank you for being with us. Bye now. Ladies and gentlemen, this concludes the Yahoo! first quarter 2005 earnings conference call. Thank you for your participation. You may disconnect at this time.

[CCBN reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES CCBN ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE

Q1 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 19, 2005 Tuesday


APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECI-
SIONS. Copyright 2005, CCBN, Inc. All Rights Reserved.]

**LOAD-DATE:** May 4, 2005

Exhibit 27

FOCUS - 34 of 53 DOCUMENTS

Copyright 2005 Voxant, Inc.
All Rights Reserved.
Copyright 2005 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

July 19, 2005 Tuesday

**TRANSCRIPT:** 071905av.723

**LENGTH:** 9183  words

**HEADLINE:** Q2 2005 Yahoo, Inc. Earnings Conference Call - Final

**BODY:**

OPERATOR: Good afternoon, ladies and gentlemen and welcome to the Yahoo! second quarter 2005 earnings conference call. At this time, all participants are in a listen-only mode. Later we will conduct a question-and-answer session. Please note that this conference is being recorded.

I will now turn the call over to Mr. Paul Hollerbach, Vice President of Financial Planning and Investor Relations. Mr. Hollerbach, you may begin.

PAUL HOLLERBACH, VP FINANCIAL PLANNING, INVESTOR RELATIONS, YAHOO, INC.: Thank you and good afternoon. And welcome to everyone to our second quarter earnings conference call.

On the call today are members of our executive team, Terry Semel, Sue Decker, Dan Rosensweig, and Jerry Yang.

Before we begin, I'd like to remind you that matters discussed in this call contain forward-looking statements that involve risks and uncertainties concerning Yahoo!'s expected financial performance as well as Yahoo!'s strategic and operational plans. Actual results may differ materially from the predicted results and reported results should not be considered as an indication of future performance.

The potential risks and uncertainties include among others, the Company's ability to compete with new or existing competitors, a reduction in spending for our marketing and premium services, and risks related to the integration of recent acquisitions. All information discussed in this call is as of July 19th and Yahoo! undertakes no duty to update this information.

Other potential factors that could affect the Company's business and financial results are included in the Company's annual and quarterly reports which are on file with the SEC.

On the call today we will also discuss the non-GAAP financial measures in talking about the Company's performance. Reconciliations of those measures to GAAP [inaudible] Investor Relations Web site.

Sue and Terry have prepared remarks that should take about 30 minutes, then we'll take questions for the remaining 30 minutes of the call. And now I'd like to turn it over to Terry.

TERRY SEMEL, CHAIRMAN, CEO, YAHOO, INC.: Good afternoon and thank you all for joining us today.

Yahoo! continued to operate full speed ahead in the second quarter delivering our ninth consecutive quarter of record results. This is a very exciting and busy time for our Company filled with significant opportunities.

Q2 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 19, 2005 Tuesday

We have a balanced and healthy business model in which all parts are perform-
ing very well. We believe we are in a position of strength as rapid adoption of
the Internet among consumers and advertisers, keeps growing. And Yahoo! forms
deeper relationships with both.

In the second quarter we reported revenue of $1.3 billion up 51% from the
second quarter of last year. We achieved balanced growth with contributions
across the board from our multiple lines of businesses and geographies.

Operating income before depreciation and amortization in Q2 was Yahoo!'s
highest ever at $368 million up 57% year-over-year. We were able to deliver
these results even while investing in and pursuing emerging opportunities show-
ing the power of our business model.

In addition, our introduction of new and innovative products has resulted in
more users on Yahoo! consuming more services and spending more time on Yahoo!
which also resulted in advertisers increasingly moving more of their dollars to
Yahoo! as well.

We ended the quarter with approximately 379 million unique users, up 27% from
300 million for the same period last year. However, what's most important is
that while we continue to extend our reach to new users, we are also becoming
better at serving the growing needs of our existing users, which we believe is
one of the driving forces behind our financial success.

Our active registered users now stand at approximately 181 million, up 26%
from 146 million in the second quarter of last year. And the fastest growing
subset of users are paid subscribers ended the quarter at 10.1 million unique
paying relationships, up 1.2 million subscribers from last quarter and up 58%
from last year.

You know, it wasn't long ago when everyone said I was crazy, and perhaps I
was, but thinking that we could attract 10 million paying relationships. So now
we're way on our way to our new goal of 15 million paid relationships.

As pleased as I am with Yahoo!'s performance in the quarter, I am even more
excited about where the industry and Yahoo! are headed. Rapid advancements in
technology are driving a new generation of user-driven applications and a deeper
level of consumer engagement.

We believe this evolution will create new business opportunities that di-
rectly align with Yahoo!'s strength. We intend to lead this transformation.
These are indeed exciting times for us.

We believe the most important attributes to create powerful and relevant ex-
periences are search, community, personalization and content. People are consum-
ing more and more content on the Web whether it is licensed, original, or user
generated.

Blending those in a way that create the unique experience for our users is
Yahoo!'s strategic advantage. For example, the release of the new My Yahoo! last
year really set the tone for the next generation of Yahoo! products and Internet
experiences.

We created an open platform with small and large publishers to integrate into
My Yahoo! using RSS. The results have been terrific with nearly half a million
publishers submitting their fees into My Yahoo!.

Additionally, more than 4 million sites have added My Yahoo! button to their
Web pages. Users now have opportunities to find more content, to publish their
own and to share it with their community.

The success of My Yahoo! has created a template that is being rolled out
across the rest of Yahoo! with great success.

Additionally, the integration of photos, blogs and photo tagging is radically
altering how news and information both reported and consumed. Within minutes of
the tragic bombings in London, citizen journalists began providing the world

Q2 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 19, 2005 Tuesday

with important and immediate information through cellphone pictures, blogs and mobile blogging.

The raw power of those images posted through Flicker complemented the hundreds of trusted professional sources packaged in Yahoo! News, the Web's number one news source. The images posted to Flicker also became important centerpieces in various other publications and broadcasts throughout the world.

Another example is music. Yahoo! is offering music fans the full spectrum of all the music they want in whatever format they want, whether it be free radio and video, subscription or downloads.

More importantly, the beta launch of Yahoo! Music Unlimited is the latest step in an entirely new music experience. The service promotes sharing and discovery by giving users the opportunity to engage with their online community via Yahoo!. Via Yahoo! Messenger and receive personalized music recommendations and play lists based on their music influences and ratings.

Within Search we continued to invest in our best-of-class Web search technology while also leveraging that technology beyond traditional Web search into environments that encourage people to find, use, share and expand knowledge. The latest in our evolution of search services, My Web Version 2.0, is a social search engine that enables people to use search to share and enhance content on the Web, creating a more relevant and personal search experience.

We also continue to invest heavily in vertical search experiences, expanding into new verticals such as video and image search.

We are changing the game in recruitment by enable job seekers to search job listings across the entire Web on an entirely new scale, I might add, and view results in one location at Yahoo! HotJobs. We believe these are important search initiatives that will drive share in the long-term.

Some of these recent offerings are just a glimpse of the potential of Yahoo! to bring people, information and content all together in a way that no other medium can accomplish.

Yahoo! has always been at the forefront of change and innovation. As a result, we have always attracted some of the most accomplished scientists, engineers, design specialists and product visionaries.

With Yahoo! well positioned for the future, we have seen a real influx of world-class additions to our ranks. They thrive on the opportunity Yahoo! provides to solve some of the most technically challenging problems, benefiting hundreds of millions of users across a range of areas such as search, communication, media mobility, data and advertising.

We have also committed long-term resources to research through initiatives such as the Yahoo! Research Labs. Our lab focuses on innovative challenges and opportunities for the industry and for Yahoo!.

In fact, last week we also announced the formation of a research facility in partnership with UC Berkeley which will conduct research and explore new technologies in the areas of social media, including tagging, community, search, and mobile media.

As Yahoo!'s talented people strive to make our network the best place in the world to share and discover online, we expect to also extend our advertising opportunities with better, more engaging and more targeted solutions. This in turn will create even bigger opportunities for our advertisers.

So let's review our advertising business in some more detail.

Our marketing services business delivered almost $1.1 billion in revenue for the quarter, representing 51% year-over-year growth as a result of strong contributions by all forms of advertising. We are extremely pleased with this performance as our revenue growth for the first half of the year on an ex-TAC basis suggest a run rate that will again outpace the market currently forecasted growth 34% this year on a global basis.

Q2 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 19, 2005 Tuesday

In brand advertising we're clearly the number one global player and we will continue to outperform that segment. Marketers continue to take advantage of the unique advertising solutions Yahoo! can offer.

We experienced growth in both advertising targeted to specific consumer groups and in rich media and video advertising as more advertisers took advantage of broadband and the popularity of our media content. We benefited from strength in three of the largest global advertising segments in any media, those being automotive, CPG and financial services.

Automotive continues to be a growing segment for us as the Internet has become an integral part of all new model launches. Automakers are also looking to expand their presence to include more lifestyle and demographic targets.

We also experienced an increase in consumer packaged goods activity driven by the category's top marketers, reallocating traditional budgets to the Internet itself And financial services continued to grow led by brokerage, banking and lending customers.

Search advertising is of course an equally exciting opportunity for us. We became a leading player in just 18 months ago and we see even more opportunity in this area around some of our larger initiatives.

We have a strong road map in place for improving technologies in order to optimize relevance and matching capabilities in our core services globally. During the balance of this year, we will introduce important upgrades in areas such as advertiser and publishing self-service platforms, which we expect will substantially improve our offerings in both content match and sponsored search.

We also plan to offer new contextual targeting capabilities which would enhance our services both on Yahoo! and for small publishers throughout the Web. These initiatives are among the highest priorities within the Company and important investment in Yahoo!'s long-term growth.

We expect to improve the relevancy and performance of our core business as well as create new opportunities for our marketing partners and for Yahoo!. We anticipate that we will begin realizing additional value from these long-term initiatives as 2006 progresses.

Looking at our overall marketing services business, we are in a position of real strength. Today, some of the largest advertisers spend roughly 2 to 4% of their marketing budgets online, while consumers are spending 15% and growing, I might add, of their media time on the Internet.

As marketing dollars continue to follow consumers, we are uniquely positioned with a large and diverse audience, industry leading geographic and demographic targeting capabilities, and opportunities to open up new markets and introduce new formats.

So in conclusion, we have a strong and balanced business model which is able to leverage our unique assets and take advantage of multiple growth opportunities. Our scalable technology platforms enable us to develop great products in an array of sectors such as search, commerce, media and communications.

We are creating a social media environment that connects all forms of content and enables sharing and discovery among consumers and leverage all forms of advertising opportunities on the Web. And we are building deeper relationships with a very strong and diverse range of customers, including hundreds of bluechip traditional marketers, hundreds of thousands of small and medium-sized businesses, and of course, hundreds of millions of consumers.

We believe we can extend these opportunities rapidly on a global scale. And we have some of the best employees to help make it all happen. The key metric that underpin our business have continued to grow at a healthy pace and we believe we have a terrific future ahead.

With that, I'd like to turn it over to Sue Decker to review our financial highlights.

Q2 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 19, 2005 Tuesday

SUE DECKER, CFO, YAHOO, INC.: Thanks, Terry. And thanks to all of you for joining us today.

We're really pleased with our second quarter results because they clearly underscore two fundamental business model strengths, excellent growth and great balance. We see this gesthault as terrific and it is not an accident.

We have been careful, deliberate and persistent about committing the appropriate investment into both internal operations and external acquisitions. At the same time, we are very aware that our mission is not simply to deliver strong returns for a few years but to make the appropriate investments in capital allocation decisions to build value over the long-term.

This would not be possible if our source of strength were a single product or if we were reliant on a narrow customer base. We still have a lot of work to do but we feel very good about our progress on delivering this combination of values to shareholders.

Before we review Q2 results, let me start with one housekeeping item.

Our earnings in Q2 contained a non-operating pretax gain of $949 million from the completion of the disposition of a non-strategic investment. We have excluded this item in our supplemental statements and from the comments that follow.

On this basis our earnings for the quarter were $192 million, or $0.13 per diluted share, up 66% from a year-ago.

Let's talk now about the highlights from the quarter starting with free cash flow which we consider to be our most important financial metric. As a reminder, we define free cash flow as cash generated from operations, which includes cash costs related to taxes and changes in working capital, less capital spending and dividends received.

Free cash flow came in at $300 million, up 52% from a year-ago and advancing our trailing 12-months free cash flow to nearly $1.1 billion. This quarterly free cash flow represented 34% of revenue after-tax and a conversion rate of 81% of operating cash flow. A testament to the exceptionally high cash productivity of our business model.

One very interesting relationship is to compare our earnings to our free cash flow. Q2 free cash flow was 56% larger than our earnings, excluding the gains from the sales of a non-strategic investment. Whereas for most companies free cash flow is less than earnings.

As compared with many companies, we continue to benefit economically from large tax loss carry forwards, even though our earnings are fully taxed for GAAP purposes, and we also benefit from relatively limited requirements to invest in our balance sheet to grow.

Let's look now at what we did with the cash and what happened to our balance sheet.

Our ending cash and marketing securities balance was $4.9 billion, up 1.1 billion since last quarter. Contributing to that increase were several sources of cash collectively amounting to 1 .7 billion.

In addition to our healthy free cash flow and the disposition of an investment, other sources included the receipt of cash back from previously initiated structured share repurchases, on which we earned an annualized rate of return of 20%, and proceeds from the exercise of employee stock options. We invested over $600 million of this cash generated into several transactions that we believe will yield investors substantial returns.

First, we entered into a $500 million structured stock repurchase series of transactions. Of this investment, 150 million was received back with a premium during the quarter and the remaining 350 million matures in October of '05.

Adding the October '05 maturing 350 million tranches to the 100 million that we have previously outstanding, at the final maturity of these securities, de-

Q2 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 19, 2005 Tuesday

pending on the price of the stock, we will either repurchase up to 14.6 million shares or return up to $450 million of our initial investment plus an annualized return of 21%.

Second, we continue to acquire and invest in companies. To this end we spent approximately $122 million in Q2. The acquisition component of this spending was for DialPad, Flicker, TeRespondo and the completion of the earn out on 3721.

Looking forward, we plan to continue to use our strong balance sheet and free cash flow to enhance value for shareholders through acquisitions, investments and share repurchase activity as appropriate.

Let's move now to the P&L.

The overall summary is that consistent with our financial strategy we are successfully supporting a massive and growing base of more revenue productive users which has allowed us to exceed both our longer term revenue and operating cash flow growth objective. Specifically, second quarter revenue ex-TAC came in at $875 million, advancing 44% over year-ago figures and up 7% from Q1 '05, despite normal adverse seasonality in the search side of the marketing services business.

The 44% growth broke down into 41% in organic underlying revenue growth, particularly strong considering tough comparisons against strong gains a year-ago, and 3% related to acquired companies owned for less than a year.

We're especially pleased with what this revenue growth says about the deepening engagement of our users. Not only is user breadth still growing rapidly, up 26% year-over-year, but depth is also increasing as measured by pageview.

Our revenue growth is outpacing both of those due to the natural lag effect in monetization versus consumer engagement with the new medium.

Let's look now at the revenue breakdown by lines of business.

Global marketing, our largest service, generated $760 million of revenue ex-TAC for the quarter, up 43% year-over-year and consistent with the very strong gains we saw in Q1. This represents an acceleration from the full-year 39 to 40% growth rates that we experienced in both 2003 and 2004.

This strength was nicely balanced across our various offerings to advertisers from pay per performance to branding and also across our vertical product categories.

Let me give a little color on the two major components of our marketing business.

Since we already do business with most of the nation's marketers in the U.S., we are principally focused on depth over breadth. Consequently, a key driver on the brand side of our non-search marketing growth is revenue per advertiser, particularly among the top 200 U.S. advertisers whose spending growth rate exceeded our overall marketing service average.

What's most exciting about this is how much more we think they can spend from here. Not only in the U.S. where many of them spend just a few percent of their budgets online, but also internationally where they're just getting started.

A big focus going forward will be to help these large marketers begin to use the Internet more extensively outside the U.S. where they have large ad budgets but are under-represented on the Internet by comparison with the U.S. On the sponsored search side growth is a function of both increasing the number of advertisers and rising revenue per advertiser.

In a nutshell we're seeing broader and deeper industry adoption of paid search. Advertisers are becoming more comfortable with the medium and in turn they're expanding their overall commitment.

This is especially the case for those advertisers that already are among the largest and most sophisticated users of sponsored search which we believe is a very good indicator of the health of the business.

Q2 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 19, 2005 Tuesday

At this stage in the industry's development, we think these customer trends are more reliable indicators of the health of the business than exactly how much revenue on the average search yields. This is because the averages are being influenced by mix issues across multiple dimensions.

For example, the large number of new advertisers that are joining the network often buy an ever expanding mix of keywords that may differ from the run rate mix. As well, new search inventory is being rolled out into new countries and new formats, many of which have different pricing characteristics from the core base.

Finally, the mix of keywords sold in any one quarter may vary for seasonal reasons and carry different average prices. The net effect of these factors is the majority of the incremental funds are currently being allocated towards more inventory versus higher priced inventory.

Turning now to fees, we produce $159 million of revenue, up 45% from year-ago levels. Excluding acquisitions, principally Musicmatch, these grew a very healthy 33%.

The main driver of this business line is our premium offerings, in which consumers and businesses pay us for our services. We exited the quarter with approximately 10.1 million paid relationships, up more than 58% from 6.4 million a year-ago, and up 1.2 million from Q1.

This strong performance was driven by content bundled with access, small business, personal, sports, music and games offerings. Last quarter we raised our expected ending paid relationships forecast to indicate that we could approach 12 million by the end of '05.

Based on our second quarter experience, we now believe we are likely to exceed 12 million, as the Verizon deal starts to play into the mix and we expect strong growth from other sources. We continue to expect these relationships to produce an average revenue per user per month of 3 to $4.

Turning to revenue by geographic segment, top line growth remains very robust internationally, up 59% ex-TAC to 215 million, and boosted in particular by the strong secular growth in sponsored search. On an organic basis and holding currencies constant our international revenue ex-TAC increased 50% in the quarter, even faster than the 36% increase domestically.

Consequently, international revenue ex-TAC represented 25% of total revenue ex-TAC in the quarter, advancing from 22% a year-ago and consistent with our expectations.

Let's turn now to some of the details behind our strong and growing profitability.

Specifically operating cash flow came in at $368 million, up 57% year-over-year and above the high end of our business outlook. Consequently, global operating cash flow margins were 42%, somewhat above what we had planned largely due to the timing of spend related to the new YME Music Service.

We decided to launch it first in beta in Q2, moving to the full release and the attendant marketing commitment in Q3. We are happy with this decision because it has led to an even better user experience with the learning that will be included in the broader release.

As you know, the major driver of margin leverage is compensation costs, our largest expense, which continues to yield productivity improvement. Head count ended the quarter at close to 8800, up about 750 from Q1 '05 levels.

Most of this was attributable to planned organic investments in key talent in various products and infrastructure, collectively designed to improve our user experience, strengthen our market position, extend new verticals and support our growing businesses. We are very pleased with both the quality and the quantity of talent we are attracting.

Q2 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 19, 2005 Tuesday

Putting this into context with our financials, average annualized revenue ex-TAC per employee stood at almost 417,000 in the quarter up 8% year-over-year. We're very pleased with our progress on this metric as an indicator of a productive and strategic allocations of resources within our property.

The observation that we've grown our employee base by 35% over the last year, investing in and acquiring key talent to enhance our consumer offering, while still seeing improvements in productivity and margins is a testament to the network effect of our model and our focus on key priority areas.

Turning to profitability by geographic segment, our Q2 operating cash flow margins on revenue ex-TAC in the U.S. for 44% while our international operations came in at 36%. Both benefiting from strong business trends.

These profitability levels reflect a flow through of incremental revenue to operating cash flow of about 50%, consistent with our previously discussed parameters. Looking forward, we plan to continue to invest in opportunities to gain market share internationally and expect the full-year international margin to be in the mid-30s, a large improvement from the 25% in 2004 and consistent with the expectations we detailed last quarter.

Let's turn now to the business outlook, which we are modestly raising at the midpoint and narrowing in terms of the range of forecasted outcomes. The adjustments that follow reflect five factors.

First, the revenue and cost impact of the strengthening dollar relative to other currencies in which we operate since we last updated you in April. Second, better visibility on the year now that we have another quarter under our belt.

Third, the incremental impact of DialPad and other acquisitions which are still in an investment mode from the perspective of the P&L. Fourth, the movement of the marketing costs for the launch of the music service from Q2 to Q3. And, fifth, better than expected operating cash flow performance in Q2.

So with those factors in mind, starting with the third quarter, we expect revenue ex-TAC to be in the range of 880 to $930 million, up 38% from a year-ago at the midpoint of the range, and reflecting normal adverse seasonality for our two forms of marketing services as compared with Q2 levels. About 200 basis points of that growth is likely to be driven by acquired companies.

Turning to profitability, at these revenue levels we expect to operate within an operating cash flow range of 350 to $380 million in the third quarter, up 41% from a year-ago at the midpoint.

As a reminder, Q3 is typically a seasonally slower period for our marketing services businesses, particularly for our international operations. This should cause sequential growth in margins to drop from the Q2 levels before an expected rebound in Q4.

For the full-year of 2005, we expect revenue ex-TAC to range from 3.6 to $3.7 billion. Up about 41% from a year-ago at the midpoint, of which acquired companies are expected to account for about 300 basis points.

Turning to the full-year 2005 operating cash flow outlook, we expect to operate in a range of 1.515 billion to 1.575 billion, representing growth of 51% year-over-year and achieving close to our 50% flow through goal for incremental revenue conversion. If we achieve this level of profitability on the previously discussed revenue ex-TAC outlook, our overall margins will expand from 39% in '04 to 42% in '05, with most of this margin expansion coming from our international operations.

Our domestic operations are now approaching an operating level that seems to strike close to the right balance between the appropriate level of current profitability and ongoing investment in future growth relative to our business model.

Last but not least for the financial outlook, we're maintaining our 2005 free cash flow range of 1.1 to $1.175 billion, up 34% from a year-ago at the midpoint, and representing an OCF flow through of approximately 74% consistent with

Q2 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 19, 2005 Tuesday

our longer term target range of 60 to 80%. This outlook contemplates capital
spending for '05 of approximately 380 to $405 million, about 25% of operating
cash flow and consistent with the levels that we have operated in for the last
three years.

Our capital spending mix has shifted in a similar way as our overall business
mix, with search and mail becoming proportionately more important to both our
operating cash flow and our Cap Ex levels. We believe this level of investment
both allows strong free cash flow conversion and also proactive investments to
drive product strength and to support user growth.

To sum up, as we take stock of our financial vital signs halfway through '05,
we're very pleased with how we're tracking. First, in Q1 after seeing how well
our business was doing, we raised the midpoint of our outlook for revenue ex-TAC
by $175 million, and our midpoint of our operating cash flow outlook by nearly
$100 million.

Our visibility has improved as we've completed another quarter allowing us to
tweak these ranges a bit higher at the midpoint and to modestly narrow them.

In our confidence in our ability to forecast our owned and operated search
business, now that we've been principle in it for over 18 months, has improved.
And we're currently benefiting from a more stable affiliate new business envi-
ronment.

Second, we're really seeing the financial waterfall of leverage in our busi-
ness model at work. Our full-year '05 outlook suggests a third consecutive year
of growing more than 30% in organic revenue ex-TAC, delivering close to 50% of
that to the operating cash flow line, and yielding more than 70% of that operat-
ing cash flow to free cash flow.

And third, and really the best part of the story, is that while Yahoo! is
continuing to extend its reach to new users, we are also becoming better at
serving the needs of existing users by listening to them and investing in better
and more relevant products and services.

This deepening engagement is really the magic that is attracting advertisers
to our global platform and users to our premium offerings. We expect this dy-
namic to continue to occur creating sustainable growth for the foreseeable fu-
ture.

And with that I'd like to turn it back to Terry.

TERRY SEMEL: Thank you, Sue.

This is a quick reminder Yahoo! is of course in a constant state of inven-
tion. We'll continue to evolve and integrate our services and assets in ways
that we believe will make our product offerings quite unique.

Our intention is to continue capitalizing on our industry-leading assets in
order to deliver consistent and powerful growth over the long-term. There are
many opportunities in front of us and we all still believe that we've only just
begun.

So with that I'd like to turn it to questions.

OPERATOR: Thank you. [Operator instructions] The first question comes from
Mark Rowen from Prudential. Please go ahead.

MARK ROWEN, ANALYST, PRUDENTIAL FINANCIAL RESEARCH: Thanks. On the fee-paying
customers, Terry or Sue, I was wondering if you could give us a sense of what
percentage of those are not from the content deals and how fast those are grow-
ing and do you expect that most of the ads this year or next year will be con-
tent related? And then if I could I have a follow-up on the sponsored search and
the branded business.

SUE DECKER: Okay. Mark, this is Sue. I'm going to address your question, your
first question, anyway.

Q2 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 19, 2005 Tuesday

On the distribution of fee-based customers we have not broken out the compo-
nent pieces in the past but what we have said is that more than half of the to-
tal number comes from our content bundled with access. And that continues to be
the case.

We're actually seeing very strong growth in both sides of that business, the
content bundled with access, as well as the, a broad variety of various premium
services that we offer. And I went through a few of them in the quarter but
those include small business, personals, sports, music, games offerings, a good
quarter for Fantasy on the sports side, so overall we saw very good growth over-
all and we continue to expect very good conversion of our active registered us-
ers into fee paying customers over time.

OPERATOR: The next question comes from Heath Terry from Credit Suisse First
Boston. Please go ahead.

HEATH TERRY, ANALYST, CREDIT SUISSE FIRST BOSTON: Thank you. I was hoping you
could, without knowing you're not going into specific numbers, just kind of
characterize the difference that you're seeing in the growth between your
branded business and your search business and kind of what your expectations for
that relationship going forward's going to be.

And then if you could also talk about international. Kind of surprising to
see particularly given the growth that, growth opportunity that that represents
for you that at least on a sequential basis we saw relatively similar growth
rates between international and the U.S. Wondering if you can kind of go a lit-
tle bit deeper into what you think it's going to take to build the same kind of
position internationally that you've got in the U.S.?

TERRY SEMEL: Terry, I'll start. The difference in growth, basically speaking
as you know, we talk about our advertisers and our advertising business so in
general, you know, Yahoo!'s the leading choice for advertisers of all sizes so
obviously on the branded side, a large degree of that advertising or those ad-
vertising dollars, as Sue points, out are coming from the top 200 and one could
even drill that further down and say to the top advertisers probably in the
world if not the U.S. and we clearly continue to extend our overall leadership
position there. It continues to grow and I might add on a global basis.

So we are doing really, really well and we're getting larger at it and we
continue to see some of our larger advertisers also now starting to experiment
and experience and start to spend money on the sponsored search side as well. So
we're seeing more opportunities of large advertisers starting to cross over on
the search side. We are very much on plan and we're growing and we continue to
see great opportunity.

I think we talked about the priorities or I did. I talked about the priori-
ties of our Company, which we have been right on target on our road map of.

So if you just think about us one more time in our first year in the search
or sponsored search business and search business, we dedicated that year to com-
ing up with what I think is the best algorithmic search product in the world.
And as we began year two, as we began '05, we put together a very aggressive and
very achievable road map which included some of the best and greatest engineers
we had here at Yahoo!, had worked on, many of whom had worked on the algorithmic
approach, and we went after the clear question of how do we increase our abili-
ties to monetize our sponsored search better, and I believe we're right on track
and we're very excited about the developments and I think you just see a lot
more of it in the latter part of this year.

SUE DECKER: So I'll take the second part of that question, which is the in-
ternational versus domestic growth.

Just first as a reminder, while international and domestic grew at the same
rate, or 7% sequentially, actually year-over-year international is up 59% as
compared with the 39% increase in domestic. And the reason that's important is
that the international seasonality is slightly different from the domestic sea-
sonality which does affect the Q to Q growth rates.

Q2 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 19, 2005 Tuesday

In particular we said when we reported our numbers in Q1, that international was particularly strong in Q1 because international is more exposed to search than it is in the U.S. and that had a seasonally strong Q1. So both in revenue growth rate and in margin in Q1 we highlighted that as a bit of an anomaly in order to compare future quarters to.

So we're very pleased overall with our international expansion as a percentage of our total revenue, it's right on track, 25% of the total versus 22% last year, that's very consistent with what we've been flagging for the last two quarters, and we continue to see margin improvement there.

I would point out two other points on international as you look at it. First, we have anniversaried the acquisition of Kalcoo now. So Kalcoo is now in our organic growth rates going forward and was in this quarter.

Our international revenue ex-currencies was up 50% and Kalcoo's growing very strongly, but as is true for any e-commerce business not quite at that level, so including it in organic does affect the growth rates in Q2 versus Q1 where it was not included in organic.

The other thing I'd just point out is in the fees line, which as in a year-ago we had the BT relationship kicked off and we actually had a couple of quarters of recognition of revenue in the year-ago quarter. We told you that at the time and that affects the comps this year. So all those factors are in play but we feel very, very good about where we are and it's exactly on track with what we expected.

HEATH TERRY: Thank you.

OPERATOR: The next question comes from Jeetil Patel from Deutsche Bank Securities. Please go ahead.

JEETIL PATEL, ANALYST, DEUTSCHE BANK SECURITIES: Great. Thank you. Two questions. Have you done any sort of different implementation as it relates to contextually integrating some of the sponsored links? It looks like you're taking a different type of a kind of approach as it relates to kind of serving up some of the advertising on some of the content pages inside the network-related sponsored links. Can you talk about how you're seeing click-throughs or click-through rates trend in that side of the equation?

Second, Sue, you just made a comment about kind of international. Just as a follow-up, your TAC growth was about 10% sequentially on international TAC and your revenues were up about 7%. Is that attributable just maybe a bit of an up-front payment going on on some of your distribution deals internationally, is that how we should think about that?

DAN ROSENSWEIG, COO, YAHOO, INC.: This is Dan. I'll take the first part of your question on the different implementations regarding content managed throughout the Yahoo! network.

We're sort of very excited about the opportunity with content match. What we try to do now is make sure that we create the right format of advertising, the greatest amount of relevancy within the environments and create the best experience for both users and advertisers.

So we're always experimenting with the right kind of matching algorithms and the right kind of locations and the balance between branded and contextual ads on the same page. So you'll always see us testing different implementations to make sure we maximize it.

All of it is yielding very good results so the technology about improving the matching algorithms on contextual advertising are going up each and every day and that's been very helpful. The new implementations are working very well and so we're seeing increased success with that and we expect to continue to roll that out across the network.

SUE DECKER: Secondly, on the TAC question. Yes, we do have TAC growing faster internationally than it is domestically. That's been the case for the last couple of quarters and really reflects some significant new business wins that we

Q2 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 19, 2005 Tuesday

had internationally in the fourth quarter of last year. So you'll see that con-
tinue until it anniversaries at least in the fourth quarter.

OPERATOR: The next question comes from Douglas Anmuth from Lehman Brothers.
Please go ahead.

DOUGLAS ANMUTH, ANALYST, LEHMAN BROTHERS: Great. Thank you. Two quick ques-
tions. Can you talk about the impact of having another large open portal out in
the market in AOL and how it affects your ad rates and your selling process to-
wards agencies and advertisers? And also wondering if you can comment on your
TAC percentage if it's increasing as a percentage of your gross search revenues?
Thank you.

TERRY SEMEL: Hi, it's Terry, I'll start. And Dan, feel free to jump in.

Let's talk about the AOL free portal. First, hard to know how that's going to
work but let's be positive about it and let's assume it works quite well.

So from that standpoint, there's no such thing as one broadcast network,
there's no such thing as one cable network. It really will help the overall
situation of attracting more and more large advertisers whose budgets are enor-
mous as it relates to what they currently are spending on the Internet so in a
nice way we wish them well.

We think in an overall sense it would encourage large advertisers to step up,
buy more than one network, and have more opportunity to have more inventory and
reach larger audiences on the Internet. So we see it as a positive move and for
their sakes hope that it's effective.

SUE DECKER: Okay. I'll take, this is Sue. I'll take the second question on
TAC.

And yeah, you saw the sequential increase of 7% quarter-to-quarter and we did
see a very modest increase in TAC in the quarter so you could draw the conclu-
sion that the overall affiliate business grew slightly less than that increase
in TAC. This is pretty consistent with what we've been saying in the past and
consistent with Q1 and basically consistent with our view that over time that
business remains competitive and we've been planning for that in all of our
business outlooks.

The next question?

OPERATOR: The next question comes from Gordon Hodge from Thomas Weisel Part-
ners. Please go ahead.

GORDON HODGE, ANALYST, THOMAS WEISEL PARTNERS: Good afternoon. Just a quick
question. I was curious if you were surprised that the pageviews declined se-
quentially in the quarter, whether you could attribute that to any seasonality
and maybe you can differentiate U.S. versus international if you have a breakout
on the usage? Thanks.

SUE DECKER: Sure, Gordon. This is Sue.

On the pageviews, I'm just going to address that on a global basis because
generally the trends are similar. What we saw both actually in users and page-
views is normal seasonality in Q2 versus Q1.

The Internet typically has a lighter quarter in June, people get out school
and are not using it as much. This is pretty consistent with what we've seen in
the past. Users were up 2% sequentially, you know, well north of 20% year-over-
year.

If you adjust for the Kalcoo users and 3721 users that we had in Q2 a year-
ago, was very consistent even the year-ago. So we've seen sort of 0 to 2 to 4%
sort of Q to Q growth rates in users, every Q2 for the last three years and on
pageviews a broadly similar trend.

Pageviews were down 2.8% in June versus March a year-ago, you'd have to ad-
just for acquisitions, but they were relatively flat and if you go back similar

Q2 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 19, 2005 Tuesday

kinds of trends. So we believe it's consistent with the seasonality that is typical in the Internet area.

OPERATOR: The next question comes from Anthony Noto from Goldman Sachs. Please go ahead.

ANTHONY NOTO, ANALYST, GOLDMAN SACHS: Thank you very much. The first question, Sue, if we assume TAC went up a little bit sequentially, it would imply from our calculation that non-search revenue, non-search net marketing services revenue grew about 10% sequentially. Is that accurate?

Second question is really about monetization Terry. You talked about that in your comments. I was wondering, do you think you can launch a new monetization algorithm before the year-end and if not at what time? And have you tested it at all at this point?

Our calculations would show that for every 100 basis points improvement and click-through rate you can drive about 8% increase in leads that you generate within search.

And then the last question, Sue, in terms of your guidance you mentioned one impact was currency. If you had assumed constant currency as opposed to the trend that's happened what would your guidance have been on the top line? Thanks.

TERRY SEMEL: Scott and Dan can jump in if you would like as well.

So let's agree on one thing. Testing is good. And testing only makes things better and in this case testing means to us even greater monetization capabilities.

So I just got off on this whole area with, you know, feeling just pretty fantastic because everything we do represents more. And everything we do represents incremental value to our Company.

So when we start off that way, bear in mind that, yes, there's no question about the fact that there will be and one can just totally assume that there will be testing going on on the number of different fronts. And we've done it before.

We're doing it again and we're doing it with a very open mind to try to determine what's best for our users, what's best for our advertisers and at the end of the day what's best for our bottom line. So we're very excited about it.

No, we have no intentions just jumping out one day and just releasing everything, but you should assume that there are multiple steps within our road map. We are right on target and we'll be following those steps, excited all the way home.

SUE DECKER: Okay. Anthony I'll follow up with your other two questions on the TAC, on your math. You've always been pretty good at math so I think I'm going to, I think you should have some confidence in your estimates there.

I think in addition to what we said in terms of the TAC increase quarter-to-quarter, the other piece of data we gave you that could help you with that is that our top 200 U.S. brand advertisers expanded their budgets more than our 43% overall average and they are the lion's share of the total. So I think your ballpark on target.

And then on the second question, the currency impact. Yes, thank you for raising that. There are a couple of cross-currents here that affected our overall business outlook.

That currency impact quarter-to-quarter, the changes in rates were we're assuming in terms of the dollar strengthening versus European currencies primarily but also relative to the yen for our overture business had an impact of more than $20 million for the back nine months of the year. Some of that was in Q2 but most of that is in the back half.

Q2 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 19, 2005 Tuesday

The other thing is you're looking at the outlook that you may want to con-
sider is some of the acquisitions we've recently made that are important invest-
ments in future growth in 2006 represent an investment in talent but don't yet
contribute to revenue. And so if you take into account the revenue impact and
the cost impact, actually, the rest of our business is improved by a more than
offsetting amount which has allowed us to increase the business outlook at the
midpoint.

But those are a few of the cross-currents that you should take into account
when you look at the overall business outlook which does carry very strong
growth in the second half.

OPERATOR: The next question comes from Mark Mahaney from Smith Barney. Please
go ahead.

MARK MAHANEY, ANALYST, SMITH BARNEY CITIGROUP: Thanks. Just one question. On
the music service it seems like there's been, I don't know, unusual amount of
delay in getting the product that you would like out in the market. Could you
talk about some of the problems you've had with the launch or at least what are
the challenges and when do you think that will launch in the quarter? Thank you
very much.

DAN ROSENSWEIG: Mark, it's Dan. There was one delay and everything else is
exactly where we expected it to be. So the plan was always to come out, put it
out in beta, test the features, test the scaleability, get user feedback.

The best way to launch product on the Internet, particularly with the advent
of social media and people publishing all the time and building on open APIs is
to go out there and put it out there and give users a chance to comment on it,
to help create it and build the product and actually to have lots of developers
build products around it which really creates a great viral nature around it. So
it's exactly on time except for the initial delay and so we're very pleased
about it.

It's actually been getting tremendous response and it's very revolutionary as
you know. It's exciting about combining all the different ways people can go af-
ter music.

As you know, we have multiple forms of revenue streams around music from sub-
scription to advertising to download, so we're very excited about it. You can
expect to see us do a lot with it later on this year.

OPERATOR: The next question comes from Lauren Fine from Merrill Lynch. Please
go ahead.

LAUREN FINE, ANALYST, MERRILL LYNCH: Thank you, just a couple of quick ones.
I'm not sure there's any significance in this, but you had a 13% increase in fee
paying customers yet your fee revenues were only up 7%. Can we use that as an
indicator that the growth rate could pick up later in the year?

And then maybe relatedly, there's obviously some price wars on broadband and
I'm wondering how that might affect your relationship if there's anything in the
contractual language that would affect you?

And then is there anything we should read into the decline in international
margins sequentially?

SUE DECKER: Let me get started and maybe my colleagues can jump in here.

On the fees versus subscribers, one thing to note is not all of our fee line
is represented by paid subscribers, there also is some revenue for royalties
from Japan and a few other things that are not fee related. And one thing to
note is, as a reminder, in Q1 we had a settlement in terms of the royalty stream
with Yahoo! Japan and we had an extra payment in Q1 which we talked to you guys
about at the time, so the comparison there in revenue versus fees versus sub-
scribers would be affected by that.

In general our ARPU trends have been stable to trending downward slightly as
the mix of our business has changed. And so that's another factor to consider.

Q2 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 19, 2005 Tuesday

In terms of the price wars, we are, our own fees are broadly protected from any kind of changes that our partners would decide to make in terms of the consumer offering.

And then finally on the international margin decline, this was somewhat of a, I'll just take you back one quarter. We had a very, very strong increase in margin in Q1 internationally to 37% and at the time we said we didn't think that was sustainable, that we expected more like a 35% margin for the year.

And the reason that was true is the seasonality of search is, Q1 benefits from query trends in search and our international business is more weighted towards search than our domestic business so we saw a benefit in Q1 there and that's something that we didn't expect to continue into Qs 2, 3, and 4 but overall, we're looking at margins of 35% as we outlined in our outlook in January and reiterated in April.

TERRY SEMEL: Could we do one more, please.

OPERATOR: Thank you. The next question comes from Scott Kessler from Standard & Poors Equity. Please go ahead.

SCOTT KESSLER, ANALYST, STANDARD & POORS EQUITY: Thanks very much. Two quick ones. The first one is, there has been some discussion on the call about the music offering. I was wondering, I know it's in beta and I know it's only been two months, but if you could provide any metrics around user adoption, usage, anything that you think we might find of relevance, that would be helpful.

The second question I have is when do you think we can expect in the general sense your new offering that's focused, or going to be focused on consumer technology? Thanks a lot.

DAN ROSENSWEIG: Okay. This is Dan. I'll attempt to answer those.

On the music side, we were pleasantly surprised by a number of things. First, the number of features that people use. That they're not just using it to listen to music or listen to radios, that they are doing all of the things. So even those that are subscribing are also significant downloaders.

That was very interesting statistic for us because we didn't know if people would choose one way to listen to music or all forms and they're definitely choosing all forms so they're choosing to subscribe and to buy. That was interesting. I think the amount of sharing that's going on is quite interesting and their ability to create, utilize dynamic playlists.

So what we're seeing are we put out a number of features in the product that's very difficult to know in advance which ones people will use. The ones they're using are the ones that we think will engage them a lot more than even we might have anticipated, but as you pointed out, it's very early days, it's only two months. We put it out in very limited data for subscribers so we'll see as it goes along.

On the new consumer tech offering I don't think we have anything that we want to say today on the call. We're obviously a very big destination for technology advertisers and we think that there's more opportunity for us to create environments for them, take advantage of our network, both through very specific content related to technology, but also the targeting across the network. So we're not going to comment specifically today but we think there's more we can do.

TERRY SEMEL: With that we thank you all for joining us. And have a good day or good evening.

OPERATOR: Thank you for participating in the Yahoo! second quarter 2005 earnings conference call. This concludes the conference for today. Thank you for your participation and you may all disconnect

[CCBN reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

Q2 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 19, 2005 Tuesday

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES CCBN ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS. Copyright 2005, CCBN, Inc. All Rights Reserved.]

**LOAD-DATE:** July 27, 2005

Exhibit 28

55 of 69 DOCUMENTS

Copyright 2005 Voxant, Inc.
All Rights Reserved.
Copyright 2005 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

October 18, 2005 Tuesday

**TRANSCRIPT:** 101805ad.765

**LENGTH:** 9469  words

**HEADLINE:** Q3 2005 Yahoo, Inc. Earnings Conference Call - Final

**BODY:**

OPERATOR: Good afternoon, ladies and gentlemen. And welcome to the Yahoo! third quarter 2005 earnings conference call. [OPERATOR INSTRUCTIONS] I will now turn the call over to Mr. Paul Hollerbach, Vice President of Finance and Investor Relations. Mr. Hollerbach, you may begin.

PAUL HOLLERBACH, VP OF FINANCE, IR, YAHOO! INC.: Thank you and good afternoon and welcome to Yahoo!'s third quarter earnings conference call. On the call today are members of our executive team, Terry Semel, Sue Decker, Dan Rosensweig, and Jerry Yang. Before I begin I'd like to remind you that matters discussed on this call contain forward-looking statements that involve risks and uncertainties concerning Yahoo!'s expected financial performance as well as the strategic and operational plans.

Actual results may differ materially from the predicted results and reported results should not be considered as future performance. The potential risk and uncertainties include, among others, the Company's ability to compete with new or existing competitors, a reduction in marketing services spending, adoption of our premium services and risks related to the integration of recent acquisitions. All information discussed in this call is as of October 18, and Yahoo! undertaking no duty to update this information. Other potential factors that could affect the Companies business and financial results are included in the Companies annual and quarterly reports which are on file with the SEC.

On the call today we'll be discussing some non-GAAP financial measures in characterizing the company's performance. Reconciliations of those measures to GAAP measures can be found on our investor relations web site. Terry and Sue will spend the next 30 minutes on prepared remarks which will then be followed by a Q and A session that will last until 3:00 p.m. pacific time.

Now I'd like to turn it over to Terry.

TERRY SEMEL, CHAIRMAN, CEO, YAHOO! INC.: Thank you, Paul and good afternoon, ladies and gentlemen. Yahoo!! has continued its run of exceptional growth. Our relentless focus on our consumers and continued investments in people and infrastructure has led to increased product quality and a powerful rate of

Q3 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 18, 2005 Tuesday

innovation which are really paying off.

As Yahoo!'s relationships with its users grows stronger the costs we have chosen to build the world's largest global online network of integrated services is being further validated. This is a very exciting time.

For the third quarter we reported revenue of $1.3 billion, up 47% from the third quarter of last year and our 10th quarter of record results. We achieved balance growth with contributions across the board from our multiple lines of business and geography.

Operating income before depreciation and amortization in the third quarter was Yahoo!'s highest ever at $385 million, up 48% year-over-year. We were able to deliver these results even while investing in and pursuing emerging opportunities and launching some of our most exciting and innovative products to date. These results clearly highlight the power of our brand, products and business models.

Yahoo! reaches 73% of all Internet users in the U.S. in any given month, which speaks to the importance of the extraordinary breathed of our product suite. In fact, there is no doubt that Yahoo! reaches more people in more ways than any other company on the web. Most importantly, Yahoo! has deeper relationships with its users which is essential to success in the next growth phase of the Internet.

This helps provide our users and advertisers with richer and more relevant experiences. The broadband and mobile Internet is always on, always fast, and always with you. As users depend on the Internet for more things in more places and on more devices, we believe Yahoo! with its integration of search, content, community and personalization has the best product suite to provide the greatest value to users around the world. By building both breathed and depth of usage globally, our consumer relationships also enable us to take advantage of multiple modernization opportunities which includes offerings all forms of advertising as well as premium services and commerce.

As a global network, among the biggest future growth opportunities of course is China. That is why we signed an agreement with Albi Boba in China during the quarter in which we combine our assets and have approximately a 40% economic stake in the entity. This transaction is expected to close in this fourth quarter.

We believe the combination of Al Boba and Yahoo! is the best approach to win in China. Together the two companies can combine to deliver the best search, commerce and communications under the management of a very strong local team. This arrangement will further strengthen Yahoo!'s position as a pre-eminent destination in Asia where we are a leader in many of the most important markets in this region.

We have been on a mission globally and it is really coming to fruition. Let's look at some of the specific highlights -- for the quarter. We ended the quarter with approximately 411 million unique users up 26% from 325 million for the same period last year. Our active registered users now stand at approximately 191 million, up 22% from 157 million in last year's third quarter. The fastest growing subset of users continue to be our paid subscribers as people find more value in Yahoo!'s suite of premium services.

Q3 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 18, 2005 Tuesday

In the third quarter, we ended with 11.4 million unique paying relationships of approximately 1.3 million subscribers from the last quarter and up 50% from last year. When we look further into our numbers, we are extremely pleased that we have achieved important share gains across many, many key verticals.

Additionally, the average number of Yahoo! services used by consumers and frequency of usage in many of our key verticals are also up. As an Internet network, we look at these trends and we know that we're moving in the right direction. We have always said great products lead to a great business and this quarter you have seen us launch some of our best products to date. I'll now give you a quick overview of some of them.

In communications, Yahoo! messenger and mail made significant advances. We announced the industry's first major IM inter-optionality agreement together with Microsoft to form the world's largest consumer I M community with more than 275 million users. We also made significant upgrades to Yahoo! messenger with high quality PC to PC voice and interactive photo sharing, which we launched in 18 countries. This was was the next step in our voice strategy which you'll see unfold further over the coming months.

Yahoo! mail hit a significant milestone becoming the largest global web-based e-mail provider according to Com Store Media Metrics. We recently launched a new beta featuring a completely redesigned intuitive user interface with the speed and responsiveness of a desk top application. Industry experts called it and I quote, "Far superior to competitors, sleeker, faster and smarter than its predecessor and stunning in its simplicity."

Our media group began its first phase of expanding its content initiatives and its integration with world class community features. We introduced well-known and respected columnist within the personal finance area and launched Kevin Sites in the hot zone. The user feedback on Kevin Sites has been absolutely great. You can read thousands of comment from our users around the world on the site.

Additionally, the integration of both professional new sources, the citizen journalism with further advance through the integration of blogs, flicker photos and my web links with Yahoo! news search. Yahoo! music continue to grow at a strong pace. Increasing our leadership position as the number one music destination on the web. The integration of community through Yahoo! messenger enables people to find, use, rate, discover and share songs.

To date, there's been more than 6 billion ratings from our community of users. And that is brilliant. Yahoo! music unlimited was launched to highly favorable reviews and user acceptance. Validating the strategy of giving the choice to listen to subscribe or download music. We're very pleased with the growth rate of our subscription service and believe that if more devices come into the marketplace, we are well-positioned to take advantage of the increasing consumption of digital music.

Audio consumption overall is increasing rapidly as users expand beyond just music. With that in mind, last week we also launched Yahoo!'s innovative new Podcasting service that will serve as a platform for all kinds of media casts in the future. Through the integration of community into all of these services, Yahoo! is at the forefront of the marriage of great professionals and user generated content.

Q3 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 18, 2005 Tuesday

The success of our products in relationships to our users has allowed us to once again forage and extend an important partnership. Four years ago, we talked about the possibility of creating truly unique broadband partnerships, combining the great assets of Yahoo!'s brand, its Internet audience and expertise with the leading telecommunication companies brand, audience and communication infrastructure.

Yesterday, we reinforce our position as a pre-eminent broadband partner of choice by announcing the new alliance with Bell South who offer their DSL subscribers co-branded Internet services. Bell south Yahoo! alliance also brings us to a full national reach in the U.S. with access to approximately 92% of the U.S. population living in the footprint of our broadband partner. This relationship is also a very important inclusion in our global broadband distribution strategy which includes some big broadband wins in the last 12 months including the extension and expansion of the SEC Yahoo! DSL alliance, the signing and subsequent launch of Verizon Yahoo! for DSL.

The continued and ongoing success with Rogers Yahoo! high speed in Canada and the extension of BT Yahoo! broadband in the UK, which was announced just last week. These relationships open up additional channels through which we share premium services today and provide an avenue for possible future modernization opportunities tomorrow. All of our accomplishments are possible because Yahoo! attracts the best and most accomplished scientists, engineers, design specialists, marketer and product visionary.

Talent, is our most important asset and during the quarter, we had tremendous success attracting, hiring and retaining highly qualified and accomplished people across multiple disciplines and geography. They thrive on the opportunity Yahoo! provides to solve some of the most technically challenging problems benefiting hundreds of millions of users across a range of areas such as search, communications, media, mobility, community data and advertising. Our innovation and leadership extends beyond our consumer products to our business model.

So let's turn now to the modernization side of the equation. We are making significant investments in our diverse modernization capabilities and we continue to see excellent results. Our marketing services business delivered almost $1.2 billion in revenue for the quarter, representing 46% year-over-year growth as a result of strong contributions by all forms of advertising. In brand advertising, we're clearly the number one player and we continue to out perform the segment and grow our share. The largest brand advertisers continue to come back and spend more.

In fact, the top 200 U.S. brand advertisers are on Yahoo! from the prior year had more than a 90% renewal rate. As it grew, the top 200 brand marketer are growing faster than all our marketing services on a revenue tax basis. This shows that the Internet and Yahoo! are firmly established as must buys for brand advertising. This is due to our unique and powerful brand advertising solutions such as advance targeting, innovative rich media format and network wide marketing packages that are helping the world's largest and most important marketer drive great results.

Targeting in particular is gaining in popularity amongst our clients. This provides a more relevant experience for our users, more effective results for our advertisers and allows Yahoo! to maximize revenues and efficiently utilize our inventory. We also store the volume of video streaming ads across the Yahoo!

Q3 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 18, 2005 Tuesday

network almost doubled year-over-year with much of this driven by consumer packaged goods company.

Search advertising continues to be a very, very exciting opportunity for us and of course, as one of our most important priorities. We're right on plan, improving and growing our modernization capability and see this area as providing real upside for Yahoo! in the near future.

In August, we launched an invite only beta of our new self-serve publisher network. We've been very successful in attracting large publishers like Via Com and I-Village and USA today we haven't yet tapped the small publisher market. We believe this service will ultimately position Yahoo! as the preferred advertising partner to small and medium sized publishers and enable us to dawn a new revenue sources by participating in this fast-growing segment.

This month also completes two years of planned integration between Overture and Yahoo!. I want to thank Ed for staying with us during this period and over seeing this important process. Moving forward, the search marketing sales team will be operating under the same management as the brand sales team and we believe the future is about even closer alignment of these two groups. This is important, because we are seeing trends that indicate an increasing percentage of our advertising, our spending in both brands and search marketing.

Already 50 of the top 200 U.S. brand advertisers are also in the top 200 U.S. search advertiser. What advertising -- advertiser are finding and as our research demonstrates is that the more they utilize both forms of advertising on the Yahoo! network, the better they do with each. Our industry leading advertising tools, the best environment for brand and performance and a sales culture that will help marketer learn and take advantage of what the web can really offer, will serve as well as the market rapidly expands.

So in conclusion, we're very proud of what we've accomplished so far, but fully embrace the belief that we are still at the beginning of significant long-term opportunities. And as the web evolves into the next exciting phase, we believe Yahoo! is in the best position to lead. And our business model gives us the competitive edge to take advantage of the growth opportunities on the Internet.

So now I will turn it over to Sue who will review more of our key financial highlights.

SUE DECKER, CFO, EXEC VP, YAHOO! INC.: Thanks, Terry. Very pleased with our third quarter results because they clearly underscore two fundamental business model strengths. Excellent growth and great balance and it is not an accident. We've been careful, deliberate and persistent about committing the appropriate investment -- of internal operations and external acquisitions.

At the same time we are very aware that our mission is not simply to deliver strong returns for a few years but to make the appropriate investments and capitol allocation decisions to build value over the long-term. This would not be possible if our source of strength were a single product or if we were reliant on a narrow customer base. We still have a lot of work to do but we feel very good about our progress on delivering this combination of value to shareholders. Before we review Q3 results let me start with a couple of housekeeping items. First, our earnings in Q3 contained a nonoperating pretax gain of $27 million which from the disposal of two nonstrategic investments

Q3 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 18, 2005 Tuesday

which we recorded in other income.

In addition, our effective tax rate for the quarter was unusually low. Earlier in the year we had estimated a full year effective tax rate of 41 to 42%. We now believe that will be about 100 basis points lower owing to greater use of tax credits than originally planned. As a result in order to adjust our nine-months tax rate to this level that we expect for the full year our Q3 effective rate was 34%. Excluding these items and assuming an effective tax rate of approximately 40% in Q3, consistent with our revised expected tax rate for the year our earnings for the quarter would have been $221 million or $0.15 per diluted share in the quarter. Up 77% from a year ago and up 15% from the $0.13 we earned in Q2. Let's talk now about some of the highlights from the quarter starting with free cash flow which we consider to be our most important financial metrics.

As a reminder we define free cash flow as cash generated from operations which includes cash costs related to taxes and changes in working capital less capital spending and dividend received Free cash flow came in at $345 million in the quarter, a new record, up 71% and advancing our trailing 12 months free cash flow to over $1.2 billion. This quarterly free cash flow represented 37% revenue ex -TAC and a conversion rate of 89% of operating cash flow. A testament to exceptional high cash productivity of our business model. One very interesting relationship is to compare our earnings to our cash flow.

Q3 free cash flow was 45% larger than our normalized earnings where as for most companies free cash flow is less than earnings. As compared with most companies we continue to benefit economically from large cash loss carry forwards. And from relatively limited requirements to invest in our balance sheet to grow. Let's look now at what we did with that cash and what happened to our balance sheet. Our ending cash and marketable securities balance was $4.8 billion up almost 1.7 billion since the same time last quarter and down about 160 million since last quarter.

Our primary sources of cash in addition to our free cash flow collectively amounted to close to 220 million. These cash sources were comprised of proceeds from the exercise of employee stock options, the sale of the two nonstrategic equity investments and the receipt of cash back from previously initiated structure share repurchase on which we earned an annualize rate of approximately 16%. We invested these cash proceeds in various transactions that we believe will yield substantial returns to investors.

In Q3 we invested over $700 million. First, we repurchased $208 million of Yahoo! stock at an average price of 32.89 per share. Second, we entered into $500 million in structured stock repurchased transactions, which mature in two troche through April of 2006. At the final maturity depending on the price of our stock we will have either repurchased up to 16.3 million shares of with these funds or will have received up to our initial $500 million investment plus an annualize premium of 18.5%.

It's important to note that our ending cash balance of 4.8 billion is net of both the 500 million in structured share repurchase transactions referenced before and also of $350 million in similar transactions that were previously entered into, all of which mature over the next three quarters. Looking forward, we plan to continue to use our strong balance sheets to enhance value to shareholders through acquisitions and share repurchase activity as appropriate.

Q3 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 18, 2005 Tuesday

Moving now to the P and L. The overall summary is that consistent with our financial strategy, we are successfully supporting a massive and growing base of more revenue productive users which has allowed us to exceed both our longer term revenue and operating cash flow growth objectives.

Specifically, third quarter revenue ex-TAC came in at $932 million advancing 42% over a year ago figures and up 7% from Q2 ' 05, despite normal adversity in seasonality in the brand side of marketing services. The 42% growth broke down into 40% growth in underlying organic revenue particularly strong considering tough comparison against year ago gains and 2% related to acquired companies owned for less than a year. Let's look now at the revenue breakdowns by lines of business.

Global marketing, are largest service generated $762 million of revenue ex-tax for the quarter up 40% year-over- year roughly consistent with both the very strong gains we saw in the first half of 2005 and also with the growth rates we experienced in '03 and '04. This was nicely balanced across our various offerings to advertisers. From pay for performance to branding. In short we believe Yahoo! is sitting in the captain's seat relative to competitors as we have both strong brand and strong search offerings and this strong positioning is showing up in the numbers. We believe were on track to gain market shares of the global online ad business for the fourth consecutive year.

Let me give you a little more color on what we see happening across our two forms of marketing. Terry mentioned that we're seeing an increasing overlap in the clients of sponsor search and brand marketing. Historically sponsor search has been driven by more direct marketer that experience transactions from their web site rather than from the OEM type of companies that typically define the brand business and sell offline and generally through distributors. However, more and more research on the buying cycle is demonstrating that the consumer conducts their primary research on the web, Often conducting multiple searches to find what they're looking for.

Once they make a decision based on that research the majority of the actually purchases generally occur offline. This has led an increasing number of OEM type companies. Such as automobile manufacturers, brick and mortar retailers, and traditional financial services companies, to begin to spend directly in search marketing and to value search beyond immediate online conversions to the search's overall influence in the buying process.

We see this in our numbers. Growth in spending from these types of advertising is out pacing our overall marketing service growth rates as advertisers are using the different media to compliment each other, rather than one medium replacing the others. Considering the size of many of these companies direct marketing budgets you can imagine how much potential upside this could be if this becomes more pervasive.

Turning to fees, we produced $170 million of revenue, up 55% from a year ago excluding acquisitions principally Music Match, fees grew a very healthy 41%. The primary driver of that business line is our premium offerings in which consumers and businesses pay us for our services. We ended the quarter with approximately 11.4 million paid relationships, up 50% from 7.6 million a year ago and up 1.3 million from Q2.

This strong performance was driven by content bundled with access, fantasy sport which is is typically strongest in Q3 for the football season, music and

Q3 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 18, 2005 Tuesday

small business. Last quarter, we raised our expected paid ending relationships forecast to indicate that we could exceed 12 million by the end of 2005.

Based on our third quarter experience and taking into account Q4 is typically challenged for Q3 in fantasy sports, we saw meaningful incremental subscriber growth from the new season , we now believe we're likely to approach 12.5 million as the Verizon deal gains momentum and other services continue to grow. We continue to expect these relationships to produce an average ARPO of 3 to $4.00 per month in 2005.

Turning to revenue by geographic segment, top line growth remains very robust internationally up 50% ex-TAC over the year ago quarter to $228 million and boosted in particular by strong growth in sponsored search as more and more inventory becomes modernization. On an organic basis our international revenue ex-TAC increased 48% in the quarter even faster than the 37% increase domestically. As a result, international revenue extack represented 25% of total revenue in the quarter advancing from 23% a year ago and consistent with expectations.

Let's turn now to some of the details behind our strong and growing profitability. Specifically operating cash flow came in at $385 million, up 48% year-over- year and above the high end f of our business outlook. Consequently global OCF margins were 41% somewhat above what we had planned despite the timing of spend relating to the Yahoo! Music Unlimited Service and seasonal challenges for the brand business in Q3.

As you know, the major driver of margin levers is compensation costs our largest expense which continues to yield productivity improvement. Head count ended the quarter at around 9660 and up about 880 from Q2, ' 05 levels, and up 38% from a year ago. Most of this was attributable to planned organic investments and key talent in various products and infrastructure, collectively designed to improve our user experience, strengthen our market position, extend new verticals and support our growing businesses.

We are very pleased that we've been able to make these investments and talents while still delivering improvements in productivity and margins. We see this as a testament of the network affect of our model our relentless focus on key priority areas. Let's turn now to the business outlook which we are upwardly revising due to better expected results and better visibility into Q4.

In addition, the updated outlook that follows includes the impact of four other factors. First, the expected impact of the pending transaction with Al BOBA on Q4 in 2006. Upon closing of this deal in Q4, Yahoo! China will no longer be consolidated in our results.

In the first quarter of 2006, we will begin recording our more than 40% economic share of the new Ali Boba entity through our equity interest line. For the full year 2006 we expect the transaction to be neutral to free cash flow and modestly dilutive to earnings due to the amortization of intangibles.

In addition, at the time we close this transaction, we expect to record a non cash gain based on the difference between Yahoo! China's fair value and its cost basis. Adjusted for our continued ownership interest in the newly combine entity. We are anticipating a noncash pretax gain of approximately 300 to $350 million in Q4 or somewhere between $0. 20 and $0.23 per share.

Q3 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 18, 2005 Tuesday

Second, the impact of MSN comprising less and less of our overall search network traffic and economics. Over the course of 2005, MSN has declined in significance to our overall network and we expect that this trend will continue as MSN sells an increasing number of links on their own. That relationship is now expected to generate approximately 70 to $75 million of revenue ex-TAC in 2005. We expect this erosion to continue in Q4 and through the anticipated termination of the relationship in June of 2006.

For the first half of 2006 we are estimating 20 to $25 million in revenue after ex-TAC from MSN. Third, the impact of the dollar modestly strengthening from the last time we provided our outlook in July relative to other currencies in which we operate. And fourth, the impact of the pending acquisition of Where on Earth, which we signed today is still in the investment mode from the perspective of the P & L, and does not generate revenue. We see this asset contributing to our ability to offer more relevant and --listings in 2006 and beyond.

Taking into account owl of those factors we expect fourth quarter revenue ex-TAC to come in a range of of 1billion 32 million to $1billion 820 million, up about 35% from a year ago. These revenue levels we expect to operate within a operating cash flow range of 452 to $482 million. Representing a 50% margin on incremental revenues and yielding a 44% margin at the midpoint. This Q4 outlook is expected to drive a full year range for 2005 of 3 billion 660 million to $3 billion 710 million in revenue ex-Tac up 42% from a year ago levels to the midpoint.

Excluding the impact of acquisitions in the past year, our organic growth rate is expected to be about 40% for the year. On the operating cash flow side combining our positive third quarter results with our outlook for the balance of the year. The full year operating cash flow range is now expected to be 1 billion 550 million to 1 billion $580 million. Up 52% from year ago levels and approaching our 50% flow through goal for incremental revenue conversion.

We expect our full year OCF margins to be 42% in 2005, up from the 39% in 2004 with most of this margin expansion coming from our international operations. As we said previously, our domestic operations are now approaching a operating level that seems to strike close to the right balance between appropriate levels of current profitability and ongoing investments in future growth.

Moving to free cash flow, we are upwardly revising our 2005 free cash flow range by $88 million to 1.2 to 1.250 billion up 45% from year ago levels and representing an OCF conversion of approximately 78%. The high end of our long end target range of 60 to 80%. This outlook contemplates capital spending for 2005 of approximately 390 to $405 million. Our capital spending mix has shifted with search and mail becoming proportionately more important to both our operating cash flow and our CapEx level.

To sum up, as we take stock of our financial vital signs for the third quarter we are very pleased with how 2005 is performing. First, it's the middle of our ranges, our full-year 2005 outlook suggest a financial model that is extremely attractive relative to most businesses. It calls for a third consecutive year of growing more than 30% in organic revenue ex-TAC. It's suggesting delivering close to 50% of that to the OCF line and it anticipates yielding more than 70% of that to free cash flow.

Q3 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 18, 2005 Tuesday

Second, we're delivering balanced growth across all of our contributors to
revenue. Whether measured by business line or geographic region. And third,
we're very pleased with the underlying consumer and advertiser metrics that
drive these results. Users, usage and modernization. And this is really the best
part of the story while Yahoo! is continuing to extend its reach to new users
we're also becoming better at serving the needs of existing users by listening
and investing in more relative products and services.

This deepening engagement is really the magic that's attracting advertisers
to our global platform and users to our premium offerings. We expect this
dynamic to continue to occur creating sustainable growth for the foreseeable
future. With that I'd like to turn it back to Terry.

TERRY SEMEL: Thanks, Sue. From some of recent offerings are just a glimpse of
the potential of Yahoo! and the value we can create for users and marketer. Our
intentions is to continue capitalizing on our industry leading assets in order
to deliver consistent and powerful growth over the long-term.

We really are blessed with amazing talent throughout the organization that
will help ensure that we stay at the forefront through change and innovation for
the year to come. Now I'd like to open it up for questions.

OPERATOR: [OPERATOR INSTRUCTIONS] This first question comes from Imran Khan
from J.P. Morgan.

IMRAN KHAN, ANALYST, JP MORGAN: Yes, Hi guys. A couple of questions. Terry
you talked about improving modernization. What are you doing in terms of gaining
market share or in the base search market -- seems like international is and
your competitors have dominant market shared there and secondly, you recently
signed a couple of network partnership with like for example an I-Village. I was
wondering if you could what drove -- on the revenue sharing part or the
technology win, could you comment on that? Thank you.

DAN ROSENSWEIG, COO, YAHOO! INC.: This is Dan. On the -- market share
globally, we have been in the search business for two years Were actually
extremely pleased. We've been growing right along with it particularly in the
United States. In Europe, we continue to pick up share in some of the larger
countries and we continue to improve the product and improve the algorithm.

There's a whole lot of things that have been placed that have been helping us
effectively. In Taiwan, in Hong Kong and other places that we have tremendous
market share already and continue to do all the necessary things in terms of
improving the product, rolling out new product, getting better distributions. So
we have done a lot in that.

OPERATOR: The next question comes from Anthony Noto from Goldman Sacks,
please go ahead.

ANTHONY NOTO, ANALYST, GOLDMAN SACHS: Thank you very much. I was wondering
you could comment on what strategic interest Yahoo!! may or may not have in
portions of AOL. Sue, a question for you, it looks like the business has a
pretty strong momentum going into the fourth quarter. Daily pages at 9% and
compare that to the fast -- that's faster than the rate of growth that you had
in revenue it looks like you're building a lot of user activity that hasn't been
monotietzed yet.

Q3 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 18, 2005 Tuesday

Could you comment on that and then in the fee business, similarly at a 13%
sequential -- for only 1% growth in revenue per unique user so it looks like
there's some momentum into that unit growth and if you could give us a
perspective and Terry, you had mentioned monization. Could you comment on what
-- sponsored leads on search on Yahoo!.com? Thanks.

PAUL HOLLERBACH: Hope we've got all this. Mine is -- I'll be easy. I'll start
off on the AOL strategic interest. I always say this, so here we go. You and I
are on this call alone. Right? These other 300 some odd people on the call are
not listening? So I'm going to pass that question because we never discuss any
of those items. We certainly -- so I'll go on to sue who will start to answer
the next question.

SUE DECKER: Sure. So Anthony, on the unique and daily page views growth in Q3
versus revenue and the Q4 momentum, I think it's worth just reminding everybody
that the seasonality of unique users and page views tends to be often the exact
compliment or the opposite of revenue.

So Q3 typically is a really strong quarter in users and usage and is
typically a little bit softer quarter from a brand advertising perspective. So
when you look at things sequentially it's a little hard to make a judgment, but
I would say that year-over-year we saw very strong gains in users and in page
views more north of 20% and that although very strong was still less than our
overall revenue growth. We are seeing enhanced monitorization on both sides of
our business.

On the brand side -- look at marketing services revenue per page view and
exclude search receive knew from the numerator and pages from the denominator.
We saw that metric grow again in the double digits year over year which is more
than what we've seen in the last few quarters. On the sponsored search side we
think the key is to focus on the fundamentals of the industry and how much
revenue each of those advertisers are generating. Whether it's more inventory or
revenue per search but getting into the specifics on queries our worldwide
trends on Yahoo! sites and our affiliates are up very strong double digits.

On the RPS side although the country and product mix changes make it
difficult to review the trends in aggregate, if you look at our own network in
the U.S. to hold the variables constant which is how we quote it every quarter
we think that's fairly representative in what we're seeing on an apples to
apples basis. And it also rose she sequentially. We're starting to see some of
the matching algorithm that we've been rolling out. I'm moving now to number 3,
the fee side. Yes, we saw very, very strong incremental subscriber growth in the
quarter 1.3 million and we raised our forecast for the year. We are seeing very,
very good gains from our collection of premium services.

We talked about some of the specifics on the call, the content abundance of
access as all of our access providers grow their subs and we start to benefit
from Verizon plus the music launch and we're seeing very good gains overall. 3
to $4 ARPO continue to be good for the year. The last question is mondernization
and where is that going to go? And I think I'll just remind you what we said
before, which is you know, when we acquired overture we first focused on the
algorithm side. After that we turned our attention to the monitorization side of
the equation and a lot of our plans this year were all about developing a
product suite. A very sequenced product suite in terms of how we could improof
our monitorization and we see that as all upside from where we are now. What we

Q3 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 18, 2005 Tuesday

said is we expected to see some of those products start to hit and benefit late
this year and then the financial impact really to build throughout 2006.

Since there's been a lot of speculation on exactly what that is and what
we're doing I think we'll share a little more transparencies on the product
suite that drives that. So just to review, Terry talked a little bit about the
Yahoo! publisher network which was launched in beta in August and we'll be more
widely available in beta in Q1 of 2006. So that's one important bucket of
activity that we expected and has already been launched. Second broad bucket is
our improving matching capabilities. Over the last couple of quarters we've been
rolling out new capabilities that enhance matching that leads to overall
increase coverage and better RPS.

We're continuing to enhance those tools to broaden our matching capabilities
and we should see changes rolled out every quarter throughout the year but we're
already start together see some benefit from that but we expect that to grow in
2006 as well. The third and final broad bucket of various initiatives is
concerned around improving our relevance and our quick through rates of our paid
listings. When our matching initiatives is largely focused on coverage and these
are largely focused on click throughs and better tools to advertisers. Our plan
there is to begin testing some of those initiatives in the first half of '06
with a broader rollout there after.

All of these initiatives have been already much right on track and consistent
with our original plan which is to have a sequenced series of products building
throughout next year and that's why we have been advising you that we expect the
financial impact to grow throughout 2006.

OPERATOR: The next question comes from Lauren Fine from Merrill Lynch. Please
go ahead.

LAUREN FINE, ANALYST, MERRILL LYNCH: Just a couple of quick ones. Terry you
talked about the integration of user generated content and professional content
and I'm just curious how you look at that from a return on investment point of
view.

I'm just thinking that some of the investment that you're making could either
be viewed as too small or too big in terms of some of the content that you're
generating yourself and I'm also curious if you could discuss head count as you
approach the end of the year, if we should expect to see an increase in the
fourth quarter as big as we saw in the fourth quarter.

PAUL HOLLERBACH: Sorry, Terry. I'll begin. I guess it depends on which side
of the glass you're looking at if the expenditures are too large or too small. I
consider them to be totally appropriate. So they are not --. This is not a
sprint. This is an ability for Yahoo! to take the leadership position and start
to evolve a whole new industry as it relates to media and media content.

And so don't look for any one thing that's either going to be wildly
expensive or any one thing that's going to change the whole direction, but look
to a series of things, some of which will be generated by Yahoo!, some of which
will be licensed and/or partnered with others as we've been doing in the past
and a large portion of it will be user generated content that Yahoo! will
totally enable and give you the opportunity to use our tools, post them, move
them around our network from either their buddy list or their families or attach
advertising links to it, you give them the ability to create businesses if you

Q3 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 18, 2005 Tuesday

will.

So we have a -- I think a very exciting road ma*p that includes some things that we're going to do on our own and many things that we're going to do with many others.

LAUREN FINE: Head count?

PAUL HOLLERBACH: Sue, you want to take it?

SUE DECKER: Sure. Lauren, on the question of head count, yeah, we did have a very large increase in Q3 which was consistent with our expectations. We're really, really fortunate to have hired some of the talent that we've hired and as you can see from some of the product rollout that Terry talked about it's been a renaissance in terms of our overall product suite. We do expect to hire probably not at the rate we experienced in Q3 in Q4.

OPERATOR: The next question comes from Jordan Rohan from RBC Capital Markets. Please go ahead.

JORDAN ROHAN, ANALYST, RBS CAPITAL MARKETS: I'm trying to interpret the fourth quarter guidance. In particular, how much of the Yahoo! China operations on both the revenue and operating loss basis are included in the 42 numbers what percent of the quart you will and if you can think of AlI BAB BA today does it currently make an operating profit?

SUE DECKER: Okay. Jordan, it's sue. Looking at the Q4 guidance, there are a few things affecting our Q4 guidance. I think if you work through the math there's roughly about a $7 million quarterly impact for the consolidation of AlI BABBA which is deem consolidation for the whole quarter but a lot of it. So no real impact from that. And then in terms of AlI BABBA specifically we can't comment on their financials. They have put out some forecasts in the past for their core B to B business which would indicate they're quite profitable, but that's really a question for them.

OPERATOR: The next question comes from Safa Rashtchy from Piper Jaffray. Please go ahead.

SAFA RASHTCHY, ANALYST, PIPER JAFFRAY: Good afternoon. Terry, you talked about the growth in the top 200 advertisers well above I believe the 40% or so growth in your world marketing services. Could you give us some more color on what you see in the broader base of your brand advertisers or let's say search advertisers. Is there a concentration among sort of a group of advertisers that are giving you a growth. Are your smaller advertisers growing as quick or not?

TERRY SEMEL: Let me start off by saying our brand advertising business is terrific and it's very, very well-balanced so we're seeing great growth in terms of the amount of dollars being spent by many of the top, top companies and top, top categories whether that's auto to CPG or financial services and others. But let me say this. We're seeing across the board growth in our and frankly in both of our advertising businesses but across the board, so our smaller and more medium-sized advertisers are doing a much better job as well and it's not really limited to any one area or any one size company.

It's company more and more becoming more and more custom and more and more comfortable with brand advertising on Yahoo!. So like the larger companies they

started with very small amounts. They started to emerge into slightly larger and that process just continues each and every quarter. We're seeing it across the board in both small, medium and large advertisers.

OPERATOR: The next question comes from Mark Rowen from Prudential. Please go ahead.

MARK ROWEN, ANALYST, PRUDENTIAL: Good afternoon. A couple of quick questions. First congratulations on the BellSouth signing. Do you think that given bell south's footprint that that will ultimately be about half the size of -- of the kind of revenues that you're generating with the SBC deal and on Verizon, given the fact that they have about a similar footprint to SBC but you're not exclusive, do you think that ultimately that could be the size of the kind of revenues you generate from SBC? And secondly, Terry, on advertising inventory for the holidays, is that basically going to be the gating factor for your growth in branded advertising where everybody wants certain pages or is demand really the gating factor? Thank you.

SUE DECKER: Okay. Mark, I'm going to start on the BellSouth deal, which we are really pleased to announce. In principle this is a very similar co-branded service provided to residential broad band subscribers for all tiers of service and the existing base will have the option to select the broad band service and in terms of the financial impact, this is not going to be launched until late '06, so I want to be sure that you're counting that in and you don't expect any meaningful contributions in '06 itself.

The structure of the deal is broadly similar to past broadband deals we receive a monthly payment and BellSouth participates in a revenue monthly share. Gaining the nationwide presence was the most important factor to us to have new users and expand our geographic footprint.

When you compare it to recent deals like that of Verizon our economic with BellSouth reflect the fact that we are initially the default offering for all new BellSouth subs which is a better position for us from a subscriber standpoint. In terms of the overall subbase, its subbase is roughly 2.4 million broadband users.

DAN ROSENSWEIG: On the -- this is Dan. On the question of the advertising and the holidays in general demand and what are the gating factors, we have tremendous inventory as you know and Terry and Sue took you through some of the highlights of the incredible growth we're seeing all through the network. Terry also mentioned that increasingly advertisers are taking us up on using targeting capabilities.

That helps us much more efficiently use our own inventory and we're able to create inventory based on a result of that. So based on the growth we have organically the number of services users are using which Terry mentioned are going up, the frequency in which people are visiting and the fact that we're more efficiently able to target advertisers and have the kind of consumers that advertisers want we think we have the ability to grow quite nicely.

OPERATOR: The next question comes from Youssef Squali of Jefferies and Company. Please go ahead.

YOUSSEF SQUALI, ANALYST, JEFFERIES AND COMPANY: Yes, thanks a lot. Sue, could you comment a little bit on your growth and the proprietary side versus size in

Q3 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 18, 2005 Tuesday

the network. Taxing stabilize from what it did last quarter when it was up a few hundred basis points and Terry, you said earlier that you're expecting your strategy to unfold over the coming months. I was wondering if you could give us any more clarity on that. Thank you.

SUE DECKER: Okay. Sure. In terms of the -- the underlying growth of our -- our search business, we really don't talk about the owned and operated piece but we do put our our tack numbers so there's a few things you can ascertain from that. You'll see it grew 5% quarter-to-quarter.

Our overall tack rates stayed stable or even declined a tad, so the underlying growth of our affiliates you could probably infer from that was a little higher than our stated tax. I think one important thing to mention from that though is that I talked a little bit about MSN and that trailing down a little bit, so that mixed shift would tend to keep the reported tack relatively stable to down even though the underlying tack continues to see the exactly what we've been expecting an that we have message you for the last two years which is modest increases in both international and domestic.

TERRY SEMEL: Hi, it Terry. So on voice over IP. Yahoo! is already a significant player in the PC to PC product and yes, I did mention that you could see future innovations coming into the upcoming months.

Bear in mind, as you know, we did buy dial pad and that does give us capabilities to much improve what we currently have in the marketplace and we're also looking forward and intend to work together with a number of our access partners in their territories and we have been exploring opportunities of working together.

OPERATOR: The next question comes from John Janedis from Bank of America. Please go ahead.

JOHN JANEDIS, ANALYST, BANK OF AMERICA: Hi. Can you please talk about the improved hot jobs offering? What has been the early feedback and have you seen much of a change in traffic and also is it safe to assume the listing of business growth rate is in line with what it's been historically? Thanks.

DAN ROSENSWEIG: I'll take the first part and Sue will take the second part. On the hot jobs it's actually been met with excellent response which is -- it's the same philosophy as search which is the ability to have the most comprehensive and relative offering. It's really opened up the marketplace to allow more users to come on in and be able to find what they that ear looking for.

So we have been quite success my been able to get more usage out of each user as they come back and come back repeatedly. This has been helping those who want to market through hot jobs have more listings on there. It helps commercial listings as well because of the frequency si of the user. So the early signs are quite good so far.

SUE DECKER: On the listing side of the house, we have seen very consistent with what we've seen in the past.

OPERATOR: The next question comes from Mark Mahaney from Citigroup. Please go ahead.

Q3 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 18, 2005 Tuesday

MARK MAHANEY, ANALYST, CITIGROUP: Thank you very much. Two quick questions. One on local search based on this where on earth acquisition. What's your sense about when local search could become material? There are a lot 06 gating factors here.

People have talked about local search for perhaps the last two years. It looks like the date has been immaterial but what's your sense on when it does become material and then a real quick question on the numbers. I think if we back into what the using the tack back into what non search marketing services revenue growth was, I think it was approximately we calculated around 10% which would actually imply an acceleration in year over year branded advertising growth. Any comment or feedback on those numbers? Thanks a lot.

DAN ROSENSWEIG: I'll take the first part of the local question. There's actually multiple parts to your question, which is when we talk about when does local become material, with if we talk from user perspective it is already material. Whether you use Yahoo! yellow pages or Yahoo! locally. It's part of what users come to us today. So from that perspective it has been gaining ground each and every year and it's actually a very large percentage of the queries that go in there. We've expanded locales to not only be in those areas but travel to become more localized.

This particular acquisition will help with the modernization side of local which is to be able to more effectively target advertising to the local markets and in that world there's two groups. The big L which is the large advertisers who have the national budgets but also localize locally. But coming on to the web and the gating factor there is how do you get them on to the web. So that's going to take time. They're coming on more and more every day. Our yellow pages help that. Our feed system helps that and our Yahoo! search marketing helps that so that's going to continue to build overtime. The ads get more relevant.

On the big L which is large advertisers targeting locally we've been quite successful with that and the kind of targeted capability that we have has been very effective in helping these advertisers expand how much we do on it. It just will keep building overtime and become more material over time.

SUE DECKER: So just moving on to the second question, I'm trying to follow the math here. I'll just give you a couple parameters here. Our marketing services extack grew 6% as a whole sequentially quarter-to-quarter and I think I mentioned earlier that you saw tack was up 5%, but that our tack rate declined slightly so that would imply our affiliate growth rate was broadly consistent with the overall ones.

Therefore I think your conclusion would be that owned and operating brand together grew roughly 6% so I'm not sure how you got into 10% but I don't think we want to get a lot more clarity beyond that and I think you have a lot more parameters to work with there.

PAUL HOLLERBACH: Let's turn to the last question please.

OPERATOR: The final question comes from Alexia Quadrani from Bear Stearns. Please go ahead.

ALEXIA QUADRANI, ANALYST, BEAR STEARNS: Thank you. If you could just give us a little bit more color on the branded side of your business specifically -- and maybe how pricing is trending versus a year ago or last quarter and then if I

Q3 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 18, 2005 Tuesday

could just clarify -- if you could just clarify a comment you made earlier on the search side in Europe, did you say you were gaining market share in all of Europe or you were just gaining market share in some markets?

PAUL HOLLERBACH: I'll start and then we'll turn over to Sue for pricing. On the inventory question as I explained earlier, that given the natural organic growth of Yahoo! which has been quite substantial as you saw this quarter and given the frequency in which users are returning all of which continued to go up quite nicely, we don't have an inventory problem in terms of the traditional ways.

Plus our targeting capability is allowing us to take the largest advertisers who would normally be focused on one particular content area and help them be successful across the network. So that's some of the benefits of being able to use the Internet. We've really doubled the number of advertisers that are using targeting capabilities over the last year so that's been a really big benefit for marketer and for Yahoo!. The search in Europe, it's not in necessarily every country.

We continue to maintain share most all major markets. In some cases we gain, but the overall message here is that the category is growing quite nicely and Yahoo! continues to grow with the category. We're extremely pleased with our success and we actually have been adding new products and new capabilities and new relevance which we think make us second to none at any of these markets so we look forward to the future.

SUE DECKER: So just to conclude with the pricing question on the branded side just to take a step back, since we already do business with most of the nation's top marketer our primary focus is on depth over breathed driving revenue per advertiser over increasing the number of advertisers. In terms of the revenue per advertisers is split across pricing and inventory. I think I mentioned earlier that a really good proxy for pricing on the brand side is to look for the marketing services revenue per page view.

On that basis pricing was up again in this quarter double digits as we've seen in most of the recent quarters that I can remember. We also had very nice growth in inventory as you saw from our overall page view gains. We said that was up 26%. That could include search and the rest of the network, but the point is that the overall attractiveness of the medium is causing more consumers to come we're seeing double digit gains in pricing.

DAN ROSENSWEIG: Thank you all for joining us. Have a great day. Bye now.

OPERATOR: Thank you for participating in the Yahoo! third quarter 2005 earnings conference call. This concludes the conference for today. You may all disconnect at this time.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors

Q3 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 18, 2005 Tuesday

and risks, which are more specifically identified in the companies' most recent
SEC filings. Although the companies may indicate and believe that the
assumptions underlying the forward-looking statements are reasonable, any of the
assumptions could prove inaccurate or incorrect and, therefore, there can be no
assurance that the results contemplated in the forward-looking statements will
be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF
THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE
AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR
INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO
WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY
ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON
THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE
ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE
APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER
DECISIONS.]

**LOAD-DATE:** October 26, 2005

Exhibit 29

FOCUS - 28 of 53 DOCUMENTS

Copyright 2006 Voxant, Inc.
All Rights Reserved.
Copyright 2006 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

January 17, 2006 Tuesday

**TRANSCRIPT:** 011706ab.717

**LENGTH:** 9749  words

**HEADLINE:** Q4 2005 Yahoo, Inc. Earnings Conference Call - Final

**BODY:**

OPERATOR: Good afternoon, ladies and gentlemen. Welcome to the Yahoo! fourth quarter 2005 earnings conference call. [OPERATOR INSTRUCTIONS]. I will now turn the call over to Miss Marta Nichols, Director of Investor Relations. Miss Nichols, you may begin.

MARTA NICHOLS, DIRECTOR OF IR, YAHOO!: Good afternoon and welcome to Yahoo!'s fourth quarter earnings conference call. On the call today are members of our executive team, Terry Semel, Sue Decker, Dan Rosensweig and Jerry Yang. Before we begin, I'd like to remind you that matters discussed on this call contain forward-looking statements that involve risks and uncertainties concerning Yahoo!'s expected financial performance as well as Yahoo!'s strategic and operational plans. Actual results may differ materially from the predicted results and reported results should not be considered as an indication of future performance.

The potential risks and uncertainties include, among others, the Company's ability to compete with new or existing competitors, reduction in spending by or loss of marketing services customers, demand by customers for Yahoo!'s premium services and risks related to the integration of recent acquisitions. All information discussed on this call is as of today, January 17th, and Yahoo! does not intend and undertakes no duty to update this information to reflect future events or circumstances.

Other potential factors that could affect the Company's business and financial results are included in the Company's annual and quarterly reports which are on file with the SEC. On the call today, we will discuss some non-GAAP financial measures in talking about the Company's performance, including operating income before depreciation and amortization which will be referred to as operating cash flow, revenue excluding traffic acquisition costs, free cash flow, and adjusted net income. Reconciliations of those measures to GAAP measures can be also be found on our website under Investor Relations.

Terry and Sue have prepared remarks that should last about 30 minutes, and then we'll have a brief Q&A session. Now I would like to turn the call over to Terry.

TERRY SEMEL, CHAIRMAN, CEO, AND DIRECTOR, YAHOO!: Good afternoon, everybody.

I am very proud of the remarkable growth and progress Yahoo! has demonstrated throughout this past year. We relentlessly focused on the expanding needs of our consumers and increased the rate of innovation and product development. This in turn translated into great financial results for our company, and we accomplished all of this while continuing to pursue emerging opportunities that we believe will help sustain our long-term competitive advantages.

Q4 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 17, 2006 Tuesday

Yahoo! reported revenue of $1.5 billion for the quarter, our 11th straight quarter of record revenues, and up 39% from the fourth quarter of the previous year. This makes our 2005 full year revenue of $5.3 billion, almost a 50% increase over the 3.6 billion in 2004. We achieved balanced growth with contributions across the board from our multiple lines of businesses and geographies, demonstrating the leverage in our business model, operating income before depreciation, and amortization in Q4 with $459 million and $1.6 billion for the full year of '05, up over 50% from the full year of '04.

Our results demonstrate the power of our great business model, Yahoo! continues to attract and engage the largest and most valuable audience on the web. This enable us us to drive our diverse lines of business around the world including brand advertising, search marketing, commerce and premium services. As more people are connecting to the internet, more often, and for more devices, we believe the future holds even greater opportunities.

There is a significant platform shift occurring in which consumers are taking advantage of the internet being always on, always fast, and always with them. As the largest global internet network, we believe now is the time to make investments in new audiences, new ways to engage them, and build new revenue opportunities. There are already 1 billion people using the internet today and it is only going to get bigger. We believe that the network that has the deepest relationship with the largest number of users connects them to the most activities on the internet across their multiple devices will ultimately be the most powerful channel for advertisers and publishers.

Our innovation in leadership in providing a valuable experience on the internet is really highlighted when you look at our key audience numbers. Users continue to endorse and reward Yahoo!, making it the number one global internet network. However, more impressive is that even with our scale, Yahoo!'s growth continues to outpace the growth of the worldwide internet population. We ended the quarter with approximately 429 million unique users, which includes users of Yahoo! China, up 24% from approximately 345 million this quarter last year. Our active registered users now stand at approximately 201 million, up 21% year-over-year from 165 million. Starting in Q1 2006, we will report a user number that reflects Yahoo!'s global reach including users of Yahoo! China and Yahoo! Japan which is approaching half a billion unique users as well as a user number that reflects our consolidated financials.

Our growth in users and share has been impressive and very exciting. It is also our growth in user engagement that really stands out. During the past year while growing overall users, we also increased the average number of properties consumed by our users by almost 25%. The increase in user engagement on Yahoo! gives us an enormous advantage as modernization opportunities on the internet continue to increase. Our high user engagement has also positively impacted our success in the growth of our premium services.

Our paying subscribers are the fastest growing subset of users on the Yahoo! Network. We ended the quarter with approximately 12.6 million unique paying relationships, up approximately 1.2 million from the previous quarter, and up almost 4.2 million or 50% on a year-over-year basis. This year we're now poised to surpass the goal of 15 million paying relationships that I previously set several quarters ago. The depth of our audience reach, the quality and engagement positively impacts our ability to provide deeper value to our advertisers, and is reflected in the success of our marketing services business.

For the fourth quarter our marketing service business delivered $1.3 billion in revenue representing 39% year-over-year growth as a result of strong contributions by all forms of advertising. We're clearly the number one player in brand advertising segments. Even as the market sees continued enormous growth, Yahoo! continues to outperform and take market share. Delivering results is the key to building and sustaining deeper relationship with the world's largest advertisers and that is why our average revenue per U.S. brand advertiser in the fourth quarter has more than doubled in less than two years.

Q4 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 17, 2006 Tuesday

In Q4 strong year-over-year growth was achieved across several industry cate-
gories including financial services, retail, technology and autos which all re-
corded their strongest quarter ever. Our unique and powerful solutions such as
advanced targeting, innovative rich media formats, and network-wide marketing
packages are helping the world's largest and most important marketers drive the
best results on the internet. Our leadership in areas such as data and targeting
provide a more relevant experience for our users, more effective results for our
advertisers, and allows Yahoo! to maximize revenues efficiently and utilize our
inventory accordingly.

Our Search advertising numbers during the quarter were also very strong and
the business is performing very well. On the sale side, we experienced strong
performance in the auto and finance categories as marketers embraced Search as
part of their customer acquisition strategies. December revenue in the retail
category also experienced a meaningful increase due of course to the holiday
season. We also believe there is significant potential upside as we improve our
modernization capabilities and our tools for publishers and advertisers. We have
been quite successful in attracting large content partners and have begun to
take advantage of the large number of small publishers on the web.

During the fourth quarter, we further expanded the beta of our self-service
Yahoo! publisher network, which is designed to tap into that segment. The beta
is ramping up nicely, and we now have several thousand publishers in the program
with thousands more requesting invitations. During the quarter, we also rolled
out a number of new matching capabilities that have already resulted in in-
creased coverage and improved RPS.

Overall, both our brand and search advertising businesses continued to ex-
pand. We're making the right investments in audience size, demographics and en-
gagement as well as exciting advances in delivering even better results for our
advertisers. As we move into 2006, we will continue to invest in the services
and experiences for which we've already received a lot of accolades. We are the
internet leader and we are well positioned to utilize the technologies, plat-
forms and services that will define our success over the coming years.

I would like to briefly give you an overview of our key priorities for 2006.
Our number one priority is building and expanding the suite of tools, services
and solutions for internet marketers and publishers. Just as you've seen us sys-
tematically build our products and platforms resulting in the world's best con-
sumer experience, you'll see us apply the same focus for our marketing partners.
Of course for good reason. We anticipate the overall internet advertising market
has the potential to double in size in the next five years.

In search marketing, our modernization efforts can be grouped into three
categories. First, we're expanding our content match services through the Yahoo!
publishing network to take advantage of the growing number of small publishers
on the web. We plan to add new features to the beta over the coming quarters in-
cluding search and enhanced ad targeting. We believe the service will ultimately
position Yahoo! as one of the preferred advertising partners for small and me-
dium sized publishers.

Second, we're focused on improving RPS through better matching and relevance
algorithms. While our matching initiatives will largely benefit coverage, we're
also focused on improving tools to drive higher relevance and click-through.
Third we are increasing the number of easy to use tools for advertisers and pub-
lishers so they can buy more key words, test more creative, and add more list-
ings faster.

Importantly, because of the millions of users and hundreds of thousands of
partners that depend upon us, we're going to be very deliberate about rolling
out changes and improvements over a period of time. There are many exciting op-
portunities in our brand advertising to advance our strong leadership position.
We are developing a brand advertising system to more efficiently deliver new
forms of advertising such as video format, increasing our targeting capabili-
ties, and enable advertisers to buy larger campaigns more efficiently.

Q4 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 17, 2006 Tuesday

Yahoo! is the only company that has scale and leadership in both brand and search advertising. As companies continue to use both forms of advertising, we have aligned our two sales channels under one management structure. In order to help advertisers even more effectively, utilize all of Yahoo!'s marketing services. We are on our way to a future where we can help marketers deliver the right message and the right format to the right customer and the right environment at the right time.

Second, we intend to continue to build audience reach and engagement. We already have a competitive advantage with respect to the size and scale of our audience and the relationships we have with our users. We plan to build on that position by further expanding and enhancing the content across our network. We intend to continue to support the full spectrum of advertising and premium supported content. If you're wondering, I have a cold. Please try to bear with me.

I talked about premium supported content and formats on the web including original, licensed and user generated content. You will also see an increasing emphasis from us on delivering more comprehensive content experiences by better integrating head and tail content and aiding discovery through community tools. Bad time to have a cold.

You will also see Yahoo! open up its network even further through open platforms and open API's that enable developers to build on top of our services which will expand our audience and business opportunities. We also believe that one of the most explosive content formats over the next few years will be video. Our strategy is to provide users with an end-to-end solution across video streaming, subscription and download. We believe Yahoo! will become a central hub for people to find, create, distribute and watch video.

We already are the leader in video with the largest video search engine, the most number of music video streams, and through the TV shows and huge live events such as Howard Stern and NASA that we have streamed. By integrating the world's best known content and the user communities that want to connect to it, we are building the most comprehensive and relevant experience that delivers on the promise of the shift to my media.

Third, we plan to continue to build tools to play a greater role in people's connected lives. Users have already invested significant time and energy setting their internet preferences on Yahoo!. We believe in a connected world users expect their internet experiences across all devices to be seamlessly integrated, and their consent to be accessible and personalized. This area should represent new and untapped market opportunities.

We raised the bar with the introduction of Yahoo! Go, earlier this month at CES, which will enable users to have a seamless connection in the three screen world across their desktop, mobile phone and TV. In 2006 we will roll out those services, build stronger relationships with carriers and device manufacturers, and explore new initiatives to enhance the consumer experience even further. We believe this area is a real strength and competitive advantage for Yahoo!. Today's generation does not see this as a paradigm shift. They see it as a way of life as we will as well.

Fourth, we will continue to invest in talent. We have been able to attract some of the leading people in the world and it is ultimately how we're going to win. I am very proud that in Yahoo!'s first year of eligibility, we were actually included in fortune's 100 best places to work list. It is not just a great working environment that makes Yahoo! attractive, but our scientists, engineers, design specialists, marketers, product visionaries and business people all thrive on the possibility of solving some of the most challenging opportunities benefiting our hundreds of millions of users. In 2006 we intend to continue to attract, hire and retain the most qualified and accomplished people across multiple disciplines and geographies.

Okay. I can -- in conclusion to save my voice I want to thank all of the Yahoo! employees throughout the world. It has been another great year for our company. I see Yahoo! extraordinarily well positioned for the future, and believe each of our businesses are still in their infancy. We have the right people, re-

Q4 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 17, 2006 Tuesday

sources and strategy to continue to take advantage of the significant opportunities ahead.

I would now like to turn the call over to Sue who will review our key financial highlights. Sue?

SUE DECKER, CFO, EVP, YAHOO!: Thanks, Terry and thanks to all of you for joining us today. As we close 2005 and commence 2006, we are excited about both our financial results and also about our opportunities ahead. Let me expand on both.

First, we believe our strong financial results and balance sheet speak to the fundamental strengths of our business model, robust and balanced growth across our various lines of business, along with geographic and product diversity. Through deliberate acquisitions and internal investment, we believe we have placed our chips in the right places and we are executing well against those opportunities.

Second, regarding our opportunities ahead, we are very aware that our mission is not simply to deliver strong returns for a few years, but rather to make the appropriate investments in capital allocation decisions to build value over the long-term. And the best part of where we sit today is we believe we have assembled and integrated the most important assets necessary to capitalize on the colorful canvas of opportunities ahead, while also having the financial resources to take advantage of the ever-changing landscape. We intend to continue to move quickly to take advantage of these strengths, which we believe will position us well, the shareholders powerful and sustainable growth over the long-term.

Before we begin with Q4 results, let me start with a few housekeeping items. As previously announced we closed the transaction with Alibaba in Q4. As a result of this and other investing activities in the quarter, we recorded a net non-cash pre-tax gain of $310 million in other income. The gain on the Alibaba transaction is based on the difference between Yahoo! China's fair value, and its cost basis adjusted for continuing ownership interest in the newly combined entity.

Second, our effective tax rate was 40% for the quarter and for the full year, excluding the benefit related to a legal entity restructuring transaction we completed during the fourth quarter. This transaction brought a reported quarterly and annual effective tax rates down to an unusual level of 2.6% and 30.2% respectively. And it yielded significant economic benefits preserving net operating tax loss carry forwards in excess of $500 million. These NOLs would otherwise have been utilized in in connection with with the close to $1 billion in gains from the sale of a nonstrategic investment earlier in 2005.

Consequently, notwithstanding the substantial profits we generated from operations, and the sale of investments in 2005, our remaining NOLs as of December 31st, totaled 3.8 billion, down only modestly from a year ago. Excluding these items and assuming an effective tax rate of approximately 40% in Q4, consistent with our effective tax rate for the full year, our Q4 earnings would have been $247 million, or $0.16 per diluted share in the quarter, up 32% from a year ago and up 12% from the $0.15 per share normalized level in Q3.

Let's talk about the financial highlights from the quarter starting with free cash flow which we view as our most important financial metric as it relates to value creation. As a reminder we define free cash flow as cash generated from operations, which includes cash costs for taxes and changes in working capital less capital spending. Free cash flow was $330 million for the fourth quarter, up more than 31% from a year ago, and totaled 1.3 billion for the full year of '05, a new record for the Company and at a level this exceeds our total revenue of only three years ago. For the quarter, free cash flow represented 31% of revenue ex-TAC and 72% of operating cash flow, demonstrating the ability of our unique collections of businesses to consistently and efficiently deliver strong cash returns.

Q4 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 17, 2006 Tuesday

One very interesting relationship is to compare our earnings to free cash flow. Q4 free cash flow was 34% greater than our normalized earnings, where as for most companies free cash flow is actually less than earnings. Let's turn to our consolidated cash balance and detail some of the significant sources and uses in the fourth quarter. Our ending cash and marketable securities balance was $4 billion, up almost 260 million from a year ago and down about 765 million from last quarter.

Please note that this ending cash balance does not include three other important sources of incremental balance sheet value. First, our Yahoo! Japan assets, the value of which increased 30% to 15.5 billion, an increase of more than $2 per Yahoo! share since last quarter to a total of more than $10 per Yahoo! share. Our investment in Alibaba, which at the time of the transaction was worth 1.4 billion and was carried on the balance sheet at that value. Third, $745 million in structured share repurchase transactions that upon maturity will result either in the repurchase of stock or the cash being returned to the Company during the first half of 2006.

Moving back to cash generation, in addition to our free cash flow this quarter, our other significant sources of cash collectively amounted to approximately $750 million. These sources were comprised of proceeds from the exercise of employee stock options and the receipt of cash back from previously initiated share repurchase transactions on which we generated an annualized return of more than 21%. Turning to how we invested that cash, we invested close to $2 billion this quarter in various transactions that we believe will yield substantial returns. The three primary areas in which we invested include first, $1 billion for the cash portion of our investment in Alibaba.

Second, $500 million for the purchase of the remaining stakes in our Yahoo! Europe and Yahoo! Korea joint ventures, and third we invested or made commitments to invest approximately 260 million in the repurchase or the potential repurchase of our shares. Most of this was through 245 million in structured stock repurchase transactions that we entered into and which mature in two [trannches] in May of '06. At the final maturity, depending on the price of our stock, we will have either repurchased up to 6.8 million shares or receive an annualized return on more than 22% on our initial investment.

To summarize, as we look back at 2005, we generated over $3 billion of cash from operating and other activities. We reinvested that cash actively through $1.7 billion of acquisitions, almost 400 million of structured share repurchases and over $600 million net in structured share repurchases, leaving our cash and securities balance up almost 260 million from a year ago. We believe the active and management investment of close to $3 billion in cash will be value creating for our shareholders.

Moving now to the P&L, the overall summary is consistent with our financial strategy we are successfully supporting a massive and growing base of more revenue productive users which has allowed us to exceed both previously announced longer term revenue and operating cash flow objectives, specifically fourth quarter revenue ex-TAC came in at $1.068 billion, our first more than $1 billion quarter on that basis, advancing 36% from a year ago figures and up 15% from Q3, despite the dampening effect from the deconsolidation of our China operations within the quarter, and adverse currency movement since we put out our Q4 business outlook since October. On a year-over-year basis, currency movements were largely neutral, but they took $3 million out of revenue versus our earlier expectations.

Now let's look at the revenue break down by lines of business. Global marketing, our largest service generated $882 million of revenue ex-TAC for the quarter, up 36% year-over-year. As expected, this growth rate reflects a more normalized comparison in our international search operations as compared with that during the first nine months of the year which were incrementally benefiting from the roll out of new markets to a greater degree than in this quarter. This strength was nicely balanced across our various offerings to advertisers from paper performance to branding. In short, we believe Yahoo! is sitting in a pole position relative to our competitors as we have strong brand and strong search

Q4 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 17, 2006 Tuesday

offerings. Advertisers are using the two forms of advertising to compliment each other rather than one medium replacing another.

Considering the size of many of our traditional clients direct marking budgets, and our ability to drive monetization higher over time, we believe search could provide significant upside as the use of this media becomes more pervasive and on the brand side, spending for advertiser doubling over the past two years still leaves us with the potential to go much deeper considering how small the internet is as a percentage of their total spending. Most importantly, this strong positioning is already showing up in the numbers. We believe we gained market share of the global ad business for the fourth consecutive year.

Turning to fees, we produced $186 million of revenue, up 38% from a year ago and bringing the full year number to $664 million. The primary driver of this business line is our premium offerings in which consumers and businesses pay us for our services. We entered the quarter with approximately -- ended the quarter with approximately 12.6 million paid relationships, up 50% year-over-year, and up 1.2 million, or 11% from Q3 levels. This strong performance was driven incrementally from Q3 by small business services, content bundled with access relationships particularly from the first full quarter of the Verizon deal and from premium music subscribers. On a year-over-year basis, we added 2.4 million paid relationship even more than the 3.5 million we added in 2004. As we look forward to 2006, we believe we are well positioned to reach 16 million paid relationships by the end of the year. In 2006 we believe our average RPU will be 3 to $4 per month as it was in 2005, trending toward the mid-point of this range as our subscriber mix continues to evolve.

Turning to revenue by geographic segment, top line growth remained very robust internationally, up 41% ex-TAC over the year ago quarter, to close to $260 million. Boosted in particular by strong growth and sponsored search, as more and more inventory became monetized, although to a lesser degree than earlier in 2005, as the successful completion of the rollouts in Japan, Taiwan and Brazil now passed their first anniversary.

Let's turn now to some of the details behind our strong and growing profitability. Specifically, operating cash flow came in at $459 million, up 40% year-over-year producing strong global OCF margins of 43% for the quarter, and 42% for the year. This strong performance was despite our decision to make various incremental investments and acquisitions driving -- aimed at driving future growth. In particular, we accelerated some of our investments in our connected life platform, recently rolled out at CES in January. As you know, the major driver of margin leverage is compensation costs, our largest expense, which continues to yield productivity improvements. Head count ended the quarter at around 9,820, up about 160 from Q4 '05 levels and up about 30% from a year ago.

The change of about 160 people from Q3 to Q4 was the net effect of the deconsolidation of China, which had roughly 520 employees, the acquisition of about 50 new employees, and the organic addition of about 630. Most of this organic gain was attributable to planned investments in key talents in product and infrastructure collectively designed to improve our user experience, strengthen our market position, extend new verticals and support our growing businesses. We are very pleased that we've been able to make these investments in talent while still delivering improvements in productivity and margins. We see this as a testament to the network effect of our models our relentless focus on key priority areas.

Let's turn now to our business outlook for 2006. We are introducing operating ranges for both Q1 and for the full year. Before getting into these numbers, let me walk you through three important factors that are impacting our outlook. First, the divesture of Yahoo! China that occurred late in October of 2005. Our Chinese operations contributed approximately $30 million of revenue for the first 10 months of '05 before deconsolidation, and will no longer be included in operating results in 2006.

Second, as we mentioned in the past, we believe the trend toward rising rates of traffic acquisition costs that we share with our affiliates will continue on

Q4 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 17, 2006 Tuesday

in 2006 as it did in 2004 and 2005. Our outlook contemplates roughly $70 million of revenue impact from raising TAC rates. Third, we wanted to remind you of the impact of the MSN relationship ceasing in mid-2006. As we indicated last quarter, MSN contributed about $75 million of revenue ex-TAC in '05, and we're planning for it to drop by $50 million to close to 25 million in the first half of '06 when the agreement is expected to terminate. The net effect of these changes on our affiliate search business is the planned loss of an estimated 120 million of very profitable revenue, having an impact on overall revenue growth and flow through rates in '06. As a result, we anticipate the growth in our owned and operated search business will out pace the growth of our affiliate search business in six '06 and will become a larger part of the mix.

Taking into act these factors, we expect first quarter revenue ex-TAC to be in the rage of $1.040 billion to $1.100 billion, up 30% from a year ago at the midpoint of the range and reflecting normal seasonality compared with a fourth quarter marketing services revenue. Turning to profitability, at these revenue levels, we expect to operate within an operating cash flow range of 410 to $440 million in Q1, up 23% from a year ago at the mid-point. Q1 margins are expected to decrease sequentially to about 40%, due to normal seasonality expected on our media ad business together with continued investment in core products and services, and the impact of several recent acquisitions that are still in development mode and not yet generating meaningful revenue.

In addition Q1 '06 will have a tough comparison against Q1 '05, due to the Yahoo! Japan $3 million royalty true up a year ago. Please consider that when you examine your sequential and year-over-year trends. For the full year of '06, we expect revenue ex-TAC to range from $4.6 billion to $4.850 billion, up about 28% from a year ago at the mid-point. Full year operating cash flow for '06 is expected to be in a range of 1,915 million to 2,055 million, yielding a full year margin of 42%, even after absorbing the loss of some highly profitable affiliate search revenue. On a segment basis, our expectation is there will be modest margin expansion in our international operations resulting in margins being generally similar to those in the U.S. The net effect of the three factors outlined at the outset of my comments on the outlook will combine to shave approximate 400 basis points from our 2006 ex-TAC growth rate and change the margin structure on incremental revenues to be in the 40 to 45% range in '06 versus the 45 to 50% range that we operated in in the second half of 2005.

Moving to our most important financial metric, free cash flow, on the heels of a very productive 2005, where we generated close to 1.3 billion, we anticipate generating free cash flow in the range of 1.4 to 1.55 billion in '06. This outlook contemplates capital spending of approximately 525 to $625 million, representing 27 to 30% of OCF. This range is a tad higher than our historical levels of approximately 24 to 26% of operating cash flow as we expect to absorb the lag effect of facilities related investments to accommodate our personnel growth and to expand our data center capacity. This strong free cash flow outlook represents a conversion of more than 70% in line with our 60 to 80% goal.

To sum up, as we reflect upon 2005, we are very pleased with how the year performed. As we look ahead, we are even more excited. Financially, at the mid-point of our ranges, our full year outlook for 2006 suggests a financial model that is extremely attractive. It calls for organic revenue ex-TAC growth approaching 30%, it suggests delivering more than 40% of that to the OCF line and it anticipates yielding around 70% of that to free cash flow.

Moreover the health of this model is allowing us to absorb expected reduced profitability in the search affiliate business, and to make significant investments to drive our premium services monetization efforts through connected life, and to drive our search effort through the coverage relevancy and efforts to improve advertiser experience that Terry outlined before. We believe that after a deliberate and staged roll out of these search monetization efforts, beginning in the second half of 2006, we will begin to see the financial benefits of these initiatives. Once these are fully rolled out and operational we expect a more significant incremental contribution to 2007 revenue and beyond.

With that, I would like to turn it back to Terry.

Q4 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 17, 2006 Tuesday

TERRY SEMEL: Okay. Thank you, Sue. Before I start coughing again I want you to know that we're very excited about many of of the opportunities that face Yahoo! in this year of 2006, and we're ready for it, and we can't wait, and we've been running on so I'd like to turn it right back to you all for questions.

OPERATOR: Thank you. [OPERATOR INSTRUCTIONS]. The first question comes from Imran Khan from J.P. Morgan. Please go ahead.

IMRAN KHAN, ANALYST, JP MORGAN: Hi, Sue and Terry. Couple of questions. If I look at the TAC growth in the international market, it seems like it was 3.7% and broad TAC was up 8.9%. In light of increased TAC rate I was trying to better understand what's going on that, did you lose any affiliates other than Microsoft revenue decreasing and secondly, you're talking about improving coverage and the clickthrough rate. I will start to get a better sense if you can share some timeline when can we really expect to see some sort of implement in the modernization and click-through rate, thank you.

SUE DECKER: Thanks. I will start. The TAC rate international is up about 4% quarter to quarter as compared with 6% last quarter. TAC rates in general were up modestly in this quarter as we've seen in the past. I think one point of factor to point out in that international TAC growth is that our international TAC has greater exposure to the yen than any of our other lines of business. The only business we consolidate in Japan is our search business, and you guys know what happened with the yen from quarter to quarter. That's a factor that shows up in the sequential growth rate of the international TAC.

MSN, as you mentioned, does continue to wind down. It has been flat to down for each of the last four quarters. I think if you look at our overall TAC rate of 13% in the quarter, I am sorry, 9%, the weighted average of domestic of 13% and international of 4%, the -- it is a little bit -- it is not quite as meaningful as an indicator of our overall search business in this quarter as it has been in past for that reason.

Regarding coverage and click through, we have talked before about the four buckets that we are undertaking to work on our search monetization efforts, which we see as real upside to the Company. The coverage initiatives have already been rolling out this year. We're already seeing a benefit from that. Our revenue per search was up again in this quarter nicely and up from last quarter as it was in previous quarters and we continue to benefit from that.

Regarding click through rate, we do have a number of relevancy initiatives that we've said in the past we would begin testing in the first half and we would roll out thereafter. We are going to stage a very systematic and deliberate roll out as not to disrupt hundreds of thousands of advertisers that depend on us. You have seen us do this before in algorithmic. We had a very careful and phased global roll out and we will perform the same way as we roll out the monetization efforts. We're very enthusiastic about it, but we don't want to rush it. We want to to do it exactly right.

As I mentioned in the comments, we will start to see more benefit of that in the back half but more meaningful as we move into '07 after we've had full roll out of the initiatives.

OPERATOR: The next question comes from Mark Mahaney of Citigroup. Please go ahead.

MARK MAHANEY, ANALYST, SMITH BARNEY CITIGROUP: Two quick questions. First, the organic growth rate relative to the 40% you reported last quarter, is it right to think about it as 36% this quarter, and secondly, just on the broader point about advertisers looking at both search and branded or display advertising, it appears increasingly that advertisers see search advertising as a tool for promoting brand awareness.

Is that an opportunity? Could you comment on whether that is an opportunity for you or a risk as brand advertisers may look at other search engines to promote brand awareness where they would have used display advertising in the past? Thank you.

Q4 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 17, 2006 Tuesday

SUE DECKER: Mark, I will start. Regarding the organic growth rate of 36% versus 40% in the prior quarters, that's correct. That was very consistent with our guidance, we in above the mid-point of our range in guidance. The reason for that is what I outlined in my comments, which is we are benefiting to a little lesser degree from incremental rollouts of some of the new search markets, Japan, Taiwan and Brazil which have now anniversaries, and so that has an effect on the overall total growth rate.

DAN ROSENSWEIG, COO, YAHOO!: Mark, this is Dan on the question of brand advertisers increasingly using search for brand advertising, the primary purposes of using search is literally for customer acquisition and customer retention. It does affect the brand positively because they get seen in more places, but of course, if it is not clicked through it will not stay in those environments. So it can't get a long-term sustainable impact the way they otherwise would in a graphical environment where they can be guaranteed placement, guaranteed location, guaranteed timing. We think it is a benefit to have both because if you're running brand on the same network you're running search, that's a real advantage so we've been able to capitalize on that.

OPERATOR: The next question is from Youssef Squali from Jefferies and Company. Please go ahead.

YOUSSEF SQUALI, ANALYST, JEFFERIES AND COMPANY: On the branded side, did the top 200 brand advertisers grow faster than all of the Company's marketing services on a rev ex-TAC basis as they did last quarter and second, do you expect any ripple effect on Yahoo! Japan from the Livedoor investigation which was heard from today Yahoo! Japan stock was down 8% today.

TERRY SEMEL: We'll go with Sue on the first piece and switch over for Japan. Thanks.

SUE DECKER: Yes, Youssef, thank you for the question. In both the fourth quarter and the full year the top 200 advertisers outgrew our marketing business ex-TAC as consistent with some of the previous quarters.

TERRY SEMEL: Okay. Youssef, on the Yahoo! Japan thing, obviously the Livedoor investigation is isolated to their CEO and Chairman and the transaction that he performed. While there has been a market reaction to it, I don't think it is anything to do with the outcome.

OPERATOR: The next question is from Jeetil Patel of Deutsche Bank. Please go ahead.

JEETIL PATEL, ANALYST, DEUTSCHE BANK: Hi, guys and hopefully Terry you you feel better. A couple of questions. First of all, were there any changes in particular in the quarter around the fees business, any change in the partnership deals, kind of implementation wise that could influence the fourth quarter, and I guess, the 4 million or so new paid relationships you're looking for in 2006, it seems like in general you would have a bigger gap up given that you have a new relationship rolling out this upcoming year. Can you talk about what are the underlying drivers that far 4 million incremental for this year and is the sub rate changing any? I think you historically talk about 3 to 5 versus 3 to 4. Can you go through that a bit? Thanks.

SUE DECKER: I am going to take that, Jeetil. Thank you. First on the fees revenue, we were up about 35% in the quarter and I think the reason you're asking is we were up 55% in the prior quarter. Remember that we anniversaried the acquisition of MusicMatch and a lot of their revenues in the fees line. You're looking at the run rate organically, in Q3 it was 41% compared to the 35% in this quarter and the other thing to consider is we deconsolidated China in this quarter, and a good portion of their revenue was from wireless which was in the fees line. If you adjust our fees upward for that, it was roughly 38% versus 41% last quarter. Very consistent with what we expected.

In terms of the outlook, I think the important thing to consider there is that the BellSouth deal does not come online until late in 2007, so we don't expect a very -- 2006, so we don't expect a big incremental contribution to the overall numbers. When you look in the past, remember we had a number of new ac-

Q4 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 17, 2006 Tuesday

cess deals that had come on or had ramped up, Verizon, Rogers, et cetera, that incrementally boosted the numbers this this last year. We don't think it is prudent to plan for more deals when we put out our forecast and we think that the sources of growth would be very consistent with what we've seen in the past, which is very strong organic growth in our content bundled with the access relationship as well as strong growth in the direct services we offer to consumers and businesses.

TERRY SEMEL: Next question, please.

OPERATOR: The next question comes from Ben Schachter from UBS. Please go ahead.

BEN SCHACTER, ANALYST, UBS WARBURG: Can you talk about the partners that you have in the YPN network and specifically refer to the domain parking business, wondering if you're happy with the quality of the partners there, and also with the YPN, will you enable advertisers to show richer media ads and non-text ads there, and also will they be PPC or impression based? Thanks.

DAN ROSENSWEIG: This is Dan. I will answer most of that. On the YPN partners, obviously as Terry mentioned, the size of it, it is a very deliberate rollout where we want to pick the partners, we want to learn how to match the traffic correctly, we want to get the click through rates right, we want to get the advertisers in the network correctly. We're taking very deliberate steps to that. The quality of the network will be as high as our normal quality is as the network scale gets larger.

For the moment we're learning a lot about the different partners and different sources of traffic. We expect on to be a super high quality network as we've done before. Won't really comment on our strategy in terms of the kinds of capabilities we're going to offer through YPN and our network, but we continue to see a really great opportunity to leverage the assets we have to be able to bring all forms of advertising and all forms of pricing to different environments as the year ages move on. We think that's the strength that Yahoo! has that the marketplace can benefit from.

TERRY SEMEL: Next question, please.

OPERATOR: The next question comes from Anthony Noto from Goldman Sachs. Please go ahead.

ANTHONY NOTO, ANALYST, GOLDMAN SACHS: Thank you very much. Sue, I was wondering in the fourth quarter if you could comment on your EBITDA margin of 43%. That was below even the mid-point even the revenue was above the mid-point of your guidance. Your guidance implied 44.2% margin and came in at 43, actually 43 is below the low end of the margin. I was wondering what happened there looks like increased investments.

Can you [laugh] specifically where the investments were and can there be a benefit in 2006 that you haven't attributed a lot to in the guidance, and additionally as we look into 2006, I understand the measured roll out of increased monetization. You talked about the bulk of the magnitude of the benefit in 2007. Can you give us a range of expectation of how you define magnitude. How much upside is there in RPFs from where you are today and even though you may not launch the second half of the year, why do you think you don't get the benefit to '07? Thanks.

SUE DECKER: Sure. Thank you, Anthony. Starting with the Q4 numbers, we delivered both revenue and EBITDA within our ranges, so we came in pretty much in line with our expectations from a few months ago. We did as I mention in my comments accelerate some investments particularly in the connected life platform that we just rolled out at CES and we thought that was a smart thing to do given the opportunity to profile that.

That was one area where we accelerated investments and made a couple of small acquisitions, [Mahad] and del.icio.us that were important. They come with costs, but very important talent that we think will be very, very helpful for the Company longer term but not yet revenue producing. When you look at the relation-

Q4 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 17, 2006 Tuesday

ship between revenue and profit growth, those are two of the factors and then
the other factor is currency incrementally from Q3 to Q4 brought down revenue
and EBITDA growth a little bit. Those combination of factors and dynamics that
went on in Q4.

In terms of the RPS roll out, we are as I mentioned going to do a staged and
very deliberate roll out. This has been part of our plan. We talked last quarter
for the first time about the four buckets of activities that we see as incremen-
tally improving our monetization. Coverage initiatives, overall matching initia-
tives, the YPN initiative, relevance initiatives, and of course the advertising
tools.

Those latter two we see coming out in the back half and we think it would be
smart not to roll it out and turn the switch on 100% of the world right away. We
do have a number of advertisers and publishers that rely on us economically and
we think it is very important that we do this very deliberately and roll out se-
quentially in various places. Our plan is to do that in the second half consis-
tent with what we've been saying and so the revenue impact would not be fully
kicking in until we have this globally rolled out around the world. That would
be in 2007.

Regarding quantifying, I appreciate the question. We're not putting out 2007
guidance today. We do see this as very significant upside to the company and
we'll let you -- thanks.

TERRY SEMEL: Next question, please.

OPERATOR: Next question is from Heath Terry from Credit Suisse First Boston.
Please go ahead.

HEATH TERRY, ANALYST, CREDIT SUISSE FIRST BOSTON: I would appreciate it if
you could break out the change in the number of employees from the numbers that
you gave to something kind of within your engineering and technology divisions,
so we can get an idea of where the hiring is happening within the organization
and then Terry, I was hoping you could talk a little more about the time line
and process for the creation side of the business. When should we start seeing
meaningful consent additions to the site and what form will those initially take
shape in.

SUE DECKER: Let me start in terms of the head count, I think I gave out some
pretty detailed numbers in terms of organic acquired and deconsolidated head
count. It is not our practice to break out employees by various function or in-
crements. I can say, though, that the largest additions are definitely in the
technology group and product development and product and engineering. We think
that is consistent with the past but very, very important as we execute on our
strategy to roll out some of these new initiatives on the product side and the
monetization side.

TERRY SEMEL: Let's talk a little bit about our content strategy. It is the
same strategy we talked about in the past, so we look at content and almost
three different buckets three different ways. First, we talk about which we have
been doing as a company forever, licensing and/or aggregating consent from oth-
ers who take advantage of our great distribution platform if you will around the
world. That's always going to be a big part of what Yahoo! does and always has
been.

We also talk about user generated content and it a large degree we entered
those mark places already and we're start to go grow more and more whether it is
somewhere between a Flickr and a blogging world and other world now attached to
Yahoo! news as well. You're seeing more and more user generated content as we
talk entering the platforms of Yahoo! and we expect a lot more of that as we go
forward. It is a very important aspect for us.

Also, Yahoo! is always done some producing or some making of its own stuff if
you will, and it has been that way since the beginning. You're really referring
to probably is entertainment stuff because we continue today doing things in the
sports world and in the travel world and the news world and a lot of those lit-

Q4 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 17, 2006 Tuesday

tle pieces have been done by Yahoo!, and then other stuff has been licensed as well.

So we see real opportunities in that, and we've also talked about the creation of some original what we'll call entertainment I think is what you're referring to, and we will do a little of that and we'll do that to kind of help lead the way and to show and familiarize ourselves to what our users are most interested in and take advantage of a lot of the data we have from our users in making some of those decisions and ultimately really look for more and more outside companies to look to us as the partner of choice. We have the audience, we have the capabilities. We have the platforms, and we have the desire to in effect help distribute and help introduce their products to our vast audiences throughout the world. It is the same strategy. It continues going forward. We do think ultimately it is a very big opportunity.

Next question.

OPERATOR: The next question is from Lauren Fine from Merrill Lynch. Please go ahead.

LAUREN FINE, ANALYST, MERRILL LYNCH: Just a couple of quick ones. Some of the external measurement services have indicated a decline in your search traffic and I am wondering what your own measurement is suggesting, and then secondly, I am just curious how you plan to compete against the MySpaces of the world. I know you have your own strategy in that area. It seems like the MySpace generation is scaling quickly, and I am wondering if you have any comment on that.

SUE DECKER: Okay. Yeah, sure, thank you. On the first point, the Yahoo! search market share, we feel really great about our position. We're holding our own. We're on our plan, and the trends really if you look over the reasonable period of time demonstrate broad market share parity between the two companies and a widening gap behind the leading two companies and all of the others, one thing I point out is that when you look at the trends that are put out by external services, you can see broad stability on the domestic side.

The international side is influenced by the way the [comsquare] worldwide data is calculated and they just have seven countries in that mix, U.S., Canada, U.K., Germany, France, Spain and Italy. They're primarily looking at countries in which our competitor is quite strong and we're less represented, and they are not including the countries in Asia where we're exceptionally strong and in many cases gaining. I would caution you against using some of those international surveys too literally. We feel really good about our own trends as we look at internal data and certainly the domestic external data is a better proxy.

DAN ROSENSWEIG: On the question of the MySpace generation, we obviously are huge believer as Terry and Sue point out in search and media and user generated content and community and we feel like we have been a leader and are a leader this that space and one of the things to keep in find is in the U.S., for example we reach nearly three quarters of everybody that come on the internet. So we have plenty of opportunities to touch people and create value for these people, particularly that generation, is also an enormous user of Yahoo!.

Our strategy has been to be able to create or assemble a series of connected assets and connecting devices so you have seen us with Flickr and del.icio.us, Yahoo! Answers, our search efforts in the community space and so we're very well positioned for that generation because we offer them value that they can not only get with the community sites but all the other motion and all the other activities they do on the web.

We're the most visited site on the web for example by ages of 12 to 24. We have tremendous relationships with all of the different demographic groups. We have assets that are building on and our social media efforts and community efforts are actually exploding as well. We're very excited about that space.

TERRY SEMEL: Okay. Last question, please.

OPERATOR: Thank you. The final question comes from from Safa Rashtchy from Piper Jaffray. Please go ahead.

Q4 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 17, 2006 Tuesday

SAFA RASHTCHY, ANALYST, PIPER JAFFRAY: Sue and Terry, could you talk about the growth trends that you see. Your results in this quarter while within your guidance showed a marked deceleration from last quarter and your guidance for '06 suggests even further deceleration, yet trends in the industry that we see are suggesting that the growth is continuing to be strong and in some cases accelerating. I think you mention you feel you're gaining shares. Could you help us reconcile the two trends? That will be my only question.

SUE DECKER: Okay. I will start and if anyone wants to join me, they can chime in here. Yes, let's the fourth quarter I think we talked about a little bit the growth rate was 36%. I was relative to 40-ish percent the quarter before, and that was right with what we planned, I think most people are looking for us to be in the mid-point of our range. We came up in about the mid-pointed of our range not to mention the only incremental thing there was the currency movement in the quarter. The reason that we planned for it to be that way is we have cycled through some of the new markets that rollouts on the affiliated business that were incrementally contributing to our international search growth and previous nine months. Those are Yahoo! Japan and Brazil and Taiwan.

They're still building and still growing rapidly, but the incremental new inventory being monetized is less of a factor in this quarter than in the past. As we look forward to the guidance, we're think we have an exceptional model. Where it is providing for some investments while still producing 30% revenue growth in a 40% more than 40% margins and more than 40% flow through and 70% of free cash flow conversion. The primary factors that are affecting that are the ones that I outlined in my comments which one is that a revenue growth would be 30 million higher if not for the deconsolidation of Yahoo! China, which of course we sold and moved into a new investment that we think has great value. We also have the loss of MSN which really didn't have too much effect on our quarters this year, but will have an effect next year as we go from a 75 million high margin source of revenue down to an expected 25 million all in the first half. That's a 50 million swing, and then we have a planned increase in TAC rates.

That's not different from the past few years but what is a little different is they have been incremental inventory coming in, new affiliate deals that have had somewhat offsetting effect in the overall numbers and we don't think it is prunted it plan for that. We did quantity if I for you the $70 million we expect from continuing increase in TAC rates, price of traffic has gone up in line with our expectations. We have been saying that from the outset when we acquired Overture, but the affiliate network is very important to our overall network, but it is not necessarily likely to be a major profit center longer term given the competitive dynamics in the market.

When you take those things into consideration, it takes about 400 basis points off the revenue growth rate that we outlined and it also takes off a couple points of margin. And those are consistent and we think it is prudent to plan in that way for based on where we stand right here at the beginning of the year. I hope that helps on the outlook.

SAFA RASHTCHY: All of our metrics, as we pointed out before are continuing to grow extremely well whether it is amount of users, amount of active registered users, time spent on Yahoo! Everything is growing extremely well and and we're very excited about it all. I think that we feel great about our company and great about our prospects and we think there is great upside to our company. With that, thank you all for joining us today and have a good day. Thanks.

OPERATOR: Thank you for participating in the Yahoo! fourth quarter 2005 earnings conference call. This concludes the conference for today. You may all disconnect at this time.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and

Q4 2005 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
January 17, 2006 Tuesday

involve risks and uncertainties. Actual results may differ materially from those
stated in any forward-looking statement based on a number of important factors
and risks, which are more specifically identified in the companies' most recent
SEC filings. Although the companies may indicate and believe that the assump-
tions underlying the forward-looking statements are reasonable, any of the as-
sumptions could prove inaccurate or incorrect and, therefore, there can be no
assurance that the results contemplated in the forward-looking statements will
be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF
THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE
AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURA-
CIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES
THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY
RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFOR-
MATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED
TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE
COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

**LOAD-DATE:** January 25, 2006

Exhibit 30

FOCUS - 26 of 53 DOCUMENTS

Copyright 2006 Voxant, Inc.
All Rights Reserved.
Copyright 2006 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

April 18, 2006 Tuesday

**TRANSCRIPT:** 041806av.793

**LENGTH:** 9648  words

**HEADLINE:** Q1 2006 Yahoo, Inc. Earnings Conference Call - Final

**BODY:**

OPERATOR: Good afternoon, ladies and gentlemen, and welcome to the Yahoo! first quarter 2006 earnings conference call. [OPERATOR INSTRUCTIONS] Please note that this conference is being recorded. I will now turn the call over to Ms. Marta Nichols, Director of Investor Relations. Ms. Nichols, you may begin.

MARTA NICHOLS, DIRECTOR, IR, YAHOO, INC.: Good afternoon, and welcome to Yahoo!'s first quarter earnings conference call. On the call today are members of our executive team, Terry Semel, Sue Decker, Dan Rosensweig, and Jerry Yang.

Before we begin, I'd like to remind you that matters discussed on this call contain forward-looking statements that involve risks and uncertainties concerning Yahoo!'s expected financial performance as well as Yahoo!'s strategic and operational plans. Actual results may differ materially from the predicted results, and reported results should not be considered as an indication of future performance. The potential risks and uncertainties include, among others -- the Company's ability to compete with new or existing competitors, reduction in spending by or loss of Marketing Services customers, demand by customers for Yahoo!'s Premium Services, and risks related to joint ventures and the integration of recent acquisitions. All information discussed on this call is as of today, April 18th, and Yahoo! does not intend and undertakes no duty to update this information to reflect future events or circumstances. Other potential factors that could affect the Company's business and financial results are included in the Company's annual and quarterly reports, which are on file with the SEC.

On the call today, we will discuss some non-GAAP financial measures when talking about the Company's performance, including operating income before depreciation and amortization, which will be referred to as operating cash flow; revenue excluding traffic acquisition costs; free cash flow; adjusted net income; and adjusted net income per share. Reconciliations of those measures to GAAP measures can also be found on our website under Investor Relations.

Terry and sue have prepared remarks that should last about 30 minutes, and then we'll have a brief Q&A session. And now, I'd like to turn the call over to Terry.

TERRY SEMEL, CHAIRMAN AND CEO, YAHOO, INC.: Good afternoon, everyone. Thank you for joining us. Yahoo! is really off to a good start in 2006. During the quarter we continued to lead the industry in building the next generation of web services for our users, while also expanding our comprehensive online advertising offerings to deliver greater value to our marketing partners. This is evidenced in our continued growth in audience size and engagements, as well as our strong financial results in the quarter. Our strength is largely due to our commitment to our users, through research and development, innovation and product quality, and to our clients by providing the best services and tools. These are

Q1 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 18, 2006 Tuesday

the key ingredients that we believe put us in an excellent position to take ad-
vantage of the growth and evolution of the Internet today and for years to come.

Yahoo! reported revenue of $1.6 billion for the quarter, our twelfth straight
quarter of record revenues, and up 34% from the first quarter of last year. We
achieved balanced growth, with contributions across the board from our multiple
lines of business and geographies. Demonstrating the leverage in our business
model, operating income before depreciation and amortization in the first quar-
ter was $435 million, up 26% from the first quarter of last year.

The strategy that we have talked about for the last couple of years, to lead
the shift from mass media to my media is starting to coalesce, and the next
phase of Yahoo! is becoming much more visible. You can see it through the con-
tinued development of communities on our networks, the expanded programming of
head and of content, and evolution beyond web search to Social Search, all while
providing personalized services for our users whenever and wherever they are.

Our innovative programming model is the reason why we can turn non-exclusive
content, such as music or news, into unique experiences and subsequently some of
the most popular offerings on the web. We believe that we have the powerful
business model, and that the course we have taken, to be both a great search en-
gine and provide deep and more innovative experiences in our vertical offerings,
is a compelling and winning strategy. In fact, testament to the strength of our
product offerings, Yahoo! was chosen ahead of all other Internet companies for
PC Magazine's Annual Award For Technical Excellence, citing what they call our
big basket of imaginative services. Innovation has always been and always will
be a hallmark of Yahoo!.

We made strong headway during the quarter to extend our leadership position
in some of our key services. We have substantially upgraded our communications
offerings in the last few months, and the next-generation versions of Yahoo!
Mail and Yahoo! Messenger with Voice. The new Yahoo! Mail beta was expanded to
six additional countries, and we extended our lead as the number one webmail
service in the world.

We also introduced PC to phone calling in Yahoo! Messenger in the United
States, now providing our Voice-over-IP customers with high-quality voice call-
ing across PC to PC, PC to phone, and phone to PC to complete calls to anywhere
in the world.

We expanded the beta of Yahoo! Answers from the U.S. to also include Canada,
the United Kingdom, and Australia, and added personalization and community en-
hancements to My Web, del.icio.us, and Flickr. The vibrancy of the Flickr commu-
nity is really evident, having just celebrated its 100 millionth photo uploaded
this March. Notably, the improvements we made in Search also enabled Yahoo! to
significantly increase its lead in search share in Yahoo! Japan and Taiwan.

Our content strategy is also winning over users as we apply our new program-
ming principle to integrate the full spectrum of content; more advanced design;
rich media; and Yahoo! pillars of community, personalization, and Search. De-
spite TV viewership being down for the Oscar show and the Grammy show recently,
our event sites both doubled their traffic and increased engagements year-over-
year. In the case of our Olympic -- or our Winter Olympics site, we had the num-
ber one audience, despite the fact that we had no official tie-ins with the
Olympics or the advantage of a broadcast network promotion. You should look to
us to us to apply these same principles within our existing content verticals.

One of the best examples of Yahoo!'s integration of user-generated and pro-
gram content -- frankly, also was a great deal of fun -- was our compilation of
a user submitted video to Shakira's latest hit, which was the number one video
on Yahoo! Music in March, with over 4 million video streams. It's these unique
experiences on Yahoo!, combined with the largest audience on the web that makes
us the programming partner of choice, which is what led 60 Minutes and CNN
Money, Dow Jones, and the Wall Street Journal to sign or extend content deals
with Yahoo! during this past quarter. And you can expect to see us continuing to
enter into exciting new partnerships in the months ahead, and that's for sure.

Q1 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 18, 2006 Tuesday

The category of video is also growing very quickly. We continued to distribute more video throughout each of our verticals, add content to our industry-leading video search engine, and increase advertising opportunities, both in streaming and embedded-in-content pages.

Our success at building relationships with users globally has enabled Yahoo! to grow its audience at a rate that is significantly outpacing the overall growth of the web. In fact, today, I am thrilled to say, that we reached a remarkable milestone of an estimated 0.5 billion monthly users on Yahoo!-branded web properties. Actually that means that one out of every two Internet users around the world is using a Yahoo! service each month.

On a consolidated basis, excluding Yahoo! Japan and China, we delivered approximately 402 million unique users, which was up 27% year-over-year, from approximately 317 million, and up from 365 million last quarter. Our consolidated active registered users grew to approximately 208 million, up 23% from the 169 million in the first quarter of last year, and up from the 193 million the previous quarter. Four years ago, imagine this, our entire user base was the size of what is now our active registered user base, and we still think there's a lot more to come. What's really exciting to me is that we maintained the largest share of time spent on the web, even while outpacing the user growth.

Our extraordinary user and engagement numbers positively impact all parts of our business, including Premium Services. Our paying subscribers are the fastest growing subset, as you know, of users on the Yahoo! Network. We ended the quarter with approximately 13.3 million unique paying relationships, up approximately 700,000 from the previous quarter, and up approximately 4.4 million, or almost 50% on a year-over-year basis.

Our innovation in leadership extends beyond our consumer products to our Marketing Services businesses. We delivered $1.4 billion in Marketing Services revenue representing a 35% year-over-year growth. Yahoo! is the only Company with leadership in all forms of Internet advertising. As a result of our range of advertising tools, targeting capabilities, and scale, we believe we are in the best position to work with marketers to deliver the right message in the right format for the right customer at the right time.

A significant initiative related to that goal is the continued improvement in our search monetization capability. The new service, which we are introducing shortly, will provide advertisers with a redesigned, easy-to-use platform that will enable advertisers to maximize their opportunities on the Yahoo! Network. Last quarter we shared with you that we expected to be testing in the first half of 2006 and rolling out the service beginning in the second half of this year. We also communicated that we planned a phased and deliberate rollout, so as not to disrupt of our hundreds of thousands of advertisers and publishers.

I would now like to provide greater clarity to what we mean by phases and deliberate. First, as was true with our rollout algorithmic search, which I'm sure many of you remember, we plan to approach this process by geographic market, which we think is the prudent way to do it. Second, there are three elements to the new system design which we will be rolling out sequentially, the first, which is almost complete, is the building foundational and core data platform on which the services will scale and be delivered. This will be adequately tested before moving to the full rollout of the market design features.

Next, we'll begin rolling out the new Advertising Management application. There are some wonderful features in this front end that will make the application much easier for advertisers to use, and that have already received very positive feedback from some of our advertisers who have already had a chance to preview an early version. After our customers have had some time to try out the new tools and to modify their own systems to take advantage of this new front end, then we'll start the third stage, which is introducing our new marketplace design, in which text-based results will be ranked to improve relevance. This new design will rank listings based on price paid, as well as incorporating other variables.

Q1 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 18, 2006 Tuesday

In summary, our goal is to complete this rollout in a way that is most productive for our advertisers and in the geographies and over the time frame that makes the most sense. We're very excited that we will be providing a more detailed overview of the product itself at our scheduled analysts' day on May 17th.

Within graphical advertising we continue to deliver outstanding results and believe that we are, again, outperforming this segment. Every vertical sales category delivered year-over-year growth, in large part due to our powerful verticals and our advanced targeting capabilities, allowing advertisers to reach their most valuable audiences across the network. We experienced significant increases in pharmaceuticals, telecom, CPG, autos, and financial services -- frankly, just to name a few.

We believe we are also seeing a growing trend across all categories of more advanced buying of graphical and video solutions, an indication that we are becoming a more integral part of the media companies' buying plan. Additionally, it's really significant to note that the revenue from our top 200 domestic advertisers in this group has more than doubled over the past two years. More and more, marketers are coming to understand that the Internet really can help them meet their needs across the full marketing spectrum, from brand awareness, consideration, intent to purchase, trial, all the way through to transaction. To help accomplish this, Yahoo! is making the right investments in audience size, demographics and engagement, as well as exciting advancements in our advertising technology, to seek to deliver even better results.

So in conclusion, I'm very excited about Yahoo!'s prospects. We are operating from a position of strength as a Company today, benefiting from our large, engaged audience and some of the industry's leading advertising solutions. Additionally, we are focusing our energies on developing platforms that are important to our future growth in both advertising and content delivery. We have enormous opportunities ahead, and I believe the right people, resources, and strategy to get there.

It's exciting to see the next generation of Yahoo! evolve, and with that, I'd like to turn it to Sue for our key financial highlights.

SUE DECKER, CFO AND EVP, FINANCE AND ADMINISTRATION, YAHOO, INC.: Thanks, Terry. And thanks to all of you for joining us today. We're pleased to report that we're off to a strong start in 2006. We have an ambitious agenda for a year that includes investment in our user experience and our advertiser offerings, designed to drive growth and profitability in future years. At the same time, we're thrilled to be able to make those investments while also delivering very strong and balanced current growth in both our key financial measures and also in our key user metrics.

Before I review Q1 results, let me start with a few housekeeping items. First, as anticipated, we adopted FAS123R in Q1 and begun expensing the fair value of stock options granted to employees in our income statements. The Q1 expense was 109 million. Second, our reported effective tax rate was approximately 43% for the quarter, and it is currently anticipated to be in a range of 43 to 45% for the year. As a reminder, our cash tax rates are expected to run at only 4 to 6% for 2006, significantly below our reported tax rate because of our NOL carry forward position.

The reported tax rate is higher in '06, as expected, for two reasons. One is the impact of FAS123R, which adds about 2 points, and the other is impact of a global restructuring project, which will also add about 1 or 2 points to our reported rate in '06 and '07, but thereafter, we believe we'll begin to reduce our tax rate from today's level by about 1 to 2 points per year, ultimately reducing our current book rate by 6 to 8% per year. This will reduce our cash taxes once our NOLs have been fully utilized.

Let's now talk about the financial highlights from the quarter, starting with free cash flow, which we view as our most important financial metric as it relates to value creation. As a reminder, we define free cash flow as cash generated from operations plus excess tax benefits from stock options that were pre-

Q1 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 18, 2006 Tuesday

viously included in cash from operating activities, less capital spending and
dividends.

Free cash flow for the quarter was $343 million, up more than 8% from a year
ago. For the quarter it represented 32% of revenue ex-TAC, and 79% of operating
cash flow, which we believe demonstrates the ability of our unique collection of
businesses to consistently and efficiently deliver strong cash returns. Our end-
ing cash and marketing -- marketable securities balance was 3.8 billion, down
about 167 million from last quarter.

Please note that this ending cash balance does not include three other impor-
tant sources of incremental balance sheet value -- first, our interest in Yahoo!
Japan, which was valued at $12.4 billion at the end of the quarter, representing
more than $8 a share; second, our investment in Alibaba, which at the time of
transaction was valued at 1.4 billion and is currently carried on our balance
sheet at that value; and, third, the $635 million in structured stock repurchase
transactions that are currently outstanding, and that upon maturity will result
in either the repurchase of stock or the cash being returned to the Company dur-
ing the year.

So moving back to the quarter in terms of cash generation, in addition to
free cash flow for the quarter, our other significant sources of cash collec-
tively amounted to 360 million. These sources were the proceeds of exercise of
employee stock options and receipt of cash back from a previously-initiated
structured stock repurchase on which we earned an annualized rate of 20%.

Turning now to how we invested that cash. We invested close to $900 million
this quarter in direct and structured stock repurchase transactions that we be-
lieve will yield substantial returns to investors. Of this amount six hundred
and -- almost, 640 million was done directly in the open market through transac-
tions. Also during the quarter, one of our previously-entered-into structured
stock repurchases matured and settled in shares. So our aggregate repurchase of
shares totaled almost $750 million in the quarter, representing 22 million
shares at an average price of just under $34.

We continue to believe the active investment and management of our cash will
be value creating for share holders. We are very pleased that are cash balances
are essentially constant year-over-year, notwithstanding the repurchase of close
to 29 million shares, entering into close to 500 million net in structured stock
repurchases, and the use of 1.6 billion in cash for acquisitions in the last 12
months. This is a testament to the substantial free cash flow we're generating
and the sagacious re-investment of our proceeds from the sales of non-strategic
investments and stock options.

Moving now to the P&L. The overall summary is that, consistent with our fi-
nancial strategy, we are successfully supporting a massive and growing base of
more revenue-productive users, producing strong growth and profitability. Spe-
cifically, first quarter revenue, ex-TAC, came in at $1.088 billion, our second
quarter of more than $1 billion on that basis, advancing more than 33% over
year-ago figures, despite the effect from deconsolidation of our China opera-
tions in the quarter. Ex-China the growth rate was 35%.

Now let's look at the revenue breakdown by lines of business. Global market-
ing, our largest service, generated $901 million of revenue ex-TAC for the quar-
ter, up 34% year-over-year. In the past, we've discussed the trends in our Mar-
keting Services business under the categories of brand and Search. However, this
language mixes an objective, that is, branding, with a specific product, which
is, Search, and doesn't adequately express the integration of how marketers are
now using both forms of advertising to complement and reinforce each other.

Let me give you two examples. First, many of the advertisers that buy links
served on our Search property are seeing branding benefit, in addition to gener-
ating a strong ROI, making the Search-brand distinctions somewhat ambiguous.
Second, our Content Match offering, typically considered to be Search, neither
runs in our Search product, nor is prompted by a search query, instead, it is
targeted on a -- to a content landing page more similar to graphical or text ad-

Q1 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 18, 2006 Tuesday

vertising that runs on our various properties traditionally described as brand, like autos and entertainment.

Consequently I'm going to communicate the trends in our business slightly differently now. I'm going to comment about our Yahoo! owned and operated network, which includes the breadth of what I previously referred to as brand- and Search-related advertising and represents the inventory that -- what we do on the inventory that we own. And I'll provide directional information on the growth trends of the inventory that we don't own but that we monetize for our distribution partners.

Within the O&O properties and services, we continue to lead the market in offering of graphical solutions to the nation's top 200 marketers. In this quarter, both of these sources of inventory, O&O and affiliates, grew fairly comparably to each other. As we indicated in the past, we expect off-network affiliate inventory to grow more slowly than our O&O inventory for the year, as MSN's business winds down, due to its decision to take its search part in house. Excluding MSN, however, our affiliate business is performing quite nicely, led by international. For the quarter our average TAC rate was essentially flat, or, adjusting for MSN, it was up modestly, in line with the expectations we communicated to you in January.

Turning to O&O network, I will discuss both volume-related and monetization-related growth. On the volume side, our best measure is overall page views, which were seasonally strong, but nevertheless rose a very strong 24% year-over-year, to an amazing 3.8 billion per day. In this quarter, I will also provide additional color on U.S. search queries, a subset of those overall global page views, specifically, these queries grew at 15 to 20% year-over-year, not quite as fast as our overall page view growth, which tend to be benefiting from international operations and also user-generated content, but very healthy increases nevertheless. Moreover, we've roughly maintained this pace of growth for each of the last four quarters -- closer to the high end of that range a year ago and closer to the midpoint today.

I mention this specifically because there's been some confusion of late due to third-party data, which has implied a massive deceleration in our search query growth to levels significantly slower than what we're actually witnessing. You should not consider this to be an ongoing statistic that we plan to release. This is a one-time disclosure to help clarify trends. Net-net, the overall volume summary is that our Yahoo! O&O network is vibrant and growing, as consumers are finding more and more relevant services on our network, enhanced by our community and personalization offerings.

Turning to the other source of growth, the rate at which we monetize our page views across the totality of our O&O global inventory, we generated 10% more revenue per page view year-over-year in Q1. If you combine that 10% in revenue per page view with the 24% growth in overall page views, this explains our 34% Marketing Services growth.

Again, given the very high degree of interest in the relative monetization of our Search product inventory as a small subset of the overall rest of our network, I'll provide a little more color here, as I have in the past. This 10% growth in revenue per page view works out to a weighted average blend of roughly 10 to 20% growth for the inventory sold in our communications, entertainment, information, and commerce properties and between 5 and 10% gains in U.S. revenue per query in our Search inventory. This is very consistent with what we've seen in the last few quarters. After our new advertising platform is fully up and running in 2007, our monetization growth rates should be even higher.

In summary, we believe Yahoo! is wonderfully positioned to offer Marketing Services to clients, seeking both mass reach and also very surgical targeting. We sell this in multiple formats -- text, display, and video -- and through both direct and self-service sales channels that enable our clients to purchase advertising, both in markets in which we set the price, and in markets which they do. Lastly we serve these messages by a variety of matching and targeting algorithms to assure relevance to the consumer. Strategically, we believe we are in

Q1 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 18, 2006 Tuesday

the sweet spot of online Marketing Services. We offer an unparalleled set of turn-key marketing solutions and consumer insight on a global scale.

Turning to fees, we produced $186 million of revenue, up 25% from a year ago. Adjusting for the year-ago one-time catch-up payment from Yahoo! Japan and the deconsolidation of China, these grew 30% year-over-year. The primary driver of this business line is our premium offerings, in which consumers and businesses pay us for our services. We exited the quarter with approximately 13.3 million paid relationships, up 49% year-over-year, and 700,000 from Q4 levels, despite the normal seasonal loss of our Fantasy Football subscribers from Q4 to Q1.

Last quarter we indicated that we expected to grow our paid relationships to 16 million by year end. Based on our first quarter experience, we now believe we are on track to exceed that target, and we continue to expect them to produce an ARPU of about $3 to $4 per month.

Turning to revenue by geographic segment, top-line growth remained very robust internationally, up 29% ex-TAC for the year-ago quarter, to 261 million, boosted in particular by strong growth in sponsored search. Holding currencies constant with Q1 '05 and adjusting for the deconsolidation of China, our international revenue ex-TAC actually increased 41% year-over-year, outpacing the also strong 34% increase domestically.

Let's turn now to some of the details behind our strong and growing profitability. Specifically, operating cash flow came in at $435 million, up 26% year-over-year, producing strong global operating cash flow margins of 40% for the quarter, and in line with what we had planned given the seasonality in the brand side of our marketing business, the impact of prior-year acquisitions, and the expected decline in MSN's business.

As you know, the major driver of margin leverage is compensation costs, our largest expense, which continued to yield productivity improvement. Headcount into the quarter, at around 10,100, up 280 from Q4 '05 levels, and up 30% from a year ago. This was primarily related to planned investments in key talent in various products and infrastructure, collectively designed to improve our user experience, strengthen our market position, extend new verticals, and support our growing businesses.

We are very pleased that we have been able to make these investments in talent while still delivering improvements in productivity and margins. We see this as a testament to the network effect of our model and our relentless focus on key priority areas.

Let's turn now to our business outlook. We're introducing a business outlook for Q2 and reiterating our previous business outlook for the year. Starting with Q2. We expect revenue ex-TAC to be in a range of $1.080 billion to $1.160 billion, up 28% at the midpoint of the range, and reflecting broadly similar seasonality compared with Q1 in Marketing Services. However, as is typical in Q2, the market for graphical advertising is expected to be seasonally stronger in Q2, while search queries are seasonally weaker in Q2 than in Q1, consistent with what we've experienced in the last two years and adjusting for the impact of the incremental country rollouts in Search last year.

Turning to profitability. At these revenue levels, we expect to operate within an operating cash flow range of 415 to $455 million, up 18% from Q2 a year ago at the midpoint. For the full year of 2006, we expect revenue ex-TAC to range from $4.600 billion to $4.850 billion, up about 28% from a year ago at the midpoint of that range. Recall that our outlook for both Q2 and the full year includes the impact of a strengthening dollar relative to other currencies in which we operate, the impact of rising TAC rate, deconsolidation of operations in China in Q4 of '05, and the anticipated impact of the MSN search relationship ceasing during 2006.

Turning to full year 2006 operating cash flow, we continue to expect to operate in a range of $1.915 billion to $2.055 billion, representing growth of 27% year-over-year and yielding a full-year margin of 42%, even after absorbing the loss of some highly profitable affiliate Search revenue. On a segment basis, our

Q1 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 18, 2006 Tuesday

expectation is that there will be some modest market margin expansion in our international operations, resulting in margins being generally similar to those in the U.S.

Moving to our most important financial metric -- free cash flow. We're maintaining a 2006 range of 1.4 billion to $1.550 billion, representing an OCF flow through of approximately 73 to 75 %, consistent with our longer-term target range of 60 to 80%. This outlook contemplates capital spending for 2005 of approximately 525 to $625 million, consistent with what we indicated to you last quarter. We believe this range both allows for strong free cash flow conversion and also proactive investments to drive our product strength and to support our user growth.

So to sum up, as we complete our first quarter out of the gate in 2006, we're very pleased with how we performed. And as we look ahead, we're even more excited. Financially, at the midpoint of our ranges, our full-year outlook for '06 suggests a financial model that is extremely attractive. It calls for organic revenue growth of ex-TAC approaching 30%. It suggests delivering more than 40% of that to the OCF line. And it anticipates yielding more than 70% of that to free cash flow. Moreover, the health of the financial model is allowing us to both show strong current growth, while also absorbing significant investments to drive future growth. This led us to repurchase more of our shares in the quarter than we have at any time in our history.

In addition we're on track with our efforts to begin to introduce a new advertising platform in the back half of this year that will help drive our Search advertising monetization efforts by better matching, increased relevance, and an improved advertiser experience. We continue to plan for a deliberate and staged rollout by major country, a rollout that ensures the best operational execution for our advertisers and for our investors.

And with that, I'd like to turn it back to Terry.

TERRY SEMEL: Thanks, Sue. It is hard for me not to resist to just mention one of the numbers that I mentioned before and then include one that Sue just raised. So when we think of Yahoo!, we think of the fact that there are approximately 500 million users using Yahoo! at least once a month throughout the world. And Sue gave us the other statistic of 3.8 billion page views a day. So if you think we don't continue, we do. We continue to focus on innovative ways to create unique and sustainable environments to deliver the greatest value to our users and ultimately our marketing partners. I strongly believe our diversified strategy will enable us to fully take advantage of both current and future growth opportunity.

And with that, I'd like to open it up to calls and, therefore, questions.

OPERATOR: Thank you. [OPERATOR INSTRUCTIONS] The first question comes from Youssef Squali from Jefferies & Company. Please go ahead.

YOUSSEF SQUALI, ANALYST, JEFFERIES & COMPANY: Thank you, very much. Sue, just two very quick questions. Was there a sequential increase in the branded revenues, Q1 over Q4? In other words, looking at your top 200 brand advertisers, did those grow faster than your Marketing Services revenues on ex-TAC basis? And, second, your fee-based revenues were flat sequentially, yet paying relationships were up 700,000. Why the decline in ARPU? Thanks.

SUE DECKER: Thank you, Youssef. To your first question, our top 200 advertisers ex-TAC did grow faster than our overall Marketing Services growth rate ex-TAC, as is consistent with past quarters. In terms of the second questions, the fees revenue. As I mentioned in my comments, there are -- there was one factor, which is the $3 million catch-up payment from Yahoo! Japan from a year ago that made it a tough comparison in the quarter. So actually the sequentially flat comparison had more to do with that than it did with the underlying subscriber-based revenue. So it wasn't so much an ARPU decline as it was the other portions of revenue had a tough comparison. We also, of course, sequentially had a tough comparison with the Fantasy Football. So there's a mix -- there's a mix of sub-

Q1 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 18, 2006 Tuesday

scribers that are slightly different this quarter than last quarter. Next question?

OPERATOR: The next question comes from Ben Schachter from UBS. Please go ahead.

BEN SCHACHTER, ANALYST, UBS: Hey, guys. First, congratulations on keeping the monetizations efforts on track. I think we're all glad to hear that. Terry, in the past, you've discussed the three types of content that Yahoo! has, in terms of Yahoo!-generated partner and the user-generated. And in the past, you've said that these are all equal priorities. Is that still the case? And in terms of revenue, how have each performed relative to expectations, thus far? And, then, finally, on video ads, could you talk about if they've had any meaningful impact on revenue now or if you expect that going into the year?

TERRY SEMEL: Yes, hi. I'll start off backwards, on video revenue. And, Dan, feel free to complement this. Not a huge impact so far. The place where we've been, I guess, had the greatest amount of experience with video revenues would be in our music. Music is a very strong advertising area. We do have the leading Internet Company in video overall, led, to a great deal, as a result of our video streaming type. And it has turned out to be an excellent business for us. And there's no question about the fact that video's just beginning. I don't think people two years from now, three years from now will refer to it as video. It will be accepted as a great form of content on the Internet, the way text is today, and other forms of content have been. So it's only just begun. It's very early days. And to that, you see us building lots of infrastructure right now, and have been this past year, to accommodate what we think the real future is.

On the three types of content, it's almost like I've often said about our advertising businesses, we have these two brilliant children. There are three, at least at this moment and there could be many more coming up in the near future, they're all terrific for us. As you know, we continue to license and, therefore, aggregate content. We continue to spend more and more of our energies, and you'll see a lot of it coming up up front, in terms of user-generated content, and I mentioned one. And we have all sorts of very, very successful blogging areas in news, in entertainment, and in games today. So user-generated, to us, is going to be a significant area. You'll see more coming of user-generated in other areas of Yahoo!, including entertainment.

And, of course, the last would be -- let's see, the last would be, I guess -- well, license, user-generated, and/or some original content as we go, stuff that we might produce either alone or with other people. You're going to see a lot of that. The big, big change for us as an industry has been probably, prior to the last six months, there've been lots of potential partners coming to talk about not doing very much and protecting pretty much what they already had. All of those partners today are coming to talk about what they might do with Yahoo!, and it's very, very exciting. Next question, please.

OPERATOR: The next question comes from Jeetil Patel from Deutsche Bank. Please go ahead.

JEETIL PATEL, ANALYST, DEUTSCHE BANK: Great. Thank. Two questions. First of all, you talked about the new page solution price times other variables. Do you think that has the impact of, obviously, improving monetization, but how do you think it does in term of pricing? Or do you think it's more of a -- yield issues where you see the biggest enhancement on monetization? Second, on behavioral targeting, can you talk about how that does -- how that drives monetization growth in the business longer term as you interact the PPC-based versus the display advertising the business? And, I guess, when do you start to see the impact of behavioral in the business?

SUE DECKER: Okay. So I'm going to take the first part of your question, Jeetil, and Dan is going to follow up on the behavioral targeting piece. So in terms of the new advertising platforms, I think it's fair to say that we see our biggest competitive opportunity on the yield enhancement side. So we optimize today for price and do pretty well on that variable. So we see the biggest opportunity more on the relevance and potentially on the click-through rate.

Q1 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 18, 2006 Tuesday

DAN ROSENSWEIG, COO, YAHOO, INC.: On behavioral targeting, we already see a nice impact today. It has so many benefits to us and to our marketing partners, in particular, and our users, which is, it allows us to work with the largest advertisers to not only place their advertising within relevant verticals, but also to extend it across the network. In addition to that, it allows us to create more value for every page of inventory that we sell because it's more relevant content for users and more relevant advertising targeting capabilities, which helps the rates continue to go up. And on top of that, the more efficient we are with our inventory, the more inventory we're actually able to create for more advertising.

So it is a virtuous cycle for us, and we're already beginning to see the impact. And even though we've had great impact already, we think it's very early days in what we could do in the future. And we continue to roll out new capabilities each quarter in this area. Next question.

OPERATOR: The next question comes from Imran Khan from JPMorgan. Please go ahead.

IMRAN KHAN, ANALYST, JPMORGAN: Yes, hi. Two questions. First, I was wondering if you could give us some color, like as you develop your monetization technology, what do your total number of advertising link on your site or your coverage will -- do you have to reduce those numbers? And, if so, what kind of offsetting factor it could be to your monetization upside? And, secondly, what kind of adoptions you have been seeing from Social Search, give us some sense how you plan to educate users on those features. Thank you.

TERRY SEMEL: It's Terry. I'm just going to start. So May 17th, analysts' day will be the first time that we will talk about some additional details of our plans and of our aspirations. And so to respect the fact that we probably have many competitors also listening to this call, we'll hang on that for awhile. In terms of Social Search, Dan, you want to try it?

DAN ROSENSWEIG: Yes, Social Search -- clearly, we think Search is at the very beginning, and we think there is going to continue to be meaningful change in that category, and we intend to continue to strive to be the best in that category and have seen great success, particularly in changing the game with Social Search.

So Terry mentioned a number of the products that we rolled out. Yahoo! Answers, in particular, has had very good early success. We've been able to roll it out in Asia, roll it out in the U.S., Canada, and the U.K. And everywhere we put it, we're beginning to see tremendous user feedback in response by balancing the combination of technology as well as humans to be able to answer the questions more relevant and more quickly. And we think that will continue to grow share, which will give us increased advertising opportunity.

TERRY SEMEL: Next question, please.

OPERATOR: The next question comes from Mark Mahaney from Citigroup. Please go ahead.

MARK MAHANEY, ANALYST, CITIGROUP: Great, thank you. And, Sue, thanks for clarifying some of the data about the queries. The question has to do with some of demographic trends you're seeing. One competitive issue that's come up has to do with the younger demographic on the Internet going to places like MySpace. Are there particular trends that you're seeing? Are there particular applications that you find have been particularly enticing on Yahoo! for that younger demographic? Is there a concern on your part about the ability to continue to attract that demographic? Thank you.

DAN ROSENSWEIG: Yes, Mark, this is Dan. On the demographic trends, we continue to do exceptionally well against all demographic groups. In fact, we're the leader in reaching all the demographics and -- as well as the youth demographic.

A number of our products and services are obviously services that people of all ages use, like Mail, our communications products are also huge in that demo-

Q1 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 18, 2006 Tuesday

graphic, music and games, of course. The demographic change that we see is that, we imagine the next five years almost every demographic group will be equally penetrated, and we have products and services for all of them to start early, whether it is Yahooligans!, youth services, like Mail and communications products, Messenger, and then continue to grow up through Yahoo!. And we've had tremendous success in doing that. I think Sue was going to comment.

SUE DECKER: Yes, just to add one more thing, that is not specifically on the demographics but, as Dan said, the demographics of Yahoo! represent the demographics of the nation and the world. But if you look -- we've gotten a lot of questions on this -- on companies like this have reached level eight, who have grown very, very rapidly. I think an interesting stat to look at is, if you look at our overall user numbers, we have, in six months, added 50 million users, which is as much as the amount of users that MySpace has, for example. So it's very important to note that we're growing very rapidly in users, from a very large base. And it's, in large part, because of the community strategy that we've adopted across every one of our verticals.

TERRY SEMEL: Next question, please.

OPERATOR: The next question comes from Anthony Noto from Goldman Sachs. Please go ahead.

ANTHONY NOTO, ANALYST, GOLDMAN SACHS: Thank you, very much. Sue and Terry and Dan, staying on this topic of usage, I guess the first question I have is your page view growth accelerated year-over-year to 24%. It looks like it was driven by an acceleration in user growth of 27%, both faster, on a year-over-year basis than Q4. And I guess my question is -- Did you launch new products or new services that drove that? Or what was the specific initiative? You alluded to something, so I'd love the specifics.

And the second part of that question is -- Do you actually think page view growth is the best measure of your engagement? Because page views today aren't what they used to be, especially, like, on the music side. I could not change a page view for 30 minutes and be fairly engaged.

And, then, my last question is -- A lot of advertisers that we talk to as it relates to Search spending, advertising spending, talk about unspent budgets in both Overture and in Google. And as you make this transition of the monetization and you do the deliberate rollout, one of the concerns is the second- and third-order impact of maybe pricing going down. But if there's a lot of unspent budgets in there, in your system -- Overture system -- and leads accelerate because of the more relevancy, you could overcome the second- and third-order risks. Could you talk about that a little bit? What's the amount of unspent budgets? And could that offset the risk, thanks?

DAN ROSENSWEIG: Question. I'll take the first part, and then turn it over to Sue. Obviously, first -- the quarter we just closed is a seasonally strong quarter for users and for page views. In terms of specific products that we rolled out, we've been talking for quite some time about the enhancements that we built into each product. Our move, as Terry pointed out, into the my media space, building greater personalization, greater community, greater capability, making our products easier to find and easier to use.

And, then, in particular, some of the Social Search products and social products that we're rolling out have really improved retention of users on the site, which includes things like time spent and page views and frequency in which they visit and number of services which they use, which all of those are up. So there isn't one particular metric that we use to measure engagement, but we do think that the frequency in which they come, the number of services in which they use, and using us as a primary service in these areas is what we focus on. And that creates tremendous business opportunities for us going forward. Because whatever the percentage of the budget that can be spent, the more inventory that we have our ability to target more aggressively either by the user, by the content, or some combination both on the network or through Search, provides tremendous upside for us in the future, is our belief. Sue?

SUE DECKER: Yes, so just picking up where Dan left off to hit the engagement question. The page views are a decent measure of engagement. They're not the only measure of engagement. Clearly, time spent is becoming an increasingly important measure. And as we introduce AJAX and other technologies into some of our products, the number of page views they generate for revenue may or not -- may not be exactly parallel with the past. But the way that will show up is we'll end up more -- with more revenue per page view. So, either way, page views times revenue per page view equals our revenue. And it's the best overall metric we have today. And if we get a better metric over time, we'll certainly share that with you.

In terms of your last question, in terms of unspent budgets, that's probably a little more detail than we're prepared to go into today. We're going to talk more about our new platforms in the coming months as appropriate, and we'll share with you the relevant detail. Next question.

OPERATOR: The next question comes from Mark Rowen from Prudential Securities. Please do ahead.

MARK ROWEN, ANALYST, PRUDENTIAL SECURITIES: Thank you. Couple of questions. First, Sue, Terry was a lot more specific about some details on the new platform and when it's going to roll out. And yet your guidance for the year is unchanged. So my question on that is -- Are you being conservative in the testing that you've done initially? Are you seeing a lot of monetization increases? And, if so, why be conservative on the full year guidance? Is that not factored in? And does that give a lot of potential for upside in the back part of the year?

And, then, second, there was an article in the paper yesterday about CPG advertisers spending a lot more online, and some of them doubling their budgets and more off of small bases. So my question is -- Some of the early adopters, like the auto companies, who are spending significantly more than average online today, are you seeing those growth rates starting to flatten out as they get to -- some of the companies get to 10 or 15% of their budgets, or is it still increasing pretty rapidly? Thanks.

SUE DECKER: Okay. Thanks, Mark. I'm going to start and then pass it on to Dan. In terms of -- yes, Terry gave some specific details by what we meant by phased and deliberate when we spoke three months ago. As we discussed three months ago, that we are having a phased and deliberate plan of implementation, and, therefore, we would expect the financial impact of the new advertising platform and Search to be a 2007 event as the year goes on. So this -- the business outlook that we discussed today was not affected in any way by any of the efforts that we have on the Search monetization front.

I think the quarter was strong, and within -- but it was within the ranges that we provided for Q1. And we think that that's reasonable to maintain the same kind of range that we had for the year, in light of what's happened with currency movements, that have created a bit of a headwind as we look through the rest of the year. So, the combination of delivering within the range that we provided three months ago, and the fact that currency for all companies that have international operations are a little bit stronger relative to the dollar, were factors behind our business outlook.

DAN ROSENSWEIG: On the question over spending in certain verticals, is it flattening and new categories growing. We see all categories growing right now. And we don't see anybody who's reached anywhere near 15% of their budget or in a category in autos category. Yahoo!'s strength in the brand and the graphical space allows these vendors to continue to spend because they cannot only spend in the verticals, but they can continue to target all sorts of demographics throughout the network, and it's the largest network in the world. And it gives them the opportunity to do different parts of their marketing, everything, as Terry said, from the branding all the way through to the transaction part. So we believe we'll continue to see growth in all of the categories that are already finding great success on the web.

CPG is moving aggressively, and, frankly, on a global basis because they, too, know that their consumers are here and they see opportunities to reach peo-

Q1 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 18, 2006 Tuesday

ple all the time and during the day, which they rarely had the opportunity to
do. So we believe that category is only at the beginning, but we're seeing very
nice growth across multiple product lines. Let's see, next question, please.

OPERATOR: The next question comes from Scott Kessler from Standard & Poor's.
Please go ahead.

SCOTT KESSLER, ANALYST, STANDARD & POOR'S: Thanks. Terry and Sue, I took note
that you both mentioned Yahoo!'s assets and prowess in Asia. Could you talk a
little bit more about how you're doing in Asia and any details about Alibaba
would also be appreciated. I also have a second question, which is -- With a
number of media companies indicating that they're putting video content online
on their own websites, I was wondering how you think this is going to affect Ya-
hoo!? Will it potentially detract from Yahoo!'s traffic growth? Thanks.

JERRY YANG, CO-FOUNDER AND CHIEF YAHOO!, YAHOO, INC.: Scott, it's Jerry, I'll
talk about Asia first. I think, in general, we're seeing a lot of strength in
what we're doing in Japan. I think Terry talked specifically about how we con-
tinue to do well in Search and overall advertising market in Japan, although we
don't consolidate it. We see Yahoo! doing well there, and it's a big part of our
-- certainly a big part of our overall relationship.

And as far as the rest of Asia goes, in China, we are very pleased with our
joint venture in Alibaba. It's coming up on six months of working together. They
are, obviously, a private company, so we can't specifically talk about what
they're doing. But, in general, I think they continue to make a lot of headways
in their businesses of B-to-B commerce as well as in B-to-C commerce. Their ef-
forts with Yahoo! China is starting to take hold, as we continue to introduce a
lot of communications and Search products. But we -- as we've said all along,
China is in early days. In other parts of Asia, I think we're starting to really
see our strategy of community in Search and personalization really take hold. In
a country like Taiwan, which is small, but I think is a great example of how we
can put a lot of those assets together and make it work and make it a very
strong portal and the Search will pick up.

TERRY SEMEL: All right. So, it's Terry. I'll try to answer the last question.
I think it's really -- it's great. So the fact that some of the folks who own
content and who make content assigned to put it on their own site, A, I compli-
ment them all. I am thrilled to see them take these things out from locked in a
cell, which is where it went before, and worried about who might touch it and
look for various ways to monetize that content.

There's no doubt in my mind, that when one is monetizing their own TV shows,
they have an awfully small audience relevant to the Internet. If they simply
wanted to, in effect, make those same TV shows available to either stream or
download on their own sites exclusively, that would not be a very good business.
These are smart people and, yes, we have all talked and, yes, they would like
Yahoo! to participate in many of the things that they're doing. There are just
great opportunities for Yahoo! now in each of these areas.

And as I mentioned before, where we did not have content, be it, say, in the
Olympics, or if you look at our Yahoo! Music and you say, well, what in the
world does Yahoo! have as it relates to content in music? Well, fundamentally,
it's non-exclusive content. We have music videos. They happen to be the same mu-
sic videos that all of our competitors have access to. Notwithstanding that, we
have the largest music audience on the web globally and in the United States. We
video stream an extraordinary amount of videos to that site.

But what we really have are all the things we talked about a little earlier.
We combined all of the assets of Yahoo! -- the personalization, the ability to
trade playlists with your buddies, and use IM tied in and Mail tied in. And it's
all of the pieces that we bring together that makes it an extraordinary experi-
ence. It's the ratings and review and the personalization. So the content's go-
ing to be important. And at the end of the day, it's going to be all of the
tools and all of the engineering capabilities that a Company like Yahoo! has. So
that's going to fully enhance whether the content's non-exclusive or, someday,
semi-exclusive or not.

Q1 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 18, 2006 Tuesday

So this would be our last question, please?

OPERATOR: Thank you. The final question comes from Jordan Rohan from RBC Capital Markets. Please go ahead.

JORDAN ROHAN, ANALYST, RBC CAPITAL MARKETS: Thank you, so much. My questions are about the World Cup in Europe in a few months. Could you please detail the nature of the agreement with for FIFA, for those of us who don't quite remember the specifics from '02? Discuss the impact on what you may see in terms of page views and search queries. And potentially the financial impact -- how much is the license fee that is left to be amortized and what do you expect in incremental advertising revenues? Thank you.

TERRY SEMEL: Let's see, I'm going to look for a volunteer. Dan, you might start, and Sue might want to throw something in.

DAN ROSENSWEIG: Yes, the nature of agreement which was signed, as you said, in 2002 and expires after this World Cup, basically gives us the opportunity to build with FIFA, the FIFA World Cup website, the official website for FIFA World Cup, and allows us to be a sponsor and you'll continue to see Yahoo! visibility all through -- all through the World Cup and all through the games. And you'll see us on the boards and all the things that you saw us historically. So, mostly, it's a play for us to get tremendous visibility and brand. It will particularly help us in Europe.

We have a number of exciting things that will roll out in terms of products, which will be mostly focused on usership, particularly in the mobile space in Europe as it relates to working with each of the teams. You'll see things that we'll be able to do on our sites and in Search that have to do with, sort of, images and the use of Flickr. So there'll be a lot of the community and social capabilities that we built around the world that will allow each of the countries to be able to participate in a fun way with FIFA and get more brand and more visibility and more usership for Yahoo!.

In terms of the revenue opportunity, it's all built into our forecast. But it's an exciting relationship, and we really enjoy the relationship with FIFA.

TERRY SEMEL: With that, I want to thank you all for joining us today. Have a very nice afternoon or evening, depending upon where you are. Thanks a lot.

OPERATOR: Thank you for participating in Yahoo!'s first quarter 2006 earnings conference call. This concludes the conference for today. You may all disconnect at this time.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED

Q1 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
April 18, 2006 Tuesday

TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE
COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

**LOAD-DATE:** May 16, 2006

Exhibit 31

## Thomson StreetEvents℠

### YHOO - Yahoo, Inc. Analyst Day

**Event Date/Time: May. 17. 2006 / 11:00AM ET**

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

## CORPORATE PARTICIPANTS

**Paul Hollerbach**
*Yahoo! Inc. - VP Finance and IR*

**Terry Semel**
*Yahoo! Inc - Chairman and CEO*

**Dan Rosensweig**
*Yahoo! Inc - COO*

**Lloyd Braun**
*Yahoo! Inc. - Head of Yahoo! Media Group*

**Jeff Weiner**
*Yahoo! Inc. - SVP Search & Marketplace*

**Tim Cadogan**
*Yahoo! Inc. - VP Search*

**Susan Decker**
*Yahoo! Inc. - CFO and EVP Finance and Administration*

**Zod Nazem**
*Yahoo! Inc. - CTO*

**Greg Coleman**
*Yahoo! Inc. - EVP Global Advertising Sales*

**Wenda Harris Millard**
*Yahoo! Inc. - Chief Sales Officer*

**David Karnstedt**
*Yahoo! Inc. - SVP and General Manager, Direct Business*

**Usama Fayyad**
*Yahoo! Inc. - Chief Data Officer and SVP*

**Jerry Yang**
*Yahoo! Inc. - Co-Founder and Chief Yahoo*

**Jack Ma**
*Alibaba - Founder, Chairman and CEO*

**Joe Tsai**
*Alibaba - CFO*

## CONFERENCE CALL PARTICIPANTS

**Safa Rashtchy**
*Piper Jaffray - Analyst*

**Dan Rosenweig**

## PRESENTATION

**Unidentified Speaker**

Ladies and gentlemen, please welcome Yahoo! Vice President Finance and Investor Relations Paul Hollerbach.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

**Paul Hollerbach** - *Yahoo! Inc. - VP Finance and IR*

Welcome and on behalf of the senior management team, we would like to say thank you for coming and thanks to those who are viewing via the webcast. We really appreciate the interest. We think we have a great day planned with exciting new information and one - a day that, hopefully, will answer many of your questions that you have.

We will be making some forward-looking statements today, so I'd like to refer you to the disclaimer statement that seems to follow me wherever I go. And some logistics. So first, for those of you who did not see the product demos stations as you walked in, there are six products that are being demoed and there's some pretty new cool stuff there. We're demo-ing the new home page, the new mail beta, our Answers product, the new tech channel, Yahoo! Go Mobile and some new finance charting capabilities. So, please - those stations will be available during the breaks, during lunch and open after the session concludes. So, take a look at those.

You all should have packets in front of you with the agenda of the day, bios of the speakers and an evaluation form. If you could take a few minutes throughout the day to fill out the evaluation, we'd really appreciate it. The feedback does help us in planning future events. One thing on the agenda, we don't have Q&A sessions outlined explicitly on the document, but we will be having Q&A sessions throughout the day and you - so, you will have an opportunity to address each of the presenters up here today. So, please save your questions for the appropriate Q&A session. We'll be concluding the day with an executive Q&A session with Sue, Dan and Terry. So, if you have questions for those folks, please save them until after Sue's financial presentation at the end of the day.

If we keep on schedule, we should end around 2 o'clock and there will be a reception outside the ballroom for all of you to attend. We also, at the conclusion of the day, will be handing out books that contain all of the slides from today's presentation for you to take with you. And if you missed anything, we are webcasting and the archive of the webcast will be available a few hours after we conclude. So, with that, I think those are the main logistics. If you need any help, there are folks - Yahoo! is walking around with yellow nametags. Feel free to stop any of them and ask for help.

We're going to start off with a video - about a five-minute video, showing you a bit of what we're excited about in terms of our products and things that we're working on and give you a glimpse of the culture here at Yahoo! And after that, Terry will take the stage and we'll get started. So, thank you and have a great day.

[BEGIN VIDEO]

**Unidentified Speaker**

When I think about Yahoo!, I think about staying connected, keeping in touch.

**Unidentified Speaker**

I use it every day. That's where I get my news. That's where I get my e-mails.

**Unidentified Speaker**

Basically, whatever you need, you can find it on Yahoo!

**Unidentified Speaker**

We have the ability to communicate with our family by using various Yahoo! services.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

**Unidentified Speaker**

I see them - I see that this is very important, too.

**Unidentified Speaker**

It knows me and it knows what I like.

**Unidentified Speaker**

Stream of consciousness words I would associate with Yahoo! would be fun ...

**Unidentified Speaker**

Innovation.

**Unidentified Speaker**

Ease of Use.

**Unidentified Speaker**

Communication and connection.

**Unidentified Speaker**

Cool.

**Unidentified Speaker**

News. I'm having trouble with this stream of consciousness.

**Unidentified Speaker**

It seems like they're trying to look ahead to what people need rather than just focusing on now. It's like they're looking to the future.

**Unidentified Speaker**

Yahoo! has always center around people. It's centered around communications. It's centered around groups.

**Unidentified Speaker**

We want to make sure that when we develop products, we really, really focus first on the customer, really understand what it is that the customer wants.


© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Unidentified Speaker**

Our approach is to hire the most passionate people in a particular area and let them loose to go for whatever their dream product would be.

**Unidentified Speaker**

All of the major products are being revved right now. When you walk through the halls, there are standup meetings.

**Unidentified Speaker**

Almost all we talk about is ideas and how to implement what we're going to do next, what the future looks like, trying to understand and trying to engineer that future.

**Unidentified Speaker**

I think the way to think about the [conference] of such community, personalization and content. They help us do what the 21st century online and interactive media company needs to do, which is to build an audience that, on the one hand, is huge, but at the other hand, it's able to deliver a micro targeted, finely grained experience.

**Unidentified Speaker**

We're bringing together all these various pieces and it's only a company that has all these various assets that can really take the next step.

**Unidentified Speaker**

The front page of Yahoo! is the single biggest homepage on the Internet. You will see a lot of great new innovations on that front page. There's a lot more personalization. There's a lot more interactivity. And that really taps into a lot of new technology that's out there, things like AJAX and DHTML that really is a window into a lot of the great innovation that's happening in the rest of the company.

**Unidentified Speaker**

Yahoo! answers. It not only connects users to web pages. It connects users to other people who can answer their questions.

**Unidentified Speaker**

There is an interesting story about my friend. One time he is thinking something. And there is instant glue in her hand. And he cannot [inaudible] it out. So, with the fingers and tried to type instant glue on the line search and he got an answer in one second.

**Unidentified Speaker**

We get these small applications that live outside the traditional boundaries of Windows that give you very specific information.



© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

**Unidentified Speaker**

We use Messenger with voice. There's a nine-hour time difference between where we're living and where most of our relatives are.

**Unidentified Speaker**

And we like to talk to our grandchildren and hear their voices.

**Unidentified Speaker**

With Yahoo! Messenger, they're able to both share photos and talk about those photos interactively. And the whole experience is free.

**Unidentified Speaker**

The new version of Yahoo! Mail is much more like a desktop e-mail client - things like drag and drop to file your messages. Things like a reading pane to read your messages quickly. It basically makes the work flow much, much faster.

**Unidentified Speaker**

My dad uses Yahoo! Photos on it a lot. So, I also check the photos out that we put up online. It's a big digital photographer.

**Unidentified Speaker**

The things that we have put in the pockets of the consumers like Yahoo! Go is really state of the art.

**Unidentified Speaker**

Yahoo! Go for TV allows you to sit on the couch, lead back and, with a remote control, experience everything that Yahoo! has to offer.

**Unidentified Speaker**

Our primary focus is on the user, but we never for forget about the opportunity for the advertiser within that ecosystem. If we do our job right, then the advertising in the context is not an imposition. It's something of extreme value. And it becomes harder and harder to differentiate between advertisement and content.

**Unidentified Speaker**

Typically, content was created by a couple guys and then broadcast out to many. Social media really says the community itself is creating the content and Yahoo! is sort of a platform to distribute that content all over the world.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Unidentified Speaker**

It's almost as if people have their own television station. There is a couple that wrote to us that told us the story of how they were running off to the hospital to have their baby, grabbed their camera phone and told their friends to tune into the Flicker page. So, they just kept on hitting reload, reload, reload and then, boom, almost in real time, they were able to experience the baby being born. And there's something extremely magical about that.

**Unidentified Speaker**

Social media is really tapping into the huge number of uses that Yahoo! has.

**Unidentified Speaker**

We have all these great new people we brought in from the company, from great acquisitions such as Upcoming.org and Flicker and del.icio.us and Me and all these people that joined out bringing great fresh ideas, but yet you have these veterans here at Yahoo! already, who innovated the entire Internet themselves.

**Unidentified Speaker**

We had eight or nine suitors for acquisition of Flicker. There is no Internet company that we felt understood this kind of media better than Yahoo!

**Unidentified Speaker**

The most exciting thing about coming to Yahoo! is that it is a chance for us to get our technology in front of the largest audience imaginable.

**Unidentified Speaker**

We're off to a great start in gathering some of the greatest talent in the industry to help us really anticipate what the next phase on the next Yahoo is going to be.

**Unidentified Speaker**

Yahoo! is my buddy. It's my glue.

**Unidentified Speaker**

It's like water.

**Unidentified Speaker**

It's my homepage.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

**Unidentified Speaker**

It's my tequila.

---

**Unidentified Speaker**

You're just going to have to have it.

---

**Unidentified Speaker**

It's like the key to everything.

[END VIDEO]

---

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

Yes, Yahoo! is my tequila. I like that one. She must walk around stoned all day long, though. So, I just would like to pick up where we were a moment ago before the film and thank you all for being here today. I know many of you have come from faraway places. We totally appreciate your being here. We're really looking forward to having an opportunity to talk to someone other than ourselves. So, we spend hours and days and weeks and months and have great planning sessions and great executions. But the fun of it is to start to talk to other people and to get your input and to listen to what you have to say and go through your questions and answers. And it's a very, very exciting time for us.

So, I'm going to kind of lead things off. And to me, about a week ago, I celebrated my fifth anniversary at Yahoo! These have been extraordinary years. And my first observations when first joining Yahoo! was the brand - great. Great brand on a global basis. It represented trust throughout the world. It still represents trust throughout the world. There were cooler brands one day and another one came another day and off and on. But it remained and still is the most trusted brand on the Internet today.

Yahoo! had a really big audience five years ago - almost 200 million unique users and less than 100 million active registered users. We'll talk more about, of course, where those numbers have gone now. That was an extraordinary large audience at the time. And Yahoo! had great talent at the company, terrific people who were really, really good at looking ahead. And here's what we didn't have as an industry. We didn't really have a business. Nobody was really making a significant amount of money in the business of the Internet. And there were many things that were missing, many of the things that we're going to talk about today and many of the things that have changed over the last five years.

But great opportunities. Our competitors were many and most of their companies were much, much larger. Their corporations were much larger, had much greater resources than, perhaps, Yahoo! had the time over the last five years. But that didn't stop Yahoo! from competing, country by country, product by product, area by area. So, we're used to competition. We kind of thrive on competition. And it's just a very, very exciting time for us. I'm so - I'm happy to be able to share it with all of you today.

So, I'm going to focus on the opportunity of the industry at large. And then others, as they follow, will talk more specifically about Yahoo! and what Yahoo!'s thoughts and plans and strategies are as we go forward. I just sort of want to remind you all about our mission. It's the core mission. It's to create the world's most relevant, vital and trusted Internet services for consumers and businesses. That hasn't changed and I don't really think it's going to change for a very, very long time.

Our strategy, which fundamentally is quite simple, is to leverage the power of Yahoo! global network for our audiences and our marketers. Now, then we break that down into three different units and we start with audience to drive deeper engagement by providing a platform and tools for individuals and communities to create personalized experiences on any device. And then, we go from audiences to advertisers and we talk about combined proprietary audience insights, rich contextual environments

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

and integrated marketing solutions to deliver the most effective marketing campaigns. And of course, we go to technology to expand global platforms, to speed innovation and time to market. And you're going to hear a lot about that strategy today.

People often ask, "Terry, what is the difference between a 20th Century media company and what I call a 21st Century media company?" And in total, it's very, very different. A 20th Century media company oftentimes has great content and they distribute that context pretty much on a global basis, sometimes on their own network and sometimes by using others to do it. What's the difference, one might say? Very, very dramatic.

When you look at content in a 21st Century company, it - the definition of content is dramatically different. It could range anywhere from e-mail to entertainment to sorts of different kinds of content. And most importantly, the distribution is extraordinarily different. It is unparalleled in scale and it can pinpoint and be very, very precise. So, it's global at the one hand and we could talk about a local community on the other hand. And we could obviously, as we distribute, we could distribute to a city, a town, a country, the whole world or any part of the world and it is a global platform indeed that we operate off of. And of course, there's technology, which provides many great things.

First of all, it makes it usable. It provides the glue, if you will, to make it all work and make it work quite seamlessly. And it has another aspect and this is the aspect that has distinguished a lot of our products and a lot of our services on Yahoo! The technology itself creates a direct relationship with users. It really can add things like personalization, add things like community, provide much more around the fact that when we talk about news or we talk about music, why is it that we have such huge sites that have nothing but non-exclusive content on them and how come they become so all-encompassing and so successful. It is the technology that enables us to do that as well a lot of the registrations that we have on Yahoo! So, big, big differences as we go forward.

It is kind of amazing to think that the Internet continues to grow and grow very, very fast with a little bit more than a billion users today, which really represents about one-sixth of the world's population. And the number that always blows my mind to think of that billion - about 500 million of the billion use and touch Yahoo!'s brand at least once a month throughout the world. So, one out of every two users, approximately, are using Yahoo! for something at least once a month throughout the world. That's massive.

And the growth rates, as you see, approaching 2 billion people over the next four years. Very, very exciting and notwithstanding the double digit growth in the actual scale and size of audience, it's interesting to note that, in areas of high penetration, like North America in particular, it isn't just the question of can it continue to grow that fast. The real question is how will be penetrate? How do we get deeper in those marketplaces? And that's something I think you're going to see a lot of today. And it's also interesting to note that about 80% of the future growth is coming from international, not North America.

Okay, I was blown away the first time I saw this. Let me just circle the first number. When you look at North America in the year 2000, it basically represented 39% of the distribution of Internet users. When you look at the year 2010, ten years later, that 39% goes down to about 16% of the Internet users coming from North America. Now, watch the converse to that. When you look at what with Asia Pacific in the year 2000, it represented about 17%.

And when you look at Asia Pacific in the year 2010, most surveys show about a 36% figure of the total Internet users. And when we said Asia Pacific, we're talking specifically about countries like China and India and Southeast Asia. So, we're not including Japan and a few other countries in that. It's a remarkable change in terms of where the users are coming from and where we see, over the next five years, enormous penetration.

But it isn't all about how large or what I'll call the breadth. It's, to a large degree, about the depth and how we get much deeper. And as you can see, as growth flattens in a number of regions around the world, like the U.S., there have been significant increases in engagement and more and more time spent. And when we compare ourselves on the Internet, to most other mediums, we appear to be, perhaps with the exception of cable satellite - and I'm going to add telco to that as well - there's some growth

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

being projected for those worlds in terms of time spent over the next five year. However, the biggest growth is in the Internet areas and it's very dramatic. So, it's not only breadth. We're starting to talk about depth. And depth is what really pays.

And probably for us the three leading drivers of deeper engagement would rest in the hands of broadband, mobility and search. So, let's just drill down on each. As you can see, you all know - and because it's broadband, it's certainly been with us for at least the last five or six years in meaningful numbers - and probably the greatest aspect of it is it's always on. And so, people with broadband use at least two times more time online and they consume at least 10 times the amount of page views. But more importantly, in the most simplistic terms, the difference is dramatic. One used to look for the Yellow Pages and whether you found it in your garage or your basement or you didn't find it at all. And then when you found it, you had to flip through it and that was another half hour process.

Today, of course, with broadband, on all the time, immediately you can go to search, you'll go to the particular site that you're looking for and immediately get your information, whether that's stock quotes or sports or anything else that you're looking for right at your fingertips. It's interesting to note that only about 19% of the world now have broadband and there's heavy - there are heavy pockets, as many of you know. Countries like Japan and Korea are virtually 100% at this time.

The one that's getting us quite excited is here in the U.S. The latest projections are, by the end of this year, possibly as much as 70%. I know we've been thinking 60%. But the latest numbers are starting to talk more like 70% of broadband penetration in the U.S., which is very, very meaningful, even though the U.S. is only country number 12 in terms of broadband penetration. So, there are a number of other countries that well ahead of us. But we're starting to close that gap in the U.S. Just significant growth up ahead makes everything better and provides us with better experiences for consumers throughout the world.

Mobility - my, oh, my, oh, my, is that growing. So, 900 million PCs in the world and about two billion cell phones. And it's thought that about 50% of the people accessing the Internet outside of the U.S. today maybe don't have a PC and may never have a PC. And maybe their way of entering the PC and hooking up to their PC will be their wireless device. I know you're familiar with some of the numbers. In China, one talks about a four-to-one ratio with four times the amount of cell phones. The PC population is a little bit north of 100 million, four times that in cell phones today.

We were just in India last week meeting with a lot of the wireless companies. They're signing about five million new subscribers every month. So, approximately 60 million more cell phone users by the month in India. And to me, the important fact, though, is most of the wireless providers, the - I - the manufacturers is what I'm talking about, talk very much so about the largest majority of wireless devices and cell phones, by the year 2008, being able to access the Internet. That, we believe, will be an enormous way to either - to increase penetration not only in wireless devices, but more and more dependency upon things people have either done on their PC or connecting the Internet through your wireless device. Primary in that change is important.

And of course, the third big change has been search. Search is just absolutely, it's a means to an end rather than just a means itself. And search has begun to mature and get better. Probably more than 50% of the search terms today - and that's what that little slide is supposed to show, but it's a bit confusing are three words or more. So they're becoming more specific and more significant and people are really drilling down on exactly what they're looking for. And we all know that search is still in its early days and there will be a number of presenters today who will start to give you ideas and thoughts of different ways that we intend to increase the usage of search and perhaps even change some of the ways we now see search.

Okay, the global advertising opportunity. I don't know, when I saw this put together the other day and I realized I started at Yahoo! in 2001, I just didn't know how bad off we were. I wish someone had shown me this chart a long time ago, but look at those numbers. They grow dramatically. Obviously, the next five years up ahead almost doubles and the numbers have been moving very, very strong and very, very dramatic. And as audiences get deeper engagement, the key is to unlocking the full monetization process. So, as people go deeper, monetization becomes more and more practical and more and more successful. And we believe at Yahoo! that perhaps we're the only company with leadership in all forms of advertising. And we're certainly very, very strong in each of them and growing by the day. Big market.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

This is quite interesting. When you talk about the new advertising environment and you realize its scale and you see it's billions of consumers online and it's tens of millions of advertisers and billions of unique offers, already you start to think about a totally different environment. And the advertising impact, the advertiser impact, relevant audiences, being able to be specific about audiences, campaign optimizations, even during the campaign itself. We track them, we see them and we can make changes and optimize for folks. New measurement tools - already, the measurement tools that exist today go far beyond traditional media and they're only just beginning. And again, you'll hear more about that today. And of course, devices and all kinds of formats, whether they're online or offline.

The landscape itself - so, one of the major contributors to that landscape - and you'll have time with that today as well - is how data is driving the change. And it has begun to drive it rather dramatically with much more coming in the future and how it affects agencies, advertisers, publishers. And the consumer roles are also shifting. It is all different. It is much, much larger. It is highly scalable. And many of us think it could likely turn out to be the advertising industry of the future, representing all sorts of industries, not just online.

Okay. I kind of had fun with this one. So, we went back and we said, all right, over the last five years, what were the four biggest bets that our company took and what did we do - how did we get to it, what did we do about it? We started with graphical advertising. We looked at it. It was almost non-existent. The Internet world had kind of crashed at that point in time. Advertising revenues were very, very small. It was a difficult time. People didn't know what they were selling and other people didn't know what they were buying. So, the educational process hadn't really started. We saw it as a great opportunity. We went about it by bringing in talent who had experience in traditional media as well as online media and we went after everybody's market share. That was our goal.

And by the end of the first year, we took a leadership position in graphical advertising. And I know most people thought, this will never be a big industry. This will never really, really grow. And of course, here we are five years later and it continues to grow. And the good news is that, on a global basis, Yahoo! is the number one player in this world and it was a great move of ours to dedicate and to focus ourselves on the only business that we could see in sight at that point in time.

We also saw search and there were early signs of search. And we had to make a huge decision. Do we go from licensing search content and search capabilities from others or do we become a principle in search? And as you all know, we took the latter. We went down the road to become a principle. We acquire two of the leading search technology companies - in Inktomi and AltaVista. A number of months later, we acquired the guys who invented how to monetize search Overture and became the other search player on a global basis. Kind of a [ballsy] thing to do.

We had never done any - either one of those two functions before and we saw it as the future and we saw it as something that we were going to place our bets in a heavy way on. And I know there were a lot of doubters at the time, but it was a great bet. And until just recently, I guess, there have only been two players of scale and of size in search in the world and Yahoo! proudly is one of those two.

Okay. So, our competitors in the U.S. and, frankly, all over the world, were knee deep in dialup partnerships and in delivering dialup. And they had many, many customers and we had none. We had not been in that business at all. We decided not to try to compete in that business, but rather to turn our attention to what everyone thought was the future. We thought it was the future. We thought the future was coming faster than perhaps a lot of other people did and we turned to partnerships. We began the first partnership with then SBC and SBC Yahoo! where we became a participant in broadband. And we became a partner. And it also created for us the backbone of a very, very successful subscription business for Yahoo! or a fees business for Yahoo! as well.

As you all know, that expanded to - actually, we expanded faster than SBC did. Now, SBC, AT&T is expanding as fast as we are. But it included Bell South. It certainly included SBC. It includes Verizon. It includes the cable company, Rogers, in Canada. It includes BT in the UK. And it includes the relationship in Japan, which is highly broadband orientated. A fantastic way, it put us out in front and we did not deal with the dialup business. We saw it as what we thought was going to be the past.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

The fourth bet was on deeper product and deeper product focus and putting all of our attention on one thing, our consumers. So, our point of view was, when we wake up every day, we're thinking about our consumers. What do they want? We have an enormous amount of input. Hundreds of millions of them are active registered users. We know them, they know us and we're going to focus on consumers. We're going to try to build the things that work, that are easy, that satisfy their needs and not build technology for the sake of technology, but build technology to help drive our consumer and to provide them with the best of everything. So, deeper product focus required us tooling up and becoming really good at a whole lot of products at the same time.

Okay. So, we look now and we say what might be the four big bets of Yahoo!? Let me just add, the four bets from the last five years, they're the backbone of our company today. They are not going away, but we are going to build on top of them, obviously, and add some other bets that we see for our future. And those start off with the next generation experience. And so, I'm bringing together a few things. Firstly, in technology, to incorporate all of the latest technologies, whether it's AJAX, whether it's Flash, whether it's what you heard in the screen just before. And to not be shy about it and to go right out to look for it, to find it and incorporate them. To get much deeper into social media. There will be a presentation on that this morning.

And so, rather than spend time, we think it's a terrific area for growth for our company and for our huge audiences. And to talk about the next generation of content. And I know there will be a presentation on that as well and that's going to deal with is it user generated? Yes. Is it licensed? Yes. Is it original? Yes. And what's the role of video as we go forward? And the answer to the last one is video is going to be just like text has been, like photos are. Video is going to be a presence of everything we do and it will be another way of communicating with people in a very, very pleasing way, I think.

The next one is monetization. We've put a lot of focus on that. I know today we're going to talk about the retooling, as we call it [panama] of our search monetization capabilities. That's one. There are many other areas that we're looking at for monetization. We are growing our fees business. We can make it a much better business over the next few years and we're looking at different ways to either partner for monetization or self build better products and better abilities for us to monetize than we do today. Very important for us because we see many opportunities ahead and need better monetization.

One of today's themes is going to be platforms. We have been building platforms for the last couple of years. I won't describe it in detail because you're going to hear it in detail today. It has made an enormous difference to our ability. Just one thing, when we build something here in the U.S., that same day we could turn on many, many countries in many, many languages and it's a whole different way for us to operate than the way we were operating three and four or five years ago. Platforms are going to be a big part of what we have been doing and we continue to do.

And you'll hear about platforms in media and communications and advertising platforms, of course, which we've always had. But advertising platforms and data that address the future. So, platform is very, very key to us. And everything beyond the browser. That the CES show this year, we presented Yahoo! Go. I know, a lot of people say are the wireless devices going to adapt that? Are people going to do that? Nokia now has, Motorola's coming. Nokia is going to do it a lot broader in the next few months. Cingular is going to start with it in the U.S. as other carriers are. And I truly believe that when you have something that a billion people in the world currently use which is a PC and you store your information on that PC, you want it available to you wherever you are. And it's going to create a big business for wireless devices as well. So everything beyond the browser.

Let me just give you real quick today's agenda. So, Dan Rosensweig, our COO, will talk about the operating framework and give you a lot of the next generation, talk about next generation experiences as well. Lloyd Braun, who runs our media group, will talk about media content. And Jeff Weiner who runs all of our search today will talk about social search, which I think you're going to find very, very fascinating. Tim Cadogan is in charge of our search product. He'll give you a more detailed presentation on what we call "Panama."

And after that we're going to have an advertising panel, which will include the four leading people at Yahoo! who are involved with advertising. So Tim, of course, will join, Greg Coleman, our Executive VP of global sales will kind of MC it. Wenda Harris Millard, our Chief Sales Officer will be there. David Karnstedt, who runs, a senior VP and running our search advertising business.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

And Usama Fayaad, who runs all of our data and research. So they'll be up, they'll be answering questions from the audience as well as some of their own that they care to have to, they would like to talk about to begin with.

So I'm going to summarize for myself just a little bit. I'm looking at the time clock and it's saying to me, "Terry, it's late." In summary, I'm going to go. You're starting to look today at what we consider to be the next Yahoo!. And it's taking advantage of that massive audience. And it's taking advantage of a lot of the things that we've talked about in the past. And it's building on top of that for the future. And we feel more excited today, I feel more invigorated today, than ever before. And it's a very, very great time for Yahoo!. With that, Dan Rosensweig, our COO.

**Dan Rosensweig** - *Yahoo! Inc - COO*

Thank you, sir. I want to thank Terry for that very warm and detailed introduction. I am Dan Rosensweig, who's Chief Operating Officer. I, like Terry -- No, I think we're okay, because you used up time. This is -- I'm actually celebrating my four year anniversary here at Yahoo!. So this is I think my third Analysts Day. And it's really wonderful to have an opportunity every now and then to stand up before you guys and give you a sense of what we're doing, how we do it, why we do it, and what we think the impact's going to be. So let me jump into it.

Why are we calling it the next Yahoo!? No, there's nothing wrong with the existing Yahoo!. It's just that we have fully embraced the philosophy that every few years, technology is going to radically change the opportunities in the businesses that we're in. So we've tooled the company to recognize that we are always going to be evolving and have to evolve quickly. So the next Yahoo! is recognizing that, as I said, every couple of years technology's going to impact us. So we can either use it to impact others and opportunities, or be impacted by it. So we feel, as opposed to four or five years ago, that we're building on top of an even stronger platform today than the platform we had a couple years ago. We actually see more and better and bigger opportunities. And we think that's very exciting for us.

In order to do that, it all starts with the products. And we have been, and you've noticed, and you'll see some more today, and you'll see some out in the hallway - bringing out some of the most important, exciting next generation of services on the internet. Taking advantage of what technology can provide today as opposed to what it could provide just a couple of years ago.

But to do this - and my role at the company is to make sure that we stay focused. There are a number of areas that we could go into. There's a number of things that people can do. And we spend 100% of our time on the priorities that Terry has laid out for the company. So the operational framework, I'm going to walk you through helps you understand how all of our employees think about how they spend their time over the course of the day, how they execute, and why we've been so successful at bringing out more and better products on the internet.

So our framework is pretty straightforward. There are six elements to it. The four elements I'm going to talk about today are going to be customer focus, monetization, platforms, and beyond the browser, which Terry laid out for you. Underlying, or an underpinning of all of those, are recognition that everything we do is global. We can't, the numbers don't lie. The charts are pretty clear that there's 6.5 billion people in the world. There's only 300 million people living in America. And today we reach 50% of everybody on the internet, and the internet is 1 billion strong.

So we already are one of, if not the leading company on a global basis on the internet. But we recognize that everything we do, everywhere we build it, must start with being internationalized from the beginning. Because in order for us to be nimble and compete, we must focus on building our products the right way from the start. Which is very different than we used to do just a few years ago.

The second thing is talent. It's not just a volume game for talent. It's bringing in the right kind of talent to go after the next generation of opportunities. And you're going to see a series of people up here today that represent Yahoo!s for the last five, 10 years. And you're going to see people who were either acquired or came into the company recently. Because Yahoo! is a

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

talent magnet. But again, it's not just volume; it's getting the right kind of talent to go after the opportunities. Let's talk about these opportunities. So customer focus. It all starts with the consumer. How does Yahoo! compete? No matter what anybody does, if we build the best products and services for consumers and we engage them more than anybody else, we stay in the game; we get an opportunity to win the game.

Monetization. Everything we do, we're a business. We recognize that. We build with the idea of how do we leverage the assets we have to bring in high margin, fast growth revenue opportunities? Platforms, which we're going to take you to in a little bit more detail today, are all about recognizing that in order to scale, we need to be able to build one time and use many times. So, and then beyond the browser, which, the numbers don't lie again. A billion PCs, 2 billion cell phones. So this the operational framework that every Yahoo! thinks about every day. And it's posted all through the company about how to make the right decision, where to focus, where they spend their time. And if it's not related to this, we don't do it.

Customer focus. Obviously customer focus is at the center of what we do. It's interesting to take a look back. You can look at Yahoo! and say: "my goodness, they're already 11 years old." Or you can say: "my goodness, they're only 11 years old." So in our case it's fun to take a little look through memory lane here, which is how Yahoo! has always found a way to stay with or slightly ahead of what the consumer wants. That's why we remain the largest site on the internet. That's why we're able to grow in every country that we're in. And so here, they originally wanted 10 or 11 years ago, they just wanted to find stuff. Yahoo! built the directory.

The next phase of what they wanted to do was "I wanted to know what was credible. Now I know there's lots of stuff. What's credible? And more than what's credible, I want to be able to find it in a very organized way." And Yahoo! started to build some of the most impressive and important content verticals on the web. And I would note that we are in the top three positions of almost every single vertical that we're in. And oftentimes number one in almost every country that we participate in. These sites reach 20-25 million people a month. They're huge.

The next step that users were looking for was they wanted to be able to communicate. Now just three or four years ago, Yahoo! was actually third in mail and third in messenger. Today we're number one on a global basis in mail and we're actually number two and in some cases in some countries number one in messenger. Because we put a tremendous focus. Which means anything we put our mind to, we're able to do and make a meaningful impact. And so today communications is at the core of the internet.

And of course, communities. So people talk about communities today, but we must remember, communities have always been an underpinning of the web. Yahoo! was early in it with Yahoo! Groups, Geocities, and Message boards which were probably the original community on the web. And today you're seeing us make significant moves into the areas like del.icio.us, and Flickr, and Podcasts, and 360. The difference for us is as we get into user generated content, you'll hear Lloyd talk more about it today, we focus on the areas that we have the largest growth, the biggest sustainability, and of course the best business opportunity for advertisers to focus on.

So as we think about that, we're not going to do everything, we're going to do the things that we think have the greatest amount of sustainability and value. So today though it's obvious that they want to take it wherever they go. So for Yahoo! to continue to be the Yahoo! that it is, we recognize that devices, and I'm going to talk more about this later, are both input and output devices. And you've seen us make a significant investment in the mobile space. And again we'll talk more about it later in this presentation.

Now, Yahoo!, in order to stay ahead of the consumers, we've always represented what's possible, what consumers wanted to do. And we're the most visited, most trafficked page on the internet. So it's funny to look at sort of the history. You can see continued evolutions of Yahoo! over the last ten years. Each time helping users use technology or find more.

And today I'm very excited to sort of showcase and announce our brand new homepage. So first of all you can see we have really great content on the top corner. Jerry and David I'll talk about that in a second. But I want to walk you through this. As

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

you can see the page is faster. It's cleaner. It's less cluttered. And it's built in conjunction with our millions of users who have provided feedback. Search is becoming more prominent. So it's bigger on the page. People search Yahoo! and search the web.

Most, one of the most exciting new features you see we're going through now is the personal assistant, which allows the things that you like most to actually be brought right to the homepage without you ever having to leave it. These will be personalizable by the user themselves as we go out into general release. So you can get your mail, your messenger, your local information. And we're going to be able to put your local events and your local calendar right through this so you never have to leave the page.

The next big step, as you see down the page we'll go, and you're seeing how the maps get to be built in. Everything we've been building has been a platform that now can evolve and be available on a global basis for all the pages of Yahoo!. And it's exciting, it's a big rig, and the feedback has already been extremely positive. I'm sure you guys have had a chance to use it.

The Pulse module down here. Our consumers have said "look Yahoo! we want to know what's going on in the Yahoo! community and what's going on in the internet at large." This Pulse community will update very frequently. There are already over 500 modules that we can make available to consumers. And as we release it users will be able to determine the modules they're most interested in. This will provide greater updates, greater engagement, greater utilization of the page. Which is really the goal. So that's an exciting opportunity.

Navigation has become easier. Some simple things, make it alphabetical so people can find things. Make it cleaner. What you don't see here but will happen is as you begin to use the page these will change on your behalf. They will bold on your behalf. Or you can do it on your own. So you'll be able to find the things you want more. The biggest complaint about Yahoo! of course is "I didn't know it was available on Yahoo!." So now we're making it easier to find out what users want and use. Since we're going for audience and engagement, these kinds of steps are meaningful when you realize this is the single most visited page on the internet.

Now of course most people want content. This is a way for us to provide more content, better content, personalized content directly to the consumer. So your page will be different than the person's page next to you. You will have access to all the different kinds of content you want. And as Terry said in all the formats that you want. The news module which you see down below here is something that people have always come to Yahoo! for. Now we can get more news. It can come directly to you. You can begin to personalize what you want. And of course the hottest format is video. People have actually asked "Just show me what you have in video." So we built the video module.

Now as the most trafficked page on the internet, and as Greg Coleman likes to say, we have a Super Bowl every day on the internet in terms of monetization. You can see we have the same number of ad units available that we've always had. Except these ad units will have more personalization, more targeting, better opportunity to frequency [cap] them, and better opportunity to update them. And as a result of that we think that we can make this page even more successful on behalf of consumers and on behalf of monetization.

So we're really excited about the homepage itself. And one of the most exciting things is the single greatest piece of user generated content ever made, if you've not seen it, is the Jerry and David video. So if you've not seen it I warmly encourage you during the break to go look at it. And I just got myself fired. So, but it's still well worth it. And there it is as you see Filo in the back. That's the most I've hear Filo say in my four years at Yahoo!. Okay. Let's move on here, there you go.

Now, I was just talking about monetization on the homepage. But monetization as Terry said is a key pillar for us. And as a key pillar for us we think of it as an ecosystem, alright? We think about everything we do as how to make sure we can build long term sustainable value for consumers and our marketing partners. It starts with a large loyal user base. We obviously have that. One out of every two human beings that goes on the internet touches a page of Yahoo!.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

On the fees side we have quality products that reach the masses. But as they go deeper and deeper we're able to provide more services for them that they're willing to pay for as they go deeper into the system. The deeper user engagement is key for us. We've been talking about that for four years and we've been able to deliver on that. As they spend more time, they spend more money because they're getting more value. That leads again to a large loyal user base.

On the advertising side, there's no competition there. Because it starts again with a large loyal base. Quality content, quality communications products. It's the thing you're going to hear Lloyd talk about and Jeff talk about with search today are a component of how we're going to continue to build on a global scale these large audiences. This attracts not only a series of demographics but the best, most qualified demographics. Which is what advertisers want. Let's face it. Large advertisers need very large environments to spend their money. Spending $300,000 doesn't change their life. They need to be able to be in places where they can spend tens and tens and tens of millions of dollars. Only Yahoo! can provide that kind of environment where we control the network.

The next part of it, and again you'll hear a little bit about it on the ad panel today, is targeting. How do we target the marketing to the right people at the right time in the right place? If we do that, the site becomes more relevant. As it becomes more relevant we get again a large loyal engaged user base. So this is the ecosystem. So similar as we just showed you with consumers, right, how we always stay with or slightly ahead of the consumers, it's fun to look back at what's gone on in advertising.

We really feel like we've only been in the ad business about four years. I know the internet's been around for longer than that, but the business of advertising has really only taken hold in the last couple years. As you look here the first step was "Hey, I just want to advertise on the internet. I don't even know what for. I just think I need to be there." And you began to see a whole diverse group of creative units that were in favor of the advertiser. Pop ups, pop unders. Remember all those things? That really sort of destroyed the user experience.

The next phase is "I want my campaign to be efficient." Standardization. No sites were the same. Yahoo! stepped up as we always do and led the discussion of the IAB standards, formats, measurements and tools. We cannot discount how important this is. The big challenge we have is not "Are we going to get our unfair share of advertising once it comes on the internet?" That's clear. It's "How are we going to get more advertising on the internet faster?" Standardization makes a huge difference in this game. And so you're going to see Yahoo! continue to standardize. And we have enough market clout to actually create standardization for the entire industry. Which we think is meaningful and important on an operational basis.

Now what's going on now which is really exciting is advertising. Advertisers are saying - and consumers are welcoming - "I don't want to just be on the internet and I don't just want to get clicks. I actually want to be able to do the things that I've been able to do in other environments. I want to engage them. I want it to be more emotive. I want to build a brand. I want to brand intensity." These are things that we think tremendously advantage Yahoo! because of the environments that we have built. And you're beginning to see new formats, multiple formats, text, graphical, video, audio, animated. So this is a really exciting opportunity for us. You're also beginning to see search. Not only targeted, but new and different kinds of things in search which Tim Cadogan will talk a little bit about today as will Jeff Weiner. So we think this is an amazing opportunity for us.

So as we go down the next step of course is targeting. In order to do targeting you have to have very large environments that you control. Very few sites have that. You have to have a tremendous amount of data. We have more registered users than any other site in the world. We have more users on a daily basis than any other site in the world. So we have more data that we can use to people's advantage. We've either built or bought some significant technology, and you'll hear a little bit more about that today, so that we can do, behavioral targeting is next, right, but we already do demographic, geolocation, contextual. This is a big opportunity for us. Because the more we do this, the more inventory we're actually able to create, the greater value for every piece of inventory that we sell. This is how we continue to grow at very high margins.

Now early on in advertising these were the two basic things people thought they needed to do on the internet. This is what they thought the internet was limited to. I want to be right in front of the purchase at the point of sale, right, click through or CPA. Or I just want to run huge. And that was very limiting for us even though it was a great way to start. The next phase has

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

actually been adding consideration and engagement to the pie. That opens up a whole lot more dollars for a company like Yahoo!. Because we're able to tap into different budgets, larger budgets, more sustainable budgets. This has been the big change over the last couple of years. This is why you continue to see Wenda and her team have such great success in the graphical area.

We also feel like we have the greatest assets of anybody to be able to go after this opportunity. The go to market capabilities and solutions that we have. First of all, people buy in different ways. They buy through field forces, they buy through telemarketers, and they buy online. And the online buying is something that we have been improving. And you'll hear more about self service today. But on the other areas we're clearly the leader. And we think we have some great opportunities for us in the self service. So the channels are going to be multi channels, and we're in the best position to go after that.

The next thing is the kinds of advertising that are available. People want to buy all sorts of formats. Text, graphical, video, audio, and whatever comes next, in product, out of product, in social media you'll see all kinds of new creative that is being developed. We have the entire spectrum of solutions in controlled environments. The next thing is about price. You need to be able to offer different prices because advertisers have different goals. Some want guaranteed location, impression based. Some want it to be different formats, right? Some want to only pay for clicks. Some want to only pay for interactions.

And as the page view metaphor begins to go away and we begin to deliver things within the same page, we're looking for new ways like time. How much time do people spend on the ad or get a chance to see the ad? But we will be evolving the entire we, because we intend to continue to lead in all areas of advertising. Targeting, again I mentioned earlier, is essential to this. With the data we have, the technology we have, with the investments we have, we think we're in the best position to be able to offer advertising the best, most relevant solutions, which is better for the user.

And then of course a continued investment in standardization and reporting. We hardly ever talk about reporting, but as you want to fill in these two gaps of consideration and engagement, the ability to understand the impact of advertising not only on Yahoo! but on every channel that people sell it is becoming increasingly important. And so from our perspective we think we're going to lead the industry in reporting. We're already do-- with the research reports that Wenda and her team put out and Usama who you're going to hear from today that he puts out. But you can't discount the importance of this if we want more and more money to come on to the internet. Now I want to show you an example of what we think only Yahoo! can do. It's a very recent ad that takes advantage. It was done in one day and it was for Mission Impossible and I'm going to explain it so let's show it.

[Video Playing]

**Dan Rosensweig** - *Yahoo! Inc - COO*

So this ad here appeared on the home page of Yahoo! in one day. As you can see, users can generate the control, the interactivity of this. The sight, the sound, the motion are things that advertisers know how to buy. Here, you can watch a video in the ad. You can scroll through the storyline. You can buy tickets. You can look at photos from the red carpet. You can really engage with the movie itself. And so things like this are things just two years ago that were impossible. So the next thing, if I can go through while this is, ends here. That, by the way, is me as Tom's stunt double. You may have heard that.

But I just want you to show they use Yahoo! in every conceivable way. In news, in movies, in avatars, in photos, in Flickr. Only Yahoo! can offer these set of assets. As a result of that, more than, and these aren't the exact numbers because we're nervous about giving them out, but over 30 million people saw this ad in one day. Imagine that.

Second, over 1 million people interacted with some form of this ad. Which is amazing. From Paramount, and they did an amazing job creating this, 51% of all people that saw the movie said they saw it first on the internet. And an overwhelming majority of

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

them said they saw it first on Yahoo!. And that's the kind of measurement tools reporting and impact that only Yahoo! can have. So that's very exciting for us. And to make all this work we have to have platforms.

So let's talk a little bit about the platforms that we're building. Terry talked about them, I'm going to go through the ones we're working on. But here's why. First of all, scale. Nobody's the size that we're at. Nobody can build things for us to be able to do the speed, the size, and the global nature of what we do. We need to be able to build things faster and cheaper than anybody.

Second is compatibility. Yahoo! has so many diverse properties we now have a toolbox where any Yahoo! property can go in and grab any piece of Yahoo! to build the site. Again, faster cheaper and more relevant to the consumers. And the last part is building the ecosystem. By opening up, by building on open platforms, we now have tens of thousands of developers around the world who are building on top of standardized Yahoo! platforms that engage more of them, build better applications and has helped us continue to grow our audience.

So these are the reasons that we do it. We don't often talk about why. We usually talk about what, which comes us next here. So first of all, these are where we're continuing the investments that we've made in the past, but accelerating some of the investments we're making in the future. Media. The ability to build a property that Lloyd will show you today anywhere in the world instantly utilizing all the capabilities of social media, data, profiling, targeting, content. Next, advertising. Not just in search, but we're already the leader in graphical. Building more delivery systems, more format systems, more measurement systems, more standardization. The ability to do more pricing systems. These are things that we think are hard for people to catch up to us in.

Next is data. The underpinning of everything we do. And Usama will talk about it, is data. If you have more, and data's the key to this giant database called the internet. We are investing heavily in how we can use it to the advantage of consumers and marketers. Community. In a world where there's going to be trillions of digital artifacts, how do you get what's relevant to you? And community is the single greatest filter ever created. And then of course personalization. If we know more about you, we ought to be able to bring you what you want when you want it where you want it, whether or not you ask for it. These are things that Yahoo! has an advantage over almost everybody else in the internet.

And then last is communications. With the leading communications platforms we have the ability to connect people to what they want to do, to whom they want to do it, and become the core of how they start and finish every single day. And I want to just give you one tangible example of where this has been meaningful to us. So when I joined Yahoo! four years ago we might at best do a single release of Messenger every 18-24 months. Because we used to build on top of applications rather than platforms. This year alone we're going to have four releases of Messenger in 18 countries at one time and be able to continue to build in new features like you just saw with our new [VOiP] products. This is the difference between Yahoo! a few years ago and Yahoo! today. Nimble, faster, less expensive, and the ability to do it on the global basis. This is why we invest in platforms.

Now the next big step here is beyond the browser. This is where we absolutely again think we have a leadership position. In thinking, Marco Boerries, whom many of you have met, is a great strategist and execution of product builder in terms of helping us go and think beyond the browser. Our users around the world, some in many places around the world may never use a PC. As Terry said, 1 billion and 2 billion, the numbers don't lie. And so for us we are taking our products to where the consumers are. We are recognizing that every single device is going to be connected to the internet. And we are also recognizing that each device is going to be an input and an output device. It isn't just about getting and receiving email. It's about the things that you can do with Flickr and all of these kinds of products. So we are investing the right time and attention in these kinds of areas.

And you've seen Terry launch at CES the Yahoo! Go series of products. And I'm going to show you now how we think about, this is our new product that hasn't come out yet. You're getting a sneak peek. This is the Java version of Yahoo! Go, which means that in the next 18 months will be available in the majority of the phones in the world. Not just the high end phones, but the majority of the phones. As you can see, it's lighter, more intuitive, faster, more graphical. You can see the scrolling on the bottom which lets you find all the things that you want to find using the actual keyboard or the keypad of the phone itself. So you don't

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

need to be able to type. You can actually mouse over it. These are the key applications that we intend to have. And this again is global in nature. Particularly recognizing that there's more mobility outside the U.S. than in the U.S.

So it's a very exciting product that you're going to see coming out for us. And we recognize, similar to the way that Yahoo! was originally built, we build large audiences, get them engaged, and then monetize them. Here we're already experimenting with three forms of monetization within the mobile environment. You can see banner ads here. You can begin to see search and pay per call. And you can begin to see sponsorships of certain kinds of sections. Now this is again early days, it's experimental. We are already investing time energy and technology in being able to deliver these on behalf of advertisers. And they're already real today. And we think that's exciting.

Now we believe like many things that we do that we're in the pole position for this. We have the largest brand in the world, more people have invested time in us. They want to take it to all the places that they currently do it. We know we're in a three screen world, and we're building our products to intuitively understand the three screen world. But we've already signed over 50 mobile partnerships.

I mentioned, we're going to be able to be supported in over 50% of all Java handsets in just the next 18 months which we think will put us way out ahead of anybody. The RIM announcement we did gives us relationships with 160 carriers. We've partnered already with two and you're going to see more of the largest manufacturers in the world to embed our stuff in it. And we think this allows Yahoo! to continue to extend its lead as we move into new platforms. Great companies pick up market share as you go into new platforms, and that's our only operational goal here.

So the next Yahoo! will be a lot like the last Yahoo!. Which is it will be the most important brand on the internet. It will start with great products and great experiences. We are going to focus on the two biggest opportunities we have, which is the consumers themselves and the partners that help fund it which is our marketing partners. And then last I didn't click it but it clicked on its own, you see that's advanced technology.

We're going to leverage and build on our strengths. We don't feel like we have to shuck and jive to find new businesses to be in. We feel like we picked the right businesses. We feel like that we are focused. And we feel like we're executing. And today you're going to see some of the areas that we're blazing the trail. Two, I'm going to introduce now our Lloyd Braun in media and Jeff Weiner in social search. These are a subset of what they do. There's a lot bigger opportunities within media and content, but these are an area that people are interested in. And we want to focus a lot of attention on it today. So I'd like to bring up the man, the legend, the head of all media, the man I like to call the guy that brought Desperate Housewives, Lost, and Grey's Anatomy to television which means there's something for me to watch again, Lloyd Braun.

---

**Lloyd Braun** - *Yahoo! Inc. - Head of Yahoo! Media Group*

Thank you Dan.

---

**Dan Rosensweig** - *Yahoo! Inc - COO*

Welcome, Lloyd.

---

**Lloyd Braun** - *Yahoo! Inc. - Head of Yahoo! Media Group*

Are you supposed to have this? Oh, you did, okay. I don't know what Dan is talking about because Filo talks to me all the time. So good morning everybody. I'm going to spend some time today talking about our media properties. And that's going to include what we're doing, how we're doing it, and why we feel that this is going to create a sustainable competitive advantage

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

for us over the long term. So I have a lot to cover so we'll get right into it. You see up here on the screen the opportunity before us.

As Terry talked to you about earlier, the growth in the internet over the past few years has been quite something. The first chart here on the left shows you though that information and entertainment is actually, has grown over the past three years from 34% to 39% of time online. Which is now the, it's the fastest growing part of the internet. And when you break it down into specific categories as we see here on the right side, you see that even in these specific categories the growth in terms of people looking for information and entertainment content is growing significantly. And of course this is due in large part to the proliferation of broadband. As Terry said it's growing at an incredible clip soon to hit 70% in the U.S. And that allows us now to deliver far more sophisticated and high quality video content.

So there's little doubt that the audience is looking for this type of content. And of course what that always means is there are plenty of players around that want to share in that opportunity.

So let's take a moment and give a quick snapshot of what the competitive landscape looks like. We've broken this down into three main categories - traditional media, portals, and social networks. But we feel very strongly that there are going to be five elements required to really succeed in this space. And those are content, community, personalization, search, and audience reach. And as you look at this chart you can see that really nobody has all five of these elements together. Except for one company and that happens to be us. And that's why we really believe we're in a position to succeed in this space. And in a world of limitless choice which we're now in and it's only going to grow before us, we really believe that community and personalization are going to be the key differentiators for us.

So we really believe we have the winning combination here. But let's take a quick look at what our strategy's going to be in order to be able to do that. So in essence we're going to leverage Yahoo!'s technology and global network to deliver the most innovative and engaging media experiences for both audiences and advertisers. And I'd like to spend a minute or two on each of the key words in this statement.

First technology. We're going to use our tools to make our sites more interactive and immersive. When content is on Yahoo! it should almost feel de facto exclusive. Which is why I'm not so worried about getting exclusive deals, because I really believe that if it's on our sites, it's going to feel exclusive. It's going to come to life in a way that it's not going to come to life anywhere else.

Global network. We're able to leverage our scale globally throughout the world. Innovative. When you're on Yahoo!, you should know you're on Yahoo!. It's going to feel distinctive and it's going to feel unique.

Engaging. A user should spend more time on a Yahoo! site. And we're going to entice the user to discover, interact with, create user generated content. And share that content.

Experiences. We have to remember that the internet is a different medium. It's not a passive medium, it is not television. And our job is to create interactive immersive experiences.

Audience. As you heard Dan and Terry say our reach is unmatched. And advertisers. I have a saying I like to give down in Santa Monica which is "We are not building these products for the Smithsonian. We are, yes, we are a consumer focused in every way. But we are also, we have to realize that the advertisers are a key constituent, and we have to build these products with the advertisers in mind."

So how are we going to do all of this? Well quite simply by creating what we feel is a truly superior user experience around our media content. So we're still going to aggregate but we're going to program just the right blend of content on these sites. And that's going to include licensed content. And by licensed content I'm referring to relationships that we will have with media companies, well known brands as well as niche players. It's going to include some original content. And by original content I

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

mean very strategically done in a cost effective and disciplined way. Think of it as the salt and pepper on the meal, not the meal itself. And user generated content, where we feel we're going to be able to really increase engagement by enticing our users to create in the context of the experience that they're having right then and there. But that is really only one piece of the puzzle, which is the content that we're going to have on these sites.

The special brew for Yahoo! is going to be through the integration of our pillars and tools. And that's really what we feel is going to create over the long term a sustainable competitive advantage that nobody is going to be able to replicate. Community, personalization, search, and applying new to the internet programming and promotion principles. And to use our scale to drive our massive audience not just across the media group but across all of Yahoo!. So we intend to create totally unique consumer experiences that will be very, very difficult if not impossible for our competitors to match. No one's going to be able to copy it, and no one's going to be able to say, shall we say, borrow it. It will be uniquely ours.

But what are these new programming principles that I talk about? Well quite simply we're going to evolve our site from what is a more linear presentation to more interactive immersive consumer focused experiences. We're going to have robust simple designs with easy to use tools that are consistently applied. We want to take the user on a journey where we provide context to the user and we help them make choices.

I'll give you a very fast example. If there's a story, let's say Dick Cheney in a hunting accident. Right now, not just on Yahoo! but on most sites, you would see that story and then you would be able effectively to see the same story on another five, six, seven sources. Are we really enticing the user now to check that story out on these other sources once they've read it on Yahoo!? I'm not so sure.

But what if we frame the choice differently to them? What if after they've read the story on our page, we say "Want to know what they think about this in the Middle East? What do the two newspapers in Iraq say? What do the Israeli papers say? What does Al Jazeera say? What are they saying about it in Europe? What's the conservative view in the U.S.? The liberal view in the U.S.? What do the late night comedians say about it in their monologues?" Where are we likely to click? In an internet framed like that? Or the way it's framed today? I really believe that we will spend more time if we help the user, if we frame these choices for the user and allow them to really think about: "Oh, that'll be good. I'll click there."

We need to entice the user to create and to share. And we have to make sure that the user never reaches a dead end. Once they're in our tent, we should be able again to take them on a journey and expose them to other things that we know they're going to be interested in. And if they want to leave, absolutely, they should be able to leave. But they're going to find that big honking Yahoo! search board right there in front of them. And they're going to use Yahoo! search. Because it's going to be convenient and it's going to provide them a great experience. And we're going to trust that they're going to come back because they're going to know that when they come back to Yahoo! they're going to get the best experience they're going to get anywhere.

And we have to remember that while the internet allows users to get what they want where they want when they want, which is a fantastic, fantastic thing, we have to keep in mind that most users do not know what they want. I know I don't know what I want half the time. And our job as programmers is to help them discover what it is that they want.

Now to give another very brief example to that. First time that I ever used our fantastic music product, Yahoo! Music Unlimited, which allows you for a monthly price to get really all the music you can eat, I'm sitting there and I have the entire world of music in front of me. And I'm like "This is going to be fantastic. I haven't been able, I haven't, there are songs I haven't heard in 20 years. I can't even remember the last time I've been to a record store. I'm going to now get all these songs back."

And I sit there and for, literally for two minutes my mind is completely blank. I have absolutely no idea what I want. I mean, in a world where I could have anything, I couldn't think of anything. And so literally I took myself back to my college dorm room. And I'm sitting there like lying on my very bad bed. And I'm saying okay. I'm going through all my albums. A. Allman Brothers.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

Oh yeah, Eat a Peach, that's good. B. Jackson Browne. Yeah, that's good. By the way, if you think these songs are bad you should see what Dan had in his dorm room.

**Dan Rosensweig** - *Yahoo! Inc - COO*

Bread.

**Dan Rosensweig** - *Yahoo! Inc - COO*

The women loved it.

**Lloyd Braun** - *Yahoo! Inc. - Head of Yahoo! Media Group*

I'll bet they did. I, however, met my wife in college. She's the only woman I've ever known.

**Lloyd Braun** - *Yahoo! Inc. - Head of Yahoo! Media Group*

This is webcast, correct? Someone teach my wife how to use the computer, please. So literally I'm going through a, b, c, d, and by the time I get to d, all of a sudden, the personalization starts kicking in and "Hey, you should try Eric Clapton, try this, Bob Dylan, dah dah dah, Jackson Browne has a new solo album out." And I'm like, "Oh my God," click, click, click, click, click. Next thing I knew I literally had 150 songs. And I have not been able to get off of this thing. And I had an iPod. And I haven't touched it literally in eight, nine months. Because I am now so wed to this playlist of all these songs that I had. Most of which I had not heard. I mean, Three Dog Night I'm listening to again all of a sudden. Who's going to go buy that album? But when you can have it for nothing, boom, you take it. And so it is. I'll get off it.

But it really for me showcased the power that this company is going to bring to the consumer when you can have absolutely anything. And how important it's going to be for us to frame it but frame it in a way that's going to resonate with me. And with each one of you. Let's get to the next slide before I get into trouble.

So what do we have to do this year in order to make this mission a reality and truly create this long term competitive advantage I'm talking about? Well we really have to do four main things. We have to build robust platforms. We have to develop key strategic relationships. We have to maximize user generated content. And we have to build core brand extensions. And I'm going to again spend a few moments on each of these. First and foremost we have to build robust platforms as Dan spoke to earlier. And that really is necessary in order to create flexible efficient and scalable editorial and content delivery.

Infrastructure is maybe not sexy although it has become quite sexy to me. But it is really vital to our long term success. That is the way we're going to truly leverage our scale and our reach to the fullest extent possible. And let me briefly talk about what some of these platforms are.

An aggregation system where we're going to consolidate all of our content feed that we receive across all of our media properties and present our content in a much more horizontal way wherever it's relevant regardless of the site. Ad simplification. So we're going to simplify the format of our ad inventory across our group. So that there isn't different format inside sports versus inside movies versus inside news. And we're going to standardize the experience and we believe through that help increase our sell-through rate.

We're going to have an inline video player. And that's going to allow us to run video content and advertising in the page in a consistent experience again across the entire media group. And media publishing. We're building publishing tools that are going to enable capabilities across all of our sites.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

And for example here on the screen you have our new Yahoo! Health site. And that's where we created what we call an expert publishing tool. That tool is a publishing platform that's used to allow professional bloggers to publish directly to our properties. It was developed specifically for Health this year. But again it was built as a scalable platform. And it's since been promptly rolled out on 26 major initiatives on 11 sites in five different countries.

So second. Develop key strategic relationships. We have to continue to develop relationships with our media partners and with brands and with smaller niche players in order to continue to build the rich media and video on our sites. So let me spend a moment talking about media companies.

Dirty little secret is we know we can't do what they do in the creation of content. They're great at it. And conversely they can't do what we do. This company has spent a lot of years developing all this amazing technology that you've seen. They can't replicate that. And both sides truly know it. And both sides I think truly now know that we need each other. It has required over the past months and years some reassurance and education. But I think that while we all recognize that we may compete a little bit here and there, we really are far more partners than competitors.

And we've really started to develop far deeper relationships last year and we continue to gain momentum this year. And a really good example of that is our relationship with CBS and 60 Minutes which you see up here on the screen right now. This is a screen shot of a preview that we did about a month and a half ago. And with almost no lead time at all, we literally finished the deal right before this interview and we had to craft the site very, very quickly, we were able to generate over a million, 1 million users and 3 million video streams on the site.

But perhaps even most importantly to CBS, the audience that they got on this site was dramatically lower than the audience that has been - on -- on this page - dramatically younger than the audience that typically watches a 60 Minutes show.

When the site premiers this fall, we're going to feature unique, online only content. And access to 40 years of 60 Minutes archives including one original story that we'll have for us every single week. And cross promotion opportunities between on air and online.

We're also going to deepen our relationship with distribution partners and niche players. And by niche I mean partners in specialized markets. From focused content to individual bloggers. The whole range of really of outside content creators. And these partnerships are not only going to enhance our own properties, but they're, it's going to give these content owners very valuable distribution. And of course access to the integration that we provide with our pillars and tools.

And I think this is a very good moment to briefly show you a very exciting beta release we had just yesterday. You see here on the screen our new Yahoo! Finance badge. These are literally syndicated charts that can be displayed on any site. And they link right into our finance data. So literally we can spread Yahoo! finance absolutely everywhere. And it doesn't take a lot to sort of extrapolate from here and think about what we can do with these badges on all of our other properties as well. Let's move on.

So finally we're going to continue building new state of the art platforms and tools to maximize and integrate user generated content across all of our sites. And as we entice the user to become the creator and the discover and share content created by others we believe we will significantly increase the stickiness or the engagement of these sites. So with this new platform we're going to be able to promote and integrate user generated content across the media group. We're going to be able to target specific niche audiences. And we're going to be able to generate special events that are really powered and embraced by the user community at large. Users are going to be able to publish right alongside the mainstream media players.

And the programming, really the most interesting and engaging user generated content, we feel we're going to be able to really turn what we today look at as tail content into head content that's going to become, that has the capacity of becoming [viral] and far more easily monetized. And through our Yahoo! Publisher network we're going to be able to offer revenue sharing to the top user publishers. So the user's going to be able to get to create, discover, share, and make money all at the same time. Really quite an unbeatable combination.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

And finally we're going to build out some core brand extensions in key areas of opportunity. Where we feel there's a real appetite from the advertising community. And our new Yahoo! Tech site is a great example of that. So here you have a screen shot of that. This was just very recently launched I'm sure as most of you know. The first new vertical launch in the media group in over five years. And the advertiser response has really been terrific. It targets everybody who uses technology in their daily lives. It's really sort of tech for the rest of us, or tech made easy. And it's a big step forward in our quest to design simple and easy to use products.

So the site really fully leverages our tools and pillars. And I just want to point out a few of the highlights. We have some original content in the form of a small inexpensive original production that we call Hook Me Up. Where regular people who actually have applied to the show through user generated content pitch themselves to upgrade their tech experiences. Sort of our small version of Extreme Home Tech Makeover. We have more user generated content in the form of thousands of product reviews, rankings and comments. We've even built in Yahoo! Answers as Jeff's going to talk about in a couple of minutes.

There's a personalized My Tech module there on the right side which follows the user wherever they go on the site. Shows them the items they've recently saved or reviewed. And users can actually save their products into what we call a Stuff I Own module. And this allows them to eventually see which products their friends have. And they can seek advice from their most trusted community, their friends and their family.

I'm now going to, in the few minutes I have left, give a little bit of a show and tell with some before and after shots. I know for me these concepts really only resonate and come to life when I actually see them in front of me. So I thought it would be fun for you to see a little bit of the befores and afters. You have here a screen shot from the last Summer Olympics that we did in Athens in 2004. It was a very good site for us, very, very successful. And, but here's a site we just did for the Turin Olympics. So this represents really only a taste of what we're going to be doing. But you can already see some of the design features and integration taking place.

The site features exclusive content from our Yahoo! field reporters. There's exclusive content integrated through Flickr where users who were actually attending the events were able to submit their photos and have everybody look at them. We even had an Olympics widget. And the results were absolutely terrific, notwithstanding the fact that NBC carried many of these events and broadcast them obviously on NBC and on their cable networks. We had the number one Olympics site online, beating NBC by an average of 36% in unique users each week.

I should also mention that our sports division which has, which designed that site, has really been doing a terrific job. I don't know if all of you have taken not of the big Reggie Bush story from USC that has circulated over the last few weeks. Our reporters at Yahoo! Sports actually wrote that story and continue to follow up on it, which is something we're very, very proud of.

Now we have a before shot of our Academy Awards site just over a year ago. Again very successful site for Yahoo!. Performed very well for us. And now we have a shot of our site this past year. Again, we're able to feature many new integrations such as video galleries using our universal video player. Expert blogging. And real time user polls. And of course we took the design of the site really to a whole new level. Here, coming off of a very successful site a year earlier, we were able to increase our unique users by 95% year to year. And our time spent increased by 35%.

Let's do another one. Here's our Health site. That was our Health just through this past January. And now here's our Health site today. One of the things I'll point out here is if you'll notice it's wide screen. And this is something we're trying to move all of our sites to. As the more sophisticated computers now have better resolution, we're able to take up most of the screen rather than have these very, very large margins that we're all used to in the past. Also fully integrated. We have a programmed rotating main module. We have ad simplification. Expert blogging. Tools such as a body mass indicator. And you cannot have a health site without a body mass indicator. We also have better integration of news and a far more engaging visual design.

And in just three months here we've increased, we've seen an increase in our unique users by about, by just under 20%. We're also in the process of transforming our Health site from what has been a somewhat more disease oriented site to much more

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

of a healthy living focus, where we're going to incorporate many more lifestyle elements. Something that we think is going to be far more appealing to the advertisers.

And finally this is a shot of a chart that I'm sure all of you in this room know very, very well. Our finance chart, which has performed extremely well for us over the last five years. And here is the new chart that we're going to be launching very, very shortly. This chart really showcases our state of the art technology. We spent a year building a back end infrastructure, developing direct relationships with the exchanges. And we really feel we've created a new industry standard for how financial data is going to be delivered to our users.

In a category like finance we really feel that visual representation of data is a key distinguishing element. And these new charts do just that. They eliminate extra scrolling or clicking. They can be personalized to meet users' needs. The charts provide historical data going back as far as the stock dates. We can show competitor and industry averages to compare performance. We can show key events such as stock splits and dividends. They're also very interactive. Users can easily add competitors or change the timeline or format. And you can save the charts, you can print the charts, you can share the charts. You can basically do everything with the charts. You can take the charts out to dinner when you go out to Sunnyvale. Something, by the way, I myself do all the time. Anyway. I could go on and on. But I encourage you all to check out our new charts. They are being demoed in the lobby. I think you're all really going to be blown away by them. Anyway. I'm now into negative territory here so I'm going to wrap up.

I hopefully have given you just a small taste of where we're going to be taking our properties. What you see today is really just the beginning. As we continue to develop this scalable technology and infrastructure and we actually begin rolling out redesigns of these sites in the months ahead, you're going to see even more robust examples of the type of programming and integration that I've talked about today. It really is a very, a wonderful time to be at this company. I could not be more excited about the opportunity and the fantastic people I work with. And we're really all thrilled about the days we know that are ahead. So I would now like to introduce my recently married, therefore in marital bliss colleague, Mr. Jeff Weiner, who's our brilliant head of search and marketplace. Jeff.

**Jeff Weiner** - *Yahoo! Inc. - SVP Search & Marketplace*

Good morning everyone. Nice to see everyone. Thank you for taking the time to join us. I'm going to start off with a very brief overview of the core web search opportunity. But as Terry alluded to earlier we're going to spend the majority of today's presentation on search focused on a very exciting opportunity before us in social search. So with regard to the broader web search opportunity, it seems like every time we've had a chance to get together over the last few years these numbers keep getting bigger. And I don't think this year is any exception. 700 million unique users around the world. 70% reach of the total internet audience. And over one billion queries a day.

One major and substantial shift over time has been the fact that, as Terry alluded to earlier, the largest segment and fastest growing segment of search queries is now coming from Asia. Not surprisingly, the business has grown as well, reaching $15 billion on a global basis in 2006. And from 2005-2008 an expected compound annual growth rate of 30%.

So it's no surprise then that search remains one of Yahoo!'s most important strategic priorities and initiatives. And for the search team specifically, core web search remains the foundation of everything we do. That said, the search industry's evolving. And while search quality remains job number one, there have been a number of other ways that we've identified to differentiate our search quality and the overall search experience of our users to create more value for them and for Yahoo!.

Here are a few of those categories. The user experience. Vertical searches like our leading efforts in local and travel. Multimedia search. Mobile search like Yahoo! Go which Dan alluded to earlier. Our distribution products. And of course the subject of today's discussion, social search. And again social search complements the overall strategy. So in talking about the social search opportunity I want to spend a brief moment on really the history of web search over the last 15 years. I think it's instructive in

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

terms of discussing this opportunity. If for no other reason, the number of game changing events that have taken place over that time period, which I think many of us in the room actually take for granted.

So if you go back, say, 15 or so years to the early 90s, the analog for search really wasn't search itself. It was newsgroups on [Newsnet], scientists, academicians, engineers, were coming together and exchanging information on thousands of newsgroups. The closest proxy to search in terms of an exchange of knowledge. Sure enough, along came Digital Equipment's Alpha chip and two guys named Jerry and David and the Yahoo! Directory. And the game was changed. Why?

Well the Alpha chip enabled AltaVista to leverage technology to massively scale the number of pages that were being indexed. And Yahoo! - oh, sure. How's that, better? Much better? Technology, an incredible thing. - So both Yahoo! and Digital Equipment's alpha chip enabled for us to change the game. Because we could start to scale from the engineers and scientists who provided the source of knowledge and information to the millions of webmasters and publishers who were now on the web. The order of magnitude also jumped radically. Thousands of newsgroups to millions of websites.

Along came Inktomi and Google. And through algorithms that generated relevancy -- Okay. Blackberry, microphone, anything else I got on me? Airport screening? Through new algorithms that enabled us to generate relevancy based on link based analysis, the number of incoming links. And massively scaling infrastructure. The order of magnitude changed yet again. From millions of websites to tens of billions of documents. And that's web search as we know it today.

Now as valuable a service as it is, as essential a service as web search is to all of us today, I think we're on the threshold of yet another shift in the order of magnitude. Because there are millions of webmasters that provide information, content and knowledge today. But there are billions of people on the planet. Billions of people that possess, in theory, trillions of knowledge artifacts. Trillions.

So how do we start to get at that knowledge? Among other things, enabling technologies. Not just scaling global search infrastructure, but technologies that make it easy for all of us to begin to share knowledge, if that's what we want to do. Incentives, personal, social, and economic incentives so the people are incented to share their knowledge. And of course critical mass. Reaching enough mass of high quality content that we can attract more users who generate more high quality content and thus enjoy network effects.

So I want to talk about those three dimensions I just mentioned in the context of a competitive landscape. I think there's some other assets that will also help determine successes in this space. In addition to web search infrastructure and the critical mass I just mentioned, community assets, which are critical because they help pre-populate these kinds of experiences, they create liquidity in knowledge marketplaces.

Registered users are key. Registered users serve as the foundation to create reputation systems that enable us to maintain quality as these properties begin to scale. Broad distribution. On a global basis on and off the network. Which enables us to not only reach critical mass but to sustain it as well. And of course the incentives I just mentioned. We believe Yahoo! is extremely well positioned in this area. You'll note incentives is yellow not only for Yahoo! but I think for the industry more broadly. This is an emerging area. And basically nascent science in terms of incentives.

Looking at the broader competitive landscape, I wanted to call out one player in particular, and that's Neighbor. I believe Neighbor, a Korean company, did a great job with their incentives system in terms of offering points for questions and answers and then allowing their users to leverage those points for their gaming properties. They achieved critical mass through first mover advantage and very successfully changed the game in Korea.

So how are we going to play within this competitive landscape? It begins with our vision, what we like to call the FUSE vision, which we developed over 18 months ago and have been executing on ever since. The vision to enrich people's lives by enabling them to find, use, share, and expand all human knowledge. So breaking it down into its component pieces. Find, enabling

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

people to find what they're looking for. Use, taking a search paradigm that has been focused historically on organizing information and going beyond organization for organization's sake. Enabling people to accomplish tasks, complete tasks, achieve purposes.

But the real key to the FUSE vision is the share. Sharing knowledge with people you connect with and connecting with people you connect with and connecting with people, in which case, you can share knowledge with. That is at the heart of the FUSE Vision. And if we're successful enabling people to find, use, share human knowledge, we'll be successful in enabling people to expand the available repositories of human knowledge.

Drilling down a little more specifically in terms of our strategy, the first step--and this is specific to social search as opposed to our broader Web search strategy, is to obtain a critical mass of high quality, user generated content; and going a step further, to distribute as broadly as possible to sustain that critical mass globally, on and off the network.

The next step of the strategy, though, is where things get very interesting. The leverage, the knowledge, the content, and the metadata --and by metadata we're referring to data that essentially describes other kinds of data. Things like notes, or tags or the relationships and contacts you enjoy. By accumulating knowledge content and metadata, we can then leverage that data to create a visibly and demonstrably better search experience. Put another way, we call this better search through people.

So, what are the priorities within social search, against which we'll be applying the strategy, I'm going to walk you through all four of these in a moment, knowledge search, social bookmarking, social media, and our modernization efforts within these areas.

Knowledge Search, priority number one. Again, tying that strategy of generating critical mass through the first mover advantage. We deployed Yahoo Answers, our knowledge search product, back in December of '05, and we were able to do that quickly as we did because we leveraged our presence in Taiwan and infrastructure that we had already built out there.

Yahoo Answers is a basic knowledge search product. Simple questions and answers from everyday people incented by points, and the more points you get, the more privileges you have within the system. I wanted to demonstrate the product for you briefly with a personal anecdote, so you can see how powerful this really is in execution.

A few months ago, I had the privilege of attending Esther Dyson's PC forum; and in our preparation for that we talked a little bit about Yahoo's personalization strategy. And after that, Esther summarized some of the things we had discussed and said, "One day Yahoo users, going through a personalized experience, may experience the world similar to the way the Queen of England does, where she thinks the world smells like fresh paint." So if you're like me you had no clue what that meant.

So, I went on to Yahoo Search, couldn't find really a definition of what that was about. I checked some other search engines just in case, and still nothing. I went on to Yahoo Answers; I typed in the question you saw there, and sure enough I got back this response from somebody that lived in the UK.

It turns out that the Queen attends a lot of grand openings. And all of the people there try to impress her. So they paint, and they clean everything up. So the Queen goes through life thinking that the world smells like fresh paint.

Similar to the way a Yahoo user might with an excellent personalized experience, believe the way they see the Yahoo experience is the way everybody else does as well. So I got my answer, very powerful, but I'll show you where this becomes even more valuable for our users, and why it really a crystal clear distillation of the FUSE Vision I mentioned earlier.

Whereas earlier, I had tried this query on Yahoo Search and not gotten any results; our search engine picked up that resolved questions and it put it at the top of the results. That's what we mean when we talk about enabling people to find, use, share, and expand all human knowledge.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

I mentioned earlier, we were able in the U.S. to generate first mover advantage among free open knowledge search platforms against the mainstream search companies, because we leveraged something in Taiwan. You can see in the dark circle, the presence we already have around the world. After the United States we were able to deploy very quickly in the UK, Canada, Australia, and India; and the light blue territories will be coming soon--France, Germany, Spain, Italy, and Latin America.

This isn't just about leveraging best demonstrated practices and building global infrastructure; it's also about connecting people around the world, and generating the network effects I was talking about earlier.

By way of example, I remember last April, Dan and I were attending a ten-year Yahoo celebration in Taipei. We were listening to their explanation of knowledge search, and he reached over to me--or leaned over to me and said, "How cool it would be if one day my daughters, doing a history report on China, could ask a question and get an answer back from a little girl in China, who responds in Mandarin, but then we're able to translate real-time."

And through our Babel Fish translation technology, and this knowledge search platform, we're one step closer to making that vision a reality. It's not just about broadening the reach on a global basis; it's also about integration on and off of our network.

By way of example, we recently deployed an answer module, customizable answer module, within Yahoo groups. Here you see and example, "Real advice for real love;" and at the bottom of this is questions and answers on family and relationships.

Now, keep in mind -- some of you are snickering out there. Before you snicker, I think some of you guys can use some of this advice. I want you to keep in mind a couple of critical numbers. Yahoo Groups, 6 million. The number of groups in Yahoo Groups -- 6 million groups of people tied by passion and affinity, and knowledge about specific subject matter. 90 million, number of cumulative members participating in the six million groups.

That's a lot of knowledge. That's a lot of untapped knowledge. People who, to date, may not have had the sophistication to digitize and share their knowledge, but generate incoming links to determine relevancy and [vote]. But by marrying Yahoo Answers with this kind of technology and groups, we're capable of tapping untapped authority and expanding human knowledge.

I want to move on now from knowledge search to social bookmarking. For those of you that don't know, social bookmarking is very similar to bookmarking; which north of 60% of all internet users are doing today -- saving your favorite sites so that you can recover them faster.

Social bookmarking just adds a community element to that. So the bookmarks you save can be shared with your contacts. The reason this has strategic significance for our social search plans is because we believe we can leverage the metadata created there, to create a more relevant search experience. Why is that?

Well, recall conventional Web search algorithms today are producing the same results, regardless of who is actually generating the query. It's very good for objective fact-based queries like "How many feet are in a mile," -- not so good for subjective opinion-based queries, which can amount to as many as a third of all queries on the Web. Why is that?

Well, for me, when it comes to picking the best Sushi restaurant in San Francisco, I'm not necessarily interested in conventional wisdom so much as I'm interested in the opinions of the people I trust. And by enabling our users to tap trusted sources of authority, either individuals or communities, we can start to create a more relevant search experience. Let me give you a example:

If you were to go into Yahoo Search today, and type in the query "jaguar," what's the first thing that came to mind? Yes, for this audience it is. A bright, shiny, new Jaguar, Right? Okay, if you were to do the same query on "delicious," and just to take a step back and remind you, del.icio.us was an asset we acquired earlier this year -- the leading social bookmarking site on the Web; founded by a guy named Joshua Schachter, brilliant guy, and essentially considered the pioneer of tagging on the Web. So, we're very fortunate to have him on the team.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

del.icio.us, in Joshua's opinion and part of his vision, is a platform on top of which communities and groups can begin to save and share bookmarks. It turns out, though, that many of the users of del.icio.us, today, tend to have very strong leanings towards technology. And, as a result, what started to happen was, the results of del.icio.us search became flavored by the interests of the community that uses it. If you type in "jaguar" to del.icio.us search, virtually all of the results are for the Apple Jaguar Operating System. We call that flavoring of search results.

Now I threw out a couple of numbers earlier. I mentioned Groups had 6 million groups. What happens when you take 6 million groups and you put them on top of a platform like this? And then what happens when you take these flavored search experiences and you integrate them into Yahoo Search? It's powerful stuff.

Third priority, Social Media. So all of the examples I've talked about thus far were based on text, essentially, text based search. Everything, that has been discussed thus far, will apply to all forms of media; imagery, video, etc.

And perhaps, there's no better example of that than Flickr, whose vision is to be the eyes of the world. You heard Caterina, in the video earlier, showing an example of a couple having their first baby. The Flickr experience, the eyes of the world, ranges from that personal experience to the millions of people who marched during these immigration marches. Flickr is truly becoming the eyes of the world, changing our society right before our very eyes.

And when you generate that kind of high-quality content and metadata, again, think about how you can leverage that. You can imagine a day where people sharing content and interested in sharing on the broadest platform possible, where we can leverage those high-quality images in Image Search to create a higher quality, more comprehensive image search experience.

There's also the notion of what happens when you marry the eyes of the world with the world's largest internet audience. And through the new Home Page experience that Dan mentioned, and greater emphasis on user generated content, you'll start to see more Flickr images being broadcast to 400 million people around the world.

And it's not just about broader distribution on Yahoo; it's also about broad distribution off of Yahoo as well. And recently we announced that Nokia was adding Flickr support for its Nseries multimedia computers. So no matter where people are, at any time, when they want to capture the analog world around them, they'll be able to do that and share it amongst the Flickr community.

We can extend FUSE beyond images, take the learnings from Flickr and apply it to other forms of media too. And, coming soon to a desktop near you, we'll be doing this with video. Yahoo Video search today, is the most comprehensive video search technology on the Web. We are actively crawling the Web for different video objects. This has been different than uploading and sharing of content, which you seen through other companies like [U2].

We believe marrying those two worlds, the comprehensiveness and relevancy of our video search technology with this FUSE Vision, will deliver fantastic experience. And we're excited about this. You'll be hearing much more about this in the next few weeks.

Our last priority that I'm going to discuss today is monetization; and how we're monetizing the inventory that's being created through the priorities that I just mentioned. Across those properties, you're seeing a hybrid of content, both traditional search content and the kind of content you find more broadly on the Yahoo network.

We'll be able to monetize a few things like sponsored listings; graphical media; sponsorships; subscriptions, Flickr has a very nice subscription business through their Flickr Pro; and digital marketplace where people who are exchanging digital goods and services will have an opportunity to generate fees as a result of that.

The checks reflect where activity is already starting to take place. The blank reflect the fact that we're still testing and exploring various opportunities. Very early days here, and tremendous value potential.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

Okay. Very briefly, accomplishments. So what have we been able to do with the priorities I mentioned thus far? For starter, two days ago we announced that our Yahoo Answers in the United States was coming out of beta and going general availability. It has already amassed, in five months, 10 million cumulative answers. By the way, I should back up a step and just remind everyone that we'll be talking about some numbers today that more likely than not will not be updated on a regular basis. Anthony, remember that next time you come around.

Yahoo Answers has reached ten million cumulative answers to date. Perhaps even more impressively, we've grown from 1 million unique users in January -- 1 million plus -- to over 7 million unique users in April; an accelerated sequential month-over-month growth rate.

Now this, in and of itself, would be exciting. But taken with the broader context of what took place in Taiwan, I think there's even more upside. Why? Taiwan deployed Knowledge Search Plus -- Yahoo deployed Knowledge Search Plus, the knowledge search product in Taiwan, in the fall of '04. You can see by December '04, it had already reached 20% of unique users in Taiwan. Over a year, later that number had grown to 67%. Impressive.

Take a look at the implications on total search market share. What happens when you combine Web search with social search? Market share for Yahoo grew from 50% to 65% over that time period; and that's one of the reasons we're so excited about the potential of knowledge search and Yahoo Answers.

With regard to social bookmarking, I mentioned earlier we acquired del.icio.us and have successfully integrated it. We've also done a lot of learning with another product, the social bookmarking product of ours called My Web. And, we'll be launching a redesigned version of My Web, which enables you to get a better search experience through sharing links with your friends in the next few weeks.

When it comes to Flickr, what more can you say about their two founders, Stewart and Caterina. I think it's very safe to say that Flickr is now officially a cultural phenomenon. On the cover of Newsweek just a few short weeks later, Stewart and Caterina was chosen by Time Magazine as two of the most influential people in the world.

I mention that in the context of the performance of this asset. 12 million unique users are visiting Flickr.com on a global basis, up 900% year-over-year. And that's a community that has generated 260 million plus photo tags since Flickr's inception. So for those who believe these are niche properties relegated to Silicon Valley status only, they're not These properties are changing the world.

In aggregate, our social media and social search properties have enjoyed growth over the last year of sixfold. And to put that into context for you, it now totals in aggregate 30% -- the equivalent of 30% of our Web search traffic. So just to be clear, if we were doing 100 queries in Web search, we're doing an incremental 30 queries in social search and social media; and that number as a percentage is growing.

I think, however, of all the accomplishments, the one we're most proud of is the fact that this vision statement has been around for this group, for the Yahoo Search Group and for Yahoo more broadly, for the better part of 18 months. We have been executing against it everyday, expanding beyond Web Search throughout Yahoo and throughout our marketplace properties, and these are just a few of those examples.

And frankly, it shouldn't come as any surprise that we've embraced FUSE to this extent. Because the company that Jerry and David founded, over eleven years ago, it was never about just technology. It was never about man versus machine. It was man and machine. The DNA of Yahoo lies at the nexus of technology and humanity. That spirit, that DNA is what fuels our FUSE Vision, and why we believe we can once again change the game. Thank you.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

I'd like to call up, now, Lloyd; and Dan Rosensweig is going to join us, and we're going to do some Q&A, specific to the two presentations that Lloyd and I did. We'd like to ask you to hold on to search monetization questions specific to efforts like Panama, until later today when Tim Cadogan has an opportunity to present to you, and we'll be doing a separate Q&A then.

**Unidentified Company Representative**

As Jeff switches out his mike, we have about ten minutes, or so, for questions. As Jeff said, there's going to be a series of opportunities today to ask questions about each presentation; and later on, financial questions for Sue and the executive team. So, if we can focus on sort of the Media Group, Search Group, and social areas, that would be great. And, I'll be happy to take questions. We'll start here, and then we'll go back there. Go ahead.

## QUESTIONS AND ANSWERS

**Unidentified Audience Member**

[inaudible question - microphone inaccessible]

**Jeff Weiner** - *Yahoo! Inc. - SVP Search & Marketplace*

Let me repeat the question in case you guys couldn't hear it. I think the question is with the change in the advertising standards and formats, are we going to end up with fewer units. Was that the question? And, what will the -- what is the advertising reaction been so far.

So, we actually end up thinking that we're going to have a net add in the amount of available advertising inventory. What we're really doing is we're eliminating units that don't work, clutter the page, slow the page down, advertisers have not been big fans of.

We're going to focus on units that we think can capture greater relevance, greater engagement, and put them all through the ad-serving system for targeting. As Lloyd pointed out, video screens on each page. So, I think that the -- clearly we think that this is a bigger monetization opportunity than the other way, and that's why we're doing it. Thank you.

**Unidentified Audience Member**

[inaudible - microphone inaccessible] What's changing in the process or in the priorities that's going to allow the next verticals to come out a lot faster than that? And in terms of incentives, Jeff, how aggressive do you want to be? Can you give some examples of incentives that you might roll out, or you're currently rolling out that could materially impact shares?

**Lloyd Braun** - *Yahoo! Inc. - Head of Yahoo! Media Group*

It's the infrastructure and platforms that we're developing now. Everything that we built for tech is scalable. I pointed out that expert publishing tool that we have in Yahoo Health which we were quickly able to roll out on 26 other things. So, what we're doing now, and we've accomplished a lot of this already during the last year is we're building these platforms in a way where all of our different properties are going to be able to take advantage of them.

But most importantly, they're designed with being global in mind. So, the other countries throughout the world is able tap into these and either launch with us concurrently or take this content and format or put their own in so that it's localized with the right flavor. I'd say that's the biggest change Jeff?

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

**Jeff Weiner** - *Yahoo! Inc. - SVP Search & Marketplace*

I think with regard to incentives, I briefly touched on it during the presentation; just to go into slightly more detail, we really think about incentives in terms of three categories; personal, social, and economic. When we talk about personal incentives, we're talking about creating personal utility for individuals. I showed you an example where I asked a question in Yahoo Answers, and I got back a good response. That creates personal utility for me and I'm incented to use the product again.

Social incentives are really about helping people on the one hand; and on the other hand, about providing ego gratification to people, providing a stage for people so they can be seen as an authority. It's amazing the extent to which social incentives have been driving a lot of the world that we've been talking about thus far today.

Caterina, in her own inimitable way, really likes to describe that dynamic as the culture of generosity. It is very much part of what has made Flickr and some of these other properties so successful.

Economic incentives are all around. Frankly, content match or ad sense, and the ad sharing relationship that's entered into with loggers and publishers is a form of economic incentives.

This is still an emerging world. I mentioned earlier, incentive is really a nascent science; and we're going to continue to test, and continue to learn, and continue to see what works and doesn't work.

I will say this though, it is not as simple as just going out and creating economic incentives; because if you have a property that's been built on that culture of generosity, the addition of economic incentives can radically change the underlying dynamic, and change the content quality.

**Unidentified Company Representative**

Let's go to be back here. Can you wait until you get a microphone? We'll try to get everybody a chance.

**Unidentified Audience Member**

Can you talk for a minute about reputation, or authority of people within social search, so that you can avoid people using social search for their own marketing purposes, and so that you can identify those in the network that have greater authority?

**Jeff Weiner** - *Yahoo! Inc. - SVP Search & Marketplace*

Yes. Absolutely. I think, as these properties and products begin to grow the reputation system will be at the heart of insuring quality over the long-term. You're going to see, over the next few weeks, us rolling our a reputation system within Answers that is based on the quality of responses, the participation, and a number of other dimensions; and will actually create algorithms to determine the reputation of individuals and allow other individuals to see the reputation of the people that they're interacting with. We're very excited about that.

**Dan Rosensweig** - *Yahoo! Inc - COO*

I would add just two things to that. First of all, it takes a little bit of time to build up your reputation. So that's why a lot of these products come out in beta week and actually build up. And Jeff and his team have been super careful about quality answers, the number of quality answers -- they have a series of metrics on that.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

The second thing I just want to point out is when we talked about platforms -- when I talked about platforms in the presentation, these are the kinds of investments in platforms that we're making -- that we think will help to differentiate us and allow these guys, and everyone in the Company to be able to use this universal profile of the user.

---

**Jeff Weiner** - *Yahoo! Inc. - SVP Search & Marketplace*

Let's go here to Anthony and then Safa.

---

**Unidentified Audience Member**

Thank you, Jeff. The case study in Taiwan raised the question about the U.S. query share. It's clear you've lost some revenue share in search to Google. But, it's not so clear that you've lost query share. And if you look at the first quarter number sequentially and make an assumption for affiliate revenue growth, and an assumption for monetization growth, actually looks like you may have gained query share in the U.S., or held it. Do you attribute that to social integration or has that not happened yet in the United States?

And then, Dan, globally there still seems to be a strategic hole in Europe. Could you address that?

---

**Jeff Weiner** - *Yahoo! Inc. - SVP Search & Marketplace*

It's a great question. I don't think that there's any one factor that drives a number that influenced by so many variables. I think it's an aggregation of a number of different dimensions; not the least of which -- as a fact we continue to invest very heavily in the quality of our underlying Web search platform. I think the social search properties are starting to make a difference.

We've only scratched the surface on integration, but what we are starting to see is deeper engagement. And we're starting to attract new customers into the network. We're very excited about the integration opportunities; and literally leveraging these properties to create a visibly and meaningfully improved search experience. And I think that's what you started to see a little bit in Taiwan.

But what was interesting about the Taiwanese situation, was the positive halo effect that was created after Knowledge Plus began to grow and reach a lot of people. And the same folks that were using Yahoo Search in Taiwan, and using Knowledge Plus were saying Yahoo Search was better -- it was a higher quality product. I think another factor, too, is smart distribution.

It's not just as simple as going out and paying for distribution, or buying deals. There are ways to make sure -- or to the greatest extent possible ensure that you have a search offering in front of the user at the moment of search inspiration. And we have substantial assets, owned and operated assets, both on the Yahoo network and off the Yahoo network, which I think you're going to start to see us leverage more and more. So, I think all of those factors play a role in market share.

---

**Dan Rosensweig** - *Yahoo! Inc - COO*

On the question of Europe, and then we'll go to Safa, and then we'll come back here. I'm not sure what you're referring to in terms of hole -- whether a particular product or category. Everything you heard us talk about so far this morning is global in nature -- the platforms, the capabilities, the content, the things that Lloyd is doing, the things that Jeff is doing.

We have -- our business in Europe has been growing quite nicely, as you know. And, we have seen through our relationship with some partnerships; first of all, these new products will continue to help us drive our growth of share. The things that are being done locally have helped us. Our relationship with BT in the UK has been a great success for us, as you know, the mobile

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

investments that we're making, since a large percentage of the audience goes through mobiles. So we actually feel that we're -- our European position is a laggard to the U.S., but we've seen great growth, and you've seen that reflected in our numbers.

So we think there's a very good opportunity for us in Europe. Terry talked a lot about Asia, so it wasn't at the exclusion of Europe, it was just rather to focus on Asia because it's a big opportunity and we have Jack, today, to talk to you. So we'll go to Safa, and then we'll come back here.

---

**Safa Rashtchy** - *Piper Jaffray - Analyst*

Thanks. First of all thanks for the opportunity for us to ask questions for this session. It's really great to have the Analyst Day [inaudible] here. First, a question for Jeff, and Lloyd. First of all, let me share something with you, Jeff. I don't know if you would like this or dislike this; but as you were giving the example about the Queen thinking the world smells like fresh paint. I typed it into Google here and it brings up Yahoo Answers results in there. I don't know if it tells something or not.

---

**Dan Rosensweig** - *Yahoo! Inc - COO*

What's not to like? Well, they've always been able to pick out high-quality.

---

**Jeff Weiner** - *Yahoo! Inc. - SVP Search & Marketplace*

It's funny, Dan says that somewhat tongue in cheek; I would say it factually. It is a high quality response, so why wouldn't they? It's a very relevant response.

---

**Safa Rashtchy** - *Piper Jaffray - Analyst*

So you're happy to help them increase their queries.

---

**Jeff Weiner** - *Yahoo! Inc. - SVP Search & Marketplace*

It's not so much about being happy helping them to increase their queries; it's that is going to generate addition traffic into the property. And remember, these properties at their root are about network effects. The more users that we bring into that funnel, having a high-quality experience, the more will participate. The more that participate, the more likely we are to expand the repositories and see that kind of placement and so forth and so on.

---

**Safa Rashtchy** - *Piper Jaffray - Analyst*

That a good segue to my real question, actually.

---

**Jeff Weiner** - *Yahoo! Inc. - SVP Search & Marketplace*

Okay, you only get one more, so how about Lloyd's question, and then we've got to go back here, because we're running out of time.

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

**Safa Rashtchy** - *Piper Jaffray - Analyst*

I'll make it quick. The Answers are great phenomenon, obviously; but it's been around since I've been covering internet, the whole idea, advice and sharing. It never took off, so I'll skip Lloyd's question if you want me to be quick. But, give us some ideas as to why you think it is picking up right now. Is it infrastructure? There have been many companies that developed and raised millions of dollars and they were popular, but the whole concept didn't take off until Wikipedia, which is a different model, so that's also my question. Do you think it will evolve into a Wikipedia type or will it really become a truly democratic and social environment?

**Jeff Weiner** - *Yahoo! Inc. - SVP Search & Marketplace*

How much time do we have?

**Unidentified Company Representative**

Not a lot.

**Jeff Weiner** - *Yahoo! Inc. - SVP Search & Marketplace*

Yes. It's one of my favorite subjects. I think there are a number of things that have changed. I think the Internet is a far more essential part of our lives. I think search is a far more essential part of our lives. I think the notion of how we accumulate and exchange knowledge is a far bigger part of our lives.

I think this notion of sharing, which absolutely has been part of the Internet since day one, has only started to grow. And, I think culturally, things are changing. The culture of generosity, that Caterina referred to earlier, has started to take root; and I think people are far more open to sharing. I do think there are clear infrastructural differences, in terms of how we scale these things, the algorithms to pick up the kind of content that you just noticed, making sure that people are exposed to these kinds of assets.

And frankly, it's not just about search. I think, all too often people see a property like Knowledge Search, and think that it's search. I'll tell a very brief anecdote and then we'll go to Lloyd.

When we initially evaluated this product, Jerry saw what was taking place in Asia years ago with regard to knowledge search; and said that this was something to keep an eye on. One of the reasons that it took off in Korea is because the corpus of available knowledge and information in Korea was much smaller than it was for English speaking countries. And so, the users in Korea were actually building a meaningful index; and when engineers evaluated the same opportunity in the United States we thought: The corpus here is already so large, how is it going to make a difference?

That was until our lead search engineer, Qi Lu, visited Taiwan and started playing around with some of the products there in China, in Mandarin; because they were in Asian languages, it was hard for some of us to really feel the impact. And, he came back, and he said, this isn't just about search. It's about community. It's about connecting with people. And, I think when you combine those two dynamics, it's extremely powerful.

**Unidentified Company Representative**

Okay. So, we've learned Safa and Jeff say they are going to speak fast -- doesn't happen.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Unidentified Audience Member**

Simplistically I couldn't help but thinking that when you bring some of the buried functionality of IM, E-mail, and other things you had to click a couple of times to get to -- before to the front page, the new redesigned front page -- it might actually increase the avails of high [CPM] front page inventory. Am I missing that, or is that intended or unintended consequence of the change there?

**Unidentified Company Representative**

I don't think you're missing it at all. I think overall, our focus has been on bringing more users and more engaged users. And the Home Page is obviously, again as Coleman talks about, is a Super Bowl every day. So it is a very high value property. So the more inventory that's available there, the more money we ought to be able to make there. So I don't think you're missing it. But, you need to understand, the engagement will also drive people through the entire network, which is Yahoo's full competitive advantage -- being able to do the entire network, not just one place.

This is the last question. Somebody? Anybody. This is closest to the mike -- sorry about that. It's a proximity game.

**Unidentified Audience Member**

Thanks. My question is for Lloyd. You talked about the right blend of license to original and user generated content; but you didn't really talk about what you thought the right blend would be or where it will go. I wonder if you could give us a sense of where you think that right blend is three years from now. And also, what the advertising opportunities are within each of those? Is one more attractive than the other? Thanks.

**Lloyd Braun** - *Yahoo! Inc. - Head of Yahoo! Media Group*

Great question. Remember the Media Group is a pretty diverse set of properties. We've got music, games, news, finance, different audiences, different demographics, and ultimately as we look at them, a different blend. There is, in my view, no one magic formula as to what that puzzle is going to look like other than we feel that it's the combination of all three of those things, generally, that's going to create, with the tools, something that is going to be very distinguishable and very, very special. I could talk about something such as news, where we're seeing already seeing bits and pieces of it in Flickr.

Where citizens, and every one with a camera, is going to be able to submit photos and videos of anything that they're seeing. So, with this head content that we're going to have from our media partners and providers, we're going to in context also to be able to have the user take a look at, in essence, the entire world of citizen journalist that we're going to have. How that mix is going to wok may actually differ from story to story depending on exactly what it is we're showcasing at the time.

So., I think that the bottom line is what we're trying to develop in the Media Group is a programming mentality; a consumer focused mentality where we -- and I think what's going to distinguish Yahoo is that we're going to have human beings programming these pages. We're going to have -- we're going to make editorial judgments as to what the consumer is going to want to see. And, that's where the mix is going to come in, in terms of how this is all going to be presented.

**Unidentified Company Representative**

Okay. Let me bring up Paul Hollerbach, with some quick housekeeping here.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

> May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Paul Hollerbach** - *Yahoo! Inc. - VP Finance and IR*

Thanks, you guys. We're going to break now for ten minutes. We're running a little bit behind, so let's say 10:27 is the target to get back here. We're going to start promptly. And Tim Cadogan is going to talk about search monetization. So, I'm sure you'll want to get back to hear that.

[BREAK]

## PRESENTATION

**Tim Cadogan** - *Yahoo! Inc. - VP Search*

Morning. I'm Tim Cadogan and I'm going to talk to you about search monetization, this morning. I want to start out talking about some of the principles that inform the way we think about monetizing search. And as Dan, Jeff, and Lloyd talked about, this morning, the consumer is at the heart of everything that we're doing at Yahoo! This applies in exactly the same way to search monetization. Now, there's a specific way of thinking about the consumer, which is the point in time which they are expressing their commercial needs in the search environment, which is when they're looking for businesses that offer the products and services that they're looking for.

So, to connect the user to satisfy their need, we compile a large pool, a database of business offers, and we do this using a marketplace format, an economic system that ascertains which of the best offers to present to the user. We then connect that at the time of search to the user, using search engine technology, and that then leads to a series of targeted leads, or clicks, that flow through to the advertiser. And the more that we do that, the more we drive the breadth and depth of participation on the part of the advertising community in this system. So, this cycle is the virtuous cycle of search monetization and we seek to grow and accelerate this so that we can deliver satisfaction to the user and conversion to the advertiser in very much two sides of the same coin.

Now, part of the reason why we are so excited about this area is there is significant opportunity in every single one of these areas. On the business offer side, we see the potential for many, many more offers. Today, we have hundreds of millions. We think we can achieve billions of offers.

On the relevance and to satisfy consumer need, we think we have considerable improvements that we can make in the near medium or long term, but how to better match that set of offers to the user's need in the way that makes both sides of that equation even happier. And that, then, will drive many more clicks, and something I'll take you through, in more detail, is the level of insight that we're going to provide to our advertisers about the value that has been created for them as businesses. And then, more participation. We have hundreds of thousands of businesses, today, participating as advertisers. We believe we can get to millions around the world, and I'll take you through some more details of that.

So, these are the principles that inform us as we go around, reinventing our search monetization platform, approaching the problem. It leads us into our strategy, which is for Yahoo! to leverage our industry-leading knowledge of both our advertisers' goals and our consumers' intent to build the world's most effective search marketplace.

So, I'm going to take you through a framework we use to think about our priorities and then take you through each one of the key five priorities in some more detail and talk you through the new ad platform. Again, it starts with the user. If the user's not happy with the result, they're not clicking, value's not being created for anyone. So, we're very, very focused on delivering value there.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

The next step is the advertiser and then creating a marketplace design, an auction, first developed by GoTo about eight years ago, now iterated over many times - how do we incent people to participate in an auction format that gets their offers in front of the user?

Secondly, the advertiser experience. How do you create a set of tools on the web and APIs that allow people to participate in that auction? That leads to a database of ads. A very large database of ads, which then, we wait for the search - and many searches are happening, every second - so then, you use matching and ranking technology to select the right ads to show to the right user at the right time. That then flows through a set of distribution systems, such as Yahoo! publishing network and our other standard serving systems, and on depending all of that is the platform, the infrastructure, that enables us to do all this at scale in many markets around the world. And that then flows out to either us, as the final publisher, or to our partner network. So, our priorities map to this priority framework.

The first is our platform. Second is the advertiser experience. The third is the new marketplace design. The fourth is driving the consumer experience to be better matching ranking. And the fifth is to increase the breadth and scale of advertiser participation in this system. I'll spend the bulk of the presentation, taking you through some more detail on each one of these components.

So, the first part is the platform, and our goal is to deploy a high-performing extensible platform. Performance is several things. It includes speed, reliability, reduced transaction cost, and cost of scale. Speed reliability really feed into transaction costs. Transaction cost means the cost of participating in any advertising medium. It's not just the fee you pay for the banner ad or the text link or the TV ad. It's the time it takes to set up the campaign, to manage the campaign, and we're seeking to reduce the cost of participation in our system to make it as frictionless as possible. Cost of scale is about our ability as a corporation to do this in a lowest cost way as possible so that we can extend our offering to our advertisers.

Scale. I touched on this a little bit, earlier. We are global . We are in 22 markets and we want to be in many more. We want to move to millions of advertisers from hundreds of thousands. We want to move to billions of offers. We already have 500 billion users around the globe, using Yahoo! services. We want to go to a billion-plus services, users, served by our advertising platform. And we want to be able to serve the tens of billions of impressions, every single day.

And then, lastly, the platform is built for rapid innovation. The version that we will be releasing, later this year, is Version 1.0 and the platform is built to anticipate a lot of additional things that we think are very likely in their future, such as additional targeting options beyond what we have in Version 1.0, such as additional ad formats. So, beyond text, adding graphical and rich media elements into the search marketing mix. Multiple distribution channels - talking about going beyond the PC to the three screens, the TV, the cell phone. And then, third party developers. There's a very large ecosystem in the search marketing industry around tool providers, search engine marketing agencies, who are building applications and tools on top of what we provide and we're very cognizant of that community and want to encourage that to flourish.

The second area of priority is to enhance the advertiser experience. So, the systems are great but the experience isn't optimal, you lose some potential benefit. The first principle - in building the system, we spend a huge amount of time, talking to our customers, our existing customers, and also people who are not customers of our system, today, who we want to have as customers, which is really just about everybody. What is it they need that's fed into the way we've thought about the system? The first area is ease of use.

Search marketing has not always been the easiest thing in the world to do. Articulating keywords, managing bids at the keyword level - those are tricky things, so we've spent a lot of time thinking through from the application level, how to make this intuitive. We have spent a great deal of time on a principle called progressive disclosure, which is a design principle which really focuses on how do you reveal the right level of functionality to a user at the point in time they need it and not more? So, the application is designed to deal with varying levels of sophistication. So, a simple user will get a simple set of data that will get them up and running in search marketing. A more advanced user will get more graphing, will get many more data points that will provide more sophisticated insight for that campaign. And the idea is we'll get as many people to start out as we can and then they grow with us, over time, and become more sophisticated, advanced users of the system.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

The second area is effectiveness. How do we help people drive the performance of their search marketing campaigns with our new platform application? The first is a feature called ad testing. It's one of the areas we've known we had a need over the last few months, a couple of years to address this in new application. Has it in [inaudible] essentially allows the advertiser to express multiple different creative titles and descriptions for their ad, and then us to optimize that until they achieve the perfect creative, which is optimal for them and optimal for the user.

Enhanced geo targeting - the most important targeting variable that advertisers have repeatedly highlighted to us. I'll spend a little bit more time on that, later. And then, goal-based optimization. Goal-based optimization takes the knowledge and the experience that we have gained with our search optimizer product, which is a product that's been in the market for a couple of years, mainly available to higher-end advertisers, and makes it available for free for every single advertiser. So, it's software. You install it on your website and it runs analytics, automatically. What this allows any advertiser to do in the new application is set up a campaign per keywords, set preliminary bids, and then set business goals. As in this example, cost per acquisition. And then, let the software run and optimize their bids without them having to participate. This is tremendously valuable because it really reduces transaction costs for the advertiser. And the reception to this in our usability testing has been outstanding.

It allows us to do several other things that are very powerful. One example I want to call out to you guys is something called [assist]. Assist works in the following way - essentially, today, in the search marketing model, it's very much a last-click attribution model, which means that the search term that got the click that led to the conversion gets all the credit.

Here's an example. Two search terms - digital camera and D70, which is a Nikon digital SLR. Very nice camera. On those two terms, digital camera will probably get quite a lot of searches, a good number of clicks, potentially somewhat lower conversion because it's a little broader. D70 will get fewer searches, a good number of clicks, probably higher conversion because it's a little bit down that funnel of a purchase intent. Looking at that, the advertiser may begin to believe digital camera is not working out for me as a term. D70 is. Maybe I'll bid more or I'll just participate on D70. That may turn out to be a mistake because digital camera may well be driving people to their site who then go away for a couple of days and think about it because a D70 is 1,200 bucks. It's not a small purchase. Then, come back, search on the next term, and then click through and convert.

What assist does is it tracks that and shows the value being created by those high-level search terms. Why that's important is it gives insight to the advertiser as to how value is being created and allows them to make more optimal decisions. This feature, we think, is a first in the entire industry, not only for search marketing providers and it's got terrific feedback from our advertising community.

The third area is making our application action focused. This is very, very important because in search marketing, there is a tremendous amount of data. And just providing mounds of data does not cut it. There's too much information. You need to enable people to understand what are the insights and how can they make decisions on top of the insights.

Here's an example - this is our current application and I'll be the first to admit it's not the easiest thing to navigate. We're moving to a much simpler way of portraying the key data. This is a budgeting tool in the new application. In this case, the advertisers put in a budget of $9,000. The graph on the right - the blue bar shows them how many clicks we estimate that you will receive for that budget over this time period. The orange section of the graph shows what opportunity are you leaving on the table and how much more would you need to allocate to your budget to extract the full opportunity in this section of the marketplace. So, right now, you get the key data and you get the ability to change your input and see the response in real time. Very, very clear control, action oriented, based on clear insights.

The final area is rapid innovation. I'm going to repeat this in every area because this is key. This is Version 1.0 and the platform is built to anticipate the next several years of where we want to go. Some things where we have a clear idea, some things where we're not sure, yet, but it's built in a very flexible way so we can add more targeting, more ad types, more pricing methods over time - it's very, very key to the way we fall through the underlying design of the system.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

Third area - the new marketplace design. The new ranking scheme, as it's often called. The first focus, here, is how do we drive a better consumer experience of the sponsored search results? Sponsored search results are not just ads. They're an integral part of our search experience. Here's a great example of where we do a nice job. Talavera tile, a certain kind of Mexican colored tile. These results are terrific. They exactly answer the need of the user. We don't do this, every time, though. We don't get it right, every time, and we need to get it right, every single time. So, we're pouring in a great deal of effort into how we use the new ranking scheme to address the needs of the consumer I outlined at the beginning.

Second area - incentive alignment. Since the beginning, the original GoTo model was based on how do you get incentive alignment, using economics? We're iterating that model based on original insights, there, learning from the marketplace and best practices in the industry, and encouraging our advertisers to help us create a better match for the user. And, therefore, better result for them, too.

Here's an example. We are exposing more data about the quality of the advertisers' listings than any other competitor. This case, this feature's called ad quality. What it does is it shows on a five-point scale, how well the ad is performing for the user. What this does is it allows the advertisers to focus on the areas where they might not be doing as well and to improve the quality of their listing. Looking at the landing page, the title inscription, the keyword matching - all the tools that we put at their to expose them. So, increasing the visibility into what's happening, and therefore, driving incentive alignment.

Similarly, focusing on advertiser control and transparency. One of the things that came through, very clearly, in all of the conversations we've been having is how much this matters to advertisers. So, as you move into the new system, really try and take the best of the old world, the best of the new world, and come out with an elegant synthesis of that. In this case, this is the bidding page. What the bidding page does is it allows the advertiser to express their bid. You can see, here, it's $0.77. And it shows them what their estimated position will be and what their share of potential will be. Excuse me. I went - where are we going? Thank you.

Share of potential is a very important concept that we have been utilizing for our higher-end clients, for a couple of years. And, again, it takes the principle of things that have worked well for the high end. We're bringing them to the mass market, just as we are doing with the goal-based optimization. What this does is gives us superior level of insight to the advertiser to how their bidding strategy is going to play out in terms of their estimated position and what are they leaving on the table if they want to increase their bids. So, competitively advantaged amount of visibility and control over their experience.

And then, rapid innovation. So, the way we thought about the ranking scheme in the marketplace design is specifically designed for us to be able to iterate and innovate on top of the first step that we'll be making, later, this year.

Fourth area is how do we then deploy this new rank scheme? How do we improve the consumer experience of the matching and the ranking. The vast majority of the work has been going into the new ranking algorithm and we spent a lot of time leveraging all of our experience and terrific skill sets of the engineers in Yahoo! search technology and in Yahoo! research labs, and that's baring a lot of fruit as we work through this.

The second area is the main additional targeting variable that we are focused on. Again, we have been through this, extensively, with our advertisers. We're focused on what are their needs and due targeting came loud and clear as a priority need for most of our advertisers. So, there's a two-step approach here. We are helping the advertiser more clearly, more easily express geographic preference when they have it, then giving them a variety of different ways to do that - by DMA, by city, by radius around the zip code, and enabling to see that interactively on a map.

We are helped, greatly, in this area through an acquisition we made at the end of last year - a company called WhereOnEarth, based in London, has been in the geo location space for about 20 years. It has an unparalleled database understanding of geo location. That's helping us make this experience much better for the advertiser - excuse me, I'm skipping ahead. Getting too excited. And it is also helping us on the consumer experience side of things where it helps massively, in understand and

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

disambiguate consumer queries to identify which queries have due intent, either explicitly or in an applied way with them, and that then helps us do a better job.

If we get the advertiser offer and a clear sense of geographic need around there and a better understanding of the user need and their geographic need, connect the dots in a more effective way. And then, ongoing innovation. A tremendous amount of work with some incredible people, working on where we're going to take this stuff in the future.

The fifth and the final priority is increasing our participation in this system. Both the breadth of our advertising participation and the depth. And so, we have a couple of things, here. One, we have organized, reorganized, relatively recently, to exploit all of the assets at Yahoo! So, small business, we have now got under one guy, Rich Riley. All matters of small business go to market at Yahoo!, which includes the domain, the hosting, the store functionality, and what we call the online channel for Yahoo! search marketing, which are the smaller advertisers.

Similarly, on the sales side, we have joined David Karnstedt's Yahoo! search marketing sales force, together with Wenda's graphical media advertising sales force, all both managed under Greg Coleman. Those guys are going to talk more about how effective that has been, already, in terms of reaching the customer in exactly the way the customer wants to be reached.

Beyond the organization, we have massive assets in these areas. On the small business side, we are one of the leading providers of domain name services, of website hosting, and other website services for hundreds and hundreds of thousands of small businesses. We are increasingly tapping into that pool because the natural next step after you have a website set up, is how do I direct traffic into that website? And so, we believe there's a lot of value to come in that area. And then, our relationships with the 4,500 advertisers are the best, bar none, and the guys will talk some more about that, later. So, we feel that we have great, great assets in terms of driving breadth. It's often called the tail. And depth, particularly for the head, but also for the tail advertiser over the next months and years.

So, how does this stack up for us as we compete in this space? So, there are a number of areas where we have needed to catch up. That's well known and we think with this release, we catch up in the majority of those areas. The relevance [inaudible] banking, we think, is a significant step forward. Ad testing addresses a well-known need. The ease of use of our control panel and our system addresses some known issues, there. Getting our ads online, very quickly, moving from a system that can take a couple of days to minutes. And then, integrating our base analytics program in the application for everybody.

But, we think this allows us to differentiate in some significant ways, as well. The quality index, providing more insight into how you're performing from a quality perspective, which we think will further accelerate the alignment of incentives. Enhanced bidding and forecast - more insight, the more action orientation around that, we think, is a significant advantage. The ease of use, we think we've not only caught up, but gone beyond in the way we've thought about progressive disclosure and the overall flow of the experience for the simplest to the most sophisticated advertiser.

The due targeting, we think, is industry leading and assists some of the other approaches we're taking to leverage the analytics and how we package that for real utility to the advertiser, we think, is terrifically valuable. And, again, this is Version 1.0. So, we have considerable set of ideas. Some, pretty well baked. Some, a little more formative, around how we're going to take this to the next level, leveraging all the assets of Yahoo! on the advertiser and consumer side.

So, a question that came up, now and then, recently - particularly, was around timing. And, so, I'm going to take you through timing for each one of the five elements so that you can see where we are. This is very much consistent with what Sue, Terry, and Dan have been communicating in our public communications, but there's a little bit more detail, here, than we have communicated, to date. So, the platform - the underlying infrastructure - is code complete. Has been for a little while. Is now in its extensive testing so we'll work through that and the plan is to deploy that in Q3 in the U.S., first. That deployment will then continue in our international markets, starting in Q1.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

The second phase is on very much the same track from a timing perspective. The advertiser experience, the application that sits on top of us is also code complete. It's in testing and will launch in the same timeframe in the U.S. and internationally.

The third part is the marketplace design, the new ranking scheme. That will launch shortly after the underlying platform and the advertiser experience in the U.S. and with a similar interval in our international markets. The reason for that is as follows - when we launched the new platform, new experience, it is a change for advertisers and we want to make sure they move into this new house in a way that gives them time and gets them comfortable with the new paradigm, the new tools, the new features. Then, we rollout the new ranking scheme and they have the tools and the features at their disposal to optimize their participation in the new scheme.

The consumer experience continues to run. Matching ranking has been a very big area of innovation for us over the past 18 months and will continue. There will be a spike of activity around the new ranking scheme as that is a big part of this. And then, the advertiser participation side of things is ramping and has been ramping and will continue to ramp over the next few months.

So, with that, just to conclude before we go to questions - this new system is deeply grounded in our understanding of what our consumers need and how to make search better, overall, and what our advertisers - both our advertisers, today, and all the folks that we want to participate - what they need, where they want to go, and how we help them achieve that.

We believe that the opportunity is very, very large for us. We think we can do a much better job for users, we think we can do a much better job for advertisers, we think we can do a much better job for both of those at much more scale. So, we're very excited about what we can do in this area. We have a clear strategy, we have a very clear execution plan, and we are very happy and well on track with that plan. And we are most excited that, to us, this is just the beginning. Once we get Version 1.0 out, we are terrifically excited about all the things that we can do on top of that.

So, with that, I want to turn to questions and Sue and Zod will come up here and join me. Thank you very much.

And I did skip - here's some examples. Some people, last night, asked me about feedback. The feedback has been really good. I think part of the reason is when you go out to market and ask people for feedback and then you build into a product and come back and show them? That's very - it makes them very happy, but we've had excellent feedback. Thank you.

## QUESTIONS AND ANSWERS

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Well, thank you, Tim. I'm please to have Zod Nazem, who most of you know, is our CTO, to join us. So, we're going to take questions for about ten minutes on Tim's presentation and Tim can represent the product side and a lot of the content that he just presented to you and Zod's here to talk about the technology side. Any questions you may have on that. So, with that, I'll start right in front. If you guys could all wait until you get your mic just so that everybody can hear and the webcast can hear.

**Unidentified Audience Member**

Thank you very much. Just a couple quick ones for Tim. Is there a risk as you move to the new algorithm that we may actually see, at least initially, a drop in bid prices, just as you haven't had maybe the same kind of scale with advertiser penetration as you would as you optimize the system?

And, secondly, how's the analytics that you're offering, or that you're about to offer, differ from what Google is offering in Urchin?

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Tim Cadogan** - *Yahoo! Inc. - VP Search*

So, on the marketplace dynamics, we do expect individual variables to move. But, we feel that in aggregate, the net experience is going to be significantly better. So, the goal is to drive that better consumer experience, and therefore, more targeted clicks at a higher value to the advertiser so the net outflow of that, we believe, will be benefit. As we've said in the past, it's going to ramp over time.

In the terms of the analytic software, we feel that it is integrated in a more compiling way and some of the ways that we draw out insight from that is more actionable to the advertiser. Therefore, the system is great but the way it actually creates value for the advertiser is more compelling.

Susan Decker Anthony?

**Unidentified Audience Member**

Thank you. Tim, you laid out several factors, making that case that your product is now as competitive with your competition, and potentially even more differentiated. Do you believe your RPS will then match your competition? If not, why?

**Tim Cadogan** - *Yahoo! Inc. - VP Search*

So, it's a progression, alright? So, we think that this will help us, considerably, and improve our experience. And therefore, the overall monetization as an outcome of that. I kind of hopefully came through that we think about the first principles as how do we drive that satisfaction for the user, for the advertiser through a marketplace and us as the beneficiary if we do the right thing. So, we think this is many, many steps of progression. We're not breaking out specific estimates for how we'll think we'll perform, but we certainly think it's going to be a meaningful progress.

Susan Decker And I think one of the things that we've tried to communicate with you along the way is we increasingly added to more disclosure about our execution plans, here, is that the machine will learn, over time. And so, we are very optimistic about our opportunity to increase the relevance in click-through measures and we're using multiple variables, now, to rank. Over time, we would see this, over periods of months and years, improving and improving and improving. So, we want to set that expectation, accordingly, that we see those as a multi-year process to improve the RPS numbers that we have, today. Safa?

**Safa Rashtchy** - *Piper Jaffray - Analyst*

This is maybe more of a question for Zod. It seems to some people that what you have outlined has been taking quite some time to code and implement. And you have been quite clear, in the past, that you have a system that's up and running. It wasn't easy to change it. My question is do you think you have a new architecture that would allow you to move faster, in the future?

**Zod Nazem** - *Yahoo! Inc. - CTO*

Yes. The reason we really took our time, we wanted to do it right. You can think about it as really the third generation of this kind of software. The first one being the GoTo, Overture, one. Maybe you can think about Google as the second one. And this is the third and there's been a lot of learning in the last six, seven years of what does it really take? How fast is the growth? What is the real scale? Where are the bottlenecks in the system that really need to be thought through in a really major way?

So, we took all the experience that we built over the last decade at Yahoo!, running and building very large systems, and especially in the search area, to bring that to bring that to bare and build an infrastructure that completely sets us for the next decade of where we need to go so it doesn't have the same restrictions that it had in the past and that is completely modular. And because of that, we have built a parallel system on the side that actually allows us to pace our migration to handholding

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

our advertisers over to new experience and not be one of those big bang, you know, one Monday morning, every advertiser comes in and all of a sudden, they have a whole new experience, a whole new marketplace.

So, it takes out a lot of the risks from the execution of the migration. And also, it's a much more cost effective and much more scalable infrastructure that we can, in fact, as Tim was alluding to in his presentation, to a very rapid innovation on all the different parts, all at the same time. So, move away from this every quarter, one release type of a model, to much more of a weekly, biweekly type enhancement.

Susan Decker So, just to reiterate because that is an incredibly important point Zod made. If it's not clear - we've completely rebuilt the system. It's not changing the system, as you said. There are two systems and it's fundamentally a completely different system in terms of scalability and approach. I mean, we have the redundancy of the existing system, which helps the integration. Sure, right there.

---

**Unidentified Audience Member**

Thank you. I'm intrigued by the idea of geo targeting with search. It seems like a place of your strengths. Can you give us an idea of the percentage of commercial queries that you think are local, in nature or intent, and the percent of advertisers you think would either employ geo targeting in their search behavior, their search marketing? Or for that matter, look to differentiate their bid prices by geo targeting?

---

**Tim Cadogan** - *Yahoo! Inc. - VP Search*

In terms of the consumer side, it's a meaningful number and it's one of the largest categories of search queries. On the advertisers side, it's interesting. There's two parts there - to that answer. One is the advertisers who are currently participating in the system for whom geotargeting is meaningful. And again, there it's a significant number. The more interesting question in some ways is what portion of companies are not currently using search marketing but would if geotargeting was a lot more robust. Because it really helps them zone in on what they're trying to address. And there we see very significant potential then tying back in with the small business space I mentioned and then some more assets on the local sort of side of the business.

---

**Unidentified Audience Member**

I've heard the number of commercial queries that are local in nature is somewhere around 40%. Is that consistent with the right range that you're seeing?

---

**Tim Cadogan** - *Yahoo! Inc. - VP Search*

It's probably in the ballpark. There are two kinds of local queries. There are those that are explicit and then those that are implicit or that can be local intent behind it or a local dimension to it. And so the latter can be larger than the former. So it's a meaningful portion of queries.

---

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

I think just to add a point to that, that's important in the question is, Tim talked at the very beginning about how customer-focused we are in terms of interviewing and getting feedback to drive the design of the system. We were very deliberate about building this form of targeting. There's a lot of forms of targeting and there are others we may build in. This is 1.0. Some of our competitors have talked about other forms of targeting. We were very deliberate about this type of targeting because we think that's the one that's the most important to the system. Yeah.

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Unidentified Audience Member**

Q4's obviously an important period for search in general - how do you think about launching a whole new interface right up against the holiday season? And is there sort of a drop dead date where, if it's not happening by then, it's not going to happen during Q4?

**Tim Cadogan** - *Yahoo! Inc. - VP Search*

So if you'll remember from the slide I showed about timing, that's a very extensive testing period that we're already in. And it's only mid-May. And that is there specifically to mitigate any potential risk, both on the technical side and on the customer migration side. And the customer migration side we have a very detailed plans that run down even to the account level about how we migrate and handhold our individual advertisers through the transition. So a part of the tradeoff is working through the timing but also every time we take this out to market and show it to our customers, they want it sooner. And they really, really are excited about the benefits that the new platform brings and so we're trying to bring that to market as soon as we can. That is consistent with our original plan. So that testing and optimization period is very important to make sure that we get that right.

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Okay?

**Unidentified Audience Member**

From what you've developed for the paid search side, what can actually be taken and used on the display advertising side and are there opportunities in this innovation you've left open to converge the two and one platform over time so you can leverage the fact that you're the largest seller of branded advertising or graphical advertising?

**Tim Cadogan** - *Yahoo! Inc. - VP Search*

As I mentioned a couple of times, there are definite thoughts about where we go post-1.0 with regard to different targeting dimensions. So for example in demographic in behavioral targeting we're a leader on the graphical side of the house. We think about other formats that we can accommodate with the new platform, weaving graphical, weaving rich media into the new platform. So we're ready to accommodate whatever we think is appropriate for the advertiser base. I think it's perhaps better to think about it as a federation of systems rather than one great big system. But we think that the new platform we have in place with that federation of underlying technologies gives us the flexibility to move in the direction that we think are most appropriate over time.

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Great. We have time for one more question. Maybe right up here - Mark?

**Unidentified Audience Member**

Thanks. So I understand your reluctance to want to put numbers around it or time frames around the improvement but since the goal is better monetization, can you give us an early read from the testing phase of the type of increases you're seeing and just - were there things that you thought would give you better monetization that haven't and conversely things that you thought were just kind of addons that have really increased monetization much more than you thought? Thanks.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Sure. I'll start and if you want to add anything, Tim, feel free. I think that one of the - well, we've spent a lot of time starting the testing process as you saw from the three horizontal lines on Tim's money chart as we call it - the chart that showed our plans in terms of geographic roll out. The - it's extraordinarily difficult to test at all a second order effect.

You really don't know until you have a real marketplace - a dynamic marketplace and new bidding arising - how other advertisers will respond. So it's fair to say that we've done a lot of modeling around this to anticipate a range of outcomes. And that we've been very careful and deliberate about trying to set your expectations that we don't expect a financial contribution from the system this year as we're ramping out - rolling - ramping out the various design features, and really looking more toward 2007. We do feel there's quite a lot of potential for the company in terms of driving RPS, particularly on the relevant related metric which is where we think that we have some work to do and the system addresses that issue.

But I think it would be premature to try to put numbers around that and we don't have any specific numbers out of testing that would help us address that other than that we feel really good about the stability of the system and we feel good about our execution plan at this point. So - all right, with that, I want to thank both Tim and Don and let's give them a big hand.

## PRESENTATION

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

So I'm going to introduce the next speaker. We are about to move to the advertising panel. Which is a - hopefully you'll find to be very exciting. We appreciate some of the questions that you all have provided. We're going to address - have a panel now discussion that will address the panelists with a lot of the questions that came from the audience and then we're going to open up to a broader q-and-a after that.

So with that it's a great pleasure for me to introduce Greg Coleman, EVP of Global Sales Operations - he's really created a lot of value for the company and is going to talk to you about a really - we think - unique approach in terms of go to market that we're deploying and some really unique set of panelists. So with that, Greg -

**Greg Coleman** - *Yahoo! Inc. - EVP Global Advertising Sales*

Thank you, Sue. Good morning everyone. Listening to the presentations today we're now into the monetization portion. Looking back to 2001, when Terry Semel and I showed up on the same day at a sales meeting in late April of 2001, we were doing several hundred million dollars of advertising. Today we're doing several billion dollars of advertising. And the changes that we've gone through with people, with technology, with platforms, with the understanding of the overall advertiser mindset, it's been an extraordinary road and today we're going to bring you up to date on what we're working on now but what we're also working on for the future. And I think you'll find it very interesting and we've set aside most of the time for questions and answers.

So I have four slides that I'm going to take us through but before I get to the slides, in the advertising world, only a few things really matter. One is the leadership. So first on the graphical side we have Wenda Harris Millard running that team. On the search side, we have David Karnstedt running that team. These two leaders set Yahoo apart. Yes, we have scale. Yes, we have data but the teams that they have built and the teams that understand the marketplace are extraordinary. You cover a lot of media companies the sales leadership really makes a difference. And that's what we're going to be talking about in part today.

Also we will be bringing up Usama Fayyad and Usama is smart of a different side. We are smart - street smart. Usama, former rocket scientist, is really smart. So he's helping us bridge the gap between what our customers want and what is technologically possible. Because today there are very few barriers in terms of what we think we can do and what we can do.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

So let's go to - let me take the clicker. Let's go to the first slide. So the opportunity very succinctly put. The first one is to provide multiple platforms for marketers of all sizes to deliver relevant messages with scale, reach and efficient targeting. So what does that mean? We have to be the company that has all of the things that our advertisers want. And we do. And they are leaning on us more and more - and you'll hear us talk more about the graphical and the search side of the business - the level of understanding that they want as to how those two disciplines can work together, that's hot on everybody's mind.

The second one that you certainly know about is deep penetration of the advertiser budgets. So we are clearly going there, working with our advertisers and if you were curious about our strategy there, our compass is 100% what does the advertiser want and what is good for the advertiser and that helps define our strategy.

The third bullet is expand our share. Share of market is our benchmark. Sue, Dan, Terry - they're pushing us - our report card is based on share. How are we doing there? So the two key areas are how do we build on the strength and leadership in the graphical advertising space and then secondly you heard Tim talk a little while ago, how do we leverage that new monetization platform in search? Those are the two things we're working on. The next slide.

I'm not going to take you through this whole slide but we look carefully at the competitive landscape here at Yahoo. Where do we play? Where can we win? Where do we have competitive advantage? So where there a lot of multi-colored balls on the screen, I'd like you to take a look at the last one which is, graphical and search alignment. Today we are the only company with two world class teams working with the advertising community in both the graphical world and the search world.

The level of interest that is generated right now in the marketplace to understand how those two disciplines work is extremely powerful and it puts a lot of pressure on us to figure out what is smart to take to the market as opposed to what are we just doing out there. We are spending at least 1 staff meeting a week with David and Wenda going into how the teams can work. Where do we make mistakes by removing the focus that has made us so successful - that's what we're staying away from right now. And how do we continue to propel ourselves in that world?

The strategy is - this is what we take for the market. We have our data and we have scale. And without the combination of those two targeting to most of the advertising world is unimportant. Because you need both targeting and tonnage to get attention. The third one is technology. I mentioned before, how do you blend those together? And content, Lloyd talked about that before. How do we take the appropriate contextually relevant content to the marketplace and finally the sales and marketing expertise that I spoke about before.

So today, we talked about it - while I'm going talk about targeting on this slide. The one key issue - let's not forget, mass audience reach is always going to be important to Yahoo. And as the TV networks have started to drift downward fairly quickly with audience, many customers are looking at the Internet, looking at Yahoo particularly our home page and run of network as a place where most of the eyeballs can be found and aggregated in one spot.

So today we're talking about the right ad, the right time and the right place. In terms of targeting, we'll get into this a little later I'm sure we'll get some questions. Improved demographic targeting - we have better geographic targeting right now so you can buy at a zip code basis a graphical ad and you heard Tim talk about the search piece. Better contextual targeting - that is something that we are working on that is very, very valuable to our advertisers.

And the final frontier or the latest frontier which is something none of us could really have thought about even two years ago - the concept of behavioral targeting - targeting consumers on behalf of our advertisers, not based on how old they are or where they live. But based on what they do. And this is the new thing and it's creating quite an opportunity with our marketers but also with enhanced CPMS.

So in terms of the panel that I'm going to bring up, I'd like to ask Wenda Harris Millard, Dr. Usama Fayyad and also David Karnstedt to come up. These are people that work the street every day. Let's give them a round of applause, will you? Come on.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Greg Coleman** - *Yahoo! Inc. - EVP Global Advertising Sales*

Thank you. Oh, excuse me. Wenda took that wrong. These are people that are out on the street with the marketing community all day long. Although for most of us, we'll do whatever it takes to bring in a little bit of advertising.

So - thank you. We have a few questions. And last night we got - and actually we asked the audience for some questions. Wenda, the first question that I looked at was what does Wenda eat for breakfast? Do you know what that could have been about?

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

I don't know. But it was a question.

**Greg Coleman** - *Yahoo! Inc. - EVP Global Advertising Sales*

A lot of protein because she's out there working hard. So in terms of the legitimate questions for the panel, Wenda and David, how do the aligned sales forces actually help our customers? And Wenda let me start with you.

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Sure. There's a lot of interest out there on the part of marketers in terms of how brand advertising affects search and how search affects brand or graphical advertising. And we are the only company that has experience in both. And so I think that one of the impacts is not only obviously helping the customer but I think - David, I feel that a lot of the advantage here is that it increases our credibility and moves us ever forward on the line of trust. And I would say that more and more advertisers are using both graphical advertising and search. And when we can provide an end-to-end or holistic solution, that's wonderful.

And there are - I would say probably more interest in four categories - probably automotive, retail, travel and financial services would be the four categories where this is most prevalent. And for example in financial services, give you a quick example, we had an advertiser who was doing very, very well. Lots of business on the graphical side with us, but was really not taking advantage of the in-market purchaser. And so David's - a bunch of people from David's team and a bunch from mine met with the marketing organization at this company - had a big summit. And the net result of our helping them understand what the opportunities were - we ended up with twice the business on the graphical side and you got 10 times.

**David Karnstedt** - *Yahoo! Inc. - SVP and General Manager, Direct Business*

10 times.

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Yeah. So when appropriate, it works.

**Greg Coleman** - *Yahoo! Inc. - EVP Global Advertising Sales*

David?

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day |
|---|

**David Karnstedt** - *Yahoo! Inc. - SVP and General Manager, Direct Business*

Well, I'd just like to add on to what Wenda said. You know, we've been doing an awful lot of work together and one of the areas that we've had a lot of success is with our agency partners.

And in one specific example, one of our agencies was working with a large automobile manufacturer and came to us at Yahoo and said how can we leverage all the assets that we have across all of our mediums? So whether that be broadcast, print - they had created a game on their site and said how can we bring this to life in the Internet space. And what we were able to do was take the creative concepts from their broadcast campaign, work with Wenda - as has been talked about before - our mini-Super Bowl - have a front page advertisement along with network penetration and then combine that with search.

What made this particularly unique is that we integrated creative concepts that would be outside of what you would think about within the typical search campaign. So beyond just brand terms or specific vehicle terms, we worked in characters from their actual broadcast ads. And in the world that we live in it's not just about, hey, this is neat, this is really cool, but did you achieve results? And I think for us the exciting part is that 40% of all the referrals for this new vehicle happened through the online space and specifically through search.

**Greg Coleman** - *Yahoo! Inc. - EVP Global Advertising Sales*

So it's also important to note that in the past, the past lifetime, David and Wenda actually worked together and this team spends hundreds of hours a year working together trying to slam out those key issues that our advertisers are looking for. Until we have it right. So Wenda let me ask you another question. I think you'll like this question. We've heard quite a lot about the strength of Yahoo's graphical advertising business over the years. The key issue now is how do you plan on maintaining and growing that share lead?

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Well, the first part of that answer absolutely has to be that it's - my team and I have the privilege of selling to the market - the world's largest and most engaged consumer base. And we have a brilliant set of products both in terms of breadth and in terms of depth. So I would say in terms of continuing along the success path, we need continued support from Lloyd and from Ash and from all of the people who create content and products from us. So I'm hugely dependent on that first of all.

Second of all, I think that customer focus for us - you've heard this from me. I know, so many times before. But it is a key differentiator. And we will never, ever stop being obsessed with the needs of our customers. We've invested a lot in understanding their business. We've also invested a lot in having them understand our business. And what it means to them.

So for example last week we hosted a major summit where we unveiled some original research - both qualitative and quantitative and the program was called the long and winding road to the cash register. And with this research we took a look at four categories and how consumers make purchasing decisions. And sometimes those decisions are short path to the cash register or a long and winding road. And so we are able to talk to our customers very, very specifically about their customers and one of the most important things that they are looking for is insight into their customers.

So I think, Greg, we have to continue to have great product. It's always proven to be great business for us but we have to stay mono-maniacally focused on their business and the solutions that we can provide to them.

**Greg Coleman** - *Yahoo! Inc. - EVP Global Advertising Sales*

So one of the things Wenda brought up and David, let me ask you this before I go to the next official question. Which is interdependency. At Yahoo because in order to satisfy the end customer the team that needs to get together to pull the issues

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

- pull the problems and the opportunities together are monumental, how would you talk about interdependency? And if you try to live on an island, you're dead meat at this company. David, how would you answer that?

**David Karnstedt** - *Yahoo! Inc. - SVP and General Manager, Direct Business*

Well, I think for us one of the things that even in Wenda's example about the long and winding road to the cash register, when customers are continually coming to us and saying help us understand how this works. And for us - this interdependency is an opportunity to leverage all that we can do together, research being one of those, the expertise of the sales teams, the breadth of products we have - all of those really help us leverage and bring more and more value to customers.

**Greg Coleman** - *Yahoo! Inc. - EVP Global Advertising Sales*

Great. So David, let me get - this is a hard-hitting question from our audience. Our search advertising business has been criticized recently. Can you tell us how you're now better positioned to compete in the marketplace on the search side?

**David Karnstedt** - *Yahoo! Inc. - SVP and General Manager, Direct Business*

Well, I think for me, taking off on what we had just talked about in terms of leveraging assets - it is a huge advantage that we have at Yahoo. And I'll give you an example of one way that we're leveraging assets. In our homepage we talk about our mini-Super Bowl every day. We've had customers come to us that are new and emerging categories and one of those would be VoIP as an example. So we were approached to say, hey, we'd really think search advertising is a way to go in VOiP advertising we said we absolutely agree with you. Let's take a look at the search volume and low and behold, there wasn't all that much search volume there.

However, when we can literally use the graphical side of the business and work together we can create demand. So through front page ads, through graphical placements, we're able to create demand and search volume and really tie that whole story together. So we're uniquely positioned to take the graphical part of our business, tie it together on the search side and underlying all of that is the data and insight that we provide for customers so it's unique to us. It's a great way for us to be able to compete in the marketplace.

And I think the second and really important thing that we're very, very excited about is the new ad platform. For us in the search space, we've spent a lot of time understanding customers needs and developing this product that's exactly what they want. And what we're able to do is not only make it easier for them which historically we have not done in the search space, focus on marketer objectives.

And the second part is to provide insights in a real-time basis. These are things that customers have been asking for us for a long period of time. We're excited about where we're at and we're excited about the product. And we're just getting started. And I think I would go all the way back in terms of our ability to compete to where you started, Greg, with people. In working with Wenda's team all the work that we've done to date and the work that we know we'll do, along with my team, we think we're uniquely positioned with the best and brightest people on this sales team out there in the market today.

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Makes all the difference.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Greg Coleman** - *Yahoo! Inc. - EVP Global Advertising Sales*

David, what would you say with the new platform - the morale of your sales team? How is this impacting what your sales people think and do every day?

---

**David Karnstedt** - *Yahoo! Inc. - SVP and General Manager, Direct Business*

Well, we kind of touched on it briefly with Tim's quotes up there that were on the screen but for us to have worked so closely with our customers and be able to launch a product that benefited greatly from their insights is very exciting. And when you get the kind of comments that you saw in the screen about how excited they are to be able to leverage this platform, it raises everybody's spirits and everybody's very, very excited about the opportunity.

---

**Greg Coleman** - *Yahoo! Inc. - EVP Global Advertising Sales*

Great. So Usama, let's move to you. What is the square root of 523? Usama? He actually knows the answer to that question. Yahoo always talks about its data. How do we bring the data to life through our advertising products?

---

**Usama Fayyad** - *Yahoo! Inc. - Chief Data Officer and SVP*

Greg, marketers have long talked about the marketing funnel - at the very top of the funnel you have - you're trying to establish awareness of the existence of a product in the mind of a consumer. At the bottom you get them to purchase it. In between, there is this phase which marketers will readily tell you that's the consideration stage.

What's interesting about that stage is consumers spend most of the time in the phase of the funnel. Yet that's the area that's most underdeveloped and poorly understood by marketers. We do not have marketing solutions out there to help marketers address consumers in that phase. What is interesting to me is the opportunity that the Internet provides here through data to figure out what consumers are interested and help marketers reach out to them with relevant messages.

So to give you an example, on the Yahoo network on a given month we can find 300,000 consumers who we know with a very high likelihood will be buying a car in the next 90 days. To an auto manufacturer that's a huge opportunity to message to them correctly, to change their mind, to encourage them, to help them buy faster, et cetera. We have similar purchase intenders targeting for people who are interested in consumer electronics, people who are interested in college education, for movers, for retirees and 15 other categories along those lines. To me, what this whole thing translates to is a generalization of how we think about interaction on the Internet versus just simply targeting by contacts.

So here's what I mean. If you are configuring a trip on Yahoo Travel, and you just landed on the Yahoo Travel confirmation page. I actually would know more about your intent and hence I can match ads and offers to you much better - I would know more about your intent than if you sat there and tried to type to me 100 key words telling me about yourself. Right? That's a very powerful contact that is the product of an interaction. Similarly if you just finished configuring an automobile, I know more about your intent than I would know through search.

Leveraging that generalization and realizing that it's not just about the interactive application search - where you type in what you want - but many other things that you do on the Yahoo network that tells us a lot more about your intent and hence allows us to give you a better experience as a consumer and of course allows us to allow the marketers to target their dollars better. And reach out to the right audiences better.

This is a new kind of targeting. We haven't seen it before. What's interesting and exciting about it is it allows advertisers to reach out to consumers in areas of the Yahoo network that they never thought about advertising in.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Yes, Usama - it might be interesting that you talked a couple minutes ago about the 300,000 people in the market in the next 90 days for a new automobile. We actually tested and again it's important - the 300,000 users were not on the Yahoo auto channel. So this was outside of the channel. And we did a test for an automotive manufacturer against those 300,000 outside of the endemic channel and we had a 36% increase in response rates so this has very, very clear significance for us - our ability to get at the true audience for an advertiser versus just the contextual environment that's obvious.

**Usama Fayyad** - *Yahoo! Inc. - Chief Data Officer and SVP*

To Wenda's point that is an extremely powerful point, that the majority of these ads are actually run on areas of the Yahoo network that are not related to the content. So email, news, all these generic properties where you come back and back and back again, allowing the advertiser to reach you with more frequency. That brings me to behavioral targeting. Greg mentioned that we recently launched a new platform. I'm very excited about this platform because it expands our capabilities in a couple of very fundamental ways. One is in actually the quality and the scale of the modeling. So we build a lot more models and the models themselves are more accurate and more sophisticated of predicting what the intent of the consumer is by observing how they behave on the Yahoo network.

We also have partitioned it into two categories and this is sort of a next level of sophistication. We now recognize that there are people that advertisers or marketers want to treat as engagers and people they want to treat as shoppers. Shoppers means you're very, very focused on conversion. Engagers means you want to build up the brand and you want to engage in a dialogue that essentially increases your trust in the brand. And those two are modeled separately because they're really different animals.

To give you a real example, a concrete example of some experiments, these are early days - we just rolled out the platform last month. And one of our early customers was our own small business solutions division where we achieved twice the click through rate and a 40% lift in conversion by targeting people on - for the services that are offered by the small business divisions.

Working with external clients, with Wenda and Greg - with a large auto insurance provider, we achieved 5 times the conversion rate over targeting based on the context related area. Right, so that's over sort of the premium targeting. Working with one of the largest U.S. mortgage providers we achieved a 7 time conversion rate lift over again targeting just the finance category in general. This is new inventory and new exciting area that has not been addressed before.

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

I might also add there that the behavioral targeting opportunity that we have is not limited to direct to marketers or direct response objectives. We've had terrific experience already with the new platform in being able to measure increases in classic brand awareness, brand consideration, intents to purchase - classic metrics for brand advertising. The BT is working very, very well there. So it's not just a direct marketing.

**Usama Fayyad** - *Yahoo! Inc. - Chief Data Officer and SVP*

So in wrap up, these are examples - concrete examples of how data is generating new value. Most importantly it's new value for consumers because I fundamentally believe a more relevant product on Yahoo including ads is a better experience for the consumer which is a win-win and of course it's a huge win for our marketers because we're enabling them to reach consumers in areas they haven't thought about. This unified platform has brought together a lot of other activities we used to do before, under one platform that's leverageable across many, many applications and as far as we can tell, it's the largest, most sophisticated most scalable targeting platform out there on the market today.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Greg Coleman** - *Yahoo! Inc. - EVP Global Advertising Sales*

So there's one thing that you should be aware of and that's the fact that the marketing community - the ad community has really had to embrace changes in technology - they've had to - and we've had to be able to talk to them with experts in the field like Usama so that they can understand that they can put it together. Because that part of the world is never going to go back to be the old way. It's technology is - technology and advertising are going to be intertwined. So with the next couple minutes that we have left before we take it onto questions from the audience, let me just ask each of you, and David, let me start with you - what gets you excited about the future?

**David Karnstedt** - *Yahoo! Inc. - SVP and General Manager, Direct Business*

Well, I think for me, we've had so much success, to date, in what I would call leveraging what we do at Yahoo!. One thing that Usama and I have worked on is literally providing some more demographic and insights into specific key words. So, we've leveraged what we've done through the Buzz products and applied that to search as an example of ways that we can leverage what we do, together. I think the new ad platform is something that we're all very, very excited about, and we think that that provides a whole host of opportunities for us. And I think the continued work that we're doing, together, in the field and the thought leadership that we have is very, very exciting as we go out and talk to customers.

**Greg Coleman** - *Yahoo! Inc. - EVP Global Advertising Sales*

Usama, how would you answer that question? What keeps you pumped up?

**Usama Fayyad** - *Yahoo! Inc. - Chief Data Officer and SVP*

What keeps you pumped up - there's much that keeps me pumped up at Yahoo!. First, we have the largest treasure trove of data on the planet. We have the capability of addressing the largest audience on the Internet. Two things that get me extremely excited in that context - one is working concretely with these guys, with Greg, with Wenda, with David, to actually bring to market a new generation of solutions that help marketers understand and leverage the true power of the Internet as an interactive medium. That is just an amazing opportunity.

The other one is our company, investing in a fundamental drive to understand what is going on, on the Internet. We, about a year ago, we decided to invest in building one of the best research labs in the world. We went about addressing issues as in how do we understand community, how do we understand trust online, how do we model incentives, what are the new economics that are emerging on the web when you have this massive interaction and a huge, wide distribution with the retail, out there, lots of activities and so forth? Very fundamental questions that when you stop and ask people what's going on there? What's the engineering recipe to build the right solutions? We don't know the answer because we don't have the science.

We started building out our team in the area of search information navigation. I'm proud of the fact that we attracted the top brains in the world to come to Yahoo! research. In that area, we started recently building out our area in the economics of the web and that's going extremely well. With those two areas, it's sort of - I don't know where to stop the excitement. Being with the sales guys or being with the scientists..

**Greg Coleman** - *Yahoo! Inc. - EVP Global Advertising Sales*

You've got to do both Wenda? Wrap it up.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Well, I tell you, what I love the most is being in a position to lead and we've had that privilege for the last several years. So, I think between the products that we're able to bring to market, the end-to-end solutions with David, and David and I have both been digital for ten years, so I think we're pretty excited all -

---

**David Karnstedt** - *Yahoo! Inc. - SVP and General Manager, Direct Business*

Following your street smart count, I'll think we'll stick with ten years.

---

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Yes, we'll do the ten years, but having the opportunity to bring this all together to really provide what our customers are really looking for. Certainly, these data insights. But, for me, this is really all about having Yahoo! be in a position to define the future, quite frankly, of digital marketing and I just don't think it gets better than that. And we're at the beginning. This is so at the beginning, you know. It's, you know, 3%, 5% of total ad dollars, that's not why I'm here. So, I'm all about leveraging everything that we have and -

---

**Greg Coleman** - *Yahoo! Inc. - EVP Global Advertising Sales*

Do you think you can you get them all? Do you think all the ad dollars?

---

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Yes, I'm going to go for that.

---

**Greg Coleman** - *Yahoo! Inc. - EVP Global Advertising Sales*

Okay.

---

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Anyway, that's what excites me.

---

**Greg Coleman** - *Yahoo! Inc. - EVP Global Advertising Sales*

Sue, let's turn it to you.

---

## QUESTIONS AND ANSWERS

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Alright. Well, good. We're going to start questions from the audience. We have about ten minutes. I think Greg has revealed that he's always wanted to be on The Apprentice and he's established his team of street smart versus book smart, here, so you can tell us how he did. Right up here, in front.

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Unidentified Audience Member**

Hi. Thank you very much. Two quick, very quick questions for Wenda. Did you have to make any changes to the structure of the sales force in anticipation of the revamped search platform? And, second, what's your take on your competitors' approach to selling graphical ads through more of an automated process and think inside target. Is that something you guys may be interested in -

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Which competitor?

**Unidentified Audience Member**

Google.

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Okay. Did I have to make any organizational changes in terms of accommodating the new platform?

**Unidentified Audience Member**

Right. The sales between search and branded.

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

No. That didn't have any effect on my organizational structure. I'm classically structured in terms of operating regionally, and then I have a strategic overlay of category expertise. So, that structure doesn't need to change.

**Unidentified Company Representative**

And we're not going to move the focus.

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Yes, and -

**Unidentified Audience Member**

How about on the search side?

**Unidentified Company Representative**

Same thing. We're similarly structured, which is what's made it so easy for us to collaborate because we can leverage the same sort of resources as we're going out into market, which has been very effective.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Right, but it doesn't really have an effect on graphical.

**Unidentified Audience Member**

And on the other one?

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Actually, I don't - in the graphical side, Google is not our competition. That's why I wasn't sure what you -

**Unidentified Audience Member**

So, Google has historically not been your competition but increasingly, they're moving into the graphical business, but they're doing it differently.

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Very differently.

**Unidentified Audience Member**

Right. Mostly through an automated process and I'm thinking is that something that you guys may, at some point, be interested?

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

To automate our relationship?

**Unidentified Audience Member**

Well, at the low end. Certainly not at the high end, but at the low end. That would be nice. Scalable.

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Yes, and I think that will be very important. But when you look at the head and the tail, the business that we're really in is monetizing it from the head standpoint, and certainly, the tail opportunity is very clearly - automation will serve that, well. But, right now, that's - we don't really compete with Google on the display side..

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

The ability to serve a graphical ad rather than a text link in response to a search query will certainly be something both companies can do very well. That's not necessarily the key differentiating point, though. Back here, the middle.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

**Unidentified Audience Member**

Thank you. A couple questions. First one for Wenda. I was wondering if you could talk about the demand for rich media in terms of if Lloyds Group came to you with, I don't know, perhaps partnerships with media companies, could you sell that content? That inventory? And then, second question, either Greg or David, on the partner - the quality of the partner network, particularly among keyword partners. And there's been a lawsuit, recently, discussing some of the issues there with domain parking and some other issues. I was wondering if you could talk about how that may change with the new platform and what were some of the issues there and how concerned should we be about that? And, particularly, if you could quantify what the risks to that business are, ex Yahoo! span.

**Unidentified Company Representative**

It sounds like a softball and a hardball. So, Wenda, take the first one.

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

I could use the softball. The demand for rich media increased very, very visibly when broadband adoption became widespread when it tipped over the 50% mark. And the advertising community looked at that and they could relate to it. It's sight, sound, and motion, and the quality of it, being as good as it is, the demand for rich media, whether it's video or more interactive, better quality, creative, that's more exciting. The demand is very high for that and Lloyd is, in fact, bringing us more video content to sell across the network, across the YMG Properties, and the demand is out there for that, so we're enjoying very, very good response from the advertising community for anything that is truly interactive on the ad side.

**Unidentified Company Representative**

And, David, why don't you take the second one? It's a hard one.

**David Karnstedt** - *Yahoo! Inc. - SVP and General Manager, Direct Business*

Sure. I think the quality of traffic for our advertising and marketing partners has always been at the core of what GoTo, Overture, and Yahoo! search marketing has been all about. And as such, we've had a lot of technology that we've run to make sure that we're doing the best we can do to filter unwarranted clicks and things like that before they even hit advertisers. We feel very good about our ability there and what we're doing there. And I think, secondly, as Tim was talking about, all the analytical opportunities that were provided for advertisers, to literally see what's happening within their space and their campaigns. And it gives them the ability to adjust for what's working and what's not working. So, that level of control is something that we feel really good about and our advertisers feel good about, as well.

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Next question.

**Unidentified Audience Member**

Thank you. For Usama, can the new behavioral targeting platform be rolled out across the publishing network? And, if so, what are the challenges to making that happen and what would be the timing of that?

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

**Usama Fayyad** - *Yahoo! Inc. - Chief Data Officer and SVP*

So, from an engineering capability, we built the new platform to scale to billions of consumers, literally, so can we roll it out? The answer is technically yes. Timing and whether we want to roll it out and whether that's the highest priority versus what our customers are asking us for, what David's team and what Greg's team is saying to us, is a different story. That's up to - I don't know if you have a comment on -

**David Karnstedt** - *Yahoo! Inc. - SVP and General Manager, Direct Business*

No, I just mean what has been a theme and will always be a theme is we take direction from the marketplace in the highest order of priorities. And what you've seen presented, today, through what Tim's launching with his team, along with us, represents the highest order of priorities that are out there, today.

**Unidentified Company Representative**

And on the behavioral targeting front, this is brand new, so we're literally out - we've done a whole bunch of tests. We're taking it out to the market, right now. Our guess is, based on the results of the demand, that it's going to be very strong so how far is that going to push the envelope throughout the entire Internet? We think we're going to take that leadership role and it's not just going to end, here.

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Great. How about back here on the right.

**Unidentified Audience Member**

Yes, a two-part question. One is - your 10-Q calls out a $39 million dollar year-over-year increase to build out your sales force headcount for new markets and better service to your existing markets. So, what's the split between those two? And how material can new markets be to your overall marketing service line? And the second question for Wenda is - can you speak to the vibrancy of the international display market?

**Unidentified Company Representative**

So, I'm not sure if I understand that. I know Wenda has a large clothing allowance, which, you know, we have to incorporate and it's important for our business, but the $39 million dollars, Sue - do you know what that is?

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Yes, so we're not prepared to split apart how much we're investing in each of the sales forces or in existing markets or new markets, but that's all fully contemplated within the business outlook and it's a big priority of the company to make sure we invest in the go-to-market side of the business, in addition to the backend of technology, and I think you're seeing both of that, today. Do you want to take the -

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

The international display.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

International. Why don't you do that one, Greg.

---

**Greg Coleman** - *Yahoo! Inc. - EVP Global Advertising Sales*

Yes, I'm sorry. Could you just repeat that?

---

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Could you repeat the international question?

---

**Unidentified Audience Member**

Yes. Two parts, and again, is how material can the new markets be to the overall marketing service line in terms of growth? And secondly, to see overall vibrancy of the international display market. Everyone knows it's very vibrant in the U.S.

---

**Greg Coleman** - *Yahoo! Inc. - EVP Global Advertising Sales*

Okay. Yes. So, right now, what I would tell you is having just gotten back from Europe and Asia, those markets are almost exactly where the United States was, two and a half or three years ago. So we're looking at growth rates that are extremely robust, coming off of fairly small total numbers. So, if you play those numbers out, we expect the growth rates outside of the United States on the advertising side to continue to actually outpace the U.S. over the next few years, although Wenda keeps thwarting that comment because her growth rates keep baffling all of us as they continue to grow.

But, the marketers engagement in the Internet, to my surprise, is that slow outside of the United States, but it's really starting to catch on. So, if you can imagine this meeting, 2003, that's where you are in most of Asia and in most of Europe, at this point. So, we're investing in it, we're bringing infrastructure, sales operations, so that those platforms can scale because it's going to be a big part of our growth story, going forward.

---

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Great. We have time for one more question. Right up front, here, in the middle.

---

**Unidentified Audience Member**

Wenda, if you could just give us a quick update on how demand is trending on the graphical side across the major verticals. And then, specifically, before you talked about the integrated offering with search - if you could maybe give us an idea of what the reaction has been from the consumer packaged goods industry from that offering.

---

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Sure.

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

I think where you start would be talking about demand in Q1 as opposed to Q2.

---

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

That said, looking backwards - the perfect sighting about that is, you know, you've heard me always talk about well, these three categories are driving the growth or these four categories are driving the growth. In looking at Q1, what I was very excited about is that the growth, now, is across, far more evenly distributed across the ten categories, more than it ever has been. So, that's very, very exciting for us, to not have the dependency so focused on just several categories. It's a very healthy spread across them.

In terms of CPG, this one I'm very proud of. My team has really done a great job in getting inside those big boats, you know, the Procter & Gamble and Unilever and Kraft and assisted, of course, by again, that focus on providing solutions that are very specific to customers. And in that category, the CPG group, as a whole, really, said, "Look, you know, this is not a transactional business for us. We're not going to move two faced off the Internet, so you literally have to prove to us how online advertising affects offline sales," and that's when we did this partnership with Nielsen.

Based on their - our product is called Consumer Direct, but their product is called Home Scan, and we were able to leverage the information that they have in household databases with advertising on Yahoo! and literally proving the literal effect of sales offline by using their Home Scan and our Consumer Direct. So, CPG, which as you know, is a huge, just huge center, offline, has certainly been in my line of sight since day one. I want a lot of those dollars -

---

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

You'd eat them for breakfast, right?

---

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

Yes, that's what I do need for breakfast, yes. But, I'm excited about the progress there and it's a very, very important category for us because the dollars that are there are so significant. So, that's going very well.

---

**David Karnstedt** - *Yahoo! Inc. - SVP and General Manager, Direct Business*

And it's another example of where we've been able to partner, very effectively, because it hasn't historically been in -

---

**Wenda Harris Millard** - *Yahoo! Inc. - Chief Sales Officer*

In search, right?

---

**David Karnstedt** - *Yahoo! Inc. - SVP and General Manager, Direct Business*

-- a customer for us in search. But when we go in there, together, and we talk about closing the loop in the consumer, or the customer experience, we're uniquely positioned to do that and we can leverage data to provide insights, which we all know is very important to that category.

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Alright. Well, I hope you'll join me in thinking Greg, Wenda, David, and Usama for their appearance. Great job. You had some great lines. Okay, so, it is now lunchtime and you guys have about 30 minutes to go get your lunch. We have box lunches, outside. Then, we're going to promptly start about 30 minutes from now with a video and then, we're going to lead right into Jerry Yang, our Co-founder, who's going to start the international panel and we have a special guest, today, from - a couple guests, here, from Ali Baba. So, thank you and enjoy your lunch.


[BREAK]


# PRESENTATION

**Jerry Yang** - *Yahoo! Inc. - Co-Founder and Chief Yahoo*

Well, I hope you all had a good lunch and I hope that all of you know that you don't have to worry about us, David or I changing our careers to do anything on a live camera again any time soon. We are excited to kick off the afternoon by talking you a little bit about our international positioning. Although, I'm still reeling from the morning, trying to figure out what shuck and jive means. So if anybody has any -- I've got an Answer question posted on Yahoo Answers.

So, you heard this morning from Terry and Dan. The vast majority of the online growth in the future is coming from the outside of the United States. And we believe that Yahoo like we've done over the last 10, 11 years, really need to take a leadership position in a lot of these new growth markets. So, what I'm going to talk about today is first discuss how we've approached different ways strategically these different markets. And second have Joe Tsai and Jack Ma from Alibaba discuss the China market.

So, our international approach has been pretty market dependent since day one. As you know we launched Yahoo.com here in the U.S. in 1995. Yet today, we are available in 15 different languages in 22 different markets around the world. And as we pursue sort of new growth opportunities we are going to continue to evaluate how we best approach each market. Whether it's through a build, partner, buy or some combination.

So, let me talk about two examples of how we address different markets in different ways. Most recently, we formed a strategic partnership and joint venture in Australia and New Zealand with Seven, one of Australia's leading media companies. As a leading broadcaster and magazine publisher, Seven reach 98% of the marketplace through its marketing and media. What we did is we combined Yahoo's internet assets in Australia with Seven's media content and created one of the most comprehensive and engaging online experiences in that market.

Then in Taiwan our approach was a little different. It was to build early and buy strategically. We pursued this combination of approaches of build and buy and built and used our technology capabilities to build an early portal in Taiwan and bought a market leader and now we are probably they most dominant internet player in Taiwan with over 95% reach.

And then there's Japan. Many of you know the story pretty well. It's the first partnership that we built outside of the United States. In fact, Yahoo Japan, just celebrated its tenth year anniversary -- it's hard to believe it's been ten years there. And continues to be the leading internet company in Japan with a market capital of $36 billion. Yahoo Japan has 90% reach and is Japan's number one player in all of these things, portal, search, broadband and options. It's managed by a POP local management team, with the backing of strategic partners like Yahoo and Softbank who provide global and technology support. We learned a tremendous amount from this kind of partnership and we believe this is the model that we are going to pursue in a market like China.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

So, in October last year we formed a strategic partnership with Alibaba. In addition to contributing our Yahoo China operations to Alibaba, we also invested in $1 billion in cash of which $250 million went into the company and $750 million went to buy shares from other Alibaba shareholders. This investment gave us 40% ownership of the new company, making us the largest shareholder in what we believe is a much larger and more valuable company. With this investment the new Alibaba is the only company in China to hold leadership positions in key sectors that we believe will drive long-term internet growth in that market.

So, together Yahoo and Alibaba have a very strong combination of commerce, payment, search and portal assets. We believe these are the key ingredients to the success in the fastest growing internet market in the world. And I believe the largest market in the world in a few years. As Jack and Joe will talk about later, their number one [soon to be] and consumer e-commerce on the internet there and also own the countries leading online payment service called Alipay. And they will discuss exciting initiatives that they are undertaking with the Yahoo China's brand of services.

The Yahoo Alibaba partnership combines the best the commerce, payment, search and portal in new ways for consumers and businesses in China. What we see of this opportunity is the fact that we integrate search and portal assets with commerce and payment services in a very seamless and innovative way. As we have learned in other markets like Taiwan and Japan, we believe that having the leading and principle positions in these key areas will continue to reinforce one another.

In addition to product leadership, we believe this is also a very unique strategic combination. Let me first talk about the significant investment. Out of the billion in cash that Yahoo put into this transaction, $250 million went into the company. With that cash along with the Yahoo assets, Alibaba is now very well resourced and well capitalized to compete in this very dynamic marketplace. Second, the structure of this partnership places management and operations in the hands of local market leaders. With Yahoo offering technology, branding and global business resources as its largest strategic investor. Third, I believe Alibaba's management team is the best team in China's internet market. You'll hopefully see that in a few minutes. They combine great market knowledge with tremendous entrepreneurialism. And culturally our two companies have great chemistry together. The teams work well together and there's definitely a shared vision of what it takes to be the best services to consumers and businesses in China. We believe this is the right structure, the right investment and the right management team that as add to a winning combination.

With that, I'd like to introduce Jack Ma and Joe Tsai. Jack is the CEO and Founder. Many of you may have seen him, he is very recognizable and he and Joe -- Joe is the CFO. Those two guys -- come on up. They'll go through their presentation as well and then we'll end up on a Q and A. So, Jack?

---

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

Thank you, Jerry for the introduction. I wish I could be like a Chief Alibaba, so I'd just be a founder and not a CEO and I could talk in a great CEO like a Jerry, so I don't have to work. [Laughter].

---

**Jerry Yang** - *Yahoo! Inc. - Co-Founder and Chief Yahoo*

Amen, I'd like that job also.

---

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

Well, I'm very happy to have a CFO like Joe and prepare for the PowerPoint. Usually when I speak I don't have a PowerPoint, when I have a PowerPoint, I don't know how to speak. But today, I'll just be introducing the Alibaba.com. So, I've got five minutes to talk first the Alibaba introduction but the other is strategic vision and then the rest of the job I'll let our CFO do the job.

So, this is the PowerPoint and I read it first and then I talk what I want to talk about. 1999 Alibaba founded in my apartment in Hangzhou as a B2B marketplace. We've got 18 [funders]. Year 2000, we got first run financing from Goldman Sachs and [Soft

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

Bank] Fidelity and other institutional investors. We were very lucky at that time. Year 2002, we broke even and in 2003 we launched the Taobao, our C2C in my apartment, too. So there is one of the reasons why Alibaba is successful is we that we have a very magic apartment.

2004 we launched the Alipay and also in my apartment and we have another small project that is preparing in my apartment too. Year 2005 and we had very lucky that Yahoo strategic partner be formed.

Okay, that's the PowerPoint. And I talk about my story. Actually I start my internet company since 1995. My first trip to the U.S.A. in Seattle and first time in my life I touch the keyboard of computer and found internet. I searched on the Yahoo search engine. And try to search China and the Yahoo search engine at that time said, no data from China.

So, I made the first internet company called chinapages.com we launched it, very successful and then I borrowed $2,000 U.S. ,start the company and we competed with China Telecom, which at that time was very, very powerful government organization. And they can not kill us and we can not defeat them. So, we had a joint venture [and filled]. And year 1997 I went to [Motech] and joined the government ministry of foreign trade company corporation. We have the government fund all the e-commerce related websites. After 14 months we were very successful and then we departed again, because government office, my boss has different ideas as I had.

Let's see this one first. Okay, we start in the past 10 years we made hundreds of mistakes. But one thing we have never changed is our dream. 1995, when we set out Chinapages.com. I believe there is e-commerce is going to change China. At that time very few people believed that e-commerce concept in China. We changed everything but we never changed this dream. That we built as a company from China that can influence China, influence Asia, influence the world -- the influence the world. And people call me crazy Jack and people call me stupid Jack, but whatever they call me I still believe e-commerce in the past ten years, next ten years I believe it. And we will make happen.

So, the first -- we started from B2B and actually when we set out the Alibaba.com we did not it was call B2B, we just made a bulletin board. Helping small, medium-sized companies to buy or sell things online just using a BBS. And people -- later people tell us, Jack this is a B2B, so we call us B2B. And the reason why we set up Alibaba because been working for government for 14 months and my boss said that we should help state only companies. We should big companies. We should control our customers.

And I don't agree with that. I think China, small, medium-sized companies and private companies will be the engine for China economic growth. And I think we should forget about EDI, the old concept e-commerce. Internet is the future. And I believe that we should help create value for the customers, not control the customers. And this is the overview for China SME. Over 2 million, 3 million SMEs, small medium sized companies in China. Private sector entrepreneurs - read that. That's the CFO's chart. He did that for me.

But, 1999 when we set up Alibaba in my apartment because after we've done our self and joined in the government, and we failed because a lot of reasons. And then we came back to my apartment and set up the company. There's one thing that people say, "Jack, your B2B will not be workable because [Ariba] is going to win. Commerce world is going to defeat you because they are so great that are US companies everywhere. When they come to China, you're dead." And I don't believe that because Ariba at that time, they focus on big companies. They focused on the buyers, and they focused on the saving time for their customers.

I believed the small, medium size companies we should help suppliers. We should not have companies to save time because in China people say "I have a plenty of time. I don't want you to help me to save time. I want you to make money." So, in the past two years, Alibaba B2B is focusing on help small, medium size suppliers to make money. Only when they make money they can save time. So, how can I come back? Go back.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

Alright. So why we go from B2B to C2C and then we just launched our B2C last week. And what C2C and Ali pay. We were very focused company, but we still think that everything should have changed. The only thing that has not changed is our dream and the change.

After we've launched the B2B for four years, we noticed that the eBay in the US is moving to the B2B. So, if we don't go to the C2C in the future, we believe that eBay is coming to China, and they are going to kill us. So, we say, "Let's do C2C." And at that time, nobody believed that we have chance to win eBay. Well, we launched our site in my apartment. We only had seven people. And people say how can you compete with eBay by 7 people? And you have no cash at that time.

But we did that because in China do business we believe one philosophy. No complain. Because people say you don't have a chance. You don't a credit card. You don't have this and don't have that. How can you do e-commerce? We say, "Well, keep changing. You go create things. You create. If you don't have trust records, build up the trust records. If you don't have the payment, build up the payment. If you don't get the support from the government, go talk to the government."

So, we believe there are five elements in China if you want be successful do e-commerce. There are five elements. Today I can only tell you four. The other one I'm not going to tell you today. And the first one is emarketplace. So we build up the Alibaba and Taobao.com. These are the emarketplace. Second, we believe is the trust record. The trust record we have build up today because we have emarketplace. So we have built up the trust past for over 150,000 companies today have their trust records on our sites. And over 15 million small, medium, 15 million users, individual users, we have trust records in our company.

And the second thing we believe is very important is the payment. And payments - so that's why we launched the Alipay - and Joe's going to tell you about the how Alipay goes there. And the next thing we think is a very important in a search. And that's why we got the Yahoo!, and the trust records. So, four things which we believe are the key elements for success in e-commerce in China.

So we launched the four services. Three of them you can fuel it, and the other one you can only see in our database. And we probably are going to launch our number five in next two years. And today I'm not supposed to tell you because everything I talk about in China or people will call me Crazy Jack. So, we will do it and then let people know about that.

Okay. So next thing is Joe is going to introduce the next part.

---

**Joe Tsai** - *Alibaba - CFO*

Okay. Jack talked about the integrated e-commerce experience. And I'm going to introduce the experience from the user's point of view. So, for us, the way we look at the opportunity is that the users either come to a marketplace through search or they come as a browser to shop. And then the next step is you create a marketplace with information and interactiveness to enable them to make an informed choice. And then you have to set up a trust rating system for them to do the transactions online. And finally, payment is how you would complete the transaction. So, this is sort of conceptually how we look at how we would capture the opportunity.

And, at the product level, the way we would go through search, shop, choose, transact, and pay, is with Yahoo! partnership we now have a search engine. And the search engine would draw traffic to one of our three marketplaces. On the left hand side, you have our international marketplace, which deals with import/export. So, for example, an exporter from China that sells toys would have a catalog on the site and we would draw traffic from over the world feeding leads to the exporter. In the middle, we have the China domestic marketplace. And that's China to China, B2B marketplace.

On the right hand side is Taobao which is our consumer e-commerce marketplace that competes with eBay in China. The unifying theme is that we would string the three marketplaces together with our Alipay online payment system and generate

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

the synergies with the marketplaces driving traffic to the payment system, and the payment system increasingly privy and conversion rates in the marketplace.

The other interesting thing to point out is that exporters, wholesalers, and retail or power sellers in each marketplace would interact with each other. So, for example, a toy manufacturer in China would probably source for plastic resin and plastic injection molding machine in the China B2B marketplace as a buyer. And then they produce and sell to the overseas marketplace. Sorry. Not used to the clicker.

So, where's Alibaba today? We are one of the top four Chinese Internet companies by revenue, even though we're not publicly traded. The other three players are both public companies, which I think you're familiar with. Our revenues this year is forecast to be over $200 million. But the thing to point out is our growth rate is going to be higher than any of the other, of our peers.

Now, I want to get into a little bit about the market potential. Overall, the Chinese Internet market is growing users at a compounded annual growth rate of close to 20%. It's projected to grow at that pace over the next, since 2003, 2007. But what's more interesting is broadband usage. Penetration rate will go from about 22% in '03 to over 60% by '07.

I'm going to go over just a few slides on each of our segments. So, remember we're in B2B e-commerce, consumer e-commerce, payment and advertising, with the Yahoo![AP] partnership, we're in the advertising business.

But, B2B e-commerce first. We use a process for B2B e-commerce, which is China exports. Because China is such an important export country, and also that's a segment that we're directly involved in. In the offline world, this business grows 27% CAGR over the last three years. But, for B2B e-commerce trade, we're growing at 93% CAGR.

Consumer e-commerce. On the left hand side you have a picture of the growth in GNV. It's grown quite rapidly as you can see, but the important thing here is penetration of the entire retail market in China is so very, very low - at below 1%. And last year, GNV was the total market GNV was $2.4 billion in '05, according to independent research. And I would add that our marketplace Taobao was a big piece of that market share and growth. Users have grown from five million to 19 million over the last four years. And, the rapid growth over the last three years had a lot to do with Taobao. We were launched in May of '03 and we really drove the usage of online e-commerce.

The online payment market, again very low penetration rate versus the online market, which we define as bank cards. That's credit cards and debit cards. 0.06% of that whole market was done online in what we define as a third-party online payment market. Our own estimate is that the online payment market in China last year was about $700 million. And Alipay was really the main driver. Our business was the main driver behind the growth. We occupy over 40% of that market. And we're the leader today in that market.

In online advertising, as you can see, potentially, it's a very, very promising market with projected CAGR of 47% from '05 projecting out to '08. By '08, the third-party estimates estimate that there's going to be about $1.4 billion revenue pool available. And we're very excited about that. The one thing to point out though is it is now and again projected to be in the future that branded advertising, or graphic advertising, will still comprise the majority of the market at about 70%, over 70%. The other 30% being search.

So, after sort of taking everyone through the exciting sort of market statistics, what does this mean in the current revenue pool of Chinese publicly traded companies? Well, it doesn't really reflect the opportunity. If you look at the 10 or 15 currently publicly traded Chinese Internet stocks, most of their revenues, 76% to be exact, come from wireless services and online games. So, it doesn't really reflect the opportunity of potentially what is available in e-commerce and advertising.

Next, I wanted to just talk a little bit about our market position versus our peers. Again, we're in four different business segments. If you look at the top left hand quadrant, the B2B marketplace is not very fragmented. There are only a few players in that market. And, Alibaba is the leader, quite clear leader in that market. On the upper right hand side, the Yahoo!China business being in

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

the advertising segment commands a very respectable position from which we plan to grow and Jack later on will talk a little bit about the Yahoo!China plans.

Going clockwise to Taobao, lower right hand side, our competition there everyone knows is eBay. And we have taken over eBay. We've grown market share to over 50% over the last year. And finally, online payment we have a sizable share. We are the number one player in online payment market. And what we believe is a bit more fragmented market. When we look at this collection of assets, we ask ourselves what are really the key competitive factors that would really make us win in this tremendous market? So, we compared ourselves to some of our direct peers. These are peers who have businesses that directly compete with us. And in the categories of search technology, critical marketplace, online payment, a user community, communication tools, sales and distribution, I think we are ranking very favorably versus the competition.

Now, I just want to review a little bit of the recent accomplishments from our different business segments. In our B2B business, we basically doubled revenues over the last four years. And as you can see from this chart, revenue growth has been outpacing paying customer growth which suggests that average revenue per customer has been growing. Next, we have Taobao, which is our consumer marketplace. 2005 was really the breakout year for us, and we really knocked the ball out of the park in terms of growing that business against the competition. GNV grew by eightfold to nearly $1 billion in '05, and we also added 10 million registered users in '05.

Next, a deeper look into the progression of growth of Taobao. This pitted against the competition. In '03 when we were first started, we had 8% market share. And over the following two years, we got to 59% market share. And by the way, there's also other independent resources - at least three independent research pieces out there on the C2C market in China that we're aware of that will put us anywhere between 60% to 70% market share.

This is market share by GNV. With this nice position of Taobao, the question is what's next. Are we going to gain more share? Can we look to the future a little bit more? If Sue will allow me to kind of be forward-looking a little bit. We take an independent survey, which asks users in three major cities in China, in Shanghai, Beijing, and Guangzhou. And the question was "In the next six months, on which online shopping platform are you more likely to participate in?" And the answer came out quite overwhelmingly that online shoppers would prefer to increase their activities on Taobao over the competition.

So next, just before I turn the podium back to Jack, Alipay's growth - this is our online payment business - grew quite exponentially over the last five quarters. The reason is quite obvious. Alipay was integrated into the Taobao marketplace. So, as Taobao grew exponentially, Alipay also grew at the same pace, actually a higher pace because we were driving higher penetration than Alipay usage in the Taobao marketplace.

Now, just one thing about Alipay that distinguishes us from the rest of the offering in the market. It is an escrow based system. What that means is it addresses the issue of settlement risk. Settlement risk, as you know, is if you buy something someone has to pay the cash and the other side has to deliver the goods. And how do things cross in the middle or get settled. And this is a true issue in e-commerce in China, and it's a very serious issue which I think in past have hindered the growth of e-commerce in China.

And we came out with an escrow based payment system that we would, actually Alipay would escrow the cash until the goods are delivered. And through this payment system, we actually were able to increase the liquidity in the Taobao marketplace. So, penetration wise, over 70% of the items sold on Taobao are completed through Alipay, this compared to less than 40% about a year ago. So that penetration growth has been really improving quite nicely.

So, I'm going to do the tag-team with Jack and hand this back to Jack and he'll talk a little bit about the Yahoo!China business.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

All right, we're running out of time, but I just want to briefly what's happening since we got the Yahoo!. Yahoo! right now for the search, and search we're at like number two, number three. And people say we're number, some people say we are number two. Some people we're number three, but I'm not happy because we got three number ones. Why we can't have another three at two. So, we will make a Yahoo! search engine number one.

But it's my habit, every company we got, we've got give them three years. So the first year we did it, in the past nine months we're doing is that we build up the team with the support and help from Yahoo!. We are launching new products, improve the technology, and also we plan to change the game because I think the C2C game is almost over. And we're going to change, start another game for the search engine and portal. So we start from September. Why September? That's my birthday. After birthday [if] that work. So, we will see because today I don't see there is a real search engine in China. And Baidu is good. And Google is good, but we have not start to compete yet. We will start from September.

Next page. Okay. This is something that for fun because we started the Yahoo! branding for the Yahoo! search. You can search all kinds of things. We invited three famous directors in China to each director give us two minutes movie introducing about Yahoo! search engine. And we are looking for three, two girls, one boy, from all the China's Internet users. So over 60,000 boys and girls registered for that. And you see that. We look at the result and even during the May holidays, all the website traffic going down. but our traffic improved 50% because of the beautiful girls and boys there. And our name is getting out. A lot of fun, we have a lot of [inaudible] and we build up the community for entertainment. And Yahoo! now we're focusing a lot on entertainment and sports and finance. And that's very safe in China on [inaudible].

The next thing. Okay. Conclusion. I think today Alibaba is the only integrated] e-commerce platform in China. And we're pretty confident on the C2C and B2B, and B2C. We launch our B2C product last week. It's different from [Emerson] model. It's more like [inaudible]. And we have got a three number ones and one number two and a three, and we want to change it in the next year. So, with that I want to say in the next 10 years, the seal, I see one thing that I just made a bet with my partner, with my colleagues. In 10 years, among the top three Internet companies, most powerful Internet competition in the world, one of them will be from China.

And next thing is amount of Fortune 500 companies. One of them will be from China private companies, not like today's state-owned companies. What Alibaba will be lucky enough to be one of the top three most powerful Internet companies of Fortune 500 Chinese private companies. I don't know. But that's the goal we are looking for. And we want to make Alibaba like a G-Microsoft and IBM. It's not like one of the IPO company. We want to be the company that can last long and can influence the people. And this is our dream. Thank you very much.

## QUESTIONS AND ANSWERS

**Unidentified Company Representative**

Thank you Jack and Joe. I think we'll have a few minutes for questions. Let me ask you guys the first one. Some of your slides kind of - it's probably one of your first times you've talked about as much about your company. Do you guys have plans to be going public? Or what is your public offering outlook? I figure that was a popular question.

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

I think we'll be a public company, but now there's things. There are so many things we need to do and there are so many opportunities I think we should focus on doing the things. We don't have a timetable for that, but I would say we'll be a public company. But not now. Too many things to do.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Unidentified Company Representative**

Too many things to do.

---

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

We've got to fix Yahoo! first, be the number one search engine.

---

**Unidentified Company Representative**

We just want to be happy shareholders. That's all. Why don't you go ahead and do that gentleman right there who's got his hand up. And you can ask questions for me on Yahoo!'s perspective of Alibaba, so [inaudible].

---

**Unidentified Audience Member**

Just on Alipay, are you using this for other platforms, or is it only being used for Taobao?

---

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

Alipay's mainly for Taobao, but today they are over 100,000 small websites. Our site Taobao is using Alipay to pay, and lots and lots of eBay users using Alipay to pay.

---

**Unidentified Company Representative**

Why don't we go on this side? Why don't we come up here since Anthony and then Safa.

---

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

You guys can just pool your questions into one, it would save a lot of time.

---

**Unidentified Audience Participant**

That would make 10. I have a history of asking too many questions. Jack, I was wondering if you could comment a little bit about your recent montetization announcement in that you're going to pay for transaction, so to speak. You bid on your final value [inaudible] if you actually sell the product, you pay that fee. Where do you think that will take, percent take, in your models?

And then second question, the e-commerce market as well as the advertising market online are both less than 1%. They're both less than 1% of revenue, which means there's a lot of time left for other combinations to replicate the business combination you have - perhaps eBay, and Google, and [Skype] have come together. Ebay, Google, Baidu, come together, what do you do in that situation with such an early market to call the market over seems kind of premature. Thanks.

---

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

You want to answer first, and then -

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

**Joe Tsai** - *Alibaba - CFO*

Let me take the first question. We launched a monetization offering on the Taobao site about a week, literally a week ago. And the idea was, as you said, it's a pay for transaction system where it's an advertising system but the user doesn't pay unless - the seller doesn't pay unless they complete a transaction. Let me emphasize that in the Taobao marketplace, it's still free. You still can list as a free seller. And that doesn't affect the fact that Taobao we don't force any of the sellers to pay any fees. To your question, I think we really have only seen one week's worth of information. I think it's just really too early to say anything about the take rates or anything like that. I think we need to see a little bit more data.

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

Yes, to the competition between Alibaba and Taobao, and with eBay, I think honestly speaking, if today I were to see eBay China, I don't know how to do. Okay. Game is over. Like two years ago, I'd say we want to do it, and nobody believed us. And now I tell you again, the game is over.

**Joe Tsai** - *Alibaba - CFO*

His question was if they can combine with the big search guy like if Baidu and Google and Skype -

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

We've been researching that. I think they're a potential, like Tom, and Baidu and 2Q, and combined together, that's what I want. I now how tough it is to integrate a company, even with Yahoo! and Alibaba same culture would be a lot of problems.

And the thing is that we share a lot of same values, same vision, and things but integration in China is such a new - I spend like 70% of my time working the Yahoo! and I get nine months, nine months for e-commerce competition is a long time. So, we will see that.

**Unidentified Company Representative**

Safa.

**Safa Rashtchy** - *Piper Jaffray - Analyst*

Jack, I want to ask you about Search and you're confident that you will overtake Baidu. You've obviously done extremely well in e-commerce, and you've captured the market. But in those days there really was no competition or was very early stages, and because of eBay. And there wasn't a dominance that Baidu has, but Baidu is the number one traffic site in China. It has huge popularity. So, my question is what gives you the confidence that given word searches, which is not the same stage as getting though business were, how can you compete and actually become number one. Beyond the advertising and the movies and other things, what do you need to do in terms of technology? What do you need to do in terms of products such as the users?

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

Okay. I think the compete with eBay and compete with Baidu is totally different game. You know, people think that this is the way you compete with either. You probably use the same way. No. Different. I change all the time. I think with the great technology Yahoo! give us, and the 700 great people we've got in Beijing. And also Alibaba since we have 2 million registered small, medium sized companies using our services. And the other thing is the payment on search engine. It's not ready.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

So, I think today, Baidu is doing pretty well, but they don't have to face a tough competitor yet. And I think three years ago when we launched our C2C site - before we launch the C2C Taobao, the C2Cs China is very small market. But now in two years and pick up the competition. So, my philosophy in compete, competition is fun. And the thing you want to do is you have to change the landscape. You have to do a different game. Let's change the game. So that's why after birthday we will have something that really fundamentally change the game, but I cannot tell you how. But we will do it in a funny way.

**Unidentified Company Representative**

Let me just supplement that. What we want to do is to focus on the user experience. And if you have been on Baidu lately, I think they have been aggressively monetizing their searches. We believe at the expense of user experience. I think at the end of the day in the search business, it's the product, it's the superior product with higher relevance that wins.

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

That's the right answer.

**Unidentified Company Representative**

There's a gentleman behind you with his hand up. Just turn around. No. Okay. Well, go ahead.

**Unidentified Audience Member**

Two questions. Sorry. First of all, you have in Yahoo! you have an integrated search and branded display business. China's 70% of the market advertising wise its display. What your interest in longer term having that component to the broader segments of the market that you're addressing. And second, when exactly is your birthday?

**Unidentified Company Representative**

Joe, do you want to take that?

**Joe Tsai** - *Alibaba - CFO*

The brand business in China, right? We think it's a great business. We think there is a - just look at Yahoo! The market potential is very large, and with the partnership with Yahoo! we now have a portal asset that we can leverage on for that business. And your second question?

**Unidentified Audience Member**

When's Jack's birthday?

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

September 10th.



© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

**Unidentified Audience Member**

Where's the party?

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

Where is the party? In my apartment.

**Unidentified Audience Member**

Mary.

**Unidentified Audience Member**

Thanks. On your birthday you have a lot of work to do to fix this Yahoo! situation using your words.

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

Yes,

**Unidentified Company Representative**

Sorry [Shari]. You okay?

**Unidentified Audience Member**

Could you talk about your plans for Mobile?

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

Mobile?

**Unidentified Audience Member**

Mobile.

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

We don't have specific plans for Mobile today now. But we have a team that's studying on that and I think there are so many companies today focused on Mobile. And everybody said they have hundreds of great ideas. So, I think still focus and search and e-commerce, and then look, and then let's go to the mobile. The priority today Mobile, I think the star become so big. And we just want to wait and see.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Unidentified Audience Member**

One more question? As you looked at the Yahoo! assets that you think you can, that you are excited about bringing into China that may not be there yet, which are the things you're most excited about?

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

First, the search engine. I still believe that there is much more powerful than today's Baidu. And the second is that some of the Flickrs and the mails, we have the second largest Yahoo!, the second largest mail providers in China. And we just launched our new mail system three days ago. And I think after today's - this morning I'm so excited. I think, yeah, this is exactly what I want to do in China. But it takes years. Two years.

**Unidentified Company Representative**

I think what really excites us is what Jeff Weiner earlier talked about - a lot of this user generated content. Products like Flickr, Knowledge Search, things like that really is exciting, very exciting to us.

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

Our Knowledge Search which launched few months ago, very successful. But the traffic we got we trace, we are very happy with that. And we're trying to invest more on that.

**Unidentified Company Representative**

Why don't we have a last question from that gentleman right there? Thank you.

**Unidentified Audience Member**

You've talked about mail, and you've talked a little bit about Mobile. I'm curious, Yahoo!Messenger, particularly with its voice component would get you into the pc-to-pc and Internet calling business. Is that in your plans? How vital is that?

**Jack Ma** - *Alibaba - Founder, Chairman and CEO*

Actually, Yahoo!Messenger's and we're working with Alibaba's the AliTalk, which we have more than 250,000 concurrent users. That's all B2B, the Messenger users. And [WoWong], which have over 300,000 registered concurrent users. So, I think we're using Yahoo!Messenger's technology plus the Taobao C2C, plus Alibaba. I think that we will do something in the short term, but the integration team they're very excited about that. I've not talked to them, but yes.

## PRESENTATION

**Unidentified Company Representative**

Great. Thank you very much. Thanks guys. So, to go to the next one. It's my pleasure to welcome to the stage Sue Decker, our CFO.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Alright. You're in the final stretch. So, congratulations for making it through. It's a real pleasure to address you tonight, this afternoon. It feels like tonight. And I'm really going to try to tie together some of the great things that you heard today and kind of marry some of the strategic and product vision you saw with a little bit of a financial framework. So, let's get started.

Okay. I wanted to start with the five financial principles that we really run the company by and share them with you. This is something that's not - internally Yahoo! we all sort of live by these and they sound kind of obvious. So I won't spend a lot of time on them, but we really do run the company this way. And that's not often that common.

We focus on cash - free cash flow as you know. I'll talk a little more about that. We think about going long - meaning we understand that only about 5% of our market value even less is made up of this year's free cash flow. And we focus on that other 95%. We really try to allocate capital that way. We look at our internal decisions based on the framework - it's DCF oriented and we look at our external investments in the same way. We try to institute metrics that matter. We try to think about what are the underlying metrics that would be operational in nature so that we could drive our business to achieve these goals. And we attempt to communicate transparently and consistently, in terms of providing you with the trends that we really think are important to ultimate value creation.

So let's hit the overall financial mission. We had the same mission that it was five years ago, which is to maximize long-term free cash flow per share and to reduce volatility. It incorporates per share, which we do think about the investment we make in employees with options - very, very carefully and seriously. We try to use one metric that we think does represent the most approximate value of, proxy of economic value creation. And that's really what we hope will never change about the company. That's like our core user mission and advertiser mission that is to become essential.

If you wanted to blow it up, as you all know, it's really a function of three things. What really drives free cash flow? Well, there's a three-legged stool that drives value - revenue growth, margins, and what your returns on your free cash. Those are the three levers we have as a company to create value for shareholders.

So, what I'm going to do is talk a little bit about - double-click one, the revenue lever and how we might think about that and then I'll go back to address each of those three legs of the stool. So when we think about revenue growth, there's really two ways to look at it. You could look at it as volume times monetization. And you could look at that from the supply perspective, or you could look at that from a demand perspective. So, a supply perspective - is it anything that relates to our inventory or our users? How many users do we have? How many page views do we generate? If you multiplied that by revenue per page, your revenue per user, that would be our overall revenue. That's one important metric we have.

Second is demand. How many advertisers? What's the revenue per advertiser? The product of those is revenue as well. We think it's important to look at both. You can look at just the supply side - "if you build it they will come." But we also look at what's the demand side look like? What are the budgets out there? What could they do?

So if audience times monetization is revenue, let's first talk about audience. I want to recap a couple of stats you heard earlier and put them into perspective. So Terry talked earlier about a billion people coming to the Internet every month. Enormous increase, 20 fold increase from when the Internet first started to be commercialized in 1995. I want to draw your attention to the numbers that are in the red circle on the far right. That talks a little bit about future growth.

There's been enormous growth in breadth of users touched by the Internet every month. It's natural that as it gets to a level of a billion, the underlying growth rate of total users is likely to slow down. Still double digit, 12% going forward. And you can see how that breaks down by major region of the world. Countries like the Japan, Europe, North America that are more established Internet markets are likely to grow in the single digits from here. And markets like Asia Pacific and rest of world are likely to continue to grow toward 20%. So let me tell you why that matters in a minute.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

But first I wanted to show you something new, which is taking on the left side the geographic footprint of the industry that Terry talked about. And now I want to show you what Yahoo!'s geographic footprint is. We have not disclosed this before. And like everything in these presentations, we reserve the right to not update the numbers. But we do want to give you a glimpse in terms of how we sit.

So, not surprisingly, the Yahoo! pie looks a lot like the world pie. We are a lot of the Internet. At 500 million people coming to Yahoo! every month out of a billion, we are an accurate reflection of the Internet at large. We're actually overweighted a bit in Asia Pacific. We view that as an enormous strength for the company. And a little underweighted in Europe.

Having said that, a lot of the underweighting in Europe is a historical issue. If you look at the growth rate in our user base versus the industry as a whole over the last four or five years, we've grown at 22% versus 19% for the industry. So, we've outpaced the growth of the industry, even through we represent half of all people who come every month. And we outperformed the growth rate in all of North America, Europe, and Asia Pacific. We've actually gained share of users in the last few years in each of those regions.

Okay. So let's go back to the overall picture of users overall and back to that point that as we get to more established and penetrated markets, growth should likely turn from breadth to depth. And that's a really exciting thing. I wanted to give you just an example of how technology evolution followed in other industries. So, I got the cable industry and the PC industry shown here. The bars in the back are households, and the color-coding represents different phases of the industry evolution. The red line is penetration. It's a standard S-curve kind of view. The cable industry took 40 years to get to a ramping phase, and then it leveled off at 60% to 70% of penetration. The PC industry happened faster, but again levels off at roughly 60% to 70% penetration.

If you look at the Internet industry, it happened even faster. But again, we think we're heading in the US, this is just a US view right now, as one of the established Internet markets. We're starting to head into that phasing out at 60% to 70% penetration. Just about anyone who can be on the Internet is on the Internet now.

Well, what does that mean? What's exciting about that is that's where the real action begins in terms of engagement. So, again, using the cable analogy, you could use a lot of different industries as an analogy. But on the left side, you can see the red lines on both of these charts are the S-curves that were on the prior charts. The purple line is time spent. So what you notice is when you get the full levels of penetration, is really when the time spent starts to increase. And the cable industry, as the industry started to level out at 60% to 70%, the time spent went from 20 hours a month to 80 hours per month. It basically quadrupled in a relatively short amount of time. We don't know exactly what's going to happen on the Internet, but it could follow very similar pattern and it looks to be following that pattern.

Why is that? Why does penetration increase at that point? Why does time increase when penetration starts to level off? Well, a lot of it is that companies that are servicing the markets figure out what users want. They invest. They learn. Remember cable programming in the early parts of the industry. It gets better and better. People spend more time. We learn. And we develop a great product. And we have more financial opportunity to invest.

So, how does engagement increase? What are the mechanisms going to be for the Internet? Terry talked a lot about the drivers - Mobile, broadband, search, and we think better products. Those are the things we're really focusing on to move toward greater and greater engagement of our user base - both in the US and all around the world.

So let me give you just one example pictorially of what you saw in a lot of the presentations today about what we're trying to do on the product side. There are a billion people accessing the Internet every month. That's the purple bar across the side. There are four things people do on the Internet. They communicate. They get informed, and entertained. They transact. And they search. And the percentages underneath those are what percentage of time is spent on each of those four basic buckets of things people do on the Internet. That's for the industry as a whole, not for Yahoo! in particular. If you look at that various columns, you'll see some of the products that we and others offer within those. In the last few years, we've really tried to move to a stickier, more engaging user experience. You saw a lot of that with Dan's presentation, and really woven through Lloyd

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

and Jeff and everything you saw today. What we're trying to do is we're trying to weave these four different - what we call pillars, but they're really a horizontal concept - integrate them in with each of the four buckets of things we do. So, what's in red are examples of product introductions that we've done over the last couple of years to essentially create stickiness around our sites through personalization, through community and integrating relevant content.

And just to put that into perspective, Jeff gave you a few examples from his world this morning. Flickr is an example of content that we're integrating into Search to differentiate. We haven't done it yet, but we will soon into [inaudible]. My Web is an example of personalization that we're putting into Search. And Yahoo!Answers is an example of community that we're putting into search. You're going to see us do this all across our products, and we have been doing it for a while. We think that's going to lead to greater and greater engagement in time spent.

So, before we move onto monetization, just to summarize. We have 500 million users coming to the site on a brand basis on a global basis every month. That's been growing faster than the Internet as a whole, and we have the geographic mix that's exposed to the fastest growth parts of the world. We think that franchise will be extremely valuable as the Internet faces the next phase of its development, which is moving from breadth to depth. And we see the key drivers of engagement as mobile, broadband, search, and a stickier product experience - all of which are key, key focus areas for us.

Users is one side of the equation, let's get back to the revenue equation. Now our monetization. Dan showed a similar chart but just for Yahoo! this morning. I'm not going to go through this concentric circles, but this shows the industry as a whole. On one side is advertising, which is about a $31 billion business this year according to estimates. And the other side is commerce, which is about a $48 billion business. We're excluding GMS. This is just the fees that companies that participate in commerce derive by our estimates. So we think it's an $80 billion industry in which we operate. It's a big, big industry.

There are a number of different revenue streams that come off this. We compete most heavily on the left side in terms of the advertising world. We offer our advertising products are served in search products, and they're served in all of the other three forms of product that we talked about earlier - commerce, communications, and information entertainment. We also compete on the right side of the chart, primarily through the subscription and fee business, as opposed to the broader commerce business. But as you just heard from our friends from Alibaba, we are very focused on the auction business and selected markets - Japan notably, Taiwan, and in China. So we compete in both and we're a little more select in terms of how we focus on the commerce market.

Here's the industries in which we operate. Terry talked about the five [the] online business this morning. I just want to point out a couple of things. One is, that the industry, the dollars being added to the industry are increasing rapidly. It took four or five years to add 15 billion from 2001 to 2005. The estimate suggests that 15 billion in two years. We as a company are trying to prepare for that growth. That is absolutely an example of as engagement deepens, more dollars come online or come onto whatever medium in which they can demonstrate that.

In terms of Yahoo!'s share, we've increased our market share from 10% of the global [ad bit] market, to 13% over the timeframe from 2001 to 2005. If you look at our forecasts inherent in our business outlook for the year, they assume basically holding share at 13%. That's without any impact from our monetization engine. It's our aim, as you heard today from Greg and the panel, to increase market share over time, we feel really good about what we've been able to accomplish in this short time given the investments that we've been making.

The other side of our business, which we really didn't talk about a lot today because we didn't have the time, and we wanted to focus on the key priority areas for you guys, but I'll just spend one minute on this. We do compete in the paid content market on a global scale, but largely in the US. This gives you an idea of what we think the market size roughly is - about $6 billion in 2005. It's an extremely fragmented market.

We are one of the leaders. We think we may be the leader if you add up the math here in terms of the various players. Some of the biggest categories - mobile, games and music, and then other which includes content bundled with access in which we

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

participate - are becoming a larger share of the total as the industry starts to get a little bit less fragmented. Although probably the top four or five players represent about 25% of the business.

We think we're in a terrific position in this market as well. We have a totally different set of competitors here than we do on the advertising side. But we think this is going to be 25% of the business. We think we're in a terrific position in this market as well. We have a totally different set of competitors here than we do on the advertising side. But we think this is going to be gaining an importance over time and we're very happy with our position. So that's the revenue side. Those are the industries in which we compete.

Now let's turn to the monetization variable. How do we think about that? Well, one way to look at it is supply. We talked about that inventory users. And I'll just take you back, back in earlier Analyst Day. We did give you a framework to think about how we might grow. We said we had an operational goal to double our revenue per user over a three to five year period, which would be from 2004 to 2006, because this was in 2001.

Happy to report that we did accomplish that late in 2004, and continue to see gains in 2005 in terms of revenue per user. Acquisitions helped that to some degree. But even if you x-out every acquisition we've made since we originally set up that goal, we apt to be very close to hitting that doubling figure at the end of this year, which is the end of the timeframe. And, that's on a user basis, much larger than we had anticipated. It's almost doubled, in terms of the user base. So, it's had an extraordinary impact on our revenue.

You can also see mathematically what those dual sources of growth look like. So from '98 to '01, when we were trying to get broader and global, our revenue growth was essentially a function of users - revenue per user was flat so that contributed 0% of growth in the early years. We shared with you in '01 we thought that more of our growth on a go-forward basis would come from monetization than from users. And in fact, it was basically 50/50 coming from users and ARPU.

Going forward, we think even more is going to come from ARPU. So, as you think about our growth, as you think about that user equation for the industry and whether you think we'll gain share in ought of the total pie, we think more than 50% of our growth going forward will be from revenue per user.

Let me turn to a different perspective, which we haven't shared with you before. The next three slides deal with the demand side. What about clients? What about the budget? We can do a lot on the inventory side, in terms of targeting, in terms of better algorithms, in terms of monetizing searches. What about the demand? Is it there? So this is just as true for everything on the Internet. Users go first, monetization comes later. So the monetization side is a little earlier stage in the volume component of growth than the user side is.

This shows you the number of advertisers with whom we do business. It doesn't tell you the number, but it shows you a graph to get you kind of there. And this is pro forma from when we acquired Overture, so it does include that very large, small, and medium sized business in it, base. It basically tripled over the last three years. Massive increase in the number of businesses with which we're doing business.

And you heard Tim Cadogen say today that the new system that we're launching is designed to move from hundreds of thousands of advertisers to literally millions. We expect to see continued increases in the number of advertisers that we service. Then you look at the revenue per advertiser. It's enormously difficult to increase revenue per advertiser, at the same time you're increasing advertisers when you're denominator's tripling. But, in fact, over the last three years, we've actually grown revenue per advertiser by a cumulative 30% over that timeframe. Those dual sources of growth are very powerful and have led to very significant revenue gains for the company.

The way you can see what's happening to depth better is if we hold the denominator constant. So, I'm going to show you a slide here with our top 200 global advertisers. And this curve that just drew is a distribution curve by what their average dollar commitment is with us a year in fiscal year 2003, just holding the number constant, the top 200. So, what you're going to see

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

here as I click this chart is every year after that, the distribution curves move to higher dollar volumes per advertiser. So each of those lines is '04, '05, and '06.

And you can see a couple of things from that. So first, I'm just going to focus on the purple versus the red line for a minute. One you see, we have a greater distribution of clients at all levels as we've gotten more heavily into small and medium sized businesses. Two, look at the peaks of the purple line and the red line. It's gone from $1 million to $3 million in spending a year to $5 million to $20 million as the greatest part of the curve. We've literally increased the revenue from our top 200 clients by about four times since 2003. That, when you look at our total ad base, gets diluted a little bit. The rest of everything else, besides the top 200 were the denominators growing very quickly has remained very stable over the timeframe.

So what does that mean? Well, this is really the opportunity. If you look at from a demand perspective, you look at the top 200 customers, and then you look at everything else, on the top 200 the opportunity is monetization deeper. It's getting monetization deeper and driven. How much business can we do with them? We do four times as much as we used to.

How far can it go? Well, just as a quick way to think about that, the AdAge 100, which has a very high overlap with our top 200 clients, spent about 3% of their budgets online, whereas roughly 6% of online advertising is the ratio for the industry as a whole. If those top clients double their participation on the Internet over the next several years, and we increase market share, noting that we actually have the highest market share among the very top - we'll break out the number - but the very top AdAge customers, we do the best business with the most complex, sophisticated marketers. And I think as David Karnstedt said and saying we're going to try to extend that out into the tail as we get more and more sophisticated on the technology side, we could easily increase our spending per advertiser by two to four times among those top 200. And again, in the next few years.

How about the rest? Well, we think that's largely volume driven at this point. We see the total number of clients, as we talked about, going from hundreds of thousands to millions. Revenue per advertiser holding at that level, maybe challenging, but we think we can hold pretty well. This means that the alpha marketing has demand potential to double revenue over time. How much time you will ask? We would aspire, if we could double our revenues for marketing over a three year period from '05 to '08, we would aspire to that. And that actually would be relatively consistent with a lot of the estimates that we've seen from you. And a little faster than the market as a whole, reflecting the gains we expect from the monetization side.

To summarize monetization, we looked at it from two perspectives. We looked at it from an inventory perspective. And we looked at it from a client side, or demand perspective. We have achieved a lot of our aggressive supply side monetization goals. And looking forward, we think it's only going to become more important. We've also outlined for you that from the demand side, we see very significant both volume and monetization growth going forward. And we feel like cross-checking both the supply side and the demand side. Either way, we see an enormous opportunity ahead in this industry.

So, let's move to the second leg on the stool margins. Before we talk about margins, we should talk about the competitive landscape as a whole. One of the things that's happening is business models are becoming more similar. What we're seeing is that companies' strategically are moving in the same direction that Yahoo! established a number of years ago, which is fundamentally to define multiple platforms for growth around the most attractive Internet services for consumers and businesses. You just herd Alibaba talk about the desire to control the full transaction stream that led them to a transaction with us as they marry search and commerce and communications into a very powerful triangle.

Cost of traffic rises. Companies that are in narrow areas, like search, that don't have as much traffic are seeking off-network traffic or are building their own traffic by becoming portals. You have companies that started as social networking start page that are looking for other kinds of verticals that they can monetize better. The industry is moving closer and closer together, which means that over time the business models are becoming more similar. We feel this is fantastic. It's fantastic for consumers. Fantastic for us because we have a nice lead in it, and we're just getting stronger and stronger in a lot of these key areas as others start to follow suit.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

So what does that mean for margins as a whole? Well, here's a few examples of companies that exist out there that you invest in, or you analyze. And you can see there was an enormous gain in margin from 2001 to about 2003 or 2004 for everybody. As search became monetized in the industry and as opportunities emerged after the real shake out in 2001. What you're seeing is that margins are now stable. They've been stable for three years, basically, in the industry. And they're starting to converge. And it makes sense that they're starting to converge. The average is roughly 38% for the industry. That would be a reflection of all the business models out there. And that's the industry environment in which we operate as various business models become a part of each other's portfolio.

How about Yahoo! in particular. This is our margin curve, from 2001 to 2006, the mid-point of our business outlook. We have a number of things that have impacted our margins favorably. Most notably, the leverage we've had on the employee costs. So the three lines that are going down here are three of our major cost lines broken out a little differently from how we do it in our public filings. We think this is actually more meaningful way to look at them versus the SEC requirements.

This breaks out employees across everything, as opposed to embedding them within separate fields of marketing, and product development, etc. And looks at sales and marketing costs and others. We've had leverage really across the board. But probably closer to 10 point margin benefit from greater revenue growth than our investment in talent, which is also been very, very significant.

Just to put that into perspective, the other major goal that we put out a few years ago was that we wanted to double revenue per employee. And you can see that from 221,000 in 2001, we came very close to achieving this in this most recent quarter. We are trying to get 442,000. I think we're within 98% of it within the timeframe that we suggested. And, that's after increasing employees by 200% over that timeframe by investing in the key areas that we think are leading to a lot of the engagement success that we have now and we have ahead.

Looking forward. I am not going to make a long-term margin projection. But, I will try to give you some drivers to think about. So this line, which represents our margin line, represents on the green side of it, the things that we think have helped pull our margins up over time. We outsource search to Overture. We initiated access relationships. We became a principal in search. And we increased our international profitability. And all the while, we invested very, very significantly in the strategic investments in product that have led to the very rapid user and time spent growth that you've seen.

Looking forward. There are some things that could pull the margin up, and there are some things that could have a modestly adverse effect. This is no comment on timing, magnitude, any of that, just want to give you some variables to think about as you think about our future. On the positive side, monetization. As we roll out our new system, our PS increasing would come at a very high margin - close to 100% incrementally because we've already absorbed a lot of the costs.

In terms of targeting, we heard a lot about targeting today and how much we could potentially increase that inventory that is for the industry 90%, 95% of the inventory is not in search. There's an enormous potential and we have that inventory with great asset to increase monetization from that. Network optimization. We're getting more and more clever. Dan talked - and more knowledgeable really that's allowing us to be more clever - Dan talked about the new home page and the real sign ups that went behind every module, every pixel on that page to develop the best monetization and user experience. Platforms. That's sort of a neutral. It's actually, in the short term, an investment for us. We're investing in new platforms while we still have the applications that are driving a lot of these products. Over time though, that should be a positive for margins as we can roll products out more quickly and not have to invest incrementally as fast.

On the other side, factors that could have a small adverse affect. [TAC]. This is not new. TAC and distribution costs we've been talking about a lot. Very consistent with what we said when we bought the overture company, now ISM. We expected that cost of traffic to be rising, and we expect that to continue. Other things. Data centers that have emerged as cost areas as users and bandwidth have increased a lot on the web, there are other items that are causing a little bit faster growth in our overall revenue growth. These are just a few variables. We'll leave them to you to think about. We plan to share with you our outlook each year and give you good insight into our overall margin levels. But it's fair to say that we have been saying since 2004, we think our

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

margins at 40% for the industry and for us represent a nice balance between very, very strong profitability and ability to invest in future growth.

So we talked about margins stabilizing for the industry after a ramp. Very nicely profitable as an industry, possibly grater margin in conversions as business models evolve. Just going to conclude with a quick talk about returns on capital, incremental and free cash flow. In contrast to margins, which are unlikely to be incrementally as important to value creation for the whole industry as they were for the last five years, returns on capital probably more important in the next five years in terms of creating value. And we think we have a good story to tell on that.

If you look at our balance sheet, you can see that we've been roughly at about $4 billion of ending cash for each of the last few years. And we've been generating enormous free cash flow, but we've been investing that very strategically. If you look at our acquisition line, it's gone from roughly $200 million to about $1.7 billion of investment over the last few years. And on the share repurchase side, we've gotten more aggressive as well - $400 million last year, $750 million in first quarter, and in the second quarter from a structured share repurchase we've completed $250 million as well. That's brought our year-to-date repurchases to $1 billion of our own stock. We feel that it's very important that we increasingly invest our cash at rates above our cost of capital. And we think this is a good example of doing that.

How about the cash that sits on our balance sheet? Well, we ventured into structured stock repurchases, which either will come back to repurchase stock, or will generate very high cash returns. We've been generating 17% to 20% on those. And we've been doing this for about 18 months. You can see back in early '04 we started doing this the line, the red line, is what we're actually generating on our cash versus what we would have gotten on very conservative investment in bank accounts. So by putting about 15% of our cash in these very high yield potential instruments, that has raised our overall return by 180 basis points, close to 75%.

How about acquisitions? We've consistently said for the last four or five years that acquisitions will be an important part of our growth. We plan to build. We plan to build and buy. And we plan to partner to achieve our objectives. One category of acquisitions is where we're buying to become a principal. Where we've moved from outsourcing to a third party to actually doing it ourselves. Much of that we've built on our own, but there are a number of acquisitions that we purchased. And on those we've achieved a 20%, actually greater than that, weighted average return on investment based on measuring that today.

All of the other acquisitions are smaller investments in people and talent that have allowed us to change the game, in a lot of the products we saw today that have allowed us to launch the kind of VOiP products that we have that have allowed us to [VoiP] the mail data that you guys have started to play with. And it's going to be more broadly used in the future that have allowed us to launch Flickr and integrate that to differentiate search. All of those have had very, very high returns as well.

And lastly, there's our investments - the things that don't show up in our cash flow but do create a lot of value for shareholders. This just shows what our Japan, at its public market price, Alibaba, at our investment value, cash and marketable securities in the most recent quarter, and the present value of our NOLs represent in terms of value. Close to $13 per share of value, or roughly 40% of our stock price in continuing to grow is an important source of off-P&L value that we've been creating.

Which then leads us to conclude that business outlook - you know the numbers but they are quite astonishing. We've gone from $717 million in revenue up to $5.2 billion last year. Massive increase in profitability to $1.5 billion and with an outlook of close to $2 billion in operating cash flow in this current year and our pre-cash has gone from basically nothing to $1.5 billion a year consistent with our goal to maximize free cash flow per share.

In conclusion, we really operate the company with what we think is a very simple but a powerful financial mission; to drive long term free cash flow per share. We're a leader in some of the largest and most dynamic markets on the internet. We think we're extremely well positioned for future value creation. We have the largest user base in the world. The largest page view base in the world. Huge in-house inventory. Low cost inventory that gets created is a huge, huge asset.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

The geographic mix of users is over weighted at Yahoo versus the best areas that are growing quickly. We're super focused on engagement opportunities with strong positions in mobile, search, access, and next generation products. We think that is really the Holy Grail to get engagement deeper which is really when the money flows. Monetization typically follows engagement.

We talked about on the supply side the levers we have to drive it, which is relevance. That's a key one in our new search monetization platform, and targeting which is something that we're going to market with increasingly through a lot of the science that we've added to that through Usama and his group.

And on the demand side. How do we get deeper and deeper with the largest marketers? How do we take those most complex relationships that we have or companies that we do business with and then extend that out into the tail to let all of the advertisers out there benefit from those features? That's why we think the future that Yahoo's defining is extremely bright.

I want to thank all of you guys for sticking with us today and I want to have my colleagues come up on stage so we can answer a few of your questions. Thanks.

## QUESTIONS AND ANSWERS

**Unidentified Audience Member**

Thanks. Two questions. The first has to do with to what extent do you think the ROI, in terms of internet marketing and advertising section, expanded the total amount of advertising and marketing spent. To what extent does your revenue come, not from cannibalization booked from other mediums, but from actually generating new marketing opportunities from other companies?

Secondly, when could mobile applications, ways to monetize those, be material to Yahoo? Is this 2007? Is there any way you could time -- give us a framework for when that could be material?

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

So, I'm going to start and then pass it back to Terry. How much of the growth has come from incremental advertising versus budget shifting, I think is your question.

I don't know that we know the answer to that, but I think a fair statement that a good portion of what's in search today was not anywhere else on the internet or offline. Traditional media is priced to reflect coverage and that coverage is usually in the millions and a small and medium sized business can't pay for that, so when you can buy it by the click, that created a whole slew of e-commerce companies that didn't exist and a self sustaining ecosystem in which they advertised and drove their sales, etc.

You're starting to see more and more overlap between the two, but the lion's share of the $15 billion search industry is probably incremental to the business within the traditional, the core business that lead in in terms of the what we call graphical or brand business, some of that may have come from more traditional sources of media. It's hard to know exactly how much.

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

Just to take a shot at the wireless world, I think one of the points that I raised earlier this morning, feels like two days ago, was that as the, what I'll call the, more economical phones and services start to come out, so we've been using as a rule of thumb, I think I mentioned this morning, 2008 when a large majority of them will be internet enabled, so not just the more expensive phones that we're seeing in the first rounds, but more and more are starting to come out and I think, like everything else we've done, there's been a lot of question about well, how will you monetize, how will you share minutes, what about advertising?

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

All those things are being considered and awful lot right now, but the first and most important thing is to get access to those phones and until only a few months ago that was not a possibility in many parts of the world and the world starting with Europe, frankly, opened up quickly.

The U.S. is starting to open up now as we talked about Cingular going with it and various manufactures starting to do it. As we've traveled the world a lot, we've met with people in many different countries all eager to see if it isn't, and it will be, another way for them to monetize their wireless devices, spending more minutes on the phone, etc.

I think a year ago we would have said early days. Today we say there's a lot of progress and you'll see a lot of it this year and perhaps next year and the year after when it really hits the masses. It could be a much more meaningful number.

Dan or Jerry, do you want to add to that?

---

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Do you want to do this or do you want me to do it?

---

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

No, I think you should do it.

---

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Okay. Now that we're answering the questions.

---

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

Pick somebody easy. These guys in the front row are tough.

---

**Unidentified Company Representative**

Anybody here not speak English?

---

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Can we go to the back for now?

---

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

Way back there.

---

**Unidentified Audience Member**

Thanks. Just a couple questions. One, Sue, in looking at the margin graph, it was interesting not to notice content as a either source of pressure on margins or perhaps an opportunity for margins. As a big network providing a lot of content worldwide, I'm just curious if you could comment on that, where you expect content costs to go.

---


© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

Another question, which is a little different topic, is, I think at CES, I think in the Yahoo Go discussions, you took it not just to mobile, but also to television and I'm wondering if you could update us on your involvement with AT&T on IPTV and other opportunities you might have there. Thanks.

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Okay. I'll start. That's right. It's really because it's very hard for us to determine today over a multi-year look whether it actually would be a positive or negative to margins, meaning would it increase by less than our revenue growth or more. That's hard to call.

We have invested more in original content -- licenses that is for things like music as part of our subscription service but that's a relatively modest part of our whole business and really when you take content as a whole within the constructs that Lloyd talked about today, some of it originally produced as we've always done, some of it licensed, and a lot of it user generated.

If you take the totality of that, the user generated is the relatively low cost cheap source of content, so we don't see it as a material mix in that changing and if for the purely the portion licensed it's hard to tell exactly whether that would have a positive or negative effect.

A lot of those are rev share deals so you end up paying the third party provider off the top before you even take it. I'd say it's probably as neutral as we could call it right now to the overall margin. Something we're going to invest in but revenue growth should probably grow similarly with that.

**Jerry Yang** - *Yahoo! Inc. - Co-Founder and Chief Yahoo*

On the TV, Yahoo Go TV stuff, I would say that there's two strategies that we announced in CES around that. First one is obviously working with our broadband partners like AT&T and we have continued to work with them on their multiple lines of product.

Not only their IPTV, but also what they're working with two wire, they call home zone, which is a dish TV box, ad inner activity box, and I think that's going well. Obviously we're partners in that we're helping them to program some of the interactive elements in the IPTV experience.

Probably just as importantly is the fact that Yahoo Go TV can now be, or soon will be, a product that you can download or get on your PC, not necessarily through a broadband provider, but you can get a high end PC running XP or running Media Center and you could be able to plug in your TV and plug in your internet access and you have a Yahoo Go TV experience. We see that sort of as a dual strategy both in terms it's going directly to consumers as well as going through our partners. Both those initiatives are rolling out. They're sort of early stages, but really more representative of what we can be doing on a broadband environment in the future.

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Can we give the front row a chance?

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

Pick one.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Okay. I'm going to start on the left. Anthony. Our left.

---

**Unidentified Audience Member**

Thank you. Two questions. One is on the demand side for advertisers. Search democratized advertising as a few of you mentioned, and it went from 5,000 advertisers on line to 500,000 today. What are the bottlenecks of getting to 1 million advertisers? Does it require new formats, just paper call, to get non-web based advertisers to use this medium or are there other factors?

The second question is you've talked about principal versus agent in the past. I was wondering if you could put that in the context of monetization. You're not monetizing a lot of different areas, such as payments. Is there an opportunity to get into these other monetization areas through agent relationships and if you could describe some of those. Thanks.

---

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

I'll take the second, you take the fist.

---

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Okay.

---

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

Do you remember what the first question was?

---

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

I think so. Number of advertisers and I think a big thing for us is reducing the friction in the system. You heard Tim talk about that this morning. Takes advertisers too long to sign up right now and we'll literally be able to do it in minutes in the future.

We think that will unlock a very significant number of new advertisers to the system and over time as our efforts in local improve, we have more and more platforms to help local advertisers sign up as well. We think a lot of the factors, plus a little time, are there to try to cause the number of advertisers to increase very significantly.

---

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

I think on the payment side we see great opportunity for new payments on various things that Yahoo does. We're approaching it as we have everything else. Jerry mentioned before, at times we partner, at times we buy, and at times we build.

We're in the process of building some things right now and we're also looking at what might be more advantageous on the outside. We start off each process and monetization is right in there. It's a little bit more complex because it has to go across our platform, across our system, but it doesn't mean we can't partner and it doesn't mean we can't build and/or buy systems.

We've been looking at that a lot because we see greater monetization opportunities over the next two or three years and we need great capacity to handle micro payment, mini payments, all sorts of things that we're facing right now. A lot of it has been done internally. We're open and have been looking at various solutions.

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

---

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

Sue has all the pressure. Alright. I'll take Safa and you take someone a little further back from the first row.

---

**Safa Rashtchy** - *Piper Jaffray - Analyst*

Thanks. This is especially for Terry and Jerry, but everyone, as we see more traditional companies becoming active and aggressive in the online world, we've seen it in e-commerce and now more and more in the media side. Can you give us your outlook for the next five to ten years? How do you think that the landscape of media and telecom will play out? What role do you think Yahoo can play? What [inaudible - background noise] can be your partners and to what degree d you think the landscape become more competitive?

---

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

Well, that's a huge question, obviously. Who could be our partners over the next five or ten years, but I would start off by saying I think it's very exciting. We're talking about a lot of traditional media companies, I guess that's where the question stems from, who six months ago kept giving us that story about please don't touch my stuff because someone's going to steal it. So, it was really impossible to make real headway to encourage those companies.

I think the total atmosphere has changed. It has changed so fast that I know everyday each of us read about somebody else wanting to test something a little differently. I think that's great. I think the attitude is those folks who have lots of stuff in their inventory and lots of stuff in their warehouses as well as some of the stuff that they're making today and releasing tonight or tomorrow, are starting to talk an awful lot about how do they access it on the internet, should they do it themselves, should they do it with other partners. I think generally speaking, we're very interested in some of that, but we have no interest in making Yahoo look like a television screen.

We don't want Yahoo to just be a place that you replay everything that has appeared some place else. We will do some of that and we will learn together. We also will do some of that as it relates to the question of what do you want to sell online? Do you want to video stream it and let advertising support it as we do music? Do you want to download it as we do music? Do you want to have subscription service for some of those things? Do you want to have a store available to do all these kinds of process?

I think the things that really interest us a great deal, and I think there will be partners, undoubtedly. I read different things each day and we have many on going conversations with many of those folks right now. What we're being a little careful about is -- I start off by saying we don't want Yahoo to look like a television set, we don't want Yahoo to only have repurposed product, and we are spending more and more time talking to people who have a point of view or who will share our point of view of a) we need existing content and we have always licensed it. Whether it's video for sports or video for finance or video for new, etc, we have been a company that licenses that stuff and we will clearly continue to be with great enthusiasm.

The stuff that we read a lot about more on the entertainment side sounds good. I think ultimately though we see a world on Yahoo that at times will be user generated, a world that will licensed, and a world that will be created for the internet. So, our great desire is not to just rush out and have things delivered to us that have already appeared on 14 other places. We will do some of that. We will license some of that.

Our greatest desire on the -- in addition to user generated and in addition to licensing, is to see and help create and help encourage people to create and see us as the largest distribution on line platform in the world, encourage people to create things that can be quite successful in this interactive world of Yahoo. So, that we see as a -- it's longer term, but that's a great opportunity for the internet and for Yahoo and so in spirit we see ourselves as a partner.

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

I know everyone will compete or think they will. I think that would be just fine. We also are a distribution company so we also have this massive audience, with great technology behind it, with the ability to help people monetize things, and so I think it's exciting.

I think that the more people who get into the space, the more people who start creating original stuff and/or remarketing or repurposing some of the existing stuff that's better, and that's a much better environment for us than when everybody stayed on the sidelines and everyone said please don't call. I think it's going to be very interesting.

**Unidentified Audience Member**

You had a slide up talking about leveraging headcount and just looking back last couple of years I think in '04 you hired about 1,700 people, last year about 2,600. How can we think about for '06 and going forward and do you think you're going to see continued leverage in the revenue per employee?

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

So, topic of headcount and I think what's inherent in our business outlook this year which would be a much slower growth rate in overall incremental talent investment. Closer to in the 1,000-2,000 range than sort of the levels that we've had in the past and as a percentage of our base and that's decreased a lot. I think you can see that in our business outlook for the nine months versus what we did in the quarter that's stating to take hold.

Why is that? We've just made a lot of investments over the last few years in some really key areas that we've started to roll out and we have a number of platforms in the hopper, as Dan and Terry had talked about. I wouldn't be prepared today to go beyond 2006. We have said that we think our profitability levels do balance really, really strong profitability and very, very good growth. We want to maintain the flexibility to invest as new opportunities emerge and will absolutely update you as soon as we put out our guidance for 2007 and where we see the specifics going for that year.

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

Can we go back there?

**Unidentified Audience Member**

Sue, I have to congratulate you on breaking the land speed record for getting through your financial slides. If you could, I need a little bit more clarification on the soft guidance or projections or forward looking outlook for advertising revenues.

The slide that you broke down between the top 200 advertisers and the others, both of which came to the conclusion you should be able to improve the revenue 2 to 4x over three years, I believe. If that's the case and we take the bottom end of that range, wouldn't that imply a 30% top line growth over the next three years? If not, please tell me what I'm doing wrong. Thank you.

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Okay, so we did not provide a new guidance for the next few years. We really -- what we're trying to do, and I recognize we have three years ago provided a more specific set of objectives that would lead you to the conclusions of exactly, I think, what we did actually. We probably exceeded those. We think today it's a different landscape that it was three or four years ago.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

First of all, we were almost IPOing the company three or four years ago. We were fundamentally adding new revenue streams that we hadn't been in. We were fundamentally changing the business after Terry came in, and we felt it was prudent to provide a look at the future that was more detailed than would be the normal. I think that's more the anomaly than the norm.

As we look going forward, our business model and our industry has gotten much more transparent. We feel you know a lot of the variables pretty well as we know the variables and it's also, as we talked about, the competitive landscape is coming together. We're competing more head to head with some of the major players, whereas a lot of them were in their own little areas three or four years ago.

We don't feel it's appropriate to share with you our three year plan for a lot of reasons in terms of; that kind of transparency is not something we think is appropriate competitively.

We are trying to provide for you though a framework to think about growth. We're trying to provide for you the variables we think are really important the way we manage the business. We think about metrics for how would we think about what we would want to increase in terms of number of clients. How would we think about revenue per client? How would we think about revenue per page group, per user? And how would we think about the overall user growth?

That was the goal. It would be an aspirational goal to try to double that within three years. That would probably get you more toward a 25-26% growth rate over a three year period than where you are. I don't know whether there's difference in math there. I wouldn't take that so literally. I think you could look at the overall industry growth rate as a whole. It's a little faster than what the industry's forecast to grow. We think that's a reasonable objective because we do see some incremental gains on monetization for us versus the industry as a whole and that's what we aspire to do.

**Unidentified Audience Member**

Thank you. This is a kind of follow up to that. I'm trying to reconcile a couple of things and clearly we agree that over time, EBITDA margins will normalize. But as I look at the potential uplift to monetization in '07 and as you look at the business over the next at least couple of years, not long term, but just a couple of years, shouldn't we be actually seeing an uptick in margins up from the 42% level in '06 as the positive effects of monetization when you talk to a number of advertisers who've talked about disparity that [inaudible] in click through rates between you and Google being at 25-35%. Shouldn't that more than offset the dampening effects from TAC and some of the other things you talked about?

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

No, we're not prepared to give a longer term margin forecast today. I think we'll provide you a business outlook in early 2007 when we think about that year. Monetization, certainly on its own, will tend to increase our margin and if you held that constant and there's a lot of other variables to consider as well. So, I'm going to leave that to you in terms of the forecasting. We just want to tell you what's the most important variables to us and you can figure out timing and magnitude.

**Unidentified Audience Member**

Thanks. Just sort of the flipside of that question. One of the things that you didn't put on the operating margin chart, which you seem to suggest for the whole industry is kind of stabilizing, is that both of your major competitors seem to be starting an arms race to some extent in both capital expenditures and product development expense and how much pressure on margins do you think that's going to create over the next few years in having to keep up with the Joneses so to speak on your part. Thanks.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Sure. We really invested a lot in product development expense over the last couple of years. Do you want to go?

---

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

No. We're just going to leave you alone.

---

**Unidentified Company Representative**

Do you guys need us for this conversation?

---

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

I'll go quick. So, -- .

---

**Unidentified Company Representative**

Because the bar is open.

---

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

So, we've invested a lot and you can see we have multiple platforms already in our cost base. As they get completed we'll be freed up to develop even more things in an even faster way. But, we do have a lot of investment as you can tell from the question earlier about how much talent we've added over the last couple years.

Again, I'm not going to make a long term forecast on that. We're not prepared to do that today, but we think that there's -- we do have a fair amount of investment in our cost space. On the CapEx side, we feel, I don't know if you all saw the disclosure that our friends made in their 10-Q yesterday in terms of how they spend their CapEx, but it is kind of interesting 2/3 of their CapEx is in real estate and facilities and 1/3 of it is in the core business.

When you look at the differences between the two companies and you look at the market share differences in that core business, which is the most capital intensive, there really isn't much of a difference in how we're spending. I think the single biggest difference that you ought to be aware of so you can ask those companies questions about this, is different companies make different choices on building versus renting both with real estate and with data centers.

Data centers are the real estate in which the servers go. Real estate is the real estate in which people go. When you're increasing on all fronts, adding more and more people and adding more and more servers to drive your business, that real estate cost is a meaningful cost.

We've tended to rent more than buy. We have one major campus that we own in Sunnyvale and actually over the last few years we've gone from maybe 60% capacity to 100% so we haven't had to add as much because we have the capacity but we have added a lot of facilities expense around the world and that's actually been higher in the last two -- it's actually doubled and taken about close to a half point out of our margin from incremental OpEx from facilities.

Others may be building. There's not a positive or a negative. We've also rented most of data centers. We're actually looking at buying a few of them now for strategic reasons. One of our competitors has mostly built. I think when you look at CapEx, you

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

should look at it relative to OpEx and OpEx margins too. There's just different choices being made, in many cases build versus buy.

We're very, very aggressively investing in our core business. You've seen our CapEx increase very significantly over the last few years to an estimated business outlook of around $600 million this year but we've also managed to keep it pretty much in line with the OpEx operating cash flow levels that we've maintained so it's contained a pretty consistent ratio. Again, balancing that investment with profitability.

**Unidentified Audience Member**

Can you take some time to update us on your thoughts on net neutrality and what impact you think that could have on your business and what kind of timeline you think we should be focused on for some kind of resolution there?

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

I'll start and I think Jerry should jump in as well. Timeline is hard to know because depends upon the two houses of Congress as to when they actually try to resolve the issue and how fast or how slow they actually try to resolve it.

I think this is an issue that most of the internet companies are all in the same place so it's kind of rare and it's kind of nice to see. We would really like to maintain a more or less open access and not enable anyone to have the ability to make it more difficult for internet companies for users to get on line and in anymore difficult a climate than they are today and to enable companies to continue to grow, notwithstanding whether or not there's a gate keeper, i.e. cable today. If cable today ever decided we don't want your lines and we don't want your access, that could be a serious problem. That would be difficult for companies to go past that.

We are aligned and we're hoping there's a good resolve to the situation and I guess we'll have to see. Jerry?

**Jerry Yang** - *Yahoo! Inc. - Co-Founder and Chief Yahoo*

The only thing I'll add to that, Terry, is I think as we've all seen -- one of the reasons internet companies from the U.S. are leading in many parts of the world is because I think there has been an ability for all these companies to create a lot of value in the environment and what we worry about in the net neutrality issues is are we creating a system where internet companies aren't able, either from start ups to big companies, to create that kind of value we've been able to create and lead the world in.

It goes back to open access, go back. Is there some sort of discriminatory taxation or unilateral decision by network providers? These are all discussions that I thin are very healthy to have. It's in light of, I think, the sort of discussions that at a Congress level they become political issues. We really do believe that the way that the internet has developed and why it's successful is there's a lot of things that's gone right in the past and we want to make sure that those things are preserved.

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

We'll take two more questions. There's one in the back over there.

**Unidentified Audience Member**

Just first a clarifying question on your revenue outlook for marketing services, Sue. In terms of a three year outlook, is the base year 2005 or 2006?

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

Yes. It is and it's really an aspirational goal. It's not meant to be an outlook, per say.

---

**Unidentified Audience Member**

Fair enough. And then in terms -- you've talked in the past about your growth relative to the market, would you say that that aspirational goal assumes constant share, modest share gains, how should we think about that?

---

**Susan Decker** - *Yahoo! Inc. - CFO and EVP Finance and Administration*

I think if you did the math it looks like it would be a little faster than the market and that's due to the -- at least the market estimates that we see out there that many of you publish, which would be likely due to some of the monetization gains that we could potentially make.

---

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

Okay, so last one.

---

**Unidentified Audience Member**

Yes. I just wanted to ask -- a significant piece of your future product development and growth business seems to be in the area of social networking and social interaction. To what extent is that as monetizable as the traditional search and advertising models?

---

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

I'm going to start and that I'd like Dan to finish this one.

---

**Dan Rosenweig**

I'm not sure I want to answer any of their questions.

---

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

Well, fine. You know, Yahoo has taken a consistent approach to that question in its entire history and the first step has always been provide a great service. Have some really good, terrific kind of product that you're providing and then build a huge audience around it. Once you build that huge audience and that huge audience starts spending more and more time in it, then there are several different ways that you can monetize most anything today on the internet. Unlike five years ago or eight years ago, it was really difficult.

Obviously we're in two different worlds of advertising today, both of which are coming together a bit. We do do subscription. We do do premium products. There are various ways to monetize it, but our first step is come up with a really great product that large audiences have great interest in and then build that audience and make that audience more and more in love with that product and then talk about which way and start testing, as we always do, which way do you think would be the most effective way to monetize.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

I think that would be -- if any of the things you saw this morning, in terms of social media, that Jeff Weiner talked about and others, as they start clicking a) you should be sure and be assured that we do little testing right now on a whole bunch of them. We start to find out what seems to be more appealing and which way. We're not going to introduce that in the early days. First we're going to build big audiences behind them, but we have been doing testing and we'll do more. Dan?

**Dan Rosenzweig**

Yes. I think, obviously, we're making a big dent in this space and we're doing it because we believe that's what consumers want to do and we believe that it's clearly going to be monetizable in a very significant way. If you look at the whole spectrum of content and the spectrum of user generated content, I think I said earlier, we don't really intend to participate in the areas that we think are more fad than forever and less interesting to consumers as they evolve and less interesting to advertisers.

There's plenty of areas where consumers interact on a regular basis and in a many to many environment when you have the entire Yahoo network and you know who they are, what they're interested in, who's in their communities, where they live, we think that there's plenty of opportunities when you add in their real interests and the dynamic nature of what they're talking about to create tremendous monetization opportunities in the future.

Terry's right. We are experimenting with everything from targeting to formats to capabilities and we're doing it in conjunction with the largest advertisers thanks to work Wenda her and her team are doing. We believe we're very bullish on both the category and the opportunities for monetization in social media, so long as you're in the right categories.

**Terry Semel** - *Yahoo! Inc - Chairman and CEO*

So, kind of in wrapping it up, we are really excited about many of the things that we talked to you about today. There are great opportunities for our company. The advertising marketplace, as you know, continues to grow and grow even faster than any of us would have guessed a year or two ago. We're major principal in both. We have an enormous amount of inventory on our own network, which is probably the most valuable asset that we have in terms of a hard asset as opposed to our enormous audience that would be our best asset, frankly.

There are great ways for us to continue to grow. We brought you into social media today because we see things there. The flickers are easy. They're already maturing and they're already -- they're growing to large scale. They're already starting to penetrate many of the sites on Yahoo. Those are kind of slam dunks. Yes, they will be monetized. Yes, we'll be doing all that more in shorter order.

Some of the things that we talked about today could have major impact on our business and on the business or on the internet as they go forward. I hope that, if nothing else, you see that we are not sitting back. We are not just trying to see what we can copy that somebody else did yesterday or the day before.

We're thinking about what else could be the next -- what could be two, three years from now, the next form of web search? Is there another one? Is it adjacent to the one that currently exists? How else can the internet continue to grow? What should content look like? Not just rush in. Just don't make announcements in the first day. Why don't we build the infrastructure first to deliver all the video that we care to do, which is exactly all the stuff that's happening now.

We're thinking long term, we're laying lots of seeds, we're trying different things and we're trying to stay exactly how we were three and four and five years ago which was entrepreneurial and at the same time taking chances, moving forward, trying new things and being aggressive about it.

I'm very thrilled with the capabilities of our company today. The kind of talent in our company today is so much deeper and so many more really capable people at Yahoo today. We didn't just hire for the sake of hiring, we added great depth to the future

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2006 / 11:00AM, YHOO - Yahoo, Inc. Analyst Day**

of our company and, as Sue said, yes, we're going to continue to grow, but we don't know that we want to or have to continue to grow as fast as we did a year or two ago when we had great need for certain science and certain engineering and certain business people. We may continue and we do. We'll always have pockets that we want to get better at and bigger at, but I think these are very exciting times.

I think everyday when you either look at Yahoo news or you pick up your favorite newspaper, please don't panic if it's something somebody else is doing. If it's really wonderful, we'll look into it as well. Don't be so sure that we haven't already looked into one or two of those things. We're here and we're going to be here as a company, I think, for a long time and I must tell you I feel that our company is better positioned today than ever before.

Thank you all for coming. We hope we've been open enough and given you a chance to talk to us and meet many of our executives and we look forward to doing this again, but not too soon.

Thank you.

---

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2006, Thomson Financial. All Rights Reserved.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Exhibit 32

FOCUS - 24 of 53 DOCUMENTS

Copyright 2006 Voxant, Inc.
All Rights Reserved.
Copyright 2006 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

July 18, 2006 Tuesday

**TRANSCRIPT:** 071806ap.771

**LENGTH:** 9477  words

**HEADLINE:** Q2 2006 Yahoo, Inc. Earnings Conference Call - Final

**BODY:**

OPERATOR: Good afternoon, ladies and gentlemen, and welcome to the Yahoo! second-quarter 2006 earnings conference call. At this time, all participants are in a listen-only mode. Later, we will conduct a question-and-answer session. Please note that this conference is being recorded.

I will now turn the call over to Ms. Marta Nichols, Director of Investor Relations.

MARTA NICHOLS, DIRECTOR OF IR, YAHOO! INC.: Good afternoon and welcome to Yahoo!'s second-quarter earnings conference call. On the call today are members of our executive team, Terry Semel, Sue Decker, Dan Rosensweig and Jerry Yang.

Before we begin, I'd like to remind you that matters discussed on this call contain forward-looking statements that involve risks and uncertainties concerning Yahoo!'s expected financial performance, as well as Yahoo!'s strategic and operational plans. Actual results may differ materially from the predicted results, and reported results should not be considered as an indication of future performance. The potential risks and uncertainties include, among others, the Company's ability to compete with new or existing competitors; reduction in spending by or loss of marketing services customers; the successful implementation of and acceptance by advertisers of the planned improvements of our advertiser platform; demand by customers for Yahoo!'s premium services; and risks related to joint ventures and the integration of recent acquisitions.

All information discussed on this call is as of today, July 18th, and Yahoo! does not intend and undertakes no duty to update this information to reflect future events or circumstances. Other potential factors that could affect the Company's business and financial results are included in the Company's annual and quarterly reports, which are on file with the SEC.

On the call today, we will discuss some non-GAAP financial measures in talking about the Company's performance, including operating income before depreciation, amortization and stock-based compensation expense, which will be referred to as operating cash flow; revenue excluding traffic acquisition costs; free cash flow; adjusted net income and adjusted net income per share. Reconciliations of those measures to GAAP measures can also be found on our website under investor relations.

Terry and Sue have prepared remarks that should last about 30 minutes, and then we will have a brief Q&A session. And now, I would like to turn the call over to Terry.

TERRY SEMEL, CHAIRMAN, CEO, YAHOO! INC.: Good afternoon, everybody. Yahoo! continues to demonstrate great strength, as we benefit from our large engaged audience and some of the industry's leading advertising solutions. During the quarter, we made important strides towards our mission to create the world's

most relevant, vital and trusted Internet services for consumers and businesses. We released some of the most innovative and consumer-friendly services on the Internet, and made further progress in enhancing and expanding our services for marketers. It is exciting for me to see the next generation of Yahoo! evolve.

For the second quarter, Yahoo! reported revenue of $1.6 billion, our 13th straight quarter for record revenues, and up 26% compared to the second quarter of last year. We achieved balanced growth, with contributions across the board from our multiple lines of business and geographies. Our profitability remains very strong as well, with operating income before depreciation, amortization and stock-based compensation expense of $457 million, up 24% from the same period last year.

We believe that the next phase of the Internet is likely to be even bigger and more exciting than the past decade. While our business has grown at a re-markable place, we are also making significant progress against our long-term investments. Our priorities are to create next-generation user experiences in order to derive more value for and from our large, engaged audience, build key platforms and infrastructure, extend Yahoo! beyond the browser and enhance our monetization capabilities for both text-based and graphical advertising. We have made investments in what we think are the right talents and resources to be in a strong position to pursue the enormous opportunity that we believe lies ahead.

It all starts with establishing the Internet's most valuable audience through deep and engaged relationships, and our ability to roll out exciting, innovative products that leverage Yahoo!'s brand, community and technologies. This past quarter was illustrative of the kinds of great services that Yahoo! can offer. Much of what we do is big, global and has the potential to make tremendous im-pact, which is why today we reach one out of every two people on the global Internet.

Let's look at some of the highlights during the quarter. Through the combina-tion of rich design and new technologies such as AJAX and DHTML, we launched en-tirely new capabilities and superior user experience for some of our services.

The most significant was the redesign of our flagship destination, the Yahoo! homepage. In addition to the dynamic, interactive and easy-to-use consumer ex-perience, the new Yahoo.com incorporates registered services to also increase personalization and relevance of our content and our advertising. Together, all of the improvements have resulted in increased usage and engagement of the home-page by our consumers, and an even better opportunity for our advertisers.

Yahoo! Answers, which is now available in 18 territories and nine languages, is gaining a tremendous amount of traction. In just seven short months, it al-ready has approximately 50 million unique users worldwide, and there have been 75 million answers across a wide spectrum of topics. Every day, questions like the best cellphone to buy or the name of a particular song are being asked. How-ever, we have also had some of the biggest questions of our times asked by some of the biggest leaders of today -- questions from people like Stephen Hawking and Bono generated a combined 50,000 answers to date, and both became global me-dia events in and of themselves.

FIFAWorldCup.com is a great example of our ability to leverage the power of the Yahoo! network to build and run partner web sites that attract millions of global users. The site attracted record traffic numbers through the wide range of integrated offerings, including 4.2 billion page views, 73 million page views on the sites of mobile destinations and more than 138 million video streams.

On the subject of video, we recently released our new Yahoo! Video product, adding user-generated content, personalization and community features for rat-ing, reviewing and sharing to our industry-leading video search capabilities. We now have a well-established infrastructure, bringing together video content by crawling the Web, accepting uploads and receiving direct fees from partners, enabling video enthusiasts to access the largest database of videos and partici-pate in an active and growing creative community.

Q2 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 18, 2006 Tuesday

There are also new things that we continue to do with many of our existing award-winning sites, such as our new chart capabilities in Yahoo! Finance, desktop-like drag-and-drop functionality in our Yahoo! Photos beta and plug-ins in Yahoo! Messenger with Voice. And, in an industry first, Yahoo! Messenger with Voice users can now connect with users of Microsoft Windows Live Messenger through a limited public beta, forming the world's largest IM community, approaching 350 million accounts.

We continue to extend Yahoo! into more environments so that we can deliver to consumers what they want, whenever and wherever they want it. During the quarter, we signed a number of new deals to distribute our mobile services, including Yahoo! Search and Yahoo! Go for Mobile. The largest of these deals is a global relationship with Hutchison 3 Group, our first strategic alliance with a global mobile broadband operator. We also expanded our global alliance with Research in Motion to bring more Yahoo! services to more BlackBerry users around the world, and announced a relationship with Helio for one-click access to Yahoo! from the Helio home screen.

It is our innovation and industry leadership that enables Yahoo! to continue attracting the largest and most engaged audience on the Web, with more than 0.5 billion monthly users on Yahoo! branded Web properties. Excluding Yahoo! Japan and China, we delivered approximately 412 million unique users, up 28% year over year from approximately 321 million, and up from 402 million last quarter. On the same basis, our active registered user number was approximately 208 million, up 20% from 174 million in the second quarter of last year and in line with the previous quarter.

What's really exciting to me is that we have the highest share of time spent on the Internet in the US, and Yahoo! is the only company among all of our competitors that has grown minutes per visitor each quarter during the last year. Our user and engagement numbers positively impact all parts of our business, including Premium Services, which of course you know is our paying subscribers, who are the fastest-growing subset of users on the Yahoo! network. We ended the quarter with approximately 14.3 million unique paying relationships, up 1 million from the previous quarter, and approximately 4.2 million, or more than 40%, year over year.

Our innovation and leadership extends beyond our consumer products to our Marketing Services business. We delivered $1.4 billion in Marketing Services revenue, representing 27% year-over-year growth. Yahoo! is a leader in all forms of Internet advertising. Our trusted brand, global reach and leading media environment and capabilities make us the logical first and, we believe, the best choice for the world's biggest advertisers.

Starting with graphical advertising specifically, we continue to deliver outstanding results. We have been developing this market for many years, turning long-term relationships and trust into increased dollars. That is why we expect to outgrow the segment in 2006, with growth rates well ahead of the projected industry growth rate, which is currently in the mid 20's. Evidence of our progress is that in the US, revenue from our top 200 graphical advertisers is growing 35 to 40% year over year, roughly similar to the trends we have seen over the past several quarters.

We also continue to attract a large majority -- I should say an extremely large majority -- of the Ad Age top 100 advertisers in any given quarter. So I am just giving a little alert to the few of you, or the few of you advertisers who seem to be missing. It's time to get aboard, because the plane or the ship is definitely moving.

Every vertical sales category in our graphical segment also delivered year-over-year growth, in large part due to our powerful verticals and our advanced targeting capabilities, which enable advertisers to reach the audiences most valuable to them across our network. We experienced significant increases in financial services, [BPG], pharmaceuticals and entertainment, just to name a few.

We continue to become a more integral part of companies' buying plans, while at the same time getting more value for our inventory. Our high-value inventory,

Q2 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 18, 2006 Tuesday

which enables us to deliver the best value to our advertisers, is one of the
reasons we believe we have a strong leadership position in graphical advertis-
ing. We recognize that's a strategic advantage, and we are focused on extending
our leadership to also include text-based advertisers.

Let me give you three examples of the proactive steps we continue to take.
First, Yahoo! is and always has been committed to protecting advertisers against
click fraud. After a thorough audit of Yahoo!'s click-through protection by a
third party, it was determined that Yahoo! has the best and continues to operate
a click protection system that is better than recent industry estimates of click
fraud levels. We feel great about the third-party validation, but we strive to
do even more, and are committed to working to build industrywide standards on
click fraud.

Second, we have strict distribution partner guidelines, and as a result we
have recently terminated relationships with publishers that didn't drive traffic
that met our standards. We will continue to use advanced technology to raise our
standards and bring even greater value to our marketplace.

Third, we have added new partners with high-quality inventory, led by the re-
cent announcement with eBay, that benefit both our search and brand advertising
positions. Inventory quality is an important strategic issue to both our company
and to the success of our industry overall, and you can expect Yahoo! to utilize
its leadership position to help drive this forward.

Moving on to another important initiate, I would like to discuss the improve-
ments we are making to our search monetization capabilities and the introduction
of our completely redesigned platform. As I described last quarter, there are
three elements to the new system design -- the core data platform, the advertis-
ing management applications and the new marketplace design. We have made some
strong progress in a couple of key areas.

First, the underlying technology and core data platform was code complete in
May, at the time of our analyst day. Since then, we have reached out to several
hundred of third-party agencies and tool providers, and have them accessing our
development tools and sandbox to adapt their systems to our new platforms. This
is a critical part of a successful launch, as their third-party tools must be
upgraded in advance of advertising migration to the new interface.

Second, we recently did a detailed review of the advertising management ap-
plication for the front end with about 175 of our most valuable search advertis-
ers, and the feedback, I must add, was very positive. As a result, we believe we
have the right functionality to help our advertisers drive demand and insight
into their market.

As with any significant new endeavor, there has also been a lot of learning
over the last two months. First, our comprehensive new platform approach, while
complex and time-consuming, is coming together very, very well. We focused up-
front on building a new system, and on various infrastructure investments that
will enable us to iterate on consumer needs very quickly during the migration
process by developing more automated tools and processes.

Second, we have also learned that, given the complexity and importance of go-
ing to market with an application of this scale, it probably requires a little
more time than we originally anticipated for our two key steps. The first is the
final integration and QA testing process, which is now underway, and the second
is the timeframe between the final QA signoff and the actual customer launch,
given the legacy systems in place that will be operating in parallel.

Therefore, to meet the standards that we believe our clients should expect
from us, we think it is prudent to add some extra time to our original estimates
for the commercial launch. We now expect to roll out the front end or advertis-
ing management application in Q4 rather than Q3. We do have an aggressive plan
to try to get the marketplace design piece out by year end, but because we want
to collect feedback from our advertisers on the timing and cause them as little
disruption as possible, for your planning purposes, we think you should plan for

Q2 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 18, 2006 Tuesday

sometime in Q1. We believe this is the right decision, in terms of assuring the most successful commercial launch possible.

More and more marketers are coming to understand that the Internet can really help them meet their needs across the full marketing spectrum, from brand awareness, consideration, intent to purchase, trial all the way through to transaction. To help accomplish this, Yahoo! is making the right investment in audience size, demographics and engagements, as well as important advancements in our advertising technology, to seek to deliver even better results.

So in conclusion, I would like you to know that I am very proud of the remarkable growth and progress that Yahoo! has demonstrated. We are making some important long-term strategic investments in areas such as talent, platforms and infrastructure, innovative products and enhancing our monetization capabilities as we build for the future. This is an important time for our company, and we have always had a track record of delivering. We are focused, driven and excited about the enormous opportunity ahead.

I would now like to turn the call over to Sue, who will review our key financial highlights.

SUE DECKER, CFO AND EVP, FINANCE AND ADMINISTRATION, YAHOO! INC.: Thanks, Terry, and thanks to all of you for joining us today. We are very pleased with our second-quarter results and what they say about our progress to date. We have an ambitious agenda for the year that includes investments in our user experience and our advertiser offerings, designed to drive growth and profitability in future years. At the same time, we're thrilled to be able to make those investments while also delivering strong and balanced growth in each of our key financial measures, and also in our key user metrics.

Let's talk now about the financial highlights from the quarter, starting with free cash flow, which we view as our most important financial metric as it relates to value creation. As a reminder, we define it as cash generated from operations, which includes cash cost for taxes, tax benefits from stock-based compensation expense and changes in working capital less CapEx and dividends. Free cash flow was $358 million for the second quarter, up more than 19% from a year ago. It represented 32% of revenue ex-tax and 78% of operating cash flow, which we believe demonstrates the ability of our unique collection of businesses to consistently and efficiently deliver strong cash returns. In addition to our free cash flow this quarter, our other significant sources of cash collectively amounted to $102 million, primarily from the proceeds from the exercise of employee stock options.

Turning to how we invested that $460 million of cash generation, we invested over $300 million this quarter in direct and structured stock repurchase transactions that we believe will yield substantial returns to investors, and 61 million for a 9% investment in Gmarket, a leading retailer e-commerce provider in Korea.

Let me give a little more detail on the share repurchase activity. We invested 51 million in direct repurchases of our stock through open-market transactions. In addition, we entered into (technical difficulty) million in new structured stock repurchase transactions which mature in October of 2006. Also during the quarter, two of our previously entered into structured stock repurchases matured and settled in shares, resulting in the buyback of 12 million shares. So in aggregate, we repurchased a total of 13.8 million shares in Q2, at an average price of $31.62 per share. Year to date, we've repurchased just under 36 million shares, at an average price of about $33 per share. We continue to believe that the active investment and management of our cash will be value-creating for shareholders.

Netting out the sources and uses of cash, our ending cash and marketable securities balance was just below $4 billion, an increase of about $132 million from last quarter. Please note that this ending cash balance does not include several other important sources of incremental balance sheet value -- first, our interest in Yahoo! Japan, which was valued at $10.6 billion at the end of Q2, representing more than $7 per share; second, our investment in Alibaba, which at

Q2 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 18, 2006 Tuesday

the time of the transaction was valued at $1.4 billion, and is currently carried on our balance sheet at that value; third, the $500 million in structured stock repurchase transactions that are currently outstanding and that, upon maturity, will result either in the repurchase of the stock or the cash being returned to the Company during this year; and fourth, our minority investment in Gmarket, valued at close to 69 million by the end of the quarter. These four investment assets collectively amount to $12.5 billion in aggregate, or almost $8.50 per share, an important complement to the underlying values of our operating assets.

Moving now to the P&L, the overall summary is that, consistent with our financial strategy, we are successfully supporting a massive and growing base of more revenue-productive users. Specifically, second-quarter revenue ex-tax came in at $1,123,000,000, our third consecutive quarter of more than $1 billion on that basis, advancing more than 28% over year-ago figures, despite the effect of the deconsolidation of China that occurred in last year's fourth quarter. Ex-China, the organic growth rate was 29%.

Let's look now at the revenue breakdown by lines of business. Global marketing, our largest service, generated $933 million of revenue ex-tax, up 30% year over year. Prior to 2006, we have discussed the trends in our marketing services business under the categories of brand and search. However, as we indicated last quarter, this approach has become much less meaningful over time, and does not adequately express the integration of how marketers are using both forms of advertising to complement and reinforce each other, both for branding and also for customer acquisition objectives.

Consequently, we are now discussing our business trends slightly different. I will comment about our O&O network -- which includes the breadth of what we previously referred to as brand and search-related advertising, and collectively runs on the inventory that we own -- and I will provide directional information on the growth trends on the inventory that we do own, but that we monetize for our affiliates.

Within the O&O network, we continue to lead the market in offering solutions to the nation's top 200 marketers, particularly with [Graphic Lab]. As we indicated last quarter, beginning in Q2, the MSN wind-down started and became evident in our figures. Consequently, our affiliate business grew at a somewhat slower rate than our O&O business, as MSN largely completed the process of moving its US business in-house. Excluding MSN, however, our affiliate business is performing very well.

Our average TAC rate was relatively roughly flat in the quarter over last year. Or, adjusting for MSN, it was up modestly, in line with the expectations that we communicated to you in January. Looking forward, we continue to expect the gap between our O&O growth rate and that of our affiliates to widen in favor of our O&O network.

Turning to O&O, I will discuss both volume-related and monetization-related growth. On the volume side, our best measure is overall page views, which were relatively strong this quarter, rising about 33% year over year to an impressive 3.9 billion per day in June, or a still very strong 28% in that month, if we exclude the incremental impact from FIFAWorldCup.com page views. This growth also outpaced the very healthy 25% increase in unique users adjusted for FIFA, implying improving engagement as well. Within our overall usage figures, we are very pleased with our search volumes and believe we are generally maintaining or gaining query share. In short, our very high-quality O&O network is vibrant and growing, as we believe consumers are finding more and more relevant services on our network, enhanced by our community and personalization investments.

Turning to the other source of growth, the rate at which we monetize our page views across the totality of our O&O global inventory, we generated 4% more revenue per page view in Q2. When combined with the average growth in page views, this explains our overall O&O growth of a little more than 30% year over year.

Additionally, given the high degree of interest and the relative monetization of our search product inventory, as compared with the rest of our network, I

Q2 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 18, 2006 Tuesday

will provide a little more color here, as I have in the past. The modest growth rate overall and revenue per page view across the whole network worked out to a blend of 10 to 20% growth for the inventory sold across our global communications, entertainment, information and commerce properties and low-single-digit trends in US revenue per search query in the Search inventory.

This US RPS trend is modestly slower than what we saw in the last few quarters, largely due to the beginning of the anniversarying of some of the coverage-related initiatives that we rolled out in Search in Q2 and Q3 a year ago. We expect this deceleration to continue in the back half, as we fully anniversary that effect. After our new ad platform is fully up and running in 2007, our monetization growth rates in Search are expected to improve.

In summary, we believe Yahoo! is very well-positioned to offer marketing services to clients seeking both mass reach and also very surgical targeting. We sell this in multiple formats -- text, display and video -- and through both direct and self-service sales channels that enable our clients to purchase advertising, both in markets in which we set the price and in markets in which they do. Lastly, we serve these messages by a variety of matching and targeting algorithms intended to assure relevance to the consumer. Strategically, we believe we are in the sweet spot of online marketing services, offering powerful turnkey marketing solutions and consumer insight on a global scale.

Turning to fees, we produced $190 million of revenue in the quarter, up 19% from a year ago. Adjusting for the year-ago one-time pricing true-up from AT&T and the deconsolidation of China, these grew 23% year over year.

The primary driver of this business line is our premium offerings, in which consumers and businesses pay us for our services. We exited the quarter with approximately 14.3 million pay relationships, up 42% year over year and up 1 million from Q1 levels. Based on our experience to date in 2006, we continue to believe we are on track to exceed 16 million paid relationships by year end, and we continue to expect them to produce an ARPU of $3 to $4 per month.

Turning to revenue by geographic segment, topline growth remained very robust internationally, up 33% ex-TAC over the year-ago quarter to 286 million, boosted in particular by strong growth in sponsored search. Holding currencies constant with Q2 2005 and adjusting for the deconsolidation of our China operations, our international revenue ex-TAC increased 38% over a year ago, outpacing the also strong 27% increase domestically.

Let's turn now to some of the details behind our strong and growing profitability. Specifically, operating cash flow came in at $457 million, up 24% year over year, producing strong global OCF margins of 41% in the quarter and somewhat ahead of what we had planned, because we moved some discretionary spending in marketing and hiring from Q2 to the back half. As you know, the major driver of margin leverage is compensation cost, our largest expense, which continues to yield productivity improvements.

Headcount ended the quarter at around 10,500, up about 400 from Q1 2006 levels and up about 20% from a year ago. This was primarily related to planned investments in our key talent and various products and infrastructure, collectively designed to improve our user experience, strengthen our market position, extend new verticals and support our growing businesses. We are very pleased that we have been able to make these investments in talent while still delivering strong profitability in margins, and we see this as a testament to the network effect of our model and our relentless focus on our key priority areas.

Let's turn now to our business outlook. We are including a business outlook for Q3 and reiterating our previous outlook for the year. Starting with the third quarter, we expect revenue ex-TAC be in the range of $1,115,000,000 to $1,225,000,000, up 26% from a year ago, at the midpoint of the range and reflecting normal adverse seasonality for our two forms of marketing services, as compared with Q2 levels, and a modest one-time license fee that will be recorded in our fees line.

Q2 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 18, 2006 Tuesday

Turning to profitability, at these revenue levels, we expect to operate within an operating cash flow range of $445 million to $505 million in Q3, up 23% from a year ago at the midpoint. Q3 margins are expected to be roughly in line with levels generated in Q2 with greater expansion in Q4, when our marketing services businesses are seasonally stronger. For the full year of 2006, we expect revenue ex-TAC to range from $4,600,000,000 to $4,850,000,000, up about 28% from year-ago levels at the midpoint. The outlook considers both our solid first-half results and an expected slight tailwind from currency rates in the second half.

Turning to full-year 2006 operating cash flow, we expect to operate in a range of $1,915,000,000 to $2,055,000,000, representing growth of 27% year over year and yielding a full-year margin of 42%, even after absorbing the previously announced loss of some highly profitable Search revenue in the affiliate side. On a segment basis, our expectation is that there will be some modest margin expansion in our international operations, resulting in margins being generally similar to those in the US on the international side.

Turning to our tax rate, we are currently estimated our annual reported effective tax rate to be in the range of 44% to 46%. This is about 100 basis points higher than previously estimated, and primarily reflects the impact of changes in the mix of foreign statutory earnings and higher-than-expected FAS 123(R) expenses.

What is more significant is that our cash tax rate is expected to run at only 6% to 8% for 2006. This is significantly below our reported effective tax rate because of our NOL carryforward position. We currently have NOLs in excess of $3 billion. As conveyed to you in our Q1 earnings call, we have a global restructuring project underway, which adds approximately 1% to 2% to our reported tax rate in 2006 and 2007. Thereafter, we believe we will begin to reduce our tax rate from today's levels by about 1 to 2% per year, ultimately reducing the current booked tax rate by 6 to 8%, and reducing our cash taxes once our NOLs have been fully utilized.

Moving to our most important financial metric, free cash flow, we are altering our current 2006 range to reflect the aggregate purchase price of approximately $120 million for some land in Santa Clara, the majority of which will be included in our Q3 CapEx number. The impact of this purchase reduces our free cash flow to a new range of $1,270,000,000 to $1,440,000,000, and reflects capital spending for 2006 of approximately $655 million to $735 million. On the land, we see this as a very attractive asset that provides additional capacity and flexibility for Yahoo!'s future. Although we don't have immediate plans for development, we will be analyzing our options and making decisions over the coming year.

To sum up, as we complete our second quarter of 2006, we are very pleased with how we performed, and as we look ahead, even more excited. Financially, at the middle of our ranges, our full-year outlook for 2006 suggests a financial model that is very attractive. It calls for organic revenue growth ex-TAC approaching 30%. It suggests delivering more than 40% of that to the OCF line, and it anticipates yielding nearly 70% of that to the free cash flow line, even including our incremental CapEx for the land in 2006.

Moreover, the health of the financial model is allowing us both to show strong current growth while also absorbing significant investments to drive future growth. In particular, we feel good about our progress to date and the early testing results from our new advertising platform, and are confident that it will help drive our search advertising monetization efforts in the future.

And with that, I would like to turn it back to Terry.

TERRY SEMEL: Thank you, Sue. We continue to focus on innovative ways to create unique and sustainable environments, deliver the greatest value to our users and ultimately our marketing partners. I strongly believe our diversified strategy will enable us to fully take advantage of both current and future growth opportunities.

Q2 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 18, 2006 Tuesday

With that, I would like to open it up to calls and questions.

OPERATOR: (OPERATOR INSTRUCTIONS). Mark Mahaney, Citigroup.

MARK MAHANEY, ANALYST, CITIGROUP: I just wanted to get into the TAC trends. Sue, is there a way you can normalize the TAC growth sequentially for the fall-loff in the MSN relationship? Did the cutting off of some poor traffic affiliates impact that as well? I think some of the guidance you have given before on MSN implies that TAC from MSN would have been something on the order of around $50 million. Is that the kind of adjustment we should think about, to figure out what the organic growth rate was?

SUE DECKER: Let me just help you. The year-over-year change in MSN rev ex-TAC revenue was down $10 million to $20 million, and so the total effect on our rev ex-TAC took about 2 points off of our overall growth. We expect that roughly 200 basis points impact to continue for the back half.

OPERATOR: Imran Khan, JPMorgan.

IMRAN KHAN, ANALYST, JPMORGAN: Sue, if we look at your Q4 guidance and Q3 guidance, it seems like in Q4 you were -- and if I take the midpoint of the numbers, it seems like you were guiding almost 15% of sequential growth. I was trying to understand, are you expecting anything from your Project Panama in Q4 that you were guiding? It seems like a higher growth rate than last year growth rate?

Secondly, on the free cash flow side, I think almost $116 million free cash flow came from excess tax benefit from the stock-based compensation. Looking forward, if we normalized, exclude those, what kind of free cash flow growth rate we should think about?

SUE DECKER: Sure. Let me start. In terms of whether our outlook for Q4 includes anything from Panama, the answer is no. We had not been including anything from Panama prior to this conversation. With the comments Terry made about us adding a little bit more time to the testing cycle and the migration cycle, you could push off one more quarter of when we expect a financial impact from Panama. So what you're seeing in the fourth quarter is what we would normally see, which is sequentially a little bit better trends in both our Search and our performance-based marketing businesses on a seasonal basis.

In terms of the free cash flow, we are in a --basically, the $116 million that you see there is the taxes that we're booking in our P&L at a full tax rate, but we are not paying any -- we are paying very limited cash taxes. That is because of the tax shield that has been created historically primarily by stock options, which amounts to $3 billion. So it's a very important source of free cash flow going forward. If you wanted to exclude it, you'd just include basically the P&L tax rate that is included in our P&L that is actually not cash.

OPERATOR: Anthony Noto, Goldman Sachs.

ANTHONY NOTO, ANALYST, GOLDMAN SACHS: Sue, you had made the comment that you largely believe you're maintaining search query share or potentially gaining share. I was wondering if you could comment specifically on how you think you're doing on a revenue basis of Search, implying what the relative change is in RPS, if you could comment on that specifically?

SUE DECKER: We don't have the information for our competitors, in terms of how they are doing. But I think we have been very clear for more than a year that we thought our system was not performing as well as our competitors' on the RPS that we're converting on our network. So on a revenue basis, we clearly lost market share. That is why we put so much into our Panama efforts this year, and that is directly what the new system is designed to address.

What we do take comfort in is that the underlying core Search product to consumers is doing so well and at least maintaining or, it looks like, at least gaining slight share relative to the industry as a whole. That means that when

Q2 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 18, 2006 Tuesday

our product is ready, we have more queries to monetize. It should lead to a larger financial opportunity for the Company down the road.

OPERATOR: Ben Schachter, UBS.

BEN SCHACHTER, ANALYST, UBS: On the partner quality issue, I was wondering if you could talk about how many partners you have removed, and are they primarily US or are they primarily international, and how we should think about that going forward. Will there be more to go?

Also, on the Project Panama, I was wondering if you could talk about specifically what's changed since the analyst day, when it seems like you were pretty confident in the timing, to now.

DAN ROSENSWEIG, COO, YAHOO! INC.: On the traffic quality issue, we just look at it as an opportunity. It has been an ongoing process and it will remain an ongoing process. So as our technology gets better, and as we are able to catch these things faster, and as we're able to make sure we sign on fewer partners who might have the risk, we just believe it's an ongoing forever process like we do in Mail with spam and other things. So we just continue to get better and better and better at that.

On the question of Project Panama and the timing, Terry did mention today that we are going to move it a quarter away. We are two months further into the process. We're actually extremely pleased with the process. We're extremely pleased with the product, the stability, as you saw from the 175 advertisers who have a chance to see it and comment. We think we have picked the right feature sets; they are extremely pleased with it.

But as we got further along in the process, we wanted to make sure that we did it right. We don't manage the company for a particular quarter, so we focused on making sure that we did all the necessary testing. We're going through testing now. Things seem to be looking good. But we do, for example, over 20,000 different tests to make sure that these things are right, stable, it's the right advertiser experience, the advertisers get what they expect. We would rather take the extra time to make sure that we do it right, rather than try to rush into a quarter. This, of course, remains our top priority.

OPERATOR: Mark Rowen, Prudential.

MARK ROWEN, ANALYST, PRUDENTIAL: We have heard in the last couple of weeks from retailers that business has been softer than they expected. Have you heard any rumblings on your end of cutting back on advertising expenses or expecting a weaker holiday season?

Second, if I could just follow up on the last question, are you finding a lot of bugs in the system that's taking longer to fix? It's still not clear to me why you need to push it out by a quarter.

DAN ROSENSWEIG: I will take the second question first and then go to Sue on the trends in advertising. No, we're not finding a lot of bugs in the system. It's just the reality is we put out our best timeline at the time. We're two months further into it. To get it over the goal line the way we want to, we just think it's going to require a little bit more time to make it the quality of the kinds of products that we normally release. So we would rather do it right and take a little extra time than hurrying it out to make a particular date. We gave you the best date we could in May, and we are giving you the best date we can know. But we're very excited about the prospects of it, and you have seen a lot of response from advertisers who are also very excited about the prospects of it.

So to be specific, we just learned more about integration, the interdependencies and those things. So it's not about bugs or quality. It's literally just what it takes to get it over the finish line. We want to do it right.

SUE DECKER: On the questions about retail and the economy, like you, we're watching those trends carefully. Let's say it's early to tell whether there will be any impact. If we were to see it, we certainly haven't seen anything on our

Q2 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 18, 2006 Tuesday

Q4 commitments, as you indicated. It's our brand business, the graphical business in which we see the most forward commitments. But retail is not as large a category as some other ones in that business. Where it would be more visible would likely be more in the e-commerce area, which is more on the Search side. That remains to be seen, and we will watch these trends carefully, as you do.

OPERATOR: Safa Rashtchy, Piper Jaffray

SAFA RASHTCHY, ANALYST, PIPER JAFFRAY: This, as far as I can see, was the first quarter that your active registered users did not grow, was flat with the previous quarter. Can you comment on how we should read into that and what factors might have contributed?

Also on Search, Sue, I just want to make sure we understand numbers right. I think you gave a 33% growth in page views -- suggesting, I assume, that that is a proxy for the overall volume growth -- and mentioned that the growth to your owned and operated sites was stronger than that. Is that the way to read into it? Because if you look at the broader Search revenues, it does suggest a sequential decline from Q1. Are you losing any volume to competitors, either on owned and operated sites or on your partners, ex-MSN?

SUE DECKER: Let me start. On the question about active registered's being flat, first, let me say there's no real impact in FIFA on those numbers. There is an incremental impact on our unique users and our page views from FIFA, which I broke out in my comments. So that's a relatively pure comparison, and that is relatively consistent with what we typically see in the Q2 period. Q2 -- as you know, the figures that we release, our page views and our users, are a June figure. They are our last month in the quarter, so they tend to, in Q2, exaggerate the seasonality of the quarter, because June is the softest month, as schools come out and summer begins. I think we might have been up 1 million or 2 million a year ago or so, but it's very consistent with what we have seen in the past, probably also reflecting a slightly larger base.

In terms of the page view growth, let me walk you through this. The 33% page view growth, again, is June over June and includes the incremental impact of FIFA. The average page view growth throughout the quarter, not just in June, is 27%. I also indicated that the O&O monetization rate was about 4%, leading to a low 30's growth rate in O&O. The affiliate business grew a little slower than that, so our average marketing growth in total was up 30%.

Now, to your question about volume versus pricing, we provided those trends last quarter as well. The 27%, 28% growth ex-FIFA in page views compares to 24% last quarter. So we were actually relatively consistent -- a little higher, actually -- in our volumes this quarter. The monetization growth rate was a little bit down, as I said in my prepared comments, and we would attribute that largely to RPS and Search, which eased a little bit from the growth rate last quarter, because we'd anniversaried a number of the coverage initiatives. We actually expect that to continue in Q3, because the coverage initiatives rolled out in Q2 and Q3 a year ago. So I think hopefully that explains the various [mix of trend].

OPERATOR: Heath Terry, Credit Suisse.

HEATH TERRY, ANALYST, CREDIT SUISSE: I was actually hoping you could talk a little bit about any kind of implications that we should be looking for from the deal that you signed with eBay, and how that could impact the model over the rest of this year and particularly into next, as you see more full development?

SUE DECKER: I'll take that one. We are really delighted about our strategic partnership with eBay in the US, which runs across Search and graphical, online payments and a cobranded toolbar. So there's a lot of elements to it. We have a lot of complementary businesses, and we actually feel like we are in a wonderful position to help both of each other grow. We're also very excited about the high-quality inventory that that offers, that we can offer to our advertisers that's [of the par] and quality that our own O&O network offers.

So we are very excited. As we indicated when we announced the deal, we do not expect any kind of financial impact in 2006. We don't plan to be up and running

Q2 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 18, 2006 Tuesday

on a lot of these implementations until 2007, and that actually will build throughout the year. I will say, though, that there has been a heck a lot of activity since we signed the deal. There's a very collaborative process in place. We have cross-company teams working together. Design and development is underway. Testing has actually started in one component, and will extend to other components throughout the half. In January, when we put out our business outlook for 2007, we would include any financial impact that we would expect at that time.

OPERATOR: Jeetil Patel, Deutsche Bank.

JEETIL PATEL, ANALYST, DEUTSCHE BANK: First of all, on the EBITDA, if you look at your guidance in Q3 and Q4 and the year, you are up about $140 million-ish on a sequential basis from Q3 to Q4. I guess historically you have been in the incremental $60 million to $70 million range in terms of incremental EBITDA between Q3 and Q4 over the past several years. Can you give us a sense of, really, what drives that type of incremental profitability in the business on a sequential basis, aside from just the top line? Is there just costs beyond the marketing side not ramping as aggressively? What drives that number?

Second, where do you think you are in terms of going through your traffic deals on the Search side and going to kind of eliminating a lot of the less desirable traffic deals? What percentage of the business is still left to transition? Or are you past that issue now?

SUE DECKER: So let me start with the first question, which was second-half profitability and incremental margin. Implied in our guidance for the Q3 and then, therefore, Q4 -- because we gave back-half and Q3 numbers, so you can ascertain Q4 -- is a margin in Q3 that is very consistent with the margin we just operated at, and relatively consistent to Q1. So there is really nothing too unusual in Q3. The margins are very comparable to what we have seen in other quarters.

I think we did indicate, then, in Q2 our margin was a little higher than we expected, because we hired a little bit slower than we originally anticipated, and some of the marketing we had planned in Q2 is pushed a little bit back. So it's just led to a more even distribution of margins through the first three quarters.

Q4 is really where we see more incremental profitability, and that is due to the -- you have two businesses. Both forms of the marketing businesses are seasonally strong in Q4, and the cost base does not increase proportionately. So that leads to a little higher margin in Q4.

In terms of the traffic deals, I would not necessarily characterize it as a transition. This has been something that is new. This has been something underway for a long time. In fact, a lot of the recent outside activity and initiatives that have looked at our systems have been very complimentary (technical difficulty) way that we approach that issue. This is an ongoing process that we do all the time, and it's very consistent with our strategic initiative to really make sure that we offer the highest-quality inventory to our advertisers and our consumers.

OPERATOR: Alexia Quadrani, Bear Stearns.

ALEXIA QUADRANI, ANALYST, BEAR STEARNS: When you look at the ad spending patterns among your large advertisers on the graphical advertising side, clearly, with the growth you are seeing, you're assuming still a very large portion of the share shift of traditional dollars to online. But do you get a sense, looking at their spending patterns, if they are more open to or they are beginning to put a bit more of their ad spending maybe on second-tier sites or looking beyond the large portals?

Then just a point of clarification, my second question -- you may have addressed this and I missed it. But [do you see there is] a slight change in your forecast for operating income for the full year 2006 versus what you had previously given? Could you just explain that change?

Q2 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 18, 2006 Tuesday

DAN ROSENSWEIG: I will take the first question, over ad spend trends on the graphical side. We continue to see tremendous momentum with large graphical, more traditional branded advertisers coming onto the Internet. They are looking for first-year sites, because if they are going to come spend their money in this medium, they are obviously going to go to the place where they imagine it's going to work best. Places like Yahoo! allow them to run not only large amounts and reach large amounts of people, but it's in the best environment for advertising, the best environment for quality of inventory.

These things are very meaningful for the largest advertisers, who have many goals with their advertising, from building a brand to extending a brand to re-invigorating a brand to moving products. There are not very many companies that can provide that entire spectrum, so I think there's plenty more for them to do with the larger sites -- particularly because of our ad capability, ad targeting, measurement systems, reporting, all of those things -- before they think about how to move to the second-tier sites. So that's why we continue to believe we're taking tremendous market share, as I think Terry and Sue pointed out on the call, in the graphical space.

SUE DECKER: I will follow up on your second question, on operating income. I would say that's a relatively small change that has to do with depreciation and amortization. There was just an update halfway through the year on what we thought the back half would look like. Our operating cash flow outlook is exactly the same as it was last quarter.

OPERATOR: Gordon Hodge, Thomas Weisel Partners.

GORDON HODGE, ANALYST, THOMAS WEISEL PARTNERS: I'm curious if you can give us a little more detail on what you saw on the international front. I know you have a little less exposure to Europe, but we are hearing the UK ad market's drying up. I'm just wondering if there's any commentary there, then contrast that with what you are seeing in the Asian markets, where I think you have more market share.

SUE DECKER: I would say that the numbers that we gave out on the call, if you adjust for currencies and our divestment of China operations, were up 38% year over year. That compared with 41% last quarter year over year. So we sell a relatively strong trend in both quarters, and relatively consistent with what we would have expected when we put our original business outlook out. We're seeing very balanced strength in both our search offerings and also our graphical offerings -- very, very good trends in both. So I would not want to further break it down between the various regions, but we're pleased with our growth overall internationally.

So with that, last question.

DAN ROSENSWEIG: One other point on the UK question. We don't see, particularly in the graphical space, advertising drying up there. We see it continuing to be extremely robust for us.

Very good. Should we go to the last question, please?

OPERATOR: Justin Post, Merrill Lynch.

JUSTIN POST, ANALYST, MERRILL LYNCH: Can you talk about maybe some of the reasons why you have improved your standing with Search? Have some of the home page changes, moving the search box around, helped? What do you think is really driving that?

Secondly, can you talk about Yahoo! Answers? Any thoughts on when we might see some monetization from that?

DAN ROSENSWEIG: Let me take the first one first. First of all, we have a tremendous opportunity across the Yahoo! network to get a larger percentage of Yahoo! users to Search. We recognize that, and as we have improved the quality of Search, we have improved the way we are able to build the entire site around the world. We have improved the home page. We have improved our toolbar. We have integrated Search into more logical places across the network. We've worked with

Q2 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 18, 2006 Tuesday

our consumers to make sure they understand that Search is available and how it works and setting defaults.

All of these things that we have done in conjunction with our users, we used better technology to be able to do it. We think that as users get more comfortable and familiar with it, they use it more. That has been a very big help to us everywhere in the world.

We have also rolled out a lot of great products within Search, whether it be Image Search or Video Search, Local -- all of these areas are doing extremely well with consumers, and allowing us to provide differentiated services to them versus other places. Our social search activities -- all of these things, we think, are contributing to the success.

The question of Answers, which is another variable that we think is going to continue to contribute to the success, particularly in the social search area -- you heard from Terry on the call how well it's doing, already 50 million users around the world, 75 million questions answered. We see this as a tremendous opportunity for advertising as we go forward. First, we needed to establish it. We needed to understand the user patterns. WE needed to build the categories in which answers are created.

But we see it as an opportunity to be able to do text listings, [sort of in search of categories], graphical -- because it's a very visual environment, and we expect that the content will be more visual as well as the advertising will be more visual. Then there will be sponsorship opportunities, and then we will actually be able to work with manufacturers in a series of categories, because consumers want information directly from the manufacturers. We can provide a platform that no one us can provide and do it on a global basis. So we are very excited about the opportunity, not just from the consumer side but also from the business side going forward.

SUE DECKER: And I just wanted to add to the first question, which is the improved standing in Search. I think it's important to point out that we think we have been doing very consistently and very solidly in our Search market share.

The issue has been that the numbers that you all are looking at, from an external perspective, the comScore numbers, don't necessarily reflect the reality of what our own log files talk about. I raised that issue last quarter. We are pleased that comScore is looking at that, and they are getting closer to what we see as our reality, based on some of the recent revisions they made.

But the year-over-year trends are still very distorted in what they are showing and what we have. Overall, we have been seeing very consistent and steady progress in our Search numbers. Some of that is the social search initiatives that Dan mentioned, but a lot of that is Web search as well.

TERRY SEMEL: We just want to thank everyone for joining us today, and I'm sure we will have many other opportunities to speak with you all. Have a great day. Thank you.

OPERATOR: Thank you for participating in the Yahoo! second-quarter 2006 earnings conference call. This concludes the conference for today. You may all disconnect at this time.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no

Q2 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
July 18, 2006 Tuesday

assurance that the results contemplated in the forward-looking statements will
be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF
THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE
AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURA-
CIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES
THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY
RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFOR-
MATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED
TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE
COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

**LOAD-DATE:** July 26, 2006

Exhibit 33

47 of 57 DOCUMENTS

Copyright 2006 Voxant, Inc.
All Rights Reserved.
Copyright 2006 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

**October** 17, 2006 Tuesday

**TRANSCRIPT:** 101706ac.723

**LENGTH:** 9350  words

**HEADLINE:** Q3 2006 **Yahoo,** Inc. Earnings Conference Call - Final

**BODY:**

OPERATOR: Good afternoon, ladies and gentlemen. Welcome to the **Yahoo!** third quarter 2006 earnings conference call.

[OPERATOR INSTRUCTIONS]

Please note this conference is being recorded. I will now turn the call over to Ms. Marta Nichols.

Ms. Nichols, please go ahead.

MARTA NICHOLS, INVESTOR RELATIONS, **YAHOO,** INC.: Thank you. Good afternoon and welcome to **Yahoo!**'s third quarter earnings conference call. On the call today are members of our executive tea, Terry Semel, Sue Decker, Daniel Rosensweig and Jerry Yang.

Before we begin, I would like to remind you that matters discussed on this call contain forward-looking statements that involve risks and uncertainties concerning **Yahoo!**'s expected financial performance as well as **Yahoo!**'s strategic and operational plans. Actual results may differ materially from the results predicted and reported, and reported results should not be considered as an indication of future performance.

The potential risks and uncertainties include among others, the successful implementation and acceptance by advertisers of the Company's new search advertising platform, the Company's ability to compete with new or existing competitors, reduction in spending buy or loss of marketing services customers, the demand by customers for **Yahoo!**'s premium services, acceptance by users of new products and services and risks related to joint ventures and the integration of recent acquisitions.

Other potential factors that could affect the Company's business and financial results are included in the Company's annual and quarterly reports which are on file with the SEC. All information discussed on this call is as of today, October 17th, and **Yahoo!** does not intend and undertakes no duty to update this information to reflect future events or circumstances.

Q3 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 17, 2006 Tuesday

On the call today we will discuss some non-GAAP financial measures in talking about the Company's performance, including operating income before depreciation, amortization and stock-based compensation expense which will be referred to as operating cash flow. Revenue, excluding traffic acquisition costs, free cash flow, adjusted net income, and adjusted net income per share, reconciliations of those non-GAAP measures to GAAP measures can also be found on our website under Investor Relations.

Terry and Sue have prepared remarks that should last about 30 minutes and then we will have a brief Q&A session. And now I would like the turn the call over to Terry.

TERRY SEMEL, CHAIRMAN, CEO & DIRECTOR, **YAHOO,** INC.: Good afternoon, everyone. Today I would like to talk about our results for the third quarter and what we see ahead.

The challenges and opportunities currently before us, and the strategy that we're pursuing to address these challenges and create substantial new opportunities going forward. Let me begin by telling you that while we're very excited about a number of things happening at **Yahoo!**, I am not satisfied with our current financial performance, and we intend to improve it. Our results for the third quarter fell short of our initial expectations, and we are lowering our fourth quarter business outlook as well.

To be clear, we're continuing to grow our business at a pace many companies would envy, and we continue to lead the industry in key measures of performance, but that's really not good enough for us. We're not exploiting our considerable strengths as well as we should be, and we are committed to doing better. We are moving decisively to improve our performance.

First, to improve our search advertising business, I am very pleased to announce that our Project Panama, our new search advertising platform is now, as of today live. Starting today we've begun inviting advertisers in the U.S. to upgrade to the new campaign management application. In fact, we even had our first external customer transition to the platform today as well.

This marks a significant turning point in our efforts to deliver additional value for advertisers helping them better manage their campaign to realize increased returns. Additionally, we believe that through this platform we will be able to unlock the full potential of our large global user base and improve our search monetization capabilities.

To facilitate a smooth upgrade, **Yahoo!** will transition customers from its current system to the new platform on a market by market basis. Invitations to upgrade will be issued in stages to U.S. advertisers over the remainder of the year and early part of next year. Since our goal is to ensure a smooth transition, we will be flexible and accommodate those advertisers that wish to defer the upgrade until after the holiday season.

I also want to reaffirm that the introduction of the marketplace design in the U.S. remains on schedule for the first quarter of next year. Following the migration and introduction of the marketplace design in the U.S., **Yahoo!** will roll out the new platform in additional markets throughout the world.

We've received a lot of positive feedback from advertisers and agencies of all sizes that have seen the early demonstrations of the platform in recent

Q3 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 17, 2006 Tuesday

months. I want to thank all of the employees involved for all of their hard work. Yes, there is a lot more to do, but it is a huge achievement to get to this point. We are very excited about the potential of the Panama Project, and we believe that **Yahoo!** will derive meaningful financial benefits from this new platform.

Second, we are responding aggressively to the shift in market dynamics in the graphical advertising segment. In the first half of this year our graphical advertising business substantially out performed this evolving marketplace. During the third quarter we saw a reduction in spending by certain clients because of their own business issues. Despite this, however, we still out performed the segment but the gap narrowed.

The market is going through a significant transition with new forms of inventory becoming available from a range of new and established competitors. Near term we're expecting our growth to be in line with the overall market. Importantly, that's from a much, much higher base. Still, that's not where we should be with the superior value we provide to advertisers.

So for the long-term, we are totally focused and determined to extend our leadership in graphical advertising. This market shift represents great opportunity for **Yahoo!**, and we have already begun taking necessary steps.

First, in response to the changing mix of available inventory, we announced today that **Yahoo!** acquired a 20% stake in Right Media, the largest emerging online advertising exchange for buying and selling ad inventory. **Yahoo!** will also join the Right Media exchange and offers advertisers the ability to bid on **Yahoo!**'s non-premium inventory through the open marketplace. This relationship gives **Yahoo!** an opportunity to lead and influence the development of this new and innovative marketplace, makes it easier for marketers to purchase **Yahoo!** inventory and has the potential to increase yield on non-premium inventory.

Second, we've added important advertising partners with high quality inventory led by our new relationships with both eBay and Telemundo. The eBay implementation is progressing very well and full deployment is on track for the first half of next year.

Third, we continue to build our arsenal of industry leading tools and capabilities such as behavioral targeting, geo targeting and demographic targeting. Today we added to those capabilities with an agreement to acquire Ad Interacts, a rich media technology provider. This will enable **Yahoo!** to provide advanced rich media creative assembly and campaign management tools directly to marketers.

Finally, we continue to create the most coveted guaranteed inventory on the web. For example, our recently redesigned home page which was already the most visited page on the web has resulted in significantly improved user engagement and satisfaction. With increases in total unique visitors, page views, minutes spent, and average usage days per visitor.

These initiatives will help ensure that **Yahoo!** continues to be the first and most attractive choice for graphical advertisers, and will position us to widen the gap with our competitors. **Yahoo!** is also the first and most attractive choice for consumers, and we want to stay that way. We believe now is the time to make investments in new audiences and new ways to engage them to ultimately build new revenue opportunities.

Q3 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 17, 2006 Tuesday

We plan to further invest, innovate and secure leading positions in the areas where we see the biggest growth opportunities, in social media, video, and mobile access. Clearly some new players have emerged in these areas that have attracted a lot of attention, but **Yahoo!** also has well established positions and important initiatives under way in each of these areas.

First, let's talk about social media. **Yahoo!** has been a pioneer in social media. It is a long-term focus of ours, and we're a far bigger player in this space than many people actually realize.

We had the foresight to by Flickr back in the early part of 2005, and since then Flickr has grown to some 20 million users per month with a lot more to come. **Yahoo!** Answers which we developed internally is alone as a stand alone, one of the largest communities and social media on the web. Answers surpassed 60 million monthly users and 120 million answers worldwide just 10 months after it launched and is now available in 18 countries and 9 languages.

Together **Yahoo!** Answers, Delicious, Flickr and **Yahoo!** Video have a total of almost 100 million users which makes us the leading force in social media today. Importantly, and boy have I read about this, within this group is the largest community of the prized 15 to 24-year-old youth demographic on the web which stands at **Yahoo!** at approximately 30 million. We're incredibly focused on making every part of **Yahoo!** a more social experience. We're convinced that the social media space will continue to grow and evolve, and we plan to be a key player in this business.

So now let me talk about how we view video. We were an early competitor in video, and we expect to be a very large player. Our goal is to make video as ubiquitous as text throughout the **Yahoo!** Network. In order to accomplish this we are executing on a number of priorities.

First, we have built one of the leading video technology infrastructures which enables us to deliver higher performance and better quality video throughout **Yahoo!**. Second, we focused on establishing high quality user generated content. To that end we recently announced the acquisition of Jump Cut which has a suite of online video editing capabilities. The integration of these tools will make **Yahoo!** an even better place for people to create, share, and discover great video online.

Third, we're moving quickly to forge partnerships with video producers. We've done more than a dozen to date including the local news partnership we announce yesterday with CBS News as well as the recently announced innovative partnership with current TV. Fourth, we're producing our own contextual relevant video within our leading verticals such as sports, news, and now entertainment.

Finally, with our superior ability to target audiences and advertisers, we are well positioned to monetize video as its importance to advertisers grows. It is early, we're off to a good start with one of the largest video audiences of more than 40 million unique monthly viewers, and we're going to continue to make this a key focus area over the long haul.

The third key area of opportunity is mobile. We believe more and more internet users are going to be going mobile. Indeed many people in emerging markets will experience the internet first and perhaps the only way through a mobile device. We are going to leverage our current leadership position in mobile access to the internet and we're going to continue to build our

Q3 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 17, 2006 Tuesday

technology, develop new products, and extend the reach of our partnerships with mobile search providers--service providers, excuse me.

Our recently developed flagship service, **Yahoo!** Go gives consumers seamless access to information on the web, through their desktop, mobile or TV. This year we globally launched Windows Mobile and Symbian versions of **Yahoo!** Go for Mobile, and we expect to launch a new Java version in the early part of '07.

We're also extending social media communities to mobile devices. To bring our **Yahoo!** services to mobile phones, we now have more than 50 partnerships with mobile service providers and device manufacturers including Airtel and Hutch in India, Smart and Globe In Southeast Asia, and global deals with both Motorola and Nokia.

Within the next 18 months we expect **Yahoo!** Go and other services will be able to a majority of the mobile phones in the world. Plus we have been delivering mobile sponsored search tests in the U.K. and Japan for the past twelve months to monetize our mobile audiences. We recently extended those learnings with a beta launch in the U.S. and the U.K. markets.

In conclusion, **Yahoo!** continues to be one of the world's leading internet companies. For more than a decade we've seen numerous trends rise and fall and various competitive threats come and go, but we've maintained our position as one of the leaders in this industry because we've been able to adapt and innovate and leverage **Yahoo!**'s many, many strengths.

When I joined **Yahoo!** in 2001, one of the first things I saw was that we had too many priorities, and we needed to focus. We concentrated on three areas that we thought could be really good--that we could really be good at and then of course it was all about execution. Five years later we've had enormous growth, but to continue this success we've got to get back to basics and again zero in on a few key priorities.

So moving forward, we're going to be laser focused on these three core things. Close the gap in monetization of search, widen our lead in graphical advertising, and seize the opportunity in social media, video, and mobile. I am very excited about the opportunity, confident in our strategy, and proud of all the amazing employees around the world for working so hard to achieve our objectives, and with that I will turn it over to Sue.

SUSAN DECKER, CFO, **YAHOO,** INC.: Thanks, Terry and thanks to all of you for joining us today.

We continue to experience strong growth in the third quarter, albeit at a slower rate than we expected a few months ago. Our profitability and cash generation remained strong allowing us to continue to invest in creating better user experiences, and improved advertiser offerings designed to drive growth and profitability in future years. I will discuss our results and our outlook, and then I would like to leave you with some important thoughts about how we continue to utilize our capital in a disciplined and opportunistic way to drive shareholder returns.

Before we review Q3 results, let me start with two brief housekeeping items. First, our G&A line benefited from the $10 million reversal of an earnout accrual. Second, our reported effective tax rate was 49% for the quarter. This includes a one-time increase of approximately 4% to our rate which relates to a

Q3 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 17, 2006 Tuesday

restructuring transaction reported to you in Q4 '05.

As a reminder our cash tax rate for the year is expected to run much lower with an anticipated range of 5% to 8% for 2006. Significantly below our reported rate because of our NOL carry-forward position. Let's talk now about the financial results in the quarter starting with free cash flow which we view to be our most important financial metric as it relates to value creation.

Reported free cash flow is $288 million adjusting for the purchase of land made in Q3 which we noted on our Q2 call, free cash flow was almost $400 million in the quarter, demonstrating the ability of our unique collection of offerings to deliver strong cash returns. In addition to our free cash flow, we received $42 million from the proceeds of the exercise of employee stock options in the quarter.

Let's turn to how we invested that cash. We invested nearly $1.1 billion this quarter repurchasing 41 million shares at an average price of $26.85 per share in the direct stock repurchase transactions that we believe will yield substantial returns to shareholders over time. Also during the quarter, two of our previously entered into structured stock repurchases matured and settled in shares resulting in the buyback of a little over 8 million shares. So in aggregate we repurchased a total of close to 49 million shares in Q3.

As of quarter end, we had fully utilized our previous share repurchase authorization for $3 billion. Our Board of Directors has authorized the repurchase of an additional $3 billion of our stock over the next five years. Given our large cash position and our expected free cash flow generation, we currently believe we have ample cash resources to cover a wide range of operating needs and acquisition opportunities.

Consequently while our first priority is to redeploy excess cash into acquisition and investments that improve our financial and strategic position, we believe there will also be value creating opportunities to return cash to shareholders. Netting out these sources and uses of cash, our ending cash and marketable securities balance was $3.2 billion. Please note that this ending cash balance does not include several other important sources of incremental balance sheet value.

Our interest in **Yahoo!** Japan, Alibaba in China and [G-Market] in Korea, together with one outstanding structured stock repurchase transaction collectively amount to $9.4 billion in value or almost $6.50 per share. An important compliment to the underlying values of our operating assets.

Moving now to the P&L, the overall summary is that although second half growth rates are slower than we originally anticipated, we maintained strong profitability and cash flow while continuing to innovate for and engage our very large and growing base of users with a broad array of products and services. Specifically third quarter revenue ex-TAC came in at $1.12 billion advancing more than 20% over year ago figures. Excluding the effect from the deconsolidation of China that occurred in the fourth quarter of last year, the organic growth rate was 22%.

Looking at the revenue breakdown by lines of business, global marketing our largest service generated $912 million of revenue ex-TAC for the quarter up 20% year-over-year. To give you additional color about the drivers of revenue, as I have in the past quarters, I will comment about our owned and operated network

Q3 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 17, 2006 Tuesday

or O&O which includes advertising that runs on our owned sites and also provide directional information on the affiliate or off network growth trends.

As we expected, our revenue continued to grow faster on our O&O site than on our off network sites in Q3 due to our leading position in growth in the graphical ad market. Our O&O sites were up more than 20% year-over-year in aggregate led by graphical where our top 200 U.S. advertisers grew between 30% and 35% year-over-year. While growth slowed in some categories as some advertisers spent less than we initially expected, we continued to see growing penetration among the nation's top marketers.

On the affiliate side, as expected we generated growth in the low double-digits year-over-year, somewhat slower than our O&O network for two reasons. First, MSN is no longer an affiliate in the U.S. having brought its business in-house. The impact of this move is consistent with the figures that we've been providing to you for the last year. Excluding MSN our affiliate business continues to grow nicely.

Second, our average TAC rate was up modestly over last quarter both including and excluding MSN in the totals, in line with our expectations that we communicated to you at the beginning of 2006. Looking forward, we continue to expect our O&O business to outpace our affiliate growth net of TAC for those same two reasons.

Now let's look more closely at volume and monetization on our O&O sites. On the volume side, we added an estimated 68 million users, unique users, year-over-year, a healthy 20% growth rate versus Q3 a year ago. Keep in mind that we continue to grow off already huge base adding new unique users in numbers approaching the entire size of the user bases of some of the largest emerging properties on the internet.

Page views our best overall volume measures grew even faster at 24% to nearly 4 billion per day in September implying better engagement as well. Within our overall usage figures, we are very pleased with our search volumes and believe we are generally maintaining query share. In e-mail we're the leader on a global basis and we have also continued to trail blaze in the social media area as Terry outlined.

In short our high quality O&O network continues to grow from an already enormous base, and we believe consumers are finding more and more relevant services on our network enhanced by our community and personalization initiatives. Turning to our other driver of revenue, the rate at which we monetize our O&O page views, in the third quarter our revenue per page view was modestly less than it was in the year ago period.

When combined with the average growth in page views of 24%, this explains our overall O&O growth of 21%. This slight decline in yield across the **Yahoo!** Network included a blend of single digit growth for graphical inventory sold in our global, communication, entertainment, information and commerce properties and a modest decline in our U.S. revenue per query and search.

As we indicated last quarter, we've anniversaried some of the coverage related initiatives that we rolled out in search in Q2 and Q3 of a year ago which were incrementally driving RPS in earlier quarters. As we mentioned in our last earnings call, after our new advertising platform of Panama is fully up and running in 2007, we expect our monetization growth rates in search to improve.

Q3 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 17, 2006 Tuesday

Turning to fees, we produced $210 million of revenue, up 23% from a year ago or a few points less than that if adjusted for one-time license fee that we noted in Q2 and that was recognized in Q3. The primary driver of this business line is our premium offerings in which consumers and businesses pay us for our services. We exited the quarter with 15.5 million paid relationships, up 36% year-over-year and up over 1 million from Q2 levels.

Based on our experience to date in 2006, we continue to believe we're on track to exceed 16 million paid relationships by year end, and we continue to expect them to produce an overall average revenue per user of $3.00 to $4.00 per month. Turning to revenue by geographic segment, international continued to outpace the U.S., up 25% ex-TAC over the year ago quarter to 285 million boosted by solid growth in both sponsored search and graphical. Currencies did not have a meaningful impact in this quarter.

Let's turn now to some of the details behind our profitability, specifically, operating cash flow came in at $474 million, up 23% year-over-year producing strong global operating cash flow margins of 42% for the quarter. Excluding the one-time benefit to our G&A line I mentioned earlier, operating cash flow would have risen just over 20% in Q3 yielding margins of 41.3% for the quarter.

As you know the major driver of margin leverage is compensation cost, our largest expense, which continues to yield productivity improvements. Head count ended the quarter at around 11,000, up about 475 from Q2 '06 levels and up almost 15% from a year ago. This was primarily related to planned investments and key talent collectively focused on improving our user experience that will strengthen our market position.

We're very pleased that we've been able to make investments in talent while still delivering strong profitability in margins and we see this as a testament to the network affect of our model and to our continued focus on key priority areas.

Let me turn now to our business outlook. Based on our current view of the marketplace, we are revising downward our business outlook for Q4 and the year. For the fourth quarter we now expect revenue ex-TAC to be in the range of $1.145 billion to $1.263 billion, up 13% from a year ago at the mid-point or 16% excluding the impact of MSN and the China divestiture.

This outlook contemplates slower, but still solid growth in our core advertising businesses with global graphical and other non-search businesses collectively up around 20% year-over-year, and global search up in the mid-single digits. Turning to profitability, at these revenue levels we expect to operate within an operating cash flow range of $475 to $55million for the fourth quarter, up 11% at the mid-point of the range. Q4 margins are expected to be approximately 41% to 43%, reflecting seasonal strength in our marketing services businesses.

Moving now to what we consider to be our most important financial metric, free cash flow, we're narrowing our full year '06 range, but maintaining the mid-point which reflects both our updated operating cash flow expectations as well as better than expected anticipated working capital contributions during the first nine months. Note that our free cash flow expectation for the full year includes the aggregate purchase price of approximately $120 million for the land in Santa Clara, the majority of which was included in Q3 CapEx.

Q3 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 17, 2006 Tuesday

Our free cash flow range of $1.295 billion to $1.415 billion reflects capital spending for '06 of approximately $670 to $720 million. On the land, we see this as an attractive asset that provides additional capacity and flexibility for **Yahoo!**'s future. Although we don't have an immediate plan for development, we will be analyzing our options and making decisions over the coming year.

To sum up, as we complete our third quarter in 2006, while we initially expected more growth, I believe it's very important to note that we remain in a very strong financial position experiencing double-digit top line growth, highly profitable margin levels, and a financial model that continues to convert 60% to 80% of OCF to free cash flow. We firmly believe that the considered and deliberate reinvestment of our revenue and our excess cash flow into key distribution technology, marketing and various large and small acquisitions is among our most important responsibilities. We've identified many of the current trends in mobile, social media, video, and emerging markets like China very early and have executed accordingly.

You often hear us say we will build, partner, and buy. What does that really mean in practice? We will build where we see opportunities to provide new and differentiated services to our users as with the extremely popular **Yahoo!** Answers and with our recent investments in improving the usability of and user engagement on our home page, **Yahoo.**com, the most visited single page eon the internet.

We will partner as we have recently with global leaders like Aser, Hewlett Packard and eBay to expand distribution of **Yahoo!** services and leverage our expertise in advertising, and we will buy where we see mutual benefits as with Flickr where we saw an emerging community that would benefit from **Yahoo!**'s distribution as they brought us exceptional technology, people, and vision that continues to enhance other **Yahoo!** services. In fact, over the last five years, we've made over 30 acquisitions valued at around 5.5 billion, some large and very substantial like our billion dollar investment in Alibaba net last year, and some relatively small that brought unique technologies and people.

Whether small or large, the common characteristic is that they all leverage our existing position and assets at prices that were well considered and when we see opportunities to deploy our strong free cash flow into our own shares, we will be aggressive about that when appropriate. We're not standing still, we are and we will remain very focussed on making the best and most profitable use of our balance sheet and our healthy free cash flow allocating capital in a strategic and disciplined way that we believe will generate appropriately strong returns for our employees, users, partners and for our shareholders and with that I'd like to turn it back to Terry.

TERRY SEMEL: Thanks, Sue.

With the landscape changing, I am personally very, very excited about the opportunities for **Yahoo!** on a go forward basis, so again, I just want to thank all of our employees throughout the world. I think we have enormous opportunity up ahead and I'm very, very excited about it.

And with that, I'd like to turn to you all for questions.

OPERATOR: Thank you.

[OPERATOR INSTRUCTIONS]

Q3 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 17, 2006 Tuesday

The first question comes from Youssef Squali from Jefferies & Company, please go ahead.

YOUSSEF SQUALI, ANALYST, JEFFERIES & CO.: Thank you very much.

Terry, just to clarify something you said, when you announced the launch of Panama, you said it's now live, you're still talking about the front-end, meaning that the marketplace design or the new rank in algorithm is still slated in Q1. Do you have a date for that for us?

And second, you had mentioned some weakness or softness in the auto and finance verticals at a conference several weeks ago, I was wondering if you could just expand on that a little bit and two weeks into the quarter, what are we seeing, are we seeing any improvement there? Thank you very much.

TERRY SEMEL: Okay, hi, it's Terry, I'll start with the first one and that's the Panama question. I said it precisely the way it was said in the past, we have achieved exactly what we set out to achieve and that is, you're absolutely right with the front-end going as of today, and basically marketplace design in the first quarter. That's how it's been said all along and that's how we're going to continue to say it and I feel very, very good about our capabilities and the people behind the steering wheel.

In terms of the advertising comments, I'm going to ask Dan to comment.

DAN ROSENSWEIG, COO, **YAHOO,** INC.: Sure, Youssef, this is Dan. We mentioned a few categories that were dealing with sort of issues around their own categories. Mostly what we saw is a couple of our large advertisers who had company specific issues, as I think Terry and Sue addressed in their comments. So there's a few categories that will continue to be a little bit slow and there are other categories that are continuing to grow quite nicely. I think that's a balance we're going to see regularly as we get larger and larger in this space, but mostly the issues were around companies who were having specific issues to them.

OPERATOR: Your next question comes from Mark Mahaney from Citigroup, please go ahead.

MARK MAHANEY, ANALYST, CITIGROUP: Thank you very much. I think, Terry, you mentioned the market going through transition with new forms of ad inventory available. Could you help us think through or quantify the level of exposure you have to the non-premium ad inventory? In other words, what percentage of your display advertising do you think is facing greater competition from these new types of inventory? Thank you.

DAN ROSENSWEIG: This is, Mark, this is Dan. I think what we're referring to is you see a whole proliferation of a lot of inventory in the lower end of the non-premium range, a lot of the social media stuff, a lot of the network stuff that's being created, a lot of the ad networks are able to serve it.

That's really focused on the low end of the people who are not interested in the environments that they're in, they're simply interested in a specific performance ratio. We think that our premium side is actually extremely well protected and doing very well because that guarantees time, location, environments, specific kinds of formats, rich media formats, video formats, so we think that's actually in very, very good shape.

Q3 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 17, 2006 Tuesday

We think with our investment in Right Media today is an example of how we can invest in capabilities and technology to actually take advantage of that part of the marketplace. So, it is more we think that there is an opportunity in the future for us to leverage that part of the marketplace along with the things that we've currently been doing.

OPERATOR: The next question comes from Imran Kahn from J.P. Morgan, please go ahead.

IMRAN KHAN, ANALYST, JPMORGAN CHASE & CO.: Yes, hi, a couple of questions. I was trying to get better sense as you going live with project Panama, can you give us some quantitative color, like what kind of RPU improvement we might see from that project, is it going to right away or is it going to take time?

Any color would be appreciated, and secondly, Terry, you and I talked in the past in terms of how you consider eBay's inventory as a premium inventory. Can you give us some sense like eBay's inventory coming into the marketplace and some of the other sites actually trying to manage like Amazon or Monster, what does that mean for your premium inventory yield? Thanks.

SUSAN DECKER: Okay, Imran, this is Sue. I am going to take the first question on Panama.

Just to review, we've launched the system, the front-end where the advertiser facing component is now launched in the fourth quarter. Terry reiterated that we would launch the marketplace design feature in the first quarter of next year and what we have said historically and continue to think is the case is that we would not expect a financial impact for at least a quarter after that.

The U.S. would be launching the marketplace design in the first quarter of next year. We would begin it see a financial impact we believe in Q2 and that that would build over time as the system and machine learns and also as we roll out to other international countries later in 2007.

DAN ROSENSWEIG: On the question of new inventory to the marketplace, eBay's inventory and perhaps others, we think that more premium inventory in the marketplace will actually be very helpful depending on the categories that they come into because it will help attract larger amounts of the big branding dollars to the internet. In the case of eBay a lot of it will do with the retail category and the shopping category and for us because we're going to serve those ads, we think it is tremendous opportunity for to us extend the buys of some of our largest marketers in that category.

I am not sure that every category or every piece of inventory on some of the name brands that you might talk about will do as well, but eBay is a very targeted environment. Our ad technology, our targeting capability and our ability to service part of the network we think will result in great results for them and for us.

OPERATOR: The next question comes from Anthony Noto from Goldman Sachs, please go ahead.

ANTHONY NOTO, ANALYST, GOLDMAN SACHS: Thank you, Sue, the reported page number you quoted was up 24% year-over-year which is a significant deceleration from 33% year-over-year in June. I was wondering if you can comment specifically on that trend and as you think about your guidance going into the fourth quarter

Q3 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 17, 2006 Tuesday

and you talked about the component for search being up mid-single digits, what
do you think the page view growth and therefore graphical advertising growth
will be? Thanks.

SUSAN DECKER: Sure. Thanks, Anthony. I am going to start with your page view
question.

I think I want to take you back to Q2 when we had the incremental
contribution of FIFA, and I think we broke out that if you took the true average
in the quarter and ex-FIFA, our page view growth in Q2 was around 27%, 28%. So
this growth--and we also said that we thought that was a bit of an anomaly at
28%. If you go back two or three quarters before that, the growth rates have all
been in this sort of 24% range and even that number we think is very high on the
enormous base we have at 4 billion per day.

So we're very pleased with the overall page view numbers and think they're
consistent with our historical pattern with the one anomaly of Q2 that we
identified last quarter. In terms of looking forward on sponsored search, I
don't think we want to get into forecasting what the page views would be, but it
is fair to say that we think the growth in our sponsored search business in Q4
will all come from volume. We don't expect any contribution from improving RPS
until Panama is out and running.

OPERATOR: The next question comes from Jordan Rohan from RBC Capital Markets,
please go ahead.

JORDAN ROHAN, ANALYST, RBC CAPITAL MARKETS / DAIN RAUSCHER: Sue, the lower
end of the guided range for EBITDA for 4Q would imply a decline in margins on
some growth in revenues. How is that really possible? Are there any big
affiliate deals that have the potential to be renegotiated higher in terms of
traffic costs, or any big display ad renewals that can work against to you make
that reality or is there just a fair amount of conservatism built into that
estimate on the lower end? Thank you.

SUSAN DECKER: Thank you, Jordan. We put out a range that represents what we
think is the best--our best outlook right now based on all of the trends that we
identified on the top line we are expecting in that outlook roughly 20% of
global marketing services growth on a X search basis and search sort of in the
mid-single digits.

That's a lower growth rate than what we were originally anticipating, and on
the margin side that we are--believe we can generate 41% to 43% margins is
really a testament of how profitable we are and that we've been able to adjust
in our cost base. We've been saying that all year that we didn't expect a lot of
sequential growth in our costs. I think you saw that in this quarter and you
expect to see that in the fourth quarter as well because there is a lot of front
end loaded investment.

OPERATOR: The next question comes from Mark Rowan from Prudential, please go
ahead.

MARK ROWEN, ANALYST, PRUDENTIAL EQUITY GROUP, LLC: Thanks. A couple of
questions.

Number one, a follow-up on that sector question on autos and financials. You
said it was those two sectors when you initially said you would come in at the

Q3 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 17, 2006 Tuesday

lower end, but is your reduced guidance for the fourth quarter today, is that basically due to those two sectors or has that started to spread to other sectors, that slowdown that you began to see in those two sectors?

And then secondly, could you give us a sense, we've been talking about Panama for a long time and waiting for a long time. Can you just give us a sense from your test results, are the RPS improvements that you're seeing in those test results as significant as you expected or more significant if you could help us there, that would be great? Thanks.

SUSAN DECKER: Okay, let me get started with your first question. We did say that we had seen some weakness in September in those two categories. Those sectors were meant as examples. They are having some industry specific issues in both cases.

We have seen a couple of--several of the various sectors showing some of that, but we think those are specific to those sectors, and we do think those will continue into Q4. We also mentioned in Terry's script that we factored into our guidance was a second issue which is that there are more alternatives out there, there is more inventory available on the low cost side, and we want to make sure that we are in a position to really actually take advantage of that opportunity, so we think there is two factors affecting our guidance. The first was the one you mentioned and also the second is the more alternatives.

On the second point, it is really too early to tell anything about RPS in testing. We've had a lot of good testing with the client on the frond end, and we've had enormously good feedback about ease of use and incremental capabilities and functionality, but the real RPS benefit of Panama would come after marketplace design and that's a quite difficult thing to test second order effects until you're out in the marketplace.

OPERATOR: The next question comes from Gordon Hodge from Thomas Weisel Partners, please go ahead.

GORDON HODGE, ANALYST, THOMAS WEISEL PARTNERS: Good afternoon. Just a question on Panama. The change in the front end system does it allow for more flexibility on pricing? I think your minimum click rate is around $0.10 and I think Google is $0.05 or thereabouts. I'm just wondering if you will have more flexibility--offer more flexibility to the marketplace there and then lastly on mobile, we're pretty excited about that opportunity but just a little curious as to how we should be thinking about the revenue opportunity there in terms of working with the carriers? Thanks.

DAN ROSENSWEIG: This is Dan, on the Panama question, yes. We've been working as you know with a cumbersome system. We haven't had the ability to do that at all. Panama addresses a number of things on the front end side which is getting in faster, being able to list more listings, be able to buy more keywords, more recommendations and we'll have a more dynamic pricing capability, so the answer is yes to that. We think that will have an effect on our overall business as Panama begins to roll out.

On the mobile side, the way we would suggest you look at it is the way we look at it which is mobile side is much like the early days of the internet which is, it's how do we establish a beachhead in terms of audience side, audience engagement and by having the relationships we have with carriers, but having the relationships we have with the device manufacturers, we think we're

Q3 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 17, 2006 Tuesday

in an absolute leadership position here because of the quality of our product, the size of our audience and people's desire to take **Yahoo!** with them to these places, and as Terry mentioned on the call we're not focusing just on taking **Yahoo!** with you, we're focusing on the mobile first customer.

The mobile first customer is somebody whose entire internet experience, maybe they've started on mobile or moved to mobile, and that is on a global basis so we think there's a great opportunity, but the first period of time is going to be about acquiring audience, and then the monetization opportunities will become to be in effect. We're testing a few on the advertising now. We're testing a few with carriers on relationships of premium capabilities, but that's going to be out in the future.

TERRY SEMEL: Hi. Terry, I'm just going to add a few words to that. We're very excited about it. I think Dan pointed out all the highlight reasons and all the reasons why we should be excited. He also mentioned in the tail end that we have started testing various approaches to monetization.

Of course both the carriers and a company like **Yahoo!** will be very interested in that as we go forward but with a huge amount of population throughout the world, some people say as many as 85% in the emerging markets of the audience is not coming from PCs to mobile devices but rather going to mobile devices to get to the internet. That to us is such a large target and such an enormous audience, that while we're working on testing different ideas and methods of monetization, as Dan mentioned, our first priority has been for the last year or more and will continue to be for the next year or two is really build large audiences, having the capabilities of using **Yahoo!** products and **Yahoo!** things that they have been using on their PCs as well.

OPERATOR: The next question comes from Jeetil Patel from Deutsche Bank Securities, please go ahead.

JEETIL PATEL, ANALYST, DEUTSCHE BANK: Two questions, first of all, as you look forward and you talked about the advertising inventory, but can you give us a sense of maybe what more inventory in the marketplace from the likes of My Space or You Tube could have? Is that something you look at and say how do we adjust pricing or what kind of impact do you envision from more inventory coming on from those types of companies in the category?

Second, I think last quarter you talked about cleaning up the search affiliate network a bit. Can you give us an update on where you stand on that at this point? Thanks.

DAN ROSENSWEIG: Jeetil, this is Dan. I will talk about the inventory glut, and it is definitely been a huge change you can see from the page views of a lot of the social media sites that exist today. That is going to change the market dynamics.

What we hope is that it is going to bring in whole new categories of advertisers who have been focused mostly on the search side to be able to bring them to the other side of the kinds of advertising that it's capable. From our standpoint, we want to be able to take advantage of that marketplace.

We think we can continue to build our premium environments by continuing to have the highest rate of growth, the highest targeting, most engaged audiences, but there are many new players and their alternatives in the markets so what we

Q3 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 17, 2006 Tuesday

have to do is continue to adjust and evolve to take advantage of those and to build packaging that marketers can't get elsewhere, and so from our standpoint, we are going to move ahead as the market leader and better position ourselves to take advantage of this new inventory and this new market opportunity. We have products like Answers, we have products like Flickr that are not yet really monetized right now.

We have assets that nobody else has, and we plan to leverage those assets so those assets are not only the quality of our audience which I think is debatable in some of these other environments but our targeting capability of not only the environments that they're in but our profiles of being able to know who they are and that's why our large registered audience base which continue to grow is becoming so important. That user data about who they are and what they've done and to be able to put ads in different formats and different kinds of buying capabilities into the contextually relevant environment and of course we do have we believe the world's best sales team who has the best relationships to be able to shepherd the large marketers into this marketplace.

I think there's going to be a glut for a while, I think there will be a transition for a while, but I think in the end our assets and our leadership will ultimately help us take the greatest amount of advantage of that opportunity.

SUSAN DECKER: Great. Let me, Jeetil, take the second question and I'm going to broaden it a little bit because we did take the opportunity last quarter to talk about quality of traffic, and we talked about that both as it relates to graphical which we see as one of our wonderful strengths historically that's led to our leadership position and also as it relates to our search offering.

We took the opportunity in the quarter to talk about the importance of eBay which brought very high quality or will bring very high quality both search and graphical inventory. We also took the opportunity to talk about the settlement that we had on Click Span which was very, very favorable compared to our competitor, and third, we mentioned that we have an ongoing effort to clean up traffic quality.

We hold our affiliate to say extraordinarily high standards in terms of conversion rates, and we last quarter and in quarters before that and ongoing will continue to clean up that quality because we think that's what delivers the highest quality inventory to our advertisers.

OPERATOR: The next question comes from Paul Keung from CIBC World Markets, please go ahead.

PAUL KEUNG, ANALYST, CIBC WORLD MARKETS: Thank you, Terry, Sue, Dan, Marta. First question, you mentioned one of the top priorities next year is to close the gap on monetization, meanwhile, Sue, I think you mentioned fourth quarter outlook is largely a function of volume if little if any improvement in monetization.

I was wondering when you look at where your business is today and what you're trying to accomplish with Panama the early part of next year where has the relative search monetization growth been growing in the marketplace and specifically how is that gap been really changing over this quarter--last quarter and this quarter?

Q3 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 17, 2006 Tuesday

SUSAN DECKER: Sure. Let me try to take that. I think that the objective that Terry outlined is to narrow that gap in the future which would be post Panama. I think we've been pretty open and transparent for the last 18 months that that was a priority of the Company and that we were working on a system to do that.

We don't expect to have any real improvement in that until the system is fully launched in the U.S. and has the marketplace design feature fully launched which would be in Q1, and so therefore Q2 of next year would be the soonest we would expect that. We do think there is an enormous opportunity for us in this and as the market gets bigger and our queries hold, that makes the upside be even greater down the road.

In terms of the current environment, I think I mentioned in my script that our RPS in search was off modestly year-over-year in the quarter, and I think in response to Anthony's question I said I didn't expect any improvement in that in the fourth quarter. We would expect our gains in search to be driven primarily by query volume which is done very, very well, so this is something that we expect in the future. We're ready to launch the system. And as it is out for awhile, we would expect the monetary benefits to accrue.

TERRY SEMEL: How about we take the next two?

OPERATOR: Thank you. The next question comes from Safa Rashtchy from Piper Jaffray, please go ahead.

SAFA RASHTCHY, ANALYST, PIPER JAFFRAY & CO.: Good afternoon, and thank you. Sue, and everyone else, could you talk a little bit more about the dynamics that are driving rather low search growth for you in Q4? I understand obviously there is the Microsoft comparison, but that couldn't possibly account for all of this.

I believe you mentioned low single digits or high single digits I should say and that seems from what we see significantly below the industry, and I know, Sue, you just mentioned that you don't expect RPS to go up, still the traffic volume that we see suggests that it should be a lot more than that, so I am wondering if there are other factors involved, maybe the involvement in Panama or other factors that might decrease your volume or are you just believing that this is the trend that the market place is seeing as well?

SUSAN DECKER: So, sure, let me talk about the fourth quarter. We said that we expected search on a global basis to grow about--up 5%. That is the way--that's what we expect taking into account no real improvement in RPS. The volume gains that we are seeing which I think you have the external numbers on those from ComScore and others is proxies.

We do have the MSN issue and then we did divest China a year ago, so all of those play a role. I think I said that our overall revenue growth, not just search, but overall in Q3--in Q4 would be hurt by 300 basis points from those two factors, MSN and China and then it would have a more dramatic impact if you just applied it to search alone.

Those are the factors. We think that that's relatively consistent with the trend line we've seen this year, it's a little slower than what we saw in the quarter, but relatively consistent with the trend line.

TERRY SEMEL: Last question.

Q3 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 17, 2006 Tuesday

OPERATOR: The final question comes from Justin Post from Merrill Lynch, please go ahead.

JUSTIN POST, ANALYST, MERRILL LYNCH: Thanks for taking my question. Could you clarify your comments on branded growth going to the industry? Is it there now or is that something you see trending over the next couple quarters for your top 200 advertiser and then kind of on a resource allocation, once you get Panama up and running in the first half of next year, is that going to free up a lot of engineering resources that you can use into other areas to help drive growth in other areas?

SUSAN DECKER: Okay, so let me start with the branded growth top 200. We saw growth in this quarter between 30% and 35% which is a little slower than what we had last quarter which was 35% to 40%. As we move forward we are trying to take into account the two factors that we mentioned to you that led us to believe that those early year growth rates which were extraordinary where we had very, very significant market share gains probably weren't sustainable in the back half of the year, those two factors were some account specific factors and industry related pressures as well as the more alternatives with inventory.

Our comments were we don't really know what others were going to grow in the fourth quarter, but the gap between our growth rate and the market growth rate has narrowed a bit. We still think in Q3 we outperformed it in graphical and time will tell what will happen in the fourth quarter.

That was meant to be a relatively short-term phenomenon as we work through this industry transition and on the other side we expect ourselves to be even stronger and more competitive. In terms of engineering resources, it is too early to talk about that. I am going to--in terms of how it might affect guidance because we don't have an '07 number out there, but with that I will turn it to Dan for a moment.

DAN ROSENSWEIG: On the engineering resources side, on the engineers and the team that's been on Panama. First of all they've done an absolutely heroic effort in the last bunch of months. You have to remember this the team that wasn't originally built it, this is the team that came in to build it, and I think you're going to be very pleased with the results.

Panama needs to continue to develop over a period of time as you know we're rolling it out starting this quarter, marketplace design is going to be next quarter, then international, so this team is going to continue to be very busy for a period of time, but ultimately what they've been building is extensible to many different things that we have in our strategy for the future of advertising.

I think that's going to be important, and ultimately they will be able to be freed up to invest in other areas of growth. So I think we're very good shape on how we plan to sequence that.

TERRY SEMEL: So on that thought, it's Terry again, I just add a touch to what Dan just said. Yes, obviously at different incremental times during next year we expect to have some resources dedicated back for other important needs of the Company. We're excited about that, and I just want to thank you all for joining us today and have a good day. Thank you.

OPERATOR: This concludes the **Yahoo!** third quarter 2006 earnings conference

Q3 2006 Yahoo, Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire
October 17, 2006 Tuesday

call. Thank you for your participation. You may all disconnect at this time.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

**LOAD-DATE:** October 25, 2006

Exhibit 34

**EARNINGS**

## CREDIT SUISSE | FIRST BOSTON
Equity Research United States

# Yahoo Inc.
**YHOO**

# Solid Q3 Results

**Yahoo reported results for Q3 above our estimates, consensus and management guidance.** Net Revenue was $932M (+42% y/y), above consensus of $918 and our estimate of $926M on stronger than expected Fees revenue and growth in the Marketing services business.  EBITDA was $385M, also above our estimate of $380M and consensus of $379M.  GAAP EPS of $0.17, which included the sale of $16M in investments ($0.01/share) and favorable tax credits, was ahead of our consensus-matching forecast of $0.14.

**Marketing services revenue grew 6.3% sequentially, with branded and search contributing equally according to mgmt.** Total traffic acquisition costs increased 5% sequentially to 34.3% of gross Marketing Services revenue, down 20 bps from last quarter.  Fee based revenue growth accelerated in the quarter to +55% y/y compared to +45% in Q2, on strong performance in the Fantasy Sports and Music businesses as well as the addition of the Verizon relationship.  During the quarter, the company added 1.3M paying subscribers to reach 11.4M.  Overall, organic revenue growth was +40% y/y in the quarter, down slightly from 41% in Q2.

**Management updated its guidance for Q4 and provided initial guidance for FY'06.**  For Q4, Yahoo expects net revenue of $1,032M - $1,082M and EBITDA in the range of $452M to $482M.  For FY'05, the company now expects revenue of $3,660M to $3,710M, compared to previous guidance of $3,600M to $3,700M and EBITDA of $1,550M - $1,580M up from $1,515M - $1,575M.  Our forward estimates are unchanged, however we believe there could be considerable upside to these estimates if Yahoo is successful in closing the monetization gap in its search business.

**Yahoo's results have positive implications for Google's report on Thursday.**  Based on Yahoo's search growth, the share gains reported by Comscore, and our expectations for improvements in monetization, we believe Google should report sequential revenue growth of 10% or higher depending on the degree of improvement in monetization.  We believe that at current levels that result would be a positive catalyst for shares of GOOG.  That said, we continue to believe that there is significant upside in owning YHOO, particularly as the company's efforts to better monetize search begin to show through on the income statement.

**research team**

**Heath P. Terry**
Research Analyst
212 538 0594
heath.terry@csfb.com

**Andrew Thomas**
Associate Analyst
212 538 0868
andrew.thomas@csfb.com

**Rachana Iyengar**
Research Associate
212 325 2442
rachana.iyengar@csfb.com

| Rating | **OUTPERFORM\*** |
|---|---|
| Price (18 Oct 05) | **33.70 (US$)** |
| Target price (12 months) | **45.00 (US$)** |
| 52 week high - low | **39.14 - 30.87** |
| Market cap. (US$m) | **50,108.53** |
| Region / Country | **Americas / United States** |
| Sector | **Consumer Internet** |
| Analyst's Coverage Universe | **Consumer Internet** |
| Weighting (vs. broad market) | **OVERWEIGHT** |
| Date | **18 October 2005** |

*\* Stock ratings are relative to the coverage universe in each analyst's or each team's respective sector.*



**Price / Indexed S&P 500**
Daily Oct.18, 2004 - Oct 17, 2005, 10/18/04 = US$35.3

On 10/17/05 the S&P 500 index closed at 1,178.14

| Year | 12/04A | 12/05E | 12/06E |
|---|---|---|---|
| EPS (CSFB adj., US$) | 0.36 | 0.58 | 0.77 |
| Prev. EPS (US$) | | 0.56 | |
| P/E (x) | 93.6 | 58.1 | 43.8 |
| P/E rel. (%) | 524.3 | 367.1 | 287.6 |
| Q1 EPS | 0.07 | 0.13 | |
| Q2 | 0.08 | 0.13 | |
| Q3 | 0.17 | 0.16 | |
| Q4 | 0.25 | 0.16 | |

| Number of shares (m) | | Price/Sales (x) | |
|---|---|---|---|
| | 1,486.9 | | 19.3 |
| BV/Share (Current, US$m) | | P/BVPS (x) | |
| | 5.04 | | 6.7 |
| Net Debt (Current, US$m) | | Dividend (12/04A, US$m) | |
| | -2,433.7 | | — |
| | | Dividend yield | |
| | — | | — |

| Year | 12/04A | 12/05E | 12/06E |
|---|---|---|---|
| Revenues  (US$m) | 2,589.8 | 3,699.7 | 4,983.3 |
| EBITDA  (US$m) | 1,022.0 | 1,575.6 | 2,178.3 |
| OCFPS (US$) | 0.75 | 1.24 | 1.14 |
| P/OCF (x) | 50.5 | 27.2 | 29.6 |

Source: Company data, CREDIT SUISSE FIRST BOSTON (CSFB) estimates

**IMPORTANT DISCLOSURES AND ANALYST CERTIFICATIONS ARE IN THE DISCLOSURE APPENDIX.** U.S. Disclosure: CSFB does and seeks to do business with companies covered in its research reports.  As a result, investors should be aware that the Firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.  Customers of CSFB in the United States can receive independent, third party research on the company or companies covered in this report, at no cost to them, where such research is available.  Customers can access this independent research at www.csfb.com/ir or call 1 877 291 2683 or email equity.research@csfb.com to request a copy of this research.

# Investment Summary

Yahoo reported results for Q3 above our estimates, consensus and management guidance.

Net Revenue was $932M (+42% y/y), above consensus of $918 and our estimate of $926M on stronger than expected Fees revenue and growth in the Marketing services business.  EBITDA was $385M, also above our estimate of $380M and consensus of $379M.  GAAP EPS of $0.17, which included the sale of $16M in investments ($0.01/share) and favorable tax credits, was ahead of our consensus-matching forecast of $0.14.  FCF per share was $0.23, compared to Q3'04 FCF per share of $0.14.

Excluding TAC, Marketing services revenue grew 6% sequentially (+40% y/y), while fee-based revenue increased 7% sequentially (+55% y/y).

Domestic net revenue in Q3 was $704M (+40% y/y), up 7% q/q, and 75% of total net revenues.  International net revenue grew 6% sequentially to $228M (+50% y/y).  US EBITDA margins declined from 44.1% of US revenues in Q2 to 43.5% of US net revenues.  International EBITDA margins declined from 35.9% in Q2 to 34.6% this quarter.

Marketing services revenue grew 6.3% sequentially, with branded and search contributing equally according to mgmt. Total traffic acquisition costs increased 5% sequentially to 34.3% of gross Marketing Services revenue, down 20 bps from last quarter.  Fee based revenue growth accelerated in the quarter to +55% y/y compared to +45% in Q2, on strong performance in the Fantasy Sports and Music businesses as well as the addition of the Verizon relationship.  During the quarter, the company added 1.3M paying subscribers to reach 11.4M.  Overall, organic revenue growth was +40% y/y in the quarter, down slightly from 41% in Q2.

Reported gross margins of 86.9% were below our estimate of 87.6%, and the company's operating margin of 29.0% operating margin was also below our estimated 29.1%.

### Management Guidance

Management updated its guidance for Q4 and provided initial guidance for FY'06.  For Q4, Yahoo expects net revenue of $1,032M - $1,082M and EBITDA in the range of $452M to $482M.  For FY'05, the company now expects revenue of $3,660M to $3,710M, compared to previous guidance of $3,600M to $3,700M and  EBITDA of $1,550M - $1,580M up from $1,515M - $1,575M.

### Changes to the Model

Our forward estimates are unchanged, however we believe there could be considerable upside to these estimates if Yahoo is successful in closing the monetization gap in its search business.

### Investment Thesis

We continue to believe that Yahoo represents one of the better risk/reward propositions in the internet space.  With stock trading at 19.0x 06 EV/EBITDA, versus and EBITDA growth rate over the next few years in excess of 30%, we believe that valuation is

**CREDIT SUISSE** | FIRST BOSTON

compelling.  With the internet space entering into the seasonally strongest part of the year and the potential catalyst of monetization improvement ahead we believe shares of Yahoo should significantly outperform over the next 6-12 months.  Therefore, we are maintaining our rating and price target.

**CREDIT SUISSE** | FIRST BOSTON

**Exhibit 1: YHOO: Income Statement**

*US$ in millions, unless otherwise stated*

| FY-DEC — Last Updated: 7/19/05 | 2002 | 2003 | 2004 Q1 | 2004 Q2 | 2004 Q3 | 2004 Q4 | 2004 | 2005 Q1 | 2005 Q2 | 2005 Q3 | 2005 Q4E | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GROSS REVENUE | 953.07 | 1,625.10 | 747.91 | 832.30 | 906.72 | 1,077.72 | 3,564.64 | 1,173.74 | 1,253.00 | 1,329.93 | 1,496.26 | 5,252.93 | 6,914.20 |
| Y/Y growth | 32.8% | 70.5% | 164.3% | 159.0% | 154.1% | 62.3% | 119.3% | 56.9% | 50.5% | 46.7% | 38.8% | 47.4% | 31.6% |
| Traffic Acquisition Cost | - | 152.58 | 207.64 | 223.16 | 251.31 | 292.71 | 974.81 | 352.99 | 377.89 | 397.81 | 424.51 | 1,553.20 | 1,930.95 |
| % of Net Marketing Services Revenue | | 13.0% | 46.4% | 44.7% | 46.1% | 45.0% | 45.5% | 52.5% | 52.7% | 52.2% | 48.9% | 51.5% | 47.5% |
| NET REVENUE | 953.07 | 1,472.51 | 540.27 | 609.14 | 655.40 | 785.01 | 2,589.83 | 820.76 | 875.11 | 932.12 | 1,071.75 | 3,699.73 | 4,983.25 |
| Y/Y growth | 32.8% | 54.5% | 90.9% | 89.5% | 83.7% | 53.5% | 75.9% | 51.9% | 43.7% | 42.2% | 36.5% | 42.9% | 34.7% |
| Marketing Services | 745.13 | 1,169.36 | 447.53 | 499.55 | 545.25 | 650.20 | 2,142.54 | 671.81 | 716.42 | 761.76 | 868.12 | 3,018.10 | 4,065.15 |
| Y/Y growth | 24.5% | 56.9% | 105.2% | 99.5% | 97.6% | 53.0% | 83.2% | 50.1% | 43.4% | 39.7% | 33.5% | 40.9% | 34.7% |
| Fees | 207.94 | 303.16 | 92.74 | 109.59 | 110.15 | 134.81 | 447.29 | 148.95 | 158.70 | 170.36 | 203.63 | 681.63 | 918.10 |
| Y/Y growth | 74.6% | 45.8% | 43.0% | 54.4% | 36.1% | 56.0% | 47.5% | 60.6% | 44.8% | 54.7% | 51.1% | 52.4% | 34.7% |
| Other Cost of Revenue | 162.88 | 205.52 | 74.07 | 74.23 | 81.02 | 94.43 | 323.75 | 100.31 | 108.01 | 122.42 | 128.61 | 459.36 | 597.99 |
| % of sales | 17.1% | 14.0% | 13.7% | 12.2% | 12.4% | 12.0% | 12.5% | 12.2% | 12.3% | 13.1% | 12.0% | 12.4% | 12.0% |
| GROSS PROFIT | 790.19 | 1,266.99 | 466.20 | 534.92 | 574.38 | 690.58 | 2,266.08 | 720.45 | 767.10 | 809.69 | 943.14 | 3,240.38 | 4,385.26 |
| Gross Margin | 82.9% | 86.0% | 86.3% | 87.8% | 87.6% | 88.0% | 87.5% | 87.8% | 87.7% | 86.9% | 88.0% | 87.6% | 88.0% |
| Sales & Marketing | 429.97 | 530.61 | 166.30 | 191.88 | 192.95 | 226.91 | 778.03 | 230.52 | 246.41 | 265.71 | 288.30 | 1,030.94 | 1,340.50 |
| % of sales | 45.1% | 36.0% | 30.8% | 31.5% | 29.4% | 28.9% | 30.0% | 28.1% | 28.2% | 28.5% | 26.9% | 27.9% | 26.9% |
| Product Development | 141.77 | 207.29 | 76.99 | 87.14 | 97.03 | 107.60 | 368.76 | 119.35 | 125.54 | 141.62 | 143.61 | 530.12 | 697.66 |
| Y/Y growth | | 46.2% | 11.5% | 15.9% | 103.5% | 37.8% | 77.9% | 55.0% | 44.1% | 45.9% | 33.5% | 43.8% | 31.6% |
| % of sales | 14.9% | 14.1% | 14.3% | 14.3% | 14.8% | 13.7% | 14.2% | 14.5% | 14.3% | 15.2% | 13.4% | 14.3% | 14.0% |
| General & Administrative | 100.68 | 157.03 | 57.56 | 63.16 | 69.22 | 72.67 | 262.60 | 73.55 | 81.43 | 77.73 | 101.82 | 334.52 | 453.48 |
| % of sales | 10.6% | 10.7% | 10.7% | 10.4% | 10.6% | 9.3% | 10.1% | 9.0% | 9.3% | 8.3% | 9.5% | 9.0% | 9.1% |
| Y/Y growth | 26.9% | 56.0% | 101.0% | 86.1% | 74.7% | 32.5% | 67.2% | 27.8% | 28.9% | 12.3% | 40.1% | 27.4% | 35.6% |
| EBITDA | 205.98 | 477.38 | 201.04 | 234.06 | 259.70 | 327.23 | 1,022.04 | 345.00 | 368.44 | 385.12 | 476.98 | 1,575.60 | 2,178.27 |
| % of sales | 21.6% | 32.4% | 37.2% | 38.4% | 39.6% | 41.7% | 39.5% | 42.0% | 42.1% | 41.3% | 44.5% | 42.6% | 43.7% |
| Amortization of Intangibles | 21.19 | 54.37 | 30.51 | 36.11 | 36.97 | 42.11 | 145.70 | 40.20 | 41.41 | 41.05 | 46.53 | 169.19 | 203.03 |
| Stock Comp expense | 8.40 | 22.03 | 12.57 | 7.14 | 6.11 | 6.47 | 32.29 | 9.47 | 10.95 | 13.52 | 12.41 | 46.35 | 50.98 |
| Total Operating Expenses | 702.00 | 971.33 | 343.92 | 385.42 | 402.28 | 455.75 | 1,587.38 | 473.08 | 505.74 | 539.63 | 592.67 | 2,111.13 | 2,745.64 |
| OPERATING PROFIT | 88.19 | 295.67 | 122.28 | 149.49 | 172.11 | 234.83 | 678.70 | 247.36 | 261.36 | 270.06 | 350.47 | 1,129.25 | 1,639.62 |
| Operating Margin | 9.3% | 20.1% | 22.6% | 24.5% | 26.3% | 29.9% | 26.2% | 30.1% | 29.9% | 29.0% | 32.7% | 30.5% | 32.9% |
| Other Income, net | 69.29 | 47.51 | 14.38 | 13.18 | 123.28 | 345.61 | 496.44 | 49.99 | 979.74 | 66.00 | 345.00 | 1,440.73 | 153.21 |
| Depreciation | 88.20 | 105.31 | 35.68 | 41.32 | 44.52 | 43.83 | 165.35 | 48.03 | 54.72 | 60.49 | 67.57 | 230.82 | 264.63 |
| PRETAX INCOME | 157.47 | 343.17 | 136.66 | 162.67 | 295.39 | 580.43 | 1,175.15 | 297.36 | 1,241.09 | 336.05 | 695.47 | 2,569.97 | 1,776.60 |
| Income Tax Provision | 71.29 | 147.02 | 60.86 | 72.52 | 67.12 | 233.62 | 434.11 | 120.43 | 515.86 | 113.80 | 297.66 | 1,047.75 | 719.52 |
| Tax Rate | 45.3% | 42.8% | 44.5% | 44.6% | 22.7% | 40.2% | 36.9% | 40.5% | 41.6% | 33.9% | 42.8% | 40.8% | 40.5% |
| Earnings in equity interests | 22.30 | 47.65 | 19.87 | 24.11 | 25.70 | 25.32 | 94.99 | 29.38 | 33.11 | 32.16 | 34.36 | 129.01 | 148.36 |
| Minority Interest In JV | (1.55) | (5.92) | (0.48) | (1.75) | (0.66) | 0.40 | (2.50) | (1.74) | (3.65) | (0.65) | (3.30) | (9.34) | (11.38) |
| Cumulative effect of accounting change | (64.12) | | | | | | | | | | | | |
| Restructuring charge | | | | | | | | | | | | | |
| NET INCOME | 106.93 | 237.88 | 95.19 | 112.51 | 253.31 | 372.52 | 833.53 | 204.56 | 754.69 | 253.77 | 428.87 | 1,641.89 | 1,194.05 |
| Net margin | 11.2% | 16.2% | 17.6% | 18.5% | 38.6% | 47.5% | 32.2% | 24.9% | 86.2% | 27.2% | 40.0% | 44.4% | 24.0% |
| Normalized EPS | 0.09 | 0.19 | 0.07 | 0.08 | 0.09 | 0.13 | 0.36 | 0.13 | 0.13 | 0.16 | 0.16 | 0.58 | 0.77 |
| GAAP EPS | 0.04 | 0.19 | 0.07 | 0.08 | 0.17 | 0.25 | 0.57 | 0.14 | 0.51 | 0.17 | 0.29 | 1.11 | 0.77 |
| Y/Y growth | -209.1% | 111.4% | 76.0% | 92.0% | 65.9% | 130.0% | 92.2% | 92.1% | 66.4% | 88.0% | 28.4% | 62.8% | -30.1% |
| Shares Outstanding (Fully Diluted) | 1,220 | 1,284 | 1,427 | 1,450 | 1,459 | 1,475 | 1,452 | 1,478 | 1,484 | 1,487 | 1,493 | 1,485 | 1,545 |

*Source: Company data, CSFB estimates*

CREDIT SUISSE | FIRST BOSTON

Yahoo Inc.

18 October 2005

5

**CREDIT** | FIRST
**SUISSE** | BOSTON

**Companies Mentioned**  *(Price as of 17 Oct 05)*
Google, Inc. (GOOG, $305.00, OUTPERFORM, TP $375.00, OVERWEIGHT)
Yahoo Inc. (YHOO, $34.16, OUTPERFORM, TP $45.00, OVERWEIGHT)

# Disclosure Appendix

## Important Global Disclosures

I, Heath P. Terry, CFA, certify that (1) the views expressed in this report accurately reflect my personal views about all of the subject companies and securities and (2) no part of my compensation was, is or will be directly or indirectly related to the specific recommendations or views expressed in this report.

*See the Companies Mentioned section for full company names.*

### 3-Year Price, Target Price and Rating Change History Chart for GOOG



—— Closing Price    ■ Target Price    ◇ Initiation/Assumption    ● Rating
Current: O=Outperform; N=Neutral; U=Underperform; R=Restricted; NR=Not Rated
Prior to 9-Sep-02: SB=Strong Buy; B=Buy; H=Hold; S=Sell; R=Restricted; NR=Not Rated

| GOOG Date | Closing Price (US$) | Target Price (US$) | Rating | Initiation/ Assumption |
|---|---|---|---|---|
| 9/28/04 | 126.86 | 145 | OUTPERFORM | X |
| 10/22/04 | 172.43 | 177 | | |
| 11/10/04 | 167.86 | 225 | | |
| 1/31/05 | 195.63 | | RESTRICTED | |
| 2/1/05 | 191.9 | | OUTPERFORM | |
| 2/2/05 | 205.97 | 275 | | |
| 2/3/05 | 210.78 | | RESTRICTED | |
| 3/7/05 | 188.81 | | OUTPERFORM | |
| 6/1/05 | 287.23 | 350 | | |
| 7/22/05 | 302.4 | 375 | | |
| 8/18/05 | 279.99 | | RESTRICTED | |
| 9/15/05 | 302.8 | | OUTPERFORM | |

**CREDIT SUISSE** | FIRST BOSTON

*40*

**3-Year Price, Target Price and Rating Change History Chart for YHOO**



Current: O=Outperform; N=Neutral; U=Underperform; R=Restricted; NR=Not Rated
Prior to 9-Sep-02: SB=Strong Buy; B=Buy; H=Hold; S=Sell; R=Restricted; NR=Not Rated

| YHOO Date | Closing Price (US$) | Target Price (US$) | Rating | Initiation/ Assumption |
|---|---|---|---|---|
| 12/27/02 | 8.29 | 7.5 | | |
| 1/16/03 | 9.37 | 7.5 | UNDERPERFORM | |
| 4/10/03 | 12.13 | 10 | | |
| 7/10/03 | 16.28 | 14 | | |
| 7/14/03 | 16.1 | | RESTRICTED | |
| 10/9/03 | 21.37 | 25 | OUTPERFORM | |
| 1/8/04 | 24.29 | 28.5 | | |
| 4/8/04 | 28.1 | 32.5 | | |
| 5/14/04 | 26.97 | 33 | | |
| 6/22/04 | 32.54 | 45 | | |

The analyst(s) responsible for preparing this research report received compensation that is based upon various factors including CSFB's total revenues, a portion of which are generated by CSFB's investment banking activities.

**Analysts' stock ratings are defined as follows\*\*\*:**

**Outperform:** The stock's total return is expected to exceed the industry average\* by at least 10-15% (or more, depending on perceived risk) over the next 12 months.

**Neutral:** The stock's total return is expected to be in line with the industry average\* (range of ±10%) over the next 12 months.

**Underperform\*\*:** The stock's total return is expected to underperform the industry average\* by 10-15% or more over the next 12 months.

*\*The industry average refers to the average total return of the analyst's industry coverage universe (except with respect to Asia/Pacific, Latin America and Emerging Markets, where stock ratings are relative to the relevant country index, and CSFB HOLT Small and Mid-Cap Advisor stocks, where stock ratings are relative to the regional CSFB HOLT Small and Mid-Cap Advisor investment universe.*

*\*\*In an effort to achieve a more balanced distribution of stock ratings, the Firm has requested that analysts maintain at least 15% of their rated coverage universe as Underperform. This guideline is subject to change depending on several factors, including general market conditions.*

*\*\*\*For Australian and New Zealand stocks a 7.5% threshold replaces the 10% level in all three rating definitions.*

**Restricted:** In certain circumstances, CSFB policy and/or applicable law and regulations preclude certain types of communications, including an investment recommendation, during the course of CSFB's engagement in an investment banking transaction and in certain other circumstances.

**Volatility Indicator [V]:** A stock is defined as volatile if the stock price has moved up or down by 20% or more in a month in at least 8 of the past 24 months or the analyst expects significant volatility going forward. All CSFB HOLT Small and Mid-Cap Advisor stocks are automatically rated volatile. All IPO stocks are automatically rated volatile within the first 12 months of trading.

**CREDIT SUISSE** | FIRST BOSTON

**Analysts' coverage universe weightings\* are distinct from analysts' stock ratings and are based on the expected performance of an analyst's coverage universe\*\* versus the relevant broad market benchmark\*\*\*:**

**Overweight:** Industry expected to outperform the relevant broad market benchmark over the next 12 months.

**Market Weight:** Industry expected to perform in-line with the relevant broad market benchmark over the next 12 months.

**Underweight:** Industry expected to underperform the relevant broad market benchmark over the next 12 months.

*\*CSFB HOLT Small and Mid-Cap Advisor stocks do not have coverage universe weightings.*

*\*\*An analyst's coverage universe consists of all companies covered by the analyst within the relevant sector.*

*\*\*\*The broad market benchmark is based on the expected return of the local market index (e.g., the S&P 500 in the U.S.) over the next 12 months.*

**CSFB's distribution of stock ratings (and banking clients) is:**

### Global Ratings Distribution

| | | |
|---|---|---|
| **Outperform/Buy\*** | 39% | (66% banking clients) |
| **Neutral/Hold\*** | 45% | (65% banking clients) |
| **Underperform/Sell\*** | 14% | (56% banking clients) |
| **Restricted** | 3% | |

*\*For purposes of the NYSE and NASD ratings distribution disclosure requirements, our stock ratings of Outperform, Neutral, and Underperform most closely correspond to Buy, Hold, and Sell, respectively; however, the meanings are not the same, as our stock ratings are determined on a relative basis. (Please refer to definitions above.) An investor's decision to buy or sell a security should be based on investment objectives, current holdings, and other individual factors.*

CSFB's policy is to update research reports as it deems appropriate, based on developments with the subject company, the sector or the market that may have a material impact on the research views or opinions stated herein.

CSFB's policy is only to publish investment research that is impartial, independent, clear, fair and not misleading. For more detail please refer to CSFB's Policies for Managing Conflicts of Interest in connection with Investment Research: http://www.csfb.com/research-and-analytics/disclaimer/managing_conflicts_disclaimer.html

CSFB does not provide any tax advice. Any statement herein regarding any US federal tax is not intended or written to be used, and cannot be used, by any taxpayer for the purposes of avoiding any penalties.

*See the Companies Mentioned section for full company names.*

**Price Target:** (12 months) for (GOOG)

**Method:** CSFB HOLT, Discounted Cash flow, Multiple Analysis

**Risks:** Changes in Industry forecasts, increase in WACC, increase in competition, dilution, competition in online advertising.

**Price Target:** (12 months) for (YHOO)

**Method:** Discounted Cash flow model, Enterprise Value to EBITDA comparative valuations

**Risks:** Competition in online advertising, specifically keyword search. Terminal Value Growth rate could be difficult to achieve. Price assumes ten year revenue growth rate of approximately 18%.

*See the Companies Mentioned section for full company names.*

The subject company (GOOG, YHOO) currently is, or was during the 12-month period preceding the date of distribution of this report, a client of CSFB.

CSFB provided investment banking services to the subject company (GOOG, YHOO) within the past 12 months.

CSFB has managed or co-managed a public offering of securities for the subject company (GOOG, YHOO) within the past 12 months.

CSFB has received investment banking related compensation from the subject company (GOOG) within the past 12 months.

CSFB expects to receive or intends to seek investment banking related compensation from the subject company (GOOG, YHOO) within the next 3 months.

As of the date of this report, CSFBLLC makes a market in the securities of the subject company (GOOG, YHOO).

**Important Regional Disclosures**

An analyst involved in the preparation of this report has visited certain material operations of the subject company (YHOO) within the past 12 months. The analyst may not have visited all material operations of

**CREDIT SUISSE** | FIRST BOSTON

*42*

Yahoo Inc.                                                    18 October 2005

the subject company.  The travel expenses of the analyst in connection with such visits were not paid or reimbursed by the subject company, other than de minimus local travel expenses.

The analyst(s) involved in the preparation of this report have not visited the material operations of the subject company (GOOG) within the past 12 months.

Restrictions on certain Canadian securities are indicated by the following abbreviations:  NVS--Non-Voting shares; RVS--Restricted Voting Shares; SVS--Subordinate Voting Shares.

Individuals receiving this report from a Canadian investment dealer that is not affiliated with CSFB should be advised that this report may not contain regulatory disclosures the non-affiliated Canadian investment dealer would be required to make if this were its own report.

For Credit Suisse First Boston Canada Inc.'s policies and procedures regarding the dissemination of equity research, please visit http://www.csfb.com/legal_terms/canada_research_policy.shtml.

As of the date of this report, CSFB acts as a market maker or liquidity provider in the equities securities that are the subject of this report.

For disclosure information on other companies mentioned in this report, please visit the website at www.csfb.com/researchdisclosures or call +1 (877) 291-2683.

Disclaimers continue on next page.

CREDIT | FIRST
SUISSE | BOSTON

*43*



## Disclaimers

Credit Suisse First Boston is the trade name for the investment banking business of Credit Suisse, a Swiss bank, and references in this report to Credit Suisse First Boston or CSFB herein include all of the subsidiaries and affiliates of Credit Suisse operating under the Credit Suisse First Boston division of Credit Suisse Group ("CSG"). For more information on our structure, please follow the below link: http://www.creditsuisse.com/en/who_we_are/ourstructure.html.

This report is not directed to, or intended for distribution to or use by, any person or entity who is a citizen or resident of or located in any locality, state, country or other jurisdiction where such distribution, publication, availability or use would be contrary to law or regulation or which would subject Credit Suisse or its subsidiaries or its affiliates ("CS") to any registration or licensing requirement within such jurisdiction. All material presented in this report, unless specifically indicated otherwise, is under copyright to CS. None of the material, nor its content, nor any copy of it, may be altered in any way, transmitted to, copied or distributed to any other party, without the prior express written permission of CS. All trademarks, service marks and logos used in this report are trademarks or service marks or registered trademarks or service marks of CSG or its affiliates.

The information, tools and material presented in this report are provided to you for information purposes only and are not to be used or considered as an offer or the solicitation of an offer to sell or to buy or subscribe for securities or other financial instruments. CS may not have taken any steps to ensure that the securities referred to in this report are suitable for any particular investor. CS will not treat recipients as its customers by virtue of their receiving the report. The investments or services contained or referred to in this report may not be suitable for you and it is recommended that you consult an independent investment advisor if you are in doubt about such investments or investment services. Nothing in this report constitutes investment, legal, accounting or tax advice or a representation that any investment or strategy is suitable or appropriate to your individual circumstances or otherwise constitutes a personal recommendation to you. CS does not offer advice on the tax consequences of investment and you are advised to contact an independent tax adviser. Please note in particular that the bases and levels of taxation may change.

CS believes the information and opinions in the Disclosure Appendix of this report are accurate and complete. Information and opinions presented in the other sections of the report were obtained or derived from sources CS believes are reliable, but CS makes no representations as to their accuracy or completeness. Additional information is available upon request. CS accepts no liability for loss arising from the use of the material presented in this report, except that this exclusion of liability does not apply to the extent that liability arises under specific statutes or regulations applicable to CS. This report is not to be relied upon in substitution for the exercise of independent judgment. CS may have issued, and may in the future issue, a trading call regarding this security. Trading calls are short term trading opportunities based on market events and catalysts, while stock ratings reflect investment recommendations based on expected total return over a 12-month period relative to the relevant coverage universe. Because trading calls and stock ratings reflect different assumptions and analytical methods, trading calls may differ directionally from the stock rating. In addition, CS may have issued, and may in the future issue, other reports that are inconsistent with, and reach different conclusions from, the information presented in this report. Those reports reflect the different assumptions, views and analytical methods of the analysts who prepared them and CS is under no obligation to ensure that such other reports are brought to the attention of any recipient of this report. CS is involved in many businesses that relate to companies mentioned in this report. These businesses include specialized trading, risk arbitrage, market making, and other proprietary trading.

Past performance should not be taken as an indication or guarantee of future performance, and no representation or warranty, express or implied, is made regarding future performance. Information, opinions and estimates contained in this report reflect a judgement at its original date of publication by CS and are subject to change without notice. The price, value of and income from any of the securities or financial instruments mentioned in this report can fall as well as rise. The value of securities and financial instruments is subject to exchange rate fluctuation that may have a positive or adverse effect on the price or income of such securities or financial instruments. Investors in securities such as ADR's, the values of which are influenced by currency volatility, effectively assume this risk.

Structured securities are complex instruments, typically involve a high degree of risk and are intended for sale only to sophisticated investors who are capable of understanding and assuming the risks involved. The market value of any structured security may be affected by changes in economic, financial and political factors (including, but not limited to, spot and forward interest and exchange rates), time to maturity, market conditions and volatility, and the credit quality of any issuer or reference issuer. Any investor interested in purchasing a structured product should conduct their own investigation and analysis of the product and consult with their own professional advisers as to the risks involved in making such a purchase.

Some investments discussed in this report have a high level of volatility. High volatility investments may experience sudden and large falls in their value causing losses when that investment is realised. Those losses may equal your original investment. Indeed, in the case of some investments the potential losses may exceed the amount of initial investment, in such circumstances you may be required to pay more money to support those losses. Income yields from investments may fluctuate and, in consequence, initial capital paid to make the investment may be used as part of that income yield. Some investments may not be readily realisable and it may be difficult to sell or realise those investments, similarly it may prove difficult for you to obtain reliable information about the value, or risks, to which such an investment is exposed. This report may provide the addresses of, or contain hyperlinks to, websites. Except to the extent to which the report refers to website material of CSG, CS has not reviewed the linked site and takes no responsibility for the content contained therein. Such address or hyperlink (including addresses or hyperlinks to CSG's own website material) is provided solely for your convenience and information and the content of the linked site does not in any way form part of this document. Accessing such website or following such link through this report or CSG's website shall be at your own risk.

This report is issued and distributed in Europe (except Switzerland) by Credit Suisse First Boston (Europe) Limited, One Cabot Square, London E14 4QJ, England, which is regulated in the United Kingdom by The Financial Services Authority ("FSA"). This report is being distributed in the United States by Credit Suisse First Boston LLC; in Switzerland by Credit Suisse; in Canada by Credit Suisse First Boston Canada Inc.; in Brazil by Banco de Investimentos Credit Suisse First Boston S.A.; in Japan by Credit Suisse First Boston Securities (Japan) Limited; elsewhere in Asia/Pacific by whichever of the following is the appropriately authorised entity in the relevant jurisdiction: Credit Suisse First Boston (Hong Kong) Limited, Credit Suisse First Boston Australia Equities Limited, Credit Suisse First Boston (Thailand) Limited, CSFB Research (Malaysia) Sdn Bhd, Credit Suisse Singapore Branch and elsewhere in the world by the relevant authorised affiliate of the above. Research on Taiwanese securities produced by Credit Suisse Taipei Branch has been prepared by a registered Senior Business Person.

In jurisdictions where CS is not already registered or licensed to trade in securities, transactions will only be effected in accordance with applicable securities legislation, which will vary from jurisdiction to jurisdiction and may require that the trade be made in accordance with applicable exemptions from registration or licensing requirements. Non-U.S. customers wishing to effect a transaction should contact a CS entity in their local jurisdiction unless governing law permits otherwise. U.S. customers wishing to effect a transaction should do so only by contacting a representative at Credit Suisse First Boston LLC in the U.S.

Please note that this report was originally prepared and issued by CS for distribution to their market professional and institutional investor customers. Recipients who are not market professional or institutional investor customers of CS should seek the advice of their independent financial advisor prior to taking any investment decision based on this report or for any necessary explanation of its contents. This research may relate to investments or services of a person outside of the UK or to other matters which are not regulated by the FSA or in respect of which the protections of the FSA for private customers and/or the UK compensation scheme may not be available, and further details as to where this may be the case are available upon request in respect of this report.

Any Nielsen Media Research material contained in this report represents Nielsen Media Research's estimates and does not represent facts. NMR has neither reviewed nor approved this report and/or any of the statements made herein.

Copyright 2005 CREDIT SUISSE and/or its affiliates.  All rights reserved.

| ASIA/PACIFIC: +852 2101-6000 | EUROPE: +44 (20) 7888-8888 | UNITED STATES OF AMERICA: +1 (212) 325-2000 |

Exhibit 35

October 18, 2005

# Prudential Equity Group, LLC

Information Technology
**Internet Portals & Commerce**
*YHOO: NICE 3Q, WITH TOP AND BOTTOM LINE OUTPERFORMANCE; RAISING ESTIMATES AS ONLINE ADVERTISING TRENDS ARE STRONG HEADING INTO 4Q*

## Yahoo! Inc.

| | YHOO | $33.70 | NASDAQ |
|---|---|

*Mark J. Rowen • 212.778.5026 • mark_rowen@prusec.com*
*Aimee Landwehr • 212.778.8397 • aimee_landwehr@prusec.com*
*Anne S. Wickland • 212.778.1537 • anne_wickland@prusec.com*

| | |
|---|---|
| Current: | **Overweight** |
| Risk: | **High** |
| Target: | **$40.00** |
| Industry: | **Neutral** |

**All important disclosures can be found at the end of this report, starting at page 6, under the section entitled Important Disclosures.**

| | FY | EPS | P/E | 1Q | 2Q | 3Q | 4Q |
|---|---|---|---|---|---|---|---|
| Actual | 12/04 | $0.36A | 94.9X | $0.07A | $0.08A | $0.09A | $0.13A |
| | | | | | | | |
| **Current** | **12/05** | **$0.60E** | **56.2X** | **$0.13A** | **$0.13A** | **$0.17A** | **$0.18E** |
| Prior | | $0.56E | 61.0X | | | $0.14E | $0.17E |
| | | | | | | | |
| **Current** | **12/06** | **$0.79E** | **42.7X** | | | | |
| Prior | | $0.75E | 45.5X | | | | |

| | | |
|---|---|---|
| Avg. Volume: **15,100,000** | Div/Yield: **NA** | EPS Growth: **35.00%** |
| Market Cap: **$48,130** m | 52w Range: **39.80-30.30** | P/E / Growth: **1.7x** |
| Shares: **1,408.95** m | | |

## HIGHLIGHTS

- YHOO reported 3Q results that beat both our top and bottom-line estimates. Net revenues increased 42% YoY to $932 million. Pro forma EPS came in at $0.17, however, EPS would have been $0.15, a penny above our estimate, excluding a one-time gain and a lower-than-expected tax rate.
- Marketing Services continues to be the main driver behind the company's growth, as segment revenues (excluding TAC) increased 40% YoY. Mgmt stated that queries were up a "healthy double-digit" percentage, and that revenue per search "grew nicely" in the U.S., suggesting that much of the growth in Search advertising was related to volume increases rather than pricing.
- YHOO provided some insight into its monetization strategy: a tool aimed at small publishers, better matching capabilities, improved click-through rates and better tools for advertisers. These initiatives should benefit YHOO starting in late '05, and build throughout '06.
- Importantly, YHOO inked a deal with Bell South, extending its broadband connectivity partnerships to now cover 92% of the U.S. population.
- We continue to believe YHOO will be one of the main beneficiaries of the migration of advertising to the online channel, and this quarter's results appear to support our thesis. We reiterate our Overweight rating and $40 price target on YHOO.

## DISCUSSION

**Better-Than-Expected Top And Bottom Line In 3Q…**
On October 18, 2005, after the close of regular trading, Yahoo! Inc. (YHOO) reported third-quarter results that beat both our top and our bottom-line estimates. Pro forma EPS came in at $0.17 (versus our consensus-matching estimate of $0.14), however, we note that EPS would have been only $0.15, just a penny above our estimate, excluding a $27 million gain on sales of non-strategic investments, and the benefit from a lower-than-expected tax rate in the quarter. Excluding traffic acquisition costs (TAC), net revenues increased 42% year-over-year to $932 million (ahead of our estimate of $919 million and the



October 18, 2005

Information Technology
**Internet Portals & Commerce**

consensus estimate of $917 million).  Importantly, YHOO inked a deal with Bell South, extending its broadband connectivity partnerships to now cover 92% of the U.S. population.  Management raised its 4Q'05 or FY'05 guidance, and accordingly, we are raising our estimates.

Yahoo!'s Marketing Services segment continues to be the main driver behind the company's growth, as segment net revenues (excluding TAC) increased 40% year-over-year, while the Fees segment grew 41% on an organic basis (or 55% including the acquisition of MusicMatch).  Management stated that queries were up a "healthy double-digit" percentage year over year, and that revenue-per-search "grew nicely" in the U.S., suggesting that much of the growth in Search advertising was related to volume increases, rather than pricing.

Yahoo! delivered better-than-expected third-quarter EPS, with strong operating performance, and a little extra benefit from below-the-line items.  We continue to believe YHOO will be one of the main beneficiaries of the migration of advertising to the online channel, and this quarter's results appear to support our thesis.  ***We reiterate our Overweight rating and $40 price target on YHOO.***

**Third Quarter Actual Versus Estimated Results…**

| ($ in millions)       | 3Q05A   | 3Q05E   | 3Q04A   |
|-----------------------|---------|---------|---------|
| Revenues excluding TAC| $932.1  | $919.5  | $655.4  |
| Gross margin          | 86.9%   | 87.5%   | 87.6%   |
| OIBDA                 | $385.1  | $379.6  | $259.7  |
| OIBDA Margin          | 41.3%   | 41.3%   | 39.6%   |
| Pro forma EPS         | $0.17   | $0.14   | $0.08   |

Source: Company reports and Prudential Equity Group, LLC estimates.

**Marketing Services Revenue Increased 40% YoY…**
YHOO's Marketing Services segment net revenues, excluding TAC, totaled $762 million in the quarter (above our $743 million estimate), a 40% increase from the year-ago period, compared to 43% organic growth in both 2Q'05 and 1Q'05.  We note that the third quarter is typically a seasonally weak quarter for online advertising.

The company noted that the growth in the Marketing Services segment was nicely balanced across its various offerings to advertisers, from pay-for-performance (search) to branding, and also across its vertical product categories.  Management stated that its top 200 advertisers increased their spending at a faster rate than Yahoo!'s Marketing-Services segment's average growth rate (>40% YoY).  YHOO also reported that it is now seeing a significant overlap in ad spending between brand and sponsored search advertisers.  The company noted that more than 50 of its top 200 brand advertisers were also in the top 200 sponsored search advertisers during the quarter, with particular strength among automotive, retail, and financial services advertisers.

For full-year 2005, we anticipate a 41% year-over-year increase in Marketing Services segment net revenue (excluding TAC).

**U.S. Revenues Grew 40% YoY, While International Revenues Increased 50%…**
U.S. revenues (excluding TAC) grew 40% year-over-year to $704 million (up slightly from 39% growth in the second quarter).  International revenues (excluding TAC) grew 50% year-over-year to $228 million (down from 59% growth in the second quarter).  Excluding currency benefits, International segment revenues grew 48% year-over-year (versus 50% in 2Q'05).

October 18, 2005

Information Technology
**Internet Portals & Commerce**

In the third quarter, International revenue (excluding TAC) accounted for 24.5% of total revenues, down 10 bps from last quarter's 24.6%, but up 130 basis points (bps) from 23.2% in 3Q'04.

**Gross Margin Declined, But OIBDA Margin Improved…**
Yahoo!'s third-quarter gross margin was 86.9% (excluding TAC), down 80 bps from 87.7% in 2Q'05, and down 70 bps from 87.6% in 3Q'04. OIBDA margin (operating income before depreciation & amortization) came in at 41.3% (excluding TAC and stock-based compensation), down from 42.1% in 2Q'05, but up from 39.6% in the year-ago period. Sales & marketing expense was 28.5% of sales, up from 28.2% in 2Q'05, but down from 29.4% in the year-ago quarter. Product development expense was 15.2% of sales, up from 14.3% in 2Q'05, and 14.8% in the year-ago quarter.

The company disclosed that its OIBDA margin was 44% in the U.S., and 35% internationally (compared to 44% and 36%, respectively, in the second quarter). We anticipate company-wide OIBDA margins, excluding traffic acquisition costs and stock compensation expense, of 42.3% in full-year 2005 (up significantly from the 39.3% posted in FY'04).

**Premium Subscriber Growth Continues To Be Driven By Connectivity Additions…**
Management noted that, at the end of the third quarter, Yahoo! had approximately 11.4 million premium-service subscribers, up 13% from 10.1 million at the end of 2Q'05, and up 50% from 7.6 million at the end of last year's third quarter. Fees segment revenues (which includes SBC Yahoo!, BT Yahoo!, Verizon, Yahoo! Personals, Yahoo! Mail, Yahoo! Games, HotJobs, and other classifieds) came in at $170 million in the quarter, up 55% from the year-ago period. The company noted that, excluding acquisitions (principally MusicMatch), revenue growth would have been 41% year over year. We note that Fees segment revenue growth trailed premium subscriber growth once again by a significant margin. We believe that the lag between premium user growth and Fees segment growth suggests limited success with more expensive premium services, and an outsized contribution from lower paying broadband providers.

Management noted that over half of its fee-paying customers are from its connectivity/content deals with telecoms and cable companies, and we believe this number could be closer to two-thirds or even three quarters of premium subscribers. For the most part, Yahoo!'s premium service customers are paying for services such as SBC/Yahoo! Access, Verizon, BT Access, Yahoo! Personals, Yahoo! Mail, and Yahoo! Games, equating to an average of approximately $3.00-$4.00 in revenue per month, per unique user. Management noted that it now expects year-end 2005 premium-service subscribers to approach 12.5 million (versus previous guidance of more than 12 million). We remind investors that at its analyst day on May 13, 2004, CEO Terry Semel disclosed that the company set a long-term goal of 15 million paid subscribers, which we believe the company could achieve by the middle of 2006.

While the level of new paying subscribers increased in the quarter, we remind investors that Yahoo! boasts 191 million active registered users, meaning that the company has enticed only about 6.0% of its active user base to sign up for any of its premium services, and the majority of these come from SBC and other broadband providers. We believe the low levels of customer enthusiasm for other premium service offerings reveals a lack of compelling content on Yahoo! While e-mail services, personals, and games have attracted a small portion of YHOO's user base, they do not yet appear to have mass appeal.

We believe that if YHOO is serious about competing for premium services customers, it will ultimately have to spend significant sums to build or secure more compelling content.

**YHOO And BellSouth To Launch A Co-Branded Broadband Service in Late 2006…**

October 18, 2005

Information Technology
**Internet Portals & Commerce**

On October 17, 2005, YHOO and Bell South announced the launch of a co-branded broadband service reaching across Bell South's nine-state operating region, and extending its broadband connectivity partnerships to now cover 92% of the U.S. population. The service is expected to launch in late 2006. YHOO does not expect any significant contribution from the deal in 2006, but noted that the structure of the deal is broadly similar to past broadband deals in which YHOO receives a monthly payment per subscriber, and BellSouth shares in any advertising revenues from these customers. Currently, BellSouth has a broadband subscriber base of approximately 2.4 million users, a good portion of which would likely transition to the Yahoo!/BellSouth joint venture.

**YHOO Provides Limited Detail On Its Monetization Plans…**
YHOO provided limited insight into its ongoing monetization improvement strategy, which currently consist of three initiatives. First, CEO Semel referred to the Yahoo! publisher network, a self-serve tool aimed at tapping into the small and medium sized publisher network. A beta version of the service was launched this past August, and will be more widely available (still in beta) in 1Q'06. The second initiative is improving and enhancing search-matching capabilities, with the goal of increased advertising coverage ratios and higher revenue per search. The company continues to roll out changes in its algorithms as they are ready, and management reports that it is already seeing some benefit from the enhancements. The third initiative is focused on improving YHOO's relevance and click through rates on paid listings, as well as getting more useful tools to advertisers. YHOO plans to begin testing some of these initiatives in 1H'06 with a broader roll out thereafter.

YHOO expects these monetization plans to begin to benefit the company late this year, with the bulk of the financial impact building throughout 2006.

**Yahoo!'s Audience Continues To Grow …**
YHOO's global audience grew to 411 million unique visitors in September (excluding Yahoo! Japan), up 8% from 379 million unique visitors in June 2005, and up 26% from 325 million in September 2004. Yahoo! had 191 million active registered users in September (again, excluding Yahoo! Japan), up 6% from 181 million three months ago (June 2005), and up 22% from 157 million in the year ago period (September 2004). Companywide revenue-per-unique-user was $2.36 in the third quarter, up from $2.33 in 2Q'05, and $2.10 in the year-ago quarter.

**Yahoo! Holds $4.8 Billion In Cash…**
YHOO ended the third quarter with a cash-and-marketable-securities balance of approximately $4.8 billion, or $4.0 billion net of long-term convertible debt. This equates to net cash of approximately $2.75 per share. During the quarter, the company generated $440 million in cash flow from operations (or $319 million, excluding a $122 million tax benefit related to stock options). Free cash flow was $345 million in the quarter, up from $311 million in the second quarter, and up significantly from $202 million in the year-ago quarter.

The company also reported that it made $208 million in stock repurchases during the third quarter, equating to approximately 6.3 million shares, at an average price of $32.89.

**The Value Of Yahoo!'s Stake In Yahoo! Japan…**
Based on the current market price, the value of Yahoo! Japan (ticker 4689 on the Tokyo Stock Exchange, not rated) is approximately $32 billion. Yahoo! owns around one-third of Yahoo! Japan's outstanding shares, which suggests a value of roughly $7.12 per YHOO share, based on the current market price of Yahoo! Japan (and using YHOO's share count at September 30, 2005). We discount Yahoo! Japan's

October 18, 2005

Information Technology
**Internet Portals & Commerce**

valuation by 30%, to account for possible downside risk, and a liquidity discount, suggesting a value of approximately $4.98 per YHOO share.

**Raising Our FY'05 Estimates…**
Given the outperformance this quarter, we are raising our estimates, as shown in the table at the top of page one. Management upped FY'05 revenue guidance to $3,660 to $3,710 million (from $3,600-$3,700 million), compared to the consensus estimate of $3,670 million. The company raised guidance for full-year 2005 operating income before depreciation and amortization (OIBDA) to $1,550-$1,580 million (from $1,515-$1,575 million).

**Risks…**
We note that investors in YHOO must be cognizant of several risks. The risks include, but are not limited to: a weaker than expected online advertising environment; the possibility that major traditional advertisers shift a lesser-than-expected portion of their advertising budgets online; the possible loss of major partners which provide traffic for YHOO's Sponsored Search network; the possibility that price-per-click or click-through rates on Sponsored Search ads deteriorate significantly; and finally, the risk that YHOO's premium service offerings gain narrower-than-expected acceptance.

**Valuation…**
Our $40 price target assumes a P/E multiple of approximately 67x times our full-year 2005 and 51x our full-year 2006 pro forma EPS estimates, respectively. Assuming 35% compounded annual earnings growth, this equates to price-to-earnings-to-growth (P/E/G) ratios of 1.9 and 1.5, respectively, which we believe are reasonable compared with those of other growth companies. We note that the S&P 500 currently trades at approximately 13.9 times forward-year earnings, equating to a P/E/G ratio of 1.2.

Our $40 price target also equates to an EV/OIBDA (enterprise value/operating income before depreciation and amortization) multiple of approximately 23x our estimated 2006 OIBDA (our EV calculation includes approximately $3 per share in net cash and $5 for the company's stake in Yahoo! Japan). The FY'06 EV/OIBDA multiple carries an approximate 130% premium to the average multiple for the traditional media companies, which we believe is justified, in the current market, for a company with YHOO's growth potential.

**<u>BUSINESS</u>**
*Yahoo! Inc. (YHOO), based in Sunnyvale, California, is a leading provider of comprehensive online products and services to consumers and businesses worldwide. Yahoo! is the No. 1 Internet brand globally and the most trafficked Internet destination worldwide.*

October 18, 2005

Information Technology
**Internet Portals & Commerce**

*To view charts associated with those stocks mentioned in this report, please visit http://cm1.prusec.com.*

**IMPORTANT DISCLOSURES**

Any analyst principally responsible for the analysis of any security or issuer included in this report certifies that the views expressed accurately reflect such research analyst's personal views about subject securities or issuers and certifies that no part of his or her compensation was, is, or will be directly or indirectly related to the specific recommendation or views contained in the research report.

Prudential Financial or its affiliates beneficially owns 1% or more of any class of common equity securities of YHOO.

Prudential Equity Group, LLC makes a market in the shares of YHOO.

A real estate affiliate of Prudential Equity Group, LLC is a party to a marketing agreement with Yahoo! Inc.

When we assign an **Overweight** rating, we mean that we expect that the stock's total return will exceed the average total return of all of the stocks covered by the analyst (or analyst team). Our investment time frame is 12-18 months except as otherwise specified by the analyst in the report.

When we assign a **Neutral** Weight rating, we mean that we expect that the stock's total return will be in line with the average total return of all of the stocks covered by the analyst (or analyst team). Our investment time frame is 12-18 months except as otherwise specified by the analyst in the report.

When we assign an **Underweight** rating, we mean that we expect that the stock's total return will be below the average total return of all of the stocks covered by the analyst (or analyst team). Our investment time frame is 12-18 months except as otherwise specified by the analyst in the report.

ANALYST UNIVERSE COVERAGE:
Mark J. Rowen: eBay, Inc., Amazon.com Inc., RadioShack Corp., The Borders Group, Yahoo! Inc., Bed Bath & Beyond, Williams-Sonoma, Inc., Barnes & Noble, Best Buy, Circuit City Stores, Staples, Inc., Office Depot, Google Inc..

Rating Distribution

| 10/17/05 | Firm | Firm's Investment Banking Clients | Sector | Sector's Investment Banking Clients |
|---|---|---|---|---|
| Overweight(Buy)* | 32% | 0% | 35% | 0% |
| Neutral Weight(Hold)* | 45% | 0% | 33% | 0% |
| Underweight(Sell)* | 23% | 0% | 31% | 0% |

October 18, 2005

Information Technology
**Internet Portals & Commerce**

Excludes Closed End Funds

| 09/30/05 | Firm | Firm's Investment Banking Clients | Sector | Sector's Investment Banking Clients |
|---|---|---|---|---|
| Overweight(Buy)* | 32% | 0% | 39% | 0% |
| Neutral Weight(Hold)* | 44% | 0% | 32% | 0% |
| Underweight(Sell)* | 24% | 0% | 29% | 0% |

Excludes Closed End Funds

| 06/30/05 | Firm | Firm's Investment Banking Clients | Sector | Sector's Investment Banking Clients |
|---|---|---|---|---|
| Overweight(Buy)* | 32% | 0% | 42% | 0% |
| Neutral Weight(Hold)* | 45% | 0% | 30% | 0% |
| Underweight(Sell)* | 22% | 0% | 28% | 0% |

Excludes Closed End Funds

| 03/31/05 | Firm | Firm's Investment Banking Clients | Sector | Sector's Investment Banking Clients |
|---|---|---|---|---|
| Overweight(Buy)* | 32% | 0% | 38% | 0% |
| Neutral Weight(Hold)* | 45% | 0% | 33% | 0% |
| Underweight(Sell)* | 23% | 0% | 29% | 0% |

Excludes Closed End Funds

*  In accordance with applicable rules and regulations, we note above parenthetically that our stock ratings of "Overweight," "Neutral Weight," and "Underweight" most closely correspond with the more traditional ratings of "Buy," "Hold," and "Sell," respectively; however, please note that their meanings are not the same.  (See the definitions above.)  We believe that an investor's decision to buy or sell a security should always take into account, among other things, that the investor's particular investment objectives and experience, risk tolerance, and financial circumstances.  Rather than being based on an expected deviation from a given benchmark (as buy, hold and sell recommendations often are), our stock ratings are determined on a relative basis (see the foregoing definitions).

Prior to September 8, 2003 our rating definitions were Buy, Hold, Sell.  They are defined as follows:

 When we assign a **Buy** rating, we mean that we believe that a stock of average or below-average risk offers the potential for total return of 15% or more over the next 12 to 18 months.  For higher-risk stocks, we may require a higher potential return to assign a Buy rating.  When we reiterate a Buy rating, we are stating our belief that our price target is achievable over the next 12 to 18 months.

When we assign a **Sell** rating, we mean that we believe that a stock of average or above-average risk has the potential to decline 15% or more over the next 12 to 18 months.  For lower-risk stocks, a lower potential decline may be sufficient to warrant a Sell rating.  When we reiterate a Sell rating, we are stating our belief that our price target is achievable over the next 12 to 18 months.

A **Hold** rating signifies our belief that a stock does not present sufficient upside or downside potential to warrant a Buy or Sell rating, either because we view the stock as fairly valued or because we believe that there is too much uncertainty with regard to key variables for us to rate the stock a Buy or Sell.

When we assign an industry rating of Favorable, we mean that generally industry fundamentals/stock prospects are improving.

October 18, 2005

Information Technology
**Internet Portals & Commerce**

When we assign an industry rating of Neutral, we mean that generally industry fundamentals/stock prospects are stable.

When we assign an industry rating of Unfavorable, we mean that generally industry fundamentals/stock prospects are deteriorating.

Ratings History: YHOO

| Rating Changes | | | | | Target Price Changes | | | |
|---|---|---|---|---|---|---|---|---|
| **Date** | **From** | **To** | **Analyst** | | **Date** | **From** | **To** | **Analyst** |
| 07/22/05 | NTRL | OVER | Rowen | | 07/22/05 | 38.00 | 40.00 | Rowen |
| 09/08/03 | Hold | NTRL | Rowen | | 01/18/05 | 32.00 | 38.00 | Rowen |
| 11/06/02 | Buy | Hold | Rowen | | 10/12/04 | 28.00 | 32.00 | Rowen |
| | | | | | 05/14/04 | 14.00 | 28.00 | Rowen |
| | | | | | 05/12/04 | SPLIT | 2 : 1 | Rowen |
| | | | | | 05/11/04 | 27.50* | 14.00* | Rowen |
| | | | | | 04/07/04 | 22.50* | 27.50* | Rowen |
| | | | | | 01/15/04 | 20.00* | 22.50* | Rowen |
| | | | | | 10/09/03 | 15.00* | 20.00* | Rowen |
| | | | | | 07/10/03 | 11.00* | 15.00* | Rowen |
| | | | | | 04/10/03 | 8.00* | 11.00* | Rowen |
| | | | | | 01/16/03 | 7.00* | 8.00* | Rowen |

***Additional Information***

Price Target – Methods/Risks

The methods used to determine the price target generally are based on future earning estimates, product performance expectations, cash flow methodology, historical and/or relative valuation multiples. The risks associated with achieving the price target generally include customer spending, industry competition and overall market conditions.

Additional risk factors as they pertain to the analyst's specific investment thesis can be found within the report.

Price History: YHOO

October 18, 2005

Information Technology
**Internet Portals & Commerce**



Source: Factset and Prudential Equity Group, LLC estimates.

October 18, 2005

Information Technology
## Internet Portals & Commerce

When recommending the purchase or sale of a security, Prudential Equity Group, LLC is subject to a conflict of interest because should such advice be followed, and result in a transaction being executed through the firm, Prudential Equity Group, LLC may earn brokerage compensation on the transaction. In addition, any order placed with Prudential Equity Group, LLC may be executed on either an agency basis resulting in a commission payment to Prudential Equity Group, LLC or on a principal basis, versus Prudential Equity Group, LLC's proprietary account, resulting in a mark-up or mark-down by Prudential Equity Group, LLC.

Any OTC-traded securities or non-U.S. companies mentioned in this report may not be cleared for sale in all jurisdictions.
**Securities products and services are offered through Prudential Equity Group, LLC, a Prudential Financial company.**

**© Prudential Equity Group, LLC, 2005, all rights reserved. One New York Plaza, New York, NY 10292**

Information contained herein is based on data obtained from recognized statistical services, issuer reports or communications, or other sources, believed to be reliable. Any statements nonfactual in nature constitute only current opinions, which are subject to change.

There are risks inherent in international investments, which may make such investments unsuitable for certain clients. These include, for example, economic, political, currency exchange rate fluctuations, and limited availability of information on international securities. Prudential Equity Group LLC, and its affiliates, make no representation that the companies which issue securities that are the subject of their research reports are in compliance with certain informational reporting requirements imposed by the Securities Exchange Act of 1934. Sales of securities covered by this report may be made only in those jurisdictions where the security is qualified for sale. The contents of this publication have been approved for distribution by Bache Financial Limited, which is authorised and regulated by The Financial Services Authority. We recommend that you obtain the advice of your Registered Representative regarding this or other investments.

If you did not receive this research report directly from Prudential Equity Group, LLC ("PEG") or Bache Financial Ltd ("BFL"), your access to, and receipt of, this report does not by itself operate to establish a client-broker relationship between you and PEG or BFL, as the case may be. Accordingly, please direct any questions you may have regarding this report to the registered representative employed by the securities firm at which your account is held who is assigned to service your account, and not to PEG or any PEG analyst whose name appears above. Please note that PEG or BFL, as the case may be, bears no responsibility for any recommendation(s) or advice that such securities firm or its registered representatives may provide to you, regardless of whether any such recommendation or advice is based in whole or in part on this report.

Additional information on the securities discussed herein is available upon request. The applicable disclosures can be obtained by writing to: Prudential Equity Group, LLC, 1 New York Plaza – 17th floor, New York, New York, 10292 Attn: Equity Research.

Prudential Equity Group, LLC and Prudential Financial, Inc. of the United States are not affiliated with Prudential plc of the United Kingdom.

Exhibit 36

North America United States
TMT Internet

**Deutsche Bank** 

17 May 2006

# Yahoo!

Reuters: **YHOO.OQ**   Bloomberg: **YHOO UQ**   Exchange: **NMS**   Ticker: **YHOO**

# Analyst day themes: China, BT & Search Monetization

| **Jeetil Patel** | **Herman Leung** | **Azeem Ebrahim** |
|---|---|---|
| Research Analyst | Research Associate | Research Associate |
| (+1) 415 617-4223 | (+1) 415 617-3246 | (+1) 415 617-4296 |
| jeetil.patel@db.com | herman.leung@db.com | azeem.ebrahim@db.com |

**BUY rating following Analyst Day**

We maintain our BUY investment rating on shares of Yahoo!, and believe that the "new" Yahoo! is looking to become a little more nimble in the current Web 2.0 environment. While the moves outlined suggested a step in the right direction, we do think the company must continue to innovate and acquire smaller companies to match against its 500mn audience of users.

**Key Highlights**

Yahoo! management indicated that search monetization is on track for a late 3Q/4Q launch, which in turn should drive RPS in 2007. Major platform changes have created for the use of behavioral targeting in driving yields in graphical ads. Meanwhile, Yahoo!'s China investment in Alibaba looks like a smart move, given the momentum at Alibaba. Finally, there appears to be plenty of growth ahead as 3% of AdAge 100 budgets goes to the internet.

**Areas of Improvement**

Revenue guidance for 2006 implies flat market share comparisons this year, which suggests more of an investment year. (2) user growth shifting to international growth (APAC, ROW) may limit the near term monetization advantages from the US and European market. (3) EBITDA margins in the 40%-43% may be capped, due to re-investments. This high margin may potentially limit the appetite to go after lower-margin projects/acquisitions, in our view (especially with MSN and Google getting more aggressive.

**Price target of $44**

We are maintaining our $44 price target, based on 26x 2006E EBITDA and 21x 2007 EBITDA) plus cash and investments. Its internet media peer group trades at 20-21x 2006E EBITDA and we value Yahoo! at a premium due to its audience reach and balanced growth from branded and search ads.

## Current Events

| **Buy** | |
|---|---|
| Price at 17 May 2006 (USD) | **30.11** |
| Price target | **44.00** |
| 52-week range | **43.42 - 30.07** |

**Price/price relative**



— Rel. to S&P 500 (L.H. Scale)
— Yahoo! (R.H. Scale)

| Performance (%) | 1m | 3m | 12m |
|---|---|---|---|
| Absolute | -2.8 | -8.1 | -15.7 |
| S&P 500 | -1.2 | -1.3 | 8.2 |

**Stock data**

| | |
|---|---|
| Market Cap (USDm) | **43,362.4** |
| Shares outstanding (m) | **1,440.1** |
| Free float (%) | **100** |
| Volume | **28,327,062** |
| S&P 500 | **1,270.32** |

**Key indicators**

| | |
|---|---|
| ROE (%) | **7.3** |
| ROA (%) | **8.4** |
| Net debt/equity (%) | **-23.8** |
| Book value/share (USD) | **6.52** |
| Price/book (x) | **4.6** |
| Net interest cover (x) | **NA** |
| EBIT margin (%) | **21.7** |

**Forecasts and ratios**

| Year End Dec 31 | 2005A | 2006E | 2007E |
|---|---|---|---|
| 1Q EPS (USD) | 0.13 | **0.11** | - |
| 2Q EPS (USD) | 0.13 | **0.11** | - |
| 3Q EPS (USD) | 0.17 | **0.13** | - |
| 4Q EPS (USD) | 0.16 | **0.17** | - |
| FY EPS (USD) | 0.60 | **0.52** | 0.66 |
| P/E (x) | 59.4 | **58.3** | 46.0 |
| EV/EBITDA (x) | 31.1 | **19.3** | 15.1 |
| Revenue (USDm) | 3,695.9 | **4,776.7** | 5,465.0 |

Source: Deutsche Bank estimates, company data

**Deutsche Bank Securities Inc.**

**All prices are those current at the end of the previous trading session unless otherwise indicated**

**Deutsche Bank does and seeks to do business with companies covered in its research reports. Thus, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report.**

**Investors should consider this report as only a single factor in making their investment decision.**

**Independent, third-party research (IR) on certain companies covered by DBSI's research is available to customers of DBSI in the United States at no cost. Customers can access this IR at http://gm.db.com, or call 1-877-208-6300 to request that a copy of the IR be sent to them.**

**DISCLOSURES AND ANALYST CERTIFICATIONS ARE LOCATED IN APPENDIX 1**

Company Research

Company Bulletin



# Analyst Day: China, Search and Behavioral targeting

## Growth Drivers Remain - BUY

We maintain our BUY investment rating and maintain our 12-month price target of $44 on shares of Yahoo! following yesterday's Analyst Day. While there was not any one specific highlight that we would argue stole the show, overall management presented a generally upbeat view of the business (with a little caution thrown in), highlighted by multiple levers of growth for the company in upcoming years. It does appear that Yahoo! is on track for its 2006 guidance and that its fundamental advertising business is in tact.  Of importance, we think that the company remains very well positioned with Mr. Jack Ma at the helm at Alibaba (in China) while the search monetization enhancements appear to be on track for a 3Q/4Q rollout. These themes represent major positives for Yahoo! as we look toward 2007. Outside of these themes, we think the Analyst meeting did not have too many meaningful catalysts.

The major themes coming out of the Analyst meeting included:

- **Social search and search monetization:** With its search monetization platform initiatives launching/ramping in late 3Q/4Q in the US, we think that Yahoo! should be able to improve revenue per thousand searches (RPS) in 2007. Meanwhile, the company is ramping up social media/knowledge search to take a differentiated approach on search and social networking. Social search already is generating an incremental 30% web search queries (above the current query volumes in search) today.

- **Behavioral targeting driving graphic ad yields:** As expected, behavioral targeting for display ads is already a meaningful component of campaigns today at Yahoo!, yet this initiative should drive a 2x-5x improvement in yields in the business.

- **China remains a success story:** Not only does it appear as though Alibaba has run away with the e-commerce market in China, with a projected $200mn in revs in 2006 and presences in quite a few segments, Yahoo! has bet on the right team and company to lead the charge in China, in our view. Time will tell whether the 40% equity stake will remain or go higher, but we like the company's longer term position in this important geography.

- **Growth driven by ad budgeting and volumes:** The dynamic in the online ad market is quite unique today, as Yahoo! expects to grow against its Top 200 advertisers via increased budget allocations to the Internet (Note the AdAge 100 spends 3% of its ad dollars online, vs. 6% for all marketers). Meanwhile, the balance of the company's advertisers (largely representative of smaller companies interested in paid search) will likely grow based on Yahoo!'s volumes (mainly search). In this case, the challenge is not budget-driven as it is building distribution on Yahoo!'s part.

We believe that Yahoo!'s shares offer an attractive entry point at current levels. The stock currently trades at 16x its 2006E EBITDA and 13x 2007E EBITDA, well below its 18x trough multiple over the past two years and below its internet media comp set at 20x '06 and 15x '07. The company offers balanced growth through display ads, search and fees and is expected to grow its EBITDA by 20-30% over the next 2-3 years. The Analyst Day certainly reaffirmed that the business is not broken and that Yahoo! should at least maintain its market share. Therefore we believe the market's discount on shares of Yahoo! since Jan-06 is overdone and suspect that the 2H implementation on search monetization should help improve enthusiasm in the stock. We reiterate our BUY rating and maintain our price target of $44), based on 26x our 2006E EBITDA (or 21x our 2007E EBITDA) plus cash and investments,

still a premium to the sector. Once again, these multiples represent premiums to the group for faster growth, scale, global footprint and margins.

**Areas of Opportunity/Improvement emerging from the meeting**

With the overall upbeat sentiment around the Analyst Day, we do think that several key themes represent modest issues and areas of opportunity for Yahoo! looking ahead.

- **Flat market share in 2006:** While Yahoo!'s aspiration/goal would be to double marketing revenues from 2005 to 2008, we do think that the company's current guidance for 2006 calls for flat (13%) market share globally (relative to 2005). While this conservatism is prudent, we note that initiatives such as behavioral targeting and improving search monetization should potentially contribute some upside to numbers (although summer seasonality may become a N-T challenge).

- **User growth shifting international:**  Through 2005, user growth in the Internet industry (and therefore Yahoo!) came from strong gains in the North American and European markets (20%-40% growth), thereby fueling robust gains in advertising for the company. However, looking ahead to the next five years, the company indicated that user growth will likely shift to the Asia-Pacific/ROW regions, which is expected to grow by 15%-17% (core geographic growth 4%-8%). With this shift in user growth also likely at Yahoo!, we do think that several unconsolidated equity positions (as in Alibaba) may limit the company's ability to own 100% of the economics and growth potential in these faster growing regions.

- **EBITDA margins capped out:** We highlight that EBITDA margins have been grounded at 40-43% in the past seven quarters. Management did not provide a long-term outlook on margin growth. Instead, it suggested possible drivers for expansion (such as improvement in monetization) but tempering that growth with increased TAC and data center related costs. Guidance is for flat margins in 2006 and given the increasingly competitive environment and subsequent need to spend/invest, we think it may be difficult for Yahoo! to meaningfully grow margins in future years.

  Furthermore, if the company remains inflexible on the margin profile in the business, we do think that it may be structurally limited in expanding its product/service offerings (particularly at a time when competitors such as Google and Microsoft are willing to dilute margins for new product/service initiatives). If Yahoo! limits business initiatives/acquisitions to minimum 40%-plus EBITDA margin businesses, we think that it may limit the company from evolving the technology to keep up with the competition while shackling it to high-margin media businesses.

Nonetheless, we are encouraged by Yahoo!'s recent moves in becoming more of a Web 2.0 company and taking advantage of newer technologies to syndicate products, services and content across the open Web. From this standpoint, it appears as though the company is playing a bit of "catch up" with the competition.

## Additional Highlights from Yesterday's Analyst Day

**New Search Platform to Launch End of 3Q 2006; But Impact not likely until 2007**

Yahoo!'s much anticipated new paid search platform is expected to (finally, after 2 yrs) launch in the US in 3Q 2006, with an international launch in 1Q 2007. This new platform incorporates geo- and demo- targeting and offers advertisers a detailed engine with which to measure campaign performance and tweak bids/keywords/targeting features to drive additional click-throughs and conversions. The new ranking system, in which sponsored links are ranked based on price and relevancy (recall that Yahoo currently only ranks based on price) will be implemented in 4Q06 in the US, and near the end of 1Q07 internationally. We do not expect

any significant improvement in RPS in the near term. The system is only as good as the data it contains, and it will take plenty of advertiser usage in order for it to improve its own relevancy and optimization capabilities before we start to see rising CTRs. Therefore we suggest that growth in RPS is more a early-/mid-2007 story. The key for Yahoo! will be to manage RPS in the near term, particularly as PPCs come down at the same time that, in theory, click-through rates climb.

**North America Usage Slowing, Targeting International Growth**

As the North America markets begin to mature, Yahoo!'s CFO Sue Decker discussed some of the audience and engagement growth opportunities on the international side of the business. In the past, Yahoo's annual growth rate outpaced the industry in Europe, Asia, and North America. While North America Internet users grew at a 22% CAGR from '95-'05, industry sources (including Yahoo!) believes the maturing market will likely post a 6% CAGR from '05-'10. Less established markets, such as Asia Pac, are expected to grow users much faster, at 15%+ CAGR from '05-'10.

Analyzing the company's 2005 user breakdown by region, the data shows that Yahoo! (compared to the overall industry breakdown) was overweight in North America (28% vs. 22%) and Asia-PAC (33% vs. 28%), and underweight in Europe (15% vs. 21%) and ROW (15% vs. 20%). Japan was flat at 9% for both Yahoo! and the industry. While key markets are reaching 60-70% Internet penetration rates, the company believes there will be a greater depth of usage in the next 10 years, similar to cable penetration rates that grew 3x, post the 60% penetration threshold.  Drivers of this increased usage are expected to be mobile, broadband, search and new product initiatives. All in, with growth rates slowing in North America (a concern as this is the core business), we believe over the next several years, growth will likely come from the international business, where e-commerce and online advertising are still in its early stages.

**A (New?) Monetization Driver - Behavioral Targeting**

As expected, we heard more about Yahoo!'s behavioral targeting solution which has delivered impressive lifts in advertisers' click-through and conversion rates. For example, the company described a 5x and 7x lift in conversion rates for an auto insurance and US mortgage lender's ad campaigns respectively. We note that Yahoo!'s competitive advantage is its vast amount of usage data from sites such as Yahoo! Travel, Yahoo! Mail and Yahoo! Search, to name but a few - it can leverage these verticals to determine behavioral profiles and subsequently deliver highly targeted ads across its network. While we believe this monetization product is an important revenue source for the company, we note that the company has already been using behavioral targeting on its sites over the past few years. Therefore the key question is how much of an incremental revenue lift this new enhanced solution can offer. Furthermore we note that ad networks are increasingly rolling out their own behavioral solutions, thus adding to the competitive environment. We suspect that at the very least, the notable conversion lifts from this new platform will enhance Yahoo!'s ability to attract more advertisers (and larger budget commitments) to the internet and potentially grow CPMs. We thus expect this product to become a key driver in sustaining Yahoo!'s overall revenue growth in the future. In our view, BT is already being employed in a meaningful percentage of advertising campaigns, with yields generally improving by 2x-5x non-BT campaigns.

**Alibaba Update: Search Initiatives Coming in mid-Sept**

Alibaba's management team, CEO Jack Ma and CFO Joe Tsai also provided a colorful and bullish update on the Chinese Internet market and its strategic plans going forward. Mr. Ma believes the China e-commerce opportunity will be driven largely by increased online penetration rates into the 23mn small businesses. In fact, there are only 700,000 websites for the 23mn small businesses today, representing a mere 3% presence online, yet the SME market represent 50% of China's GDP of $1.7 trillion. We believe there will be continued

migration online over the next several years in China and the market should continue to accept the Internet as an additional channel to transact business. Overall, we think this investment represents one of the most significant, positive moves by Yahoo! since the Overture deal (although potentially more significant 3-5 years down the road).

As for Alibaba, we believe it is well positioned to benefit from the growth in China, considering its key business lines in portals, search, marketplaces and payments. Here are some key highlights from its business lines:

- **Portal/Search:** Currently, Alibaba is still focused on integrating the Yahoo! operations into its business. In the coming months, post the integration period, Alibaba plans to launch a new search initiative to gain share in the China market. Per Jack Ma, he noted the launch will be post his birthday (Sept. 10) and expects to gain search market share, targeting the current leaders: Baidu and Google.

- **Marketplace:** Taobao gaining share in online auctions, reaching 59% of GMV market share in 2005, up from 8% in 2003. This compares to eBay China at 36% in 2005, down from the 79% level in 2003 according to iResearch. In addition, Taobao recently added monetization initiatives on its site, where sellers have an option to pay commissions in return for preferred listing placement. Commissions are on an auction-based platform, where the highest bidder achieves the top placement. We view this as a positive, as the company is monetizing its user base, at the discretion of still providing the free listing option.

- **Payments:** AliPay's escrow based online payment system continues to gain traction as it addresses the trust factor in online China payments. Currently, 98% of the items listed on Taobao are AliPay enabled and over 70% of items purchased on Taobao are completed through AliPay.

Furthermore, Alibaba pointed out four elements to be successful in China e-commerce and another to be disclosed at a later time (Per Jack Ma). The elements are: 1) Marketplaces (a place where buyers/sellers transact) 2) Trust Record (fraud-free environment), 3) Payment (ability to facilitate transaction) and lastly 4) Search (consumers find what they want). In terms of financials, the company expects revenue to be more than $200mn in 2006, growing more than 100% Y/Y, faster than Tencent, Netease and Tom Online.

## PT of $44, Maintain BUY

We are maintaining our 12-month price target of based on 26x 2006E EBITDA (or 21x 2007 EBITDA) plus $2.57 per share in cash, $4.93 per share for the 34% stake in Yahoo! Japan , which reflects a 40% liquidation discount to current market value, $0.94 per share in the Alibaba stake and $0.43 per share outstanding in share repurchase contracts. The stock currently trades at 18x our 2006E EBITDA and 15x our 2007E EBITDA. Given our expectations for 20%-30% EBITDA growth over the next 2-3 years, we feel that our target multiplies are justified and expect the share price to rise as investors appreciate the sustained growth profile of the advertising business at Yahoo!. Note that the internet media group currently trades at about 20x-21x its 2006E EBTIDA and 15x its 2007E EBITDA. Maintain BUY rating.

## Investment risks

* Increase in online advertising spending by large brand marketers may be slower or less pronounced than expected

* Competition from paid search companies Google and MSN, may impede Yahoo!'s paid search business growth





* Acceptance of Yahoo!'s new paid search platform may be slower or less widespread than expected

* Integration of acquisitions may not proceed as quickly as expected or may create disruptions to the business that impact operating results



# Appendix 1

## Important Disclosures

Additional information available upon request

| Disclosure checklist | | | |
|---|---|---|---|
| **Company** | **Ticker** | **Recent price** | **Disclosure** |
| Yahoo! | YHOO.OQ | 30.11 (USD) 17 May 06 | 2,6,7,14 |

2.  Deutsche Bank and/or its affiliate(s) makes a market in securities issued by this company.

6.  Deutsche Bank and/or its affiliate(s) owns one percent or more of any class of common equity securities of this company calculated under computational methods required by US law.

7.  Deutsche Bank and/or its affiliate(s) has received compensation from this company for the provision of investment banking or financial advisory services within the past year.

14. Deutsche Bank and/or its affiliate(s) has received non-investment banking related compensation from this company within the past year.

**For disclosures pertaining to recommendations or estimates made on securities other than the primary subject of this research, please see the most recently published company report or visit our global disclosure look-up page on our website at http://gm.db.com.**

## Analyst Certification

The views expressed in this report accurately reflect the personal views of the undersigned lead analyst(s) about the subject issuer and the securities of the issuer.  In addition, the undersigned lead analyst(s) has not and will not receive any compensation for providing a specific recommendation or view in this report. Jeetil Patel

17 May 2006    Internet  Yahoo!                                     **Deutsche Bank**

## Historical recommendations and target price: Yahoo! (YHOO.OQ)

*(as of 5/17/2006)*



Previous Recommendations

Strong Buy
Buy
Market Perform
Underperform
Not Rated
Suspended Rating

Current Recommendations

Buy
Hold
Sell
Not Rated
Suspended Rating

*New  Recommendation  Structure
as of September 9, 2002

| 1. | 7/8/2004: | Buy, Target Price Change USD35.00 | 3. | 1/19/2005: | Buy, Target Price Change USD46.00 |
| 2. | 10/13/2004: | Buy, Target Price Change USD38.00 | 4. | 1/18/2006: | Buy, Target Price Change USD44.00 |

## Equity rating key                              Equity rating dispersion and banking relationships

**Buy:** Expected  total return (including dividends) of 10%
or more over a 12-month period.
**Hold:** Expected  total return (including dividends)
between -10% and 10% over a 12-month period.
**Sell:** Expected  total return (including dividends) of -
10% or worse over a 12-month period.
**Notes:**
1.   Published research ratings may occasionally fall
outside these definitions, in which case additional
disclosure will be included in published research and on
our disclosure website (http://gm.db.com);
2.   Newly issued research recommendations and
target prices always supersede previously published
research.



North American Universe

## Regulatory Disclosures

## Disclosures required by United States laws and regulations

See company-specific disclosures above for any of the following disclosures required for covered companies referred to in this report: acting as a financial advisor, manager or co-manager in a pending transaction; 1% or other ownership; compensation for certain services; types of client relationships; managed/comanaged public offerings in prior periods; directorships; market making and/or specialist role.

### The following are additional required disclosures:

Ownership and Material Conflicts of Interest: DBSI prohibits its analysts, persons reporting to analysts and members of their households from owning securities of any company in the analyst's area of coverage.

Analyst compensation: Analysts are paid in part based on the profitability of DBSI, which includes investment banking revenues.

Analyst as Officer or Director: DBSI policy prohibits its analysts, persons reporting to analysts or members of their households from serving as an officer, director, advisory board member or employee of any company in the analyst's area of coverage.

Distribution of ratings: See the distribution of ratings disclosure above.

Price Chart: See the price chart, with changes of ratings and price targets in prior periods, above, or, if electronic format or if with respect to multiple companies which are the subject of this report, on the DBSI website at http://gm.db.com.

### Additional disclosures required under the laws and regulations of jurisdictions other than the United States

The following disclosures are those required by the jurisdiction indicated, in addition to those already made pursuant to United States laws and regulations.

Analyst compensation: Analysts are paid in part based on the profitability of Deutsche Bank AG and its affiliates, which includes investment banking revenues

**Australia:** This research, and any access to it, is intended only for "wholesale clients" within the meaning of the Australian Corporations Act.

**Germany:** See company-specific disclosures above for (i) any net short position, (ii) any trading positions (iii) holdings of five percent or more of the share capital. In order to prevent or deal with conflicts of interests Deutsche Bank AG has implemented the necessary organisational procedures to comply with legal requirements and regulatory decrees. Adherence to these procedures is monitored by the Compliance-Department.

**EU:** A general description of how Deutsche Bank AG identifies and manages conflicts of interest in Europe is contained in our public facing policy for managing conflicts of interest in connection with investment research.

**Hong Kong:** See http://gm.db.com for company-specific disclosures required under Hong Kong regulations in connection with this research report.  Disclosure #5 includes an associate of the research analyst.  Disclosure #6, satisfies the disclosure of financial interests for the purposes of paragraph 16.5(a) of the SFC's Code of Conduct (the "Code").  The 1% or more interests is calculated as of the previous month end.  Disclosures #7 and #8 combined satisfy the SFC requirement under paragraph 16.5(d) of the Code to disclose an investment banking relationship.

**Japan:** See company-specific disclosures as to any applicable disclosures required by Japanese stock exchanges, the Japanese Securities Dealers Association or the Japanese Securities Finance Company.

**United Kingdom:** Persons who would be categorized as private customers in the United Kingdom, as such term is defined in the rules of the Financial Services Authority, should read this research in conjunction with prior Deutsche Bank AG research on the companies which are the subject of this research.

**Turkey :** The information, interpretation and advice submitted herein are not in the context of an investment consultancy service. Investment consultancy services are provided by brokerage firms, portfolio management companies and banks that are not authorized to accept deposits through an investment consultancy agreement to be entered into such corporations and their clients. The interpretation and advices herein are submitted on the basis of personal opinion of the relevant interpreters and consultants. Such opinion may not fit your financial situation and your profit/risk preferences. Accordingly, investment decisions solely based on the information herein may not result in expected outcomes.

**Deutsche Bank Securities Inc.**

## North American locations

**Deutsche Bank Securities Inc.**
60 Wall Street
New York, NY 10005
(212) 250 2500

**Deutsche Bank Securities Inc.**
225 Franklin Street
25th Floor
Boston, MA  02110
(617) 988 8600

**Deutsche Bank Securities Inc.**
222 West Adams Street
Suite 1900
Chicago, IL  60606
(312) 424 6000

**Deutsche Bank Securities Inc.**
3033 East First Avenue
Suite 303, Third Floor
Denver, CO  80206
(303) 394 6800

**Deutsche Bank Securities Inc.**
1735 Market Street
24th Floor
Philadelphia, PA  19103
(215) 854 1546

**Deutsche Bank Securities Inc.**
101 California Street
46th Floor
San Francisco, CA  94111
(415) 617 2800

## International locations

**Deutsche Bank Securities Inc.**
60 Wall Street
New York, NY 10005
United States of America
Tel: (1) 212 250 2500

**Deutsche Bank AG London**
1 Great Winchester Street
London EC2N 2EQ
United Kingdom
Tel: (44) 20 7545 8000
Fax: (44) 20 7545 6155

**Deutsche Bank AG**
Große Gallusstraße 10-14
60272 Frankfurt am Main
Germany
Tel: (49) 69 910 41339

**Deutsche Bank AG**
Deutsche Bank Place
Level 16
Corner of Hunter & Phillip Streets
Sydney, NSW 2000
Australia
Tel: (61) 2 8258 1234
Fax: (61) 2 8258 1400

**Deutsche Bank AG**
Level 55
Cheung Kong Center
2 Queen's Road Central
Hong Kong
Tel: (852) 2203 8888
Fax: (852) 2203 6921

**Deutsche Securities Inc.**
Level 20, 2-11-1 Nagatacho
Sanno Park Tower
Chiyoda-ku, Tokyo 100-6171
Japan
Tel: (81) 3 5156 6701
Fax: (81) 3 5156 6700

# Global Disclaimer

The information and opinions in this report were prepared by Deutsche Bank AG or one of its affiliates (collectively "Deutsche Bank").  The information herein is believed by Deutsche Bank to be reliable and has been obtained from public sources believed to be reliable.  With the exception of information about Deutsche Bank, Deutsche Bank makes no representation as to the accuracy or completeness of such information.

This published research report may be considered by Deutsche Bank when Deutsche Bank is deciding to buy or sell proprietary positions in the securities mentioned in this report.

For select companies, Deutsche Bank equity research analysts may identify shorter-term opportunities that are consistent or inconsistent with Deutsche Bank's existing, longer-term Buy or Sell recommendations.  This information is made available on the SOLAR stock list, which can be found at http://gm.db.com.

Deutsche Bank may trade for its own account as a result of the short term trading suggestions of analysts and may also engage in securities transactions in a manner inconsistent with this research report and with respect to securities covered by this report, will sell to or buy from customers on a principal basis.  Disclosures of conflicts of interest, if any, are discussed at the end of the text of this report or on the Deutsche Bank website at http://gm.db.com.

Opinions, estimates and projections in this report constitute the current judgement of the author as of the date of this report.  They do not necessarily reflect the opinions of Deutsche Bank and are subject to change without notice.  Deutsche Bank has no obligation to update, modify or amend this report or to otherwise notify a reader thereof in the event that any matter stated herein, or any opinion, projection, forecast or estimate set forth herein, changes or subsequently becomes inaccurate, except if research on the subject company is withdrawn.  Prices and availability of financial instruments also are subject to change without notice.  This report is provided for informational purposes only.  It is not to be construed as an offer to buy or sell or a solicitation of an offer to buy or sell any financial instruments or to participate in any particular trading strategy in any jurisdiction.  The financial instruments discussed in this report may not be suitable for all investors and investors must make their own investment decisions using their own independent advisors as they believe necessary and based upon their specific financial situations and investment objectives.  If a financial instrument is denominated in a currency other than an investor's currency, a change in exchange rates may adversely affect the price or value of, or the income derived from, the financial instrument, and such investor effectively assumes currency risk.  In addition, income from an investment may fluctuate and the price or value of financial instruments described in this report, either directly or indirectly, may rise or fall.  Furthermore, past performance is not necessarily indicative of future results.

Unless governing law provides otherwise, all transactions should be executed through the Deutsche Bank entity in the investor's home jurisdiction.  In the U.S. this report is approved and/or distributed by Deutsche Bank Securities Inc., a member of the NYSE, the NASD, NFA and SIPC. In Germany this report is approved and/or communicated by Deutsche Bank AG Frankfurt authorised by Bundesanstalt für Finanzdienstleistungsaufsicht. In the United Kingdom this report is approved and/or communicated by Deutsche Bank AG London, a member of the London Stock Exchange and regulated by the Financial Services Authority for the conduct of investment business in the UK and authorised by Bundesanstalt für Finanzdienstleistungsaufsicht (BaFin). This report is distributed in Hong Kong by Deutsche Bank AG, Hong Kong Branch, in Korea by Deutsche Securities Korea Co. and in Singapore by Deutsche Bank AG, Singapore Branch.  In Japan this report is approved and/or distributed by Deutsche Securities Inc. The information contained in this report does not constitute the provision of investment advice. In Australia, retail clients should obtain a copy of a Product Disclosure Statement (PDS) relating to any financial product referred to in this report and consider the PDS before making any decision about whether to acquire the product.  **Additional information relative to securities, other financial products or issuers discussed in this report is available upon request.**  This report may not be reproduced, distributed or published by any person for any purpose without Deutsche Bank's prior written consent.  Please cite source when quoting.

**Copyright © 2006 Deutsche Bank AG**                                                                                                          12/2005

Exhibit 37

# Jefferies & Company, Inc.

May 18, 2006

**Technology**
**Internet Software & Services**

# Yahoo! (NASDAQ: YHOO)

### Time for Yahoo! Search to Catch up!

## Investment Summary

Yahoo! is the only player today with scale and strength in both graphic and search advertising in our view, and we continue to believe that it's very well positioned to lead this market. With valuations near a two-year low, we recommend purchase of the stock on the pullback.

**Company Update**

| | |
|---|---|
| Rating: | BUY |
| Price: | $30.11 |
| Price Target: | $45.00 |
| **Bloomberg:** | **NASDAQ: YHOO** |

### Market Data

| | |
|---|---|
| 52-Week Range: | $43.66-$29.75 |
| Total Entprs. Value (MM): | $37,806.9 |
| Insider Ownership: | 10.0% |
| Institutional Ownership: | 72.0% |
| Shares Out. (MM): | 1,408.8 |
| Market Cap. (MM): | $42,419.0 |
| Float (MM): | 1,240.0 |
| Float (%): | NA |
| Avg. Daily Vol.: | 20,101,594 |

### Financial Summary

| | |
|---|---|
| Book Value (MM): | $6116.70 |
| Net Debt (MM): | ($4612.10) |
| Net Debt/Capital: | 11% |
| Cash/Share: | $2.04 |
| 5 Yr. Rev. CAGR: | 19.0% |

*EV(02) ($Mils.): Not adjusted for Yahoo! Japan*

| USD | 2004A | 2005A | 2006E | 2007E |
|---|---|---|---|---|
| Rev. (MM) | 2599.7 | 3695.9 | 4721.4 | 5814.1 |
| EV/Rev. | 14.5x | 10.2x | 8.0x | 6.5x |
| EBITDA (MM) | 1,031.9 | 1,557.3 | 1,945.9 | 2,598.5 |
| EV/EBITDA | 36.6x | 24.3x | 19.4x | 14.5x |
| **EPS** | | | | |
| Mar | 0.06 | 0.13 | 0.15A | — |
| Jun | 0.08 | 0.13 | 0.15 | — |
| Sep | 0.09 | 0.16 | 0.17 | — |
| Dec | 0.13 | 0.16 | 0.21 | — |
| **FY Dec** | **0.36** | **0.58** | **0.67** | **0.83** |
| FY P/E | 83.6x | 51.9x | 44.9x | 36.3x |
| *Recurring EPS* | | | | |
| **Consensus** | **—** | **—** | **0.54** | **0.73** |
| *Consensus data is for GAAP EPS* | | | | |

**Youssef H. Squali**
(212) 284-2121, ysquali@Jefferies.com

**Hagit Reindel**
(212) 284-2064, hreindel@Jefferies.com

**Naved Khan**
(212) 284-2566, nkhan@Jefferies.com

## Event

Yahoo! held a well-attended Analyst Day in CA yesterday. We're reiterating our Buy rating and $45 price target.

## Key Points

- While AD presentations highlighted strength in various areas of the Yahoo! business, much emphasis was put on the new search platform, which is set to launch in 3Q, and which should dramatically improve the company's standing against Google.
- We believe that the first version of this platform will help Yahoo! improve search relevancy, click-throughs and ultimately shrink the monetization gap with Google's AdWords. Over time, we believe that Yahoo! is building a differentiated search experience by drawing on its massive engaged audience of active registered users, and offering advertisers different ways of targeting audiences including behavioral and geographic.
- Financially, management reiterated its FY06 guidance of $4.6-4.85B in revenues, $1.915B-$2.055B in operating cash flow and $1.4BB-$1.55B in free cash flow. Longer term, Sue Decker, CFO, spoke to a doubling in marketing services revenue FY05 to FY08, which we view positively since it implies a 26% CAGR vs. our 23% estimate.
- However, she also spoke to a levelling off of margins long-term, which may be construed negatively since expectations are for incremental margin improvement overtime. While we agree that long-term margins are likely to stabilize, we expect to see improvement from FY06' 42% guidance over the next couple of years, driven primarily by better monetization.
- We believe that Yahoo! should continue to grow its branded advertising faster than the market and gain share, given its scale and depth, and its focus on Fortune 500 companies.
- Yahoo!'s investment in China's Alibaba was another high point. Alibaba is now #1 in C2C auctions, #1 in B2B commerce, #1 in online payment and is expected to improve Yahoo! China's position in the advertising and search markets where it's currently #3.

## Valuation/Risks

- With valuations near a two-year low, we're reiterating our Buy rating and $45 price target. The stock is trading at EV/EBITDA of 17.3x on FY06 and 12.9x FY07 estimates, vs. eBay (EBAY-$29.51-Buy) at 17.2x and 13.2x, respectively, and Google (GOOG-$374.50-Buy) at 24.4x and 17.0x. Our FY07 target of $45 is DCF-based and implies 28.5x FY06 EV/EBITDA and 21.3x FY07.
- Risks include: 1) competition from Google, 2) the rise of MSN, and 3) execution of the new initiatives underway.

## Impact on Other Companies

EBAY - negative

Please see important disclosure information on pages 12 - 15 of this report.



Top of mind at this year's Analyst Day was Yahoo!'s new search advertising platform, which was initially announced on May 8, 2006, and based on our channel checks, is being met with much enthusiasm from advertisers. While this will be the first version of many iterations to come, it should help close the technological gap between the old GoTo platform (later Overture) and Google's more sophisticated AdWords system. New features and capabilities such as a simplified control panel, fast ad activation, ad testing, click forecasting and analytics, which are already part of Google AdWords, will now be offered on the Yahoo!'s platform. This discrepancy between the two platforms is what has accounted for the large difference in search monetization between Yahoo! and Google, which we estimate at more than 30%. With the new platform,Yahoo! should over time recapture much of that difference, in our view.

The new version is currently being tested and will become available to advertisers in 3Q06. And while we expect a positive effect from phase 1 and 2 roll out (i.e. roll out of the platform and tools to enhance advertisers' experience including ad testing, enhanced geo targeting and analytics), we believe that a meaningful financial lift will only occur after the phase 3 roll out, which will include an implementation of a quality-based ranking model. Phase 3 is expected in 4Q06. Like with Google, the ability to rank ads based on click through rates - not just bid amounts, should increase overall relevancy of the results and drive click throughs higher, ultimately resulting in incremental high-margin revenues to Yahoo!.

Over time, we believe that Yahoo!'s engaged audience of active registered users will prove to be a competitive advantage as the company evolves its search platform and makes it smarter and more comprehensive by integrating new services, such as Yahoo! Answers in the algorithmic results (announced earlier this week.) We believe that this is a key component to reinvigorating traffic to Yahoo! Search and growing query share again. In addition, the information that Yahoo! collects on its user base should allow it to use behavioral and geographic information to better target audiences for advertisers.

In addition to Terry Semel, CEO, Dan Rosensweig, COO and Sue Decker, CFO, several executives presented their respective businesses, with search clearly being center stage. Below are highlights from some of these presentations.


### Financial Framework (Sue Decker):

Management reiterated that their financial target is to maximize free cash flow per share, a measure that incorporates share count and thus dilution from employee stock options. It is driven by revenue growth, margins and return on free cash.

- Revenues: Yahoo! drives to increase users and ARPU on both the consumer (demand) and advertiser (supply) sides.
  - On the user side, globalization and time spent online are the major drivers, and Yahoo! is investing in personalization, community and relevant content to create stickiness through engagement. Yahoo!'s market share of global online advertising dollars increased to 13% in FY05 from 10% in 2001. ARPU doubled in 2005 and going forward more than 50% of growth should come from ARPU.
  - On the advertiser side, Yahoo! focuses on both the top 200 advertisers and the tail of smaller advertisers. With the top 200 advertisers, the goal is deeper monetization - spending increased 4x in the past three years and could increase 2-4x in the next few years. With respect to the "tail" the goal is volume - with the company driving to increase the number of advertisers 2-4x.
  - Longer term, management spoke to a doubling in marketing services revenue FY05 to FY08, which we view positively since it implies a 26% CAGR vs. our 23% estimate.
- Margins: While merely a "framework" (i.e. not guidance), management spoke of 40%sh OCF margin as representing a good balance between profitability and investment in future growth. Going forward several developments should have a positive impact on margins, such as better search monetization and network optimization. Other developments such as rising TAC and data center costs will have a negative effect on margins. This levelling off of margins long-term is likely to be construed negatively since expectations are for incremental margin improvement overtime. While we agree that long-term margins are likely to stabilize, we expect to see improvement from FY06' 42% guidance over the next couple of years, as benefits of better monetization more than offsets rising costs.
- Return on free cash: YTD Yahoo! spent $1B on stock repurchases and is generating 17-20% return on structured stock repurchases. Acquisitions are also a good source of return on investment, generating over 20% on acquisitions where Yahoo! becomes a principal (such as Overture, Kelkoo) and good returns also on technology acquisitions. As a result, $13 per share or 40% of the stock price is off the P&L (Japan, China, cash and NOLs).

---

Please see important disclosure information on pages 12 - 15 of this report.

**Jefferies & Company, Inc.**

Youssef H. Squali , ysquali@Jefferies.com, (212) 284-2121

Page 2 of 15

*36*

**Search monetization (Tim Cadogan):**

The strategy is to leverage Yahoo!'s knowledge of advertisers' goals and consumer intent to create the leading search platform. The priorities are as follows:
- Launch a high performing extensible platform through speed, reliability, scale, and rapid innovation. Version 1.0 will launch this year. In the future, the platform will have additional ad formats, targeting options and distribution channels.
- Enhance the advertiser experience through fast editorial and intuitive control, testing of different creative, geo-targeting, analytics and optimization, and bidding and budget tools that are easier to navigate.
- Incentive alignment – expose more data about the ad quality (more than any other competitor) and give more control and transparency regarding the bidding strategy.
- Consumer experience – the company is working on a new ranking algorithm and enhanced geo-targeting (based on the "Where On Earth" acquisition).
- Expand advertiser participation – increasingly targeting small businesses and maintaining relationships with Fortune 500 advertisers.

The timing of the roll out is as follows:
- Platform and advertiser experience – completed code in 2Q06, began testing and will deploy in the US in 3Q06 and internationally in 1Q07.
- Marketplace design will launch in the US in 4Q06.

**Social Search (Jeff Weiner):**

Search is on the threshold of a shift from webmasters to users. Technology will allow everyone to share knowledge. Key factors for success include infrastructure, a first mover advantage and critical mass, communities, registered users, broad distribution and incentives for users to generate content. Yahoo!'s search vision is to enrich people's lives by enabling them to find, use, share and expand ("FUSE") all human knowledge. Social search strategy is to obtain critical mass of user generated content and distribute it globally. Leverage data (such as notes and tags) to deliver a better search experience. Management stressed the following priorities:
- Knowledge search – Yahoo! Answers generates critical mass through its first mover advantage. Already in North America and Asia, Yahoo! Answers will deploy in additional geographies such as France, Germany and Latin America. In the future will use Babelfish technology to translate answers. Yahoo! Groups is a source of untapped knowledge. Yahoo! Answers reached 7.2M users in April (with an accelerating sequential month over month growth rate) and generated 10M answers to date. The company deployed the service in Taiwan in 2004, which increased Yahoo! Search's market share in that country from 50% to 65%. In the US, Yahoo! will roll out a reputation system within Answers in the next few weeks.
- Social bookmarking – adds community element by allowing bookmarks to be shared. Will enhance opinion-based queries. del.icio.us offers flavored results based on its community's interests.
- Social media – combining Flickr "the eyes of the world" with the largest Internet audience. Flickr has 12M unique users, up 900% y/y, and 260M photo tags generated. Yahoo!'s video search technology already the most comprehensive in the market and the only one crawling the web for video.
- Monetization – social search creates monetizable inventory, although it's in its very early stage.

**Operational framework (Dan Rosensweig):**
- Customer Focus – Yahoo! delivers on the evolving expectations of users. From the initial directory, to mail and IM, to social media such as 360 and Flickr Yahoo! answers the changing need from information to communication to community. The new home page provides personalized content to users in areas such as news and video.
- Monetization – Yahoo! provides advertisers with the formats they need (from pop ups to standardized ad formats to multiple formats such as video or text). The company will use the data amassed on users to do behavioral targeting, with geographical and contextual targeting already in place. The company is also investing in reporting and analytics, which is key to understanding the impact of advertising and ROI.
- Platforms - areas of investment are media, advertising, data, community, personalization and communications. Yahoo! has a lead in all areas, and is nimble, faster, less expensive and global.
- Beyond the PC – moving beyond the browser into mobile. Yahoo! is aggressively moving to offer its content and applications on other platforms. These applications are now built to be global in nature. For the mobile platform in particular, the company has over 50 mobile partnerships already signed and will be supported by over 50% of handsets over the next 18 months.

Please see important disclosure information on pages 12 - 15 of this report.

Youssef H. Squali , ysquali@Jefferies.com, (212) 284-2121

**Jefferies & Company, Inc.**

Page 3 of 15

37

**Media (Lloyd Braun):**

Yahoo! has all the elements required to succeed in the market: content, community, personalization, search and audience reach. Community and personalization are key differentiators. The company's strategy is to leverage Yahoo!'s technology and global network to deliver the most innovative and engaging media experiences for audiences and advertisers and create a superior user experience through licensed content, some original content (in a cost effective and strategic way), and user generated content. New programming principles will be unique and difficult for competitors to match through interactivity, design, and new framing of choices for users. Search will be prominent on all properties. 2006 priorities in media are:

- Robust platforms – simplify ad formats across the systems to increase sell through, run video content and advertising consistently across the media group and build new publishing tools.
- Develop relationships to build rich media capabilities. Yahoo! is more of a partner than a competitor with the large media players (the new relationship with CBS is an example). Also develop new distribution partnerships.
- User generated content – turn "tail" content into "head" content. Offer revenue sharing to the top partners through YPN.
- Core brand extensions – Yahoo! Tech is an example. Include user generated content such as Yahoo! Answers.

**Alibaba (Jack Ma):**

Alibaba's assets are 1) the management team (combining market knowledge and entrepreneurship), 2) the organizational structure, which combines the respective strengths of Alibaba and Yahoo! and 3) $250M investment from Yahoo!. Alibaba is one the largest 4 Internet companies in China, with over $200M in revenues in FY06 and a growth rate that is higher than peers. The company has aspirations to going public at some point in the future but has no immediate plans to do so. Alibaba operates four divisions and all four have a strong position in their respective market:

- Alibaba is a clear leader in the B2B market. Registered a three-year GMV CAGR of 121% and doubled B2B revenues over the past four years, with growing average revenue per customer.
- Taobao is the number one in C2C and 2005 was a breakout year. GMV grew 8x to nearly $1B and 10M registered users were added. Market share grew to 59% in 2005 from 8% three years earlier. Users increased to 19M from 15M three years earlier.
- Alipay is the number one player in online payments and is integrated into the Taobao marketplace, fueling its growth. Over 70% of items sold on Taobao are completed through Alipay (up from 40% a year ago).
- Yahoo! search is now number 3 in the market, with the goal of becoming number 1. The company will launch a new search engine in September, which is expected to change the competitive landscape.

## Company Description
Yahoo! is an Internet consumer and business services company, offering a network of Web properties to roughly 400 million individuals worldwide.

---

Please see important disclosure information on pages 12 - 15 of this report.

Youssef H. Squali , ysquali@Jefferies.com, (212) 284-2121

**Jefferies & Company, Inc.**

Page 4 of 15

*38*

**Jefferies & Company**
Yahoo! Inc.
**Consolidated Statement of Operations**

Youssef Squali, (212) 284-2121
Hagit Reindel, (212) 284-2064
Naved Khan, (212) 284-2566

| Fiscal Year Ends Dec 31 | 2005A | | | | 2006E | | | |
|---|---|---|---|---|---|---|---|---|
| *(data in thousands, except share data)* | 1Q05A | 2Q05A | 3Q05A | 4Q05A | 1Q06A | 2Q06E | 3Q06E | 4Q06E |
| Marketing and listings revenue | $ 1,024,796 | $ 1,094,301 | $ 1,159,572 | $ 1,315,303 | $ 1,380,854 | $ 1,414,164 | $ 1,445,235 | $ 1,619,969 |
| Fee-based revenue | 148,946 | 158,696 | 170,357 | 185,697 | $ 186,201 | $ 196,546 | 207,465 | 218,991 |
| Total gross revenue | $ 1,173,742 | $ 1,252,997 | $ 1,329,929 | $ 1,501,000 | $ 1,567,055 | $ 1,610,709 | $ 1,652,700 | $ 1,838,959 |
| *Y/Y Growth* | *54.9%* | *50.5%* | *46.7%* | *39.3%* | *33.5%* | *28.5%* | *24.3%* | *22.5%* |
| TAC | (352,987) | (377,885) | (397,814) | (433,051) | (479,357) | (468,724) | (474,748) | (525,242) |
| **Total revenue (net of TAC)** | **$ 820,755** | **$ 875,112** | **$ 932,115** | **$ 1,067,949** | **$ 1,087,698** | **$ 1,141,985** | **$ 1,177,952** | **$ 1,313,717** |
| *Y/Y Growth* | *49%* | *44%* | *42%* | *36%* | *33%* | *30%* | *26%* | *23%* |
| | | | | | *11%* | | | |
| Other cost of revenue | (113,937) | (122,273) | (136,567) | (161,687) | (176,901) | (185,730) | (171,852) | (163,608) |
| **Gross profit** | **$ 706,818** | **$ 752,839** | **$ 795,548** | **$ 906,262** | **$ 910,797** | **$ 956,255** | **$ 1,006,100** | **$ 1,150,110** |
| *Y/Y Growth* | *51.4%* | *43.4%* | *41.1%* | *33.9%* | *28.9%* | *27.0%* | *26.5%* | *26.9%* |
| Sales & marketing | (230,519) | (246,406) | (265,714) | (282,610) | (292,293) | (309,950) | (311,719) | (330,264) |
| *% Total revenues* | *-28.1%* | *-28.2%* | *-28.5%* | *-26.5%* | *-26.9%* | *-27.1%* | *-26.5%* | *-25.1%* |
| Product development | (119,349) | (125,544) | (141,616) | (160,628) | (179,860) | (198,279) | (202,478) | (208,879) |
| *% Total revenues* | *-14.5%* | *-14.3%* | *-15.2%* | *-15.0%* | *-16.5%* | *-17.4%* | *-17.2%* | *-15.9%* |
| General & administrative | (73,545) | (81,430) | (77,733) | (86,982) | (97,933) | (102,821) | (104,999) | (111,245) |
| *% Total revenues* | *-9.0%* | *-9.3%* | *-8.3%* | *-8.1%* | *-9.0%* | *-9.0%* | *-8.9%* | *-8.5%* |
| Stock compensation expense | (9,466) | (10,948) | (13,524) | (18,533) | (108,641) | (97,500) | (112,500) | (112,500) |
| *% Total revenues* | *-1.2%* | *-1.3%* | *-1.5%* | *-1.7%* | *-10.0%* | *-8.5%* | *-9.6%* | *-8.6%* |
| Amortization of intangibles | (26,576) | (27,154) | (26,904) | (28,561) | (30,858) | (29,521) | (26,962) | (24,625) |
| *% Total revenues* | *-3.2%* | *-3.1%* | *-2.9%* | *-2.7%* | *-2.8%* | *-2.6%* | *-2.3%* | *-1.9%* |
| Restructuring/acquisition-related expense | - | - | - | - | - | - | - | - |
| Total operating costs | $ (459,455) | $ (491,482) | $ (525,491) | $ (577,314) | $ (709,585) | $ (738,070) | $ (758,659) | $ (787,514) |
| *Y/Y Growth* | *37.3%* | *30.9%* | *34.2%* | *30.7%* | *54.4%* | *50.2%* | *44.4%* | *36.4%* |
| **Operating income (loss)** | **$ 247,363** | **$ 261,357** | **$ 270,057** | **$ 328,948** | **$ 201,212** | **$ 218,184** | **$ 247,441** | **$ 362,596** |
| *Operating margin* | *30.1%* | *29.9%* | *29.0%* | *30.8%* | *18.5%* | *19.1%* | *21.0%* | *27.6%* |
| *Y/Y Growth* | *25.5%* | *21.7%* | *10.3%* | *3.0%* | *-38.6%* | *-36.0%* | *-27.5%* | *-10.4%* |
| Other income (expense) | 49,994 | 979,736 | 65,995 | 340,132 | 35,436 | 23,102 | 25,561 | 26,001 |
| Pre-tax income (loss) | 297,357 | 1,241,093 | 336,052 | 669,080 | 236,648 | 241,286 | 273,002 | 388,597 |
| Income tax provision | (120,435) | (515,855) | (113,797) | (17,729) | (102,932) | (104,949) | (118,745) | (169,023) |
| Tax rate | -40.5% | -41.6% | -33.9% | -2.6% | -43.5% | -43.5% | -43.5% | -43.5% |
| Earnings in equity interests | 29,378 | 33,105 | 32,164 | 33,597 | 26,437 | 26,437 | 26,437 | 26,437 |
| Minority interest | (1,740) | (3,654) | (646) | (1,740) | (294) | (294) | (294) | (294) |
| Cumulative effect of accounting change | | | | | | | | |
| **Net income (loss)** | **$ 204,560** | **$ 754,689** | **$ 253,773** | **$ 683,208** | **$ 159,859** | **$ 162,480** | **$ 180,401** | **$ 245,716** |
| *Net margin* | *17.4%* | *60.2%* | *19.1%* | *45.5%* | *10.2%* | *10.1%* | *10.9%* | *13.4%* |
| **EPS** | **$ 0.14** | **$ 0.51** | **$ 0.17** | **$ 0.46** | **$ 0.11** | **$ 0.11** | **$ 0.12** | **$ 0.16** |
| Basic shares o/s | 1,384,958 | 1,395,596 | 1,398,272 | 1,408,338 | 1,404,703 | 1,407,203 | 1,409,703 | 1,412,203 |
| Diluted shares o/s | 1,477,811 | 1,484,200 | 1,486,876 | 1,496,942 | 1,493,307 | 1,495,807 | 1,498,307 | 1,500,807 |
| **EBITDA:** | | | | | | | | |
| Operating income (loss) | $ 247,363 | $ 261,357 | $ 270,057 | $ 328,948 | $ 201,212 | $ 218,184 | $ 247,441 | $ 362,596 |
| Add: D&A | 88,233 | 96,135 | 101,541 | 111,233 | 125,079 | 121,458 | 117,795 | 120,992 |
| Add: Stock compensation expense | 9,466 | 10,948 | 13,524 | 18,533 | 108,641 | 97,500 | 112,500 | 112,500 |
| Add: restructuring/acquisition-related costs | - | - | - | - | - | - | - | - |
| **EBITDA** | **$ 345,062** | **$ 368,440** | **$ 385,122** | **$ 458,714** | **$ 434,932** | **$ 437,143** | **$ 477,737** | **$ 596,088** |
| *Y/Y Growth* | *63.6%* | *57.4%* | *48.3%* | *40.2%* | *26.0%* | *18.6%* | *24.0%* | *29.9%* |
| *EBITDA Margin (ex-TAC)* | *42.0%* | *42.1%* | *41.3%* | *43.0%* | *40.0%* | *38.3%* | *40.6%* | *45.4%* |
| **EBITDA per share** | **$ 0.23** | **$ 0.25** | **$ 0.26** | **$ 0.31** | **$ 0.29** | **$ 0.29** | **$ 0.32** | **$ 0.40** |
| **RECURRING EARNINGS:** | | | | | | | | |
| Net income | $ 204,560 | $ 754,689 | $ 253,773 | $ 683,208 | $ 159,859 | $ 162,480 | $ 180,401 | $ 245,716 |
| Add: Non-recurring items | (11,384) | (563,000) | (16,185) | (436,610) | $ 65,185 | $ 58,500 | $ 67,500 | $ 67,500 |
| **Recurring net income (loss)** | **$ 193,176** | **$ 191,689** | **$ 237,588** | **$ 246,598** | **$ 225,044** | **$ 220,980** | **$ 247,901** | **$ 313,216** |
| *Net margin* | *16.5%* | *15.3%* | *17.9%* | *16.4%* | *14.4%* | *13.7%* | *15.0%* | *17.0%* |
| **Recurring EPS** | **$ 0.13** | **$ 0.13** | **$ 0.16** | **$ 0.16** | **$ 0.15** | **$ 0.15** | **$ 0.17** | **$ 0.21** |
| *Y/Y Growth* | *104.4%* | *66.4%* | *87.3%* | *29.6%* | *15.3%* | *14.4%* | *3.5%* | *26.7%* |

*Source: Company Reports and Jefferies & Company*

Please see important disclosure information on pages 12 - 15 of this report.
Youssef H. Squali , ysquali@Jefferies.com, (212) 284-2121

**Jefferies & Company, Inc.**
Page 5 of 15

*39*

**Jefferies & Company**
**Yahoo! Inc.**
**Consolidated Statement of Operations**

Youssef Squali, (212) 284-2121
Hagit Reindel, (212) 284-2064
Naved Khan, (212) 284-2566

| Fiscal Year Ends Dec 31 *(data in thousands, except share data)* | FY05A | FY06E | FY07E | FY08E | FY09E | FY10E | FY11E | CAGR 2006-2011 |
|---|---|---|---|---|---|---|---|---|
| Marketing and listings revenue | $ 4,593,972 | $ 5,860,222 | $ 7,120,869 | $ 8,539,534 | $ 10,150,833 | $ 11,985,151 | $ 14,074,052 | 19.2% |
| Fee-based revenue | 663,696 | 809,202 | 963,089 | 1,099,469 | 1,222,382 | 1,329,379 | 1,418,726 | 11.9% |
| Total gross revenue | 5,257,668 | 6,669,423 | 8,083,958 | 9,639,002 | 11,373,214 | 13,314,530 | 15,492,778 | 18.4% |
| *Y/Y Growth* | 47.1% | 26.9% | 21.2% | 19.2% | 18.0% | 17.1% | 16.4% | |
| TAC | (1,561,737) | (1,948,071) | (2,269,910) | (2,641,526) | (3,069,674) | (3,561,744) | (4,125,727) | |
| **Total revenue (net of TAC)** | **$ 3,695,931** | **$ 4,721,353** | **$ 5,814,048** | **6,997,476** | **8,303,541** | **9,752,786** | **11,367,051** | **19.2%** |
| *Y/Y Growth* | 42% | 28% | 23% | 20% | 19% | 17% | 17% | |
| | | | | | | | | |
| Other cost of revenue | (534,464) | (698,091) | (859,655) | (1,034,635) | (1,227,747) | (1,442,030) | (1,680,713) | |
| **Gross profit** | **$ 3,161,467** | **$ 4,023,261** | **$ 4,954,392** | **5,962,841** | **7,075,793** | **8,310,756** | **9,686,338** | **19.2%** |
| *Y/Y Growth* | 41.6% | 27.3% | 23.1% | 20.4% | 18.7% | 17.5% | 16.6% | |
| | | | | | | | | |
| Sales & marketing | (1,025,249) | (1,244,227) | (1,503,117) | (1,774,083) | (2,063,694) | (2,375,114) | (2,711,404) | 16.9% |
| *% Total revenues* | -27.7% | -26.4% | -25.9% | -25.4% | -24.9% | -24.4% | -23.9% | |
| Product development | (547,137) | (789,496) | (919,888) | (1,044,150) | (1,164,307) | (1,279,742) | (1,389,260) | 12.0% |
| *% Total revenues* | -14.8% | -16.7% | -15.8% | -14.9% | -14.0% | -13.1% | -12.2% | |
| General & administrative | (319,690) | (416,998) | (498,971) | (583,041) | (671,106) | (763,854) | (861,869) | 15.6% |
| *% Total revenues* | -8.6% | -8.8% | -8.6% | -8.3% | -8.1% | -7.8% | -7.6% | |
| Stock compensation expense | (52,471) | (431,141) | (452,698) | (475,333) | (499,100) | (524,055) | (550,257) | |
| *% Total revenues* | -1.4% | -9.1% | -7.8% | -6.8% | -6.0% | -5.4% | -4.8% | |
| Amortization of intangibles | (109,195) | (111,966) | (185,360) | (61,787) | (11,234) | (535) | (190) | -72.1% |
| *% Total revenues* | -3.0% | -2.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | |
| Restructuring/acquisition-related expense | - | - | - | - | - | - | - | |
| Total operating costs | $ (2,053,742) | $ (2,993,828) | $ (3,560,034) | $ (3,938,395) | $ (4,409,441) | $ (4,943,300) | $ (5,512,979) | 13.0% |
| *Y/Y Growth* | 33.0% | 45.8% | 18.9% | 10.6% | 12.0% | 12.1% | 11.5% | |
| | | | | | | | | |
| **Operating income (loss)** | **$ 1,107,725** | **$ 1,029,434** | **$ 1,394,359** | **$ 2,024,447** | **$ 2,666,352** | **$ 3,367,455** | **$ 4,173,359** | **32.3%** |
| *Operating margin* | 30.0% | 21.8% | 24.0% | 28.9% | 32.1% | 34.5% | 36.7% | |
| *Y/Y Growth* | 60.9% | -7.1% | 35.4% | 45.2% | 31.7% | 26.3% | 23.9% | |
| | | | | | | | | |
| Other income (expense) | 1,435,857 | 110,099 | 120,414 | 176,859 | 222,223 | 278,811 | 349,399 | 26.0% |
| Pre-tax income (loss) | $ 2,543,582 | $ 1,139,533 | $ 1,514,773 | $ 2,201,305 | $ 2,888,575 | $ 3,646,266 | $ 4,522,758 | 31.7% |
| | | | | | | | | |
| Income tax provision | (767,816) | (495,649) | (636,141) | (891,437) | (1,140,867) | (1,403,660) | (1,695,845) | |
| Tax rate | -30.2% | -43.5% | -42.0% | -40.5% | -39.5% | -38.5% | -37.5% | |
| Earnings in equity interests | 128,244 | 105,748 | 116,323 | 127,955 | 140,751 | 154,826 | 170,308 | |
| Minority interest | (7,780) | (1,176) | (1,646) | (2,305) | (3,227) | (4,518) | (6,325) | 40.0% |
| Cumulative effect of accounting change | - | - | - | - | - | - | - | |
| **Net income (loss)** | **$ 1,896,230** | **$ 748,456** | **$ 993,308** | **$ 1,435,519** | **$ 1,885,232** | **$ 2,392,914** | **$ 2,990,896** | **31.9%** |
| *Net margin* | 51.3% | 15.9% | 17.1% | 20.5% | 22.7% | 24.5% | 26.3% | |
| **EPS** | **$ 1.28** | **$ 0.50** | **$ 0.65** | **$ 0.93** | **$ 1.21** | **$ 1.52** | **$ 1.87** | **30.2%** |
| | | | | | | | | |
| Basic shares o/s | 1,396,791 | 1,408,453 | 1,428,453 | 1,448,453 | 1,468,453 | 1,488,453 | 1,508,453 | 1.4% |
| Diluted shares o/s | 1,486,457 | 1,497,057 | 1,517,057 | 1,537,057 | 1,557,057 | 1,577,057 | 1,597,057 | 1.3% |
| | | | | | | | | |
| **EBITDA:** | | | | | | | | |
| Operating income (loss) | $ 1,107,725 | $ 1,029,434 | $ 1,394,359 | $ 2,024,447 | $ 2,666,352 | $ 3,367,455 | $ 4,173,359 | |
| Add: D&A | 397,142 | 485,325 | 751,431 | 649,426 | 624,810 | 643,027 | 673,906 | |
| Add: Stock compensation expense | 52,471 | 431,141 | 452,698 | 475,333 | 499,100 | 524,055 | 550,257 | |
| Add: restructuring/acquisition-related costs | - | - | - | - | - | - | - | |
| **EBITDA** | **$ 1,557,338** | **$ 1,945,900** | **$ 2,598,488** | **$ 3,149,205** | **$ 3,790,262** | **$ 4,534,537** | **$ 5,397,522** | **22.6%** |
| *Y/Y Growth* | 50.9% | 25.0% | 33.5% | 21.2% | 20.4% | 19.6% | 19.0% | |
| *EBITDA Margin (ex-TAC)* | 42.1% | 41.2% | 44.7% | 45.0% | 45.6% | 46.5% | 47.5% | |
| | | | | | | | | |
| **EBITDA per share** | **$ 1.05** | **$ 1.30** | **$ 1.71** | **$ 2.05** | **$ 2.43** | **$ 2.88** | **$ 3.38** | **21.1%** |
| | | | | | | | | |
| **RECURRING EARNINGS:** | | | | | | | | |
| Net income | $ 1,896,230 | $ 748,456 | $ 993,308 | $ 1,435,519 | $ 1,885,232 | $ 2,392,914 | $ 2,990,896 | |
| Add: Non-recurring items | (1,027,179) | 258,685 | 271,619 | 285,200 | 299,460 | 314,433 | 330,154 | |
| **Recurring net income (loss)** | **$ 869,051** | **$ 1,007,140** | **$ 1,264,927** | **$ 1,720,719** | **$ 2,184,692** | **$ 2,707,346** | **$ 3,321,050** | **27.0%** |
| *Net margin* | 23.5% | 21.3% | 21.8% | 24.6% | 26.3% | 27.8% | 29.2% | |
| **Recurring EPS** | **$ 0.58** | **$ 0.67** | **$ 0.83** | **$ 1.12** | **$ 1.40** | **$ 1.72** | **$ 2.08** | **25.3%** |
| *Y/Y Growth* | 64.7% | 15.1% | 23.9% | 34.3% | 25.3% | 22.4% | 21.1% | |

*Source: Company Reports and Jefferies & Compan*

---

Please see important disclosure information on pages 12 - 15 of this report.

**Jefferies & Company, Inc.**

Youssef H. Squali , ysquali@Jefferies.com, (212) 284-2121

Page 6 of 15

*40*

**Jefferies & Company**
**Yahoo! Inc.**
**Consolidated Statement of Operations**

Youssef Squali, (212) 284-2121
Hagit Reindel, (212) 284-2064
Naved Khan, (212) 284-2566

| Fiscal Year Ends Dec 31<br>(data in thousands, except share data) | 1Q05A | 2Q05A | 3Q05A | 4Q05A | 1Q06A | 2Q06E | 3Q06E | 4Q06E |
|---|---|---|---|---|---|---|---|---|
| **MARKETING SERVICES** | | | | | | | | |
| Total paid search revenue - gross | $ 740,365 | $ 769,162 | $ 817,481 | $ 910,949 | $ 993,177 | $ 974,653 | $ 987,437 | $ 1,082,556 |
| Branded advertising revenue | $ 245,493 | $ 283,539 | $ 297,455 | $ 357,794 | $ 338,781 | $ 385,897 | $ 399,467 | $ 474,364 |
| Marketing services revenue | $ 985,858 | $ 1,052,701 | $ 1,114,936 | $ 1,268,743 | $ 1,331,958 | $ 1,360,550 | $ 1,386,904 | $ 1,556,920 |
| *Y/Y Growth* | *58.7%* | *53.7%* | *46.9%* | *40.2%* | *35.1%* | *29.2%* | *24.4%* | *22.7%* |
| *% Total Revenues* | *84.0%* | *84.0%* | *83.8%* | *84.5%* | *85.0%* | *84.5%* | *83.9%* | *84.7%* |
| TAC | $ (352,987) | $ (377,885) | $ (397,814) | $ (433,051) | $ (479,357) | $ (468,724) | $ (474,748) | $ (525,242) |
| Marketing services revenue ex-TAC | $ 632,871 | $ 674,816 | $ 717,122 | $ 835,692 | $ 852,601 | $ 891,826 | $ 912,156 | $ 1,031,678 |
| *Y/Y Growth* | *53.0%* | *46.1%* | *41.2%* | *36.5%* | *34.7%* | *32.2%* | *27.2%* | *23.5%* |
| *% Total Revenues ex-TAC* | *77.1%* | *77.1%* | *76.9%* | *78.3%* | *78.4%* | *78.1%* | *77.4%* | *78.5%* |
| **Marketing and listings revenue** | **$ 1,024,796** | **$ 1,094,301** | **$ 1,159,572** | **$ 1,315,303** | **$ 1,380,854** | **$ 1,414,164** | **$ 1,445,235** | **$ 1,619,969** |
| *Y/Y Growth* | *56.4%* | *51.4%* | *45.6%* | *39.5%* | *34.7%* | *29.2%* | *24.6%* | *23.2%* |
| *% Total Revenues* | *87.3%* | *87.3%* | *87.2%* | *87.6%* | *88.1%* | *87.8%* | *87.4%* | *88.1%* |
| **Marketing and listings revenue ex-TAC** | **$ 671,809** | **$ 716,416** | **$ 761,758** | **$ 882,252** | **$ 901,497** | **$ 945,439** | **$ 970,488** | **$ 1,094,727** |
| | | | | | | | | |
| **FEES** | | | | | | | | |
| Avg consolidated unique visitors | 358,500 | 375,500 | 395,000 | 388,000 | 383,500 | 420,500 | 457,500 | 494,500 |
| Monthly ARPU | $ 0.138 | $ 0.141 | $ 0.144 | $ 0.160 | $ 0.162 | $ 0.156 | $ 0.151 | $ 0.148 |
| **Fee-based revenue** | **$ 148,946** | **$ 158,696** | **$ 170,357** | **$ 185,697** | **$ 186,201** | **$ 196,546** | **$ 207,465** | **$ 218,991** |
| *% Total Revenues ex-TAC* | *18.1%* | *18.1%* | *18.3%* | *17.4%* | *17.1%* | *17.2%* | *17.6%* | *16.7%* |
| *Y/Y Growth* | *60.6%* | *44.8%* | *54.7%* | *37.8%* | *25.0%* | *23.9%* | *21.8%* | *17.9%* |
| | | | | | | | | |
| **TOTAL COMPANY ARPU** | | | | | | | | |
| Marketing ARPU | $ 0.92 | $ 0.93 | $ 0.94 | $ 1.09 | $ 1.16 | $ 1.08 | $ 1.01 | $ 1.05 |
| Fee ARPU | $ 0.14 | $ 0.14 | $ 0.14 | $ 0.16 | $ 0.16 | $ 0.16 | $ 0.15 | $ 0.15 |
| Listing ARPU | $ 0.04 | $ 0.04 | $ 0.04 | $ 0.04 | $ 0.04 | $ 0.04 | $ 0.04 | $ 0.04 |
| **Total ARPU** | **$ 0.76** | **$ 0.78** | **$ 0.79** | **$ 0.92** | **$ 0.95** | **$ 0.91** | **$ 0.86** | **$ 0.89** |
| *Y/Y Growth* | *11.7%* | *9.8%* | *12.5%* | *17.5%* | *23.9%* | *16.5%* | *9.1%* | *-3.5%* |
| | | | | | | | | |
| **CONSOLIDATED METRICS** | | | | | | | | |
| Unique Visitors (mil.) | 372 | 379 | 411 | 365 | 402 | 439 | 476 | 513 |
| Active Registered Users (mil.) | 176 | 181 | 191 | 193 | 208 | 231 | 254 | 278 |
| Subscribers (000s) | 8,900 | 10,100 | 11,400 | 12,600 | 13,300 | 14,039 | 14,819 | 15,642 |
| Average Daily Page Views/Day (mil.) | 3,232 | 3,140 | 3,420 | 3,283 | 3,799 | 4,253 | 4,727 | 5,223 |
| Headcount | 8,023 | 8,043 | 9,660 | 9,800 | 10,098 | 10,118 | 10,138 | 10,158 |
| Annualized Revenue / Employee (000s) | $ 409 | $ 435 | $ 386 | $ 436 | $ 431 | $ 451 | $ 465 | $ 517 |

*Source: Company Reports and Jefferies & Company*

Please see important disclosure information on pages 12 - 15 of this report.

Youssef H. Squali , ysquali@Jefferies.com, (212) 284-2121

**Jefferies & Company, Inc.**
Page 7 of 15

41

(NASDAQ:YHOO)

**Jefferies & Company**
**Yahoo! Inc.**
**Consolidated Statement of Operations**

Youssef Squali, (212) 284-2121
Hagit Reindel, (212) 284-2064
Naved Khan, (212) 284-2566

| Fiscal Year Ends Dec 31 (data in thousands, except per share data) | FY05A | FY06E | FY07E | FY08E | FY09E | FY10E | FY11E | CAGR 2006-2011 |
|---|---|---|---|---|---|---|---|---|
| **MARKETING SERVICES** | | | | | | | | |
| Total paid search revenue - gross | $ 3,237,957 | $ 4,037,823 | $ 4,735,828 | $ 5,524,869 | $ 6,428,787 | $ 7,475,025 | $ 8,697,893 | |
| Branded advertising revenue | $ 1,184,282 | $ 1,598,509 | $ 2,101,710 | $ 2,697,156 | $ 3,384,885 | $ 4,161,664 | $ 5,021,199 | |
| Marketing services revenue | $ 4,422,238 | $ 5,636,332 | $ 6,837,538 | $ 8,222,025 | $ 9,813,672 | $ 11,636,689 | $ 13,719,093 | 19.5% |
| *Y/Y Growth* | *48.9%* | *27.5%* | *21.3%* | *20.2%* | *19.4%* | *18.6%* | *17.9%* | |
| *% Total Revenues* | *84.1%* | *84.5%* | *84.6%* | *85.3%* | *86.3%* | *87.4%* | *88.6%* | |
| TAC | $ (1,561,737) | $ (1,948,071) | $ (2,269,910) | $ (2,641,526) | $ (3,069,674) | $ (3,561,744) | $ (4,125,727) | |
| Marketing services revenue ex-TAC | $ 2,860,501 | $ 3,688,261 | $ 4,567,628 | $ 5,580,499 | $ 6,743,998 | $ 8,074,946 | $ 9,593,366 | 21.1% |
| *Y/Y Growth* | *43.4%* | *28.9%* | *23.8%* | *22.2%* | *20.8%* | *19.7%* | *18.8%* | |
| *% Total Revenues ex-TAC* | *77.4%* | *78.1%* | *78.6%* | *79.8%* | *81.2%* | *82.8%* | *84.4%* | |
| **Marketing and listings revenue** | **$ 4,593,972** | **$ 5,860,222** | **$ 7,120,869** | **$ 8,539,534** | **$ 10,150,833** | **$ 11,985,151** | **$ 14,074,052** | |
| *Y/Y Growth* | *47.4%* | *27.6%* | *21.5%* | *19.9%* | *18.9%* | *18.1%* | *17.4%* | |
| *% Total Revenues* | *87.4%* | *87.9%* | *88.1%* | *88.6%* | *89.3%* | *90.0%* | *90.8%* | |
| **Marketing and listings revenue ex-TAC** | **$ 3,032,235** | **$ 3,912,151** | **$ 4,850,959** | **$ 5,898,008** | **$ 7,081,159** | **$ 8,423,407** | **$ 9,948,325** | |
| **FEES** | | | | | | | | |
| Avg consolidated unique visitors | 379,250 | 439,000 | 555,550 | 622,566 | 661,101 | 683,258 | 695,998 | 9.7% |
| Monthly ARPU | $ 0.146 | $ 0.154 | $ 0.144 | $ 0.147 | $ 0.154 | $ 0.162 | $ 0.170 | 2.0% |
| **Fee-based revenue** | **$ 663,696** | **$ 809,202** | **$ 963,089** | **$ 1,099,469** | **$ 1,222,382** | **$ 1,329,379** | **$ 1,418,726** | **11.9%** |
| *% Total Revenues ex-TAC* | *18.0%* | *17.1%* | *16.6%* | *15.7%* | *14.7%* | *13.6%* | *12.5%* | |
| *Y/Y Growth* | *48.4%* | *21.9%* | *19.0%* | *14.2%* | *11.2%* | *8.8%* | *6.7%* | |
| **TOTAL COMPANY ARPU** | | | | | | | | |
| Marketing ARPU | $ 3.89 | $ 4.28 | $ 4.10 | $ 4.40 | $ 4.95 | $ 5.68 | $ 6.57 | 9.0% |
| Fee ARPU | $ 0.58 | $ 0.61 | $ 0.58 | $ 0.59 | $ 0.62 | $ 0.65 | $ 0.68 | 2.0% |
| Listing ARPU | $ 0.15 | $ 0.17 | $ 0.17 | $ 0.17 | $ 0.17 | $ 0.17 | $ 0.17 | 0.0% |
| **Total ARPU** | **$ 0.81** | **$ 0.90** | **$ 0.87** | **$ 0.94** | **$ 1.05** | **$ 1.19** | **$ 1.36** | **8.7%** |
| *Y/Y Growth* | *12.7%* | *10.4%* | *-2.7%* | *7.4%* | *11.7%* | *13.6%* | *14.4%* | |
| **CONSOLIDATED METRICS** | | | | | | | | |
| Unique Visitors (mil.) | 365 | 513 | 598 | 647 | 675 | 691 | 701 | 6.4% |
| Active Registered Users (mil.) | 193 | 278 | 330 | 364 | 386 | 400 | 411 | 8.2% |
| Subscribers (000s) | 12,600 | 15,642 | 18,532 | 21,278 | 23,886 | 26,233 | 28,346 | 12.6% |
| Average Daily Page Views/Day (mil.) | 3,269 | 4,501 | 5,813 | 6,637 | 7,166 | 7,516 | 7,758 | 11.5% |
| Headcount | 9,800 | 10,158 | 10,516 | 10,874 | 11,232 | 11,590 | 11,948 | |
| Annualized Revenue / Employee (000s) | $ 377 | $ 465 | $ 553 | $ 644 | $ 739 | $ 841 | $ 951 | |
| | 3.27 | 4.50 | 5.81 | 6.64 | 7.17 | 7.52 | 7.76 | |

*Source: Company Reports and Jefferies & Compan*

---

Please see important disclosure information on pages 12 - 15 of this report.
Youssef H. Squali , ysquali@Jefferies.com, (212) 284-2121

**Jefferies & Company, Inc.**
Page 8 of 15

42

**Jefferies & Company**
**Yahoo! Inc.**
**Discounted Cash Flow Analysis**

Youssef Squali, (212) 284-2121
Hagit Reindel, (212) 284-2064
Naved Khan, (212) 284-2566

| Fiscal Year Ends Dec 31 *(in thousands, except share data)* | FY06E | FY07E | FY08E | FY09E | FY10E | FY11E | FY12E |
|---|---|---|---|---|---|---|---|
| **Free Cash Flow (FCF)** | | | | | | | |
| EBITDA | $ 1,945,900 | $ 2,598,488 | $ 3,149,205 | $ 3,790,262 | $ 4,534,537 | $ 5,397,522 | $ 6,395,167 |
| Less: Depreciation | (373,359) | (566,071) | (587,639) | (613,576) | (642,492) | (673,716) | (706,941) |
| EBITA | 1,572,541 | 2,032,417 | 2,561,567 | 3,176,686 | 3,892,045 | 4,723,806 | 5,688,227 |
| Less: Taxes @ 35.0% | (550,389) | (711,346) | (896,548) | (1,111,840) | (1,362,216) | (1,653,332) | (1,990,879) |
| Add: Depreciation | 373,359 | 566,071 | 587,639 | 613,576 | 642,492 | 673,716 | 706,941 |
| Less: Capital expenditures & investments | (239,841) | (595,337) | (625,104) | (656,359) | (689,177) | (723,636) | (759,818) |
| **Adjusted Free Cash Flow** | **$ 1,155,669** | **$ 1,291,804** | **$ 1,627,553** | **$ 2,022,062** | **$ 2,483,144** | **$ 3,020,553** | **$ 3,644,470** |
| | | | | | | | |
| **Present Value of Cash Flows** | | | | | | | |
| 2011 Terminal Value | $ 34,214,443 | $ 38,662,321 | $ 43,688,423 | $ 49,367,918 | $ 55,785,747 | $ 63,037,894 | $ 71,232,820 |
| 2012 Cash Flow | 1,750,506 | 1,978,072 | 2,235,222 | 2,525,800 | 2,854,154 | 3,225,195 | 3,644,470 |
| 2011 Cash Flow | 1,639,435 | 1,852,562 | 2,093,395 | 2,365,536 | 2,673,056 | 3,020,553 | |
| 2010 Cash Flow | 1,522,959 | 1,720,943 | 1,944,666 | 2,197,473 | 2,483,144 | | |
| 2009 Cash Flow | 1,401,390 | 1,583,571 | 1,789,435 | 2,022,062 | | | |
| 2008 Cash Flow | 1,274,613 | 1,440,312 | 1,627,553 | | | | |
| 2007 Cash Flow | 1,143,190 | 1,291,804 | | | | | |
| 2006 Cash Flow | 1,155,669 | | | | | | |
| 2005 Cash Flow | | | | | | | |
| **Enterprise Value** | **$ 44,102,206** | **$ 48,529,586** | | | | | |
| Add: Cash & Investments | 4,386,544 | 6,492,293 | | | | | |
| Add: 34% Interest in Yahoo! Japan | 12,400,000 | 12,400,000 | | | | | |
| Less: Debt & capital leases | $ (1,063,239) | $ (1,063,239) | | | | | |
| Add: PV of NOLs | 1,060,529 | 1,198,398 | | | | | |
| **Equity Value** | **$ 60,886,040** | **$ 67,557,038** | | | | | |
| Divide by: Diluted shares | 1,497,057 | 1,517,057 | | | | | |
| **Price Target** | **$ 41** | **$ 45** | | | | | |
| Implied EV/EBITDA Multiple | 22.7x | 18.7x | | | | | |

| **Assumptions** | |
|---|---|
| Perpetuity Growth Rate | 7.5% |
| Beta (Bloomberg) | 1.39 |
| Risk free rate (avg of 30-yr Treasuries) | 5.5% |
| S&P 500 (cagr since 1975) | 11.5% |
| Assumed tax rate | 35.0% |
| Assumed WACC | 13.0% |
| Implied EV/EBITDA terminal multiple | 11.7x |

*Source: Company Reports and Jefferies & Company*

---

Please see important disclosure information on pages 12 - 15 of this report.

Youssef H. Squali , ysquali@Jefferies.com, (212) 284-2121

**Jefferies & Company, Inc.**

**Jefferies & Company**
**Yahoo! Inc.**
**Consolidated Balance Sheets**

Youssef Squali, (212) 284-2121
Hagit Reindel, (212) 284-2064
Naved Khan, (212) 284-2566

| Fiscal Year Ends Dec 31<br>*(data in thousands, except share data)* | FY05A | FY06E | FY07E | FY08E | FY09E | FY10E | FY11E |
|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | |
| **Current Assets:** | | | | | | | |
| Cash and cash equivalents | 1,429,693 | 1,915,158 | 4,020,907 | 5,713,292 | 7,824,401 | 10,457,842 | 13,719,707 |
| Short-term investments | 1,131,141 | 1,066,396 | 1,066,396 | 1,066,396 | 1,066,396 | 1,066,396 | 1,066,396 |
| Accounts receivable, net | 721,723 | 873,231 | 966,616 | 1,152,556 | 1,359,919 | 1,592,046 | 1,852,504 |
| Prepaid expenses and other current assets | 166,976 | 198,811 | 221,684 | 264,328 | 311,884 | 365,120 | 424,854 |
| Total current assets | 3,449,533 | 4,053,596 | 6,275,602 | 8,196,572 | 10,562,600 | 13,481,404 | 17,063,461 |
| **Long Term Assets:** | | | | | | | |
| Long-term investments | 1,439,014 | 1,404,990 | 1,404,990 | 1,404,990 | 1,404,990 | 1,404,990 | 1,404,990 |
| Restricted cash and investments | - | - | - | - | - | - | - |
| Property and equipment, net | 697,522 | 861,083 | 890,350 | 927,816 | 970,600 | 1,017,285 | 1,067,205 |
| Goodwill | 2,895,557 | 2,925,909 | 2,925,909 | 2,925,909 | 2,925,909 | 2,925,909 | 2,925,909 |
| Intangible assets, net | 534,615 | 259,505 | 74,144 | 12,357 | 1,123 | 588 | 399 |
| Other assets, net | 1,815,593 | 1,851,304 | 1,851,304 | 1,851,304 | 1,851,304 | 1,851,304 | 1,851,304 |
| Total long term assets | 7,382,301 | 7,302,791 | 7,146,697 | 7,122,376 | 7,153,926 | 7,200,076 | 7,249,807 |
| **Total assets** | **10,831,834** | **11,356,387** | **13,422,300** | **15,318,948** | **17,716,526** | **20,681,481** | **24,313,268** |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | | | |
| **Current Liabilities:** | | | | | | | |
| Accounts payable | 70,291 | 82,303 | 93,955 | 113,079 | 134,185 | 157,605 | 183,691 |
| Accrued expenses and other liabilities | 827,589 | 788,710 | 995,185 | 1,197,751 | 1,421,309 | 1,669,375 | 1,945,687 |
| Deferred revenue | 306,172 | 379,917 | 1,232,748 | 1,469,882 | 1,734,337 | 2,030,374 | 2,362,542 |
| Total current liabilities | 1,204,052 | 1,250,929 | 2,321,888 | 2,780,712 | 3,289,831 | 3,857,354 | 4,491,920 |
| **Long Term Liabilities:** | | | | | | | |
| Debt and other liabilities | 1,061,367 | 1,063,239 | 1,063,239 | 1,063,239 | 1,063,239 | 1,063,239 | 1,063,239 |
| Minority interest | - | 8,520 | 10,166 | 12,471 | 15,698 | 20,216 | 26,541 |
| Total long term liabilities | 1,061,367 | 1,071,759 | 1,073,405 | 1,075,710 | 1,078,937 | 1,083,455 | 1,089,780 |
| **Stockholders' Equity:** | | | | | | | |
| Equity | 5,464,543 | 5,183,371 | 5,183,371 | 5,183,371 | 5,183,371 | 5,183,371 | 5,183,371 |
| Retained earnings (deficit) | 3,101,872 | 3,850,328 | 4,843,636 | 6,279,154 | 8,164,387 | 10,557,300 | 13,548,196 |
| Total stockholders' equity | 8,566,415 | 9,033,699 | 10,027,007 | 11,462,526 | 13,347,758 | 15,740,671 | 18,731,567 |
| **Total liabilities and stockholders' equity** | **10,831,834** | **11,356,387** | **13,422,300** | **15,318,948** | **17,716,526** | **20,681,481** | **24,313,268** |
| **RATIO ANALYSIS** | | | | | | | |
| Receivables turnover | 8.8x | 8.4x | 8.4x | 8.4x | 8.4x | 8.4x | 8.4x |
| Prepaid expense turnover | 39.6x | 36.5x | 36.5x | 36.5x | 36.5x | 36.5x | 36.5x |
| Payables turnover | 9.0x | 9.1x | 9.1x | 9.1x | 9.1x | 9.1x | 9.1x |
| Accrued expense turnover | 0.6x | 0.9x | 0.9x | 0.9x | 0.9x | 0.9x | 0.9x |
| Deferred revenue / Sales | 15.2% | 15.2% | 15.2% | 15.2% | 15.2% | 15.2% | 15.2% |

*Source: Company Reports and Jefferies & Company*

Please see important disclosure information on pages 12 - 15 of this report.
Youssef H. Squali , ysquali@Jefferies.com, (212) 284-2121

**Jefferies & Company, Inc.**
Page 10 of 15

44

**(NASDAQ:YHOO)**

**Jefferies & Company**
**Yahoo! Inc.**
**Consolidated Statement of Cash Flows**

Youssef Squali, (212) 284-2121
Hagit Reindel, (212) 284-2064
Naved Khan, (212) 284-2566

| Fiscal Year Ends Dec 31<br>(data in thousands, except share data) | FY05A | FY06E | FY07E | FY08E | FY09E | FY10E | FY11E |
|---|---|---|---|---|---|---|---|
| **Cash Flows From Operating Activities:** | | | | | | | |
| Net income (loss) | 1,896,230 | 748,456 | 993,308 | 1,435,519 | 1,885,232 | 2,392,914 | 2,990,896 |
| Add: depreciation and amortization | 397,142 | 485,325 | 751,431 | 649,426 | 624,810 | 643,027 | 673,906 |
| Add: minority interest | 7,780 | 1,176 | 1,646 | 2,305 | 3,227 | 4,518 | 6,325 |
| Add: Other non-cash items | (583,884) | 114,690 | - | - | - | - | - |
| Decrease (increase) in accounts receivable, net | (272,387) | (146,821) | (93,385) | (185,940) | (207,363) | (232,127) | (260,458) |
| Decrease (increase) in ppd expenses and other assets | (35,344) | (38,315) | (22,873) | (42,644) | (47,557) | (53,236) | (59,733) |
| Increase (decrease) in accounts payable | 31,574 | 10,267 | 11,652 | 19,124 | 21,106 | 23,420 | 26,086 |
| Increase (decrease) in accrued expenses and other liab | 212,112 | (43,018) | 206,475 | 202,566 | 223,558 | 248,066 | 276,312 |
| Increase (decrease) in deferred revenue | 58,160 | 70,501 | 852,831 | 237,134 | 264,455 | 296,037 | 332,168 |
| Net cash produced (used) by operating activities | 1,711,383 | 1,202,260 | 2,701,086 | 2,317,490 | 2,767,468 | 3,322,619 | 3,985,502 |
| **Cash Flows From Investing Activities:** | | | | | | | |
| Capital expenditures, net of salvage proceeds | (408,934) | (507,016) | (595,337) | (625,104) | (656,359) | (689,177) | (723,636) |
| Decrease (increase) in investments and other assets | (412,996) | 267,175 | - | (0) | (0) | 0 | - |
| Net cash used for investing activities | (821,930) | (239,841) | (595,337) | (625,104) | (656,359) | (689,177) | (723,636) |
| **Cash Flows From Financing Activities:** | | | | | | | |
| Issuance (purchase) of debt | 1,749 | - | - | - | - | - | - |
| Issuance (purchase) of equity | (252,349) | (489,102) | - | - | - | - | - |
| Net cash provided by financing activities | (250,600) | (489,102) | - | - | - | - | - |
| Foreign exchange effects | (32,883) | 12,148 | - | - | - | - | - |
| Net increase (decrease) in cash and cash equivalents | 605,970 | 485,465 | 2,105,749 | 1,692,386 | 2,111,108 | 2,633,441 | 3,261,865 |
| Cash and cash equivalents at beginning of period | 823,723 | 1,429,693 | 1,915,158 | 4,020,907 | 5,713,292 | 7,824,401 | 10,457,842 |
| Cash and cash equivalents at end of period | 1,429,693 | 1,915,158 | 4,020,907 | 5,713,292 | 7,824,401 | 10,457,842 | 13,719,707 |

*Source: Company Reports and Jefferies & Company*

---

Please see important disclosure information on pages 12 - 15 of this report.
Youssef H. Squali , ysquali@Jefferies.com, (212) 284-2121

**Jefferies & Company, Inc.**

## ANALYST CERTIFICATIONS

I, Youssef Squali, certify that all of the views expressed in this research report accurately reflect my personal views about the subject security(ies) and subject company(ies). I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed in this research report.

I, Hagit Reindel, certify that all of the views expressed in this research report accurately reflect my personal views about the subject security(ies) and subject company(ies). I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed in this research report.

I, Naved Khan, certify that all of the views expressed in this research report accurately reflect my personal views about the subject security(ies) and subject company(ies). I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed in this research report.

## Important Disclosures

As is the case with all Jefferies employees, the analyst(s) responsible for the coverage of the financial instruments discussed in this report receive compensation based in part on the overall performance of the firm, including investment banking income. Jefferies & Company, Inc. and Jefferies International Limited and their affiliates and their respective directors, officers and employees may buy or sell securities mentioned herein as agent or principal for their own account. Additional and supporting information is available upon request.

Jefferies makes a market in eBay, Inc.

Jefferies makes a market in Google, Inc.

Jefferies makes a market in Yahoo!, Inc.

## Meanings of Jefferies & Company, Inc, Ratings

Buy - Describes stocks that we expect to provide a total return (price appreciation plus yield) of 10% or more within a 12-month period. A Buy-rated stock's total return is expected to exceed the average total return of the analyst's (or industry team's) industry coverage universe, on a risk-adjusted basis.

Hold - Describes stocks that we expect to provide a total return (price appreciation plus yield) of plus or minus 10% within a 12-month period. A Hold-rated stock's total return is expected to be in line with the average total return of the analyst's (or industry team's) industry coverage universe, on a risk-adjusted basis.

Underperform - Describes stocks that we expect to provide a total negative return (price appreciation plus yield) of 10% or more within a 12-month period. An Underperform-rated stock's total return is expected to be below the average total return of the analyst's (or industry team's) industry coverage universe, on a risk-adjusted basis.

NR - The investment rating and price target have been temporarily suspended. Such suspensions are in compliance with applicable regulations and/or Jefferies & Company, Inc. policies.

CS - Coverage Suspended. Jefferies & Company, Inc. has suspended coverage of this company.

NC - Not covered. Jefferies & Company, Inc. does not cover this company.

Speculative Buy - Describes stocks we view with a positive bias, whose company fundamentals and financials are being monitored, but for which there is insufficient information for Jefferies & Company, Inc. to assign a Buy, Hold or Underperform Rating. At the discretion of the analyst, a Speculative buy-rated stock could also include stocks with a price under $5, or where the company is not investment grade to highlight the risk of the situation.

Speculative Underperform - Describes stocks we view with a negative bias, whose company fundamentals and financials are being monitored, but for which there is insufficient information for Jefferies & Company, Inc. to assign a Buy, Hold or Underperform Rating. At the discretion of the analyst, a Speculative underperform-rated stock could also include stocks with a price under $5, or where the company is not investment grade to highlight the risk of the situation.

Restricted - Describes issuers where, in conjunction with Jefferies engagement in certain transactions, company policy or applicable securities regulations prohibit certain types of communications, including investment recommendations.

Please see important disclosure information on pages 12 - 15 of this report.

Youssef H. Squali , ysquali@Jefferies.com, (212) 284-2121

**Jefferies & Company, Inc.**
Page 12 of 15

46

Monitor - Describes stocks whose company fundamentals and financials are being monitored, and for which no financial projections or opinions on the investment merits of the company are provided.

## Valuation Methodology

Jefferies' methodology for assigning ratings may include the following: market capitalization, maturity, growth/value, volatility and expected total return over the next 12 months. The price targets are based on several methodologies, which may include, but are not restricted to, analyses of market risk, growth rate, revenue stream, discounted cash flow (DCF), EBITDA, EPS, cash flow (CF), free cash flow (FCF), EV/EBITDA, P/E, PE/growth, P/CF, P/FCF, premium (discount)/average group EV/EBITDA, premium (discount)/average group P/E, sum of the parts, net asset value, dividend returns, and return on equity (ROE) over the next 12 months.

## Risk which may impede the achievement of our Price Target

Risk which may impede the achievement of our Price Target This report was prepared for general circulation and does not provide investment recommendations specific to individual investors. As such, the financial instruments discussed in this report may not be suitable for all investors and investors must make their own investment decisions based upon their specific investment objectives and financial situation utilizing their own financial advisors as they deem necessary. Past performance of the financial instruments recommended in this report should not be taken as an indication or guarantee of future results. The price, value of, and income from, any of the financial instruments mentioned in this report can rise as well as fall and may be affected by changes in economic, financial and political factors. If a financial instrument is denominated in a currency other than the investor's home currency, a change in exchange rates may adversely affect the price of, value of, or income derived from the financial instrument described in this report. In addition, investors in securities such as ADRs, whose values are affected by the currency of the underlying security, effectively assume currency risk.



Please see important disclosure information on pages 12 - 15 of this report.

Youssef H. Squali , ysquali@Jefferies.com, (212) 284-2121

**Jefferies & Company, Inc.**

Page 13 of 15

47





## Distribution of Ratings

| Rating | Count | Percent | IB Serv./Past 12 Mos. Count | Percent |
|---|---|---|---|---|
| BUY [BUY/SB] | 416 | 52.39 | 73 | 17.55 |
| HOLD [HOLD] | 348 | 43.83 | 31 | 8.91 |
| SELL [UNPF/SU] | 30 | 3.78 | 3 | 10.00 |

## OTHER DISCLOSURES

This material has been prepared by Jefferies & Company, Inc. a U.S.-registered broker-dealer, employing appropriate expertise, and in the belief that it is fair and not misleading. The information upon which this material is based was obtained from sources believed to be reliable, but has not been independently verified, therefore, we do not guarantee its accuracy. Additional and supporting information is available upon request. This is not an offer or solicitation of an offer to buy or sell any security or investment. Any opinion or estimates constitute our best judgment as of this date,

Please see important disclosure information on pages 12 - 15 of this report.

**Jefferies & Company, Inc.**

Youssef H. Squali , ysquali@Jefferies.com, (212) 284-2121

Page 14 of 15

*48*

and are subject to change without notice. Jefferies & Company, Inc. and Jefferies International Limited and their affiliates and their respective directors, officers and employees may buy or sell securities mentioned herein as agent or principal for their own account.

## Additional information for UK and Canadian investors

This material is approved for distribution in the United Kingdom by Jefferies International Limited regulated by the Financial Services Authority ("FSA"). While we believe this information and materials upon which this information was based are accurate, except for any obligations under the rules of the FSA, we do not guarantee its accuracy. This material is intended for use only by professional or institutional investors falling within articles 19 or 49 of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001 and not the general investing public. None of the investments or investment services mentioned or described herein are available to other persons in the U.K. and in particular are not available to "private customers" as defined by the rules of the FSA. For Canadian investors, this material is intended for use only by professional or institutional investors. None of the investments or investment services mentioned or described herein are available to other persons or to anyone in Canada who is not a "Designated Institution" as defined by the Securities Act (Ontario).

## © 2006 Jefferies & Company, Inc

Please see important disclosure information on pages 12 - 15 of this report.

Youssef H. Squali , ysquali@Jefferies.com, (212) 284-2121

Jefferies & Company, Inc.

Page 15 of 15

49

Exhibit 38

## Yahoo! Class Period Sales Activities

| Date | Adj. Close* | Nazem Shares Sold | Nazem Sales Price | Nazem Gross Proceeds | Rosensweig Shares Sold | Rosensweig Sales Price | Rosensweig Gross Proceeds | Semel Shares Sold | Semel Sales Price | Semel Gross Proceeds | Decker Shares Sold | Decker Sales Price | Decker Gross Proceeds |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/10/2004 | $20.85 | | | | | | | | | | | | |
| 3/11/2004 | $20.83 | | | | | | | | | | | | |
| 3/12/2004 | $21.51 | | | | | | | | | | | | |
| 3/15/2004 | $20.88 | | | | | | | | | | | | |
| 3/16/2004 | $21.28 | | | | | | | | | | | | |
| 3/17/2004 | $22.42 | | | | | | | | | | | | |
| 3/18/2004 | $22.52 | | | | | | | | | | | | |
| 3/19/2004 | $22.88 | | | | | | | | | | | | |
| 3/22/2004 | $22.24 | | | | | | | | | | | | |
| 3/23/2004 | $22.04 | | | | | | | | | | | | |
| 3/24/2004 | $22.25 | | | | | | | | | | | | |
| 3/25/2004 | $23.47 | | | | | | | | | | | | |
| 3/26/2004 | $23.57 | | | | | | | | | | | | |
| 3/29/2004 | $23.84 | | | | | | | | | | | | |
| 3/30/2004 | $24.40 | | | | | | | | | | | | |
| 3/31/2004 | $24.24 | | | | | | | | | | | | |
| 4/1/2004 | $24.73 | | | | | | | | | | | | |
| 4/2/2004 | $25.08 | | | | | | | | | | | | |
| 4/5/2004 | $25.00 | | | | | | | | | | | | |
| 4/6/2004 | $24.39 | | | | | | | | | | | | |
| 4/7/2004 | $24.17 | | | | | | | | | | | | |
| **▼▼ Class Period Begins ▼▼** | | | | | | | | | | | | | |
| 4/8/2004 | $28.10 | | | | | | | | | | | | |
| 4/12/2004 | $27.57 | 100,000 | $ 27.515 | $ 2,751,500.00 | | | | 3,000,000 | $ 27.60 | $ 82,795,000.00 | | | |
| 4/13/2004 | $27.07 | | | | 166,000 | $ 27.0583 | $ 4,491,677.80 | | | | | | |
| 4/14/2004 | $27.34 | | | | | | | | | | | | |
| 4/15/2004 | $26.95 | | | | | | | 440,000 | $ 27.25 | $ 11,992,000.00 | | | |
| 4/16/2004 | $27.07 | | | | | | | 560,000 | $ 27.23 | $ 15,246,520.00 | | | |
| 4/19/2004 | $27.84 | 100,000 | $ 27.815 | $ 2,781,500.00 | | | | | | | | | |
| 4/20/2004 | $26.77 | | | | | | | | | | | | |
| 4/21/2004 | $27.29 | | | | | | | | | | | | |
| 4/22/2004 | $28.80 | 200,000 | $ 28.415 | $ 5,683,000.00 | | | | | | | | | |
| 4/23/2004 | $28.38 | | | | | | | | | | | | |
| 4/26/2004 | $28.50 | | | | | | | | | | | | |
| 4/27/2004 | $28.77 | | | | | | | | | | | | |
| 4/28/2004 | $27.92 | | | | | | | | | | | | |
| 4/29/2004 | $27.35 | | | | | | | | | | | | |
| 4/30/2004 | $25.26 | | | | | | | | | | | | |
| 5/3/2004 | $26.15 | | | | | | | | | | | | |
| 5/4/2004 | $26.42 | | | | | | | | | | | | |
| 5/5/2004 | $26.58 | | | | | | | | | | | | |
| 5/6/2004 | $26.18 | | | | | | | | | | | | |
| 5/7/2004 | $26.40 | | | | | | | | | | | | |
| 5/10/2004 | $25.67 | | | | | | | | | | | | |
| 5/11/2004 | $26.76 | 100,000 | $ 26.765 | $ 2,676,500.00 | | | | | | | | | |
| 5/12/2004 | $27.08 | | | | | | | | | | | | |
| 5/13/2004 | $27.10 | | | | | | | | | | | | |
| 5/14/2004 | $26.97 | | | | | | | | | | | | |
| 5/17/2004 | $27.02 | | | | | | | | | | | | |
| 5/18/2004 | $27.77 | | | | | | | | | | | | |
| 5/19/2004 | $27.95 | 50,000 | $ 28.78 | $ 1,439,000.00 | | | | | | | | | |
| 5/20/2004 | $28.03 | | | | | | | | | | | | |
| 5/21/2004 | $28.55 | | | | | | | | | | | | |

**Yahoo! Class Period Sales Activities**

| Date | Adj. Close* | Nazem Shares Sold | Nazem Sales Price | Nazem Gross Proceeds | Rosensweig Shares Sold | Rosensweig Sales Price | Rosensweig Gross Proceeds | Semel Shares Sold | Semel Sales Price | Semel Gross Proceeds | Decker Shares Sold | Decker Sales Price | Decker Gross Proceeds |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/24/2004 | $29.43 | 50,000 | $ 29.57 | $ 1,478,350.00 | | | | | | | 600,000 | $ 29.4282 | $ 17,656,902.92 |
| 5/25/2004 | $30.28 | 100,000 | $ 29.88 | $ 2,988,000.00 | | | | | | | | | |
| 5/26/2004 | $30.11 | | | | | | | | | | | | |
| 5/27/2004 | $30.56 | 100,000 | $ 30.56 | $ 3,056,000.00 | | | | | | | | | |
| 5/28/2004 | $30.66 | 50,000 | $ 31.02 | $ 1,551,000.00 | | | | | | | | | |
| 6/1/2004 | $32.48 | | | | | | | | | | | | |
| 6/2/2004 | $31.55 | | | | | | | | | | | | |
| 6/3/2004 | $31.19 | | | | | | | | | | | | |
| 6/4/2004 | $31.87 | | | | | | | | | | | | |
| 6/7/2004 | $32.51 | | | | | | | | | | | | |
| 6/8/2004 | $32.99 | | | | | | | | | | | | |
| 6/9/2004 | $32.32 | | | | | | | | | | | | |
| 6/10/2004 | $32.40 | | | | | | | | | | | | |
| 6/14/2004 | $31.65 | | | | | | | | | | | | |
| 6/15/2004 | $32.10 | | | | | | | | | | | | |
| 6/16/2004 | $32.47 | | | | | | | | | | | | |
| 6/17/2004 | $32.38 | | | | | | | | | | | | |
| 6/18/2004 | $32.07 | | | | | | | | | | | | |
| 6/21/2004 | $31.67 | | | | | | | | | | | | |
| 6/22/2004 | $32.54 | | | | | | | | | | | | |
| 6/23/2004 | $33.97 | | | | | | | | | | | | |
| 6/24/2004 | $34.11 | | | | | | | | | | | | |
| 6/25/2004 | $34.91 | | | | | | | | | | | | |
| 6/28/2004 | $35.48 | | | | | | | | | | | | |
| 6/29/2004 | $35.35 | | | | | | | | | | | | |
| 6/30/2004 | $36.40 | | | | | | | | | | | | |
| 7/1/2004 | $34.30 | | | | | | | | | | | | |
| 7/2/2004 | $33.94 | | | | | | | | | | | | |
| 7/6/2004 | $33.22 | | | | | | | | | | | | |
| 7/7/2004 | $32.60 | | | | | | | | | | | | |
| 7/8/2004 | $30.08 | | | | | | | | | | | | |
| 7/9/2004 | $30.11 | | | | | | | | | | | | |
| 7/12/2004 | $30.26 | | | | | | | | | | | | |
| 7/13/2004 | $30.34 | 100,000 | $ 30.3153 | $ 3,031,530.00 | | | | 1,632,500 | $ 30.37 | $ 49,586,125.00 | | | |
| 7/14/2004 | $30.66 | | | | | | | 367,500 | $ 30.51 | $ 11,211,125.00 | | | |
| 7/15/2004 | $30.25 | | | | | | | | | | | | |
| 7/16/2004 | $29.19 | | | | 20,000 | $ 29.913 | $ 598,260.00 | | | | | | |
| 7/19/2004 | $28.11 | | | | 91,000 | $ 27.758 | $ 2,525,990.38 | | | | | | |
| 7/20/2004 | $29.39 | | | | | | | | | | | | |
| 7/21/2004 | $28.13 | | | | | | | | | | | | |
| 7/22/2004 | $29.26 | | | | | | | | | | | | |
| 7/23/2004 | $28.19 | | | | | | | | | | | | |
| 7/26/2004 | $28.21 | | | | | | | | | | | | |
| 7/27/2004 | $30.00 | | | | | | | 1,000,000 | $ 29.95 | $ 29,949,250.00 | | | |
| 7/28/2004 | $29.70 | | | | | | | | | | | | |
| 7/29/2004 | $30.49 | | | | | | | | | | | | |
| 7/30/2004 | $30.80 | | | | | | | | | | | | |
| 8/2/2004 | $30.42 | | | | 76,000 | $ 30.44885 | $ 2,314,112.60 | | | | | | |
| 8/3/2004 | $29.15 | | | | | | | | | | | | |
| 8/4/2004 | $27.91 | | | | | | | | | | | | |
| 8/5/2004 | $26.80 | | | | | | | | | | | | |
| 8/6/2004 | $26.02 | | | | | | | | | | | | |
| 8/9/2004 | $25.70 | | | | | | | | | | | | |
| 8/10/2004 | $27.15 | | | | | | | | | | | | |

**Yahoo! Class Period Sales Activities**

| Date | Adj. Close* | Nazem Shares Sold | Nazem Sales Price | Nazem Gross Proceeds | Rosensweig Shares Sold | Rosensweig Sales Price | Rosensweig Gross Proceeds | Semel Shares Sold | Semel Sales Price | Semel Gross Proceeds | Decker Shares Sold | Decker Sales Price | Decker Gross Proceeds |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/11/2004 | $27.42 | | | | | | | | | | | | |
| 8/12/2004 | $27.55 | | | | | | | | | | | | |
| 8/13/2004 | $27.49 | | | | | | | | | | | | |
| 8/16/2004 | $28.25 | | | | | | | | | | | | |
| 8/17/2004 | $28.34 | | | | | | | | | | | | |
| 8/18/2004 | $28.48 | | | | | | | | | | | | |
| 8/19/2004 | $28.11 | | | | | | | | | | | | |
| 8/20/2004 | $28.61 | | | | | | | | | | | | |
| 8/23/2004 | $28.63 | | | | | | | | | | | | |
| 8/24/2004 | $28.41 | | | | | | | | | | | | |
| 8/25/2004 | $29.37 | 50,000 | $ 29.40 | $ 1,470,000.00 | | | | | | | | | |
| 8/26/2004 | $29.17 | | | | | | | | | | | | |
| 8/27/2004 | $29.30 | | | | | | | | | | | | |
| 8/30/2004 | $28.46 | | | | | | | | | | | | |
| 8/31/2004 | $28.51 | 100,000 | $ 28.30 | $ 2,830,000.00 | | | | | | | | | |
| 9/1/2004 | $29.01 | | | | 76,000 | $ 28.23 | $ 2,145,480.00 | | | | | | |
| 9/2/2004 | $29.84 | | | | | | | | | | | | |
| 9/3/2004 | $29.46 | | | | | | | | | | | | |
| 9/7/2004 | $29.64 | | | | | | | | | | | | |
| 9/8/2004 | $30.38 | | | | | | | | | | 200,000 | $ 30.20 | $ 6,039,460.82 |
| 9/9/2004 | $30.49 | | | | | | | | | | 250,000 | $ 30.42 | $ 7,605,177.17 |
| 9/10/2004 | $31.08 | | | | | | | | | | 150,000 | $ 30.67 | $ 4,600,807.68 |
| 9/13/2004 | $31.87 | | | | | | | | | | | | |
| 9/14/2004 | $33.20 | | | | | | | | | | | | |
| 9/15/2004 | $32.90 | | | | | | | | | | | | |
| 9/16/2004 | $32.79 | | | | | | | | | | | | |
| 9/17/2004 | $33.46 | | | | | | | | | | | | |
| 9/20/2004 | $33.26 | | | | | | | | | | | | |
| 9/21/2004 | $33.26 | | | | | | | | | | | | |
| 9/22/2004 | $32.47 | | | | | | | | | | | | |
| 9/23/2004 | $33.04 | | | | | | | | | | | | |
| 9/24/2004 | $32.58 | | | | | | | | | | | | |
| 9/27/2004 | $31.82 | | | | | | | | | | | | |
| 9/28/2004 | $32.80 | | | | | | | | | | | | |
| 9/29/2004 | $34.00 | | | | | | | | | | | | |
| 9/30/2004 | $33.91 | | | | | | | | | | | | |
| 10/1/2004 | $35.03 | | | | 76,000 | $ 34.72 | $ 2,638,720.00 | | | | | | |
| 10/4/2004 | $34.91 | | | | | | | | | | | | |
| 10/5/2004 | $34.96 | | | | | | | | | | | | |
| 10/6/2004 | $34.96 | | | | | | | | | | | | |
| 10/7/2004 | $34.78 | | | | | | | | | | | | |
| 10/8/2004 | $34.17 | | | | | | | | | | | | |
| 10/11/2004 | $34.02 | | | | | | | | | | | | |
| 10/12/2004 | $34.23 | | | | | | | | | | | | |
| 10/13/2004 | $34.96 | | | | | | | | | | | | |
| 10/14/2004 | $34.96 | | | | | | | | | | | | |
| 10/15/2004 | $34.52 | 100,000 | $ 34.80 | $ 3,480,000.00 | | | | | | | | | |
| 10/18/2004 | $35.30 | | | | | | | | | | | | |
| 10/19/2004 | $34.64 | 100,000 | $ 35.55 | $ 3,555,000.00 | | | | 900,000 | $ 35.15 | $ 31,634,775.00 | | | |
| 10/20/2004 | $34.49 | | | | | | | 167,000 | $ 34.26 | $ 5,720,600.00 | | | |
| 10/21/2004 | $35.70 | | | | | | | 1,383,000 | $ 35.42 | $ 48,979,250.00 | | | |
| 10/22/2004 | $34.96 | 100,000 | $ 35.68 | $ 3,568,000.00 | | | | 550,000 | $ 36.06 | $ 19,831,275.00 | | | |
| 10/25/2004 | $35.20 | | | | | | | | | | | | |
| 10/26/2004 | $35.09 | | | | | | | | | | | | |

**Yahoo! Class Period Sales Activities**

| Date | Adj. Close* | Nazem Shares Sold | Nazem Sales Price | Nazem Gross Proceeds | Rosensweig Shares Sold | Rosensweig Sales Price | Rosensweig Gross Proceeds | Semel Shares Sold | Semel Sales Price | Semel Gross Proceeds | Decker Shares Sold | Decker Sales Price | Decker Gross Proceeds |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/27/2004 | $36.18 | 200,000 | $ 35.91 | $ 7,182,000.00 | | | | | | | | | |
| 10/28/2004 | $36.45 | | | | | | | | | | | | |
| 10/29/2004 | $36.19 | | | | | | | | | | | | |
| 11/1/2004 | $36.92 | 100,000 | $ 36.95 | $ 3,695,000.00 | 76,000 | $ 36.2695 | $ 2,756,482.00 | | | | | | |
| 11/2/2004 | $37.74 | 100,000 | $ 38.03 | $ 3,803,000.00 | | | | | | | | | |
| 11/3/2004 | $37.97 | | | | | | | | | | | | |
| 11/4/2004 | $37.66 | | | | | | | | | | | | |
| 11/5/2004 | $36.35 | | | | | | | | | | | | |
| 11/8/2004 | $37.14 | | | | | | | | | | | | |
| 11/9/2004 | $37.03 | | | | | | | | | | | | |
| 11/10/2004 | $36.66 | | | | | | | | | | | | |
| 11/11/2004 | $37.79 | | | | | | | | | | | | |
| 11/12/2004 | $37.80 | | | | | | | | | | | | |
| 11/15/2004 | $37.63 | | | | | | | | | | | | |
| 11/16/2004 | $36.74 | | | | | | | | | | | | |
| 11/17/2004 | $36.95 | | | | | | | | | | | | |
| 11/18/2004 | $37.19 | | | | | | | | | | | | |
| 11/19/2004 | $36.15 | | | | | | | | | | | | |
| 11/22/2004 | $36.45 | | | | | | | | | | | | |
| 11/23/2004 | $36.40 | | | | | | | | | | | | |
| 11/24/2004 | $37.61 | | | | | | | | | | | | |
| 11/26/2004 | $37.81 | | | | | | | | | | | | |
| 11/29/2004 | $38.12 | 100,000 | $ 38.05 | $ 3,805,000.00 | | | | | | | | | |
| 11/30/2004 | $37.62 | | | | | | | | | | | | |
| 12/1/2004 | $38.00 | | | | 76,000 | $ 37.7678 | $ 2,870,352.80 | | | | | | |
| 12/2/2004 | $39.14 | | | | | | | | | | | | |
| 12/3/2004 | $39.02 | | | | | | | | | | | | |
| 12/6/2004 | $38.84 | | | | | | | | | | | | |
| 12/7/2004 | $37.08 | | | | | | | | | | | | |
| 12/8/2004 | $37.05 | | | | | | | | | | | | |
| 12/9/2004 | $38.31 | | | | | | | | | | | | |
| 12/10/2004 | $38.02 | | | | | | | | | | | | |
| 12/13/2004 | $38.09 | | | | | | | | | | | | |
| 12/14/2004 | $38.26 | | | | | | | | | | | | |
| 12/15/2004 | $38.29 | | | | | | | | | | | | |
| 12/16/2004 | $37.08 | | | | | | | | | | | | |
| 12/17/2004 | $36.77 | | | | | | | | | | | | |
| 12/20/2004 | $36.66 | | | | | | | | | | | | |
| 12/21/2004 | $36.66 | | | | | | | | | | | | |
| 12/22/2004 | $37.29 | | | | | | | | | | | | |
| 12/23/2004 | $37.25 | | | | | | | | | | | | |
| 12/27/2004 | $37.74 | | | | | | | | | | | | |
| 12/28/2004 | $37.90 | | | | | | | | | | | | |
| 12/29/2004 | $37.85 | | | | | | | | | | | | |
| 12/30/2004 | $37.87 | | | | | | | | | | | | |
| 12/31/2004 | $37.68 | | | | | | | | | | | | |
| 1/3/2005 | $38.18 | | | | 76,000 | $ 38.1885 | $ 2,902,326.00 | | | | | | |
| 1/4/2005 | $36.58 | | | | | | | | | | | | |
| 1/5/2005 | $36.13 | | | | | | | | | | | | |
| 1/6/2005 | $35.43 | | | | | | | | | | | | |
| 1/7/2005 | $35.96 | | | | | | | | | | | | |
| 1/10/2005 | $36.32 | | | | | | | | | | | | |
| 1/11/2005 | $35.66 | | | | | | | | | | | | |
| 1/12/2005 | $36.14 | | | | | | | | | | | | |

**Yahoo! Class Period Sales Activities**

| Date | Adj. Close* | Nazem Shares Sold | Nazem Sales Price | Nazem Gross Proceeds | Rosensweig Shares Sold | Rosensweig Sales Price | Rosensweig Gross Proceeds | Semel Shares Sold | Semel Sales Price | Semel Gross Proceeds | Decker Shares Sold | Decker Sales Price | Decker Gross Proceeds |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/13/2005 | $35.33 | | | | | | | | | | | | |
| 1/14/2005 | $36.70 | | | | | | | | | | | | |
| 1/18/2005 | $37.18 | | | | | | | | | | | | |
| 1/19/2005 | $36.45 | | | | | | | | | | | | |
| 1/20/2005 | $35.78 | | | | | | | | | | | | |
| 1/21/2005 | $35.30 | | | | | | | | | | | | |
| 1/24/2005 | $33.93 | | | | | | | | | | | | |
| 1/25/2005 | $34.04 | | | | | | | | | | | | |
| 1/26/2005 | $35.47 | | | | | | | | | | | | |
| 1/27/2005 | $34.73 | | | | | | | | | | | | |
| 1/28/2005 | $34.62 | | | | | | | | | | | | |
| 1/31/2005 | $35.21 | | | | | | | | | | | | |
| 2/1/2005 | $34.75 | | | | 76,000 | $ 34.8648 | $ 2,649,724.80 | | | | | | |
| 2/2/2005 | $35.54 | | | | | | | | | | | | |
| 2/3/2005 | $35.09 | | | | | | | | | | | | |
| 2/4/2005 | $35.02 | | | | | | | 21,000 | $ 35.20 | $ 739,265.00 | | | |
| 2/7/2005 | $34.47 | | | | | | | 2,900 | $ 35.09 | $ 101,761.00 | | | |
| 2/8/2005 | $34.36 | | | | | | | | | | | | |
| 2/9/2005 | $33.59 | | | | | | | | | | | | |
| 2/10/2005 | $33.44 | | | | | | | | | | | | |
| 2/11/2005 | $34.15 | | | | | | | | | | | | |
| 2/14/2005 | $34.33 | | | | | | | | | | | | |
| 2/15/2005 | $33.98 | | | | | | | | | | | | |
| 2/16/2005 | $34.42 | | | | | | | | | | | | |
| 2/17/2005 | $33.82 | | | | | | | | | | | | |
| 2/18/2005 | $33.60 | | | | | | | | | | | | |
| 2/22/2005 | $32.79 | | | | | | | | | | | | |
| 2/23/2005 | $32.12 | | | | | | | | | | | | |
| 2/24/2005 | $31.48 | | | | | | | | | | | | |
| 2/25/2005 | $31.73 | | | | | | | | | | | | |
| 2/28/2005 | $32.27 | | | | | | | | | | | | |
| 3/1/2005 | $32.30 | | | | 76,000 | $ 32.20 | $ 2,446,873.20 | | | | | | |
| 3/2/2005 | $32.23 | | | | | | | | | | | | |
| 3/3/2005 | $32.31 | | | | | | | | | | | | |
| 3/4/2005 | $32.36 | | | | | | | | | | | | |
| 3/7/2005 | $33.09 | | | | | | | | | | | | |
| 3/8/2005 | $33.16 | | | | | | | | | | | | |
| 3/9/2005 | $32.32 | | | | | | | | | | | | |
| 3/10/2005 | $31.91 | | | | | | | | | | | | |
| 3/11/2005 | $31.65 | | | | | | | | | | | | |
| 3/14/2005 | $31.32 | | | | | | | | | | | | |
| 3/15/2005 | $31.94 | | | | | | | | | | | | |
| 3/16/2005 | $31.58 | | | | | | | | | | | | |
| 3/17/2005 | $31.61 | | | | | | | | | | | | |
| 3/18/2005 | $31.11 | | | | | | | | | | | | |
| 3/21/2005 | $31.62 | | | | | | | | | | | | |
| 3/22/2005 | $30.99 | | | | | | | | | | | | |
| 3/23/2005 | $30.87 | | | | | | | | | | | | |
| 3/24/2005 | $31.41 | | | | | | | | | | | | |
| 3/28/2005 | $32.25 | | | | | | | | | | | | |
| 3/29/2005 | $32.16 | | | | | | | | | | | | |
| 3/30/2005 | $33.48 | | | | | | | | | | | | |
| 3/31/2005 | $33.90 | | | | | | | | | | | | |
| 4/1/2005 | $34.28 | | | | 76,000 | $ 34.583 | $ 2,628,277.60 | | | | | | |

**Yahoo! Class Period Sales Activities**

| Date | Adj. Close* | Nazem Shares Sold | Nazem Sales Price | Nazem Gross Proceeds | Rosensweig Shares Sold | Rosensweig Sales Price | Rosensweig Gross Proceeds | Semel Shares Sold | Semel Sales Price | Semel Gross Proceeds | Decker Shares Sold | Decker Sales Price | Decker Gross Proceeds |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/4/2005 | $35.07 | | | | | | | | | | | | |
| 4/5/2005 | $35.15 | | | | | | | | | | | | |
| 4/6/2005 | $34.49 | | | | | | | | | | | | |
| 4/7/2005 | $35.07 | | | | | | | | | | | | |
| 4/8/2005 | $34.76 | | | | | | | | | | | | |
| 4/11/2005 | $34.60 | | | | | | | | | | | | |
| 4/12/2005 | $34.28 | | | | | | | | | | | | |
| 4/13/2005 | $33.60 | | | | | | | | | | | | |
| 4/14/2005 | $33.46 | | | | | | | | | | | | |
| 4/15/2005 | $32.46 | | | | | | | | | | | | |
| 4/18/2005 | $32.55 | | | | | | | | | | | | |
| 4/19/2005 | $33.22 | | | | | | | | | | | | |
| 4/20/2005 | $34.65 | | | | | | | | | | | | |
| 4/21/2005 | $35.87 | | | | | | | | | | | | |
| 4/22/2005 | $34.87 | 100,000 | $  35.27 | $  3,527,000.00 | | | | 880,000 | $  35.02 | $  30,815,400.00 | | | |
| 4/25/2005 | $35.49 | 100,000 | $  35.50 | $  3,550,000.00 | | | | 620,000 | $  34.87 | $  21,617,500.00 | | | |
| 4/26/2005 | $35.00 | | | | | | | 550,000 | $  35.18 | $  19,348,400.00 | | | |
| 4/27/2005 | $34.95 | | | | | | | 200,000 | $  35.05 | $  7,010,000.00 | | | |
| 4/28/2005 | $34.33 | | | | | | | | | | | | |
| 4/29/2005 | $34.50 | | | | | | | | | | | | |
| 5/2/2005 | $34.38 | | | | 76,000 | $  34.41 | $  2,614,932.00 | | | | | | |
| 5/3/2005 | $34.28 | | | | | | | | | | | | |
| 5/4/2005 | $35.18 | 262,272 | $  35.30 | $  9,258,201.60 | | | | 750,000 | $  35.26 | $  26,442,100.00 | | | |
| 5/5/2005 | $34.71 | | | | | | | | | | | | |
| 5/6/2005 | $34.52 | | | | | | | | | | | | |
| 5/9/2005 | $34.59 | | | | | | | | | | | | |
| 5/10/2005 | $34.06 | | | | | | | | | | | | |
| 5/11/2005 | $34.88 | | | | | | | | | | | | |
| 5/12/2005 | $34.71 | | | | | | | | | | | | |
| 5/13/2005 | $34.82 | | | | | | | | | | | | |
| 5/16/2005 | $35.45 | 100,000 | $  35.40 | $  3,540,000.00 | | | | | | | | | |
| 5/17/2005 | $35.68 | | | | | | | | | | | | |
| 5/18/2005 | $35.95 | | | | | | | | | | | | |
| 5/19/2005 | $36.75 | | | | | | | | | | | | |
| 5/20/2005 | $36.33 | 50,000 | $  36.49 | $  1,824,500.00 | | | | | | | | | |
| 5/23/2005 | $36.80 | 100,000 | $  36.73 | $  3,673,000.00 | | | | | | | 300,000 | $  37.00 | $  11,100,000.00 |
| 5/24/2005 | $36.63 | | | | | | | | | | | | |
| 5/25/2005 | $36.27 | | | | | | | | | | | | |
| 5/26/2005 | $37.14 | 50,000 | $  36.49 | $  1,824,500.00 | | | | | | | 300,000 | $  37.0734 | $  11,122,014.52 |
| 5/27/2005 | $37.27 | 50,000 | $  36.58 | $  1,829,000.00 | | | | | | | | | |
| 5/31/2005 | $37.20 | | | | | | | | | | | | |
| 6/1/2005 | $38.42 | | | | 76,000 | $  38.252 | $  2,907,152.00 | | | | | | |
| 6/2/2005 | $38.50 | | | | | | | | | | | | |
| 6/3/2005 | $37.92 | | | | | | | | | | | | |
| 6/6/2005 | $38.52 | | | | | | | | | | | | |
| 6/7/2005 | $37.44 | | | | | | | | | | | | |
| 6/8/2005 | $36.63 | | | | | | | | | | | | |
| 6/9/2005 | $37.45 | | | | | | | | | | | | |
| 6/10/2005 | $36.81 | | | | | | | | | | | | |
| 6/13/2005 | $36.90 | | | | | | | | | | | | |
| 6/14/2005 | $36.80 | | | | | | | | | | | | |
| 6/15/2005 | $36.32 | | | | | | | | | | | | |
| 6/16/2005 | $36.40 | | | | | | | | | | | | |
| 6/17/2005 | $36.30 | | | | | | | | | | | | |

**Yahoo! Class Period Sales Activities**

| Date | Adj. Close* | Nazem Shares Sold | Nazem Sales Price | Nazem Gross Proceeds | Rosensweig Shares Sold | Rosensweig Sales Price | Rosensweig Gross Proceeds | Semel Shares Sold | Semel Sales Price | Semel Gross Proceeds | Decker Shares Sold | Decker Sales Price | Decker Gross Proceeds |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/20/2005 | $36.45 | | | | | | | | | | | | |
| 6/21/2005 | $36.95 | | | | | | | | | | | | |
| 6/22/2005 | $36.90 | | | | | | | | | | | | |
| 6/23/2005 | $36.20 | | | | | | | | | | | | |
| 6/24/2005 | $36.09 | | | | | | | | | | | | |
| 6/27/2005 | $35.68 | | | | | | | | | | | | |
| 6/28/2005 | $35.80 | | | | | | | | | | | | |
| 6/29/2005 | $34.94 | | | | | | | | | | | | |
| 6/30/2005 | $34.65 | | | | | | | | | | | | |
| 7/1/2005 | $34.44 | | | | 76,000 | $ 34.46 | $ 2,619,051.20 | | | | | | |
| 7/5/2005 | $34.60 | | | | | | | | | | | | |
| 7/6/2005 | $34.12 | | | | | | | | | | | | |
| 7/7/2005 | $34.63 | | | | | | | | | | | | |
| 7/8/2005 | $34.62 | | | | | | | | | | | | |
| 7/11/2005 | $35.76 | | | | | | | | | | | | |
| 7/12/2005 | $36.23 | | | | | | | | | | | | |
| 7/13/2005 | $36.73 | | | | | | | | | | | | |
| 7/14/2005 | $36.86 | | | | | | | | | | | | |
| 7/15/2005 | $36.58 | | | | | | | | | | | | |
| 7/18/2005 | $36.58 | | | | | | | | | | | | |
| 7/19/2005 | $37.73 | | | | | | | | | | | | |
| 7/20/2005 | $33.40 | | | | | | | | | | | | |
| 7/21/2005 | $32.94 | | | | | | | | | | | | |
| 7/22/2005 | $33.53 | | | | | | | | | | | | |
| 7/25/2005 | $33.85 | | | | | | | | | | | | |
| 7/26/2005 | $34.15 | | | | | | | 200,000 | $ 34.1739275 | $ 6,834,785.50 | | | |
| 7/27/2005 | $34.29 | | | | | | | 200,000 | $ 34.27000 | $ 6,854,000.00 | | | |
| 7/28/2005 | $34.01 | | | | | | | | | | | | |
| 7/29/2005 | $33.34 | | | | | | | | | | | | |
| 8/1/2005 | $33.33 | | | | 76,000 | $ 33.573 | $ 2,551,548.00 | | | | | | |
| 8/2/2005 | $33.88 | | | | | | | | | | | | |
| 8/3/2005 | $34.51 | | | | | | | | | | | | |
| 8/4/2005 | $34.06 | | | | | | | | | | | | |
| 8/5/2005 | $33.52 | | | | | | | | | | | | |
| 8/8/2005 | $33.94 | | | | | | | | | | | | |
| 8/9/2005 | $34.06 | | | | | | | | | | | | |
| 8/10/2005 | $34.19 | | | | | | | | | | | | |
| 8/11/2005 | $34.94 | | | | | | | | | | | | |
| 8/12/2005 | $34.60 | | | | | | | | | | | | |
| 8/15/2005 | $34.60 | | | | | | | | | | | | |
| 8/16/2005 | $34.23 | | | | | | | | | | | | |
| 8/17/2005 | $34.39 | | | | | | | | | | | | |
| 8/18/2005 | $34.36 | 100,000 | $ 34.43 | $ 3,443,000.00 | | | | | | | | | |
| 8/19/2005 | $34.00 | | | | | | | 542,886 | $ 34.32 | $ 18,630,730.20 | | | |
| 8/22/2005 | $33.20 | | | | | | | | | | | | |
| 8/23/2005 | $33.11 | | | | | | | | | | | | |
| 8/24/2005 | $33.47 | | | | | | | | | | | | |
| 8/25/2005 | $33.48 | | | | | | | | | | | | |
| 8/26/2005 | $33.57 | | | | | | | | | | | | |
| 8/29/2005 | $33.68 | 100,000 | $ 36.65 | $ 3,665,000.00 | | | | | | | | | |
| 8/30/2005 | $33.18 | | | | | | | | | | | | |
| 8/31/2005 | $33.32 | | | | | | | | | | | | |
| 9/1/2005 | $33.24 | | | | 76,000 | $ 33.18 | $ 2,521,908.00 | | | | | | |
| 9/2/2005 | $33.17 | | | | | | | | | | | | |

**Yahoo! Class Period Sales Activities**

| Date | Adj. Close* | Nazem Shares Sold | Nazem Sales Price | Nazem Gross Proceeds | Rosensweig Shares Sold | Rosensweig Sales Price | Rosensweig Gross Proceeds | Semel Shares Sold | Semel Sales Price | Semel Gross Proceeds | Decker Shares Sold | Decker Sales Price | Decker Gross Proceeds |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/6/2005 | $33.68 | | | | | | | | | | | | |
| 9/7/2005 | $34.06 | | | | | | | | | | | | |
| 9/8/2005 | $33.34 | | | | | | | | | | | | |
| 9/9/2005 | $33.46 | | | | | | | | | | | | |
| 9/12/2005 | $33.91 | | | | | | | | | | | | |
| 9/13/2005 | $34.30 | | | | | | | | | | | | |
| 9/14/2005 | $33.80 | | | | | | | | | | | | |
| 9/15/2005 | $33.57 | | | | | | | | | | | | |
| 9/16/2005 | $33.17 | | | | | | | | | | | | |
| 9/19/2005 | $32.75 | | | | | | | | | | | | |
| 9/20/2005 | $32.64 | | | | | | | | | | | | |
| 9/21/2005 | $31.97 | | | | | | | | | | | | |
| 9/22/2005 | $32.04 | | | | | | | | | | | | |
| 9/23/2005 | $32.13 | | | | | | | | | | | | |
| 9/26/2005 | $32.18 | | | | | | | | | | | | |
| 9/27/2005 | $32.48 | | | | | | | | | | | | |
| 9/28/2005 | $32.35 | | | | | | | | | | | | |
| 9/29/2005 | $33.46 | | | | | | | | | | | | |
| 9/30/2005 | $33.84 | | | | | | | | | | | | |
| 10/3/2005 | $33.77 | | | | 76,000 | $ 33.93 | $ 2,578,930.80 | | | | | | |
| 10/4/2005 | $33.57 | | | | | | | | | | | | |
| 10/5/2005 | $33.49 | | | | | | | | | | | | |
| 10/6/2005 | $33.80 | | | | | | | | | | | | |
| 10/7/2005 | $34.16 | | | | | | | | | | | | |
| 10/10/2005 | $34.53 | | | | | | | | | | | | |
| 10/11/2005 | $34.10 | | | | | | | | | | | | |
| 10/12/2005 | $33.93 | | | | | | | | | | | | |
| 10/13/2005 | $33.37 | | | | | | | | | | | | |
| 10/14/2005 | $33.52 | | | | | | | | | | | | |
| 10/17/2005 | $34.16 | | | | | | | | | | | | |
| 10/18/2005 | $33.70 | | | | | | | | | | | | |
| 10/19/2005 | $35.91 | | | | | | | | | | | | |
| 10/20/2005 | $35.26 | | | | | | | | | | | | |
| 10/21/2005 | $35.29 | | | | | | | | | | | | |
| 10/24/2005 | $35.28 | | | | | | | 913,150 | $ 35.18 | $ 32,125,675.54 | | | |
| 10/25/2005 | $35.12 | | | | | | | 639,218 | $ 35.14 | $ 22,465,240.68 | | | |
| 10/26/2005 | $35.46 | 100,000 | $ 35.49 | $ 3,549,000.00 | | | | 447,632 | $ 35.36 | $ 15,829,436.34 | | | |
| 10/27/2005 | $35.45 | | | | | | | 500,000 | $ 35.42 | $ 17,709,601.35 | | | |
| 10/28/2005 | $35.58 | | | | | | | 500,000 | $ 35.60 | $ 17,800,046.82 | | | |
| 10/31/2005 | $36.97 | 200,000 | $ 35.285 | $ 7,057,000.00 | | | | | | | | | |
| 11/1/2005 | $37.72 | 111,052 | $ 38.03 | $ 4,223,307.56 | 76,000 | $ 36.94 | $ 2,807,440.00 | | | | | | |
| 11/2/2005 | $37.99 | | | | | | | | | | 104,167 | $ 38.0134 | $ 3,959,739.85 |
| 11/3/2005 | $37.45 | | | | | | | | | | | | |
| 11/4/2005 | $37.87 | | | | | | | | | | | | |
| 11/7/2005 | $37.90 | | | | | | | | | | | | |
| 11/8/2005 | $37.97 | | | | | | | | | | | | |
| 11/9/2005 | $37.75 | | | | | | | | | | | | |
| 11/10/2005 | $38.69 | 100,000 | $ 38.53 | $ 3,853,000.00 | | | | | | | 104,167 | $ 38.52 | $ 4,012,254.74 |
| 11/11/2005 | $38.49 | | | | | | | | | | | | |
| 11/14/2005 | $38.45 | | | | | | | | | | | | |
| 11/15/2005 | $37.65 | | | | | | | | | | | | |
| 11/16/2005 | $40.04 | 200,000 | $ 39.705 | $ 7,941,000.00 | | | | | | | 139,999 | $ 55.6319 | $ 7,788,416.81 |
| 11/17/2005 | $42.23 | | | | | | | | | | 55,000 | $ 41.04 | $ 2,256,938.32 |
| 11/18/2005 | $41.54 | | | | | | | | | | | | |

**Yahoo! Class Period Sales Activities**

| Date | Adj. Close* | Nazem Shares Sold | Nazem Sales Price | Nazem Gross Proceeds | Rosensweig Shares Sold | Rosensweig Sales Price | Rosensweig Gross Proceeds | Semel Shares Sold | Semel Sales Price | Semel Gross Proceeds | Decker Shares Sold | Decker Sales Price | Decker Gross Proceeds |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/21/2005 | $42.27 | | | | | | | | | | | | |
| 11/22/2005 | $42.36 | | | | | | | | | | | | |
| 11/23/2005 | $42.50 | 100,000 | $ 42.94 | $ 4,294,000.00 | | | | | | | | | |
| 11/25/2005 | $42.13 | | | | | | | | | | | | |
| 11/28/2005 | $41.11 | | | | | | | | | | | | |
| 11/29/2005 | $40.19 | | | | | | | | | | | | |
| 11/30/2005 | $40.23 | | | | | | | | | | | | |
| 12/1/2005 | $41.07 | | | | 76,000 | $ 40.8321 | $ 3,103,239.60 | | | | | | |
| 12/2/2005 | $41.21 | | | | | | | | | | | | |
| 12/5/2005 | $40.47 | | | | | | | | | | | | |
| 12/6/2005 | $40.19 | | | | | | | | | | | | |
| 12/7/2005 | $40.11 | | | | | | | | | | | | |
| 12/8/2005 | $40.35 | | | | | | | | | | | | |
| 12/9/2005 | $40.31 | | | | | | | | | | | | |
| 12/12/2005 | $40.08 | | | | | | | | | | | | |
| 12/13/2005 | $41.20 | | | | | | | | | | | | |
| 12/14/2005 | $41.30 | | | | | | | | | | | | |
| 12/15/2005 | $41.75 | | | | | | | | | | | | |
| 12/16/2005 | $42.32 | | | | | | | | | | | | |
| 12/19/2005 | $41.05 | | | | | | | | | | | | |
| 12/20/2005 | $40.68 | | | | | | | | | | | | |
| 12/21/2005 | $40.47 | | | | | | | | | | | | |
| 12/22/2005 | $40.83 | | | | | | | | | | | | |
| 12/23/2005 | $40.63 | | | | | | | | | | | | |
| 12/27/2005 | $39.94 | | | | | | | | | | | | |
| 12/28/2005 | $40.25 | | | | | | | | | | | | |
| 12/29/2005 | $39.56 | | | | | | | | | | | | |
| 12/30/2005 | $39.18 | | | | | | | | | | | | |
| 1/3/2006 | $40.91 | | | | 76,000 | $ 39.43 | $ 2,996,680.00 | | | | | | |
| 1/4/2006 | $40.97 | | | | | | | | | | | | |
| 1/5/2006 | $41.53 | | | | | | | | | | | | |
| 1/6/2006 | $43.21 | | | | | | | | | | | | |
| 1/9/2006 | $43.42 | | | | | | | | | | | | |
| 1/10/2006 | $42.98 | | | | | | | | | | | | |
| 1/11/2006 | $41.87 | | | | | | | | | | | | |
| 1/12/2006 | $40.89 | | | | | | | | | | | | |
| 1/13/2006 | $39.90 | | | | | | | | | | | | |
| 1/17/2006 | $40.11 | | | | | | | | | | | | |
| 1/18/2006 | $35.18 | | | | | | | | | | | | |
| 1/19/2006 | $34.33 | | | | | | | | | | | | |
| 1/20/2006 | $33.74 | | | | | | | | | | | | |
| 1/23/2006 | $34.17 | | | | | | | | | | | | |
| 1/24/2006 | $34.87 | | | | | | | | | | | | |
| 1/25/2006 | $34.49 | | | | | | | | | | | | |
| 1/26/2006 | $35.17 | | | | | | | | | | | | |
| 1/27/2006 | $35.09 | | | | | | | | | | | | |
| 1/30/2006 | $35.05 | | | | | | | | | | | | |
| 1/31/2006 | $34.38 | | | | | | | | | | | | |
| 2/1/2006 | $35.00 | | | | 76,000 | $ 34.5025 | $ 2,622,190.00 | | | | | | |
| 2/2/2006 | $34.25 | | | | | | | | | | | | |
| 2/3/2006 | $33.54 | | | | | | | | | | | | |
| 2/6/2006 | $32.92 | | | | | | | | | | | | |
| 2/7/2006 | $33.02 | | | | | | | | | | | | |
| 2/8/2006 | $33.00 | | | | | | | | | | | | |

**Yahoo! Class Period Sales Activities**

| Date | Adj. Close* | Nazem Shares Sold | Nazem Sales Price | Nazem Gross Proceeds | Rosensweig Shares Sold | Rosensweig Sales Price | Rosensweig Gross Proceeds | Semel Shares Sold | Semel Sales Price | Semel Gross Proceeds | Decker Shares Sold | Decker Sales Price | Decker Gross Proceeds |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/9/2006 | $32.50 | | | | | | | | | | | | |
| 2/10/2006 | $32.51 | | | | | | | | | | | | |
| 2/13/2006 | $32.04 | | | | | | | | | | | | |
| 2/14/2006 | $32.72 | | | | | | | | | | | | |
| 2/15/2006 | $33.02 | | | | | | | 400,000 | $ 33.18 | $ 13,273,718.80 | | | |
| 2/16/2006 | $32.75 | | | | | | | 100,000 | $ 33.29 | $ 3,328,791.65 | | | |
| 2/17/2006 | $32.76 | | | | | | | 200,000 | $ 33.07 | $ 6,614,227.16 | | | |
| 2/21/2006 | $32.39 | | | | | | | 50,000 | $ 33.01 | $ 1,650,674.95 | | | |
| 2/22/2006 | $33.16 | 100,000 | $ 33.25 | $ 3,325,000.00 | | | | 250,000 | $ 33.05 | $ 8,262,103.75 | | | |
| 2/23/2006 | $33.15 | | | | | | | | | | | | |
| 2/24/2006 | $33.01 | | | | | | | | | | | | |
| 2/27/2006 | $32.74 | | | | | | | | | | | | |
| 2/28/2006 | $32.06 | | | | | | | | | | | | |
| 3/1/2006 | $32.18 | | | | 76,000 | $ 32.14 | $ 2,442,640.00 | | | | | | |
| 3/2/2006 | $31.70 | | | | | | | | | | | | |
| 3/3/2006 | $31.45 | | | | | | | | | | | | |
| 3/6/2006 | $31.57 | | | | | | | | | | | | |
| 3/7/2006 | $31.43 | | | | | | | | | | | | |
| 3/8/2006 | $30.99 | | | | | | | | | | | | |
| 3/9/2006 | $30.28 | | | | | | | | | | | | |
| 3/10/2006 | $30.58 | | | | | | | | | | | | |
| 3/13/2006 | $30.15 | | | | | | | | | | | | |
| 3/14/2006 | $30.99 | | | | | | | | | | | | |
| 3/15/2006 | $30.53 | | | | | | | | | | | | |
| 3/16/2006 | $30.13 | | | | | | | | | | | | |
| 3/17/2006 | $30.07 | | | | | | | | | | | | |
| 3/20/2006 | $30.44 | | | | | | | | | | | | |
| 3/21/2006 | $30.11 | | | | | | | | | | | | |
| 3/22/2006 | $30.75 | | | | | | | | | | | | |
| 3/23/2006 | $31.83 | | | | | | | | | | | | |
| 3/24/2006 | $31.77 | | | | | | | | | | | | |
| 3/27/2006 | $31.45 | | | | | | | | | | | | |
| 3/28/2006 | $32.39 | | | | | | | | | | | | |
| 3/29/2006 | $32.56 | | | | | | | | | | | | |
| 3/30/2006 | $32.42 | | | | | | | | | | | | |
| 3/31/2006 | $32.26 | | | | | | | | | | | | |
| 4/3/2006 | $31.89 | | | | 76,000 | $ 32.3617 | $ 2,459,489.20 | | | | | | |
| 4/4/2006 | $32.10 | | | | | | | | | | | | |
| 4/5/2006 | $32.11 | | | | | | | | | | | | |
| 4/6/2006 | $32.79 | | | | | | | | | | | | |
| 4/7/2006 | $32.27 | | | | | | | | | | | | |
| 4/10/2006 | $32.55 | | | | | | | | | | | | |
| 4/11/2006 | $31.39 | | | | | | | | | | | | |
| 4/12/2006 | $31.10 | | | | | | | | | | | | |
| 4/13/2006 | $31.13 | | | | | | | | | | | | |
| 4/17/2006 | $30.97 | | | | | | | | | | | | |
| 4/18/2006 | $31.30 | | | | | | | | | | | | |
| 4/19/2006 | $33.54 | | | | | | | | | | | | |
| 4/20/2006 | $33.37 | | | | | | | | | | | | |
| 4/21/2006 | $32.89 | | | | | | | | | | | | |
| 4/24/2006 | $33.01 | 100,000 | $ 33.14 | $ 3,314,000.00 | | | | | | | | | |
| 4/25/2006 | $31.99 | 100,000 | $ 31.95 | $ 3,195,000.00 | | | | | | | | | |
| 4/26/2006 | $33.00 | 100,000 | $ 32.93 | $ 3,293,000.00 | | | | | | | | | |
| 4/27/2006 | $33.20 | 100,000 | $ 33.20 | $ 3,320,000.00 | | | | | | | | | |

**Yahoo! Class Period Sales Activities**

| Date | Adj. Close* | Nazem Shares Sold | Nazem Sales Price | Nazem Gross Proceeds | Rosensweig Shares Sold | Rosensweig Sales Price | Rosensweig Gross Proceeds | Semel Shares Sold | Semel Sales Price | Semel Gross Proceeds | Decker Shares Sold | Decker Sales Price | Decker Gross Proceeds |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/28/2006 | $32.78 | | | | | | | | | | | | |
| 5/1/2006 | $32.08 | | | | 76,000 | $ 32.7888 | $ 2,491,948.80 | | | | | | |
| 5/2/2006 | $31.85 | | | | | | | | | | | | |
| 5/3/2006 | $32.17 | | | | | | | | | | | | |
| 5/4/2006 | $32.19 | | | | | | | | | | | | |
| 5/5/2006 | $32.66 | 100,000 | $ 32.57 | $ 3,257,000.00 | | | | | | | | | |
| 5/8/2006 | $32.87 | 100,000 | $ 33.31 | $ 3,331,000.00 | | | | | | | | | |
| 5/9/2006 | $32.49 | | | | | | | | | | | | |
| 5/10/2006 | $32.09 | 100,000 | $ 32.05 | $ 3,205,000.00 | | | | | | | | | |
| 5/11/2006 | $30.99 | | | | | | | | | | | | |
| 5/12/2006 | $30.81 | | | | | | | | | | | | |
| 5/15/2006 | $31.03 | | | | | | | | | | | | |
| 5/16/2006 | $30.97 | | | | | | | | | | | | |
| 5/17/2006 | $30.11 | | | | | | | | | | | | |
| 5/18/2006 | $29.00 | | | | | | | | | | | | |
| 5/19/2006 | $29.53 | | | | | | | | | | | | |
| 5/22/2006 | $30.46 | | | | | | | | | | | | |
| 5/23/2006 | $30.76 | | | | | | | | | | | | |
| 5/24/2006 | $31.79 | | | | | | | | | | | | |
| 5/25/2006 | $32.92 | 100,000 | $ 32.95 | $ 3,295,000.00 | | | | | | | | | |
| 5/26/2006 | $33.02 | | | | | | | | | | | | |
| 5/30/2006 | $32.00 | | | | | | | | | | | | |
| 5/31/2006 | $31.59 | | | | | | | | | | | | |
| 6/1/2006 | $31.99 | | | | 76,000 | $ 31.565 | $ 2,398,936.20 | | | | | | |
| 6/2/2006 | $31.52 | | | | | | | | | | | | |
| 6/5/2006 | $30.82 | | | | | | | | | | | | |
| 6/6/2006 | $30.70 | | | | | | | | | | | | |
| 6/7/2006 | $30.54 | | | | | | | | | | | | |
| 6/8/2006 | $30.45 | | | | | | | | | | | | |
| 6/9/2006 | $30.37 | | | | | | | | | | | | |
| 6/12/2006 | $29.78 | | | | | | | | | | | | |
| 6/13/2006 | $29.65 | | | | | | | | | | | | |
| 6/14/2006 | $29.62 | | | | | | | | | | | | |
| 6/15/2006 | $30.79 | | | | | | | | | | | | |
| 6/16/2006 | $30.36 | | | | | | | | | | | | |
| 6/19/2006 | $30.35 | | | | | | | | | | | | |
| 6/20/2006 | $30.60 | | | | | | | | | | | | |
| 6/21/2006 | $31.06 | | | | | | | | | | | | |
| 6/22/2006 | $30.68 | | | | | | | | | | | | |
| 6/23/2006 | $31.37 | | | | | | | | | | | | |
| 6/26/2006 | $31.55 | | | | | | | | | | | | |
| 6/27/2006 | $31.51 | | | | | | | | | | | | |
| 6/28/2006 | $31.92 | | | | | | | | | | | | |
| 6/29/2006 | $32.97 | | | | | | | | | | | | |
| 6/30/2006 | $33.00 | | | | | | | | | | | | |
| 7/3/2006 | $33.30 | | | | 76,000 | $ 33.03 | $ 2,510,280.00 | | | | | | |
| 7/5/2006 | $32.47 | | | | | | | | | | | | |
| 7/6/2006 | $33.11 | | | | | | | | | | | | |
| 7/7/2006 | $32.50 | | | | | | | | | | | | |
| 7/10/2006 | $32.85 | | | | | | | | | | | | |
| 7/11/2006 | $33.17 | | | | | | | | | | | | |
| 7/12/2006 | $33.38 | | | | | | | | | | | | |
| 7/13/2006 | $32.23 | | | | | | | | | | | | |
| 7/14/2006 | $32.08 | | | | | | | | | | | | |

**Yahoo! Class Period Sales Activities**

| Date | Adj. Close* | Nazem Shares Sold | Nazem Sales Price | Nazem Gross Proceeds | Rosensweig Shares Sold | Rosensweig Sales Price | Rosensweig Gross Proceeds | Semel Shares Sold | Semel Sales Price | Semel Gross Proceeds | Decker Shares Sold | Decker Sales Price | Decker Gross Proceeds |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/17/2006 | $31.84 | | | | | | | | | | | | |
| 7/18/2006 | $32.24 | | | | | | | | | | | | |
| | | | | | ▲▲ Class Period Ends ▲▲ | | | | | | | | |
| 7/19/2006 | $25.20 | | | | | | | | | | | | |
| 7/20/2006 | $25.27 | | | | | | | | | | | | |
| 7/21/2006 | $25.89 | | | | | | | | | | | | |
| 7/24/2006 | $26.94 | | | | | | | | | | | | |
| 7/25/2006 | $26.95 | | | | | | | | | | | | |
| 7/26/2006 | $27.08 | | | | | | | | | | | | |
| 7/27/2006 | $26.70 | | | | | | | | | | | | |
| 7/28/2006 | $27.47 | | | | | | | | | | | | |
| 7/31/2006 | $27.14 | | | | | | | | | | | | |
| 8/1/2006 | $26.94 | | | | | | | | | | | | |
| 8/2/2006 | $26.63 | | | | | | | | | | | | |
| 8/3/2006 | $26.90 | | | | | | | | | | | | |
| 8/4/2006 | $26.99 | | | | | | | | | | | | |
| 8/7/2006 | $27.08 | | | | | | | | | | | | |
| 8/8/2006 | $27.44 | | | | | | | | | | | | |
| 8/9/2006 | $27.22 | | | | | | | | | | | | |
| 8/10/2006 | $27.49 | | | | | | | | | | | | |
| 8/11/2006 | $27.50 | | | | | | | | | | | | |
| 8/14/2006 | $27.26 | | | | | | | | | | | | |
| 8/15/2006 | $28.17 | | | | 74,000 | $  28.0873 | $  2,078,460.20 | | | | | | |
| 8/16/2006 | $28.39 | | | | | | | | | | | | |
| 8/17/2006 | $28.91 | | | | | | | | | | | | |
| 8/18/2006 | $29.78 | | | | | | | | | | | | |
| 8/21/2006 | $28.90 | | | | | | | | | | | | |
| 8/22/2006 | $29.26 | | | | | | | | | | | | |
| 8/23/2006 | $28.70 | | | | | | | | | | | | |
| 8/24/2006 | $28.99 | | | | | | | | | | | | |
| 8/25/2006 | $28.77 | | | | | | | | | | | | |
| 8/28/2006 | $28.91 | | | | | | | | | | | | |
| 8/29/2006 | $28.96 | | | | | | | | | | | | |
| 8/30/2006 | $29.02 | | | | | | | | | | | | |
| 8/31/2006 | $28.83 | | | | | | | | | | | | |

Exhibit 39

# FOR IMMEDIATE RELEASE

### *Yahoo! Reports First Quarter 2004 Financial Results*

### *Company Posts Revenues of $758 Million,*
### *Operating Income of $132 Million,*
### *Operating Income Before Depreciation and Amortization of $211 Million*

**SUNNYVALE, Calif. – April 7, 2004 -** Yahoo! Inc. (Nasdaq: YHOO) today reported results for the first quarter ended March 31, 2004.

"Yahoo!'s performance surpassed even our high expectations, delivering the most successful quarter in the Company's history," said Terry Semel, chairman and chief executive officer, Yahoo!. " With our products more popular than ever before, we have experienced success across our entire business including strong growth in our fee-based and marketing services."

- Revenues were $758 million in the first quarter of 2004, compared to $283 million in the same period of 2003.
- Revenues excluding traffic acquisition costs ("TAC") were $550 million in the first quarter of 2004, compared to $283 million for the same period of 2003.
- Gross profit for the first quarter of 2004 was $476 million, compared to $240 million for the same period of 2003.
- Operating income for the first quarter of 2004 was $132 million, compared to $55 million for the same period of 2003.
- Operating income before depreciation and amortization for the first quarter of 2004 was $211 million, compared to $85 million for the same period of 2003.
- Cash flow from operating activities for the first quarter of 2004 was $236 million, compared to $99 million for the same period of 2003.
- Free cash flow for the first quarter of 2004 was $197 million, compared to $78 million for the same period of 2003.

"Yahoo! is off to a great start in 2004. Our growth is a result of very impressive performance from our ongoing operations, leveraged further by recent acquisitions" said Susan Decker, chief financial officer, Yahoo!.  "Looking forward, we are focused on making the appropriate investments and capital allocation decisions to help ensure sustainable, long-term growth.  Due to our increased optimism about our business, we have raised our financial outlook for the full year 2004."

**First Quarter 2004 Financial Highlights**

<u>Cash flow from operating activities and Free cash flow</u>:  Cash flow from operating activities for the first quarter of 2004 totaled $236 million, compared to $99 million for the same period of 2003. Free cash flow for the first quarter of 2004 totaled $197 million, a 153 percent increase over the $78 million reported for the same period of 2003.

Cash, cash equivalents and investments in marketable debt and equity securities increased by approximately $219 million to $2,790 million at March 31, 2004, compared to $2,571 million at December 31, 2003.  In addition to the free cash flow of $197 million generated for the quarter ended March 31, 2004, the company increased its cash, cash equivalents and investments in marketable debt and equity securities balances by $92 million related to issuance of common stock from exercise of employee stock options and approximately $24 million related to other investing activities, offset by approximately $50 million used to enter into a structured stock repurchase transaction and approximately $44 million used for acquisitions completed in the first quarter of 2004, net of cash acquired.  The structured stock repurchase will mature in the third quarter of 2004, at which point depending on the price per share of Yahoo! shares, Yahoo! will either repurchase shares or receive the $50 million investment and a premium.

Revenues: In the first quarter of 2004, Yahoo! reported revenues of $758 million, a 168 percent increase compared to the $283 million reported in the same period in 2003.

Marketing services revenue for the first quarter of 2004 totaled $635 million, a 235 percent increase from the $190 million reported in the same period in 2003.  This amount includes approximately $10 million related to a one-time gain from unredeemed third party loyalty program points that expired during the quarter.  The year over year increase in marketing services revenue (excluding the gain related to the points expiration) resulted from a 48 percent growth in Yahoo!'s organic marketing services revenues, primarily in the search and marketplace properties, and incremental revenue associated with acquisitions completed during the past year.

Fees revenue for the first quarter of 2004 totaled $88 million, a 39 percent increase compared to the $64 million reported in the same period in 2003.  This increase was primarily driven by the growth in the number of paying relationships for Yahoo!'s premium services, which were approximately 5.8 million at March 31, 2004 compared to approximately 2.9 million at March 31, 2003.

Listings revenue for the first quarter of 2004 totaled $34 million, a 16 percent increase compared to the $29 million reported in the same period in 2003.  This increase was primarily driven by our search and marketplace listings.

Revenues excluding TAC and Gross profit:  Revenues excluding TAC for the first quarter of 2004 totaled $550 million, a 94 percent increase compared to the $283 million in the same period of 2003.  Gross profit for the first quarter of 2004 totaled $476 million, compared to $240 million in the same period of 2003.  The increase in revenues excluding TAC for the quarter ended March 31, 2004, when compared to the same period in 2003, resulted from the combination of a strong increase in revenues from Yahoo!'s organic marketing services revenues, as well as the incremental revenue associated with the acquisitions completed during the past year.

Operating income and Operating income before depreciation and amortization:  Operating income for the first quarter of 2004 totaled $132 million, compared to $55 million in the same period of 2003.  Operating income before depreciation and amortization for the first quarter of 2004 totaled $211 million, a 149 percent increase compared to the $85 million achieved in the same period of 2003.  The increase in operating income and operating income before depreciation and amortization for the quarter ended March 31, 2004, when compared to the same period in 2003, reflects strong growth in revenues excluding TAC while maintaining ongoing cost discipline.

Net Income:  Net income for the first quarter of 2004 was $101 million or $0.14 per diluted share (which included $0.01 per diluted share related to the one-time gain from unredeemed third party loyalty program points that expired during the quarter), compared with $47 million or $0.08 per diluted share for the same period of 2003.

<u>Stock Split:</u> Yahoo!'s Board of Directors approved a two-for-one split of all outstanding shares of the company's common stock, payable May 11, 2004 to stockholders of record on April 26, 2004.

Please refer to the "Note to Unaudited Condensed Consolidated Statements of Operations" for definition of these key financial measures and "Business Outlook" attached to this press release.

**Quarterly Conference Call**

Yahoo! will host a conference call to discuss first quarter results at 5:00 p.m. Eastern Time today. A live Webcast of the conference call, together with supplemental financial information can be accessed through the Company's Investor Relations Web site at http://yhoo.client.shareholder.com/earnings.cfm.  In addition, an archive of the Webcast can be accessed through the same link. An audio replay of the call will be available following the conference call by calling 877-213-9653 or 630-652-3041, reservation number: 8685021

**About Yahoo!**

Yahoo! Inc., headquartered in Sunnyvale, Calif., is a leading provider of comprehensive online products and services to consumers and businesses worldwide. Yahoo! is the No. 1 Internet brand globally and the most trafficked Internet destination worldwide.

*This press release includes the financial measures revenues excluding traffic acquisition costs, operating income before depreciation and amortization and free cash flow.   These measures are defined as non-GAAP financial measures by the Securities and Exchange Commission and may be different from non-GAAP financial measures used by other companies. The presentation of this financial information is not intended to be considered in isolation or as a substitute for the financial information prepared and presented in accordance with generally accepted accounting principles.   See Note to Unaudited Condensed Consolidated Statements of Operations and Reconciliations to Unaudited Condensed Consolidated Statements of Operations included in this press release for further information regarding these non-GAAP financial measures.*

*This press release and its attachments contain forward-looking statements that involve risks and uncertainties concerning Yahoo!'s expected financial performance (as described without limitation in the Business Outlook section and quotations from management in this press release), as well as Yahoo!'s strategic and operational plans. Actual results may differ materially from the results predicted and reported results should not be considered as an indication of future performance. The potential risks and uncertainties include, among others, decreases or delays in marketing services spending, including performance of the Company's recently acquired businesses; the actual increases in demand by customers for Yahoo!'s premium services; acceptance of new products and services; general economic conditions; risks related to the integration of recent acquisitions; the ability to adjust to changes in personnel, including management changes; and the dependence on third parties for technology, services, content and distribution. All information set forth in this release and its attachments is as of April 7, 2004.  Yahoo! undertakes no duty to update this information. More information about potential factors that could affect the Company's business and financial results is included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2003, including (without limitation) under the captions, "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," which is on file with the SEC and available at the SEC's website at www.sec.gov. Additional information will also be set forth in those sections in Yahoo!'s Quarterly Report on Form 10-Q for the quarter ended March 31, 2004, which will be filed with the SEC in the second quarter of 2004.*

### ###

Yahoo! and the Yahoo! logos are trademarks and/or registered trademarks of
Yahoo! Inc.  All other names are trademarks and/or registered trademarks of their res pective owners.

**Media Relations Contacts:**
Brian Nelson, Yahoo! Inc., (408) 349-7329,  bnelson@yahoo-inc.com
Ruben Osorio, Fleishman-Hillard, (415) 318-4108,  osorior@fleishman.com

**Investor Relations Contact:**
Cathy La Rocca, Yahoo! Inc., (408) 349-5188,  cathy@yahoo-inc.com

**Yahoo! Inc.**
**Unaudited Condensed Consolidated Statements of Operations**
**(in thousands, except per share amounts)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2003 | 2004 |
| Revenues | $ 282,948 | $ 757,786 |
| Cost of revenues | 43,132 | 281,705 |
| Gross profit | 239,816 | 476,081 |
| Operating expenses: | | |
| Sales and marketing | 113,479 | 166,295 |
| Product development | 36,398 | 76,989 |
| General and administrative | 28,640 | 57,556 |
| Stock compensation expense [*] | 575 | 12,572 |
| Amortization of intangibles | 5,747 | 30,512 |
| Total operating expenses | 184,839 | 343,924 |
| Income from operations | 54,977 | 132,157 |
| Other income, net | 12,530 | 14,378 |
| Earnings in equity interests | 9,729 | 19,868 |
| Minority interests in operations of consolidated subsidiaries | (1,908) | (482) |
| Income before income taxes | 75,328 | 165,921 |
| Provision for income taxes | 28,625 | 64,709 |
| Net income | $ 46,703 | $ 101,212 |
| Net income per share - diluted | $ 0.08 | $ 0.14 |
| Shares used in per share calculation - diluted | 615,788 | 713,274 |
| (*) Stock compensation expense is allocated as follows: | | |
| Sales and marketing | $ 209 | $ 3,605 |
| Product development | 286 | 4,723 |
| General and administrative | 80 | 4,244 |
| Total stock compensation expense | $ 575 | $ 12,572 |

| | | |
| --- | --- | --- |
| *Supplemental Financial Data (See Note)* | | |
| Revenues excluding traffic acquisition costs ("TAC") | $ 282,948 | $ 550,150 |
| Operating income before depreciation and amortization | $ 84,625 | $ 210,921 |
| Free cash flow | $ 78,125 | $ 197,286 |

**Yahoo! Inc.**
**Note to Unaudited Condensed Consolidated Statements of Operations**

The Company believes that the non-GAAP financial measures revenues excluding traffic acquisition costs ("TAC"), operating income before depreciation and amortization and free cash flow are helpful, when presented in conjunction with the comparable GAAP measures of gross profit, income from operations, and cash flow from operating activities.

Revenues excluding TAC is defined as gross profit before other cost of revenues. We believe this performance measure is useful to management and investors as it is more comparable to our historical profitability, because traffic acquisition costs paid to affiliates of Overture Services, Inc., ("Overture"), which the Company acquired on October 7, 2003, are a significant percentage of revenues generated from Overture's sponsored search services. A limitation of revenues excluding TAC is that other cost of revenues are excluded and therefore it does not represent the actual gross profit for the period.

Operating income before depreciation and amortization is defined as income (loss) from operations before depreciation, amortization of intangible assets and amortization of stock compensation expense. We consider operating income before depreciation and amortization to be an important indicator of the operational strength of the Company. This measure eliminates the effects of depreciation, amortization of intangible assets and amortization of stock compensation expense from period to period, which we believe is useful to management and investors in evaluating the operating performance of the Company as depreciation and amortization costs are not directly attributable to the underlying performance of the Company's business operations. A limitation associated with this measure is that it does not reflect the periodic costs of certain capitalized tangible and intangible assets used in generating revenues in the Company's businesses. Management evaluates the costs of such tangible and intangible assets through other financial measures such as capital expenditures. A further limitation associated with this measure is that it does not include all expenses related to our workforce. Management compensates for this limitation by providing supplemental information about stock compensation expense on the face of our consolidated statements of operations.

Free cash flow is defined as cash flow from operating activities less capital expenditures. In addition, for the quarters ended June 30, 2002 and December 31, 2003, free cash flow also included change in long-term deferred revenue and Overture receivable settled through acquisition, respectively. Change in long-term deferred revenue represented cash payments received in advance of revenue recognized. Overture receivable settled through acquisition represented a Yahoo! accounts receivable balance owed from Overture that was settled as part of the acquisition. We consider free cash flow to be a liquidity measure which provides useful information to management and investors about the amount of cash generated after the acquisition of property and equipment, which can then be used for strategic opportunities including, among others, investing in the Company's business, making strategic acquisitions, strengthening the balance sheet and repurchasing stock. A limitation of free cash flow is that it does not represent the total increase or decrease in the cash balance for the period.

In addition, management refers to these financial measures to facilitate internal and external comparisons to the Company's historical operating results, in making operating decisions, for budget planning purposes, and in some cases to form the basis upon which management is compensated. These measures should be considered in addition to, not as a substitute for, or superior to, gross profit, income from operations, cash flow from operating activities, or other measures of financial performance prepared in accordance with generally accepted accounting principles.

**Yahoo! Inc.**
**Reconciliations to Unaudited Condensed Consolidated Statements of Operations**
**(in thousands)**

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2003 | 2004 |
| **Revenues for groups of similar services:** | | |
| Marketing services | $ 189,965 | $ 635,468 |
| Fees | 63,729 | 88,470 |
| Listings | 29,254 | 33,848 |
| Total revenues | $ 282,948 | $ 757,786 |
| **Revenues by segment:** | | |
| United States | $ 238,546 | $ 599,271 |
| International | 44,402 | 158,515 |
| Total revenues | $ 282,948 | $ 757,786 |
| **Cost of revenues:** | | |
| Traffic acquisition costs ("TAC") | $ - | $ 207,636 |
| Other cost of revenues | 43,132 | 74,069 |
| Total cost of revenues | $ 43,132 | $ 281,705 |
| **Revenues excluding TAC:** | | |
| Gross profit | $ 239,816 | $ 476,081 |
| Other cost of revenues | 43,132 | 74,069 |
| Revenues excluding TAC | $ 282,948 | $ 550,150 |
| **Revenues excluding TAC by segment:** | | |
| **United States:** | | |
| Gross profit | $ 203,228 | $ 389,108 |
| Other cost of revenues | 35,318 | 62,617 |
| Revenues excluding TAC | $ 238,546 | $ 451,725 |
| **International:** | | |
| Gross profit | $ 36,588 | $ 86,973 |
| Other cost of revenues | 7,814 | 11,452 |
| Revenues excluding TAC | $ 44,402 | $ 98,425 |
| **Operating income before depreciation and amortization:** | | |
| Income from operations | $ 54,977 | $ 132,157 |
| Depreciation and amortization | 29,073 | 66,192 |
| Stock compensation expense | 575 | 12,572 |
| Operating income before depreciation and amortization | $ 84,625 | $ 210,921 |
| **Operating income before depreciation and amortization by segment:** | | |
| Operating income before depreciation and amortization - United States | $ 77,523 | $ 191,254 |
| Operating income before depreciation and amortization - International | 7,102 | 19,667 |
| Operating income before depreciation and amortization | 84,625 | 210,921 |
| Corporate and unallocated operating costs and expenses: | | |
| Depreciation and amortization | (29,073) | (66,192) |
| Stock compensation expense | (575) | (12,572) |
| Income from operations | $ 54,977 | $ 132,157 |
| **United States** | | |
| Income from operations | $ 51,000 | $ 121,289 |
| Depreciation and amortization | 25,948 | 59,300 |
| Stock compensation expense | 575 | 10,665 |
| Operating income before depreciation and amortization - United States | $ 77,523 | $ 191,254 |
| **International** | | |
| Income from operations | $ 3,977 | $ 10,868 |
| Depreciation and amortization | 3,125 | 6,892 |
| Stock compensation expense | - | 1,907 |
| Operating income before depreciation and amortization - International | $ 7,102 | $ 19,667 |
| **Free cash flow:** | | |
| Cash flow from operating activities | $ 98,628 | $ 235,975 |
| Acquisition of property and equipment, net | (20,503) | (38,689) |
| Free cash flow | $ 78,125 | $ 197,286 |

**Yahoo! Inc.**
**Business Outlook**


## Business Outlook

The following business outlook is based on current information (including the effect of our acquisition of Kelkoo S.A.) and expectations as of April 7, 2004.  Yahoo!'s business outlook as of today is expected to be available on the Company's Investor Relations Web site throughout the current quarter. It is currently expected the full business outlook will not be updated until the release of Yahoo!'s next quarterly earnings announcement, notwithstanding subsequent developments; however, Yahoo! may update the full business outlook or any portion thereof at any time.

|  | Three months ending June 30, 2004 | Year ending December 31, 2004 |
|---|---|---|
| Revenues excluding traffic acquisition costs* ("TAC") outlook (in millions): | | |
| Gross Profit | $500 - $530 | $2,080 - $2,170 |
| Other cost of revenues | $80 - $85 | $325 - $350 |
| Revenues excluding TAC | $580- $615 | $2,405 - $2,520 |
| | | |
| Operating income before depreciation and amortization* outlook (in millions): | | |
| Income from operations | $131 - $148 | $575 - $625 |
| Depreciation and amortization | $70 - $75 | $280 - $300 |
| Stock compensation expense | $9 - $12 | $35 - $45 |
| Operating income before depreciation and amortization | $210 - $235 | $890 - $970 |

\*    Refer to Note to Unaudited Condensed Consolidated Statements of Operations.

**Yahoo! Inc.**
**Unaudited Condensed Consolidated Statements of Cash Flows**
**(in thousands)**

|  | Three Months Ended March 31, | |
|---|---|---|
|  | **2003** | **2004** |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net income | $ 46,703 | $ 101,212 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 29,073 | 66,192 |
| Tax benefits from stock options | 21,057 | 60,750 |
| Earnings in equity interests | (9,729) | (19,868) |
| Minority interests in operations of consolidated subsidiaries | 1,908 | 482 |
| Stock compensation expense | 575 | 12,572 |
| Other noncash charges | 3,012 | (1,273) |
| Changes in assets and liabilities, net of effects of acquisitions: | | |
| Accounts receivable, net | (15,347) | 1,189 |
| Prepaid expenses and other assets | 5,215 | (4,410) |
| Accounts payable | 2,603 | (17,909) |
| Accrued expenses and other liabilities | 4,260 | 32,303 |
| Deferred revenue | 9,298 | 4,735 |
| Net cash provided by operating activities | 98,628 | 235,975 |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Acquisition of property and equipment, net | (20,503) | (38,689) |
| Purchases of marketable securities | (137,440) | (514,555) |
| Proceeds from sales and maturities of marketable securities | 430,518 | 382,060 |
| Acquisitions, net of cash acquired | (228,318) | (43,517) |
| Proceeds from sales of other investments | 1,281 | 10,661 |
| Net cash provided by (used in) investing activities | 45,538 | (204,040) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from issuance of common stock, net | 23,567 | 92,295 |
| Structured stock repurchase | - | (50,000) |
| Net cash provided by financing activities | 23,567 | 42,295 |
| | | |
| Effect of exchange rate changes on cash and cash equivalents | (262) | 3,040 |
| | | |
| Net change in cash and cash equivalents | 167,471 | 77,270 |
| Cash and cash equivalents, beginning of period | 310,972 | 713,539 |
| | | |
| Cash and cash equivalents, end of period | $ 478,443 | $ 790,809 |

**Yahoo! Inc.**
**Unaudited Condensed Consolidated Balance Sheets**
**(in thousands)**

|  | December 31, 2003 | March 31, 2004 |
|---|---|---|
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $    713,539 | $    790,809 |
| Short-term investments in marketable securities | 595,978 | 767,118 |
| Accounts receivable, net | 282,415 | 281,966 |
| Prepaid expenses and other current assets | 129,777 | 138,052 |
| Total current assets | 1,721,709 | 1,977,945 |
| | | |
| Long-term investments in marketable securities | 1,261,693 | 1,232,343 |
| Property and equipment, net | 449,512 | 449,428 |
| Goodwill | 1,805,561 | 1,849,111 |
| Intangible assets, net | 445,640 | 433,477 |
| Other assets | 247,539 | 249,883 |
| Total assets | $  5,931,654 | $  6,192,187 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current liabilities:** | | |
| Accounts payable | $      31,890 | $      15,234 |
| Accrued and other current liabilities | 483,628 | 516,415 |
| Deferred revenue | 192,278 | 200,991 |
| Total current liabilities | 707,796 | 732,640 |
| | | |
| Long term debt | 750,000 | 750,000 |
| Other liabilities | 72,890 | 75,996 |
| Minority interests in consolidated subsidiaries | 37,478 | 42,060 |
| Stockholders' equity | 4,363,490 | 4,591,491 |
| Total liabilities and stockholders' equity | $  5,931,654 | $  6,192,187 |

**Yahoo! Inc.**
**Unaudited Supplemental Financial Information and Business Metrics**
**(in thousands)**

| | Q1 2003 | Q2 2003 | Q3 2003 | Q4 2003 | Q1 2004 |
|---|---|---|---|---|---|
| **Revenues for groups of similar services:** | | | | | |
| Marketing services | $ 189,965 | $ 219,198 | $ 245,072 | $ 545,498 | $ 635,468 |
| Fees | 63,729 | 69,926 | 79,358 | 85,179 | 88,470 |
| Listings | 29,254 | 32,282 | 32,391 | 33,245 | 33,848 |
| Total revenues | $ 282,948 | $ 321,406 | $ 356,821 | $ 663,922 | $ 757,786 |
| **Revenues for groups of similar services (Trailing Twelve Months):** | | | | | |
| Marketing services | $ 703,858 | $ 771,346 | $ 850,657 | $ 1,199,733 | $ 1,645,236 |
| Fees | 232,124 | 252,987 | 275,614 | 298,192 | 322,933 |
| Listings | 107,368 | 114,631 | 121,291 | 127,172 | 131,766 |
| Total revenues | $ 1,043,350 | $ 1,138,964 | $ 1,246,962 | $ 1,625,097 | $ 2,099,935 |
| **Revenues by segment:** | | | | | |
| United States | $ 238,546 | $ 271,345 | $ 299,759 | $ 545,503 | $ 599,271 |
| International | 44,402 | 50,061 | 57,062 | 118,419 | 158,515 |
| Total revenues | $ 282,948 | $ 321,406 | $ 356,821 | $ 663,922 | $ 757,786 |
| **Revenues by segment (Trailing Twelve Months):** | | | | | |
| United States | $ 878,532 | $ 962,412 | $ 1,052,036 | $ 1,355,153 | $ 1,715,878 |
| International | 164,818 | 176,552 | 194,926 | 269,944 | 384,057 |
| Total revenues | $ 1,043,350 | $ 1,138,964 | $ 1,246,962 | $ 1,625,097 | $ 2,099,935 |
| **Cost of revenues:** | | | | | |
| Traffic acquisition costs ("TAC") | $ - | $ - | $ - | $ 152,583 | $ 207,636 |
| Other cost of revenues | 43,132 | 46,842 | 47,287 | 68,259 | 74,069 |
| Total cost of revenues | $ 43,132 | $ 46,842 | $ 47,287 | $ 220,842 | $ 281,705 |
| **Cost of revenues (Trailing Twelve Months):** | | | | | |
| Traffic acquisition costs | $ - | $ - | $ - | $ 152,583 | $ 360,219 |
| Other cost of revenues | 168,192 | 173,326 | 179,580 | 205,520 | 236,457 |
| Total cost of revenues | $ 168,192 | $ 173,326 | $ 179,580 | $ 358,103 | $ 596,676 |
| **Revenues excluding TAC:** | | | | | |
| Gross profit | $ 239,816 | $ 274,564 | $ 309,534 | $ 443,080 | $ 476,081 |
| Other cost of revenues | 43,132 | 46,842 | 47,287 | 68,259 | 74,069 |
| Revenues excluding TAC | $ 282,948 | $ 321,406 | $ 356,821 | $ 511,339 | $ 550,150 |
| **Revenues excluding TAC (Trailing twelve months):** | | | | | |
| Gross profit | $ 875,158 | $ 965,638 | $ 1,067,382 | $ 1,266,994 | $ 1,503,259 |
| Other cost of revenues | 168,192 | 173,326 | 179,580 | 205,520 | 236,457 |
| Revenues excluding TAC | $ 1,043,350 | $ 1,138,964 | $ 1,246,962 | $ 1,472,514 | $ 1,739,716 |
| **Revenues excluding TAC by segment** | | | | | |
| **United States:** | | | | | |
| Gross profit | $ 203,228 | $ 232,890 | $ 261,290 | $ 371,557 | $ 389,108 |
| Other cost of revenues | 35,318 | 38,455 | 38,469 | 58,446 | 62,617 |
| Revenues excluding TAC | $ 238,546 | $ 271,345 | $ 299,759 | $ 430,003 | $ 451,725 |
| **International:** | | | | | |
| Gross profit | $ 36,588 | $ 41,674 | $ 48,244 | $ 71,523 | $ 86,973 |
| Other cost of revenues | 7,814 | 8,387 | 8,818 | 9,813 | 11,452 |
| Revenues excluding TAC | $ 44,402 | $ 50,061 | $ 57,062 | $ 81,336 | $ 98,425 |
| **Revenues excluding TAC by segment (Trailing Twelve Months):** | | | | | |
| **United States:** | | | | | |
| Gross profit | $ 744,266 | $ 822,088 | $ 905,792 | $ 1,068,965 | $ 1,254,845 |
| Other cost of revenues | 134,266 | 140,324 | 146,244 | 170,688 | 197,987 |
| Revenues excluding TAC | $ 878,532 | $ 962,412 | $ 1,052,036 | $ 1,239,653 | $ 1,452,832 |
| **International:** | | | | | |
| Gross profit | $ 130,892 | $ 143,550 | $ 161,590 | $ 198,029 | $ 248,414 |
| Other cost of revenues | 33,926 | 33,002 | 33,336 | 34,832 | 38,470 |
| Revenues excluding TAC | $ 164,818 | $ 176,552 | $ 194,926 | $ 232,861 | $ 286,884 |
| **Operating income before depreciation and amortization:** | | | | | |
| Income from operations | $ 54,977 | $ 62,772 | $ 83,498 | $ 94,419 | $ 132,157 |
| Depreciation and amortization | 29,073 | 34,503 | 33,013 | 63,099 | 66,192 |
| Stock compensation expense | 575 | 891 | 485 | 20,078 | 12,572 |
| Operating income before depreciation and amortization | $ 84,625 | $ 98,166 | $ 116,996 | $ 177,596 | $ 210,921 |
| **Operating income before depreciation and amortization (Trailing Twelve Months):** | | | | | |
| Income from operations | $ 147,340 | $ 202,594 | $ 256,615 | $ 295,666 | $ 372,846 |
| Depreciation and amortization | 115,507 | 122,534 | 125,796 | 159,688 | 196,807 |
| Stock compensation expense | 3,357 | 3,129 | 2,661 | 22,029 | 34,026 |
| Operating income before depreciation and amortization | $ 266,204 | $ 328,257 | $ 385,072 | $ 477,383 | $ 603,679 |

**Yahoo! Inc.**
**Unaudited Supplemental Financial Information and Business Metrics**
**(in thousands)**

| | Q1 2003 | Q2 2003 | Q3 2003 | Q4 2003 | Q1 2004 |
|---|---|---|---|---|---|
| **Operating income before depreciation and amortization by segment:** | | | | | |
| Operating income before depreciation and amortization - United States | $ 77,523 | $ 91,446 | $ 106,607 | $ 165,796 | $ 191,254 |
| Operating income before depreciation and amortization - International | 7,102 | 6,720 | 10,389 | 11,800 | 19,667 |
| Operating income before depreciation and amortization | 84,625 | 98,166 | 116,996 | 177,596 | 210,921 |
| Depreciation and amortization | (29,073) | (34,503) | (33,013) | (63,099) | (66,192) |
| Stock compensation expense | (575) | (891) | (485) | (20,078) | (12,572) |
| Income from operations | $ 54,977 | $ 62,772 | $ 83,498 | $ 94,419 | $ 132,157 |
| | | | | | |
| **Operating income before depreciation and amortization by segment (Trailing Twelve Months):** | | | | | |
| Operating income before depreciation and amortization - United States | $ 257,795 | $ 309,568 | $ 357,601 | $ 441,372 | $ 555,103 |
| Operating income before depreciation and amortization - International | 8,409 | 18,689 | 27,471 | 36,011 | 48,576 |
| Operating income before depreciation and amortization | 266,204 | 328,257 | 385,072 | 477,383 | 603,679 |
| Depreciation and amortization | (115,507) | (122,534) | (125,796) | (159,688) | (196,807) |
| Stock compensation expense | (3,357) | (3,129) | (2,661) | (22,029) | (34,026) |
| Income from operations | $ 147,340 | $ 202,594 | $ 256,615 | $ 295,666 | $ 372,846 |
| | | | | | |
| **Operating income before depreciation and amortization by segment:** | | | | | |
| **United States** | | | | | |
| Income from operations | $ 51,000 | $ 60,472 | $ 77,684 | $ 90,246 | $ 121,289 |
| Depreciation and amortization | 25,948 | 30,083 | 28,438 | 57,423 | 59,300 |
| Stock compensation expense | 575 | 891 | 485 | 18,127 | 10,665 |
| Operating income before depreciation and amortization - United States | $ 77,523 | $ 91,446 | $ 106,607 | $ 165,796 | $ 191,254 |
| | | | | | |
| **International** | | | | | |
| Income from operations | $ 3,977 | $ 2,300 | $ 5,814 | $ 4,173 | $ 10,868 |
| Depreciation and amortization | 3,125 | 4,420 | 4,575 | 5,676 | 6,892 |
| Stock compensation expense | - | - | - | 1,951 | 1,907 |
| Operating income before depreciation and amortization - International | $ 7,102 | $ 6,720 | $ 10,389 | $ 11,800 | $ 19,667 |
| | | | | | |
| **Operating income before depreciation and amortization by segment (Trailing Twelve Months):** | | | | | |
| **United States** | | | | | |
| Income from operations | $ 150,646 | $ 197,244 | $ 244,177 | $ 279,402 | $ 349,691 |
| Depreciation and amortization | 103,792 | 109,195 | 110,763 | 141,892 | 175,244 |
| Stock compensation expense | 3,357 | 3,129 | 2,661 | 20,078 | 30,168 |
| Operating income before depreciation and amortization - United States | $ 257,795 | $ 309,568 | $ 357,601 | $ 441,372 | $ 555,103 |
| | | | | | |
| **International** | | | | | |
| Income (loss) from operations | $ (3,306) | $ 5,350 | $ 12,438 | $ 16,264 | $ 23,155 |
| Depreciation and amortization | 11,715 | 15,339 | 15,033 | 17,796 | 21,563 |
| Stock compensation expense | - | - | - | 1,951 | 3,858 |
| Operating income before depreciation and amortization - International | $ 8,409 | $ 18,689 | $ 27,471 | $ 36,011 | $ 48,576 |
| | | | | | |
| **Free cash flow:** | | | | | |
| Cash flow from operating activities | $ 98,628 | $ 92,123 | $ 135,533 | $ 101,860 | $ 235,975 |
| Acquisition of property and equipment, net | (20,503) | (20,770) | (38,445) | (37,611) | (38,689) |
| Overture receivable settled through acquisition | - | - | - | 28,071 | - |
| Free cash flow | $ 78,125 | $ 71,353 | $ 97,088 | $ 92,320 | $ 197,286 |
| | | | | | |
| **Free cash flow (Trailing Twelve Months):** | | | | | |
| Cash flow from operating activities | $ 353,633 | $ 342,374 | $ 405,642 | $ 428,144 | $ 565,491 |
| Acquisition of property and equipment, net | (64,769) | (71,238) | (96,390) | (117,329) | (135,515) |
| Change in long-term deferred revenue | (30,000) | - | - | - | - |
| Overture receivable settled through acquisition | - | - | - | 28,071 | 28,071 |
| Free cash flow | $ 258,864 | $ 271,136 | $ 309,252 | $ 338,886 | $ 458,047 |

Exhibit 40

# FOR IMMEDIATE RELEASE

## *Yahoo! Reports Second Quarter 2004 Financial Results*

### *Company Posts Revenues of $832 Million,*
### *Operating Income of $149 Million,*
### *Operating Income Before Depreciation and Amortization of $234 Million*

---

**SUNNYVALE, Calif. – July 7, 2004 -** Yahoo! Inc. (Nasdaq: YHOO) today reported results for the second quarter ended June 30, 2004.

"Yahoo!'s second quarter results represent another record quarter for the Company and demonstrate continued execution of our core priorities," said Terry Semel, chairman and chief executive officer, Yahoo!.  "Yahoo! is in the midst of a product renaissance, as we have been busier than ever rolling out new products and services we believe will be essential to our users."

- Revenues were $832 million for the second quarter of 2004, compared to $321 million for the same period of 2003.
- Revenues excluding traffic acquisition costs ("TAC") were $609 million for the second quarter of 2004, compared to $321 million for the same period of 2003.
- Gross profit for the second quarter of 2004 was $535 million, compared to $275 million for the same period of 2003.
- Operating income for the second quarter of 2004 was $149 million, compared to $63 million for the same period of 2003.
- Operating income before depreciation and amortization for the second quarter of 2004 was $234 million, compared to $98 million for the same period of 2003.
- Cash flow from operating activities for the second quarter of 2004 was $250 million, compared to $92 million for the same period of 2003.
- Free cash flow for the second quarter of 2004 was $194 million, compared to $71 million for the same period of 2003.

"Yahoo! is benefiting from its diverse and balanced sources of revenue, which have well positioned the Company to deliver strong, consistent, and profitable growth," said Susan Decker, chief financial officer, Yahoo!.  "Yahoo! remains committed to making the appropriate investments in our products and services in order to ensure that they remain among the most popular on the Internet, and continue to contribute to the creation of long-term shareholder value."

**Second Quarter 2004 Financial Highlights**

<u>Cash flow from operating activities and Free cash flow</u>:  Cash flow from operating activities for the second quarter of 2004 totaled $250 million, compared to $92 million for the same period of 2003. Free cash flow for the second quarter of 2004 totaled $194 million, a 172 percent increase over the $71 million reported for the same period of 2003.

Cash, cash equivalents and investments in marketable securities were approximately $2,650 million at June 30, 2004, compared to $2,790 million at March 31, 2004.  The net decrease in cash, cash equivalents and investments in marketable securities balances is primarily a result of $530 million used for acquisitions completed in the second quarter of 2004, net of cash acquired, offset by free cash flow of $194 million and $225 million of cash generated from the issuance of common stock as a result of the exercise of employee stock options for the quarter ended June 30, 2004.

<u>Revenues</u>: In the second quarter of 2004, Yahoo! reported revenues of $832 million, a 159 percent increase compared to the $321 million reported in the same period in 2003.

Marketing services revenue for the second quarter of 2004 totaled $691 million, a 215 percent increase from the $219 million reported in the same period in 2003. The year over year increase in marketing services revenue resulted from strong growth in Yahoo!'s organic marketing services revenues, primarily in the search and marketplace properties, and incremental revenue associated with acquisitions completed during the past year.

Fees revenue for the second quarter of 2004 totaled $104 million, a 49 percent increase compared to the $70 million reported in the same period in 2003. This increase was primarily driven by the growth in the number of paying relationships for Yahoo!'s premium services, which were approximately 6.4 million at June 30, 2004 compared to approximately 3.5 million at June 30, 2003.

Listings revenue for the second quarter of 2004 totaled $38 million, a 17 percent increase compared to the $32 million reported in the same period in 2003. This increase was primarily driven by our search and marketplace listings.

<u>Revenues excluding TAC and Gross profit:</u> Revenues excluding TAC for the second quarter of 2004 totaled $609 million, a 90 percent increase compared to the $321 million in the same period of 2003. Gross profit for the second quarter of 2004 totaled $535 million, compared to $275 million in the same period of 2003. The increase in revenues excluding TAC for the quarter ended June 30, 2004, when compared to the same period in 2003, resulted from the combination of a strong increase in revenues from Yahoo!'s organic marketing services revenues, as well as the incremental revenue associated with the acquisitions completed during the past year.

<u>Operating income and Operating income before depreciation and amortization:</u> Operating income for the second quarter of 2004 totaled $149 million, compared to $63 million in the same period of 2003. Operating income before depreciation and amortization for the second quarter of 2004 totaled $234 million, a 138 percent increase compared to the $98 million achieved in the same period of 2003. The increase in operating income and operating income before depreciation and amortization for the quarter ended June 30, 2004, when compared to the same period in 2003, reflects strong growth in revenues excluding TAC while maintaining ongoing cost discipline.

<u>Net Income:</u> Net income for the second quarter of 2004 was $113 million or $0.08 per diluted share, compared with $51 million or $0.04 per diluted share for the same period of 2003.

Please refer to the "Note to Unaudited Condensed Consolidated Statements of Operations" for definition of these key financial measures and "Business Outlook" attached to this press release.

**Quarterly Conference Call**

Yahoo! will host a conference call to discuss second quarter results at 5:00 p.m. Eastern Time today. A live Webcast of the conference call, together with supplemental financial information can be accessed through the Company's Investor Relations Web site at http://yhoo.client.shareholder.com/earnings.cfm. In addition, an archive of the Webcast can be accessed through the same link. An audio replay of the call will be available following the conference call by calling 877-213-9653 or 630-652-3041, reservation number: 9286236

**About Yahoo!**

Yahoo! Inc. is the No. 1 Internet brand globally and the most trafficked Internet destination. Headquartered in Sunnyvale, Calif., Yahoo!'s mission is to provide online products and services essential to consumers' lives and offer a full range of marketing solutions to enable businesses to connect with Yahoo!'s hundreds of millions of users worldwide.

*This press release includes the following financial measures: revenues excluding traffic acquisition costs, operating income before depreciation and amortization, and free cash flow. These measures are defined as non-GAAP financial measures by the Securities and Exchange Commission and may be different from non-GAAP financial measures used by other companies. The presentation of this financial information is not intended to be considered in isolation or as a substitute for the financial information prepared and presented in accordance with generally accepted accounting principles. See Note to Unaudited Condensed Consolidated Statements of Operations and Reconciliations to Unaudited Condensed Consolidated Statements of Operations included in this press release for further information regarding these non-GAAP financial measures.*

*This press release and its attachments contain forward-looking statements that involve risks and uncertainties concerning Yahoo!'s expected financial performance (as described without limitation in the Business Outlook section and quotations from management in this press release), as well as Yahoo!'s strategic and operational plans. Actual results may differ materially from the results predicted and reported results should not be considered as an indication of future performance. The potential risks and uncertainties include, among others, decreases or delays in marketing services spending, including performance of the Company's recently acquired businesses; the actual increases in demand by customers for Yahoo!'s premium services; acceptance of new products and services; the Company's ability to compete with new or existing competitors; general economic conditions; risks related to the integration of recent acquisitions; dependence on key personnel; and the dependence on third parties for technology, services, content and distribution. All information set forth in this release and its attachments is as of July 7, 2004. Yahoo! undertakes no duty to update this information. More information about potential factors that could affect the Company's business and financial results is included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2003 and the Quarterly Report on Form 10-Q for the quarter ended March 31, 2004, including (without limitation) under the captions, "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," which are on file with the SEC and available at the SEC's website at www.sec.gov. Additional information will also be set forth in those sections of Yahoo!'s Quarterly Report on Form 10-Q for the quarter ended June 30, 2004, which will be filed with the SEC in the third quarter of 2004.*

###

Yahoo! and the Yahoo! logos are trademarks and/or registered trademarks of Yahoo! Inc. All other names are trademarks and/or registered trademarks of their respective owners.

**Media Relations Contacts:**
Brian Nelson, Yahoo! Inc., (408) 349-7329, bnelson@yahoo-inc.com
Ruben Osorio, Fleishman-Hillard, (415) 318-4108, osorior@fleishman.com

**Investor Relations Contact:**
Cathy La Rocca, Yahoo! Inc., (408) 349-5188, cathy@yahoo-inc.com

**Yahoo! Inc.**
**Unaudited Condensed Consolidated Statements of Operations**
**(in thousands, except per share amounts)**

| | | Three Months Ended June 30, | | | Six Months Ended June 30, | |
|---|---|---|---|---|---|---|
| | | 2003 | 2004 | | 2003 | 2004 |
| Revenues | $ | 321,406 | $ 832,299 | $ | 604,354 | $ 1,590,085 |
| Cost of revenues | | 46,842 | 297,383 | | 89,974 | 579,088 |
| Gross profit | | 274,564 | 534,916 | | 514,380 | 1,010,997 |
| Operating expenses: | | | | | | |
|     Sales and marketing | | 122,106 | 191,875 | | 235,585 | 358,170 |
|     Product development | | 45,099 | 87,140 | | 81,497 | 164,129 |
|     General and administrative | | 33,934 | 63,159 | | 62,574 | 120,715 |
|     Stock compensation expense [(*)] | | 891 | 7,140 | | 1,466 | 19,712 |
|     Amortization of intangibles | | 9,762 | 36,108 | | 15,509 | 66,620 |
|         Total operating expenses | | 211,792 | 385,422 | | 396,631 | 729,346 |
| Income from operations | | 62,772 | 149,494 | | 117,749 | 281,651 |
| Other income, net | | 10,334 | 13,179 | | 22,864 | 27,557 |
| Earnings in equity interests | | 10,001 | 24,108 | | 19,730 | 43,976 |
| Minority interests in operations of consolidated subsidiaries | | (1,126) | (1,752) | | (3,034) | (2,234) |
| Income before income taxes | | 81,981 | 185,029 | | 157,309 | 350,950 |
| Provision for income taxes | | 31,153 | 72,517 | | 59,778 | 137,226 |
| Net income | $ | 50,828 | $ 112,512 | $ | 97,531 | $ 213,724 |
| Net income per share – diluted | $ | 0.04 | $ 0.08 | $ | 0.08 | $ 0.15 |
| Shares used in per share calculation – diluted | | 1,257,154 | 1,449,707 | | 1,244,365 | 1,438,128 |
| (*) Stock compensation expense is allocated as follows: | | | | | | |
| Sales and marketing | $ | 112 | $ 2,376 | $ | 321 | $ 5,981 |
| Product development | | 588 | 2,548 | | 874 | 7,271 |
| General and administrative | | 191 | 2,216 | | 271 | 6,460 |
|     Total stock compensation expense | $ | 891 | $ 7,140 | $ | 1,466 | $ 19,712 |

| | | Three Months Ended | | | Six Months Ended | |
|---|---|---|---|---|---|---|
| ***Supplemental Financial Data*** *(See Note)* | | | | | | |
| Revenues excluding traffic acquisition costs ("TAC") | $ | 321,406 | $ 609,141 | $ | 604,354 | $ 1,159,291 |
| Operating income before depreciation and amortization | $ | 98,166 | $ 234,062 | $ | 182,791 | $ 444,983 |
| Free cash flow | $ | 71,353 | $ 194,003 | $ | 149,478 | $ 391,289 |

**Yahoo! Inc.**
**Note to Unaudited Condensed Consolidated Statements of Operations**

The Company believes that the non-GAAP financial measures revenues excluding traffic acquisition costs ("TAC"), operating income before depreciation and amortization, and free cash flow are helpful, when presented in conjunction with the comparable GAAP measures of gross profit, income from operations, and cash flow from operating activities.

Revenues excluding TAC is defined as gross profit before other cost of revenues.  Following our acquisition of Overture Services, Inc. ("Overture"), on October 7, 2003, our total costs of revenue include TAC paid to affiliates of Overture in connection with its sponsored search services.  TAC also comprises a significant percentage of the revenues reported from Overture.  We believe revenues excluding TAC is a useful measure to management and investors because it is more comparable to our historically reported profitability numbers.  A limitation of revenues excluding TAC is that other cost of revenues are excluded and therefore it does not represent the actual gross profit for the period.

Operating income before depreciation and amortization is defined as income (loss) from operations before depreciation, amortization of intangible assets and amortization of stock compensation expense.  We consider operating income before depreciation and amortization to be an important indicator of the operational strength of the Company.  This measure eliminates the effects of depreciation, amortization of intangible assets and amortization of stock compensation expense from period to period, which we believe is useful to management and investors in evaluating the operating performance of the Company as depreciation and amortization costs are not directly attributable to the underlying performance of the Company's business operations.  A limitation associated with this measure is that it does not reflect the periodic costs of certain capitalized tangible and intangible assets used in generating revenues in the Company's businesses.  Management evaluates the costs of such tangible and intangible assets through other financial measures such as capital expenditures.  A further limitation associated with this measure is that it does not include stock compensation expenses related to our workforce.  Management compensates for this limitation by providing supplemental information about stock compensation expense on the face of our consolidated statements of operations.

Free cash flow is defined as cash flow from operating activities less net capital expenditures. In addition, for the quarters ended June 30, 2002 and December 31, 2003, free cash flow also included change in long-term deferred revenue and Overture receivable settled through acquisition, respectively.  Change in long-term deferred revenue represented cash payments received in advance of revenue recognized.  Overture receivable settled through acquisition represented a Yahoo! accounts receivable balance owed from Overture that was settled as part of the acquisition.  We consider free cash flow to be a liquidity measure which provides useful information to management and investors about the amount of cash generated after the acquisition of property and equipment, which can then be used for strategic opportunities including, among others, investing in the Company's business, making strategic acquisitions, strengthening the balance sheet and repurchasing stock.  A limitation of free cash flow is that it does not represent the total increase or decrease in the cash balance for the period.

In addition, management refers to these financial measures to facilitate internal and external comparisons to the Company's historical operating results, in making operating decisions, for budget planning purposes, and in some cases as a factor in determining management compensation. These measures should be considered in addition to, not as a substitute for, or superior to, gross profit, income from operations, cash flow from operating activities, or other measures of financial performance prepared in accordance with generally accepted accounting principles.

**Yahoo! Inc.**
**Reconciliations to Unaudited Condensed Consolidated Statements of Operations**
**(in thousands)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2003** | **2004** | **2003** | **2004** |
| **Revenues for groups of similar services:** | | | | |
| Marketing services | $ 219,198 | $ 690,634 | $ 409,163 | $ 1,326,102 |
| Fees | 69,926 | 103,851 | 133,655 | 192,321 |
| Listings | 32,282 | 37,814 | 61,536 | 71,662 |
| Total revenues | $ 321,406 | $ 832,299 | $ 604,354 | $ 1,590,085 |
| | | | | |
| **Revenues by segment:** | | | | |
| United States | $ 271,345 | $ 624,161 | $ 509,891 | $ 1,223,432 |
| International | 50,061 | 208,138 | 94,463 | 366,653 |
| Total revenues | $ 321,406 | $ 832,299 | $ 604,354 | $ 1,590,085 |
| | | | | |
| **Cost of revenues:** | | | | |
| Traffic acquisition costs ("TAC") | $ - | $ 223,158 | $ - | $ 430,794 |
| Other cost of revenues | 46,842 | 74,225 | 89,974 | 148,294 |
| Total cost of revenues | $ 46,842 | $ 297,383 | $ 89,974 | $ 579,088 |
| | | | | |
| **Revenues excluding TAC:** | | | | |
| Gross profit | $ 274,564 | $ 534,916 | $ 514,380 | $ 1,010,997 |
| Other cost of revenues | 46,842 | 74,225 | 89,974 | 148,294 |
| Revenues excluding TAC | $ 321,406 | $ 609,141 | $ 604,354 | $ 1,159,291 |
| | | | | |
| **Revenues excluding TAC by segment:** | | | | |
| **United States:** | | | | |
| Gross profit | $ 232,890 | $ 413,788 | $ 436,118 | $ 802,896 |
| Other cost of revenues | 38,455 | 60,304 | 73,773 | 122,921 |
| Revenues excluding TAC | $ 271,345 | $ 474,092 | $ 509,891 | $ 925,817 |
| | | | | |
| **International:** | | | | |
| Gross profit | $ 41,674 | $ 121,128 | $ 78,262 | $ 208,101 |
| Other cost of revenues | 8,387 | 13,921 | 16,201 | 25,373 |
| Revenues excluding TAC | $ 50,061 | $ 135,049 | $ 94,463 | $ 233,474 |
| | | | | |
| **Operating income before depreciation and amortization:** | | | | |
| Income from operations | $ 62,772 | $ 149,494 | $ 117,749 | $ 281,651 |
| Depreciation and amortization | 34,503 | 77,428 | 63,576 | 143,620 |
| Stock compensation expense | 891 | 7,140 | 1,466 | 19,712 |
| Operating income before depreciation and amortization | $ 98,166 | $ 234,062 | $ 182,791 | $ 444,983 |
| | | | | |
| **Operating income before depreciation and amortization by segment:** | | | | |
| Operating income before depreciation and amortization - United States | $ 91,446 | $ 198,365 | $ 168,969 | $ 389,619 |
| Operating income before depreciation and amortization - International | 6,720 | 35,697 | 13,822 | 55,364 |
| Operating income before depreciation and amortization | 98,166 | 234,062 | 182,791 | 444,983 |
| | | | | |
| Corporate operating costs and expenses: | | | | |
| Depreciation and amortization | (34,503) | (77,428) | (63,576) | (143,620) |
| Stock compensation expense | (891) | (7,140) | (1,466) | (19,712) |
| Income from operations | $ 62,772 | $ 149,494 | $ 117,749 | $ 281,651 |
| | | | | |
| **United States** | | | | |
| Income from operations | $ 60,472 | $ 128,556 | $ 111,472 | $ 249,845 |
| Depreciation and amortization | 30,083 | 63,711 | 56,031 | 123,011 |
| Stock compensation expense | 891 | 6,098 | 1,466 | 16,763 |
| Operating income before depreciation and amortization - United States | $ 91,446 | $ 198,365 | $ 168,969 | $ 389,619 |
| | | | | |
| **International** | | | | |
| Income from operations | $ 2,300 | $ 20,938 | $ 6,277 | $ 31,806 |
| Depreciation and amortization | 4,420 | 13,717 | 7,545 | 20,609 |
| Stock compensation expense | - | 1,042 | - | 2,949 |
| Operating income before depreciation and amortization - International | $ 6,720 | $ 35,697 | $ 13,822 | $ 55,364 |
| | | | | |
| **Free cash flow:** | | | | |
| Cash flow from operating activities | $ 92,123 | $ 249,702 | $ 190,751 | $ 485,677 |
| Acquisition of property and equipment, net | (20,770) | (55,699) | (41,273) | (94,388) |
| Free cash flow | $ 71,353 | $ 194,003 | $ 149,478 | $ 391,289 |

## Yahoo! Inc.
## Business Outlook

### Business Outlook

The following business outlook is based on current information and expectations as of July 7, 2004.  Yahoo!'s business outlook as of today is expected to be available on the Company's Investor Relations Web site throughout the current quarter. It is currently expected the full business outlook will not be updated until the release of Yahoo!'s next quarterly earnings announcement, notwithstanding subsequent developments; however, Yahoo! may update the full business outlook or any portion thereof at any time.

|  | Three months ending September 30, 2004 | Year ending December 31, 2004 |
|---|---|---|
| Revenues excluding traffic acquisition costs* ("TAC") outlook (in millions): |  |  |
| Gross Profit | $535 - $570 | $2,145 - $2,215 |
| Other cost of revenues | $75 - $80 | $310 - $320 |
| Revenues excluding TAC | $610- $650 | $2,455 - $2,535 |
| Operating income before depreciation and amortization* outlook (in millions): |  |  |
| Income from operations | $152 - $169 | $620 - $650 |
| Depreciation and amortization | $73 - $78 | $295 - $310 |
| Stock compensation expense | $5 - $8 | $30 - $35 |
| Operating income before depreciation and amortization | $230 - $255 | $945 - $995 |

\*   Refer to Note to Unaudited Condensed Consolidated Statements of Operations.

**Yahoo! Inc.**
**Unaudited Condensed Consolidated Statements of Cash Flows**
**(in thousands)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2003 | 2004 | 2003 | 2004 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | |
| Net income | $ 50,828 | $ 112,512 | $ 97,531 | $ 213,724 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | |
| Depreciation and amortization | 34,503 | 77,428 | 63,576 | 143,620 |
| Tax benefits from stock options | 28,588 | 60,371 | 49,645 | 121,121 |
| Earnings in equity interests | (10,001) | (24,108) | (19,730) | (43,976) |
| Minority interests in operations of consolidated subsidiaries | 1,126 | 1,752 | 3,034 | 2,234 |
| Stock compensation expense | 891 | 7,140 | 1,466 | 19,712 |
| Gains from sale of assets and other, net | 4,535 | 10,889 | 7,547 | 9,616 |
| Changes in assets and liabilities, net of effects of acquisitions: | | | | |
| Accounts receivable, net | (8,182) | (37,011) | (23,529) | (35,822) |
| Prepaid expenses and other assets | (9,180) | 4,992 | (3,965) | 582 |
| Accounts payable | (3,008) | 4,316 | (405) | (13,593) |
| Accrued expenses and other liabilities | (5,193) | 19,566 | (933) | 51,869 |
| Deferred revenue | 7,216 | 11,855 | 16,514 | 16,590 |
| Net cash provided by operating activities | 92,123 | 249,702 | 190,751 | 485,677 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | |
| Acquisition of property and equipment, net | (20,770) | (55,699) | (41,273) | (94,388) |
| Purchases of marketable securities | (528,738) | (347,458) | (666,178) | (862,013) |
| Proceeds from sales and maturities of marketable securities | 219,981 | 369,663 | 650,499 | 751,723 |
| Acquisitions, net of cash acquired | - | (530,110) | (228,318) | (573,877) |
| Purchases of other investments | (7,555) | (491) | (6,274) | (491) |
| Proceeds from sale of assets and other | - | 6,068 | - | 16,979 |
| Net cash used in investing activities | (337,082) | (558,027) | (291,544) | (762,067) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | |
| Proceeds from issuance of debt, net | 733,125 | - | 733,125 | - |
| Proceeds from issuance of common stock, net | 105,044 | 225,383 | 128,611 | 317,678 |
| Structured stock repurchase | - | - | - | (50,000) |
| Net cash provided by financing activities | 838,169 | 225,383 | 861,736 | 267,678 |
| Effect of exchange rate changes on cash and cash equivalents | 3,929 | 13 | 3,667 | 3,053 |
| Net change in cash and cash equivalents | 597,139 | (82,929) | 764,610 | (5,659) |
| Cash and cash equivalents, beginning of period | 478,443 | 790,809 | 310,972 | 713,539 |
| Cash and cash equivalents, end of period | $ 1,075,582 | $ 707,880 | $ 1,075,582 | $ 707,880 |

**Yahoo! Inc.**
**Condensed Consolidated Balance Sheets**
**(in thousands)**

| | December 31, 2003 | | June 30, 2004 (unaudited) |
|---|---|---|---|
| **ASSETS** | | | |
| **Current assets:** | | | |
| Cash and cash equivalents | $ | 713,539 | $    707,880 |
| Short-term investments in marketable securities | | 595,978 | 829,387 |
| Accounts receivable, net | | 282,415 | 337,082 |
| Prepaid expenses and other current assets | | 129,777 | 138,518 |
| Total current assets | | 1,721,709 | 2,012,867 |
| Long-term investments in marketable securities | | 1,261,693 | 1,112,556 |
| Property and equipment, net | | 449,512 | 463,890 |
| Goodwill | | 1,805,561 | 2,295,585 |
| Intangible assets, net | | 445,640 | 504,841 |
| Other assets | | 247,539 | 270,288 |
| Total assets | $ | 5,931,654 | $    6,660,027 |
| | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| **Current liabilities:** | | | |
| Accounts payable | $ | 31,890 | $    27,075 |
| Accrued and other current liabilities | | 483,628 | 552,867 |
| Deferred revenue | | 192,278 | 213,378 |
| Total current liabilities | | 707,796 | 793,320 |
| Long term debt | | 750,000 | 750,000 |
| Other liabilities | | 72,890 | 111,768 |
| Minority interests in consolidated subsidiaries | | 37,478 | 43,812 |
| Stockholders' equity | | 4,363,490 | 4,961,127 |
| Total liabilities and stockholders' equity | $ | 5,931,654 | $    6,660,027 |

**Yahoo! Inc.**
**Unaudited Supplemental Financial Information and Business Metrics**
**(in thousands)**

| | Q1 2003 | Q2 2003 | Q3 2003 | Q4 2003 | Q1 2004 | Q2 2004 |
|---|---|---|---|---|---|---|
| **Revenues for groups of similar services:** | | | | | | |
| Marketing services | $ 189,965 $ | 219,198 $ | 245,072 $ | 545,498 $ | 635,468 $ | 690,634 |
| Fees | 63,729 | 69,926 | 79,358 | 85,179 | 88,470 | 103,851 |
| Listings | 29,254 | 32,282 | 32,391 | 33,245 | 33,848 | 37,814 |
| Total revenues | $ 282,948 $ | 321,406 $ | 356,821 $ | 663,922 $ | 757,786 $ | 832,299 |
| **Revenues for groups of similar services (Trailing Twelve Months):** | | | | | | |
| Marketing services | $ 703,858 $ | 771,346 $ | 850,657 $ | 1,199,733 $ | 1,645,236 $ | 2,116,672 |
| Fees | 232,124 | 252,987 | 275,014 | 298,192 | 322,933 | 356,858 |
| Listings | 107,368 | 114,631 | 121,291 | 127,172 | 131,766 | 137,298 |
| Total revenues | $ 1,043,350 $ | 1,138,964 $ | 1,246,962 $ | 1,625,097 $ | 2,099,935 $ | 2,610,828 |
| **Revenues by segment:** | | | | | | |
| United States | $ 238,546 $ | 271,345 $ | 299,759 $ | 545,503 $ | 599,271 $ | 624,161 |
| International | 44,402 | 50,061 | 57,062 | 118,419 | 158,515 | 208,138 |
| Total revenues | $ 282,948 $ | 321,406 $ | 356,821 $ | 663,922 $ | 757,786 $ | 832,299 |
| **Revenues by segment (Trailing Twelve Months):** | | | | | | |
| United States | $ 878,532 $ | 962,412 $ | 1,052,036 $ | 1,355,153 $ | 1,715,878 $ | 2,068,694 |
| International | 164,818 | 176,552 | 194,926 | 269,944 | 384,057 | 542,134 |
| Total revenues | $ 1,043,350 $ | 1,138,964 $ | 1,246,962 $ | 1,625,097 $ | 2,099,935 $ | 2,610,828 |
| **Cost of revenues:** | | | | | | |
| Traffic acquisition costs ("TAC") | $ - $ | - $ | - $ | 152,583 $ | 207,636 $ | 223,158 |
| Other cost of revenues | 43,132 | 46,842 | 47,287 | 68,259 | 74,069 | 74,225 |
| Total cost of revenues | $ 43,132 $ | 46,842 $ | 47,287 $ | 220,842 $ | 281,705 $ | 297,383 |
| **Cost of revenues (Trailing Twelve Months):** | | | | | | |
| Traffic acquisition costs | $ - $ | - $ | - $ | 152,583 $ | 360,219 $ | 583,377 |
| Other cost of revenues | 168,192 | 173,326 | 179,580 | 205,520 | 236,457 | 263,840 |
| Total cost of revenues | $ 168,192 $ | 173,326 $ | 179,580 $ | 358,103 $ | 596,676 $ | 847,217 |
| **Revenues excluding TAC:** | | | | | | |
| Gross profit | $ 239,816 $ | 274,564 $ | 309,534 $ | 443,080 $ | 476,081 $ | 534,916 |
| Other cost of revenues | 43,132 | 46,842 | 47,287 | 68,259 | 74,069 | 74,225 |
| Revenues excluding TAC | $ 282,948 $ | 321,406 $ | 356,821 $ | 511,339 $ | 550,150 $ | 609,141 |
| **Revenues excluding TAC (Trailing twelve months):** | | | | | | |
| Gross profit | $ 875,158 $ | 965,638 $ | 1,067,382 $ | 1,266,994 $ | 1,503,259 $ | 1,763,611 |
| Other cost of revenues | 168,192 | 173,326 | 179,580 | 205,520 | 236,457 | 263,840 |
| Revenues excluding TAC | $ 1,043,350 $ | 1,138,964 $ | 1,246,962 $ | 1,472,514 $ | 1,739,716 $ | 2,027,451 |
| **Revenues excluding TAC by segment:** | | | | | | |
| **United States:** | | | | | | |
| Gross profit | $ 203,228 $ | 232,890 $ | 261,290 $ | 371,557 $ | 389,108 $ | 413,788 |
| Other cost of revenues | 35,318 | 38,455 | 38,469 | 58,446 | 62,617 | 60,304 |
| Revenues excluding TAC | $ 238,546 $ | 271,345 $ | 299,759 $ | 430,003 $ | 451,725 $ | 474,092 |
| **International:** | | | | | | |
| Gross profit | $ 36,588 $ | 41,674 $ | 48,244 $ | 71,523 $ | 86,973 $ | 121,128 |
| Other cost of revenues | 7,814 | 8,387 | 8,818 | 9,813 | 11,452 | 13,921 |
| Revenues excluding TAC | $ 44,402 $ | 50,061 $ | 57,062 $ | 81,336 $ | 98,425 $ | 135,049 |
| **Revenues excluding TAC by segment (Trailing Twelve Months):** | | | | | | |
| **United States:** | | | | | | |
| Gross profit | $ 744,266 $ | 822,088 $ | 905,792 $ | 1,068,965 $ | 1,254,845 $ | 1,435,743 |
| Other cost of revenues | 134,266 | 140,324 | 146,244 | 170,688 | 197,987 | 219,836 |
| Revenues excluding TAC | $ 878,532 $ | 962,412 $ | 1,052,036 $ | 1,239,653 $ | 1,452,832 $ | 1,655,579 |
| **International:** | | | | | | |
| Gross profit | $ 130,892 $ | 143,550 $ | 161,590 $ | 198,029 $ | 248,414 $ | 327,868 |
| Other cost of revenues | 33,926 | 33,002 | 33,336 | 34,832 | 38,470 | 44,004 |
| Revenues excluding TAC | $ 164,818 $ | 176,552 $ | 194,926 $ | 232,861 $ | 286,884 $ | 371,872 |
| **Operating income before depreciation and amortization:** | | | | | | |
| Income from operations | $ 54,977 $ | 62,772 $ | 83,498 $ | 94,419 $ | 132,157 $ | 149,494 |
| Depreciation and amortization | 29,073 | 34,503 | 33,013 | 63,099 | 66,192 | 77,428 |
| Stock compensation expense | 575 | 891 | 485 | 20,078 | 12,572 | 7,140 |
| Operating income before depreciation and amortization | $ 84,625 $ | 98,166 $ | 116,996 $ | 177,596 $ | 210,921 $ | 234,062 |
| **Operating income before depreciation and amortization (Trailing Twelve Months):** | | | | | | |
| Income from operations | $ 147,340 $ | 202,594 $ | 256,615 $ | 295,666 $ | 372,846 $ | 459,568 |
| Depreciation and amortization | 115,507 | 122,534 | 125,796 | 159,688 | 196,807 | 239,732 |
| Stock compensation expense | 3,357 | 3,129 | 2,661 | 22,029 | 34,026 | 40,275 |
| Operating income before depreciation and amortization | $ 266,204 $ | 328,257 $ | 385,072 $ | 477,383 $ | 603,679 $ | 739,575 |

**Yahoo! Inc.**
**Unaudited Supplemental Financial Information and Business Metrics**
**(in thousands)**

| | Q1 2003 | Q2 2003 | Q3 2003 | Q4 2003 | Q1 2004 | Q2 2004 |
|---|---|---|---|---|---|---|
| **Operating income before depreciation and amortization by segment:** | | | | | | |
| Operating income before depreciation and amortization - United States | $ 77,523 $ | 91,446 $ | 106,607 $ | 165,796 $ | 191,254 $ | 198,365 |
| Operating income before depreciation and amortization - International | 7,102 | 6,720 | 10,389 | 11,800 | 19,667 | 35,697 |
| Operating income before depreciation and amortization | 84,625 | 98,166 | 116,996 | 177,596 | 210,921 | 234,062 |
| Depreciation and amortization | (29,073) | (34,503) | (33,013) | (63,099) | (66,192) | (77,428) |
| Stock compensation expense | (575) | (891) | (485) | (20,078) | (12,572) | (7,140) |
| Income from operations | $ 54,977 $ | 62,772 $ | 83,498 $ | 94,419 $ | 132,157 $ | 149,494 |
| **Operating income before depreciation and amortization by segment (Trailing Twelve Months):** | | | | | | |
| Operating income before depreciation and amortization - United States | $ 257,795 $ | 309,568 $ | 357,601 $ | 441,372 $ | 555,103 $ | 662,022 |
| Operating income before depreciation and amortization - International | 8,409 | 18,689 | 27,471 | 36,011 | 48,576 | 77,553 |
| Operating income before depreciation and amortization | 266,204 | 328,257 | 385,072 | 477,383 | 603,679 | 739,575 |
| Depreciation and amortization | (115,507) | (122,534) | (125,796) | (159,688) | (196,807) | (239,732) |
| Stock compensation expense | (3,357) | (3,129) | (2,661) | (22,029) | (34,026) | (40,275) |
| Income from operations | $ 147,340 $ | 202,594 $ | 256,615 $ | 295,666 $ | 372,846 $ | 459,568 |
| **Operating income before depreciation and amortization by segment:** | | | | | | |
| **United States** | | | | | | |
| Income from operations | $ 51,000 $ | 60,472 $ | 77,684 $ | 90,246 $ | 121,289 $ | 128,556 |
| Depreciation and amortization | 25,948 | 30,083 | 28,438 | 57,423 | 59,300 | 63,711 |
| Stock compensation expense | 575 | 891 | 485 | 18,127 | 10,665 | 6,098 |
| Operating income before depreciation and amortization - United States | $ 77,523 $ | 91,446 $ | 106,607 $ | 165,796 $ | 191,254 $ | 198,365 |
| **International** | | | | | | |
| Income from operations | $ 3,977 $ | 2,300 $ | 5,814 $ | 4,173 $ | 10,868 $ | 20,938 |
| Depreciation and amortization | 3,125 | 4,420 | 4,575 | 5,676 | 6,892 | 13,717 |
| Stock compensation expense | - | - | - | 1,951 | 1,907 | 1,042 |
| Operating income before depreciation and amortization - International | $ 7,102 $ | 6,720 $ | 10,389 $ | 11,800 $ | 19,667 $ | 35,697 |
| **Operating income before depreciation and amortization by segment (Trailing Twelve Months):** | | | | | | |
| **United States** | | | | | | |
| Income from operations | $ 150,646 $ | 197,244 $ | 244,177 $ | 279,402 $ | 349,691 $ | 417,775 |
| Depreciation and amortization | 103,792 | 109,195 | 110,763 | 141,892 | 175,244 | 208,872 |
| Stock compensation expense | 3,357 | 3,129 | 2,661 | 20,078 | 30,168 | 35,375 |
| Operating income before depreciation and amortization - United States | $ 257,795 $ | 309,568 $ | 357,601 $ | 441,372 $ | 555,103 $ | 662,022 |
| **International** | | | | | | |
| Income (loss) from operations | $ (3,306) $ | 5,350 $ | 12,438 $ | 16,264 $ | 23,155 $ | 41,793 |
| Depreciation and amortization | 11,715 | 13,339 | 15,033 | 17,796 | 21,563 | 30,860 |
| Stock compensation expense | - | - | - | 1,951 | 3,858 | 4,900 |
| Operating income before depreciation and amortization - International | $ 8,409 $ | 18,689 $ | 27,471 $ | 36,011 $ | 48,576 $ | 77,553 |
| **Free cash flow:** | | | | | | |
| Cash flow from operating activities | $ 98,628 $ | 92,123 $ | 135,533 $ | 101,860 $ | 235,975 $ | 249,702 |
| Acquisition of property and equipment, net | (20,503) | (20,770) | (38,445) | (37,611) | (38,689) | (55,699) |
| Overture receivable settled through acquisition | - | - | - | 28,071 | - | - |
| Free cash flow | $ 78,125 $ | 71,353 $ | 97,088 $ | 92,320 $ | 197,286 $ | 194,003 |
| **Free cash flow (Trailing Twelve Months):** | | | | | | |
| Cash flow from operating activities | $ 353,633 $ | 342,374 $ | 405,642 $ | 428,144 $ | 565,491 $ | 723,070 |
| Acquisition of property and equipment, net | (64,769) | (71,238) | (96,390) | (117,329) | (135,515) | (170,444) |
| Change in long-term deferred revenue | (30,000) | - | - | - | - | - |
| Overture receivable settled through acquisition | - | - | - | 28,071 | 28,071 | 28,071 |
| Free cash flow | $ 258,864 $ | 271,136 $ | 309,252 $ | 338,886 $ | 458,047 $ | 580,697 |

Exhibit 41

# FOR IMMEDIATE RELEASE

### *Yahoo! Reports Second Quarter 2005 Financial Results*

### *Revenues - $1,253 Million,*
### *Operating Income - $261 Million,*
### *Operating Income Before Depreciation and Amortization - $368 Million*

**SUNNYVALE, Calif. – July 19, 2005 -** Yahoo! Inc. (Nasdaq: YHOO) today reported results for the second quarter ended June 30, 2005.

"Yahoo! continued to see solid growth in the second quarter as a result of our strength in both search marketing and brand advertising, increased engagement from our large, global audience, and our ability to execute and perform according to plan," said Terry Semel, chairman and chief executive officer, Yahoo!. "We have a healthy business model that we believe will enable us to take advantage of future growth opportunities and we remain dedicated to providing our users with the very best services on the Internet."

**Consolidated Financial Results**

- Revenues were $1,253 million for the second quarter of 2005, a 51 percent increase compared to $832 million for the same period of 2004.
  - Marketing services revenue was $1,094 million for the second quarter of 2005, a 51 percent increase compared to $723 million for the same period of 2004.
  - Fees revenue was $159 million for the second quarter of 2005, a 45 percent increase compared to $109 million for the same period of 2004.
- Revenues excluding traffic acquisition costs ("TAC") were $875 million for the second quarter of 2005, a 44 percent increase compared to $609 million for the same period of 2004.
- Gross profit for the second quarter of 2005 was $767 million, a 43 percent increase compared to $535 million for the same period of 2004.
- Operating income for the second quarter of 2005 was $261 million, a 75 percent increase compared to $149 million for the same period of 2004.
- Operating income before depreciation and amortization for the second quarter of 2005 was $368 million, a 57 percent increase compared to $234 million for the same period of 2004.
- Cash flow from operating activities for the second quarter of 2005 was $404 million, a 62 percent increase compared to $250 million for the same period of 2004.
- Free cash flow for the second quarter of 2005 was $300 million, a 55 percent increase compared to $194 million for the same period of 2004.
- Net income for the second quarter of 2005 was $755 million or $0.51 per diluted share (including net income of $563 million, or $0.38 per diluted share, related to the sale of an investment).  This compares with net income of $113 million or $0.08 per diluted share for the same period of 2004.

"We are very pleased with our second quarter results as they clearly underscore two fundamental business model strengths: excellent growth and great balance," said Susan Decker, chief financial officer, Yahoo!.  "We see this as a terrific combination, leading to the quarter's strong organic revenue growth, robust profitability, and substantial free cash flow."

**Segment Financial Results**

- United States revenues for the second quarter of 2005 were $870 million, a 39 percent increase from the $624 million reported for the same period of 2004.
- International revenues for the second quarter of 2005 were $383 million, an 84 percent increase from the $208 million reported for the same period of 2004.
- United States segment operating income before depreciation and amortization for the second quarter of 2005 was $291 million, a 47 percent increase from the $198 million reported for the same period of 2004.
- International segment operating income before depreciation and amortization for the second quarter of 2005 was $77 million, a 116 percent increase from the $36 million reported for the same period of 2004.

**Cash Flow Information**

Free cash flow was $300 million in the second quarter of 2005 compared to $194 million for the same period of 2004.  Cash, cash equivalents and investments in marketable debt securities grew by $1,073 million from $3,852 million at March 31, 2005 to $4,925 million at June 30, 2005. In addition to free cash flow of $300 million, Yahoo! generated $212 million from the issuance of common stock as a result of the exercise of employee stock options, and $959 million in proceeds from sales of marketable equity securities. These increases were offset by a net $264 million used in structured stock repurchase transactions, and $122 million used for acquisitions and investing activities.

Please refer to the "Note to Unaudited Condensed Consolidated Statements of Operations" for definitions of certain key financial measures used here and in the "Business Outlook" attached to this press release.

**Quarterly Conference Call**

Yahoo! will host a conference call to discuss second quarter results at 5:00 p.m. Eastern Time today.  A live webcast of the conference call, together with supplemental financial information can be accessed through the Company's Investor Relations website at http://yhoo.client.shareholder.com/earnings.cfm.  In addition, an archive of the webcast can be accessed through the same link. An audio replay of the call will be available following the conference call by calling 877-213-9653 or 630-652-3041, reservation number: 11995938.

**About Yahoo!**

Yahoo! Inc. is a leading global internet brand and one of the most trafficked Internet destinations worldwide.  Yahoo! seeks to provide online products and services essential to users' lives, and offers a full range of tools and marketing solutions for businesses to connect with Internet users around the world.  Yahoo! is headquartered in Sunnyvale, California.

*This press release includes the following financial measures defined as non-GAAP financial measures by the Securities and Exchange Commission: revenues excluding traffic acquisition costs, operating income before depreciation and amortization, and free cash flow.  These measures may be different from non-GAAP financial measures used by other companies. The presentation of this financial information is not intended to be considered in isolation or as a substitute for the financial information prepared and presented in accordance with generally accepted accounting principles.  See "Note to Unaudited Condensed Consolidated Statements of Operations" and "Reconciliations to Unaudited Condensed Consolidated Statements of Operations" included in this press release for further information regarding these non-GAAP financial measures.*

*This press release and its attachments contain forward-looking statements that involve risks and uncertainties concerning Yahoo!'s expected financial performance (as described without limitation in the Business Outlook section and quotations from management in this press release), as well as Yahoo!'s strategic and operational plans. Actual results may differ materially from the results predicted and reported results should not be considered as an indication of future performance. The potential risks and uncertainties include, among others, the Company's ability to compete with new or existing competitors; reduction in spending by, or loss of, marketing services customers;  the demand by customers for Yahoo!'s premium services; acceptance by users of new products and services; risks related to the integration of recent acquisitions; risks related to the Company's international operations; failure to manage growth and diversification; adverse results in litigation, including intellectual property infringement claims; the Company's ability to protect its intellectual property and the value of its brands; dependence on key personnel; dependence on third parties for technology, services, content and distribution; and general economic conditions. All information set forth in this release and its attachments is as of July 19, 2005.  Yahoo! undertakes no duty to update this information. More information about potential factors that could affect the Company's business and financial results is included under the captions, "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," in the Company's Annual Report on Form 10-K for the year ended December 31, 2004 and the Quarterly Report on Form 10-Q for the quarter ended March 31, 2005 which are on file with the SEC and available at the SEC's website at www.sec.gov. Additional information will also be set forth in those sections in Yahoo!'s Quarterly Report on Form 10-Q for the quarter ended June 30, 2005, which will be filed with the SEC in the third quarter of 2005.*

###

Yahoo! and the Yahoo! logos are trademarks and/or registered trademarks of Yahoo! Inc.  All other names are trademarks and/or registered trademarks of their respective owners.

**Media Relations Contacts:**

Kelly Delaney, Yahoo! Inc., (408) 349-2579, kellyd@yahoo-inc.com
Kim Milosevich, OutCast Communications, (415) 392-8282, kim@outcastpr.com

**Investor Relations Contact:**
Cathy La Rocca, Yahoo! Inc., (408) 349-5188, cathy@yahoo-inc.com

**Yahoo! Inc.**
**Unaudited Condensed Consolidated Statements of Operations**
**(in thousands, except per share amounts)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2004 | 2005 | 2004 | 2005 |
| Revenues | $ 832,299 | $ 1,252,997 | $ 1,590,085 | $ 2,426,739 |
| Cost of revenues | 297,383 | 485,898 | 579,088 | 939,195 |
| Gross profit | 534,916 | 767,099 | 1,010,997 | 1,487,544 |
| Operating expenses: | | | | |
|     Sales and marketing | 191,875 | 246,406 | 358,170 | 476,925 |
|     Product development | 87,140 | 125,544 | 164,129 | 244,893 |
|     General and administrative | 63,159 | 81,430 | 120,715 | 154,975 |
|     Stock compensation expense [*] | 7,140 | 10,948 | 19,712 | 20,414 |
|     Amortization of intangibles | 36,108 | 41,414 | 66,620 | 81,617 |
|         Total operating expenses | 385,422 | 505,742 | 729,346 | 978,824 |
| Income from operations | 149,494 | 261,357 | 281,651 | 508,720 |
| Other income, net | 13,179 | 979,736 | 27,557 | 1,029,730 |
| Income before income taxes, earnings in equity interests, minority interests | 162,673 | 1,241,093 | 309,208 | 1,538,450 |
| Provision for income taxes | (72,517) | (515,855) | (137,226) | (636,290) |
| Earnings in equity interests | 24,108 | 33,105 | 43,976 | 62,483 |
| Minority interests in operations of consolidated subsidiaries | (1,752) | (3,654) | (2,234) | (5,394) |
| Net income | $ 112,512 | $ 754,689 | $ 213,724 | $ 959,249 |
| Net income per share – diluted | $ 0.08 | $ 0.51 | $ 0.15 | $ 0.65 |
| Shares used in per share calculation – diluted | 1,449,707 | 1,484,200 | 1,438,128 | 1,481,114 |
| [*] Stock compensation expense is allocated as follows: | | | | |
| Sales and marketing | $ 2,376 | $ 1,509 | $ 5,981 | $ 2,999 |
| Product development | 2,548 | 3,741 | 7,271 | 7,003 |
| General and administrative | 2,216 | 5,698 | 6,460 | 10,412 |
|     Total stock compensation expense | $ 7,140 | $ 10,948 | $ 19,712 | $ 20,414 |

| | | | | |
|---|---|---|---|---|
| _**Supplemental Financial Data**_  (See Note) | | | | |
| **Revenues excluding traffic acquisition costs ("TAC")** | $ 609,141 | $ 875,112 | $ 1,159,291 | $ 1,695,867 |
| **Operating income before depreciation and amortization** | $ 234,062 | $ 368,440 | $ 444,983 | $ 713,502 |
| **Free cash flow** | $ 194,003 | $ 299,874 | $ 391,289 | $ 617,440 |

**Yahoo! Inc.**
**Note to Unaudited Condensed Consolidated Statements of Operations**

This press release includes the non-GAAP financial measures of revenues excluding traffic acquisition costs, operating income before depreciation and amortization, and free cash flow, which are reconciled to gross profit, income from operations, and cash flow from operating activities, respectively, which we believe are the most comparable GAAP measures. We use these non-GAAP financial measures for internal managerial purposes, when publicly providing business outlook, and as a means to evaluate period-to-period comparisons. These non-GAAP financial measures are used in addition to and in conjunction with results presented in accordance with GAAP. These non-GAAP financial measures reflect an additional way of viewing aspects of our operations that, when viewed with our GAAP results and the accompanying reconciliations to corresponding GAAP financial measures, provide a more complete understanding of factors and trends affecting our business. These non-GAAP measures should be considered as a supplement to, and not as a substitute for, or superior to, gross profit, income from operations, and cash flow from operating activities calculated in accordance with generally accepted accounting principles.

Revenues excluding traffic acquisition costs or TAC is defined as gross profit plus other cost of revenues. Under GAAP, both our revenues and cost of revenues include TAC. In defining revenues excluding TAC as our non-GAAP gross profit measure, we have removed TAC from both revenues and cost of revenues. TAC consists of payments made to affiliates that have integrated our sponsored search offerings into their websites and payments made to companies that direct consumer and business traffic to the Yahoo! website. We present revenues excluding TAC: (1) to provide a metric for our investors to analyze and value our Company and (2) to provide investors one of the primary metrics used by the Company for evaluation and decision-making purposes. We provide revenues excluding TAC because we believe it is useful to investors in valuing our Company. One of the ways investors value companies is to apply a multiple to revenues. Since a significant portion of the GAAP revenues associated with our sponsored search offerings is paid to our third party affiliates, we believe investors find it more meaningful to apply multiples to revenues excluding TAC to assess our value as this avoids "double counting" revenues that are paid to, and being reported by, our third party affiliates. Further, management uses revenues excluding TAC for evaluating the performance of our business, making operating decisions, for budgeting purposes, and as a factor in determining management compensation. A limitation of revenues excluding TAC is that it is a measure which we have defined for internal and investor purposes that may be unique to the Company and therefore it may not enhance the comparability of our results to other companies in our industry who have similar business arrangements but address the impact of TAC differently.

Operating income before depreciation and amortization is defined as income from operations before depreciation, amortization of intangible assets and amortization of stock compensation expense. We consider operating income before depreciation and amortization to be an important indicator of the operational strength of the Company. This measure eliminates the effects of depreciation, amortization of intangible assets and amortization of stock compensation expense from period to period, which we believe is useful to management and investors in evaluating the operating performance of the Company, as depreciation and amortization costs are not directly attributable to the underlying performance of the Company's business operations. A limitation associated with this measure is that it does not reflect the periodic costs of certain capitalized tangible and intangible assets used in generating revenues in the Company's businesses. Management evaluates the costs of such tangible and intangible assets through other financial measures such as capital expenditures. A further limitation associated with this measure is that it does not include stock compensation expenses related to our workforce. Management compensates for this limitation by providing supplemental information about stock compensation expense on the face of the consolidated statements of operations.

Free cash flow is defined as cash flow from operating activities including the tax benefit from stock options, less net capital expenditures and dividends received. We consider free cash flow to be a liquidity measure which provides useful information to management and investors about the amount of cash generated by the business after the acquisition of property and equipment, which can then be used for strategic opportunities including, among others, investing in the Company's business, making strategic acquisitions, strengthening the balance sheet and repurchasing stock. A limitation of free cash flow is that it does not represent the total increase or decrease in the cash balance for the period.

**Yahoo! Inc.**
**Reconciliations to Unaudited Condensed Consolidated Statements of Operations**
**(in thousands)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2004 | 2005 | 2004 | 2005 |
| **Revenues for groups of similar services [*]:** | | | | |
| Marketing services | $ 722,705 | $ 1,094,301 | $ 1,387,751 | $ 2,119,097 |
| Fees | 109,594 | 158,696 | 202,334 | 307,642 |
| Total revenues | $ 832,299 | $ 1,252,997 | $ 1,590,085 | $ 2,426,739 |
| **Revenues by segment:** | | | | |
| United States | $ 624,161 | $ 869,517 | $ 1,223,432 | $ 1,688,243 |
| International | 208,138 | 383,480 | 366,653 | 738,496 |
| Total revenues | $ 832,299 | $ 1,252,997 | $ 1,590,085 | $ 2,426,739 |
| **Cost of revenues:** | | | | |
| Traffic acquisition costs ("TAC") | $ 223,158 | $ 377,885 | $ 430,794 | $ 730,872 |
| Other cost of revenues | 74,225 | 108,013 | 148,294 | 208,323 |
| Total cost of revenues | $ 297,383 | $ 485,898 | $ 579,088 | $ 939,195 |
| **Revenues excluding TAC:** | | | | |
| Gross profit | $ 534,916 | $ 767,099 | $ 1,010,997 | $ 1,487,544 |
| Other cost of revenues | 74,225 | 108,013 | 148,294 | 208,323 |
| Revenues excluding TAC | $ 609,141 | $ 875,112 | $ 1,159,291 | $ 1,695,867 |
| **Revenues excluding TAC by segment:** | | | | |
| United States: | | | | |
| Gross profit | $ 413,788 | $ 575,460 | $ 802,896 | $ 1,115,549 |
| Other cost of revenues | 60,304 | 84,585 | 122,921 | 163,388 |
| Revenues excluding TAC | $ 474,092 | $ 660,045 | $ 925,817 | $ 1,278,937 |
| International: | | | | |
| Gross profit | $ 121,128 | $ 191,639 | $ 208,101 | $ 371,995 |
| Other cost of revenues | 13,921 | 23,428 | 25,373 | 44,935 |
| Revenues excluding TAC | $ 135,049 | $ 215,067 | $ 233,474 | $ 416,930 |
| **Operating income before depreciation and amortization:** | | | | |
| Income from operations | $ 149,494 | $ 261,357 | $ 281,651 | $ 508,720 |
| Depreciation and amortization | 77,428 | 96,135 | 143,620 | 184,368 |
| Stock compensation expense | 7,140 | 10,948 | 19,712 | 20,414 |
| Operating income before depreciation and amortization | $ 234,062 | $ 368,440 | $ 444,983 | $ 713,502 |
| **Operating income before depreciation and amortization by segment:** | | | | |
| Operating income before depreciation and amortization - United States | $ 198,365 | $ 291,244 | $ 389,619 | $ 561,659 |
| Operating income before depreciation and amortization - International | 35,697 | 77,196 | 55,364 | 151,843 |
| Operating income before depreciation and amortization | $ 234,062 | $ 368,440 | $ 444,983 | $ 713,502 |
| United States: | | | | |
| Income from operations | $ 128,556 | $ 202,275 | $ 249,845 | $ 392,293 |
| Depreciation and amortization | 63,711 | 78,591 | 123,011 | 150,194 |
| Stock compensation expense | 6,098 | 10,378 | 16,763 | 19,172 |
| Operating income before depreciation and amortization - United States | $ 198,365 | $ 291,244 | $ 389,619 | $ 561,659 |
| International: | | | | |
| Income from operations | $ 20,938 | $ 59,082 | $ 31,806 | $ 116,427 |
| Depreciation and amortization | 13,717 | 17,544 | 20,609 | 34,174 |
| Stock compensation expense | 1,042 | 570 | 2,949 | 1,242 |
| Operating income before depreciation and amortization - International | $ 35,697 | $ 77,196 | $ 55,364 | $ 151,843 |
| **Free cash flow:** | | | | |
| Cash flow from operating activities | $ 249,702 | $ 404,195 | $ 485,677 | $ 789,910 |
| Acquisition of property and equipment, net | (55,699) | (93,651) | (94,388) | (161,800) |
| Dividends received | - | (10,670) | - | (10,670) |
| Free cash flow | $ 194,003 | $ 299,874 | $ 391,289 | $ 617,440 |

[*]  Yahoo! currently classifies its revenues as either Marketing Services or Fees.  For the three and six months ended June 30, 2004, Yahoo! reclassified previously reported Marketing Services revenues of $6 million and $10 million, respectively, as Fees in order to refine its alignment of revenue sources with these classifications.

**Yahoo! Inc.**
**Business Outlook**

## Business Outlook

The following business outlook is based on current information and expectations as of July 19, 2005. Yahoo!'s business outlook as of today is expected to be available on the Company's Investor Relations website throughout the current quarter. It is currently expected the outlook will not be updated until the release of Yahoo!'s next quarterly earnings announcement, notwithstanding subsequent developments; however, Yahoo! may update the outlook or any portion thereof at any time.

| | Three months ending September 30, 2005 | Year ending December 31, 2005 |
|---|---|---|
| **Revenues excluding traffic acquisition costs [*] ("TAC") outlook (in millions):** | | |
| Gross profit | $768-$808 | $3,150-$3,225 |
| Other cost of revenues | 112-122 | 450-475 |
| Revenues excluding TAC | $880-$930 | $3,600-$3,700 |
| | | |
| **Operating income before depreciation and amortization [*] outlook (in millions):** | | |
| Income from operations | $235-$252 | $1,075-$1,105 |
| Depreciation and amortization | 105-115 | 400-420 |
| Stock compensation expense | 10-13 | 40-50 |
| Operating income before depreciation and amortization | $350-$380 | $1,515-$1,575 |

[*] Refer to Note to Unaudited Condensed Consolidated Statements of Operations.

**Yahoo! Inc.**
**Unaudited Condensed Consolidated Statements of Cash Flows**
**(in thousands)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2004 | 2005 | 2004 | 2005 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | |
| Net income | $ 112,512 | $ 754,689 | $ 213,724 | $ 959,249 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | |
| Depreciation and amortization | 77,428 | 96,135 | 143,620 | 184,368 |
| Tax benefits from stock options | 60,371 | 495,041 | 121,121 | 602,568 |
| Earnings in equity interests | (24,108) | (33,105) | (43,976) | (62,483) |
| Dividends received | - | 10,670 | - | 10,670 |
| Minority interests in operations of consolidated subsidiaries | 1,752 | 3,654 | 2,234 | 5,394 |
| Stock compensation expense | 7,140 | 10,948 | 19,712 | 20,414 |
| (Gain)/loss from sale of investments, assets and other, net | 10,889 | (937,998) | 9,616 | (952,266) |
| Changes in assets and liabilities, net of effects of acquisitions: | | | | |
| Accounts receivable, net | (37,011) | (47,740) | (35,822) | (78,157) |
| Prepaid expenses and other | 4,992 | (8,868) | 582 | 10,240 |
| Accounts payable | 4,316 | 10,433 | (13,593) | (14,193) |
| Accrued expenses and other liabilities | 19,566 | 34,597 | 51,869 | 79,816 |
| Deferred revenue | 11,855 | 15,739 | 16,590 | 24,290 |
| Net cash provided by operating activities | 249,702 | 404,195 | 485,677 | 789,910 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | |
| Acquisition of property and equipment, net | (55,699) | (93,651) | (94,388) | (161,800) |
| Purchases of marketable debt securities | (550,422) | (3,838,067) | (1,461,937) | (5,474,827) |
| Proceeds from sales and maturities of marketable debt securities | 552,635 | 3,597,080 | 1,469,667 | 5,374,465 |
| Acquisitions, net of cash acquired | (530,110) | (72,404) | (573,877) | (126,374) |
| Proceeds from sales of marketable equity securities | - | 958,914 | 1,351 | 970,296 |
| Other investing activities, net | 5,577 | (49,913) | 15,137 | (38,595) |
| Net cash provided by (used in) investing activities | (578,019) | 501,959 | (644,047) | 543,165 |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | |
| Proceeds from issuance of common stock, net | 225,383 | 212,420 | 317,678 | 302,724 |
| Repurchases of common stock | - | - | - | (164,895) |
| Structured stock repurchases, net | - | (263,729) | (50,000) | (359,931) |
| Other financing activities, net | - | - | - | 800 |
| Net cash provided by (used in) financing activities | 225,383 | (51,309) | 267,678 | (221,302) |
| Effect of exchange rate changes on cash and cash equivalents | 13 | (25,332) | 3,053 | (15,073) |
| Net change in cash and cash equivalents | (102,921) | 829,513 | 112,361 | 1,096,700 |
| Cash and cash equivalents, beginning of period | 631,174 | 1,090,910 | 415,892 | 823,723 |
| Cash and cash equivalents, end of period | $ 528,253 | $ 1,920,423 | $ 528,253 | $ 1,920,423 |
| Supplemental schedule of acquisition-related activities: | | | | |
| Cash paid for acquisitions | $ 568,927 | $ 73,455 | 619,611 | $ 127,452 |
| Cash acquired in acquisitions | (38,817) | (1,051) | (45,734) | (1,078) |
| | $ 530,110 | $ 72,404 | $ 573,877 | $ 126,374 |
| Common stock, restricted stock and stock options issued in connection with acquisitions | $ - | $ 6,615 | $ 2,209 | $ 44,381 |

**Yahoo! Inc.**
**Unaudited Condensed Consolidated Balance Sheets**
**(in thousands)**

| | December 31, 2004 | | June 30, 2005 | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | $ | 823,723 | $ | 1,920,423 |
| Marketable debt securities | | 1,875,964 | | 1,474,101 |
| Marketable equity securities | | 812,288 | | - |
| Accounts receivable, net | | 479,993 | | 548,408 |
| Prepaid expenses and other current assets | | 98,507 | | 157,918 |
| Total current assets | | 4,090,475 | | 4,100,850 |
| | | | | |
| Long-term marketable debt securities | | 1,042,575 | | 1,530,149 |
| Property and equipment, net | | 531,696 | | 589,373 |
| Goodwill | | 2,550,957 | | 2,563,597 |
| Intangible assets, net | | 480,666 | | 491,494 |
| Other assets | | 481,832 | | 396,904 |
| Total assets | $ | 9,178,201 | $ | 9,672,367 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 48,205 | $ | 30,909 |
| Accrued expenses and other current liabilities | | 853,115 | | 709,394 |
| Deferred revenue | | 279,387 | | 304,287 |
| Total current liabilities | | 1,180,707 | | 1,044,590 |
| | | | | |
| Long-term deferred revenue | | 65,875 | | 64,584 |
| Long-term debt | | 750,000 | | 750,000 |
| Other long-term liabilities | | 35,907 | | 81,237 |
| Minority interests in consolidated subsidiaries | | 44,266 | | 50,354 |
| Stockholders' equity | | 7,101,446 | | 7,681,602 |
| Total liabilities and stockholders' equity | $ | 9,178,201 | $ | 9,672,367 |

Exhibit 42

# FOR IMMEDIATE RELEASE

### *Yahoo! Reports Third Quarter 2005 Financial Results*

### *Revenues - $1,330 Million,*
### *Operating Income - $270 Million,*
### *Operating Income Before Depreciation and Amortization - $385 Million*

**SUNNYVALE, Calif. – October 18, 2005 -** Yahoo! Inc. (Nasdaq: YHOO) today reported results for the third quarter ended September 30, 2005.

"Yahoo! had another record quarter and continued to see solid growth across our business.  We introduced a number of new and innovative products and services and continued to provide more effective means for advertisers to engage with consumers," said Terry Semel, chairman and chief executive officer, Yahoo!  "Our ongoing ability to execute against plan and utilize our industry-leading technology continues to position us for long-term growth and enables us to provide our users with the best content and most relevant online experience."

**Consolidated Financial Results**

- Revenues were $1,330 million for the third quarter of 2005, a 47 percent increase compared to $907 million for the same period of 2004.
  - Marketing services revenue was $1,160 million for the third quarter of 2005, a 46 percent increase compared to $797 million for the same period of 2004.
  - Fees revenue was $170 million for the third quarter of 2005, a 55 percent increase compared to $110 million for the same period of 2004.
- Revenues excluding traffic acquisition costs ("TAC") were $932 million for the third quarter of 2005, a 42 percent increase compared to $655 million for the same period of 2004.
- Gross profit for the third quarter of 2005 was $810 million, a 41 percent increase compared to $574 million for the same period of 2004.
- Operating income for the third quarter of 2005 was $270 million, a 57 percent increase compared to $172 million for the same period of 2004.
- Operating income before depreciation and amortization for the third quarter of 2005 was $385 million, a 48 percent increase compared to $260 million for the same period of 2004.
- Cash flow from operating activities for the third quarter of 2005 was $440 million, a 65 percent increase compared to $267 million for the same period of 2004.
- Free cash flow for the third quarter of 2005 was $345 million, a 71 percent increase compared to $202 million for the same period of 2004.
- Net income for the third quarter of 2005 was $254 million or $0.17 per diluted share (including a net impact of $16 million, or $0.01 per diluted share, related to the sales of investments).  For the same period of 2004, net income was $253 million or $0.17 per diluted share (including a net impact of $129 million, or $0.09 per share, related to the sale of an investment and an associated tax benefit).

"We are extremely pleased with our third quarter results, which exceeded expectations, showing strong revenue growth, continued profitability, and significant free cash flow," said Susan Decker, chief financial officer, Yahoo!  "Our ability to deliver another quarter of record results, while also investing in internal operations and external acquisitions, continues to reinforce the power of our business model."

**Segment Financial Results**

- United States revenues for the third quarter of 2005 were $923 million, a 41 percent increase from the $655 million reported for the same period of 2004.
- International revenues for the third quarter of 2005 were $407 million, a 62 percent increase from the $252 million reported for the same period of 2004.
- United States segment operating income before depreciation and amortization for the third quarter of 2005 was $306 million, a 37 percent increase from the $223 million reported for the same period of 2004.
- International segment operating income before depreciation and amortization for the third quarter of 2005 was $79 million, an 117 percent increase from the $36 million reported for the same period of 2004.

**Cash Flow Information**

Free cash flow was $345 million in the third quarter of 2005 compared to $202 million for the same period of 2004. In addition to free cash flow, Yahoo! generated $75 million from the issuance of common stock as a result of the exercise of employee stock options, and $36 million in proceeds from sales of marketable equity securities. These increases were offset by $208 million used in direct stock repurchases and a net $393 million used in structured stock repurchase transactions. Cash, cash equivalents and investments in marketable debt securities were $4,764 million at September 30, 2005 as compared to $4,925 million at June 30, 2005, a reduction of $161 million.

Please refer to the "Note to Unaudited Condensed Consolidated Statements of Operations" for definitions of certain key financial measures used here and in the "Business Outlook" attached to this press release.

**Quarterly Conference Call**

Yahoo! will host a conference call to discuss third quarter results at 5:00 p.m. Eastern Time today. A live webcast of the conference call, together with supplemental financial information can be accessed through the Company's Investor Relations website at http://yhoo.client.shareholder.com/earnings.cfm. In addition, an archive of the webcast can be accessed through the same link. An audio replay of the call will be available following the conference call by calling 877-213-9653 or 630-652-3041, reservation number: 12875515.

**About Yahoo!**

Yahoo! Inc. is a leading global internet brand and one of the most trafficked Internet destinations worldwide. Yahoo! seeks to provide online products and services essential to users' lives, and offers a full range of tools and marketing solutions for businesses to connect with Internet users around the world. Yahoo! is headquartered in Sunnyvale, California.

*This press release includes the following financial measures defined as non-GAAP financial measures by the Securities and Exchange Commission: revenues excluding traffic acquisition costs, operating income before depreciation and amortization, and free cash flow. These measures may be different from non-GAAP financial measures used by other companies. The presentation of this financial information is not intended to be considered in isolation or as a substitute for the financial information prepared and presented in accordance with generally accepted accounting principles. See "Note to Unaudited Condensed Consolidated Statements of Operations" and "Reconciliations to Unaudited Condensed Consolidated Statements of Operations" included in this press release for further information regarding these non-GAAP financial measures.*

*This press release and its attachments contain forward-looking statements that involve risks and uncertainties concerning Yahoo!'s expected financial performance (as described without limitation in the Business Outlook section and quotations from management in this press release), as well as Yahoo!'s strategic and operational plans. Actual results may differ materially from the results predicted and reported results should not be considered as an indication of future performance. The potential risks and uncertainties include, among others, the Company's ability to compete with new or existing competitors; reduction in spending by, or loss of, marketing services customers; the demand by customers for Yahoo!'s premium services; acceptance by users of new products and services; risks related to the integration of recent acquisitions; risks related to the Company's international operations; failure to manage growth and diversification; adverse results in litigation, including intellectual property infringement claims; the Company's ability to protect its intellectual property and the value of its brands; dependence on key personnel; dependence on third parties for technology, services, content and distribution; and general economic conditions. All information set forth in this release and its attachments is as of October 18, 2005. Yahoo! undertakes no duty to update this information. More information about potential factors that could affect the Company's business and financial results is included under the captions, "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," in the Company's Annual Report on Form 10-K for the year ended December 31, 2004 and the Quarterly Report on Form 10-Q for the quarter ended June 30, 2005 which are on file with the SEC and available at the SEC's website at www.sec.gov. Additional information will also be set forth in those sections in Yahoo!'s Quarterly Report on Form 10-Q for the quarter ended September 30, 2005, which will be filed with the SEC in the fourth quarter of 2005.*

###

Yahoo! and the Yahoo! logos are trademarks and/or registered trademarks of Yahoo! Inc. All other names are trademarks and/or registered trademarks of their respective owners.

**Media Relations Contacts:**

Kelly Delaney, Yahoo! Inc., (408) 349-2579, kellyd@yahoo-inc.com
Kim Milosevich, OutCast Communications, (415) 345-4734, kim@outcastpr.com

**Investor Relations Contact:**

Cathy La Rocca, Yahoo! Inc., (408) 349-5188, cathy@yahoo-inc.com

**Yahoo! Inc.**
**Unaudited Condensed Consolidated Statements of Operations**
**(in thousands, except per share amounts)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2004 | 2005 | 2004 | 2005 |
| Revenues | $ 906,715 | $ 1,329,929 | $ 2,496,800 | $ 3,756,668 |
| Cost of revenues | 332,333 | 520,238 | 911,421 | 1,459,433 |
| Gross profit | 574,382 | 809,691 | 1,585,379 | 2,297,235 |
| **Operating expenses:** | | | | |
| Sales and marketing | 192,950 | 265,714 | 551,120 | 742,639 |
| Product development | 97,033 | 141,616 | 261,162 | 386,509 |
| General and administrative | 69,215 | 77,733 | 189,930 | 232,708 |
| Stock compensation expense [*] | 6,111 | 13,524 | 25,823 | 33,938 |
| Amortization of intangibles | 36,968 | 41,047 | 103,588 | 122,664 |
| Total operating expenses | 402,277 | 539,634 | 1,131,623 | 1,518,458 |
| Income from operations | 172,105 | 270,057 | 453,756 | 778,777 |
| Other income, net | 123,281 | 65,995 | 150,838 | 1,095,725 |
| Income before income taxes, earnings in equity interests, minority interests | 295,386 | 336,052 | 604,594 | 1,874,502 |
| Provision for income taxes | (67,117) | (113,797) | (204,343) | (750,087) |
| Earnings in equity interests | 25,696 | 32,164 | 69,672 | 94,647 |
| Minority interests in operations of consolidated subsidiaries | (660) | (646) | (2,894) | (6,040) |
| Net income | $ 253,305 | $ 253,773 | $ 467,029 | $ 1,213,022 |
| Net income per share - diluted | $ 0.17 | $ 0.17 | $ 0.32 | $ 0.82 |
| Shares used in per share calculation - diluted | 1,458,610 | 1,486,876 | 1,444,955 | 1,482,739 |
| [*] Stock compensation expense is allocated as follows: | | | | |
| Sales and marketing | $ 1,731 | $ 2,278 | $ 7,712 | $ 5,277 |
| Product development | 2,371 | 6,817 | 9,642 | 13,820 |
| General and administrative | 2,009 | 4,429 | 8,469 | 14,841 |
| Total stock compensation expense | $ 6,111 | $ 13,524 | $ 25,823 | $ 33,938 |

| *Supplemental Financial Data* (See Note) | | | | |
|---|---|---|---|---|
| Revenues excluding traffic acquisition costs ("TAC") | $ 655,401 | $ 932,115 | $ 1,814,692 | $ 2,627,982 |
| Operating income before depreciation and amortization | $ 259,704 | $ 385,122 | $ 704,687 | $ 1,098,624 |
| Free cash flow | $ 201,680 | $ 344,637 | $ 592,969 | $ 962,077 |

**Yahoo! Inc.**
**Note to Unaudited Condensed Consolidated Statements of Operations**

This press release includes the non-GAAP financial measures of revenues excluding traffic acquisition costs, operating income before depreciation and amortization, and free cash flow, which are reconciled to gross profit, income from operations, and cash flow from operating activities, respectively, which we believe are the most comparable GAAP measures. We use these non-GAAP financial measures for internal managerial purposes, when publicly providing business outlook, and as a means to evaluate period-to-period comparisons. These non-GAAP financial measures are used in addition to and in conjunction with results presented in accordance with GAAP. These non-GAAP financial measures reflect an additional way of viewing aspects of our operations that, when viewed with our GAAP results and the accompanying reconciliations to corresponding GAAP financial measures, provide a more complete understanding of factors and trends affecting our business. These non-GAAP measures should be considered as a supplement to, and not as a substitute for, or superior to, gross profit, income from operations, and cash flow from operating activities calculated in accordance with generally accepted accounting principles.

Revenues excluding traffic acquisition costs or TAC is defined as gross profit plus other cost of revenues. Under GAAP, both our revenues and cost of revenues include TAC. In defining revenues excluding TAC as our non-GAAP gross profit measure, we have removed TAC from both revenues and cost of revenues. TAC consists of payments made to affiliates that have integrated our sponsored search offerings into their websites and payments made to companies that direct consumer and business traffic to the Yahoo! website. We present revenues excluding TAC: (1) to provide a metric for our investors to analyze and value our Company and (2) to provide investors one of the primary metrics used by the Company for evaluation and decision-making purposes. We provide revenues excluding TAC because we believe it is useful to investors in valuing our Company. One of the ways investors value companies is to apply a multiple to revenues. Since a significant portion of the GAAP revenues associated with our sponsored search offerings is paid to our third party affiliates, we believe investors find it more meaningful to apply multiples to revenues excluding TAC to assess our value as this avoids "double counting" revenues that are paid to, and being reported by, our third party affiliates. Further, management uses revenues excluding TAC for evaluating the performance of our business, making operating decisions, for budgeting purposes, and as a factor in determining management compensation. A limitation of revenues excluding TAC is that it is a measure which we have defined for internal and investor purposes that may be unique to the Company and therefore it may not enhance the comparability of our results to other companies in our industry who have similar business arrangements but address the impact of TAC differently.

Operating income before depreciation and amortization is defined as income from operations before depreciation, amortization of intangible assets and amortization of stock compensation expense. We consider operating income before depreciation and amortization to be an important indicator of the operational strength of the Company. This measure eliminates the effects of depreciation, amortization of intangible assets and amortization of stock compensation expense from period to period, which we believe is useful to management and investors in evaluating the operating performance of the Company, as depreciation and amortization costs are not directly attributable to the underlying performance of the Company's business operations. A limitation associated with this measure is that it does not reflect the periodic costs of certain capitalized tangible and intangible assets used in generating revenues in the Company's businesses. Management evaluates the costs of such tangible and intangible assets through other financial measures such as capital expenditures. A further limitation associated with this measure is that it does not include stock compensation expenses related to our workforce. Management compensates for this limitation by providing supplemental information about stock compensation expense on the face of the consolidated statements of operations.

Free cash flow is defined as cash flow from operating activities including the tax benefit from stock options, less net capital expenditures and dividends received. We consider free cash flow to be a liquidity measure which provides useful information to management and investors about the amount of cash generated by the business after the acquisition of property and equipment, which can then be used for strategic opportunities including, among others, investing in the Company's business, making strategic acquisitions, strengthening the balance sheet and repurchasing stock. A limitation of free cash flow is that it does not represent the total increase or decrease in the cash balance for the period.

**Yahoo! Inc.**
**Reconciliations to Unaudited Condensed Consolidated Statements of Operations**
**(in thousands)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2004 | 2005 | 2004 | 2005 |
| **Revenues for groups of similar services** [*]: | | | | |
| Marketing services | $ 796,568 | $ 1,159,572 | $ 2,184,319 | $ 3,278,669 |
| Fees | 110,147 | 170,357 | 312,481 | 477,999 |
| Total revenues | $ 906,715 | $ 1,329,929 | $ 2,496,800 | $ 3,756,668 |
| | | | | |
| **Revenues by segment:** | | | | |
| United States | $ 654,985 | $ 922,860 | $ 1,878,417 | $ 2,611,103 |
| International | 251,730 | 407,069 | 618,383 | 1,145,565 |
| Total revenues | $ 906,715 | $ 1,329,929 | $ 2,496,800 | $ 3,756,668 |
| | | | | |
| **Cost of revenues:** | | | | |
| Traffic acquisition costs ("TAC") | $ 251,314 | $ 397,814 | $ 682,108 | $ 1,128,686 |
| Other cost of revenues | 81,019 | 122,424 | 229,313 | 330,747 |
| Total cost of revenues | $ 332,333 | $ 520,238 | $ 911,421 | $ 1,459,433 |
| | | | | |
| **Revenues excluding TAC:** | | | | |
| Gross profit | $ 574,382 | $ 809,691 | $ 1,585,379 | $ 2,297,235 |
| Other cost of revenues | 81,019 | 122,424 | 229,313 | 330,747 |
| Revenues excluding TAC | $ 655,401 | $ 932,115 | $ 1,814,692 | $ 2,627,982 |
| | | | | |
| **Revenues excluding TAC by segment:** | | | | |
| United States: | | | | |
| Gross profit | $ 438,737 | $ 609,466 | $ 1,241,633 | $ 1,725,015 |
| Other cost of revenues | 64,340 | 94,151 | 187,261 | 257,539 |
| Revenues excluding TAC | $ 503,077 | $ 703,617 | $ 1,428,894 | $ 1,982,554 |
| | | | | |
| International: | | | | |
| Gross profit | $ 135,645 | $ 200,225 | $ 343,746 | $ 572,220 |
| Other cost of revenues | 16,679 | 28,273 | 42,052 | 73,208 |
| Revenues excluding TAC | $ 152,324 | $ 228,498 | $ 385,798 | $ 645,428 |
| | | | | |
| **Operating income before depreciation and amortization:** | | | | |
| Income from operations | $ 172,105 | $ 270,057 | $ 453,756 | $ 778,777 |
| Depreciation and amortization | 81,488 | 101,541 | 225,108 | 285,909 |
| Stock compensation expense | 6,111 | 13,524 | 25,823 | 33,938 |
| Operating income before depreciation and amortization | $ 259,704 | $ 385,122 | $ 704,687 | $ 1,098,624 |
| | | | | |
| **Operating income before depreciation and amortization by segment:** | | | | |
| Operating income before depreciation and amortization - United States | $ 223,260 | $ 306,031 | $ 612,879 | $ 867,690 |
| Operating income before depreciation and amortization - International | 36,444 | 79,091 | 91,808 | 230,934 |
| Operating income before depreciation and amortization | $ 259,704 | $ 385,122 | $ 704,687 | $ 1,098,624 |
| | | | | |
| United States: | | | | |
| Income from operations | $ 151,402 | $ 209,735 | $ 401,247 | $ 602,028 |
| Depreciation and amortization | 66,668 | 83,413 | 189,679 | 233,607 |
| Stock compensation expense | 5,190 | 12,883 | 21,953 | 32,055 |
| Operating income before depreciation and amortization - United States | $ 223,260 | $ 306,031 | $ 612,879 | $ 867,690 |
| | | | | |
| International: | | | | |
| Income from operations | $ 20,703 | $ 60,322 | $ 52,509 | $ 176,749 |
| Depreciation and amortization | 14,820 | 18,128 | 35,429 | 52,302 |
| Stock compensation expense | 921 | 641 | 3,870 | 1,883 |
| Operating income before depreciation and amortization - International | $ 36,444 | $ 79,091 | $ 91,808 | $ 230,934 |
| | | | | |
| **Free cash flow:** | | | | |
| Cash flow from operating activities | $ 267,424 | $ 440,131 | $ 753,101 | $ 1,230,041 |
| Acquisition of property and equipment, net | (65,744) | (95,494) | (160,132) | (257,294) |
| Dividends received | - | - | - | (10,670) |
| Free cash flow | $ 201,680 | $ 344,637 | $ 592,969 | $ 962,077 |

[*]  Yahoo! currently classifies its revenues as either Marketing Services or Fees.  For the three and nine months ended September 30, 2004, Yahoo! reclassified previously reported Marketing Services revenues of $6 million and $16 million, respectively, as Fees in order to refine its alignment of revenue sources with these classifications.

**Yahoo! Inc.**
**Business Outlook**

## Business Outlook

The following business outlook is based on current information and expectations as of October 18, 2005 and assumes the closing of the previously announced strategic combination with Alibaba.com Corporation in the fourth quarter. Yahoo!'s business outlook as of today is expected to be available on the Company's Investor Relations website throughout the current quarter. It is currently expected the outlook will not be updated until the release of Yahoo!'s next quarterly earnings announcement, notwithstanding subsequent developments; however, Yahoo! may update the outlook or any portion thereof at any time.

| | Three months ending December 31, 2005 | Year ending December 31, 2005 |
|---|---|---|
| **Revenues excluding traffic acquisition costs ("TAC")** [*] **outlook (in millions):** | | |
| Gross profit | $893-$933 | $3,190-$3,230 |
| Other cost of revenues | 139-149 | 470-480 |
| Revenues excluding TAC | $1,032-$1,082 | $3,660-$3,710 |
| **Operating income before depreciation and amortization** [*] **outlook (in millions):** | | |
| Income from operations | $322-$337 | $1,100-$1,115 |
| Depreciation and amortization | 114-124 | 400-410 |
| Stock compensation expense | 16-21 | 50-55 |
| Operating income before depreciation and amortization | $452-$482 | $1,550-$1,580 |

[*] Refer to Note to Unaudited Condensed Consolidated Statements of Operations.

**Yahoo! Inc.**
**Unaudited Condensed Consolidated Statements of Cash Flows**
**(in thousands)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2004 | 2005 | 2004 | 2005 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | |
| Net income | $ 253,305 | $ 253,773 | $ 467,029 | $ 1,213,022 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | |
| Depreciation and amortization | 81,488 | 101,541 | 225,108 | 285,909 |
| Tax benefits from stock options | 56,145 | 121,180 | 177,266 | 723,748 |
| Earnings in equity interests | (25,696) | (32,164) | (69,672) | (94,647) |
| Dividends received | - | - | - | 10,670 |
| Minority interests in operations of consolidated subsidiaries | 660 | 646 | 2,894 | 6,040 |
| Stock compensation expense | 6,111 | 13,524 | 25,823 | 33,938 |
| (Gain)/loss from sale of investments, assets and other, net | (100,683) | (24,472) | (91,067) | (976,738) |
| Changes in assets and liabilities, net of effects of acquisitions: | | | | |
| Accounts receivable, net | (47,466) | (50,764) | (83,288) | (128,921) |
| Prepaid expenses and other | (7,016) | (2,504) | (6,434) | 7,736 |
| Accounts payable | 12,694 | 8,839 | (899) | (5,354) |
| Accrued expenses and other liabilities | 31,692 | 31,580 | 83,561 | 111,396 |
| Deferred revenue | 6,190 | 18,952 | 22,780 | 43,242 |
| Net cash provided by operating activities | 267,424 | 440,131 | 753,101 | 1,230,041 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | |
| Acquisition of property and equipment, net | (65,744) | (95,494) | (160,132) | (257,294) |
| Purchases of marketable debt securities | (695,951) | (1,157,592) | (2,157,888) | (6,632,419) |
| Proceeds from sales and maturities of marketable debt securities | 395,609 | 1,415,056 | 1,865,276 | 6,789,521 |
| Acquisitions, net of cash acquired | (34,648) | (1,089) | (608,525) | (127,463) |
| Proceeds from sales of marketable equity securities | 191,429 | 35,846 | 192,780 | 1,006,142 |
| Other investing activities, net | (151) | (435) | 14,986 | (39,030) |
| Net cash provided by (used in) investing activities | (209,456) | 196,292 | (853,503) | 739,457 |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | |
| Proceeds from issuance of common stock, net | 105,913 | 75,027 | 423,591 | 377,751 |
| Repurchases of common stock | - | (208,457) | - | (373,352) |
| Structured stock repurchases, net | (45,907) | (392,786) | (95,907) | (752,717) |
| Other financing activities, net | - | 949 | - | 1,749 |
| Net cash provided by (used in) financing activities | 60,006 | (525,267) | 327,684 | (746,569) |
| Effect of exchange rate changes on cash and cash equivalents | 3,711 | (4,576) | 6,764 | (19,649) |
| Net change in cash and cash equivalents | 121,685 | 106,580 | 234,046 | 1,203,280 |
| Cash and cash equivalents, beginning of period | 528,253 | 1,920,423 | 415,892 | 823,723 |
| Cash and cash equivalents, end of period | $ 649,938 | $ 2,027,003 | $ 649,938 | $ 2,027,003 |
| Supplemental schedule of acquisition-related activities: | | | | |
| Cash paid for acquisitions | $ 36,403 | $ 1,140 | 656,014 | $ 128,592 |
| Cash acquired in acquisitions | (1,755) | (51) | (47,489) | (1,129) |
| | $ 34,648 | $ 1,089 | $ 608,525 | $ 127,463 |
| Common stock, restricted stock and stock options issued in connection with acquisitions | $ 1,175 | $ - | $ 3,384 | $ 44,381 |

**Yahoo! Inc.**
**Unaudited Condensed Consolidated Balance Sheets**
**(in thousands)**

| | December 31, 2004 | | September 30, 2005 |
|---|---|---|---|
| **ASSETS** | | | |
| **Current assets:** | | | |
| Cash and cash equivalents | $ | 823,723 | $ 2,027,003 |
| Marketable debt securities | | 1,875,964 | 1,156,688 |
| Marketable equity securities | | 812,288 | - |
| Accounts receivable, net | | 479,993 | 599,129 |
| Prepaid expenses and other current assets | | 98,507 | 179,875 |
| Total current assets | | 4,090,475 | 3,962,695 |
| | | | |
| Long-term marketable debt securities | | 1,042,575 | 1,579,930 |
| Property and equipment, net | | 531,696 | 623,050 |
| Goodwill | | 2,550,957 | 2,564,073 |
| Intangible assets, net | | 480,666 | 451,018 |
| Other assets | | 481,832 | 362,856 |
| Total assets | $ | 9,178,201 | $ 9,543,622 |
| | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| **Current liabilities:** | | | |
| Accounts payable | $ | 48,205 | $ 38,879 |
| Accrued expenses and other current liabilities | | 853,115 | 739,813 |
| Deferred revenue | | 279,387 | 324,039 |
| Total current liabilities | | 1,180,707 | 1,102,731 |
| | | | |
| Long-term deferred revenue | | 65,875 | 63,811 |
| Long-term debt | | 750,000 | 749,995 |
| Other long-term liabilities | | 35,907 | 87,694 |
| Minority interests in consolidated subsidiaries | | 44,266 | 51,961 |
| Stockholders' equity | | 7,101,446 | 7,487,430 |
| Total liabilities and stockholders' equity | $ | 9,178,201 | $ 9,543,622 |

Exhibit 43



## Yahoo! and Click Fraud: Our Commitment to Protecting Advertisers

Yahoo! is pleased to announce that it has reached an important settlement agreement with Checkmate Strategic Group that will provide more clarity about our click protection efforts and significantly more transparency to advertisers in the future. We know that our customers – and the industry as a whole – have many questions and concerns about click fraud, especially given the litigation that Yahoo! and other search engines have been engaged in over the past few years and we're pleased to take a leading role in addressing this issue.

### Extensive History of Clickthrough Protection

Looking back, when Yahoo! Search Marketing (formerly Overture) created the pay-per-click search advertising model in 1998, one of the very first challenges we identified was the potential for people with bad intentions to click on listings with the sole purpose of generating a charge to the advertiser. To address this challenge, we quickly established a system of proprietary technologies and people dedicated to protecting our advertisers from click fraud and other traffic quality related issues.

For the past eight years, our Clickthrough Protection (CTP) system has run 24 hours a day, seven days a week, using search and click data to identify suspicious clicks and remove them from our billing system. During that period, our system has identified and not billed advertisers for billions of clicks. This includes click fraud as well as other clicks that we believe shouldn't be billed to advertisers (for example, blocked IP addresses, double-clicks, back browser clicks).

### Settlement with Checkmate Strategic Group

Yahoo! and Checkmate Strategic Group have been engaged in a class action click fraud lawsuit since June 2005. To help the Plaintiff's counsel and their experts understand what we do to protect advertisers, we invited them to Yahoo! to see our proprietary Clickthrough Protection (CTP) system in action, interview our team members, review our filtering data and determine for themselves whether Yahoo! is truly meeting that commitment.

After this thorough review, the Plaintiff's counsel and their experts determined that Yahoo! has in the past and continues to operate a click protection system that goes above and beyond what is necessary to address recent industry estimates about click fraud. We are very pleased with their finding, as it validates the effectiveness of our system, but we recognize that some advertisers may still have questions about certain clicks and that many advertisers want to hear more from Yahoo! with respect to click fraud and related issues.

To address this, both parties have agreed to the following settlement terms:

- One-Time Extended Claims Period: Yahoo! will offer advertisers a one-time extended claims period during which advertisers can submit click fraud claims for clicks dating back through January 2004. If our investigation determines that a credit is due that was not given previously, we will issue a 100% credit, which can be used however the advertiser wishes to use it. This claims process will be overseen by a retired Federal judge.
- Dedicated Traffic Quality Advocate: Yahoo! will appoint a Traffic Quality Advocate who will be dedicated entirely to addressing advertiser concerns about click fraud and traffic quality issues. This advocate will serve as the internal voice of the advertiser within Yahoo! on these matters.
- Annual Access to CTP System and Team: To ensure that the advertising community has ongoing visibility into our Clickthrough Protection system, Yahoo! will host a panel of individual advertisers at our CTP headquarters once a year. During these visits, we will allow the advertisers to review our systems, meet with the CTP team and provide feedback on how we can continue to enhance our approach to fighting click fraud.
- Industry-Wide Click Protection Efforts: Yahoo will work with a reputable third party toward building industry-wide efforts to combat click fraud, including development of industry-wide definitions of click fraud and a comprehensive lists of identified bots.
- Traffic Quality Resource Center: Yahoo! will commit technical and human resources to build a Traffic Quality Resource Center, which will provide advertisers with more detailed information about traffic quality issues (including click fraud) and solutions via FAQs, advice columns, best practices guides and additional access to analytics tools.

In addition, to provide advertisers with even more of the transparency for which they've been asking,, Yahoo! is also committing to the following efforts that go beyond the requirements of the settlement agreement:

- Traffic Quality Inquiry Response Times: Yahoo! will provide advertisers who submit click fraud- or traffic quality-related inquiries with a time by which they will receive the results of Yahoo!'s investigation or, if the investigation is particularly complex, a status update.
- Additional Traffic Quality Refund Detail: To provide advertisers with more clarity around refunds for click fraud and other traffic quality issues, Yahoo! will include additional detail in advertiser refund notices.

We're very pleased with this important settlement because it not only validates the strength of the search marketing industry and the effectiveness of our system, but also it allows us to move forward to work more closely with our advertisers and others across the industry to fight click fraud.

Reggie Davis, Associate General Counsel, Yahoo! Inc. and
John Slade, Sr. Director, Yahoo! Clickthrough Protection

Exhibit 44



## Yahoo! To Launch New Search Marketing Ranking Model in the U.S. On February 5

**New Marketplace Values Ad Quality, Rewards Relevancy**

SUNNYVALE, Calif., Jan 23, 2007 (BUSINESS WIRE) -- Yahoo! Inc. (Nasdaq: YHOO), a leading global Internet brand and one of the most trafficked Internet destinations worldwide, today announced that it will launch its new search marketing ranking model in the U.S. on Monday, February 5. With the new ranking model, all Yahoo! search marketing ads in the U.S. will be ranked by quality in addition to keyword bid price. As a result, Yahoo! will be able to provide a more relevant search experience to users, more valuable customer leads to advertisers, and additional opportunities to its distribution partners.

"Yahoo! is very excited to introduce our new, more quality-focused ranking model because it has the power to significantly enhance the experience we deliver to our users and unlock the full potential of Yahoo!'s search marketing network," said Terry Semel, chief executive officer, Yahoo! Inc. "With this important piece in place our new search marketing system will allow Yahoo! to more effectively connect people with the businesses, products, services and information they are passionate about."

To date, search ads on Yahoo! and its distribution partner sites have been ranked solely by bid price - the higher the bid, the higher an ad appears within the search results. When the new ranking model goes into effect, both bid and the ad's quality together will determine where an ad appears in the search results. The quality of an ad will be determined by its historical performance in the new system and its expected performance relative to other ads displayed at the same time. Ads of higher quality will generally receive better placement on the results page.

"By encouraging advertisers to focus on the quality of their ads, we can deliver a better search experience for all of our customers. Everybody wins," said Tim Cadogan, Yahoo!'s vice president, search marketing. "We firmly believe that delivering more relevant ads to users will result in more quality leads to advertisers, invite even more participation in our network and ultimately create a more valuable marketplace for users, advertisers, publishers and Yahoo!."

With this change, Yahoo! is providing advertisers with industry-leading marketplace visibility and features that allow them to better understand their performance and make informed marketing decisions. Advertisers who have upgraded to the new system (code named "Panama") can gauge the quality of their ads by viewing the prominently displayed quality index within the Panama application. Yahoo! also provides advertisers with an estimated average position and estimated forecast of clicks for their ad campaigns, based on budget allocation and ad quality.

As a result of its customer-focused approach, Yahoo! continues to receive positive feedback about its new system and the upgrade experience.

"Internet search marketing is one of the most important ways in which our automotive customers connect with vehicle buyers, and Yahoo!'s Panama system makes it even easier for us to deliver that connection," said John Holt, CEO of The Cobalt Group, a leading provider of marketing services to the automotive industry. "The transition to Yahoo!'s new system has been seamless for us, our clients are responding very positively to the new features, and we're fully prepared to help our customers maximize the quality of their ads when Yahoo! switches over to its new relevancy-based ranking model."

Yahoo! will continue to send upgrade invitations to advertisers in the U.S. throughout Q1 2007 and anticipates that all active U.S. advertisers will be upgraded to the new system by the end of the quarter. Advertisers that wish to schedule their upgrade as early as possible can make a request through the upgrade reservation page: http://advision.webevents.yahoo.com/newsponsoredsearch/invite/.

Yahoo! plans to begin the roll out of the new platform in non-US markets in Q2 2007. International rollout will be conducted on a market-by-market basis and will follow a similar process as in the U.S. by introducing the system interface first, followed by the new ranking model.

To sign up online for a new Yahoo! account or to learn more about the new search marketing system, please visit: http://signup.marketingsolutions.yahoo.com

About Yahoo!

Yahoo! Inc. is a leading global internet brand and one of the most trafficked Internet destinations worldwide. Yahoo!'s mission is to connect people to their passions, their communities, and the world's knowledge. Yahoo! is headquartered in Sunnyvale, California.

This press release contains forward-looking statements that involve risks and uncertainties concerning Yahoo!'s new search marketing system and related strategic and operational plans. Actual events or results may differ materially from those described in this press release due to a number of risks and uncertainties. The potential risks and uncertainties include, among others, the successful implementation, and acceptance by advertisers, of the Company's new search marketing system, and the reduction in spending by, or loss of, marketing services customers. More information about potential factors that could affect the Company's business and financial results is included under the captions, "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," in the Company's Annual Report on Form 10-K for the year ended December 31, 2005 and the Quarterly Report on Form 10-Q for the quarter ended September 30, 2006 which are on file with the SEC and available at the SEC's website at www.sec.gov.

SOURCE: Yahoo! Inc.

Yahoo!
Gaude Lydia Paez, 818-524-4580 (Media)
gaude@yahoo-inc.com
Marta Nichols, 408-349-3527 (Investor Relations)
mnichols@yahoo-inc.com

Copyright Business Wire 2007

News Provided by COMTEX

Exhibit 45



<< Back to Article

# Click Fraud: Problem and Paranoia

Adam L. Penenberg    03.10.05 | 2:00 AM

Last week, I served on the "Click Fraud: Problem or Paranoia" panel at the Search Engine Strategies conference in New York. At one point, Jessie Stricchiola, one of my fellow panelists, tried to gauge the extent of the problem by asking the 80 people in attendance to raise their hands if they had ever been victims of "click fraud."

About half of the audience members, most of them small businesses owners, raised their hands.



**Media Hack**

Then Stricchiola, founder of Alchemist Media, wanted to know how much each had lost. Most reported losses in the $5,000 to $10,000 range. A couple hit $20,000, and the biggest loser of all claimed his company had been fleeced for more than $300,000.

That's when I realized the panel might have more aptly been called "Click Fraud: Problem and Paranoia."

Click fraud -- the skewing of pay-per-click advertising data with illegitimate hits -- can be accomplished in a number of ways, ranging from manually clicking on the same ad link repeatedly to deploying automated bots. Whatever the method, the results are the same: Merchants pay for traffic from someone who has no intention of purchasing anything. Return on investment: bupkis.

It doesn't just affect online merchants. Google, Yahoo and other search engines may also be vulnerable. In the "How We Generate Revenue" section of its latest quarterly report (.pdf), Google stated, "We derive most of our revenues from fees we receive from our advertisers" and acknowledged it has "regularly refunded revenue" to click-fraud victims. (In fact, a full third of audience members reported that they had received refund letters from Google.)

"If fraudulent clicks are not detected," Google went on to say, "the affected advertisers may experience a reduced return on their investment (and) could lead the advertisers to become dissatisfied with our advertising programs, which could lead to loss of advertisers and revenue."

To paraphrase another panelist, Danny Sullivan, editor of SearchEngineWatch.com, if Google is concerned, that's good enough for me.

So who commits click fraud? It could be a scurrilous search engine ad affiliate who clicks for dollars. Auction Experts International, a Google AdSense partner located in Houston, allegedly reaped $50,000 in commissions by hammering away on ad links until Google sued in November. Its principals never showed up in court, and Google won by default. (The site dissolved into the ether.)

Or a company might do it to deplete or expand a rival's pay-per-click budget. Some businesses that pay Google or Yahoo's Overture $20 a click to appear as the No. 1 or 2 ad for a specific keyword estimate that as much as 35 percent of their traffic is fraudulent. Who do they blame? Competitors seeking to bankrupt them.

This is what happened to Tammy Harrison, president of 2K Medical, which markets billing software to doctors. A year ago, she reviewed her log files and noticed a repeated pattern of clicks for keywords that were not normally searched. She realized a majority of the clicks originated from IP addresses located in the same state, and immediately suspected a former employee who had started a rival firm. Total cost to

Harrison: $100,000 in sales, time spent determining the extent of the problem, and money wasted on useless ads.

You'd think that victims like Harrison and others who attended the panel discussion might consider confronting the search engines. But many are afraid to complain because of the fear they will get blacklisted by Google, Yahoo and the others, which provide most of their traffic.

"I am scared to death," Harrison said, "but I feel someone needs to speak up so this problem will be resolved. They are the search engines gods and I respect their powers." That said, she emphasized that she is interested in working with the search engines and not against them, and Google and Yahoo have provided refunds for fraudulent clicks, although not for the 200 hours she put in sifting through her logs.

If the Googles of the world are off-limits, perhaps merchants who suspect rivals of juicing up their search ad traffic should consider suing. But this also presents significant obstacles. First, to build a case, they'd need cooperation from the search engines, which are paid whether the clicks are fraudulent or legit. Says Ben Edelman, a panelist who made his name fighting adware companies: "Search engines don't have the incentive but have the data, while the advertisers have the incentive but not the data."

Besides, as Peter D. Raymond, an attorney at the international law firm Reed Smith, said during the panel discussion, "There are three certain things in life: death, taxes and legal fees." It simply might not make sense to spend money pursuing a lawsuit when the outcome is uncertain but the retainer fee isn't.

What can a victim of click fraud do? One solution bandied about at the conference seemed simple enough. Contest the charges on your credit card as fraudulent. If enough merchants did it, they could enlist powerful allies: American Express, Visa and MasterCard, who would likely pressure the other search engines to do something about it.

It sure beats trusting Google to mail you a refund check.

- - -

Adam L. Penenberg is an assistant professor at New York University and the assistant director of the business and economic reporting program in the department of journalism.

Exhibit 46



**Home**   **Free Subscription**   **Latest Brief**   **Web Clinic**   **Research Archive**   **About Us**   **Help**   **Blog**   **Careers**

Home ▸ PPC/Organic Search ▸ Click Fraud - Our research

Search: [ Enter Term or Phrase ]   **GO**

### Click Fraud - Our research

Thursday, 30 June 2005

**Paid Search Certification:** Learn How To Maximize Your Paid Search (PPC)



**Current Research**

**Latest Brief:**
Marketer's Intuition Revisited: Is There a Place for Intuition in Web Page Optimization

**Latest Web Clinic:**
Marketer's Intuition Revisited: Is There a Place for Intuition in Web Page Optimization?

**Web Clinic Podcast:**
Podcast

**Latest Blog Entry:**
MarketingExperimentsBlog

**Marketing Blueprint:**
Organize these reports into a step-by-step marketing

**Subscribe To:** The Marketing Experiments Journal

[ Name ]

[ Email Address ]

**Subscribe For Free**

We promise to protect your privacy. See our POLICY.



**SYNOPSIS**

**Topic:** Click Fraud — Our research indicates that as much as 30% of paid search traffic may be fraudulent.

We recently released the audio recording of our clinic on this topic. You can listen to a recording of this clinic here:

Click Fraud (Windows Media Audio)
http://meclabs.com/cgi-bin/pl/pl.cgi?c5w

Click Fraud (RealMedia)
http://meclabs.com/cgi-bin/pl/pl.cgi?c5r

This research brief will answer the following questions:

blueprint.
(View the Plan)

### Research Topics

**Email Marketing**

Email Marketing Tested, Part 2

Email Marketing Tested

The Impact of SPAM on Email Tested

Ezine Advertising Tested

Welcome Message Sequence Tested

See all reports on this topic

**Marketplaces**

eBay Stores Tested

Amazon OLS Stores Tested

Data Feeds Tested

eBay Basics Tested

Yahoo! Store Changes Tested

See all reports on this topic

**Online Advertising**

Marketing Blueprint 2006

Press Releases Tested

Click Fraud

See all reports on this topic

**PPC/Organic Search**

PPC Advertising

Harnessing Social Media - Web 2.0 Grows Up - Free Internet Traffic

Small PPC Search Engines Revisited

The ROI on PPC vs. Affiliate Marketing

Click Fraud Detection

1. What is click fraud?

2. How significant is the problem of click fraud?

3. How do you avoid click fraud?

 **FINDINGS**

### 1. What is click fraud?

Click fraud is generally defined as any paid-for click that originates in a malicious attempt to drain an advertiser's budget. Especially for high-priced search terms, advertisers will sometimes attempt to drive up their competitors' marketing costs by clicking on their ads.

Click fraud is sometimes also motivated by revenue generated by pay-per-click (PPC) engines' affiliate networks. Here, an affiliate is driven by simple greed to run up multiple fraudulent clicks.

Most PPC search engines have systems in place that identify click fraud and then subsequently do not charge the advertiser for the fraudulent clicks. Google, the largest PPC-driven engine, seems to be able to detect rapid, successive clicking from the same person or IP address. However, individuals or organizations conducting click fraud are using more advanced cloaking technologies that may circumvent these preventive systems.

Google often issues refunds and adjustments based on reported click fraud. The company has also recently implemented more advanced human-based and technology-driven click fraud detection mechanisms.

In the majority of click fraud cases that we have investigated, we have found that click-fraud criminals are using rolling-IP distributed attacks from multiple countries. In addition, it appears that they may have organized human click-fraud campaigns using low-cost third-world labor.

On Google, "impression fraud" is another equally problematic form of click

See all reports on this topic

**Site Conversion**

Marketer's Intuition Revisited

Increasing Conversion

Landing Page Optimization

MarketingExperiments Webinar - Pt2

MarketingExperiments Webinar

See all reports on this topic

**Submit A Topic**

What would **you** like us to test?



Enter Your Email

Enter Topic Ideas

Submit Topics

**Opportunities**

Careers

Affiliate Program  NEW!

fraud. Impression fraud occurs when criminals manipulate the number of page impressions for a given search term. When an advertiser's relative click-through rate (CTR) decreases, his or her search term can be suspended because of low CTR performance. This creates a window of opportunity for other advertisers. By committing impression fraud, they are able to obtain higher search rankings at lower costs due to the crippled competition.

The revenue that is generated by click fraud varies greatly depending on whom you ask. However it is widely believed that if click fraud were completely eliminated, all of the major PPC engines would suffer a significant blow to revenues and share prices. It is important, however, that these PPC companies realize that maintaining the trust of their advertisers is vital to the long-term health of the industry.

**2. How significant is the problem of click fraud?**

SEMPO (Search Engine Marketing Professional Organization) recently did a study that shows that many advertisers don't recognize click fraud as a significant problem:

| Survey: The Problem of Click Fraud | | | | |
|---|---|---|---|---|
| Statement | All Advertisers | Advertisers of < 500 Employees | Advertisers of 500+ Employees | Agencies |
| This is a significant problem we have tracked | 6% | 10% | 0% | 4% |
| It is a moderate problem we have tracked | 19% | 21% | 15% | 30% |
| We have not tracked it much, but we are worried about it | 45% | 36% | 58% | 43% |
| It is not a significant | | | | |

| | | | | |
|---|---|---|---|---|
| concern | 26% | 28% | 23% | 23% |
| Never heard of it before | 5% | 5% | 4% | 0% |

 **What You Need To UNDERSTAND:** Of those who recognize that click fraud may be a significant problem (70%) only 25% of all advertisers have tracked click fraud.

Source: http://www.sempo.org/press/click-fraud.php

To further illustrate the current perception regarding click fraud, we have included a number of excerpted quotes from industry experts and the major press:

"Search engine traffic is among the most valuable traffic to a web marketer due to the state of mind of a searcher. Click fraud, charging marketers for poor quality non-converting clicks, could poison the well…"

-Kevin Lee
SEMPO.org

"Click fraud is the biggest threat to the Internet economy…"

-George Reyes
Chief Financial Officer
Google, Inc.

(As quoted in the Wall Street Journal)

"Anyone who says this is not a real challenge is kidding you…"

-John Slade,
Senior Director of Product Management
Yahoo, Inc.

(As quoted in the Wall Street Journal)

We decided to test click fraud. In an attempt to "defraud" Google's AdSense system (the content-based, affiliate-driven element of AdWords), we created a search term that would not receive any other bids. In this way, we could rest assured that our "fraud" would only hurt ourselves.

Case 4:08-cv-02150-CW     Document 15-47     Filed 06/20/2008     Page 6 of 12

We bid on the term "daurf kcilc" ("click fraud" spelled backwards) and created an ad:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The Latest Spy Equipment

Bug Your Neighbor

Literally

www.marketplacesnapshot.com
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

We then attempted to create an AdSense page that would serve this ad:

http://www.marketplacesnapshot.com/duarfkcilc.html

However, we never managed to get the AdSense account to serve our ad for "daurf kcilc", even though it was the only ad for that search term.

So we moved on to just searching for "daurf kcilc" on Google's main site. Now we were able to pull up our ad and attempt to run up fraudulent clicks. Here are the results of those efforts:

| Attempted Click Fraud on Google AdWords | | |
|---|---|---|
| **Click Fraud Attempt** | **Successive Clicks** | **Clicks Registered by Google** |
| Individual clicking on the ad | 10 | 0 |
| Individual clicking on the ad with Anonymizer | 10 | 1 |
| Clicking on the ad with a different computer, same IP address | 10 | 1 |
| Clicking on the ad with a different computer, different IP address | 10 | 1 |

 **What You Need To UNDERSTAND:** Based on this test, it does not appear that a competing individual or company could do too much damage to someone simply by clicking on your ad over and over.

These results were encouraging. However, they do not address the larger problem of individuals or companies defrauding the PPC system with more sophisticated software or organizational efforts (such as third-world labor).

South African search firm Incubeta.com has developed a unique click-tracking tool that creates and measures a unique click ID for each click. This ID is created based on a number of characteristics that they believe to be statistically significant. This tool was used in creating the three campaigns below.

Specifics of these tested campaigns included:

- All three campaigns ran over a ten day period.

- Duplicates were determined by comparing IP address, language, browser settings, referring URL, time of click, operating system, browser plug-ins, and country.

- Campaign A was implemented for a finance company with a high-end ($1.00-$2.00) cost-per-click (CPC), Campaign B was for a travel company with a mid-range ($0.20-$0.30) CPC, and campaign C was for a "jobs" company with a low ($0.05-$0.15) CPC.

| Documented Click Fraud for Three Google AdWords Campaigns | | | |
|---|---|---|---|
| | **Campaign A** | **Campaign B** | **Campaign C** |
| Total Clicks | 34,763 | 12,790 | 4,184 |
| Duplicate Clicks | 10,268 | 1,257 | 349 |
| Alleged Click Fraud | 29.5% | 9.8% | 8.3% |
| Clicks Billed By Google | 34,758 | 12,671 | 4,130 |
| Google Credits | - 5 | - 119 | - 54 |
| Non-Credited Fraudulent Clicks | 10,263 | 1,138 | 295 |
| Cost to Advertiser | $15,394.50 | $284.50 | $29.50 |

**What You Need To UNDERSTAND:** This random sample showed as much as 29.5% fraud. Fraud increased as the bid price increased. Google only seemed to detect a very small percentage of fraud.

**KEY POINT:** Data indicates that the potential for significant click fraud increases proportionately to the bid price.

This data clearly indicates that click fraud may be a larger problem than the major online search engines admit. Until more information becomes available, PPC advertisers will have to remain vigilant against the dangers of PPC fraud.

### 3. How do you avoid click fraud?

A business owner can combat click fraud and impression fraud in a number of ways:

1. Carefully monitor rapid drops in website conversion with corresponding spikes in paid search traffic. This type of rapid change in metrics could indicate someone or something is manipulating your search campaign. Large amounts of click traffic with no new sales or leads often indicate click fraud, particularly if you have historical data that shows a higher average website conversion rate from the same core search terms.

2. Implement a click-fraud tracking tool. There are several monitoring tools that will look for irregular patterns in your click traffic and flag potential fraud. We have listed a number of these tools in the Literature Review at the end of this report.

3. Be aware of impression fraud. Pay attention to the search terms that have been deactivated in your Google account because of apparent low conversion. If the campaigns have been running for some time successfully and suddenly some of your key terms have been deactivated, it may indicate impression fraud.

4. Report any click fraud to Google so that their fraud team can attempt to identify the source of the fraud. Google has various click fraud screening tools that monitor all click traffic, and they have even more advanced screening tools that their staff uses to identify the source of click fraud. Like SPAM, we believe much of the click fraud comes from just a handful of criminals.

5. Monitor your overall site traffic on a daily basis. By utilizing an accurate web analytics tool you can monitor the quality of your overall traffic and infer potential problems based on trends.

6. The more a PPC engines depends on affiliates for its traffic, the more susceptible it will be to fraud. Traffic quality tends to be better on Google, Yahoo!, and Lycos, for example, because each of these sites has its own branded destination where consumers go to search. However, smaller PPC engines often rely exclusively on partner sites for traffic.

Until more conclusive data becomes available, marketers must remain vigilant against the ongoing potential of lost marketing revenue to click fraud. The aforementioned techniques will help you combat click fraud, which will enable your PPC campaigns to produce the optimum return on investment for your company.

We will continue to evaluate click fraud and will release further research as it becomes available.

**::Top Of Page::**

 **NOTES**

**RELATED MEC REPORTS:**

- PPC Ad Copy Tested

- Avoiding Unprofitable PPC Campaigns

- Google AdWords Tested, Part 2

- Google AdWords Tested

- Google AdSense Tested

- Overture Tested

- PPC for Subscription-Based Sites

- Small PPC Engines Tested

- [5 Paid Search Engines Tested](#)

**::Top Of Page::**



# LITERATURE REVIEW

As part of our research on this topic, we have prepared a review of the best Internet resources on this topic.

### Rating System

These sites were rated for usefulness and clarity, but alas, the rating is purely subjective.

\* = Decent | \*\* = Good | \*\*\* = Excellent | \*\*\*\* = Indispensable

- [http://www.sempo.org/press/click-fraud.php](#) \*\*\*\*
- [India 's Secret Army of Ad Clickers](#) \*\*\*
- [Google CFO: Fraud a Big Threat](#) \*\*\*
- [Exposing Click Fraud](#) \*\*\*
- [Lost Per Click: Search Advertising & Click Fraud](#) \*\*\*
- [Click Fraud: A Legal Look](#) \*\*\*
- [Attorneys Seek Advertisers for Click Fraud Class Action](#) \*\*\*
- [Click Fraud in the Spotlight](#) \*\*\*
- [Click Fraud: What It Is, How to Fight It](#) \*\*\*
- [Google and Overture Define Click Fraud](#) \*\*\*

- Google Sues AdSense Publisher for Click Fraud **
- Programmer Arrested in Alleged AdSense Extortion Plot **
- Coping with Fraudulent PPC Traffic **
- Wired News: BlowSearch Tackles Click Fraud **
- Wired News: Click Fraud: Problem or Paranoia **
- New Attacks and Defenses in Click-Fraud War **
- A Brief History of Click Fraud **
- How to Stop Click Fraud (Or at Least Get a Refund) **
- Clicks2Customers **
- KeywordMax **
- ClickDefense.com **
- ClickDetective **
- AdWatcher **
- Authenticlick.com **
- Click Authority **
- Click Sentinel**

 **ABOUT THIS BRIEF**

**Credits:**

Editor — Flint McGlaughlin

Writer — Brian Alt

Contributors — Jalali Hartman

HTML Designer — Cliff Rainer

**::Top Of Page::**

**Home     Latest Brief     Web Clinic     Research Archive     About Us     Help     Speakers     Blog     Careers     Affiliate**

© MarketingExperiments – 412 1st Street North, Jacksonville Beach, Florida 32250.
© Copyright 2001 - 2008 By DTI. All Rights Reserved.

Exhibit 47



**DIRECT**





Sizing Up Click Fraud
Jun 1, 2006 12:00 PM , BY BRIAN QUINTON
NO ONE'S CLAIMING CLICK FRAUD NEVER HAPPENS,
BUT THE LARGE SEARCH ENGINES say bogus ad clicks
are a small, manageable problem, caught either before
advertisers get charged or credited to the defrauded ad
accounts once detected.

A report by the Search Engine Marketing Professional
Organization found that 40% of online advertisers say
they've discovered fraud among their clicks, 16% more than
the previous year. Some monitoring firms have pegged the
fraud rate as high as 30% to 35% of all pay-per-click ad
clicks. Who's right?

CLICK FRAUD IS DOING a bang-up impersonation of
Keyser Soze, that shadowy master criminal from the movie
"The Usual Suspects," of whom it was said his greatest trick
was convincing the world he didn't exist.

No one's claiming click fraud never happens, but some
parties in the search marketing industry — particularly the
large engines — say bogus ad clicks are a small,
manageable problem, caught either before advertisers get
charged or credited to the defrauded ad accounts once
detected. Yahoo! CEO Terry Semel told CNBC in mid-May
that click fraud was a "bug that needs to be fixed" but that
"this has already gotten better and will continue to get
better."

In March, Google CEO Eric Schmidt dismissed click fraud as
"not a material issue" for his company, thanks to detection
systems and reimbursement processes in place. A few days
later, the company offered advertisers $90 million in ad
credits to settle a class-action click fraud lawsuit. Advertisers
have until June 15 to opt out of the deal, but early reports
suggest some of them consider the settlement — $30 million
of which will go for legal fees — to be equally immaterial.

A December 2005 report by the Search Engine Marketing Professional Organization found that 40% of online advertisers say they've discovered fraud among their clicks, 16% more than the previous year. Some monitoring firms have pegged the fraud rate as high as 30% to 35% of all pay-per-click (PPC) ad clicks.

Sizing up click fraud has been difficult partly because of mistrust among the parties involved. Search engines can only see who's visiting a site; they can't know whether those visitors convert. So they use special algorithms to look for other telltale signs that clicks are not coming from ordinary random visitors. But they're reluctant to reveal too much about those processes for fear of teaching felons how to defeat them. They've also intimated that some advertisers claim fraud any time their PPC conversion rates drop, when in fact the falloff might be due to subtle changes in ad text or other factors.

On the other hand, PPC advertisers have lots of data about how visitors behave once they arrive at their sites. But they don't want to let the engines know too much about how well their keyword campaigns perform, fearing higher bid prices as a result. That suspicion is fed by the engines' sometimes cryptic and almost arbitrary fraud compensation policies.

"On one side, you have Google and Yahoo! saying they're doing everything they can to track this and refund clicks, but doing it in a very secretive way" says Andy Beal, president of search marketing firm Fortune Interactive. "On the other, you've got the advertisers who say it's happening, and these small tracking firms that have appeared saying it's occurring in ridiculously high percentages."

During the last year, several interested parties have launched efforts to determine the size of the click-fraud problem. In January, SEM consultant Greg Boser embarked on a homegrown project to test the reliability of search engine fraud detection systems — an effort that also should be able to confirm or repudiate their fraud estimates. Boser is using automated software — "click bots" — to click on PPC ads he's taken out for some of his clients and then watching to see how good the engines are at picking out the bogus clicks.

If they don't do a good job, he'll publish the results to prove it, Boser promised in a blog post. "[But] if it turns out they actually are doing a solid job catching the majority of bad clicks, we'll publish that as well," he said. So far Boser hasn't publicized any of the project's findings.

Fair Isaac, the credit-fraud detection company, has gotten involved as well. Enlisting the help of pioneering click-fraud expert Jessie Stricchiola, president of Alchemist Media, Fair Isaac aims to investigate what click data is needed from both advertisers and engines to determine if marketers are getting a fair return on their PPC spending — specifically, how much is being wasted on fraudulent clicks.

And in April, click auditing firm Click Forensics issued the first findings from a study of fraudulent clicks among its Click Fraud Network, a voluntary association of PPC marketers.

The network's findings for March were novel enough to attract attention from both industry and press. According to the results, "high threat" click fraud among the network members ran at about 13.7% for the month.

Interestingly, the index also broke out fraud figures for three different search engine tiers. It found that fraud rates ran at 12.1% of clicks on the top-tier search engines Google and Yahoo!, and 21.3% on second-tier engines such as Ask.com and MSN Search. Third-tier engines like LookSmart and Lycos saw March fraud rates of about 29.8%, according to the index.

"We'd been looking at fraud data for about three years in our Web analytics experience and as a spinoff from our former parent company, [Web analytics firm] Optimal IQ," says Click Forensics president Tom Cuthbert. "And it struck us that there really are no good industry statistics for what click fraud looks like. Our feeling was that collective data from multiple clients, across multiple search providers and industries, would be really beneficial in developing a highly accurate scoring engine."

In joining the Click Fraud Network, Web operators either submit their log files or add a small tag to their PPC landing and conversion pages. The tag software then marks records and tracks visitors who come to members' Web pages through PPC ads, analyzing the data on Click Forensics' servers using a proprietary scoring algorithm and assessing the likelihood of fraud for each click. Members get a weekly e-mail update on threat levels for their own clicks and those of their wider industry category. Members that typically get fewer than 100,000 ad clicks a month aren't charged for the tag software. Besides fraud analysis, network members receive detailed reports on suspect or high-threat clicks among their PPC traffic.

"We've never believed the click-fraud guesstimates of as

much as 35% to 40%," he says. "There certainly are instances in particular cases, or seasonality issues, that have caused increases in fraud on some terms. But we think those high numbers are exaggerated and anecdotal."

Other industry figures disagree. Michael Caruso, co-founder and president of the Click Facts auditing firm, thinks the Click Fraud Network's approach is flawed on several levels. The data collected is statistically unreliable, he says, because the network's sample is undefined as to the size of the participants and the segments they market in. Giving the tagging technology free to low-click advertisers skews the results in that direction. "We have clients for whom fraud can be 1%, 10% or 20% during certain periods," he says. "Sometimes it's zero, because the bots are smart enough to vary their approach."

Caruso also maintains that examining regular log files won't yield information that turns up those smart click bots. "That method won't look deep into the automated fraud an algorithm can pull out," he says. "It will show the obvious spikes that a monkey could figure out."

### Rating the Risk on Search Engine Clicks

| > | |
| --- | --- |
| > | **Click Fraud Rate*** |
| Tier 1 (Google, Yahoo!)** | 12.1% |
| Tier 2 (Ask.com, MSN Search) | 21.3% |
| Tier 3 (LookSmart, Lycos) | 29.8% |
| **Overall Click Fraud Rate** | **13.7%** |

*As of 4/24/06
**Search engines noted are representative of a given tier
Source: Click Forensics Inc.

**Find this article at:**
http://www.directmag.com/disciplines/search-webmarketing/marketing_sizing_click_fraud/index.html

☐  Check the box to include the list of links referenced in the article.

© 2007 Penton Media, Inc. All rights reserved.

Exhibit 48

POWERED BY
BNET.com

FindArticles > Business Wire > July 17, 2006 > Article > Print friendly

**Industry Average Click Fraud Rate Climbs in Second Quarter 2006; Click Fraud Rate for High-Priced Search Terms Tops 20.2 Percent**

SAN ANTONIO -- Click Forensics(TM), LLC today released the latest industry Pay Per Click fraud figures for the second quarter 2006 from the search advertising industry's leading independent click fraud reporting service -- the Click Fraud Index(TM) (www.ClickFraudIndex.com). The Click Fraud Index monitors and reports on data gathered from the Click Fraud Network(TM), which more than 1,300 online advertisers and their agencies have joined. Network members can track their online campaigns for click fraud free of charge. Key findings from data reported for Q2 2006 include:

--The overall industry average click fraud rate was 14.1 percent, slightly higher than the average of 13.7 percent for Q1

--The industry average click fraud rate for high-priced search terms was 20.2 percent. High-priced terms are defined as terms that cost over $2.00. These high-priced terms often make up the majority of an advertiser's total spend.

--The industry average click fraud rate for companies running online advertising campaigns through:

--Tier 1 search providers, such as Yahoo! and Google, was 12.8 percent vs. 12.1 percent in Q1

--Tier 2 search providers was 20.3 percent vs. 21.3 percent in Q1

--Tier 3 search providers was 27.1 percent vs. 29.8 percent in Q1

--The average pay per click term cost for the top key terms across the five biggest search advertising industries -- Retail, Financial Services, Health & Fitness, Technology, and Entertainment -- for Q2 was $4.51. This compares to $4.75 from Q1.

--The greatest percentage of click fraud, over 88 percent, originated from within the U.S. and Canada. Outside North America, the greatest amount of click fraud originated from within India. Unwanted click activity originating from India increased 26 percent during Q2.

"One of the most interesting findings from our Q2 data was the difference between the overall average industry click fraud rate and the click fraud rate for the most expensive search terms," said Tom Cuthbert, president and CEO of Click Forensics, LLC. "For the first time, we have industry data that clearly shows what many have expected -- organizations purchasing higher-priced search terms are significantly more vulnerable to click fraud."

The Click Fraud Index publishes data collected from the Click Fraud Network (www.ClickFraudNetwork.com), the industry's first independent third-party click fraud detection service dedicated to helping companies more accurately monitor their online advertising campaigns for Pay Per Click (PPC) fraud. Using CF Analytics(TM), a patent-pending click fraud detection technology, the Click Fraud Network allows advertisers to track their online campaigns for potential click fraud. The service is unique in that it monitors online campaigns for click fraud by correlating data collected from search provider campaigns and the advertisers own web sites -- providing the industry's most accurate view of click fraud to date.

The Click Fraud Index tracks and publishes industry click fraud data on a weekly and quarterly basis for specific search providers, industries and trends. Industries covered include Retail, Financial Services, Health & Fitness, Technology, and Entertainment. Individuals can access information from the Click Fraud Index at www.ClickFraudIndex.com. Advertisers can join the Click Fraud Network at www.JoinTheNetwork.com and monitor their individual pay per click campaigns for up to 100,000 clicks per month free of charge.

About The Click Fraud Network

More than 1,300 advertisers and agencies are currently members of the Click Fraud Network, which is the industry's first and largest independent third-party service dedicated to helping advertisers, agencies and search providers monitor online advertising campaigns for click fraud free of charge. The network is comprised of a representative cross-section of online advertisers and interactive advertising agencies, including Fortune 500 companies and some of the world's largest retailers, travel sites, financial services firms and pharmaceutical companies. Advertisers and agencies who wish to monitor online Pay Per Click advertising campaigns with up to 100,000 clicks per month free of charge, can sign up for the Click Fraud Network at www.JoinTheNetwork.com.

About Click Forensics, LLC

Click Forensics, LLC is the leading provider of third-party technology and services that help online advertisers, agencies and search providers to better identify and stop Pay Per Click fraud. The company runs the top independent click fraud detection service in the industry, the Click Fraud Network (www.ClickFraudNetwork.com), which monitors online advertising campaigns for click fraud free of charge. Click Forensics also provides and enterprise-class solutions to help advertisers with campaigns of 100,000 clicks or more per month track click fraud. More information on Click Forensics and its offerings are available at www.ClickForensics.com.

Click Forensics and Click Fraud Network are trademarks of Click Forensics, LLC. All other company and product names mentioned are used only for identification and may be trademarks or registered trademarks of their respective companies.

COPYRIGHT 2006 Business Wire
COPYRIGHT 2006 Gale Group

Exhibit 49

Print   Close

New Fair Isaac Research Indicates Click Fraud is Potentially Large
Problem in Parts of Search Engine Advertising

-----------------------------------------------

*Early results of study using Fair Isaac's proven fraud detection technology indicate that 10-15 percent of advertisers'
billed traffic from ad networks may be fraudulent*

May 18, 2007 - (San Francisco, California, USA) - Fair Isaac Corporation (NYSE:FIC), the leading provider of
analytics and decision management technology, today announced preliminary results of its research study into click
fraud in pay-per-click (PPC) advertising. Early results indicate that fraudulent clicks can amount to 10-15 percent of
advertisers' billed click traffic. The study applied Fair Isaac's market-proven artificial intelligence and fraud-fighting
technologies to assess the scope of the problem and test effective ways to expose fraudulent clicks.

The announcement was made at Fair Isaac's annual InterACT conference in San Francisco, where Fair Isaac presented
a session on its research into click fraud. The company launched the study in summer 2006 with support from the
Search Engine Marketing Professional Organization (SEMPO). SEMPO members and non-member pay-per-click
advertisers contributed anonymous click-stream data to the study in exchange for analysis of their search engine
advertising and potential click fraud.

"These early results represent a significant step toward addressing the problem of click fraud in online advertising,"
said Dr. Joseph Milana, chief scientist in Fair Isaac's Research and Development group. "Based on these preliminary
results, we believe Fair Isaac's expertise and proven fraud detection technologies can be effectively brought to bear in
helping to detect fraud in the pay-per-click marketing space."

Dr. Milana also indicated that more research into the problem is necessary.

"These are early results based upon a limited view of the market," said Milana. "We're looking for more advertisers
to contribute to the study to help us arrive at a solid picture of the problem's size and scope across the broader
marketplace and different vertical markets."

Click fraud occurs when advertisers pay for ad clicks that come from fraudulent sources instead of legitimate web
traffic. A primary form of click fraud takes place when unscrupulous search engine affiliates/publishers in the ad
networks arrange for repeated clicks on the site ads in order to increase revenue. Online robots or "botnets" as well as
"click farms" of low-cost workers in remote countries are two mechanisms that perpetrate this type of fraud for profit.

Another common form of fraud occurs when employees of companies click on a competitor's ads to deplete
advertising budgets and dilute results. According to Fair Isaac's study, fraudulent traffic as a result of malicious clicks
by a competitor appears to be relatively contained and does not seem to have a significant impact on advertisers'
bottom-line.

"Marketers have embraced pay-per-click advertising, but ways to defraud the system also have become more
sophisticated," said SEMPO Chair Gord Hotchkiss. "Based on these early results, we believe the opportunity exists
for our members to participate in an expanded study that can help further determine the extent of the problem and
point the way to industry-wide measures for dealing with them."

In addition to using the company's patented, multi-entity profiling technologies used to successfully fight payment
card fraud for more than 15 years, the study uses an anomaly detection engine - initially deployed in Fair Isaac's

Network Assurance solution - to analyze advertisers' click-stream data, identify predictive patterns and generate a "pathology" score indicative of click fraud.

Fair Isaac's Falcon™ fraud detection solutions are known worldwide for their effectiveness in helping businesses in the financial services, telecommunications, healthcare and pharmaceutical industries reduce fraud losses and protect their customers from fraudulent transactions. The company's Falcon™ Fraud Manager solution protects 65 percent of the world's credit card transactions.

**About Fair Isaac**
Fair Isaac (NYSE:FIC) makes decisions smarter. The company's solutions and technologies for Enterprise Decision Management give businesses the power to automate more processes, and apply more intelligence to every customer interaction. Through increasing the precision, consistency and agility of their decisions, Fair Isaac clients worldwide increase sales, build customer value, cut fraud losses, manage credit risk, reduce operational costs, meet changing compliance demands and enter new markets more profitably. Founded in 1956, Fair Isaac powers hundreds of billions of decisions per year in financial services, insurance, telecommunications, retail, consumer branded goods, healthcare and the public sector. Fair Isaac also helps millions of individuals manage their credit health through the www.myfico.com website. Visit Fair Isaac online at www.fairisaac.com.

**Fair Isaac Statement Concerning Forward-Looking Information**
Except for historical information contained herein, the statements contained in this press release that relate to Fair Isaac, including statements regarding its Falcon™ product offerings, are forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially, including any unforeseen technical difficulties related to the implementation, use and functionality of the offerings, the risks that customers will not perceive material benefits from the offerings, failure of the products to deliver the expected results, the possibility of errors or defects in the offerings, regulatory changes applicable to the use of consumer credit and other data, and other risks described from time to time in Fair Isaac's SEC reports, including its Annual Report on Form 10-K for the year ended September 30, 2006, and its quarterly report on Form 10-Q for the period ended March 31, 2007. Forward-looking statements should be considered with caution. If any of these risks or uncertainties materializes or any of these assumptions proves incorrect, Fair Isaac's results could differ materially from Fair Isaac's expectations in these statements. Fair Isaac disclaims any intent or obligation to update these forward-looking statements.

Fair Isaac and Falcon are trademarks or registered trademarks of Fair Isaac Corporation, in the United States and/or in other countries. Other product and company names herein may be the trademarks of their respective owners.

Exhibit 50

FOCUS - 3 of 10 DOCUMENTS

Copyright 2007 Factiva ®, from Dow Jones
All Rights Reserved

Dow Jones Factiva

(c) 2007 Reuters Limited
Reuters News

March 22, 2007 Thursday 5:59 AM GMT

**LENGTH:** 635 words

**HEADLINE:** Yahoo names executive to combat online ad fraud

**BYLINE:** By Eric Auchard

**DATELINE:** March 22, 2007

**BODY:**

SAN FRANCISCO, March 21 (Reuters) - Yahoo Inc. has named a senior executive to lead the company's efforts to combat click fraud in its Web search advertising business, the company said on Wednesday, in a bid to reassure advertisers.

Yahoo, the No. 2 provider of pay-per-click ads behind rival Google Inc. , said attorney Reggie Davis, a seven-year veteran of the company, will take on the newly created post of vice president of marketplace quality.

The Internet media company also disclosed for the first time that it discards as invalid or of inferior quality 12 to 15 percent of the time Yahoo users click on its advertisements. In cases of invalid clicks, Yahoo does not charge advertisers.

Similarly, Google last month said its computers automatically reject up to 10 percent of potential advertising billings resulting from invalid clicks. How comparable the two figures are is unclear as there is no industry agreement that defines what constitutes an invalid click.

"We need to take some of the inconsistency out of this issue," said Davis, who, as associate general counsel managing litigation for Yahoo, previously was in charge of defending the company in click fraud lawsuits filed against it.

While an arcane subject to most people, the topic is a hot issue among online advertising customers who believe click fraud may be unfairly inflating the prices they pay for ads. Both Google and Yahoo have settled class-action suits accusing them of failing to protect customers against click fraud.

Click fraud can occur when Web site publishers attempt to trick Google's ad system into counting ads never seen by real users, or when competitors use automated programs to create fake clicks, driving up per-click charges and site ad rates.

Previously, Google and Yahoo were tight-lipped on the extent of fraud in their systems, arguing that disclosing too many details makes it easier for bad actors to game their systems.

Davis is responsible for providing advertisers with greater transparency on how Yahoo's display and search ad systems work, seeking to put to rest uncertainty the extent to which its automated ad systems act as magnets for computer fraud.

He is charged with hiring a staff that will work with both advertisers and Web site publishers to respond to issues across Yahoo businesses related to click fraud, traffic quality, network placement and other marketplace quality issues.

Besides quality control, Davis has begun working with Yahoo product management team on enhancements to give search ad customers greater visibility into how well their ads perform.

Later this year, Yahoo aims to introduce quality-based pricing; domain-level blocking that allows advertisers to exclude traffic from suspicious Web sites, and more automated advertiser feedback and control over ads they are billed for.

"We want to take the heat out of this issue around click fraud," Davis said. "Everything on top of that will be used to define the competition. We really want to focus the issue on who is doing a better job around quality," he said.

Tom Cuthbert, a vocal critic of the industry's handling of the click fraud issue, said he was pleased by Yahoo's moves.

"I think Yahoo is taking a more honest approach than others," Cuthbert said. Specifically, he criticized market leader Google for denying click fraud is a material issue.

Cuthbert is the president of Click Forensics, a San Antonio, Texas-based company who has been battling with the major search advertising players to allow his company to work an independent auditor on behalf of their ad customers.

"None of this eliminates the need for a third party to verify click quality," Cuthbert said. "Only with this greater transparency will it create a trust among (advertising) customers that doesn't really exist right now."

**NOTES:** YAHOO-CLICKFRAUD/|LANGEN|ABN|E|RBN|U|RNP|DNP|PCO;
PUBLISHER: Reuters Limited

**LOAD-DATE:** March 23, 2007

```
Send To:  SCHUELLER, EVI
          MORRISON & FOERSTER - TRANS
          425 MARKET ST
          SAN FRANCISCO, CA 94105-2406
```

Exhibit 51

Brian S. Kabateck (Bar No. 152054)
Richard L. Kellner (Bar No. 171416)
KABATECK BROWN KELLNER LLP
350 South Grand Avenue
39th Floor
Los Angeles, CA 90071
Telephone: (213) 217-5000
Facsimile: (213) 271-5010

Attorneys for Plaintiff

Shawn Khorrami (Bar No. 180411)
LAW OFFICES OF SHAWN KHORRAMI
14450 Haynes Street, Third Floor
Van Nuys, California 91411
Telephone: (818) 947-5111
Facsimile: (818) 947-5121

Attorneys for Plaintiff

Gregory E. Keller (Admitted pro hac vice)
Darren T. Kaplan (Admitted pro hac vice)
CHITWOOD HARLEY HARNES LLP
2300 Promenade II
1230 Peachtree Street, NE
Atlanta, GA 10022
Telephone: (404) 873-3900
Facsimile: (404) 876-4476

Attorneys for Plaintiff

Larry W. McFarland (Bar No. 129668)
Dennis Wilson (Bar No. 155407)
Emil W. Herich (Bar No. 116783)
KEATS McFARLAND & WILSON LLP
9720 Wilshire Boulevard
Penthouse Suite
Beverly Hills, California 90212
Telephone: (310) 248-3830
Facsimile: (310) 860-0363
Emails:    lmcfarland@kmwlaw.com
           dwilson@kmwlaw.com
           eherich@kmwlaw.com

Attorneys for Defendant
YAHOO! INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| CHECKMATE STRATEGIC GROUP, INC., a Florida corporation, individually, and purportedly on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>YAHOO! INC., a Delaware corporation, and DOES 1 THROUGH 100, Inclusive,<br><br>Defendants. | Case No.: CV 05-4588 CAS (FMOx)<br><br>STIPULATION AND SETTLEMENT AGREEMENT<br><br>Date:       June 28, 2006<br>Time:       1:00 p.m.<br>Courtroom:  5 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## STIPULATION AND SETTLEMENT AGREEMENT

This Stipulation and Settlement Agreement ("Agreement") is entered into by and between Checkmate Strategic Group, Inc. ("Checkmate"), on behalf of itself and each of the Class Members defined below, and Yahoo! (as defined below).

## I.

## RECITALS

WHEREAS, Checkmate is the named plaintiff in the action titled <u>Checkmate Strategic Group, Inc. v. Yahoo!, Inc.</u> pending in the United States District Court for the Central District of California, Western Division, Case No. CV 05-4588 CAS (FMOx)(the "Action");

WHEREAS, Checkmate claims that Yahoo! has breached its contracts with Class Members (as defined below) for Yahoo! Ads (as defined below) and committed unfair business practices under California Business & Professions Code § 17200 et seq., including improperly collecting revenue by charging and/or overcharging Class Members for clicks that were click fraud, click through fraud, fraudulent clicks, click spam, invalid clicks, unwanted clicks, unqualified clicks, improper clicks, non-converting clicks, inadequately converting clicks, clicks that were not reasonably expected by Class Members or otherwise claimed by Class Members as clicks for which Class Members should not have been charged, and improperly collecting revenue by charging and/or overcharging Class Members for clicks where users did not actively choose the Class Members' listings;

WHEREAS, Yahoo!, despite its belief that its click protection system has filtered clicks in a total amount which exceeds a reasonable estimate with respect to the quantity of clicks which are Challenged Clicks (defined below), that its actions have been proper, that it is not liable for the claims asserted, that it has valid and legal defenses to those claims and that the Class Representative (as defined below) and the

1  Class Members have not suffered any damage, has nevertheless agreed to enter into
2  this Agreement to avoid further expense, inconvenience and the burden of protracted
3  litigation;
4      WHEREAS, after conducting a significant investigation into the facts and law,
5  including reviewing extensive information, interviewing and retaining experts
6  interviewing witnesses and engaging in extensive settlement discussions with Yahoo!,
7  supervised by the Honorable Gary L. Taylor U.S.D.J. (retired), the Class
8  Representative (as defined below) and Class Counsel (as defined below) have
9  concluded that a settlement according to the terms and conditions set forth below is
10  fair, adequate and reasonable, and in the best interest of the Class Representative and
11  the Class (as defined below); and
12      NOW THEREFORE, in consideration of the covenants, agreements and
13  releases set forth herein and for other good and valuable consideration, and subject to
14  the approval of this Court, it is agreed by and among the undersigned that the Action
15  (as defined below) be settled, compromised, and dismissed on the merits with
16  prejudice as to Yahoo! on the following terms and conditions:

## II.

## DEFINITIONS

19  1.    The "Agreement" means this Stipulation and Settlement Agreement.
20  2.    The "Action" means <u>Checkmate Strategic Group, Inc., et. al. v. Yahoo!,</u>
21  <u>Inc., et al.</u>, United States District Court for the Central District of California, Western
22  Division, Case No. CV-05-4588 CAS (FMOx).
23  3.    For the purpose of this Agreement, "Challenged Clicks" is defined as all
24  clicks on Yahoo! Ads (defined below) that are or are alleged to be click fraud, click
25  through fraud, fraudulent clicks, click spam, invalid clicks, unwanted clicks,
26  unqualified clicks, improper clicks, non-converting clicks, clicks that the Class
27  Persons contend did not convert at a reasonable, satisfactory or adequate level, clicks
28

1    that were charged to the Class Persons that were not in fact or reasonably expected or

2    anticipated by Class Persons for any reason or otherwise claimed by Class Persons as

3    clicks for which Class Persons were overcharged or should not have been charged and

4    clicks where the user did not actively choose the Class Persons' listings, automated

5    clicks, clicks generated by robots, clicks generated with the assistance of deceptive

6    software, clicks from servers or users located outside the United States, clicks

7    generated by Persons who did not have a bona fide interest in viewing the content of a

8    Yahoo! Ad (defined below), clicks that were deceptive, malicious or executed in bad

9    faith, clicks that were not generated in good faith, and clicks made in bad faith with

10   the sole purpose of generating a charge to the Class Person.

11        4.    "Claim Form" means the application that a Class Member must submit in

12   order to be eligible to potentially receive a Credit (as defined below), and which is

13   attached hereto as Exhibit A.

14        5.    "Claims Administrator" means that individual or entity selected to

15   administer the claims notice process, as set forth in Paragraph 36 below;

16        6.    The "Class" or "Class Persons" means all Persons together with any

17   officer, employee, independent contractor, principal or agent of the same that have

18   purchased Yahoo! Ads during the Class Period (as defined in Paragraph 9), regardless

19   of where the advertisement was displayed.

20        7.    The "Class Counsel" consists of Brian S. Kabateck and Richard L. Kellner

21   of Kabateck, Brown, Kellner, LLP, Gregory E. Keller and Darren Kaplan of

22   Chitwood, Harley, Harnes, LLP and Shawn Khorrami of the Law Offices of Shawn

23   Khorrami.

24        8.    The "Class Members" means all Persons falling within the definition of

25   the Class who do not timely and properly exclude themselves from the terms of this

26   Agreement.

27

28

1     9.   The "Class Period" means from January 1, 1998, through and including
2  July 31, 2006.

3     10.   The "Class Representative" consists of Checkmate Strategic Group, Inc.,
4  together with its past or present directors, officers, employees, partners, principals,
5  agents, controlling shareholders, predecessors, successors, parents, affiliated and sister
6  corporations, and subsidiaries of same.

7     11.   The "Court" means the United States District Court for the Central
8  District of California, Western Division, together with any court exercising appellate
9  review thereof, and includes any other courts which take jurisdiction of the Action.

10     12.   "Effective Date" has the meaning described in paragraph 29.

11     13.   "Final Judgment" shall mean the Final Order Approving Settlement and
12  Judgment of Dismissal with Prejudice.

13     14.   The "Lane's Gifts Action" means <u>Lane's Gifts & Collectibles. L.L.C., et
14  al. v. Yahoo!, Inc., et al.</u>, Circuit Court of Miller County, Arkansas, Case No. CV-
15  2005-052-1, a copy of the Second Amended Class Complaint is attached hereto as
16  Exhibit B.

17     15.   The "Parties" consist of the Class Members, Yahoo! and Checkmate
18  collectively.

19     16.   "Person" or "Persons" means all natural persons and all entities
20  including, but not limited to, corporations, sole proprietorships, partnerships, or other
21  entities in which a natural person may have a legal or equitable interest.

22     17.   "Released Claims" has the meaning described in paragraph 30.

23     18.   "Released Parties" has the meaning described in Paragraph 30.

24     19.   "Yahoo!" means Yahoo!, Inc., Yahoo! Search Marketing, Overture
25  Services, Inc., and GoTo.com, Inc.

26     20.   "Yahoo! Ad" or "Yahoo! Ads" means the participation and/or the ability
27  to participate in a system which displays advertising, including without limitation,

28

1   titles and descriptions, uniform resource locators, images, text and all other content

2   delivered, served, published, and/or otherwise displayed by Yahoo! and the Yahoo!

3   Ad Partners (defined below), including without limitation, via any and all web sites, e-

4   mails, applications, and software, including without limitation, domain channels,

5   downloadable applications, content match, domain match, adware, spyware, arbitrage,

6   and e-mail campaigns.

7       21.   "Yahoo! Ad Partners" means all Persons together with any past or present

8   directors, officers, employees, partners, principals, agents, controlling shareholders,

9   predecessors, successors, parents, affiliated and sister corporations and subsidiaries of

10  same, that disseminated, displayed, distributed, delivered, served, published, and/or

11  otherwise provided any Yahoo! Ad.

12      22.   "Yahoo!'s Counsel" consists of Keats, McFarland & Wilson LLP.

13                              **III.**

14                         **CERTIFICATION**

15      23. The Parties stipulate and agree to the certification of a nationwide class for

16  purposes of this Agreement ONLY, defined as follows:

17          *"All Persons, together with any officer, employee, independent*

18          *contractor, principal or agent of same, who purchased Yahoo! Ads (as*

19          *defined above) from January 1, 1998 through July 31, 2006, regardless*

20          *of where the advertisement was displayed."*

21          Should the settlement embodied in this Agreement not become final, for

22  whatever reason, the fact that the Parties were willing to stipulate to class certification

23  of a nationwide class as part of the settlement shall have no bearing on, and shall not

24  be admissible in connection with, the issue of whether a class should be certified in a

25  non-settlement context in this Action or any other action or proceeding, including

26  without limitation the Lane's Gifts Action.  Yahoo! expressly reserves its right to

27

28

1    oppose class certification on any and all grounds should the settlement embodied in

2    this Agreement not become final.

3                                    **IV.**

4                         **PROCEDURAL HISTORY**

5        24.    The Action was originally filed June 23, 2005. Yahoo! successfully

6    moved to dismiss certain claims for relief alleged in the complaint. An Amended

7    Complaint was filed on or about November 3, 2005, which contained causes of action

8    for breach of contract and violation of California Business and Professions Code §

9    17200 et seq. Yahoo!'s subsequent motion to dismiss was denied by the Court. The

10   Court thereafter issued an order setting forth the schedule for discovery and the filing

11   of a motion for class certification. The Parties held a series of mediations before the

12   Honorable Gary L. Taylor U.S.D.J. (retired).

13                                   **V.**

14                          **INVESTIGATION**

15       25.    The Class Representative and Yahoo! have conducted significant

16   investigation of the facts and law both before and during the prosecution of this

17   Action. Such discovery and investigation has included, *inter alia*, the exchange of

18   information between the parties, numerous meetings and conferences between

19   representatives of the Parties, interviews of numerous potential witnesses, and

20   interviews of retained experts. Counsel for the Parties have further investigated the

21   applicable law as applied to the facts discovered regarding the alleged claims of the

22   Class and potential defenses thereto, and the damages that could be claimed by the

23   Class including during the course of briefing two separate motions to dismiss.

24                                   **VI.**

25                       **FAIRNESS OF SETTLEMENT**

26       26.    Class Counsel are experienced in litigation of this nature and have

27   considered the strength of Class Representative's case; the risk, expense, complexity,

28

1   and likely duration of further litigation; the risk of maintaining class action status

2   throughout the trial; the amount offered in settlement; the extent of discovery

3   completed, and the stage of the proceedings at which settlement is being offered.

4   Based on consideration of all the foregoing, Class Counsel has determined that the

5   settlement set forth in this Agreement is a fair, adequate and reasonable settlement,

6   and is in the best interests of all Class Persons.

7        27.   Yahoo! contends that all monies it received for Yahoo! Ads were

8   properly and legally charged and collected by Yahoo!. Yahoo! further contends that it

9   did not and has not breached--willingly or unwillingly--any contract between it and

10  any Class Members or between it and any Class Persons. Yahoo! further contends

11  that it has not committed unfair trade practices including without limitation based on

12  any misrepresentations to any Class Members or Class Persons. Yahoo! has denied

13  and continues to deny each of the claims and contentions alleged by the Class

14  Representative in the Action and the claims and contentions alleged in the Lane's

15  Gifts Action. Yahoo! denies any wrongdoing or legal liability arising out of any of

16  the facts or conduct alleged in the Action and in the Lane's Gifts Action, and believes

17  that it has valid defenses to the Class' claims. Neither this Agreement, any document

18  referred to or contemplated herein, nor any action taken to carry out this Agreement is,

19  or may be construed as or used as, an admission, concession or indication by or

20  against Yahoo! of any fault, wrongdoing or liability whatsoever, including any

21  concession that certification of a class would be appropriate in this or in any other

22  case.

23                              **VII.**

24                  **INADMISSIBILITY OF AGREEMENT**

25       28.   Whether or not the Court ultimately approves this Agreement, neither this

26  Agreement, any document, statement, proceeding or conduct related to this

27  Agreement, nor any reports or accounts thereof, shall in any event be construed as,

28

1  offered or admitted in evidence as, received as, or deemed to be an admission for any

2  purpose adverse to Class Representative or Yahoo! (including, but not limited to, as

3  evidence of a presumption, concession, indication or admission by Yahoo! of any

4  liability, fault, wrongdoing, omission, concession or damage) in the Action or in any

5  other action or proceeding, except for the sole purposes of settling this Action

6  pursuant to this Agreement, effectuating the terms of this Agreement, and enforcing

7  the releases in this Agreement.

8                                                   **VIII.**

9                                   **EFFECTIVE DATE**

10      29.    As used in this Agreement, "Effective Date" means the date by which this

11  Agreement is finally approved as provided herein and the Court's Final Judgment

12  becomes final. For purposes of this paragraph, the Court's Final Judgment "becomes

13  final" upon the latter of: (i) the date of final affirmance of an appeal of the Final

14  Judgment; (ii) the expiration of the time for an appeal to review the Final Judgment

15  and, if certiorari be granted, the date of final affirmance of the Final Judgment

16  following review pursuant to that grant; (iii) the date of final dismissal of any appeals

17  from the Final Judgment or the final dismissal of any proceeding on certiorari to

18  review the Final Judgment; or (iv) if there are no appeals of the Final Judgment, the

19  date after expiration of any and all available appeal periods following entry of the

20  Final Judgment.

21                                                   **IX.**

22                        **RELEASE AS TO ALL CLASS MEMBERS**

23      30.    As of the Effective Date, the Class Members, including the Class

24  Representative, fully, finally, and forever settle, release, and discharge the Released

25  Parties – as defined below in subparagraph (i) – from the Released Claims – as

26  defined below in subparagraph (ii) – and are forever barred and enjoined from

27  asserting any of the Released Claims in any court or forum whatsoever. The

28

1   provisions of any state, federal, municipal, local, or territorial law or statute providing

2   in substance that releases shall not extend to claims, demands, injuries, or damages

3   that are unknown or unsuspected to exist at the time this Agreement is executed and

4   approved by the Court, are hereby expressly, knowingly, and voluntarily waived by all

5   Class Members. In addition, to the extent applicable, Class Members waive the

6   application of Section 1542 of the California Civil Code (and any similar law of any

7   other state, municipality or territory), which provides that: "A GENERAL RELEASE

8   DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW

9   OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF

10   EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST

11   HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE

12   DEBTOR."

13         i.     Released Parties.

14         As used in this Agreement, the term "Released Parties" shall mean

15   Yahoo!, (defined in Paragraph 19 as Yahoo, Inc.!, Yahoo! Search Marketing,

16   Overture Services, Inc., and GoTo.com, Inc.) and their past or present directors,

17   officers, employees, partners, principals, agents, predecessors, successors, parents,

18   affiliated and sister corporations, subsidiaries, licensees, divisions, and related or

19   affiliated entities, and the Yahoo! Ad Partners.

20         ii.    Released Claims.

21         As used in this Agreement, the term "Released Claims" shall mean any

22   and all claims or causes of action of any nature whatsoever through and including

23   July 31, 2006, regardless of legal theory and the type of relief or damages claimed,

24   including but not limited to any claim for violations of federal, state, or other law

25   (whether in contract, tort, or otherwise, including statutory, common law, property,

26   and equitable claims), and also including "Unknown Claims" (as defined below in

27   subparagraph (iii)), that have been or could have been asserted against the Released

28

1  Parties in the Action, and the Released Parties in the Lane's Gifts Action, and any

2  other complaint, action, or litigation in any other court or forum based upon or in

3  any way relating to, referring to or arising out of the charging or overcharging for

4  Challenged Clicks, and further includes:

5          (a)    Any such claim for breach or violation of, or for benefits

6  conferred by, any federal, state, common or other law or statute, regulation or

7  ordinance, including without limitation those concerning consumer or other

8  transactions, unfair or deceptive business practices, false advertising, unfair

9  competition, violation of consumer protection law, consumer legal remedies, or

10  private attorney general;

11          (b)    Any such claim for breach of any duty imposed by law, by

12  contract or otherwise, including without limitation breach of contract, constructive

13  trust, restitution, or unjust enrichment;

14          (c)    Any such claim based on principles of tort law, consumer

15  protection, or other kind of liability including without limitation negligence, fraud or

16  consumer fraud, negligent or intentional misrepresentation, conversion, or other

17  direct or derivative liability;

18          (d)    Any such claim for declaratory or injunctive relief,

19  restitution or disgorgement, or other equitable relief;

20          (e)    Any such claim for penalties, punitive damages, exemplary

21  damages, or any other claim for damages based on a multiplication of compensatory

22  damages; and

23          (f)    All claims, causes of action, demands, rights, liabilities,

24  debts, defenses, liens, obligations, suits, appeals, sums of money, accounts,

25  reckonings, covenants, contracts, controversies, attorneys' fees and costs, expenses,

26  losses, damages, judgments, orders, promises whatsoever, whenever arising, known

27  and unknown, suspected or unsuspected, contingent or fixed, liquidated or un-

28

1   liquidated, matured or un-matured, whether sounding in law, equity, bankruptcy,

2   tort, contract, any state unfair competition or consumer protection law, or any other

3   law of any state or jurisdiction, and whether for economic damages, non-economic

4   damages, restitution, penalties, or any other relief, which the Class Members or their

5   heirs, predecessors, successors, assigns, present and former partners, subsidiaries,

6   related entities, affiliated and sister corporations, divisions, officers, owners,

7   directors, shareholders, employers, employees, representatives and agents ever had,

8   now have, or hereafter can, shall or may have against Yahoo! or the Yahoo! Ad

9   Partners, which incorporate, refer to, relate to or arise out of the Challenged Clicks

10  which existed or accrued at any time through and including July 31, 2006, including

11  without limitation all the claims, demands, rights, liabilities, or causes of action

12  described above.

13      iii.    Unknown Claims.

14          As used in this Agreement, the term "Unknown Claims" means any and

15  all Released Claims that any Class Member does not know or even suspect to exist

16  against any of the Released Parties which, if known, might have affected his, her or

17  its decision regarding the settlement of the Action. The Class Members shall further

18  acknowledge that he, she, or it may hereafter discover facts in addition to or

19  different from those that he, she, or it now know or believe to be true concerning the

20  subject matter of this release, but nevertheless fully, finally, and forever settle and

21  release any and all Released Claims, known or unknown, suspected or unsuspected,

22  contingent or non-contingent, which now exist, may hereafter exist, or heretofore

23  have existed based upon actions, conduct, events or transactions occurring on or

24  before the date of this Agreement, without regard to subsequent discovery or

25  existence of such different or additional facts concerning each of the Released

26  Parties.

27

28

iv.   Retained Claims by Yahoo!.

The Parties specifically understand and agree that Yahoo! does not release and in fact retains any claim(s) it may have against any Class Member, including but not limited to claims arising from unpaid amounts or charges due Yahoo!. However, Yahoo! may not deny or reduce the Credit (as defined below) owed to any Class Member under this Agreement by virtue of the existence of any alleged claim by Yahoo! against that Class Member.

31.   The Class Members agree not to sue or otherwise make a claim against Yahoo! or any of the Yahoo! Ad Partners that is in any way related to the Released Claims.

## X.

## SETTLEMENT TERMS

32.   In exchange for the release of claims described above, Yahoo agrees as follows:

i.   Within ninety (90) calendar days of the Effective Date, Yahoo! shall launch a traffic quality center, which will be available to its advertisers (the "Traffic Quality Center"). The Traffic Quality Center will include a resource center which will contain FAQs, best practices documents, traffic quality articles, enforcement guidelines, and an advice column;

ii.   Within ninety (90) calendar days of the Effective Date, Yahoo! shall designate a Yahoo! employee as a Yahoo! traffic quality advocate who will be part of a traffic quality group to fulfill the function of fielding advertisers' concerns regarding traffic quality, including Yahoo!'s click fraud prevention efforts;

iii.   Within ninety (90) calendar days of the Effective Date, Yahoo! shall start a program in which it chooses at least three advertisers per year who have registered complaints regarding traffic quality issues to be invited by Yahoo! to obtain special access to the traffic quality team and additional information with respect to

1  Yahoo!'s click protection system, subject to the advertisers' execution of

2  nondisclosure agreements. Yahoo! shall permit the advertisers to provide feedback to

3  members of Yahoo!'s traffic quality team regarding the effectiveness of Yahoo!'s

4  click fraud prevention efforts.

5        iv.    Yahoo! shall work with third parties in an effort to develop

6  industry-wide standards that define click fraud, set forth standards with respect to the

7  detection of click fraud and provide the public with periodic general evaluations

8  regarding the effectiveness of providers' efforts to filter and prevent the charging of

9  click fraud to customers.

10        v.    While Yahoo! asserts that its click protection system has filtered

11  clicks in a total amount which exceeds a reasonable estimate with respect to the

12  quantity of clicks which are Challenged Clicks, and Class Representative recognizes

13  that Yahoo! has engaged in substantial efforts in that regard, the parties recognize that

14  there may be instances in the past with respect to which particular Class Members

15  believe that they have been improperly charged for particular clicks. Accordingly, as

16  part of Yahoo!'s commitment to its advertisers, Yahoo! has agreed to create an

17  additional click fraud review process as part of this Agreement. Pursuant to this

18  Agreement, Yahoo! will temporarily lift its contractual provision limiting claims of

19  overcharging to clicks received within the prior sixty (60) calendar days to allow

20  Class Members to make click fraud claims for the period from January 1, 2004 to July

21  31, 2006, as follows;

22        (a)    Any Class Member that wishes to participate in the

23  additional click fraud review process will have to complete the Assertion of Right to

24  Participate in Additional Claims Review Process form (hereinafter, "Assertion of

25  Right to Participate") (Exhibit C) by accessing the web site maintained by the Claims

26  administrator, printing out the form, and completing it by: 1) checking the box that

27  indicates the Class Member's desire to participate in the additional click fraud review

28

1 process; 2) filling in the Class Member's name, address and telephone number; and 3)

2 mailing, by registered or certified mail to the Claims Administrator on or before

3 November 20, 2006.

4         (b)    If a Class Member does not mail to the Claims

5 Administrator a completed Assertion of Right to Participate with a postmark on or

6 before November 20, 2006, such Class Member shall be barred from filing a Claim

7 Form and is further barred from making any further claim against the Released Parties

8 for the Class Period.;

9         (c)    Within twenty (20) calendar days following the Effective

10 Date, the Claims Administrator shall mail a Claim Form to each Class Member who

11 mailed a timely and complete Assertion of Right to Participate. The Claim Form must

12 be completed in its entirety, signed under penalty of perjury and must be returned by

13 registered or certified mail to the Claims Administrator, and must be postmarked on or

14 before sixty-five (65) calendar days from the date, as shown on the postmark of such

15 mailing, that the Claims Administrator mailed the Claim Form to the Class Member.

16 For the purposes of this Agreement, a Claim Form is considered "valid" only if the

17 Class Member has filled out the required portions of the Claim Form in their entirety,

18 dated the Claim Form, signed the Claim Form under penalty of perjury, and the

19 information provided by the Class Member matches Yahoo!'s records for that Class

20 Member.

21         (d)    If the Claims Administrator does not receive the Claim Form

22 from the Class Member within the time period set forth above, the Class Member is

23 barred from making any further claims against the Released Parties for the Class

24 Period.

25         (e)    If the Claims Administrator receives a timely Claim Form,

26 but it is incomplete, the Claims Administrator shall notify the Class Member within a

27 reasonable period of time and allow the Class Member an additional fifteen (15)

28

1  calendar days from the date of mailing by the Claims Administrator, as shown on the
2  postmark of such mailing, to fully and correctly complete the Claim Form. The
3  corrected Claim Form must be returned by registered or certified mail to the Claims
4  Administrator at the address specified in Exhibit D, and must be postmarked on or
5  before fifteen (15) calendar days from the date, as shown on the postmark of such
6  mailing, that the Claims Administrator mailed the notice that the Claim Form
7  submitted by the Class Member was incomplete.

8         (f)    If the Claims Administrator does not receive the corrected
9  Claim Form with the time period set forth above, the Class Member is barred from
10  making any further claims against the Released Parties for the Class Period.

11         (g)    Within a reasonable period of time following the receipt of a
12  fully completed and valid Claim Form from the Claims Administrator, Yahoo! shall
13  conduct an investigation of the click fraud claim which may include running the
14  historic click data information for the specified period of alleged click fraud through
15  Yahoo!'s click fraud filters as of July 31, 2006 ("Yahoo's Investigation").

16         (h)    If Yahoo!'s Investigation determines that any credits are due
17  to the Class Member, Yahoo! will grant the Class Member a 100% credit for any such
18  clicks that the Class Member was charged for and that were not previously refunded
19  or credited by Yahoo! (the "Credit"). The Credit shall be issued in the form of
20  monetary credits into the Class Members' active account; shall be used in the same
21  manner as any other credits that the Class Member might have when paying (as
22  required under the Yahoo! contracts) for future advertising with Yahoo!; and will be
23  treated as any other unrestricted credit in an advertiser's account. Yahoo! shall send a
24  Notice of Accepted Claim form to the Class Member, stating the amount of the Credit
25  and the conditions for the Credit's use. If the Class Member has not been an
26  advertiser for more than two years prior to the date of the Notice of Accepted Claim,
27  Yahoo! shall issue the Class Member a refund.

28

1          (i)    Yahoo! will send a Notice of Denied Claim form to any
2    Class Member who submits a Claim Form that was not timely and/or not valid and/or
3    did not demonstrate entitlement to a Credit stating the reason(s) that the claim was
4    denied. Although Class Members who do not demonstrate entitlement to a Credit and
5    who do not submit a valid and timely Claim Form shall not receive a Credit, such
6    Persons shall nonetheless be Class Members and will be bound by all the terms of this
7    Agreement and any Final Judgment entered in this Action if the settlement is
8    approved by the Court.

9          (j)    If a claim as set forth in the Claim Form is denied because
10   Yahoo! contends that the Class Member did not demonstrate entitlement to a Credit,
11   that Class Member may have the denial reviewed by the Honorable Judge Gary L.
12   Taylor, who shall be appointed by the Court as a Special Master. In the event that
13   Judge Taylor is unable or unwilling to act as a Special Master, Class Counsel and
14   Yahoo!'s Counsel shall work together in good faith to agree to another person who
15   will act as a Special Master. In the event that Class Counsel and Yahoo!'s Counsel
16   are unable to agree on such person, the Court shall appoint a Special Master.

17         (k)    In order for a Class Member to obtain an independent
18   review of Yahoo!'s denial of its claim, the Class Member must, within fifteen (15)
19   calendar days of the date as shown on the postmark of such mailing that Yahoo!
20   mailed the Notice of Denied Claim, send by registered or certified mail to the Claims
21   Administrator a completed written request for review (hereinafter "Written Review
22   Request"), which will be sent to the Class Member along with the Notice of Denied
23   Claim. If the Claims Administrator does not receive the Written Review Request
24   from the Class Member within the time period set forth above, the Class Member is
25   barred from making any further claims against the Released Parties for the Class
26   Period. If the Claims Administrator receives a timely and complete Written Review
27   Request from a Class Member, it shall forward, within a reasonable period of time, the
28

1   Written Review Request and notify Yahoo! to forward documents related to Yahoo!'s

2   review of the Class Member's Claim Form to Judge Taylor for his review (the

3   "Review Materials"). Judge Taylor shall conduct an independent review, limited

4   solely to the Review Materials, to ensure that Yahoo! followed adequate processes

5   and procedures in analyzing the Class Member's claim as set forth in the Claim Form,

6   but he shall not make any independent determination whether any particular claim is

7   valid or whether any particular click is click fraud. There shall be no discovery

8   conducted under this Agreement or with respect to this review by Judge Taylor, nor

9   shall the Class Member be allowed to talk to or otherwise communicate with Judge

10   Taylor. Judge Taylor's decision with respect to any such review shall be final and

11   binding and neither Yahoo! nor the Class Member shall have any right of appeal from

12   Judge Taylor's determination nor any right to contest such determination. Judge

13   Taylor shall provide Yahoo! with the written results of the review he conducted in

14   response to the Class Member's Written Review Request (the "Written Results").

15   Yahoo! shall, within a reasonable period of time, provide the Class Members with a

16   copy of the Written Results either by U.S. mail or e-mail, at Yahoo!'s election. If

17   Judge Taylor finds that Yahoo! did not follow adequate processes and procedures in

18   analyzing the Class Member's claim as set forth in the Claim Form, Yahoo! shall re-

19   review the Class Member's Claim Form and shall adhere to adequate processes and

20   procedures.

21           (l)     For purposes of the foregoing provisions, the date of the

22   postmark on the return mailing envelope shall be the exclusive means used to

23   determine whether the particular document has been timely submitted. In the event

24   that the postmark is illegible, the document shall be deemed untimely unless it is

25   received on or before five business days following the date by which the document

26   must be postmarked.

27

28

1         vi.    Yahoo! will pay to Class Counsel reasonable attorneys' fees and

2  expenses to compensate such attorneys for their services to the Class in this Action

3  and to reimburse such attorneys for the costs and expenses in prosecuting this Action

4  and this settlement in the amount of four million nine hundred and fifty thousand

5  dollars ($4,950,000.00) plus costs to be proven by Class Counsel in an amount not to

6  exceed twenty-five thousand dollars ($25,000.00), (the "Fees Award") within thirty

7  (30) business days after the entry of Final Judgment by the Court into an interest

8  bearing account until the Effective Date. Within thirty (30) business days after the

9  Effective Date, Yahoo! shall transfer the Fees Award plus all accrued interest by wire

10  transfer to the trust account of Kabateck Brown Kellner LLP, who shall distribute the

11  Fees Award plus all accrued interest between Class Counsel as Class Counsel shall

12  mutually agree among themselves. Payment of the Fees Award to Class Counsel in

13  the Action shall constitute full satisfaction of Yahoo!'s obligation to pay any amounts

14  to any Person, attorney or law firm for attorneys' fees, or cost and expenses incurred

15  therefor in the Action on behalf of Class Representative and the Class, and shall

16  relieve Yahoo!, the Yahoo! Ad Partners, the Released Parties, and Yahoo!'s Counsel,

17  of any other claims or liability to any Person, attorney or law firm for any attorneys'

18  fees, expenses and/or costs to which any of them may claim to be entitled with respect

19  to the Action, including for representation of Class Representatives and the Class.

20  Transfer of the Fees Award and accrued interest shall release Yahoo!, the Yahoo! Ad

21  Partners and the Released Parties for attorneys' fees, costs or expenses resulting from

22  this Action.

## XI.

## NOTICE/APPROVAL OF SETTLEMENT & SETTLEMENT
## IMPLEMENTATION

26     33.    As part of this Agreement, the Parties agree to the following procedures

27  for obtaining preliminary Court approval of the settlement, certifying a Class,

28

1  notifying the Class, obtaining final Court approval of the settlement and processing
2  the settlement payments.

3      34.    Preliminary Settlement Hearing: The Court will hear the Parties' request
4  for a preliminary approval of the settlement embodied in this Agreement on such date
5  and time agreeable to the Parties and/or which the Court may order. In conjunction
6  with this hearing, Class Counsel will submit this Agreement, which sets forth the
7  terms of this settlement, and will include proposed forms of all notices and other
8  documents as attached hereto necessary to implement the settlement embodied in this
9  Agreement.

10     35.    Certification of Class: Simultaneous with the filing of the Stipulation of
11  Settlement, and solely for purposes of this Agreement, Class Counsel will request the
12  Court to enter the Preliminary Approval of Stipulation of Settlement and Approval of
13  Notice of Pendency of Settlement of Class Action to Class Members ("Preliminary
14  Approval Order"), preliminarily approving the proposed settlement, conditionally
15  certifying the Class and the Class Period for settlement purposes only, and setting a
16  date for a Final Approval Hearing to determine final approval of the settlement. The
17  Order shall provide for notice of the settlement and related matters to be sent to the
18  Class as specified herein.

19     36.    Claims Administrator and Notice to Class: A Claims Administrator
20  appointed by the Court shall be responsible for preparing and sending via both U.S.
21  mail and electronic mail ("email") the Notice of Pendency of Class Action, Proposed
22  Settlement and Proposed Hearing Date for Court Approval (hereinafter "Notice")
23  (Exhibit D); keeping records of Class Members who opt out of the settlement; and
24  such other tasks as the Parties mutually agree that the Claims Administrator should
25  perform. Any claim or demand by Class Members against Yahoo! or the Claims
26  Administrator arising out of or in connection with its or their performance of these
27  responsibilities shall be limited to seeking, as the sole and exclusive remedy, the
28

1    specific performance of these responsibilities.  No later than fifty (50) calendar days

2    after entry by the Court of the Preliminary Approval Order, the Claims Administrator

3    shall send a copy of the Notice to all Class Persons via U.S. Mail and email

4    ("Electronic Notice") using the addresses and email addresses in Yahoo!'s electronic

5    records that the Class Person supplied to Yahoo! in connection with the Yahoo! Ads.

6    The date on which the Claims Administrator first sends the Notice is referred to herein

7    as the "Notice Date."  No skip trace or re-mailing of returned mail shall be required.

8    Any mailed Notices returned to the Claims Administrator as non-delivered before the

9    Objection/Exclusion Deadline Date specified below shall be sent to the forwarding

10   address described therein, if any.  In the event the procedures in this paragraph are

11   followed and the intended recipient still does not receive the Notice, the intended

12   recipient shall be deemed a Class Member, but, absent the submission of a timely and

13   valid Claim Form, shall not be eligible to receive a Credit.   In addition, the Claims

14   Administrator shall maintain a web site, which shall provide Class Members with

15   current information regarding the status of the approval process and a downloadable

16   copy of the Notice.

17        37.  _Procedure for Objecting to Class Action Settlement_: Only Class Members

18   may object to the settlement as embodied in this Agreement. Class Members who

19   wish to object to the settlement must file with the Court and serve on counsel for the

20   Parties a written statement objecting to the settlement. Such written statement must be

21   filed with the Court and served on counsel for the Parties no later than sixty (60)

22   calendar days after the Notice Date (the "Objection/Exclusion Deadline Date"). No

23   Class Member shall be entitled to be heard at the Final Approval Hearing (defined

24   below) (whether individually or through separate counsel) unless written notice of the

25   Class Member's intention to appear at the Final Approval Hearing shall have been

26   filed with the Court and served on counsel for the Parties on or before the

27   Objection/Exclusion Deadline Date.   Any objection must contain (a) a heading which

28

1  refers to the Action; (b) the objector's name, address, telephone number, and Yahoo!

2  account number(s); (c) a statement whether the objector intends to appear at the Final

3  Approval Hearing, either in person or through counsel, and, if through counsel,

4  identifying counsel by name, address, and phone number; and (d) a statement of the

5  grounds supporting the claim. The date of the postmark on the return mailing

6  envelope shall be the exclusive means used to determine whether an objection and/or

7  intention to appear has been timely submitted. In the event that the postmark is

8  illegible, the objection and/or intention to appear shall be deemed untimely unless it is

9  received within five (5) calendar days of the Objection/Exclusion Deadline Date.

10  Class Members who fail to file and serve timely written objections in the manner

11  specified above shall be deemed to have waived any objections and shall be forever

12  barred from making any objection to the Agreement and the proposed settlement by

13  appearing at the Final Approval Hearing, appeal, collateral attack, or otherwise.

14       38.    Procedure for Requesting Exclusion from the Class: Class Persons who

15  wish to exclude themselves from the Class must submit a written statement requesting

16  exclusion from the Class on or before the Objection/Exclusion Deadline Date

17  ("Request for Exclusion") Such Request for Exclusion must be personally executed

18  by the Class Person, contain the full name, address, telephone number, and account

19  number(s) of the Class Person requesting exclusion and the date(s) of the advertising

20  campaign with Yahoo!, must be returned by registered or certified mail to the Claims

21  Administrator at the address specified in Exhibit D, and must be postmarked on or

22  before the Objection/Exclusion Deadline Date. The date of the postmark on the return

23  mailing envelope shall be the exclusive means used to determine whether a Request

24  for Exclusion has been timely submitted. In the event that the postmark is illegible,

25  the Request for Exclusion shall be deemed untimely unless it is received within five

26  (5) calendar days of the Objection/Exclusion Deadline Date. Any Class Person who

27  properly opts out will not be bound by the settlement and shall not have any right to

28

1  object, appeal or comment thereon or to appear at the Final Approval Hearing. Class

2  Persons who fail to submit a valid and timely Request for Exclusion on or before the

3  Objection/Exclusion Deadline Date shall be bound by all terms of the settlement

4  embodied in this Agreement and any Final Judgment entered in this Action if the

5  settlement embodied in this Agreement is approved by the Court.

6      39.   No Solicitation of Settlement Objections or Exclusions: The Parties agree

7  to use their best efforts to carry out the terms of this Agreement. At no time shall any

8  of the Parties or their counsel seek to solicit or otherwise encourage Class Members to

9  submit written objections to the settlement or Class Persons to request exclusion from

10  the settlement, or encourage Class Persons to appeal from the Court's Final Judgment.

11  Class counsel agree not to initiate unsolicited contact with any Class Person that is not

12  a Class Representative or under a fee arrangement with Class Counsel regarding

13  Yahoo! unless and until Class Counsel are first contacted by that individual Class

14  Person.

15      40.   Final Settlement Approval Hearing and Entry of Final Judgment: Upon

16  expiration of the Objection/Exclusion Deadline Date, with the Court's permission, a

17  Final Approval Hearing shall be conducted to determine final approval of the

18  settlement. Upon final approval of the settlement by the Court at or after the Final

19  Approval Hearing, the Parties shall present a Final Judgment to the Court for its

20  approval and entry.

21      41.   Administration Costs: The Parties agree to cooperate in the settlement

22  administration process and to make all reasonable efforts to control and minimize the

23  costs and expenses incurred in the administration of the settlement. Yahoo! shall pay

24  any costs of settlement administration.  Class Counsel shall be provided with

25  reasonable access to claims information upon reasonable notice.

26      42.   Nullification of Settlement Agreement: In the event: (i) the Court does

27  not enter the Preliminary Approval Order specified herein, or one that is materially the

28

1   same; (ii) the Court does not finally approve the settlement as provided herein; (iii) the

2   Court does not enter a Final Judgment as provided herein which becomes final as a

3   result of the occurrence of the Effective Date; or (iv) Class Persons whose total

4   payments to Yahoo! for Yahoo! Ads comprise more than five percent (5%) of

5   Yahoo!'s revenues from Yahoo! Ads during the Class Period opt out of the settlement

6   and Yahoo! gives written notice within thirty (30) calendar days after receiving notice

7   that the specified percentage of timely and valid Requests for Exclusion have been

8   submitted to Class Counsel and the Court that it is terminating this Agreement for that

9   reason, then this Agreement shall be null and void and any order or judgment entered

10  by the Court in furtherance of this settlement shall be treated as withdrawn by

11  stipulation of the parties. In such a case, the Parties shall be returned to their

12  respective statuses as of the date and time immediately prior to the execution of this

13  Agreement, and the Parties shall proceed in all respects as if this Agreement had not

14  been executed. In the event an appeal is filed from the Court's Final Judgment, or any

15  other appellate review is sought prior to the Effective Date, administration of the

16  settlement shall be stayed pending final resolution of the appeal or other appellate

17  review.

18      43.   Notices: Unless otherwise specifically provided herein, all notices,

19  demands, or other communications given hereunder shall be in writing and shall be

20  deemed to have been duly given as of the third business day after mailing by United

21  States registered or certified mail, return receipt requested, addressed as follows:

22      Class Counsel

23      Brian S. Kabateck, Esq.
        Richard L. Kellner, Esq.
24      Kabateck Brown Kellner LLP
25      350 South Grand Avenue, 39th Floor
        Los Angeles, California 90071
26

27      Gregory E. Keller, Esq.
        Darren T. Kaplan, Esq.
28

1    Chitwood Harley Harnes LLP
2    2300 Promenade II
     1230 Peachtree Street, N.E.
3    Atlanta, Georgia 30309

4    <u>Defendant's Counsel</u>
5

6    Larry W. McFarland, Esq.
     Dennis L. Wilson, Esq.
7    Keats McFarland & Wilson LLP
     9720 Wilshire Boulevard
8    Penthouse Suite
9    Beverly Hills, CA 90212

## XII.

## <u>PRIVACY OF DOCUMENTS AND INFORMATION</u>

44.     Within thirty (30) calendar days of the filing of the Final Judgment, Class Representative and Class Counsel agree that they will return to Yahoo! all documents and information provided to them by Yahoo!, or shall provide a declaration that the documents have been destroyed, and that none of the documents and information provided to them by Yahoo! shall be used for any purpose.

## XIII.

## <u>EXHIBITS AND HEADINGS</u>

45.     The terms of this Agreement include the terms set forth in the attached Exhibits and are incorporated by this reference as though fully set forth herein. Any Exhibits to this Agreement are an integral part of the settlement. The descriptive headings of any paragraphs or sections of this Agreement are inserted for convenience of reference only and do not constitute a part of this Agreement.

## XIV.

## <u>MATERIALITY</u>

46.     The Parties have negotiated all of the terms and conditions of this Agreement at arms-length. All terms, conditions, and exhibits in their exact form are

1  material and necessary to this Agreement and have been relied upon by the Parties in

2  entering into this Agreement.

3  ## XV.

4  ## INTERIM STAY OF PROCEEDINGS

5      47.    The Parties agree to hold all proceedings in the Action between Yahoo!

6  and the Class Representative, except such proceedings necessary to implement and

7  complete the settlement, in abeyance pending the entry of Final Judgment.

8  ## XVI.

9  ## AMENDMENT OR MODIFICATION

10      48.    This Agreement may be amended or modified only by a written

11  instrument signed by counsel for all Parties or their successors-in-interest.

12  ## XVII.

13  ## ENTIRE AGREEMENT

14      49.    This Agreement and any attached Exhibits constitute the entire

15  agreement among the Parties, and no oral or written representations, warranties or

16  inducements have been made to any Party concerning this Agreement or its Exhibits

17  other than the representations, warranties and covenants contained and memorialized

18  in such documents. Yahoo! shall not be required as part of the settlement embodied in

19  this Agreement to modify or eliminate any of its practices other than as set forth

20  herein. Further, the Parties acknowledge that during the negotiation of this

21  Agreement, the Parties circulated various drafts of the Agreement containing various

22  revisions, including drafts that added and deleted certain language, terms and

23  conditions. The Parties specifically agree that should a dispute arise under this

24  Agreement requiring the interpretation of the same, the Parties shall not refer to the

25  various drafts of the Agreement and its revisions. Rather, the interpretation of this

26  Agreement shall be based only on the final language, terms and conditions set forth

27  herein.

28

## XVIII.

## AUTHORIZATION TO ENTER INTO SETTLEMENT AGREEMENT

50.     The Parties warrant and represent they are authorized to take all appropriate action required or permitted to be taken by such Parties pursuant to this Agreement, to effectuate its terms, and to execute any other documents required to effectuate the terms of this Agreement. The Parties and their counsel will cooperate with each other and use their best efforts to effect the implementation of the settlement. In the event the Parties are unable to reach agreement on the form or content of any document needed to implement the settlement, or on any supplemental provisions that may become necessary to effectuate the terms of the settlement embodied in this Agreement, the Parties may seek the assistance of the Court to resolve such disagreement.

## XIX.

## JURISDICTION OF THE COURT

51.     The Court shall retain continuing and exclusive jurisdiction over the Parties to this Agreement, including all Class Members, and over the interpretation, implementation, administration and enforcement of this Agreement.  In the event of a breach of this Agreement by a Class Member, by Checkmate, or by Yahoo!, the Court may exercise all equitable powers over the breaching party or parties to enforce this Agreement and the Final Judgment without regard to the availability or adequacy of any remedy at law.  Such powers include without limitation the powers of specific performance, contempt, and injunctive relief.

## XX.

## COOPERATION AND DRAFTING

52.     Each of the Parties has cooperated in the drafting and preparation of this Agreement. Hence, this Agreement shall not be construed against any of the Parties.

## XXI.

### INVALIDITY OF ANY PROVISION

53.    Before declaring any provision of this Agreement invalid, the Court shall first attempt to construe all provisions valid to the fullest extent possible consistent with applicable precedents.

## XXII

### PLAINTIFF'S WAIVER OF RIGHT TO BE EXCLUDED AND OBJECT

54.    Checkmate agrees to sign this Agreement and by signing this Agreement is bound by the terms herein stated, and further agrees not to request to be excluded from the settlement and agrees not to object to any of the terms of this Agreement.  Any such request for exclusion or objection shall therefore be void and of no force or effect.

## XXIII.

### EXTENSIONS

55.    The Settling Parties may agree upon a reasonable extension of time for deadlines and dates reflected in this Agreement, without further notice (subject to Court approval as to Court dates).

## XXIV.

### COMPROMISE

56.    This Agreement and the settlement it evidences is made in compromise of disputed claims.  Because this is a class action, this Agreement must receive preliminary and final approval by the Court.  Accordingly, Checkmate and Yahoo! enter into this Agreement on a conditional basis.  In the event that the Court does not execute and file the Final Judgment, or in the event that such Final Judgment does not become final for any reason, or is modified in any material respect, or in the event that the Effective Date, as defined herein, does not occur, this Agreement shall be deemed

1  null and void *ab initio* and shall be of no force or effect whatsoever, and shall not be

2  referred to or utilized for any purpose whatsoever.

3  ### XXV.

4  ### CALCULATIONS

5     57.   It is understood and agreed by the Parties that the process for Class

6  Members to potentially obtain a Credit and the procedures for effectuating this

7  Settlement are subject to approval by the Court. If the Court requires Yahoo! to pay

8  Credits other than as set forth in Paragraph 32; diminishes the releases to be obtained

9  by Yahoo!; or requires any other changes in the Agreement that are materially

10  detrimental to Yahoo!, the Agreement shall be voidable by Yahoo!, by written notice

11  to at least one of the attorneys who are Class Counsel served in a manner authorized

12  by Cal. Code of Civil Procedure section 1013, no later than fifteen (15) calendar days

13  after Yahoo! receives notice of entry of any such order.

14  Execution by Parties:

15  ### XXVI.

16  ### COUNTERPARTS

17     58.   This Agreement may be executed in one or more counterparts. All

18  executed counterparts and each of them shall be deemed to be one and the same

19  instrument provided that counsel for the Parties to this Agreement shall exchange

20  among themselves original signed counterparts. Facsimile signatures will be accepted

21  if the original signature is provided within seven (7) calendar days. Any executed

22  counterpart shall be admissible in evidence to prove the existence and contents of this

23  Agreement.

24  ///

25  ///

26  ///

27

28

## XXVII.

### BINDING ON SUCCESSORS AND ASSIGNS

59.    This Agreement shall be binding upon, and inure to the benefit of, the successors or assigns of the Parties hereto, as previously defined.

## XXVIII.

### CALIFORNIA LAW GOVERNS

60.    All terms of this Agreement and the Exhibits hereto shall be governed by and interpreted according to the laws of the State of California. Any action pertaining to the Parties or this Agreement shall be commenced and adjudicated by the federal district court in and for the Central District of California, or, if for any reason, federal jurisdiction is not extant, by the Superior Court in and for the County of Los Angeles.

Dated: _____

_____
                      on behalf of
Checkmate Strategic Group, Inc.

Dated: _____

_____
Jeffrey Weiner on behalf of
Yahoo!, Inc.

1

2                                XXVII.

3                 BINDING ON SUCCESSORS AND ASSIGNS

4        59.    This Agreement shall be binding upon, and inure to the benefit of, the

5   successors or assigns of the Parties hereto, as previously defined.

6                                XXVIII.

7                      CALIFORNIA LAW GOVERNS

8        60.    All terms of this Agreement and the Exhibits hereto shall be governed by

9   and interpreted according to the laws of the State of California. Any action pertaining

10  to the Parties or this Agreement shall be commenced and adjudicated by the federal

11  district court in and for the Central District of California, or, if for any reason, federal

12  jurisdiction is not extant, by the Superior Court in and for the County of Los Angeles.

13  Execution by the Parties:

14

15  Dated: _____

16

17                               _____

18                                              on behalf of
                                 Checkmate Strategic Group, Inc.
19

20  Dated: _6/26/06_____

21

22

23                               _____
                                 Jeffrey Weiner on behalf of
24                               Yahoo!, Inc.

25

26

27

28

                              Page - 30 - of 32

1

2

3    Approved as to form:

4

5    Dated: ___6/27/06___                    KEATS MCFARLAND & WILSON LLP

6

7                                            By _____
                                                Dennis L. Wilson
8

9                                            Larry W. McFarland
                                             Dennis Wilson
10                                           Emil W. Herich
                                             KEATS McFARLAND & WILSON LLP
11                                           9720 Wilshire Boulevard
                                             Penthouse Suite
12                                           Beverly Hills, California  90212

13

14                                           Attorneys for Defendant
                                             YAHOO!, INC.
15

16

17   Dated: ___6/27/66___                    KABATECK BROWN KELLNER LLP

18

19                                           By _____
                                                Brian S. Kabateck
20

21                                           Brian S. Kabateck
                                             Richard L. Kellner
22                                           KABATECK BROWN KELLNER LLP
                                             350 South Grand Avenue
23                                           39th Floor
                                             Los Angeles, CA  90071
24

25                                           Gregory E. Keller
                                             Darren T. Kaplan
26                                           CHITWOOD HARLEY HARNES LLP
                                             2300 Promenade II
27                                           1230 Peachtree Street, NE
                                             Atlanta, GA  10022
28

1

2  Shawn Khorrami
   LAW OFFICES OF SHAWN KHORRAMI
3  14450 Haynes Street, Third Floor
   Van Nuys, California  91411

4

5  Attorneys for Plaintiff
   CHECKMATE STRATEGIC GROUP, INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

## CLAIM FORM

**A. CLAIMANT IDENTIFICATION:**          **ADDRESS/CONTACT CHANGES:**

_____          _____
(Claimant)

_____          _____
(Address)

_____          _____
(City)          (State)          (Zip)

_____          _____
(Tel. No.)

_____          _____
(Email Address)

_____
(Yahoo! Account No(s).)

Please identify the contact person for this claim, if different from the claimant:

_____          _____
(Name)                                   (Tel. No.)

_____          _____
(Title/Relation to Claimant)             (Email Address)

     If you want to assert your right to additional review of your Yahoo! account, this Claim Form must be completed in its entirety and must be returned by registered or certified mail to the Claims Administrator at the address specified below and must be postmarked on or before sixty-five (65) calendar days from the date, as shown on the postmark of such mailing, that the Claims Administrator mailed this Claim Form to you, the Class Member.

Mail to:
xxxxxxxxxxxxxx
xxxxxxxxxxxxxx
xxxxxxxxxxxxxx

     If the Claims Administrator does not receive this Claim Form from you within the time period set forth above, you are barred from making any further claims against Yahoo!, Yahoo! Search Marketing, Overture Services, Inc., or GoTo.com, Inc. (collectively "Yahoo!") under this settlement.

## B. ACCOUNT INFORMATION

     This Claim Form is a filing with the Court and any false statements may lead to serious consequences, including, but not limited to criminal or civil prosecution.

     You must answer all of the questions below and provide all of the requested information with respect to each Yahoo! account. You may attach additional pages as necessary if you need more space. For the purpose of this Claim Form, Click Fraud is defined as "clicks made with bad

faith with the sole purpose of generating a charge to the advertiser with zero possibility of a legitimate site visit or transaction occurring." Please provide the following information:

1. Have you previously sought exclusion from or "opted-out" from this Class Action?

        □ YES        □ NO

2. Based on the definition of Click Fraud set forth above for the time period from January 1, 2004 through July 31, 2006 have you been charged by Yahoo! for clicks that constituted Click Fraud for any of the terms that you bid on?

        □ YES        □ NO

3. Have you ever engaged in or authorized another to engage in Click Fraud activity?

        □ YES        □ NO

(If you answer "yes," you will not be eligible to receive a Credit to your Yahoo! account.)

4. Have you previously contacted Yahoo! regarding suspected Click Fraud?

        □ YES        □ NO

5. If you answered yes to Question #4, please explain in detail your complaint and if any adjustment or credit was provided by Yahoo! to you or on your behalf.

_____

_____

_____

6. Please list the particular term(s) and the precise date(s) during which you claim that the term(s) received clicks that constituted Click Fraud.

_____

_____

_____

7. Please state all the facts with respect to each term and with respect to the listed date(s) that cause you to believe that such term(s) received clicks that constituted Click Fraud.

_____

_____

_____

8. For each term you have listed above, please identify the total dollar amount of your advertising spend that you believe was the result of receiving clicks that constituted Click Fraud.

_____

_____

_____

9. For each term listed above, please identify to the best of your knowledge, the source(s) of the clicks that you believe constituted Click Fraud.

_____

_____

_____

### C. SUBMISSION TO JURISDICTION OF COURT, AGREEMENT WITH SETTLEMENT, ETC.:

I have received and read the Notice of Pendency of Class Action, Proposed Settlement and Proposed Hearing Date for Court Approval. I submit this Claim Form under the terms of the proposed settlement described in the Notice of Pendency of Class Action, Proposed Settlement and Proposed Hearing Date for Court Approval. I also submit to the jurisdiction of the United States District Court for the Central District of California with respect to my claim as a Class Member and for purposes of enforcing the release of claims stated in the Stipulation and Settlement Agreement filed with the Court (the "Agreement"). The full and precise terms of the proposed settlement are contained in the Agreement. I agree to be bound by the Agreement and the release of claims contained therein. I further acknowledge that I am bound by the terms of any Final Judgment that may be entered in this class action. I agree to furnish additional information to support this claim if required to do so.

### D. VERIFICATION THAT NO CLAIMS HAVE BEEN ASSIGNED:

I verify that I have not assigned any claims against Yahoo! to anyone else.

### E. CERTIFICATION

I declare under penalty of perjury under the laws of the United States that the foregoing information is true and accurate and that I am authorized to act on behalf of the claimant for these account(s).

Executed this _____ day of _____, 2006, at _____, _____.
                            (Month)                          (City)             (State)

_____
(Signature of Claimant)

_____
(Printed Name)

**EXHIBIT B**

IN THE CIRCUIT COURT OF MILLER COUNTY, ARKANSAS

| | |
|---|---|
| LANE'S GIFTS AND COLLECTIBLES, L.L.C., U.S. CITIZENS FOR FAIR CREDIT CARD TERMS, INC., SAVINGS 4 MERCHANTS, INC., AND MAX CAULFIELD d/b/a CAULFIELD INVESTIGATIONS, INDIVIDUALLY AND AS CLASS REPRESENTATIVES ON BEHALF OF ALL SIMILARLY SITUATED PERSONS, | § § § § § § § § § § |
| *Plaintiffs,* | § § |
| Vs. | § CASE NO. CV-2005-52-1 |
| YAHOO! INC., OVERTURE SERVICES, INC., TIME WARNER INC., AMERICA ONLINE, INC., NETSCAPE COMMUNICATIONS CORPORATION, ASK JEEVES, INC., BUENA VISTA INTERNET GROUP D/B/A GO.COM, GOOGLE INC., LYCOS, INC., LOOKSMART, LTD., and FINDWHAT.COM, INC. | § § § § § § § § § § |
| *Defendants.* | § NATIONAL CLASS ACTION |

PLAINTIFFS' SECOND AMENDED CLASS COMPLAINT

COME NOW, Plaintiffs Lane's Gifts and Collectibles, L.L.C., U.S. Citizens for Fair

Credit Card Terms, Inc. Savings 4 Merchants, Inc. and Max Caulfield d/b/a Caulfield

Investigations, Individually and as Class Representatives on Behalf of All Similarly Situated

Persons, and submit the following First Amended Class Complaint against Yahoo! Inc., Overture

Services, Inc., Time Warner Inc., America Online, Inc., Netscape Communications Corporation,

Ask Jeeves, Inc., Buena Vista Internet Group d/b/a Go.com, Google Inc., Lycos, Inc.,

Looksmart, Ltd., and FindWhat.com, Inc. (hereinafter referred to as "Defendants").

PLAINTIFFS' SECOND AMENDED CLASS COMPLAINT  Page 1



## INTRODUCTION AND NATURE OF CASE

1.      Defendants are internet search engines and/or corporate entities providing web search capabilities and sell Pay Per Click (hereinafter referred to as "PPC") advertising.

2.      Defendants collected and or shared revenues for the PPC advertising charged to Plaintiffs.

3.      In 2004, PPC advertising revenues were approximately $4 billion dollars nationwide.

4.      Defendants charged and/or collected revenue for PPC advertising from Plaintiffs and Class which was not generated by actual consumer click through advertising.

5.      Accordingly, Plaintiffs and all other similarly situated persons and/or members of the Class were charged for services which were not provided by Defendants.

## PARTIES

6.      Plaintiff, Lane's Gifts and Collectibles, L.L.C. is an Arkansas Corporation.

7.      Plaintiff U.S. Citizens for Fair Credit Care Terms, Inc. is an Arkansas Corporation.

8.      Plaintiff Savings 4 Merchants, Inc. is a California Corporation.

9.      Plaintiff Max Caulfield d/b/a Caulfield Investigations is an individual d/b/a Caulfield Investigations and is a Florida resident.

10.     Defendant Yahoo! Inc. is a Delaware Corporation that has done business in the State of Arkansas in the past and has not appointed a registered agent for service in the State of Arkansas. Accordingly, service may be made by serving its Registered Agent for service of process at Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

11.     Defendant Overture Services, Inc. is a Delaware Corporation that has done business in the State of Arkansas in the past and has not appointed a registered agent for service in the State of Arkansas.  Accordingly, service may be made by serving its Registered Agent for service of

process at Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808.

12.    Defendant Time Warner, Inc. is a Delaware Corporation that has done business in the State of Arkansas in the past and has not appointed a registered agent for service in the State of Arkansas. Accordingly, service may be made by serving its Registered Agent for service of process at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

13.    Defendant America Online, Inc. is a Delaware Corporation that has done business in the State of Arkansas in the past and has not appointed a registered agent for service in the State of Arkansas. Accordingly, service may be made by serving its Registered Agent for service of process at The Prentice-Hall Corporation System, Inc., 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808.

14.    Defendant Netscape Communications Corporation is a Delaware Corporation that has done business in the State of Arkansas in the past and has not appointed a registered agent for service in the State of Arkansas. Accordingly, service may be made by serving its Registered Agent for service of process at Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808.

15.    Defendant Ask Jeeves, Inc. is a Delaware Corporation that has done business in the State of Arkansas in the past and has not appointed a registered agent for service in the State of Arkansas. Accordingly, service may be made by serving its Registered Agent for service of process at National Registered Agents, Inc., 9 East Loockerman Street, Suite 1B, Dover, Delaware, 19901.

16.    Defendant Buena Vista Internet Group d/b/a Go.com is a California Corporation that has done business in the State of Arkansas in the past and has not appointed a registered agent for service in the State of Arkansas. Accordingly, service may be made by serving its Registered

PLAINTIFFS' SECOND AMENDED CLASS COMPLAINT    Page 3

Agent for service of process at Marsha L. Reed, 500 S. Buena Vista Street, Burbank, California 91521.

17.    Defendant Google Inc. is a Delaware Corporation that has done business in the State of Arkansas in the past and has not appointed a registered agent for service in the State of Arkansas. Accordingly, service may be made by serving its Registered Agent for service of process at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

18.    Defendant Lycos, Inc. is a Delaware Corporation that has done business in the State of Arkansas in the past and has not appointed a registered agent for service in the State of Arkansas. Accordingly, service may be made by serving its Registered Agent for service of process at The Prentice-Hall Corporation System, Inc., 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808.

19.    Defendant Looksmart, Ltd. is a Delaware Corporation that has done business in the State of Arkansas in the past and has not appointed a registered agent for service in the State of Arkansas. Accordingly, service may be made by serving its Registered Agent for service of process at Corporate Agents, Inc., 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808.

20.    Defendant FindWhat.com, Inc. is a Delaware Corporation that has done business in the State of Arkansas in the past and has not appointed a registered agent for service in the State of Arkansas. Accordingly, service may be made by serving its Registered Agent for service of process at Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808.

## JURISDICTION AND VENUE

21.    This is a Class Action lawsuit seeking monetary damages and equitable relief pursuant to Arkansas Rule of Civil Procedure 23. Plaintiffs file this lawsuit for the purpose of certifying a nationwide class of Plaintiffs pursuant to A.R.C.P. 23.

22.    This Court has personal jurisdiction over Defendants by virtue of the extensive amount of business each Defendant regularly conducts within the State of Arkansas and, further, because of the specific conduct at issue relating to Plaintiff and the Class. Defendants are amenable to service under the Arkansas long-arm statute and the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.

23.    Plaintiff Lane's Gifts and Collectibles, L.L.C., the proposed Class Representative, is a citizen of Arkansas and resident of Miller County. Venue is proper in Miller County, Arkansas, pursuant to Ark. Code Ann. Section 16-55-213(b) as Miller County is the residence of this properly joined named Class Representative.

24.    Plaintiff Savings 4 Merchants, Inc. is a California Corporation. Defendant Buena Vista is a California Corporation. In addition, Defendants Yahoo! Inc., Overture Services, Inc., Netscape Communications Corporation, Ask Jeeves, Inc., Google Inc., and Looksmart, Ltd. have their principal place of business in California. As a result, one or more Defendants are California residents. Further, Max Caulfield d/b/a Caulfield Investigations, an individual d/b/a Caulfield Investigations, is a Florida resident. Defendant Findwhat.com, Inc. is likewise a Florida Corporation with its principal place of business in that same state. Because there are citizens of the same state who are both Plaintiffs and Defendants, complete diversity of citizenship does not exist for purposes of federal jurisdiction. As such, removal to federal court by one or more Defendants would be patently frivolous and constitute additional acts in furtherance of the conspiracy alleged in this complaint.

PLAINTIFFS' SECOND AMENDED CLASS COMPLAINT    Page 5

## RELEVANT FACTUAL BACKGROUND

25.    At all times relevant to this cause of action, Defendants have been providing online PPC advertising for Plaintiffs and all other similarly situated members of the Class.

26.    At all times relevant to this cause of action, Defendants have billed and/or collected revenue for PPC advertising from Plaintiffs and all other members of the putative Class.

27.    Defendants have collected revenue for illegitimate PPC advertising traffic which was not made by or generated by bona fide consumers. As a result, Defendants billed and collected fees for PPC advertising which was not provided to Plaintiffs.

28.    Further, Defendants overcharged Plaintiffs for PPC advertising.

## CLASS ALLEGATIONS

29.    Plaintiffs bring this cause of action individually and on behalf all other similarly situated individuals and/or persons, pursuant to A.R.C.P. 23.

30.    Plaintiffs define this Class as any and all persons and/or entities who:

    a.    were overcharged for PPC advertising by Defendants.

31.    The following persons and/or entities are excluded from the Class:

    a.    Persons and/or entities who timely opt-out of this proceeding using the correct protocol for opting-out that will be formally established by this Court;

    b.    Any and all federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and

    c.    Any currently sitting Arkansas state court judge and/or justice in the current style and/or any persons within the third degree of consanguinity to such judge and/or justice.

    d.    Any person or entity who had filed a lawsuit against Defendants for overcharging for PPC advertising.

32.     In the unlikely event that the Court should determine not to certify a nationwide Class, then in the alternative, Plaintiffs seek certification of an Arkansas only Class. Based upon information and belief, the Class is comprised of hundreds of thousands of individuals who are geographically disbursed across the United States and tens of thousands disbursed across Arkansas. As a result, joinder of individual Plaintiffs is impracticable. The disposition of Plaintiffs' claim will provide a substantial benefit to the persons and the court system by using Rule 23 as the vehicle to adjudicate the rights of hundreds of thousands of individuals and/or entities in one cause of action. Joining and naming each Class Member as a co-Plaintiff is unreasonable and unpracticable. Such a requirement would only result in Defendants' retention of money which is necessary to compensate the Class to remedy and/or remediate the damage caused by Defendants' defective product.

33.     There is a well defined commonality of interests in common questions of law and fact that affect Class Members. As to the Class, there are common questions of law and fact which predominate over any questions affecting individual Class Members which include, but are not limited to:

    a.     Whether Defendants overcharged Plaintiffs for internet PPC advertising;

    b.     Whether Defendants knowingly and intentionally overcharged Plaintiffs;

    c.     Whether restitution is the appropriate remedy for Class Members;

    d.     Whether Defendants and all others in the chain of advertising and/or revenue sharing scheme are liable for the overcharging which may have been committed in whole or in part by third parties;

    e.     Whether Defendants were complicit in the overcharging;

    f.     Whether Class Members are entitled to monetary damages for Defendants wrongful collection of PPC advertising revenues and/or charges;

g.  Whether Class Members are entitled to an injunction requiring Defendants to cease and desist from collecting illegal and/or illegitimate PPC advertising revenue;

h.  Whether Defendants are required to pay reasonable and necessary attorneys' fees and costs associated with prosecuting this lawsuit.

34.  Claims asserted by the Plaintiffs are typical of the claims of the Class. The Class and Plaintiffs have all been charged by Defendants for internet PPC advertising which should not have been collected and/or charged.

35.  Plaintiffs will fairly and adequately represent the interest of the Class. The interest of the Class is not antagonistic with those of the individual Plaintiffs. The Plaintiffs have the ability to assist and adequately protect the rights of the Class during the litigation. Further, the Plaintiffs are represented by legal counsel who are competent and experienced in this type of Class Action litigation.

36.  This Class Action is not only the appropriate method for the fair and efficient adjudication of the controversy, but is, in fact, superior method to all other available cause of action because:

a.  The joinder of hundreds of thousands of geographically diverse individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.  There is no special interest by Class Members and individually controlling prosecution of separate causes of action;

c.  Class Members' individual claims now may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, expensive, if not totally impossible, to justify individual Class Members addressing their loss;

d.  When Defendants' liability has been adjudicated, claims of all Class Members can be determined by the court and administered efficiently in a manner which is far

less erroneous, burdensome, and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

e.  This Class Action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of class claims to promote economies of time, resources, and limited pool of recovery;

f.  This Class Action will assure uniformity of decisions among Class Members;

g.  Without the Class Action, Class Members will go without restitution or money damages;

h.  Without this Class Action, the restitution will not be ordered and Defendants will reap the benefits or profits of overcharging the Plaintiffs for services which were not provided;

i.  The resolution of this controversy through this Class Action presents fewer management difficulties than individual claims filed in which the parties may be subject to varying indifferent adjudications of their rights;

## FRAUDULENT CONCEALMENT/ DISCOVERY RULE

37.  Defendants had a duty to disclose to Plaintiffs notice and/or knowledge that they were overcharging the Plaintiffs

38.  Rather than disclosing this information to Plaintiffs, Defendants actively and fraudulently concealed that the overcharges and improper collection of revenue from Plaintiffs.

39.  Defendants' fraudulent concealment tolls the running of any applicable statute of limitations.

40.  In the alternative, Plaintiffs could not have, with the exercise of real caution, prudence, or diligence, discovered the defect within the applicable statute of limitations. As a result, the statute of limitations is tolled making all Plaintiffs' claims timely filed.

## MISCELLANEOUS

41.  Any conditions preceding the institution of this lawsuit have been performed, have occurred, and/or have been waived.

42.    By filing the lawsuit, Plaintiffs neither intend to, nor in fact do, waive or release any right, claim, action, cause of action, defense and/or election of remedy that they may now or ever have.

## CAUSE OF ACTION

### Breach of Contract

43.    Plaintiffs hereby incorporate by reference the allegations contained in the Original Complaint as if set forth herein verbatim.

44.    Defendants either expressly and/or implicitly, contractually agreed to provide internet PPC advertising and/or services to Plaintiffs and only charge for the actual click through advertising from actual consumers. Defendants breached that contract by collecting revenues for services which were not provided. Accordingly, Plaintiffs seeks a refund of all improper and/or illicit charges.

### Restitution/Unjust Enrichment/Money Had and Received

45.    Plaintiffs hereby incorporate by reference the allegations contained in the Original Complaint as if set forth herein verbatim.

46.    The additional sums of money charged to Plaintiffs and all other similarly situated individuals for PPC advertising which was illegitimate and/or improper must be refunded. These amounts of money constitute money which, in equity in good conscience, should be returned by Defendants to Plaintiffs and members of the Class pursuant to the equitable doctrine of restitution/unjust enrichment/money had and received because such money was collected in violation of applicable law.

### Civil Conspiracy

47.    Defendants engaged in a conspiracy to bill and/or collect advertising revenue for services which were not actually and/or legitimately provided to Plaintiffs and all other similarly situated members of the Class. Defendants conspired to conceal the fact that they were

PLAINTIFFS' SECOND AMENDED CLASS COMPLAINT  Page 10

overcharging and/or over-collecting revenue for advertisements which were not actually provided to the Plaintiffs from bona fide consumers. Defendants worked in conjunction with one another to promote the use of internet and/or PPC advertising and actively concealed their collective attempts to overcharge and/or collect revenue for advertising which was not usually provided to consumers. This is an industry wide conspiracy in which all search engines have worked together to develop and/or create a market which allows for over billing and/or overcharging of businesses and/or entities which purchase online PPC advertising.

48.    As a result of this conspiracy, scheme, and/or agreement, Defendants have attempted to create a larger market for internet and/or online PPC advertising which has been growing each and every year.

49.    Defendants have refused to disclose all known or suspected overcharges to Plaintiffs and/or members of the Class. Defendants have grown the internet PPC advertising market while failing to disclose that they have routinely and systematically overcharged and/or over collected for PPC advertising revenues from their customers. Defendants have engaged in a pattern, practice, and/or scheme to achieve a common goal and/or purpose of increasing the market and cost of PPC advertising throughout Arkansas and the United States while overcharging customers and hiding the overcharges from Plaintiffs and/or all members of the Class.

## JOINT VENTURE / JOINT ENTERPRISE

50.    At all times relevant to this cause of action, the Defendants were engaged in a joint enterprise as the parties have: (1) an agreement, either express or implied, with respect to the enterprise or endeavor; (2) a common purpose; (3) a community of interest in that purpose, among the members; and (4) a right of control in the direction of the enterprise.

51.    At all times relevant to this cause of action, the Defendants entered into a joint venture as they had an agreement which included: (1) a community of interest in the venture; (2) an

PLAINTIFFS' SECOND AMENDED CLASS COMPLAINT  Page 11

agreement to share profits; (3) an express agreement to share losses; and (4) a mutual right to control or management of the venture. This joint venture and/or enterprise allowed for a seamless PPC advertising web in which Defendants share revenues for improper charges levied against Plaintiffs and members of the Class.

### RELIEF REQUESTED

52.    Plaintiffs Lane's Gifts and Collectibles, L.L.C., U.S. Citizens for Fair Credit Card Terms, Inc., Savings 4 Merchants, Inc. and Max Caulfield d/b/a Caulfield Investigations, Individually and as Class Representatives on behalf of all similarly situated persons and/or entities, respectfully request that the Court grant the following relief and/or enter judgment against the Defendants, jointly and severally for the following:

    a.    Certify this cause of action as a class action pursuant to A.R.C.P. 23 and appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class counsel;

    b.    Award appropriate monetary damages to Plaintiffs and the proposed Class in an amount equal to provide restitution for the overcharges to Plaintiffs;

    c.    Alternatively, an amount equal to the overcharges and/or surcharges above the contracted PPC advertising amounts which Plaintiffs had contracted with Defendants to provide;

    d.    Awarding prejudgment interest to prevent Defendants from receiving unjust enrichment for their improper conduct;

    e.    Awarding reasonable and necessary attorneys' fees and costs to Class counsel;

    f.    Awarding such other and further relief in law or in or equity as the Court determines fair, reasonable, appropriate, and/or just deems just.

Whether by restitution and/or money damages or any combination thereof, Plaintiffs seek a recovery from all Defendants, jointly and severally, including all interests and costs, including prejudgment interest, post-judgment interest, court costs, and attorneys fees. Therefore, Plaintiffs

contend that Defendants are jointly and severally liable for all damages and relief owed to the Plaintiffs and/or individual Class Members.

Respectfully submitted,

JOHN GOODSON
KEIL & GOODSON P.A.
Arkansas State Bar No. 90018
611 Pecan Street
Texarkana, Arkansas 71854-5337
(870) 772-4113 (telephone)
(870) 773-2967 (facsimile)

ATTORNEYS FOR PLAINTIFF

**EXHIBIT C**

<u>**Assertion of Right to Participate in Additional Claims Review Process**</u>

By checking the "Yes" box and returning this form, I am indicating my desire to participate in the additional claims review process:

☐ Yes, I wish to participate.

Please identify the person, business, or other entity that is requesting a Claim Form:

Name_____

Street
Address_____

City_____State_____Zip_____

Telephone Number_____Email Address_____

    Return via certified or registered mail **ON OR BEFORE November 20, 2006** to the Claims Administrator at the following address:

**XXXXXXXXXX**
**XXXXXXXXXX**
**XXXXXXXXXX**

**EXHIBIT D**

1
2
3
4

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CHECKMATE STRATEGIC GROUP, INC., a Florida corporation, individually, and purportedly on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>YAHOO! INC., a Delaware corporation, and DOES 1 THROUGH 100, Inclusive,<br><br>Defendants. | Case No.: CV 05-4588 CAS (FMOx)<br><br>NOTICE OF PENDENCY OF CLASS ACTION, PROPOSED SETTLEMENT AND PROPOSED HEARING DATE FOR COURT APPROVAL |

5
6
7
8
9
10
11
12
13

## THIS NOTICE MAY AFFECT YOUR RIGHTS
## PLEASE READ ALL OF IT CAREFULLY

14
15
16

**ATTENTION: ALL PERSONS OR ENTITIES WHICH BID AND PAID FOR ADVERTISING PLACEMENT IN YAHOO!'S SEARCH MARKETING SYSTEM BETWEEN JANUARY 1, 1998 AND JULY 31, 2006**

17
18

Dear Yahoo!, Inc. Customer,

19
20
21
22
23
24
25
26
27
28

This notice (the "Notice") informs you of a proposed settlement of class action claims against Yahoo!, Inc. (defined as Yahoo!, Inc., Yahoo! Search Marketing, Overture Services, Inc., and GoTo.com, Inc.). For the sake of brevity and clarity, Yahoo!, Inc. will be referred to for the remainder of this Notice simply as Yahoo!. This Notice describes the purposed settlement and informs you of your rights as a settlement class member. You are being sent this Notice because you have been identified as a Yahoo! customer who paid for advertising services between January 1, 1998 and July 31, 2006. Yahoo! has agreed, under the terms of the Settlement, to provide you with the opportunity to submit a valid and timely claim form through which you may be eligible to receive advertising credits.

**READ THIS FIRST**

1. <u>**WHY SHOULD I READ THIS?**</u>  This Notice, given pursuant to an Order of the Court dated _____, 2006, describes a proposed settlement of a class action against Yahoo!, and you have been identified as a Class Person.

2. <u>**WHY DID I RECEIVE THIS NOTICE?**</u>  You received this Notice because a search of Yahoo!'s computer records indicates that you are a current or former Yahoo! account holder who bid and paid for advertising placement on Yahoo!'s Search Marketing System at some point between January 1, 1998 and July 31, 2006.  This Notice provides a summary of the terms of the proposed settlement.  It also explains the lawsuit, your legal rights under the settlement, what benefits are available to you under the settlement, and how to get them.

3. <u>**WHAT IS A CLASS ACTION?**</u>  In a class action, one or more individuals or businesses, called Class Representatives (in this case, Checkmate Strategic Group, Inc.) sue on behalf of others that have similar claims.  All of these other individuals or businesses are members of the "class."  One court resolves the issues for all Class Members, except for those who exclude themselves from the Class.  United States District Judge Christina A. Snyder is in charge of this class action.

4. <u>**WHAT ARE THE CRITICAL DATES?**</u>

| Event | Date |
|---|---|
| The last date to submit your Assertion of Right to Participate in Additional Claims Review Process form, if you wish to be eligible to possibly receive advertising credits. | November 20, 2006 |
| The last date to submit your written request to be excluded from the settlement if you are not willing to be bound by it and do not want to be eligible to receive advertising credits. [60 days after notice.] | _____, 2006 |

| The last date to submit any written objection to the settlement. [60 days after notice.] | _____, 2006 |
|---|---|
| The hearing on any objections and to give final approval to the settlement. [90 days after notice per CAFA.] | _____, 2006 |

**5.    DO I HAVE TO DO ANYTHING?** The settlement is subject to the approval by the Court. If the Court approves the settlement and it becomes effective, you will *automatically be eligible* to submit the Assertion of Right to Participate in Additional Claims Review Process form (hereinafter "Assertion of Right to Participate"), indicating that you intend to file a claim form for Yahoo! advertising credits and will give up your ability to sue Yahoo! over the subject matter of this case. The Assertion of Right to Participate form is available for download at www._____.com. The form must be printed out, filled out completely, and mailed via certified or registered mail to the Claims Administrator at _____ by November 20, 2006. You may attend the court hearing described below if you wish, but your attendance or non-attendance will not affect your eligibility to submit the Assertion of Right to Participate form. You do not need to appear in court, and you do not need to hire an attorney in this case. You may object to the proposed settlement if you so desire.

**6.    WHAT IS THIS CASE ABOUT?** Plaintiff Checkmate Strategic Group, Inc. claims that Yahoo! has breached its contracts with Class Persons and committed unfair business practices under California Business & Professions Code § 17200 et seq., including improperly collecting revenue by charging and/or overcharging Class Persons for clicks that were click fraud, click through fraud, fraudulent clicks, click spam, invalid clicks, unwanted clicks, unqualified clicks, improper clicks, non-converting clicks, inadequately converting clicks, clicks that were not reasonably expected by Class Persons or otherwise claimed by Class Persons as clicks for which

1    Class Persons should not have been charged, and improperly collecting revenue by

2    charging and/or overcharging Class Persons for clicks where users did not actively

3    choose the Class Persons' listings (hereinafter "Challenged Clicks").

4    **A.    The Proposed Settlement**

5    Since filing the action, Plaintiff, through Class Counsel, has conducted an

6    investigation of the facts, including review of Yahoo!'s billing procedures and

7    Yahoo!'s click filtering systems, interviews with key Yahoo! personnel, and has

8    analyzed the relevant legal and factual issues.  Class Counsel obtained substantial

9    information about the nature and extent of Yahoo!'s challenged practices through this

10   process.

11   Although Yahoo! does not believe it has done anything wrong and continues to

12   deny all claims and allegations of wrongdoing asserted in the Action, Plaintiff and

13   Yahoo! agreed to enter into a settlement agreement after an extensive exchange of

14   information and vigorous arms-length negotiation. If approved by the Court, the

15   settlement agreement will result in dismissal of this case and final resolution of all

16   claims raised.  Such dismissal will release Yahoo! from future liability for the acts and

17   practices complained of.  The settlement terms are described in full in a document

18   known as Stipulation and Settlement Agreement (hereinafter "Agreement").[1]  The

19   Agreement is available for your inspection at the clerk's office of the United States

20   District Court, Central District of California, Western Division.  The terms of the

21   settlement, in summary form, are as follows:

22       i)  Yahoo! shall launch an online traffic quality center, which will be available

23           to its advertisers within 90 calendar days of the Effective Date of the

24           settlement.  The traffic quality center will include a resource center which

25

26   _____

27   [1]  The capitalized terms as used in this Notice have the same meaning as the terms
     set forth in the Agreement.

28

1     will contain FAQs, best practices documents, traffic quality articles,

2     enforcement guidelines, and an advice column.

3   ii) Yahoo! shall designate a Yahoo! employee as a traffic quality advocate who

4     will be part of a traffic quality group to fulfill the function of fielding

5     advertisers' concerns regarding traffic quality, including its click fraud

6     prevention efforts, within 90 calendar days of the Effective Date of the

7     settlement.

8   iii) Within 90 calendar days of the Effective Date of the settlement, Yahoo!

9     shall start a program in which it chooses at least three advertisers per year

10     who will be invited to Yahoo! to obtain special access to the traffic quality

11     team and additional information with respect to Yahoo!'s click protection

12     system, subject to the advertisers' execution of nondisclosure agreements.

13   iv) Yahoo! shall work with third parties in an effort to develop industry-wide

14     standards that define click fraud, set forth standards with respect to the

15     detection of click fraud and provide the public with periodic general

16     evaluations regarding the effectiveness of providers' efforts to filter and

17     prevent the charging of click fraud to customers.

18   v) Yahoo! will temporarily lift its 60-day contractual provision to allow Class

19     Members to make click fraud claims for the period from January 1, 2004 to

20     July 31, 2006. Any Class Member that wishes to participate in the

21     additional claims review process will have to complete the Assertion of

22     Right to Participate form, and mail by certified or registered mail the

23     completed form to the Claims Administrator on or before November 20,

24     2006.

25 **B.    Attorneys' Fees and Class Representative Compensation**

26     Class Counsel will request that the Courts award them attorneys' fees and

27 expenses. They intend to request $4,950,000.00 in attorneys' fees plus costs in an

28

1  amount not to exceed $25,000.00. The fees and costs figures were determined

2  independently of negotiation of the other terms of the settlement. Class Counsel's

3  petition for fees and expenses will be filed with the court no later than

4  _____, and may be reviewed by any interested party. The amount paid for

5  attorneys' fees, expenses, and costs will be paid by Yahoo! and so will not diminish or

6  affect any Credits which Class Members may receive.

7  **7.     WHAT AM I GIVING UP IF I PARTICIPATE IN THE SETTLEMENT?**

8          The settlement provides that once the Court enters an order finding the

9  proposed settlement fair, adequate, and reasonable and all appeals have been resolved

10  or all appeals periods have expired, those Class Persons who have not timely

11  requested exclusion from this Action shall be deemed to have and by operation of the

12  Final Judgment shall have fully, finally and forever released, relinquished, and

13  discharged all Released Claims as set forth below.

14          Specifically, the settlement is intended to settle any and all known and unknown

15  claims from January 1, 1998 through July 31, 2006 against Yahoo! that Class

16  Members have asserted or could have asserted based upon or in any way relating to,

17  referring to, or arising out of the charging or overcharging for Challenged Clicks (the

18  "Released Claims"). The release will extend to Yahoo! and its past or present

19  directors, officers, employees, partners, principals, agents, predecessors, successors,

20  parents, affiliated and sister corporations, subsidiaries, licensees, divisions, and related

21  or affiliated entities, and the Yahoo! Ad Partners (defined as all Persons together with

22  any past or present directors, officers, employees, partners, principals, agents,

23  controlling shareholders, predecessors, successors, parents, affiliated and sister

24  corporations and subsidiaries of same, that disseminated, displayed, distributed,

25  delivered, served, published, and/or otherwise provided any Yahoo! Ad (defined as

26  the participation and/or the ability to participate in a system which displays

27  advertising, including without limitation, titles and descriptions, uniform resource

28

1   locators, images, text and all other content delivered, served, published, and/or
2   otherwise displayed by Yahoo! and the Yahoo! Ad Partners, including without
3   limitation, via any and all web sites, e-mails, applications, and software, including
4   without limitation domain channels, downloadable applications, content match,
5   domain match, adware, spyware, arbitrage, and e-mail campaigns.))

6       If the settlement is approved by the Court and not otherwise terminated, the
7   Court will dismiss the Action with prejudice, and bar and permanently enjoin the
8   named Plaintiff and each Class Member from prosecuting the Released Claims. As a
9   result, once the judgment of the Court in accordance with this settlement has become
10  final, each of the Class Members and their legal successors-in-interest shall be deemed
11  to have forever given up any Released Claims against Yahoo! and the other Released
12  Parties. If you have purchased advertising on the Yahoo! Search Marketing System
13  between January 1, 1998 and July 31, 2006, and do not elect to exclude yourself from
14  the Class, you will be deemed to have entered in to this release and to have released
15  the above-described claims. If the settlement is not approved by the Court or does not
16  become final for some other reason, the litigation will continue.

17  **8.    HOW DO I EXERCISE MY RIGHT TO ADDITIONAL REVIEW OF**
18  **MY YAHOO! ACCOUNT?**

19      To exercise your right to additional review of your Yahoo! account, go to
20  www. _____ .com and print a copy of the Assertion of Right to
21  Participate form. Fill out the form completely and mail by certified or registered mail
22  to the Claims Administrator at _____ on or before **November**
23  **20, 2006.**

24  **9.    WHY ARE CLASS COUNSEL RECOMMENDING THIS**
25  **SETTLEMENT?**

26      Relative to the risks and costs of continuing the litigation, Class Counsel
27  believe this settlement provides a favorable recovery which is in the best interest of

28

1  the Class. Class Counsel's collective evaluation in this regard is based on the
2  extensive investigation and discovery they have undertaken, and upon their experience
3  prosecuting similar cases. Absent settlement, Plaintiff would have to secure class
4  certification on the claims set forth in the Action over the opposition of Yahoo!.
5  Additionally, at trial, Plaintiff would have the burden of proof to establish liability and
6  the amount of damages. The case involves many unresolved factual and legal issues,
7  some of which could be decided against Plaintiff at or before trial, and which would
8  jeopardize Plaintiff's ability to certify a class or to obtain a favorable judgment and
9  preserve it on appeal.

10         In addition, settling the case now has the further advantage of avoiding the very
11  substantial additional costs and delay that further litigation would involve. Yahoo!
12  has made it clear that it would likely seek appellate review of a grant of class
13  certification outside the settlement context and any final adverse result at trial. Thus,
14  absent settlement, it is likely to be years before the litigation ends and Class Members
15  receive Credits, if any. Given the costs involved in further litigation and the time-
16  value of money, even if a favorable judgment were obtained at trial, it could well
17  produce less net recovery to the Class Members than the present settlement.

18  **10.    WHAT IF I DO NOT WISH TO PARTICIPATE IN THE**
19  **SETTLEMENT?**

20         **A.    Your Right to Exclude Yourself from the Settlement**

21         As a Class Person, you may elect to exclude yourself from the class settlement.
22  If you wish to exclude yourself from the class, you must submit a written statement
23  requesting exclusion from the Class on or before _____ (hereinafter
24  "Request for Exclusion"). Such request to be excluded must be personally executed
25  by the Class Person, contain the full name, address, telephone number, and account
26  number(s) of the Class Person requesting exclusion and the date(s) of the advertising
27  campaign with Yahoo!, and must be returned to the Claims Administrator at

28

1    _____, by certified or registered mail.  If you exclude yourself

2    from the Class and the proposed settlement with Yahoo! is finally approved, you will

3    not be entitled to receive any benefits of the settlement and will remain free to pursue

4    any legal rights you may have against Yahoo! at your own expense, but the

5    representative plaintiff and their lawyers will not represent you as to any claims

6    against Yahoo!.

7    **B.    Your Right to Appear and Object to the Proposed Settlement**

8    Any Class Member may appear at the Final Approval Hearing in person or by a

9    duly appointed authorized attorney and show cause, if any, why the settlement should

10   not be approved; provided that (except by special permission of the court) no Class

11   Member shall be heard unless, on or before, _____, 2006, the Class

12   Member files with the court a written "Notice of Intent to Appear", to the clerk's

13   address set out below, setting forth all of the Class Member's objections to the

14   settlement, and mails copies of all such papers to Plaintiff's and Yahoo!'s counsel at

15   the addresses specified below.  Any objection must contain (a) a heading which refers

16   to the Action; (b) the objector's name, address, telephone number, and Yahoo!

17   account number(s); (c) a statement whether the objector intends to appear at the Final

18   Approval Hearing, either in person or through counsel, and, if through counsel,

19   identifying counsel by name, address, and phone number; and (d) a statement of the

20   grounds supporting the claim.

21   <u>Office of the Clerk</u>

22   xxxxxxxxxxxxxxxxxxxxxxxxxx

23   xxxxxxxxxxxxxxxxxxxxxxxxxx

24   xxxxxxxxxxxxxxxxxxxxxxxxxx

25

26   / / /

27   / / /

28

1

| Plaintiff's Counsel | Yahoo's Counsel |
|---|---|
| Brian S. Kabateck | Larry W. McFarland |
| Richard L. Kellner | Dennis L. Wilson |
| KABATECK BROWN KELLNER LLP | KEATS McFARLAND & WILSON LLP |
| 350 South Grand Avenue | 9720 Wilshire Boulevard |
| 39th Floor | Penthouse Suite |
| Los Angeles, CA 90071 | Beverly Hills, CA 90212 |

## C.    The Final Approval Hearing

The court will conduct a hearing (the "Final Approval Hearing") at the United States District Court, Central District of California, Western Division, in the courtroom of the Honorable Christina M. Snyder on _____, 2006 (or at the dates and times to which the court may, without further notice, reschedule the hearing). The purpose of the Final Approval Hearing will be to determine whether the proposed settlement is fair, adequate, and proper; and whether the courts should enter judgments approving the settlement, awarding attorneys' fees and expenses, and dismissing the class action. You have the right, but are not required to attend. Attendance or non-attendance will not affect any Credits to which you may be entitled under the settlement.

## 11.    HOW DO I GET MORE INFORMATION?

### A.    Availability of the Pleadings, the Agreement, and Other Papers in this Action

The Agreement, with its exhibits and all other papers filed with the court relating to this action, are available for inspection in the offices of the clerk of the court identified above. The documents on file with the court may be examined by any Class Member in person or by counsel during normal court hours each day other than on Saturdays, Sundays, and legal holidays.

Do not call or write the courts, other than as provided above.

///

///

**B.** **Settlement Administration Line**

If you have questions, you may call a special Settlement Administration line at 1-800-xxx-xxxx weekdays, 9:00a.m to 5:00p.m., Pacific Standard Time

**C.** **Change of Address**

If your present address is different from the address on the envelope in which you received this Notice, or if you did not receive this Notice directly but believe you should have, you should call the Settlement Administration line at 1-800-xxx-xxxx and provide your new address.

END OF NOTICE.