COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SPENCER A. BURKHOLZ (147029)
HENRY ROSEN (156963)
ANNE L. BOX (224354)
LAURIE L. LARGENT (153493)
MARY K. BLASY (211262)
JULIE A. WILBER (246949)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@csgrr.com
henryr@csgrr.com
anneb@csgrr.com
llargent@csgrr.com
maryb@csgrr.com
jwilber@csgrr.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| In re YAHOO! INC. | ) Master File No. 4:08-cv-02150-CW |
| | ) |
| | ) CLASS ACTION |
| This Document Relates To: | ) |
| | ) LEAD PLAINTIFFS PENSION TRUST |
| ALL ACTIONS. | ) FUND FOR OPERATING ENGINEERS |
| | ) AND POMPANO BEACH POLICE AND |
| | ) FIREFIGHTERS' RETIREMENT |
| | SYSTEM'S OPPOSITION TO |
| | DEFENDANTS' MOTION TO DISMISS |
| | PLAINTIFFS' CONSOLIDATED |
| | AMENDED COMPLAINT |
| | |
| | DATE: September 18, 2008 |
| | TIME: 2:00 p.m. |
| | CTRM: 2, 4th Floor |
| | JUDGE: Hon. Claudia Wilken |

1

**TABLE OF CONTENTS**

2

                                                                                                    **Page**

3    I.      INTRODUCTION ................................................................................................1

4    II.     STATEMENT OF FACTS ...................................................................................3

5    III.    THE COMPLAINT SATISFIES THE PLEADING REQUIREMENTS FOR
             FALSITY ............................................................................................................6

6
7            A.      Defendants' Statements that the Development of Yahoo!'s Search
                     Business Was Successful and Competitive with Google Were False and
8                    Misleading..............................................................................................6

9            B.      Statements Regarding Panama Were False and Misleading.....................8

10           C.      Defendants Are Liable for the Third-Party Statements Alleged in the
                     Complaint.............................................................................................10

11           D.      Plaintiffs' Allegations of Falsity Regarding Yahoo!'s Search Business Are
12                   Further Corroborated by Numerous Confidential Witnesses ...............10

13           E.      Yahoo!'s Financial Results Were False and Misleading Because They
                     Improperly Included Revenues from Click Fraud .................................12

14           F.      The PSLRA's Safe Harbor Provision Does Not Insulate Defendants from
15                   Liability for Their False and Misleading Statements.............................14

16   IV.     THE COMPLAINT ADEQUATELY ALLEGES SCIENTER .........................16

17           A.      The Confidential Witness Accounts Show Defendants Had Actual
                     Knowledge of the Falsity of Their Statements When Made...................17

18           B.      The Complaint Also Raises a Strong Inference that Defendants'
19                   Misrepresentations Were Either Made Intentionally or with Deliberate
                     Recklessness .......................................................................................18

20           C.      Defendants' Scienter Is Strongly Inferred from Their Signed Certifications
21                   to the SEC ...........................................................................................20

22           D.      The Individual Defendants' Insider Trading of Yahoo! Stock Supports a
                     Strong Inference of Scienter ................................................................20

23           E.      The Complaint Pleads with Particularity Facts Demonstrating that
24                   Defendant Nazem Is Liable as a Primary Violator of Section 10(b) ...........22

25   V.      THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION ...........22

26   VI.     PLAINTIFFS HAVE ADEQUATELY ALLEGED AN INSIDER TRADING
             CLAIM UNDER SECTION 20A ......................................................................24

27   VII.    PLAINTIFFS HAVE ADEQUATELY ALLEGED CONTROL PERSON
             LIABILITY UNDER SECTION 20(a)...............................................................25

28

1

# TABLE OF CONTENTS

2

**Page**

VIII.    CONCLUSION...........................................................................................................25

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

Page

3 CASES

4 *Barrie v. Intervoice-Brite, Inc.*,
   397 F.3d 249 (5th Cir. 2005) ......................................................................10
5

*Berson v. Applied Signal Technology, Inc.*,
6    527 F.3d 982 (9th Cir. 2008) ................................................................. *passim*

7 *Chiarella v. United States*,
   445 U.S. 222 (1980) .....................................................................................22
8

*Commc'ns Workers of Am. Plan for Employees' Pensions & Death Benefits*
9    *v. CSK Auto Corp.*,
     525 F. Supp. 2d 1116 (D. Ariz. 2007) ............................................................6
10

*Credit Suisse First Boston Corp. v. Arm Fin. Group*,
11    No. 99 Civ. 12046 (WHP), 2001 U.S. Dist. LEXIS 3332
      (S.D.N.Y. Mar. 28, 2001) ............................................................................15
12

*Dura Pharms., Inc. v. Broudo*,
13    544 U.S. 336 (2005) ........................................................................2, 23, 24

14 *Eminence Capital, L.L.C. v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ....................................................................25
15

*Howard v. Everex Sys.*,
16    228 F.3d 1057 (9th Cir. 2000) ....................................................................20

17 *In re Cabletron Sys.*,
   311 F.3d 11 (1st Cir. 2002)...................................................................10, 12
18

*In re Copper Mountain Sec. Litig.*,
19    311 F. Supp. 2d 857 (N.D. Cal 2004) ....................................................15, 16

20 *In re Daou Sys.*,
   411 F.3d 1006 (9th Cir. 2005) ............................................................. *passim*
21

*In re Lattice Semiconductor Corp. Sec. Litig.*,
22    No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262
      (D. Or. Jan. 3, 2006) ...................................................................................20
23

*In re Omnivision Techs.*,
24    No. C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009
      (N.D. Cal. July 29, 2005)..............................................................................21
25

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
26    124 F. Supp. 2d 527 (S.D. Ohio 2000) ..................................................10, 22

27 *In re USA Talks.com, Inc. Sec. Litig.*,
   No. 99-CV-0162-L(JA), 2000 U.S. Dist. LEXIS 14823
28    (S.D. Cal. Sept. 14, 2000) ...........................................................................10

*In re Vantive Corp. Sec. Litig.,*
        283 F.3d 1079 (9th Cir. 2002) ...................................................................21

*In re VeriFone Securities Litigation,*
        11 F.3d 865 (9th Cir. 1993) .....................................................................24

*LDK Solar Sec. Litig.,*
        No. C 07-05182 WHA, 2008 U.S. Dist. LEXIS 42425
        (N.D. Cal. May 29, 2008) .................................................................12, 14, 24, 25

*Lee v. City of Los Angeles,*
        250 F.3d 668 (9th Cir. 2001) ....................................................................11

*Metzler Investment GMBH v. Corinthian Colleges, Inc.,*
        No. 06-55826, 2008 U.S. App. LEXIS 15935
        (9th Cir. July 25, 2008) .............................................................7, 16, 17, 24

*No. 84 Employer-Teamster Joint Counsel Pension Trust Fund
        v. Am. West Holding Corp.,*
        320 F.3d 920 (9th Cir. 2003) ................................................................ *passim*

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,*
        380 F.3d 1226 (9th Cir. 2004) .....................................................10, 11, 12, 20

*Oran v. Stafford,*
        226 F.3d 275 (3d Cir. 2000).......................................................................9

*Pension Trust Fund v. Clorox Co.,*
        353 F.3d 1125 (9th Cir. 2004) ..................................................................15

*Pirraglia v. Novell, Inc.,*
        339 F.3d 1182 (10th Cir. 2003) .................................................................13

*Provenz v. Miller,*
        102 F.3d 1478 (9th Cir. 1996) ....................................................................9

*Rosenbaum Capital, LLC v. McNulty,*
        549 F. Supp. 2d 1185 (N.D. Cal. 2008) ......................................................16

*S. Ferry LP #2 v. Killinger,*
        399 F. Supp. 2d 1121 (W.D. Wash. 2005).................................................8, 11

*Schlagal v. Learning Tree, Int'l,*
        No. CV 98-6384, 1998 U.S. Dist. LEXIS 20306
        (C.D. Cal. Dec. 23, 1998) .........................................................................22

*Shurkin v. Golden State Vintners, Inc.,*
        471 F. Supp. 2d 998 (N.D. Cal. 2006) .......................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
        __ U.S. __, 127 S. Ct. 2499 (2007).......................................................2, 11, 16

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78i(b)................................................................................................................7, 22, 24, 25
    §78t(a).........................................................................................................................25
    §78t-1..........................................................................................................................24
    §78u-4...........................................................................................................................6
    §78u-4(b)(2).......................................................................................................... *passim*

Federal Rules of Civil Procedure
    Rule 8(a)(2)..................................................................................................................23
    Rule 9(b) ...................................................................................................................6, 9

1

2

3                        **ISSUES TO BE PRESENTED**

4  **Falsity**

5        1.        Whether the Complaint's alleged false material statements are pled with sufficient

6  particularity because the Complaint sets forth: (a) Defendants' false statements made directly to the

7  market and to securities analysts who repeated them to the market; and (b) the reasons why those

8  statements were false, because these allegations are bolstered by 15 confidential witnesses who

9
   corroborated each other and were in positions to know the information attributed to them.

10

11  **Safe Harbor**

12        2.        Whether the alleged false statements of historical fact are actionable because they are

13  more than mere statements of optimism and whether the statements are not insulated from liability

14
    under the PSLRA's safe harbor provisions because they are not forward-looking and, even if

15  considered forward-looking, they were made with actual knowledge or not accompanied by

16
    meaningful cautionary language.
17

18  **Scienter**

19
        3.        Whether the Complaint satisfies the PSLRA's scienter standard by: (a) pleading

20  Defendants' actual knowledge of their false statements; and (b) whether sufficient facts regarding

21  Defendants' hands-on control of Yahoo!'s core business, SOX certifications and massive insider

22  selling allow the Court to draw an inference of scienter.

