1

2

3

4

5                      IN THE UNITED STATES DISTRICT COURT

6

7                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9   ELLEN ROSENTHAL BRODSKY, et al.,          No. C 08-02150 CW

10          Plaintiffs,                        ORDER GRANTING
                                               DEFENDANTS' MOTION
11      v.                                     TO DISMISS

12  YAHOO! INC., TERRY S. SEMEL, SUSAN L.
    DECKER, FARZAD NAZEM, and DANIEL
13  ROSENSWEIG,

14          DefendantS.
    _____/
15

16       Defendants Yahoo! Inc., Terry S. Semel, Susan L. Decker,

17  Farzad Nazem and Daniel Rosensweig move to dismiss the Consolidated

18  Amended Class Action Complaint (CAC).  Lead Plaintiffs Pension

19  Trust Fund for Operating Engineers and Pompano Beach Police and

20  Firefighters' Retirement Systems oppose the motion.  The motion was

21  heard on October 2, 2008.  Having considered all of the parties'

22  papers and oral argument on the motion, the Court grants

23  Defendants' motion and grants Lead Plaintiffs leave to amend the

24  complaint.

25                            BACKGROUND[1]

26       Defendant Yahoo! is a global internet services company

27  _____

28       [1]All facts are taken from Lead Plaintiffs' CAC and are assumed
    to be true for purposes of this motion.

headquartered in Sunnyvale, California.  The four individual Defendants are Terry S. Semel, former Chairman and Chief Executive Officer; Susan L. Decker, currently Yahoo!'s President and former Chief Financial Officer and Executive Vice President of Finance and Administration during the Class Period; Farzad Nazem, former Chief Technology Officer; and Daniel L. Rosensweig, former Chief Operating Officer.

Lead Plaintiffs and Ellen Brodsky purport to represent a class of persons and entities that bought common stock of Yahoo! between April 8, 2004 and July 18, 2006 (Class Period).

Plaintiffs allege that, during the Class Period, Defendants engaged in a scheme to inflate artificially the price of Yahoo! stock by falsely representing that Yahoo!'s business model and search business was succeeding.  Over the course of the Class Period, Defendants Semel, Decker and Rosensweig made many public statements expressing enthusiasm for Yahoo!.  These statements were in the form of Yahoo! press releases, quarterly conference calls, SEC filings, and analyst reports.  See CAC ¶¶ 49-53, 57-59, 61-72, 75-78, 81-89, 91-101, 103-112, 114-122, 124-126, 133, 137-138, 141-143.  Plaintiffs allege that these statements were false and misleading because they conflicted with the facts of Yahoo!'s myriad internal problems.

Plaintiffs also allege that Yahoo! inflated its revenue by relaxing the "click fraud" filtering system "to allow non-billable click activity to be passed on to customers, thereby increasing the Company's revenues at the end of the quarter."  CAC ¶ 56(f).  Click fraud describes activity undertaken for the sole purpose of causing Yahoo! or another search marketing business to log a click which

2

generates a payment due from an advertiser.  CAC ¶ 92.  Click fraud

may be committed by a search marketing business seeking to generate

a payment for itself, or by an advertiser's competitor seeking to

impose a cost on the advertiser.  Id.  Plaintiffs allege that

relaxing the click fraud standards inflated Yahoo!'s revenue at

least ten percent during each of the ten quarters in the Class

Period.  Plaintiffs lastly allege that Yahoo! misstated that

"Panama," an upgrade to Yahoo!'s search marketing platform, would

launch earlier than it eventually did.

Plaintiffs rely on fifteen Confidential Witnesses (CWs) to

support their allegations.  The CWs describe problems that arose

from Yahoo!'s 2003 acquisition and integration of Overture

Services, Inc., an internet search company that was engaged in a

type of internet advertising called "search marketing" or "pay per

click" advertising.  CAC ¶ 3.  Plaintiffs allege that Yahoo!'s

unsuccessful integration of Overture and "solving the blob," both

precursor programs to Panama, caused delays in releasing Panama.

LEGAL STANDARD

A complaint must contain a "short and plain statement of the

claim showing that the pleader is entitled to relief."  Fed. R.

Civ. P. 8(a).  On a motion under Rule 12(b)(6) for failure to state

a claim, dismissal is appropriate only when the complaint does not

give the defendant fair notice of a legally cognizable claim and

the grounds on which it rests.  See Bell Atl. Corp. v. Twombly,

__ U.S. __, 127 S. Ct. 1955, 1964 (2007).

In considering whether the complaint is sufficient to state a

claim, the court will take all material allegations as true and

construe them in the light most favorable to the plaintiff.  NL

**United States District Court**
For the Northern District of California

Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).
Although the court is generally confined to consideration of the
allegations in the pleadings, when the complaint is accompanied by
attached documents, such documents are deemed part of the complaint
and may be considered in evaluating the merits of a Rule 12(b)(6)
motion.  Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th
Cir. 1987).

