1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT
7                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
8
9  ELLEN ROSENTHAL BRODSKY, et al.,        No. C 08-02150 CW

10          Plaintiffs,                     ORDER GRANTING
                                           DEFENDANTS' MOTION
11      v.                                  TO DISMISS

12  YAHOO! INC., TERRY S. SEMEL, SUSAN L.
   DECKER, FARZAD NAZEM, and DANIEL
13  ROSENSWEIG,

14          Defendants.
                                                    /
15  ─────────────────────────────────────

16      In this securities fraud class action, Defendants Yahoo! Inc.,

17  Terry S. Semel, Susan L. Decker, Farzad Nazem and Daniel Rosensweig

18  move to dismiss the Second Amended Consolidated Complaint (SAC).

19  Lead Plaintiffs Pension Trust Fund for Operating Engineers and

20  Pompano Beach Police and Firefighters' Retirement Systems oppose

21  the motion.  The motion was heard on April 23, 2009.  Having

22  considered all of the parties' papers and oral argument on the

23  motion, the Court grants Defendants' motion.

24                           BACKGROUND[1]

25      Defendant Yahoo! is a global internet services company

26  headquartered in Sunnyvale, California.  The four individual

27  ─────────────────────

28      [1]All facts are taken from Lead Plaintiffs' SAC and are assumed
   to be true for purposes of this motion.

United States District Court
For the Northern District of California

Defendants are Terry S. Semel, former Chairman and Chief Executive Officer; Susan L. Decker, Yahoo!'s current President and former Chief Financial Officer and its Executive Vice President of Finance and Administration during the Class Period; Farzad Nazem, former Chief Technology Officer; and Daniel L. Rosensweig, former Chief Operating Officer.

Lead Plaintiffs and Ellen Brodsky purport to represent a class of persons and entities that bought common stock of Yahoo! between April 8, 2004 and July 18, 2006 (Class Period).

Plaintiffs allege that, during the Class Period, Defendants engaged in a scheme to inflate artificially the price of Yahoo! stock by falsely representing that Yahoo!'s business model and search business was succeeding. Over the course of the Class Period, Defendants Semel, Decker and Rosensweig made many public statements expressing enthusiasm for Yahoo!. These statements were in the form of Yahoo! press releases, quarterly conference calls, SEC filings, and analyst reports. See SAC ¶¶ 90-92, 98, 101-106, 111-112, 118-121, 124-127, 131-135, 139, 141, 143, 145-147, 151-156, 162-163, 165-166. Plaintiffs allege that these statements were false and misleading because they conflicted with the facts of Yahoo!'s myriad internal problems.

Plaintiffs also allege that Yahoo! inflated its revenue by relaxing the "click fraud" filtering system "to allow non-billable click activity to be passed on to customers, thereby increasing the Company's revenues at the end of the quarter." SAC ¶ 95(h). Click fraud describes activity undertaken for the sole purpose of causing Yahoo! or another search marketing business to log a click which generates a payment due from an advertiser. SAC ¶ 9. Click fraud

2

United States District Court
For the Northern District of California

may be committed by a search marketing business seeking to generate a payment for itself, or by an advertiser's competitor seeking to impose a cost on the advertiser.  Id.  Plaintiffs allege that relaxing the click fraud standards inflated Yahoo!'s revenue by at least $680 million out of $3.165 billion in search revenue.  SAC ¶ 267.  Plaintiffs lastly allege that Yahoo! falsely represented that "Panama," an upgrade to Yahoo!'s search marketing platform, would launch earlier than it eventually did.

Plaintiffs rely on seventeen Confidential Witnesses (CWs) to support their allegations.  The CWs describe problems that arose from Yahoo!'s 2003 acquisition and integration of Overture Services, Inc., a search driven advertising company.  SAC ¶ 3. Plaintiffs allege that Yahoo!'s unsuccessful integration of Overture and lack of success in a project called "solving the blob," both precursors to Panama, caused delays in releasing Panama.