23

24  **Loss Causation**

25        4.        Whether the Complaint sets forth "some indication of the loss and the causal

26  connection that the Plaintiff has in mind" by demonstrating that the January and July 2006 declines

27  in Yahoo!'s stock price were directly tied to Defendants' false statements regarding Yahoo!'s efforts

28

to upgrade its search business and false financial results bolstered by improperly recognized click fraud revenue.

**Insider Trading Claim**

5.      Whether the Complaint states a claim for unlawful contemporaneous trading because Plaintiffs plead a primary violation of the securities laws and Defendants were in possession of material, non-public information when they made contemporaneous stock sales.

**Control-Person Claim**

6.      Whether the Complaint states a claim for control-person liability against Defendants because Plaintiffs plead a primary violation of the securities laws and set forth particularized facts demonstrating that the Individual Defendants ran the day-to-day operations of Yahoo!, influenced and controlled the decision-making at Yahoo! and the contents and release of the alleged false statements.

I.      INTRODUCTION

Plaintiffs' Consolidated Amended Complaint for Violation of the Federal Securities Laws ("Complaint") easily meets this Circuit's pleading requirements.  The Complaint pleads specifics, from 15 confidential witnesses ("CWs"), detailing why Defendants' public statements were false by identifying the material adverse facts that were concealed from investors.  The crucial failure of Yahoo! to develop a search engine business to compete with Google was withheld from investors. Investors were also unaware Yahoo! was improperly recognizing revenue from click fraud from its affiliates and partners to the detriment of its advertising customers, which allowed Yahoo! to meet earnings estimates and inflate Yahoo!'s stock price.

Defendants' assertions that Plaintiffs have not adequately pled falsity are wrong. Defendants' statements of historical fact that Yahoo! had successfully integrated Overture, that the Company was successfully developing an upgrade to Overture and that the Company's search business was allowing it to achieve record results were false and misleading when made.  The Complaint contains particularized allegations setting forth why Defendants' statements were false and were not merely optimistic forward-looking statements about future prospects or search business upgrades, that are supported by credible CWs, including former employees who were in a position to know why Yahoo!'s acquisition of Overture and Project Panama's ("Panama") development were failures.

Contrary to Defendants' assertion that Plaintiffs' false revenue recognition claims are conclusory and not supported by adequate particularity as to the amount of revenue improperly recognized, the Complaint sets forth an adequate basis that the amount of the improper revenue recognized by click fraud was at least 10% of Yahoo!'s quarterly revenues by pointing to independent experts and ex-Yahoo! employees who observed the practice. ¶¶204-208.[1]  Yahoo! has also agreed in a settlement with its advertising customers to refund click fraud generated revenue recognized during the Class Period, although it continues to conceal the amount.  ¶¶10, 147.

_____

[1]  Unless otherwise stated, all "¶" or "¶¶" references are to the Complaint.  All emphasis is added and citations are omitted, unless otherwise noted.

1    The Complaint also sets forth a strong inference of Defendants' scienter based on facts from

2    15 CWs, who are all former employees of Yahoo!, demonstrating Defendants' actual knowledge of

3    the Overture integration and Panama development problems and the way Yahoo! benefited from

4    click fraud revenues to meet quarterly earnings numbers.   ¶¶20-34, 155-178.   The CWs are

5    corroborated by cogent inferences drawn from Defendants' executive positions and involvement in

6    the Company's core operations.   Defendants were not only at the center of the Overture integration,

7    development of Panama and closely monitored the Company's systems used to detect and

8    supposedly prevent click fraud, but Defendants held themselves out to the market as extremely

9    hands-on managers familiar with Yahoo!'s business and even signed SOX certificates stating the

10   Company's internal controls were effective.   This Court should reject Defendants' effort to ignore an

11   astounding $879 million in stock sales, constituting a significant percentage of their holdings – 84%

12   to 90% excluding vested options, and 35.6% to 68.1% including vested options – and an amount

13   670% larger than the same period prior to the Class Period.   ¶12.   In sum, Plaintiffs' inferences of

14   scienter are at least as compelling as Defendants' non-culpable explanations.   *Tellabs, Inc. v. Makor*

15   *Issues & Rights, Ltd.*, __ U.S. __, 127 S. Ct. 2499, 2509 (2007).

16       Defendants' arguments regarding loss causation also fail because the Complaint provides

17   Defendants with far more than the required "indication of the loss and the causal connection that the

18   plaintiff has in mind."   *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).   Here, the partial

19   disclosure and Class Period ending announcement all tie directly to the Defendants' fraudulent

20   statements regarding Yahoo!'s search business and improper recognition of revenue via click fraud.

21   ¶¶125, 126, 130, 150.   Yahoo!'s stock price declined significantly in January 2006 and again in July

22   2006 when Yahoo! disclosed its true business conditions and was forced to downsize future earnings

23   targets.   As such, Plaintiffs have fulfilled the requirements from *Dura* by explaining how their loss

24   was suffered when the market became aware that Panama was delayed and the Company's search

25   revenue was declining because it was forced to terminate relationships with lower quality affiliates

26   who were contributing to click fraud at Yahoo!.   ¶150.   With these allegations, Plaintiffs have

27   exceeded what the Ninth Circuit found sufficient in *In re Daou Sys.*, 411 F.3d 1006 (9th Cir. 2005).

28

## II.    STATEMENT OF FACTS

Plaintiffs bring this securities fraud class action on behalf of investors who acquired Yahoo! securities from April 8, 2004 to July 18, 2006 (the "Class Period"), against Yahoo! and the Individual Defendants.[2]  The detailed allegations in the Complaint show that by 2003 Yahoo! was desperate to end its dependence on Google's algorithm for its search business, which accounted for 40% of its revenues.  ¶¶3, 42.  Although Google was dominating this expanding, lucrative industry, in 2003 Yahoo! acquired Overture, an internet search company, to catch up to Google and develop its own search algorithm.  *Id.*  The Overture acquisition was a disaster.  Overture's internet platform, accounting for over 50% of Yahoo!'s revenue and critical to the expansion of its search marketing business, was incapable of handling the internet traffic pulsing through it and was "'bursting at the seams'" and "literally self destructing."  ¶30.  In spite of the major obstacles to Yahoo!'s development of a new search technology, the Company ignored repeated requests from personnel to provide additional funding for servers in Overture's Pasadena facility.  ¶¶29, 30, 56(a).  Yahoo! also fired senior Overture engineers most knowledgeable about and capable of developing the new search technology.  ¶3, 29, 56(b).

With knowledge of these crippling problems, in an effort to maintain the facade of keeping up with Google, Defendants told investors the Overture acquisition was a success when exactly the opposite was true.  In Yahoo!'s 2003 Annual Report, CEO Semel stated: "The integration of the Yahoo! and Overture . . . has proceeded well, and . . . seems even more compelling than we initially thought."  ¶45.  In releasing Yahoo!'s 1Q 04 financial results, the Company reported: "'On the technology front we hit the ball out of the park.'"  ¶56.  Given the problems permeating Overture since its acquisition, these statements were false and misleading.  The failure to successfully integrate Overture had longstanding and detrimental consequences on Yahoo!'s execution of an improved search marketing technology.  In an effort to revamp the Overture system and better

---

[2]  The Individual Defendants include Terry S. Semel, Yahoo! CEO and Chairman of the Board of Directors; Daniel L. Rosensweig, Yahoo! COO; Farzad Nazem, Yahoo! Executive Vice President and CTO; and Susan L. Decker, Yahoo! CFO and Executive Vice President of Finance and Administration ("Individual Defendants," and with Yahoo! "Defendants").  ¶¶13-18.

1   "monetize" its search business, in 2004 Yahoo! embarked on "Project Panama." ¶3. Panama was

2   also a nightmare for the Company. Panama's leadership changed three times in 2004 and 2005. ¶3,

3   32. The integration of separate software systems, a necessary precursor to Panama and known

4   internally as "'solving the blob,'" was far behind schedule due to Yahoo!'s firing of Overture

5   engineers. ¶¶3, 29, 102(c), 163. The user interface and algorithm were delayed and incomplete.

6   ¶¶30, 139(a). An essential integration of back-end components known as "Cheetah" was delayed

7   due to the problems at Overture. ¶23. Panama as a whole was "'stalled, delayed, and derailed'"

8   because Yahoo! fired Overture's technical experts. ¶31(d).

9        Each Individual Defendant was aware of these dilemmas impeding the execution of Panama.

10  Panama was run out of Nazem's office after October 2005 when it was transferred to Sunnyvale, and

11  Nazem was briefed on a weekly basis by the lead project manager of Panama. ¶¶20, 23. In turn,

12  Nazem shared the truth regarding Panama's delayed and uncertain status with the other Individual

13  Defendants in weekly meetings. ¶¶20(a), 160. Semel was also briefed on Panama's dire situation on

14  a weekly basis by the project's leadership team. ¶¶32, 94.

15       Despite the problems with Panama, Defendants assured investors the implementation of

16  Yahoo!'s improved search marketing technology was moving ahead in a successful and timely

17  manner. *See, e.g.*, ¶¶103, 104. Defendants' statements were false and misleading, as the Individual

18  Defendants knew yet failed to disclose that Panama was far behind schedule, with no tangible date

19  for release confirmed. ¶¶20(a), 160. On October 18, 2005, CFO Decker informed investors that

20  Panama would be complete in late 2005, with financial benefits growing through 2006. ¶117.

21  Analysts repeated this information, emphasizing Panama as a "key driver" of the Company's

22  earnings in late 2005 and throughout 2006. ¶120.