When granting a motion to dismiss, the court is generally
required to grant the plaintiff leave to amend, even if no request
to amend the pleading was made, unless amendment would be futile.
Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911
F.2d 242, 246-47 (9th Cir. 1990).  In determining whether amendment
would be futile, the court examines whether the complaint could be
amended to cure the defect requiring dismissal "without
contradicting any of the allegations of [the] original complaint."
Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990).

I.   Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for any
person to "use or employ, in connection with the purchase or sale
of any security . . . any manipulative or deceptive device or
contrivance in contravention of such rules and regulations as the
[SEC] may prescribe."  15 U.S.C. § 78j(b); see also 17 C.F.R.
§ 240.10b-5 (Rule 10b-5).  To state a claim under § 10(b), a
plaintiff must allege: "(1) a misrepresentation or omission of
material fact, (2) scienter, (3) a connection with the purchase or
sale of a security, (4) transaction and loss causation, and
(5) economic loss."  In re Gilead Sciences Securities Litig., 536
F.3d 1049, 1055 (9th Cir. 2008).

4

**United States District Court**
For the Northern District of California

1    Some forms of recklessness are sufficient to satisfy the

2   element of scienter in a § 10(b) action.  See Nelson v. Serwold,

3   576 F.2d 1332, 1337 (9th Cir. 1978).  Within the context of § 10(b)

4   claims, the Ninth Circuit defines "recklessness" as

5        a highly unreasonable omission [or misrepresentation],
     involving not merely simple, or even inexcusable
6        negligence, but an extreme departure from the standards
     of ordinary care, and which presents a danger of
7        misleading buyers or sellers that is either known to the
     defendant or is so obvious that the actor must have been
8        aware of it.

9   Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir.

10  1990) (en banc) (quoting Sundstrand Corp. v. Sun Chem. Corp., 553

11  F.2d 1033, 1045 (7th Cir. 1977)).  As explained by the Ninth

12  Circuit in In re Silicon Graphics Inc. Securities Litig., 183 F.3d

13  970 (9th Cir. 1999), recklessness, as defined by Hollinger, is a

14  form of intentional conduct, not merely an extreme form of

15  negligence.  See Silicon Graphics, 183 F.3d at 976-77.  Thus,

16  although § 10(b) claims can be based on reckless conduct, the

17  recklessness must "reflect[] some degree of intentional or

18  conscious misconduct."  See id. at 977.  The Silicon Graphics court

19  refers to this subspecies of recklessness as "deliberate

20  recklessness."  See id. at 977.

21    As stated above, Plaintiffs must plead any allegations of

22  fraud with particularity, pursuant to Rule 9(b) of the Federal

23  Rules of Civil Procedure.  In re GlenFed, Inc. Sec. Litig., 42 F.3d

24  1541, 1543 (9th Cir. 1994) (en banc).  Pursuant to the requirements

25  of the Private Securities Litigation Reform Act of 1995 (PSLRA),

26  Pub. L. No. 104-67, the complaint must "specify each statement

27  alleged to have been misleading, the reason or reasons why the

28  statement is misleading, and, if an allegation regarding the

5

statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

Further, pursuant to the requirements of the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  The PSLRA thus requires that a plaintiff plead with particularity "facts giving rise to a strong inference that the defendant acted with," at a minimum, deliberate recklessness.  See 15 U.S.C. § 78u-4(b)(2); Silicon Graphics, 183 F.3d at 977.  Facts that establish a motive and opportunity, or circumstantial evidence of "simple recklessness," are not sufficient to create a strong inference of deliberate recklessness. See Silicon Graphics, 183 F.3d at 979.  To satisfy the heightened pleading requirement of the PSLRA for scienter, plaintiffs "must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent."  Id.

A.    Misrepresentation or Omission of a Material Fact

To state a claim pursuant to § 10(b) of the Exchange Act, Plaintiffs must allege, among other things, a misrepresentation or omission of a material fact.  The plaintiff's complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statement were false, does not

meet this standard." Metzler Investment v. Conrinthian Colleges, __ F.3d __, 2008 WL 3905427, *15 (9th Cir.); see Falkowski v. Imation Corp., 309 F.3d 1123, 1133 (9th Cir. 2002) ("Although the allegations here are voluminous, they do not rise to the level of specificity required under the PSLRA.  The allegations consist of vague claims about what statements were false or misleading, how they were false, and why we can infer intent to mislead.  We have dismissed much more specific and compelling allegations.")

1.   Particularity of Pleading

Defendants argue that, because most of the CAC consists of block quotations taken from statements by Defendants and securities analysts, Plaintiffs have not plead falsity with the required particularity.  The Court agrees.  Much of the CAC is poorly organized and difficult to follow.

"In the context of securities class action complaints, courts have repeatedly lamented plaintiffs' counsels' tendency to place 'the burden [] on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims." Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1244 (N.D. Cal 1998).  Throughout the 209 page CAC, instead of pointing to how each of Defendants' statements is false, Plaintiffs merely repeat the same few pages of CW statements which restate the problems Yahoo! was experiencing with Overture, "solving the blob" and Panama.  This repetition does not help the Court align which CW's statements prove the falsity of which Defendant's statements.