On October 7, 2008, the Court dismissed Plaintiffs' Consolidated Amended Complaint (CAC) because it failed to meet the heightened pleadings standards under the Private Securities Litigation Reform Act of 1995 (PSLRA).  Plaintiffs filed their SAC on December 19, 2008.

The biggest change in the SAC is the addition of three new CWs, 8, 16 and 17.  The import of the new CWs and other new factual allegations will be discussed below.

LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  On a motion under Rule 12(b)(6) for failure to state

a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff.  NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). Although the court is generally confined to consideration of the allegations in the pleadings, when the complaint is accompanied by attached documents, such documents are deemed part of the complaint and may be considered in evaluating the merits of a Rule 12(b)(6) motion.  Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir. 1987).

When granting a motion to dismiss, the court is generally required to grant the plaintiff leave to amend, even if no request to amend the pleading was made, unless amendment would be futile. Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 246-47 (9th Cir. 1990).  The district court may deny leave to amend "due to 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment.'"  Leadsinger, Inc. v. BMG Music Publ'g, 512 F.3d 522, 532 (9th Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).  Where "the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, '[t]he district court's discretion to

deny leave to amend is particularly broad.'"  <u>Zucco Partners, LLC, v. Digimarc Corp.</u>, 552 F.3d 981, 1007 (9th Cir. 2009); (citing <u>In re Read-Rite Corp. Sec. Litig.</u>, 335 F.3d 843, 845 (9th Cir. 2003)).

REQUESTS FOR JUDICIAL NOTICE

Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Even where judicial notice is not appropriate, courts may also properly consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleadings."  <u>Branch v. Tunnell</u>, 14 F.3d 449, 454 (9th Cir. 1994).

The Court grants Plaintiffs' request for judicial notice of Exhibits 2 through 4 to the Rosen declaration and Defendants' request as to Exhibits 2 through 4 of the Foster declaration because these documents are public court records capable of accurate and ready determination.  The Court grants Defendants' request as to Exhibits 5 through 17 and 48 through 55 to the Foster declaration because SEC filings may be judicially noticed.  <u>See Dreiling v. American Exp. Co.</u>, 458 F.3d 942, 946 (9th Cir. 2006). Defendants also seek judicial notice of Exhibits 18 through 30, conference call transcripts.  The Court takes judicial notice of the fact that these statements were made on the dates specified, but not of the truth of the matters asserted therein.  The Court also grants Defendants' request as to Exhibits 31 through 47, Yahoo! press releases, news articles, analyst reports, and third party press releases to which the SAC refers, but not for the truth

5

of their contents.   The Court grants Defendants' request as to

Exhibit 56 because historic stock prices are subject to accurate

and ready determination by resort to sources whose accuracy cannot

reasonably be questioned.

I.    Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for any

person to "use or employ, in connection with the purchase or sale

of any security . . . any manipulative or deceptive device or

contrivance in contravention of such rules and regulations as the

[SEC] may prescribe."   15 U.S.C. § 78j(b); see also 17 C.F.R.

§ 240.10b-5 (Rule 10b-5).   To state a claim under § 10(b), a

plaintiff must allege: "(1) a misrepresentation or omission of

material fact, (2) scienter, (3) a connection with the purchase or

sale of a security, (4) transaction and loss causation, and

(5) economic loss."   In re Gilead Sciences Securities Litig., 536

F.3d 1049, 1055 (9th Cir. 2008).

Some forms of recklessness are sufficient to satisfy the

element of scienter in a § 10(b) action.   See Nelson v. Serwold,

576 F.2d 1332, 1337 (9th Cir. 1978).   Within the context of § 10(b)

claims, the Ninth Circuit defines "recklessness" as

> a highly unreasonable omission [or misrepresentation],
> involving not merely simple, or even inexcusable
> negligence, but an extreme departure from the standards
> of ordinary care, and which presents a danger of
> misleading buyers or sellers that is either known to the
> defendant or is so obvious that the actor must have been
> aware of it.

Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir.