23  **The Truth Begins to Emerge**

24       One quarter later, Defendants announced during a January 18, 2006 conference call that there

25  would be a delay in Panama's implementation to the second half of 2006. ¶125. Defendants also

26  made a partial disclosure that day in its 4Q05 results, missing estimates and issuing guidance lower

27  than expected by investors for FY 2006. ¶6, 126, 130. Yahoo! blamed slower search growth and an

28  anticipated increase in rates paid to affiliate websites. ¶6. The Company was being pressured to

1   drop lower quality affiliates that were being utilized for click fraud, which benefited Yahoo!, and

2   therefore would have to share more advertising revenue with higher quality affiliates. ¶¶6, 126, 130.

3   The Company's stock price decreased over 10% on 118 million shares traded – five times Yahoo!'s

4   normal trading volume. ¶¶126, 130. Defendants did not admit, however, the full truth – that click

5   fraud revenues obtained from these affiliate websites were becoming harder to justify given the

6   recent advertiser backlash and increased media scrutiny of click fraud. ¶127.

7        Because Yahoo! failed to successfully integrate Overture and implement Panama, in 2004

8   and 2005, the Company's paid search revenues stagnated. ¶56(f). Desperate to demonstrate

9   growing search revenues, Yahoo! developed ways to use click fraud to their advantage, allowing the

10  recognition of search revenue they had not earned. ¶¶4-5, 22, 25, 29, 31, 56(e).[3] Purposefully

11  exploiting the problem of click fraud, Yahoo! decided in late 2004 to "relax" the business rules and

12  filters in the click fraud detection system, particularly at quarter-end, allowing Yahoo! to generate

13  additional revenue by permitting the counting of improper clicks on content match partner sites.

14  ¶¶5, 22(d), 27, 31(k). Further, refunds for non-billable clicks were delayed until after quarter end.

15  ¶31(l)-(k). In total, click fraud during the Class Period resulted in Yahoo!'s recognition of $387

16  million in unearned revenue. ¶¶199, 203.

17       Finally, on July 18, 2006, Yahoo! made a full disclosure of the Company's problems, issuing

18  its 2Q06 results, missing revenue estimates, and announcing another delay of Panama beyond 4Q06.

19  ¶¶8, 150. Semel confirmed Yahoo!'s search revenue would be lower and its payments to affiliate

20  websites higher because the Company was forced to terminate relationships with affiliate websites

21  that were known to contribute to click fraud. ¶150. Investors punished the Company's stock on this

22

23  [3] Defendants' contention that Yahoo! filtered fraudulent clicks during the Class Period misses the point. Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint ("Defs.'
24  Mem.") at 3. Plaintiffs' well-pled allegations show that Yahoo! lacked the proper controls to fully prevent click fraud revenue and Defendants manipulated the computer system to deliberately
25  recognize fraudulent revenue throughout the Class Period. ¶¶4, 5, 22, 25, 29, 31, 56(d). Defendants' contention that in March 2007, Yahoo! announced the rates at which "they had already been filtering
26  invalid clicks" is misleading. Defs.' Mem. at 9 n.2. The March 2007 press release to which they refer says nothing about Defendants' control over fraudulent clicks during the Class Period. Defs.'
27  Mem. at 1; Declaration of Mark R.S. Foster in Support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint ("Foster Decl."), Ex. 50.

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MTD COMPLAINT - 4:08-cv-02150-CW          - 5 -

1    news, sending the share price down over 22% with 204 million shares traded, over 10 times the

2    normal trading volume.  ¶8, 150, 232.

3    **III.    THE COMPLAINT SATISFIES THE PLEADING REQUIREMENTS FOR
         FALSITY**

4

5            Defendants take issue with the structure of the Complaint and assert that "plaintiffs fail to

     identify with particularity the statements they contend are false."  Defs.' Mem. at 10.  In fact, the

6    Complaint details, in an organized fashion and on a quarterly basis, the "who, what, when and

7

8    where" of Defendants' false and misleading statements,[4] "why" they were false,[5] and analysts'

     reaction to, and confirmation of, Defendants' false statements.[6]  The Complaint further alleges, in a

9    straightforward manner, CW accounts that corroborate the allegations (¶¶20-34, 155-178); facts

10   demonstrating Defendants' knowledge of their fraud (¶¶155-178, 179-197); the financial motives for

11   Defendants' fraud, including their massive insider trading (¶¶179-197); Yahoo!'s false financial

12   statements (¶¶199-226); and loss causation (¶¶228-234).  This is certainly enough to satisfy the

13   Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4, and Federal Rule of Civil

14   Procedure 9(b).[7]

15           **A.    Defendants' Statements that the Development of Yahoo!'s Search
                Business Was Successful and Competitive with Google Were False
16              and Misleading**

17           This Court should flatly reject Defendants' suggestion the misstatements alleged regarding

18   the integration of Overture and development of Panama are inactionable, "generalized, vague and

19   unspecific assertions," and that Plaintiffs are simply complaining about "'[p]roblems and difficulties

20

21   _____

22   [4]  *See* ¶¶49-52, 55, 57-59, 61, 62, 64-66, 68, 72, 75, 76, 78, 81, 82, 84, 89, 93, 96, 101, 103, 104,
     109, 112, 114, 118, 120, 122, 124-126, 133, 137, 138, 142, 143, 146.

23   [5]  *See* ¶¶56, 60, 73, 79, 90, 102, 113, 123, 131, 139, 144.

24   [6]  *See* ¶¶53, 67, 70, 77, 83, 97, 99, 105, 108, 119, 120, 128, 129, 141.

25   [7]  Defendants' assertion that Plaintiffs' have engaged in "puzzle" pleading should be rejected
     because the allegations of falsity and scienter contained in the Complaint are readily ascertainable.
26   *See Commc'ns Workers of Am. Plan for Employees' Pensions & Death Benefits v. CSK Auto Corp.*,
     525 F. Supp. 2d 1116, 1118 n.1 (D. Ariz. 2007) (rejecting puzzle pleading argument because
27   complaint was "sufficiently clear to enable Defendants to respond and [the] Court to rule").

28

1    [that] are the daily work of business people.'"  Defs.' Mem. at 12, 15. [8]  In this Circuit, the

2    concealment of business problems is actionable fraud.[9]  Defendants were desperate to compete with

3    Google for market share in the fast growing, multi-billion dollar search business, and rushed to

4    create Yahoo!'s own search technology, which resulted in chaos and insurmountable engineering

5    problems that negatively impacted Yahoo!'s advertising revenue growth.  After the acquisition of

6    Overture, Defendants misled investors by representing the integration was successful and Yahoo!

7    was positioned for revenue growth with its new search platforms.[10]  These statements were false and

8    misleading because Defendants knew that their new search platform was an engineering disaster,

9    "'bursting at the seams'" and "literally self destructing."  ¶¶30, 56, 60, 73, 79, 90, 102, 113.

10   However, Defendants continued to mislead investors about the Company's record revenue growth

11   resulting from the new search platform, knowing that the engineering problems were stagnating

12   revenues.[11]

13        Defendants also argue that these statements are non-actionable "expressions of enthusiasm,

14   dedication, and optimism."  Defs.' Mem. at 10-12.  The Complaint concerns Defendants' false

15   statements regarding Yahoo!'s **current** business condition.  Advertising revenue growth and the

16

17   [8]  The Ninth Circuit's recent decision in *Metzler Investment GMBH v. Corinthian Colleges, Inc.*, No.
     06-55826, 2008 U.S. App. LEXIS 15935 (9th Cir. July 25, 2008), is not controlling.  Here, Plaintiffs
18   have set forth with particularity each of Defendants' false statements and specifically why each
     statement was false.  In *Metzler*, the Ninth Circuit held plaintiff's falsity allegations were inadequate
19   because in a blanket fashion, plaintiff claimed each statement made during the class period related to
     the defendant company's financial health was false for exactly the same reason and failed to
20   adequately articulate why each statement was false.  *Id.* at *50-*51.

21   [9]  *See No. 84 Employer-Teamster Joint Counsel Pension Trust Fund v. Am. West Holding Corp.*, 320
     F.3d 920 (9th Cir. 2003) (defendants violated §10(b) by making misleading statements about
22   company's financial outlook at a time the company was experiencing operational problems which
     were negatively impacting its business).

23   [10]  *See, e.g.*, ¶50 (defendant Semel stated: "Looking at Overture specifically . . . the underlying
24   strategic fit with Yahoo! and financial upside to or network has surpassed our original
     expectations."); ¶52 (defendant Rosensweig stated: "[W]e just recently launched Yahoo! search
25   technology around the world . . . all within two weeks and it is very exciting and it's doing very
     well.").

26   [11]  *See, e.g.*, ¶61 (Semel stated: "'Yahoo!'s second quarter results represent another record quarter
27   for the Company and demonstrate continued execution of our core priorities.'"); ¶66 (Rosensweig
     stated: "[O]ur business is in great shape and growing at a very fast pace.").

28

1    Company's successful search business, including the integration of Overture and operation of the

2    new platform, were critical aspects of Yahoo!'s business and closely watched by analysts and

3    investors. Defendants' statements that Overture and its new search platform were successful, were

4    neither vague nor amorphous so that no reasonable investor would rely on them. *S. Ferry LP #2 v.*

5    *Killinger*, 399 F. Supp. 2d 1121, 1129 (W.D. Wash. 2005) ("[T]he exception for puffery is narrowly

6    drawn [and only] statements on the extreme edge of generality and vagueness may be insufficient as

7    a basis . . . for securities fraud.").