The CAC follows a distinct pattern.  It presents Defendants' public statements after each financial quarter during the Class

7

Period; then it presents the alleged reasons why these statements were false.  For example, the CAC begins by noting that on April 7, 2004, Yahoo! reported its first quarter results.  Then the CAC recites eight pages of short quotes from Defendants' public statements.  Defendants' statements are presented a couple sentences at a time, often separated by ellipses, with apparently random sentences bolded and italicized.  After listing pages of statements, the CAC lists observations by CWs that allegedly contradict all of Defendants' previous statements.

Here is how the pattern presents itself in the CAC.  In a April 7, 2004 conference call with shareholders and analysts immediately following a report of first quarter results, Defendant Semel stated that "on the technology front we hit the ball out of the park. . . . I'm really proud of the technology and product group who did an extraordinary job this quarter."  CAC ¶ 50.  Semel also stated that "looking at Overture specifically within these figures, as we mentioned last time, the underlying strategic fit with Yahoo! and financial upside to our network has surpassed our original expectations."  Id.  The New York Times reported that "Mr. Semel said that the switch [from Google search] was technically smooth and increased the satisfaction of users."  In an interview with CNN, Defendant Rosensweig stated that "we just recently launched Yahoo! search technology around the world . . . all within two weeks and it is very exciting and it's doing very well."  CAC ¶ 52.  The complaint includes eight pages of like comments, which all refer to the 2004 first quarter financial report.

Plaintiffs then assert that all of Defendants' above statements were materially false and misleading because Yahoo! was

United States District Court
For the Northern District of California

8

actually experiencing myriad problems.  Plaintiffs support this allegation by pointing to five pages of comments made by CWs.  Most of the supporting comments are made by CW 11, who was a former account manager of Yahoo! and Overture, and worked for Yahoo! until December, 2004.  CW 11 stated that "at the time of the Overture acquisition, Yahoo!'s Overture platform, responsible for more than 50% of the Company's revenue, was literally 'bursting at the seams.'"  CAC ¶ 30.  CW 11 also observed that "with the increased traffic, the Overture platform was literally self destructing."  Id.  CW 10, a former Engineering Director at Yahoo!, observed that Yahoo! did not purchase enough servers to upgrade the systems to filter out non-billable clicks.  CAC ¶ 29.  According to CW 10, Yahoo!'s decision to terminate some experienced Overture engineers when Yahoo! acquired Overture delayed the schedule to complete the "solving the blob" project.  Id.  The "solving the blob" project was a necessary precursor to Project Panama; therefore, delays in "solving the blob" also would delay Panama.  Id.  Plaintiffs allege that all of these problems had "a disastrous impact on Yahoo!'s business performance."  CAC ¶ 56(f).

The CAC continues this pattern.  For the next seven pages, Plaintiffs quote more of Defendants' statements regarding Yahoo!'s success.  Plaintiffs then assert that these statements were materially false and misleading.  To support this allegation, the CAC recites, almost verbatim, the same five page description of Yahoo!'s problems as noted above.

The CAC then lists eight more pages of Defendants' quotes. These eight pages are followed by five more pages of Yahoo!'s problems that are virtually identical to those alleged when

9

rebutting the first two sets of Defendants' statements.  This
pattern continues throughout the 209 page complaint.  To plead the
claims adequately, Plaintiffs must specifically describe which of
Defendants' statements are shown false by which of a CW's
statements.

        2.   Analysts' Statements

     "When statements in analysts' reports clearly originated from
the defendants, and do not represent a third party's projection,
interpretation, or impression, the statements may be held to be
actionable even if they are not exact quotations."  Nursing Home
Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1235 (9th
Cir 2004).  Defendants assert that they cannot be held liable for
any analyst statements in the CAC because Plaintiffs did not plead
that Defendants expressly or impliedly endorsed these statements.
The Court notes that most of the analysts' statements do not
"clearly originate" from Defendants.  Moreover, statements such as
"management noted that revenue-per-search grew sequentially after
two quarters of no sequential growth," and "while management does
not release a break-down of marketing services revenues, they
commented that search revenues were strong, driven primarily by
growth in volume" do not refer to any specific Defendant.
Therefore, these types of statements cannot support the pleading
requirement in this action.  CAC ¶¶ 77, 83.

     However, on several occasions, Plaintiffs include analyst
statements that directly refer to statements made by Defendants or
that include quotes from Defendants.  For instance, an April 8,
2004 New York Times article reads, "In the first quarter, [Yahoo!]
replaced Web search results provided by Google -- which has become

Yahoo's biggest competitor -- with its own Web search system.  Mr. Semel said that the switch was technically smooth and increased the satisfaction of users."  ¶ 51.  This statement, and statements that clearly originated from Defendants, assuming they are specific enough, support the pleading requirement.