1990) (en banc) (quoting Sundstrand Corp. v. Sun Chem. Corp., 553

F.2d 1033, 1045 (7th Cir. 1977)).   As explained by the Ninth

Circuit in In re Silicon Graphics Inc. Securities Litig., 183 F.3d

United States District Court

For the Northern District of California

970 (9th Cir. 1999), recklessness, as defined by <u>Hollinger</u>, is a form of intentional conduct, not merely an extreme form of negligence.  <u>See Silicon Graphics</u>, 183 F.3d at 976-77.  Thus, although § 10(b) claims can be based on reckless conduct, the recklessness must "reflect[] some degree of intentional or conscious misconduct."  <u>See id.</u> at 977.  The <u>Silicon Graphics</u> court refers to this subspecies of recklessness as "deliberate recklessness."  <u>See id.</u> at 977.

Plaintiffs must plead any allegations of fraud with particularity, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure.  <u>In re GlenFed, Inc. Sec. Litig.</u>, 42 F.3d 1541, 1543 (9th Cir. 1994) (en banc).  Pursuant to the requirements of the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

Further, pursuant to the requirements of the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  The PSLRA thus requires that a plaintiff plead with particularity "facts giving rise to a strong inference that the defendant acted with," at a minimum, deliberate recklessness.  <u>See</u> 15 U.S.C. § 78u-4(b)(2); <u>Silicon Graphics</u>, 183 F.3d at 977.  Facts that establish a motive and opportunity, or circumstantial evidence of "simple recklessness," are not sufficient to create a strong inference of deliberate recklessness.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   See Silicon Graphics, 183 F.3d at 979.  To satisfy the heightened

2   pleading requirement of the PSLRA for scienter, plaintiffs "must

3   state specific facts indicating no less than a degree of

4   recklessness that strongly suggests actual intent."  Id.

5        A.   Misrepresentation or Omission of a Material Fact

6        To state a claim pursuant to § 10(b) of the Exchange Act,

7   Plaintiffs must allege, among other things, a misrepresentation or

8   omission of a material fact.  "A litany of alleged false

9   statements, unaccompanied by the pleading of specific facts

10  indicating why those statement were false, does not meet this

11  standard."  Metzler Investment v. Corinthian Colleges, 540 F.3d

12  1049, 1070 (9th Cir. 2008); see Falkowski v. Imation Corp., 309

13  F.3d 1123, 1133 (9th Cir. 2002) ("Although the allegations here are

14  voluminous, they do not rise to the level of specificity required

15  under the PSLRA.  The allegations consist of vague claims about

16  what statements were false or misleading, how they were false, and

17  why we can infer intent to mislead.  We have dismissed much more

18  specific and compelling allegations.")

19           1.   Particularity of Pleading

20       The Court's October 7, 2008 Order noted that Plaintiffs did

21  not plead falsity with the required particularity and that the

22  complaint was poorly organized and difficult to follow.  Plaintiffs

23  have attempted to remedy these flaws by deleting superfluous

24  financial analysts' quotes and cross-referencing other parts of the

25  complaint rather than repeating paragraphs.  However, the basic

26  flaws of the CAC continue to pervade the SAC.

27       "In the context of securities class action complaints, courts

28  have repeatedly lamented plaintiffs' counsels' tendency to place

'the burden [] on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims.'" <u>Wenger v. Lumisys, Inc.</u>, 2 F. Supp. 2d 1231, 1244 (N.D. Cal 1998) (quoting <u>In re Oak Technologies Sec. Litig.</u>, 1997 WL 448168 (N.D. Cal.). Throughout the 209 page CAC, instead of pointing to how each of Defendants' statements is false, Plaintiffs merely repeated the same few pages of CW statements which restate the problems Yahoo! was experiencing with Overture and Panama. This repetition does not demonstrate that the CW's allegations prove the falsity of each of Defendants' statements.