8         In fact, it was Yahoo!'s switch to its own search technology via Overture, and its revenue

9    growth, that were critical to convincing the market that the Company had a shot at competing with

10   Google. At the time Defendants were making these false statements, they knew that the integration

11   of Overture was a failure, the Company's transition to a new search platform (so it could compete

12   with Google) was an engineering disaster and revenues stagnated as a result. Clearly, investors

13   would consider statements regarding the most critical aspect of Yahoo!'s business to be important

14   when deciding whether to purchase Yahoo! stock. *Am. West*, 320 F.3d at 933 (a fact is material if

15   there is a substantial likelihood that a reasonable investor would consider it important in decision

16   making).

17        **B.    Statements Regarding Panama Were False and Misleading**

18        Because Panama was critical to Yahoo!'s ability to compete with Google, beginning in July

19   2005, Defendants repeatedly promised investors that increased revenue from Panama would be

20   ***realized*** in late 2005 and throughout 2006.[12] Defendants' promises were repeated by analysts who

21   clearly understood the importance of Panama to Yahoo!'s ability to compete with Google. *See* ¶105

22   (RBC Capital Markets reported: "Yahoo management has recently confirmed its intention to make

23   this change happen late this year or early in 2006."); ¶120 (William Blair & Co. stated:

24   "Management highlighted the progress it is making in search monetization, which is beginning to

25

26   _____

     [12] *See, e.g.*, ¶104 (defendant Semel stated on July 19, 2005: "we will begin realizing additional
     value from long-term initiatives as 2006 progresses"); ¶117 (defendant Decker stated on October 18,
27   2005: "What we said is we expected to see some of those products start to hit and benefit late this
     year [2005] and then the financial impact really to build throughout 2006.").

28

1   have a favorable impact on results that slowly build and become more meaningful as we enter next

2   year."). Panama's importance was also clearly demonstrated when Yahoo!'s stock plummeted upon

3   Defendants' disclosure in July 2006 that Panama would again be delayed, this time beyond 4Q06.

4   ¶¶8, 150.  Investors punished Yahoo!'s stock, sending it down over 22% on 204 million shares –

5   *over 10 times its normal trading value*.  *Id.  See also Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir.

6   2000) (materiality can be properly measured *post hoc* by looking to the stock's price movement in

7   the period immediately following the alleged disclosure).

8          Defendants suggest their statements about Panama's launch are non-actionable forecasts.

9   Defs.' Mem. at 14.  The statements are actionable because Defendants had no reasonable basis for

10  believing them to be true and, more importantly, had actual knowledge of undisclosed facts that

11  seriously undermined the accuracy of the statements.  *See Provenz v. Miller*, 102 F.3d 1478 (9th Cir.

12  1996).  Defendants knew that the critical "solving the blob" project was extremely delayed, no code

13  had been written for Panama as of December 2005, there was under-funding, lack of executive

14  support and terminated engineers that delayed Panama and Panama had failed at least two prior

15  times.  ¶¶113(d), 123, 131, 139, 144.[13]

16         Both Semel and Decker lied to investors on numerous occasions about when increased

17  revenues would be seen from Panama.  ¶¶104, 115, 117, 118, 125, 133, 146.  Defendants had no

18  reasonable basis for their promises that the real financial impact would be seen in 2006, as they

19  knew about all the problems with Panama.  ¶¶113(d), 123, 131, 139, 144.  These allegations more

20  than sufficiently identify the particular false and misleading statements and adequately show why the

21  statements were false, thereby satisfying both the PSLRA and Rule 9(b).

22  _____

23  [13] Defendants' argument that their statements regarding the Panama launch were not false because
    the second phase of Panama rolled out only three weeks after 3Q06 is highly misleading.  In total,

24  Panama was more than one year late.  When Defendants first started giving analysts guidance as to
    when Yahoo! would experience revenue from Panama in October 2005, Defendants promised a late

25  2005 launch and increasing revenues throughout 2006.  ¶117.  In reality, Panama did not roll out
    until February 2007!  Foster Decl., Ex. 44.  Defendants unpersuasively challenge the relevance of

26  Plaintiffs' allegations that the Panama code was not complete as of December 2005.  Defs.' Mem. at
    15 n.7.  While Defendants stated on May 17, 2006 that the underlying code was finished, this does

27  not mean Panama was complete, or that the code was ready to be used in any functional manner.
    Foster Decl., Ex. 31 at 40.

28

1

2

**C.    Defendants Are Liable for the Third-Party Statements Alleged in the Complaint**

3    Defendants also assert they are not liable for analyst statements, yet the Ninth Circuit has

4    held defendants can be liable for third-party statements.  "[W]hen statements in analysts' reports

5    clearly originated from the defendants . . . the statements may be held to be actionable even if they

6    are not exact quotations."  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226,

7    1235 (9th Cir. 2004).  Analyst statements set forth in the Complaint reiterate factual assertions made

8    by Defendants during conference calls.  For example, following Yahoo!'s release of its 3Q04 results,

9    Prudential Equity Group stated: "Management noted that revenue-per-search grew sequentially after

10    two quarters of no sequential growth."  ¶¶77, 83.  *See In re USA Talks.com, Inc. Sec. Litig.*, No. 99-

11    CV-0162-L(JA), 2000 U.S. Dist. LEXIS 14823, at *12 (S.D. Cal. Sept. 14, 2000) (defendants cannot

12    disclaim liability for analysts' statements that simply repeat facts asserted by defendants).

13    Defendants also erroneously claim their statements during the May 17, 2006 analyst day

14    conference call are not actionable because Defendants did not speak about the three-phase Panama

15    launch.  Defs.' Mem. at 13-14.  The conference call transcript shows (Foster Decl., Ex. 31) each

16    Defendant was present when the statements about Panama's launch were made and therefore each is

17    liable for the statements.  *See In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 543

18    (S.D. Ohio 2000) ("[A] high ranking company official cannot sit quietly at a conference with

19    analysts, knowing that another official is making false statements and hope to escape liability for

20    those statements.  If nothing else, the former official is at fault for a material omission in failing to

21    correct such statements in that context."); *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 262 (5th Cir.

22    2005) (same).

23

**D.    Plaintiffs' Allegations of Falsity Regarding Yahoo!'s Search Business Are Further Corroborated by Numerous Confidential Witnesses**

24    Plaintiffs' allegations of falsity concerning the success of Yahoo!'s search business and

25    growing revenues are corroborated by numerous CWs.  Contrary to well established law in this

26    Circuit, Defendants ignore specific details provided by CWs as to both falsity and scienter, the basis

27    of their knowledge and the interlocking corroboration between their reports detailed in the

28    Complaint.  *Daou*, 411 F.3d at 1015; *Oracle*, 380 F.3d at 1234; *see also In re Cabletron Sys.*, 311

1   F.3d 11, 30 (1st Cir. 2002) (with a "number of different sources," their "consistent accounts

2   reinforce one another").  The witness allegations must be accepted as true at the pleading stage.

3   *Tellabs*, 127 S. Ct. at 2509.

4        The CW accounts in this case easily meet *Daou* and *Oracle*.  The Complaint identifies each

5   CWs by number, describes their job titles and duties, lists where they worked and their dates of

6   employment.  ¶¶20-34; *see Daou*, 411 F.3d at 1015.  Furthermore, the Complaint alleges how the

7   CWs knew about the information they provided.  *Oracle*, 380 F.3d at 1233.  Several CWs

8   corroborate the known delays impacting Panama, bolstering the reliability of each witness account.

9   *Daou*, 411 F.3d at 1015 (the number of sources demonstrates the reliability of those sources).[14]  The

10  Complaint also identifies other CWs (CW10, CW11, CW12) that corroborate the problems with the

11  Overture integration and new search platform.  ¶¶30-32.

12       Faced with these detailed statements, Defendants also attempt to create  factual and

13  credibility issues with respect to the CWs, which is improper at the pleading stage.  *See Lee v. City*

14  *of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001).  For example, Defendants ignore the fact that

15  CW12 was an Operations Sales Manager during the Class Period and in that position had an integral

16  role in the initiation and roll-out of Panama.  In challenging the reliability of CW15, Defendants

17  again completely ignore the Complaint's allegations.  Contrary to Defendants' contentions, the

18  Complaint identifies CW15's responsibilities, the types of meetings CW15 attended and the details

19  of what was discussed at the meetings.  ¶34.[15]

20  _____

21  [14]  *See* ¶20 (CW1 was Vice President of Engineering throughout the Class Period and assigned by

22  defendant Nazem to lead Panama in October 2005.  As part of Yahoo!'s engineering department and
    as leader for Panama, CW1 had knowledge of all the delays and problems Panama faced); ¶21

23  (CW2, a former Yahoo! insider sales manager confirmed that Panama was delayed because of back-
    end (*i.e.*, "solving the blob") problems); ¶23 (CW4 confirmed that resources weren't given to

24  Panama until fall 2005 when Panama moved to Sunnyvale and that, because the "solving the blob"
    problem was delayed, making a 3Q06 rollout was not feasible); ¶26 (CW7 confirmed that "solving

25  the blob" was not complete by February 2006).

26  [15]  That CW10 and CW11 left Yahoo! before Defendants began making promises about Panama's
    roll-out dates does not distract from these witnesses' credibility because others corroborated their

27  reports.  For example, CW2, CW4, CW7 were at Yahoo! for the major part of the Class Period, if
    not all the Class Period, and confirm CW10's report that the "solving the blob" problem (also known

28  as the "back-end" problem) was a critical precursor to Panama.  ¶¶21, 23, 26, 29.  *S. Ferry*, 399 F.