### 3.    Positive Statements about Yahoo!

Defendants also assert that "generalized, vague and unspecific assertions" of confidence in Yahoo! cannot support PSLRA's heightened pleading requirement.  Glen Holly Entertainment, Inc. v. Tektronix, Inc., 352 F.3d 367, 379 (9th Cir. 2003).  "No matter how untrue a statement may be, it is not actionable if it is not the type of statement that would significantly alter the total mix of information available to investors."  Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998) (quotation marks and citation omitted).  "Professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives, who have a personal stake in the future success of the Company."  In re VeriFone Sec. Litig., 784 F. Supp. 1471, 1481 (N.D. Cal. 1992), aff'd, 11 F.3d 865 (9th Cir. 1993).  The Ninth Circuit has defined the point at which a projection of optimism becomes an actionable, "factual" misstatement under section 10(b), namely, when "(1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy."  See Kaplan v. Rose, 49 F.3d 1363, 1375 (9th Cir. 1994).

The Court agrees that many of Yahoo!'s statements are "generalized, vague and unspecific assertions, constituting mere 'puffery' upon which a reasonable consumer could not rely."  Glen

11

Holly, 352 F.3d at 379.  For example, Defendants' statements that "on the technology front we hit the ball out of the park," that Yahoo! "did an extraordinary job this quarter," that Yahoo!'s "network has surpassed our original expectations," or "to sum up our marketing services business, we have built an attractive advertising platform," all constitute puffery.  Other claims of "advertising growth," that "all the pieces are coming together," being "well positioned to succeed," "being able to compete effectively with Google" and other similar comments all constitute vague, unspecific assertions of corporate optimism.

However, not all of Defendants' statements fall into the puffery category.  In an interview with the New York Times on April 8, 2004, Defendant Semel stated that "the switch [from Google search to its own product] was technically smooth."  CAC ¶ 51. Plaintiffs assert that CW 11's observation that Overture was "bursting at the seams" and that the Overture platform was "literally self-destructing" satisfy the PSLRA's requirement to plead falsity.  CAC ¶ 30.

The Court notes, however, that in a business as large and complex as Yahoo!, "problems and difficulties are the daily work of business people.  That they exist does not make a lie out of any alleged false statement."  Ranconi v. Larkin, 253 F.3d 423, 434 (9th Cir. 2001).  Also, it is impossible to determine the temporal relationship between CW 11's statements and Semel's statement.  CW 11 worked at Yahoo! at the time Yahoo! acquired Overture, but it is not clear whether CW 11's observations about Overture coincide with Semel's April 8, 2004 statement that the "switch was technically smooth."  Further, it is difficult to determine whether Semel's

**United States District Court**
For the Northern District of California

statement was false without any objective indicators that Overture
was indeed "bursting at the seams" and "literally self-
destructing."  Also, it is important to note that CW 11 stopped
working at Yahoo! in December, 2004, yet Plaintiffs rely on CW 11's
observations to show the falsity of Defendants' statements about
Yahoo!'s health throughout the entire Class Period, which extends
until July 18, 2006.  This type of temporal gap belies the
credibility of Plaintiffs' allegations.

The above is only one example of how a temporal mismatch
between a CW's statement and a Defendant's statement results in a
failure to plead with particularity "the reason or reasons why the
statement is misleading." 15 U.S.C. § 78u-4(b)(1).  The CAC is
full of other such examples.  Without more supporting information
as to how Defendants' positive statements were actually false, the
Court cannot sustain Plaintiffs' claims.  At this point, Plaintiffs
have not shown how Yahoo!'s circumstances at the time of each of
Defendants' statements were "inconsistent with the statements so as
to show that the statements must have been false or misleading when
made." Ranconi, 253 F.3d at 434.

        4.   Revenue Recognition

Plaintiffs also assert that Defendants made false statements
about Yahoo!'s revenues over the Class Period.  Plaintiffs allege
that Defendants manipulated their click fraud filters and delayed
refunds fraudulently to boost revenues.  As a result, Defendants'
financial statements were overstated by $387 million over the Class
Period.

Plaintiffs arrive at the $387 million figure by citing three
magazine articles and two press releases.  CAC ¶¶ 204-208.  Some

13

United States District Court
For the Northern District of California

of these sources estimate that click fraud accounted for ten percent of all pay-per-click revenue in the search industry while other sources estimate the fraud rate as high as thirty-five percent.  Plaintiffs adopt the ten percent rate and allege that $387 million of Yahoo!'s $3.878 billion in sponsored search revenue was attributable to click fraud.

Plaintiffs point to the statements by CW 3, CW 6, CW 8, CW 9, CW 10, CW 11 and CW 12 to support the click fraud allegations.  For the complaint to survive the pleadings stage, Plaintiffs must describe these CWs' roles in Yahoo!'s revenue recognition process, or whether these CWs had any first-hand knowledge of Defendants' accounting decisions.  See In re U.S. Aggregates, Inc. Sec. Litig., 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) (accounting fraud claim not corroborated by CW statements where "none of the confidential witnesses have any first-hand knowledge of [defendant's] accounting decisions").