The SAC follows the same pattern as the CAC. It presents Defendants' public statements after each financial quarter during the Class Period; then it presents the alleged reasons why these statements were false. Virtually all of the paragraphs that describe Yahoo!'s statements of optimism and financial statements refer back to ¶ 95, which itself merely repeats, refers to and characterizes the CW statements contained in ¶¶ 193-210. <u>See, e.g.</u>, SAC ¶ 99(a)-(b), 108(a)-(b), 122(a)-(c), 130(a)-(c), 137(c), 142(d). This repetition necessarily means that Plaintiffs' allegations of falsity are not particular to the public statements Plaintiffs identify. As the Court noted in its October 7, 2008 Order, this technique does not satisfy the requirements under the PSLRA.

     2.   Positive Statements about Yahoo!

Plaintiffs have not plead specific facts showing that Defendants' general optimistic statements were false. As the Court noted in its previous order, general positive statements such as

Defendant Semel's statement that "all the pieces are coming together," SAC ¶ 92, are "generalized, vague, and unspecific assertions, constituting mere 'puffery' upon which a reasonable consumer could not rely." Glen Holly Entm't v. Tektronix, Inc., 352 F. 3d 367, 379 (9th Cir. 2003). A projection of optimism becomes actionable, when "(1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." See Kaplan v. Rose, 49 F.3d 1363, 1375 (9th Cir. 1994).

Plaintiffs' complaint merely juxtaposes public statements expressing enthusiasm for Yahoo! with paragraphs referring to myriad internal problems at Yahoo!. Alleging a litany of problems is not enough to refute specifically general statements that project optimism and Yahoo!'s growth. As the Court previously noted, in a business as large and complex as Yahoo!, "problems and difficulties are the daily work of business people. That they exist does not make a lie out of any alleged false statement." Ranconi v. Larkin, 253 F.3d 423, 434 (9th Cir. 2001).

Most importantly, Plaintiffs have not remedied their reliance on CW statements that lack factual particularity or foundation. For example, Plaintiffs continue to rely on CW 11's statement that the Overture platform was "severely overloaded" to establish the falsity of Defendant Semel's April 8, 2004 statement that "the switch [from Google search to its own product] was technically smooth." SAC ¶ 92. As the Court previously stated, it cannot determine the temporal relationship between CW 11's statements and Semel's statements. CW 11 worked at Yahoo! at the time Yahoo!

10

United States District Court
For the Northern District of California

acquired Overture, but it is still not clear whether CW 11's observations about Overture coincide with Semel's statement. Further, Plaintiffs fail to add compelling objective indicators that would describe how Semel's statement was false.  Without supporting information as to how Defendants' positive statements were actually false, the Court cannot sustain Plaintiffs' claims. Plaintiffs have not shown how Yahoo!'s circumstances at the time of each of Defendants' statements were "inconsistent with the statement so as to show that the statements must have been false or misleading when made." Ranconi, 253 F.3d at 434.

                    3.    Revenue Recognition

    In the SAC, Plaintiffs continue to assert that Defendants made false statements about Yahoo!'s revenues over the Class Period. Plaintiffs allege that Defendants manipulated their click fraud filters and delayed refunds fraudulently to boost revenues.  As a result, Defendants' financial statements were allegedly overstated by $680 million over the Class Period.

    Plaintiffs assert that newly added facts from CW 3, CW 5, CW 8 and CW 17, combined with the facts previously attributed to CW 6, CW 10, CW 11 and CW 12, detail how Yahoo! improperly recognized revenue.  For the complaint to survive the pleadings stage, Plaintiffs must describe with particularity these CWs' roles in Yahoo!'s revenue recognition process and that they had personal knowledge of Defendants' accounting decisions.  See Zucco, 552 F.3d at 986-98; Berson v. Applied Signal Technology, Inc., 527 F.3d 982, 985 (9th Cir. 2008); In re Daou, 411 F.3d 1006, 1015 (9th Cir. 2005).  The Court has reviewed the CW statements and concludes that the SAC fails to provide the requisite particularity to establish

11

United States District Court

For the Northern District of California

that certain statements of these confidential witnesses are based on their personal knowledge of Defendants' fraud.