1    Contrary to Defendants' arguments, the consistent theme throughout the CW accounts – that

2    engineering and timing obstacles with Panama made it impossible for monetization to happen by

3    2006 – supports the reliability of their statements.  ¶¶20, 30, 31.  In *Berson v. Applied Signal*

4    *Technology, Inc.*, 527 F.3d 982 (9th Cir. 2008), the Ninth Circuit recently rejected an argument

5    similar to Defendants' argument that Plaintiffs' witnesses were not in positions to know about

6    certain projects "first-hand."  *Id.* at 985.[16]

7    **E.    Yahoo!'s Financial Results Were False and Misleading Because They**
     **Improperly Included Revenues from Click Fraud**

8    As a result of the engineering problems detailed above, the Company's advertising revenue

9    growth was stagnant by the start of the Class Period.  ¶4.  To bury this problem, Defendants ignored

10   that their sub-par technology was allowing click fraud revenue to be recognized, manipulated the

11   click fraud filters and delayed refunds to fraudulently boost revenues.  ¶¶31(k), 31(l).  Consequently,

12   Yahoo's Class Period financial statements were overstated by $387 million (¶¶199-210, 214-223).

13   Consistent with *Daou*, Plaintiffs have specifically pled, on a quarterly basis, the amount

14   Yahoo! overstated revenue and total net income per share during the Class Period (¶¶56(g), (k),

15   73(g), (k), 79(g), (k), 90(g), (k), 102(g), (k), 113(h), (l), 123(g), (k), 131(d), (h), 139(b), (f)), and how

16   Defendants violated Generally Accepted Accounting Principles by including click fraud revenues in

17   Yahoo!'s financial statements and failing to include the accrued liabilities for foreseeable refunds to

18   customers (¶¶202-213).  *See Daou*, 411 F.3d at 1017 (a plaintiff need only allege enough

19   information for the court to determine that the problems are significant in affecting a company's

20   "financial statements" and "overall financial position").[17]  Further, the Complaint provides detailed

21

22   _____

23   Supp. 2d at 1140 ("the consistent and interlocking nature of the evidence provided by each witness
     bolsters the evidence's reliability and credibility").

24

25   [16] *See also LDK Solar Sec. Litig.*, No. C 07-05182 WHA, 2008 U.S. Dist. LEXIS 42425, at *23-*24
     (N.D. Cal. May 29, 2008) (for pleading purposes, it is not necessary that the source have personal
26   first-hand knowledge).

27   [17]  As *Daou* noted, other circuits are consistent.  411 F.3d at 1015.  The First Circuit rejected a
     contention that a plaintiff must plead "exact dollar amounts" or specific "identities" as long as other
28   allegations collectively are sufficient.  *Cabletron*, 311 F.3d at 32.  The Ninth Circuit has held that

1    allegations that corroborate the falsity of Yahoo!'s financial statements, including reports from

2    industry experts and analysts who have determined click fraud amounts to be at least 10%, and as

3    much as 30%, of all pay-per-clicks (¶¶204-208) and corroborating accounts by CW3, CW6, CW8,

4    CW9, CW10, CW11 and CW12.  ¶¶22, 25, 27-30, 31(l)-(k).[18]

5           Defendants fasten on to the "turning the dial" allegations rather than considering the full

6    context of the facts alleged in the Complaint and the detail with which ***all*** click fraud allegations are

7    pled.  Defs.' Mem. at 8.  As confirmed by CW3, CW6, CW9, CW10 and CW11, Yahoo!'s new

8    developing search technology was poorly equipped to filter bad clicks and account for its low quality

9    traffic partners.  ¶¶22, 25, 27-30, 31(h).  As confirmed by CW9, who worked on Yahoo!'s Click

10   Activity Research team, which was responsible for handling click fraud complaints, Defendants did

11   nothing to block the source of the click fraud (*i.e.*, low quality traffic partners) and chose to include

12   the revenue in the Company's financial statements, in addition to including improperly recognized

13   revenue from Defendants' end-of-quarter filter manipulations.  ¶28.  CW3 also confirmed the

14   Company relaxed its click fraud filters to generate more revenues.  ¶22(d).  According to CW9,

15   Yahoo! had thousands of low quality content match partners who had an incentive to commit click

16   fraud or increase non-billable clicks since they received a piece of the revenues from Yahoo!, and

17   customer complaints about click fraud always increased at end-of-quarter.  ¶28.  Contrary to

18   Defendants' argument, the Company's settlement of the customer click fraud lawsuit provides

19

20

21   witness reports of a 50% miss in revenue projections provided sufficiently "hard numbers" when

22   confirmed by adequate corroborating details.  *Oracle*, 380 F.3d at 1231.

23   [18]  Ironically, Defendants attack the lack of internal documents supporting, and Plaintiffs' inability to
     quantify, the overstated click fraud revenue when Defendants are solely in possession of such
24   documents, but have been unwilling to quantify any amounts.  Defs.' Mem. at 8-9.  In June 2006,
     Yahoo! agreed to settle a customer click fraud lawsuit by providing advertisers with refunds due to
25   click fraud during the Class Period.  In addition, Defendants are vigorously defending a second click
     fraud lawsuit in California, in which class certification will not be complete until spring 2009.  ¶140.
26   Because only Defendants have access to the information, cases like *Daou* have found that allegations
     of accounting fraud do not have to raise to the level of particularity Defendants suggest.  *See*
27   *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1193 n.14 (10th Cir. 2003) (This is especially true "at the
     pleading stage" since such specifics "would presumably be kept" in the Company's "private files.").

28

1  further corroboration that the click fraud revenues were improperly included in Yahoo!'s Class

2  Period financial statements.  Defs.' Mem. at 9 n.2; ¶¶140, 147.

3          Defendants incorrectly contend Yahoo! missed investor expectations on four occasions

4  during the Class Period, thereby undermining Plaintiffs' allegations of click fraud.  Defs.' Mem. at 8.

5  Defendants' contention is misleading because two of the occasions were the January and July 2006

6  announcements when Defendants disclosed their fraud to investors.  ¶¶125, 126, 150.  Further, 2Q04

7  and 2Q05  were seasonally weaker quarters where Yahoo! failed to achieve the high end of analyst

8  expectations.  Although investors were disappointed, Yahoo! claimed to achieve its own internal

9  guidance and referred to the results as "the best quarter in Yahoo! history" and "record results."

10  ¶¶62, 104.  As alleged in the Complaint, however, Yahoo! only achieved the reported results via

11  improper recognition of click fraud revenue and subsequently went on a media campaign to

12  convince investors that their search business was competitive with Google.  ¶69.

### F.  The PSLRA's Safe Harbor Provision Does Not Insulate Defendants from Liability for Their False and Misleading Statements

14          The safe harbor provision of the PSLRA protects only "'forward-looking statements

15  identified as such, which are accompanied by meaningful cautionary statements,'" and is

16  inapplicable to any "description of past or present events."  *LDK Solar*, 2008 U.S. Dist. LEXIS

17  42425, at *45.  Defendants' false and misleading statements are not protected by the safe harbor (or

18  pre-PSLRA bespeaks caution rule) because they were not forward-looking; and even if they were,

19  they were knowingly false when made and not accompanied by meaningful cautionary language.

20          First, Defendants made statements about the ***current status*** of the development of Yahoo!'s

21  search business.[19]  Second, even if Yahoo!'s statements regarding the progress and status of Panama

22  were forward-looking, the safe harbor does not shield Defendants from liability when representations

---

[19]  *See, e.g.*, ¶50 ("Looking at Overture specifically . . . the underlying strategic fit with Yahoo! and financial upside to our network has surpassed our original expectations."); ¶76 ("Our . . . continued investment in people and infrastructure have led to the increased product quality and powerful rate of innovation which are really both paying off."); ¶103 ("'Yahoo! continued to see solid growth in the second quarter as a result [in part] of our strength in . . . search marketing . . . and our ability to execute and perform according to plan.'"); ¶104 ("The new [improving matching algorithms] are working very well and so we're seeing increased success with that.").

1    were **known** to be false or misleading when made.  The Company "may be held liable if the

2    'forward-looking statement' [was] made with 'actual knowledge . . . the statement was false or

3    misleading.'"  *Am. West*, 320 F.3d at 936.  The Complaint alleges numerous detailed facts showing

4    Defendants knew about material problems with Panama, yet failed to disclose them to investors.[20]

5         Third, even if Defendants' statements were forward-looking, the cautionary language

6    accompanying the announcements was meaningless because it did not truthfully address the specific

7    risks or disclose existing adverse risks.  *See Credit Suisse First Boston Corp. v. Arm Fin. Group*, No.

8    99 Civ. 12046 (WHP), 2001 U.S. Dist. LEXIS 3332, at *23 (S.D.N.Y. Mar. 28, 2001) ("warnings of

9    specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to

10   appreciating the magnitude of the risks described").  As the Ninth Circuit recently emphasized,

11   knowingly warning a negative event "might" occur is "quite different" from informing the public it

12   has already "***in fact***" occurred.  *Berson*, 527 F.3d at 987 (emphasis in original).  Clearly, "investors

13   would treat the two differently."  *Id.* at 990.  *See In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d

14   857, 883 (N.D. Cal 2004) ("'the inclusion of general cautionary language . . . would not excuse the

15   alleged failure to reveal known material, adverse facts'").[21]

16        Defendants argue warnings of the risks relevant to Yahoo!'s search marketing business,

17   notably those in press releases and conference calls from April 7, 2004 to October 18, 2005, are

18   protected by the safe harbor.  Defs.' Mem. at 22.  They are not, however, because Defendants were

19   aware these risks had already materialized.  *Berson*, 527 F.3d at 987.  By April 7, 2004, the

20

_____

21   [20] On an October 18, 2005 conference call, for example, Defendant Decker informed investors the
22   financial benefits of Panama would be seen in late 2005 and 2006, despite the Individual
     Defendants' knowledge that the search algorithm was slated for launch no earlier than 2Q06.  ¶¶3,
23   20(a), 116, 117.  Also, during a May 17, 2006 analyst day, Defendants provided details of a
     three-phase Panama roll-out beginning in 3Q06 and concluding in 4Q06, despite their knowledge
24   that a first-phase launch in 3Q06 and full implementation in 4Q06 was impossible.  ¶¶8, 143, 144(b).