CW 3 worked as an Engineering Manager for Overture until Yahoo! acquired Overture in 2003.  After the acquisition, CW 3 worked in the Business Information Systems group at the Overture facility until October, 2004.  CAC ¶ 22.  CW 3 claims that "Yahoo! decided in late 2004 to 'relax' the business rules and filters in the click-fraud detection system."  CAC ¶ 22(d).  "CW 3 estimates revenues generated from the relaxation in rules represented approximately 25% of Overture's operating revenue."  CAC ¶ 22(f).  CW 3 learned of this rule relaxation from Yahoo!'s Loss Prevention manager.  CAC ¶ 22(d).  CW 6 was a sales representative for Yahoo! and had regular communication with customers who complained about click fraud.  Id.  CW 6 noted that "15% of the revenues generated

14

**United States District Court**
For the Northern District of California

in his/her group was created via click fraud and irrelevant clicks from poor content match."  CAC ¶ 25.

The Court has no basis to determine whether CW 5's or 6's estimates of Yahoo!'s revenues satisfy the pleading requirement under the PSLRA.  For CW 5's or 6's statements to carry any weight at the pleadings stage in this action, Plaintiffs must describe their roles in Yahoo!'s revenue recognition process, or whether they had any first-hand knowledge of Defendants' accounting decisions.  Also, because CW 3 was not a Yahoo! employee for most of the Class Period, the Court cannot rely on his statements to support claims of false revenue reporting for the entire Class Period.

CW 8 was a Manager of the Overture Loss Prevention organization until February, 2006.  CW 8 noted that "there was an effort inside Yahoo! to relax the click-fraud detection standards." CAC ¶ 27.  CW 8 met with Defendant Decker some time after Yahoo! was sued in 2005 for click fraud, and the two discussed click fraud.  Id.  Through CW 8's statement, Plaintiffs successfully allege that Defendant Decker had general knowledge of the click fraud problem, but Plaintiffs have not shown how CW 8 knows about an effort to relax Yahoo!'s click fraud detection standards, or how CW 8 knows that this effort translated into misstated revenues. Similarly, Plaintiffs have not shown whether CW 8 had any first-hand knowledge of Defendants' accounting decisions.  Therefore, CW 8's statements do not support Plaintiffs' allegations of revenue fraud.

CW 9 worked for Yahoo! in the Customer Solutions group from December, 2003 to February, 2007.  CAC ¶ 28.  Defendant Decker

15

**United States District Court**
For the Northern District of California

fired CW 9 in 2007, after the Class Period, for mishandling a
customer complaint that might have been related to click fraud.
Id.  CW 10, Engineering Director for Yahoo! until January, 2005,
gave Defendant Decker access to the revenue reporting system at the
Overture Pasadena facility.  CAC ¶ 29.  CW 10 observed that
Yahoo!'s ability to filter out non-billable clicks was impacted by
not having adequate resources, such as enough computer servers.
Id.  CW 11 worked for Overture and then Yahoo! as an advertising
account manager until December, 2004.  CAC ¶ 30.  CW 11 described
"click tsunamis" at Yahoo!, when a search brought up results that
led to thousands of unwanted clicks.  Id.  Advertisers were charged
for these clicks, but rarely realized sales from them.  Id.
Plaintiffs have not shown whether CW 9, CW 10 or CW 11 had a role
in Yahoo!'s revenue recognition process, or whether they had any
first-hand knowledge of Defendants' accounting decisions.
Therefore, their statements do not support revenue fraud
allegations either.

CW 12 worked for Yahoo! as an Operations Sales Manager until
October, 2006.  CAC ¶ 31.  At weekly customer service meetings, CW
12 learned that "Yahoo!'s revenues began to decline 'month by
month' beginning in 4Q 05."  CAC ¶ 31(g).  CW 12 attended weekly
Customer Service meetings where she learned that "because Yahoo!
was not meeting its traffic forecasts, the Company was not
attaining its revenue forecasts associated with those clicks in 4Q
05."  Id.  CW 12 also recounted that the "running joke at Yahoo!
Search Marketing was that there was a 'dial' on the click-fraud
detection system which Yahoo! turned down at the end of the quarter
to allow more billable click activity to be passed on to

16

United States District Court
For the Northern District of California

customers." CAC ¶ 31(l).  Hearing at a meeting that revenue forecasts will not be reached is not equivalent to knowing that Yahoo! misstated its revenues.  Similarly, recounting jokes about altering the click fraud dial does not satisfy PSLRA's pleading requirements.  See Limantour v. Cray, Inc., 432 F. Supp. 3d 1129, 1141 (W.D. Wash. 2006) (rejecting confidential witness statements based on "gossip and innuendo").  Therefore, CW 12's statements do not meet the PSLRA's heightened standards to prove revenue fraud either.  In sum, Plaintiffs fail to plead with particularity their allegations that Yahoo! issued false financial statements.