CW 3 worked as an Engineering Manager for Overture until Yahoo! acquired Overture in 2003.  After the acquisition, CW 3 worked in the Business Information Systems group at the Overture facility until October, 2004.  SAC ¶ 196.  CW 3 claims that Yahoo! "decided in late 2004 to 'relax' the business rules and filters in the click-fraud detection system."  SAC ¶ 196(d).  "CW 3 estimates revenues generated from the relaxation in business rules represented approximately 25% of Overture's operating revenue." SAC ¶ 196(f).  CW 3 learned of this rule relaxation from Yahoo!'s Loss Prevention manager.  SAC ¶ 196(d).  CW 5 worked at Yahoo! from August, 2003 to June, 2004 as a Senior Credit Analyst.  SAC ¶ 198. CW 5 reviewed and approved credit applications for advertising customers and reviewed customer invoices.  Id.  CW 5 noted that customers regularly complained that they were billed on an estimated number of clicks rather than the actual number of clicks that occurred on their advertisement.  Id.  CW 6 was a sales representative for Yahoo! and had regular communication with customers who complained about click fraud.  SAC ¶ 199.  CW 6 noted that "15% of the revenues generated in his/her group was created via click fraud and irrelevant clicks from the poor quality Content Match program."[2]  Id.  Plaintiffs also rely on an expert report by Charles Richard, which estimated that click fraud accounted for 21.5 percent ($680 million) of Yahoo!'s revenue during the class period.  The Richard report relied on two surveys of companies that

---

[2]Content March is a program that matches advertisements to a webpage's content.

United States District Court
For the Northern District of California

advertised on the web, but less than half of the companies surveyed bought ads from Yahoo!.

The Court has no basis to determine whether CW 3's, CW 6's or Richard's estimates of Yahoo!'s revenues satisfy the pleading requirement under the PSLRA. For these statements to carry any weight at the pleadings stage in this action, Plaintiffs must describe with particularity the CW's personal knowledge of Yahoo!'s revenue recognition process. CW 5's observations about customer complaints do not bolster Plaintiffs' allegations of Defendants' fraudulent revenue recognition. Also, because CW 3 and CW 5 were not Yahoo! employees for most of the Class Period, the Court cannot rely on their statements to support claims of false revenue reporting for the entire Class Period.

CW 8 worked as an engineer at Yahoo! on "search monetization projects" throughout the Class Period. SAC ¶ 201. CW 8 noted that Content Match "had operating problems since its inception in 2003 and throughout the Class Period." SAC ¶ 201(a). CW 8 described in detail how Content Match placed ads on websites with unrelated content. Id. CW 8 also stated that Defendants Nazem, Semel and Decker knew of this problem. Through CW 8's statement, Plaintiffs successfully allege that Defendants had general knowledge of the Content Match problem, but Plaintiffs have not shown how CW 8 knows that this problem translated into misstated revenues. Similarly, Plaintiffs have not shown whether CW 8 had any personal knowledge of Defendants' accounting decisions. Therefore, CW 8's statements do not support Plaintiffs' allegations of revenue fraud.

CW 10, Engineering Director for Yahoo! until January, 2005, gave Defendant Decker access to the revenue reporting system at the

13

Overture Pasadena facility.  SAC ¶ 203.  CW 10 observed that Yahoo!'s ability to filter out non-billable clicks was impacted by a lack of adequate resources, such as computer servers.  Id.  CW 11 worked for Overture and then Yahoo! as an advertising account manager until December, 2004.  SAC ¶ 204.  CW 11 described "click tsunamis" at Yahoo!, when a search brought up results that led to thousands of unwanted clicks.  Id.  Advertisers were charged for these clicks, but rarely realized sales from them.  Id.  Plaintiffs have not shown whether CW 10 or CW 11 had a role in Yahoo!'s revenue recognition process, or whether they had any personal knowledge of Defendants' accounting decisions.  Therefore, their statements do not support revenue fraud allegations either.