25   [21] *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125
     (9th Cir. 2004), cited by Defendants, is distinguishable.  In *Clorox*, many of defendant's "statements
26   were cautions in themselves," and defendant "identified the important problems with [the
     acquisition] that could cause her estimate of the approximate timetable to be off."  *Id.* at 1133.  Here,
27   Defendants' statements assured successful development of the new search algorithm, absent
     disclosure they ***already knew*** the timetable for Panama was not as they represented.

28

1    integration and performance of Overture was already known to be disastrous due to underfunding

2    and Yahoo!'s firing of senior engineers. ¶¶3, 29, 30, 56. Also, by April 7, 2004, Defendants knew

3    Yahoo! was adjusting poorly to changes in Overture personnel because Yahoo! had terminated the

4    engineers capable of executing new search technology, causing major delays and obstacles. ¶3, 29,

5    56. Not until the fall of 2005 did Yahoo! begin to dedicate more resources to the development of

6    Panama. ¶¶20(a), 21, 23. The cautionary language cited by Defendants as adequate warnings at the

7    May 17, 2006 analyst day about the three-phase roll-out of Panama in 3Q and 4Q 2006 therefore has

8    no effect, because they **already knew** they were "unable to adapt [their] systems in a timely manner,"

9    yet continued to assure investors Panama would be successfully executed by the end of 2006. ¶¶8,

10   143. Because Defendants failed "'to reveal known material, adverse facts'" (*Copper Mountain*, 311

11   F. Supp. 2d at 883), and did not disclose to investors that the risks addressed in these press releases

12   had already "**in fact**" occurred (*Berson*, 527 F.3d at 987) (emphasis in original)), the cautionary

13   language cited by Defendants was meaningless.[22]

14   **IV.    THE COMPLAINT ADEQUATELY ALLEGES SCIENTER**

15        To plead scienter under the PSLRA (15 U.S.C. §78u-4(b)(2)), Plaintiffs' allegations "taken

16   collectively" must give rise to a strong inference of scienter, and not be viewed as individual

17   allegations "scrutinized in isolation." *Tellabs*, 127 S. Ct. at 2509. "The inference that the defendant

18   acted with scienter **need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most**

19   **plausible of competing inferences**.'" *Id*. at 2510. Instead, "[w]hen the allegations are accepted as

20   true and taken collectively," a court need only find that a reasonable person would "deem the

21   inference of scienter **at least as strong as any opposing inference**." *Id*. at 2511. When all of the

22   allegations are considered together as *Tellabs* mandates, Plaintiffs properly allege that Defendants

23   knowingly (or at least recklessly) made false and misleading statements to the investing public.[23]

24   _____

25   [22]  *See also Rosenbaum Capital, LLC v. McNulty*, 549 F. Supp. 2d 1185, 1191 (N.D. Cal. 2008)

26   (warnings lose value when defendants publicly stated an acquisition was well integrated when they
     knew the integration was "highly problematic").

27   [23]  Plaintiffs' strong allegations of scienter easily satisfy *Metzler*, 2008 U.S. App. LEXIS 15935.

28   Here, massive insider trading was dramatically out of line with pre-Class Period sales, and detailed

A.    **The Confidential Witness Accounts Show Defendants Had Actual Knowledge of the Falsity of Their Statements When Made**

The Complaint alleges with particularity that the Individual Defendants, all Yahoo! top officers and executives, knew of the falsity of their statements regarding Yahoo!'s search business and the inclusion of click fraud revenues in Yahoo!'s financial statements. ¶¶20-34, 155-178. The CW accounts in the Complaint paint a stunning picture of the Individual Defendants' personal involvement in every aspect of the key components of Yahoo!'s financial operations during the Class Period – the integration of Overture, the execution of Panama, and the recognition of click fraud revenue – and corroborate allegations showing Defendants knew their statements were false when made. *Id.*

According to CW1, Nazem removed the previous engineer in charge of Panama after it "'failed miserably'" in July or August 2005. ¶20. CW4 confirmed in October 2005, Nazem yanked Panama from the Overture facilities and based it out of his corporate office, then selected CW1 to lead Panama and placed him/her under "'a lot of pressure'" to "get [Panama] out there immediately." ¶¶20, 23. Nazem met with CW1 every Wednesday for progress reports on Panama, and CW15 also attended weekly meetings held by Nazem to discuss Panama. ¶¶20(a), 34. CW2 recalled in March 2006, Nazem met with sales management in Pasadena to discuss the resources dedicated to Panama. ¶21. CW12 attended a meeting in early 2006 wherein Nazem announced Project Symphony, a back-end project associated with Panama, was being "'scratched'" and its resources diverted to Panama. ¶31.

CW1 further confirmed Nazem met on a weekly basis with and provided updates on Panama to Defendants Semel, Decker and Rosensweig. ¶29(a). CW13 stated Defendant Semel received additional weekly briefings on Panama from other senior management. ¶32. Each Individual Defendant constantly monitored, and therefore knew about, the delays and problems with the

corroborating CW accounts establish Defendants' personal involvement in the fraud alleged, rather than conclusory allegations that Defendants had to be aware of the Company's improper practices. *Id.* at *39-*43.

1    execution of Panama, while falsely assuring investors that everything was on track for improving the

2    Company's search monetization.  ¶¶20(a), 32, 158.

3         The Complaint also alleges facts showing Defendants knew, or were deliberately reckless in

4    not knowing, that Yahoo!'s financial statements were falsely overstated because they included click

5    fraud revenues.  Decker was intimately involved in the Company's recognition of click fraud

6    revenue.  Defendants not only ignore Plaintiffs' detailed and corroborating witness accounts (¶¶20-

7    34), as well as the extensive additional indicia of scienter (¶¶155-178), but Defendants also attempt

8    to mislead the Court into thinking none of the CWs ever communicated or met with Decker or

9    Semel.  Defs.' Mem. at 17.  This simply is not true.  CW8 met with Decker to discuss click fraud at

10   Yahoo! in 2005.  ¶27.  CW10 gave Decker access to the revenue reporting system at Overture.  ¶29.

11   CW9 talked to Decker about customer complaints about click fraud.  ¶170.  Decker had access to the

12   "'CVS code log'" computer system, in which *she could ascertain and even amend the method to*

13   *determine whether a click was billable*.  ¶29.  CW8, CW9 and CW10 confirmed Defendant Decker

14   was aware of the majority of customer complaints regarding click fraud.  ¶¶27-29.  Also, in August

15   2005, CW14 and other engineers from CW14's group had a meeting with Semel and discussed the

16   diminished customer search experience due to increased ads placed to increase revenue.  ¶¶33, 178.

17        Customer complaints about click fraud were logged in the customer relationship management

18   system and according to CW9 and CW10, both of whom worked in divisions at Yahoo! dealing with

19   click fraud, Decker reviewed the complaints.  ¶¶33, 176, 178.  Importantly, CW12 stated there were

20   more complaints from customers about click fraud at the end of each quarter.  ¶31.  These CW

21   accounts show Decker knew, or was deliberately reckless in not knowing, that click fraud revenues

22   were improperly included in Yahoo!'s revenues each quarter during the Class Period.

23        **B.    The Complaint Also Raises a Strong Inference that Defendants'**
           **Misrepresentations Were Either Made Intentionally or with**
24         **Deliberate Recklessness**

25        A strong inference of scienter can be inferred where defendants were high level managers

26   and the accounting fraud had a significant impact on the company's revenue.  *Berson*, 527 F.3d at

27   987.  The Individual Defendants held themselves out as the persons most knowledgeable about the

28

1    key components of Yahoo!'s financial condition during the Class Period – the integration of

2    Overture, the execution of Panama, and the recognition of click fraud revenue.  ¶¶155, 156.

3        A strong inference is warranted because Yahoo!'s false statements and omissions regarding

4    Overture, Panama and click fraud related to its sponsored search business, which provided 40% of

5    the Company's total revenues.  ¶¶3, 157-168, 175-178.  In this Circuit, facts critical to a company's

6    core operations or important transactions are so apparent that knowledge of such facts may be

7    reasonably attributed to the company and its key officers.  *Berson*, 527 F.3d at 989 ("'absurd to

8    suggest'" top management would be unaware of facts important to company's business).

9        The Complaint alleges that as top executives and officers at Yahoo!, the Individual

10   Defendants knew about all aspects of Yahoo!'s business operations and participated regularly in

11   meetings where issues about Yahoo!'s search business were discussed, including Panama. ¶¶15-18,

12   159-168.  Semel was Yahoo!'s CEO, made numerous public statements during the Class Period

13   about Yahoo!'s search business and click fraud issues, and was briefed on a weekly basis regarding

14   the status of Panama by its leadership team.  ¶¶15, 32, 94.  Similarly, Rosensweig was Yahoo!'s

15   COO until March 2007 when he left the Company, and spoke numerous times during the Class

16   Period on issues involving Yahoo!'s search business and click fraud.  ¶16.  Nazem was Yahoo!'s

17   Executive Vice President and CTO and was intimately involved in all aspects of Yahoo!'s business

18   operations, including Panama and click fraud issues, and met weekly during the Class Period with

19   the Panama manager, CW1.  ¶¶17, 20(a), 159-168.  Decker was Yahoo!'s CFO and intimately

20   involved in monitoring click fraud issues at Yahoo!.  ¶18.  This is confirmed by CW8 who met with

21   Decker in 2005 about the Company's click fraud issues and Decker's firing of CW9, because CW9

22   agreed to an $8,000 click fraud refund for a customer.  ¶¶18, 27-28, 117.  CW9 reported Decker

23   regularly reviewed customer complaints about click fraud.  ¶¶18, 28.  These allegations of Decker's

24   personal involvement, and her position as CFO in charge of revenue, support a strong inference she

25   knew Yahoo!'s financial statements were falsely overstated with click fraud revenues.