     5.  Panama Release

     Plaintiffs allege that Defendants made false and misleading statements when they repeatedly promised that increased revenue from Panama would be realized in late 2005 and throughout 2006. Plaintiffs point to several statements made by Defendants and analysts to support this allegation.  For instance, on July 19, 2005, Defendant Semel stated that "we expect to improve the relevancy and performance of our core business as well as create new opportunities for our marketing partners and for Yahoo!.  We anticipate that we will begin realizing additional value from these long-term initiatives as 2006 progresses."  CAC ¶ 104.  On October 18, 2005, when discussing a variety of new search programs, Defendant Decker stated that "all of these initiatives have been already much right on track and consistent with our original plan which is to have a sequenced series of products building throughout next year and that's why we have been advising you that we expect the financial impact to grow throughout 2006."  CAC ¶ 117.  On September 28, 2005, RBC Capital Markets issued a report that states

that "we do not believe that any beta testing has begun for this change in the Yahoo search platform, and therefore, are not able to forecast a specific date for the change in monetization to occur. Yahoo management has recently confirmed its intention to make this change happen late this year or early in 2006." CAC ¶ 105.

It is difficult for the Court to determine whether the introduction of Panama was indeed late according to any release date set by Defendants. Plaintiffs include many statements made by Defendants that generally discuss the introduction of products to the market in 2005 and 2006, but none explicitly state that Panama will be released on a specific date. Plaintiffs also include many statements made by CWs about problems with Overture and "solving the blob," both precursors to Panama, but problems with these programs do not mean Defendants unreasonably stated that they "expect to improve the relevancy and performance of our core business" or that they "expect the financial impact [of their products] to grow throughout 2006." Problems with Panama's precursor programs do not make the facts about releasing Panama "inconsistent with the statements so as to show that the statements must have been false or misleading when made." Ranconi, 253 F.3d at 434.

Plaintiffs also cannot rely on analysts' statements that generally refer to Yahoo! "management" to support the allegation that a specific Defendant represented that Panama would be introduced on a certain date. As noted above, to hold a Defendant accountable for a third party statement, that statement must clearly originate from that Defendant. See Nursing Home Pension Fund, 380 F.3d at 1235. For these reasons, Plaintiffs have not

1  adequately plead that Yahoo!'s estimates for the Panama release

2  date lacked a reasonable basis when made.

3       B.   Requisite Mental State

4       As discussed above, a complaint must "state with particularity

5  facts giving rise to a strong inference that the defendant acted

6  with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  When

7  evaluating the strength of an inference, "the court's job is not to

8  scrutinize each allegation in isolation but to assess all the

9  allegations holistically." Tellabs, Inc. v. Makor Issues & Rights,

10 Ltd., __ U.S. __, 127 S. Ct. 2499, 2511 (2007).  "The inference of

11 scienter must be more than merely 'reasonable' or 'permissible' --

12 it must be cogent and compelling, thus strong in light of other

13 explanations." Id. at 2510.  A complaint will survive "only if a

14 reasonable person would deem the inference of scienter cogent and

15 at least as compelling as any opposing inference one could draw

16 from the facts alleged." Id.  However, "the inference that the

17 defendant acted with scienter need not be irrefutable, i.e., of the

18 'smoking-gun' genre, or even the 'most plausible of competing

19 inferences.'" Id.

20      Plaintiffs allege that there is a strong inference that

21 Defendants acted with scienter because of Defendants'

22 (1) interactions with CWs, (2) involvement in Yahoo!'s core

23 operations, (3) signatures on SEC certificates, and (4) stock

24 sales.

25           1.   Confidential Witnesses

26      Defendant Nazem allegedly met with CW 1 weekly to discuss

27 Panama's progress.  CAC ¶ 20(a).  CW 1 asserts that Defendant Nazem

28 discussed Panama during weekly meetings with Defendants Semel,

United States District Court

For the Northern District of California

Decker and Rosensweig.  Id.  During a meeting with Nazem, CW 1 told him that "the August 2006 [Panama] launch was not going to happen." Id.  Plaintiffs allege that Nazem then shared this information with Defendants Semel, Decker and Rosensweig at a weekly meeting.  Id. The question is whether this interaction creates a strong inference that Defendants knew that their positive statements about Yahoo! and Panama were false.

First, the Court notes that Plaintiffs have failed to plead with particularity that Defendants' statements were false.  Second, even if Defendants' statements about Yahoo!'s health were false, Plaintiffs do not allege that Nazem made any false statements to the public about Yahoo!.  In the CAC, Plaintiffs allege only that Defendants Semel, Decker and Rosensweig made such public statements.  Third, Plaintiffs have not sufficiently plead that Nazem shared information about Yahoo!'s problems so as to make any statements Defendants Semel, Decker and Rosensweig made so inconsistent with the circumstances that Defendants knew these statements were false.

Plaintiffs also allege that CW 13 observed that leaders of engineering groups met with and briefed Defendant Semel weekly. CAC ¶ 32.  Plaintiffs, however, fail to describe the substance of these meetings.  Thus, CW 13's observations do not provide the Court with enough information to conclude that there is a strong inference that Defendant Semel acted with the required mental state under the PSLRA.

Plaintiffs assert that because CW 10 gave Defendant Decker access to the revenue reporting system at Overture, Ms. Decker could ascertain and even amend the method to determine whether a

click was billable.  See CAC ¶ 29.  Plaintiffs do not support this hypothetical scenario with any allegations of specific facts that show Defendant Decker actually manipulated the revenue reports. Therefore, Plaintiffs' hypothetical scenario does not create a strong inference of the mental state required under the PSLRA.