CW 12 worked for Yahoo! as an Operations Sales Manager until October, 2006.  SAC ¶ 205.  At weekly customer service meetings, CW 12 learned that "Yahoo!'s revenues began to decline 'month by month' beginning in 4Q 05."  SAC ¶ 205(e).  At these meetings, CW 12 also discovered that "because Yahoo! was not meeting its traffic forecasts, the Company was not attaining its revenue forecasts associated with those clicks in 4Q 05."  Id.  CW 12 also recounted that "it appeared to Yahoo! Search Marketing personnel as though there was a 'dial' on the click-fraud detection system which Yahoo! turned down at the end of the quarter to allow more billable click activity to be passed on to customers."  SAC ¶ 205(j).  Hearing at a meeting that revenue forecasts will not be reached is not equivalent to knowing that Yahoo! misstated its revenues. Similarly, reporting an increase in billable activity towards the end of a financial quarter does not satisfy PSLRA's pleading requirements.  Therefore, CW 12's statements do not meet the

14

PSLRA's heightened standards to prove revenue fraud either.

CW 17 was a content editor from the start of the Class Period through 2005.  SAC ¶ 210.  In this role, CW 17 evaluated customers' websites and identified key search words that would be most relevant for the customer in a search advertising campaign.  <u>Id.</u> CW 17 noted that Content Match was not working well and that customers were charged for clicks on their advertisements placed on unrelated websites.  <u>Id.</u>  CW 17 does not claim to have any role in the revenue recognition process or any personal knowledge of Defendants' accounting decisions.  Therefore, CW 17's statement does not support revenue fraud allegations.

Of the new CWs in the SAC, only CW 16 had any accounting-related responsibilities at Yahoo!.  CW 16 was the Revenue Controller from August, 2001 to April, 2007.  CW 16 was responsible for Yahoo!'s revenue accounting and reporting company-wide.  CW 16 was in a position to provide a personal account of how Defendants falsified $680 million in revenue; however, she/he does not provide any particular facts to support revenue fraud allegations.  In sum, Plaintiffs fail to plead with particularity their allegations that Yahoo! issued false financial statements.

        5.    Panama Release

In the SAC, Plaintiffs continue to allege that Defendants made false and misleading statements when they repeatedly promised that increased revenue from Panama would be realized in late 2005 and throughout 2006.  Plaintiffs point to several statements made by Defendants and other Yahoo! executives to support this allegation. For instance, on July 19, 2005, Defendant Semel stated that "we expect to improve the relevancy and performance of our core

15

United States District Court
For the Northern District of California

business as well as create new opportunities for our marketing
partners and for Yahoo!.  We anticipate that we will begin
realizing additional value from these long-term initiatives as 2006
progresses."  SAC ¶ 133.  On August 8, 2005, Jeff Weiner, a senior
vice president at Yahoo!, discussed search monetization at Yahoo!
and noted that "you'll start to see some changes by the end of '05
and you'll see it in bigger changes in '06."  SAC ¶ 141.  On
October 18, 2005, when discussing a variety of new search programs,
Defendant Decker stated that "all of these initiatives have been
already much right on track and consistent with our original plan
which is to have a sequenced series of products building throughout
next year and that's why we have been advising you that we expect
the financial impact to grow throughout 2006."  SAC ¶ 146.

Plaintiffs do not provide sufficient facts to allege clearly
that the introduction of Panama was indeed late according to any
release date set by Defendants.  Plaintiffs include many statements
made by Defendants and other Yahoo! executives that generally
discuss the introduction of products to the market in 2005 and
2006, but none explicitly state that Panama will be released on a
specific date.  CW 8 and CW 12 allege that Defendants' statements
about new products and increased revenue were references to Panama
only and not other products.  SAC ¶¶ 137(a), 142(a), 149(a),
157(a).  But these conclusory allegations lack a foundation in
particular facts.  Plaintiffs also include many statements made by
CWs about problems with Overture and the "solving the blob"
project, both precursors to Panama, but these problems do not mean
Defendants unreasonably stated that they "expect to improve the
relevancy and performance of our core business" or that they

"expect the financial impact [of their products] to grow throughout 2006." Problems with Panama's precursor projects do not make the facts about releasing Panama "inconsistent with the statements so as to show that the statements must have been false or misleading when made." <u>Ranconi</u>, 253 F.3d at 434. For these reasons, Plaintiffs have not adequately plead that Yahoo!'s estimates for the Panama release date lacked a reasonable basis when made.