26

27

28

1

2

**C.    Defendants' Scienter Is Strongly Inferred from Their Signed
        Certifications to the SEC**

3        Not only did the Defendants hold themselves out as knowledgeable about Yahoo!'s search

4   business and the recognition of click fraud revenue (¶¶155, 156), they also attested to reviewing,

5   designing and certifying the accuracy of Yahoo!'s financial statements and internal controls (¶¶224-

6   227).

7        As alleged in the Complaint, Yahoo! mantained a "'CVS code log'" which provided a

8   method to track changes to the software that determined whether a click was billable, and was used

9   to comply with the controls called for by SOX.  ¶172.  Thus, when Defendants Semel and Decker

10  signed their certifications they either had actual knowledge that Yahoo!'s software system was not

11  accurately detecting click fraud and did nothing about it, ***or*** they recklessly stated on their

12  certifications that they personally evaluated Yahoo!'s controls (which included the CVS system) and

13  they were adequate, which creates a strong inference of scienter.  *In re Lattice Semiconductor Corp.*

14  *Sec. Litig.*, No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262, at *50-*51 (D. Or. Jan. 3, 2006).[24]

15  **D.    The Individual Defendants' Insider Trading of Yahoo! Stock
          Supports a Strong Inference of Scienter**

16       The Individual Defendants also engaged in massive insider trading both unusual in timing

17  and amount throughout the Class Period, which supports an inference of scienter.  *Am. West*, 320

18  F.3d at 938-39.  *See also Daou*, 411 F.3d at 1022; *Oracle*, 380 F.3d at 1232.  Throughout the Class

19  Period, each Individual Defendant sold an enormous percentage of his or her Yahoo! stock,

20  dramatically inconsistent with the insider's prior trading history.  ¶¶180-188.  First, the amount and

21  percentage of Yahoo! shares sold by each of the Individual Defendants during the Class Period is

22

23

24  ────────────────

25  [24]  Sarbanes-Oxley §302's certification requirements were expressly designed to prevent top
    executives from adopting a "'head in the sand'" defense to actions for securities fraud committed on

26  their watch.  Indeed, by requiring the CEOs and CFOs signatures, these "'officer[s] believe[] that the
    statements in the document are true.'"  *Lattice*, 2006, U.S. Dist. LEXIS 262, at *47-*49 (rejecting

27  defendants' argument regarding the import of CEOs and CFOs signatures on Sarbanes-Oxley
    certification) (citing *Howard v. Everex Sys.*, 228 F.3d 1057, 1061 (9th Cir. 2000)).

28

1    suspicious.[25]   The Complaint alleges the Individual Defendants sold between 84%-90% of their

2    shares during the Class Period, with the proceeds exceeding $879 million.[26]   Second, a strong

3    inference of scienter is reinforced because Individual Defendants' insider sales were dramatically out

4    of line with their pre-Class Period sales, constituting only **7%** (Semel), **9%** (Decker), **8%**

5    (Rosensweig) and **39%** (Nazem) of their Class Period insider sales.[27]   *See Am. West*, 320 F.3d at

6    939-40; *In re Omnivision Techs.*, No. C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009, at *14-*15

7    (N.D. Cal. July 29, 2005) (sales of 18% and 64% during the class period, versus 7% and 29%,

8    respectively, during the prior year, meet the Ninth Circuit's "'dramatically out of line standard'").[28]

9         Third, the general timing of the insider sales raises suspicion.  The Individual Defendants

10   typically sold their Yahoo! stock only on days after issuing favorable, albeit **false**, statements about

11   the Company – designed to keep share price artificially inflated.   ¶180.   Even if Individual

12   Defendants sold some Yahoo! stock just after earnings announcements not in line with expectations

13   (Defs.' Mem. at 20), they were still trading based on known, yet undisclosed, inside information

14   because these statements did not disclose the truth.  ¶¶150, 180-188.  The Individual Defendants sold

---

16   [25]   The length of the Class Period is consistent with Yahoo!'s fraudulent scheme detailed in the
     Complaint.  On April 7, 2004 (the day before the start of the Class Period), Defendants began to
17   make false statements related to the Company's new search algorithm, causing its stock price to be
     artificially inflated, and on July 18, 2006 (the last day of the Class Period), Defendants made a full
18   disclosure of Yahoo!'s failure to launch the search algorithm as it had promised, and revealed it was
     forced to terminate relationships with affiliates known to contribute to click fraud.  ¶¶49, 150.

19   [26]   Plaintiffs calculated the percentage of Yahoo! shares sold during the Class Period based upon the
20   publicly available Form 4s for each Individual Defendant filed with the SEC throughout that time.
     ¶¶181-188.  Even if vested options were included when calculating the percentage of Yahoo! shares
21   sold during the Class Period, as Defendants suggest, the percentage sold by each Individual
     Defendant is still a significant amount (**49.3%** for Semel; **68.1%** for Rosensweig; **58.1%** for Nazem;
22   and **35.6%** for Decker).  Defs.' Mem. at 20 n.12.

23   [27]   Defendants' charts (*see* Defs.' Mem., App. A at A1-A5), listing the number of shares sold during
     the Class Period, fail to show pre-Class Period sales that constituted a fraction of Class Period sales.

24   [28]   The *Vantive* case, heavily relied upon by Defendants, is distinguishable.  *In re Vantive Corp. Sec.*
25   *Litig.*, 283 F.3d 1079 (9th Cir. 2002).  Here, the Complaint sets forth corroborating reports by 15
     CWs alleging Yahoo!'s fraudulent scheme.  ¶¶20, 34, 155-178.  *Vantive*, by contrast, emphasized the
26   insider trading allegations did not support an inference of scienter in the "context" of "insufficient
     allegations of fraud [that] have a spillover effect" onto the court's analysis.  283 F.3d at 1093, 1096.
27   Also many of the insider sales examined in *Vantive* were not dramatically out of line with pre-class
     period sales.  *Id.* at 1094-95.

28

1    *26,794,443 shares* of Yahoo! stock, reaping over *$879 million* in insider trading proceeds *before* the

2    true facts regarding Yahoo!'s financial condition were revealed.  ¶¶150, 180-188; *see Schlagal v.*

3    *Learning Tree, Int'l*, No. CV 98-6384, 1998 U.S. Dist. LEXIS 20306, at *50 (C.D. Cal. Dec. 23,

4    1998) ("motive is 'strengthened' where stock sales occur while the market is still receiving allegedly

5    misleading revenue information").

      **E.    The Complaint Pleads with Particularity Facts Demonstrating that**
6               **Defendant Nazem Is Liable as a Primary Violator of Section 10(b)**

7            Any suggestion by Defendants that Nazem is not primarily liable for violation of Securities

8    Exchange Act of 1934 ("Exchange Act") §10(b), 15 U.S.C. §78j(b), improperly ignores the totality

9    of Plaintiffs' allegations.  Here, Plaintiffs pled Nazem was the CTO at Yahoo! during the Class

10   Period and had knowledge of all the problems that Yahoo! was experiencing with regard to the

11   integration of Overture, the development of the Company's new search platform and Panama.  ¶18.

12   Indeed, as the CTO of an internet media company such as Yahoo!, Nazem was at the center of

13   Defendants' concealment of the Company's engineering woes.  Nazem participated in the May 17,

14   2006 analyst day conference call where Defendants made false and misleading statements.  Nazem

15   cannot shield himself from liability for those statements by arguing that he said nothing during the

16   conference call.  *See SmarTalk*, 124 F. Supp. 2d at 543.  Moreover, Nazem dumped over 88% of his

17   Yahoo! shares during the Class Period while in possession of material, non-public information

18   regarding Yahoo!'s fraudulent conduct.  ¶187.  This is a *separate* violation of §10(b).  *See Chiarella*

19   *v. United States*, 445 U.S. 222, 230 (1980) ("[S]ilence in connection with the purchase or sale of

20   securities may operate as a fraud actionable under §10(b) despite the absence of statutory language

21   or legislative history specifically addressing the legality of nondisclosure.").

22   **V.    THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION**

23           Plaintiffs have adequately pled loss causation by identifying in detail Defendants'

24   misrepresentations and omissions that artificially inflated the price of Yahoo! stock,[29] the problems

---

[29]  *See* ¶¶49-52, 55, 57-59, 61, 62, 64-66, 68, 72, 75, 76, 78, 81, 82, 84-89, 93-96, 101, 103, 104, 109, 112, 114, 118, 120, 122, 124-126, 133, 137, 138, 142, 143, 146.

1    surrounding the development of Yahoo!'s paid search business (Overture and Panama) and the

2    improper recognition of click fraud revenue which made Defendants' statements false,[30] the

3    disclosures revealing the falsity of Defendants' statement,[31] and the resulting decline in Yahoo!

4    stock on January 18, 2006 and July 18, 2006, after the truth was revealed.[32]

5         In *Dura*, the Supreme Court recognized that pleading loss causation is "not meant to impose

6    a great burden upon a plaintiff," but simply requires a short and plain statement under Federal Rule

7    of Civil Procedure 8(a)(2) showing what the relevant loss "might be" and "what the causal

8    connection might be between" the plaintiffs' loss and the defendants' misconduct. *Dura*, 544 U.S. at

9    347.