> 2.   Core Operations

Allegations regarding management's role in a company "may be used in any form along with other allegations that, when read together, raise an inference that is 'cogent and compelling, thus strong in light of other explanations.'"  South Ferry LP v. Killinger, 2008 WL 4138297, at *6 (9th Cir.) (quoting Tellabs, 127 S. Ct. at 2510).  These allegations may conceivably satisfy the PSLRA standard "without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter."  Id.

Plaintiffs assert that Defendants knowingly or with deliberate recklessness made false statements about Yahoo!'s strength because Defendants, as Yahoo! executives, knew about problems with Overture, "solving the blob" and Panama.  As the Court noted above, the existence of these alleged problems do not make Defendants' positive statements about Yahoo! false.  Standing alone, and even together with all other facts alleged in the CAC, Defendants' high level positions in the company do not provide a strong inference of scienter.

> 3.   SEC Certificates

Plaintiffs also allege that Defendants' signing of SEC certificates creates a strong inference of scienter.  Under the

21

**United States District Court**
For the Northern District of California

Sarbanes-Oxley Act of 2002, Defendant Semel as CEO and Defendant Decker as CFO are required to certify certain aspects of a company's 10-Q and 10-K Forms.  See 15 U.S.C. § 7241.  Defendants Semel and Decker certified that, based on their knowledge, each quarterly and annual report to the SEC and investors did not contain untrue statements of a material fact or omit to state a material fact.  CAC ¶ 225.  Plaintiffs allege that this certificate is evidence that Defendants Semel and Decker knew or recklessly disregarded information that Yahoo! software was not accurately detecting click fraud.  The Court disagrees.  Without any supporting allegations that Defendants made false accounting entries or inflated revenues, Defendants' signatures on the SEC certificates do not create a strong inference of scienter.  See In re Intelligroup Securities Litig., 527 F. Supp. 2d 262, 289-90 (D. N.J. 2007) ("[W]hile the issue of what impact a Sarbanes-Oxley certification has on a 10b-5 claim is a relatively novel question, the above-discussed holdings indicate that--as with allegations that defendants violated GAAP--allegations based on defendants' erroneous SOX certification cannot establish the requisite strong inference of scienter unless the complaint asserts facts indicating that, at the time of certification, defendants knew or consciously avoided any meaningful exposure to the information that was rendering their SOX certification erroneous.").

            4.   Stock Transactions

     Plaintiffs contend that the quantity and timing of Defendants' stock transactions support a strong inference of scienter. Plaintiffs allege that Defendants sold between eighty-four and ninety percent of their shares during the Class Period, amounting

United States District Court
For the Northern District of California

to $870 million in proceeds.  If vested options are included when calculating the percentage of Yahoo! shares sold during the Class Period then Defendants sold between thirty-five and sixty-eight percent of their shares.

Insider stock sales become suspicious "only when the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."  In re Vantive Corporation Securities Litig., 283 F.3d 1079, 1092 (9th Cir. 2002).  "Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history."  Silicon Graphics, 183 F.3d at 986.

Here, the amount and percentage of shares sold by Defendants raise the specter of suspicious behavior.  However, Plaintiffs have selected an unusually long class period of over 118 weeks.  See Vantive, 283 F.3d at 1092 ("the plaintiffs have selected an unusually long class period of sixty-three weeks").  Just as in Vantive, "lengthening the class period has allowed plaintiffs to sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period."  Id.  Thus, "by themselves, large numbers do not necessarily create a strong inference of fraud."  Id. at 1093.

The timing of the sales is also not suspicious.  Plaintiffs have not alleged how the stock sales were designed to "maximize the personal benefit" of any Defendant.  Defendants regularly sold stock following earnings releases, which is common practice among

United States District Court
For the Northern District of California

corporate executives.  Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1037 (9th Cir. 2002) ("We conclude that the timing of Gantz's stock transactions was not suspicious.  Officers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures.").

Plaintiffs also note that Defendants' pre-Class Period stock sales were out of line with their Class Period sales; pre-Class Period sales constituted only seven percent (Semel), nine percent (Decker), eight percent (Rosensweig) and thirty-nine percent (Nazem) of their Class Period sales.  Plaintiffs allege that this inconsistency supports a strong inference of scienter.  Comparing Defendants' sales within the Class Period and outside the Class Period does make Defendants' actions look suspicious.  Yet, this comparison is less powerful when viewed in the context that the Class Period is longer than the pre-Class Period.  In sum, the Court concludes that Defendants' stock transactions do not support a strong inference of scienter.