B.   Requisite Mental State

As discussed above, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). When evaluating the strength of an inference, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 127 S. Ct. 2499, 2511 (2007). "The inference of scienter must be more than merely 'reasonable' or 'permissible' -- it must be cogent and compelling, thus strong in light of other explanations." <u>Id.</u> at 2510. A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Id.</u> However, "the inference that the defendant acted with scienter need not be irrefutable, <u>i.e.</u>, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" <u>Id.</u>

Plaintiffs' SAC fails to cure the CAC's deficiencies with respect to scienter for many of the same reasons outlined in the Court's October 7, 2008 Order. Plaintiffs continue to allege that there is a strong inference that Defendants acted with scienter

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

because of Defendants' (1) interactions with CWs, (2) involvement
in Yahoo!'s core operations and (3) stock sales.

               1.   Confidential Witnesses

In its October 7, 2008 Order, the Court considered the
scienter allegations from CW 1, CW 10 and CW 12 and concluded that
they did not provide facts to support a strong inference of
scienter.  Plaintiffs have not sufficiently amended the scienter
allegations with respect to those three CWs nor the other CWs.

Plaintiffs' three new CW statements in the SAC from CW 8, CW
16 and CW 17 also fail to support an inference of scienter.  CW 17
does not describe any personal contact with any of the Defendants.
Although CW 16 claims to have "substantial contact with Decker"
because of his/her position as Yahoo!'s Revenue Controller, he/she
does not allege any specific facts that would implicate Decker or
any other Defendant in accounting fraud.  CW 8 alleges that
Defendants knew about click fraud because they received weekly
briefings or attended regular meetings about the topic, but knowing
about click fraud is different than lying to the public about it.
In fact, Defendants never publicly denied the existence of click
fraud in any public statement.  It is also important to note that
none of the CW statements provide particularized facts about what
was said in any briefing or meeting.

               2.   Core Operations

Allegations regarding management's role in a company "may be
used in any form along with other allegations that, when read
together, raise an inference that is 'cogent and compelling, thus
strong in light of other explanations.'"  South Ferry LP v.
Killinger, 542 F.3d 776, 785 (9th Cir. 2008) (quoting Tellabs, 127

18

United States District Court
For the Northern District of California

S. Ct. at 2510); Zucco, 522 F.3d at 1001, 1007.  These allegations
may conceivably satisfy the PSLRA standard "without accompanying
particularized allegations, in rare circumstances where the nature
of the relevant fact is of such prominence that it would be
'absurd' to suggest that management was without knowledge of the
matter."  Id.

Plaintiffs' SAC continues to allege that Defendants made false
statements about Yahoo!'s strength knowingly or with deliberate
recklessness because Defendants, as Yahoo! executives, must have
known about problems with Overture, "solving the blob" and Panama.
As the Court noted above, the existence of these alleged problems
does not make Defendants' positive statements about Yahoo! false.
Standing alone, and even together with all other facts alleged in
the SAC, Defendants' high level positions in the company do not
provide a strong inference of scienter.

3.   Stock Transactions

Plaintiffs have not changed their allegations of insider stock
sales.  Plaintiffs continue to allege that the quantity and timing
of Defendants' stock transactions support a strong inference of
scienter.  Plaintiffs allege that Defendants sold between eighty-
four and ninety percent of their shares during the Class Period,
amounting to $870 million in proceeds.  If vested options are
included when calculating the percentage of Yahoo! shares sold
during the Class Period then Defendants sold between thirty-five
and sixty-eight percent of their shares.