10        The Complaint pleads a causal link between Defendants' January 18, 2006 and July 18, 2006

11   disclosures of the Company's delay in implementing Panama and Plaintiffs' losses. ¶¶232-234.

12   Defendants' suggestion there is no loss causation for statements concerning Panama is belied by the

13   market's reaction to the delays, described by one securities analyst as "'Panamawful,'" and the

14   major drops in Yahoo!'s stock price as the market absorbed this news. ¶150. The Complaint also

15   pleads a causal link between Defendants' false financial statements and Plaintiffs' losses by alleging

16   that on January 18 and July 18, 2006, Yahoo!'s stock plummeted when the Company was forced to

17   announce revenues would decrease because the Company was terminating relationships with lower

18   quality affiliates known to contribute to click fraud.[33]

19        Defendants argue, inconsistent with *Daou*, that a specific disclosure regarding improperly

20   recognized revenue is required to establish loss causation. Defs.' Mem. at 23. In *Daou*, the Ninth

21   _____

22   [30]  *See* ¶¶3-5, 20-34, 56, 60, 73, 79, 90, 102, 113, 123, 131, 139, 144, 155-178, 199-213.

23   [31]  *See* ¶¶126-154.

24   [32]  *See* ¶¶130, 150, 232.

25   [33]  Defendants' arguments that Yahoo! had previously disclosed increasing traffic acquisition costs
     ("TAC") also fail because anticipating higher TAC is not the same as revealing the Company's
26   revenues were inflated via click fraud. Defs.' Mem. at 23-26. In January and July 2006, Yahoo!'s
     stock price declined because the market became aware Yahoo! had to distance itself from lower
27   quality affiliates that had been generating revenue via click fraud, and therefore Yahoo!'s TAC
     would increase because higher quality affiliates cost more. ¶¶22(e), 28, 29, 126, 127.

28

Circuit rejected the district court's holding that express disclosures of fraud at the time the stock price dropped were required to plead loss causation. 411 F.3d at 1026.[34] *Daou* found it sufficient under *Dura* to allege the stock drop was caused by disclosures of negative financial results alleged to be the direct result of improper accounting practices, which is what Plaintiffs have done here. *Id.*; *see* ¶¶6, 8, 130, 150. *See also Berson*, 527 F.3d at 990 (plaintiff adequately pled loss causation where defendants overstated revenues and a stock price decline occurred immediately after defendants revealed the company's "'true financial condition'") (quoting *Daou*, 411 F.3d at 1025-26).[35]

## VI.     PLAINTIFFS HAVE ADEQUATELY ALLEGED AN INSIDER TRADING CLAIM UNDER SECTION 20A

The Complaint alleges a viable §10(b) claim, as well as facts showing the Individual Defendants sold Yahoo! stock contemporaneously with one or more Plaintiff(s) when they possessed material, adverse information unknown to the investing public, and thus are liable under Exchange Act §20A, 15 U.S.C. §78t-1. ¶¶2, 262-270; *Shurkin v. Golden State Vintners, Inc.*, 471 F. Supp. 2d 998, 1026 (N.D. Cal. 2006). *In re VeriFone Securities Litigation*, 11 F.3d 865, 870, 872 (9th Cir. 1993) does not require Plaintiffs specify the precise, material non-public information possessed by Defendants at the exact moment they sell stock. The knowledge requirement is not heightened as Defendants suggest; Plaintiffs need only allege scienter as to their §10(b) claims to adequately allege Defendants knew material, non-public information when selling Yahoo! stock. *Id.*

---

[34]  *Metzler*, 2008 U.S. App. LEXIS 15935, does not overrule *Daou*, and the Complaint adequately pleads loss causation under *Daou*. *Metzler* is distinguishable regardless, because Defendants therein issued two announcements that did not disclose, or even suggest, to the market that the Company was engaged in the fraudulent activity alleged to have caused Plaintiffs' losses. *Id.* at *27-*28, *31. Here, unlike *Metzler*, in January and July 2006 Yahoo! specifically disclosed the truth about key components of the fraud alleged – delays in the execution of Panama, as well as declines in revenue because it was terminating relationships with lower quality affiliates to reduce click fraud. ¶¶6, 126, 127, 150.

[35]  Defendants' suggestion that the financial statements were not false because they were never "questioned" by anyone, including the Company's auditors, is wrong. Defs.' Mem. at 23. In *LDK Solar*, 2008 U.S. Dist. LEXIS 42425, the court rejected this argument stating "'the fact that the financial statements for the year  in question were not restated does not end [the plaintiff's] case when he has otherwise meet the pleading requirements of the PSLRA. To hold otherwise would shift to accountants the responsibility that belongs to the courts.'" *Id.* at *31-*32.

1

**VII.    PLAINTIFFS HAVE ADEQUATELY ALLEGED CONTROL PERSON LIABILITY UNDER SECTION 20(a)**

2

3

Because Plaintiffs have properly pled a §10(b) violation, they may prevail on their Exchange

4

Act §20(a), 15 U.S.C. §78t(a), claim because the Complaint sets forth how each Defendant not only

5

had direct and supervisory involvement in the day-to-day operations of the Company, but also

6

exercised his or her power to influence and control the decision-making of Yahoo! and the content

7

and dissemination of the statements identified by Plaintiffs as false and misleading. *LDK Solar*, U.S.

8

Dist. LEXIS 42425, at *50; *In re Adaptive Broadband Sec. Litig.*, No. C 01-1092 SC, 2002 U.S.

9

Dist. LEXIS 5887, at *58-*59 (N.D. Cal. Apr. 2, 2002); ¶¶257, 258.[36]

**VIII.    CONCLUSION**

10

The motion to dismiss should be denied.  In the event this Court grants Defendants' motion

11

to dismiss in whole or in part, Plaintiffs respectfully request leave to amend the Complaint.

12

*Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003).

13

DATED:  August 1, 2008                         Respectfully submitted,

14

15                                                                  COUGHLIN STOIA GELLER
                                                                      RUDMAN & ROBBINS LLP
                                                                   HENRY ROSEN

16                                                                 ANNE L. BOX
                                                                   LAURIE L. LARGENT

17                                                                 MARY K. BLASY
                                                                   JULIE A. WILBER

18

19

20                                                                 _____
                                                                             s/ Henry Rosen
                                                                           HENRY ROSEN

21

22

23

24

[36]  Defendants do not contest Plaintiffs have pled the control relationship with sufficient particularity as to Defendants Decker and Semel, and assert these two Defendants can escape liability under §20(a) only if the Court rejects Plaintiffs' §10(b) claims. Defs.' Mem. at 24-25. During the Class Period, Defendant Nazem was Executive Vice President and Yahoo!'s CTO and defendant Rosensweig was COO.  ¶¶16, 17.  Both were intimately involved in the preparation of Yahoo!'s financial statements, including decisions on disclosures of internal controls, and reviewed and approved SEC filings and Annual Reports to Shareholders. *Id.*  Rosensweig regularly participated in conference calls for the investment community.  ¶¶50, 62, 76, 82, 94, 96, 104, 115.

25

26

27

28

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

SUGARMAN & SUSSKIND
ROBERT SUGARMAN
100 Miracle Mile, Suite 300
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)

Additional Counsel for Plaintiff

S:\CasesSD\Yahoo\BRF00052964.doc

1

<u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on August 1, 2008, I electronically filed the foregoing with the Clerk of

3  the Court using the CM/ECF system which will send notification of such filing to the e-mail

4  addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5  mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6  participants indicated on the attached Manual Notice List.

7      I further certify that I caused this document to be forwarded to the following designated

8  Internet site at:  http://securities.csgrr.com/.

9      I certify under penalty of perjury under the laws of the United States of America that the

10  foregoing is true and correct.  Executed on August 1, 2008.

11

12                              s/ HENRY ROSEN
                              HENRY ROSEN

13

14                              COUGHLIN STOIA GELLER
                                  RUDMAN & ROBBINS LLP
15                              655 West Broadway, Suite 1900
                              San Diego, CA  92101-3301
16                              Telephone:  619/231-1058
                              619/231-7423 (fax)
17                              E-mail:  HenryR@csgrr.com

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 4:08-cv-02150-CW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

**Mary K. Blasy**
maryb@lerachlaw.com,e_file_sf@lerachlaw.com

**Anne Louise Box**
anneb@csgrr.com

**Spencer A. Burkholz**
SpenceB@csgrr.com,jwilber@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

**Patrick J. Coughlin**
PatC@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

**Alan I. Ellman**
aellman@labaton.com,cchan@labaton.com

**Jordan Eth**
jeth@mofo.com

**Mark R.S. Foster**
mfoster@mofo.com,vpooni@mofo.com

**Christopher J. Keller**
ckeller@labaton.com,cchan@labaton.com

**Mark Irving Labaton**
mlabaton@kreindler.com,wkurtz@kreindler.com

**Laurie L. Largent**
llargent@csgrr.com

**Judson Earle Lobdell**
jlobdell@mofo.com,mblackmer@mofo.com

**Tricia Lynn McCormick**
triciam@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

**Andrei V. Rado**
arado@labaton.com

**Darren Jay Robbins**
e_file_sd@csgrr.com

**Henry Rosen**
HenryR@csgrr.com

**Anna Erickson White**
awhite@mofo.com,avickery@mofo.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Nathan Bear**
Coughlin Stoia Geller Rudman and Robbins
655 West Broadway Suite 1900
San Diego, CA 92101