   C.   Loss Causation

"Loss causation is the 'causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss."  Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (2005). "The complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses."  Metzler Investment v. Corinthian Colleges, 2008 WL 3905427, *10 (9th Cir.).  The complaint must allege that the company's "share price fell significantly after the truth became known."  Dura Pharms, 544 U.S. at 347.  "So long as the complaint alleges facts that, if taken as true, plausibly establish loss

24

United States District Court

For the Northern District of California

causation, a Rule 12(b)(6) dismissal is inappropriate." In re
Gilead Sciences Securities Litig., 536 F.3d 1049, 1057 (9th Cir.
2008).  The loss causation element "'simply calls for enough facts
to raise a reasonable expectation that discovery will reveal
evidence of' loss causation." Id. (quoting Bell Atl., 127 S. Ct.
at 1965).

Plaintiffs allege Yahoo!'s stock dropped as a result of public
statements Defendants made on January 18 and July 18, 2006.  In
those statements, Defendants allegedly revealed that they had
falsely inflated past revenue statements by including revenue from
click fraud, and that they had made false statements about the
release of Panama.

Defendants do not challenge Plaintiffs' characterization that
Yahoo!'s stock dropped as a result of statements Defendants made on
January 18 and July 18, 2006.  Defendants disagree that the stock
devaluation was related in any way to Defendants' disclosure of
anything Plaintiffs alleged.  To plead loss causation, Plaintiffs
must adequately plead that the "market learned of and reacted to
this fraud, as opposed to merely reacting to reports of defendant's
poor financial health generally." Metzler, at *10.  Here,
Plaintiffs have not met this requirement.

On January 18, 2006, Defendants announced that 2005 fourth
quarter earnings were within projections, but showed a deceleration
compared to growth in previous quarters.  As a result of this
announcement, Yahoo!'s stock price declined.  However, Plaintiffs
fail to link this stock price decline to any announcement of fraud.
In fact, Plaintiffs note that, at the time of this announcement,
Defendants did not comment on any click fraud issues.  Plaintiffs

25

**United States District Court**
For the Northern District of California

assert that, in the January 18, 2008 announcement, "Defendants did not admit the true reason for Yahoo!'s loss of affiliates and revenue -- which was that the click-fraud revenue obtained from these affiliate websites was becoming harder to justify and allow with advertiser backlash and increased media scrutiny in this area."  CAC ¶ 127.

On July 18, 2006, Defendants released Yahoo!'s 2006 second quarter results which showed that its search revenue decreased and that the release of Panama would be delayed.  Nowhere do Plaintiffs plead that these announcements contain statements by Yahoo! relating the revenue decrease to false statements Yahoo! previously made about click fraud or Panama's release.  In sum, Plaintiffs have not adequately plead loss causation because they did not plead that any of Yahoo!'s public statements about the alleged fraud caused a decline in Yahoo!'s stock.

## II.   Section 20(a) of the Exchange Act

Plaintiffs allege control person liability against Defendants based on Section 20(a) of the Exchange Act, which states that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).

To prove a prima facie case under Section 20(a), a plaintiff must prove: (1) "a primary violation of federal securities law" and

26

United States District Court
For the Northern District of California

(2) "that the defendant exercised actual power or control over the primary violator." Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000). "[I]n order to make out a prima facie case, it is not necessary to show actual participation or the exercise of power; however, a defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation." Id. "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." Id.

Plaintiffs allege that, by virtue of Defendants' high-level positions in Yahoo!, they influenced and controlled the content and dissemination of the myriad statements that Plaintiffs contend are false and misleading. Because Plaintiffs failed to plead a primary securities violation, Plaintiffs have also failed to plead a violation of Section 20(a). Moreover, Plaintiffs failed to plead that Nazem's and Rosensweig's "participation in the day-to-day affairs" of Yahoo! was such that they "exercised actual power or control over" the issuance of any accounting decisions or financial statements.

III. Section 20A of the Exchange Act

Plaintiffs also allege that Defendants violated Section 20A of the Exchange Act, which states that "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such

1  violation, has purchased . . . securities of the same class." 15

2  U.S.C. § 78t-1.

3      Plaintiffs' Section 20A violation claim also fails because

4  Plaintiffs failed to plead a primary violation of the federal

5  securities law.  Moreover, Plaintiffs fail to identify any specific

6  material nonpublic information in the possession of any Defendant

7  at the time of a specific trade.

8                           CONCLUSION

9      For the foregoing reasons, the Court GRANTS Defendants' motion

10 to dismiss Plaintiffs' CAC (Docket No. 14).  The Court dismisses

11 Plaintiffs' CAC with leave to amend in accordance with this order.

12 Plaintiffs shall serve and file their second consolidated amended

13 complaint by November 17, 2008.  Defendants shall respond by

14 December 18, 2008.  Any motion to dismiss shall be noticed for

15 February 26, 2009 at 2 p.m.  The opposition to Defendants' motion

16 to dismiss shall be filed on January 22, 2008, and any reply brief

17 is due February 5, 2009.  A further case management conference will

18 be held on February 26, 2009 at 2 p.m., even if no motion to

19 dismiss is filed.

20     IT IS SO ORDERED.

21

22 Dated: 10/7/08

23                                 _____
                                   CLAUDIA WILKEN
24                                 United States District Judge

25

26

27

28

28

**United States District Court**
For the Northern District of California