Insider stock sales become suspicious "only when the level of
trading is dramatically out of line with prior trading practices at
times calculated to maximize the personal benefit from undisclosed

United States District Court
For the Northern District of California

inside information." In re Vantive Corporation Securities Litig., 283 F.3d 1079, 1092 (9th Cir. 2002). "Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." Silicon Graphics, 183 F.3d at 986.

Here, the amount and percentage of shares sold by Defendants are suspicious. However, Plaintiffs have selected an unusually long class period of over 118 weeks. See Vantive, 283 F.3d at 1092 ("the plaintiffs have selected an unusually long class period of sixty-three weeks"). Just as in Vantive, "lengthening the class period has allowed plaintiffs to sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period." Id. Thus, "by themselves, large numbers do not necessarily create a strong inference of fraud." Id. at 1093.

The timing of the sales is not suspicious. Plaintiffs have not alleged how the stock sales were designed to "maximize the personal benefit" of any Defendant. Defendants regularly sold stock following earnings releases, which is common practice among corporate executives. Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1037 (9th Cir. 2002) ("We conclude that the timing of Gantz's stock transactions was not suspicious. Officers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures.").

Plaintiffs also note that Defendants' pre-Class Period stock sales were out of line with their Class Period sales; pre-Class Period sales constituted only seven percent (Semel), nine percent

(Decker), eight percent (Rosensweig) and thirty-nine percent
(Nazem) of their Class Period sales.  Plaintiffs allege that this
inconsistency supports a strong inference of scienter.  Comparing
Defendants' sales within the Class Period and outside the Class
Period does look suspicious.  Yet, this suspicion is not enough to
conclude that Defendants' stock transactions support a strong
inference of scienter.[3]

II.  Section 20(a) of the Exchange Act

Plaintiffs allege control person liability against Defendants
based on Section 20(a) of the Exchange Act, which states,

> Every person who, directly or indirectly, controls any person
> liable under any provision of this chapter or of any rule or
> regulation thereunder shall also be liable jointly and
> severally with and to the same extent as such controlled
> person to any person to whom such controlled person is liable,
> unless the controlling person acted in good faith and did not
> directly or indirectly induce the act or acts constituting the
> violation or cause of action.

15 U.S.C. § 78t(a).

To prove a prima facie case under Section 20(a), a plaintiff
must prove: (1) "a primary violation of federal securities law" and
(2) "that the defendant exercised actual power or control over the
primary violator."  Howard v. Everex Sys., Inc., 228 F.3d 1057,
1065 (9th Cir. 2000).  "[I]n order to make out a prima facie case,
it is not necessary to show actual participation or the exercise of
power; however, a defendant is entitled to a good faith defense if
he can show no scienter and an effective lack of participation."
Id.  Because Plaintiffs failed to plead a primary securities
violation, Plaintiffs have also failed to plead a violation of

---

[3]Because the Court concludes that Plaintiffs did not
adequately plead material misstatements or scienter, it need not
address the issue of loss causation.

United States District Court
For the Northern District of California

1    Section 20(a).

2    III. Section 20A of the Exchange Act

3         Plaintiffs also allege that Defendants violated Section 20A of

4    the Exchange Act, which states,

5         Any person who violates any provision of this chapter or the
          rules or regulations thereunder by purchasing or selling a
6         security while in possession of material, nonpublic
          information shall be liable in an action in any court of
7         competent jurisdiction to any person who, contemporaneously
          with the purchase or sale of securities that is the subject
8         of such violation, has purchased . . . securities of the same
          class.

9    15 U.S.C. § 78t-1.  Plaintiffs' Section 20A violation claim also

10   fails because Plaintiffs failed to plead a primary violation of the

11   federal securities law.

12                              CONCLUSION

13        For the foregoing reasons, the Court GRANTS Defendants' motion

14   to dismiss Plaintiffs' SAC (Docket No. 38) without leave to amend.

15   Plaintiffs have previously been granted leave to amend and have

16   failed to add the requisite particularity to their claims.

17        IT IS SO ORDERED.

18   Dated: 6/18/09                _____
19                                 CLAUDIA WILKEN
                                   United States District Judge
20

21

22

23

24

25

26

27

28